## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT, and
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

       Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

       Defendants.

_____

## MOTION FOR PRELIMINARY INJUNCTION
_____

      Plaintiffs submit the following motion for preliminary injunction against all Defendants

**Certification**:  The undersigned has conferred with counsel for all Defendants.  All Defendants

oppose this motion.

## INTRODUCTION

      This action challenges the constitutionality of certain provisions of ordinances enacted by

Defendant Town of Superior, Defendant City of Louisville, Defendant City of Boulder and

Defendant Board of County Commissioners of Boulder County (collectively, "Defendants" or

the "Municipalities") in the summer of 2022.  The Ordinances (defined below) ban (1) certain

1

semi-automatic firearms that are held by millions of law-abiding American citizens for lawful purposes and (2) certain firearm magazines that are held by millions of law-abiding American citizens for lawful purposes.  The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes.  *D.C. v. Heller*, 554 U.S. 570, 627 (2008).  Thus, these provisions of the Ordinances are unconstitutional. Accordingly, Plaintiffs hereby move the Court to enter a preliminary injunction enjoining the Defendants from enforcing these unconstitutional provisions of the Ordinances.

## FACTS

**A.     Defendants Enact Ordinances Arms in Common Use**

1.      Each Defendant passed separate but substantially similar ordinances regulating certain weapons and accessories, all of which became effective between July 7, 2022 and August 2, 2022.

2.      (a) SUPERIOR, COLO. CODE ch. 10, art. IX (as adopted Jun. 7, 2022 in Ord. No. O-9, § 1) is attached as Exhibit A and shall be referred to as the "Superior Ordinance."

(b) BOULDER, COLO., REV. CODE title 5, ch. 8 (as adopted Jun. 7, 2022 in Ord. Nos. 8494, 8525-29) is attached as Exhibit B and shall be referred to as the "Boulder Ordinance."

(c) BOULDER COUNTY, COLO. ORDINANCES, Ord. No. 2022-5 (as adopted Aug. 2, 2022) is attached as Exhibit C and shall be referred to as the "County Ordinance."

(d) LOUISVILLE, COLO. CODE title 9, ch. VIII (as adopted Jun. 7, 2022 in Ord. No. 1831-2022) is attached as Exhibit D and shall be referred to as the "Louisville Ordinance."

**B.      The Banned Arms**

3.      The term "assault weapon" is not a technical term used in the firearms community for firearms commonly available to civilians.  Declaration of Dudley Brown ¶ 4.  Instead, the term is a rhetorically charged political term[1]  meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. *Id*. Also, Defendants' characterization of certain magazines as "large capacity" is a misnomer, because magazines capable of holding more than 10 rounds are standard capacity, not large capacity, magazines. *Id*.

4.      In this Motion, the term "Banned Firearm" shall mean "assault weapon" as that term is defined in the Ordinances, and the term "Banned Magazine" shall mean "large-capacity magazine" as that term is defined in the Ordinances.

**C.      The Superior Ordinance**

5.      Section 10-9-20 of the Superior Ordinance defines the term "assault weapon." Ex. A. Section 10-9-20 states that the term "illegal weapon" includes any "assault weapon."  Section 10-9-40 makes it illegal to possess, sell or otherwise transfer any "illegal weapon."

6.      Under section 10-9-240, a person who legally possessed a Banned Firearm on July 1, 2022, may apply to the Boulder County Sheriff's office for a certificate.  If the Boulder County Sheriff issues the certificate, under section 10-9-190, if the person is prosecuted for possessing a Banned Firearm, he may assert as a defense the fact that he has a certificate.  After July 1, 2022, no person (including persons who have obtained a certificate) may acquire Banned Firearms or

---

[1] *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

3

transfer a grandfathered Banned Firearm in the Town, including to members of his own family.

Any person who inherits a Banned Firearm must destroy it or remove it from the Town.

7.      Section 10-9-20 defines the term "large-capacity magazine" to mean any firearm

magazine capable of holding more than ten rounds of ammunition.  Section 10-9-20 states that

the term "illegal weapon" includes any "large-capacity magazine."  Section 10-9-40 makes it

illegal to possess, sell or otherwise transfer any "illegal weapon."

**D.      The Boulder Ordinance**

8.      Section 5-8-2 of the Boulder Ordinance defines the term "assault weapon." Ex. B.

Section 5-8-2 states that the term "illegal weapon" includes any "assault weapon."  Section 5-8-

10(a) makes it illegal to possess, sell or otherwise transfer any "illegal weapon" in the City of

Boulder.

9.      Section 5-8-28 provides an exception to the general illegality of Banned Firearms in the

City of Boulder.  Under that section, a person who legally possessed a Banned Firearm on July 1,

2022, may apply to the Boulder Police Department for a certificate.  If the Boulder Police

Department issues a certificate to a person and the person is later prosecuted for possession of a

Banned Firearm, he may assert as a defense the fact that he has a certificate.  No person in the

City (including persons who have obtained a certificate) may acquire Banned Firearms or

transfer a grandfathered Banned Firearm in the City, including to members of his own family.

Any person who inherits a Banned Firearm must destroy it or remove it from the City.

10.      Section 5-8-2 defines the term "large-capacity magazine" to mean any firearm magazine

capable of holding more than ten rounds of ammunition.  Section 5-8-2 states that the term

"illegal weapon" includes any "large-capacity magazine."  Section 5-8-10 makes it illegal to

possess, sell or otherwise transfer any "illegal weapon."

4

**E.      The County Ordinance**

11.      Section 1(a) of the County Ordinance defines the terms "assault weapon." Ex. C. Section 2(a) of the Ordinance makes it illegal to manufacture, import, purchase, sell or transfer any so-called "assault weapon" in an unincorporated part of the County.

12.      Section 1(c) of the Ordinance defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.  Section 2(a) of the Ordinance makes it illegal to manufacture, import, purchase, sell or transfer any such magazine in an unincorporated part of the County.

**F.      The Louisville Ordinance**

13.      Section 9.80.010 of the Louisville Ordinance defines the term "assault weapon." Ex. D. Section 9.80.010 states that the term "illegal weapon" includes any "assault weapon."  Section 9.84.010(a) makes it illegal to possess, sell or otherwise transfer any "illegal weapon" in the City of Louisville.

14.      Section 9.86.010 provides an exception to the general illegality of Banned Firearms in the City of Louisville.  Under that section, a person who legally possessed a Banned Firearm on July 1, 2022, may apply to the Louisville Police Department for a certificate.  If the Louisville Police Department issues a certificate to a person and the person is later prosecuted for possession of a Banned Firearm, he may assert as a defense the fact that he has a certificate.  No person in the City (including persons who have obtained a certificate) may acquire Banned Firearms or transfer a grandfathered Banned Firearm in the City, including to members of his own family. Any person who inherits a Banned Firearm must destroy it or remove it from the City.

15.      Section 9.80.010 defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.  Section 9.80.010 states that

the term "illegal weapon" includes any "large-capacity magazine."  Section 9.84.010(a) makes it illegal to possess, sell or otherwise transfer any "illegal weapon."

**G.    The Banned Arms are in Common Use**

16.    At least 20 million semi-automatic firearms such as those defined as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes. Declaration of James Curcuruto ¶ 6.

17.    At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes.  Declaration of James Curcuruto ¶ 7.

**H.    Plaintiffs Fear of Prosecution on Account of Constitutionally Protected Activity**

18.    The term "assault weapon" as used in the Ordinances is not a technical term used in the firearms community for firearms commonly available to civilians.  Declaration of Dudley Brown ¶ 4.  Instead, the term is a rhetorically charged political term[2]  meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. *Id*. Defendants' characterization of certain magazines as "large capacity" is a misnomer, because magazines capable of holding more than 10 rounds are standard capacity magazines. *Id*.

19.    In this Motion, the term "Banned Firearm" shall mean "assault weapon" as that term is defined in the Ordinances, and the term "Banned Magazine" shall mean "large-capacity magazine" as that term is defined in the Ordinances.

---

[2] *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

20.     RMGO and NAGR have members who reside within each of the Municipalities. Brown Dec. ¶ 6. RMGO's and NAGR's members who reside in the Municipalities currently own and possess Banned Firearms and Banned Magazines. *Id*. These RMGO/NAGR members desire to continue to possess the Banned Firearms and Banned Magazines in the Municipalities. *Id*. Moreover, they wish to acquire more Banned Firearms and/or Banned Magazines; potentially transfer their currently owned Banned Firearms and Banned Magazines to members of their families and/or other persons in the Municipalities; and bequeath their Banned Firearms and Banned Magazines to their devisees who live in the Municipalities. *Id*.  These members of RMGO and NAGR reasonably fear prosecution by the Municipalities if they engage in these constitutionally protected activities. *Id*.

21.     Plaintiff Charles Bradley Walker is a resident of the Town of Superior and a law-abiding citizen of the United States. Walker Dec. ¶ 3. He currently owns Banned Firearms and Banned Magazines.  *Id*.  He has possessed this property lawfully for years. *Id*. He desires to continue possessing his lawfully owned property, acquire additional Banned Firearms and Banned Magazines, and transfer these arms to others. *Id*. But for the Town of Superior's restrictions on these commonly used arms, and his reasonable fear of criminal prosecution for violating these restrictions, he would continue to possess these arms, acquire additional arms, and/or transfer them to others. *Id*.

22.     Plaintiff James Michael Jones is a resident of the City of Boulder and a law-abiding citizen of the United States.  Jones Dec. ¶ 3. He currently owns Banned Firearms and Banned Magazines. *Id*. He has possessed this property lawfully for years. *Id*. He desires to continue possessing his lawfully owned property, acquire additional Banned Firearms and Banned Magazines, and transfer these arms to others. *Id*. But for the City of Boulder's restrictions on

7

these commonly used arms, and his reasonable fear of criminal prosecution for violating these restrictions, he would continue to possess these arms, acquire additional arms, and/or transfer them to others. *Id.*

23.    Plaintiff Martin Carter Kehoe is a resident of unincorporated Boulder County and is a law-abiding citizen of the United States.  Kehoe Dec. ¶ 3. He currently owns Banned Firearms and Banned Magazines. *Id.* He has possessed this property lawfully for years. *Id.* He desires to continue possessing his lawfully owned property, acquire additional Banned Firearms and Banned Magazines, and transfer these arms to others. *Id.* But for Boulder County's restrictions on these commonly used arms, and his reasonable fear of criminal prosecution for violating these restrictions, he would continue to possess these arms, acquire additional arms, and/or transfer them to others. *Id.*

24.    Plaintiffs Bryan LaFonte, Craig Wright and Gordon Madonna are residents of the City of Louisville and are law-abiding citizens of the United States. LaFonte Dec. ¶ 3; Wright Dec. ¶ 3. Madonna Dec. ¶ 3.  They currently own Banned Firearms and Banned Magazines. *Id.* They have possessed this property lawfully for years. *Id.* They desire to continue possessing their lawfully owned property, acquire additional Banned Firearms and Banned Magazines, and transfer these arms to others. *Id.* But for the City of Louisville's restrictions on these commonly used arms, and their reasonable fear of criminal prosecution for violating these restrictions, they would continue to possess these arms, acquire additional arms, and/or transfer them to others. *Id.*

## STANDARD FOR GRANTING PRELIMINARY INJUNCTION

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing

party; and (4) the injunction, if issued, will not adversely affect the public interest. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

It is well-settled that a showing of the infringement of a constitutional right is enough and requires no further showing of irreparable injury. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019). In the context of constitutional claims, this principle collapses the first and second preliminary-injunction factors. *Id*., at 806. The third and fourth factors also merge when the government is the opposing party. *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020), *citing Nken v. Holder*, 556 U.S. 418, 435 (2009).

In a constitutional case, the likelihood of success on the merits will often be the determinative factor. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014).[3] This is because: (a) the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury; (b) when a law is likely unconstitutional, the government's interests do not outweigh a plaintiff's interests in having his constitutional rights protected; and (c) it is always in the public interest to prevent violation of a person's constitutional rights. *Id*. Indeed, in constitutional cases, whether to grant the injunction often turns on likelihood of success on the merits only, usually making it unnecessary to dwell on the remaining factors. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (*en banc*) (*per curiam*).

---

[3] This case arose in a First Amendment context, but that distinction makes no difference. In *Bruen*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id*., 142 S. Ct. at 2130. *See also Ezell v. City of Chicago*, 651 F.3d 684, 997 (7th Cir. 2011) (equating standard for obtaining a preliminary injunction in the Second Amendment context with the standard for obtaining that relief in a First Amendment case).

**THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATION**

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the

Supreme Court unambiguously placed on the government a substantial burden of demonstrating

that any law seeking to regulate firearms is consistent with this Nation's historical tradition of

firearm regulation. [4] The Court stated:

> "To support that [its claim that its regulation is permitted by the Second
> Amendment], the burden falls on [the government] to show that New York's
> proper-cause requirement is consistent with this Nation's historical tradition of
> firearm regulation**. Only if respondents carry that burden** can they show that the
> pre-existing right codified in the Second Amendment, and made applicable to the
> States through the Fourteenth, does not protect petitioners' proposed course of
> conduct."

*Bruen*, 142 S. Ct. at 2135 (emphasis added).

In this case, the Second Amendment's plain text covers Plaintiffs' conduct in seeking to

possess and acquire bearable arms.  *Bruen*, 142 S. Ct. at 2132 ("the Second Amendment extends,

prima facie, to all instruments that constitute bearable arms").  Accordingly, Plaintiff's conduct

is **presumptively** protected by the Second Amendment.  *Bruen*, 142 S. Ct. at 2126 ("when the

Second Amendment's plain text covers an individual's conduct, the Constitution presumptively

protects that conduct").  In order for the Ordinances to stand, the Municipalities must carry their

burden of showing their regulations are consistent with this Nation's historical tradition of

firearm regulation.  As set forth below, the Municipalities will not be able to carry this burden.

---

[4] "Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests
squarely on the government to establish that the activity has been subject to some measure of regulation."  *Friedman
v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

## ARGUMENT

I.   **The Supreme Court has Reaffirmed the *Heller* Standard**

    A.   **A Regulation Burdening the Right to Keep and Bear Arms is Unconstitutional Unless it is Consistent with the Text of the Second Amendment and the Nation's History and Traditions**

In *Bruen*, the Court rejected the two-part balancing test for Second Amendment challenges that several courts of appeal adopted in the wake of *Heller* and *McDonald v. City of Chicago, Ill*., 561 U.S. 742 (2010).  Instead, it reiterated the *Heller* standard, which it summarized as follows:

> "Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 142 S. Ct. at 2126 (internal quotation marks omitted).

The *Bruen* court spent significant time describing how lower courts are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that "applies to new circumstances." *Id*. at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id*., *citing Caetano v. Massachusetts*, 577 U.S. 411, 411—412 (2016) *(per curiam)* (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*.

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id*.  In considering history, courts are to engage in "reasoning by analogy." *Id*. This analogical reasoning requires the government to identify a well-established and representative historical analogue to the challenged regulation. *Id*. at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court. *Id*. at 2132.

**B.    The Tenth Circuit's Decision in *United States v. Reese* is no Longer Good Law**

The decisions of Tenth Circuit panels, absent *en banc* consideration, bind this Court. *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1228–29 (10th Cir. 2021).  This is not so, however, when a subsequent Supreme Court decision contradicts or invalidates the prior Tenth Circuit panel's analysis.  *Id*.  When the Supreme Court speaks, it supersedes conflicting Tenth Circuit case law.  *Id*.

This principle applies in this case with respect to the Tenth Circuit's decision in *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and its progeny.  In *Reese*, the Tenth Circuit adopted a "means-end" scrutiny standard for analyzing Second Amendment challenges.  In *Bruen*, the Court held that the judicial balancing of means and ends pursuant to intermediate scrutiny review plays no part in Second Amendment analysis.  "*Heller* does not support applying means-end scrutiny."  *Id*., 142 S. Ct. at 2127; *see also Id*., 142 S. Ct. at 2129 (inquiry into the statute's alleged "salutary effects" upon "important governmental interests" is not part of the test).  Importantly, the Court expressly abrogated the Tenth Circuit's holding in *Reese*. *Bruen*, 142 S. Ct. at 2127 n. 4 (2022).

### C.     Only "Dangerous and Unusual Arms" Can be Banned Consistent with Our History and Tradition

This case involves a blanket prohibition on two classes of arms. Both *Bruen* and *Heller* identified only one aspect of the nation's history and tradition that is sufficiently analogous to – and therefore capable of justifying – such a ban: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in common use, there is, by definition, no historical tradition of banning it. Thus, for the type of restrictions at issue in this case, the Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be subject to a blanket ban, but arms "in common use at the time" may not be. *Id*.

This Court's task is therefore a simple one: it merely must determine whether the banned arms are "dangerous and unusual."  Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., *concurring*). An arm that is in common use for lawful purposes is, by definition, not unusual. Such an arm therefore cannot be both dangerous and unusual and therefore cannot be the subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629.

To determine whether an arm is "unusual" the Supreme Court has made clear that the Second Amendment focuses on the practices of the American people nationwide, not just, say, in this state. *See id*. at 2131 ("It is this balance – struck by the traditions of the American people – that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., *concurring*) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country").

As set forth below, the Banned Firearms and the Banned Magazines are "typically possessed by law-abiding citizens for lawful purposes." Under *Heller* and *Bruen*, that is the end of the analysis. The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

## II. The Municipalities' Prohibition on Possession of the Banned Firearms is Unconstitutional

This case thus reduces to the following, straightforward inquiry: are the arms banned by the Municipalities in "common use," according to the lawful choices by contemporary Americans? They unquestionably are. There is no class of firearms known as "assault weapon." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). But while "assault weapon" is not a recognized category of firearms, "semiautomatic rifle" is. And it is semiautomatic rifles that the Municipalities' "assault weapon" bans target. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 (1994) at n. 1. There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much. In *Staples,* it concluded that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available

for over a century. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTMP. L. 381, 413 (1994).

In contrast to this long history of legal ownership of semi-automatic rifles, the first "assault weapon" ban was not enacted until California did so in 1989, a full 200 years after the Constitution became effective. Obviously, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment, no matter which is the relevant historical reference point. *Bruen*, 142 S.Ct. at 2126 (cautioning against giving post enactment history more weight than it can rightly bear). Even today, the vast majority of states (42 out of 50)[5], do not ban semiautomatic weapons that would be deemed "assault weapons" under the Ordinances.[6]

Thus, there is no historical tradition of banning semi-automatic firearms. This is borne out by the fact that millions of law-abiding citizens choose to possess firearms in that category. *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

---

[5] The federal government banned semi-automatic rifles from 1994 to 2004 when Congress allowed that law after the Justice Department concluded that it produced "no discernible reduction" in gun violence. Christopher S. Koper, Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms, 19 Crim'y & Pub. Pol'y 96 (2020).

[6] The bans and the year each was enacted are: CAL. PENAL CODE §§ 30600, 30605 (**1989**); N.J. STAT. §§ 2C:39-5(f), 2C:39-9(g) (**1990**); HAW. REV. STAT. § 134-8(a) (**1992**); CONN. GEN. STAT. § 53-202c (**1993**); MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303 (**1994**); MASS. GEN. LAWS ch. 140, § 131M (**1994**); N.Y. PENAL LAW §§ 265.02(7), 265.10(1)-(3) (**2000**); 11 DEL. CODE § 1466 (**2022**).

The AR-15, for example,  is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009); *see also Duncan v. Becerra* ("*Duncan III*"), 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

This issue was addressed in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen*, *supra*.  In his dissent (which, after *Bruen*, likely represents the correct interpretation of the law), Judge Traxler stated:

> "It is beyond any reasonable dispute from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds) for lawful purposes.  Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States.  In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales.  In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150.  In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of *Heller*."

*Id*., 849 F.3d at 153, Traxler, J. dissenting (internal citations and quotation marks omitted).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the United States exceeds twenty-four million. The Firearms Industry Trade Ass'n, *Commonly Owned:  NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at https://bit.ly/3pUj8So.[7]

According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern semiautomatic rifles, Bloomberg, *Why*

---

[7] *See also* Declaration of James Curcuruto ¶ 6 ("At least 20 million semi-automatic firearms such as those defined as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes."

*Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at https://bit.ly/3R2kZ3s, and an estimated 5.4 million Americans purchased firearms for the first time in 2021. The Firearms Industry Trade Ass'n, *NSSF Retailer Surveys Indicate 5.4 million First-Time Gun Buyers in 2021,* (Jan. 25, 2022), available at https://bit.ly/3dV6RKI.  In fact, a recent survey of gun owners estimated that 24.6 million Americans have owned AR-15 or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), available at https://bit.ly/3yPfoHw .

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes.  In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33-34. This is consistent with the findings of an earlier 2013 survey of 21,942 confirmed owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. *See also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd* 784 F.3d 406 (7th Cir. 2015). "An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle." *Id*. Indeed the "AR-15 type rifle . . . is the leading type of firearm used in national matches and in other matches sponsored by the congressionally established Civilian Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn. 2014).

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other Banned Firearms are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'"

Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997).  This conclusion is

borne out by FBI statistics.  In the five years from 2015 to 2019 (inclusive), there were an

average of 14,556 murders per year in the United States.  On average, rifles of all types (of

which so-called "assault weapons" are a subset) were identified as the murder weapon in 315

murders per year. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by*

*Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at

https://bit.ly/31WmQ1V.  By way of comparison, on average 669 people are murdered by

"personal weapons" such as hands, fists and feet.  *Id.*  According to the FBI, a murder victim is

more than twice as likely to have been killed by hands and feet than by a rifle of any type.

Even in the counterfactual event that a modern semiautomatic rifle had been involved in

each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24

million modern sporting rifles in circulation in the United States during that time period –around

.001 percent – would have been used for that unlawful purpose. More broadly, as of 2016, only

0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for

which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms*

*Involved in Crimes: Survey of Prison Inmates*, 2016, U.S. DEPT OF JUST., OFF. OF JUST.

PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned

by the Municipalities are in common use.  That case concerned Massachusetts's ban on the

possession of stun guns, which that state's highest court had upheld on the ground that such

weapons are not protected by the Second Amendment.  *Id.*, 577 U.S. at 411.  In a brief *per*

*curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411-12. Though the Court

remanded the case back to the state court without deciding whether stun guns are constitutionally

protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id*. at 420 (Alito, J., concurring) (cleaned up) (citation omitted). If hundreds of thousands" of arms constitute wide ownership, *a fortiori* so does the tens of millions of semiautomatic rifles sold to private citizens nationwide.

The Massachusetts court got the message.  In a subsequent case, that court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the Municipalities to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of the Municipalities' blanket ban, which restricts arms that are many times more common than stun guns.

### III.   The Municipalities' Prohibition on Possession of Banned Magazines is Unconstitutional

Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century commentary recognizing that "[t]he

possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (without bullets, the right to bear arms would be meaningless).

Just as the First and Fourteenth Amendments protect modern forms of communications and search, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Caetano*, *supra* (stun guns). Thus, as the Supreme Court reiterated in *Bruen*, when assessing whether arms are protected by the Second Amendment, the question is whether they are "in common use today." *Id.*, 142 S.Ct. at 2134. If they are, then they are presumptively protected by the Second Amendment, and it is the government's burden to prove that any efforts to restrict their possession or use have a "well- established and representative historical analogue." *Bruen*, 142 S.Ct. at 2133. But, as noted above, in the context of a blanket prohibition such as that at issue here with respect to the Banned Magazines, establishing such an analogue is impossible. The Municipalities may impose a blanket prohibition only on "dangerous and unusual" arms, but by definition, an arm in common use is not unusual. The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

The magazines the Municipalities have banned unquestionably satisfy the "common use" test. *See Duncan III*, 366 F.Supp.3d at 1143-45; *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1146-7 (9th Cir. 2020). Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes,

including self-defense, sporting, and hunting.[8] They come standard with many of the most popular handguns and long guns on the market, and Americans own roughly **115 million of them**, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta ("Duncan V")*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145. In short, there can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.

In his dissent in *Kolbe v. Hogan*, Judge Traxler also addressed magazines such as the Banned Magazines.  He stated:

> "The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id.*, 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

Magazines such as those banned by the Municipalities are without the slightest question commonly possessed by law abiding citizens for lawful purposes (again, the dispositive fact under *Heller* and *Bruen*).  Therefore, based on this fact alone, the Statute is unconstitutional.

Even if magazines such as those banned by the Municipalities were not in common use, they cannot come close to proving that restrictions on firing or magazine capacity are part of the nation's historical tradition. To the contrary, history and tradition establish the exact opposite.

---

[8] *See* Declaration of James Curcuruto ¶ 7 ("At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes.")

*See Duncan III*, 366 F.Supp.3d at 1149-53; *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history).

Firearms capable of firing more than 10 rounds without reloading are nothing new. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date[d] the American Revolution." *Duncan IV*, 970 F.3d at 1147. Well before the framing of the Fourteenth Amendment, they had become "common," as witnessed by popular firearms such as the Pepperbox-style pistol, which could "shoot 18 or 24 shots before reloading individual cylinders." *Id*. By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had magazines that held more than 10 rounds.  Id. at 1148. For example, the Winchester 66 had a 17- round magazine and could fire all 17 rounds plus the one in the chamber in under nine seconds. *Id*. Later models, including the famed Winchester 73 ("the gun that won the West"), likewise had magazines that held more than 10 rounds and sold a combined "over 1.7 million total copies" between 1873 and 1941. *Id*.

As detachable box-style magazines became more popular around the turn of the twentieth century, so too did rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semi-automatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Id*. In 1963, the U.S. government sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount. *Id*. That same year, the first AR-15 rifle was released. *Id*. The AR-15 comes standard with a 30-round magazine and as noted above, remains the most popular rifle in America today. *Id*.; *Duncan III*,

366 F.Supp.3d 1145.  Today, the most popular handgun in America is the Glock 17, which comes standard with a 17-round magazine.  *Duncan IV*, 970 F.3d at 1142, 1148.  Many other popular pistols likewise come standard with magazines that hold more than 10 rounds. For example, the Beretta Model 92 comes standard with a sixteen-round magazine, Smith & Wesson M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds, and the Ruger SR9 has a 17-round standard magazine. *Id*. at 1142 & n.4.

Firearms capable of firing more than 10 rounds predate the founding by more than a century. *See Duncan IV*, 970 F.3d at 1147. Such arms were neither novelties nor confined to the military; to the contrary, they were marketed to and bought by civilians from the start. "[I]n 1821, the New York Evening Post described the invention of a new repeater as 'importan[t], both for public and private use,' whose 'number of charges may be extended to fifteen or even twenty.'" *Ass 'n of N J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N J.* ("ANJRPC II"), 974 F.3d 237, 255 (3d Cir. 2020) (Matey, dissenting). The popular Pepperbox-style pistol was marketed to civilians, the Girandoni air rifle "was famously carried on the Lewis and Clark expedition," and millions of Winchesters were sold to civilians in the decades following the ratification of the Fourteenth Amendment. *Duncan IV*, 970 F.3d at 1147-48; *Duncan V*, 19 F.4th at 1154-55 (Bumatay, J., dissenting). And the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market.  *Duncan IV*, 970 F.3d at 1148.

The historical record confirms that, "[l]ong before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 862 (2015). In short, arms that could fire more than 10 rounds without reloading would by no means

have been "unforeseen inventions to the Founders." *Duncan IV*, 970 F.3d at 1147. They have

been available for centuries, and "magazines of more than ten rounds had been well established

in the mainstream of American gun ownership" "long before" a handful of capacity restrictions

started to pop in the late twentieth century. *See Kopel, supra* at 862-64.

The first state to restrict magazine capacity as such (New Jersey) did not do so until 1990

– more than two centuries after the founding.  As with "assault weapon" bans, that is far too late

to demonstrate anything about the original meaning of the Second or Fourteenth Amendment.

The federal government did not restrict magazine capacity until 1994, and Congress allowed that

law to expire in 2004.  Since 1990, when the first magazine capacity restriction was adopted, a

total of 12 states have enacted such restrictions, with half of those restrictions enacted within the

last decade.[9]  The Municipalities thus cannot even identify a "well-established" tradition of

restricting magazine capacity today, let alone identify any representative historical analogue that

might justify its confiscatory magazine ban. *Bruen*, 142 S.Ct. at 2133 (emphasis omitted).

Yet, despite a long historical tradition of law abiding citizens possessing these firearms

for lawful purposes, there is no similar tradition of government regulation, let alone confiscation.

To the contrary, the historical tradition of advancement in firearms technology reflects a steady

trend toward increasing the firing capacity of the most popular and common arms, with no

corresponding trend of government restrictions on firing capacity. The Municipalities cannot

possibly meet their burden of "affirmatively prov[ing] that its [magazine ban] is part of the

---

[9] The statutes and the year they were enacted are: N.J. Stat. Ann. §2C:39- l(y), - 3G) (**1990**); 1992 Haw. Sess. Laws 740, 742 (**1992**); Md. Code Ann., Crim. Law §4-305 (**1994**); Cal. Penal Code §§32310, 16740 (**1999**); Mass. Gen. Laws ch. 140 §§121, 131a (**1998**); N.Y. Penal Law §265.36 (**2000**); Colo. Rev. Stat. §18-12-302(1)) (**2013**); Conn. Gen. Stat. §53- 202w (**2013**); Vt. Stat. Ann. tit. 13, §4021 (**2017**); Wash. Rev. Code Ann. §§9.41.010, .370 (**2022**); 11 R.I. Gen. Laws Ann. § 11-47.1-3 (**2022**); Del. Code Ann. tit. 11, § 1469 (**2022**).

historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142

S.Ct. at 2127.

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully move the Court to enter an order

preliminarily enjoining the Defendants from enforcing the Ordinances as such Ordinances apply

to the Banned Firearms and the Banned Magazines.

Respectfully submitted this 18th day of October 2022.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Voice:  (303) 205-7870; Fax:  (303) 463-0410
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2022, I electronically filed a true and correct copy of the
foreground with the Clerk of the Court using the CM/ECF system, which will send notification of
such filing via email to the following counsel of record:

Gordon Vaughan
Attorney for Defendants Town of Superior and City of Louisville

Catherine R. Ruhland
David Evan Hughes
Attorneys for Defendant Board of County Commissioners of Boulder County

In addition, on October 18, 2022, I emailed the forgoing to:

Luis Angel Toro
Teresa Taylor Tate
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
Attorneys for Defendant City of Boulder

*/s/ Barry K. Arrington*
_____
Barry K. Arrington