**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

**DEFENDANTS' MOTION TO PARTIALLY STRIKE EXPERT REPORTS
AND PARTIALLY EXCLUDE TESTIMONY OF MARK PASSAMANECK**

On April 12, 2023, Plaintiffs disclosed an initial expert report authored by Mr. Mark Passamaneck (the "Initial Report"). Ex. A. On July 20, 2023, well after the June 8, 2023 deadline for rebuttal reports, Plaintiffs disclosed an expert reply report (the "Reply Report"), also authored by Mr. Passamaneck, elaborating on certain items from the Initial Report. Ex. B., *see also* Scheduling Order (ECF 49).[1] In these reports, Mr. Passamaneck, a mechanical engineer and

---

[1] Although titled a "Supplemental Report," the Reply Report is—by Mr. Passamaneck's own admission—a response to an expert report of Louis Klarevas submitted by Defendants, which was itself responding to Passamaneck's Initial Report. Ex. C (Passamaneck Deposition

competitive shooter, opines on two topics: (1) the number of AR-15 style semi-automatic rifles and large capacity magazines ("LCMs")[2] in the United States (the "Numerical Estimates"), and (2) the operation and durability of firearm magazines. As the sections of the reports discussing the first topic[3] contain numerous deficiencies in both form and substance and bear none of the required indicia of expertise, they should be struck pursuant to Federal Rule of Evidence 702 and Mr. Passamaneck's testimony as to that topic should be excluded from trial of this matter.[4]

First, Mr. Passamaneck is wholly unqualified to opine on the Numerical Estimates. His deposition testimony reflects a complete lack of the experience and training necessary to perform statistical research or to interpret statistical studies done by others. It is clear from the record that Mr. Passamaneck is merely parroting the results of studies he does not understand—an utterly inappropriate basis for testimony under Rule 702 under established Tenth Circuit case law.

Second, Mr. Passamaneck employs unreliable principles and methods. He claims to be able to verify the statistics he cites by virtue of his expertise in *firearms*—not any *statistical* expertise—and by conversations with untested third parties. He also makes numerous methodological errors attempting to synthesize these sources and derive new numbers. The result is that Mr. Passamaneck's estimates of the number of assault weapons and LCMs owned

---

Transcript) at 15:8–16 ("There were several things that I read in [Klarevas]'s report and some other things that I felt were worthy of clarification"). As the Reply Report was untimely under the Court's Scheduling Order, it should be struck on this basis alone.

[2] Note generally that Mr. Passamaneck's discussion of LCMs appears to incorrectly assume a cutoff of 15 rounds, while the ordinances at issue in this case use a 10 round cutoff. *See infra* Section II.

[3] This includes the entirety of the Reply Report.

[4] The Initial Report is identical to one disclosed in another case in this District, in which Mr. Passamaneck's testimony is also being challenged under Rule 702. *See* Mot. to Partially Strike Expert Report and Partially Exclude Testimony of Mr. Mark Passamaneck under Fed. R. Evid. 702, *Gates v. Polis*, 22-cv-01866 (D. Colo. 2022) (ECF 56).

by private individuals are unreliable and substantially inflated even based on his own purported sources. Regardless of whether the true figures would be useful in determining whether these weapons and magazines are "in common use" for self-defense (the Defendants would argue they largely would not), Mr. Passamaneck's unreliable estimates are certainly not useful for that purpose.

## CERTIFICATE OF CONFERRAL

Defendant's counsel conferred with counsel for the Plaintiffs by telephone on September 13, 2023. Plaintiffs' counsel indicated that Plaintiffs oppose the relief requested.

## LEGAL STANDARD

"In determining whether expert testimony is admissible, the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (quoting Fed. R. Evid. 702). "[A]ppropriate qualifications are a threshold requirement which, if not met, requires exclusion of expert opinions." *Basanti v. Metcalf*, 35 F. Supp. 3d 1337, 1343 (D. Colo. 2014). "Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]." *Nacchio*, 555 F.3d at 1241. "The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).

# ARGUMENT

## I. Mr. Passamaneck lacks the expertise on statistical analysis or surveying methods needed to opine on the Numerical Estimates.

By his own admission, Mr. Passamaneck is not an expert on statistical analysis. Ex. C at 37:7–10. Nonetheless, Mr. Passamaneck opines on the number of certain Assault Weapons ("AWs") and LCMs in the United States largely by "reviewing" the results of three surveys and reports and relying on several biased and unreliable hearsay statements. Ex. C at 92:5–7. While Mr. Passamaneck certainly has experience building and shooting firearms and has numerous acquaintances involved in the firearm and magazine manufacturing industry, he lacks any of the requisite "knowledge, skill, experience, training, or education" in statistical analysis or surveying methodology that would enable him to assess or synthesize these scattered sources into expert testimony on the total number of AWs and LCMs owned by private individuals in the United States. *See* Fed. R. Evid. 702. The pertinent inquiry is "not the reasonableness *in general* of" an individual's expertise but whether the individual can "draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153–54 (1999) (emphasis in original).

### A. Mr. Passamaneck lacks training, education, skill, or experience in statistical analysis.

To qualify as an expert on the Numerical Estimates topic, Mr. Passamaneck would have to demonstrate sufficient statistical analysis or surveying experience. Mr. Passamaneck lacks any formal training or education in these areas. Ex. F at 33:12–17. He is a Professional Engineer who lists his practices areas as "mechanical, plumbing, and automotive" on his

4

resume.[5] Ex. C at 42:16. His resumes also list a number of firearms-related experiences that do not bear on the question at hand: "extensive knowledge related to firearms, cartridge reloading, and shooting incidents," which is restricted to: "training, shooting, testing and reconstruction"; manufacturing firearm magazines, base pads, and other accessories for shooting competitions; participating in such competitions; and visiting trade shows. Ex. B at 6; Ex. C at 32:9–13; 33:10–13. Notably, none of Mr. Passamaneck's varied "little piecemeal portions" of experience (his own words) include anything remotely related to statistical analysis or survey methodology. Ex. C at 33:14–16.

By his own admission, Mr. Passamaneck's professional experience evaluating the quality of surveys is limited to talking to people at the National Shooting Sports Foundation ("NSSF") about certain of the data he uses in his reports:

> Q. Do you have any professional experience estimating the number of firearms or magazines within the United States?
>
> A. No, I'm not a statistician, and I don't conduct surveys. I review data.
>
> Q. Do you have any professional experience evaluating the quality of surveys?
>
> A. I didn't hear the last word.
>
> Q. Surveys.
>
> A. To -- to some extent, yes. I mean, I understand the National Shooting Sport Foundation. I've talked to them at length, both prior to and during this case, as to where that data comes from. And the fact that that data comes from manufacturers and ATF forms is relevant.
>
> I mean, they establish the base numbers for what the various numbers relate to, whether it's magazines or different types of firearms.

---

[5] Mr. Passamaneck has two resumes, neither of which were produced with the Initial Report. The first concerns general (non-firearm) experience. Ex. E. The second is a supplement that contains his firearm-related experience. Ex. B at 6.

> Q. So you've spoken to the people who conducted that particular study. Do you have any other professional experience doing similar work?
>
> A. No.
>
> Q. So what exactly are your qualifications to hold yourself out as an expert on reviewing surveys and studies such as this?
>
> A. My experience in the industry.

Ex. C at 34:4–21.

Importantly, "[n]othing in the record provides the necessary connection" between Mr. Passamaneck's firearms experience and the ability to evaluate the Report Sources. *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014). Experts "must explain how his or her experience leads to the conclusion reached [and] why that experience is a sufficient basis for the opinion." *United States v. Nacchio,* 555 F.3d 1234, 1258 (10th Cir. 2009) (en banc) (internal quotation marks omitted).

Finally, all of Mr. Passamaneck's prior testimony and expert reports have focused exclusively on his engineering knowledge. The only exception, where he opined on the same Numerical Estimates in an identical report, has similarly been challenged under Rule 702. Ex. C at 27:8–25; 26:23–25; *Gates*, 22-cv-1866 (ECF 56) (pending motion to exclude testimony).

### B. Mr. Passamaneck lacks the necessary knowledge to evaluate the accuracy of surveys conducted by others.

Not only is Mr. Passamaneck not an expert on statistical analysis, he also lacks the necessary training, skill, or experience to evaluate the accuracy of surveys conducted by others. Tenth Circuit courts have routinely rejected experts who simply parrot survey results without possessing the necessary knowledge to evaluate their accuracy. In *Fish v. Kobach*, it was "clear that [the defendant's proffered expert was] not qualified to testify as an expert about [a] survey" because the defendant had "not demonstrated that [the proffered expert] possesse[d] any special skill or experience required to testify about the survey results; indeed, all but one paragraph

6

simply recite[d] the survey's findings, rather than any opinion." 304 F. Supp. 3d 1027, 1038 (D. Kan. 2018). Mr. Passamaneck likewise offers no special skill or experience in his Initial Report when he merely recites survey findings from the NSSF and Georgetown University Professor William English without any opinions beyond classifying them as "[c]onservative estimates." Ex. A at 1–2.

Neither can Mr. Passamaneck "invoke vague allusions to his 'experience'" to lay a foundation for his opinions. *Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021). But this is exactly what he attempts when he claims to "review data" based on his "education and experience in the firearms industry." Ex. C at 33:4–5, 34:22–25. This experience amounts to attending "trade shows" and "shooting competitions" and frequently "talk[ing] to these guys [manufacturers]." Ex. C at 60: 17–18. Throughout his reports and depositions, Mr. Passamaneck repeatedly attempts to compensate for his own inability to evaluate the quality of these surveys by turning to hearsay from people who are not involved in this case, but who he views as more qualified than himself to speak on the topic. Most egregiously, Mr. Passamaneck repeatedly stated in his deposition that he considers a brief Facebook Messenger conversation with a magazine manufacturer to be the best available estimate of the number of LCMs. Ex. C at 182:2; *id* at 182:7–10; *id* at 246:2–5; *see also* Ex. D (the conversation in its entirety).

Mr. Passamaneck's inability to evaluate the accuracy of surveys is similarly reflected by his deposition in the *Gates* case, where he was unable to answer basic questions about the methodology used in one of his cited surveys. *See* Ex. F at 92:21–93:9. When asked his opinion about the "raked weighting" in one survey he cited, Mr. Passamaneck replied that he did not "have one" and admitted that he did not know what raked weighting meant. *Id*.

7

### C. Mr. Passamaneck's report contains no explanation of how his experience enables him to accurately make the Numerical Estimates.

Nothing in Mr. Passamaneck's "experience in the industry" bears any relation to the particular topic he opines on, namely, "assessing numbers of firearms and magazines of certain capacities that are in possession of American citizens." Ex. C at 32:1–3. When asked in his deposition about his purported expertise, Mr. Passamaneck responded, "I mean, I have been a sponsored shooter, I've worked for manufacturers, I manufacture a barrel, you know, there's a lot of – there's a lot of little piecemeal portions that are professional experience in that – in that area." Ex. C at 33:10–16.

Where an expert witness's testimony relies solely on experience, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Nacchio*, 555 F.3d at 1258 (internal quotation marks omitted). In a recent challenge to a similar Oregon law restricting LCMs, the district court excluded a firearms expert's statistical analysis opinion on Rule 702 grounds. *Or. Firearms Fed'n v. Kotek*, No. 2:22-CV-01815-IM, 2023 WL 4698752, at *2 (D. Or. May 31, 2023). There, the plaintiffs' expert "ha[d] practical experience with firearms that render[ed] him sufficiently knowledgeable about how LCMs might be useful in self-defense situations," but the court declared that he could "not testify about quantifiable data on the frequency with which any particular number of rounds are fired in self-defense situation" because the expert did "not have relevant experience with statistical analyses or data." *Id*. The same is true here. Mr. Passamaneck's hands-on manufacturing, training, and shooting experience with firearms does not give him "relevant experience with statistical analyses or data." *Id.* When given the opportunity to expand on any experiences that might qualify him to evaluate surveys, Mr. Passamaneck responded, "I talk to these guys [manufacturers] all the

8

time," and, failing to apply any critical analysis, said he simply "take[s] them at their word." Ex. C at 60:16–18; 61:3–8. This simply does not satisfy the Plaintiff's burden to show that Mr. Passamaneck is qualified to make his Numerical Estimates.

## II. Mr. Passamaneck employs neither reliable methodology nor supports his opinion with sufficient data or facts when making his Numerical Estimates.

Even if the Court finds that Mr. Passamaneck is qualified, the Numerical Estimates testimony should be excluded under Rule 702(b)–(d) because Mr. Passamaneck failed to rely on sufficient or reliable facts or data, failed to use reliable principles and methods, and failed to reliably apply those principles and methods to the facts of this case. Each of these failures is sufficient to disqualify him on its own.

### A. Mr. Passamaneck fails to provide adequate foundation for and validation of the facts and data behind his Numerical Estimates.

Under Rule 702(b), "expert testimony [must] be based on sufficient facts or data" and be "supported by 'appropriate validation—i.e., "good grounds."'" *Cruz v. City & Cnty. Of Denver, Colo.*, No. 21-cv-03388-KLM, 2023 WL 4073195, at *5 (D. Colo. June 20, 2023) (quoting *Daubert*, 509 U.S. at 590) (some citations omitted). Further, "[a] failure to validate data by itself can constitute grounds for excluding an expert report." *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 24 (2d Cir. 2017). Falling far short of this standard, Mr. Passamaneck's basis for the Numerical Estimates consists entirely of (1) parroted surveys and reports by the *Washington Post*, the NSSF, and a survey conducted by Professor William English; (2) unverifiable information relayed to him in a Facebook message exchange;[6] and (3) unrepresentative and biased personal observations. Ex. A at 1–2; Ex. B at 1; Ex. C at 92:5–7; Ex. D at 1.

---

[6] In the Initial Report, Mr. Passamaneck's assertion that "Mag-Pul, the largest manufacturer of AR15 magazines (and who also produces Glock and AR10 magazines) estimates the total number of magazines of 15+ rounds at 350 million" is stated without citation. Ex. A at 2. In deposition, Mr. Passamaneck revealed that the source for this figure is a very brief Facebook

9

### 1. Mr. Passamaneck parroted the results of the surveys and reports cited in his report without performing appropriate validation.

Throughout Mr. Passamaneck's deposition, he admitted that he did not review the methodology for most of his sources. He said that he reviewed "some" of the *Washington Post* survey methodology, but immediately hedged that he is not a statistician. Ex. C at 138:24–139:3.[7] He stated that he was comfortable with the methodology of the English survey because "[English] explained what he did and how," but did not opine on the methodology itself. *Id.* at 144:1–6. And his "review" of the NSSF survey methodology and verification of the accuracy of the numbers compiled by NSSF consisted of phone conversations with Salam Fatohi—an NSSF employee who himself was "very confident that those numbers…can be verified"—during which Mr. Passamaneck did not take notes.[8,9] *Id.* at 34:8–18, 80:1–5, 107:8–24, 122:2–123:11, 126:3–18, 131:20–25, 158:4–9, 173:7–10. When an expert "call[s]" another individual, "who provide[s an] assurance" that the underlying data is accurate, a "district court

---

Messenger conversation between Mr. Passamaneck and Duane Liptak, Executive Vice President of Magpul, which is attached here as Exhibit D. Ex. C at 150:25–151:4, 178:8–22. Mr. Liptak provided no source for this figure; Mr. Passamaneck did not solicit one. Ex. C at 181:11–17; Ex. C at 185:7–9.

[7] Strangely, Mr. Passamaneck also indicated that this survey relies on unreliable methodology. Ex. C at 139:11–22.

[8] These conversations appear to have occurred *after* Mr. Passamaneck submitted his report, and after he was challenged on this methodology in his deposition in the *Gates* case. Ex. C at 30:23.

[9] In another Second Amendment case, Fatohi testified that he was not personally involved in creation of 2018 chart and a court noted that "in assessing the weight and credibility to give Mr. Fatohi's testimony, this Court notes that the NSSF is a plaintiff in this case and has been a plaintiff in several Second Amendment challenges to firearms regulations. The NSSF is a firearm and industry trade association which advocates for the firearm and ammunition industry. NSSF members have a significant financial interest in the outcome of this case." *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, No. 2:22-CV-01815-IM, 2023 WL 4541027, at *23 n.18 (D. Or. July 14, 2023) .

[can] consider this assurance an inadequate safeguard of reliability." *Hall v. Conoco, Inc.*, 886 F.3d 1308, 1313 (10th Cir. 2018).

In possibly the most troubling example of his unwillingness to verify the survey results he cites, Mr. Passamaneck admitted that the only source for his claim that NSSF President and CEO Joseph Bartozzi stated that 20 million Americans own AR-15 rifles[10] was an article on the NSSF website that *no longer exists* and is supported only by his own recollection. Ex. C at 90:2–23, 92:2–4.

### 2. Mr. Passamaneck provided little or no foundation for many of the facts and data on which he bases his testimony, instead relying on his preconceived notions of scale and vague memories.

Many of the numbers relating to assault weapon ownership described in Mr. Passamaneck's report are wholly unsourced. For example, he writes without any citation that "it is estimated that about 8 to 9 million AR-15 style rifles were owned by US citizens prior to 1990." Ex. A at 1; *see also* Ex. B. at 2. When asked in his deposition, Mr. Passamaneck explained that he used a multiple of the 2 million AR-15s manufactured by Colt between 1975 and 1980. Ex. C at 104:17–24. To justify this apparently arbitrary multiple, Mr. Passamaneck alludes to references to other firearm manufacturers he found on "various forums and websites," none of which he identified. Ex. C at 98:3–4.

But more generally, Mr. Passamaneck's methodology for assessing the reliability of the numbers contained in his report was to compare them to his own preconceived notions of their

---

[10] Mr. Passamaneck also appears confused about whether this 20 million figure represented the number of AR-15 style rifles in circulation at the time, or the number of Americans who owned such rifles, a key distinction in understanding any of these numbers. Ex. C at 141:21–25.

11

scale, a method he tries to pass off as "experience."[11] *See, e.g.,* Ex. A at 2 ("The estimate of 8 to 9 million AR15 style rifles in the US prior to 1990 is based on this author's experience and participation in the firearms industry and competition with the AR15 style of rifles."); *see also* Ex. B at 2 ("[T]he estimates related to standard capacity magazines over 15 rounds presented in the initial expert report are *valid based on the author's knowledge and experience*" (emphasis added)). Those preconceived notions are based not on familiarity of the overall size of these totals, but on small and non-random sampling from conversations with gun owners and users who are not representative of the overall population. Ex. C at 114:23–116:7, 153:3–8, 169:22–170:6, 193:3–22, 194:1–195:4.

Further, Mr. Passamaneck cannot "invoke vague allusions to his 'experience'" to lay a foundation for his opinions. *Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021). In lieu of verifying the accuracy of data upon which he relied, and despite acknowledging that in many cases "the source data doesn't exist" and manufacturer estimates are "not verifiable numbers," Mr. Passamaneck claims to be able to form reliable Numerical Estimates because he "goes to competitions" and "talk[s] to the manufacturers." Ex. C at 103:3–9, 104:25–105:23. Mr. Passamaneck repeatedly and unreliably extrapolates numerical data from his "experience" being in and around the gun industry, which according to him includes participating in firearm competitions, talking to firearm owners and manufacturers, and watching a television show produced by the NRA. Ex. C at 95:18–24, 96:18–97:11, 114:23–116:7, 153:3–8, 169:22–170:6, 193:3–22, 194:1–195:4.

---

[11] As his reports severely lack methodology descriptions, Defendants only learned of Mr. Passamaneck's unorthodox methods after walking through his reports line-by-line in an almost seven-hour deposition.

B.  **Mr. Passamaneck employs unreliable methodology and made numerous errors concerning citing information, terminology, and arithmetic.**

Mr. Passamaneck also made numerous errors, demonstrating that his application of his own principles and methods to this case is unreliable. These errors include (1) imprecise use of terminology; (2) mistakes in reading the plain-language descriptions of his figures, resulting in incorrect calculations; and (3) logical errors.

*First,* Mr. Passamaneck's inconsistent, imprecise, and often conflicting use of terminology makes it almost impossible to discern the meaning of his statements and dramatically changes the data pulled from his sources. For example, Mr. Passamaneck proffered conclusions about "AR15 style rifles," despite his data source cataloguing data on "modern sporting rifles"—which include both "AR- and AK-platform firearms." Ex. G at 5, Ex. A at 1–2, *see* Ex. C at 79:10–80:24. In his deposition, Mr. Passamaneck brushed off the discrepancy, claiming that "modern sporting rifle" is a "political term." *Id.* at 79:19.[12] In another example (occurring in multiple places in his reports), Mr. Passamaneck interchanges the already vague term "Americans" with "U.S. citizens," even where the one or the other term is wrong in the context of the studies he is referring to. *See* Ex. C at 76:17–22, Ex. F at 1286:16–129:19. *Cf. Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1241 (W.D. Wash. 2018) (disqualifying an expert because, in part, the "terms are extremely general" in the expert report).

*Second*, Mr. Passamaneck made basic reading-comprehension errors. For example, in concluding that there are "approximately 250 million rifle magazines *over 15 rounds*," he subtracted his approximation of "100 million handgun magazines in the US that are *over 15*

---

[12] Mr. Passamaneck also rejects the use of the terms "assault weapon" (or "AW") and "large capacity magazine" as political, despite the terms being defined in the ordinances at issue, and despite the resulting misfit of all of his opinions to the case at hand. Ex. C at 71:20, 79:19.

13

*rounds*" from Magpul's estimate of 350 million "magazines of *15+ rounds*."[13] Ex. A at 2 (emphases added). But Magpul's estimate included magazines containing exactly 15 rounds, which Mr. Passamaneck explained are one of the most common magazines used in handguns. *Id.* As a result, the 250 million *rifle magazines* number includes an apparently large number of exactly-15-round *handgun magazines*.[14]

*Third*, Mr. Passamaneck makes basic logical errors. For example, Mr. Passamaneck notes that the number of gun owners is not significantly lower than the number of guns, while concurrently acknowledging that "most of the people [he] personally know[s] … have multiples," including Mr. Passamaneck himself.[15] *See* Ex. C at 142:9–11, Ex. A at 142:4–6, 212:5–6. Mr. Passamaneck also incorrectly deduced that the NSSF's count of "rifles produced minus exports," which includes firearms sitting unsold at retailers and wholesalers, is equivalent to the number "sold in the US." *See* Ex. A at 1; *see also* Ex. G at 6.

## CONCLUSION

For the reasons set forth above, Defendants respectfully requests that this Court grant this motion to strike the Numerical Estimates portion of Mr. Passamaneck's Initial Report and the

---

[13] There are also deeper issues with this calculation, as the 350 million and 100 million numbers stemmed from entirely different methodologies, had entirely different error rates, and the former represented a best guess, whereas the latter was "conservative." Basic logic demonstrates that subtracting a conservative estimate of the size of a sub-population from a best guess estimate of the larger population will not give a reasonable estimate of the size of the remaining population—it will definitionally give an overestimate.

[14] Further note that the ordinances at issue in this litigation define LCMs as having more than 10 rounds, unlike the state statute, which uses 15. Nevertheless, Passamaneck's report focuses on LCMs with a capacity of more than 15 rounds. Doubtless this is an artifact of the reuse of Mr. Passamaneck's report, but it also adds to the impression that Mr. Passamaneck has little interest in what the challenged ordinances say. Ex. C at 192:7–11; *see also* Ex. C at 19:6–14.

[15] That many of the guns in circulation are concentrated in the hands of owners of a relatively small number of gun owners is consistent with the testimony offered by other experts in this case, and with sources cited by Mr. Passamaneck himself. *See* Ex. I (English Report) at 17.

entirety of his Reply Report, and to exclude his testimony on that topic.[16]

Dated:  September 15, 2023

                              Respectfully submitted,

By:   */s/  Hendrik van Hemmen*
       Antonio J. Perez-Marques
       James H.R. Windels
       Christopher P. Lynch
       David B. Toscano
       Hendrik van Hemmen
       Jennifer Kim
       DAVIS POLK & WARDWELL LLP
       450 Lexington Avenue
       New York, NY 10017
       (212) 450-4515
       antonio.perez@davispolk.com
       james.windels@davispolk.com
       christopher.lynch@davispolk.com
       david.toscano@davispolk.com
       hendrik.vanhemmen@davispolk.com
       jennifer.kim@davispolk.com
       *Counsel for All Defendants*

       Carey R. Dunne
       Kevin Trowel
       Martha Reiser
       FREE AND FAIR LITIGATION GROUP
       266 W. 37th Street, 20th Floor
       New York, NY 10018
       (917) 499-2279
       carey@freeandfairlitigation.org
       kevin@freeandfairlitigation.org
       martha@freeandfairlitigation.org
       *Counsel for All Defendants*

---

[16] Defendants believe that the Court can decide this matter without a hearing, but are available at the Court's convenience for a hearing if it would assist the Court. *See Wildearth Guardians v. Pub. Serv. Co. of Colo.*, 853 F. Supp. 2d 1086, 1090 (D. Colo. 2012).

William Taylor
EVERYTOWN LAW
450 Lexington Avenue, #4184
New York, NY 10017
(646) 324-8215
wtaylor@everytown.org
*Counsel for All Defendants*

Gordon L. Vaughan
VAUGHAN & DEMURO
111 South Tejon Street
Suite 545
Colorado Springs, CO 80903
(719) 578-5500
gvaughan@vaughandemuro.com
*Counsel for Town of Superior and Town of Louisville*

Luis A. Toro
Teresa T. Tate
BOULDER CITY ATTORNEY'S OFFICE
P.O. Box 791
1777 Broadway
Boulder, CO 80306
(303) 441-3020
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
*Counsel for the City of Boulder*

David Evan Hughes
Catherine R. Ruhland
BOULDER COUNTY ATTORNEY'S OFFICE
P.O. Box 471
Boulder, CO 80306
(303) 441-3190
dhughes@bouldercounty.org
truhland@bouldercounty.org
*Counsel for the Board of County Commissioners of Boulder County*

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 15, 2023, I served a true and complete copy of the foregoing **DEFENDANT'S MOTION TO PARTIALLY STRIKE EXPERT REPORT AND PARTIALLY EXCLUDE TESTIMONY OF MARK PASSAMANECK**, upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

Dated:  September 15, 2023

                                  Respectfully submitted,

                    By:    */s/  Hendrik van Hemmen*
                            Hendrik van Hemmen
                            DAVIS POLK & WARDWELL LLP
                            450 Lexington Avenue
                            New York, NY 10017
                            (212) 450-4515
                            hendrik.vanhemmen@davispolk.com
                            *Counsel for All Defendants*