# EXHIBIT C

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3

4    Civil Action No. 22-cv-2680

5    _____

     ROCKY MOUNTAIN GUN OWNERS, NATIONAL ASSOCIATION FOR

6    GUN RIGHTS, CHARLES BRADLEY WALKER, BRYAN LAFONTE,

     CRAIG WRIGHT, and GORDON MADONNA, JAMES MICHAEL

7    JONES, and MARTIN CARTER KEHOE,

8               Plaintiffs,

9    V.

10   THE TOWN OF SUPERIOR, CITY OF LOUISVILLE, COLORADO,

     CITY OF BOULDER, COLORADO, and BOARD OF COUNTY

11   COMMISSIONERS OF BOULDER COUNTY,

12              Defendants.

     _____

13

14

15         REMOTE VIDEO-RECORDED DEPOSITION

16                     OF

17            MARK WILLIAM PASSAMANECK

18             FRIDAY, JULY 28, 2023

19

20

21

22

23

24

25

Page 2

```
1           APPEARANCES
2
3
    For Plaintiffs: ARRINGTON LAW FIRM
4        By: Barry Arrington, Esq.
         3801 East Florida Avenue
5        Suite 830
         Denver, CO 80210
6        (303) 205-7870
         barry@arringtonpc.com
7
8   For Defendants  DAVIS POLK & WARDWELL, LLP
    Superior,    By: Hendrik van Hemmen, Esq.
9   et al.:      Matthew Hanner, Esq.
                 450 Lexington Avenue
10               11th Floor
                 New York, NY 10017
11               (212) 450-3391
                 hendrik.vanhemmen@davispolk.com
12               matthew.haner@davispolk.com
13
    For Defendants  VAUGHAN & DEMUIRO
14  Superior &    By: Gordon Vaughan, Esq.
    Louisville:   111 S Tejon Street
15               Colorado Springs, CO 80903
                 (719) 578-5500
16               gvaughan@vaughandemuro.com
17
18  Also Present:  Jerry DeBoer, Videographer
19
20
21
22
23
24
25
```

Page 3

```
1           INDEX
2
3   EXAMINATIONS:                PAGE
4   MARK WILLIAM PASSAMANECK
5      Examination By Mr. van Hemmen    8
6      Examination By Mr. Arrington     218
7      Examination By Mr. van Hemmen    249
8
9           EXHIBITS
10
11  No.     Description          Identified
12  Exhibit 1   Mark Passameck Initial    10
                Report
13
    Exhibit 2   Supplemental Report of Mark   13
14              Passameck
15  Exhibit 3   Rebuttal Report of Louis   16
                Klarevas
16
    Exhibit 4   Expert rebuttal report of    17
17              James Yurgealitis
18  Exhibit 5   Initial report of James      17
                Yurgealitis
19
    Exhibit 6   Town of Superior Ordinance   19
20
    Exhibit 7   City of Boulder Ordinance    20
21
    Exhibit 8   Boulder County Ordinance     20
22
    Exhibit 9   City of Louisville Ordinance 20
23
    Exhibit 10  Transcript of Deposition     29
24              Testimony of Mark Passameck
                dated May 31, 2023
25
```

Page 4

```
1   Exhibit 11   Mark Passameck Curriculum   39
                 Vitae
2
    Exhibit 12   Staff Summary of Meeting of 62
3                the Senate Committee on the
                 Judiciary
4
    Exhibit 13   NSSF Report Copyright 2020  86
5
    Exhibit 14   2022 Washington Post Survey 88
6
    Exhibit 15   2021 National Firearms Survey 89
7
    Exhibit 16   Estimating AR15 Production,  102
8                1964-2017
9   Exhibit 17   Screenshots from Facebook   180
                 Messenger between Mark
10               Passameck and Duane Liptak
11  Exhibit 18   Congressional Research Service 228
12  Exhibit 19   Expert Report of Louis      229
                 Klarevas
13
    Exhibit 20   2021 National Firearms Survey: 249
14               Updated Analysis
                 Including Types of Firearms
15               Owned
                 William English, PhD
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1       PURSUANT TO WRITTEN NOTICE and the
2   appropriate rules of civil procedure, the
3   Remote Video-Recorded Deposition of MARK WILLIAM
4   PASSAMANECK, called for examination by the Defendant,
5   was taken via Zoom, commencing at 9:06 on Friday,
6   July 28, 2023, before Jennifer L. Smith, California
7   CSR No. 10358, Washington CCR No. 3101, RMR, CRR,
8   CRC, and Notary Public in and for the State of
9   Colorado.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

1  P R O C E E D I N G S
2
3      THE VIDEOGRAPHER:  Good morning.  We are
4  going on the record at 9:06 AM Mountain Time on
5  July 28, 2023.
6      Please note that this deposition is being
7  conducted virtually.  Quality of recording depends on
8  the quality of camera, microphone, and Internet
9  connection of participants.  What is seen from the
10 witness and heard on the screen is what will be
11 recorded.  Audio and video recording will continue to
12 take place unless all parties agree to go off the
13 record.
14     This is Media Unit 1 of the video-recorded
15 deposition of Mark Passamaneck, taken by counsel for
16 the defendants in the matter of Rocky Mountain Gun
17 Owners, et al., versus the Town of Superior, et al.,
18 filed in the United States District Court for the
19 District of Colorado, Case Number 22-cv-2680.
20     This deposition is being held remotely via
21 Zoom.  My name is Jerry DeBoer, representing Veritext
22 Legal Solutions, and I'm the videographer.  The court
23 reporter is Jennifer Smith, for the firm of Veritext
24 Legal Solutions.
25     I am not related to any party in this

1  action, nor am I financially interested in the
2  outcome.
3      Counsel and everyone attending remotely will
4  now state their appearances and affiliations for the
5  record.  If there are any objections to proceeding,
6  please state them at the time of your appearance,
7  beginning with the noticing attorney.
8      MR. VAN HEMMEN:  This is Hendrik van Hemmen.
9  I am representing the defendants, Superior, et al.
10     MR. ARRINGTON:  Barry Arrington for the
11 plaintiffs.
12     MR. VAUGHAN:  Gordon Vaughn for Superior and
13 also for -- lost my mind.
14     MR. ARRINGTON:  Louisville, I think, Gordon.
15     MR. VAUGHAN:  Thank you.  Louisville.
16     MR. HANNER:  Matthew Hanner with the
17 defense.
18     MR. ARRINGTON:  Jennifer, you don't play a
19 major role in terms of speaking, but to the extent
20 you do, I can barely hear you.
21     THE COURT REPORTER:  Is that better?
22     MR. ARRINGTON:  Much better.  Thank you.
23     THE VIDEOGRAPHER:  All right.  Thank you,
24 Counsel.  You may proceed.
25 ///

1      MARK WILLIAM PASSAMANECK,
2      having been first duly sworn,
3      was examined and testified as follows:
4
5      EXAMINATION
6  BY MR. VAN HEMMEN:
7      Q.  All right.  Can you please state your name
8  for the record.
9      A.  Mark William Passamaneck.
10     Q.  Have you ever been deposed before,
11 Mr. Passamaneck?
12     A.  Yes.
13     Q.  So I'm sure that none of this is going to be
14 new to you, but I just want to cover a few ground
15 rules before we get started.
16     For the benefit of the court reporter, I
17 will try to avoid speaking over you, and I ask that
18 you avoid speaking over me.
19     In other words, wait for me to finish before
20 you begin speaking, and I'll do the same.  Okay?
21     A.  Okay.
22     Q.  Please also be sure to answer questions
23 verbally.  Please don't nod your head or say uh-huh,
24 because it's difficult for the court reporter to get
25 that.  All right?

1      A.  All right.
2      Q.  Your attorney may object to certain
3  questions I have, but unless he instructs you not to
4  answer the question, you should still answer my
5  question.
6      Do you understand?
7      A.  I do.
8      Q.  If you need to take a break at any point,
9  just ask, and we can take a break.  I only ask that
10 you answer whatever question I've already asked
11 before we do that.
12     Sound good?
13     A.  Correct.
14     Q.  All right.  And if there's any question that
15 I ask that you don't understand, please just ask me
16 to clarify, and I'll be happy to do that.  If you
17 don't understand the question, it's just not helpful
18 to make something up.
19     Does sound good?
20     A.  Yes.
21     Q.  All right.  You're under oath.
22     Do you understand that?
23     A.  I do.
24     Q.  Is there any reason you can't testify
25 truthfully today?

3 (Pages 6 - 9)

Page 10

1   A.  There is not.
2   Q.  Have you consumed any alcohol, medication,
3 or drugs that would affect your ability to testify
4 today?
5   A.  No.
6   Q.  Have you consumed anything that affects your
7 memory, as you sit here today?
8   A.  No.
9   Q.  Great.
10      I want to start by introducing a few
11 documents that we're going to be using a lot in the
12 course of the day of the deposition, starting with --
13      Matt, what is labeled as Tab 1 on our list.
14      Just let me know when -- okay.  It looks
15 like it's up in the marked exhibits.
16      (Exhibit 1 was identified.)
17 BY MR. VAN HEMMEN:
18   Q.  Are you able to view that?
19   A.  Do -- I don't have anything yet.  It
20 actually says I don't have permission.
21   Q.  Okay.
22      MR. ARRINGTON:  Go off the record.
23      THE VIDEOGRAPHER:  Counsel, you agree to go
24 off the record?
25      MR. ARRINGTON:  Hendrik?

Page 11

1      MR. VAN HEMMEN:  Yes.  Yes.  Sorry.
2      MR. ARRINGTON:  You agree to go off the
3 record?
4      MR. VAN HEMMEN:  Agree to go off the record.
5      THE VIDEOGRAPHER:  Going off the record.
6 The time is 9:11.
7      (Recess taken.)
8      THE VIDEOGRAPHER:  We're back on the record.
9 The time is 9:14.
10 BY MR. VAN HEMMEN:
11   Q.  All right.  This is a copy of your initial
12 report, marked as Exhibit 1.
13      Is this the initial report that you
14 submitted in this case?
15   A.  It is.
16   Q.  Does it contain your opinions?
17   A.  It does.
18   Q.  If you go -- scroll down to Page 4, it's the
19 last page, actually, because it has the cover page.
20      Is that your signature at the bottom?
21   A.  It is.
22   Q.  All right.  At the top of your report, which
23 is Page 3 in this actual file, the date at the top
24 says April 12, 2023.
25      Is this the date you submitted the report?

Page 12

1   A.  Yes.
2   Q.  We received this report without any
3 attachments.  So I just want to confirm that that was
4 right.
5      Are there any missing attachments here?
6   A.  There should have been two attachments.  One
7 would be the NSSF 2020 industry report, and the other
8 one would be the -- which is referenced in the
9 report -- let me find it.  The 2021 survey by William
10 English.
11   Q.  All right.
12      Barry, I don't think we got those.  I think
13 we probably have those from other sources, but if you
14 could just send along the original version, when you
15 get a chance, that would be helpful.
16      MR. ARRINGTON:  Okay.  You were able to find
17 those.  Obviously, you're --
18      MR. VAN HEMMEN:  Yeah.
19      MR. ARRINGTON:  -- your rebuttal experts
20 referenced them; so I expect you got them.
21      MR. VAN HEMMEN:  Yeah, yeah.  I think we
22 have them.
23      All right.  Thank you.
24 BY MR. VAN HEMMEN:
25   Q.  You didn't include a CV or a resume with

Page 13

1 this report; is that correct?
2   A.  That is correct.
3   Q.  And you didn't include a list of
4 publications?
5   A.  Correct.
6   Q.  And you didn't include a bibliography or a
7 list of work cited; is that correct?
8   A.  Correct.
9   Q.  Okay.  That sounds good.
10      Matt, let's go to the next exhibit.
11      (Exhibit 2 was identified.)
12 BY MR. VAN HEMMEN:
13   Q.  It should be Tab 2.  It's probably just
14 taking a minute for Matt to put it across.  All
15 right.  Try clicking again on marked exhibits.  It
16 looks like it's there.  I just needed to click the
17 folder again.  And this will be Exhibit 2.
18   A.  Okay.
19   Q.  Is this the supplemental report that you
20 submitted in this case?
21   A.  It's still opening.
22   Q.  Oh, all right.
23   A.  I have it open now.
24   Q.  All right.  Is this the supplemental report
25 that you submitted?

4 (Pages 10 - 13)

Page 14

1    A. It is.
2    Q. And if you scroll down to Page 3, is that
3 your signature?
4    A. It is.
5    Q. The date at the top of the report is
6 July 20, 2023.
7       Is this the date that you submitted this
8 report?
9    A. Yes.
10    Q. Does this rebuttal report contain your
11 opinions?
12    A. It does.
13    Q. There appear to be three attachments here,
14 record of prior testimony, a firearms/shooting resume
15 supplement, and a copy of the 2022 NSSF report; is
16 that correct?
17    A. Yes.
18    Q. Are there any missing attachments?
19    A. I do not believe so.
20    Q. Did you draft these attachments?
21    A. I'm not sure what your question means.
22    Q. No problem.  I guess it might be easier to
23 just take them one at a time.
24       Did you draft this list of prior testimony?
25    A. No.

Page 15

1    Q. Who drafted this?
2    A. My assistant.
3    Q. Did you review it and confirm its accuracy?
4    A. I did.
5    Q. Did you draft the firearms/shooting resume
6 supplement?
7    A. I did.
8    Q. All right.  Why did submit this supplemental
9 report?
10    A. There were several things that I read in
11 your expert's report and some other things that I
12 felt were worthy of clarification.
13    Q. And the report by our witness, defenses'
14 witness, that you're referencing, that is the
15 Klarevas rebuttal report?
16    A. Yes.
17    Q. Okay.  You wrote your initial report without
18 having seen any of the reports of the defense
19 experts; is that correct?
20    A. That is correct.
21    Q. Have you now read those reports?
22    A. Yes.
23    Q. Which ones?
24    A. I would have to go back and look at my
25 files.  I read Klarevas -- I hope that's right

Page 16

1 Klarevas, and there was another one I'd have to look
2 in my email to see which ones they were.
3    Q. No problem.
4       Did you -- so you reviewed Klarevas's
5 rebuttal report?
6    A. I did.
7    Q. Did you review Klarevas's initial report?
8    A. I don't know.  Again, I'd have to go back
9 and look at which actual reports Mr. Arrington sent
10 to me via email.
11    Q. Okay.
12       Matt, can you please mark what is Tab 5 for
13 us.
14       Okay.  Can you open Exhibit 3, please.
15       (Exhibit 3 was identified.)
16 BY MR. VAN HEMMEN:
17    Q. Just let me know when have you that.
18    A. Okay.  It's opened now, 30 pages.
19    Q. Yes, that looks correct.  It says, "Rebuttal
20 Report of Louis Klarevas"; is that correct?
21    A. Yes.
22    Q. Have you reviewed this report?
23    A. I believe that is the one that I looked at,
24 yes.
25    Q. Great.

Page 17

1       Matt, Tab 3 now, please.  All right.  It
2 looks likes it's there.  This will be Exhibit
3 Number 4.
4       (Exhibit 4 was identified.)
5       THE WITNESS:  That has opened now.  It's got
6 eight pages.
7 BY MR. VAN HEMMEN:
8    Q. Have you reviewed this report?
9    A. I believe that I have.
10    Q. This is the expert rebuttal report of James
11 Yurgealitis.
12       All right.  The next one, which will be
13 Exhibit 5, I believe.
14       (Exhibit 5 was identified.)
15 BY MR. VAN HEMMEN:
16    Q. This is the initial report of James
17 Yurgealitis.
18       Just let me know when you see it.
19    A. Okay.  It's opened.  There are 57 pages.
20    Q. Okay.  Have you previously reviewed this
21 report?
22    A. I do not know.  I would have to go back and
23 look.
24    Q. Okay.  Did you review any reports from the
25 defenses' experts before -- scratch that.  Never

Page 18

1 mind.
2     All right.  Let's just -- all right.  Let's
3 do it this way:  How many expert reports from the
4 defense did you review?
5     A.  Two.
6     Q.  Two.  Okay.
7     So it -- it would have then been those two
8 rebuttal reports that we opened?
9     A.  I believe that is accurate.
10    Q.  Okay.
11    A.  If you want me to look at -- if you want to
12 take a break and have me look at my email, I can
13 confirm that for you, but I can't confirm that for
14 you without looking at my notes.
15    Q.  Understood.
16    Have you -- okay.  But I think that that
17 basically answers the question, and we can come back
18 later.
19    Have you changed any of the opinions
20 expressed in either of your reports based on the
21 reports of the defenses' experts?
22    A.  No.
23    Q.  Have you changed any of your opinions in
24 your two reports for any other reason since writing
25 them?

Page 19

1     A.  No.
2     Q.  Are you familiar with the ordinances being
3 challenged in this case?
4     A.  I am familiar with them.  I could not quote
5 them for you.
6     Q.  Have you reviewed the ordinances?
7     A.  I have briefly read them, but, no, I have --
8 I have not reviewed them in depth.
9     Q.  Are you familiar with the relevant
10 definitions contained within those ordinances?
11    A.  I think you'd have to tell me what
12 definitions you're talking about.  If they're legal
13 definitions, I would probably have to have you
14 clarify them for me.
15    Q.  Understood.  We'll come back to that later.
16    For now, Matt, can you please just mark
17 Tabs, I think it's, 15 through 18.
18    All right.  Exhibit 6.
19    (Exhibit 6 was identified.)
20    THE WITNESS:  I don't know how many pages
21 this is, but it's opened up as Exhibit 6, Tab 15.  It
22 says Exhibit A.
23 BY MR. VAN HEMMEN:
24    Q.  All right.  This is the ordinance in the
25 Town of Superior Ordinance Number 09 Series 2022.

Page 20

1     If I refer to the Superior ordinance, which
2 it's unlikely that's what I'm talking about --
3     Matt, can you put up the next one, please.
4 They're all there.
5     All right.  Exhibit Number 7.  It should
6 come up as Exhibit B.  Let me know when you see it.
7     (Exhibit 7 was identified.)
8     THE WITNESS:  Is that City of Boulder?
9 BY MR. VAN HEMMEN:
10    Q.  This is City of Boulder.  That's correct.
11    All right.  Exhibit 8.
12    (Exhibit 8 was identified.)
13 BY MR. VAN HEMMEN:
14    Q.  This is Boulder County.
15    A.  Did you ask me a question?
16    Q.  Sorry.  Did you have it up?
17    A.  I did open Exhibit 7, and then I did open
18 Exhibit 8.
19    Q.  You did open Exhibit 8.  Okay.
20    Exhibit 8 is Boulder County.
21    And Exhibit 9 will be City of Louisville.
22    (Exhibit 9 was identified.)
23    THE WITNESS:  Yes.
24 BY MR. VAN HEMMEN:
25    Q.  All right.  Will you understand if I use the

Page 21

1 expression "the challenged ordinances," that I'm
2 referring to these four ordinances?
3     A.  That's acceptable.
4     Q.  And is it your understanding that these four
5 ordinances define assault weapons and large capacity
6 magazines for short LCMs for purposes of their laws,
7 their ordinances?
8     A.  I understand that that text is within some
9 of them, yes.
10    Q.  All right.  Are you familiar enough with
11 these ordinances to recognize that those definitions
12 are substantially the same across the four
13 ordinances?
14    A.  Yes.
15    Q.  Okay.  Thanks.
16    All right.  Can you please tell me what you
17 did to prepare for this deposition?
18    A.  I read through my expert report and
19 supplemental report, and then I spent some time
20 making sure that I could get online.
21    Q.  All right.  Did you meet with anybody?
22    A.  I did not.
23    Q.  Did you review any other documents in
24 preparation for this deposition?
25    A.  I did go through the 2022 NSSF industry

6 (Pages 18 - 21)

Page 22

1 report briefly again.
2    Q.  And did you review the ordinances, the
3 challenged ordinances?
4    A.  I did not.
5    Q.  Did you review any of defense experts'
6 reports in preparation for this deposition?
7    A.  I did not.
8    Q.  Do you have any documents with you today?
9    A.  I have my two reports in front of me.
10 That's it.
11    Q.  All right.  Apart from reading his reports
12 in this case, are -- I guess just the one report --
13 are you familiar with James Yurgealitis?
14    A.  Not until I read his report.
15    Q.  Have you considered his qualifications to
16 offer his opinions in this report?
17    A.  I read what was in his rebuttal report, but,
18 no, I've not really evaluated his qualifications.
19    Q.  All right.  I understand that you may --
20 might disagree with some of his opinions, and we'll
21 discuss the differences between yours and his.  But
22 as a preliminary matter, do you believe he is
23 qualified to offer those opinions?
24    A.  I do not know.
25    Q.  Do you have any doubts about his educational

Page 23

1 qualifications?
2    A.  I do not know.  It's not something I was
3 asked to review.
4    Q.  Is there -- okay.  So you have no basis,
5 then, to believe he is not qualified?
6    A.  I have no opinion one way or the other.
7    Q.  Apart from reading his reports in this case,
8 are you familiar with Lou Klarevas?
9    A.  No.
10    Q.  Have you considered his qualifications to
11 offer his opinions in this report?
12    A.  No.
13    Q.  Again, I understand that you might disagree
14 with his opinions, which we'll discuss, but, again,
15 as a preliminary matter, do you believe that he is
16 qualified to offer those opinions?
17    A.  I do not know.
18    Q.  Do you have any reason to believe he is not
19 qualified?
20    A.  I don't know.
21    Q.  You don't know if you have any reason to
22 believe he's not qualified?
23    A.  I -- if I'm not evaluating it, I can't tell
24 you yes or no.
25    Q.  Okay.  So -- okay.

Page 24

1    Q.  How many times have you been deposed before?
2    A.  Close to 100.
3    Q.  Have your previous depositions been in
4 connection with your work as an expert witness?
5    A.  Yes.
6    Q.  In how many matters have you testified as an
7 expert witness?
8    A.  Less than 100.  It's probably in the realm
9 of 50 or so.
10    Q.  And how many matters --
11    A.  I'm not including depositions.  I'm just
12 including trial or some kind of court.
13    Q.  Okay.  If you include depositions, it would
14 be over 100, you're saying?
15    A.  Yes.
16    Q.  In how many matters have you written an
17 expert report?
18    A.  Thousands.
19    Q.  All right.  You provided lists of testimony
20 with both your initial and supplemental reports.
21        If you could go to Exhibit 2.  That's your
22 supplemental report.  On page -- it's Page 4 of the
23 document.  This is the list of testimony.
24        Is this a complete list of all the testimony
25 you've provided in the past four years?

Page 25

1    A.  It is.
2    Q.  Does this list differ from the list that you
3 included with your initial report?
4    A.  It does.
5    Q.  How so?
6    A.  There was a case that was missing, and I
7 believe that is 2309, Alves versus the Army Corp.
8    Q.  Were you disqualified in that case?
9    A.  I was not aware that I was disqualified in
10 the case, but I understand from a prior deposition
11 that my testimony was restricted.
12    Q.  Have you been disqualified as an expert
13 witness in any other case?
14    A.  Not that I'm aware of.
15    Q.  The last item on this list, the National
16 Foundation For Gun Rights versus Polis, is that one
17 also new?
18    A.  Well, it's new as if -- because it's after
19 the initial date of my first report.
20    Q.  Understood.
21        Have you offered expert opinions in the form
22 of either reports or depositions in gun cases
23 previously?
24    A.  I have.
25    Q.  On how many occasions?

7 (Pages 22 - 25)

Page 26

1    A. I don't know the exact number. I don't
2 believe that there's any trial testimony or
3 deposition. It's all been reports. It's probably in
4 the neighborhood of 30 or so.
5    Q. Okay. In which cases?
6    A. I could not tell you all of them off the top
7 of my head.
8    Q. All right.
9        MR. ARRINGTON: Counsel, when you say "gun
10 cases," do you mean Second Amendment or engineering
11 cases? Because I think he's focusing only on
12 engineering cases.
13        MR. VAN HEMMEN: All right. Let's pose that
14 as two separate questions, then. Thanks, Barry.
15        MR. ARRINGTON: Okay.
16 BY MR. VAN HEMMEN:
17    Q. We'll start with Second Amendment cases.
18        How many occasions have you previously
19 offered expert opinions in Second Amendment cases?
20    A. This case would be the third. There are two
21 prior.
22    Q. And what are the two cases?
23    A. One of the National Foundation For Gun
24 Rights versus Polis, and then a prior one was Rocky
25 Mountain Gun Owners versus Hickenlooper.

Page 27

1    Q. I didn't catch that name. Can you spell
2 that?
3    A. Rocky Mountain Gun Owners versus
4 Hickenlooper.
5    Q. Hickenlooper. Thank you.
6        And what was your area of expertise in these
7 cases?
8    A. They were all relatively the same.
9    Q. As in this case?
10    A. As in this case, yes. And to separate it out, as Barry
11    Q. All right. And to separate it out, as Barry
12 pointed out, on how many occasions have you offered
13 expert testimony in non-Second Amendment gun cases?
14    A. It would be 25 to 30 cases.
15    Q. And what was your area of expertise in those
16 cases?
17    A. They varied from shooting reconstruction to
18 proper use of force to actual failures of firearms.
19        MR. ARRINGTON: So, counsel, just for the
20 record, if you'll check your email, the -- I have
21 sent to you the 2020 NSS survey and English report,
22 which I believe you indicated you already had, but I
23 went ahead and forwarded those anyway.
24        Also, Mr. Passamaneck has a -- a CV that you
25 might want to look at that was also perhaps

Page 28

1 inadvertently left off because of his initial report.
2        MR. VAN HEMMEN: Thank you, Barry.
3 BY MR. VAN HEMMEN:
4    Q. What do you mean by providing an area of
5 expertise as to use of force?
6    A. I was asked to provide opinions as to
7 whether the use of lethal force was proper or not.
8    Q. And what was the basis for your expertise?
9    A. My experience and education.
10    Q. As you noted, you submitted a report in the
11 National Foundation For Gun Rights versus Polis case,
12 which will be that last item on your list of
13 testimony.
14        I'll refer to that as the State case.
15        Will you understand what I mean if I say
16 that?
17    A. I'm sorry. I didn't hear the first word.
18 As the what case?
19    Q. State case.
20    A. State case.
21        That's -- yes, that's fine.
22    Q. Is the report that you submitted in that
23 case exactly identical to the initial report that you
24 submitted in this case?
25    A. I believe Mr. Arrington submitted the same

Page 29

1 report for both, yes.
2    Q. At the time that you wrote your report in
3 the State case, did you understand that it would be
4 used in both cases?
5    A. I did not.
6    Q. Did you do any additional review or work on
7 these cases between submitting your report in the
8 State case and submitting your report in this case?
9    A. No.
10    Q. Were you deposed in the State case?
11    A. Yes.
12    Q. All right.
13        Matt, could you please mark Tab 7. This
14 will be Exhibit 10, I believe.
15        (Exhibit 10 was identified.)
16 BY MR. VAN HEMMEN:
17    Q. Let me know when you can see it.
18    A. I see it. Do you want me to open it?
19    Q. Oh, yes, please.
20        MR. ARRINGTON: Is there a question pending?
21        MR. VAN HEMMEN: I was waiting for it to
22 open.
23 BY MR. VAN HEMMEN:
24    Q. Are you able to view it?
25    A. Not yet.

8 (Pages 26 - 29)

Page 30

1    Q.  Okay.
2    A.  So it says Exhibit B, and there are
3  50 pages.
4    Q.  All right.  The main thing when looking at
5  these, you'll see there's a yellow box.  It says
6  Exhibit MP 10.  That's your initials and 10.  That's
7  the key thing to make sure we're all looking at the
8  same thing.
9      If you go down to the second page, you'll
10 see your name at the top.  This is a transcript of
11 the deposition.  Is this your deposition in the State
12 case?
13   A.  It is.
14   Q.  Dated May 31, 2023; correct?
15   A.  Correct.
16   Q.  Did you do any additional review or work in
17 this case or the State case between the time of this
18 deposition -- meaning the State deposition -- and
19 today?
20   A.  Yes.
21   Q.  What did you do?
22   A.  Well, I wrote the supplemental report and --
23 in part of that, I actually talked to Salam Fatohi,
24 who the director of research for NSSF via email and a
25 phone call.

Page 31

1    Q.  Thank you.
2      Is there anything that you have said in this
3  deposition that you have since learned is incorrect?
4    A.  Other than the issue with the testimony that
5  was missing, which was corrected within the -- the
6  deposition, I don't believe so.
7    Q.  Okay.  You are charging $250 an hour for
8  your work in this action; is that correct?
9    A.  That is correct.
10   Q.  Have you been paid yet for your work to
11 date?
12   A.  I couldn't tell you if I've been paid up
13 till current, but when we have submitted invoices, we
14 have been paid promptly, yes.
15   Q.  Does your compensation depend in any way on
16 the outcome of this litigation?
17   A.  No.
18   Q.  Given that the same report was filed in this
19 case and the State case, did you receive any
20 additional compensation for your initial report in
21 this case?
22   A.  No.
23   Q.  What topic or topics are you holding
24 yourself out as an expert on in this case?
25   A.  Well, in -- in general, the firearms and

Page 32

1  their function, and my assessment of the numbers of
2  firearms and magazines of certain capacities that are
3  in possession of American citizens -- or in
4  possession of Americans.
5    Q.  All right.  Taking those one at a time,
6  starting with the magazines and their function, what
7  are your qualifications to offer an expert opinion on
8  that topic?
9    A.  Well, as an engineer and through my company,
10 I have designed, manufactured, and produced magazines
11 of various capacities for both pistols and shotguns.
12 I use them.  I've consulted directly with
13 manufacturers as well.
14   Q.  Have you published anything on this topic?
15   A.  No.
16   Q.  Do you have any professional experience
17 related to that topic?
18   A.  Yes.  As I said, I have consulted for
19 firearms manufacturers and magazine manufacturers on
20 this subject.
21   Q.  Okay.  Moving on to the second one.  Sorry
22 if I summarize this different.  Correct me if I get
23 it wrong.  But what are your qualifications to offer
24 an expert opinion on the number of firearms and/or
25 magazines that are owned by Americans?  Is that how

Page 33

1  you phrased it?
2    A.  Yes.
3    Q.  What are your qualifications on that topic?
4    A.  My -- my education and experience in the
5  firearms industry for over 30 years.
6    Q.  Have you published anything on that topic?
7    A.  No.
8    Q.  Do you have any professional experience
9  related to that topic?
10   A.  I guess -- I guess you'd have to say what
11 is -- what do you mean by "professional experience"?
12 I mean, I have been a sponsored shooter, I've worked
13 for manufacturers, I manufacture a barrel, you know,
14 there's a lot of -- there's a lot of little piecemeal
15 portions that are professional experience in that --
16 in that area.
17   Q.  You have any professional --
18      MR. ARRINGTON:  Did you say you manufacture
19 a barrel or a magazine?
20      THE WITNESS:  Barrel.
21      MR. ARRINGTON:  Barrel.  Okay.  Sorry.  Go
22 ahead.
23 BY MR. VAN HEMMEN:
24   Q.  Do you have any professional experience
25 estimating the number of firearms or magazines within

9 (Pages 30 - 33)

Page 34

1 the United States?
2     A.  No, I'm not a statistician, and I don't
3 conduct surveys.  I review data.
4     Q.  Do you have any professional experience
5 evaluating the quality of surveys?
6     A.  I didn't hear the last word.
7     Q.  Surveys.
8     A.  To -- to some extent, yes.  I mean, I
9 understand the National Shooting Sport Foundation.
10 I've talked to them at length, both prior to and
11 during this case, as to where that data comes from.
12 And the fact that that data comes from manufacturers
13 and ATF forms is relevant.
14         I mean, they establish the base numbers for
15 what the various numbers relate to, whether it's
16 magazines or different types of firearms.
17     Q.  So you've spoken to the people who conducted
18 that particular study.
19         Do you have any other professional
20 experience doing similar work?
21     A.  No.
22     Q.  So what exactly are your qualifications to
23 hold yourself out as an expert on reviewing surveys
24 and studies such as this?
25     A.  My experience in the industry.

Page 35

1     Q.  Are you holding yourself out as an expert on
2 any other topics in this case?
3     A.  Other than what's in my report, no.
4     Q.  Are you holding yourself out as an expert on
5 firearm and/or magazine engineering?
6     A.  I am.  And there is -- there are sections of
7 my report that actually do talk about the design and
8 function of magazines.
9     Q.  Do you have academic training in that field?
10     A.  I'm licensed as a mechanical engineer, and
11 they're mechanical devices.  So several of my -- of
12 my courses and my engineering work and work that I've
13 done as a professional relate directly to that, yes.
14     MR. ARRINGTON:  Hendrik, this is Barry.  I
15 presume that since you saw his previous deposition in
16 the State case, you also saw his expanded CV that was
17 marked as an exhibit in that case; is that correct?
18     MR. VAN HEMMEN:  That's correct.  I also saw
19 it in the supplemental report.  It was attached as an
20 exhibit.
21     MR. ARRINGTON:  Okay.  And there was --
22 well, and there was an original CV, talking about his
23 academic background that was marked an exhibit in
24 that case.  I presume that you saw that as well?
25     MR. VAN HEMMEN:  I did.

Page 36

1     MR. ARRINGTON:  Yeah.  And --
2     MR. VAN HEMMEN:  Is that also the CV that
3 you forwarded to us?
4     MR. ARRINGTON:  Yes.  So, I mean, if --
5 obviously, if you want to inquire about that, that
6 contains an expanded version of his academic record.
7     MR. VAN HEMMEN:  Thanks, yes.
8     MR. ARRINGTON:  Sure.
9     MR. VAN HEMMEN:  We'll take a look at that.
10 BY MR. VAN HEMMEN:
11     Q.  Has any of your -- have you taken any
12 courses within your academic training, relating
13 specifically to firearms and/or magazines?
14     A.  In my engineering degree?  No.
15     Q.  Have you taken courses as a part of your
16 academic training relating to guns and/or magazines
17 not related to your engineering course work?
18     A.  My engineering course work is the sum total.
19 I mean, I am not going to tell you I haven't taken
20 classes that involve firearms, but they -- they're
21 not -- they were not engineering courses through an
22 accredited college.
23     Q.  Were there non-engineering courses through
24 an credited college?
25     A.  No.

Page 37

1     Q.  Have you published in the field of firearm
2 and/or magazine engineering?
3     A.  No.
4     Q.  Okay.  Are you holding yourself out as an
5 expert on the -- on firearm and/or magazine markets?
6     A.  No.
7     Q.  Are you holding yourself out as an expert on
8 statistical analysis?
9     A.  Not specifically, no.  I mean, I reviewed
10 data, but I'm not a statistician.
11     Q.  Are you holding yourself out in this case as
12 an expert on ballistic testing?
13     A.  No.
14     Q.  Are you holding yourself as an expert in
15 this case on failure testing?
16     A.  No.
17     Q.  Are you holding --
18     A.  Actually, let me back that up.
19         I actually do talk about some elements of
20 failure of magazines in my report.
21         So I -- yes.  I'm sorry.
22     Q.  You have academic training in that field,
23 apart from what we already discussed?
24     A.  Failure analysis?
25     Q.  Uh-huh.

10 (Pages 34 - 37)

Page 38

1    A. I do.
2    Q. Have you published in that field?
3    A. In failure analysis?
4    Q. Yes.
5    A. Multiple times, yes.
6    Q. What is -- were any of these publications
7 peer reviewed?
8    A. Some were; some were not.
9    Q. Are you holding yourself out in this case as
10 an expert on hunting?
11   A. Not in this case, no.
12   Q. Are you holding yourself out in this case as
13 an expert on gunshot wounds?
14   A. Not in this case, no.
15   Q. Have you ever been an expert witness on the
16 subject of gunshot wounds?
17   A. Yes.
18   Q. Which cases?
19   A. I would have to go back and look.
20   Q. Would any of these cases be on your list of
21 prior testimony?
22   A. No.
23   Q. Have you offered testimony in the past four
24 years on that subject?
25   A. No.

Page 39

1    Q. Okay. What is the highest level of
2 education you've received?
3    A. Bachelor's degree.
4    MR. VAN HEMMEN: Okay. Matt, can we go to
5 Tab 8. I believe by my count that should be Exhibit
6 11.
7    (Exhibit 11 was identified.)
8 BY MR. VAN HEMMEN:
9    Q. All right. Let me know when you have that
10 open.
11   A. It's open now.
12   Q. We pulled this from the Entropy Engineering
13 website.
14   Is this your CV?
15   A. Yes.
16   Q. In combination with the resume supplement
17 that you provided with your supplemental report, does
18 this make up your full and accurate CV, your resume?
19   A. Yes.
20   Q. Why do you have two separate resumes?
21   A. Because the firearms is more specific, and
22 also I have found that when I put significant amounts
23 of the firearms-related topics into my CV, one, it
24 became too long; and, two, there are several
25 attorneys that will not hire somebody who does

Page 40

1 firearms cases.
2    Q. I notice that there are several references
3 to firearms within this CV that we're looking at.
4    Has that cost you any work, that you're
5 aware of?
6    A. I am aware of at least one case, yes.
7    Q. Is this CV up to date?
8    A. I believe so.
9    Q. Taking a look at the list of publications,
10 the last date I see is 2010.
11   Have you published anything since then?
12   A. No.
13   Q. Is there any reason that you stopped
14 publishing in 2010?
15   A. Just busy.
16   Q. Which firearms-related periodicals have you
17 published articles in?
18   A. There are a couple that are listed -- at
19 least one that's listed there, "The Canadian
20 Marksman"; I've been published in the USPSA magazine,
21 which is a -- I think they send it out monthly; and
22 I've been published in "Recoil," which is also a
23 magazine.
24   I think as far as published magazines or
25 periodicals, that -- that's it.

Page 41

1    Q. What were the subjects of those articles?
2    A. The one in "Recoil" was specifically related
3 to AR15 failures. I tested a couple firearms to
4 failure and basically posted on or wrote about why
5 they failed and what the pressures were.
6    The one that was in USPSA, I know one of
7 them is related to lead bullets in Glocks, but I
8 couldn't tell you what the other -- what the other
9 ones were. They were a long time ago.
10   Q. Is there any reason you don't list those
11 articles?
12   A. I don't know where they are.
13   Q. I notice you have here "The Glock In
14 Competition."
15   Is that a book?
16   A. It is.
17   Q. Did you write this book?
18   A. I did not.
19   Q. Did you write a chapter --
20   A. I --
21   Q. I'm sorry. You can finish.
22   A. I wrote a chapter of that book.
23   Q. What was the subject of that chapter?
24   A. It was related to failures of Glocks
25 shooting lead bullets.

11 (Pages 38 - 41)

1    Q.  And what was the conclusion?
2    A.  That if you shoot too many bullets that are
3  lead based through a polygonal rifle barrel, the
4  pressure goes up, and you can cause a failure of the
5  pistol.
6    Q.  Is that relevant to this case?
7    A.  Not specifically, no.
8    Q.  At the top of your CV, there are three
9  practice areas listed.
10       Can you read them, please.
11    A.  I'm not sure where you're looking at.
12    Q.  You'll see there's a yellow box at the top
13  of your CV that says Exhibit MP0011.
14    A.  Yes.
15    Q.  Just to the right of that.
16    A.  Oh, mechanical, plumbing, and automotive.
17    Q.  And do all of the cases you previously
18  testified in involve those three practice areas?
19    A.  Yes -- yes, generally, they do.  There are a
20  few cases that I've worked on just -- just to be
21  transparent -- that are building envelope issues,
22  more related to water intrusion, and those are not
23  specifically educational areas that I have education
24  in, but they're areas that I worked on in one of my
25  prior companies that I have a lot of experience on.

1  I have a couple of clients that have continued to use
2  me in that area.
3    Q.  And would you see your testimony in this
4  case as falling into one of those areas?
5    A.  Yes.
6    Q.  Which would that be?
7    A.  Mechanical.
8    Q.  And how would that relate to the two areas
9  of expertise that you have identified as being
10  relevant in this case?
11    A.  Well, firearms are a mechanical system, just
12  like an engine is a mechanical system.
13    Q.  Does that relate to the estimates of the
14  number of firearms within the country?
15    A.  No.
16    Q.  All right.  Let's move down to the
17  automotive and mechanical systems section.
18       It says here you're a nationally recognized
19  expert in plumbing systems and component failures; is
20  that correct?
21    A.  Yes.
22    Q.  And how much -- what percentage of your work
23  would you say that accounts for?
24    A.  Today, maybe 20 percent.
25    Q.  All right.  And it says that you investigate

1  failures and performance problems on HVAC systems?
2    A.  Correct.
3    Q.  And roughly what percentage of your work
4  would you say that accounts for?
5    A.  I mean, I guess I would fold into that the
6  next line, which is also carbon monoxide.  And if you
7  look at HVAC and carbon monoxide, it's maybe 20, 25
8  percent.
9    Q.  And it says you have designed, built, and
10  driven race cars in competition?
11    A.  Yes.
12    Q.  That sounds pretty cool.  What -- does that
13  account for any of your current work?
14    A.  I'm sorry.  Can you say that again?
15    Q.  Sorry.
16       What percentage of your work would you say
17  that accounts for?
18    A.  I mean, today it -- it's sporadic.  I mean,
19  I've been asked to do reconstructions at race tracks
20  and on race cars, but there's not -- I would not say
21  it's a large percentage of my work.
22    Q.  Okay.  Did you do the SAE competition in
23  college?
24    A.  I did.
25    Q.  Very cool.  I always sort of regret not

1  having done that when I was in engineering school.
2       All right.  The last sentence of this
3  section says you have extensive knowledge related to
4  firearms, cartridge reloading, and shooting
5  incidents?
6    A.  Yes.
7    Q.  What is the nature of this experience?
8    A.  Well, I -- I have been shooting and hunting
9  since I was a small -- small person.  I thoroughly
10  enjoy firearms, and I shoot them and use them and
11  train with them in a variety of aspects.  I've loaded
12  over a million cartridges, I've shot over a million
13  rounds, and I both consult for law enforcement and do
14  shooting reconstructions as we prior -- talked about
15  prior.
16    Q.  Okay.  Does anything else in this resume
17  relate to firearms?  I think I hit everything.
18    A.  No.
19    Q.  Sorry.  No, nothing else relates to
20  firearms?
21    A.  No.
22    Q.  All right.  Under Work History, the first
23  item says that you've been president of Carbon Arms
24  Corp from 2011 to present; is that correct?
25    A.  Correct.

12 (Pages 42 - 45)

Page 46

1   Q.  What is Carbon Arms Corp?
2   A.  Within Carbon Arms Corp, I design and
3  manufacture specific accessories for shooting
4  competition and some -- some for hunting.
5   Q.  What particular items does Carbon Arms
6  design, manufacture, and/or sell?
7   A.  So shotgun shell loading, magazine tubes, I
8  have some compensators, I have a couple of parts that
9  actually go on an AR15, as far as the forward assist
10  elite.  And then I have a d/b/a, which is STRETCH
11  Precision, and I -- through STRETCH Precision, I
12  manufacture AR15 barrels.
13   Q.  Stretch Precision is a d/b/a.  So it's not a
14  separate company?
15   A.  It is -- it is complicated.  STRETCH
16  Precision is actually owned by a guy named Lou
17  Graves, and he stopped running it and basically just
18  gave me the company to run, and I pay him a
19  commission per barrel sold.
20   Q.  And to be clear, d/b/a is doing business as;
21  correct?
22   A.  Yes.
23   Q.  And for purposes of this conversation, I'll
24  refer to both of them together, but do either of
25  these companies design, manufacture, and/or sell

Page 47

1  complete guns?
2   A.  No.
3   Q.  Magazines?
4   A.  Up until 2013, yes.
5   Q.  And what happened in 2013?
6   A.  There was a law passed in Colorado,
7  restricting the manufacture, sale, and possession of
8  magazines over 15 rounds.
9   Q.  And all of the magazines that you produced
10  within these two companies were over 15 rounds?
11   A.  No.  I had -- I had variable capacities.
12   Q.  So why did you stop producing less than
13  15-round magazines?
14   A.  The majority of the magazines that I sold
15  were over 15 rounds, and it -- it was just -- became
16  a pain in the butt to do it; so I stopped.
17   Q.  Okay.  Do either of these two companies
18  design and manufacture and/or sell ammunition?
19   A.  No.
20   Q.  So other than the parts, the magazines,
21  which you no longer produce, and the accessories, is
22  there anything else that Carbon Arms does?
23   A.  Well, I do my training through Carbon Arms
24  Corp, yes.
25   Q.  Your training is also through Carbon Arms.

Page 48

1  Okay.
2      When you stopped producing magazines, how
3  much revenue did that account for?
4   A.  I don't know.  It was not a large component
5  of my total income, but I couldn't tell you a number.
6   Q.  Was it a large portion of your Carbon Arms's
7  revenue?
8   A.  At the time, no.  It was -- it was a smaller
9  portion.
10   Q.  Have you made any adjustments to what you
11  produce as a response to the ordinances being
12  challenged in this case?
13   A.  No.
14   Q.  Do you have an ownership stake in Carbon
15  Arms?
16   A.  I own Carbon Arms, yes.
17   Q.  And I believe, from what you said before,
18  you also own STRETCH Precision; is that correct?
19   A.  It -- it's -- I run STRETCH Precision as a
20  d/b/a, but the actual ownership of the name belongs
21  to Lou Graves.
22   Q.  So just to be clear, do you -- you license
23  the name, or you -- how does that relationship work?
24   A.  I run the company -- I actually run the
25  company.  So all the income, you know, the checking

Page 49

1  account, all that information is through the Carbon
2  Arms EIN, and I literally just pay him a per-barrel
3  royalty for each barrel, because he has a patent on
4  the barrel, and it's just simpler -- it was just
5  simpler for him to retain the ownership of the name
6  and the patent than to try to change all that.
7   Q.  Okay.  Understood.
8      Okay.  Do any of the other items under your
9  work history on your CV relate to firearms?
10   A.  No.
11   Q.  Under licensure and education, I see a line
12  that says, "master's level course work."
13      Do you have a master's degree?
14   A.  I do not.
15   Q.  So this is essentially that you started a
16  master's degree and didn't complete it?
17   A.  I did all the course work for a master's
18  degree and did not write a thesis.
19   Q.  Okay.  In addition to the two lines of
20  college experience listed on your CV, the B.S. in
21  mechanical engineering from University of Colorado,
22  Denver, and the master's level course work at the
23  University of Colorado, do you have any other college
24  experience?
25   A.  Yes, I did take two classes at Arapahoe

13 (Pages 46 - 49)

Page 50

1 Community College, and I couldn't tell you how many
2 classes, but I did take some classes at Metro at --
3 all at the same time.
4    Q.  Did you go to Colorado School of Mines?
5    A.  I did.
6    Q.  When was that?
7    A.  That was from 1985 until '88.
8    Q.  Did you earn a degree?
9    A.  I did not.
10    Q.  What did you study?
11    A.  Mechanical engineering.
12    Q.  And why did you end your course work there?
13    A.  Some of it was financial; some of it was
14 personal.
15    Q.  Okay.  And why do you not list this on your
16 CV?
17    A.  Because I didn't get a degree.
18    Q.  Okay.  All right.  Let's turn to the
19 firearms supplement.  So that's going to be in
20 Exhibit 2, your supplemental report.  And I believe
21 it's Page 6.
22    A.  Okay.
23    Q.  Is this supplement up to date?
24    A.  I believe so.
25    Q.  In sort of the middle of the page, you have

Page 51

1 a section that lists gun-related memberships and
2 offices.
3        Is this an up to date list?
4    A.  No.  So, I mean, it does say,
5 "Mr. Passamaneck holds or has held the following
6 memberships and/or offices."  I'm not the Action
7 Pistol Executive of the CSSA any more.
8    Q.  Okay.
9    A.  I'm no longer a member of IDPA, nor am I the
10 VP of Front Range IDPA.
11    Q.  Okay.  And with the possible exception of
12 the NRA, these are all organizations primarily
13 devoted to shooting; is that correct?
14    A.  Yes.
15    Q.  Am I correct that these are not professional
16 organizations?
17    A.  Correct.
18    Q.  And they're not scientific or engineering
19 organizations; correct?
20    A.  Correct.
21    Q.  And none of these organizations are
22 dedicated to studying the prevalence and/or role of
23 guns in society; is that correct?
24    A.  I don't know.  I haven't looked at anything
25 from the NRA in a long time.  They might do that.  I

Page 52

1 don't know.
2    Q.  So are any of these organizations directly
3 related to the two topics of expertise that you're
4 providing in this case?
5    A.  The NRA, like I said, may have some
6 information or data.  It's not something I reviewed,
7 though.  But I'm not going to say that they don't
8 have any relevance.
9    Q.  All right.  Have you ever served in the
10 military?
11    A.  No.
12    Q.  Have you ever served in the National Guard?
13    A.  No.
14    Q.  Have you ever worked in law enforcement?
15    A.  No.
16    Q.  How many guns do you own?
17    A.  I'm not going to answer that.
18        MR. VAN HEMMEN:  Barry, is there any basis
19 to not answer this, that you're aware of?
20        MR. ARRINGTON:  Yes.  Under Rule 26, the
21 scope of discovery is information that is relevant to
22 the claims or defenses in the case.
23        How many firearms an expert witness
24 personally owns, I don't see how that can be remotely
25 relevant to the -- to the claims and defenses in this

Page 53

1 case.
2        MR. VAN HEMMEN:  Well, he claims --
3        MR. ARRINGTON:  Furthermore, there --
4 it's -- there's an expectation of privacy and his
5 personal property, especially his security
6 arrangements and his own firearms, and to the extent
7 that you're trying to embarrass him, that would be
8 improper.
9        So I don't know why you would -- frankly,
10 I'm stunned that you would ask a question like that.
11        MR. VAN HEMMEN:  Well, I don't -- it has
12 nothing to do with embarrassment, but Mr. Passamaneck
13 is holding himself as having expertise in --
14 particularly in the areas of the overall prevalence
15 of guns in the country.
16        And, furthermore, it appears that most of
17 his supposed qualifications in that area have to do
18 with just being around guns, being around people that
19 have guns, and, I think that the -- his personal
20 ownership of guns is highly relevant to answering
21 that question.
22        MR. ARRINGTON:  Well, let's go off the
23 record.  I can consult with Mr. Passamaneck, and
24 we'll see what position he wants to take on that.
25        MR. VAN HEMMEN:  All right.  That works for

14 (Pages 50 - 53)

Page 54

1 me.
2      THE VIDEOGRAPHER:  This is the end of Media
3 Number 1.  Going off the record.  The time is 10:21.
4      (Recess taken.)
5      THE VIDEOGRAPHER:  We are back on the
6 record.  The time is 10:27.  This is the beginning of
7 Media Number 2.
8      MR. ARRINGTON:  Okay.  So I've spoken with
9 Mr. Passamaneck, and I will just renew the objection
10 that I articulated earlier, plus there's nothing in
11 his report that remotely indicates that his personal
12 firearm ownership at the moment is -- forms any sort
13 of the basis of his opinions; and, therefore, I don't
14 see how you can get into his personal affairs in this
15 deposition.
16      So I object to the questions.  I don't
17 represent Mr. Passamaneck.  He's a retained expert,
18 and he'll have to make his own decision about whether
19 to answer that question, but I do object to the
20 question.
21      MR. VAN HEMMEN:  All right.  Well, we -- we
22 are certainly of the opinion that there is no basis
23 to not answer this question.  Again, for the same
24 reason --
25      MR. ARRINGTON:  Do you have any authority

Page 55

1 for the proposition that you can inquire into a
2 retained expert's personal affairs in a deposition?
3      MR. VAN HEMMEN:  I'm inquiring into his
4 qualifications.  His qualifications to talk about the
5 prevalence of weapons appear largely to be based on
6 the fact that he considers himself a gun guy and is
7 within the gun-owning community.  And for that
8 reason, I believe this is highly relevant.
9      MR. ARRINGTON:  Well, so, one, he -- he is
10 familiar with the magazine market, having been a
11 producer of magazines.  And so I wouldn't just say
12 that his opinion is based strictly on the fact that
13 he's a gun guy.
14      But, you know what?  The number -- the
15 number and type of weapons that he personally owns
16 is -- is not a factor in developing opinions about
17 the prevalence of guns widely in society.  I mean,
18 that's -- that's -- I don't even see how that --
19 that's simply a non sequitur.
20      But, go ahead.  Make your record.
21      MR. VAN HEMMEN:  All right.
22 BY MR. VAN HEMMEN:
23      Q.  I believe this next question might provoke
24 the same response.
25      How many magazines do you own?

Page 56

1      A.  I -- again, I'm not going to answer that,
2 but I couldn't tell you.  I have no idea.
3      Q.  Okay.
4      MR. ARRINGTON:  And I think that is an
5 answer.  I mean, do you have --
6      Is the answer you don't know how many
7 personal magazines you have?
8      THE WITNESS:  I -- I don't know.  I know
9 it's a lot, but I don't know the number.
10      MR. ARRINGTON:  Okay.
11 BY MR. VAN HEMMEN:
12      Q.  Okay.  Would I be safe to assume that the
13 number of guns you own would be a similarly high
14 number?
15      A.  It -- it is likely over the average.
16 That's -- that's as far as I'll go.
17      Q.  Have you ever used a gun in self-defense?
18      A.  Have I ever fired a gun or used a gun?
19 Because there's a difference.
20      Q.  Okay.  Let's go with both questions.
21      A.  I have never fired a gun in self-defense.
22      Q.  In what respect have you used a gun in
23 self-defense?
24      A.  I have -- I have had a couple of occurrences
25 to have a firearm in my hand when I believed that my

Page 57

1 life was in jeopardy.
2      Q.  What were those circumstances in which you
3 believed your life was in jeopardy?
4      MR. ARRINGTON:  So can we stop right here?
5      How is this related to his opinions in this
6 case?  I mean, you've got some leeway, but he's not
7 offering opinions upon -- about self-defense.  He's
8 not offering opinions about the use of these
9 weapons -- these magazines or weapons.  He's offering
10 opinions about how many there are.
11      Why are you inquiring into his personal
12 affairs, Mr. Hemmen?
13      MR. VAN HEMMEN:  Again, Mr. Arrington, this
14 has to do with the fact that a lot of his
15 qualifications for the statistical portion of his
16 report seem to be based on language such as -- as
17 represented in use by competitors in competition or
18 through my participation in the firearms industry in
19 competition.
20      These are questions -- these are purported
21 qualifications that depend on his actual use and
22 experience with firearms.
23      MR. ARRINGTON:  So the record will reflect
24 that Mr. Hemmen was giggling as he said that,
25 obviously, trying to embarrass Mr. Passamaneck.

15 (Pages 54 - 57)

Page 58

1 Highly improper, highly unprofessional.  If you keep
2 up trying to embarrass him, Mr. Hemmen, we'll go to
3 Court.  Maintain your decorum.
4        MR. VAN HEMMEN:  I don't think that I --
5        MR. ARRINGTON:  You don't think giggling at
6 a deposition is unprofessional?  Well, let me tell
7 you, son, it is.
8        MR. VAN HEMMEN:  All right.  Thank you,
9 Mr. Arrington.  We'll move on.
10 BY MR. VAN HEMMEN:
11       Q.  Other than your work at Entropy Engineering
12 and at Carbon Arms/STRETCH Precision, do you have any
13 other sources of income?
14       A.  Yes.
15       Q.  What are the sources of income?
16       A.  I have actually been employed by National
17 Shooting Sports Foundation, and I will again at SHOT
18 Show.  I am part of management at SHOT Show.
19       I do photography for a local school, and
20 I -- again, through Carbon Arms, I'm not sure how you
21 phrased it, but through Carbon Arms, I do actually
22 firearms training.
23       Q.  And --
24       A.  Let me -- let me -- I am a head coach of
25 a -- of a high school shooting team, and I've done

Page 59

1 that volunteer.  But as of this year, there's going
2 to be a contract.  They've -- they said they're going
3 to pay me for it.  I haven't been paid before, but I
4 don't know where that -- I don't know how that falls
5 in your question.  I just want to be transparent
6 there.
7        Q.  Understood.
8        You might potentially in the future be paid
9 for coaching a shooting team; is that correct?
10       A.  Possibly, yes.
11       Q.  And the other item that you mentioned
12 before, that's related to you running shooting
13 competitions; is that correct?
14       A.  No.  I'm actually in -- I have, and I have
15 run shooting competitions for income, for pay.  I do
16 not do that any more.
17       When I said, "National Shooting Sports
18 Foundation," they have an industry event called the
19 national -- called the SHOT Show, and I actually run
20 the live fire ranges at SHOT Show.
21       You may not agree, but I'm uniquely
22 qualified, based on my experience, to actually run
23 and manage a live shoot -- the shoot houses at SHOT
24 Show, and I operate and run the entire live shoot
25 area.

Page 60

1        So I have police officers that work for me,
2 as well as people who do breathalyzers and range
3 officers.  I manage the whole thing.
4        Q.  I -- to be entirely clear, I'm very
5 impressed with that work.  I think that it is work
6 that would qualify you for a lot of things.  My
7 overall sense is that it doesn't qualify you for
8 coming up with an estimate of the number of firearms
9 in the country.
10       Do you believe that that is related to your
11 ability to estimate the number of firearms in the
12 country that fit these definitions?
13       A.  Well, I have six manufacturers who
14 manufacture firearms and magazines, and I talk to
15 them on a regular basis.
16       So, you know, say what you want, but, you
17 know, my experience as -- being involved in the
18 firearms industry, I talk to these guys all the time.
19 You can discount it, but --
20       Q.  Do your --
21       A.  -- it still -- it still happens.
22       Q.  So the nature -- the nature of this
23 qualification is that you have communications with
24 people who would have information relevant to this
25 question?

Page 61

1        A.  Yes, and I -- and we chat about it all the
2 time.
3        Q.  Do you have any qualifications to evaluate
4 that information?
5        A.  I mean, are you asking me if I -- if I ask
6 the people if they're telling me the truth?  No, I
7 don't ask them that.  I take their -- I take them at
8 their word.
9        Q.  Do you ask questions that would allow you to
10 evaluate how reliable their numbers are?
11       A.  I mean, it's a conversation.  I -- I don't
12 even know what you're trying to get at.
13       Q.  All right.  Do you have any sponsorships
14 related to your competitive shooting?
15       A.  I do.
16       Q.  And -- okay.
17       And what sponsorships would those be?
18       A.  Are you asking current or how many total, or
19 what are you asking?  Numbers?
20       Q.  Sure.  Current numbers.  How many?
21       A.  Currently I'm sponsored by two -- two
22 companies.
23       Q.  And which companies are those?
24       A.  Burris is a primary sponsor of mine, and
25 I've been sponsored by Burris for many, many years.

16 (Pages 58 - 61)

Page 62

1    Q. Okay. And the other?
2    A. Lucas Oil.
3    Q. Okay.
4    A. I don't -- I don't know that they're going
5  to -- I don't know if I'm going to be sponsored by
6  them in the future, but I have been for the last
7  eight, nine years.
8    Q. Have you ever participated in a competition
9  within Boulder County?
10    A. Yes.
11    Q. Would you expect there to be an effect on
12  your competitions if these challenged ordinances go
13  into effect?
14    A. I don't know.
15    Q. As the State -- the law in the State case
16  that we discussed earlier, has that had an effect on
17  your competitions?
18    A. Yes.
19    Q. What is that effect?
20    A. Several regional and national-level matches
21  have been cancelled in the State of Colorado as a
22  direct result of the state magazine ban.
23    Q. All right.
24       Matt, can you pull up Tab 14, please.
25       (Exhibit 12 was identified.)

Page 63

1  BY MR. VAN HEMMEN:
2    Q. While that's loading, have you ever
3  testified in a State Senate committee meeting in
4  support of a gun bill?
5    A. In support of? I think I testified in
6  opposition to.
7    Q. Okay. Exhibit 12, when it comes up. Let me
8  know when you have it open.
9    A. It's open.
10    Q. All right. Do you see that it says, "Staff
11  Summary of Meeting of the Senate Committee on the
12  Judiciary"?
13    A. I do.
14    Q. Dated March 9, 2015?
15    A. Yes.
16    Q. And if you scroll down to the second page at
17  2:07 PM, it says, "Mr. Mark Passamaneck, representing
18  himself, testified in support of the bill.
19  Mr. Passamaneck discussed firearms competitions that
20  he runs. He stated he has had to hold some
21  competitions out of Colorado due to the ban on
22  certain ammunitions magazines in Colorado.
23  Mr. Passamaneck also discussed the effect of the law
24  on the operability of magazines."
25    A. I see that.

Page 64

1    Q. Is that -- that Mr. Passamaneck is you? Is
2  that -- that's referring to you?
3    A. Yes, I believe it is.
4    Q. Okay. And is that an accurate description
5  of what you represented?
6    A. I believe so. This -- this is the repeal of
7  the bill. Is that -- give me a second, and let me
8  look at it.
9    Q. In terms of supporting the bill, is that --
10    A. Yeah.
11    Q. -- what --
12    A. This is a -- this is a bill that was
13  repealing -- or sought to repeal the magazine ban.
14    Q. That's right.
15    A. Yes.
16    Q. Were -- were you looking at something to
17  confirm that?
18    A. I looked up at the very top when it
19  said, "Cosponsors or coprime sponsors presenting the
20  Bill 15175 for certain repealing certain provisions."
21    Q. Okay.
22    A. I did testify in 2013 as well.
23    Q. All right. When it says representing
24  yourself, that means that you reached out to the
25  committee to testify on this?

Page 65

1    A. No. Somebody called and asked -- I don't
2  know if it was someone from the NRA or somebody from
3  one of the Senator's office, but they actually called
4  me and asked me if I would testify.
5    Q. All right. Thank you.
6       Would you expect that the challenged
7  ordinances in this case would have a similar effect
8  to that that you mentioned in this testimony?
9    A. Yes.
10    Q. Okay. Are you a member of Rocky Mountain
11  Gun Owners?
12    A. I am not.
13    Q. Have you ever been a member of Rocky
14  Mountain Gun Owners?
15    A. No.
16    Q. Do you know anyone in the leadership of
17  Rocky Mountain Gun Owners?
18    A. I do.
19    Q. Who is that?
20    A. I know Mr. Brown.
21    Q. How long have you known him?
22    A. I don't know. I've known of him for a long
23  time. Personally met him? I'm not sure that it
24  wasn't initially in the -- the law challenging Rocky
25  Mountain Gun Owners versus Hickenlooper. That's

Page 66

1  probably the first time I met him in person.
2      Q.  And what is the nature of your relationship?
3      A.  I'm an acquaintance of his.  I -- he's an
4  acquaintance of mine.  I know who he is.  We don't
5  hang out together.  I just know who he is.
6      Q.  Have you worked together?
7      A.  Rocky Mountain Gun Owners did pay -- did pay
8  me for my work, yes.
9      Q.  Okay.  Are you a member of the National
10 Association For Gun Rights?
11     A.  I am not.
12     Q.  Have you ever been a member of the National
13 Association For Gun Rights?
14     A.  No.
15     Q.  Do you know anyone in the leadership of the
16 National Association For Gun Rights?
17     A.  Unless it's also Dudley Brown, no.
18     Q.  All right.  Let's turn to the substance of
19 your reports now.
20        If you could go to Tab 1 -- or sorry,
21 Exhibit 1, which is also Tab 1.
22     A.  I have it open.
23     Q.  Okay.  At the start of your report itself,
24 which is on Page 3, the first sentence says, "At your
25 request, Entropy Engineering Corporation has

Page 67

1  evaluated portions of the case referenced above"; is
2  that correct?
3      A.  It is.
4      Q.  And were you hired through Entropy
5  Engineering Corporation or in your personal capacity?
6      A.  Through Entropy.
7      Q.  The next sentence says, "The purpose of this
8  report is to provide expert opinions on matters for
9  which the author is qualified and has extensive
10 knowledge."
11        Does the report aim to answer any particular
12 questions?
13     A.  Well, they are questions related to the
14 ownership, which is in the first portion, and then
15 questions related to magazines, which are the last
16 couple of paragraphs.
17     Q.  Are you offering an opinion as to the answer
18 to any particular question, or are you just generally
19 putting out knowledge on certain topics?
20     A.  It's knowledge that is relevant to the case,
21 and we already established that I wrote this report
22 related to the State case, and it was filed in the
23 municipal cases.  So that is part of the reason why I
24 wrote the supplemental report.
25     Q.  All right.  So are there any -- what

Page 68

1  particular expert opinions or conclusions do you
2  reach within this report?
3      A.  Are you asking me to read my report to you
4  or -- I mean --
5      Q.  I'm saying so, as opposed to stating your
6  reasoning or support for your conclusions, are there
7  any particular conclusions that you reached in this
8  report?
9      A.  Yes.  I mean, I'll go through and read it
10 for you, if you'd like me to.  But, I mean, they're
11 all -- they're all established in the discussion
12 section.
13     Q.  Okay.  You have any other expert opinions
14 related to this case that are not contained within
15 either of these reports?
16     A.  No.
17     Q.  Okay.  The first sentence of the discussion
18 section says, "Standard capacity magazines, as
19 originally designed, manufactured, and sold within
20 the State of Colorado are commonly possessed and used
21 for lawful purposes."
22        So we're all on the same page, I just want
23 to clarify what you mean here with certain terms.
24        First of all, how do you define "standard
25 capacity magazines"?

Page 69

1      A.  They are the original design capacity that
2  the manufacturer intended.  So it's variable.
3      Q.  How would -- how would you determine whether
4  a magazine is standard capacity or not?
5      A.  It depends on the design of the firearm and
6  how -- what the manufacturer designed.
7      Q.  I mean, I'm not -- I'm not asking for a
8  particular number of rounds.  I'm saying, if you were
9  to look at a magazine, how would you determine
10 what -- whether it's standard capacity or not?
11     A.  You're -- there's different answers based on
12 the type of firearm.
13     Q.  So for any particular magazine, there is no
14 answer -- tentative answer as to whether or not it is
15 a standard capacity magazine?
16     A.  I mean, I -- I'm not trying to be obtuse,
17 but you're not asking the right questions.  If you
18 ask the right questions, I'll give you an answer.
19 But you're asking a general question that cannot be
20 answered.
21     Q.  Okay.  So how about a hypothetical?  If I
22 were to put a magazine in front of you, say on the
23 table, and say, "Is this a standard-capacity
24 magazine?" would you be able to answer that question?
25     A.  Most likely, yes.

18 (Pages 66 - 69)

Page 70

1   Q. How would you answer that question?
2   A. It would depend on the type of firearm it
3 went in and what the actual capacity is.
4   Q. What would your methodology for determining
5 whether that is a standard-capacity magazine be?
6   A. Visual observations and whether or not there
7 are blocks in it or other means to limit the
8 capacity.
9   Q. And once you visually looked at it and saw
10 whether there are blocks in it or not, how would you
11 then know whether or not it is a standard-capacity
12 magazine?
13   A. I would know what the round count is, and I
14 would be able to understand what firearm it came
15 from, and what the capacity was.
16   Q. Are you saying for any particular firearm,
17 there is -- I suppose with a detachable magazine,
18 there is one standard capacity associated with that
19 firearm?
20   A. Typically, yes.
21   Q. And if a firearm is offered with multiple
22 different types of magazines of different capacities,
23 would each of those be a standard-capacity magazine?
24   A. Not necessarily, no.
25   Q. And in what situation would it not be?

Page 71

1   A. Well, there are -- there are -- because of
2 the magazine capacity laws that have been passed,
3 manufacturers have started to limit capacity within
4 the normal size of the magazine body itself.
5       So just because -- just because a round --
6 or a magazine is offered with a certain number of
7 rounds below the maximum capacity of the magazine
8 body itself does not mean that that's standard. That
9 means that an after -- it's not an after market, but
10 to that is something that was designed after the
11 original design of the firearm.
12   Q. You used this term as equivalent to
13 large-capacity magazines?
14   A. Standard could -- standard could be large.
15 It could be small. It depends on the firearm.
16   Q. Do you -- how would you define
17 large-capacity magazines?
18   A. I -- there's not a definition, other than
19 what has been politicized. I'm sorry. It's a
20 political term, saying, "large capacity magazine."
21 Who defines what large is? It's -- it's not a --
22 it's not engineering term. It's not a firearms
23 industry term. It is -- it's another term.
24       So unless you can show me a legal definition
25 of it, I don't know what it -- what it means.

Page 72

1   Q. Are you familiar with the ordinances at the
2 center of this case?
3   A. Familiar? Yes.
4   Q. Have you reviewed them enough to know what
5 their definition of a large capacity magazine is?
6   A. No. I mean, I generally can answer it, but,
7 no, I would have to go back and actually look at it
8 and make sure I understood exactly what their
9 specification was.
10   Q. Do you know the number of rounds that these
11 ordinances define as large-capacity magazine?
12   A. I think generally the ordinances, from what
13 I recall in the state, is 15 or -- or is over 15, and
14 in the municipal cases, it's over 10.
15   Q. Thank you.
16       And so would you consider that a legal
17 definition of large-capacity magazines?
18   A. No.
19   Q. Why would you not?
20   A. Because it's ambiguous.
21   Q. Can you please elaborate on that?
22   A. It's a number that somebody decided that's
23 the number. I mean, there's no basis in engineering
24 or mechanics that says, "Large is over ten, and small
25 is under ten." It's a -- it's a made-up term.

Page 73

1   Q. Are you disputing that -- are you disputing
2 that within these towns, magazines larger than ten
3 rounds are considered large capacity magazines?
4       MR. ARRINGTON: I'm going to object to the
5 form of the question, and in particular the form of
6 the question that includes the giggles, again.
7       Counsel, stop giggling at the witness. If
8 you -- if you can't refrain from giggling at the
9 witness and trying to embarrass him, we're going to
10 go to the Court, and we're going to have a protective
11 order. And if the protective order needs to
12 say, "Lawyers shouldn't giggle at witnesses," that's
13 what it's going to say.
14       MR. VAN HEMMEN: Thank you, Barry.
15       THE WITNESS: You asked a question. My
16 answer is that they have defined -- or within
17 ordinances, they have defined that number. It's
18 irrelevant to me. It's -- it's an ambiguous
19 definition.
20 BY MR. VAN HEMMEN:
21   Q. Is it relevant to this report?
22   A. It -- the number is relevant, yes. But
23 the -- I mean, there are standard-capacity magazines
24 that are six, eight, ten, twelve, thirteen. I mean,
25 I don't see anywhere -- I've never seen anywhere that

19 (Pages 70 - 73)

Page 74

1 defines, once you go over a certain number, it's
2 large until this whole thing became a political
3 issue, in terms of magazine capacity restrictions.
4        So you can define it.  I mean, I'm willing
5 to say that, yes, the ordinances say that over ten,
6 they define as large capacity.  I just don't think
7 it's a relevant.  It's not a real term.
8    Q.  Is whether a magazine is standard capacity
9 relevant to this report?
10   A.  Yes.
11   Q.  How so?
12   A.  Standard is as its originally designed and
13 manufactured.  That's what the report says.  It's
14 what I answered.
15   Q.  Is that relevant to your opinions in this
16 report?
17   A.  In some cases, yes.  In some cases, no.
18   Q.  Okay.  What do you mean in this sentence
19 that we were starting on the first sentence of the
20 discussion, by "As originally designed, manufactured,
21 and sold within the state of Colorado"?
22   A.  Exactly what it means.  Those words -- I
23 mean, you can look up the definitions, but the words
24 are what they are.  I don't mean anything other than
25 exactly what I said.

Page 75

1    Q.  Sure.
2        Is this being -- is this phrase defining
3 standard-capacity magazines?
4    A.  No.
5    Q.  What is this phrase modifying in this
6 sentence?
7    A.  What do you mean what is it modifying?  It's
8 not modifying anything.
9    Q.  Is this saying that -- okay.  So this
10 sentence is saying, "Standard capacity magazines are
11 commonly possessed and used for lawful purposes."  Is
12 that middle part of the sentence conveying additional
13 information?
14   A.  Yes.
15   Q.  And what is the middle part of that sentence
16 changing about, as opposed to just saying,
17 "Standard-capacity magazines are commonly possessed
18 and used for lawful purposes"?
19   A.  Because it's how they're designed and
20 manufactured and then sold.
21   Q.  Okay.  What do you mean by "commonly
22 possessed and used for lawful purposes"?
23   A.  Exactly what the words mean.  They're
24 possessed by people in the state of Colorado, and
25 they're lawfully used on a regular basis.

Page 76

1    Q.  Are "possessed" and "used" two different
2 things?
3    A.  Yes, they are.
4    Q.  And am I correct that the number of firearms
5 possessed would be different than the number of
6 firearms used?
7    A.  I thought we were talking about magazines.
8    Q.  Sure.
9        Would the number of magazines possessed be
10 different from the number of magazines used?
11   A.  Sure.  Yes.
12   Q.  All right.  The next sentence in your report
13 says, "Millions of Americans own and use AR15-style
14 rifles."
15       Again, I want to start by talking about some
16 terms.
17       What do you mean by "Americans"?
18   A.  People that are in America.
19   Q.  Okay.  In other places in your report, you
20 use the term "U.S. citizens."
21       Are you using these as equivalents?
22   A.  Yes.
23   Q.  Are you including law enforcement officers
24 within "Americans"?
25   A.  Absolutely.

Page 77

1    Q.  Are you including retailers and/or
2 wholesalers within Americans?
3    A.  Yes.
4    Q.  Are you including people who cannot legally
5 own firearms?  For example, felons?
6    A.  No.  I mean, I'm sure they own them, but I'm
7 not -- that has nothing to do with my initial
8 sentence that says, "Commonly possessed and used for
9 lawful purposes."
10       I'm not trying to say that felons don't own
11 them.
12   Q.  Are you -- when -- when within your report
13 you say, "X number of Americans own Y," within that
14 number, do you adjust for people who cannot legally
15 own firearms?
16   A.  No.
17   Q.  Do you adjust for retailers and wholesalers?
18   A.  No.
19   Q.  Do you adjust for whether those -- some
20 subset of those people are law enforcement officers?
21   A.  No.
22   Q.  Okay.  Is the "own" in this sentence used
23 differently than the "possessed" used in the previous
24 sentence?
25   A.  No.

20 (Pages 74 - 77)

1   Q.  So you use "own" and "possess" as
2 equivalents throughout your report?
3   A.  Yes.
4   Q.  How do you define "AR15-style rifles"?
5   A.  They are a rifle that is generally based on
6 the original design by Eugene Stoner.
7   Q.  When -- you occasionally, within your two
8 reports, use the term "AR15 or AR15s," and other time
9 you use "AR15-style rifles."
10     Are these equivalent terms to you?
11   A.  Yes.
12   Q.  Does your definition of the term "AR15-style
13 rifles" match the definitions of assault weapons used
14 in the ordinances relevant to this case?
15   A.  Likely they do.
16   Q.  Are the weapons covered by your definition
17 of AR15-style rifles a subset of the term "assault
18 weapons" covered by the ordinances?
19   A.  Yes.
20   Q.  Are there AR15-style rifles that would not
21 fall under the scope of the ordinances?
22   A.  I don't know.
23   Q.  That's because you haven't compared the
24 definition within the ordinances to your definition
25 of AR15-style rifles?

1   A.  No, because there's some -- there's
2 ambiguity.  We know that when certain laws are
3 passed, that there are manufacturers that will change
4 the features in order to bypass whatever laws or
5 ordinances are written so that their firearms can
6 still be sold.  They're still an AR15-style rifle,
7 even if the features have been changed.
8     So it's -- again, it's an ambiguous
9 question.
10   Q.  In your supplemental report, you also use
11 the term "modern sporting rifle" or MSR.
12     How does that definition relate to the
13 definitions of AR15-style rifle?
14   A.  Generally both the NRA and National Shooting
15 Sports Foundation sought to get away from the term or
16 not use the term "assault rifles," and so
17 politically, they started using the term "modern
18 sporting rifle."
19     Again, it's a political term.  The -- the
20 MSR is probably a larger umbrella to firearms that
21 fall under general terms, which -- within the
22 ordinances would be listed as assault rifles, and not
23 specifically just AR15s.  But if you look at their
24 publications, the AR15, every time they talk about
25 the MSR, it is the AR15.

1     And when I spoke to Mr. Fatohi directly, I
2 said, "Can you give me a number, can you give me some
3 term, where I can separate AR15 style from MSR?"
4     He said, "No, we don't have any way to do
5 that specifically."
6     But most of the -- most of the firearms that
7 they have under the term "modern sporting rifle," the
8 vast, vast majority of them are AR15-style rifles.
9   Q.  Would all AR15-style rifles be considered
10 modern sporting rifles?
11   A.  Maybe.  I mean, again, there's manufacturers
12 that are coming out with all kinds of odd things all
13 the time.  I mean, there -- there is an AR15-style
14 rifle that uses a conventional buttstock and
15 eliminates the gas tube.  It's still an AR15-style
16 rifle, but it would not be under several of the
17 ordinances or laws that have been passed banning,
18 quote, "assault rifles."
19   Q.  So assault -- "assault weapons" as defined
20 within these ordinances are likely a subset of modern
21 sporting rifles?
22     Is that what you're saying?
23   A.  That's probably the same -- probably the
24 same.
25   Q.  So would you consider -- okay.  I think that

1 answers it.
2     All right.  One more question, I guess:
3 Would rifles based on the AK standard be considered
4 modern sporting rifles?
5   A.  Are you talking AK-47s and AK-74s?
6   Q.  Yes.
7   A.  Most likely, yes.
8   Q.  Okay.  So it is a more inclusive category
9 than AR15-style rifle; is that correct?
10   A.  Yes.
11   Q.  So between your initial and supplemental
12 reports, you appear to cite five studies and other
13 materials in your calculations of, A, the number of
14 AR15-style rifles in the United States; and, B, the
15 number of owners of AR15-style rifles in the United
16 States.
17     Did you review any studies for other
18 materials considering the number of users of
19 AR15-style rifles in the United States?
20   A.  No, not specifically.  There are some police
21 officers who use AR15-style rifles that are issued to
22 them by the department so they do not own them, but
23 that is a fairly small subset.
24   Q.  But there would -- would there be owners of
25 AR15-style rifles who don't use AR15-style rifles?

21 (Pages 78 - 81)

Page 82

1   A. Sure.
2   Q. And you didn't review any studies or other
3   materials, considering the number of users of
4   AR15-style rifles in the United States?
5   A. No.
6   Q. Is that correct?
7       What is your basis for stating, then, that
8   millions of Americans use AR15-style rifles?
9   A. Because they do. I mean, there's -- if you
10  look at the various types of competition, as well
11  as -- as law enforcement, there's millions of
12  Americans that use them in those ways on a regular
13  basis. Some additionally use them for home defense.
14      So "use" does not necessarily mean that they
15  fire them, but they have them as defensive weapons,
16  or they use them in competition, or they use them for
17  self-defense. Some also use them for hunting.
18  Q. And do you have a basis for stating that
19  those categories of people combined would be in the
20  millions?
21  A. Well, yes. I mean, that's using the NSSF
22  and the English report to some degree, and then also
23  knowing personally and understanding how many people
24  actually compete and hunt and use those types of
25  firearms for self-defense.

Page 83

1   Q. Do you know whether the challenged
2   ordinances exclude police officers from the
3   restrictions on assault weapons?
4   A. I -- I don't -- I couldn't tell you exactly
5   what it says. I think there's some exclusions for
6   law enforcement and military.
7   Q. Are you offering any opinion in this case on
8   the prevalence of use of assault weapons as would be
9   affected by the ordinances relevant to this case?
10  A. I'm -- can you restate that?
11  Q. Sure.
12      Are you offering an opinion in this case as
13  to the prevalence of use of the weapons defined in
14  this case as assault weapons?
15  A. I mean, there's several -- there's several
16  components to that. I mean, one is that, yes, there
17  are some people that are not going to use them as a
18  result of this law or ordinance or not buy them.
19      There's other people that are going to use
20  them regardless. So, as you just said, I mean, I
21  don't think that the -- I'm not seeing anything that
22  the police in these cities are going to give up their
23  AR15s, and there's likely civilians that will not as
24  well. That may make them run afoul of the law, but
25  I'm -- I'm not going to -- I'm not going to sit here

Page 84

1   and tell you that I can psychoanalyze all the
2   different groups of people and tell you who's going
3   to comply, and who's not going to comply, and who's
4   going to get rid of their guns, and who's going to
5   keep them. I have no idea.
6   Q. Are you -- is the fact that police officers
7   and departments own and use AR15-style rifles a
8   significant piece of getting comfortable with the
9   idea that millions of Americans use AR15-style
10  rifles?
11  A. Well, they -- they are -- they are
12  Americans. I mean, for the most part, I mean, yeah,
13  there's probably some jurisdiction that allow people
14  who are not Americans to be police officers, but I'm
15  not aware of those in Colorado.
16      So, I mean, yes, they are a subset of
17  Americans.
18  Q. Are you -- what is your impression of the
19  portion of these millions of Americans that use
20  AR15-style rifles that consists of law enforcement
21  officers?
22  A. I'm not even sure what you're asking.
23  Q. How many law enforcement officers do you
24  believe in this country use AR15-style rifles?
25  A. I don't know.

Page 85

1       MR. ARRINGTON: Counsel, is this a good time
2   to take a break? We've been going for two hours and
3   15 minutes.
4       MR. VAN HEMMEN: Yeah, I think it's a good
5   time.
6       THE VIDEOGRAPHER: This is the end of Media
7   Number 2. Going off the record. The time is 11:15.
8       (Lunch recess taken.)
9       THE VIDEOGRAPHER: We are back on the
10  record. The time is 11:49. This is the beginning of
11  Media Number 3.
12      MR. VAN HEMMEN: Thank you.
13  BY MR. VAN HEMMEN:
14  Q. So before the break, we were discussing the
15  use of AR15-style rifles.
16      Regarding the ownership of AR15-style
17  rifles, from your two reports, you appear to rely on
18  five sources. And I'm just going to go through them
19  and make sure that I -- I have them right.
20      For the total number of guns in circulation,
21  I believe you cite the NSSF 2022 industry report,
22  which is attached to your supplemental report, and
23  then also the NSSF 2020 industry report, which -- it
24  sounds like you intended to attach to your initial
25  report, but we just pulled it from the website,

22 (Pages 82 - 85)

Page 86

1 because we didn't have it.
2      And then Matt should be marking that now as
3 Exhibit 13, I believe.
4      (Exhibit 13 was identified.)
5 BY MR. VAN HEMMEN:
6      Q. There it is. If you could just open it and
7 confirm that this is the correct report.
8      MR. ARRINGTON: What is it? Is there an
9 exhibit number?
10      MR. VAN HEMMEN: Sorry. I thought I said
11 it. Exhibit 13.
12      THE WITNESS: Yes, I have that open,
13 18 pages, and it's marked MP0013.
14 BY MR. VAN HEMMEN:
15      Q. Yes.
16      And so they unfortunately don't put the year
17 at the top of the report, but you can see in -- at
18 the very bottom of the report, you can see it appears
19 to be copyrighted in 2020. This is the --
20      MR. ARRINGTON: If we could go off the
21 record for a moment. Gordon is having difficulties.
22      MR. VAN HEMMEN: Yeah.
23      THE VIDEOGRAPHER: Going off the record.
24 The time is 11:53.
25      (Recess taken.)

Page 87

1      THE VIDEOGRAPHER: We are back on the
2 record. The time is 11:56.
3 BY MR. VAN HEMMEN:
4      Q. We were looking at Exhibit 13, and at the
5 bottom, I just asked you to confirm that it says
6 "Copyright 2020, National Shooting Sports Foundation,
7 Incorporated."
8      A. It does.
9      Q. Okay. This is the NSSF report that you
10 referred to in your initial report?
11      A. Yes.
12      Q. This and the other 2020 industry report, you
13 both use for number of guns and number of magazines;
14 is that correct?
15      A. It's not the other 2020 report. It --
16      Q. I'm sorry.
17      A. The one that we have open in Exhibit 13 is
18 1991 to 2018, and it's titled "The 2020 report." The
19 second one is the 2022 report that includes up
20 through up through 2020, as far as numbers.
21      Q. Thank you. I misspoke. I appreciate the
22 correction.
23      But these are the -- these are your two
24 sources for the number of guns or magazines as
25 opposed to numbers of owners; is that correct?

Page 88

1      A. Yes.
2      Q. All right. For number of owners, I count
3 three sources. The first is a 2022 Washington Post
4 survey, which Matt, I believe, will be marking now as
5 Exhibit 14.
6      (Exhibit 14 was identified.)
7 BY MR. VAN HEMMEN:
8      Q. And I just want you to take a look and
9 confirm that this is the one you were using because
10 there wasn't a full citation. So this just appears
11 to be a Washington Post article in 2022 on this
12 topic.
13      And it should be there now, Exhibit 14.
14      A. Yes. Give me one second.
15      I think that's -- I think that's correct.
16      Q. Okay. Thank you.
17      A. The format looks different -- the format
18 looks different, but --
19      Q. Yeah, I think it's got --
20      A. -- it's got the numbers in there, but there
21 is something different about the formatting.
22      Q. Yeah. I think what happens is some of these
23 websites for these news organizations use weird
24 formatting that doesn't print well.
25      A. Yeah. And if you look at -- give me a

Page 89

1 second.
2      If you look at Page 1, it says, "The survey
3 found," and so I think this is a summary of their
4 survey, because it's definitely a different format.
5      Q. Okay. So you believe that your source was
6 the survey that is linked to at the top of, I think
7 it's Page 2?
8      A. Well, yeah. I can't click it. It's a .pdf.
9      Q. I understand. I understand.
10      A. But I believe so.
11      Q. Okay. Thank you.
12      And now Matt should be putting up Exhibit
13 Number 14 -- or 15. And this, I believe, is the same
14 as -- is the same report that you noted -- that you
15 attached that didn't come through to us with your
16 initial report and that Barry sent to us. It should
17 be Exhibit 15, and when it comes up, it should say at
18 the top "2021 National Firearms Survey."
19      (Exhibit 15 was identified.)
20      THE WITNESS: Yes, that is correct. I think
21 that is the right one.
22 BY MR. VAN HEMMEN:
23      Q. All right. And both this and the Washington
24 Post survey concerned number of owners, as opposed to
25 number of units, guns, or magazines?

23 (Pages 86 - 89)

Page 90

1     A. Correct.
2     Q. Is that correct?
3        The last source that I see in your report is
4  a 2020 statement by NSSF president and CEO Joseph
5  Bartozzi. I'm not quite sure what this was.
6        Was this in a speech of some sort?
7     A. My -- give me one second.
8        My understanding, from talking to Salam
9  Fatohi, was that that was in an article that they
10 have since pulled, and he did not have access to it
11 when I talked to him.
12       And I had looked at it, I had bookmarked it,
13 but I went to open the bookmark, and it -- it's
14 not -- it wasn't there. It was a bad link.
15       So he's not sure why they pulled it exactly,
16 but I can't verify that document at this time.
17    Q. Okay. Is there -- do you have any
18 information that would allow us to identify this?
19    A. Only that it was in an article that the NSSF
20 had on their website.
21    Q. And, to your knowledge, there's no longer a
22 copy of this?
23    A. That's correct.
24    Q. Okay. All right.
25       And this statement also applied to the

Page 91

1  number of owners of weapons as opposed to the number
2  of individual --
3     A. Can you refer me to -- are you
4     Q. Sure.
5     A. -- talking about my report now?
6     Q. Yeah. Let's go back to your report. This
7  will be Tab -- or Exhibit 1.
8     A. Okay.
9     Q. And if we go down to the discussion section
10 after the sentence starting, "A Washington Post
11 survey."
12    A. Yes.
13    Q. It says, "A Washington Post survey in 2022,
14 numbers the owners of AR15s at 16 million, while the
15 2020 number was almost 20 million, according to NSSF
16 president and CEO Joseph Bartozzi."
17    A. Yes.
18    Q. So that -- it says, "While the 2020 number,"
19 which seems to point back to numbers the owners of
20 AR15s.
21    A. Correct.
22    Q. So this is -- okay. So to go back to the
23 original question, this statement by Joseph Bartozzi
24 that there are 20 million refers to owners as opposed
25 of AR15s?

Page 92

1     A. I believe so, yes.
2     Q. And that's your recollection because you no
3  longer have the copy of the source?
4     A. Unfortunately, that's correct.
5     Q. Okay. Did I miss any other sources
6  regarding your count of AR15s?
7     A. No.
8        MR. ARRINGTON: Well, you did refer to
9  the -- his conversation with Mr. Bartozzi where he
10 did confirm making the statement. Are you not
11 counting that as a source?
12       MR. VAN HEMMEN: No.
13       MR. ARRINGTON: Okay. Well, never mind.
14       MR. VAN HEMMEN: Okay.
15 BY MR. VAN HEMMEN:
16    Q. Why would you not count that as a source?
17    A. I did not talk to Mr. Bartozzi directly. I
18 talked to Mr. Fatohi, who is not Mr. Bartozzi.
19    Q. Thank you.
20       There is also a mention of a 2018 NSSF
21 estimate of the number of semiautomatic handguns. I
22 believe that's just referring to the 2020 report,
23 because the dataset for the 2020 report ends in 2018.
24       Is that your recollection as well?
25    A. Where are you in my report?

Page 93

1     Q. Sure.
2        This is on Page 2 in sort of the middle of
3  that top portion of a paragraph that says, "The
4  2018 NSSF estimate of semiautomatic handguns is
5  89 million."
6     A. Yes. That would -- that would refer to the
7  2020 report.
8     Q. Excellent. Okay.
9        Other than the five sources we just went
10 over, did anything else go into your opinion as to
11 the number of AR15-style rifles or owners in the
12 United States?
13    A. Not a -- not a reference or a source, no.
14    Q. All right. We'll come back to those named
15 sources as we go on. But your reports also make a
16 number of statements where the sources are included.
17 So I'd just like to run through them and tie them to
18 the appropriate source.
19       So in your initial report, at the bottom of
20 the first page, you write, "It is estimated that
21 8 to 9 million AR15s were owned by U.S. citizens
22 prior to 1990, and the total number of semiautomatic
23 rifles owned in the U.S. 2018 had just over 43
24 million."
25       Is there a source for that in your initial

24 (Pages 90 - 93)

1 report?
2     A.  The 2018 number is from the NSSF report.
3 The 8 to 9 million is -- is an estimate that I have
4 come up with based on various pieces of information
5 that I understand and know, such as talked about in
6 the supplemental report, whereas Colt prior to that
7 time had manufactured about 2 million rifles -- or,
8 I'm sorry, 2 million AR15s.
9     Q.  All right.  If we go to Exhibit 2, which is
10 your supplemental report.
11     A.  Okay.
12     Q.  You state at -- let me find the right spot.
13 On Page 2, halfway down the first section of
14 paragraph, it says, "The estimate of 8 to
15 9 million AR15-style rifles in the U.S. prior to 1990
16 is based on this author's experience and
17 participation in the firearms industry and
18 competition with the AR15 style of rifles."
19        Is that the same 8 to 9 million as in your
20 initial report?
21     A.  Yes.
22     Q.  And how -- how do you get to 8 and 9 million
23 through experience and participation in the firearms
24 industry and competition with the AR15 style of
25 rifles?

1     A.  Well, there's a couple of things:  One, the
2 Colt number prior to that is around 2 million.
3 There are various sources where you can go and look
4 up and -- for serial number research projects.
5        For instance, if you go to Glock Talk, which
6 is an online forum, you can look through Glock Talk,
7 and you can look at serial numbers, and you can start
8 to add up how many firearms are owned.
9        Colt and Bushmaster, there are several of
10 these forums out there where you can look at serial
11 numbers and start to add up numbers, based on the
12 serial numbers manufactured and the methods that the
13 manufacturers use to mark those.
14        In addition, there are numerous
15 manufacturers that are no longer in business.  For
16 instance, Del-Ton is no longer in business.  They
17 manufactured firearms in that time frame.  We don't
18 know what the numbers were.  But when you go to
19 high-power competition, and you go to three-gun
20 competitions, and you look at the firearms that are
21 represented, it's -- there is some data there to be
22 looked at and said, "Okay.  If these firearms are
23 showing up in the hands of competitors, they're
24 obviously manufactured and are available."
25     Q.  Do you consider the set of firearms used in

1 competitions to be representative of the total
2 population of AR15s?
3     A.  No.
4     Q.  Is that because it would be more likely at
5 competitions that there would be rare or specialized
6 rifles?
7     A.  Not necessarily rare or specialized.
8 Configured differently, but, I mean, a standard
9 16-inch AR15 is a very common rifle to be used in
10 three-gun competition or even high-power competition.
11        You know, people accessorize them, but you
12 also have a couple other factors that are ignored in
13 all of the data from NSSF, and that is that lower
14 receivers and upper receivers can be bought
15 independently, and those are not classified as rifles
16 when they're sold.  And so that data is basically
17 camouflaged from direct analysis.
18     Q.  Have you -- have you seen at competitions
19 millions of AR15-style rifles?
20     A.  No.
21     Q.  Have you seen hundreds of thousands of
22 AR15-style rifles?
23     A.  Probably not even that high.
24     Q.  Have you seen thousands of AR15-style rifles
25 that were manufactured between 1967 and 1968 by

1 manufacturers other than Colt?
2     A.  Over the course of 30 years?  Probably, yes.
3     Q.  And from that, you extrapolate that there
4 must be millions of such rifles?
5     A.  That and other information, yes.
6     Q.  What's the other information?
7     A.  I have -- I've told you that.  There are
8 several manufacturers that no longer make AR15
9 rifles.  They're even out of business, even prior to
10 the NSSF collecting data.  There are numerous that
11 went out of business.
12     Q.  You're saying there are over 100 producers,
13 such producers?
14     A.  There have been well over 100 producers,
15 yes.
16     Q.  Within the 1977 through 1990 period?
17     A.  That -- that number may -- it's hard to
18 define, but there are likely close to 100 in that
19 time frame, yes.
20     Q.  Would you be able to -- would you be able to
21 name ten such producers?
22     A.  Not without doing some research, no.
23     Q.  Okay.
24     A.  I mean, I know Del-Ton is not in existence
25 and Bushmaster is not in existence, and, you know,

Page 98

1 there are others that have gone out. They're not
2 ones that I personally owned or used. So it's
3 literally looking at various websites and forums to
4 look at and see what manufacturers were there.
5     I mean, you can look at those numbers and
6 say, "Wow, there's a lot of them," and I have
7 actually counted them on various websites before.
8    Q. You've counted producers?
9    A. Manufacturers -- so brand names or
10 manufacturers of AR15s, yes.
11    Q. And your count was close to 100? Over 100?
12    A. Well over 100 currently. I obviously did
13 not count them in the time frame of 1990 because I
14 wasn't working on this case.
15    Q. All right. Would you agree that for this
16 pre-1990 calculation, the relevant subset of
17 producers would be those pre-1990?
18    A. Can you say that again?
19    Q. I mean, you said you didn't count in 1990
20 because you weren't on this case. But would you
21 agree that producers that existed in 1990 or prior to
22 1990 is the correct group of producers that you would
23 need to count in order to make such a statement?
24    A. To make what statement?
25    Q. Maybe I'm misunderstanding what you just

Page 99

1 said.
2    A. Can you direct me back to my report, what
3 you're -- what you're asking?
4    Q. So for your calculation of 8 or 9 million
5 AR15s owned prior to 1990.
6       MR. ARRINGTON: Is there a question pending?
7 BY MR. VAN HEMMEN:
8    Q. Yeah. The question is did you -- have you
9 counted producers prior to 1990 -- have you counted
10 producers who produced AR15-style rifles prior to
11 1990?
12    A. I have made that attempt, yes.
13    Q. And what number did you come up with?
14    A. It's -- it's more than 100 --
15    Q. Okay.
16    A. -- that were producing AR15s prior to 1990.
17    Q. Okay. You appear to disagree with
18 Mr. Klarevas on this point.
19     If we could go to -- let's see. It's Tab --
20 Exhibit 3 is the rebuttal report from Mr. Klarevas.
21    A. I have it open.
22    Q. In Paragraph 13, Mr. Klarevas discusses this
23 issue, specifically your claim that about 8 to 9
24 million AR15 were owned by U.S. citizens prior to
25 1990.

Page 100

1     Did you review the sources cited by
2 Mr. Klarevas?
3    A. Yes.
4    Q. Do you disagree with their methodology?
5    A. I -- give me a second.
6     I mean, that's -- that's his opinion. And
7 he has a citation, but I don't think that they are
8 collecting all of the -- all of the data that was
9 available.
10    Q. Okay.
11    A. And even prior to 1977, that's actually not
12 true. Colt did actually -- I mean, his one statement
13 is absolutely false. It says, "From 1963 through
14 1977 when the patent for the AR15 expire." Colt was
15 the only firearms manufacturer producing AR15 rifles
16 for sale to civilians. That's not true. Colt did
17 license that to other companies, and there were other
18 companies that produced them in very small numbers
19 prior to '77.
20    Q. What -- you say "very small numbers." What
21 was the scale?
22    A. I don't know.
23    Q. Is it thousands?
24    A. It -- there are some -- there are some
25 references that are available, that, yes, would

Page 101

1 probably place it in that realm. So very small
2 numbers.
3    Q. The --
4    A. And then he also says -- I'm sorry. I was
5 still going.
6     This says, "Between 1963 and 1979 Colt only
7 manufactured a total of 96,401 AR15 Mark Sporter
8 rifles.
9     Colt made more than just Sporter rifles.
10 Sporter is specific type of rifle. They actually
11 also made the Dissipators and the HBARs.
12     So he's only looking at a small subset of
13 what Colt actually manufactured.
14    Q. Okay. And then the number you cite for what
15 Colt manufactured was 2 million?
16    A. Correct.
17    Q. It looks like that's a slightly different
18 date range also. But for -- you cite 2 million
19 through 1986.
20    A. Yes.
21    Q. All right. For the serial number counts,
22 Mr. Klarevas cited an article that showed -- I don't
23 think it's in this. So we'll mark that as well.
24     Matt, could you mark Tab 23. This will be
25 Exhibit Number 16.

26 (Pages 98 - 101)

1          (Exhibit 16 was identified.)
2   BY MR. VAN HEMMEN:
3       Q.  It's showing up for me.
4       A.  Yeah, it's opening.  It's open now.
5       Q.  Did you review this source?
6       A.  No.
7       Q.  Okay.  All right.  Let's go back to your
8   supplemental report.  It's Exhibit Number 2.
9          When -- on the top of Page 2 we already
10  discussed this sentence, but you noted that several
11  of the producers are no longer in business.
12         Is the significance of that statement that
13  you are no longer able to get counts of what they
14  produced?
15      A.  Yes.
16      Q.  And are you -- do you believe that those
17  producers produced a large number of AR15 rifles?
18      A.  I -- I don't know.  I mean, part -- part of
19  the -- that becomes part of the issue.  Like, for
20  instance, Eagle Arms was a very cheap manufacturer of
21  AR15s, and I've searched, and I can't find any data
22  anywhere.
23         But cheaper samples typically sell in higher
24  volume than more expensive samples.  So if you look
25  at JP Rifles versus Daniel Defense Rifles versus, you

1   know, PSA Rifles, the volume of those rifles that are
2   less expensive definitely sell in higher numbers.
3          So it's very difficult to come up with
4   actual numbers.  It's really just looking at -- I
5   guess, it's a combination of looking at the numbers,
6   looking at what Colt produced, and trying to come up
7   with some estimate.  There is no way anybody is going
8   to come up with an actual, verifiable number because
9   the source data doesn't exist.
10      Q.  All right.  So given that, how were you
11  able to arrive at -- if you're saying Colt produced
12  2 million in the relevant range before 1990 and
13  you're saying that 8 to 9 million existed before, is
14  my math right that that would be 6 or 7 million from
15  these other producers?
16      A.  Yes.
17      Q.  And how are you able to go from there were
18  100 producers to those producers produced 6 to 7
19  million rifles?
20      A.  It's -- it's an estimate.  Like I've told
21  you before, it's looking at the data, looking at how
22  many companies there are, looking at the -- the
23  existence of firearms from manufacturers that are
24  defunct in competition through the years.  It's an
25  estimate.

1       Q.  But what is -- what math did you do in order
2   to arrive at that estimate?
3       A.  It's looking at what Colt produced and what
4   Colt produced even between '77 and, say, 1980, in
5   that time frame versus what other companies are
6   producing, and seeing that they were ramping up
7   production and then backing off from those companies,
8   say, okay, it would have been that lower tier, those
9   companies that are no longer in production, and
10  multiplying that number by those companies.  It's an
11  estimate.  I can't tell you the --
12      Q.  What number --
13      A.  -- that it's an actual number.
14      Q.  Apologies for speaking over you there.
15         What -- what number did you use to multiply
16  by -- by those producers?
17      A.  There are some reports out there that talk
18  about the production of Colts, and I don't remember
19  if it's Klarevas, if it's one of -- one of the
20  articles he cited or it's a different one.  But they
21  compare Colt, Bushmaster, and other manufacturers
22  through this time frame of 19 -- I think it's 1975
23  through 1980, in that time frame.  And it look --
24  just looking at their numbers.
25      Q.  And you didn't -- you didn't cite to any of

1   these sources?
2       A.  They're not verifiable numbers.  I mean,
3   it's an estimate.  That's what I say in my report
4   that it is an estimate.  It's based on my experience
5   and knowledge and looking at what kind of numbers are
6   actually out there.  And not to belabor the point,
7   but, you know, I'm going to rely on the NSF numbers
8   that only go from, you know, those small brackets
9   from 1990 to 2018.  That's -- that's your bottom
10  number.
11         Some number over that?  Yeah, it's -- it's a
12  number over that.  Can I verify it?  No.  So I'm
13  going to rely on the NSSF numbers that are verifiable
14  as the low -- the low-end, conservative estimate.
15      Q.  All right.  So you're saying that you are
16  offering an opinion on the since-1990 numbers, and
17  that you offer the pre-1990 number as just a guess?
18  Is that what you're saying?
19      A.  No, it's an estimate.  That's what my report
20  says.  That's what I say.  It's an estimate.
21      Q.  So would I be correct to say your
22  methodology, as you look at each producer that you
23  have identified before 1990 and then estimate how
24  many weapons they produced and add them up?
25      A.  Generally, yes.  And, like, again, there are

27 (Pages 102 - 105)

1 other sources too.  I mean, I did say, and remember
2 this, that not all AR15 frames or lowers are sold as
3 complete rifles.  In fact, people who are in
4 competition typically do not buy complete rifles,
5 they buy lowers.  Those aren't included in any of the
6 numbers we're talking about, because they weren't
7 complete rifles; therefore, there's no tax.  So, you
8 know, the 11 percent excise tax is on complete
9 rifles, not lowers.
10      And hundreds and hundreds of thousands of
11 lowers have been sold as a serialized part.  Even
12 though they were on 4473s, there's no tracking of
13 them anyway, other than the 4473.
14      Q.  So what qualifies you to do this type of
15 analysis with vary -- varying levels of trustworthy
16 versus untrustworthy sources that you compile into a
17 total estimate?
18      A.  Again, like I told you, I'm at -- I go to
19 competitions.  I talk to the manufacturers.  I mean,
20 Tactical Machining is a manufacturer in Florida.  I
21 mean, over the course of their history, their claim
22 is that more than half of the AR15 lowers that they
23 produced were sold as lowers, not rifles.
24      And so whatever their number is that they
25 report to NSSF, it's -- the number of lowers that

1 have likely been turned into AR15s doubles their
2 number, and they're just one manufacturer.
3      Q.  Going back to the first full sentence on
4 Page 2 of Exhibit 2, you say that "These 100
5 producers of AR15-style rifles, several which are no
6 longer in business and none of which reported their
7 production numbers to NSSF during that time frame."
8      How do you know that none of them reported
9 their numbers to the NSSF?
10      A.  Because I asked NSSF.  Their data starts in
11 1990.
12      Q.  Okay.  Who at NSSF told you that?
13      A.  Mr. -- I'll have to read his name again.
14 Mr. Fatohi, Salam Fatohi.  And I actually asked
15 him, "Do you have a way to determine the number prior
16 to 1990?"
17      And he said, "No, none exists that I know
18 of."
19      So we had a long conversation about this
20 8 to 9 million number, and he agreed there were a lot
21 of producers, that there were a lot of lowers that
22 were made that were not serialized firearms,
23 and -- but he says, "We don't have any data because
24 we didn't start collecting that data until 1990."
25      Q.  All right.  Next you state that, "Likewise,

1 there is no governmental agency that reported the
2 production numbers during that time."
3      First of all, what is your source for this?
4      A.  Are you asking me to prove a negative?
5 Because I can't do that.
6      Q.  Okay.  Is it even correct?
7      A.  As far as I know, yes.
8      Q.  All right.  Do you know what an AFMER report
9 is?
10      A.  I do.
11      Q.  Is it your understanding that they did not
12 exist in this time frame?
13      A.  I don't know exactly when they started, but,
14 again, their collection methodology is flawed in that
15 they use pistols and rifles and not specifically
16 AR15s.
17      So there is no way for us to know what of
18 that subset was AR15s.
19      Q.  Okay.  So you're saying that the AFMER
20 reports in general are not reliable because they
21 don't contain breakouts of AR15s; correct?
22      A.  Correct.
23      Q.  Okay.
24      A.  I mean, even as it sits today, their reports
25 are inaccurate because the industry estimates that

1 there are several million -- and I don't know the
2 number -- but there are several million AR15 pistols.
3      So those would be classified in the ATF
4 forms as pistols, not rifles.  And, again, those
5 receivers that are not classified as rifles or
6 pistols are not counted, because they're not full
7 firearms.
8      Q.  Okay.  Thank you.
9      Next you state, "Based on the prevalence of
10 other manufacturers' rifles procured by law
11 enforcement agencies in that time frame, which
12 predominantly purchased the civilian semiautomatic
13 versions as opposed to the military select fire
14 versions and as represented and used by competitors
15 in competition, it is apparent that Colt produced far
16 less than half of the AR15-style rifles between 1977
17 and 1990."
18      There's a lot going on in the sentence, but
19 it appears you're basing the statement that Colt
20 produced far less than the AR15-style rifles between
21 1977 and 1990 on two main sources or categories of
22 sources.  One is law enforcement purchases and the
23 other is their prevalence in competition.
24      Do I have that right?
25      A.  Yes.

28 (Pages 106 - 109)

1    Q. Is there anything else you're basing the
2  less-than-half figure on?
3    A. No.
4    Q. As to law enforcement purchasing, where are
5  you getting this information?
6    A. Asking friends of mine who are in law
7  enforcement, as well as going to the competitions
8  that are -- at that time were predominantly law
9  enforcement only.
10      And so there are some competitions that were
11  law enforcement only, and looking at the firearms
12  that they are using in those -- in those
13  competitions.
14      For instance, there is -- there is an
15  article from Soldier of Fortune in Boulder that
16  actually talks about the Soldier of Fortune match,
17  and in 1980 and 1981 literally lists the firearms of
18  the top ten competitors in each of those years. And
19  virtually none of them were manufactured by Colt.
20  The majority of those people were also in law
21  enforcement.
22    Q. But they were manufactured within that
23  relevant date range, between 1977 and 1990?
24    A. Yes. Because they -- these -- this was
25  competitions that occurred in 1980 and 1981.

1    Q. Okay. And would you say that those -- those
2  winning competition rifles are a representative
3  sample of the population of AR15s?
4    A. Not necessarily. But when USPSA and SOF and
5  3-Gun Nation and all those various entities publish
6  the list of firearms used by top competitors, similar
7  to NASCAR, if you win on Sunday, you sell on Monday.
8      And so if you look at the sales figures from
9  some of these companies, when they had enough
10  sponsored shooters that won matches, their sales went
11  up drastically in that time frame.
12    Q. So you're saying that rifles that perform
13  better in competitions have higher sales numbers?
14    A. No. I'm saying that people that use rifles
15  that compete well in competition, those rifles get
16  sold at a higher rate. It doesn't mean the rifles
17  there's a lot of factors go into it. I mean, if you
18    Q. Okay. You also noted that rifles that are
19  cheaper tend to have better sales figures.
20    A. That's correct.
21    Q. Do you see any tension between those two
22  statements?
23    A. Sure.
24    Q. Have you reviewed any law enforcement
25  procurement records?

1    A. Not directly, no.
2    Q. Have you reviewed a compilation?
3    A. I just asked people that I know who are in
4  the firearms community. So friends of mine who
5  either work for manufacturers or are in procurement
6  or sales. I mean, at one point I went and ran the FN
7  match, and FN -- I don't know if you know this, but
8  FN manufactured a lot of rifles for Colt under
9  their -- under the Colt licensure as supplied to the
10  military and then sold to civilians.
11      I'm good friends with the director of law
12  enforcement sales, and so I've talked to him. I've
13  talked to Ruger. I've -- I mean, I don't know how --
14  what you want me to do. These are things that are in
15  my head that I know over the course of many years
16  being in the firearms industry, competing, and
17  talking.
18      I like -- I like the information. I like
19  firearms. I like understanding why -- what makes
20  what work. And I ask these questions, and so that's
21  where that information comes from.
22    Q. Would you agree that the sample of
23  information that you've collected through
24  competitions and talking to people at competitions is
25  not representative of the entire population?

1    A. Not the way you stated it. No, I wouldn't.
2    Q. Okay. So the bases that I've -- I've heard
3  you describe give you a sense that a large proportion
4  of law enforcement purchases are made up of these --
5  these rifles from -- from other producers.
6      Do you have a sense of the overall size of
7  the law enforcement procurement sales or numbers at
8  this time period?
9      MR. ARRINGTON: Object to form.
10     MR. VAN HEMMEN: Yeah, sorry. It was not a
11  very clear sentence.
12  BY MR. VAN HEMMEN:
13    Q. So do you have a sense of how many
14  AR15-style rifles were purchased in this period by
15  law enforcement?
16    A. It was hundreds of thousands, and it --
17  there's a lot of factors go into it. I mean, if you
18  look at -- for instance, you can go look at law
19  enforcement guns that have been turned back in to
20  manufacturers that are now for sale.
21      And over the course of years, I've seen
22  several that were marked by a variety of departments,
23  whether it be Glock pistols or AR15s. And they are
24  marked as firearms that came from various
25  departments.

29 (Pages 110 - 113)

Page 114

1    At one point in the -- in the 1990s, that
2 almost virtually stopped, as it relates to AR15s.
3 And so that data is not being replicated from 1990
4 moving forward as it was prior to 1990.
5    Q. But hundreds of thousands is not close to
6 half of 8 to 9 million.
7    A. No. I don't think I ever -- I don't think
8 anywhere in my report did I say that the half of the
9 8 to 9 million were bought by law enforcement. Not
10 even close.
11    Q. Okay. So what -- do you have a sense of
12 what percentage that would be? It sounds now like
13 that was a relatively small percentage of that
14 8 to 9 million number?
15    A. Yeah, it's going to be a subset. And, no, I
16 don't know exactly what that number would be.
17    Q. Okay. So the -- would the majority of that
18 8 to 9 million then be coming from your personal
19 sample of information and information that you've
20 looked up as you've described based on competitors in
21 competitions?
22    A. No.
23    Q. Okay. Moving on to the next sentence of
24 your supplemental report, you say, "Regardless, it is
25 obvious that from 1990 until the current day, the

Page 115

1 AR15 style of rifle has become more popular among
2 U.S. citizens for recreational purposes, hunting, and
3 self-defense than it was prior to 1990."
4    What is this observation based on?
5    A. Well, it's based on the NSF numbers and the
6 proliferation of the use of the AR15 in competition,
7 hunting, and self-defense.
8    Q. Okay.
9    A. I mean, if you go -- if you go, like, prior
10 to 1990, and were you to go ask an average homeowner
11 what kind of firearm did they have -- and I'm talking
12 firearms owners, what kind of firearm did they have
13 in their home for self-protection, it was a variety
14 of things, revolvers, shotguns, you know, some
15 semiautomatic pistols.
16    If you do the same thing today, there's a
17 very dominant answer that is AR15s.
18    Q. Have you reviewed any studies breaking out
19 the use of AR15-style rifles by recreational
20 purposes, hunting, and self-defense?
21    A. Only the data -- the only data that I have
22 seen that I know is there was a -- there was a TV
23 show literally called The Modern Sporting Rifle, and
24 I think it was produced by the NRA, and there was
25 some data in that that talked about -- I don't

Page 116

1 remember if it ran for one season or two seasons, but
2 they actually talked about the proliferation of the
3 AR15 as used for defense, competition, and hunting.
4    And there were some numbers in there. I
5 can't quote exactly what they were, but it is a TV
6 show that used data that the NRA collected when they
7 produced that show.
8    Q. Did you review the data, the underlying
9 data, that was collected?
10    A. I have in the past, yes. I mean, that's
11 part of -- that's part of my rationale for why I say
12 that the AR15 is more popular today than it was then.
13    I mean, if you're saying that my number of
14 8.9 million -- or 8 to 9 million prior to 1990 is,
15 you know -- is too high, the lower you make that
16 number, the more true it makes my statement that it's
17 a much more popular firearm today than it was in
18 1990.
19    So go one way or the other, I mean, it's
20 just getting more and more popular as time goes on.
21    Q. So I understand that. I'm not really sure
22 what your point is there, though.
23    Turning to the last sentence of the
24 paragraph, you state, "Since all manufacturers do not
25 report to NSSF, estimating the number of AR15-style

Page 117

1 rifles prior to 1990 is difficult. The number of
2 AR15-style rifles that actually exist is certainly
3 higher than those in the NSSF estimates."
4    And I just want to make sure I understand
5 here.
6    First of all, the NSSF estimates that you
7 referred to are the 2020 and 2022 NSSF industry
8 intelligence reports that we previously marked; is
9 that right?
10    A. Correct. Correct.
11    Q. Okay. So is your point here simply stating
12 that the NSSF numbers don't include pre-1990 numbers,
13 and some of the pre-1990 AR15-style rifles presumably
14 still exist; therefore, the NSSF estimates are lower
15 than the number of existing AR15-style rifles?
16    A. There -- not completely, no.
17    Q. Okay. Can you elaborate, then?
18    A. Sure.
19    So the NSSF says through 2020, from -- so
20 from 1990 to 2020, they estimate the number at 24.4
21 million. That does not include anything prior to
22 1990.
23    So whatever -- whatever AR15 existed prior
24 to 1990 would then have to be added to that number.
25    If you're looking at rifles, all of those

30 (Pages 114 - 117)

Page 118

1 produced as pistols would also have to be added to
2 that number. If you're looking at AR15s that exist
3 that were put together by people at home from AR15
4 lowers, that, again, adds to that number.
5        Then if you add the number of companies that
6 are not members of NSSF, therefore, do not report to
7 NSSF, that adds to that number again. And then you
8 have self-manufactured AR15s, which, again, adds to
9 that number.
10       So there are -- there are several areas of
11 that 24.4 million does not include. So that number
12 of 24.4 million, that is the bottom number. It's at
13 least that many, and it -- we know it's more.
14    Q. Do the NSSF estimates account for rifles
15 that have worn out or otherwise broken or been
16 destroyed?
17    A. They do.
18    Q. They remove those numbers from their counts?
19    A. No, no. That's not what I said. I guess
20 ask your question again, and I'll answer it. But
21 maybe I misunderstood your question.
22    Q. Do all of the -- does the count for NSSF
23 estimates -- is that limited to rifles that currently
24 exist?
25    A. No. That is the total number of rifles

Page 119

1 produced from 1990 to 2022 -- to 2020.
2    Q. Okay. So when you say that the number of
3 AR15-style rifles that actually exists, you're not
4 talking about actually exists currently. You're
5 saying that have been produced?
6    A. If you -- if you want to argue about how
7 long it takes for an AR15 rifle to wear out and be,
8 you know, dysfunctional, we can do that. But it's a
9 very, very small number, that 24.4, that would have
10 been taken out of service due to malfunction or
11 damage. Theft, that's probably a small portion as
12 well.
13    Q. What about illegal trafficking to Mexico,
14 for example?
15    A. I -- I mean, are you talking about, like,
16 what the ATF did moving guns to Mexico, or are you --
17 I mean, I don't know exactly what you're asking.
18       I mean, there's not a whole lot of AR15s
19 that end up going to that realm. But the majority of
20 those are other firearms that were made in other
21 countries that come in. But that data is -- if you
22 can show me some data, I'd be happy to look at it,
23 but from my -- what my understanding is, that's a
24 pretty low number as well.
25    Q. Have you reviewed any data that gives you a

Page 120

1 sense of the scale of it?
2    A. I've read some ATF reports.
3    Q. Have you reviewed any data on illegal trade
4 in AR15-style rifles in your preparation of this
5 report?
6    A. No.
7    Q. Does your estimate of the pre-1990 rifles
8 account for exports?
9    A. No.
10    Q. And this actually-exist calculation includes
11 rifles that are owned by law enforcement?
12    A. Yes.
13    Q. And it includes rifles that are owned by
14 retailers and/or wholesalers that have not passed on
15 to the ultimate consumer; correct?
16    A. Correct.
17    Q. All right. So going back to the top of your
18 supplemental report discussion section --
19       MR. ARRINGTON: Sounds like you're at a
20 breakpoint.
21       MR. VAN HEMMEN: Sure. We can take a break.
22       MR. ARRINGTON: Five minutes?
23       MR. VAN HEMMEN: Sure.
24       THE VIDEOGRAPHER: This is the end of Media
25 Number 3. Going off the record. The time is 12:50.

Page 121

1       (Recess taken.)
2       THE VIDEOGRAPHER: We are back on the
3 record. The time is 12:59. This is the beginning of
4 Media Number 4.
5 BY MR. VAN HEMMEN:
6    Q. All right. We're still looking at
7 Exhibit 2, your supplemental report. At the start of
8 the discussion section on Page 1 of the report, it
9 says, "Since the original report was issued, the
10 updated NSSF industry intelligence report has been
11 reviewed. It was provided to this author by
12 Mr. Fatohi, the director of research for the NSSF."
13       Did Mr. Fatohi reach out to you?
14    A. No.
15    Q. Did you reach out to Mr. Fatohi for the
16 updated report?
17    A. I did.
18    Q. Did you reach out before the updated report
19 was published?
20    A. No.
21    Q. Is there a reason you didn't just go get the
22 published report?
23    A. Well, when I was talking to them, he emailed
24 it to me, and my understanding was what was online
25 had a few changes to the most current version, which

31 (Pages 118 - 121)

Page 122

1 is what he emailed to me.
2    Q.  Okay.  From our earlier discussion, I
3 understand that you discussed the contents of the
4 report with Mr. Fatohi.
5       Did you discuss this case with him?
6    A.  Absolutely.
7    Q.  What did you discuss?
8    A.  The numbers in the NSSF industry report.  I
9 wanted more information.  Some of the -- some of the
10 references appeared to me to be indistinct, and so I
11 wanted more verification from -- from Salam as to
12 what some of the references in the footnotes actually
13 meant.  You know, there are some -- there are some
14 portions in the report.  For instance, on Page 7 --
15 and I'm going go to it directly so I don't say
16 something wrong.  Let's see --
17    Q.  Sure.
18    A.  So on Page 7, the NSSF magazine chart on the
19 bottom it says, "Source:  ATF AFMER," and I said, "So
20 is the NSSF magazine chart that's on Page 7, is it
21 based on ATF AFMERs?"
22       He said, "No."
23       I said, "Is it based on U.S. ITC?"
24       He said, "No."
25       I said, "Is it based on industry estimates?"

Page 123

1       He said, "Yes, that is all that is based on
2 is the industry estimates."
3       And so some of the citations are not
4 specific because if you look up to the next one up,
5 where it says estimated modern sporting rifles, that
6 says the source is the ATF AFMER and industry
7 estimates.  It is the same one as is related to
8 Page 7.
9       And so, in fact, the ATF AFMERs are not
10 related to the NSSF magazine chart.  Those are some
11 of the questions I wanted to ask him, and I did ask.
12    Q.  Okay.  Is it your understanding that
13 Mr. Fatohi is in charge of putting this report
14 together?
15    A.  He is the director of research.  So he has
16 several people who work for him on this, but
17 ultimately, he's the one responsible for the
18 production of this report at this time.  Honestly, I
19 don't know if he was the one responsible for
20 producing the prior one.  I didn't ask him that.  I
21 don't know.
22    Q.  Okay.  Did you have discussions concerning
23 the prior report with anyone at NSSF?
24    A.  Yes, I did talk to that -- on that report, I
25 did talk to Zach Snow at SHOT prior to the issuance

Page 124

1 of my report, and it's just general, like, "Where
2 does this information come from?"
3       And so I had a general understanding from
4 Mr. Snow as to where this information was coming
5 from, but I was not aware of Mr. Fatohi at that time.
6    Q.  And what was Mr. Snow's information?
7    A.  Well, it was -- I asked him, "Where does
8 this information come from?"
9       MR. ARRINGTON:  You mean his position at
10 NSSF, or his position --
11       MR. VAN HEMMEN:  Yes.  Sorry, Barry.  Thank
12 you for that clarification.
13 BY MR. VAN HEMMEN:
14    Q.  I mean, what is his role with --
15    A.  Oh, I think he's the director or the -- I
16 think he's the director of developmental --
17 development of ranges and clubs.
18    Q.  Is it your understanding that he has a role
19 in producing this report?
20    A.  No, it's not.
21    Q.  Okay.  Did -- okay.
22       So for the modern sporting rifles chart,
23 what did Mr. Fatohi tell you about the methodology
24 for putting together this chart?
25    A.  So that is a combination of data that they

Page 125

1 have from those actual three sources that are below:
2 ATF, AFMER, whatever the US ITC stands for.  I can't
3 remember exactly what that stands for.  But that
4 number includes, or that is related to the
5 information in the green column, which is the import
6 and export number, which they alter.
7       And then the industry estimates are -- is
8 actual reporting back from the industry.
9       And so what he told me is they attempt to
10 take the industry estimates, look at the number of
11 ATF AFMER, and there is never a number that they
12 produce that is over or an extrapolation to those
13 companies that are not members of NSSF.
14       So they either get the numbers from the
15 industry report or they get them from the AFMERs, and
16 so they look at those two numbers, and obviously they
17 can't add both of them together.  So they have to
18 exclude the information from one of those two groups
19 before they add them together.
20    Q.  So is it -- it's your understanding that
21 they, for each manufacturer, use either the ATF AFMER
22 numbers, or if they do get a report from the
23 manufacturer, they use manufacturer's number?
24    A.  Correct.
25    Q.  So the ATF AFMER numbers, I believe you

32 (Pages 122 - 125)

Page 126

1 previously noted that they just say "rifles."  They
2 don't separate out modern sporting rifles.
3       How do they get from that full number rifles
4 to the MSR number?
5     A.  You'd have to ask them.  We talked about it,
6 but I did not take notes on our conversation.  So I
7 could not tell you.
8     Q.  Okay.  So you're unaware of how they do it,
9 but your understanding is that they don't use the
10 full ATF AFMER number?
11     A.  That is my understanding, when they have a
12 better number from their members, yes.
13     Q.  Would it -- would it surprise you if they
14 inferred a percentage for those producers from the
15 industry estimates that they get from the other
16 manufacturers?
17     A.  I don't think that they do that, based on my
18 conversation with Mr. Fatohi.
19     Q.  So what -- do you have any idea what
20 information they would use to create those
21 percentages?
22     A.  I don't see a percentage anywhere in the --
23 in their number -- in their chart.
24       What percentage are you asking about?
25     Q.  The percentage of rifles as reported in the

Page 127

1 AFMERs that would qualify as modern sporting rifles.
2     A.  I don't -- it's not in the chart.  I don't
3 see it.
4     Q.  Okay.  So is it your understanding that
5 there must be an additional source besides those
6 three sources listed under the chart?
7     A.  I -- not that I know of.
8     Q.  Okay.  What leads you, then, to believe that
9 the ATF AFMER reporting manufacturers that do not
10 provide estimates in NSSF -- the numbers used by the
11 NSSF are lower than the actual numbers?
12     MR. ARRINGTON:  Wait.  Wait.
13     MR. VAN HEMMEN:  I can rephrase.
14     MR. ARRINGTON:  Okay.
15 BY MR. VAN HEMMEN:
16     Q.  For the producers that do not provide NSSF
17 reports, how can you be confident that the numbers
18 that are added into this chart are below the actual
19 number of modern sporting rifles produced by those
20 producers?
21     A.  I didn't say they were.
22     Q.  Okay.  So it's possible that those numbers
23 are overestimated?
24     A.  I don't believe so, no.
25     Q.  You are saying you don't believe so, but you

Page 128

1 don't have a high confidence that that's correct?
2     A.  I have --
3     MR. ARRINGTON:  Wait.  Wait.  I will object
4 to the form of that question.  I don't know what the
5 antecedent of it is.
6       But go ahead -- if you understand it, go
7 ahead and answer it.
8     THE WITNESS:  The 24,446,000 number, that is
9 the low estimate.  There are certainly more than that
10 number.  There are some that were not collected and
11 counted.  So I don't know what you're asking, but
12 that 24.4 million, that is the bottom number.
13 BY MR. VAN HEMMEN:
14     Q.  Would you agree that there are two types of
15 numbers going into this chart, and we'll set aside
16 for now the green column, but in the -- in the blue
17 column of just U.S. production, that there are either
18 producers that provide an industry estimate to NSSF
19 or producers that do not?
20     A.  I think you're mixing two things together.
21     Q.  Sure.  Is it your understanding --
22     MR. ARRINGTON:  Can you remind me which
23 chart we're talking about now?
24     MR. VAN HEMMEN:  We're talking about the MSR
25 chart on the top of Page 7 of the 2022 industry

Page 129

1 intelligence report.  I believe it's Page 13 of
2 Exhibit 2.
3     MR. ARRINGTON:  Okay.
4 BY MR. VAN HEMMEN:
5     Q.  So through your conversation with
6 Mr. Fatohi, it's your understanding that they
7 cataloged the producers of MSRs for each of them,
8 comes up with an estimate of the number that were
9 produced, and then adds them together; is that
10 correct?
11     A.  No.  They --
12     Q.  Okay.
13     A.  For -- for those manufacturers, who are NSSF
14 members who report their production numbers to NSSF,
15 that -- that is a number that they use.
16       For those members that are not NSSF members,
17 who do not report to NSSF, they use the AT -- the ATF
18 AFMER.
19       So there's two separate sources of data
20 based on their association with NSSF.
21     Q.  And you are -- you're confident -- are you
22 confident that the producers that -- the number for
23 the producers that use the AFMER in this report, that
24 those numbers are low?
25     A.  Yes.  Yeah.  Absolutely they're low.

33 (Pages 126 - 129)

Page 130

1    Q.  How can you be confident of that?
2    A.  Because their -- I explained to you before.
3  There is a -- there is an excise tax.  Once you
4  produce a certain number of rifles, you have to pay
5  the excise tax, and you have to report to ATF those
6  firearms that you sell, and you have to pay the
7  excise tax.
8       There's a lot of manufacturers out there
9  that stay below that threshold.  Granted, they're
10  small numbers, but they are staying below that
11  threshold because they literally do not want to
12  report to the ATF, and they do not want to increase
13  the price of their products that 11 percent.
14       So they --
15    Q.  You have --
16    A.  So they are meeting the law, but they are
17  not going to report because they are not over the
18  excise tax limit number.
19    Q.  Do you have a sense of the overall size of
20  that population of rifles?
21    A.  I don't.
22    Q.  Do you have an order of magnitude?
23    A.  It's a small number in relation to the
24  24.4 million.
25    Q.  Okay.  Counting just rifles that are

Page 131

1  produced as rifles that would go into this chart, are
2  you confident that that number is above the number
3  that is used in this chart simply from the ATF AFMER?
4    A.  I mean, if -- are you asking me to verify
5  the veracity of the ATF reporting?  Because I can't
6  do that.  I have no idea.
7    Q.  Okay.
8    A.  I'm going to rely on the ATF's numbers of
9  reporting that they know what they're doing in terms
10  of taking boxes and doing data entry and counting it
11  up.
12       I'm sure there are people who don't report
13  who are supposed to.  But I'm sure that's a fairly
14  small number, all things considered.
15    Q.  Would you be surprised if you found out that
16  this chart was calculated, using the ATF AFMER
17  numbers as a baseline and then adjusting based on the
18  industry estimates of the proportion of rifles that
19  were modern sporting rifles?
20    A.  I -- I don't know that I can answer that one
21  way or the other.
22       I mean, in talking to -- in talking to
23  Salam, he's very confident that those numbers are
24  accurate numbers that can be verified, and so I'm
25  going to rely on that.  I mean, it -- these are the

Page 132

1  same numbers that have been reported to the
2  congressional research office and, you know, that
3  have been used in these kinds of cases all over the
4  country.
5       So I -- unless you can show me a flaw, I'm
6  going to rely on those numbers as being valid.
7    Q.  Would it be accurate to say that your
8  confidence in these numbers comes from your
9  estimation of the credibility of Mr. Fatohi?
10    A.  No, it comes from the -- it comes from the
11  credibility of ATF to be able to count things and the
12  NSSF industry companies to report their numbers.
13    Q.  All right.  Other than the new numbers for
14  2019 and 2020 and resulting cumulative totals across
15  this report, are you aware of any changes between the
16  2020 and 2022 reports?
17    A.  Mr. Fatohi told me that there were some.  I
18  did not go and investigate specifically what they
19  were.  He said there were a couple small things that
20  were -- that were changed in formatting and
21  reporting, but I couldn't tell you what they are.
22    Q.  Are you aware of any changes to the
23  methodology?
24    A.  No.
25    Q.  Okay.  So just to save talking about these

Page 133

1  reports individually, would I be correct to say that
2  the strengths and weaknesses of the 2020 and 2022
3  surveys -- or studies would be the same?
4    A.  I don't know.  You'd have to ask Mr. Fatohi
5  that question.
6    Q.  Okay.  All right.
7       Going back to -- I guess it's the same
8  exhibit, but at the top, right after you say that you
9  got this from Mr. Fatohi and --
10    A.  Excuse me.  I'm on Exhibit 2.  You want me
11  to go to another exhibit?
12    Q.  Top of Exhibit 2.
13    A.  Okay.  I'm at the top.
14    Q.  This is your supplemental report.  We were
15  looking at the attachment.
16    A.  Understood.
17    Q.  After you note that you got the report from
18  Mr. Fatohi and the file name, you say, "This is the
19  same report referred to in the defendant expert
20  Klarevas report."
21    A.  Yes.
22    Q.  I just want to clarify, you mean this is the
23  later version of the same report; is that correct?
24    A.  Yes.  I mean, it's from the same source.  I
25  guess I should have said it's from the same source.

34 (Pages 130 - 133)

1    Q.  Okay.  Just wanted to make sure that you
2  weren't under the impression that Klarevas was using
3  the 2022 report.
4        All right.  Would it be fair to say that
5  after that first discussion paragraph --
6        MR. ARRINGTON:  Can we go off the record for
7  just a moment?
8        MR. VAN HEMMEN:  Sure.
9        MR. ARRINGTON:  Okay.
10       THE VIDEOGRAPHER:  This is the end of Media
11  Number 4.  Going off the record.  The time is 1:19.
12       (Recess taken.)
13       THE VIDEOGRAPHER:  We are back on the
14  record.  The time is 1:21.  This is the beginning of
15  Media Number 5.
16  BY MR. VAN HEMMEN:
17    Q.  All right.  We just went off the record so
18  that Mr. Arrington could point us to a reference from
19  Mr. Klarevas's report to the NSSF 2022 report.
20       Mr. Passamaneck, did you review
21  Mr. Klarevas's initial report?
22    A.  Not before I wrote the supplemental, no.
23    Q.  And you, since then, have reviewed
24  Mr. Klarevas's initial report?
25    A.  I have seen it, yes.  I have not reviewed it

1  in depth.
2    Q.  Okay.  Mr. Passamaneck, did Mr. Arrington
3  ask you to include this sentence, saying that this is
4  the same report referred to in the defendant Klarevas
5  report?
6    A.  No.
7    Q.  All right.  When you say that you have seen
8  Mr. Klarevas's initial report, do you mean that it
9  has been provided to you?
10    A.  I don't know if it's been provided to me or
11  not.  I would have to go and look.  I know that I've
12  now seen it in this, but I'm not sure if
13  Mr. Arrington provided it to me as an email
14  attachment or not.
15    Q.  Okay.
16    A.  I would have to look.
17    Q.  So you're saying that when you -- when
18  you're saying you saw it since the supplemental
19  report, you mean when we were marking the exhibits
20  earlier today?
21    A.  I have seen it then, yes.  That's correct.
22    Q.  Okay.  And you don't know if you'd seen it
23  prior?
24    A.  I don't know.
25    Q.  Okay.  But the only reports that you have

1  actually reviewed are the supplemental -- or the
2  rebuttal reports of Mr. Klarevas and Mr. Yurgealitis?
3    A.  I believe that's correct.
4    Q.  Okay.  Thank you.
5        Okay.  In case you moved away from it since
6  then, let's go back to the 2022 report -- or, sorry,
7  the supplemental report, which is Exhibit 2.
8    A.  I'm sorry.  Tab what?
9    Q.  It will be Exhibit 2.
10    A.  Oh, okay.  Back to where we were.
11    Q.  To your supplemental report.
12        Yeah, I think it's where we were, but just
13  because of the other discussions, I wanted to make
14  sure.
15        I noticed you typing just there.  Can I ask
16  what you were typing?
17    A.  Yeah, I looked in my email to see if I had
18  actually received the Klarevas original report from
19  Mr. Arrington as an attachment, and I don't see it.
20  All I see is the rebuttal.
21    Q.  Thank you.
22        For -- okay.  Let's see.
23        After the first discussion paragraph, where
24  you cite the NSSF industry intelligence report and
25  the sentence or two after that describing that 2022

1  report, is it fair to say that the rest of this
2  supplemental report is a response to the Klarevas
3  rebuttal report?
4    A.  Generally, yes.
5    Q.  Okay.  Let's go back to your initial report,
6  which is Exhibit 1.
7    A.  Okay.
8    Q.  Near the beginning of this report you state,
9  "A Washington Post survey in 2022, numbers the owners
10  of AR15 at 16 million," and then the statement by
11  NSSF president.
12        Per the Washington Post study, this is the
13  exhibit that we previously marked as 14 for the
14  record, but I'm going to stay on 1 for a moment.
15        Defense expert Louis Klarevas attempted to
16  recreate your work here, in terms of this Washington
17  Post statement of 16 million?
18        MR. ARRINGTON:  Where are we now?
19        MR. VAN HEMMEN:  We're still on the -- the
20  initial report, the sentence that says "Washington
21  Post survey" --
22        MR. ARRINGTON:  Okay.
23        MR. VAN HEMMEN: -- "estimated the number of
24  AR15 owners at 16 million."
25        MR. ARRINGTON:  Okay.

Page 138

1 BY MR. VAN HEMMEN:
2     Q. So defense expert Klarevas attempted to
3 recreate your work here in his rebuttal report. And
4 that would be, if we go to Exhibit 3, Paragraph 8.
5        My understanding is that you've already
6 reviewed this report.
7        Do you recall reviewing this paragraph?
8     A. Yes.
9     Q. And is this an accurate description of how
10 you arrived at the 16 million number?
11     A. Give me a second. I don't know what IPSOS
12 is.
13     Q. Okay. Noted.
14     A. Yes, that's generally the same.
15     Q. Okay. Do you disagree with anything in the
16 paragraph?
17     A. Not really, no.
18     Q. Okay. Do you consider this Washington Post
19 surveys to be a trustworthy source?
20     A. In so much as their survey was appropriate,
21 yes. I mean, they -- they were doing a survey. And
22 so, yes, I think it's generally accurate, based on
23 the constraints within the report or their survey.
24     Q. Okay. Have you reviewed the methodology for
25 the Washington Post survey?

Page 139

1     A. I did read through some of it, but I -- I
2 cannot quote it to you, and I don't -- I'm not a
3 statistician.
4     Q. Okay. Can you please go to Exhibit 10,
5 Page 21.
6     A. 21, as numbered or as page?
7     Q. Yeah, 21 as the pages within the document
8 viewer. It you're looking at the corners of that
9 grid that they put transcripts in, it's Page 79.
10     A. Okay. I'm looking at Page 79.
11     Q. This is the transcript of your deposition in
12 the State case. And if you look at the first
13 question on that Page, 79, it says:
14        "You don't think the Washington Post survey
15        figure is accurate?
16        "I don't.
17        "So you don't think it is a trustworthy
18        source?
19        "I don't."
20        Do you -- have you had any change in view on
21 this survey since you took the other deposition?
22     A. No.
23     Q. Okay. Going back to Exhibit 1, and back
24 down to the first page of your actual report, which
25 is Page 3 in the document viewer, the rest of the

Page 140

1 sentence that you start off with the Washington Post
2 survey, we discussed a bit earlier, "While the 2020
3 number was almost 20 million," do you have any
4 insight into the methodology behind that statement of
5 20 million?
6     A. I don't.
7     Q. Okay. The sentence says, "The Washington
8 Post survey in 2022 numbers found 16 million, while
9 the 2020 number was almost 20 million."
10        Are you saying that the number of rifles
11 went down over that period?
12     A. No.
13     Q. You're just saying that there are error --
14 there's like an inherent error range in these
15 numbers, and this falls within that?
16     A. Well, there are two estimates. One is from
17 the Washington Post, and one's from NSSF. And we've
18 already talked about that there are errors in some of
19 those numbers.
20     Q. Okay.
21     A. I mean, is it 16 million? Is it 17 million?
22 Is it 22 million? It's a big number. I'm going to
23 rely on those sources as being at least a band.
24     Q. My understanding is that you've never spoken
25 to Mr. Bartozzi; is that correct?

Page 141

1     A. That's correct.
2     Q. Is it possible that this 20 million number
3 is the same as the 20 million number from the NSSF
4 industry report?
5     A. It is possible.
6     Q. And would you agree that the NSSF industry
7 report counts number of guns, while you previously
8 stated that this 20 million number is number of
9 owners?
10        MR. ARRINGTON: Object to form.
11        THE WITNESS: Yes, there is --
12        MR. ARRINGTON: Wait. Which sentence are we
13 talking about here? The one that begins, "A
14 Washington Post survey"?
15        MR. VAN HEMMEN: Yes.
16        THE WITNESS: Can you ask your question
17 again, please.
18 BY MR. VAN HEMMEN:
19     Q. Sure. Let me look at that so I can ask it
20 the same way.
21        Would you agree that the NSSF industry
22 report counts number of guns, while you previously
23 stated that this 20 million number in this sentence
24 is number of owners?
25     A. Yes.

36 (Pages 138 - 141)

1    Q.  Would you agree that the number of owners is
2  definitionally lower than the number of weapons?
3    A.  Yes.
4    Q.  Would you agree that it's likely to be
5  significantly lower?
6    A.  No, I wouldn't.
7    Q.  How many weapons do you think the average
8  owner owns?  Let me specify, AR15 weapons.
9    A.  Most the people I personally know have --
10  have one, unless they're competitors, and then they
11  have multiples.  And competitors are a small subset.
12      So I don't know that I can give you a direct
13  answer, but I don't think that it is a significantly
14  different number.
15    Q.  So you don't -- you don't see an issue with
16  two statements from the same year, showing the same
17  number both from sources at the NSSF -- you don't --
18  that sentence -- the way I started it, it wasn't
19  going to finish.
20      But you don't see attention between the
21  20 million owners and 20 million guns statements from
22  the same year both from the NSSF?
23    A.  Yes, there may be -- there may be an error
24  there.
25    Q.  Would you agree that this statement says

1  "AR15s," whereas the NSSF report says "modern
2  sporting rifles"?
3    A.  I do agree to that, yes.
4    Q.  And would you agree that the NSSF report,
5  when we looked at the headings, stated that it
6  included both AR15s and AK-47 style weapons?
7    A.  Yes.
8    Q.  All right.  Let's move to -- let's see, the
9  English report, which I believe is Exhibit 15.  Or
10  actually -- yeah, let's just -- let's just stay on
11  the initial report, and within the discussion
12  section, after the sentence that we were just
13  discussing, it says, "A 2021 survey conducted by
14  Georgetown University Professor William English in
15  2021 of 16,000 gun owners revealed that of those,
16  30 percent owned AR15-style rifles."
17      This is the same report that we previously
18  marked; correct?
19    A.  Yes.
20    Q.  Do you consider this survey to be a
21  trustworthy source?
22    A.  Yes.
23    Q.  Have you reviewed the methodology of the
24  survey?
25    A.  To some degree, I did.

1    Q.  Okay.  Please explain why you're comfortable
2  with the methodology of this survey?
3    A.  Because within his report, he explained what
4  he did and how, and I'm relying on his numbers, and
5  they are consistent with the NSSF numbers to some
6  degree.
7      And so there is some synergy between
8  Mr. English's numbers and the NSSF numbers.
9    Q.  Based on the methodology within that survey,
10  do you believe that you would -- you or someone else
11  would be able to recreate that study and reproduce
12  the results?
13    A.  I don't know that I would be able to do
14  that.  I don't do surveys of 16,000 people.  But I
15  think another person that -- that did these types of
16  surveys would be able to reproduce those numbers
17  substantially close to the same numbers that
18  Mr. English got.
19    Q.  Do you recall discussing this survey during
20  your deposition in the State case?
21    A.  I do.
22    Q.  Since that time, have you done any further
23  review of the methodology of this survey?
24    A.  I read through it again, but nothing really
25  has changed.

1    Q.  You haven't changed any of your opinions
2  regarding the English survey since your deposition in
3  the State case?
4    A.  No.
5    Q.  Let's go back to Mr. Klarevas's rebuttal
6  report, which is Exhibit 3.  And let's go down to
7  Paragraph 11.
8      I don't think you'll disagree with anything
9  in this paragraph, but please go ahead and read it
10  and let me know if you do.
11    A.  Okay.
12    Q.  Do you disagree with anything in that
13  paragraph?
14    A.  I don't.
15    Q.  Okay.  Can you now please read Paragraph 12
16  and let me know if you disagree with anything there.
17    A.  I don't agree that I just glossed over it.
18  There are -- and I've explained to you why there are
19  issues with the NSSF numbers being low, in that
20  they're not collecting all forms of data.
21      So I understand what he's saying.  I don't
22  agree with all of it, but I understand what he's
23  saying.
24    Q.  Okay.  Other than the characterization in
25  the first sentence, do you agree with the rest of the

37 (Pages 142 - 145)

Page 146

1 paragraph which discusses the concentration of AR15s
2 amongst owners?
3     A. Yeah, I don't -- I don't know if -- if all
4 of that is able to be extrapolated. You know,
5 it's -- if 11 million people own them, okay. I mean,
6 if 16 million people own them, okay.
7         I mean, the fact is we don't know who owns
8 them. We only know what the NSSF number says is
9 produced. And that number, at least from 1990 to
10 2020, is 24.4 million. That's -- to me, that's the
11 only number that anybody can say with any absolute
12 certainty is a base number, and it -- that -- by
13 "base number," I mean that number is going to be
14 higher.
15         The rest of it is based on assumptions and
16 estimates and crunching numbers, and as the number
17 gets smaller and smaller, I mean, he -- English
18 basically interviewed 16,000 people, and now Klarevas
19 is saying that 74,000 people own, you know, half of
20 the AR15s in America? That's an extrapolation
21 that -- it's just math, but that's an extrapolation.
22     Q. What is your understanding of how English
23 came up with his 44 million number from the sample of
24 16,000?
25     A. I'm sorry. You said 44 million? I don't

Page 147

1 know where you're at.
2     Q. Yeah. Sorry. Okay. Sorry. That wasn't
3 what you cited the English survey for.
4         What is your understanding -- so you state
5 that the English report found that 30 percent of
6 those 16,000 gun owners owned AR15-style rifles.
7     A. Yes.
8     Q. My understanding of the purpose of that
9 sentence was so that you could extrapolate from some
10 total number of guns how many AR15-style rifles
11 exist.
12         Was that the purpose of your sentence?
13     A. Correct.
14     Q. Do you, anywhere in this report, cite a
15 total number of U.S. gun owners?
16     A. I don't believe that I do.
17     Q. Okay. So your -- is it your opinion that a
18 count of rifles, such as the NSSF produced, is
19 inherently more reliable than an extrapolated sample?
20     A. Yes.
21     Q. Okay. Thank you. All right. Just to
22 summarize this discussion, I think we've gone over
23 most of your discussion from your two reports,
24 concerning your count of AR15-style rifles.
25         Other than what we discussed, did you rely

Page 148

1 on anything else in forming your opinions concerning
2 the prevalence of AR15-style rifles?
3     A. No.
4     Q. Before we move on to the magazines, I just
5 want to confirm that I'm correctly understanding the
6 scope of your opinions on the topic of AR15-style
7 rifle ownership.
8         To that extent, your opinions do fall into
9 two categories; right? Either the number of owners
10 of these guns or to the number of guns owned; is that
11 correct?
12     A. Correct.
13     Q. And you -- you haven't offered any numerical
14 estimate of the numbers of AR15-style rifles used for
15 any particular purpose; is that correct?
16     A. Correct.
17     Q. And you're not offering an opinion as to the
18 number of assault weapons, as that term is defined in
19 the relevant ordinances or the number of owners of
20 such weapons; correct?
21     A. Correct.
22     Q. And you're not offering an opinion as to the
23 number of non-AR15-style assault weapons as defined
24 in the relevant ordinances; is that correct?
25     A. Correct.

Page 149

1     Q. And you're not offering any opinion as to
2 the number of handguns falling under the ordinance's
3 definition of assault weapons; is that correct?
4     A. Correct.
5     Q. And you're not offering any opinion as to
6 the number of shotguns falling under the ordinance's
7 definition of assault weapons; is that correct?
8     A. That's correct.
9     Q. And you do not offer any opinion as to the
10 use of assault weapons, as defined in the relevant
11 statutes, in self-defense; is that correct?
12     A. Correct.
13     Q. All right. So far we've mostly talked about
14 your methods in counting the number of AR15-style
15 rifles in the United States.
16         I understand that that wasn't a main issue
17 in the State case where your initial report was
18 originally filed, and I now want to turn to your
19 calculation of the number of magazines, which I think
20 is the focus of your report.
21         From reviewing your reports, I think that
22 you used three different methods to calculate
23 magazine ownership in the United States, and I want
24 you to just listen to these categories and tell me if
25 you agree that these are the three methods you used:

38 (Pages 146 - 149)

Page 150

1 One is by multiplying the number of guns sold by the
2 number of magazines sold with those particular guns;
3 is that correct?  Is that one of your methods?
4     A.  Yes.  I mean, some come with two, some come
5 with three.  But that is a data point, yes.
6     Q.  Okay.  Two is by relying on the magazine
7 charts contained in the NSSF industry intelligence
8 reports that we previously marked?
9     A.  Correct.
10     Q.  And the third is relying on a conversation
11 with the representative of Magpul; is that correct?
12     THE COURT REPORTER:  I'm sorry.  The
13 representative of?
14     (Simultaneous cross-talk.)
15     THE COURT REPORTER:  I'm sorry.  You were
16 both talking over each other, and I didn't hear what
17 you said.
18     MR. VAN HEMMEN:  I'm sorry.  I'll spell it
19 since it was my question.  M-a-g-p-u-l.
20     THE WITNESS:  Do you want me to answer that
21 question, or am I still waiting?
22     MR. ARRINGTON:  No, what is the -- what is
23 the question that's pending?  I'm sorry.
24 BY MR. VAN HEMMEN:
25     Q.  That the third method for calculations of

Page 151

1 magazine ownership in the United States are based on
2 a conversation with a representative of Magpul; is
3 that correct?
4     A.  That is correct.
5     Q.  Did I miss any other methods?
6     A.  Let me look real quick.
7     Q.  Sure.
8     A.  I think that covers it.
9     Q.  Okay.  So I'm going to go through each of
10 those methods.
11     First, regarding the numbers derived from
12 the gun ownership numbers.  So near the top of your
13 initial report -- I think we're still on Exhibit 1.
14 If not, can you please go there.
15     A.  I'm there.
16     Q.  Near the top of Page 2 of the report itself,
17 I believe it's Page 4 of the document in the viewer,
18 it says, "So conservatively, there are at least
19 34 million AR15s owned by U.S. citizens, and the vast
20 majority of those rifles were sold with at least one
21 20-, or 30-round, 30-round standard being the most
22 common magazines."
23     Is this meant to imply that there are at
24 least 34 million, 20- or 30-round magazines that fit
25 in AR15s?

Page 152

1     A.  Yes.
2     Q.  How do you know that the vast majority of
3 those rifles were sold with at least one 20- or
4 30-round magazine?
5     A.  Because that's what they're sold with.
6     Q.  How do you know that the vast majority of
7 them are sold with that?
8     A.  Because that's what they were sold with.  I
9 mean, I -- there's no other way to answer it.  That's
10 what they were sold with.
11     Q.  Did you review any studies that say this?
12     A.  There are no studies such as that.  You
13 would have to know firearms.  Go into a gun store and
14 look at the websites of the manufacturers of AR15s,
15 and they all say, if they are -- if they are AR10 or
16 large-frame platforms, they almost always say
17 20-round magazine, and if they are AR15 or small
18 frame, they almost all say 30-round magazine.
19     I mean, it's like asking are cars normally
20 sold with three or four tires?  Well, they're
21 normally sold with four tires.  It's the way it is.
22     Q.  Can you buy an AR15 with a magazine of less
23 than 20 or 30 rounds?
24     A.  You can.
25     Q.  Are there some states where you can only buy

Page 153

1 an AR15 with magazines of less than 20 or 30 rounds?
2     A.  Yes, there are.
3     Q.  So how can you be confident that the vast
4 majority of sales of AR15s -- excuse me, were sold
5 were at least one 20- or 30-round magazine?
6     A.  Because that's what they're sold with.
7     I mean, even today if you go look, I mean,
8 the majority of AR15s that are sold are sold in
9 states that don't have a magazine restriction.  And
10 even magazines say, like people from Colorado that go
11 to Wyoming that buy magazines and/or rifles and bring
12 them to Colorado.
13     So even Colorado residents are buying AR15s
14 in adjoining states with 20- and 30-round magazines.
15     Q.  How do you know that that accounts for a
16 vast majority?
17     A.  Because they do.  You can go look at the
18 manufacturers' websites.  This is not rocket science.
19 This is very simple.  The manufacturers manufacture
20 their rifles and they provide them with
21 standard-capacity magazines which, again, are either
22 20- or 30-round magazines.
23     Most of those manufacturers, as they sell
24 them, even if they sell them in the restrict states,
25 leave it up to the distributors or the actual

39 (Pages 150 - 153)

Page 154

1 firearms retailer to make sure that those magazines
2 are compliant.
3        Do those retailers do that? Some do. Some
4 don't. Some literally take the magazines out, resell
5 them, and put low-capacity magazines in that are
6 after market, but they're still shipping with those
7 magazines that are full capacity.
8    Q. All right. I think I see the disconnect
9 here.
10       Is it correct that when you say the vast
11 majority of those rifles, you are not talking about
12 the vast majority of the individual rifles in the
13 hands of consumers that were purchased, but rather
14 the vast majority of types of rifles?
15    A. No. I'm saying that, whether you call them
16 AR15s or AR15s and AKs or MSR, semiautomatic rifles
17 with detachable magazines are predominantly sold --
18 the majority are sold with 20- or 30-round magazines.
19 That's across the United States.
20       And as the laws have prevented those from
21 being sold, there are less of them sold. This
22 doesn't mean it's still not the majority.
23    Q. Do the websites of the manufacturers say how
24 many rifles they've sold with different size
25 magazines?

Page 155

1    A. No, they generally don't.
2    Q. Have you -- okay.
3       So your basis for the statement, the vast
4 majority of those rifles were sold with at least one
5 20- or 30-round magazine is simply that in your
6 observations of -- through your experience being in
7 and around the gun industry, that is correct?
8    A. That is correct.
9    Q. You've done no outside research to
10 corroborate that statement; correct?
11    A. There -- there's none needed. It's -- I
12 mean, if you can't figure that out, I'm sorry.
13 That's plain as day. I hate to be dismissive, but
14 it's obvious if you go and talk to the manufacturers,
15 that's what they do. That's what they sell. Go into
16 distributors or actual FFLs, you know, yes, there are
17 modifications that get made.
18       But, you know, you talk to Ruger, talk to
19 Daniel Defense, talk to Smith & Wesson, they all
20 produce their box with a 30-round magazine and an
21 AR15 in it. That's what they ship.
22    Q. Okay. So moving on towards the middle of
23 the first paragraph on Page 2. You say the
24 "2018 NSSF estimate of semiautomatic handguns is
25 89 million, excuse me, with about 40 percent being

Page 156

1 9 millimeter, which are commonly 15 or 17 rounds
2 depending on frame size."
3       I -- am I correct, from our previous
4 discussion, that this is referring to the 2020 NSSF
5 estimate?
6    A. So, no. It's the 2018 NSSF estimate that is
7 contained in the 2020 industry report.
8       If you look at the 2020 industry report, it
9 stops at 18. The '22 report stops at 20.
10       So, no, that is an accurate statement.
11    Q. I wasn't challenging the accuracy. I was
12 just confirming that it is the -- what we have been
13 referring as the 2022 report, which I -- it sounds
14 like you're saying is correct.
15    A. Well, this is from the 2020 report.
16    Q. Excuse me. Now I misspoke.
17       In any case, can we go to Exhibit 13.
18    A. Okay.
19    Q. And am I correct that this is the report?
20    A. Yes.
21    Q. If you go to Page 17 of this report, am I
22 correct that the 89 million number came from the
23 chart on the bottom left there?
24    A. Yes. And you said Page 17. That is the
25 actual Page 17 of the report.

Page 157

1    Q. I think it's both.
2       MR. ARRINGTON: I don't know where we are.
3 What's the -- what does it say at the very top of the
4 page?
5       MR. VAN HEMMEN: It's Exhibit 13, Page 17.
6 And I think in this document, the page numbers line
7 up between the viewer and the number on the bottom of
8 the page.
9       MR. ARRINGTON: So does it say "Firearms to
10 U.S. Market (1991-2019 Interim)"?
11       THE WITNESS: Yes.
12       MR. VAN HEMMEN: Yes, that's the title of
13 the chart at the top.
14       MR. ARRINGTON: All right.
15 BY MR. VAN HEMMEN:
16    Q. And I believe you already answered this, the
17 chart on the bottom left is where the 89 million
18 number came from; correct?
19    A. Correct.
20    Q. Are you familiar with the methodology used
21 to come up with the numbers in this chart?
22    A. Other than what we've already talked about,
23 it's the same -- same numbers. They're right at the
24 bottom.
25    Q. From that, you mean that it's the same

40 (Pages 154 - 157)

Page 158

1 sources?
2     A. Same sources, yes. I'm sorry. Same
3 sources.
4     Q. All right. And other than the fact that
5 it's the same sources, you don't have any other
6 knowledge of the methodology used to come up with
7 these numbers?
8     A. Other than my discussions with Mr. Fatohi,
9 no.
10     Q. Did you specifically discuss this chart?
11     A. Yes, we talked about this chart. We talked
12 about the chart on Page 7.
13     Q. Okay. I would note that the charts on
14 Page 7 say AFMER, US ITC, and industry estimates --
15     A. It does.
16     Q. -- whereas this chart says US ITC, ATF
17 AFMER, and NSSF estimates.
18     A. Exact --
19     Q. And then you cite to the difference between
20 industry estimates and NSSF estimates?
21     A. Exactly the same thing.
22     Q. Mr. Fatohi told you that these are exactly
23 the same thing?
24     A. They are exactly the same thing, yes.
25     Q. He told you that?

Page 159

1     A. He told me that. They are exactly the same
2 thing.
3     Q. Okay. All right. Going back to your
4 initial report, Exhibit 1, the same sentence we were
5 previously looking at, beginning with, however, the
6 2018 NSSF magazine chart, where did you get the
7 40 percent of semiautomatics are 9 millimeter number?
8 That was also from the NSSF report?
9     A. It was.
10     Q. And I'm sorry for going back and forth. I'm
11 not sure there's a better way to do this.
12 Unfortunately we can't look at two exhibits side by
13 side here, but if we could go back to Exhibit 13,
14 could you show me where that 40 percent number came
15 from?
16     A. Just a second.
17        So if you look on Page 5, you will see that
18 there are several numbers, and they bridge. So over
19 the course of 25 years, 1994 to 2018, the percentage
20 was 38.1, and 1999 to 2018, which is, again, it's
21 bridged, it was 38.7 percent.
22        If you then go to 15 years, it's at
23 39 percent; 10 year, 41 percent; and 5 years,
24 45 percent.
25        And so that number is in the course of the

Page 160

1 time frame of the report, it's about 40 percent.
2     Q. Okay. Thank you.
3        Within that same sentence in your report --
4 and we can go back there, if helpful, you say that,
5 "Of 9 millimeter, semiautomatic handguns," you then
6 say, "which are commonly 15 or 17 rounds, depending
7 on frame size."
8        Is it correct that you're saying that
9 9 millimeters are commonly 15 or 17 rounds depending
10 on frame size?
11     A. That's what I said.
12     Q. Okay. Wouldn't this depend on the magazine,
13 rather than the firearm?
14     A. No.
15     Q. So you're saying that the firearm itself has
16 an inherent number of rounds?
17     A. Well, based on the frame size, yes. You can
18 only fit a certain number of rounds inside a grip of
19 a common 9 millimeter semiautomatic firearm.
20        And in the time frame that this report was
21 written up through 2018, the significant overload of
22 9 millimeter handguns were either compact or full
23 size, which is 15 and 17 rounds.
24        Today that number has shifted. I mean, in
25 the last five or six years, we've seen a lot more

Page 161

1 smaller firearms that are under -- under 15 rounds.
2 13, 10, 8, those types of numbers.
3     Q. Is it true that the semiautomatic firearms
4 would be purchased with smaller magazines?
5     A. They can be.
6     Q. And this would be the same gun, only the
7 magazine would be spaced, essentially, to contain
8 fewer rounds; is that correct?
9     A. Well, usually it's the same magazine -- it's
10 usually the same exact parts of the magazine. The
11 only thing they change is either they add a block or
12 they alter the spring.
13     Q. Okay. And other than the number of rounds
14 it can hold, the function does not change?
15     A. That's not entirely true, actually.
16     Q. Okay. What -- what changes in the function?
17     A. Well, depending on how they have altered the
18 magazine to have fewer rounds, like, for instance,
19 the Glock 17 with 10-round magazines is known to be
20 less reliable than the Glock 17 with 17-round mags.
21 The ten round magazines just aren't as reliable.
22        I mean, there are reasons, and some of it
23 has to do with the function of the firearm, as well
24 as the springs and spring rate and how the blocks
25 actually interact with the springs and the

41 (Pages 158 - 161)

Page 162

1 cartridges.
2     And some gun designs, doesn't really matter.
3 In others, it significantly matters.
4     Q. And this is because the -- would you say
5 that this is because the smaller magazines were
6 poorly designed?
7     A. They're not really -- they're not really
8 designed at all. I mean, they're modified to fit a
9 law in most cases. They're not -- they don't go back
10 and redesign them because it's not worth the time and
11 the effort to do it. So they just make a
12 modification.
13     Q. Your report makes no statement as to the
14 size of magazines that come with semiautomatic
15 handguns that are not 9 millimeter; is that correct?
16     A. That's correct.
17     Q. All right. If we go back to your initial
18 report, following along with where we were on Page 2
19 of your report, 4 of the old document, continuing on
20 from where we were reading, sort of middle of that
21 top paragraph, it says, "The Glock 17 is the most
22 prolific handgun in the U.S., with 60 to 70 percent
23 of LEOs utilizing them, and at least 30 percent of
24 targeted sports shooters using them."
25     First of all, what is your source for the

Page 163

1 Glock 17 being the most prolific handgun in the U.S.?
2     A. Numbers sold.
3     Q. Okay. Have you reviewed sales numbers for
4 individual models of handguns?
5     A. No.
6     Q. Okay. My -- my question, then, is how do
7 you -- what do you base your statement on, then?
8     A. I mean, there's production numbers, and that
9 comes from the -- I mean, the ATF -- the ATF
10 reporting forms and NSSF have data, and Glock does
11 report to NSSF, and Glock does, at times, produce
12 their times. And you can compare them to Smith &
13 Wesson, which is -- typically has been in second
14 place, and compare them to Ruger, which is further --
15 much further down the chain as far as total numbers
16 sold. I mean, it's not that complicated to do.
17     I mean, if you look at law enforcement
18 agencies, that's what they buy. You know, you look
19 at academies, all police academies pretty much focus
20 on you need to have a Glock 17 or something that
21 functions or operates substantially similar to a
22 Glock 17 just to go to the academy.
23     Once they're -- once they're on the street,
24 they can choose other firearms. But the Glock 17 is
25 what they use for training for the vast majority of

Page 164

1 police officers in the U.S. That number is
2 declining. I mean, Glock does not hold the -- they
3 do not hold the same level of acceptance or
4 utilization that they used to. SIG is taking away
5 significant market share, as is Smith & Wesson.
6 Smith & Wesson was the first one to start taking away
7 significant market share from the Glock.
8     Q. Okay. You state that, "60 to 70 percent of
9 LEOs utilize them."
10     First of all, I think I know the answer, but
11 LEO is law enforcement officer; correct?
12     A. Correct.
13     Q. And what is your source for this 60 to 70
14 percent?
15     A. Law enforcement agencies report on this, and
16 so does the FBI. It's -- it's not -- it's -- I would
17 almost say it's common knowledge in the firearms
18 industry that it's 60 to 70 percent.
19     Q. Okay.
20     A. There are -- there are groups that have gone
21 through and tried to tabulate the number. You're not
22 going to find a direct number, but, you know, Glock
23 actually puts out, I guess you call them, press
24 releases or brag papers, whatever you want to call
25 it, as to what percentage of firearms that they're

Page 165

1 supplying to LEO departments. And so the ones that
2 are actually supplied by departments, that's --
3 that's the number.
4     Q. All right. And what is the relevance of law
5 enforcement officers' use of the Glock 17 to this
6 case?
7     A. It's just a number. It's just a data point.
8     Q. Okay. What is your source for at least
9 30 percent of targeted sports shooters use the
10 Glock 17?
11     A. So as I told you before, when you look at
12 competitions -- so USPSA and IDPA, those are the
13 largest two action shooting groups, they typically
14 produce reports after their events, and they say what
15 kind of powder, what kind of firearm, you know, what
16 kind of bullet is used. All that information, and
17 that information is typically right around 30 percent
18 between IDPA and USPSA of the numbers who -- from the
19 members who compete in those competitions.
20     Q. What percentage of gun owners in the United
21 States participate in competitive shooting?
22     A. That's hard to say. And are you -- if
23 you're talking pistols versus all competitive
24 shooting, it's a different number. So I guess I'd
25 like you to be more specific.

42 (Pages 162 - 165)

Page 166

1  Q. Sure.
2     Let's start with pistols.
3     A. The current number is estimated somewhere
4  around 100,000, and that comes from the number of
5  people who belong to IDPA, USPSA, and also compete
6  who are not members. That number is probably
7  conservative, because there are a lot of private
8  ranges who have competitions that are not sanctioned.
9     In fact, almost every range that I've ever
10 belonged to and have attended, they have private --
11 or not private, but non-sanctioned competition.
12    And by "non-sanctioned," I'm not meaning
13 it's illegal or anything. It's just not sanctioned
14 by a national body.
15    Q. All right. But in any case, would you --
16 you would expect it to be in the single percent of
17 gun owners?
18    A. I would. You know, as a -- you haven't
19 asked this question, but as far as when I train
20 people, I try to get them to compete, because there's
21 a benefit to maintaining your skills in competition.
22    It's almost disappointing how many few --
23 how few people are -- will go to a competition and
24 compete. Law enforcement officers are almost even
25 worse.

Page 167

1     Q. I would agree with you, by the way, that is
2  a shame.
3     All right. Your report then states, "They,"
4  Glock 17s, "also have an edge for use as a home or
5  self-defense firearm."
6     What do you mean here by "have an edge"?
7     A. So they are very -- they're very easy to
8  use. They -- they're rudimentary, in terms of form
9  and function. So they're not expensive, as related
10 to other firearms. They are easy to shoot fast, and
11 they are extremely reliable as a platform.
12    Q. Okay. So you're saying that they are well
13 suited to home or self-defense firearm?
14    A. I don't want you to put those words in my
15 mouth. I'm just saying they have an edge, as the
16 public perceives them. And so they are bought more
17 prolifically than other firearms. I'm not going to
18 assert that they are superior.
19    Q. Would you -- what would you recommend --
20 never mind. It's not important.
21    You state that the Glock 17 is sold with two
22 or three standard capacity 17-round magazines.
23    Would you expect those magazines to be owned
24 by a single owner?
25    A. I mean, if they bought the firearm, and they

Page 168

1  came with two or three magazines, yes, they usually
2  keep those, and most people will go and buy one or
3  two more.
4     Q. Okay. All right.
5     Moving back up a little bit on the page, I
6  think it's the sixth line down or so, on Page 2 of
7  your initial report, it says, "However, the 2018 NSSF
8  magazine chart estimates 71 million handgun magazines
9  of 11-plus rounds, 9.4 million rifle magazines from
10 11 to 29 rounds, 20 being the most common and 15
11 being the second most common, and 79 million rifle
12 magazines of 30-plus rounds."
13    Is the magazine chart you referred to here,
14 the one that we previously discussed in the 2020 NSSF
15 industry report?
16    A. Yes.
17    Q. Okay. And you agree that the magazine chart
18 in the 2020 and the 2022 NSSF reports are identical?
19    A. Yes.
20    Q. I'm just trying to figure out how to do this
21 with the fewest number of times that we flip back and
22 forth between these exhibits.
23    All right. Let's go to your supplemental
24 report. That's Exhibit 2. And if we go to Page 2,
25 the first full paragraph -- or the second paragraph

Page 169

1  on that report, the paragraph about halfway down;
2  starting with, "While the estimates related to
3  standard capacity magazines."
4     I believe all of the numbers in this
5  paragraph come from that 2022 industry intelligence
6  report. You can correct me if we find something
7  other than that, but is that your general
8  understanding?
9     A. Yes.
10    Q. So in the first paragraph -- or the first
11 sentence, you say, "While the estimates related to
12 standard capacity magazines over 15 rounds presented
13 in the initial report are valid, based on the
14 author's knowledge and experience, the fact remains
15 that verification of those numbers is difficult."
16    So from -- based on the author's knowledge
17 and experience, are you basically referring to your
18 gut impression?
19    A. My what?
20    Q. Your gut impression.
21    A. No.
22    Q. Okay. What did you mean specifically
23 about "based on the author's knowledge and
24 experience"?
25    A. Well, again, it's my experience, having been

43 (Pages 166 - 169)

Page 170

1 in the gun industry for 30 years and competing, and,
2 you know, even some of those numbers that we talked
3 about above related to the 9 millimeter magazines.
4 It's not -- it's not just a gut feeling.  It is based
5 on evaluation of factors that I can see that are
6 related to these numbers.
7        I mean, I even say that it's difficult to --
8 to determine exactly how many.  So there are some
9 bottom numbers that I think are valid, but, you know,
10 that -- that high number, nobody is going to be able
11 to come up with that exact high number.  It's just
12 not possible.
13        And so those baseline numbers from NSSF are
14 what I rely on as to be the baseline numbers.  It's
15 that or more.
16    Q.  Okay.  About halfway down this paragraph you
17 say, "The number of rifle and pistol magazines that
18 are 11-plus rounds is estimated to be 159.8 million.
19 This is surely a number that is well below reality.
20 However, it is a number that can be substantiated
21 based on the NSSF data, which is conservative."
22        I think a lot of that is related to what you
23 just said, but how -- why do you say that the number
24 is -- of 19.8 million is surely well below reality?
25    A.  Because there are magazines that are

Page 171

1 produced by a variety of means and methods that are
2 not in the NSSF report.
3    Q.  Okay.  And what do you mean when you say,
4 "The 159.8 million number can be substantiated based
5 on the NSSF data"?
6    A.  Well, if you do the math in the -- on that
7 chart, on Page 7, you can come up with 159.8 that are
8 11-plus -- 11-plus rounds.
9    Q.  So the NSSF data that you're referring to is
10 the data displayed in the table?
11    A.  The data displayed what?
12    Q.  The NSSF data that you referred to in this
13 sentence is the data that's displayed in the table of
14 the NSSF report?
15    A.  On Page 7, yes.
16    Q.  And you get that 159.8 number from the NSSF
17 table?
18    A.  Yes.
19    Q.  So are you saying that the table
20 substantiates itself?
21    A.  No.  I'm saying that that table is from
22 NSSF, and that that table is -- from their data is
23 the bottom number.  I'm not saying it substantiates
24 itself.  That would kind of be silly.
25        The data that they've collected shows that

Page 172

1 number of the 159.8.
2    Q.  And when you say that the NSSF data is
3 conservative, by that you mean that, as you've said
4 in your impression, it is a floor?
5    A.  It is what?
6    Q.  A floor.
7    A.  It is.  Yes, I do consider that a floor or a
8 lower bound, absolutely.
9    Q.  The next sentence in your report says the
10 NSSF data is a lower bound, which is based on
11 industry reporting, which is considered to be the
12 most reliable source of data for the lower bound of
13 magazines.
14        Just to parse this sentence a bit, are you
15 saying that industry reporting is considered to be
16 the most reliable source of data for the lower band
17 of magazines, or that the NSSF data is considered to
18 be the most reliable source?
19    A.  It's the same thing, yes.
20    Q.  Okay.  When you say, "is considered to be
21 the most reliable source," who is it that considers
22 this to be the most reliable source?
23    A.  The Congressional Research Office considers
24 the NSSF data to be reliable, and that's what they
25 use.  The industry -- so the manufacturers consider

Page 173

1 the NSSF data to be reliable as well, and it's
2 because they report to it.  And I'm pretty sure your
3 expert uses the same -- the same data.
4    Q.  Sure.
5        I'm not saying you're wrong.  I'm just
6 asking for the bases.
7        Are you familiar with the methodology used
8 to generate the NSSF magazine chart?
9    A.  Yes.  That is something that I already said
10 that I talked to Salam about when I spoke with him.
11    Q.  Okay.  I mean, previously we spoke about the
12 MSR chart.  So I'm just making sure.  And we
13 discussed already the three sources listed under that
14 chart.
15        What's your impression of how those three
16 sources of data are combined to arrive at this number
17 for the magazines?
18    A.  Well, I already said that I don't believe
19 that the ATF and the ITSC are significant
20 contributors to that.  So the ATF definitely is not.
21 Firearms parts that are exported have to be reported
22 through the Secretary of State, and I'm not talking
23 about Colorado.  I'm talking about on the federal
24 level.
25        So there may be some from the ITSC, but the

44 (Pages 170 - 173)

1 primary source of that data is from industry
2 reporting to NSSF.
3     Q.  Would you be surprised if you were to learn
4 that the numbers in this chart reflect a count of
5 guns manufactured imported and exported based on
6 government data, which is then adjusted based on
7 industry responses, estimating the number of
8 magazines sold in a box with each gun?
9     A.  I wouldn't be surprised, no.
10     Q.  And in the description that I just gave, why
11 would you characterize the ATF MER reports as not
12 being an important component of that calculation?
13     A.  Because that number does not specifically
14 report the magazines themselves.  It reports guns.
15     Q.  If -- if the calculation done by NSSF is
16 number of guns sold times magazines sold per gun,
17 you're saying the number of guns sold is not an
18 important contributor to the chart?
19     A.  No, that's not what I'm saying.
20     What I'm saying is that NSSF, through its
21 members, is going to understand how many magazines
22 are sold with specific firearms, and that -- that's
23 from their reporting.
24     If they've got reporting from nonmembers,
25 and they have firearms manufacturing, according to

1 Salam, those are numbers they can't count because
2 they've got no way to verify them.
3     So, yes, the industry reporting is the main
4 staple of the chart on Page 7.
5     Q.  I'm trying to understand.
6     You're saying that there are two numbers
7 that are multiplied by each other to reach the
8 ultimate number, and you're saying one of those two
9 numbers is the most important?
10     A.  Yes, because the NSSF, their members report
11 to them, not just firearms manufactured, but also
12 magazines.  And so that number is a better number for
13 them to come up with their estimate than estimating
14 how many magazines are sold with firearms from
15 nonmembers.
16     And so there is some component of that, but
17 it's the industry -- it's the industry reporting
18 that's going to make up the bulk of that number,
19 which is the most reliable component as well.
20     MR. ARRINGTON:  Counsel, is this a good time
21 for a break?
22     MR. VAN HEMMEN:  Yeah.  Can I ask one
23 follow-up question just to finish out this line of
24 questioning?
25     MR. ARRINGTON:  All right.

1 BY MR. VAN HEMMEN:
2     Q.  So you're saying that, of those two numbers
3 multiplied together, the magazines sold per box is
4 more reliable than the number from the government of
5 boxes sold?
6     A.  That is my opinion, yes.
7     MR. VAN HEMMEN:  Okay.  All right.  We can
8 take a break, Barry.
9     THE VIDEOGRAPHER:  This is the end of Media
10 Number 5.  Going off the record.  The time is 2:33.
11     (Recess taken.)
12     THE VIDEOGRAPHER:  We are back on the
13 record.  The time is 2:53.  This is the beginning of
14 Media Number 6.
15 BY MR. VAN HEMMEN:
16     Q.  All right.  Before the break, we were
17 discussing the NSSF magazine charts.  I don't think
18 we need to be looking at them for this last line of
19 questioning on them, but we can always pull it up if
20 you need; so just let me know.
21     Do the NSSF magazine charts account for
22 worn, broken, or otherwise unusable magazines?
23     A.  No.
24     Q.  Later in your report, you note many
25 magazines wear out and become inoperable after as few

1 as 500 rounds; is that correct?
2     A.  Yes.
3     Q.  So presumably many of the magazines counted
4 in this chart are no longer in use; is that correct?
5     A.  Correct.
6     Q.  Dot NSSF magazine charts account for
7 magazines that have been illegally trafficked out of
8 the United States?
9     A.  I would assume that they are in their
10 numbers, yes.
11     Q.  Okay.  They're not adjusted to remove that
12 number?
13     A.  I would not believe so, no.
14     Q.  Do the NSSF magazine counts include
15 magazines that are currently possessed by retailers
16 and/or wholesalers who haven't made it to the final
17 consumer?
18     A.  Most likely, yes.
19     Q.  Do the NSSF magazine chart counts include
20 magazines that are possessed by people who cannot
21 legally possess firearms, for example, felons?
22     A.  I assume there are some, yes.
23     Q.  Do the NSSF magazine chart counts include
24 magazines that are possessed by law enforcement?
25     A.  They would, yes.

45 (Pages 174 - 177)

Page 178

1    Q.  Okay.  Turning back to your initial report.
2        Oh, geez, one second.  I just realized that
3  when I came back from break, I forgot to shut my
4  door.
5        All right.  Turning down to Page 2 of your
6  initial report, which is Page 4 in the document
7  viewer, about halfway down the first paragraph, you
8  state, "Magpul, the largest manufacturer of AR15
9  magazines, and who also produces Glock and AR10
10 magazines, estimates the total number of magazines at
11 15-plus rounds at 350 million."
12       Where did you get this information?
13   A.  From Duane Liptak.
14   Q.  Okay.  And why would he know the answer to
15 this question?
16   A.  Because he is a VP at Magpul.
17   Q.  And what was the form of this conversation?
18   A.  I literally asked him if he had any way of
19 knowing what the total number of magazines at 15-plus
20 rounds in the U.S. were.
21   Q.  Was this in a phone call?
22   A.  No.  It was -- I used Facebook Messenger.
23   Q.  Did you retain a copy of that Facebook
24 Messenger conversation?
25   A.  It's still in my -- it's still in Messenger,

Page 179

1  and it's in my file, yes.
2    Q.  Can you provide us with the copy of that
3  conversation?
4    A.  Yeah, I guess I can.  Do you want me to do
5  it now, or do you want me to do afterwards?
6        MR. ARRINGTON:  Actually, I think that's a
7  good -- I did not realize that this was Facebook
8  Messenger.  Can you print that out and send it to --
9  we'll just take a five-minute break?  Is that all
10 right, Hendrik?
11       MR. VAN HEMMEN:  Yeah.
12       MR. ARRINGTON:  Thank you.
13       THE VIDEOGRAPHER:  Going off the record.
14 The time is 2:57.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  We are back on the
17 record.  The time is 3:05.
18 BY MR. VAN HEMMEN:
19   Q.  All right.  Before we went off, I think the
20 last thing was I asked whether you could send us the
21 Facebook Messenger conversation with Dave Liptak?
22   A.  Which we did.
23   Q.  Oh, sorry.  I didn't look at my email during
24 the break.  I appreciate that.  I will pull that up
25 now.

Page 180

1        Actually, can we go off the record again for
2  a minute?  I want to --
3        MR. ARRINGTON:  All right.
4        THE VIDEOGRAPHER:  Going off the record.
5  The time is 3:06.
6        (Recess taken.)
7        THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 3:08.
9  BY MR. VAN HEMMEN:
10   Q.  All right.  I have the document, and it
11 should be being marked right about now.
12       (Exhibit 17 was identified.)
13 BY MR. VAN HEMMEN:
14   Q.  All right.  What you sent us is now
15 Exhibit 17.  If you could open that, please.
16       Just let me know when you have it.
17   A.  Okay.
18   Q.  All right.  Is this the full conversation?
19   A.  It is.
20   Q.  Were there any subsequent conversations on
21 this topic?
22   A.  That's the full conversation.  There is
23 absolutely nothing else.
24   Q.  Okay.  Thank you.
25       All right.  You note here that in the first

Page 181

1  message, that "Colorado has a 15-round limit, but the
2  data I have is under over 10 rounds."
3        Is it -- am I correct that you reached
4  out to Mr. Liptak because the Colorado limit was
5  15 rounds and after, whatever calculations you did
6  beforehand, you wanted to see whether you needed to
7  adjust for the actual requirement?
8    A.  Well, I mean, I wrote what I wrote.  I
9  wanted to know if he had a reference, and that's what
10 I was looking for.
11   Q.  Okay.  Did he give you a reference?
12   A.  Well, no, he did not.  He -- he gave me a
13 number.
14   Q.  And as this is the extent of the
15 conversation, you never followed up with him on where
16 that number came from?
17   A.  I did not.
18   Q.  Okay.  I think that's all I have to say on
19 that.
20       All right.  Do you -- do you have any reason
21 to -- okay.  Never mind.
22       I prepared questions, not expecting that I
23 would see the actual conversation.  So I am crossing
24 a lot of these out.
25       Okay.  Do you consider this estimate to be

46 (Pages 178 - 181)

Page 182

1 trustworthy?
2    A. I do.
3    Q. Do you have any basis to evaluate this
4 estimate?
5    A. I did not, other than my knowledge of
6 Mr. Liptak.
7    Q. Okay. So your basis for evaluating the
8 number is just that you believe Mr. Liptak is
9 qualified to produce this number?
10   A. Correct.
11   Q. Do you consider this number to be, as you
12 put it, a floor, a ceiling, or a most likely number
13 for the actual number?
14   A. Well, I mean, he -- he said we use 300 -- we
15 used over 350 million as a conservative number. It
16 seems reasonable to me that that's a conservative
17 number.
18   Q. Okay.
19   A. And I'm going to take away from that,
20 though. I mean, I still say that the NSSF numbers
21 are the floor, and this number is, obviously, higher
22 than that.
23       And so it's a number, but it's -- it's
24 harder to verify that number than the NSSF numbers.
25   Q. Okay. You state that Magpul is the largest

Page 183

1 manufacturer of AR15 magazines.
2       How do you know this?
3    A. Because they make more than anybody else.
4    Q. Okay. Are there published production
5 numbers for manufacturers of magazines?
6    A. There are. There are some out there. You
7 know, Magpul, up until they left Colorado, I had
8 frequent interactions with not just Magpul, but
9 Magpul official as well as Magpul testing personnel.
10      In fact, one of my friends was one of the
11 people who was actually testing Magpul magazines, and
12 so I had access to employees of Magpul, as far as
13 their numbers for both military and civilian
14 production, and I can't take it out of my head. It's
15 in my head.
16      But, you know, there's -- there's not
17 anybody else who ever has had production numbers that
18 are as high as Magpul's for magazines, or AR15s.
19   Q. If these production numbers exist, what was
20 your basis for not using those production numbers to
21 calculate this?
22   A. Well, Magpul has production numbers for
23 their protection, but they don't have production
24 numbers for other manufacturers. They have -- they
25 have estimates, and that's what that number is is an

Page 184

1 estimate of their manufacturer. I mean, it's a
2 combined number. I mean, that's what his answer was.
3 It's a combined number.
4    Q. And -- and do you know if they're the
5 largest manufacturer of AR15 magazines for the
6 civilian market?
7    A. Yes, they are.
8    Q. Do they sell magazines to law enforcement?
9    A. They do.
10   Q. Do they sell magazines to the military?
11   A. They do.
12   Q. Do you know whether either of those groups
13 are included in the 350 million?
14   A. I asked him "owned by Americans." And so
15 ownership does not include the government, and the
16 government would be the military, not police
17 officers, but the military.
18   Q. Okay. Is that a standard use of the
19 word "owned" in this context?
20   A. In the firearms industry? Yes, it is.
21   Q. Okay. All right. So we went over three
22 methods for estimating the number of 15-plus round
23 magazines, one being this conversation with
24 Mr. Liptak, one being the NSSF magazine chart, and
25 one being your estimate of various types of firearms

Page 185

1 and the magazines that they're sold with.
2       Of those three methods, which do you
3 consider the most reliable?
4    A. I don't know that any of them is going to be
5 the most reliable, because you're asking me to
6 substantiate something that we can't say.
7       We know that the NSSF number is the most
8 conservative of those three numbers and that
9 Mr. Liptak's number is the highest, but if I don't
10 have data to prove it, it's just an estimate.
11      So I'm not going to tell you that one is
12 more reliable than the other. One may be more
13 verifiable than the other, which is the NSSF. But
14 just because it's more verifiable does not mean it's
15 more accurate either.
16   Q. Are you saying that you are not qualified to
17 evaluate these different methods for their
18 reliability or accuracy?
19   A. Not at all.
20   Q. All right. Going back to your initial
21 report, Tab 1. And this will be down near the bottom
22 of the first paragraph on Page 2. It says,
23 "Conservative estimates are just that, conservative,
24 and there are certainly close to 100 million handgun
25 magazines in the U.S. that are over 15 rounds. That

47 (Pages 182 - 185)

Page 186

1 leaves approximately 250 million rifle magazines over
2 15 rounds."
3      My guess is here what you're doing is taking
4 this 350 million 15-plus round magazines from your
5 conversation with Mr. Liptak and subtracting your
6 estimate of 100 million 15-plus round handgun
7 magazines to arrive at 250 15-plus rifle magazines;
8 is that correct?
9   A. That's correct.
10   Q. Does "certainly close to 100 million" mean
11 100 million plus or minus some margin of error?
12   A. Sure.
13   Q. What would you put the margin of error on
14 that as?
15   A. I don't know. I mean, if we go back to
16 the -- to the chart from NSSF, and we add up the
17 number, we come to -- give me a second. The number
18 of rifle and pistol magazines that are 11-plus rounds
19 estimated to be just about 160 million.
20      So that's the -- that's a lower floor, and
21 so are there more than that? Yes. How much more?
22 Maybe it's 350 million. I don't know. But there's
23 definitely more than 160 million.
24   Q. You're saying based on the NSSF, there are
25 definitely more than 160 15-plus round magazines?

Page 187

1   A. 11-plus round mags.
2   Q. 11-plus. Thanks.
3      Where, then, did this 100 million number
4 come from?
5   A. That is the estimate of semiautomatic
6 handguns, 89 million, and looking at the fact that
7 most of them come with two or three rounds. So I'm
8 saying it's at least 100 million.
9   Q. Okay. And you say certainly close to
10 100 million, and you mean at least 100 million?
11   A. Well, it says, "conservative estimates are
12 that, conservative," and there are certainly close to
13 100 million handgun magazines in the U.S. that are
14 over 15 rounds. It's -- it's going to be over --
15 it's some number over that.
16      You know, if you take 89 million handguns,
17 and you back out how many of them are 9 millimeters,
18 then you can do a calculation that comes up with --
19 give me a second. It would be somewhere in the range
20 of 80 million 9 millimeter handguns -- I'm sorry.
21 9 millimeter magazines that are over 15 rounds.
22      Again, it's estimates based on the
23 information that's available.
24   Q. Okay. And why did you calculate handgun
25 magazines this way, but not rifle magazines this way?

Page 188

1   A. Because it's really hard to -- it's really
2 hard to look at handgun magazines and rifle magazines
3 in the same manner.
4      Most people who own a handgun, they will go
5 and buy, you know, one or two magazines after they
6 initially buy a handgun.
7      People who buy rifle magazines, that number
8 is -- is higher. There's not a way to directly
9 correlate the number of rifles sold to the number of
10 magazines that are supplied with them.
11      So typically they come with one, but I can
12 tell you that I don't know anybody who owns an AR15
13 that doesn't have at least five or six magazines for
14 their AR15.
15      So that -- that upper bound is just much
16 more difficult to determine. It's easier to
17 determine with a handgun.
18   Q. All right. Why -- okay. All right.
19      So I wish I knew the data science term for
20 this concept, but does it strike you as problematic
21 that you have a number that represents a total
22 population, 350 million for Magpul, that was
23 determined through one methodology, and you subtract
24 a subset of that population in order to estimate the
25 remaining population, where the subset was calculated

Page 189

1 through a different methodology?
2   A. Sure.
3      They're estimates. I've never said anything
4 other than they were estimates.
5   Q. If one of those numbers is further off from
6 the true number than the other, what would that do to
7 the error on the derived number?
8   A. Well, the derived number of 250 million?
9   Q. Yeah.
10   A. It would lower it. If there's more handgun
11 magazines than 100 million, then it would lower it.
12 If there's less, then it would raise it.
13   Q. If, hypothetically, we ask someone how
14 many handguns are in this room in -- or, let's say,
15 in New York City, and we had a number. Say that
16 number ended up being a million. I have no idea
17 whether that's anywhere near plausible.
18      And say we then went out and counted the
19 number of semiautomatic handguns that we see and came
20 up with 100,000.
21      Would we then be safe to say -- or would it
22 even make sense to say that we estimate that the
23 number of revolvers in New York City are that million
24 minus the number of semiautomatics?
25   A. No.

48 (Pages 186 - 189)

Page 190

1    Q. Isn't that analogous to what we're doing
2 here?
3    A. Not really.
4    Q. Why is that?
5    A. Because it's a different population, and you
6 don't know how many guns are in New York.  And the
7 other point is that the people who own firearms in
8 New York are going to be less likely to tell you that
9 they own them than people who live in areas where
10 firearms have few or no restrictions.
11    Q. All right.  But just from taking that,
12 saying that we know that the number we counted is
13 going to be an underestimate, and saying that we know
14 that the total number is likely to be a
15 underestimate, can we really say anything about the
16 number of revolvers?
17    A. I mean, it depends on a lot of factors.
18 It's a different -- it's a different set of things
19 that you're looking at.
20    With firearms, we have serial numbers in
21 most cases, and we can look at the data and compile
22 them.
23    Magpul has made a few firearms.  They are
24 primarily a magazine and accessories manufacturer,
25 and so their magazines are not counted by

Page 191

1 manufacturers, as well as place -- companies like
2 Mec-Gar and Lancer.  I mean, Lancer does make some
3 rifles.  But most of these companies who make AR15
4 magazines, that is primarily what they make, and they
5 turn out thousands and thousands of them every week.
6    So it's a different accounting method.  You
7 don't have reporting to the ATF to be able to go back
8 and look at them.  So it's very different.
9    Q. Let me make a much simpler example.
10    If I were to have a jar filled with red and
11 blue marbles, and you were to estimate the number of
12 marbles within that jar, and then you were going to
13 count the number of visible red marbles within that
14 jar, would it be reasonable to subtract the number of
15 red marbles from the overall estimate of marbles in
16 the jar to arrive at the blue marbles?
17    A. Sure.
18    Q. Even though you know there are likely red
19 marbles that are not visible?
20    A. Yeah, you're looking at a population.
21    Q. Okay.  The last sentence of that paragraph
22 we've been looking at -- and this is Exhibit 1,
23 Page 2, first full paragraph -- or first paragraph
24 says, "From one third to one half of all U.S. gun
25 owners surely own a magazine that is over 15 rounds."

Page 192

1    Other than the summary sentence that starts
2 the whole discussion section, this appears to be the
3 only sentence in your initial report that deals with
4 the number of owners of large-capacity magazines as
5 opposed to the number of magazines; is that correct?
6    A. That is correct.
7    Q. And unlike the ten-round cutoff from the
8 ordinances in this case and from several places you
9 estimated elsewhere, here you use a 15-round cutoff;
10 is that correct?
11    A. That is correct.
12    Q. Okay.  What's your basis for the one-third
13 to one-half estimate?
14    A. Looking at the firearms sold, the English
15 report, the NSSF data, looking at all of it, when you
16 look at the firearms that are sold and the magazines
17 that would be 15 or over, that's what the numbers
18 sell -- tell you.
19    Q. So the NSSF reports are number of magazines
20 as opposed to number of owners; correct?
21    A. They are.
22    Q. Would -- are you making an assumption here
23 that the distribution of magazines is even -- like
24 types of magazines is even across owners?
25    A. I'm sorry.  I didn't hear one of those

Page 193

1 words.
2    Q. Sorry.
3    Are you saying that the distribution of
4 different size magazines across the population of
5 magazines is the same or reasonably the same as the
6 distribution of different size magazines across
7 firearm owners?
8    A. Generally, yes.  I mean, that goes to make
9 sense.  I mean, in the people that I've trained over
10 the years, this is very consistent.  I mean,
11 everybody that I train is a gun owner, and so I've
12 got a dataset of 7,000 people that I can look at and
13 say, "What -- what firearms do you own, and what do
14 you have?"
15    And over the, you know, 20-plus years that
16 I've been training, the vast majority of people that
17 come to my classes have firearms that have a round --
18 a round count over 15.
19    And so I still think that's a conservative
20 estimate.  Sure, there are some that have some that
21 are over and some that are under, but I think that is
22 an absolutely accurate statement.
23    Q. Do they have -- do you think that that
24 population has a higher number per person of
25 higher-capacity magazines?

49 (Pages 190 - 193)

Page 194

1    A.  No.  People that I compete with probably
2  does, but the average -- the average person on the
3  street that comes to one of my basic classes, no.
4  They -- they are typical of the general gun owner and
5  what I see as far as firearms ownership on the
6  various forums and various surveys.
7    Q.  Okay.  And is that the entire basis of the
8  one-third to one-half estimate?
9    A.  Everything -- everything that's in my report
10  and that's in my head says that is a legitimate
11  number.
12    Q.  Okay.  You didn't review any studies,
13  reports, or other materials that specifically address
14  this number?
15    A.  I mean, I did look at the English report,
16  obviously, and I've looked at the Washington Post
17  report, and, you know, there is data in there.
18      So, yes, I've looked at that data, and, yes,
19  inquiries and questions to manufacturers and of my
20  own students, yes.
21    Q.  Okay.
22    A.  That's all that combined.
23    Q.  But those aren't cited in the report.  You
24  only cite the Washington Post and the English report
25  for number of AR15s; is that correct?

Page 195

1    A.  Well, my education and experience is
2  something that I can rely on, and that's what that
3  report -- that's what that sentence has a
4  component of.  Absolutely.
5    Q.  Okay.  Would you be comfortable using this
6  number to extrapolate -- to determine the number of
7  owners of 15-plus round magazines in the United
8  States?
9    A.  I think so, yes.  I think that's a
10  legitimate number.
11    Q.  How many gun owners do you think there are
12  in the United States?
13    A.  It depends on who you believe.  15 million
14  to 25 million, depending on who you listen to and who
15  you believe.  Some groups put that number much, much
16  higher.  I don't know.
17    Q.  You don't have an opinion on the number of
18  gun owners in the United States?
19    A.  Well, English has a number, and, you know, I
20  can't remember exactly what he says the number is,
21  but, you know, 30 percent, you know, of homes have a
22  firearm is a number that I've seen.
23      I mean, if you want to go back and look at
24  the English report, we can go back and look at it.
25  But, you have a number of U.S. citizens, a number of

Page 196

1  adults, you also have a higher number of people
2  living in the United States that are above that
3  number, because we're not counting -- in some of
4  those census numbers, they're not counting people who
5  are undocumented, whatever the proper term is today
6  for that.  I think that's the right term.
7      But, you know, some of those people
8  obviously are going to own firearms.  Whether they're
9  prohibited or not, that's a legal matter.  But that
10  number is, by all the indications that I've seen,
11  that one third to one half is an appropriate
12  statement.
13    Q.  Other than those that we -- sorry.  One more
14  question there.
15      Did the English report discuss a -- discuss
16  large capacity magazines or higher capacity
17  magazines, whatever term you want to use?
18    A.  I mean, I would have to go look at it.  I
19  mean, I reference the English report in some portions
20  of my report, but I would have to go look at it
21  specifically to tell you exactly what it says,
22  regarding large-capacity magazines.
23    Q.  Okay.  All right.  Other than those that
24  we've already discussed, did you rely on any other
25  sources in forming your opinions concerning the

Page 197

1  prevalence of magazines?
2    A.  No.
3    Q.  You're not offering any opinions on the
4  number of magazines that have been discarded or
5  destroyed; is that correct?
6    A.  Correct.
7    Q.  You're not offering any opinions on the
8  total number of individuals who own large capacity
9  magazines; correct?
10    A.  Other than what's referenced in my report,
11  no.
12    Q.  And you're not offering any opinions on the
13  use of large capacity magazines for any purpose;
14  correct?
15    A.  I'm not sure what you -- I mean, I've got it
16  in my report; so how would you say that I'm not?
17  It's in my report.
18    Q.  You're not offering any opinions on, for
19  example, the use of large-capacity magazines in
20  self-defense?
21    A.  That's in my report.
22    Q.  Can you show me where in your report it is?
23    A.  I mean, in my -- in my initial report, it
24  says, "manufactured and sold within the State of
25  Colorado or commonly possessed and used for lawful

50 (Pages 194 - 197)

Page 198

1 purposes."
2      I mean, you can use a firearm in
3 self-defense.  You can use a firearm for hunting.
4 You can use a firearm for competition.  And, yes,
5 those are used.  I mean, I don't know how you can say
6 I'm not saying anything about it when it's right in
7 the report.
8      Q.  Okay.  Are you offering any opinion on the
9 prevalence of use of large-capacity magazines in, for
10 example, self-defense?
11      A.  No, I don't have that data.
12      Q.  Okay.  And you don't have that data for use
13 of large-capacity magazines for any other purpose
14 either; correct?
15      A.  Well, I mean, I could give you an estimate
16 how many people shoot three gun and high power and
17 those kind of things in Colorado.  It's a pretty
18 significant number.
19      Most the people in Colorado, who do predator
20 hunting, use the AR15 with high-capacity magazines.
21 I don't know what to tell you.
22      I mean, you're trying to restrict what my
23 opinion is when I have not restricted my own opinion.
24      Q.  I'm just trying to understand the scope of
25 your opinion here.  That's all.

Page 199

1      A.  Well, the scope is what's in my report.  I
2 mean, after my deposition, if we go to trial, I'm not
3 allowed to say anything that's not in my deposition
4 or my report.  So my report is the scope of what I'm
5 talking about.
6      Q.  All right.
7      Jennifer, can you give us a time estimate
8 here?
9      THE COURT REPORTER:  Five hours, six
10 minutes.
11      MR. VAN HEMMEN:  All right.  Thank you.
12 BY MR. VAN HEMMEN:
13      Q.  All right.  You stated earlier that you
14 reviewed the Yurgealitis rebuttal report, which is
15 Exhibit 4.
16      Can you please go to Exhibit 4.
17      A.  Okay.
18      Q.  Do you agree with the opinions contained in
19 this report?
20      A.  No.
21      Q.  Did you respond to anything in this report
22 in your supplemental report?
23      A.  Not -- I don't think so specifically.  I
24 mean, I did read it, but I responded to basically the
25 things that were germane to my original report and

Page 200

1 clarification of the numbers specifically.  I did not
2 see anything else that was worth responding to.
3      Q.  Okay.  Do you agree with the factual
4 descriptions contained in this report?
5      A.  Nope.
6      Q.  Do you agree with -- do you disagree with
7 any of the methodology contained in this report?
8      A.  I probably do.  I would have to read through
9 it again to tell you specifically.
10      Q.  Okay.  All right.  If you go down to
11 Paragraph 7.
12      A.  Seven?
13      Q.  Yes.
14      A.  Okay.
15      Q.  Do you disagree with anything in this
16 paragraph?
17      MR. ARRINGTON:  My paragraph says -- oh, as
18 discussed in this report?  Are you talking about that
19 one?
20      MR. VAN HEMMEN:  The paragraph is Number 7.
21 It says -- it's on, let's see, Page 3 of this exhibit
22 and is the second paragraph there, "As I explained in
23 my initial report (see Paragraphs 29, 35, 49, 119,
24 and 121)."
25      MR. ARRINGTON:  I don't think that I am on

Page 201

1 the right exhibit.  You're on Exhibit 5?
2      MR. VAN HEMMEN:  Four.
3      MR. ARRINGTON:  Four.  Oh, okay.  That makes
4 a difference.  Okay.  All right.
5 BY MR. VAN HEMMEN:
6      Q.  Have you read the paragraph,
7 Mr. Passamaneck?
8      A.  Yes.
9      Q.  Do you disagree with anything in that
10 paragraph?
11      A.  Yes.
12      Q.  All right.  Can you please describe what you
13 disagree with?
14      A.  Well, it's misleading.  It says that
15 numerous semiautomatic firearms -- the ones that he
16 lists are very small subset, and, in fact, the
17 Browning BAR does have a detachable magazine.  SKSs
18 can also have detachable magazines.
19      Q.  Okay.  Going to Paragraph 8, the next
20 sentence, do you agree with this paragraph?
21      A.  No.
22      Q.  Okay.  And how so?
23      A.  Because it wouldn't be a semiautomatic
24 firearm if it didn't have a magazine.  It would be a
25 single-shot firearm.

51 (Pages 198 - 201)

1    Q.  Okay.  Is it possible to discharge a firearm
2  without a magazine?
3    A.  One time.
4    Q.  Okay.
5    A.  That's why I said it would be a single shot.
6    Q.  Going down to Paragraph 18, do you take
7  issue with anything in this paragraph?  And take a
8  minute to read it.
9    A.  Yeah, I mean, his -- his -- Paragraph 18 is
10  anecdotal information about his 26 years.  So, I
11  mean, I guess my anecdotal information that I've had
12  dozens of magazines fail is irrelevant because he was
13  a cop, and I'm not.  It's anecdotal.  It doesn't --
14  and it does not mesh with reality.
15    Q.  Okay.  If we go down to Paragraph 20, which
16  is a short one, do you agree with that statement?
17    A.  No.
18    Q.  What about that statement do you disagree
19  with?
20    A.  Well, he says, "Traditional steel, hyphen,
21  or aluminum."  Well, the traditional magazines for
22  AR15s are actually aluminum, not steel.  And it's
23  unclear what he's talking about specifically, but
24  magazines can be a combination of -- they actually
25  are a combination of more than one material.  They're

1  usually either polymer, steel, or aluminum body.
2  Aluminum magazines are not extremely durable.  In
3  fact, if you step on one, it's usually going to be a
4  problem.  And they are sensitive.  In fact, they make
5  little tools to correct and repair feed lips for AR15
6  magazines.
7    Q.  All right.  And going down to the last
8  paragraph, Paragraph 23.  Can you please read that
9  paragraph and let me know if you disagree with
10  anything in it.
11    A.  Yeah, it -- it's, again, it's very
12  misleading, because it says that, "In government
13  administered tests, the PMAG, reportedly cycled
14  20,400 rounds of M855A1 ammo without any
15  magazine-related stoppages."  That was not just a
16  magazine.  That was a group of magazines.  And, like
17  I said, I mean, I was friends with one of the guys
18  who was testing magazines for Magpul, and this just
19  is not true.
20    Q.  Okay.  All right.  Let's turn back to
21  your -- sorry.  My note -- I just put your report --
22  just give me a second to realize which one it is.
23  Probably the first one.
24    So Exhibit 1, your initial report.
25    A.  Okay.

1    Q.  And if we scroll down to Page 2, the second
2  paragraph begins, "Detachable magazines are necessary
3  to make semiautomatic firearms designed to receive
4  such magazines operate effectively.  Without such
5  magazines semiautomatic firearms are inoperable."
6    What is your reason for including this
7  statement in your report?
8    A.  Because it's true.  I mean, I'm confused why
9  you're even asking.  I already explained it to you
10  when we were going through the prior report.  If you
11  don't have a magazine there to feed rounds in the
12  magazine, it's a single shot.  It's not a
13  semiautomatic.  So they are absolutely necessary.  I
14  mean, were -- the point is --
15    Q.  Is this --
16    A.  -- some people say that that's not true does
17  not make it untrue, and the fact is that they are
18  designed specifically to feed mag -- to feed
19  ammunition into semiautomatic firearms.  And so if
20  you don't have them, they don't work.
21    Q.  I think I'm trying to understand why this is
22  even something that we're discussing.
23    A.  Well, your expert said I was wrong on that
24  topic.  So obviously it's worth discussing if your --
25  if your expert has one opinion, I've got a completely

1  opposite opinion, it's worth discussing.
2    Q.  Okay.  I think from our earlier discussion I
3  now understand what you mean here, but let me ask it.
4    Is the purpose of this paragraph as a whole
5  to say that firearms will not function correctly with
6  magazines with ten rounds or less because most
7  firearms were designed to be used with magazines that
8  hold more rounds?
9    A.  No.  That's -- that's not what that
10  paragraph's about.
11    Q.  Okay.  Can you explain to me what this
12  paragraph is about?
13    A.  I -- I don't know what to tell you.  It's
14  very clear.
15    MR. ARRINGTON:  Wait.  Wait.  Just so I'm
16  clear, which paragraph are we on again?  The one that
17  begins, "Detachable magazines are necessary"?
18    MR. VAN HEMMEN:  Yeah.  That's correct.
19    MR. ARRINGTON:  Okay.  Thanks.  Go ahead.
20    THE WITNESS:  It's clear.  If you don't
21  have -- if you don't have magazines as they're
22  originally designed, if they wear out and fail, then
23  that firearm becomes worthless.
24    If -- if the magazine is not allowed to
25  cycle ammunition into the firearm, it's no longer a

Page 206

1 semiautomatic firearm, and it's no longer operating
2 as it was originally designed and intended to do so.
3       And magazines are absolutely wear items.
4 They absolutely do wear out. I mean, if you don't
5 have them, if you can't replace them, your firearm
6 that you bought at some point becomes worthless to
7 you.
8 BY MR. VAN HEMMEN:
9    Q. If you were -- in general, if you have a
10 magazine that wears out, do you buy a new magazine?
11    A. I used to. I used to throw Magpul magazines
12 and aluminum AR15 magazines in the trash. But now I
13 do my best to rebuild them.
14    Q. Are you able to buy ten round or fewer
15 magazines that fit those guns?
16    A. In some cases, yes. In other cases, no.
17    Q. What is an example of a gun that will not
18 function with a sub ten -- ten round or fewer
19 magazine?
20    A. It's not necessarily that they won't
21 function. It's that they're not available. And even
22 the Glock 17, when you buy ten-round magazines from
23 Glock, they're not reliable. They just don't
24 function at the same reliability rate that the
25 standard capacity magazines function.

Page 207

1       Even -- even in competition where the round
2 count is limited to ten rounds, you will find
3 virtually everyone using standard-capacity magazines
4 downloaded, because the ten-round magazines from the
5 manufacturers are not reliable.
6    Q. All right. I think what's missing for me
7 here is that -- because I don't believe this ever
8 states that magazines with ten rounds or less will
9 wear out faster.
10    A. I don't say they'll wear out faster. I said
11 they just aren't as reliable.
12    Q. Okay. Or aren't as reliable. I mean, it
13 doesn't say that in this paragraph; right?
14    A. No.
15    Q. Okay. All right.
16       Moving on to the next paragraph beginning
17 with, "Magazines are not merely a box in which
18 ammunition is stored. Rather, cartridges are held in
19 the magazine under spring tension."
20       First of all, is the last word of this
21 sentence a typo?
22    A. "Tension"?
23    Q. Yeah.
24    A. No.
25    Q. Should it be "compression"?

Page 208

1    A. No.
2    Q. Okay. In that case, maybe I'm not really
3 understanding how this works.
4       If we could go back to Exhibit 4 and down to
5 Page, I believe it's 3, of the report. There is a
6 picture there.
7    A. Okay.
8    Q. So my understanding is that that spring is
9 compressed into the tube, and the rounds that are
10 added into the magazine, further compress the spring,
11 and as you fire the gun, the spring pushes the
12 magazines up into the mechanism of the gun; is that
13 correct?
14    A. Correct.
15    Q. And so where is the tension in that process?
16    A. It's on the feed lips. Without the feed
17 lips, a compression of the spring would go away. So
18 it's held in tension. The compression of the spring
19 holds the cartridge against the feed lips, which is
20 the tension.
21    Q. All right. Thanks for clearing that up.
22    A. Uh-huh.
23    Q. All right. Next, what is the significance
24 of this sentence? I'm not quite seeing how it fits
25 into the rest of the paragraph.

Page 209

1       MR. ARRINGTON: Who -- I don't know which
2 sentence we're talking about now.
3       MR. VAN HEMMEN: This is the first sentence
4 of the last paragraph on Page 2. It says, "Magazines
5 are not merely a box in which ammunition is stored,
6 rather cartridges are held in the magazine under
7 spring tension."
8       MR. ARRINGTON: Okay. Great. Thanks.
9       And you're asking him for the meaning of
10 that sentence, the first sentence?
11       MR. VAN HEMMEN: Yeah.
12       MR. ARRINGTON: Okay. Great.
13       THE WITNESS: It is the whole design of the
14 firearm along with the magazine. They are held there
15 in order to feed into the chamber when a prior round
16 is fired. Everything else is explained in the first
17 sentence.
18 BY MR. VAN HEMMEN:
19    Q. Okay. Is this -- is the -- this mechanism
20 different in a magazine that is designed for greater
21 than or fewer than ten rounds?
22    A. Not necessarily, no.
23    Q. All right. Let's go to the last discussion
24 paragraph of the record. It says, "In addition, for
25 at least the last 40 years, magazines, as an integral

53 (Pages 206 - 209)

Page 210

1 commodity product that allow the semiautomatic
2 firearm to function, have been designed with basepads
3 that specifically allow them to be" -- I believe it
4 actually said, "specially allow them to be changed
5 with different pads, allowing for variable
6 capacities."
7        What's the significance of this?
8        THE WITNESS:  So in relation to the Colorado
9 magazine ban, there was language in the bill that
10 said "readily convertible," and my opinion is that if
11 readily convertible is part of the law, then all
12 magazines are basically outlawed.  That was clarified
13 from a legal perspective, but not an engineering
14 perspective, and so this is still relevant.  If you
15 give me a ten-round magazine and a pop off the
16 basepad and I pop off the basepad, and I put a
17 plus-five basepad on it, now I have a 15-round mag.
18 That's the way firearms magazines have been designed
19 for, again, the last 40 years.
20        So in the '80s, that's when firearm
21 magazines started to have base pads that were easy to
22 remove.
23        Prior, you know, either metal steel or metal
24 aluminum magazines for AR15s and even magazines for,
25 say, you know, Ruger and Smith & Wesson, they -- they

Page 211

1 were clamped or somehow affixed to the bottom of the
2 magazine base so they could not be removed.  Now
3 they're simple to remove.  I can take a magazine
4 basepad off, rebuild the magazine, and change it from
5 15 rounds to 25 rounds in you, know, just a matter of
6 a few seconds.
7 BY MR. VAN HEMMEN:
8    Q.  All right.  Thank you.
9        MR. ARRINGTON:  Jennifer, where are we on
10 time?
11        THE COURT REPORTER:  Five hours, 28 minutes.
12        MR. VAN HEMMEN:  I'm just about done here.
13 The only thing I want to do now is go back to those
14 couple unanswered questions at the beginning and just
15 put on the record that these are not being answered.
16 BY MR. VAN HEMMEN:
17    Q.  All right.  Mr. Passamaneck, how many guns
18 do you own?
19    A.  I'm not going to answer that question.
20    Q.  What is your basis for not answering the
21 question?
22    A.  It's irrelevant.
23    Q.  Irrelevance is not a basis for a grounds to
24 not answer within a deposition.
25        Are you aware of that?

Page 212

1    A.  It's -- it's -- these are my personally
2 owned firearms, and I'm not going to tell you how
3 many I own.  I don't think you have any right to ask
4 me that question.
5    Q.  All right.  What types of guns do you own?
6    A.  I own rifles, pistols, and shotguns.
7    Q.  Do you own any weapons that would be defined
8 as assault weapons under the definition of the
9 challenged ordinances?
10    A.  Most likely I do.
11    Q.  How many?
12    A.  I don't know.
13    Q.  Is it more than ten?
14    A.  I don't know.
15    Q.  Is it more than 100?
16    A.  If I don't know 10, I'm not going to know
17 100.
18    Q.  All right.  How many magazines do you own?
19    A.  I'm not -- I honestly cannot tell you how
20 many I own.  It's -- it's a lot, but I could not tell
21 you the actual number.
22    Q.  Is there -- is it more than 100?
23    A.  I'm not going to answer any further than
24 that.
25    Q.  What is your basis for not answering?

Page 213

1    A.  I just told you I don't know how many I own.
2    Q.  Is it more than 50?
3    A.  I -- probably.  I don't know exactly what
4 the number is.  I've never really sat down and
5 counted them.
6    Q.  Is it more than 20?
7    A.  Probably.
8    Q.  All right.  What proportion of the magazines
9 do you own hold more than ten rounds?
10    A.  I don't know.
11    Q.  Do you own more than ten magazines that hold
12 more than ten rounds?
13    A.  Probably.
14    Q.  Do you own more than twenty?
15    A.  I -- I'm not going any further down this
16 path.  I mean, what I personally own is not -- is not
17 something I'm going to answer.
18    Q.  And what is your basis for not answering?
19    A.  This is my personal property.  I've not
20 talked about it in my report.  I've not used that --
21 how many magazines or guns that I own is not part of
22 my report or my expertise.
23    Q.  And is that the same basis for not answering
24 the questions on numbers of assault weapons --
25    A.  Yes.

54 (Pages 210 - 213)

Page 214

1 Q. -- as defined by the ordinances?
2 A. Correct.
3 Q. All right. I've asked this before, but have
4 you ever used a gun in self-defense?
5     MR. ARRINGTON: Objection. Asked and
6 answered.
7 BY MR. VAN HEMMEN:
8 Q. You can answer.
9     MR. ARRINGTON: You can answer,
10 Mr. Passameneck.
11     THE WITNESS: I have not fired a gun in
12 self-defense. I have used a firearm in self-defense,
13 yes.
14 BY MR. VAN HEMMEN:
15 Q. You've brandished a gun in self-defense?
16 A. I did not. That would be illegal.
17 Q. It would be illegal to brandish a gun in
18 self-defense?
19 A. Absolutely. Brandishing is a legal term.
20 You guys can figure that out. But, no, I did not
21 brandish a firearm.
22 Q. Have you ever aimed a firearm at a person in
23 self-defense?
24 A. I have.
25 Q. How many times has this happened?

Page 215

1 A. I'm -- it's happened more than once.
2 Q. Do you know how many times it's happened?
3 A. I do.
4 Q. How many times?
5 A. I guess I would ask why -- why does that
6 matter?
7 Q. So, again, relevance is not a grounds to not
8 answer a question in a deposition.
9 A. But my expert opinion limits what I'm going
10 to talk about in court or in trial. And so my -- I
11 am paid as an expert witness to talk about what is in
12 my report, and that is it. So if I add something to
13 my deposition, then that can be used in trial, and
14 it's not in my report.
15     So, again, I'm not sure why it's relevant.
16 I'm not sure why you should be able to ask me
17 anything you want about any part of my life. I just
18 don't think it's relevant.
19 Q. But to be clear, you are not answering the
20 question because you believe it is irrelevant?
21 A. I don't believe you have the right to ask
22 that type of question, based on my expert report and
23 what I was retained to do in this case.
24 Q. All right. What type of guns do you use in
25 these situations?

Page 216

1 A. I'm not going to answer any more questions
2 related to this line of questioning. It's just --
3 I'm not going to do it.
4 Q. All right. Just to be clear, I have to ask
5 this line of questions, even if it seems repetitive,
6 just to build the record.
7     So you can keep saying the same thing,
8 that's fine, but I'm going to keep asking the
9 questions.
10     MR. ARRINGTON: Actually, you're not. At
11 some point, you're harassing this witness. And we're
12 going to put a stop to it and call the Court.
13     MR. VAN HEMMEN: All right. I have two more
14 questions.
15     MR. ARRINGTON: All right.
16 BY MR. VAN HEMMEN:
17 Q. What type of magazines did you use in these
18 incidents?
19 A. The magazines that went to the firearms.
20 Q. Were these magazines of a capacity greater
21 than ten?
22 A. In -- in a case, yes, they probably were.
23 Q. All right. All right.
24     Barry, to be clear -- be clear, we have to
25 keep the deposition open in light of the refusals to

Page 217

1 answer these questions and the earlier question.
2 Yeah, I just want to note that before we go on to
3 your cross.
4     MR. ARRINGTON: These questions and the
5 earlier question?
6     MR. VAN HEMMEN: Yeah.
7     MR. ARRINGTON: I hear you saying that he
8 didn't answer questions about the number and type of
9 guns he has, the number and type of mags he has, and
10 his self-defense experience. Was there a fourth area
11 that you're talking about?
12     MR. VAN HEMMEN: Yes, there was, and just
13 give me a minute to find it. I thought that I wrote
14 it down right here, but I must have wrote it down
15 somewhere else.
16     Matt, do you happen to have that at your
17 fingertips?
18     MR. HANNER: I don't, no.
19     MR. VAN HEMMEN: Sorry. I'm waiting for the
20 realtime text player to load. It seems to have
21 reset.
22     So I am -- can we go off the record for a
23 second? I think I'm having technical difficulties.
24     MR. ARRINGTON: Okay.
25     THE VIDEOGRAPHER: This is the end of Media

55 (Pages 214 - 217)

Page 218

1 Number 6. Going off the record. The time is 4:14.
2       (Recess taken.)
3       THE VIDEOGRAPHER: We are back on the
4 record. The time is 4:17. This is the beginning of
5 Media Number 7.
6
7             EXAMINATION
8 BY MR. ARRINGTON:
9   Q. Okay. We'll start with where we left off.
10      Mr. Passamaneck, you were retained as a
11 retained expert in this case; is that correct?
12  A. Yes.
13  Q. And you've prepared an opinion for this
14 case?
15  A. Yes.
16  Q. And your opinions are reflected in the
17 reports that you've issued here?
18  A. Two reports, yes.
19  Q. And do -- do your opinions, in any way, even
20 tangentially turn on your personal ownership of guns?
21  A. No.
22  Q. Do they even in any way tangentially turn on
23 your personal magazines?
24  A. No.
25  Q. Do they in any way tangentially -- even

Page 219

1 tangentially relate to your experience of
2 self-defense using firearms?
3       MR. VAN HEMMEN: I'm going to object to
4 these leading questions.
5       MR. ARRINGTON: It's cross examination,
6 Counsel.
7       MR. VAN HEMMEN: It's your own witness,
8 Counsel.
9       MR. ARRINGTON: It's cross examination.
10 That's what you get when you take a witness on
11 direct. But you can object.
12 BY MR. ARRINGTON:
13  Q. Go ahead and answer.
14  A. No.
15  Q. Okay. Do you consider Mr. van Hemmen's
16 questions about your personal firearm, magazine, and
17 self-defense experience to be offensive?
18  A. I do.
19  Q. Do they --
20      MR. VAN HEMMEN: Object to form.
21 BY MR. ARRINGTON:
22  Q. Do you consider them to be an invasion of
23 your privacy?
24  A. Yes.
25  Q. Do you consider them to be an attempt to

Page 220

1 intimidate you?
2  A. No.
3       MR. VAN HEMMEN: Object to the form.
4 BY MR. ARRINGTON:
5  Q. Do you consider them to be an attempt to
6 embarrass you?
7  A. I don't know. Maybe they are. I can't tell
8 you what his intentions are.
9  Q. Do you -- do you consider that your guns,
10 magazine, and self-defense history is a private,
11 personal matter?
12  A. I do.
13  Q. Okay.
14      So we need to call the Court and get a
15 ruling on this. I will start that process. I'm
16 going to call Magistrate Cruz, if I can get ahold of
17 him.
18      THE VIDEOGRAPHER: Counsel, are you wanting
19 to stay on the record for this?
20      MR. ARRINGTON: No.
21      THE VIDEOGRAPHER: You all would like to go
22 off?
23      MR. ARRINGTON: Yes, please.
24      THE VIDEOGRAPHER: Going off the record.
25 The time is 4:20.

Page 221

1       (Recess taken.)
2       THE VIDEOGRAPHER: We're back on the record.
3 The time is 4:25.
4       MR. VAN HEMMEN: All right, Barry. I'm done
5 with my direct.
6       MR. ARRINGTON: Okay. Thank you. Oh, I
7 thought I was already on my cross.
8       MR. VAN HEMMEN: Oh, sure.
9       MR. ARRINGTON: Did you put his CV in that
10 has his firearms experience?
11      MR. VAN HEMMEN: Yes. It's part of
12 supplemental report.
13      MR. ARRINGTON: Oh, there you go.
14      MR. VAN HEMMEN: It's Exhibit 2.
15 BY MR. ARRINGTON:
16  Q. Mr. Passamaneck, how long have you been
17 involved in the firearms industry?
18  A. For over 30 years.
19  Q. Are you a -- have you -- are you part -- so
20 you indicated you're part owner of Carbon Arms
21 Corporation; is that correct?
22  A. Correct.
23  Q. As part of Carbon Arms Corporation, did you
24 design magazines?
25  A. I did, yes.

56 (Pages 218 - 221)

Page 222

1    Q. And magazine --
2        MR. VAN HEMMEN: Object to form.
3        MR. ARRINGTON: What's wrong with the form
4  of that question?
5        MR. VAN HEMMEN: Leading.
6        MR. ARRINGTON: Did you design magazines is
7  leading?
8        MR. VAN HEMMEN: I think I misheard you,
9  then. I'm sorry.
10 BY MR. ARRINGTON:
11   Q. Did you design magazines as part of your
12 work with Carbon Arms?
13   A. Yes.
14   Q. Okay. Did you sell magazines through Carbon
15 Arms?
16   A. Yes.
17   Q. So did you participate in the magazine --
18 the market for magazines, in other words?
19   A. Yes.
20   Q. Are you familiar with the market for
21 magazines?
22   A. I am.
23       MR. VAN HEMMEN: Object to form.
24       MR. ARRINGTON: What is wrong with the form
25 of that question, Counsel?

Page 223

1        MR. VAN HEMMEN: You're asking a series of
2  leading questions.
3        MR. ARRINGTON: "Are you familiar with the
4  market for magazine?" How is that leading? How does
5  that suggest his answer?
6        MR. VAN HEMMEN: Keep going.
7        MR. ARRINGTON: All right. If you are just
8  going to throw in frivolous objections to disrupt the
9  deposition, we'll stop the deposition, and I'll move
10 for sanctions.
11       MR. VAN HEMMEN: All right.
12       MR. ARRINGTON: Okay.
13 BY MR. ARRINGTON:
14   Q. And you -- do you have --
15       MR. VAUGHAN: Barry, it's Gordon. Can we go
16 off the record for about five minutes and go into
17 a -- can we go into a -- a separate room for a
18 minute?
19       MR. ARRINGTON: Yes, sir.
20       MR. VAUGHAN: Thank you.
21       THE VIDEOGRAPHER: Going off the record.
22 The time is 4:28.
23       (Recess taken.)
24       THE VIDEOGRAPHER: We are back on the
25 record. The time is 4:31.

Page 224

1  BY MR. ARRINGTON:
2    Q. Thank you, Mr. Passamaneck.
3        Did you have a training company?
4    A. Yes.
5    Q. And how many individuals do you believe
6  that -- estimate that you have trained over the
7  years?
8    A. Approximately 7,000.
9    Q. And what aspects did you train them?
10   A. The majority of that was either tactical
11 pistol or introduction to practical pistol. Most of
12 the people were looking at getting a CCW permit or
13 least the training for such. That is the largest
14 component of the students that I've had.
15   Q. Okay. And you have -- do you have
16 certificates from various associations related to
17 your training work?
18   A. You mean my personal training?
19   Q. Yes.
20   A. Yes, I do.
21   Q. And they're reflected here in Exhibit 2,
22 your CV?
23   A. Yes.
24   Q. Okay. Have you -- have you been to trade
25 shows with respect to firearms?

Page 225

1    A. Yes.
2    Q. How many do you think that you've been to?
3    A. Fifteen or so.
4    Q. Have you been to -- have you talked to
5  firearms and magazine manufacturers?
6    A. Yes.
7    Q. How many firearm and magazine -- well, let's
8  take them one at a time.
9        How many firearm -- well, firearm
10 manufacturers, do you believe that you've spoken to
11 over the years with respect to various issues?
12   A. Oh, I don't know what the number is. 50,
13 60, 70, maybe somewhere in that range.
14   Q. What about magazines? How many
15 manufacturers of magazines representatives have you
16 discussed various matters with over the years?
17   A. It's probably in the -- generally the same
18 number, and I'll qualify that in that some firearms
19 manufacturers buy their magazines from third parties,
20 which I've talked to. So it's probably in the
21 neighborhood of, you know, 50 as well.
22   Q. Okay. Did you discuss sales figures with
23 those sales representatives from the various
24 manufacturers?
25   A. At times, yes.

57 (Pages 222 - 225)

1 Q. Okay. You mentioned SHOT Show.
2 Can you tell us what that is?
3 A. SHOT Show is the Shooting, Hunting, and
4 Outdoor Trade Show that is put on by National
5 Shooting Sports Foundation.
6 Q. And is it a small show? a large show?
7 What's the scale of the show?
8 A. It is the largest industry-to-industry show
9 in the -- at least in the United States. It might be
10 in the world. But it has between -- or for over the
11 years, 60- to 80,000 people. It's not a consumer
12 show. It's for literally people that are in the
13 industry.
14 Q. And you said that you played a role in that
15 this year?
16 A. So last year and this year I was asked to be
17 part of management to run the live fire portion of
18 SHOT Show.
19 Q. You were part of management at SHOT Show?
20 A. Correct.
21 Q. The largest industry gathering on the
22 planet?
23 A. Yes.
24 Q. Okay. How many articles about various
25 firearms talks do you believe -- can you estimate

1 that you've read over the last 30 years?
2 A. That I've read?
3 Q. Yeah.
4 A. Holy cow.
5 Q. Hundreds? Thousands?
6 A. Oh, easily over 10,000. I mean, I consume
7 data. I mean, when -- literally when I look up at
8 my -- at my bookshelf, I've got, you know,
9 20-some-odd books that are just firearms-related
10 books, mixed in with my engineering books. I -- I
11 enjoy reading.
12 Q. Hold on just a second.
13 You indicated in your direct examination
14 that you were aware that Congressional Research
15 Office has relied upon the NSSF reports in providing
16 information to congress?
17 A. Correct.
18 Q. What is that awareness based upon?
19 A. You read several of those actually in my
20 last deposition.
21 Q. Okay. So you're familiar with -- from the
22 information. Was there a particular document?
23 A. I don't know. I would have to go back and
24 look at my exhibits from my deposition.
25 Q. This is not giving me an opportunity to

1 upload documents. I guess I'm not understanding
2 that.
3 Why is that? Let's go off the record.
4 THE VIDEOGRAPHER: Going off the record.
5 The time is 4:39.
6 (Recess taken.)
7 THE VIDEOGRAPHER: We're back on the record.
8 The time is 4:45.
9 BY MR. ARRINGTON:
10 Q. Let's go back to exhibit -- let's go to
11 Exhibit 18, Mr. Passamaneck.
12 (Exhibit 18 was identified.)
13 BY MR. ARRINGTON:
14 Q. Go to the second page. There's a paragraph
15 that has a heading "AR- and AK-Type Rifles in
16 Circulation."
17 A. Okay. I have it.
18 Q. Does this refresh your recollection
19 about how you know if Congressional Research Service
20 uses the NSSF data to inform congress about the
21 number of ARs and AKs in circulation?
22 A. Yes.
23 Q. So what is your -- what is that
24 recollection?
25 A. I mean, in that paragraph -- and so we're

1 talking about the first full paragraph on the right
2 side of Page 2 of 3, it literally quotes the NSSF
3 data from 1990 through 2020, which would be the same
4 2022 industry report, having a number at 24.5 million
5 AR and AK type rifles. And that is the MSR number
6 from the NSSF report.
7 Q. So do you -- do you think it's reasonable
8 for Congressional Research Office to inform congress
9 about the number of ARs and AKs in circulation using
10 the NSSF data?
11 A. I think if they're going to cite data, yes,
12 the NSSF data is the data they should be using.
13 Q. If you could put the -- well, go ahead and
14 mark Exhibit 19. That would be the Klarevas report.
15 (Exhibit 19 was identified.)
16 THE WITNESS: Okay. I have that open.
17 BY MR. ARRINGTON:
18 Q. Okay. We'll set that aside for a moment.
19 So you indicated that you had designed and
20 manufactured and sold magazines; is that correct?
21 A. Yes.
22 Q. And you also designed firearms and/or
23 firearm components?
24 A. Yes.
25 Q. And who did you design those for?

Page 230

1     A. It's various entities.  So one is Remington,
2 one is FN, and I've worked on other firearms
3 components that were specifically intended to go on a
4 particular firearm.  Some of them were -- you know,
5 went to military trials.  One of my coms was actually
6 in a -- and gas walks was actually in a military
7 trial for a firearm, oh, like, six or seven years
8 ago.
9     Q. Okay.  And FN means what?
10     A. It is -- I'm not sure exactly.  FNH, but FN,
11 I think it's Fabrique Nationale.  I mean, it's --
12 they're a manufacturer.  So I don't know exactly what
13 FN stands for, but I think it's Fabrique Nationale.
14 And the H has recently been dropped.  So when I did
15 it, it was FNH.  Now it's just FN.
16     Q. Okay.  So counsel asked you a question
17 earlier, and you said -- well, is it true that you --
18 you think that you can issue expert reports just
19 because you're a quote, unquote, "gun guy"?
20       Do you consider this -- consider yourself to
21 be more than just a gun guy, whatever that means?
22     A. Yes.  I mean, I have designed firearms.
23 I've worked on -- as an expert, I've worked on
24 several cases, and so I have extensive training and
25 education, experience, related to firearms.  I mean,

Page 231

1 from design and manufacturer, use, and even from the
2 training perspective.
3     Q. And do you believe that your experience
4 gives you a perspective that would be helpful to the
5 Court in evaluating the data about the number of
6 magazines in the country?
7     A. I do.
8     Q. And why do you believe that?
9     A. Because it shows -- it shows some
10 perspective from the eyes of a person who actually
11 has been involved in the firearms industry, designing
12 magazines, using magazines, rather than just looking
13 at numbers that are not going to be reflective of the
14 total number of magazines or even firearms that have
15 been manufactured and are in the common use in the
16 United States.
17     Q. Thank you.
18       Could you -- so the first sentence of your
19 paragraph -- or your report, your initial report, it
20 says that you believe that magazines are in common
21 use.
22     A. Yes.
23     Q. Okay.  Go to Exhibit 19, please.
24     A. I am at 19.
25     Q. Okay.  This is Mr. Klarevas's expert report,

Page 232

1 dated May 5, 2023.  If you'd go to Paragraph 11.  Is
2 that correct?  It's the Klarevas report from May of
3 '23?
4       MR. VAN HEMMEN:  I'm sorry.  Are you asking
5 me, Barry?
6       MR. ARRINGTON:  No, I'm asking the witness.
7       MR. VAN HEMMEN:  Oh, okay.
8 BY MR. ARRINGTON:
9     Q. Go to the last page for the date is the only
10 place I can find the date.
11     A. The very last page?
12     Q. The very last page under --
13     A. Yeah, executed May 5, 2023, in New York.
14     Q. Okay.  So the paragraph -- or Exhibit 19
15 purports to be the Klarevas expert report from May of
16 2023?
17     A. Yes.
18     Q. Okay.  Go to Paragraph 14.
19     A. Fourteen?
20     Q. Yes.  On Page 11.
21     A. Okay.
22     Q. If you could read for the record the
23 sentence that begins, "Based on National Sport."
24     A. "Based on National Sport Shooting Foundation
25 and federal government data, quote, 'modern sporting

Page 233

1 rifles,' end quote, which is a firearm-industry term
2 for AR15 platform and AK-47 platform firearms make up
3 approximately 5.3 percent of all firearms in
4 circulation in American society, according to the
5 most recently publicly available data.  This is
6 24.4 million out of an estimated 461.9 million
7 firearms."
8       Do you want me to keep reading?
9     Q. Nope.
10       So do you understand the 24.4 and the 461.9
11 million figures to be from the NSSF report 2022?
12     A. Give me a second, because I know the -- the
13 24.4 certainly appears to be from the NSSF report
14 and --
15     Q. Actually, just if you can look at -- read
16 Footnote 8.
17     A. Yeah, I'm looking at it.
18       Yes, that appears to be accurate.
19     Q. What appears to be accurate?
20     A. The question that you asked, are those two
21 numbers from the NSSF report.
22     Q. So the next sentence in Footnote 8
23 begins, "In a 2020 report that captured data through
24 the end of 2018."
25       Do you see that?

59 (Pages 230 - 233)

Page 234

1     A.  Yes.
2     Q.  Is that the same report that you referred to
3  in your initial report?
4     A.  It is.
5     Q.  Okay.  So in your estimation, was it
6  reasonable for Dr. Klarevas to base his opinions in
7  his initial expert report on NSSF data?
8     A.  Yes.
9     Q.  And why do you think that is?
10     A.  Because that is the -- what I've said is the
11  most reliable baseline number of numbers that we can
12  look at, as far as the ownership of firearms and
13  magazines.
14     Q.  Dr. Klarevas says that the 24.4 million --
15  well, I won't put words in his mouth.
16        Can you see the sentence that says, "And in
17  all likelihood"?
18     A.  In the footnote or above?
19     A.  Above this.
20     A.  Give me a second.
21     Q.  It's after 461.9 million.
22     A.  Oh, yes.  Yep.
23     Q.  Can you read that into the record.
24     A.  It says, "And, in all likelihood, this is an
25  overestimation because the figures appear to include

Page 235

1  firearms belonging to law enforcement agencies in the
2  United States."
3     Q.  So I am -- I read this, and it seems to
4  say -- and I'm asking -- I'm asking if you agree with
5  this interpretation of what he's saying -- that the
6  NSSF data states that there are 24.4 million modern
7  sporting rifles in circulation, but in Dr. Klarevas's
8  opinion that overstates it because it includes
9  firearms belonging to law enforcement.
10        Does that appear to be what it's saying to
11  you?
12     A.  That --
13        MR. VAN HEMMEN:  I know we have a standing
14  objection to the form.  I'm just going to note that
15  on the record here, but please continue.
16        THE WITNESS:  Yeah, actually, he's
17  misstating the data.  He says, "The NSSF estimates
18  there are approximately 24.4 million sporting rifles
19  in civilian hands."
20        That's not what the NSSF data says.  The
21  NSSF data shows how many firearms were made between
22  1990 and either 2018 or 20 -- actually, in this case,
23  and 2022.  So a -- sorry, a 30-year span.
24        So that's not even an accurate estimation as
25  to the ownership.  And regardless of whether or not

Page 236

1  they're owned by law enforcement agencies or not
2  doesn't make a difference.  They were still
3  manufactured.  They're still owned by somebody, and
4  that somebody is not the military.
5  BY MR. ARRINGTON:
6     Q.  So what I'm -- what my question is, if one's
7  goal is to determine -- or estimate the number of
8  modern sporting rifles in circulation among
9  law-abiding United States citizens, why would want
10  exclude law enforcement?
11     A.  They wouldn't.
12     Q.  Are you familiar -- have you -- one would
13  assume, wouldn't one, that law enforcement personnel
14  are typically law-abiding United States citizens.
15     A.  Everyone that I know is, yes.
16     A.  And excluding them from that circulation
17  number would just essentially be an arbitrary slicing
18  off the top, wouldn't it?
19     A.  It would.
20     Q.  So if you could go to Exhibit 3.
21     A.  Got it.
22     Q.  Go to Page 6, please.
23     A.  Okay.
24     Q.  Paragraph 11, Dr. Klarevas quotes the
25  English survey, and, of course, the English survey is

Page 237

1  something you relied upon in your report?
2     A.  Yes.
3     Q.  Says, "24.6 million people have owned an AR
4  or similar rifle and up to 44 million such rifles
5  have been owned."
6        Do you see that part?
7     A.  I do.
8     Q.  That's just quoting from the English survey;
9  right?
10     A.  Correct.
11     Q.  So go to Paragraph 12.
12        MR. VAN HEMMEN:  I'm sorry, Barry.  We're in
13  Exhibit 3?
14        MR. ARRINGTON:  Yes.
15  BY MR. ARRINGTON:
16     Q.  Do you remember counsel asking you questions
17  about Paragraph 12 and Dr. Klarevas's conclusions in
18  that paragraph?
19     A.  I do.
20     Q.  So he talks about 74,000 people and 320,000
21  people.  That's a total of 394,000; correct?  That's
22  just math?
23     A.  74,000 and -- yes.
24     Q.  And he talks about a -- that as a subset of
25  the total number of people who own these -- these --

Page 238

1 we'll call them modern sporting rifle, AR -- by which
2 I mean AR or similarly styled rifles; correct?
3     A. Correct.
4     Q. And so in Paragraph 11 he quotes English,
5 saying they're 24.6 million total owners, and if you
6 back out that 394, you come to roughly 24.2 million;
7 right?
8     A. If you back out -- from -- if you back out
9 24.6 from which number?
10     Q. No. If you back out 394 --
11     A. Oh, okay.
12     Q. -- from 24.6, you get about 24.2.
13     A. Correct.
14     Q. Is that correct?
15     A. Correct.
16     Q. Okay.
17         MR. VAN HEMMEN: Barry, I know that we've
18 been referring to as the cross-examination, but let
19 me just remind you that this is your witness.
20         MR. ARRINGTON: Okay.
21 BY MR. ARRINGTON:
22     Q. And so he's talking about 11 million AR
23 style rifles concentrated in the hands of that
24 1.6 percent.
25         Do you see that bolded sentence in

Page 239

1 Paragraph 7?
2     A. I do.
3     Q. Okay. According to English, how many -- if
4 you back out that 11 million from the total number of
5 rifles he estimated, how many million rifles would be
6 left? I'd refer you up to Paragraph 11.
7     A. If you backed out 11 from 24.6?
8     Q. Nope. That's owners, not rifles.
9     A. Oh, 11 from 44 million?
10     Q. Yes.
11     A. Would be 33 million total rifles.
12     Q. Because let me ask the question again.
13         If you follow Dr. Klarevas's logic and back
14 out the 11 million AR style rifles owned by this
15 1.6 percent, how many million rifles are owned by all
16 the other owners?
17     A. 33 million.
18     Q. Okay. So is it fair to say that even if you
19 back out the owners of rifles -- let me start over.
20         Is it fair to say that even if you back out
21 these owners of rifles who own them at a high rate
22 over five, you still have tens of millions of rifles
23 left over in the hands of some 24.2 other million
24 people?
25     A. I -- I think that's inaccurate, because he

Page 240

1 says -- I think he uses 11 to 100, and if you back
2 that out, that would still be 24.6 minus that smaller
3 number of 394.
4         So it would be 24.2 million, which is --
5     Q. Okay.
6     A. -- really close to the number of, you know,
7 24.2 that was actually manufactured from 1990 to
8 2020.
9     Q. Okay. Let's go to paragraph -- or I'm
10 sorry. Exhibit 20.
11     A. Exhibit 20.
12         (Exhibit 20 was identified.)
13 BY MR. ARRINGTON:
14     Q. And just look at the title there where it
15 says, "Expanded Report," just above the word
16 "Abstract."
17     A. Still opening.
18     Q. Okay.
19     A. All right. I have it now.
20     Q. Okay. Do you see where the title -- at the
21 bottom of the title, it says "Expanded Report"?
22     A. Yes.
23     Q. Okay. Close that down and the -- look at
24 the English report that was marked previously.
25     A. Exhibit 15?

Page 241

1     Q. Okay. Yes.
2         And that's a -- the English report from
3 about a year earlier, and it doesn't say "Expanded
4 Report"; correct?
5     A. Correct. It says, "Draft Report, July 13,
6 2021."
7     Q. Okay. So which one do you believe that you
8 looked at? Was it the draft report or the expanded
9 report?
10     A. I believe it was the draft report.
11     Q. Okay. You looked at the first one or the
12 later one?
13     A. The later one, the one that is marked
14 MP0015 is the one that I looked at.
15     Q. Oh, okay.
16         Look at Exhibit 10, please.
17     A. Okay.
18     Q. Page 79.
19     A. Page 79 in the actual transcript?
20     Q. 79 -- yes, Page 79 of the transcript. Yes.
21     A. Okay.
22     Q. We're talking about the Washington Post
23 survey -- actually, you can go back to 78 at the
24 bottom.
25     A. Okay.

61 (Pages 238 - 241)

Page 242

1    Q. It says, "What source are you using there?"
2        "The Washington Post survey."
3        "Is that a trustworthy source?"
4        And then you say, "I don't know."
5        Earlier today, you recall talking to counsel
6    about the Washington Post survey?
7    A. Yes.
8    Q. And I guess I'm trying to understand if it's
9    not trustworthy, how you can rely upon it in your
10   report.
11       Do you have -- do you mean -- tell me
12   what --
13   A. Yeah, it is -- it is a dataset, and it is a
14   dataset that comes from surveys, and it is also
15   significantly below the NSSF.
16       And so I believe that it -- while it's based
17   on a survey, I believe that it's substantially lower
18   numbers than what is actually represented, and that's
19   because the NSSF report, I believe, is a more robust
20   set of data than what the Washington Post used.
21   Q. So when you say it's not trustworthy, are
22   you saying they're just totally out to lunch?
23   A. No.
24   Q. Or are you saying -- or are you saying it's
25   not trustworthy in the sense that -- that the NSSF

Page 243

1    data is more reliable?
2    A. The NSSF data is more reliable. That's --
3    that's what I've said. That's what's in my report.
4    This is a data point that is in -- Washington Post
5    uses, and I believe that that number is low, that
6    their numbers are significantly below what is
7    actually in existence.
8        But at the same time, this Washington Post
9    report is a report that has been used by people to
10   say, this is the number of firearms or the number of
11   AR15s that are in existence, and I think their
12   numbers are -- are flawed. I think they're too low.
13   Q. Okay. Same question about the English
14   survey.
15       If it -- you are saying that it's completely
16   untrustworthy, or that it's just less trustworthy
17   than the NSSF report?
18   A. Well, I think the English report looks at
19   different types of information and types of
20   information that is closer to the Washington Post
21   report.
22       That is, they did surveys. The NSSF, yes,
23   those are surveys, but they are surveys from industry
24   members and from ATF forms. And so my confidence
25   that the numbers -- granted, they are only in a

Page 244

1    period from 1990 to 2018 or 1990 to 2020, I think
2    those numbers in that window are more reliable than
3    the Washington Post numbers.
4    Q. The English report -- I mean, there's --
5    yes, there's some validity to it. He did the
6    research. He did the survey. Those numbers are
7    higher than the Washington Post numbers. It's --
8    it's to punctuate that it's hard to come up with
9    specific numbers. And that's -- that's the basis and
10   also why I rely and why I say in my supplemental
11   report that the NSSF numbers are the benchmark that
12   I'm going to use.
13   Q. When you talked about your -- your
14   discussion about Magpul, you said you -- well, let me
15   back up.
16       When you got the answer that -- from the VP
17   at Magpul, was his estimate surprising at all?
18   A. No.
19   Q. Why wasn't it surprising?
20   A. Because I think the numbers are really much
21   higher than what we have been able to count in either
22   surveys or -- well, in surveys from English,
23   Washington Post, and the National Shooting Sports
24   Foundation.
25       I think there are missing elements, and so

Page 245

1    their number, I believe, is probably closer to actual
2    and accurate.
3        You know, we have magazines that have been
4    imported from foreign countries even that there's
5    no -- there's no recording of them in any manner.
6    Q. So did it give you some confidence, when you
7    heard that number, that it was -- it's not exactly
8    the same as the other numbers that you had seen, at
9    least roughly consistent with those numbers?
10   A. Yes. And, you know, the point is that in --
11   while I do discuss it, and I do -- do math off of it,
12   that is an upper -- that is an upper bound. I mean,
13   I would not feel comfortable going beyond what
14   Magpul's estimate is.
15       But, again, in my supplemental report, I
16   basically state, again, that the NSSF numbers are the
17   baseline. Those are the numbers that I know that can
18   be determined to be accurate and factual.
19   Q. Okay. So was the fact that it was roughly
20   consistent with other data a basis upon which you
21   could evaluate the Magpul representative's
22   representation?
23   A. Yes.
24   Q. Okay. So you testified earlier that you had
25   no basis to evaluate his representation.

62 (Pages 242 - 245)

Page 246

1    Was that accurate?
2        A.  No, I think the questions are different.
3    You know, I -- I basically said that I evaluated
4    Mr. Liptak's based on that I trust Mr. Liptak.  That
5    is that number that he gave me.
6        Looking at the NSSF numbers, which are much
7    less, I have confidence that Magpul has a good
8    estimate, but that difference between, you know, the
9    160 million magazines or whatever from the NSSF and
10   the 350 million magazines that Magpul says, that's
11   unverifiable.  It doesn't mean they don't exist.
12   It's just that's the unverifiable component of that
13   number, whereas NSSF numbers are verifiable.
14       It's -- it's almost like if you go into a
15   school and -- I mean, Mr. van Hemmen asked about
16   marbles.  If you go into a school and you count the
17   number of children in a room, and you know that there
18   are ten other classes, but you only count those
19   numbers, you can verify those numbers because you saw
20   them.  But you may not have gone into the other rooms
21   and counted the other ones.  You may not have had the
22   ability to do that.
23       So the verifiable is the NSSF.  That
24   unverifiable number doesn't mean they don't exist,
25   but it's somewhere higher than NSSF and probably

Page 247

1    close to the Magpul number.
2        MR. ARRINGTON:  Okay.  That's all my
3    questions.
4        MR. VAN HEMMEN:  All right.  Give me just a
5    minute.
6
7                    EXAMINATION
8    BY MR. VAN HEMMEN:
9        Q.  All right.  Can we go to Exhibit 18?
10       A.  Okay.
11       Q.  Were you aware of this document when you
12   wrote your initial report?
13       A.  No.
14       Q.  Did you first learn of this document in the
15   deposition in the State case?
16       A.  Yes.
17       MR. VAN HEMMEN:  All right.  Thank you.  I'm
18   good.
19       MR. ARRINGTON:  That it?
20       MR. VAN HEMMEN:  Yep.
21       MR. ARRINGTON:  Okay.
22       THE VIDEOGRAPHER:  This concludes today's
23   testimony given by Mark Passamaneck.  The total
24   number of media units used was seven and will be
25   retained by Veritext Legal Solutions.

Page 248

1        Going off the record.  The time is 5:20.
2        (End of video deposition.)
3        THE COURT REPORTER:  I just want to confirm
4    who is getting what orders?
5        MR. ARRINGTON:  I guess we've got a
6    conundrum here in terms of -- well, I guess if we
7    have to reconvene this deposition, there will be two
8    transcripts then; right?
9        THE COURT REPORTER:  Yes.  It would just be
10   a Volume II and have the next consecutive page
11   number.
12       MR. ARRINGTON:  My normal order is fine.
13   Regular turnaround is fine with me.
14       THE COURT REPORTER:  And would you like a
15   rough tonight?
16       MR. ARRINGTON:  Would I?  No.
17       MR. VAN HEMMEN:  Yeah, if we could get the
18   rough, that would be great, but normal timeline is
19   fine.
20       THE COURT REPORTER:  Great.  Thank you,
21   Counsel.
22       THE VIDEOGRAPHER:  Are you going to need a
23   copy of the video of this one?
24       MR. VAN HEMMEN:  Yes.  Yes, please.
25       THE VIDEOGRAPHER:  And, Mr. Arrington?

Page 249

1        MR. ARRINGTON:  No.
2        THE VIDEOGRAPHER:  Mr. van Hemmen, do you
3    need the expedited copy of the video?  Our normal
4    turnaround is 15 days.  Is that adequate for you
5    guys?
6        MR. VAN HEMMEN:  That's fine.
7        THE VIDEOGRAPHER:  Our standard video format
8    is synced with the transcript.  Is that all right, or
9    do you have a different format you would like?
10       MR. VAN HEMMEN:  I think that should be
11   fine.
12       THE VIDEOGRAPHER:  All right.  Very good.
13   Thank you.
14
15       (Whereupon, the proceedings were concluded
16   at 5:20 PM.  Total time on the record was
17   6 hours, 29 minutes.)
18
19
20
21
22
23
24
25

63 (Pages 246 - 249)

Page 250

```
 1        REPORTER'S CERTIFICATE
 2
 3        I, JENNIFER L. SMITH, California CSR No.
 4   10358, Washington CCR No. 3101, RMR, CRR, CRC, and
 5   Notary Public within and for the State of Colorado,
 6   commissioned to administer oaths, do hereby certify
 7   that previous to the commencement of the examination,
 8   the witness was duly sworn by me to testify the truth
 9   in relation to matters in controversy between the
10   said parties; that the said deposition was taken in
11   stenotype by me at the time and place aforesaid and
12   was thereafter reduced to typewritten form by me; and
13   that the foregoing is a true and correct transcript
14   of my stenotype notes thereof.
15        That I am not an attorney nor counsel nor in
16   any way connected with any attorney or counsel for
17   any of the parties to said action nor otherwise
18   interested in the outcome of this action.
19        My commission expires:  February 7, 2026
20
21        Jennifer L. Smith
         _____
22        JENNIFER L. SMITH
          CA CSR NO. 10358
23        WA CCR NO. 3101
          RMR, CRR, CRC,
24        and Notary Public
25
```

Page 251

```
 1   BARRY ARRINGTON, ESQ.
 2   barry@arringtonpc.com
 3        August 7, 2023
 4   RE: ROCKY MOUNTAIN GUN OWNERS, et al. vs.
          THE TOWN OF SUPERIOR, et al.
 5   7/28/2023, Mark W. Passamaneck (#5991442)
 6        The above-referenced transcript is available for
 7   review.
 8        Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12        The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-ny@veritext.com.
16
17        Return completed errata within 30 days from
18   receipt of testimony.
19        If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

Page 252

```
 1   ROCKY MOUNTAIN GUN OWNERS, et al. vs.
          THE TOWN OF SUPERIOR, et al.
 2   7/28/2023 - Mark W. Passamaneck (#5991442)
 3            E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Mark W. Passamaneck            Date
25
```

Page 253

```
 1   ROCKY MOUNTAIN GUN OWNERS, et al. vs.
          THE TOWN OF SUPERIOR, et al.
 2   7/28/2023 - Mark W. Passamaneck (#5991442)
 3        ACKNOWLEDGEMENT OF DEPONENT
 4        I, Mark W. Passamaneck, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____  _____
12   Mark W. Passamaneck            Date
13   *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25
```

64 (Pages 250 - 253)