## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

      Plaintiffs move for summary judgment pursuant to Fed.R.Civ.Proc. 56. As grounds for this motion, they state:

## I. INTRODUCTION

      Plaintiffs bring this Second Amendment challenge to the Ordinances (defined below) pursuant to the standard set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Challenges to arms bans such as this one are prime candidates for pre-trial resolution, because, as the Ninth Circuit recently held, such

challenges involve issues of so-called "legislative facts" (i.e., facts that have relevance to legal reasoning and the lawmaking process such as the formulation of a legal principle) rather than "adjudicative facts" (i.e., the facts of the particular case). *Teter v. Lopez*, 76 F.4th 938, 946–47 (9th Cir. 2023) (remanding for entry of summary judgment for Second Amendment plaintiffs). Indeed, each of the three major Supreme Court cases dealing with Second Amendment issues in recent years was decided on a bare motion to dismiss record. *See D.C. v. Heller*, 554 U.S. 570, 576 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); and *Bruen*, 142 S. Ct. at 2125.

In *Bruen*, the Court held that the framework for resolution of a Second Amendment case has two steps: (1) Does the plain text of the Second Amendment cover a plaintiff's conduct? (2) If so, has the government demonstrated that its ban is consistent with the Nation's historical tradition of firearm regulation? *Id.*, 142 S. Ct. 2129-30. In this case, the plain text of the Second Amendment covers Plaintiffs' conduct in seeking to acquire and possess bearable arms. There is no historical tradition analogous to Defendants' ban of arms commonly possessed by law-abiding citizens for lawful purposes. As in *Heller* and *Bruen*, the Court can easily make these determinations without a trial based on the summary judgment record assembled by the parties.

This brief addresses Plaintiffs' standing and the application of the *Bruen* standard to the Ordinances' bans of called "assault weapons" and "large capacity magazines." Plaintiffs note that the district court for the Southern District of California recently enjoined the State of California's "assault weapon" and "large

capacity magazine" bans. *Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) and *Duncan v. Bonta*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023).[1] Plaintiff's respectfully urge the Court to adopt Judge Benitez's extremely thorough and well-reasoned analysis and enjoin the Ordinances.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Ordinances

1.     Defendants are the Town of Superior ("Superior"), the City of Louisville ("Louisville"), the City of Boulder ("Boulder), and Boulder County (the "County").

2.     Superior, Louisville, Boulder, and the County shall be referred to collectively as the "Municipalities."

3.     The term "Superior Law" shall mean SUPERIOR, COLO., CODE ch. 10, art. IX (as adopted Jun. 7, 2022 in Ord. No. O-9, § 1). A copy of the Superior Law is attached as Exhibit A.

4.     The term "Boulder Law" shall mean BOULDER, COLO., REV. CODE title 5, ch. 8 (as adopted Jun. 7, 2022 in Ord. Nos. 8494, 8525-29). A copy of the Boulder Law is attached as Exhibit B.

5.     The term "County Law" shall mean BOULDER COUNTY, COLO., ORDINANCES, Ord. No. 2022-5 (as adopted Aug. 2, 2022). A copy of the Boulder Law is attached as Exhibit C.

---

[1] The preliminary injunction entered in *Duncan* has been partially stayed. *Duncan v. Bonta*, 2023 WL 6588623, at *2 (9th Cir. Oct. 10, 2023). However, in its one-paragraph consideration of the merits, the court engaged in practically no analysis of Judge Benitez's decision.

6.     The term "Louisville Law" shall mean LOUISVILLE, COLO., CODE title 9, ch. VIII (as adopted Jun. 7, 2022 in Ord. No. 1831-2022). A copy of the Louisville Law is attached as Exhibit D.

7.     The term "Superior Ordinance" shall mean Sections 10-9-40 and 10-9-240 of the Superior Law as such apply to "assault weapons" and "large capacity magazines."

8.     The term "Boulder Ordinance" shall mean Sections 5-8-10 and 5-8-28 of the Boulder Law as such apply to "assault weapons" and "large capacity magazines."

9.     The term "County Ordinance" shall mean the portion of the County Law regarding "assault weapons" and "large capacity magazines."

10.    The term "Louisville Ordinance" shall mean Sections 9.84.010 and 9.86.010 of the Louisville Law as such apply to "assault weapons" and "large capacity magazines."

11.    The term "Ordinances" shall mean the Superior Ordinance, the Boulder Ordinance, the County Ordinance, and the Louisville Ordinance.

12.    The term "AW Firearm" as used herein shall have the same meaning as "assault weapon" as that phrase is used in the Ordinances.

13.    The term "LCM" as used herein means "large capacity magazine" as that phrase is used in the Ordinances.

14.    Magazines with a capacity of over 10 rounds are not necessarily large capacity magazines. Walker Dec. ¶ 6. Many firearms come standard with such magazines. *Id*. "Assault weapon" is also a political term developed by anti-gun publicists. *Stenberg*

*v. Carhart*, 530 U.S. 914, 1001 n. 16 (2000) (Thomas, J., dissenting). Nevertheless, in this Motion, Plaintiffs will use the politically charged terms used in the Ordinances.

15.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance classify AW Firearms and LCMs as "illegal weapons." Ex. A, 8; Ex. B, 13; Ex. D, 6.

16.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance make it a crime to knowingly possess, sell, or otherwise transfer an illegal weapon. Ex. A, 10; Ex. B, 14; Ex. D, 9.

17.    The County Ordinance makes it a crime to manufacture, import, purchase, sell, or transfer any AW Firearm or LCM after August 2, 2022. Ex. C, 6, 7.

18.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance each have a provision for obtaining a "certificate of ownership" for an AW Firearm certifying that the AW Firearm was owned prior to July 1, 2022. Ex. A, 16; Ex. B, 16; Ex. D, 10.

19.    Even if a person were to obtain a "certificate of ownership" for an AW Firearm, under these ordinances he or she would not be permitted to possess the firearm anywhere but their own property, at a gunsmith, or a firing range, and they would also be prohibited from possessing any AW Firearm acquired after July 1, 2022. Ex. A, 16-17; Ex. B, 17; Ex. D, 10-11.

20.    The deadline for obtaining a "certificate of ownership" for an AW Firearm under the Superior, Boulder, and Louisville Ordinances was December 31, 2022. Ex. A, 16; Ex. B, 16; Ex. D, 10. There is no provision in the Ordinances for obtaining such a certificate after that date.

21.     The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance provide that it is an affirmative defense to a prosecution for possession of an illegal weapon if the illegal weapon is an assault weapon accompanied by a valid certificate of ownership. Ex. A, 15; Ex. B, 15; Ex. D, 9.

22.     None of the Ordinances has a provision for obtaining a certificate of ownership for an LCM; nor do any of the Ordinances provide for an affirmative defense for the possession of an LCM that was owned prior to a particular date.

23.     In summary, the Superior, Boulder, and Louisville Ordinances make it illegal to possess an AW Firearm that a citizen owned prior to July 1, 2022, unless such citizen obtained a "certificate of possession" prior to December 31, 2022, and even then the citizen would not be permitted to use the AW Firearm for self-defense in public; and

24.     the Superior, Boulder, and Louisville Ordinances make it illegal for any citizen to acquire an AW Firearm under any circumstances after July 1, 2022; and

25.     the Superior, Boulder, and Louisville Ordinances make it illegal for a citizen to possess an LCM whether or not the citizen owned or possessed the LCM prior to any particular time; and

26.     the County Ordinance makes it illegal to manufacture, import, purchase, sell, or transfer any AW Firearm or LCM in the unincorporated part of the County after August 2, 2022.

**B.     Standing**

27.     Plaintiff Charles Bradley Walker is a resident of Superior and a law-abiding citizen of the United States. Walker Dec. ¶3. He challenges the Superior Ordinance.

28.     Plaintiff James Michael Jones is a resident of Boulder and a law-abiding citizen of the United States. Jones Dec. ¶ 3. He challenges the Boulder Ordinance.

29.     Plaintiff Martin Carter Kehoe is a resident of the unincorporated portion of the County and is a law-abiding citizen of the United States. Kehoe Dec. ¶ 3. He challenges the County Ordinance.

30.     Plaintiffs Bryan LaFonte and Gordon Madonna are residents of Louisville and are law-abiding citizens of the United States. LaFonte Dec. ¶ 3; Madonna Dec. ¶ 3. They challenge the Louisville Ordinance.

31.     Each of the individual Plaintiffs currently owns and possesses within the municipality in which he resides a number of firearms and firearm magazines, which he possesses and uses for a variety of lawful purposes, including target shooting and self-defense. Walker Dec. ¶ 7; Jones Dec. ¶ 7; Kehoe Dec. ¶ 7; LaFonte Dec. ¶ 7; Madonna Dec. ¶ 7.

32.     Each of the individual Plaintiffs currently owns and possesses within the municipality in which he resides firearms that are considered AW Firearms under the Ordinances. Walker Dec. ¶ 8; Jones Dec. ¶ 8; Kehoe Dec. ¶ 8; LaFonte Dec. ¶ 8; Madonna Dec. ¶ 8.

33.     The individual Plaintiffs desire to continue to own and possess these AW Firearms within such municipality and in their homes in particular. *Id.*

34.    The individual Plaintiffs also desire to be able to freely transfer these AW Firearms to others, including members of their family. *Id.*

35.    Each of the individual Plaintiffs owns and possesses within the municipality in which he resides a number of LCMs. Walker Dec. ¶ 10; Jones Dec. ¶ 10; Kehoe Dec. ¶ 9; LaFonte Dec. ¶ 10; Madonna Dec. ¶ 10.

36.    Each of the individual Plaintiffs has acquired AW Firearms in the past and would like to continue to be able to do so in the future and own and possess such AW Firearms in the municipality in which he resides. Walker Dec. ¶ 11; Jones Dec. ¶ 11; Kehoe Dec. ¶ 10; LaFonte Dec. ¶ 11; Madonna Dec. ¶ 11.

37.    Each of the individual Plaintiffs has acquired LCMs in the past and would like to continue to be able to do so in the future and own and possess such LCMs in the municipality in which he resides. Walker Dec. ¶ 12; Jones Dec. ¶ 12; Kehoe Dec. ¶ 11; LaFonte Dec. ¶ 12; Madonna Dec. ¶ 12.

38.    Many firearms, even those not considered AW Firearms under the Ordinances, come standard with an LCM. Walker Dec. ¶ 6, 13. Each of the individual Plaintiffs would like to continue to be able acquire such firearms and the LCMs that come standard with them and possess them within the municipality in which he resides. Walker Dec. ¶ 13; Jones Dec. ¶ 13; Kehoe Dec. ¶ 12; LaFonte Dec. ¶ 13; Madonna Dec. ¶ 13.

39.    The enforcement of the Ordinances is currently stayed, but if the Ordinances were to become effective each of the individual Plaintiffs would refrain from acquiring AW Firearms and LCMs for fear of prosecution if he were to possess them within the

8

municipality in which he resides. Walker Dec. ¶ 14; Jones Dec. ¶ 14; Kehoe Dec. ¶ 13; LaFonte Dec. ¶ 14; Madonna Dec. ¶ 14.

40.     Most of the individual Plaintiffs do not desire to obtain a certificate for any AW Firearm that they own, nor have they. Walker Dec. ¶ 9; Jones Dec. ¶ 9; LaFonte Dec. ¶ 9; Madonna Dec. ¶ 9.

41.     In any event, the deadline for obtaining a certificate passed while this litigation has been pending and the Ordinances were stayed.

42.     Thus, were the Superior, Boulder, and Louisville Ordinances to become effective, the Ordinances would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of their presently-owned AW Firearms within these municipalities (including from their homes). Walker Dec. ¶ 8; Jones Dec. ¶ 8; LaFonte Dec. ¶ 8; Madonna Dec. ¶ 8.

43.     As set forth above, the Superior, Boulder, and Louisville Ordinances have no grandfather provision for LCMs. Thus were these Ordinances to become effective, they would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of these arms within these municipalities. Walker Dec. ¶ 12; Jones Dec. ¶ 12; Kehoe Dec. ¶ 11; LaFonte Dec. ¶ 12; Madonna Dec. ¶ 12.

44.     Plaintiff Rocky Mountain Gun Owners shall be referred to herein as "RMGO," and Plaintiff National Association for Gun Rights shall be referred to as "NAGR."

45.     Dudley Brown is the President of RMGO and NAGR. Brown Dec. ¶ 2.

46.    RMGO and NAGR are nonprofit membership and donor-supported organizations that seek to defend the right of all law-abiding individuals to keep and bear arms. Brown Dec. ¶ 3.

47.    RMGO and NAGR have members who reside within each of the Municipalities, and RMGO and NAGR represent the interests of these members. Brown Dec. ¶ 4.

48.    Specifically, RMGO and NAGR represent the interests of those of their members whose Second Amendment rights have been infringed by the Ordinances. Brown Dec. ¶ 5.

49.    Brown has communicated with RMGO and NAGR members who reside in the Municipalities who have informed him that (a) they currently own and possess within the municipality in which they reside firearms that are considered AW Firearms under the Ordinances and they would like to continue to possess these firearms; (b) they have not obtained certificates of possession and do not intend to do so; and (c) they own and possess within the municipality in which they reside one or more LCMs. Brown Dec. ¶ 6.

50.    All of these activities would be illegal if the Ordinances were effective.

51.    Plaintiffs Jones, Kehoe, and Madonna are members of both RMGO and NAGR. Jones Dec. ¶ 2; Kehoe Dec. ¶ 2; Madonna Dec. ¶ 2. Plaintiffs LaFonte and Walker are members of RMGO. LaFonte Dec. ¶ 2; Walker Dec. ¶ 2.

**D.    Magazines Are Arms**

52.    Plaintiffs have designated Mark Passamaneck as an expert regarding two topics: (1) an estimate of the number of "assault weapons" and "large capacity

magazines" in the United States; and (2) the operation and durability of these magazines.

53.     Without a magazine, the operation of a semi-automatic firearm in semi-automatic firing mode is impossible. Passamaneck Declaration, 4-5.

54.     A magazine is not merely a box in which ammunition is stored; rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id.*

55.     The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id.*

56.     If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id.*

57.     Thus, without a magazine as a designed dynamic component, semi-automatic firearms would not exist. *Id.*

**E.     The AW Firearms Are in Common Use**

58.     The National Shooting Sports Foundation ("NSSF"), the firearms industry trade association, included the table on the following page in its 2022 Industry Intelligence Report (the "2022 NSSF Compilation").

## Estimated Modern Sporting Rifles in the United States 1990 – 2020

| Year | US Production less exports of MSR/AR platform | US Import less exports of MSR/AR, AK platform | ANNUAL TOTAL |
|---|---|---|---|
| 1990 | 43,000 | 31,000 | 74,000 |
| 1991 | 46,000 | 69,000 | 115,000 |
| 1992 | 33,000 | 72,000 | 105,000 |
| 1993 | 62,000 | 226,000 | 288,000 |
| 1994 | 103,000 | 171,000 | 274,000 |
| 1995 | 54,000 | 77,000 | 131,000 |
| 1996 | 27,000 | 43,000 | 70,000 |
| 1997 | 44,000 | 81,000 | 125,000 |
| 1998 | 70,000 | 75,000 | 145,000 |
| 1999 | 113,000 | 119,000 | 232,000 |
| 2000 | 86,000 | 130,000 | 216,000 |
| 2001 | 60,000 | 119,000 | 179,000 |
| 2002 | 97,000 | 145,000 | 242,000 |
| 2003 | 118,000 | 262,000 | 380,000 |
| 2004 | 107,000 | 207,000 | 314,000 |
| 2005 | 141,000 | 170,000 | 311,000 |
| 2006 | 196,000 | 202,000 | 398,000 |
| 2007 | 269,000 | 229,000 | 498,000 |
| 2008 | 444,000 | 189,000 | 633,000 |
| 2009 | 692,000 | 314,000 | 1,006,000 |
| 2010 | 444,000 | 140,000 | 584,000 |
| 2011 | 653,000 | 163,000 | 816,000 |
| 2012 | 1,308,000 | 322,000 | 1,630,000 |
| 2013 | 1,882,000 | 393,000 | 2,275,000 |
| 2014 | 950,000 | 237,000 | 1,187,000 |
| 2015 | 1,360,000 | 245,000 | 1,605,000 |
| 2016 | 2,217,000 | 230,000 | 2,447,000 |
| 2017 | 1,406,000 | 158,000 | 1,564,000 |
| 2018 | 1,731,000 | 225,000 | 1,956,000 |
| 2019 | 1,679,000 | 169,000 | 1,848,000 |
| 2020 | 2,466,000 | 332,000 | 2,798,000 |
| TOTALS | 18,901,000 | 5,545,000 | 24,446,000 |

59.     Defendants have designated Dr. Louis Klarevas as an expert in this matter. His report is attached as Exhibit E.

60.     "Modern Sporting Rifle" as used in the NSSF Compilation is a firearm industry term for AR-15-platform and AK-47-platform firearms. Klarevas Report 11.

61.     Based on the 2022 NSSF Compilation (and in particular the table set forth in paragraph 58), Mr. Passamaneck estimated the number of modern sporting rifles produced from 1990 to 2020 to be 24.4 million. Passamaneck Declaration, 7.

62.     Dr. Klarevas also used the 24.4 million NSSF figure as the basis of his estimate of the number of "assault weapons" in the United States, citing the table set forth in paragraph 58. Klarevas Report, 11 (paragraph 14 and note 8). [2]

63.     Mr. Passamaneck attempted to estimate the number of AR-15-type rifles produced before 1990 and after 2020 (which would not be reflected in the table in paragraph 58) and arrived at a total estimate of 34 million. Passamaneck Declaration, 4, 8.

64.     Plaintiffs are willing to stipulate to the lower number on which Dr. Klarevas based his estimate of the number of "assault weapons." The parties agree that tens of millions of such weapons are in circulation in the United States.

65.     The modern sporting rifle is the most-popular-selling centerfire semiautomatic rifle in the United States today according to the NSSF press release cited by Dr. Klarevas. Klarevas Report, 11, n.8.

66.     Mr. Passamaneck agrees that millions of Americans own AR-15-style rifles and that it is the most popular rifle sold in America. Passamaneck Declaration, 3.

**F.     LCMs Are in Common Use**

67.     The NSSF Compilation contains the following table:

---

[2] Indeed, in *Miller v. Bonta*, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023), the court relied on Dr. Klarevas' identical conclusions in finding "assault weapons" are in common use.



68.     Mr. Passamaneck cited this table for his lower-bound estimate of the number of LCMs in the United States of 159.8 million. Passamaneck Declaration, 3, 8.

69.     Dr. Klarevas also cited to an NSSF report that contained this same table. Klarevas Report, 11, n.8, citing NSSF, Firearm Production in the United States with Firearm Import and Export Data, Industry Intelligence Report, 2020, available at https://bit.ly/3z67cBx.

70.     Mr. Passamaneck opined that the number of LCMs is certainly higher than reflected in the NSSF Compilation (perhaps as high as 350 million), but the NSSF data is a reliable lower bound. Passamaneck Declaration, 4, 8.

**G.     Citizens Use Their Firearms Even if They do Not Fire Them**

71.     Plaintiff Gordon Madonna was a law enforcement officer for over 40 years. Madonna Dec. ¶ 15.

72.     During his 40-plus-year career as a police officer, he was always armed while he was on duty. *Id.* ¶ 16. He discharged his firearm against a suspect only once during his career. *Id.* ¶ 17.

73.     During his career, he was constantly armed for the purpose of both actual and possible confrontation with an assailant. *Id.* ¶ 18.

74.     Thus, during his career, he was constantly using his firearm for self-defense even when he was not discharging it or brandishing it. *Id.*

75.     It is not true that he never used his firearm during 40-plus years except that one moment when he discharged it against a suspect. *Id.* ¶ 19.

## III.  THE ELEMENTS OF STANDING

To establish standing under Article III of the Constitution, a plaintiff must show three elements: (1) He has suffered an "injury in fact"; (2) The injury is fairly traceable to the challenged action of the defendant; and (3) It is likely that the injury will be redressed by a favorable decision. *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022) (internal citations and quotation marks omitted). Defendants cannot reasonably argue that Plaintiffs have failed to establish causation and redressability. The Ordinances require them to divest themselves of AW Firearms and LCMs and/or prohibit them from acquiring additional ones. There is obviously a causal connection between the injury they allege and the existence of the Ordinances. *See Aptive Env't, LLC v. Town of Castle Rock*,

15

959 F.3d 961, 978 (10th Cir. 2020). Moreover, there is no dispute that enjoining the enforcement of the Ordinances redresses Plaintiffs' injuries by removing the alleged violation of their Second Amendment rights. *Id*. Since the existence of the second and third elements of standing cannot reasonably be disputed, Plaintiffs will focus their discussion on the first element, i.e., "injury in fact."

Before considering the issue of injury in fact, it is important to recognize that to establish standing it is necessary only to demonstrate that it is *arguable* that a constitutional right has been abridged. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022). The standing inquiry must not be conflated with evaluation of the merits. "For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014) (*quoting Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc)). "Rather, we must assume for purposes of the standing inquiry that each claim is legally valid." *Id*. Courts have held that so-called "assault weapons" and "large capacity magazines" are "arms" protected by the Second Amendment. *See, e.g., Barnett v. Raoul*, 2023 WL 3160285, at *8, *10 (S.D. Ill. Apr. 28, 2023). Since a court has actually held that arms such as those at issue in this case are constitutionally protected, for standing purposes it is at least arguable that they are protected.

Finally, Plaintiffs have submitted declarations in support of their standing. For purposes of this motion for summary judgment, the specific facts set forth in those

declarations must be "taken to be true." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023) (internal citation and quotation marks omitted).

## IV.  PLAINTIFFS HAVE SUFFERED AN INJURY IN FACT

### A.  Dispossession of Arms Protected by the Second Amendment Constitutes Injury in Fact *Per Se*

Were the Superior, Boulder, and Louisville Ordinances to become effective, the ordinances would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of their presently-owned AW Firearms within these municipalities (including their homes). UMF 15, 16, 18, 20, 21, 23, 32, 40, 41, 42.[3] Were the Superior, Boulder, and Louisville Ordinances to become effective, the ordinances would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of their presently owned LCMs within these municipalities (including their homes). UMF 15, 16, 22, 35, 43.

Recently, in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), the Ninth Circuit considered a Second Amendment challenge to a state statute that banned "butterfly knives." The plaintiffs submitted evidence in their motion for summary judgment that they had once owned such knives but were forced to dispose of the knives by the statute. 76 F.4th at 942. The plaintiffs argued that the forced dispossession of their arms combined with their inability to acquire replacements constituted a present injury in fact. *Id*., at 943. The state argued that the plaintiffs had not established standing for a "pre-enforcement challenge." *Id*. The court agreed with plaintiffs,

---

[3] "UMF" refers to the above "Statement of Undisputed Material Facts." Such facts will be referred to by paragraph number. For example, paragraph 1 of the Statement of Undisputed Material Facts will be referred to as "UMF 1."

holding that "a threat of prosecution is unnecessary to prove standing where the plaintiffs' injury is not a hypothetical risk of prosecution but rather actual, ongoing harm resulting from their adherence to the challenged statute." *Teter v. Lopez*, 76 F.4th 938, 944, n.2 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up). In this case, the Superior, Boulder, and Louisville Plaintiffs have demonstrated standing by their actual, ongoing harm resulting from their adherence to the challenged Ordinances were they to become effective and require them to give up actual possession of their constitutionally protected arms within the Municipalities (and especially their homes).

### B. Prohibiting the Acquisition of Arms Protected by the Second Amendment Constitutes Injury in Fact *Per Se*

All of the Ordinances, were they to become effective, make it illegal to acquire arms within the Municipalities after July 1, 2022 (Superior, Boulder, Louisville) or August 2, 2022 (the County). UMF 19, 24, 17, 26.

In *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014), the plaintiffs sought to enjoin San Francisco's ban on the sale of hollow-point ammunition. 746 F.3d at 958. San Francisco argued that Ms. Jackson had "not suffered an injury in fact because she could easily obtain hollow-point ammunition outside San Francisco." *Id*. at 967. The Ninth Circuit rejected this argument and held the plaintiff established an injury in fact because she alleged that the Second Amendment provided her with a legally protected interest to purchase hollow-point ammunition, and that but for the ban, she would do so within San Francisco. *Id*. Ms. Jackson had not been threatened with prosecution under the ban – which prohibited

18

only the transfer of such ammunition in San Francisco, not its possession. The court required no proof of such a threatened prosecution before concluding that she had suffered a cognizable injury.

In *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), the plaintiffs' summary judgment declarations stated that but for the statutory ban they would acquire the banned knives. *Id.*, at 944. Relying on *Jackson*, the court held that these declarations were sufficient to establish standing even without a concrete plan or a threat of prosecution. *Id.* at 945. *See also*, *Barnett v. Raoul*, 2023 WL 3160285, at *2 (S.D. Ill. Apr. 28, 2023) ("a plaintiff who wishes to engage in conduct that is arguably protected by the Constitution, but criminalized by a statute, successfully demonstrates an immediate risk of injury").

## C.   Even Under a Pre-Enforcement Analysis the Individual Plaintiffs Have Standing

As set forth above, it is not necessary to engage in a pre-enforcement analysis because Plaintiffs have established a present injury in fact. Even with such an analysis, however, Plaintiffs have established standing. In a pre-enforcement challenge, a plaintiff can establish injury sufficient to bring a constitutional challenge to a law by (1) showing an intention to engage in a course of conduct that is (2) arguably affected with a constitutional interest, but is (3) proscribed by statute, and (4) there exists a credible threat of prosecution thereunder. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (internal citation and quotation marks omitted); *Teter v. Lopez*, 76 F.4th 938, 945 (9th Cir. 2023).

### 1.   Plaintiffs Intend to Engage in the Proscribed Conduct

The Plaintiffs are law-abiding citizens who reside in the Defendant Municipalities. UMF 27-30. They currently own within the Municipalities a number of firearms and firearm magazines which they possess and use for a variety of lawful purposes, including target shooting and self-defense. UMF 31. Each of the individual Plaintiffs currently owns and possesses firearms that are considered AW Firearms under the Ordinances. UMF 32. They desire to continue to own and possess these AW Firearms within the Municipalities, and in their homes in particular. UMF 33. They also desire to be able to freely transfer these AW Firearms to others, including members of their families. UMF 34. Each individual Plaintiff also owns and possesses a number of LCMs. UMF 35.

Each Plaintiff has acquired AW Firearms and LCMs in the past and would like to continue to be able to do so in the future and own and possess such arms. UMF 36, 37. Many firearms, even those not considered AW Firearms under the Ordinances, come standard with an LCM, and each Plaintiff would like to continue to be able acquire such firearms and the LCM that comes standard with them and possess them. UMF 35. The enforcement of the Ordinances is currently stayed, but if the Ordinances were to become effective the individual Plaintiffs would refrain from acquiring AW Firearms and LCMs for fear of prosecution if they were to possess them. UMF 39.

Most of the individual Plaintiffs do not desire to obtain a certificate for any AW Firearm that they own, and in any event, the deadline for obtaining a certificate passed while this litigation has been pending and the Ordinances were stayed.

UMF 40-41. Thus, were the Superior, Boulder, and Louisville Ordinances to become effective, these Ordinances would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of their presently owned AW Firearms or risk prosecution for possessing them. UMF 42.

The Superior, Boulder, and Louisville Ordinances have no grandfather provision for LCMs. UMF 43. Thus, the effect of these Ordinances, were they to become effective, would be to require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of these arms within these municipalities or risk prosecution for possessing them. *Id.*

Plaintiffs are not required to have a definite plan to break the law to demonstrate they intend to engage in the proscribed conduct. Courts do not require plaintiffs to "risk actual prosecution before challenging an allegedly unconstitutional" statute. *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016) (cleaned up). Instead, a plaintiff in a suit for prospective relief can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of conduct affected by the challenged government action; (2) evidence that they have a present desire, though no specific plans, to engage in the conduct; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced. *Peck v. McCann*, 43 F.4th 1116, 1129–30 (10th Cir. 2022) (internal citation and quotation marks omitted). *Peck* arose in the First Amendment context but after *Bruen* that is a distinction that makes no

difference. In *Bruen*, the Court held that the constitutional right to bear arms "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id*., 142 S. Ct. at 2156 (citation and quotation marks omitted). The Court specifically held that the Second Amendment is directly analogous to the First Amendment and imposes similar burdens on the government. *Id*., 142 S. Ct. at 2130.[4]

Applying the *Peck* framework to this case, Defendants cannot plausibly dispute that in the past Plaintiffs have engaged in the type of conduct affected by the Ordinances. They have purchased and possessed AW Firearms and LCMs. Nor is there any reasonable dispute that they will continue to do so, and their conduct would become illegal if the Ordinances were to become effective. Finally, because they have frequently engaged in such conduct in the past, their assertion that they will engage in the conduct in the future is plausible, as is their claim that they would not break the law because they fear prosecution. As the Ninth Circuit held in *Teter*, this is sufficient to show the requisite injury. *Id*., 76 F.4th 938, 946 (9th Cir. 2023) ("exact dates and times are not necessary;" it is sufficient that plaintiffs affirmatively intend to possess the banned arms if criminal prohibition is invalidated).

### 2. Plaintiffs' Conduct is Arguably Affected with a Constitutional Interest

---

[4] *See also Ezell v. City of Chicago*, 651 F.3d 684, 702–03, 706 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that First Amendment analogies are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." (internal citation omitted)).

A federal court has held that laws banning arms such as AW Firearms and LCMs violate the Second Amendment. *See, Barnett v. Raoul*, 2023 WL 3160285, at *8, *10 (S.D. Ill. Apr. 28, 2023). Since a court has actually held that these arms are constitutionally protected, for standing purposes it is at least arguable that they are protected.

### 3.   Plaintiffs' Conduct is Proscribed by the Ordinances

Defendants cannot dispute that the Ordinances, were they effective, would make it a criminal offense for the Plaintiffs to possess, acquire, or transfer the banned arms.

### 4.   There Exists a Credible Threat of Prosecution

As noted above, a plaintiff need not risk actual prosecution. *Bronson v. Swensen*, 500 F.3d 1099, 1107 (10th Cir. 2007). Moreover, it is unclear what it would mean to risk prosecution in this context because the Ordinances are stayed. Surely, a Plaintiff does not lose standing to challenge a law because it is stayed and therefore, he has no risk of prosecution for continuing to engage in conduct that violates the law. Instead, standing exists if there is "an objectively justified fear of real consequences" if the Ordinances were to go into effect. *Peck*, 43 F.4th at 1132 (citation and internal quotation marks omitted). In *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253 (D. Colo. Aug. 7, 2023), the plaintiffs brought a Second Amendment challenge to a Colorado statute that criminalized the acquisition of arms for adults 18 to 20 years old. This Court held that the individual plaintiffs had standing because they would acquire the arms but for the prohibition of the statute and there was "no

evidence of an assurance that the statute will not be enforced" against them. *Id*. at *7 (citation omitted).

### D.   Standing Has Been Found in Similar Cases Post-*Bruen*

As noted above, this Court found standing to exist in a similar case in *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253 (D. Colo. Aug. 7, 2023). Similarly, in *Barnett v. Raoul*, 2023 WL 3160285, at *2 (S.D. Ill. Apr. 28, 2023), the court held the plaintiffs had standing to bring a Second Amendment challenge to Illinois' magazine ban. *See also Bevis v. City of Naperville, Illinois*, 2023 WL 2077392, at *5 (N.D. Ill. Feb. 17, 2023) (same); *Sullivan v. Ferguson*, 636 F. Supp. 3d 1276, 1286 (W.D. Wash. 2022) (standing to challenge Washington's magazine ban); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (standing to challenge ammunition ban); and *Teter v. Lopez*, 76 F.4th 938, 947 (9th Cir. 2023).

### E.   RMGO and NAGR Have Standing

An association may bring claims on behalf of its members so long as (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022) (internal citations and quotation marks omitted).

RMGO and NAGR are nonprofit membership and donor-supported organizations that seek to defend the right of all law-abiding individuals to keep and

bear arms. UMF 46. Thus, the interests they seek to protect are germane to the organizations' purposes.

RMGO and NAGR have members who reside within each of the Municipalities. and RMGO and NAGR represent the interests of these members. UMF 47, 48. Dudley Brown is the president of both organizations. UMF 45. He has communicated with RMGO and NAGR members who reside in the Municipalities who have informed him that (a) they currently own and possess within the municipality in which they reside firearms that are considered AW Firearms under the Ordinances and they would like to continue to possess these firearms; (b) they have not obtained certificates of possession and do not intend to do so; and (c) they own and possess within the municipality in which they reside one or more LCMs. UMF 49. Of course, all of these activities would be illegal if the Ordinances were to become effective, and thus these members would have standing in their own right. However, their individual participation is not necessary because RMGO and NAGR are seeking declaratory and prospective relief only (as opposed to damages). Finally, RMGO and NAGR have specifically identified some of their members who reside in the Municipalities. UMF 51.

Even if there were some question regarding RMGO's and NAGR's associational standing, there is no need for the Court to address their standing separately from that of the individual Plaintiffs. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," and the Court may proceed to the merits without determining the other Plaintiffs' standing. *Rocky*

*Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1153 (10th Cir. 2022) (*quoting Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)); *see also Campbell v. Buckley*, 203 F.3d 738, 740 n.1 (10th Cir. 2000) ("Because the individual plaintiffs ... have standing, and because ... [they] jointly raise the same substantive arguments on appeal, ... there is no need to address the standing of the [other] plaintiffs.").

## F.   Summary: Plaintiffs Have Standing

For the foregoing reasons, there is no genuine dispute concerning the material facts supporting Plaintiffs' standing, and those facts are sufficient to establish their standing to bring their constitutional challenge to the Ordinances.

## IV. STANDARD OF REVIEW

## A.   Summary Judgment Standard

Summary judgment must be granted if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 920–21 (10th Cir. 2022) (cleaned up); Fed. R. Civ. P. 56(a). To dispute a fact, the nonmovant must do more than simply show that there is some metaphysical doubt as to the facts. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006). Instead, once the moving party has presented evidence in support of a fact, the nonmoving party has the burden of citing specific facts showing that there is a genuine issue for trial as to the fact. *Ezell v. BNSF Ry. Co.*, 949 F.3d 1274, 1278 (10th Cir. 2020). Therefore, to establish a triable issue of fact on, for example, the prevalence of

LCMs in the United States, Defendants would need to do more than merely deny Plaintiffs' evidence that tens of millions (if not hundreds of millions) are owned by Americans. They would need to submit affirmative evidence that would rebut that fact (which they obviously cannot do).

**B.     Standard for Permanent Injunction**

For a party to obtain summary judgment for a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). The requirements for obtaining a permanent injunction are "remarkably similar" to those for obtaining a preliminary injunction. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 908 (10th Cir.) (*citing Prairie Band Potawatomi Nation, supra*). The only difference between the two is that a permanent injunction requires showing actual success on the merits; whereas a preliminary injunction requires showing a substantial likelihood of success on the merits. *Id*.

**V.     PLAINTIFFS SUCCEED ON THE MERITS**

**A.     Legal Framework for Second Amendment Claims**

*Bruen* states that the appropriate test for applying the Second Amendment is: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then

justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.*, 142 S. Ct. at 2129-30 (internal citation and quotation omitted).

**B.     The Plain Text of the Second Amendment Covers Plaintiffs' Conduct**

In *Bruen*, the issue under the first step was "whether the plain text of the Second Amendment protects … carrying handguns publicly for self-defense." *Id.* at 2134. In answering this question, *Bruen* analyzed only the "Second Amendment's text," applying ordinary interpretive principles. *Id.* at 2134–35. Because the word "bear" naturally encompasses public carry, the Court concluded that the conduct at issue (public carry) was protected by the plain text of the Second Amendment. *Id.* at 2143.

In this case, Plaintiffs desire to acquire and possess the banned AW Firearms and LCMs. Thus, the first issue is whether the plain text of the Second Amendment covers this conduct. The plain text provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Court held that a handgun was an "arm" within the meaning of the Second Amendment. 554 U.S. at 581, 628–29, 128 S.Ct. 2783. In reaching that conclusion, the Court began by noting that, as a general matter, the "18th-century meaning" of the term "arms" is "no different from the meaning today." *Id.* at 581. Then, as now, the Court explained, the term generally referred to "[w]eapons of offence, or armour of defence." *Id.* (cleaned

up). The Court further noted that all relevant sources of the original public meaning of "arms" agreed that "all firearms constituted 'arms'" within the then-understood meaning of that term. *Id*. And, just as the scope of protection afforded by other constitutional rights extends to modern variants, so too the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582.

Defendants have asserted that magazines are not "arms." But numerous courts have held that LCMs are "arms" within the meaning of the Second Amendment. *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen* ("*ANJRPC*"); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017); and *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015). In *ANJRPC*, the Third Circuit addressed "the question [of] whether a magazine is an arm under the Second Amendment" and concluded "[t]he answer is yes." *Id*. at 116. It reasoned that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Id*.

A panel of the Fourth Circuit in *Kolbe* reasoned that because the Second Amendment plainly covers firearms, "there must also be an ancillary right to possess the magazines necessary to render those firearms operable." 813 F.3d at 175. The panel found "strong historical support" for the notion that magazines constitute "arms" because "magazines and the rounds they contain are used to strike at another

and inflict damages" and early American provisions protecting gun rights "suggest[ ] 'arms' should be read to protect all those items necessary to use the weapons effectively." *Id*. at 175 (citation omitted). *See also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (magazines necessary for many firearms to operate).

After *Bruen*, lower courts have held the same. *See Duncan v. Bonta*, 2023 WL 6180472, at *8 (S.D. Cal. Sept. 22, 2023)[5] (magazine is arm); *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) (same); *Barnett v. Raoul*, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) (same); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *7 (D. Del. Mar. 27, 2023) (same); and *Hanson v. D.C.*, 2023 WL 3019777, at *6 (D.D.C. Apr. 20, 2023) (same).

These holdings that magazines are arms make perfect sense. The right to keep and bear arms protects those things necessary for its exercise. *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). For example, in *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), the court held that the right to possess firearms implies a corresponding right to possess the components necessary to use them (specifically ammunition). As firearms expert Mark Passamaneck states, without a detachable magazine, operation of a semi-automatic firearm as a semi-automatic firearm is impossible. UMF 53. A magazine is not merely a box in which ammunition is stored. UMF 54. Rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id*. The magazine holds

---

[5] The preliminary injunctions entered in *Duncan* and *Barnett* have been stayed pending appeal.

cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. UMF 55. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. UMF 56. Thus, without magazines as a designed dynamic component, semi-automatic firearms would not exist. UMF 57. This is the reason the Third Circuit held that magazines are "arms" in *ANJRPC*.

Two lower courts have held that magazines are not arms. *See Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. 2022); and *Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, *9 (D. Or. 2022). But as the district court stated in *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023), these cases were wrongly decided because they ignore that under *Bruen*, a modern instrument that facilitates armed self-defense is an arm entitled to the prima facie protection of the Second Amendment.

In *Ocean State* the court held that both ammunition and "parts" of weapons (such as triggers and magazines) are not arms as the word is used in the Second Amendment and therefore are completely devoid of constitutional protection. *Id.* at *13. With all due respect, this conclusion is obviously wrong. If *Ocean State* were correct, the Municipalities could completely disarm their residents by rendering all firearms useless. How? According to *Ocean State*, the Municipalities could make the possession of ammunition illegal. Moreover, while it could not make possession of an

assembled firearm illegal, it could outlaw possession of each of its constituent parts. An interpretation of the Second Amendment that would effectively nullify the right to keep and bear firearms is obviously inconsistent with *Bruen*.

The court's analysis in *Oregon Firearms* fares no better. There, the court specifically acknowledged that "magazines in general are necessary to the use of firearms for self-defense." *Id.*, at \*9. But then the court stated that since large capacity magazines specifically are not necessary to use a firearm, they are not covered by the plain text of the Second Amendment. *Id.* This makes no sense. If a magazine of a certain size is an arm covered by the plain text, how does increasing the capacity of that magazine by one round (and thus tipping it into the LCM category) make it not an arm? The *Oregon Firearms* court's confusion results from confusing the first step of the *Bruen* test (text) with the second step (history).  Under the first step, a magazine is a bearable arm and thus presumptively protected. Does this mean that Defendants cannot ban so-called "large capacity magazines"? Not necessarily. Just like any arm, if Defendants can demonstrate that a regulation banning large capacity magazines is "consistent with the Nation's historical tradition of firearm regulation," they can ban them (though, as discussed below, they cannot make such a demonstration).

In summary, a magazine is necessary to make the Second Amendment right to fire a semi-automatic firearm effective. Therefore, magazines, in general, constitute bearable arms that are prima facie protected by the Second Amendment under step

one (text) of the *Bruen* test. Whether magazines of a particular size can be banned is a different question that must be resolved under step two (history) of that test.

## C.  History and Tradition Support Banning Only Weapons that Are Unusual in Society at Large

Plaintiffs have carried their burden of showing their conduct is covered by the plain text of the Second Amendment. The burden now shifts to Defendants to justify their regulations by demonstrating that they are consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2129-30. In the context of a weapons ban, *Heller* held that a law absolutely banning a weapon commonly possessed by law-abiding citizens for lawful purposes is categorically unconstitutional. *Heller*, 554 U.S. at 631-32. The Court reached this conclusion because no regulation in the Founding era "remotely burden[ed] the right of self-defense as much as an absolute ban on" a commonly possessed firearm. *Bruen*, 142 S. Ct. at 2128 (citing *Heller*, 554 U.S. at 631-32).

Thus, under *Heller* and *Bruen*, the government cannot ban a weapon that is commonly possessed for lawful purposes. It follows that the government may absolutely ban a weapon *only* if it is not commonly possessed by law-abiding citizens for lawful purposes. In *Heller*, the Court identified two categories of weapons that meet this criterion: (1) dangerous and *unusual* weapons, and (2) sophisticated military arms that are highly *unusual* in society at large, such as machine guns, bombers, and tanks. *Id*. 554 U.S. at 627. In this case, Defendants may justify their absolute ban of AW Firearms and LCMs only if they demonstrate that these arms fall into one of these categories. Accordingly, while Plaintiffs have no obligation to

33

demonstrate that the arms are in common use to carry their burden under *Bruen's* first step, if they do make such a showing it will be impossible for Defendants to carry their burden under *Bruen's* second step. This is so because if Plaintiffs make this showing, it will be impossible for Defendants to demonstrate that their absolute bans fall into either of the categories where such bans are constitutionally permitted.

The County Ordinance bans only the acquisition, as opposed to the possession, of the commonly possessed arms. This distinction makes no difference. *Bruen* cited with approval the Third Circuit's decision in *Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021).[6] In that case, the court held that the right to possess arms in common use implies a right to acquire such arms. 9 F.4th at 227, *citing Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Thus, banning the acquisition of commonly held arms is just as unconstitutional as banning their possession.

## D. Defendants May Not Shift Their Burden onto Plaintiffs

Defendants may argue that because *Heller* and *Bruen* held the Second Amendment protects only weapons that are in common use, Plaintiffs have the burden of proving the banned arms are in common use to establish they are protected. This is a misreading of those cases. It is true that in *Bruen* the Court noted that *Heller* held that the Second Amendment protects only weapons in common use. *See Bruen*, 142 S. Ct. at 2143 (*quoting Heller*, 554 U.S. at 627). But the Court was careful to note that *Heller* reached this conclusion because under the Nation's history and tradition

---

[6] *Bruen*, 142 S. Ct. at 2133.

of firearms regulation, weapons in common use are protected and the two categories of unusual weapons discussed above are not. The Court wrote:

> [In *Heller*,] we found it 'fairly supported by the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'

*Id.*, 142 S. Ct. at 2128 (*quoting Heller*, 554 U.S. at 627) (emphasis added).

The Court also wrote:

> Drawing from this *historical tradition*, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that are 'highly unusual in society at large.'

*Id.*, 142 S. Ct. at 2143 (*quoting Heller*, 554 U.S. at 627) (emphasis added).

Thus, in both passages where the Court noted that the Second Amendment protects only weapons that are in common use, it stated this is so because that rule is supported by *historical tradition*. Accordingly, whether an arm is in common use or, conversely, falls into one of the unprotected categories is addressed at the second *Bruen* step (history and tradition). The Ninth Circuit addressed this issue in *Teter* where it rejected Hawaii's argument that dangerous and unusual weapons are not "arms." The court wrote: "*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the *historical tradition* of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627 (emphasis added) (cleaned up). It did not say that dangerous and unusual weapons are not *arms*. Thus, whether butterfly knives are 'dangerous and unusual' is a contention as to which

Hawaii bears the burden of proof in the second prong of the *Bruen* analysis." *Teter*, 76 F.4th at 949–50 (emphasis in original).

Defendants' argument confuses the difference between (1) conduct prima facie protected by the text and (2) the subset of that conduct that may be regulated consistent with the Nation's history and traditions. This distinction is not unique to the Second Amendment. For example, on its face, the First Amendment prohibits all laws abridging freedom of speech. But that seemingly absolute guarantee sometimes yields to a regulation that is consistent with the Nation's history and tradition of speech regulation. Thus, a law proscribing "true threats" does not violate the right to free speech because the Nation's "historical and traditional" regulation of speech has countenanced such laws from "1791 to the present." *Counterman v. Colorado*, 143 S. Ct. 2106, 2113–14 (2023). A "true threat" is not protected by the First Amendment, but no one would argue that because it is unprotected it is not "speech" in the first instance.

Similarly, the plain text of the Second Amendment extends to all "arms." Nevertheless, a prohibition on a "dangerous and unusual" weapon (such as a short-barreled shotgun) does not violate the Second Amendment because laws banning such weapons existed in 1791 and have been in place ever since. *Heller*, 554 U.S. at 627. A short-barreled shotgun is not protected by the Second Amendment, but no one would argue that because it is unprotected it is not a bearable arm in the first instance.

In summary, the arms banned by the Municipalities are bearable arms, and the plain text of the Second Amendment extends, prima facie, to protect them. The

Municipalities are free to argue that their arms bans are consistent with the Nation's history and tradition of firearm regulation. But there is no reasonable argument that the AW Firearms and LCMs are not "arms" covered by the plain text in the first instance.

### E.   Common Use is Determined by Whether an Arm is Commonly Possessed by Law-Abiding Citizens

Whether an arm is in common use is determined by whether it is commonly possessed by law-abiding citizens for lawful purposes. In *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015), Justice Thomas, joined by Justice Scalia, put the matter as follows: "Roughly five million Americans own AR-style semiautomatic rifles … The overwhelming majority of citizens who own and use such rifles do so for lawful purposes … Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Id.* (Thomas, J., and Scalia, J., dissenting from denial of certiorari) (emphasis added). Thus, "all that is needed" for Plaintiffs to show that they have a right under the Second Amendment to keep AW Firearms and LCMs is to evidence that these arms are owned in the millions. Plaintiffs have shown this. UMF 61, 68. Indeed, Defendants' expert agrees that tens of millions of AW Firearms are in circulation (UMF 64), several times more than the threshold cited by Justice Thomas.

More recently, in *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *8 (D. Del. Mar. 27, 2023), the court applied identical reasoning to determine whether LCMs (in that case defined as

37

those having a capacity of over 17 rounds) are in common use. The court wrote: "There are currently tens of millions of rifle magazines that are lawfully possessed in the United States with capacities of more than seventeen rounds, including magazines for the AR-15 rifle … The AR-15 platform is capable of accepting standard magazines of 20 or 30 rounds and is typically sold with 30-round magazines … This is enough to show that LCMs are in common use for self-defense." *Id*. at *8 (internal citations and quotation marks omitted; cleaned up).

Numerous other courts have come to a similar conclusion. *See, e.g., Duncan v. Bonta*, 2023 WL 6180472, at *12 (S.D. Cal. Sept. 22, 2023) (millions of LCMs sufficient for common use); *Barnett v. Raoul*, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023) (tens of millions of AW Firearms and LCMs possessed sufficient to find common use); *Miller v. Bonta*, 2023 WL 6929336, at *33 (S.D. Cal. Oct. 19, 2023) (tens of millions of AW Firearms sufficient); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (use measured by statistics on possession); *Fyock, supra*, 779 F.3d at 998; *ANJRPC, supra*, 910 F.3d at 116; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the … large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); and *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

## F.     It is Not Necessary for Citizens to Fire a Weapon to Use it

Defendants will probably argue that Plaintiffs do not "use" their arms unless they actually fire them. This is a misreading of *Heller* and *Bruen*, as Plaintiff

38

Gordon Madonna's law enforcement experience illustrates. Mr. Madonna was a law enforcement officer for over 40 years. UMF 71. While during that time he discharged his weapon against a suspect only once, he was constantly armed for the purpose of both actual and possible confrontation. UMF 72, 73. Thus, he was always using his firearm for self-defense even when he was not discharging it. UMF 74.

Thus, Defendants' conception of "use" is cramped, because, as Mr. Madonna's experience illustrates, "use" covers both the times a firearm is discharged as well as the possession of the firearm for a purpose even it is not actually fired. *See Duncan v. Bonta*, 2023 WL 6588623, at *10 (9th Cir. Oct. 10, 2023) (Bumatay, J., dissenting). The same is true on the other side of the law. Criminal statutes do not require a firearm to be discharged in order for it to be "used" in a crime. *See, e.g., Smith v. United States*, 508 U.S. 223 (1993). Defendants' position is like saying a person does not use her seatbelt unless she crashes or she never used her alarm system if a burglar never set it off. The word "use" requires consideration of context. *Bailey v. United States*, 516 U.S. 137, 143 (1995) (someone can "use" a gun to protect his house while never having to "use" it). And in context it is clear that *Heller*, *McDonald* and *Bruen* all used the word "use" to mean possession with a purpose. This is obvious because none of the cases required empirical studies of actual use. It is also obvious, because that is what the cases actually said. *Heller* held that weapons "typically *possessed* by law-abiding citizens for lawful purposes," are protected. 554 U.S. at 625 (emphasis added). In *McDonald*, the Court wrote that the right to keep and bear arms is valued "because the *possession* of firearms was

thought to be essential for self-defense." 561 U.S. at 787 (emphasis added). In

*Bruen*, the Court wrote that the Second Amendment protects *carrying* weapons in

common use. *Id.*, 142 S. Ct. at 2143 (emphasis added).

## G.     The Banned Firearms Are in Common Use

The parties do not dispute that there are tens of millions of AW Firearms in

circulation in the United States. UMF 58-64. This is not even controversial, much

less genuinely disputable, as many courts have held. *See Barnett v. Raoul*, 2023 WL

3160285, at *10 (S.D. Ill. Apr. 28, 2023); and *Miller v. Bonta*, 2023 WL 6929336, at

*35 (S.D. Cal. Oct. 19, 2023) (both citing the same 24 million NSSF statistic as Mr.

Passamaneck and Dr. Klarevas); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,

804 F.3d 242, 255 (2d Cir. 2015) (millions owned); *Kolbe v. Hogan*, 849 F.3d 114,

128–29 (4th Cir. 2017), *abrogated by Bruen* (millions owned); *United States v.*

*Barber*, 2023 WL 1073667, at *5 (E.D. Tex. Jan. 27, 2023) (most popular rifle in

America); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017), *abrogated by Bruen*

(Traxler, J., dissenting) ("beyond any reasonable dispute" that millions are owned);

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 136 S. Ct. 447, 449 (2015)

(Thomas, J., dissenting) (millions owned).

In summary, the AR-15 platform is the most popular rifle in America.

UMF 65-66. *See also Heller v. D.C.*, 670 F.3d 1244, 1287 (D.C. Cir. 2011)

(Kavanaugh, J., dissenting) (with millions owned, the AR-15 is the most popular

rifle). Thus, there can be no doubt that AW Firearms are in common use.

And, as borne out by FBR statistics, they are used almost exclusively for lawful purposes. In the five years from 2015 to 2019, there were an average of 14,556 murders per year in the United States. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI (available at https://bit.ly/31WmQ1V). On average, rifles of all types (of which so-called "assault weapons" are a subset) were identified as the murder weapon in 315 (or 2.5%) of the murders per year. *Id*. By way of comparison, on average 669 people per year are murdered by "personal weapons" such as hands, fists, and feet. *Id*. Thus, according to FBI statistics, a murder victim is more than twice as likely to have been killed by hands and feet than by an "assault weapon." Even in the counterfactual event that an assault weapon had been involved in each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24 million assault rifles in circulation in the United States during that time period (0.006%) would have been used for that unlawful purpose.

## H.   LCMs Are in Common Use

There also does not appear to be any dispute that tens of millions of LCMs are in circulation. UMF 67-70. This too has been acknowledged by numerous courts. *See Duncan v. Bonta*, 2023 WL 6180472, at *4 (S.D. Cal. Sept. 22, 2023) ("millions of Americans across the country own large capacity magazines. 'One estimate ... shows that ... civilians possessed about 115 million LCMs'"); *Barnett v. Raoul*, 2023 WL 3160285, at *10 (S.D. Ill. Apr. 28, 2023) (hundreds of millions owned); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023

WL 2655150, at *8 (D. Del. Mar. 27, 2023) (tens of millions owned); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017), *abrogated by Bruen* (75 million); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *6 (D. Del. Mar. 27, 2023) (millions owned); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 112 (3d Cir. 2018), *abrogated by Bruen*; *Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, 2023 WL 4541027, at *10 (D. Or. July 14, 2023) (Millions of Americans today own LCMs); *Wiese v. Becerra*, 263 F. Supp. 3d 986, 991 (E.D. Cal. 2017); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).

## I.    Summary: AW Firearms and LCMs Are Protected by the Second Amendment

The *Bruen* test has two steps: [1] "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 142 S. Ct. at 2129-30. The banned AW Firearms and LCMs are bearable arms presumptively protected under *Bruen's* step one. It will be impossible for the Municipalities to carry their burden under step two (history and tradition). They cannot demonstrate that the banned arms fall into either of the two categories of "unusual" arms that under the Nation's history and tradition may be subjected to an absolute ban, i.e. (1)

dangerous and *unusual* weapons, and (2) sophisticated military arms that are highly *unusual* in society at large, such as machine guns, bombers, and tanks. It is beyond dispute that the banned arms are owned in the tens of millions. Therefore, under no reasonable interpretation of the word can they be considered "unusual." In summary, this case is controlled by *Heller*. Like the handguns at issue in *Heller*, the AW Firearms and the LCMs are overwhelmingly chosen by American society for lawful purposes such as self-defense. *See D.C. v. Heller*, 554 U.S. 570, 628 (2008). The material facts are not genuinely disputed, and Plaintiffs have shown they will succeed on the merits as a matter of law.

## VI.  THE REMAINING INJUNCTION FACTORS FAVOR PLAINTIFFS

### A.  Plaintiffs Have Suffered Irreparable Harm

Plaintiffs have established that they will prevail on the merits of their claim that the Ordinances violate the Second Amendment. Violation of constitutional rights per se constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury). Recently, the Ninth Circuit applied the *Elrod* principle in the Second Amendment context. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). In *Baird*, the court held that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Id.*, at 1048. Moreover, such a likelihood, "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context);

and *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."); and *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases).

## B.   The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief

Finally, the balance of harms and public interest factors[7] favor injunctive relief. A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in his favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023) (internal citation and quotation marks omitted; cleaned up). In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id.* "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id.* (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061,

---

[7] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

Defendants may argue their arms bans should not be enjoined for "public safety" reasons. Plaintiffs disagree that the arms bans have any measurable effect on public safety. But even if they did, that fact would be irrelevant under *Bruen*. Indeed, the public safety argument is in effect a backdoor means-end test of the type rejected by *Bruen*. 142 S. Ct. at 2129 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*., 142 S. Ct. at 2126. *Bruen's* rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation. Moreover, "[w]hile the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom. Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (cleaned up) (*citing Newsom v. Albemarle Cnty. Sch. Bd*., 354 F.3d 249, 261 (4th Cir. 2003)).

## VII.   Conclusion

For the foregoing reasons, Plaintiffs respectfully request the Court to enter summary judgment in their favor and enter an order permanently enjoining enforcement of the Ordinances.

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email:  barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*

_____
Barry K. Arrington