EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv- 2680**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO, CITY
OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

**Expert Report of Louis Klarevas**

---

## EXPERT REPORT OF LOUIS KLAREVAS

I, Louis Klarevas, declare:

1.      I have been asked by the Defendants to prepare an Expert Report addressing recent trends in mass shootings in the United States, the use of assault weapons and large-capacity magazines (LCMs) in mass shootings and the impact on fatalities and harm caused, and how restrictions on assault weapons and LCMs have affected mass shooting violence.  This Report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report ("Report" hereinafter).

### PROFESSIONAL QUALIFICATIONS

2.      I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3.      I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts.  I have also served as Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

4.      My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that focuses on reducing intentional shootings at elementary and secondary schools.

5.      In addition to having made over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces.  In

---

[1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

2019, my peer-reviewed article on the effectiveness of restrictions on LCMs in reducing high-fatality mass shootings that result in six or more victims killed was published in the *American Journal of Public Health*.[2]  This study found that jurisdictions with LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans.  Despite being over 3 years old now, this study continues to be one of the highest impact studies in academia.  It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

      6.      Since January 1, 2019, I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

**California – Central District**
*Rupp v. Bonta*                                    8:17-cv-00746-JLS-JDE
**California – Eastern District**
*Wiese v. Bonta*                                   2:17-cv-00903-WBS-KJN
**California – Southern District**
*Duncan v. Bonta*                                 17-cv-1017-BEN-JLB
*Jones v. Bonta*                                    19-cv-01226-L-AHG
*Miller v. Bonta*                                   3:19-cv-1537-BEN-JBS
*Nguyen v. Bonta*                                3:20-cv-02470-WQH-MDD
**Colorado**
*Gates v. Polis*                                     1:22-cv-01866-NYW-SKC
**Connecticut**
*National Association for Gun Rights v. Lamont*       3:22-cv-01118-JBA
**Hawaii**
*National Association for Gun Rights v. Lopez*        1:22-cv-404-DKW-RT

---

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed February 11, 2023).  According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies.  Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans.  They helped build the foundation for future studies while overcoming the limitations of previous research."  *Ibid.*

**Illinois – Northern District**

| | |
|---|---|
| *Viramontes v. Cook County* | 1:21-cv-04595 |
| *National Association for Gun Rights v. Highland Park* | 22-cv-04774 |
| *Herrera v. Raoul* | 1:23-cv-00532 |

**Illinois – Southern District**

| | |
|---|---|
| *Harrel v. Raoul*[*] | 23-cv-141-SPM |
| *Langley v. Kelly*[*] | 23-cv-192-SPM |
| *Barnett v. Raoul*[*] | 23-cv-209-SPM |
| *Federal Firearms Licensees of Illinois v. Pritzker*[*] | 23-cv-215-SPM |
| *Kenneally v. Raoul* | 3:23-cv-50039 |

**Massachusetts**

| | |
|---|---|
| *National Association for Gun Rights v. Campbell* | 1:22-cv-11431-FDS |

**Oregon**

| | |
|---|---|
| *Oregon Firearms Federation v. Kotek*[†] | 2:22-cv-01815-IM |
| *Fitz v. Rosenblum*[†] | 3:22-cv-01859-IM |
| *Eyre v. Rosenblum*[†] | 3:22-cv-01862-IM |
| *Azzopardi v. Rosenblum*[†] | 3:22-cv-01869-IM |

**Washington – Eastern District**

| | |
|---|---|
| *Brumback v. Ferguson* | 1:22-cv-03093-MKD |

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

7.      In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8.      I have also submitted declarations in the following state court cases: *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado, 2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant County, Washington, 23-2-00377-13 (Civil).

4

9.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this Report.

10.      I am being compensated at a rate of $480/hour for my work on this Report, $600/hour for any testimony in connection with this matter, and $120/hour for travel required to provide testimony.

## OPINIONS

11.      It is my professional opinion, based upon my extensive review and analysis of the data, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs.  Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of gun massacres.[4]

---

[4] For purposes of this Report, mass shootings are defined in a manner consistent with my book *Rampage Nation*, *supra* note 1 (*see* Excerpt Attached as **Exhibit B**).  "Mass shootings" are shootings resulting in four or more victims being shot (fatally or non-fatally), regardless of location or underlying motive.  As a subset of mass shootings, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more victims being shot to death, regardless of location or underlying motive.  The data on high-fatality mass shootings is from a data set that I maintain and continuously update.  This data set is reproduced

## I.   MASS SHOOTINGS ARE A GROWING THREAT TO PUBLIC SAFETY

12.     Examining mass-casualty acts of violence in the United States since 1991 points to two disturbing patterns.[5]  First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings.  Second, as displayed in Figures 1-2, the problem of high-fatality mass shooting violence is on the rise.  To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%.  However, when the number of people killed in high-fatality mass shootings in the 1990s is compared to the number killed in such incidents in the 2010s, it reflects an increase of 260%.  In other words, the rise in gun massacre violence has far outpaced the rise in national population—by a factor of 13.  The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

---

in **Exhibit C**.  Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in Sections I, II, and VI of this Report are drawn from **Exhibit C**.

[5] Because the analysis in Section VI of this Report necessarily uses data from 1991 through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections I and II also use data from 1991 through 2022.

6

**Figure 1.  Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2.  Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

7

## II.   THE USE OF ASSAULT WEAPONS AND LCMS ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

13.    In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6]  As shown in Figures 3-4, based on high-fatality mass shootings where details allow a determination on the use of assault weapons and LCMs are available, over half of all incidents in the last four years involved assault weapons and all incidents in the last four years involved LCMs having a capacity greater than 10 bullets.  As shown in Figures 5-6, a similar pattern emerges when examining deaths in high-fatality mass shootings in the last four years, with 62% of deaths resulting from incidents involving assault weapons and 100% of deaths resulting from incidents involving LCMs having a capacity greater than 10 bullets.  These trends demonstrate that, among perpetrators of gun massacres, there is a growing preference for using assault weapons and LCMs to carry out their attacks.[7]

---

[6] Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault pistols, assault rifles, and assault shotguns.  For purposes of this Report, unless otherwise stated, assault weapons are defined and coded in a manner consistent with **Exhibit C**.  Per the 1994 federal ban definition, LCMs are generally ammunition-feeding devices with a capacity greater than 10 bullets.  The ammunition threshold of the 1994 federal definition (greater than 10 bullets) is identical to that of the definition of LCMs in the ordinances of all four jurisdictions that are parties in the present case.  For purposes of this Report, unless otherwise stated, LCMs will be defined in a manner consistent with the 1994 federal ban on LCMs, which defined them as ammunition-feeding devices with a capacity greater than 10 bullets.  While the term "assault weapons" as referenced in the present case is defined by law, the modern-day roots of the term can be traced back to the 1980s, when gun manufacturers branded military-style firearms with the label in an effort to make them more marketable to civilians.  *See*, Violence Policy Center, *Assault Weapons and Accessories in America* (1988) (Attached as **Exhibit D**); Violence Policy Center, *Bullet Hoses: Semiautomatic Assault Weapons—What Are They? What's So Bad about Them?* (2003) (Attached as **Exhibit E**); Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (2008) (Relevant Excerpt Attached as **Exhibit F**); and Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 16, 2013, *available at* https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html (last accessed January 24, 2023).

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents.  Furthermore, for two

8

**Figure 3.  Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4.  Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

of these 14 incidents, it is also not possible to determine whether they involved assault weapons. Therefore, the tables, figures, and percentages discussed in this section of the Report are based on calculations that only use data points from the incidents in which the involvement of assault weapons and/or LCMs could be determined.

9

**Figure 5.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.


**Figure 6.  Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

14.     The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme.  Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform firearms—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly available data (24.4 million out of an estimated 461.9 million firearms).[8]  And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement agencies in the United States.[9]  But even using this estimate, if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons.  However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar.  Indeed, the current difference is approximately ten-fold, with the rate at which assault weapons

---

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data.  The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available).  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).  In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States.  NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023).  According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide.  ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023).  Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million.  The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 8, at 12; NSSF, 2020, *supra* note 8, at 2-3.

are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

15.      Another pattern that stands out when examining the relationship between assault weapons use and gun massacre violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs.  For instance, returning to the aforementioned list of the seven deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, six of the seven incidents (86%) involved assault weapons and LCMs, as shown in Table 2.  When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking.  In the past 32 years, assault weapons and LCMs with an ammunition capacity greater than 10 rounds have been used, respectively, in 34% and 77% of all high-fatality mass shootings.  However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs.  For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8).  As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

---

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

**Table 2.  The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|--------|------|----------|--------------------------|-------------------------------|
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

**Figure 7.  Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

13

013

**Figure 8.  Percentage of High-Fatality Mass Shootings Involving LCMs (Ammunition Capacity Greater Than 10 Rounds) by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

16.     Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths.  The average death toll for these 31 incidents is 13.7 fatalities per shooting.  By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3).  Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use was determined, 61 involved LCMs with an ammunition capacity greater than 10 rounds, resulting in 704 deaths.  The average death toll for these 61 incidents is 11.5 fatalities per shooting.  The average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4).  In other words, in the last 32 years, the use of assault weapons and LCMs in gun massacres has resulted, correspondingly, in 67% and 58% increases in average fatalities per incident (Tables 3-4).

17.     Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs.  When

14

LCMs with an ammunition capacity greater than 10 rounds are not used, the average death toll is 7.3 fatalities.  When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities.  When LCMs are used with assault weapons, the average death toll is 14.0 fatalities.  The data show that using LCMs without an assault weapon resulted in a 26% increase in the average death toll.  However, using LCMs with an assault weapon resulted in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involved neither LCMs nor assault weapons.

17.     This review of the data suggests that assault weapons and LCMs are force multipliers when used in mass shootings.

**Table 3.  The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

### III.   DOUBLE-DIGIT-FATALITY MASS SHOOTINGS ARE A POST-WORLD WAR II PHENOMENON IN AMERICAN HISTORY AND THEY INCREASINGLY INVOLVE ASSAULT WEAPONS

18.     I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9).[11]  In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949.  In other words, for 70% of its 247-year existence as a nation, the United States did not experience a

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

*single* mass shooting resulting in double-digit fatalities.  They are relatively modern phenomena in American history.[12]

19.      After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred nine years later, in 1975.  And the fourth such incident occurred seven years after, in 1982.  Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era.  Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit G** of this Report.

**Table 6.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**

|  | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe, TX | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators.  An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban or (2) the statutes of the state where the gun massacre occurred.  An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

**Figure 9.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**



**Figure 10.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



20.     The distribution of double-digit-fatality mass shootings changes in the early

1980s, when five such events took place in a span of just five years (Table 6 and Figure 10).

This timeframe also reflects the first time that assault weapons were used to perpetrate mass

shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths).  But this cluster of incidents was followed by a 20-year period in which only two double-digit-fatality mass shootings occurred (Figure 10).  This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

21.     It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[14]  Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern.  In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities (a frequency rate of one incident every 5.6 years).  In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings (a frequency rate of one incident every 0.9 years).  In other words, the frequency rate has increased over six-fold since the Federal Assault Weapons Ban expired (Table 6 and Figure 10).  (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section VI of this Report.)

22.     Over three-quarters of the mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs (Table 6).  As also shown in the analyses of mass shootings in Section II, death tolls in double-digit-fatality mass shootings are related to the use of firearm

---

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit H**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit I**); Charles DiMaggio, et al., "Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019) (Attached as **Exhibit J**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021) (Attached as **Exhibit K**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as **Exhibit L**).

technologies like assault weapons and LCMs that, in terms of mass shootings, serve as force multipliers.

## IV. ASSAULT WEAPONS ARE ALMOST NEVER USED BY PRIVATE CITIZENS IN SELF-DEFENSE DURING ACTIVE SHOOTINGS

23.     An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them?  As shown above in Section II, assault weapons have been used to perpetrate approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3).  And in the past eight years, the share of high-fatality mass shootings that have been perpetrated with assault weapons has risen to approximately half (Figure 3).

24.     The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15]  According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16]  A simple way to conceptualize active shooter incidents is to think of them as attempted mass shootings.  As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

---

[15] All of the information in this section, including definitions and data, are publicly available from the FBI.  *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023).

[16] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023, at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2022-042623.pdf/view (last accessed May 4, 2023).  The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms.  The *active* aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome."  *Ibid.* (emphasis in original).  In addition to the report on incidents in 2022, the FBI has published seven other reports on active shooter incidents covering the following seven time periods: 2000-2013, 2014-2015, 2016-2017, 2018, 2019, 2020, and 2021.  All of these reports are available at the FBI's "Active Shooter Safety Resources" website, *supra* note 15.

021

25.     In the 23 years between January 1, 2000 and December 31, 2022, the FBI has identified 456 active shootings occurring in the United States.  Out of these 456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17]  Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one assault rifle).[18]  In other words, out of the 17 incidents where an armed civilian intervened and it was possible to identify the DGU firearm, only one incident (5.9%) involved an assault weapon.[19]  Within the broader context of all active shooter incidents, only one incident out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon.[20]

---

[17] In 17 of the 18 DGU-involved active shooter incidents, there was an exchange of gunfire.  For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased.  FBI, *supra* notes 15 and 16.

[18] All 14 DGU incidents that involved handguns also involved armed civilians who held valid concealed-carry permits or were legally carrying their handguns.  *Ibid*.  In 12 of these 14 incidents, details about the types of handguns used in self-defense were available in news media accounts or in news media photographs of the crime scene.  In two of the 14 incidents, the use of concealed handguns was inferred based on details about the shooting reported in news media accounts.  There is no evidence that either of these two DGU incidents involved an assault pistol.

[19] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident.  *Ibid*.  Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun.  *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023).  Adding this incident to the 17 DGU-involved incidents would mean that 5.6% (as opposed to 5.9%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[20] FBI, *supra* notes 15 and 16.  The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas.  In that incident, an armed private citizen used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene.  While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him.  *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

26.     The bottom line is that assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[21]

## V.     OWNERSHIP RATES OF "MODERN SPORTING RIFLES" IN THE U.S.

27.     As noted above in Para. 13, based on the most recent publicly available NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform firearms—appear to make up as many as 5.3% of all firearms in circulation in American society (24.4 million out of an estimated 461.9 million firearms, although this is likely an overestimate due to the apparent inclusion of modern sporting rifles possessed by law enforcement agencies). Furthermore, in its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.[22]  Based on this data, only 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[23]  In other words, less than 8% of all civilian gun owners in the United States own modern sporting

---

[21] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention.  As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

[22] NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed January 16, 2023).

[23] The estimate that approximately 6.4 million gun owners possess what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such rifles estimated to be in civilian circulation.  This calculation (24.4 million divided by 3.8) equals 6.4 million. Based on survey data, 81 million American adults are estimated to own guns.  Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022, *available at* https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-ban-wont-turn-gun-owners- (last accessed January 16, 2023).

rifles.[24]  In terms of the total population of the United States, estimated by the Census Bureau to be approximately 333 million people in 2022, less than 2% of all Americans own a modern sporting rifle.[25]

28.  In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[26]  According to the ATF, from 1986 through 2020 (which reflects the most currently available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[27]  As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

29.  According to ATF data, handguns are the most commonly owned firearms; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[28]

---

[24] The finding that less than 8% of all gun owners possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American adults estimated to be gun owners.  Taking 6.4 million and dividing it by 81 million equals 7.9%.

[25] The Census Bureau's total population estimate for 2022 is 333,287,557 persons.  U.S. Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last accessed January 16, 2023).  The finding that less than 2% of all Americans possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333 million persons in the United States.  Taking 6.4 million and dividing it by 333 million equals 1.9%.

[26] NSSF, 2020, *supra* note 8.

[27] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 8.  For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[28] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

**Figure 11.  Share of Firearms in Civilian Circulation in the United States, 1986-2020**



## VI.      RESTRICTIONS ON ASSAULT WEAPONS AND LCMs REDUCE THE INCIDENCE OF GUN MASSACRES, RESULTING IN LIVES SAVED

### VI.A.      THE OPERATIVE MECHANISM OF ASSAULT WEAPONS BANS: SUPPRESSION AND SUBSTITUTION EFFECTS

30.      As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[29]  The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements.  This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[30]

**Figure 12.  The Trinity of Violence**



---

[29] Klarevas, *supra* note 1, at 27-29, 229-238.

[30] *Ibid.*

31.     Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[31]  Bans on assault weapons and LCMs generally make it illegal to manufacture, import, transfer, own, or possess certain firearms and certain magazines.  Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial.  With regard to perpetrators, bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior.  In the case of bans on assault weapons and LCMs, they threaten conviction, imprisonment, and/or fines should an individual build or otherwise acquire a prohibited assault weapon or LCM.  The primary mechanism at work here centers around dissuading potential shooters from trying to acquire banned firearm technologies.  But there is also a secondary mechanism at work, focused on the assault weapon or LCM itself: *deprive potential instruments of violence*.  Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons and LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it.  This, in essence, reinforces the strategy of dissuading the offender with the strategy of denying the instruments of violence.

32.     Ideally, someone intent on committing a mass shooting with an assault weapon and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice are not available.  In such a scenario, the attack would be quashed.  This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely related desirable outcome.[32]  A real-world example

---

[31] Philip J. Cook, "Research in Criminal Deterrence: Laying the Groundwork for the Second Decade," 2 *Crime and Justice* 211 (1980) (Attached as **Exhibit M**); and Daniel S. Nagin, "Deterrence in the Twenty-First Century," 42 *Crime and Justice* 199 (2013) (Attached as **Exhibit N**).

[32] Paul Dolan and Mateo M. Galizzi, "Like Ripples on a Pond: Behavioral Spillovers and Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015) (Attached as **Exhibit O**); K. Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755 (2020) (Attached as **Exhibit P**).

026

of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun (that did not have an LCM). At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle and LCMs. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on a rampage and "killed as many people as I possibly could." As he noted, "because I didn't have an assault weapon, that didn't happen."[33] In this case, the unavailability of an assault weapon due to the federal ban appears to have suppressed the perpetrator's impulse to commit a mass shooting.

33.     Of course, some potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable. They will instead replace their desired instruments of violence with available alternatives. This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[34] A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California. In that attack, the gunman appears to have been unable to acquire an assault rifle and LCMs due to California's ban on both. Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines. As a result, the gunman quickly ran out of bullets, and while pausing to reload—which appears to have been extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a

---

[33] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023).

[34] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981) (Attached as **Exhibit Q**); Anthony A. Braga, et al., "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021) (Attached as **Exhibit R**).

congregant chased him away, preventing him from continuing his attack.[35]  In this incident, which resulted in one death, California's ban on assault weapons and LCMs worked exactly as intended.  It deprived the active shooter of the mechanisms that might have allowed him to kill enough people to surpass the fatality threshold of a mass shooting.  Stated differently, if you examine data sets that identify shootings resulting in mass murder, you will not find the Poway synagogue attack on their lists.

34.     It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument.  Nevertheless, this is exactly how bans on assault weapons and LCMs work in theory.  They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable.  And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

**VI.B.     THE OPERATIVE MECHANISM OF LCM BANS: FORCING PAUSES IN ACTIVE SHOOTINGS**

35.     Restrictions on assault weapons and LCMs also address the multiple advantages LCMs provide to active shooters.  Offensively, LCMs increase kill potential.  Basically, the more bullets a shooter can fire at a target within a finite amount of time, the more potential wounds they can inflict.  Furthermore, the more bullets that strike a victim, the higher the odds that that person will die.  These two factors—sustained-fire capability and multiple-impact capability— allow LCMs to increase a shooter's kill potential.

36.     When inserted into either a semiautomatic or fully automatic firearm, an LCM facilitates the ability of an active shooter to fire a large number of rounds at an extremely quick

---

[35] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50 Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

rate without pause.  This phenomenon—sustained-fire capability—comes in handy when a target is in a gunman's line of sight for only a few seconds.  For example, sustained-fire capability allows a reasonably competent shooter to fire three rounds per second with a semiautomatic firearm and ten rounds per second with an automatic firearm.  That results in numerous chances to hit a target in a short window of opportunity, especially when ammunition capacity is large.

37.     LCMs also facilitate the ability of a shooter to strike a human target with more than one round.  This phenomenon—multiple-impact capability—increases the chances that the victim, when struck by multiple rounds, will die.  At least two separate studies have found that, when compared to the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than one bullet were over 60 percent higher.[36]  The implication is straightforward: being able to strike human targets with more than one bullet increases a shooter's chances of killing their victims.  In essence, LCMs are force multipliers when it comes to kill potential—and the evidence from gun massacres supports this conclusion (*see* Section II).

38.     In addition to offensive advantages, LCMs also provide the defensive advantage of extended cover.  During an active shooting, a perpetrator is either firing their gun or not firing their gun.  While pulling the trigger, it is difficult for those in harm's way to take successful defensive maneuvers.  But if the shooter runs out of bullets, there is a lull in the shooting.  This precious downtime affords those in the line of fire with a chance to flee, hide, or fight back.

39.     There are several examples of individuals fleeing or taking cover while active shooters paused to reload.  For instance, in 2012, several first-graders at Sandy Hook Elementary School in Newtown, Connecticut, escaped their attacker as he was swapping out magazines,

---

[36] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in Washington, DC, 1983–1990," 127 *Archives of Surgery* 694 (June 1992) (Attached as **Exhibit S**); Angela Sauaia, et al., "Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000–2013," 315 *JAMA* 2465 (June 14, 2016) (Attached as **Exhibit T**).

allowing them to exit their classroom and dash to safety.[37]  Other well-known examples include the 2007 Virginia Tech and the 2018 Borderline Bar and Grill rampages.[38]  There is also the possibility that someone will rush an active shooter and try to tackle them (or at the very least try to wrestle their weapon away from them) while they pause to reload.[39]  In recent history, there have been numerous instances of gunmen being physically confronted by unarmed civilians while reloading, bringing their gun attacks to an abrupt end.  Prominent examples include the 1993 Long Island Rail Road, the 2011 Tucson shopping center, the 2018 Nashville Waffle House, and the 2022 Laguna Woods church shooting rampages.[40]  When there are pauses in the shooting to reload, opportunities arise for those in the line of fire to take life-saving action.

---

[37] *See* Dave Altimari, et al., "Shooter Paused and Six Escaped," *Hartford Courant*, December 23, 2012 (Attached as **Exhibit U**).

[38] Virginia Tech Review Panel, Mass Shootings at Virginia Tech, April 16, 2007: Report of the Virginia Tech Review Panel Presented to Governor Kaine, Commonwealth of Virginia, Revised with Addendum, November 2009, *available at* https://scholar.lib.vt.edu/prevail/docs/April16ReportRev20091204.pdf (last accessed February 1, 2023); "California Bar Shooting: Witnesses Describe Escaping as Gunman Reloaded," CBS News, December 7, 2018, *available at* https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in (last accessed February 1, 2023).

[39] The longer a shooter can fire without interruption, the longer they can keep potential defenders at bay.  The longer potential defenders are kept from physically confronting a shooter, the more opportunity there is for the shooter to inflict damage.

[40] *See*, Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at* http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-hero-stopped-murderer-article-1.1540846 (last accessed February 1, 2023); Sam Quinones and Nicole Santa Cruz, "Crowd Members Took Gunman Down," *Los Angeles Times*, January 9, 2011, *available at* https://www.latimes.com/archives/la-xpm-2011-jan-09-la-na-arizona-shooting-heroes-20110110-story.html (last accessed February 1, 2023); Brad Schmitt, "Waffle House Hero: Could You Rush Toward a Gunman Who Just Killed People?" *The Tennessean*, April 24, 2018, *available at* https://www.tennessean.com/story/news/crime/2018/04/24/waffle-house-hero-could-you-rush-toward-gunman-who-just-killed-people/543943002 (last accessed February 1, 2023); "Parishioners Stop Gunman in Deadly California Church Attack," NPR, May 16, 2022, *available at* https://www.npr.org/2022/05/16/1099168335/parishioners-stop-gunman-in-california-church-shooting (last accessed February 1, 2023).

**VI.C.     BANS ON ASSAULT WEAPONS AND LCMS IN PRACTICE**

40.     In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures was the 1994 Federal Assault Weapons Ban.  In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[41]

41.     Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[42]  Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand.  As Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[43]

42.     The legislative intent of the Town of Superior, the City of Boulder, the City of Louisville, and Boulder County in enacting the laws being challenged in the present case is similar to that of other legislative bodies that have restricted assault weapons and LCMs:

---

[41] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[42] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

[43] *See* sources cited *supra* note 14.

reducing gun violence, especially the frequency and lethality of mass shootings. Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

43.     Currently, 32% of the U.S. population is subject to a ban on both assault weapons and LCMs. The following is a list of the eleven state-level jurisdictions that presently restrict both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[44] As a reminder, from September 13, 1994 through September 12, 2004, the entire country was also subject to a federal ban on both assault weapons and LCMs.

44.     In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect. This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time. Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans. In addition, fatality rates—the number of deaths, per population, that result from particular events

---

[44] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[45]

45.     Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit C**).[46]  Calculating incidence and fatality rates for this time period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates.  They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of whether assault weapons or LCMs were used (Table 7).[47]

46.     When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories is even more pronounced.  In the time period from January 1, 1991 through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs.  Similarly, jurisdictions with such bans in effect experienced a 72% decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

---

[45] For purposes of this Report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control.  *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

[46] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990.  Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs.  As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990 would make no difference.

[47] Between September 13, 1994 and September 12, 2004, the Federal Assault Weapons Ban was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs.  As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the time frame that the Federal Assault Weapons Ban was in effect.

47.     All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

48.     The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs.  The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost.

49.     Moreover, forcing active shooters to reload creates critical pauses in an attack. These pauses provide opportunities for people in the line of fire to take life-saving measures (such as fleeing the area, taking cover out of the shooter's sight, and fighting back), which in turn can help reduce casualties.

50.     The epidemiological data lend support to the policy choices of the Town of Superior, the City of Boulder, the City of Louisville, and Boulder County that seek to enhance public safety through restrictions on civilian access to certain firearms and magazines.  While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to restrict such instruments of violence should result in lives being saved.

**Table 7. Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022**

|  | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| **All High-Fatality Mass Shootings** |  |  |  |  |  |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States |  |  | 56% |  | 66% |
| **High-Fatality Mass Shootings Involving Assault Weapons or LCMs** |  |  |  |  |  |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States |  |  | 62% |  | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

Executed on May 5, 2023, at Nassau County, New York.



/s/

Louis Klarevas

35

035