**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

       Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

       Defendants

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES

INTRODUCTION ................................................................................................................1

BACKGROUND.................................................................................................................4

   I.    THE TRAGEDY OF MASS SHOOTINGS IN COLORADO .....................................................4

   II.   THE STRUCTURE OF THE ORDINANCES.........................................................................6

   III.  PROCEDURAL HISTORY ...............................................................................................7

LEGAL STANDARD ..........................................................................................................8

ARGUMENT ....................................................................................................................9

   I.    THE LEGAL FRAMEWORK FOR SECOND AMENDMENT CLAIMS .......................................9

      A. THE SCOPE OF THE RIGHT ..........................................................................9

      B. *BRUEN*'S TWO-STEP, BURDEN SHIFTING FRAMEWORK  ...........................................10

   II.   ASSAULT WEAPONS AND LCMS DO NOT FALL WITHIN THE "PLAIN TEXT" OF THE SECOND AMENDMENT ...............................................................................................11

      A. LCMS AND ASSAULT WEAPONS ARE NOT "IN COMMON USE TODAY FOR SELF-DEFENSE" ........................................................................................................12

      B. ASSAULT RIFLES AND LCMS ARE UNSUITABLE FOR SELF-DEFENSE AND WERE DESIGNED FOR MILITARY USE .................................................................................14

      C. ASSAULT WEAPONS AND LCMS ARE ALSO "DANGEROUS AND UNUSUAL WEAPONS" UNPROTECTED BY THE SECOND AMENDMENT ......................................18

      D. LCMS ARE NOT "ARMS"..........................................................................21

   III.  THE ORDINANCES ARE CONSISTENT WITH THE NATION'S HISTORY OF FIREARMS REGULATION...............................................................................................................23

      A. THE COURT SHOULD USE A "MORE NUANCED" ANALOGICAL APPROACH............24

          1.   RAPID FIRE ASSAULT WEAPONS REPRESENT A "DRAMATIC TECHNOLOGICAL CHANGE" SINCE THE FOUNDING AND RECONSTRUCTION .................................................................................24

          2.   MASS SHOOTINGS REFLECT AN UNPRECEDENTED SOCIETAL CONCERN IN THE NATION'S HISTORY .......................................................................27

      B. THE NATION HAS A HISTORICAL TRADITION OF REGULATING PARTICULARLY DANGEROUS WEAPONS THAT POSE A THREAT TO PUBLIC SAFETY.........................28

          1.   THE COLONIAL AND EARLY REPUBLIC PERIODS (1600-1812).................29

          2.   THE ANTEBELLUM AND RECONSTRUCTION PERIODS (1813-1881) ..........31

          3.   LATE NINETEENTH AND EARLY TWENTIETH CENTURIES (1882-1930S) ..32

C.  The Ordinances Are "Relevantly Similar" to Comparable Historical Regulations .................................................................................................35

1.  The Ordinances' Burden on the Right to Armed Self-Defense Is Not Greater than Comparable Historical Regulations ........35

2.  The Ordinances Are Comparably Justified ...................................37

Conclusion......................................................................................................................39

Statement of Undisputed Material Facts .............................................................39

I.   Facts Relevant to the Plain Text Analysis .......................................................40

II.  Facts Relevant to the History and Tradition Analysis ..................................42

Certificate of Service ...............................................................................................48

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Barnett v. Raoul*, No. 23-1825,
    Dkt. 30 (7th Cir. May 12, 2023) ........................................................................................2

*Bevis v. City of Naperville, Illinois*,
    No. 22 C 4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023)................2, 19, 21, 24 30, 35

*Brumback v. Ferguson*,
    No. 1:22-CV-03093-MKD, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023............2, 9, 22

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)..........................................................................................................10

*Crowe v. ADT Sec. Servs., Inc.*,
    649 F.3d 1189 (10th Cir. 2011) .........................................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................................3, 8

*Delaware State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
    No. CV 22-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023)....................................2

*DeWilde v. United States*,
    No. 23-CV-00003-SWS, 2023 WL 4884582 (D. Wyo. July 17, 2023)............................25

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).................................................1, 4, 7, 9, 10, 11, 14, 16, 19, 21, 36, 37

*Duncan v. Bonta*,
    No. 23-55805, 2023 WL 6588623 (9th Cir. Oct. 10, 2023) .................................................3

*Duncan v. Bonta*,
    19 F.4th 1087, 1104 (9th Cir. 2021) .................................................................................36

*Grant v. Lamont*,
    No. 3:22-cv-01223, 2023 WL 5533522 (D. Conn. Aug. 28, 2023)..............................2, 24

*Hanson v. District of Columbia*,
    No. CV 22-2256 (RC), 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ...........2, 29, 34, 37, 38

*Hartford v. Ferguson*,
No. 3:23-cv-05364, 2023 WL 3836230 (W.D. Wash. June 6, 2023) ..........2, 24, 29,34, 36

*Heller v. D.C.*,
670 F.3d 1244, 1262 (D.C. Cir. 2011) ............................................................................36

*Herrera v. Raoul*,
No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023).......................................2, 24

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) ...........................................................................................11

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022).....................................................................................................10

*Kleinsmith v. Shurtleff*,
571 F.3d 1033 (10th Cir. 2009) ........................................................................................10

*Kluth v. Spurlock*,
No. 21-CV-03417-NYW-SBP, 2023 WL 6198894 (D. Colo. Sept. 22, 2023) ..................8

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) .............................................11, 14, 15, 17, 20, 36

*Maehr v. United States Dep't of State*,
5 F.4th 1100 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1123 (2022)................................10

*McDonald v. City of Chicago*,
561 U.S. 742  (2010)................................................................................................1, 4, 9

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. CV 3:22-1118 (JBA), 2023 WL 4975979 (D. Conn.  Aug. 3, 2023)......................2, 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111  (2022).................................................... 1-4, 7, 9-14, 21-24, 28, 24-37, 39

*Ocean State Tactical, LLC v. State of Rhode Island*,
2022 WL 17721175 (D.R.I. Dec. 14, 2022) ................................................ 2, 13, 15, 21-22

*Oregon Firearms Fed'n v. Brown*,
644 F.Supp.3d 782 (D. Or. 2022) ................................................................................2, 11

*Oregon Firearms Fed'n v. Kotek*,
--- F.Supp.3d ---, 2023 WL 4541027 ...................... 2, 12, 13, 20, 24, 26, 28-31, 33, 36, 38

*Rocky Mountain Gun Owners v. Polis,*
  467 P.3d 314 (Colo. 2020) .................................................................................12

*Rocky Mountain Gun Owners v. Polis,*
  No. 23-cv-1077-PAB, 2023 WL 5017253 (D. Colo. Aug. 7, 2023)...................................10

*Trueforce Glob. Servs., Inc. v. TruEffect, Inc.,*
  No. 20-CV-01566 (NYW), 2023 WL 4624902 (D. Colo. July 19, 2023) ..........................9

*United States v. Cox,*
  906 F.3d 1170  (10th Cir. 2018) ...........................................................................22

*United States v. Lane,*
  No. 23CR62 (RCY), 2023 WL 5663084 (E.D. Va. Aug. 31, 2023)................................11

*United States v. Rowson,*
  No. 22-cr-310 (PAE), 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023)................................24

*Vincent v. Garland,*
  80 F.4th 1197 (10th Cir. 2023) ...................................................................... 10-11

## OTHER AUTHORITIES

Colorado, Department of Local Affairs, Active Colorado Municipalities,
  https://dola.colorado.gov/lgis/municipalities.jsf .................................................6

John L. Plaster, *Testing the Army's M855A1 Standard Ball Cartridge,* NRA American
  Rifleman (May 21, 2014) https://www.americanrifleman.org/content/testing-the-army-s-
  m855a1-standard-ball-cartridge/..............................................................................15

Keith Coffman, *Suspect in Colorado shooting bought gun legally – officials*, REUTERS
  (Mar. 26, 2021, 1:06 PM), https://www.reuters.com/article/colorado-shooting-
  idINKBN2BI2LU ........................................................................................................5

*History of mass shootings in Colorado*, THE DENVER GAZETTE (Nov. 20, 2022, updated Aug.
  23, 2023), https://gazette.com/news/history-of-mass-shootings-in-
  colorado/article_4c9f1d9c-68ee-11ed-a7e6-430ab4287868.html .......................................5

Leana Wen, *What Bullets Do to Bodies*, THE NEW YORK TIMES (June 15, 2017),
  https://www.nytimes.com/2017/06/15/opinion/virginia-baseball-shooting-gun-shot-
  wounds.html.........................................................................................................21

Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity
  Ammunition Magazines*, at 8, 13, https://vpc.org/fact_sht/VPCshootinglist.pdf (last
  updated Sep. 29, 2023)...............................................................................................5

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants the Town of Superior, Colorado, City of Louisville, Colorado, City of Boulder, Colorado, and Board of County Commissioners of Boulder County, Colorado ("Defendants") respectfully submit this motion for summary judgment on all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56.

## INTRODUCTION

The Second Amendment to the U.S. Constitution is not a "regulatory straightjacket," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022), and the right it secures is "not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  The Second Amendment properly permits "[s]tate and local experimentation with reasonable firearms regulations," *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010), and "leaves [elected officials with] a variety of tools for combating th[e] problem" of gun violence, *Heller*, 554 U.S. at 636.  The Second Amendment does not confer on citizens "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.

In direct response to repeated, horrific mass shootings in the State of Colorado and across the country, Defendants passed ordinances ("Ordinances") restricting the possession and sale of assault weapons and large capacity magazines ("LCMs").[1]  These weapons and magazines— which exponentially multiply killing power to resemble military armaments—have been used in virtually all mass shootings in recent years and are proper subjects of regulation under the Second Amendment.

---

[1] *See* Exs. A (Town of Superior, Colorado, Code Ch. 10, art IX (the "Superior Ord.")), B (City of Boulder, Colorado, Rev. Code Title 5, Ch. 8 (the "Boulder City Ord.")), C (City of Louisville, Colorado, Code Tit. 9, Ch. VIII (the "Louisville Ord.")), D (Boulder County, Colorado, Ord. No. 2022-5 (the "Boulder Cnty. Ord.")).

Plaintiffs in this case—two gun rights organizations and five Colorado residents—challenge the Ordinances under the Second Amendment.  Yet Plaintiffs' Second Amendment right does not protect their possession of weapons of war, much less accessories that make such weapons even more efficient killing machines.  And it does not render lawmakers powerless to address the dramatic changes in firearms technology since our nation's founding, or the tragic and unprecedented societal ill of mass shootings to which those technologies have been put to such devastating use.  Accordingly, federal courts across the country have rejected challenges, like Plaintiffs' here, to restrictions on assault weapons and LCMs.[2]

---

[2] *See Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, --- F. Supp. 3d ----, 2023 WL 4541027, at *55 (D. Or. July 14, 2023) (upholding Oregon's law restricting large-capacity magazines following bench trial), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir. Jul. 17, 2023); *Or. Firearms Fed'n v. Brown*, 644 F. Supp. 3d 782, 813 (D. Or. 2022) (denying plaintiffs' motion for TRO), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022); *Brumback v. Ferguson*, No. 1:22-cv-03093, 2023 WL 6221425, at *12 (E.D. Wash. Sept. 25, 2023) (denying plaintiffs' motion for a preliminary injunction in challenge to Washington's law restricting LCMs); *Hartford v. Ferguson*, No. 3:23-cv-05364, --- F. Supp. 3d -- ---, 2023 WL 3836230, at *7 (W.D. Wash. Jun. 6, 2023) (same, as to Washington's assault weapon law); *Grant v. Lamont*, No. 3:22-cv-01223, 2023 WL 5533522, at *1 (D. Conn. Aug. 28, 2023) (same, as to Connecticut's assault weapon law), *appeal docketed*, No. 23-1344 (2d Cir. Sept. 28, 2023); *Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-cv-1118, --- F. Supp. 3d ----, 2023 WL 4975979, at *26 (D. Conn. Aug. 3, 2023) (hereinafter "*NAGR*") (same, as to Connecticut's assault weapon and LCM laws), *appeal docketed*, Nos. 23-1162 (2d Cir. Aug. 16, 2023); *Herrera v. Raoul*, No. 1:23-cv-00532, --- F. Supp. 3d ----, 2023 WL 3074799, at *13 (N.D. Ill. Apr. 25, 2023) (same, as to Illinois's assault weapon and LCM laws and similar local ordinances), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023); *Hanson v. District of Columbia*, No. 1:22-cv-02256, 2023 WL 3019777, at *5 (D.D.C. Apr. 20, 2023) (same, as to D.C.'s LCM law), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-cv-00951, --- F. Supp. 3d ----, 2023 WL 2655150, at *3 (D. Del. Mar. 27, 2023) (hereinafter, "*DSSA*") (same, as to Delaware's assault weapon and LCM laws), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023); *Bevis v. City of Naperville, Illinois,* No. 1:22-cv-04775, 2023 WL 2077392, at *9 (N.D. Ill. Feb. 17, 2023) (same, as to Illinois's assault weapon and LCM laws and similar local ordinance), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 373 (D.R.I. 2022) (same, as to Rhode Island's LCM law), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023). Three district court decisions have held to the contrary in contested proceedings since *Bruen*.  The Seventh and Ninth Circuits have stayed the only two of those decisions to reach the courts of appeals.  *See*

In support of the constitutionality of the Ordinances, Defendants have compiled a voluminous record, consisting of ten expert reports covering each of the relevant issues: from the technical characteristics of assault weapons and LCMs, to their unique ability to harm and mutilate the human body, to their limited to non-existent usefulness for self-defense, to the nation's lengthy history of firearm regulation.  Plaintiffs, by contrast, offer essentially nothing. Their only disclosed fact witnesses are the Plaintiffs themselves, and the only documents they have identified in support of their claims are those "attached or referred to in any pleading" and those "disclosed by any other party."  (Ex. E., Pltfs' Initial Disclosures).  Against Defendants' unchallenged reports from ten expert witnesses, Plaintiffs proffered a single expert report so deficient and methodologically unsound that it fails the minimum standards for expert testimony established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[3]  Plaintiffs have thus offered no reliable, admissible evidence to support their claims, and the record developed by Defendants overwhelmingly establishes that the Ordinances are consistent with the Second Amendment.

*Bruen* establishes a two-step analysis, first asking whether the weapons and accessories at issue are covered by the "plain text" of the Second Amendment and specifically whether they are "in common use today for self-defense."  142 S. Ct. at 2134.  Here, the undisputed evidence provided by Defendants establishes that assault weapons and LCMs are neither in common use,

---

*Barnett v. Raoul*, No. 23-1825, Dkt. 30 (7th Cir. May 12, 2023) (Illinois assault weapon and LCM laws); *Duncan v. Bonta*, No. 23-55805, --- F. 4th ----, 2023 WL 6588623 (9th Cir. Oct. 10, 2023) (en banc) (California LCM law).  A third decision was issued yesterday by the same district judge as in *Duncan* enjoining California's assault weapon law; it has been stayed for 10 days to allow California to seek a further stay on appeal.  *See Miller v. Bonta*, No. 3:19-cv-01537, Dkt. 175 (S.D. Cal. Oct. 19, 2023).   As of this filing, California has filed a notice of appeal, but it has not yet been docketed by the Ninth Circuit.  *See Miller*, Dkt. 176.

[3] (*See* Defendants' Motion to Partially Strike Expert Reports and Partially Exclude Testimony of Mark Passamaneck (CM/ECF Dkt. No. 68)).

nor suitable, for the self-defense purpose at the heart of the Second Amendment, *see McDonald*, 561 U.S. at 768, and they are instead "most useful in military service," *Heller*, 554 U.S. at 627–28.  They are also "dangerous and unusual" weapons that can be permissibly regulated under the Second Amendment.  *Id.* at 627.  Moreover, LCMs are not "Arms" for the purposes of the Second Amendment and they therefore fall outside the scope of the right.  *Heller*, 554 U.S. at 581-82.  The Court may dispose of Plaintiffs' claims on these grounds alone.

*Bruen*'s second step asks whether the Ordinances are "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130, and here the undisputed evidence shows that they are.  The Ordinances address "dramatic technological changes" in weaponry and the "unprecedented societal concern[]" of mass shootings, which are disproportionately committed by individuals armed with assault weapons and LCMs.  *Id.* at 2131–32.  *Bruen* therefore instructs that the Court should employ a "more nuanced approach" to the historical analysis.  *Id.* at 2132.  As set forth below, the Ordinances are consistent with our nation's historical tradition, dating back to the Founding and Reconstruction, with respect to "how and why the [Ordinances] burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132–33.  If the Court reaches the questions posed by *Bruen*'s second step, it should grant summary judgment in favor of Defendants on that additional ground.

## BACKGROUND

### I.      The Tragedy of Mass Shootings in Colorado

On the afternoon of March 22, 2021, a man armed with a Ruger AR-556 and wearing a tactical vest entered the King Soopers grocery store on Table Mesa Drive in the City of Boulder and opened fire.  He murdered ten innocent people that day, using a firearm that is encompassed

by the Ordinances' definition of "assault weapon,"[4] i.e., a firearm that "allows shooters to rapidly fire a large number of rounds—more than is ever needed for lawful self-defense while maintaining control of the firearm in order to accurately target and kill more victims."  (Ex. D at 1–2; *see also* Exs. A § 10-9-20 (defining "assault weapon"), B § 5-8-.2(b) (same), C § 9.80.010(2) (same), D § 1(a)(2), (3) (same)).  The killer purchased the Ruger AR-556 legally in the days prior to the shooting.[5]

The King Soopers shooting is but one of the many tragic mass shootings that have plagued the State of Colorado.  Two of the most horrific mass shootings in the last 30 years happened in the state: in 1999, two shooters killed 12 students and a teacher at Columbine High School; and, in 2012, a shooter in Aurora killed 12 and injured 70 in a movie theater.  The tragedies in Columbine and Aurora both involved assault weapons equipped with LCMs.[6]  In Colorado, as in other states, mass shootings have occurred with disturbing frequency.[7]

Defendants enacted the Ordinances following the King Soopers tragedy and in response to the devastating toll of mass shootings in Colorado and throughout the United States.  (Exs. A at 1, B at 1, C at 1, D at 1).  The purpose of the Ordinances is "to protect the public health, safety, and welfare by regulating[, in relevant part,] the possession, storage, and use" of "assault

---

[4] Contrary to Plaintiffs' assertion that the term "assault weapon" is "politically charged rhetoric" (Compl. ¶ 17), the term was "first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry" (Report of Prof. Robert J. Spitzer ¶ 70) (Ex. N)/

[5] Keith Coffman, *Suspect in Colorado shooting bought gun legally – officials*, REUTERS (Mar. 26, 2021, 1:06 PM), https://www.reuters.com/article/colorado-shooting-idINKBN2BI2LU.

[6] Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Ammunition Magazines*, at 8, 13, https://vpc.org/fact_sht/VPCshootinglist.pdf (last updated Sep. 29, 2023).

[7] *History of mass shootings in Colorado*, THE DENVER GAZETTE (Nov. 20, 2022, updated Aug. 23, 2023), https://gazette.com/news/history-of-mass-shootings-in-colorado/article_4c9f1d9c-68ee-11ed-a7e6-430ab4287868.html.

weapons" and "large capacity magazines" as those terms are defined in the Ordinances.  (Ex. A at 6, 8; *see also* Exs. B at 7; C at 1, 2, 4; D at 1, 4).

## II.     The Structure of the Ordinances

Boulder County is one of 64 counties in the State of Colorado.  The Town of Superior and the Cities of Louisville and Boulder are incorporated municipalities within Boulder County.[8] The Boulder County Ordinance applies in "unincorporated Boulder County" (Ex. D § 2(a); Compl. ¶¶ 27–29), and the Town of Superior Ordinance, City of Louisville Ordinance and City of Boulder Ordinance each apply within the boundaries of their respective incorporated municipalities.

Three of the four Ordinances have a materially similar structure.  The ordinances enacted by the Town of Superior and the Cities of Louisville and Boulder provide, in relevant part, that "[n]o person shall knowingly possess or sell or otherwise transfer an illegal weapon," and they define "illegal weapon" to mean, *inter alia*, "an assault weapon [or] large-capacity magazine." (Ex. A §§ 10-9-20, 10-9-50(a); *see also* Ex. B §§ 5-8-2, 5-8-10(a), Ex. C §§ 9.80.010, 9.84.010(a)).  The Boulder County Ordinance provides, in relevant part, that "[n]o person . . . in unincorporated Boulder County may manufacture, import, purchase, sell or transfer[, *inter alia*,] any assault weapon [or] large-capacity magazine"—it does not prohibit the possession of assault weapons and LCMs.  (Ex. D § 2(a)).

All four Ordinances define the term "assault weapon" to encompass semi-automatic center-fire rifles and pistols with certain characteristics, and the term "large capacity magazines" to encompass "ammunition feeding device[s] with the capacity to accept more than 10 rounds."

---

[8] *See* Colorado, Department of Local Affairs, Active Colorado Municipalities, https://dola.colorado.gov/lgis/municipalities.jsf.

(Exs. A § 10-9-20, B § 5-8-2, C § 9.80.010, D § 1(a)).  The definitions of "assault weapon" and "large-capacity magazine" have various exceptions that are not relevant to Plaintiffs' challenge in this case.  Importantly, the Ordinances do not prohibit or restrict any firearms that are not semi-automatic, nor do they prohibit or restrict semi-automatic firearms that lack certain features rendering them particularly dangerous (e.g., pistol grips, flash suppressors, barrel shrouds, etc.).  Likewise, the Ordinances do not prohibit or restrict any magazines with a maximum capacity of 10 or fewer rounds.

### III.   Procedural History

Plaintiffs asserted "facial[] and/or as applied" Second Amendment challenges to the Ordinances in a complaint filed on October 12, 2022.  (Compl. ¶ 48).  On November 3, 2022, the Court entered an order, pursuant to the parties' joint stipulation, approving an agreed-upon stay of those parts of the Ordinances that prohibit the possession, sale or transfer of "assault weapons" and "large-capacity magazines," i.e., the portions challenged in Plaintiffs' complaint. (CM/ECF Dkt. No. 38).  The stay remains in effect as of the filing of this motion.

The Court entered a Scheduling Order, dated January 19, 2023, governing fact and expert discovery (CM/ECF Dkt. No. 49), and the parties completed discovery consistent with the order on July 28, 2023.  In the course of discovery, Defendants served reports from ten expert witnesses providing factual information and opinions relevant to the Second Amendment analysis in *Heller* and *Bruen*.  These reports, which are submitted with this motion in their entirety, discuss: the historical development and technical characteristics of assault weapons and LCMs; the extraordinary lethality of these weapons and accessories; their resemblance to military armaments; their frequent usage in mass shootings; their limited to non-existent utility for self-defense purposes; and the consistency of the Ordinances with the history of firearm regulation in the United States.  (*See* Exs. F–O).  Plaintiffs elected not to take depositions of any

of Defendants' experts and submitted reports from only one purported expert, which Defendants have moved to strike pursuant to Federal Rule of Evidence 702 and *Daubert*.  (CM/ECF Dkt. No. 68).  Plaintiffs have otherwise failed to respond to Defendants' expert reports in any respect within the record of this case.

## LEGAL STANDARD

Under Rule 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).[9]

"A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim." *Kluth v. Spurlock*, No. 1:21-cv-03417, 2023 WL 6198894, at *2 (D. Colo. Sept. 22, 2023).  "[T]he burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial."  *Id.* "A moving party who bears the burden at trial must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Id.*

The party that bears the burden at trial must, in all cases, "point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on

---

[9] In all case quotations, internal quotation marks, citations, and alterations are omitted except where otherwise indicated.

speculation, conjecture, or subjective belief are insufficient." *Trueforce Glob. Servs., Inc. v. TruEffect, Inc.*, No. 20-cv-01566, 2023 WL 4624902, at *2 (D. Colo. July 19, 2023).  In this context, the Court may consider only evidence the substance of which would be admissible at trial.  *Id.*

## ARGUMENT

The evidence adduced by Defendants is overwhelming and undisputed, and the Court should grant summary judgment in their favor.  Defendants have offered the credible, coherent, and admissible testimony of ten highly qualified experts, relevant to each of the issues this Court must address under *Bruen*.  Plaintiffs have offered conjecture and unsupported argument.  In the Second Amendment context, like any other, the Court must decide the case based on the "record compiled by the parties," *Bruen*, 142 S. Ct. at 2130 n.6; *accord Brumback*, 2023 WL 6221425, at *4, and, as set forth below, only Defendants have compiled such a record.

## I.     The Legal Framework for Second Amendment Claims

### A.     The Scope of the Right

The Second Amendment right described in *Bruen* is not unlimited.  The Supreme Court has emphasized that "individual self-defense" is "the *central component*" of the right.  *Bruen,* 142 S. Ct. at 2132-33, 2161 (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)).

The Supreme Court has also emphasized that "the Second Amendment right . . . extends only to certain types of weapons," *Heller*, 554 U.S. at 623, that is, those that are "in common use today for self-defense," *Bruen,* 142 S. Ct. at 2134; *see also NAGR*, 2023 WL 4975979, at *13.  Against this backdrop, the Supreme Court has acknowledged our nation's historical tradition of regulating "dangerous and unusual" weapons and explained, for example, that "short-barreled shotguns," and "weapons that are most useful in military service—M-16 rifles and the like—may

be banned" consistent with the Second Amendment.  *Heller*, 554 U.S. at 625, 627; *see also*

*Bruen*, 142 S. Ct. at 2143.

> **B.**    ***Bruen*'s Two-Step, Burden-Shifting Framework**

*Bruen* also clarified the text-and-history framework for analyzing challenged firearm

regulations, and explained that a court reviewing a challenged firearm regulation must engage in

a two-step analysis.  142 S. Ct. at 2126; *Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir.

2023).  At the first step, the challenger bears the burden of establishing that the conduct

prohibited by the regulation falls within the Second Amendment's "plain text" and is therefore

"presumptively protect[ed]."  *Bruen*, 142 S. Ct. at 2126; *see, e.g., Rocky Mountain Gun Owners*

*v. Polis*, No. 23-cv-1077-PAB, 2023 WL 5017253, at *9 (D. Colo. Aug. 7, 2023) (finding that

plaintiffs have the burden at *Bruen*'s first step), *appeal docketed*, No. 23-1251 (10th Cir. Aug.

14, 2023); *NAGR*, 2023 WL 4975979, at *15 (same).[10]  At this step, a court must determine

whether (1) the proscribed conduct involves an "Arm" as that term is used in the Second

Amendment, i.e., a "[w]eapon[] of offence, or armour of defence," or "any thing that a man

wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,"

*Heller*, 554 U.S. at 581; and, if so, (2) whether the regulated Arm is "in common use today for

self-defense," *Bruen*, 142 S. Ct. at 2134.  In considering the latter point, a court should consider

---

[10] This initial burden is consistent with the Supreme Court's instruction in *Bruen* that the framework for assessing Second Amendment claims "accords with how we protect other constitutional rights," including "for instance, the freedom of speech in the First Amendment." *Bruen*, 142 S. Ct. at 2130.  "[I]t is the obligation of the person desiring to engage in assertedly [protected] conduct to demonstrate that the [relevant] Amendment even applies."  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984); *accord Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022); *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1118 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1123 (2022); *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009).

whether the regulated item is "most useful in military service," or is "like" an "M-16," *Heller*, 554 U.S. at 627–28.[11]

If the "plain text" of the Second Amendment "covers an individual's conduct," the government may "justify its regulation" by demonstrating that it "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126; *see Vincent*, 80 F.4th at 1200; *see also NAGR*, 2023 WL 4975979, at *11, *15. At this stage of the analysis, the "central consideration" is whether the challenged regulation and historical regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen,* 142 S. Ct. at 2133. To prevail, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* Where, as here, the challenged regulation addresses "unprecedented societal concerns or dramatic technological changes," the court should take "a more nuanced approach" to the analogical task described in *Bruen*. *Id*. at 2132.

## II. Assault Weapons and LCMs Do Not Fall Within the "Plain Text" of the Second Amendment

At the first step of the *Bruen* analysis, Plaintiffs have failed to meet their burden of demonstrating that assault weapons and LCMs are covered by the Second Amendment's plain text. For one, they have not shown that these items are "in common use today for self-defense." *Bruen*, 142 S. Ct. at 2134. To the contrary, the undisputed evidence adduced by Defendants demonstrates that they are neither in common use nor suitable for that purpose, and that they are

---

[11] *See also Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (en banc); *Hollis v. Lynch*, 827 F.3d 436, 446–47 (5th Cir. 2016). *Bruen* abrogated *Kolbe*'s use of means-end scrutiny, 142 S.Ct. at 2126, but not abrogate *Kolbe*'s ruling that assault weapons are materially "like" M-16s and therefore beyond the Second Amendment. *United States v. Lane*, No. 23CR62 (RCY), 2023 WL 5663084, at *15, n.21 (E.D. Va. Aug. 31, 2023); *see also Or. Firearms Fed'n v*, 644 F. Supp. 3d 782 at 801 (citing *Kolbe* approvingly); *NAGR*, 2023 WL 4975979, at *24 (same).

instead "most useful in military service."  They are also "dangerous and unusual" weapons that may be regulated consistent with the Second Amendment.  More fundamentally, Plaintiffs have failed even to meet their burden of demonstrating that LCMs are "Arms" for purposes of the Second Amendment.  Because there is no factual dispute about these issues, the Court should grant summary judgment in favor of Defendants under the *Bruen* analysis.

A.      **LCMs and Assault Weapons Are Not "In Common Use Today for Self-Defense"**

Plaintiffs have failed to adduce any evidence that assault weapons and LCMs are in "common use for self-defense," and the undisputed evidence adduced by Defendants establishes that they are not.  For example, data compiled by the National Rifle Association ("NRA") about the use of weapons in self-defense determined that the average number of shots fired in incidents of armed self-defense is 2.2—well below the capacity of an assault weapon equipped with an LCM.  (Report of Lucy P. Allen ¶ 10 (Ex. F)).  Of 736 incidents described in the NRA database, only 2 (0.3%) involved a defender firing 10 or more shots.  (*Id.*).  By contrast, in 18.2% of incidents in the NRA database, the defender did not fire a single shot.  (*Id.*).  An analysis of published news stories revealed a similar number of average shots per incident of self-defense (*i.e.*, 2.34).  (*Id.* ¶ 18).  That analysis further found that in 97.3% of incidents the defender fired five or fewer shots, and that there were no incidents where the defender was reported to have fired more than 10 rounds.  (*Id.* ¶ 19).  *See, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *12 (crediting similar testimony from Allen); *NAGR*, 2023 WL 4975979, at *21 (same).  In a prior state constitutional challenge by Plaintiff Rocky Mountain Gun Owners ("RMGO") to the state's 15-round LCM law, the Colorado Supreme Court noted that "testimony at trial established that in no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more."  *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (D. Colo. 2020).

Unsurprisingly, during its Rule 30(b)(6) deposition in this case, RMGO acknowledged, through its current Executive Director Taylor Rhodes, that it was not aware of a single incident in which an RMGO member fired (or even brandished) an assault weapon or a weapon equipped with an LCM in self-defense.  (Ex. P at 86–87).  During the Rule 30(b)(6) deposition of Plaintiff National Association for Gun Rights ("NAGR"), NAGR's current President Dudley Brown suggested that he had heard about self-defense encounters involving assault weapons and LCMs, but he refused to provide the names of the individuals from whom he heard the stories, and he could not provide details about the incidents sufficient to identify them.  (Ex. Q at 116–22). When asked if they had ever fired or brandished an assault weapons in self-defense, none of the individual Plaintiffs described doing so.  (*E.g.,* Exs. R at 43–44, S at 69, T at 34, U at 53, V at 108 (dismissed Plaintiff Wright)).

Like Plaintiffs here, plaintiffs in similar cases across the country have also failed to identify *any* self-defense incident involving an assault weapon or LCM, much less establish that assault weapons and LCMs are "commonly used" for that purpose.  For example, at trial in *Oregon Firearms Federation*, plaintiffs offered anecdotes about a law enforcement officer and a security guard, neither of which involved a "citizen[] with ordinary self-defense needs," as described in *Bruen*.  2023 WL 4541027, at *32; *see also Bruen*, 142 S. Ct. at 2150.  In *NAGR*, at the preliminary injunction stage, the plaintiffs proffered no evidence to support their assertion that assault weapons or LCMs are commonly used in incidents of self-defense.  *See* 2023 WL 4975979, at *22.  In *Ocean State Tactical*, which concerned a challenge to an LCM ban, the court surveyed the evidence compiled by the plaintiffs, noted the conspicuous absence of any evidence concerning the use of LCMs in self-defense, and found the evidence "wanting."  2022

WL 17721175, at *14 & n.29.  In each of those cases, the court correctly found that plaintiffs had failed to meet their burden at *Bruen*'s first step.[12]

### B.   Assault Weapons and LCMs Are Unsuitable for Self-Defense and Were Designed for Miliary Use

Assault weapons and LCMs are not in common use for self-defense because they are not suitable for the "ordinary self-defense needs" that are at the core of the right protected by the Second Amendment.  *Bruen*, 142 S.Ct. at 2150.  Rather, they were designed for extreme lethality on the battlefield, and they are replete with "features initially designed (or patterned after those designed) for a military purpose."  (Ex. O ¶¶ 7–8, 54 (Yurgealitis)).  Those features make assault weapons and LCMs unnecessary and even counterproductive for civilian self-defense.  The history of their development shows that they are instead "weapons that are most useful in military service," comparable to "M-16 rifles," and, accordingly, they "may be banned" consistent with the Second Amendment.  *See Heller*, 554 U.S. at 627.

Assault weapons and the ammunition used in them were designed "to kill or incapacitate enemy combatants at distances of hundreds of yards" and they are overpowered for civilian self-defense encounters.  (Ex. O ¶ 136 (Yurgealitis)).  AR-platform rifles fire 5.56x45mm NATO cartridges at a muzzle velocity of 3,200 to 3,500 feet per second—nearly three times the muzzle velocity of a round fired from a 9mm pistol.  (*Id.* ¶¶ 46–47, 72).  As a result, a round fired from such an assault weapon releases into its target more than three times the energy of a round fired by a Thompson machinegun, approximately four to 19 times more than a handgun (depending on caliber), and approximately ten times more than the energy released by a musket.  (Report of Dr.

---

[12] In *Kolbe v. O'Malley*, which predates *Bruen*, the plaintiffs similarly "fail[ed] to identify a single incident in which a Marylander defended herself using an assault weapon."  42 F. Supp. 3d 768, 786–87 (D. Md. 2014), *aff'd*, 849 F.3d at 127

Stephen W. Hargarten ¶ 26 (Ex. J)).  LCMs allow the user of an assault weapon to *further* increase their lethality by allowing them to fire repeatedly without having to reload, and therefore to "release more kinetic energy per minute than other kinds of firearms."  (*Id.* ¶ 14; Report of Dr. Martin A. Schreiber ¶ 28 (Ex. M)).

Assault weapons' extraordinary lethality dramatically enhances the risk of serious injury to innocent people during a typical home or commercial self-defense encounter, which "are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire."  (Ex. O ¶ 136 (Yurgealitis)).  In an experiment published in the NRA's *American Rifleman* magazine in 2014,[13] nine different types of .223-caliber/5.56mm ammunition easily penetrated walls made out of typical home construction materials, and "exploded" one-gallon water jugs placed three feet behind the wall.  (*Id.* ¶ 137).[14]  Most commercially available .223/5.56mm ammunition can penetrate some hardened steel, and commercially available 5.56x45mm NATO cartridges can penetrate up to 3mm of non-hardened steel.  (*Id.* ¶ 139).  These capabilities "pose[] substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings."  (*Id.*).  *See, e.g.*, *Kolbe*, 849 F.3d at 114; *Ocean State Tactical*, 646 F. Supp. 3d at 395-97.

Assault weapons also require far more skill than handguns to operate under stress.  If an assault weapon is safely stored, a user may need to take multiple steps to make the weapon ready to fire—steps that are difficult to accomplish under pressure, even for trained law enforcement officers.  (Ex. O ¶¶ 140–41 (Yurgealitis)).  Assuming a user is able to make an assault weapon ready to fire during a self-defense encounter, an AR-15 weighs more than twice as much as a

---

[13] John L. Plaster, *Testing The Army's M855A1 Standard Ball Cartridge*, NRA AMERICAN RIFLEMAN (May 21, 2014) https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/.

[14] .223-caliber ammunition is largely interchangeable with 5.56mm NATO ammunition. (Yurgealitis ¶ 46).

conventional handgun and, unlike handguns, assault rifles and many assault pistols require two hands to aim and fire.  (*Id.* ¶¶ 140, 142).  As the Court explained in *Heller*, handguns are suitable for armed self-defense because they are "easier to store in a location that is readily accessible in an emergency; [they] cannot easily be redirected or wrestled away by an attacker; [they are] easier to use for those without the upper-body strength to lift and aim a long gun; [and they] can be pointed at a burglar with one hand while the other hand dials the police."  554 U.S. at 629.  (Ex. O ¶¶ 140, 142 (Yurgealitis)).

For all these reasons, assault weapons and LCMs are not recommended for personal self-defense needs.  Dr. Martin Schreiber, one of Defendants' experts, was deployed once to Iraq and twice to Afghanistan as a U.S. Army surgeon, during which time he was required to carry a 9mm Beretta M9 pistol for self-defense.  (Ex. M ¶¶ 11, 20 (Schreiber)).  In the "U.S. military's judgment[,] . . . handguns, not assault rifles, are the right weapon for self-defense, while assault rifles, not handguns, are the right weapon for killing enemy combatants. . . ."  (*Id.* ¶ 20).  Similarly, Defendants' expert James Yurgealitis, former Senior Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives, explains that he is often asked to recommend firearms for personal and home defense, and, in over 25 years, he has never recommended an AR, AK or other similar assault weapon as a personal-defense or home-defense weapon.  (*See* Ex. O ¶¶ 144–46 (Yurgealitis) (recommending weapons for self-defense purposes)).

Assault weapons and LCMs are unsuited to civilian self-defense because they "directly trace their origins to weapons developed for use in military combat."  (*Id.* ¶ 7).  The origin story of the modern assault weapon begins with the German StG 44 "storm rifle" produced late in World War II, which incorporated novel technologies like gas-powered semi-automatic fire, lightweight steel stampings, a detachable magazine, a separate pistol-style grip, a barrel shroud,

and a threaded barrel.  (*Id.* ¶¶ 55–84).  Each of these features "primarily served to increase the firepower and lethality of an individual [military] combatant."  (*Id.* ¶ 64).  Based on the design of the StG 44, the Soviet Union developed the AK-47 rifle—the "quintessential assault rifle"—which incorporated features "derived directly from the StG 44."  (*Id.* ¶ 66).

In the United States, these technological developments were incorporated into the rifle that became known as the AR-15 in its commercially available semi-automatic version and the M-16 in its "select fire" military iteration.  (*Id.* ¶¶ 70–76, 84, 41).  The only difference between the military and civilian versions of this firearm was, and continues to be, that the military version is capable of firing in fully automatic mode.  (*Id.* ¶ 112).  But that distinction should bear little weight in the Second Amendment analysis, given that the U.S. Army Manual instructs that the most effective—i.e., most lethal—use of an M-16 at distances greater than 25 yards is in semi-automatic mode.  (*Id.* ¶ 153).  *See also Kolbe*, 849 F.3d at 125 ("[S]emiautomatic fire . . . is more accurate and lethal than automatic fire in many combat and law enforcement situations."); *NAGR*, 2023 WL 4975979 at *24 ("[T]he Army's own field manual states that semi-automatic fire is the most important firing technique during fast-moving, modern combat[.]").

Since the inception of the M-16/AR-15, those weapons have chambered a 5.56x45mm NATO cartridge and followed what has become "standard assault rifle design."  (Ex. O ¶¶ 72, 75 (Yurgealitis)).  That design persists today in weapons regulated by the Ordinances and incorporates many of the features that appeared on the German StG 44: an internal gas operating system, lightweight design, a separate pistol grip and shoulder stock, a barrel shroud, detachable magazines, and flash suppressor/muzzle brake variations.  (*Id.*).  When employed during the Vietnam War, this lethal design resulted in "catastrophic injuries to Viet Cong combatants who were shot . . . including severing of limbs and decapitation."  (*Id.* ¶ 73).  In the decades since the

advent of the fully automatic M-16 and the commercially available semi-automatic AR-15, their "basic configuration, appearance, construction, and operation . . . has remained unchanged."  (*Id.* ¶ 75).[15]

LCMs were developed in tandem with the weapons described above, to facilitate their lethal military purpose, and they were generally not commercially available when assault weapons first entered the market.  Prior to the advent of the weapons described above, U.S. infantrymen were issued an M1 Garand semi-automatic rifle that had an internal fixed magazine that held eight rounds.  (*Id.* ¶ 121).  In the 1950s and 1960s, the M-16, and its precursor the M-14, were issued to U.S. infantrymen with a detachable 20-round magazine, while the commercially available AR-15 was sold with two five-round magazines.  (*Id.* ¶¶ 121–22).  After World War II, commercially available semi-automatic pistols were likewise generally equipped with magazines of ten or fewer rounds.  (*Id.* ¶ 124).

### C.  Assault Weapons and LCMs Are Also "Dangerous and Unusual Weapons" Unprotected by the Second Amendment

Consistent with the military origins of assault weapons and LCMs, the record establishes that they are "dangerous and unusual" and therefore Defendants may regulate them consistent with the Second Amendment.  *See Heller*, 554 U.S. at 627, 635.[16]  A firearm's destructive power "is a function of the bullet's velocity and mass," which "increases geometrically along with

---

[15] The technological developments that gave rise to the StG44 and the military weapons described above also led to the development, for military purposes, of automatic and semi-automatic weapons that chambered and fired pistol-caliber (or "sub-caliber") rounds, also known as "submachine guns."  (Ex. O ¶¶ 85–92 (Yurgealitis)).  Those developments are incorporated in a number of modern pistols, including the TEC-9 and MAC-10, which are encompassed within the definition of "assault weapon" in the Ordinances.  (*Id.*).

[16] Although in *Heller*, the Court stated that lawmakers may regulate firearms that are "dangerous *and* unusual," the historical sources cited by the Court use the disjunctive—"dangerous *or* unusual." *NAGR*, 2023 WL 4975979, at *16; *Bevis*, 2023 WL 2077392, at *10.

increases in mass [i.e., the weight of the cartridge], and exponentially with increases in [muzzle] velocity," i.e., the speed at which the round leaves the muzzle of the firearm. (Ex. J ¶ 13 (Hargarten); *see* Ex. M ¶ 22 (Schreiber)). The effect of assault weapons' extraordinary muzzle velocity on the human body is horrific, categorically different from the effect of the handguns at issue in *Heller* and *Bruen*, and "virtually identical" to the kinds of wounds caused by similar weapons used in military combat. (Ex. M ¶¶ 35–37 (Schreiber); *see* Report of Dr. Christopher B. Colwell ¶¶ 12, 14 (Ex. H)). 5.56x45mm NATO rounds fired from an assault rifle create larger wound cavities than other cartridges fired from other firearms, and they do "extreme damage to the tissue and organs of shooting victims," particularly solid organs like the liver and spleen. (Ex. J ¶ 14 (Hargarten); *see also* Exs. O ¶¶ 73, 79–80 (Yurgealitis), H ¶ 14 (Colwell), M ¶¶ 26-27 (Schreiber)). Injuries caused by assault weapons to the head, neck and trunk are "usually lethal," whereas wounds caused by handguns are "generally survivable unless the bullet penetrates a critical organ or major blood vessel." (Ex. M ¶¶ 38, 44 (Schreiber)). Inside the human body, a round fired from an assault weapon "can destroy organs in a way that looks like an explosion has happened." (*Id.* ¶ 39; Ex. H ¶¶ 12, 14 (Colwell)).

Such injuries are especially lethal to children. (Ex. J ¶¶ 14, 32 (Hargarten);). "Because children have smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves, the energy release and greater temporary and permanent cavities associated with [5.56x45mm NATO] bullets are even more likely to cause serious damage to children as compared to teenagers or adults." (*Id.* ¶ 35). Not one of the children shot with an assault weapon at Sandy Hook survived. (*Id.*).

LCMs further "increase kill potential." (Report of Dr. Louis Klarevas ¶ 35 (Ex. K)). "[T]he more bullets a shooter can fire at a target within a finite amount of time, the more

potential wounds they can inflict," and "the more bullets that strike a victim, the higher the odds that that person will die." (*Id.* ¶¶ 35, 37 (noting that the fatality rate is more than 60% higher among those struck with more than one bullet)). *See Or. Firearms Fed'n*, 2023 WL 4541027, at *14 (citing Dr. Klarevas). LCMs also confer a "defensive advantage of extended cover" on shooters, because while they are firing, "it is difficult for those in harm's way to take successful defensive maneuvers." (Ex. K ¶ 38 (Klarevas)). LCMs therefore "enable shooters to inflict mass casualties while depriving victims and law enforcement officers of opportunities to escape or overwhelm the shooters while they reload their weapons." *Kolbe*, 849 F.3d at 127. (Ex. K ¶ 39 (Klarevas).

The evidence compiled by Defendants on this point is overwhelming and undisputed. The unique and extraordinary dangerousness of assault weapons and LCMs as compared not only to weapons within the Second Amendment's scope (like handguns), but also to weapons that are plainly beyond it (like Thompson (or "Tommy") machine guns), make them unusual and dangerous in every relevant sense. The Second Amendment would be rendered incoherent as a governing principle if it were understood to authorize local, state, and federal authorities to exercise an ancient authority, described by Blackstone, to regulate categories of weapons that include machine guns and weapons of war, but *not* assault weapons that employ the same technologies and are equally capable of "pulverizing bones, tearing blood vessels and liquefying organs."[17] "Because assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories," the Court should find that they may

---

[17] *See* Leana Wen, *What Bullets Do to Bodies*, The New York Times (June 15, 2017), https://www.nytimes.com/2017/06/15/opinion/virginia-baseball-shooting-gun-shot-wounds.html (cited in Ex. J ¶ 33 n.10 (Hargarten)).

be regulated by the Ordinances consistent with the Second Amendment.  *Bevis*, 2023 WL 2077392, at *16.

### D.    LCMs Are Not "Arms"

With respect to LCMs, the Court should grant summary judgment for Defendants for an additional reason: magazines, including LCMs, are accessories, not "Arms" as that term is used in the Second Amendment, and they are therefore beyond the scope of the right described in *Heller* and *Bruen*.  In *Heller*, the Court looked to 18th century dictionaries and defined the term "Arms" as encompassing "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  554 U.S. at 581.  The Court concluded that the meaning of the term "Arms" at the Founding was "no different from the meaning today."  *Id.*

As a matter of common usage, magazines, including LCMs, do not fall within this definition.  "To the ordinary reader [of the Second Amendment], magazines themselves are neither firearms nor ammunition.  They are *holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling." *Ocean State Tactical*, 646 F. Supp. 3d at 387.  As such, they "are not used in a way that "cast[s] at or strike[s] another."  *Id.*  One would not refer to a person in possession of only ammunition, much less an "ammunition feeding device," as "armed."  (Ex. O ¶ 49 (Yurgealitis) (explaining that LCMs simply "hold[] the ammunition for a firearm before it is chambered and fired")).  *See Brumback*, 2023 WL 6221425, at *8 ("A magazine is a part of a firearm" and "[o]n its own, it cannot be used to attack or defend."); *see also United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that a silencer is a "firearm accessory" not protected by the Second Amendment).

The historical record compiled by Defendants confirms that the Founding generation did not understand "Arms" to cover firearm accessories.  Firearms "magazines" did not exist at the Founding because, until the late 19th century, "single-shot, muzzle-loaded firearms were the ubiquitous guns" in the United States.  (Ex. N ¶ 47 (Spitzer)).  The term "'magazine' was not typically used to refer to a compartment of a gun containing bullets until late in the nineteenth century" and firearm "magazines" "remained relatively rare until the 1920s."  (Report of Prof. Dennis Baron ¶ 24 (Ex. G)).  Instead, during the Founding era, firearm users kept ammunition in what were called "cartridge boxes," "cartouch boxes," or "pouches," which are the closest analogue to the modern-day magazine.  (*Id.* ¶¶ 33, 35).  Those items were considered "accoutrements"—that is, "ancillary equipment"—as categorically distinct from "arms."  (*Id.* ¶ 9).  Indeed, Founding-era sources "regularly referred to" "accoutrements" "separately from 'arms.'"  (*Id.* ¶¶ 31, 39).  This understanding persisted through the Reconstruction era.  (*Id.* ¶¶ 32, 53).  As such, ample historical evidence demonstrates that magazines—including LCMs— are not "'Arms' within the textual meaning of the Second Amendment.'"  *Ocean State Tactical*, 646 F. Supp. 3d at 387–88 (relying on a declaration from Prof. Baron).

*     *     *

Plaintiffs have failed to meet their burden at *Bruen*'s first step.  The evidence demonstrates that assault weapons and LCMs are neither in common use, nor suitable, for self-defense, as they are instead military weapons designed to increase lethality and accuracy on the battlefield.  Moreover, they are "dangerous and unusual" weapons that may be regulated consistent with the Second Amendment.  More fundamentally, LCMs are not "arms" for purposes of the Second Amendment.  The Court should enter summary judgment in favor of Defendants on this ground.

**III.     The Ordinances Are Consistent with the Nation's History of Firearms Regulation**

Even if Plaintiffs had met their textual burden under *Bruen* (which they have not), their Second Amendment challenge would still fail because, as the uncontroverted evidence put forward by Defendants establishes, the Ordinances are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.  As described in Part III.A, the Ordinances are directed at an "unprecedented societal concern" driven by "dramatic technological changes"—the epidemic of mass shootings perpetrated with assault weapons and LCMs—and the Court should therefore employ the "more nuanced" approach to analogical reasoning contemplated by *Bruen* at this stage of the analysis.  *See id.* at 2132.  In light of the uncontroverted historical record compiled by Defendants, discussed in Part III.B, the Court should conclude, for the reasons set forth in Part III.C, that the Ordinances are consistent with the nation's historical tradition of firearm regulation, imposing a "comparable burden on the right of armed self-defense" that is "comparably justified" to historical analogues.  *Id.* at 2133.

With respect to each of these issues, Plaintiffs have failed to raise a genuine dispute of material fact.  Although the Supreme Court has instructed that, after *Bruen*'s second step, courts must "decide a case based on the historical record compiled by the parties," Plaintiffs have neither offered historical experts of their own, nor rebutted the extensive collection of historical laws and expert testimony compiled by Defendants.  *Id.* at 2130, n.6.  Given this one-sided historical record, if the Court reaches this point in *Bruen*'s analysis on this motion, it should find that the Ordinances are relevantly similar to the long and undisputed history of laws restricting certain weapons, weapon features, and accessories viewed to be particularly dangerous or associated with criminal activity.  Such a finding is consistent with what courts across the country have concluded in similar cases.  *See, e.g.*, *NAGR*, 2023 WL 4975979, at *26 (finding that, even if plaintiffs had met their burden at *Bruen*'s first step, "[d]efendants have demonstrated

23

under step two . . . that the [challenged laws] pose a comparable burden to relevantly similar historical analogues for comparably justified reasons").[18]  Thus, for this reason, too, the Court should grant summary judgment in favor of Defendants.

### A.    The Court Should Use a "More Nuanced" Analogical Approach

*Bruen* establishes that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the historical inquiry.  142 S. Ct. at 2132.  That is the case here.  The Ordinances address a dramatic technological change— the development of rapid-fire semi-automatic assault weapons and large-capacity magazines— and the unprecedented societal concern of mass shootings.  As a result, the Court should conduct "a broader search for historical analogies."  *United States v. Rowson*, No. 22-cr-310 (PAE), 2023 WL 431037, at *24 (S.D.N.Y. Jan. 26, 2023).[19]

### 1.    Rapid Fire Assault Weapons Represent a "Dramatic Technological Change" Since the Founding and Reconstruction

The technology that makes assault weapons and LCMs so deadly would have been inconceivable to the Founders.  Firearms during the colonial and Founding eras could not be stored loaded, they were liable to misfire, they could not fire multiple rounds without reloading, and the process of loading each round took at least half a minute.  (Ex. L ¶¶ 19, 48 (Roth)).  As a result, they had limited utility as murder weapons.  Although 50 to 60% of households during the Colonial and Founding eras owned a working firearm, homicide rates were exceptionally low for

---

[18] *See also DSSA*, 2023 WL 2655150, at *13 (finding Delaware laws consistent with historical tradition); *Bevis*, 2023 WL 2077392, at *16 (same, as to Illinois laws and similar local ordinance); *Herrera*, 2023 WL 3074799, at *9 (same); *Grant*, 2023 WL 5533522, at *6 (same, as to Connecticut assault weapon law); *Or. Firearms Fed'n*, 2023 WL 4541027, at *46 (same, as to Oregon LCM law); *Hartford*, 2023 WL 3836230, at *6 (same, as to Washington assault weapon law); *Hanson*, 2023 WL 3019777, at *15 (same, as to D.C. LCM law).

[19] *See also, e.g.*, *NAGR*, 2023 WL 4975979, at *29; *DSSA*, 2023 WL 2655150, at *11(applying "more nuanced approach"); *Oregon Firearms Fed'n*, 2023 WL 4541027, at *36 (same).

most of the 18th century and only 10–15% of homicides were committed with a gun.  (*Id.* ¶¶ 17, 18, 20).

By contrast, with even minimal training, the user of an assault weapon equipped with an LCM can fire 40 to 50 rounds per minute.  (Ex. O ¶ 153 (Yurgealitis)).  Given the extraordinary muzzle velocity of rounds fired from assault weapons and the characteristics of the NATO rounds they typically fire, "the danger these firearms pose is intrinsically different from past weaponry."  (Ex. L ¶ 64 (Roth)); *see also supra* Part II.A-B.  Indeed, the destructive power of modern assault weapons and LCMs dramatically exceeds that of even fully automatic Tommy guns, the regulation of which is unquestionably constitutional under the Second Amendment.  (Ex. J ¶ 29 (Hargarten)).  *See supra* Part II.B; *see also DeWilde v. United States*, No. 23-CV-00003-SWS, 2023 WL 4884582, at *6 (D. Wyo. Jul. 17, 2023) (noting that federal courts of appeals have "uniformly" held that machine guns are unprotected by the Second Amendment and collecting cases), *appeal docketed*, No. 23-8054 (10th Cir. Aug. 1, 2023).

The few experimental multi-shot firearms existing in the 18th century bear little resemblance to modern assault weapons and LCMs and were rare curiosities that few would have seen and virtually none would have had occasion to use.  (Report of Prof. Brian DeLay ¶ 27 (Ex.  I); Ex. N ¶ 28 (Spitzer)).  None of those experimental firearms functioned safely or reliably enough to become militarily or commercially significant.  (Ex. I ¶ 11 (DeLay)).  As another district court recently concluded following trial, "large-capacity repeating firearms . . . were extremely rare at the adoption of the Second Amendment."  *Or. Firearms Fed'n*, 2023 WL 4541027, at *37.

Nor does any 19th century firearm compare to the modern assault weapon and LCM. Following the advent of "percussion cap" technology in the 1810s, the first repeating firearms

entered the market in the 1830s.  (Ex. I ¶ 46 (DeLay)).  But those firearms—known as "revolvers" and "pepperboxes"—were far less powerful than modern assault weapons, typically held seven or fewer rounds, and had to be manually and laboriously reloaded round-by-round after all of the rounds were expended.  (*Id.* ¶¶ 49-51, 59).  And they, too, were rarities: "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles."  (Ex. N ¶ 46 (Spitzer)).

In the second half of the 19th century, repeating Henry and Winchester rifles appeared on the market, but they "constituted less than 0.2% of all firearms in the United States as late as 1872."  (Ex. I ¶ 56 (DeLay)).  These weapons could hold magazines containing up to 15 rounds, but they operated with a slow lever-action mechanism (Ex. N ¶ 60 (Spitzer)) and, like the revolvers and pepperboxes preceding them, they had to be manually reloaded round-by-round once their capacity was depleted (Ex. I ¶ 59 (DeLay)).  The shooter in the Virginia Tech massacre in 2007, by contrast, fired 174 rounds in nine minutes, killing 33 victims and injuring 17 others.  (*Id.* ¶ 51; *see also* Ex. M ¶ 32 (Schreiber) (regarding the 2017 Las Vegas shooting)).  No 19th century repeating firearm came close to that kind of destructive firepower.  (Ex. I ¶¶ 58–63 (DeLay); Ex. J ¶ 26 (Hargarten)).

Weapons capable of rapid fire first entered the market at the turn of the 20th century, and the primary market for such weapons was the military.  (Exs. I ¶ 65 (DeLay), N ¶ 54 (Spitzer)).  The most infamous was the Tommy gun, which was invented in 1918, made commercially available in the 1920s, and used by criminal gangs to inflict mass casualties on rivals.  (Exs. I ¶ 69 (DeLay), L ¶¶ 52, 55 (Roth), N ¶ 20 (Spitzer)).  The Tommy gun dramatically increased the number of bullets a single shooter could fire in a short period of time—many hundreds of rounds

per minute (Ex. N ¶ 36 (Spitzer))—and it was promptly regulated at the state and federal levels (Ex. L ¶¶ 56–57 (Roth)).

As described above, modern assault weapons represent significant technological advances beyond the machine guns of the early to mid-20th century.  The first assault rifle was not developed until World War II.  (Ex. O ¶ 55 (Yurgealitis)).  The AR-15 (later the M-16) was not designed until the mid-1950s, and even then, the weapon was designed solely for military use.  (*Id.* ¶ 72).  It did not begin to sell in significant numbers among the civilian public until later.  (*Id.* ¶ 54).  LCMs, too, are a modern phenomenon with military roots—part and parcel of the dramatic change in commercially available weapons technology.  (*Id.* ¶¶ 121–23).

## 2. Mass Shootings Reflect an Unprecedented Societal Concern in the Nation's History

The Ordinances also respond to the unprecedented societal concern of mass shootings. For a period of over 170 years—from 1776 to 1948—there was not a single known mass shooting incident in the United States resulting in 10 or more fatalities.  (Ex. K ¶¶ 18–19 (Klarevas)).  After the first such mass shooting in 1949, a few others occurred from the mid-1960s to the early 1980s, but after a spike in the 1980s, the federal law prohibiting assault weapons and LCMs slowed the trend.  (*Id.* ¶¶ 18–21).  Since that law expired in 2004, however, there have been at least 20 mass shootings with double-digit fatalities (*id.* ¶ 21), and that number continues to climb, *see, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *37 (finding that "mass shootings were rare even half a century ago and have increased rapidly in very recent years"). Strikingly, there have been more mass shootings resulting in 10 or more deaths since 2017 than there were in the first 224 years of our nation's history.  (Ex. K ¶ 19, Tbl. 6 (Klarevas)).

In more than 75% of double-digit fatality mass shootings, the shooter used an assault weapon and/or an LCM, resulting in substantially higher loss of life.  (*Id.* ¶¶ 16, 17, 22).[20] Simply put, "these incidents of singular and concentrated violence against civilians are unprecedented" in our nation's history—and would have been unimaginable in 1791 or 1868. *Or. Firearms Fed'n*, 2023 WL 4541027, at *37; *see also, e.g.*, *NAGR*, 2023 WL 4975979, at *29 (finding that "mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem").  For this additional reason, the Court should employ the "more nuanced approach" to the search for historical analogues contemplated by *Bruen*.

### B.      The Nation Has a Historical Tradition of Regulating Particularly Dangerous Weapons that Pose a Threat to Public Safety

Our nation's history reveals a well-established pattern by which lawmakers regulate dangerous weapons, including firearms, in furtherance of public safety.  As new weapons technologies are invented and developed, some will proliferate in civil society and create criminological problems, and only then will lawmakers be called upon to act.  (Exs. N ¶¶ 44, 66 (Spitzer), I ¶¶ 40–42 (DeLay)).  *See, e.g.*, *DSSA*, 2023 WL 2655150, at *12 (citing Dr. Spitzer). Our nation's history and common experience make clear that lawmakers do not regulate new technologies when they are invented or conceived, but only if and when those technologies "circulate sufficiently in society to spill over into criminal or other harmful use."  (Exs. N ¶¶ 44, 66 (Spitzer), I ¶ 42 (DeLay)).  *See, e.g., Hanson*, 2023 WL 3019777, at *16 (citing Prof. DeLay).

---

[20] From the colonial period through the 19th century, mass killings were generally committed by groups because technological constraints limited the ability of a single person to commit mass murder.  (Ex. L ¶ 48 (Roth)).  Dynamite and fully automatic weapons were used to perpetrate mass killings in the late 19th and early 20th centuries, respectively.  (*Id.* ¶¶ 50–57).  Lawmakers responded promptly to those societal and criminological challenges: dynamite and other explosive substances have been heavily regulated under federal law since 1917 and machine guns have been illegal under federal law since 1934.  *See NAGR*, 2023 WL 4975979, at *31.

This national tradition of regulating particularly dangerous weapons for the public safety follows precisely that pattern and makes clear the constitutionality of laws like the Ordinances that restrict assault weapons and LCMs.[21]  *See supra* n. 18.

### 1.   The Colonial and Early Republic Periods (1600–1812)

Since the earliest days of our nation, legislative bodies have regulated particularly dangerous weapons and accessories posing a threat to public safety, "demonstrating that there is a longstanding tradition of the government exercising its power to regulate new and dangerous weapon technology." *NAGR*, 2023 WL 4975979, at *32.[22]  In the 1770s, for example, states began prohibiting "trap guns"— devices often used in a misguided effort to protect businesses, property and possessions that were rigged to fire remotely when a string or wire was tripped. (Ex. N ¶¶ 102–04 (Spitzer)).  New Jersey was the first state to prohibit the possession of trap guns in 1771, after which 15 states followed suit with anti-trap gun laws in the 19th and 20th centuries.  (*Id.*).  These laws directly reflect concern by our forebearers that risks to public safety outweighed the subjective desire of some to use "trap guns" for self-defense.  (*Id.* ¶ 103).  *See, e.g.*, *Hartford*, 2023 WL 3836230, at *4 (relying on Dr. Spitzer to find that trap gun laws are relevant historical analogues for assault weapon restrictions); *Or. Firearms Fed'n*, 2023 WL 4541027, at *23, *39–40 (same, as to LCM law).

Prohibitions on trap guns were far from the only notable weapons restrictions during this period.  Because muzzle-loading single-shot firearms were impractical for criminal use, the overwhelming majority of homicides during this era were committed "with hands and feet or

---

[21] Certain of these historical analogues are highlighted below.  They are more fully set forth, and discussed, in Defendants' accompanying expert reports.  (*See* Exs. F–O).

[22] In addition to enacting restrictions on particularly dangerous weapons, early American legislators also imposed strict restrictions on "the possession, use, or sale of gunpowder." *Or. Firearms Fed'n*, 2023 WL 4541027, at *40.

weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives" (Exs. L ¶¶ 18, 20 (Roth), I ¶ 30 (DeLay)), and lawmakers responded by restricting those categories of arms as well.  Beginning in New York in 1664 and continuing into the early 20th century, every state in the nation enacted one or more laws against the carrying of "various types of clubs and other blunt weapons."  (Ex. N ¶ 91, 92, 94 & Exhibit C (Spitzer)).  *See, e.g.*, *Bevis*, 2023 WL 2077392, at *11 (relying on Dr. Spitzer's analysis of these historical laws); *Or. Firearms Fed'n*, 2023 WL 4541027, at *40 (same).  Further, in 1686, New Jersey prohibited the concealed carrying of various bladed instruments, including "skeines, stilettoes, daggers, or dirks," and "unusual" weapons.  (Ex. N ¶ 99 & Exhibit E (Spitzer)).  Given our forebearers' regulation of these items— some of which could be made with "ease" from otherwise lawful materials, *Or. Firearms Fed'n*, 2023 WL 4541027, at *41—it strains credulity to assert that they would have believed themselves powerless to regulate the modern weapons of war at issue here.

Even though the firearms of this era did not yet pose a significant social or criminological problem, and despite the young nation's limited means of enforcing weapons-related restrictions—police and policing did not exist until the years before the Civil War, and then only in a handful of major cities (Ex. N ¶ 90 (Spitzer))—lawmakers still took steps to regulate firearms for the safety of the public.  For example, the 1686 New Jersey law mentioned above also prohibited the concealed carry of pocket pistols (*id.* ¶ 99), "which were viewed as particularly dangerous due to their size and ease of concealment," *Or. Firearms Fed'n*, 2023 WL 4541027, at *42. Similar laws followed in other states.  (Ex. N ¶ 90 (Spitzer).

### 2.        The Antebellum and Reconstruction Periods (1813–1881)

Laws restricting particularly dangerous types of weapons continued throughout the early 19th century and Reconstruction.  Following the Revolution, the country experienced an increase in interpersonal violence and homicides, often involving concealable knives and pistols.  (Ex. L

¶ 27 (Roth)).  Accordingly, consistent with the pattern of regulatory response described above, legislatures focused on the developing societal and criminological problems they faced and took steps to mitigate them in the public interest.  (*Id.* ¶ 28).  *See, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *20–21.

Beginning in 1813, several states (Georgia, Kentucky, Louisiana, Indiana, Arkansas, Virginia) prohibited the possession and/or concealed carry of the kinds of weapons that were "used in an alarming proportion of the era's murders and serious assaults," including deadly knives.  (Ex. L ¶ 28, 30 (Roth)).  *See, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *20.  At a time when single-shot pistols were still "unreliable and inaccurate," prominent among the regulated weapons were "Bowie knives"—known as "fighting knives"—which were "widely used in fights and duels" and "accounted for a growing share of the known weapons that whites used to kill whites."  (Ex. N ¶ 80 (Spitzer)).  Given the dangers posed by the use of Bowie and similar knives during this era, in 1837 Georgia barred the possession, sale, or carry of "Bowie, or any other kind of knives," intended to be worn or carried as "arms of offence or defence."  (Exs. L ¶ 31 (Roth), N ¶ 88 (Spitzer)).  In the balance of the 19th century, at least 44 states barred the concealed and/or public carry of Bowie knives (Ex. N ¶¶ 87, 89–90 (Spitzer)), and Arkansas barred the sale of Bowie knives entirely in 1881 (*id.* ¶ 88).  *See, e.g.*, *DSSA*, 2023 WL 2655150, at *11 (discussing "extensive and ubiquitous" anti-knife laws).  States also expanded regulation of dangerous blunt instruments during this period.  (Ex. N ¶¶ 92–98 (Spitzer)).

Dramatic improvements in firearm technology and related risks to public safety led lawmakers to impose additional regulations on certain firearms in this era.  In 1836, Samuel Colt invented the cap-and-ball revolver which allowed users to fire "five or six shots in rapid succession and to reload quickly."  (Ex. L ¶ 36 (Roth)).  In 1857, Smith & Wesson invented the

seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver—"a near-perfect murder weapon."  (*Id.* ¶ 37-38; Ex. O ¶¶ 45, 53, n.2 (Yurgealitis)).  Unlike earlier muzzle-loaded weapons, the Smith & Wesson revolver "could be kept loaded indefinitely" and was "ready to use at any time."  (Ex. L ¶¶ 37, 38 (Roth)).  These weapons were more lethal than knives or older pistols and concealable, and they quickly became the primary weapons used in interpersonal assaults during the latter part of this period.  (*Id.* ¶ 39).

State and local lawmakers responded to the heightened risks posed by these new and uniquely dangerous firearms in myriad ways.  In 1871, Tennessee prohibited the open or concealed carry of pocket pistols and revolvers (except for those carried by members of the military) and in 1879 it barred the sale of pocket pistols and revolvers entirely.  (*Id.* ¶¶ 42–43).  Like Tennessee, Arkansas prohibited open or concealed carry of pocket pistols and revolvers in 1881 and barred the sale of such weapons—along with pistol cartridges—that same year.  (*Id.* ¶ 43).  "By the end of the 1800s, nearly every state in the country" had laws restricting the concealed carry of revolvers and other concealable pistols, "and, by the early 1900s, at least six states barred possession of these weapons outright."  *DSSA*, 2023 WL 2655150, at *11 (citing Dr. Spitzer).

### 3.      Late Nineteenth and Early Twentieth Centuries (1882–1930s)

Firearms technology changed rapidly in the late 19th and early 20th centuries, leading to the development of the first large-capacity repeating firearms for individual use.  These weapons were the result of three technological developments that occurred around the turn of the century: (1) a mechanism to harness recoil energy to chamber a firearm's next round; (2) smokeless gun powder; and (3) the detachable magazine.  (Ex. I ¶¶ 65–67 (DeLay)).  This trio of design features "allowed individuals to fire a greater number of rounds than ever before without needing to

reload," *Or. Firearms Fed'n*, 2023 WL 4541027, at *44, which dramatically increased the amount of damage a single shooter could inflict with a single firearm (Ex. I ¶¶ 68, 70 (DeLay)).

When weapons incorporating these features first appeared and began to pose societal and criminological problems in the early 20th century, lawmakers—including Congress—acted promptly to regulate them.  As discussed above, the Tommy gun entered the commercial market in the United States in the 1920s and quickly became the most notorious and deadly of these weapons.  (Exs. I ¶ 69 (DeLay), N ¶ 20 (Spitzer)).  When Tommy guns and similar weapons were used by criminals, they exacted a "devastating toll and garnered extensive national attention," as was the case with the St. Valentine's Day massacre in Chicago in 1929, which left seven people dead at the hands of mobsters with Tommy guns.  (Ex. N ¶¶ 26, 30 (Spitzer)).  Members of the press and the public responded with outrage to these events and to the ease with which criminals could access these deadly weapons, and lawmakers at the state and federal level responded promptly.  (*Id.* ¶ 31).

From the 1920s through 1934, lawmakers across the country responded by enacting laws regulating automatic and semi-automatic weapons.  (*Id.* ¶¶ 34–35).  Some 31 states and the District of Columbia enacted restrictions on fully automatic weapons during this period, mainly outright prohibitions on sale and possession.  (*Id.* ¶ 34 & Exhibits B, D).  As many as ten states plus the District of Columbia enacted laws prohibiting or otherwise restricting semi-automatic weapons.  (*Id.* ¶ 39 & Exhibits B, C).[23]  *See, e.g.*, *Hartford*, 2023 WL 3836230, at *5 (citing Dr. Spitzer).  Notably, "D.C.'s ban—which Congress passed—was modeled heavily after the Uniform Act, 'a model law' that the National Rifle Association endorsed."  *Hanson*, 2023 WL

---

[23] The language of the Illinois, Louisiana and South Carolina restrictions was ambiguous with respect to their application to semi-automatic weapons.  (Ex. N ¶ 39, n.45 (Spitzer)).

3019777, at *15 (citing Dr. Spitzer).  In 1934, these state and D.C. regulations led to the enactment of the first major piece of federal firearms legislation, the National Firearms Act, which imposed strict requirements on the civilian acquisition and circulation of automatic weapons.  (Ex. N ¶ 35, 43 (Spitzer)).

During this same period, several state laws also focused on the number of rounds that could be fired without reloading, from more than one round (Massachusetts and Minnesota) up to a high of 18 (Ohio).  (*Id.* ¶¶ 41–43).  *See Hanson*, 2023 WL 3019777, at *15 (describing these laws).  In total, 23 states imposed limits on the number of rounds such weapons could fire without reloading.  (Ex. N ¶¶ 41–42 & Tbl. 1 (Spitzer)).  These 20th century analogues are consistent with the earlier-enacted laws restricting other dangerous weapons, *see supra* Part III B(1) & (2)., and thus relevant under *Bruen*, *see, e.g.*, *NAGR*, 2023 WL 4975979, at *31 & n.51 (relying on 20th century laws in upholding restrictions on assault weapons and LCMs, and noting that "[n]owhere does *Bruen* forbid consideration of any regulations or history after the end of the 19th century"); *Hanson*, 2023 WL 3019777, at *16 (same, as to LCM law).

*        *        *

The history compiled by Defendants is clear and uncontroverted: since even before the nation's founding, lawmakers have restricted particularly dangerous weapons, weapons features, and accessories in an effort to protect the public from preventable acts of violence.  The Ordinances and laws like them fall comfortably within this long tradition and therefore within the bounds of the Second Amendment.

### C.    The Ordinances Are "Relevantly Similar" to Comparable Historical Regulations

These laws, comprising a 300-plus-year history and tradition of regulating "highly dangerous arms (and related dangerous accessories)," *Bevis*, 2023 WL 2077392, at *14, are

relevantly similar to the Ordinances along both metrics identified in *Bruen*: how and why they burden a law-abiding citizen's right to armed self-defense, *see* 142 S. Ct. at 2133.  As the record compiled by Defendants makes clear, the Ordinances impose a minimal burden, if any, on self-defense, and one that is comparable to, or lesser than, the burden imposed by the historical analogues above.  Further, whatever minimal burden imposed by the Ordinances is justified by the same concerns that motivated regulations of weapons throughout our nation's history: the need to protect the public against the threat of unusually dangerous weapons susceptible to criminal misuse.  Defendants have carried their burden at the second step of the *Bruen* analysis, and the Court should also grant summary judgment in their favor on this additional basis.

### 1.     The Ordinances' Burden on the Right to Armed Self-Defense Is Not Greater than Comparable Historical Regulations

The Ordinances impose little or no material burden on the right of armed self-defense as described in *Bruen*, much less a burden greater than comparable historical laws.  As demonstrated above, assault weapons and LCMs are neither in common use, nor suitable*,* for self-defense.  *See supra* Part II.A–B.  The Ordinances also permit Plaintiffs and others to acquire, use, and possess many commonly used firearms for self-defense, including various kinds of semi-automatic weapons other than assault weapons, as well as all manner of firearm magazines capable of holding ten or fewer rounds.  In short, as courts across the country assessing similar records in challenges to similar restrictions have found, laws like the Ordinances impose, at most, a "slight" burden on the right to armed self-defense that is comparable to, or less than, the historical regulations discussed above.  *DSSA*, 2023 WL 2655150, at *12; *Hartford*, 2023 WL 3836230, at *6.[24]

---

[24] *See also, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *39-46; *NAGR*, 2023 WL 4975979, at *33; *Hanson*, 2023 WL 3019777, at *15.  A number of pre-*Bruen* cases in the federal courts of appeals reached a similar conclusion regarding the burden imposed by assault weapon and LCM

Like early trap gun regulations, for example, the Ordinances restrict only certain weapons and accessories that are particularly dangerous, while leaving a variety of other weapons and accessories available for self-defense. *See Or. Firearms Fed'n*, 2023 WL 4541027, at *39–40 (noting that LCM restrictions, like trap gun laws, place "a minimal burden on the right to armed self-defense").  The same is true with respect to early Bowie knife regulations, which targeted only a particular category of dangerous knives rather than all knives.  The Ordinances target only particular types of semi-automatic firearms and magazines with particularly dangerous capacities, leaving Plaintiffs and other residents of Boulder, Louisville, Superior, and unincorporated Boulder County with countless other firearm options with which to exercise their right to armed self-defense. *See, e.g.*, *id.* at *42 (finding that "the prohibition on the carry of a Bowie knife likely placed a greater burden on the right to armed self-defense than [Oregon]'s restrictions on LCMs"); *NAGR*, 2023 WL 4975979, at *33 (finding that restrictions on Bowie knives impose a "comparable burden" to assault weapon and LCM laws).

The burden imposed by the Ordinances is also comparable to or lesser than the burden imposed by early-20th century regulations of automatic and semi-automatic firearms, enacted shortly after such weapons began to pose societal and criminological problems in the United States.  Like the Ordinances, the early-20th century laws regulated a particularly dangerous type of weapons and accessories, leaving an array of other weapons and accessories available for self-defense that were better suited to, and commonly used for, that purpose. *See, e.g.*, *Hanson*, 2023 WL 3019777, at *15.  Further, unlike the narrowly focused Ordinances, the early-20th century

---

laws. *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1104 (9th Cir. 2021) (en banc); *Kolbe*, 849 F.3d at 138; *Heller v. D.C.*, 670 F.3d 1244, 1262 (D.C. Cir. 2011).  *Bruen* vacated or abrogated these decisions to the extent they relied on means-ends scrutiny, but it did nothing to disturb their burden analysis.

regulations applied to categories of arms beyond automatic and semi-automatic firearms, including other kinds of firearms and blunt weapons. *See DSSA*, 2023 WL 2655150, at *12.

Finally, the (at most) minimal burden on self-defense imposed by the Ordinances is significantly less than the burden imposed by the regulations at issue in *Heller* and *Bruen*. The challenged regulations in those cases broadly restricted the possession and carry of handguns— the "quintessential self-defense weapon." *See Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629). *Heller*, for example, involved an "absolute ban on handguns," 554 U.S. at 632, and *Bruen* involved a regulation that made it "virtually impossible" for most "law-abiding people to carry a gun outside the home for self-defense." 142 S. Ct. at 2159 (Alito, J., concurring). The Ordinances, by contrast, affect only a subcategory of semi-automatic weapons with particularly dangerous features that are neither in common use, nor suitable, for self-defense, leaving Plaintiffs and other residents of the defendant municipalities with a wide variety of firearms and magazines with which to exercise their Second Amendment right. *See, e.g.*, *NAGR*, 2023 WL 4975979, at *33.

### 2. The Ordinances Are Comparably Justified

The Ordinances are also comparably justified by the same rationale as the historical regulations extending back more than 300 years through our nation's history: the desire to protect the populace from violence associated with particularly dangerous types of weapons, weapons features, and accessories. Since the 17th and 18th centuries, lawmakers have acted to protect the innocent or unwary from acts of violence committed by individuals armed with blunt instruments and knives, and from the disproportionate harm cause by trap guns. *See Or. Firearms Fed'n*, 2023 WL 4541027, at *40. In the 19th century, lawmakers imposed a variety of restrictions on Bowie knives and certain types of firearms, largely concealable pocket pistols and revolvers, in response to the increasing use of these weapons to commit acts of violence. *See,*

*e.g.*, *id.* at *41-44; *NAGR*, 2023 WL 4975979, at *33.  In the 20th century, states and the federal government imposed sweeping regulations on automatic and semi-automatic firearms (and dynamite) to protect the public from acts of mass violence.  *See Hanson*, 2023 WL 3019777, at *15.

The modern predicate for the Ordinances is consistent with this long tradition.  Like these historical regulations, the Ordinances "were enacted in response to pressing public safety concerns regarding weapons determined to be dangerous."  *DSSA*, 2023 WL 2655150, at *13. Defendants enacted the Ordinances in "respon[se] to a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons."  *Id.*  (*See also* Exs. A at 1–5, B at 1–7, C at 1–4, D at 1–4).

Mass shootings have increased at an alarming rate in the last three decades, as has the frequency with which mass shootings involve assault weapons and LCMs.  (Ex. K ¶¶ 12–13 (Klarevas)).  The deadliest individual acts of criminal violence in the United States since September 11, 2001 have all been mass shootings.  (*Id.* ¶ 12 & Tbl. 1).  Between 2018 and 2022, more than half of all mass shootings in the United States involved assault weapons, and *every* mass shooting involved LCMs.  (*Id.* ¶ 13–14).  Further, assault weapons were used in 34% of those incidents resulting in more than five deaths; 61% of mass shootings resulting in more than 10 deaths; 75% of shootings resulting in more than 20 deaths; and both of the two mass shootings resulting in more than 40 deaths.  (*Id.* ¶ 15, Tbl. 2, Fig. 7).  LCMs were used in 77% of mass shootings resulting in more than five deaths, 94% of mass shootings resulting in more than 10 deaths, and 100% of incidents resulting in more than 20 deaths.  (*Id.* ¶ 15, Tbl. 2, Fig. 8; Ex. M ¶¶ 32–33 (Schreiber)).  The data shows that use of assault weapons in mass shootings has resulted in a 67% increase in fatalities and the use of LCMs (without an assault weapon) has

resulted in a 26% increase.  (Ex. K ¶¶ 16–17 (Klarevas)).  The use of assault weapons *with* LCMs has resulted in a staggering 92% increase in fatalities.  (*Id.* ¶ 17).

Although this societal concern is unprecedented in our history, the justification for the Ordinances is comparable to the justification for weapons restrictions stretching back centuries. Since the Founding, through Reconstruction and into the 20th century, lawmakers have recognized the particularly lethal characteristics of certain weapons, weapons features, and accessories, and the dangerous role they play in facilitating violent criminal acts, and lawmakers have responded, consistent with the Second Amendment, by enacting laws to address this harmful weaponry to protect the public.  The societal and criminological challenges posed by assault weapons and LCMs are as pressing as any in our nation's history, and they provide ample, and historically comparable, justification for the Ordinances.  Accordingly, if the Court reaches *Bruen*'s historical inquiry, Defendants have demonstrated the Ordinances are consistent with the nation's tradition of firearm regulation and thus do not violate the Second Amendment.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion and enter summary judgment in their favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.  Facts Relevant to the Plain Text Analysis

   *A.  Facts Relevant to Whether LCMs and Assault Weapons are "In Common Use Today for Self-Defense"*

1. Data compiled by the National Rifle Association ("NRA") about the use of weapons in self-defense indicate that of 736 reported incidents in which firearms were used in self-defense, the average number of shots fired was 2.2.  (Ex. F ¶ 10 (Allen)).

2. Of the 736 incidents described in the NRA's database about the use of weapons in self-defense, only 2 (0.3%) involved a defender firing more than ten rounds.  (*Id.* ¶ 10).

3. An analysis of published news stories revealed that in a random selection of 200 accounts of armed self-defense incidents in the home, the average number of shots per incident was 2.34.  (*Id.* ¶ 18).

4. The analysis of 200 published news stories found that in 97.3% of incidents the defender fired five or fewer shots, and there were no incidents where the defender was reported to have fired more than 10 rounds.  (*Id.* ¶ 19).

   *B.  Facts Relevant to Whether Assault Weapons and LCMs are Suitable for Self-Defense and were Designed for Military Use*

5. Assault weapons and LCMs were designed for extreme lethality on the battlefield, and they are replete with military-style features.  (Ex. O ¶¶ 7–8, 54 (Yurgealitis)).

6. .223-caliber ammunition—which was designed in part for use in the original civilian assault weapon and its military counterpart, the AR-15 and M-16—was designed with the intent to kill or incapacitate enemy combatants at distances of hundreds of yards.  (*Id.* ¶¶ 46, 136).

7. AR-15 rifles fire .223 and 5.56mm cartridges at a muzzle velocity of 3,200 to 3,500 feet per second—nearly three times the muzzle velocity of a round fired from a 9mm pistol.  (*Id.* ¶¶ 46, 47, 79, 136).

8. A round fired from an AR-15-style rifle releases into its target more than three times the energy of a round fired by a Thompson machinegun, approximately four to 19 times more than a handgun (depending on caliber), and approximately ten times more than the energy released by a musket.  (Ex. J ¶ 26 (Hargarten)).

9. LCMs allow the user of an assault weapon to increase his lethality by allowing him to fire repeatedly without having to reload, and therefore to release more kinetic energy per minute.  (*Id.* ¶ 30; Ex. M ¶ 28 (Schreiber)).

10. Most commercially available .223/5.56mm ammunition can penetrate some hardened steel, and commercially available 5.56x45mm NATO cartridges can penetrate up to 3mm of non-hardened steel. (Ex. O ¶ 139 (Yurgealitis)).

11. Self-defense encounters rarely, if ever, involve lengthy shootouts at long ranges with extensive exchanges of fire. (*Id.* ¶ 136).

12. An AR-15 weighs more than twice as much as a conventional handgun. (*Id.* ¶ 140).

13. Unlike conventional handguns, AR-platform rifles and many assault pistols require two hands to aim and fire. (*Id.* ¶¶ 140, 142).

14. Assault weapons and LCMs were originally designed for use in military combat and were not intended to be utilized by civilians or the general public. (*Id.* ¶¶ 7–9).

15. The U.S. Department of Defense adopted the AR-15 as standard issue in the 1960s after field evaluations of the weapon in Vietnam described various catastrophic injuries to Viet Cong combatants who were shot by AR-15s, including severing of limbs and decapitation. Later, after a series of engineering changes, the standard U.S. military designation was changed to the M-16. (*Id.* ¶¶ 73–74).

16. The design configuration of AR-15s produced today is virtually identical to the design configuration of M-16s in the 1960s, and there are multiple internal parts of the weapons that are interchangeable. (*Id.* ¶ 76).

17. When the AR-15 was first produced for sale on the civilian market, the only difference between the AR-15 and the M-16 was that the civilian version was not capable of firing in fully automatic mode. (*Id.* ¶ 84).

18. When the first semi-automatic variants of the M-16 and AR-15 were distributed to civilians in 1964, they came supplied with two five-round magazines, not the military-issue 20-round magazine. (*Id.* ¶¶ 121–22).

19. After World War II, commercially available semi-automatic pistols were generally equipped with magazines of 10 or fewer rounds. (*Id.* ¶ 124).

    C. *Facts Relevant to Whether Assault Weapons and LCMs are "Dangerous and Unusual"*

20. Assault weapons are capable of inflicting enormous damage on the human body, and tend to cause more damage to muscles, bones, soft tissue and vital organs than other firearms. (Exs. J ¶ 32 (Hargarten), M ¶¶ 36–39, 44–46 (Schreiber), H ¶¶ 12–18 (Colwell)).

21. The standard cartridge used in an AR-15—a 5.56x45mm NATO or .223 Remington cartridge—creates larger wound cavities than other cartridges fired from handguns and other firearms, and it does extreme damage to the tissue and organs of shooting victims, particularly solid organs like the liver and spleen. (Exs. H ¶ 14 (Colwell), J ¶¶ 27, 32 (Hargarten), M ¶¶ 26–27 (Schreiber), O ¶¶ 72, 79–80 (Yurgealitis)).

22.    The likelihood of serious injury and death from a wound caused by an assault weapon is high for adult victims and even higher for pediatric victims, who have smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves. (Ex. J ¶ 35 (Hargarten)).

    *D.  Facts Relevant to Whether LCMs are "Arms"*

23.    Until the late 19th century, single-shot, muzzle-loading firearms were the dominant guns in the United States (Ex. N ¶ 47 (Spitzer)).

24.    Firearms "magazines" did not exist at the Founding and remained relatively rare until the 1920s.  (Ex. G ¶¶ 24–25 (Baron)).

25.    During the Founding era, firearm users kept ammunition in what were called "cartridge boxes," "cartouch boxes," or "pouches."  (*Id.* ¶¶ 26, 33, 35).

26.    These ammunition holders were considered "accoutrements," as categorically distinct from "arms."  (*Id.* ¶¶ 4, 9).  During the Founding and Reconstruction eras, the term "arms" as a stand-alone term was used to refer to weapons and almost never included ammunition or ammunition storage containers such as cartridge boxes.  (*Id.* ¶¶ 9, 31, 32, 35, 53, 79).

## II. Facts Relevant to the History and Tradition Analysis

    *A.  Facts Relevant to Whether a More Nuanced Analogical Approach is Appropriate*

27.    Firearms during the colonial era could not be stored loaded and were liable to misfire. (Ex. L ¶ 19 (Roth)).

28.    Firearms during the colonial era could not fire multiple rounds without reloading and the process of loading each round took at least half a minute.  (*Id.* ¶ 19).

29.    Homicide rates were exceptionally low for most of the 18th century and only 10–15% of homicides were committed with a gun.  (*Id.* ¶¶ 17, 18, 20).

30.    The handful of experimental multi-shot firearms that existed in the 18th century were rare curiosities that few alive at the time would have seen and virtually none would have had occasion to use.  (Exs. I ¶ 27 (DeLay), N ¶ 28 (Spitzer)).

31.    None of the experimental multi-shot firearms that existed in the 18th century were safe or reliable enough to become militarily or commercially significant.  (Ex. I ¶ 11 (DeLay)).

32.    The first repeating firearms entered the market in the 1830s.  They typically held seven or fewer rounds and had to be manually reloaded round-by-round after all of the rounds were expended.  (*Id.* ¶¶ 47–51, 59).

33.    In the second half of the 19th century, Henry and Winchester rifles could hold magazines containing up to 15 rounds, but they operated with a slow lever-action mechanism (Ex. N

¶ 60 (Spitzer)) and had to be manually reloaded round-by-round once their capacity was depleted (Ex. I ¶ 59 (DeLay)).

34.    Henry and Winchester rifles constituted less than 0.2% of all firearms in the United States as late as 1872.  (*Id.* ¶ 56).

35.    Weapons capable of rapid fire first entered the market at the turn of the 20th century, and the primary market for such weapons was the military.  (*Id.* ¶ 65; Ex. N ¶ 54 (Spitzer)).

36.    The first assault rifle was developed in World War II.  (Ex. O ¶ 55 (Yurgealitis)).

37.    The AR-15 (later the M-16) was designed in the mid-1950s solely for military use.  (*Id.* ¶ 72).

38.    The user of an assault weapon equipped with an LCM can fire 40 to 50 rounds per minute.  (*Id.* ¶ 153).

39.    For a period of over 170 years—from 1776 to 1948—there was not a single known mass shooting incident in the United States that resulted in 10 or more fatalities.  (Ex. K ¶ 18 (Klarevas)).

40.    After the federal law prohibiting assault weapons and LCMs expired in 2004, mass shootings in the United States increased substantially.  Since that law expired, there have been at least 20 mass shootings with double-digit fatalities.  (*Id.* ¶ 21).

41.    There have been more mass shootings resulting in 10 or more deaths since 2017 than there were in the first 224 years of United States history.  (*Id.* ¶ 19, Tbl. 6).

42.    In more than 75% of the double-digit fatality mass shootings that have occurred in United States history, the shooter used an assault weapon and/or an LCM.  (*Id.* ¶ 22).

43.    From the colonial period through the 19th century, mass killings were generally committed by groups of people because technological constraints limited the ability of a single person to commit mass murder. (Ex. L ¶ 48 (Roth)).

    B.  *Facts Relevant to Whether There Is a Tradition of Regulating Particularly Dangerous Weapons that Pose a Threat to Public Safety*

44.    The overwhelming majority of homicides during the colonial era were committed with hands and feet or weapons that were close to hand, such as whips, sticks, hoes, shovels, axes, or knives.  (Exs. L ¶¶ 18, 20 (Roth), I ¶ 30 (DeLay)).

45.    Beginning in New York in 1664 and continuing into the early 20th century, every state in the nation enacted one or more laws against the carrying of various types of clubs and other blunt weapons.  (Ex. N ¶¶ 91, 92, 94 & Exhibit C (Spitzer)).

46.    Beginning in the 1770s, states also began prohibiting trap guns—devices that were used to protect businesses, property, and possessions that were rigged to fire remotely when a

string or wire was tripped.  New Jersey was the first state to prohibit the possession of trap guns in 1771, after which 15 states followed suit with anti-trap gun laws in the 19th and 20th centuries.  (*Id.* ¶¶ 102–04).

47.   The resources available to state and local governments to enforce weapon restrictions were limited in the nation's early history.  Modern policing did not exist until the years before the Civil War, and only then did it exist in a handful of major cities.  (*Id.* ¶ 90).

48.   Following the Revolution, the United States experienced an increase in interpersonal violence and homicides, often involving concealable knives and pistols.  (Ex. L ¶ 27 (Roth)).

49.   Beginning in 1813, several states (Georgia, Kentucky, Louisiana, Indiana, Arkansas, Virginia) prohibited the possession and/or concealed carry of the kinds of weapons that were used in many of the era's murders and serious assaults, including concealable knives and pistols.  (*Id.* ¶ 30).

50.   At least 44 states in the 19th century barred the concealed and/or public carry of a particularly dangerous type of knife, the Bowie knife, and Arkansas barred the sale of Bowie knives entirely.  (Ex. N ¶¶ 80, 87–90 (Spitzer)).

51.   Firearms technology improved in the 19th century, which resulted in the development of the revolver.  Due to its lethal, reliable, and easy-to-conceal nature, the revolver became the primary weapon used in interpersonal assaults during the latter part of the 19th century.  (Ex. L ¶¶ 36–39 (Roth)).

52.   The first automatic and semi-automatic firearms came onto the market in the 1890s.  (Ex. I ¶ 65 (DeLay)).

53.   The introduction of the first automatic and semi-automatic weapons was the result of three technological developments that occurred at the turn of the century: (1) a mechanism to harness recoil energy to chamber a firearm's next round; (2) smokeless gun powder; and (3) the detachable magazine.  This trio of developments significantly increased the number of bullets a single shooter could fire in a short period of time.  (*Id.* ¶¶ 65–67).

54.   When automatic and semi-automatic firearms began to disseminate among the public in the early 20th century, the weapons began to pose criminological problems.  The Thompson submachine gun, also known as the "Tommy gun," quickly became the most notorious and deadly of these weapons.  (*Id.* ¶ 69; Ex. N ¶ 20–21 (Spitzer)).

55.   When Tommy guns and similar weapons were used by criminals in the early 20th century, they exacted a devastating toll and garnered national attention, as was the case with the St. Valentine's Day massacre in Chicago in 1929.  (Ex. N ¶¶ 26, 30 (Spitzer)).

56.   From the 1917 through 1934, lawmakers across the country responded to the problems created by automatic and semi-automatic weapons by enacting laws regulating them.  (*Id.* ¶¶ 34–35).

57. Some 31 states and the District of Columbia enacted restrictions on fully automatic weapons from the 1920s through 1934—mainly outright prohibitions on sale and possession.  As many as ten states plus the District of Columbia enacted laws prohibiting or otherwise restricting semi-automatic weapons.  (*Id.* ¶¶ 34, 39 & Exs. B, C).

58. A number of the laws regulating automatic and semi-automatic weapons from the early 20th century focused on the number of rounds that could be fired without reloading, from more than one round (Massachusetts and Minnesota) up to a high of 18 (Ohio).  Between 1917 and 1934, 23 states imposed limits on the number of rounds that automatic and/or semi-automatic weapons could fire without reloading.  (*Id.* ¶¶ 41–43 & Tbl. 1).

59. In 1934, Congress enacted the first major piece of federal firearms legislation, the National Firearms Act, which imposed strict requirements on the civilian acquisition and circulation of automatic weapons.  (*Id.* ¶¶ 36, 43).

   C. *Facts Relevant to Whether the Ordinances are "Relevantly Similar" to the Comparable Historical Regulations.*

60. The Ordinances regulate only certain weapons and accessories, and otherwise permit Plaintiffs and others to acquire, use and possess many commonly used firearms for self-defense, including various kinds of semi-automatic weapons other than assault weapons, as well as all manner of firearm magazines capable of holding ten or fewer rounds.  (Exs. A, B, C, D).

61. The deadliest individual acts of criminal violence in the United States since September 11, 2001 have all been mass shootings.  (Ex. K ¶ 12 & Tbl. 1 (Klarevas)).

62. Between 2018 and 2022, more than half of all mass shootings in the U.S. involved assault weapons, and every mass shooting involved an LCM.  (*Id.* ¶¶ 13, 15).

63. From 1991 to 2022, assault weapons were used in 34% of mass shootings resulting in more than five deaths, 61% of mass shootings resulting in more than 10 deaths, 75% of mass shootings resulting in more than 20 deaths, and 100% of mass shootings resulting in more than 40 deaths.  (*Id.* ¶¶ 15, Fig. 7).

64. From 1991 to 2022, LCMs were used in 77% of mass shootings resulting in more than five deaths, 94% of mass shootings resulting in more than 10  deaths, and 100% of incidents resulting in more than 20 deaths.  (*Id.* ¶ 15, Tbl. 2, Fig. 8).

65. From 1991 to 2022, the use of assault weapons in mass shootings has resulted in a 67% increase in fatalities and the use of LCMs (without an assault weapon) has resulted in a 26% increase.  (*Id.* ¶¶ 16–17).

66. From 1991 to 2022, the use of assault weapons with LCMs has resulted in a 92% increase in fatalities in mass shootings.  (*Id.* ¶ 17).

Dated:    October 20, 2023

                                        Respectively submitted,

By:    /s/ Antonio J. Perez-Marques
           Antonio J. Perez-Marques
           James H.R. Windels
           Christopher P. Lynch
           David B. Toscano
           Hendrik van Hemmen
           Jennifer Kim
           DAVIS POLK & WARDWELL LLP
           450 Lexington Avenue
           New York, NY 10017
           (212) 450-4515
           antonio.perez@davispolk.com
           james.windels@davispolk.com
           christopher.lynch@davispolk.com
           david.toscano@davispolk.com
           hendrik.vanhemmen@davispolk.com
           jennifer.kim@davispolk.com
           *Counsel for All Defendants*

           Carey R. Dunne
           Kevin Trowel
           Martha Reiser
           FREE AND FAIR LITIGATION GROUP
           266 W. 37th Street, 20th Floor
           New York, NY 10018
           (917) 499-2279
           carey@freeandfairlitigation.org
           kevin@freeandfairlitigation.org
           martha@freeandfairlitigation.org
           *Counsel for All Defendants*

           William Taylor
           EVERYTOWN LAW
           450 Lexington Avenue, #4184
           New York, NY 10017
           (646) 324-8215
           wtaylor@everytown.org
           *Counsel for All Defendants*

Gordon L. Vaughan
VAUGHAN & DEMURO
111 South Tejon Street
Suite 545
Colorado Springs, CO 80903
(719) 578-5500
gvaughan@vaughandemuro.com
*Counsel for Town of Superior and Town of Louisville*

Luis A. Toro
Teresa T. Tate
BOULDER CITY ATTORNEY'S OFFICE
P.O. Box 791
1777 Broadway
Boulder, CO 80306
(303) 441-3020
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
*Counsel for the City of Boulder*

David Evan Hughes
Catherine R. Ruhland
BOULDER COUNTY ATTORNEY'S OFFICE
P.O. Box 471
Boulder, CO 80306
(303) 441-3190
dhughes@bouldercounty.org
truhland@bouldercounty.org
*Counsel for the Board of County Commissioners of Boulder County*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2023, I served a true and complete copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

Dated:    October 20, 2023

                                        Respectively submitted,

                          By:    /s/ Antonio J. Perez-Marques
                                        Antonio J. Perez-Marques
                                        DAVIS POLK & WARDWELL LLP
                                        450 Lexington Avenue
                                        New York, NY 10017
                                        (212) 450-4515
                                        antonio.perez@davispolk.com
                                        *Counsel for All Defendants*