# EXHIBIT C

Case 1:22-cv-02680-NYW Document 14-1 Filed 10/20/22 USDC Colorado Page 2 of 13

Second Reading Amendments

Ordinance No. 1831, Series 2022 is revised to read as follows (amendments are shown in **bold underline** and **bold strikeout**):

## ORDINANCE NO. 1831
## SERIES 2022

### AN ORDINANCE AMENDING TITLE 9, ARTICLE VIII OF THE LOUISVILLE MUNICIPAL CODE BANNING THE SALE AND POSSESSION OF ASSAULT WEAPONS, LARGE-CAPACITY MAGAZINES AND RAPID-FIRE TRIGGER ACTIVATORS, AND ESTABLISHING A MINIMUM AGE TO POSSESS FIREARMS

**WHEREAS,** the City of Louisville (the "City"), is a Colorado home rule municipal corporation duly organized and existing under laws of the State of Colorado and the City of Louisville Home Rule Charter (the "City Charter"); and

**WHEREAS,** gun violence poses a grave ~~public safety~~ threat **to public safety, public health, and public education** in the City of Louisville. Statewide in Colorado, guns are the leading cause of death for children ages 1–17 and cause the deaths of nearly 2/3 of women who are killed by intimate partners; and

**WHEREAS,** Colorado has the 18th-highest gun death rate among the 50 states and saw elevated levels of mass shootings in 2020 and early 2021, when a mass shooter killed 10 people at King Soopers in Boulder using an assault weapon and large-capacity magazines; and

**WHEREAS,** assault weapons are semiautomatic firearms with large ammunition capacities and specific features that are useful in military and criminal applications yet are unnecessary in shooting sports or self-defense. These weapons include semiautomatic assault rifles that have the ability to accept large-capacity magazines holding up to 100 rounds, and with features that enhance concealability, control, and the ability to fire many dozens of rounds without pause. They also include assault pistols and high-capacity "combat" shotguns; and

**WHEREAS,** assault weapons are semiautomatic versions of firearms. Although these semiautomatic versions of military firearms are marketed to civilians, they are military-grade weapons: the U.S. military calls semiautomatic rifle fire the "most important firing technique during fast-moving, modern combat" and "most accurate technique of placing a large volume of fire." These rifles fire bullets with a velocity three times greater than 9mm handguns, leaving "softball-sized exit wounds" much more likely to kill than to incapacitate victims; and

**WHEREAS,** perpetrators of the five deadliest shootings in modern U.S. history—Las Vegas, Orlando, Sandy Hook, Sutherland Springs, and El Paso—used assault rifles with military-style features. Colorado's deadliest mass shooters have also used assault rifles or pistols, including the Aurora movie theater shooter, who used an assault rifle and a 100-round drum magazine; and the King Soopers shooter, who used an AR-style pistol that an ATF expert described as "made for the military and designed for short-range combat"; and

Case 1:22-cv-02680-NYW Document 14-1 Filed 10/20/22 USDC Colorado Page 3 of 13

**WHEREAS,** researchers have found that firearm purchasers with criminal histories are more likely to buy assault weapons, and that probability was even higher if purchasers have more serious criminal histories. These weapons are regularly used in violent crime beyond mass shootings, including violence against police officers; and

**WHEREAS,** assault weapons are inappropriate for civilian use due to their unique features that allow shooters to rapidly fire a large number of rounds—more than is ever needed for lawful self-defense—while maintaining control of the firearm in order to accurately target and kill more victims. Specific features that allow an assault weapon to perform this way are:

*Detachable magazine*: Firearms that can accept detachable magazines allow a shooter to attach magazines of any size available for the firearm and quickly reload the weapon with pre-filled magazines. In some cases, magazines can hold as many as 100 rounds, but even smaller detachable magazines can greatly increase firepower.

*Pistol grip*: To counteract the movement that occurs during rapid fire, assault weapons are typically equipped with features that allow the shooter to steady the weapon. A pistol grip, not typically found on a sporting rifle or shotgun (which would be fired from the shoulder), allows the shooter to control the firearm more accurately—and lethally—by maneuvering the weapon or shooting from the hip during rapid fire;

*Thumbhole stock*: As with a pistol grip, a thumbhole stock allows the shooter to control the firearm during rapid fire;

*Folding or telescoping stock*: A folding or telescoping stock folds or collapses to make the weapon easier to conceal and transport;

*Flash Suppressor*: A flash suppressor enables a shooter to mask their location by reducing the visible signature of the firearm when it fires; and

*Barrel shroud*: As with a pistol grip and thumbhole stock, a barrel shroud allows the shooter to steady the firearm during rapid fire. The shroud encircles the barrel of the firearm and allows the shooter to hold it without getting burned; and

**WHEREAS,** in addition to military-style assault rifles, gun manufacturers have also begun marketing AK-style and AR-style pistols with the same features that enable a shooter to continue shooting the weapon numerous times without losing control over it. These pistols are also designed to fire rifle rounds capable of penetrating body armor, but which are concealable like handguns; and

**WHEREAS,** AK-style and AR-style pistols pose a similar if not identical threat to public safety as do short-barreled rifles, because of their short length and ability to fire rifle rounds that can penetrate ballistic resistant vests worn by patrol officers. Because their lethality is on par with highly restricted short-barreled rifles, yet they have almost entirely evaded regulation, armor-piercing, concealable firearms have been used in murders across the country, including at the 2021 King Soopers shooting and at the 2019 mass shooting in Dayton, Ohio; and

Case 1:22-cv-02065-RMR-NRN Document 14 Filed 08/22/22 USDC Colorado Page 4 of 13

**WHEREAS,** high-capacity "tactical" or "combat" shotguns are assault weapons modeled after firearms originally used for riot control by foreign law enforcement. After the Armsel Striker, popular in South Africa and marketed in the U.S. as the Street Sweeper, was designated a "destructive device" under the National Firearms Act, gunmakers designed workaround weapons as powerful as the Street Sweeper that inflict catastrophic injuries by rapidly firing a dozen or more shotgun slugs. These weapons are unfit for lawful sporting or self-defense uses; and

**WHEREAS,** at the 2017 Mandalay Bay shooting in Las Vegas, Nevada, the shooter modified semiautomatic assault rifles with bump stocks so they could fire at speeds approaching fully automatic machine guns. Bump stocks, as well as binary triggers, burst triggers, rotating trigger cranks, and other after-market rapid-fire trigger activators enable firing many rounds per second and serve no lawful self-defense function; and

**WHEREAS,** several years after the Las Vegas shooting drew attention to the dangers of bump stocks that give shooters automatic firepower, the ATF adopted a federal rule effectively banning their possession. However, legal challenges to the federal bump stock rule are still pending and state and local action is needed to restrict other rapid-fire trigger activators; and

**WHEREAS,** large-capacity magazines are ammunition feeding devices that hold more than 10 rounds and may hold as many as 100 rounds of ammunition. Mass shootings that involve large-capacity magazines result in nearly five times as many people shot compared to mass shootings that do not involve high capacity magazines. These magazines increase the number of victims injured and killed by enabling shooters to fire more rounds before reloading—a critical moment when many criminal shooters are stopped before they can further increase their death tolls; and

**WHEREAS,** large-capacity magazines also make gun violence far more lethal in situations other than mass shootings, including interpersonal gun violence and shootings by organized crime or street groups. Firearms equipped with large-capacity magazines account for 22 to 36% of crime guns in most places, and research shows upwards of 40% of crime guns used in serious violent crimes, including murders of police officers, are equipped with large-capacity magazines; and

**WHEREAS,** City Council is unaware of any reported incidents where someone engaged in self-defense fired more than 10 rounds of a large-capacity magazine to fend off an attack. Despite analyzing several decades of evidence about defensive shootings, gun-rights groups raising legal challenges to magazine restrictions in other jurisdictions have been unable to identify a single incident anywhere in the nation during which someone needed to fire more than ten rounds at once in lawful self-defense. Conversely, numerous high-profile mass shootings nationally and within Colorado have been carried out with LCMs, including the King Soopers shooting and the Aurora movie theater shooting. Nationally, the five deadliest mass shootings of the last decade all involved the use of LCMs holding more than 10 rounds of ammunition; and

**WHEREAS,** in 1994, a federal ban on the manufacture, transfer, and possession of assault weapons and the transfer and possession of large-capacity magazines was enacted. The

law included a ten-year sunset provision. In 2004, Congress allowed the law to expire; and

**WHEREAS,** studies show that the federal assault weapon ban resulted in a marked decrease in the use of assault weapons and large-capacity magazines in crime. One study found that in several major cities, the share of recovered crime guns that were assault weapons declined by 32% to 40% after the federal ban was adopted. Another study in Virginia found a clear decline in the percentage of crime guns that were equipped with large-capacity magazines after the federal ban was enacted. The percentage of guns seized by Virginia police reached a low of 10% in 2004 and then steadily climbed after Congress allowed the ban to expire; by 2010, the percentage was close to 22%; and

**WHEREAS,** the federal law restricting assault weapon and large-capacity magazines also had a significant protective effect in lowering mass shooting fatalities. During the 10-year period the law was in effect, mass shooting fatalities were 70% less likely to occur compared to when the ban wasn't in effect. In addition, the number of high-fatality mass shootings fell by 37%, and the number of people dying in such shootings fell by 43%. After the ban lapsed, there was a 183% increase in high-fatality mass shootings and a 239% increase in deaths from such shootings; and

**WHEREAS,** state-level prohibitions on large-capacity magazines have been shown to reduce the frequency and lethality of the deadliest mass shootings—strong evidence that regional and local legislation can be effective even absent a federal ban. A peer-reviewed study published in the American Journal of Public Health found that "states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents," seeing more than double the number of such shootings and three times the number of deaths from high-fatality mass shootings, as compared to states that ban large-capacity magazines; and

**WHEREAS,** survey data and gun-industry supplied statistics suggest that, at most, only a small fraction of U.S. gun owners possess semiautomatic assault rifles and private ownership of these weapons is concentrated in the hands of super-owners who have 10 or more firearms. Similar claims about the ubiquity of large-capacity magazines is contradicted by the fact that most magazines for handguns—the "quintessential self-defense weapon," *see District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)—hold 10 rounds or fewer; and

**WHEREAS,** because assault weapons, trigger activators, and large-capacity magazines are designed for and have repeatedly been used to inflict mass casualties and enable other violent crimes, and the fact that these weapons and accessories are ill-suited to and unnecessary for responsible self-defense, and are not chosen or used by most law-abiding gun owners for this purpose, City Council finds that it is in the best interests of the health, safety, and welfare of Louisville residents to prohibit the possession, sale, manufacture, and transfer of assault weapons, rapid-fire trigger activators, and large-capacity magazines; and

**WHEREAS,** this ordinance recognizes the enactment of Senate Bill 21-256 and is intended to be consistent with that law.

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE**

Case 1:22-cv-02680-NYW Document 14-1 Filed 10/20/22 USDC Colorado Page 6 of 13
Case 1:22-cv-02680-NYW Document 14-1 Filed 10/19/22 USDC Colorado Page 5 of 13

**CITY OF LOUISVILLE, COLORADO:**

<u>**Section 1.**</u>  Title 9, Article VIII of the Louisville Municipal Code (Weapons) is hereby amended by a new Chapter 9.80 to read as follows:

### Chapter 9.80

### General Provisions

**Sec. 9.80.010  Definitions.**

For the purposes of this Article the following terms, phrases, words, and their derivatives shall have the meanings given in this section:

*About the person* means sufficiently close to the person to be readily accessible for immediate use.

*Assault weapon* means:

(a) All semi-automatic center-fire rifles that have the capacity to accept a detachable magazine and that have any of the following characteristics:
    (1) A pistol grip or thumbhole stock;
    (2) A folding or telescoping stock;
    (3) A flash suppressor; or
    (4) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearms with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

(b) All semi-automatic center-fire pistols that have any of the following characteristics:
    (1) A threaded barrel;
    (2) A secondary protruding grip or other device to allow the weapon to be stabilized with the non-trigger hand;
    (3) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;
    (4) A flash suppressor;
    (5) The capacity to accept a detachable ammunition feeding device at some location outside of the pistol grip;
    (6) A manufactured weight of 50 ounces or more when unloaded;
    (7) A buffer tube, arm brace, or other part that protrudes horizontally under the pistol grip; or

(8) A fixed magazine that has the capacity to accept more than 10 rounds.

(c) All semi-automatic shotguns that have any of the following characteristics:
  (1) A pistol grip or thumbhole stock;
  (2) A folding or telescoping stock;
  (3) A fixed magazine capacity in excess of five rounds; or
  (4) The capacity to accept a detachable magazine.

(d) Any firearm which has been modified to be operable as an assault weapon as defined herein.

(e) Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person.

*Constructive knowledge* means knowledge of facts or circumstances sufficient to cause a reasonable person to be aware of the fact in question.

*Firearm* means any handgun, automatic revolver, pistol, shotgun, or other instrument or device capable or intended to be capable of discharging bullets, cartridges, or other explosive charges. This definition does not include an antique firearm as defined in 18 U.S.C. § 921(a)(16).

*Illegal weapon* means an assault weapon, large-capacity magazine, rapid-fire trigger activator, blackjack, gas gun, metallic knuckles, gravity knife or switchblade knife.

*Large-capacity magazine* means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

(a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.
(b) A 22-caliber tube rim-fire ammunition feeding device.
(c) A tubular magazine that is contained in a lever-action firearm.

*Locked container* means a secure container which is enclosed on all sides and locked by a padlock, key lock, combination lock, or similar device, but does not include the utility compartment, glove compartment, or trunk of a motor vehicle.

*Minor* means a person under twenty-one years of age.

*Pistol Grip* means a grip that protrudes conspicuously beneath the action of the weapon and that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.

*Provide* means to give, lend, sell, or to place in an unsecured location where a minor, an unauthorized person or an incompetent person could foreseeably gain access to a firearm.

***Purchase* and *sale* mean the transfer of ownership of a firearm in consideration of payment or promise of payment.**

*Rapid-Fire Trigger Activator* means:

(a) A device that attaches to a firearm to allow the firearm to discharge two or more shots in a burst when the device is activated; or
(b) A manual or power-driven trigger-activating device that, when attached to a firearm, increases the rate of fire of that firearm.

*Semi-automatic* means a firearm that fires a single round for each pull of the trigger and automatically chambers a new round immediately after a round is fired.

### Sec. 9.80.020 Matters of local and mixed concern.

It is the intention of the City Council that those ordinances and provisions contained in this Article that deal with matters of "local" concern supersede the laws of the State of Colorado to the extent that they conflict and that those that deal with matters of "mixed" concern apply concurrently with the laws of the State of Colorado. No provision of this code on a matter of "mixed" concern is to be construed expressly or by implication to permit conduct that is illegal under the laws of the State of Colorado. The provisions of this code are to be construed to apply to ~~misdemeanors and other minor and petty offenses only and are not to be interpreted to apply to~~ conduct ~~that is defined as a felony under the laws of the State of Colorado~~ **subject to the jurisdiction of the City of Louisville**.

### Sec. 9.80.030 Affirmative defense.

It is an affirmative defense to any charge of a violation of this Article relating to carrying firearms that the defendant was carrying the firearm in a private ~~automobile~~ **motor vehicle** or other private means of conveyance for lawful protection of such person or another person or property or for hunting while traveling in, into or through the City, as permitted by § 18-12-105.6, C.R.S.

Ordinance No. 1831 Series 2022
Page **7** of **12**

**Sec. 9.80.040 Exemptions.**

Nothing in this Article shall be construed to forbid the following persons from having in their possession, displaying, concealing or discharging such weapons as are necessary in the authorized and proper performance of their official duties:

(1) United States Marshals, any sheriffs, constables and their deputies,

(2) Any regular or ex officio police officer,

(3) Any government agent, officer, or employee, any other peace officer, or Members of the United States Armed Forces, Colorado National Guard or Reserve Officer Training Corps~~, to the extent such person is otherwise authorized to acquire or possess an assault weapon and/or large-capacity magazine, and does so within the scope of his or her~~ **acting in the course and scope of their** duties.

**Section 2. Chapter 9.82 of the Louisville Municipal Code is hereby amended by the addition of a new Section 9.82.130 to read as follows:**

**Sec. 9.82.130 Sales to and purchases by minors prohibited.**

**(a) No person under the age of twenty-one shall purchase a firearm.**

**(b) No person shall sell a firearm to a person under the age of twenty-one.**

**(c) This section shall not apply to:**
  **(1) Any federal, state or local law enforcement officer when purchasing or selling firearms in connection with official duties.**

  **(2) Any member of the United States Armed Forces or Colorado National Guard when engaged in official duties.**

**Section ~~2~~ 3.** Title 9, Article VIII of the Louisville Municipal Code (Weapons) is hereby amended by a new Chapter 9.84 to read as follows:

### Chapter 9.84

### Illegal Weapons

**Sec. 9.84.010 Possession and sale of illegal weapons.**

(a) No person shall knowingly possess or sell or otherwise transfer an illegal weapon.

(b) Nothing in this section shall be construed to forbid any person:
  (1) Holding a Federal Firearms License issued by the United States Government from possession of any firearm authorized pursuant to such license;
  (2) From possessing a firearm for which the United States Government has issued a stamp or permit pursuant to the National Firearms Act; or
  (3) Selling an illegal weapon to a person identified in Section 9.80.030 of this Code, "Exemptions from this Article."
  **(4) Engaged in the manufacture or sale of items pursuant to a United States military or law enforcement procurement contract in accordance with C.R.S. § 29-11.7-103(3) from possessing a weapon that is subject to such procurement contract.**

(c) Nothing in this section shall be deemed to apply to any firearm that has been modified either to render it permanently inoperable or to permanently make it not an assault weapon.

(d) Nothing in this section shall be deemed to restrict a person's ability to travel with a firearm in a private ~~automobile~~ **motor vehicle** or other private means of conveyance for lawful hunting, for lawful competition, or for lawful protection of a person or another person or property while traveling into, though, or within, the City of Louisville, regardless of the number of times the person stops in the City of Louisville.

(e) It is a specific defense to a charge of violating this Section:
  (1) That the person had a valid permit for such weapon pursuant to federal law at the time of the offense; or
  (2) That the illegal weapon was an assault weapon accompanied by a certificate of ownership, under Section 9.86.010(c), issued by the Louisville Police Department.

**Section ~~3~~ 4.** Title 9, Article VIII of the Louisville Municipal Code (Weapons) is hereby amended by a new Chapter 9.86 to read as follows:

### Chapter 9.86

### Assault Weapons

**Sec. 9.86.010 Assault weapons.**

(a) Any person who, prior to July 1, 2022, was legally in possession of an assault weapon or large capacity magazine shall have until December 31, 2022 to obtain a certificate for the assault weapon as provided in subsection (c) of this section.

(b) Any person who, prior to July 1, 2022, was legally in possession of a rapid-fire trigger activator shall have until August 1, 2022 to do any of the following without being subject to prosecution:
- (1) Remove the rapid-fire trigger activator from the City of Louisville; or
- (2) Surrender the rapid-fire trigger activator to the Louisville Police Department for destruction.

(c) Any person seeking to certify an assault weapon that he or she legally possessed prior to July 1, 2022~~, unless they obtained a certificate of ownership under previous ordinances,~~ must comply with the following requirements:
- (1) Submit to a background check conducted by the appropriate law enforcement agency to confirm that he or she is not prohibited from possessing a firearm pursuant to 18 U.S.C. § 922 or C.R.S § 18-12-108; and
- (2) Unless the person is currently prohibited by law from possessing a firearm, prior to December 31, 2022 apply for a certificate for the assault weapon from the Louisville Police Department.

(d) All persons who obtain a certificate pursuant to subsection (c) of this section shall:
- (1) Safely and securely store the assault weapon pursuant to the regulations adopted by the appropriate law enforcement agency;
- (2) Possess the assault weapon only on property owned or immediately controlled by the person, or while on the premises of a licensed gunsmith for the purpose of lawful repair, or while engaged in the legal use of the assault weapon at a duly licensed firing range, or while traveling to or from these locations, provided that the assault weapon is stored unloaded in a locked container during transport. The term "locked container" does not include the utility compartment, glove compartment, or trunk of a motor vehicle; and
- (3) Report the loss or theft of a certified assault weapon to the appropriate law enforcement agency within 48 hours of the time the discovery was made or should have been made.

(e) If a certified assault weapon is used in the commission of a crime, the owner shall be civilly liable for any damages resulting from that crime. The liability imposed by this subsection shall not apply if the assault weapon was stolen and the certified owner reported the theft of the firearm to law enforcement within 48 hours of the time the discovery was made or should have been made.

(f) Certified assault weapons may not be purchased, sold or transferred in the City of Louisville, except for transfer to a licensed gunsmith for the purpose of lawful repair, or transfer to the appropriate law enforcement agency for the purpose of surrendering the assault weapon for destruction.

(g) Persons acquiring an assault weapon by inheritance, bequest, or succession shall, within 90 days of acquiring title, do one of the following:
(1) Modify the assault weapon to render it permanently inoperable;
(2) Surrender the assault weapon to the Louisville Police Department for destruction;
(3) Transfer the assault weapon to a firearms dealer who is properly licensed under federal, state and local laws; or
(4) Permanently remove the assault weapon from the City of Louisville.

(h) The owner of a certified assault weapon may not possess in the City of Louisville any assault weapons purchased after July 1, 2022.

(i) The City Manager shall charge a fee for each certificate sufficient to cover the costs of administering the certificate program. The City Manager shall issue to qualified applicants two original copies of each certificate issued. The City of Louisville shall not maintain any records of certificates issued. The person who received the certificate shall keep one copy with the weapon certified and the second copy in a secure place to replace the certificate maintained with the weapon.

**Section 4 5.** If any portion of this ordinance is held to be invalid for any reason, such decision shall not affect the validity of the remaining portions of this ordinance. The City Council hereby declares it would have passed and approved this ordinance and each part hereof irrespective of the fact that any one part be declared invalid.

**Section 5 6.** The repeal or modification of any provision of the Municipal Code of the City of Louisville by this ordinance shall not release, extinguish, alter, modify, or change in whole or in part any penalty, forfeiture, or liability, either civil or criminal, which shall have been incurred under such provision, and each provision shall be treated and held as still remaining in force for the purpose of sustaining any and all proper actions, suits, proceedings, and prosecutions for the enforcement of the penalty, forfeiture, or liability, as well as for the purpose of sustaining any

Case 1:22-cv-02680-NYW Document 41-6 Filed 10/21/22 USDC Colorado Page 13 of 13

judgment, decree, or order which can or may be rendered, entered, or made in such actions, suits, proceedings, or prosecutions.

**Section 6 7.** All other ordinances or portions thereof inconsistent or conflicting with this ordinance or any portion hereof are hereby repealed to the extent of such inconsistency or conflict.

**Section 7 8.** Any person convicted of violating this ordinance may be punished as set forth in 1.28.010 of the Louisville Municipal Code, as may be amended but which currently provides violations shall be punished by a fine of not more than $2,650.00, as shall be adjusted for inflation on January 1, 2014 and on January 1 of each year thereafter, or by imprisonment not to exceed 364 days, or by both such fine and imprisonment.

**INTRODUCED, READ, PASSED ON FIRST READING, AND ORDERED PUBLISHED** this 17th day of May, 2022.

_____
Ashley Stolzmann, Mayor

ATTEST:

_____
Meredyth Muth, City Clerk

APPROVED AS TO FORM:

_____
Kelly PC
City Attorney

**PASSED AND ADOPTED ON SECOND AND FINAL READING,** this 7th day of June, 2022.

_____
Ashley Stolzmann, Mayor

ATTEST:

_____
Meredyth Muth, City Clerk

Ordinance No. 1831 Series 2022
Page **12** of **12**