# EXHIBIT D

03975161    08/04/2022 07:52 AM
RF: $0.00    DF: $0.00    Page: 1 of 8
Electronically recorded in Boulder County Colorado. Recorded as received.

## ORDINANCE NO. 2022-5

## AN ORDINANCE OF THE BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO PROHIBITING THE SALE AND PURCHASE OF ASSAULT WEAPONS, LARGE CAPACITY MAGAZINES, AND TRIGGER ACTIVATORS

### RECITALS

A.    Gun violence poses a grave public safety threat in Boulder County. According to data from Centers for Disease Control and Prevention, Wide-ranging Online Data for Epidemiologic Research, statewide in Colorado guns are the leading cause of death for children ages one through 17 and cause the deaths of nearly two thirds of women who are killed by intimate partners.

B.    Colorado has the 18th-highest gun death rate among the 50 states and saw elevated levels of mass shootings in 2020 and early 2021, when a mass shooter killed 10 people at a King Soopers in Boulder using an assault weapon and large-capacity magazines.

C.    Assault weapons are semiautomatic firearms with large ammunition capacities and specific features that are useful in military and criminal applications yet are unnecessary in shooting sports or self-defense. These weapons include semiautomatic assault rifles that can accept large-capacity magazines holding up to 100 rounds, and with features that enhance concealability, control, and the ability to fire many dozens of rounds without pause. They also include assault pistols and high-capacity "combat" shotguns.

D.    Assault rifles are semiautomatic versions of firearms. Although these semiautomatic versions of military firearms are marketed to civilians, they are military-grade weapons: the U.S. military has called semiautomatic rifle fire the "most important firing technique during fast-moving, modern combat" and "most accurate technique of placing a large volume of fire." These rifles fire bullets with a velocity three times greater than 9mm handguns, leaving softball-sized exit wounds much more likely to kill than to incapacitate victims.

E.    Perpetrators of the five deadliest shootings in modern U.S. history—Las Vegas, Orlando, Sandy Hook, Sutherland Springs, and El Paso—used assault rifles with military-style features. Colorado's deadliest mass shooters have also used assault rifles or pistols, including the Aurora movie theater shooter, who used an assault rifle and a 100-round drum magazine; and the King Soopers shooter, who used an AR-style pistol that an expert from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") described as "made for the military and designed for short-range combat."

F.    Researchers have found that firearm purchasers with criminal histories are more likely to buy assault weapons, and that probability was even higher if purchasers have more serious criminal histories. These weapons are regularly used in violent crime beyond mass shootings, including violence against law enforcement officers.

G.    Assault weapons are inappropriate for civilian use due to their unique features that allow shooters to rapidly fire a large number of rounds—more than is ever needed for lawful

DocuSign Envelope ID: FB22C695-7035-4668-BD16-0AD4B5F46D5D

self-defense—while maintaining control of the firearm in order to accurately target and kill more victims. Specific features that allow an assault weapon to perform this way are:

- Detachable magazine: Firearms that can accept detachable magazines allow a shooter to attach magazines of any size available for the firearm and quickly reload the weapon with pre-filled magazines. In some cases, magazines can hold as many as 100 rounds, but even smaller detachable magazines can greatly increase firepower.

- Pistol grip: To counteract the movement that occurs during rapid fire, assault weapons are typically equipped with features that allow the shooter to steady the weapon. A pistol grip, not typically found on a sporting rifle or shotgun (which would be fired from the shoulder), allows the shooter to control the firearm more accurately—and lethally—by maneuvering the weapon or shooting from the hip during rapid fire;

- Thumbhole stock: As with a pistol grip, a thumbhole stock allows the shooter to control the firearm during rapid fire;

- Folding or telescoping stock: A folding or telescoping stock folds or collapses to make the weapon easier to conceal and transport;

- Flash Suppressor: A flash suppressor enables a shooter to mask their location by reducing the visible signature of the firearm when it fires; and

- Barrel shroud: As with a pistol grip and thumbhole stock, a barrel shroud allows the shooter to steady the firearm during rapid fire. The shroud encircles the barrel of the firearm and allows the shooter to hold it without getting burned.

H.  In addition to military-style assault rifles, gun manufacturers have also begun marketing AK-style and AR-style pistols with the same features that enable a shooter to continue shooting the weapon numerous times without losing control over it.  These pistols are also designed to fire rifle rounds capable of penetrating body armor, but which are concealable like handguns.

I.  AK-style and AR-style pistols pose a similar if not identical threat to public safety as do short-barreled rifles, because of their short length and ability to fire rifle rounds that can penetrate ballistic resistant vests worn by patrol officers. Because their lethality is on par with highly restricted short-barreled rifles, armor-piercing, concealable firearms have been used in murders across the country, including at the 2021 King Soopers shooting in Boulder and at the 2019 mass shooting in Dayton, Ohio.

J.  High-capacity "tactical" or "combat" shotguns are assault weapons modeled after firearms originally used for riot control by foreign law enforcement. After the Armsel Striker, popular in South Africa and marketed in the U.S. as the Street Sweeper, was designated a "destructive device" under the National Firearms Act, gunmakers designed workaround weapons as powerful as the Street Sweeper that inflict catastrophic injuries by

DocuSign Envelope ID: FB22C695-7035-4668-BD16-0AD4B5F46D5D

rapidly firing a dozen or more shotgun slugs. These weapons are unfit for lawful sporting or self-defense uses.

K.   At the 2017 Mandalay Bay shooting in Las Vegas, Nevada, the shooter modified semiautomatic assault rifles with bump stocks so they could fire at speeds approaching fully automatic machine guns. Bump stocks, as well as binary triggers, burst triggers, rotating trigger cranks, and other after-market rapid-fire trigger activators enable firing many rounds per second and serve no lawful self-defense function.

L.   Several years after the Las Vegas shooting drew attention to the dangers of bump stocks that give shooters automatic firepower, the ATF adopted a federal rule effectively banning their possession. However, local action is needed to restrict other rapid-fire trigger activators.

M.   Large-capacity magazines are ammunition feeding devices that hold more than 10 rounds and may hold as many as 100 rounds of ammunition. Mass shootings that involve large-capacity magazines result in nearly five times as many people shot compared to mass shootings that do not involve high-capacity magazines. These magazines increase the number of victims injured and killed by enabling shooters to fire more rounds before reloading—a critical moment when criminal shooters can be stopped before they can further increase their death tolls.

N.   Large-capacity magazines also make gun violence far more lethal in situations other than mass shootings, including interpersonal gun violence and shootings by organized crime or street groups.

O.   The Board of County Commissioners of Boulder County is unaware of any reported incidents in Boulder County or nationally where a civilian who was engaged in self-defense fired more than 10 rounds of a large-capacity magazine to fend off an attack. In *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), the court noted that even six expert witnesses could not identify a single example of a self-defense episode in which ten or more shots were fired. Conversely, numerous high-profile mass shootings nationally and within Colorado have been carried out with large-capacity magazines, including the Boulder King Soopers shooting and the Aurora movie theater shooting.

P.   In 1994, a federal ban on the manufacture, transfer and possession of assault weapons and the transfer and possession of large-capacity magazines was enacted, but the law included a 10-year sunset provision. In 2004, Congress allowed the law to expire.

Q.   Studies show that the federal assault weapon ban resulted in a marked decrease in the use of assault weapons and large-capacity magazines in crime.

R. State-level prohibitions on large-capacity magazines have been shown to reduce the frequency and lethality of the deadliest mass shootings—strong evidence that regional and local legislation can be effective. A peer-reviewed study published in the American Journal of Public Health found that "states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents," seeing more than double the number of such shootings and three times the number of deaths from high-

fatality mass shootings, as compared to states that ban large-capacity magazines.

S.   Survey data and gun-industry supplied statistics suggest that, at most, only a small fraction of U.S. gun owners possess semiautomatic assault rifles and private ownership of these weapons is concentrated in the hands of super-owners who have 10 or more firearms.

T.   The nation has a historical tradition of regulating weapons that are unusual and dangerous, and this tradition supports the adoption of regulations that prohibit the carrying of dangerous and unusual weapons. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022); *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008).

U.   Because assault weapons, trigger activators, and large-capacity magazines are designed for and have repeatedly been used to inflict mass casualties and enable other violent crimes, and the fact that these weapons and accessories are ill-suited to and unnecessary for responsible self-defense, and are not chosen or used by most law-abiding gun owners for this purpose, the Board of County Commissioners of Boulder County finds that it is in the best interests of the health, safety, and welfare of Boulder County residents to prohibit the sale, manufacture, and transfer of assault weapons, rapid-fire trigger activators, and large-capacity magazines.

V.   Pursuant to Section 30-11-101(2) of the Colorado Revised Statutes, a county has the authority to adopt and enforce ordinances regarding issues of health, safety, and welfare.

W.   Pursuant to Section 29-11.7-103 of the Colorado Revised Statutes, a county has the authority to adopt and enforce ordinances regulating the sale, purchase, transfer and possession of firearms.

**BE IT ORDAINED**, by the Board of County Commissioners of Boulder County, the following:

## SECTION 1. DEFINITIONS

(a)   "Assault weapon" means any:

(1)   Semiautomatic center-fire rifle that has the capacity to accept a detachable magazine and has one or more of the following characteristics:

(i)   A pistol grip or thumbhole stock;

(ii)   Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii)   A folding or telescoping stock;

(iv)   A flash suppressor;

DocuSign Envelope ID: FB22C695-7035-4668-BD16-0AD4B5F46D5D

       (v)     A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

(2)     Semiautomatic center-fire pistol that has the capacity to accept a detachable ammunition feeding device and any one of the following:

       (i)     A threaded barrel;

       (ii)    A second pistol grip, or second other feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

       (iii)   A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

       (iv)   A flash suppressor;

       (v)     The capacity to accept a detachable ammunition feeding device at some location outside of the pistol grip;

       (vi)   A manufactured weight of 50 ounces or more when unloaded; or

       (vii)  A buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip.

(3)     Semiautomatic center-fire pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

(4)     Semiautomatic shotgun that has one or more of the following features:

       (i)     A pistol grip or thumbhole stock;

       (ii)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

       (iii)   A folding or telescoping stock;

       (iv)   A fixed magazine capacity in excess of 5 rounds; or

       (v)     An ability to accept a detachable magazine.

(5) Any firearm that has been modified to be operable as an assault weapon as defined herein;

(6) Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon

may be readily assembled if those parts are in the possession or under the control of the same person.

(b) "Assault weapon" does not include any firearm that has been made permanently inoperable, an antique firearm manufactured before 1899, or a replica of an antique firearm.

(c) "Large-capacity magazine" or "LCD" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

    (1)    A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

    (2)    A .22 caliber tube ammunition feeding device.

    (3)    A tubular magazine that is contained in a lever-action firearm.

(d) "Rapid-fire trigger activator" means any device, including a removable manual or power-driven activating device, constructed so that, when installed in or attached to a semiautomatic firearm:

    (1)    the rate at which the trigger is activated substantially increases; or

    (2)    the rate of fire substantially increases.

## SECTION 2. PROHIBITION ON SELLING AND PURCHASING ASSAULT WEAPONS, LARGE-CAPACITY MAGAZINES, OR RAPID-FIRE TRIGGER ACTIVATORS

(a) No person, corporation or other entity in unincorporated Boulder County may manufacture, import, purchase, sell or transfer any assault weapon, large-capacity magazine, or rapid-fire trigger activator.

(b) Section (a) shall not apply to:

    (1)    Any government officer, agent, or employee, member of the armed forces of the United States, or peace officer, to the extent that such person is otherwise authorized to acquire or possess an assault weapon and/or large-capacity magazine, and does so while acting within the scope of his or her duties; or

    (2)    The manufacture of an assault weapon or large-capacity magazine for the purpose of sale to any branch of the armed forces of the United States, or to a law enforcement agency in unincorporated Boulder County for use by that agency or its employees, provided the manufacturer is properly licensed under federal, state and local laws.

    (3)    The sale or transfer of an assault weapon or large-capacity magazine by a dealer that is properly licensed under federal, state and local laws to any

DocuSign Envelope ID: FB22C695-7035-4668-BD16-0AD4B5F46D5D

branch of the armed forces of the United States, or to a law enforcement agency in unincorporated Boulder County for use by that agency or its employees for law enforcement purposes.

(4)     The transfer of an assault weapon to a licensed gunsmith for the purpose of lawful repair.

(5)     The transfer of an assault weapon, large-capacity magazine, or trigger activator to the Boulder County Sheriff's Office for the purpose of surrendering the weapon, LCD or trigger activator.

## SECTION 3. VIOLATIONS AND PENALTIES

Any violation of this ordinance by a person who knew or reasonably should have known that their conduct was prohibited is a misdemeanor and upon conviction shall be punished by a fine of not more than one thousand dollars, by incarceration of up to one year in jail, or by both such fine and incarceration.

## SECTION 4. SEVERABILITY

If any section, clause, sentence, or part of this ordinance is adjudged by any court of competent jurisdiction to be invalid, such invalidity shall not affect, impair, or invalidate the other provisions of this ordinance which can be given effect without such invalid provision.

## SECTION 5. SAFETY CLAUSE

This ordinance shall take effect immediately upon its adoption. This ordinance is necessary to protect the public health, safety, and welfare of the residents of the county due in part to the need to control the activity subject to this ordinance as soon as possible.

ADOPTED WITH AMENDMENTS ON SECOND AND FINAL READING at a public hearing on   _August 2, 2022_____.

THE BOARD OF COMMISSIONERS
OF THE COUNTY OF BOULDER, COLORADO

*Marta Loachamin*
_____
Marta Loachamin, Chair

ATTEST:

*Cecilia Lacey*
_____
Name: Cecilia Lacey
Clerk to the Board

# CERTIFICATION AND ATTESTATION

I, Molly Fitzpatrick, Boulder County Clerk and Recorder, do hereby certify that the foregoing Ordinance No. 2022-5, entitled "**AN ORDINANCE OF THE BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY, COLORADO PROHIBITING THE SALE AND PURCHASE OF ASSAULT WEAPONS, LARGE CAPACITY MAGAZINES, AND TRIGGER ACTIVATORS**" is a true, correct and complete copy from the records in my office, that said ordinance was duly adopted by the Board of County Commissioners of the County of Boulder. The first reading of Ordinance 2022-5 took place on July 5, 2022, at a regular Board of County Commissioners Meeting. It was published in full in the Boulder Daily Camera on July 8, 2022. The Ordinance was adopted with amendments on second reading at a public hearing held before the Board of County Commissioners on August 2, 2022. Further, one (1) copy of the Ordinance is now filed in the office of the Clerk and Recorder for the County of Boulder, Colorado, and may be inspected during regular business hours.

*Molly Fitzpatrick*
_____
Clerk and Recorder