# EXHIBIT Q

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-2680
_____

ROCKY MOUNTAIN GUN OWNERS, NATIONAL ASSOCIATION FOR GUN RIGHTS, CHARLES BRADLEY WALKER, BRYAN LAFONTE, CRAIG WRIGHT, and GORDON MADONNA, JAMES MICHAEL JONES, and MARTIN CARTER KEHOE,

    Plaintiffs,

v.

THE TOWN OF SUPERIOR, THE CITY OF LOUISVILLE, COLORADO, THE CITY OF BOULDER, COLORADO, and THE BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

    Defendants.
_____

REMOTE VIDEO 30(b)(6) DEPOSITION OF
NATIONAL ASSOCIATION FOR GUN RIGHTS
by
DUDLEY BROWN
APPEARING REMOTELY FROM
LOVELAND, COLORADO
July 24, 2023
_____

(CONFIDENTIAL DESIGNATIONS PENDING)

```
 1   REMOTE APPEARANCES:
 2
     ON BEHALF OF THE PLAINTIFFS:
 3           BARRY ARRINGTON, ESQ.
             Arrington Law Firm
 4           3801 East Florida Avenue, Suite 830
             Denver, Colorado  80210
 5           Phone:  303-205-7870
             Email:  barry@arringtonpc.com
 6
 7   ON BEHALF OF THE DEFENDANTS:
             KEVIN TROWEL, ESQ.
 8           CAREY R. DUNNE, ESQ.
             Free & Fair Litigation Group
 9           266 W. 37th Street, 20th Floor
             New York, New York  10018
10           Phone:  646-434-8604
             Email:  kevin@freeandfairlitigation.org
11           Email:  carey@freeandfairlitigation.org
12           and
13           JENNIFER KIM, ESQ.
             Davis Polk & Wardwell, LLP
14           1600 El Camino Real
             Menlo Park, California  94025
15           Phone:  650-752-2000
             Email:  jennifer.kim@davispolk.com
16
             and
17
             MACKENZIE BOUVERAT, ESQ.
18           Davis Polk & Wardwell, LLP
             450 Lexington Avenue, 11th Floor
19           New York, New York 10017
             Phone:  212-450-3070
20           Email:  mackenzie.bouverat@davispolk.com
21
22
23
24
25
```

1  REMOTE APPEARANCES (cont.):

2

   ON BEHALF OF THE DEFENDANTS, THE CITY OF LOUISVILLE and the
3  TOWN OF SUPERIOR:

            GORDON VAUGHAN, ESQ.
4           Vaughan & DeMuro
            111 S. Tejon Street
5           Colorado Springs, Colorado  80903
            Phone:  719-578-5500
6           Email:  gvaughan@vaughandemuro.com

7

   Also Present:  James Jones
8                 Taylor Rhodes
                  Jerry DeBoer, videographer

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

1  A. I spent 30 years talking to our members.
2  Not quite 30.
3  Q. Has any member of NAGR fired an assault
4  weapon as defined in the challenged ordinances in
5  self-defense?
6  A. Yes.
7  Q. Who?
8  A. I don't recall all their names, and I
9  wouldn't identify them anyway.
10  Q. Can you describe the incidents in which
11  they were used, the firearms -- the -- sorry.  Let me
12  withdraw that and start again.
13  Can you describe the incidents in which
14  one or more NAGR members fired an assault weapon in
15  self-defense?
16  A. Yes.  I had a member attacked in downtown
17  Denver and he used a pistol, a -- with a, quote, high
18  capacity magazine, large capacity magazine, to defend
19  himself and ended up in court and was ruled a
20  self-defense.
21  Q. What year was that?
22  A. The one I'm thinking in particular was
23  2022.  I know of -- I can remember four or five of those
24  in the metro area specifically with handguns that would
25  fit under these ordinances.

Page 117

1  Q. Let me step back for a minute and refer to
2  the first one you mentioned there.
3  How many shots did that individual fire,
4  if you know?
5  A. Six, I think.
6  Q. The other incidents that you have in mind,
7  can you tell me how many shots were fired in each of those
8  incidents?
9  A. There's one in particular with a 12-round
10 mag reload.
11 Q. What year was that?
12 A. More recent. I'm guessing 2008.
13 Q. Where was it?
14 A. It was in this greater metro area.
15 Q. Of...
16 A. Denver.
17 Q. As -- as you sit here today, is it your
18 testimony that the 2008 incident and the 2022 incident,
19 those were both NAGR members?
20 A. No. I believe those would be RMGO members
21 back then.
22 Q. I'm going to return to the original
23 question, because I think your answer was a little off to
24 the side.
25 As you sit here today, are you aware of any

Page 118

1  member of NAGR who has fired an assault weapon as defined
2  in the challenged ordinances in self-defense?
3         A.   Yeah.  Yes.  So I will go outside of
4  Colorado.  Yes, we get those phone calls all the time.
5         Q.   Can you describe one such incident?
6         A.   St. Louis, we had a member who was
7  arrested for self-defense in St. Louis during the summer
8  of 2020.  Not a very pleasant time.  He discharged his
9  firearm.  And then while he was trying to retreat, he
10 ended up firing in the air, it -- not -- I mean, just
11 trying to scare away his assailant and he was asking for
12 legal help.  I -- I talked to him on the phone, I -- we
13 didn't have a solid attorney to send him to in that area.
14        Q.   What was that individual's name?
15        A.   I -- I don't recall it, and I wouldn't
16 give it to you if I had it.
17        Q.   Was that individual an NAGR member?
18        A.   Yes.
19        Q.   Is that individual still a NAGR member?
20        A.   I don't know.  I didn't check.
21        Q.   How many shots did that individual fire?
22        A.   I -- I don't recall.
23        Q.   Can you identify any NAGR -- let me
24 withdraw that.
25             Can you identify any incident in which an

Page 119

1  NAGR member in the state of Colorado fired an assault
2  weapon as defined in the challenged ordinances in
3  self-defense?
4          A.   When you use the term fired, no, not that
5  I can think of.
6          Q.   Now, you mentioned -- actually, let me
7  withdraw that and start again.
8               Has any member of NAGR, as far as you are
9  aware, brandished an assault weapon, as that term assault
10 weapon is defined in the challenged ordinances, in
11 self-defense?
12         A.   Yes, of course.
13         Q.   Describe one such incident for me, please.
14         A.   A member in Indiana, I think, was -- was
15 in his vehicle, broken down vehicle, and a group of guys
16 pulled over next to him and he pulled his AR15 out of the
17 vehicle and just stood there and they drove off.
18              He was worried about being prosecuted
19 for -- for that.  He didn't end up being prosecuted.
20 That's a -- that's a very common scenario.
21              If you are defining assault weapons as
22 broadly as these ordinances do, I could go on for hours.
23         Q.   As you sit here today, do the individuals
24 who drove up in the car, do you know what their intent
25 was?

Page 120

```
 1            A.   No.  At 2 in the morning, real late, yep,
 2   frankly I don't care what their intent is.
 3            Q.   I'm asking, as you sit here today, do you
 4   know what their intent was?
 5            A.   Since it was a group of guys, it wasn't --
 6   it was not probably to help him so...
 7            Q.   As you sit here today, do you know what
 8   their intent was?
 9            A.   No.  No.
10            Q.   Are you aware of any member of NAGR who has
11   brandished an assault weapon, as that term is used in the
12   challenged ordinances, in self-defense in the state of
13   Colorado?
14            A.   Say that again.
15            Q.   Are you aware of any NAGR member who's
16   brandished an assault weapon, again using that term as
17   it's used in the challenged ordinances, in the state of
18   Colorado in self-defense?
19            A.   Yeah.
20            Q.   Can you describe that incident or those
21   incidents?
22            A.   Yeah.  I know a guy in Littleton who
23   was -- his house was being broken into, again, very late
24   at night, he pulled an AR15, he did not have to fire it
25   but he advanced on them because he had kids in the house.
```

Page 121

1  They ran out of the house.
2          Q.   What's that individual's name?
3          A.   I -- I would -- I decline to tell you.
4  Yep.
5          Q.   Was there a police report filed, do you
6  know?
7          A.   I don't remember.  I -- to be clear, when
8  we take these phone calls, we don't follow through.
9  That's not our role.  We're not attorneys.  We generally
10 refer them to a criminal defense attorney if there are
11 problems.  We don't give legal advice except find an
12 attorney.
13              To this day, we send them to Kyle Sauer as
14 a criminal defense attorney and sometimes he will -- he
15 will get the individual to agree to give us information
16 as it -- if it's going through court.  But generally
17 information comes to us and that's it.
18         Q.   Did you -- that story you just recounted
19 about the home invasion, did you take any steps to verify
20 it?
21         A.   No, but I knew the guy.
22         Q.   Did you take any steps to verify that --
23 that the incident had happened as he described it?
24         A.   No.
25         Q.   Was he arrested or charged in any way?

|||
|---|---|
|||

Page 122

```
 1              A.    I believe he was.
 2              Q.    Where -- where was that, if you recall?
 3              A.    I think it was Littleton or Englewood,
 4     something -- one of those municipalities.  South metro
 5     area.
 6              Q.    And about approximately when, if you
 7     remember?
 8              A.    2006, '7, something like that.  Maybe '8.
 9              Q.    Was that individual an NAGR member?
10              A.    Oh, yes.
11              Q.    And just to be precise, he was an NAGR
12     member separate and apart from being an RMGO member.
13              A.    Yeah.
14              Q.    But, again, to be clear, you are declining
15     to provide that individual's name.
16              A.    Yes.
17                    MR. TROWEL:  Could we take just a moment
18     to confer?  And then I'm not sure we're going to need a
19     personal deposition, but maybe if you don't object,
20     Barry, we will take a couple of minutes to talk and then
21     come back and that may be it.
22                    MR. ARRINGTON:  Thank you.
23                    THE VIDEOGRAPHER:  Going off the record.
24     The time is 12:17.
25                    (Recess from 12:17 p.m. to 12:21 p.m.)
```