**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

_____

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

Plaintiffs submit the following response to Defendants' motion for summary

judgment (ECF 78; "Mot.").

## I.       Introduction

### A.       Weapons in Common Use Cannot be Banned

Dr. Klarevas estimates that there are approximately 24.4 million "assault weapons" in circulation in American society. Klarevas Dec. (ECF 78-12), p. 12.[1] Dr. Klarevas also states that in 2022 in the United States, 63 people were killed in seven mass shootings. (ECF 78-11), p. 67. Thus, according to Defendants' own expert, at least 23,999,937 of the 24.4 million "assault weapons" in circulation were not used in mass shootings last year. Defendants insist that the 99.9999% of such weapons that were not used in mass shootings last year may be banned because of the .0001% that were. Defendants are wrong.

Americans own tens of millions of AR-15s and similar rifles for lawful purposes. Under the Supreme Court's precedents, "*that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (emphasis added). The same is true for the so-called "large capacity magazines" banned by the Ordinances. *Duncan v. Bonta* *("Duncan II")*, 83 F.4th 803, 816 (9th Cir. 2023) (Bumatay, J., dissenting from order granting stay) (*quoting* Justice Thomas in *Friedman, supra*).[2] In a case challenging a law that bans weapons in common use, "*Heller's* 'in common use' constitutional test

---

[1] Dr. Klarevas uses the term "modern sporting rifle" (NSSF's term for AR-15 and AK-47 platform rifles) as a proxy for "assault weapons." For reasons that are unclear, he suggests that those rifles owned by law enforcement officers do not count as in circulation. Even granting this dubious premise, it is undisputed that tens of millions of the weapons are in circulation.

[2] Plaintiffs point to Judge Bumatay's dissenting opinion because his reasoning is consistent with *Heller* and *Bruen*, as opposed to the majority opinion which, inexplicably, engaged in practically no analysis at all.

controls, and there is nothing for the lower courts to do except apply that test to the facts at issue." Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41, 2 (2023).

Defendants make much of the fact that they have retained 10 experts who have submitted declarations that cumulatively total over 1,500 pages. That much paper weighs over 15 pounds, and if cases were determined by comparing the sheer weight of the parties' expert declarations, Plaintiffs would be crushed. But that is not how cases are determined. Cases are determined by applying the law to the facts, and if the law states that one simple fact is dispositive, a simple record establishing that fact is sufficient for Plaintiffs to prevail. This is such a case. Under *Heller's* simple rule, establishing that millions of Americans possess an arm for lawful purposes "is all that is needed" for Plaintiffs to prevail.

Defendants' strategy is to distract the Court from *Heller's* simple rule with a barrage of expert declarations. But the overwhelming majority of Defendants' experts' declarations can be boiled down to two points: 1. These weapons are dangerous and criminals have used them to kill people. 2. Therefore, banning the weapons furthers an important governmental policy. Plaintiffs will address each point in the following sections.

### B.    Point 1 is Not Disputed

It was not necessary for Defendants to contribute significantly to global deforestation to establish its first point. No one disputes it. Firearms are dangerous, and sometimes criminals use them to do horrible things. But the same thing was true in *Heller*. Indeed, it was even more true in *Heller*. As then-judge Kavanaugh wrote in 2011, criminals use the semi-automatic handguns that were held to be protected in *Heller* to kill far more people than are killed by semi-automatic rifles such as those banned by Defendants. *Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("semi-automatic handguns are more dangerous as a class than semi-automatic rifles. ... So it would seem a bit backwards ... to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles.").

Defendants nevertheless press on and argue that their bans are constitutional because criminals use the banned weapons to commit mass shootings. But if that were true, *Heller* would have gone the other way.[3] In *Heller*, the Court was keenly aware that semi-automatic handguns can be used to perpetrate mass shootings. In its brief, D.C. argued – exactly as Defendants argue today – that its handgun ban should be upheld because only months earlier, handguns were used to perpetrate the Virginia Tech mass shooting.[4] But the use of handguns in that shooting – up until then the largest mass shooting in history – did not deter the Supreme Court from holding that firearms like those used in the shooting are protected by the Second

---

[3] *See Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (If a possible increase in death rates in the absence of a ban sufficed to justify the ban, "*Heller* would have been decided the other way.").

[4] Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53.

Amendment. The Court wrote: "We are aware of the problem of handgun violence in this country ... But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [commonly possessed arms] held and used for self-defense in the home." *Id.*, 554 U.S. at 636.

### C.   Point 2 is Foreclosed by *Bruen* and *Heller*

The main thrust of Defendants' motion is that because "assault weapons" and "large capacity magazines" are dangerous, banning them furthers an important governmental policy. But this argument is plainly foreclosed by *Bruen*, where the Court held:

> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Id.*, 142 S. Ct. at 2126.

*Heller* held that under the Nation's historical tradition of firearm regulation the Second Amendment does not countenance a complete prohibition of a weapon in common use for lawful purposes. *Bruen*, 142 S. Ct. at 2128 (*citing Heller*, 554 U.S. at 629). The weapons banned by the Defendants are in common use for lawful purposes. Therefore, the policy choice of banning the weapons, especially for self-defense in the home, is "off the table."

### D.       In the Law, Logos Prevails Over Pathos

In their respective motions for summary judgment, Plaintiffs appeal to logos and Defendants appeal to pathos. In other words, all of the law is on Plaintiffs' side, so they appeal to the law, and all of the emotion is on Defendants' side, so they appeal to emotion. But cases are decided based on the law, and as Justice Alito wrote in *Bruen*, emotional appeals are not relevant to the issue before the Court. *Id*., 142 S. Ct. 2111, 2157 (Alito, J., concurring). This is a simple case that turns on a simple fact that is not in genuine dispute. Indeed, this Court has previously found that "[L]awfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions . . . [and] semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense." *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014), *vacated in part and remanded*, 823 F.3d 537 (10th Cir. 2016).[5] Therefore, under *Heller's* simple rule, the Court should deny Defendant's motion for summary judgment and grant Plaintiffs'.

## II.     *Bruen* Step One: Plaintiffs' Conduct is Covered by the Plain Text

### A.       Fire*arms* are Arms

The "textual analysis focuse[s] on the normal and ordinary meaning of the Second Amendment's language." *Bruen*, 142 S. Ct. at 2127 (*citing Heller*, 554 U.S. at 576–577, 578) (internal quotation marks omitted). Defendants begin their textual analysis with the remarkable assertion that firearms are not "arms" within the plain

---

[5] The Court's vacated decision in *Colorado Outfitters* has no legal effect, but the facts that it found have not changed.

text of the Second Amendment. Mot. 11. This assertion is facially self-refuting, because a fire*arm* is most certainly an arm. Not only does Defendants' analysis defy common sense, but also it is contrary to *Heller*, which noted that all firearms constitute "arms" within the meaning of the plain text. *Id*., 445 U.S. at 581.

### B.    Magazines Are Covered by the Plain Text

In their motion for summary judgment ("Pl. Mot."), Plaintiffs anticipated that Defendants would argue for the dubious proposition that magazines are not covered by the plain text, and they have done so. Mot. 21-22. Rather than repeat their refutation of this argument here, Plaintiffs direct the Court to their prior discussion. *See* Pl. Mot. 29-33.

### C.    The "Common Use" Inquiry is Not Part of the Plain Text Step

Plaintiffs anticipated that Defendants would attempt to shift their burden under *Bruen's* step two (history and tradition) onto Plaintiffs, and they did. Defendants argue that Plaintiffs have the burden of demonstrating the banned arms are in common use as part of the textual analysis. Mot. 12-14. This is wrong, and Plaintiffs direct the Court to their prior discussion. *See* Pl. Mot. 34-37. Judge Brennan addressed this issue in *Bevis v. City of Naperville, Illinois*, 2023 WL 7273709, at *21 (7th Cir. Nov. 3, 2023) (Brennan, J., dissenting).[6] He wrote that the term "Arms" "should be read as 'Arms' – not 'Arms in common use at the time.'" *Id*., at *21. At least two reasons support this reading of *Bruen. Id*., at *22. First, *Bruen* noted that the "in common use" test is drawn from the "historical tradition" of

---

[6] Plaintiffs cite to Judge Brennan's dissenting opinion because, as in *Duncan II*, the dissenting opinion is manifestly more consonant with *Heller* and *Bruen* than the majority opinion.

restrictions on "dangerous and unusual weapons." *Id*., at 2143. The test is *not* drawn from a historical understanding of what an "Arm" is. *Id*., *citing Bruen* at 2132. Second, if a weapon is an "Arm," it is only *prima facie* protected by the Second Amendment. *Id., citing Bruen*, 142 S. Ct. at 2132. Whether it is actually protected is determined in the second step. To be sure, "in common use" is a sufficient condition for finding arms protected under the history and tradition test in *Bruen*. *Id*. But it is "not a necessary condition to find them 'Arms.' The nature of an object does not change based on its popularity, but the regulation of that object can." *Id*.

Finally, as discussed above, the "textual analysis focuse[s] on the normal and ordinary meaning of the Second Amendment's language." *Bruen*, 142 S. Ct. at 2127 (*citing Heller*, 554 U.S. at 576–577, 578) (internal quotation marks omitted). In other words, the textual analysis focuses on the text. It is not an empirical analysis. Indeed, an "empirical textual analysis" is an obvious contradiction in terms.

### D.     Summary: The Ordinances Are Presumptively Unconstitutional

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*., 142 S. Ct. at 2129-30. Plaintiffs have demonstrated that the plain text covers their conduct in seeking to acquire, keep, and bear the banned firearms and magazines. Therefore, the Constitution presumptively protects that conduct. Another way of putting it is that the Ordinances are presumptively unconstitutional, and Defendants bear the burden of rebutting that presumption under *Bruen's* step two.

8

It might give the Court pause that demonstrating a law is presumptively unconstitutional is such a simple and straightforward process. But under *Bruen* it can be. Indeed, that is exactly what happened in *Bruen*. The Court allocated only *six paragraphs* of its 46-page opinion to analyzing the "plain text" issue. *Id.*, at 2134-35. Analysis of the issue presented "little difficulty" because it was obvious that the plain text of the Second Amendment protects carrying handguns publicly for self-defense. *Id.*, at 2134. The last of those six paragraphs was only one sentence long: "The Second Amendment's plain text thus presumptively guarantees petitioners [] a right to 'bear' arms in public for self-defense." *Id.*, at 2135. Similarly in this case, it is obvious that the plain text covers Plaintiffs' conduct in seeking to acquire, keep and bear bearable arms. The Second Amendment's plain text thus presumptively guarantees their right to do so.

## III.   *Bruen* Step 2: The Ordinances Are Categorically Unconstitutional

### A.   An Absolute Ban of Weapons in Common Use is Categorically Unconstitutional

Plaintiffs have demonstrated that their proposed conduct is covered by the plain text of the Second Amendment. The burden now shifts to Defendants to demonstrate that their Ordinances are consistent with the Nation's historical tradition of firearm regulation. As discussed above, a Second Amendment plaintiff is not required to show that a weapon is in common use at the plain text step. To be sure, however, the plaintiff will usually want to introduce such evidence because if a plaintiff shows that the banned arm is in common use, it will be impossible for the government to meet its burden under the historical tradition step. This is true

because when a plaintiff shows a weapon is in common use, it necessarily means the government will not be able to show the arm is in the category of "unusual" arms that have traditionally been banned under the Nation's history of firearms regulation. As Judge Brennan wrote, while it is not necessary to demonstrate that a weapon is in common use to establish it is an "arm," such a demonstration is sufficient to find it is protected under the history and tradition test. *Bevis*, at *22. Indeed, this is *Heller's* central holding. 554 U.S. at 632 (No Founding-era regulation "remotely burden[ed] the right of self-defense as much as an absolute ban" on a weapon in common use.).

### B.     The Banned Arms Are in Common Use

In their motion for summary judgment, Plaintiffs established that there is no genuine dispute that Americans possess tens of millions of the arms banned by the Ordinances. Pl. Mot. 40-42. As noted above, Defendants expert agrees. *See* p. 1, *supra*.

### C.     "Common Use" Does Not Mean "Commonly Fired"

Plaintiffs anticipated that Defendants would argue that *Heller's* and *Bruen's* statements that weapons in common use for self-defense are protected requires Plaintiffs to introduce empirical data that the banned arms are frequently actually fired in self-defense situations, even though neither *Heller* nor *Bruen* required the plaintiffs in those cases to introduce such empirical data. (It should be remembered that both *Heller* and *Bruen* were decided on a motion to dismiss record). Defendants did make that argument. Mot. 12-14. This is wrong, and Plaintiffs direct the Court to their prior discussion refuting the argument. *See* Pl. Mot. 38-39.

### D.    The Banned Arms are In Common Use for Lawful Purposes

In *Miller v. Bonta*, 2023 WL 6929336, at *3 (S.D. Cal. Oct. 19, 2023) (stayed),

Judge Benitez wrote:

> California's 'assault weapon' ban takes away from its residents the choice of
> using an AR-15 type rifle for self-defense. Is it because modern rifles are used
> so frequently for crime? No. The United States Department of Justice reports
> that in the year 2021, in the entire country 447 people were killed with rifles
> (of all types). … if 447 rifles were used to commit 447 homicides and every
> rifle-related homicide involved an AR-15, it would mean that of the
> approximately 24,400,000 AR-15s in the national stock, *less than .00001832%*
> *were used in homicides*. It begs the question: what were the other AR-15 type
> rifles used for? The only logical answer is that 24,399,553 (or 99.999985%) of
> AR-15s were used for lawful purposes.

*Id.*, at *3 (emphasis added).

As discussed in Section I.A., Defendants have introduced evidence that an

infinitesimal fraction of the banned arms are used in criminal activity. Ironically,

*Defendants'* evidence helps Plaintiffs make their case. If only a handful of the tens of

millions of arms of the type banned by the Ordinances are used in crime, as Judge

Benitez pointed out, the only logical conclusion is that the overwhelming majority of

those weapons are used for lawful purposes.

### E.    Conclusion: The Court Should Follow *Heller's* Simple Rule

*Heller* announced a very simple rule. Only weapons that are "unusual" in

society at large may be banned. Therefore, a law that purports to ban a weapon that

is possessed by millions of Americans for lawful purposes is categorically

unconstitutional. *Id.*, 554 U.S. at 629. The AW Firearms and LCMs banned by the

Ordinances are in common use for lawful purposes. Therefore, they are categorically

unconstitutional.

## IV.    This is Not a "Nuanced" Case

Defendants argue that under *Bruen* the historical inquiry in this case is "nuanced." Mot. 24. This is wrong. Under *Heller's* simple rule, this is a "straightforward" case. The passage in *Bruen* to which Defendants allude states in full: "While the historical analogies here and in *Heller* are relatively simple to draw, *other cases* implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 142 S. Ct. at 2132 (emphasis added). The Court made as plain as it could that the "nuanced approach" did not apply in a case like *Heller*. It applied only in "other cases."

As Professor Smith explained in his recent article, under *Heller* and *Bruen*, Second Amendment cases are divided into two categories: (1) laws that ban weapons in common use; and (2) laws that otherwise regulate the sale or use of arms. Smith, *supra*, at 2. In its discussion of how to apply its historical analogue approach, *Bruen* noted that unlike the relatively straightforward case presented by *Heller*, "other cases," involving unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. *Id*. "But this consideration comes into play only when a court is engaged in examining analogues in non-arms-ban cases for which *Heller* does not provide the binding rule of decision." *Id*. This is such a case. The Defendants' ban of arms in common use implicates *Heller's* "straightforward" and simple rule. This is not a non-arms ban case that might call for a more "nuanced" approach.

**V.    None of the Laws Listed by Defendants Come Close to Being Analogous to the Ordinances**

**A.    Introduction**

As discussed above, this is not a "nuanced" case. Bans of arms in common use fall under *Heller's* simple rule. The Supreme Court has already done the history and tradition analysis with respect to such bans and determined that they are categorily unconstitutional. There is no need to repeat that analysis in this case. As Solicitor General Elizabeth Prelogar noted in her oral argument a few days ago in *United States v. Rahimi*, once a Second Amendment principle is "locked in," it is not "necessary to effectively repeat that same historical analogical analysis for purposes of determining whether a modern-day legislature's disarmament provision fits within the category." Trans., 55:18 – 56:1 (available at https://bit.ly/3QwPm3c).

Nevertheless, Defendants offer a list of several laws that they argue really are analogous to their absolute bans of commonly possessed arms. In this section, Plaintiffs will demonstrate why Defendants are wrong. As in *Heller*, the laws they advance are not "remotely" analogous to their bans.

Defendants offer the declaration of Robert Spitzer (Ex. N) in an attempt to carry their burden of demonstrating historical laws that are analogous to their arms ban. Dr. Spitzer also worked for California in *Duncan v. Bonta ("Duncan I")*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) (stayed), and Defendants offer to the Court much the same list of laws that were rejected as relevant historical analogues in that case. Judge Benitez engaged in a months-long painstaking analysis of each and every one of the 316 laws submitted for review by California. *Duncan I,* at *22. Plaintiffs

13

respectfully suggest that the Court would benefit from a detailed review of his exhaustive analysis, much of which is summarized in the pages that follow.

### B. There Were *Zero* Prohibitions on Possessing Firearms in the Founding Era

The history and tradition of the United States evinces widespread gun ownership and expertise. "[T]hose who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so." *Bruen*, 142 S. Ct. at 2146.

> Before, during, and after the Revolution, *no state banned any type of arm, ammunition, or accessory.* Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787. Instead, the discussions about arms during the ratification of the Constitution and the Bill of Rights centered on ensuring that the people had enough firepower to resist a tyrannical government. There is no evidence that any of the Founders were concerned about individuals having too much firepower. After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.

David B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900*, 50 Journal of Legislation, Vol. 50, No. 2, 45-46 (2024) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197) (emphasis added).

This conclusion is borne out by Defendants' inability to identify any laws from the Founding era – any laws whatsoever – that banned firearms. This is not surprising. In *Heller*, D.C. was not able to point to any early firearm bans either and the historical record has not changed in the intervening 15 years. Judge Benitez wrote in a companion case to *Duncan I*:

> It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind. Based on a close review of the State's law list and the Court's own analysis, there are no Founding-era categorical bans on firearms in this nation's history. Though it is the State's burden, even after having been offered a clear opportunity to do so, *the State*

*has not identified any law, anywhere, at any time, between 1791 and 1868* that prohibited simple possession of a gun.

*Miller v. Bonta*, 2023 WL 6929336, at *13 (S.D. Cal. Oct. 19, 2023) (stayed) (emphasis added).

The history and tradition of the northern states was to leave firearm ownership and use completely unregulated. *Duncan I*, at *26. From the time of the adoption of the Second Amendment to the time of the adoption of the Fourteenth Amendment, there were *zero* state gun laws of any kind in Pennsylvania, New York, Connecticut, Rhode Island, Vermont, New Hampshire, Michigan, Wisconsin, Minnesota, Iowa, Nebraska, Kansas, Missouri, or the District of Columbia. In Massachusetts and Maine there were only surety statutes. *Id.* In New Jersey there was a sentencing enhancement for carrying a pistol while committing a burglary. Thus, in this half of the nation, keeping and bearing firearms was done freely without government interference. *Id.*

Among the southern states, there were many laws restricting firearms for slaves, African-Americans, and Indians. *Id.* Setting aside that obviously unconstitutional tradition, among the southern states firearm ownership was largely unregulated for at least the first 50 years after 1791. *Id.* Like the northern states, from 1791 to 1868 there were *zero* state gun laws of any kind in Delaware, North Carolina, South Carolina, Mississippi, Florida, West Virginia, and Texas. *Id.*

The few laws in other southern states that did exist concerned mainly carrying a pistol with the intent to assault another and carrying a pistol in a concealed manner. *Id.* Tennessee enacted the first firearm regulation in the southern states in

1801 in the form of a surety law – a law that was dismissed by *Bruen*. 142 S. Ct. at 2144-45. A decade later in 1811, Maryland passed the second firearm regulation in the south. *Duncan I,* at *26. The Maryland law was a sentencing enhancement for carrying a pistol with the intent to assault another, not a prohibition on possession. *Id*. In 1813, Louisiana passed the first law prohibiting the *carrying of a concealed* gun. *Id*. *Bruen* noticed that a Louisiana court found the prohibition on concealed carry constitutional only because it permitted open carrying of a firearm. 142 S. Ct. at 2146. Kentucky passed a prohibition on carrying a concealed pistol that same year which was struck down as unconstitutional a short time later. *Duncan I,* at *27. The only other firearm regulation in the south during this time period was Georgia's 1816 law prohibiting the carrying of a pistol with intent to assault another person. *Id*.

Around 50 years after the Second Amendment, four southern states passed their first firearm regulations in the form of concealed carry prohibitions. *Id*. Arkansas and Georgia banned carrying a pistol concealed in 1837. *Id*. The constitutionality of the Georgia law was upheld because open carry was unregulated. *Nunn v. State*, 1 Ga. 243, 251 (1846). In 1838, Virginia prohibited carrying a pistol concealed, as did Alabama in 1839. *Id*. In 1856, Tennessee passed a firearm law that affected only minors. *Id*. In 1868, Florida prohibited carrying secretly "arms of any kind whatever" and the outright carrying of a pistol or other arm or weapon, though this law was never subjected to judicial review. *Id*.

Significantly, the first restriction on a dangerous and unusual firearm did not occur until 1868, the year the Fourteenth Amendment was adopted, when Alabama

prohibited carrying a "rifle walking cane." *Id*. In summary, the history and tradition of the southern states was to leave firearm ownership and use mostly unregulated with a handful of states enacting prohibitions on carrying pistols in public in a concealed manner and Maryland and Georgia making it a crime to carry a firearm with the intent to assault another person. *Id*.[7] Again, with the single exception of the "rifle walking cane," none of these laws prohibited ownership or possession of any firearm.

In light of this history, *Bruen* concluded that "[n]one of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." 142 S. Ct. at 2150. The same can be said about the Ordinances. *cf. Duncan I* at *29. None of these historical limitations on methods of using or carrying arms remotely approaches Defendants' complete ban on mere possession of common arms even within the confines of one's home for the purpose of self-defense. *Id*.

## C. The Regulation of the Use of Knives, Clubs, and Trap Guns is Not Analogous to an Absolute Ban on Mere Possession in the Home

Defendants cannot point to a single law in the Founding era that banned possession of *any* firearm. Because Defendants cannot find a historic ban on the possession of firearms, they point to historic regulations of weapons such as bladed weapons, melee weapons, blunt weapons, or leaded weapons. But these regulations

---

[7] Defendants list laws from cities and territories, but *Bruen* held that such laws are not useful in analyzing the historical tradition. 142 S. Ct. at 2154.

are not analogous to Defendants' absolute ban. In *Bruen*, the Court wrote that in assessing whether a historic regulation is relevantly similar to a present regulation, courts should examine "*how and why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-33 (emphasis added).  The vast majority of the nineteenth-century regulations advanced by Professor Spitzer regulated the public carry of weapons. In other words, the "how" of the regulations was to regulate the *manner of use* of these weapons in public. There was no widespread tradition of absolutely banning these weapons. *See, e.g.,* David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited September 28, 2023). After an exhaustive review of all nineteenth-century state and territorial statutes, Professor Kopel concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century*, no state prohibited possession of Bowie knives.*" *Id.* (emphasis added).

Defendants write that "[b]eginning in 1813, several states (Georgia, Kentucky, Louisiana, Indiana, Arkansas, Virginia) prohibited the possession and/or concealed carry" of certain weapons, including knives. Mot. 31. First, six states hardly constitute "several." More importantly, the "and/or" in that sentence is doing a lot of work. There was simply no widespread tradition of prohibiting mere possession, and lumping the outliers that did with the states that regulated carry only elides this truth.

It should go without saying that regulating the manner of use of a weapon in public is not analogous to prohibiting the mere possession of the weapon, especially for self-defense in the home. In *Bruen*, the Court acknowledged the existence of prohibitions on concealed carry. But it held that none of these historical limitations on the manner of use was analogous to even a law prohibiting public carry altogether. 142 S. Ct. at 2150. Far less are they analogous to a law prohibiting possession altogether.

Nevertheless, Defendants insist that the burden of restricting carry in public is comparable to absolutely prohibiting possession even in the home. This is obviously wrong as a matter of logic. It is also wrong as a matter of history. For example, Defendants note that Tennessee prohibited the open or concealed carry of pocket pistols and revolvers. Mot. 32. But in *Andrews v. State*, 50 Tenn. 165, 185-86 (1871),[8] the Tennessee Supreme Court considered the Tennessee statute that prohibited a person from publicly or privately carrying revolvers. *Id*., at 171. In resolving the case, the court articulated the fundamental difference between the regulatory burden of a carry restriction and the regulatory burden of a ban on possession in the home. The court stated:

> It will be seen the statute ... in effect is an absolute prohibition against keeping such a weapon, and not a regulation of the use of it. ... Under this statute, *if a man should carry such a weapon about his own home, or on his own premises ... he would be subjected to the severe penalties* of fine and imprisonment prescribed in the statute. In a word, as we have said, the statute amounts to a prohibition to keep and use such weapon for any and all purposes. *It therefore, in this respect, violates the constitutional right* to keep arms ... If the Legislature think proper, they may by a proper law regulate

---

[8] The statute at issue was an outlier in its severity. *Bruen*, 142 S. Ct. at 2147. But the Tennessee Court's discussion of the "how" and "why" of the statute is illuminating.

the carrying of this weapon publicly ... We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Id.*, 50 Tenn. at 187–88 (emphasis added).

In a word, the Tennessee Supreme Court recognized that the burden imposed by a regulation of public carry is not, as Defendants contend, relevantly similar to an absolute prohibition of possession even in the home. The court considered the former to be permissible and the latter to be so severe as to be constitutionally intolerable.

*Andrews v. State*, also illustrates why the "why" of the Ordinances is not relevantly similar to the "why" of laws regulating public carry. Regarding that issue, the court wrote:

The principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member. ... [N]o law can punish him for [using] such arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others. *Yet, when he carries his property abroad, goes among the people in public assemblages where others are to be affected by his conduct, then he brings himself within the pale of public regulation*, and must submit to such restriction on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.

*Id.*, 50 Tenn. at 185–86 (emphasis added).

No law can punish a citizen for keeping and using a common arm in his own home for self-defense. But when the same citizen carries his weapon in public, he subjects himself to a higher degree of regulation. Why? Because it is hardly any of the government's business what a citizen does in the privacy of his home. But when he goes into the public, his conduct impacts his fellow citizens, and the government does have something to say about that. It is just plain common sense that the scope

of the government's regulatory powers over a person is far narrower when he is in his home than when he is on a crowded public street. That is why Defendants' argument that the early legislatures' rationale for regulating carry of a weapon in public is equivalent to Defendant's rationale for banning a weapon even in the home does not hold up under scrutiny.

Finally, the Supreme Court did not look to laws regulating knives and clubs when reviewing a restriction about guns in *Bruen*. Three different times *Bruen* repeats the specific phrase "tradition of *firearm regulation*": 142 S. Ct. at 2126, 2130, 2135 (emphasis added). In contrast, the *Bruen* majority opinion did not mention knives and clubs at all. Thus, it is clear that the Court did not consider regulation of knives and clubs and other melee weapons to be analogous to firearms regulations.

Professor Spitzer's final category is "Trap guns," which were devices rigged to fire without the presence of a person. Again, these laws regulated the manner of use of a weapon as a trap, not its possession in the home for self-defense, and are therefore not analogous to an absolute ban. In other words, the weapons themselves were not banned. The laws merely prohibited using the weapons to set a trap.

### D.   Multi-Shot Arms Have Existed for Centuries

Multi-shot firearms have existed for centuries. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 852 (2015). Even Defendants admit that multi-shot firearms were available as early as the 1830s with the first Colt revolvers. Mot. 26. They also admit that multi-shot Henry and Spencer repeating rifles were introduced after 1850. Mot. 26. The Henry rifle further evolved

into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name, the Model 1866. Kopel, *supra*, *The History of Firearm Magazines and Magazine Prohibitions*, at 855. With seventeen rounds in the magazine and one in the chamber, the M1866 could fire eighteen rounds in nine seconds. *Id*. The gun was a particularly big seller in the American West, with over 170,000 produced. *Id*. Despite the existence of multi-shot weapons going back to the Founding era and beyond, there were no bans on the firearms or their ammunition capacity during the Founding era or even during Reconstruction.[9]

### E.    The Early Militia Laws Completely Foreclose the Possibility That Defendants Will Find an Analogous Founding-Era Regulation

During the Founding era, both the federal and state governments enacted laws for the formation and maintenance of citizen militias. Examples of these statutes are described in *United States v. Miller*, 307 U.S. 174, 180-81 (1939). These laws did not ban firearms or restrict firing capacity. They did just the opposite by mandating the acquisition of firearms and a minimum firing capacity, i.e., the laws required citizens to arm themselves with a minimum quantity of bullets and gunpowder. For example, Congress passed the Militia Act in 1792. 1 Stat. 271, 2 Cong. Ch. 33. The law required a citizen to acquire a firearm and be equipped to fire at least 20 to 24 shots. This and

---

[9] Plaintiffs do not concede that laws from the Reconstruction era are relevant to the Second Amendment inquiry. Indeed, they are not because they are too late. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id*., 142 S. Ct. at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Second Amendment was adopted in 1791. 1868 is far too late to be relevant to the meaning of the text. There is no need for the Court to determine this issue in this case, however, because, like *Bruen*, there are no analogous laws in either period.

other state militia laws demonstrate that, contrary to the idea of a firearm ban or a firing-capacity ceiling, there was a firearm *requirement* and firing-capacity floor in the Founding era. It follows that far from being analogous to a Founding-era law, the Ordinances would have been unthinkable under the understanding of the Second Amendment at the time of the Founding.

### F. Twentieth Century Laws Are Irrelevant

To make up for the lack of Founding-era laws analogous to the Ordinances, Defendants turn to twentieth-century laws regulating or banning machine guns and argue that these are analogous to the Ordinances. Mot. 34. The problem for Defendants is that these laws come far too late to shed any light on the meaning of the Second Amendment. Defendants' argument ignores the Supreme Court's holding in *Bruen*, in which New York also advanced twentieth-century analogues to support its case. The Court simply ignored these laws as irrelevant, writing that such evidence did "not provide insight into the meaning of the Second Amendment." *Id*., 142 S. Ct. at 2154, n. 28. To the extent later history contradicts the earlier record, the earlier record controls. 142 S. Ct. at 2137. "Liquidating indeterminacies in written laws is far removed from expanding or altering them." *Id* (cleaned up). Thus, the Court should reject Defendants' effort to make up for the lack of Founding-era analogues by pointing to twentieth-century analogues. Indeed, if analogues from the twentieth century were relevant, both *Heller* and *Bruen* would have surely come out the other way. They are not.

### VI. Defendants' Historical Analysis is Directly Contrary to *Heller* and *Bruen*

Defendants seem to believe they can dispense with pointing to Founding-era regulations that were "relevantly similar" to their arms bans because the banned arms represent an advance in technology and are used in mass shootings. Mot. 24-28. Defendants are wrong. For one thing, their approach to the historical analysis has no limiting principle. According to Defendants, the Nation's history and tradition of firearms regulation is consistent with banning any modern weapon if the purpose of the ban is to "protect the public from preventable acts of violence." Mot. 34. If that were the law, Defendants could constitutionally ban all modern weapons, because, presumably, the purpose of all such bans would be to "protect the public from preventable acts of violence."[10]

Not only does Defendants' argument lack any limiting principle, but also it is contrary to both *Heller* and *Bruen*. First, the fact that a weapon is the product of new technology does not mean that it can be absolutely banned.[11] "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (*quoting Heller*, 554 U.S. at 582). The fact that the semi-automatic arms banned by Defendants represent an

---

[10] Whether such bans achieve that purpose is debatable but not relevant, so Plaintiffs will not address that issue.

[11] Defendants assert machine guns have been illegal under federal law since 1934. Mot. 28, n. 20. This is false. The 1934 National Firearms Act heavily regulates machine guns. It does not ban them. Even today civilians legally own nearly 200,000 machine guns. *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016). Thus, even if the 1934 federal law to which Defendants point were not irrelevant because it came in the 20th century, it would still not be analogous to an absolute ban.

advance in technology does not mean they do not fall under *Heller's* rule.[12] In *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011), then-Judge Kavanaugh put the matter this way: "D.C. asks this Court to find that the Second Amendment protects semi-automatic handguns but not semi-automatic rifles. There is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Id.*, at 1286 (Kavanaugh, J., dissenting). And then Judge Kavanaugh got to the crux of the matter raised by Defendants' arguments:

> [A line between semi-automatic handguns and semi-automatic rifles] might be drawn out of a bare desire to restrict *Heller* as much as possible or to limit it to its facts, but that is not a sensible or principled constitutional line for a lower court to draw or a fair reading of [*Heller*].

*Id.*, n.14.

Modern semi-automatic handguns and their magazines are the product of exactly the same sort of technological innovation that produced the modern semi-automatic rifles and magazines banned by Defendants. And in *Heller*, the Court held that D.C.'s ban on modern semi-automatic handguns was unconstitutional because it was an extreme historical outlier. *Id.*, 554 U.S. at 629. The same is true with Defendants' ban on semi-automatic rifles and the magazines that make them possible.

Moreover, while mass shootings are undoubtedly tragic, as discussed above, they remain relatively rare. Dr. Klarevas asserts there were 928 deaths due to mass shootings in the 33 years between 1990 and 2022 (on average, 28 deaths per year).

---

[12] *See* Smith, *supra*, at 6 ("Because *Bruen's* discussion of societal concerns and technological changes applies only in non-arms-ban cases, arguments about alleged societal concerns and technological changes are not relevant in arms-ban cases because *Heller* provides the relevant legal test.").

Klarevas Dec. (ECF 78-11), pp. 65-67. Surely, in a nation of 330 million people, 928 deaths in 33 years cannot serve as the basis for depriving law-abiding citizens of the right to possess arms that are owned by literally millions of their fellow citizens.

This conclusion is reinforced by *Heller* itself, as Defendants' motion demonstrates. Defendants point to the 2007 Virginia Tech massacre as an example of semi-automatic weapons put to tragic use. Mot. 26. But, as noted above, in *Heller*, D.C. also pointed to that shooting in its arguments. It informed the Court that at Virginia Tech "a single student with two *handguns* discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). D.C.'s point was the same point Defendants are making to this Court. Semi-automatic weapons (in that case semi-automatic handguns) are dangerous and can be used in mass shootings, and therefore they are not constitutionally protected. But the Supreme Court rejected D.C.'s argument, writing in response: "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised …" *Id.*, 554 U.S. at 636. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of [commonly possessed arms] held and used for self-defense in the home." *Id.* Thus, when it decided *Heller*, the Court was acutely aware of the potentially devastating capabilities of modern semi-automatic weapons in the hands of a single madman. But it nevertheless held that millions of law-abiding citizens may not be deprived of weapons in common use on the ground that those weapons are sometimes abused by non-law-abiding citizens.

In summary, a few dozen people have used arms like those banned under the challenged Ordinances to commit horrific mass shootings. But the arms used in these events account for less than one one-hundredth of one percent of the millions owned by law-abiding citizens. The question before the Court, therefore, is whether these millions of citizens' rights should yield because of the bad acts of dozens? Defendants answer, yes, they should. But *Heller* answered no, they should not. Plaintiffs urge the Court to answer in the same way *Heller* did.

## VII.   *Heller* Rejected "Dangerousness" Arguments Practically Identical to Those Advanced by Defendants

Defendants devote the largest portion of their motion describing to the Court their experts' views about the "dangerousness" of the banned arms. *See, e.g.*, Mot. 4-5, 14-20, 24-27. The problem with Defendants' approach to the "dangerousness" issue is that practically identical arguments could have been made in *Heller*. Indeed, practically identical arguments were made in *Heller*, and the arguments obviously did not change the outcome of the case. In Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-Ban Cases-Again*, 2023 Harv. J.L. & Pub. Pol'y Per Curiam 41, 7–8 (2023), Professor Smith summarized several of the "dangerousness" arguments advanced by D.C. and its amici in *Heller*:

> While the public policy arguments based on 'dangerousness' that were briefed in *Helle*r cannot be listed comprehensively here, the following are a few examples:

- 'In the recent Virginia Tech shooting, a single student with two handguns discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more.' [Brief for Petitioner at 53]

- 'When more rounds are fired and guns can be more quickly reloaded, the likelihood of inflicting wounds, and the severity of the resulting injuries, increases. *This unfortunate fact is illustrated all too often in mass shootings* in America's schools, malls, places of worship, and other public arenas.' [Brief of Violence Pol'y Ctr. *et al*. as Amicus Curiae Supporting Petitioner at 16-17 (emphasis added]

- 'Handguns also are used in an extraordinary percentage of this country's well-publicized shootings, including the *large majority of mass shootings*. A review of 50 high-profile shootings over the past four decades revealed that from 1980 onward the bulk of such incidents (39) were mass shootings. A handgun was used in 74 percent of these mass shootings as the only or primary weapon.' [*Id*. at 24 (emphasis added]

- 'The [D.C.] Council targeted handguns because they are disproportionately linked to violent and deadly crime .... [The Council found that] 'handguns are used in roughly 54% of all murders, 60% of robberies, 26% of assaults and 87% of all murders of law enforcement officials.' Handguns were also particularly deadly in other contexts: 'A crime committed with a pistol is 7 times more likely to be lethal than a crime committed with any other weapon." [Brief for Petitioner at 4]

- 'The District considered evidence indicating that murders, robberies, and assaults were more likely to be committed with a handgun. Based on this evidence, the District concluded that handguns were uniquely dangerous and that it was necessary to prohibit the possession and use of such guns, while still permitting access to other weaponry if licensed and stored safely.' [Brief of D.C. Appleseed Ctr. et al. as Amicus Curiae Supporting Petitioner at 22]

- 'Handguns for the civilian market now fire ammunition capable of piercing body armor--the last line of defense responsible for saving thousands of police officers' lives.' [Brief of Violence Pol'y Ctr. *et a*l. as Amicus Curiae Supporting Petitioner at 18]

Thus, arguments that certain firearms must be banned because of technological changes and the social problem of mass shootings are not new. *Id.* D.C.'s arguments in *Heller* focused on societal problems such as the criminal misuse of the handguns,

mass shootings, and the allegedly dramatic technological developments in firearms that supposedly created or exacerbated these problems. *Id.*

The only difference between the arguments made in *Heller* and Defendants' arguments in this case is that those made in 2008 concerned the "uniquely" dangerous nature of modern handguns, and those being advanced by Defendants focus on the uniquely dangerous nature of certain semi-automatic rifles. "In short, arms-ban advocates switched their pre-*Heller* strategy of 'rifles good, handguns bad' to a post-*Heller* strategy of 'handguns good, rifles bad.' *Id*. If those arguments failed in *Heller*, there is no reason they should succeed now.

## VII.   Defendants' "Suitability" Argument is Stealth Interest Balancing

Defendants argue that AW Firearms and LCMs may be banned because their experts say other weapons are more "suitable" for self-defense. Mot. 14-18. But Defendants' argument is "a stealth return to the interest balancing test rejected by *Heller* and *Bruen*." *Duncan I*, at *3. When they employ this argument, Defendants are not even attempting to justify their arms bans by demonstrating that they are consistent with the Nation's history and tradition of firearm regulation – the only ground upon which the bans may be justified. Rather, they are asserting that their opinion on the suitability of the banned arms for self-defense purposes is superior to the opinion of the millions of citizens who have chosen the arms for that purpose. But this argument is based on exactly the sort of empirical interest balancing test expressly forbidden by *Bruen*, 142 S. Ct. at 2130, and should be rejected.

As Professor Smith explained, the "suitability" argument "acts as an open invitation to courts to assess whether individuals really need the banned firearms, or whether their features are, in the judgment of experts and the courts, well-suited to the self-defense needs of Americans. But *Heller* made clear that such questions are not for expert or even court decision. Rather, it is the judgment of the American people that matters and 'whatever the reason' that they choose certain weapons, that they choose them is enough." *Smith*, *supra*, at 12.

## VIII.  Defendants Misunderstand *Heller's* Reference to Weapons "Most Useful in Military Service"

Defendants argue that the history of the development of the banned arms shows that they are "weapons that are most useful in military service," and may, therefore, be banned. Mot. 20 (*citing Heller*, 554 U.S. at 627). This argument mischaracterizes *Heller*. Indeed, the very passage from *Heller* cited by Defendants demonstrates why their argument is wrong. In that passage, the Court held that specialized military arms like M-16 machine guns "that are highly unusual in society at large" are not protected for civilian use by the Second Amendment. *Heller*, 554 U.S. at 627. *See also id*. at 625 (contrasting machine guns, which may be banned, with weapons in common use that may not be banned). Thus, by definition, the passage cited by Defendants does not apply to weapons in common use like those banned by the Ordinances.

Moreover, Defendants seem to be arguing that *Heller's* reference to military arms must mean that any arm that could be used in warfare is not protected. But *Heller* said the very opposite. In the same passage, it held that weapons in common

30

use brought to militia service by members of the militia are protected by the Second Amendment. *Id*. What do militia members do with those weapons when they bring them to militia service? They fight wars.[13] It would be extremely anomalous, therefore, if *Heller* were interpreted to mean simultaneously that (1) weapons brought by militia members for fighting wars are protected by the Second Amendment, and (2) all weapons used for fighting wars are not protected by the Second Amendment. This is not the law. Rather, "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). *See also Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting) (calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens.").

Finally, if Defendants were correct and weapons used in military service may be banned, the military's standard-issue semi-automatic pistol (whether the Colt 1911 or the Beretta M9) could be banned. *Bevis*, at *36. But millions of civilians own those handguns, and such ownership is protected under *Heller's* plain holding. It follows that the Defendants are not correct.

---

[13] *See* U.S. Const. amend. V (referring to "the Militia, when in actual service in time of War").

In summary, the whole point of the passage from *Heller* Defendants cited is that weapons in common use are protected while sophisticated military weapons that are "highly unusual in society at large" are not. *Id.*, 554 U.S. at 627. Defendants are simply wrong when they argue that no matter how many millions of Americans have chosen a weapon for self-defense in the home, they may ban it if it resembles a weapon used by the military.

## IX.   The Supreme Court has Held That the Difference Between Semi-Automatic AR-15s and Automatic M-16s is Legally Significant

Defendants argue that AR-15s may be banned because they are legally indistinguishable from the military M-16. Mot. 17. This is not correct. The difference between the semi-automatic AR-15 and the automatic M-16 is legally significant, as the Supreme Court held in *Staples v. United States*, 511 U.S. 600 (1994). That case concerned a criminal statute and therefore turned on the question of *mens rea*. The Court held that to convict a person of possession of an unregistered machinegun, the government must prove the defendant knew that it would fire automatically. *Id.*, at 619. Key to this discussion was the contrast between the semi-automatic AR-15 and the automatic M16. *Id.*, at 603. The Court stated that "[e]ven dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation." *Id.*, at 610–11. The Court contrasted ordinary firearms such as the AR-15 at issue in that case with "machineguns, sawed-off shotguns, and artillery pieces," and stated that guns falling outside of the latter categories "traditionally have been *widely accepted as lawful possessions*." *Id.*, at 612 (emphasis added). The point of the discussion was that guns

32

like the AR-15 have been widely accepted as lawful possessions, and therefore *mens rea* was not established merely by establishing that the defendant knew he was in possession of an AR-15.

## X.  Defendants' "Particularly Dangerous" Argument Does not Work Because "Dangerous and Unusual" is a Conjunctive Test

Defendants argue that an arm may be constitutionally banned if it is "particularly dangerous" regardless of whether the arm is in common use. Mot. 20. This is not correct because nothing in *Heller* nor *Bruen* even hints that the Second Amendment does not protect a weapon merely because in a reviewing court's view it is "particularly dangerous." This stands to reason. All weapons are dangerous, and if the Second Amendment does not protect a weapon merely because the government has hung the adjective "particularly" onto "dangerous," the Second Amendment protects nothing at all. This is why Justice Alito wrote that the "dangerous and unusual" test is "a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 418 (2016) (emphasis in the original). And "the relative dangerousness of a weapon is irrelevant" if it is commonly used for lawful purposes. *Id*. Defendants' argument that an arm may be banned merely because it is "particularly dangerous" obviously conflicts with Justice Alito's observation.

The Fifth Circuit recently addressed this issue in *VanDerStok v. Garland*, 2023 WL 7403413, at *3, n. 6 (5th Cir. Nov. 9, 2023). The court noted that ["t]he Supreme Court has held that, to be banned, a weapon must be 'both dangerous and unusual,' and thus, 'the relative dangerousness of a weapon is irrelevant when the weapon

belongs to a class of arms commonly used for lawful purposes.'" (*quoting Caetano, supra*). Of particular relevance to this case, the court observed that "for many years now, millions of AR-15 rifles have been sold to civilians, who may lawfully possess them." *Id*. Finally, whether an arm is "particularly dangerous" or merely "ordinarily dangerous" is a "difficult empirical judgment" of the sort that *Bruen* expressly prohibited courts from making in reviewing Second Amendment challenges. *Id*., 142 S. Ct. at 2130.

## XI.    The Availability of Non-Banned Arms Does Not Save the Ordinances

Defendants argue that their arms bans are constitutional because they did not ban all semi-automatic rifles. But *Heller* rejected this precise argument when it held that it is "no answer" to say that banning a commonly possessed arm is permitted so long as other arms are allowed. 554 U.S. at 629. In *Bruen*, the New York law did not completely bar the practice of carrying firearms, but instead subjected it to a discretionary licensing regime. Nevertheless, the Court struck the law down even though it did not bar public carry altogether. One doubts the government would argue that it can ban newspapers so long as it allows magazines. The fact that Defendants make an equivalent argument means that they consider the Second Amendment to be a "second-class" right. It is not. *Bruen*, 142 S. Ct. at 2156.

## XII.    Conclusion

Plaintiffs do not dispute that mass shootings are horrible (though thankfully they remain exceedingly rare and account for only a fraction of 1% of firearm homicides). But a law aimed at a few mad men with guns that also makes criminals

34

out of responsible, law-abiding people who have chosen the banned arms to protect themselves is not consistent with the Second Amendment. *Duncan I,* at *35. The text, history, and tradition of the Second Amendment support laws against the misuse of firearms, but they do not support disarming law-abiding citizens. *Id*. Freedom entails risk, but as the Court noted in *McDonald,* the "right to keep and bear arms … is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." 561 U.S. at 783. Nevertheless, the Court has never refrained from enforcing a right "on the ground that the right at issue has disputed public safety implications." *Id*. The adoption of the Second Amendment was a freedom calculus decided long ago by our first citizens who cherished individual freedom – with its associated risks – more than security. *Id*. And under *Heller's* simple rule, Defendants absolute bans on weapons owned by millions of Americans for lawful purposes are categorically unconstitutional. For that reason, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants'.

### RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

**1-4**: Denied. Allen's conclusions are "suspect" for the reasons set forth in *Duncan I,* 2023 WL 6180472, at *12-*16 (S.D. Cal. Sept. 22, 2023).

**5, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 36, 37, 38**: Plaintiffs have not retained an expert to rebut Yurgealitis' opinions because those opinions are not

relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Yurgealitis' opinions.

**8, 22**:  Plaintiffs have not retained an expert to rebut Hargarten's opinions because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Hargarten's opinions.

**9, 20**:  Plaintiffs have not retained an expert to rebut Schreiber's opinions because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Schreiber's opinions.

**20**:  Plaintiffs have not retained an expert to rebut Colwell's opinions because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Colwell's opinions.

**23, 24, 25, 26**: Plaintiffs have not retained an expert to rebut Baron's opinions because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Baron's opinions.

**27, 28, 29**: Plaintiffs have not retained an expert to rebut Roth's opinions set forth in these paragraphs because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Roth's opinions set forth in these paragraphs.

Plaintiffs note that Roth's opinion in paragraph 28 conflicts with Spitzer's and DeLay's opinions in paragraphs 30 and 31.

**30**: Plaintiffs admit that multi-shot firearms have existed for centuries. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 852 (2015). Plaintiffs have not retained an expert to evaluate how many living people saw or used those weapons in the colonial era.

**31**: Plaintiffs have not retained an expert to rebut DeLay's opinions in this paragraph because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny DeLay's opinions in this paragraph.

**32**: Plaintiffs admit that multi-shot firearms were available in the 1830s, including the first Colt revolvers which held up to seven rounds. Plaintiffs also admit that then, as now, when ammunition is expended it must be manually reloaded round by round.

**33, 34**: Plaintiffs admit that multi-shot Henry and Spencer rifles with magazines containing up to 15 rounds became prevalent after Reconstruction and that the Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name, the Model 1866. Kopel, *supra*, at 855. With seventeen rounds in the magazine and one in the chamber, the M1866 could fire eighteen rounds in nine seconds. *Id*. The gun was a particularly big seller in the American West, with over 170,000 produced. *Id*. Plaintiffs admit that despite the existence of multi-shot

weapons going back to the Founding era and beyond, there were no bans on firearms or ammunition capacity.

**35**: Denied. Weapons capable of rapid fire entered service much earlier than the 20th century. Kopel, *supra*, at 855.

**39**: Denied. Roth reports that mass killings occurred in the colonial period through the 19th century. See paragraph 43.

**40**: Denied. See Christopher S. Koper, Report to the National Institute of Justice and United States Department of Justice, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*. In this federally funded study, Professor Koper, joined by Professor Roth, concluded that there was no evidence the federal ban reduced gun violence. *Id.*, at 2.

**41**: Plaintiffs admit that Klarevas' report states that since 2017, 211 people (an average of 30 people per year) have been killed in incidents he characterizes as mass shootings. Plaintiffs have not retained an expert to count the number of people killed in such incidents between 1776 and 2000.

**42**: Plaintiffs admit that Klarevas' report states that in more than 75% of the incidents he characterizes as mass shootings, the shooter used weapons that would be characterized as assault weapons and/or LCMs under the Ordinances.

**43**: Plaintiffs admit that mass killings occurred from the colonial period through the 19th century and that they were generally committed by groups. Plaintiffs deny that a single person could not commit mass murder with, for example, the

Winchester Model 1866, which could fire eighteen rounds in nine seconds. Kopel, *supra*, at 855.

**44**: Plaintiffs admit that during the colonial era many homicides were committed with hands, feet, knives and blunt objects, just as in 2022 five times as many homicides were committed with hands, feet, knives, and blunt objects than with rifles of all types, including so-called "assault weapons." See FBI Crime Data Explorer, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/shr.

**45**: Plaintiffs admit that the statutes prohibiting carrying various types of clubs and blunt objects listed in Spitzer's report existed.

**46**: Plaintiffs admit that the statutes prohibiting setting trap guns listed in Spitzer's report existed.

**47**: Plaintiffs have not retained an expert to rebut Spitzer's opinions set forth in this paragraph because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Spitzer's opinions set forth in this paragraph.

**48**: Plaintiffs have not retained an expert to rebut Roth's opinions set forth in this paragraph because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Roth's opinions set forth in this paragraph.

**49**: Denied. Six states do not constitute "several states." Plaintiffs admit that the statutes listed in Spitzer's report existed.

**50**. Plaintiffs admit that the statutes regulating concealed and/or public carry and sale of Bowie knives listed in Spitzer's report existed. Plaintiffs deny that as of 1899 any state prohibited the possession of Bowie knives. David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD.

**51**: Plaintiffs admit that improvements in firearms technology in the 19th century resulted in the development of the revolver. Plaintiffs admit that for various reasons revolvers were used to commit violence in the latter part of the 19th century.

**52**: Admitted.

**53**: Admitted.

**54, 55, 56, 57, 58**: Plaintiffs have not retained an expert to rebut Spitzer's opinions set forth in these paragraphs because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment. Therefore, Plaintiffs are not in a position to admit or deny Spitzer's opinions set forth in these paragraphs.

**59**: Plaintiffs admit that Congress enacted the National Firearms Act in 1934 and that the Act regulated (but did not prohibit) the acquisition and circulation of automatic weapons.

**60**: Plaintiffs admit that the Ordinances ban the weapons that they ban and that they do not ban the weapons that they do not ban.

**61**: Denied. *See e.g.*, Jason Buch, Julio-Ceesar Chavez and Ted Hesson, Reuters, *Two Mexicans charged after death of 51 migrants in sweltering Texas truck*, (June 28, 2022).

**62, 63, 64, 65, 66**: Plaintiffs admit that Klarevas' report states these statistics.

Plaintiffs have not retained an expert to rebut the statistics set forth in these

paragraphs because those statistics are not relevant to the Court's resolution of the

pending motions for summary judgment. Therefore, Plaintiffs are not in a position

to admit or deny the accuracy of the statistics.

Respectfully submitted this 21st day of November 2023.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
(303) 205-7870
barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2023, I electronically filed a true and
correct copy of the foregoing with the Clerk of the Court using the CM/ECF system,
which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington