**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

      Defendants the Town of Superior, Colorado, City of Louisville, Colorado, City of

Boulder, Colorado, and Board of County Commissioners of Boulder County, Colorado

("Defendants") respectfully submit this Opposition to Plaintiffs' Motion for Summary Judgment

(CM/ECF Dkt. No. 76) pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth

below and in Defendants' Motion for Summary Judgment (CM/ECF Dkt. No. 78), Plaintiffs'

motion should be denied.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.   PLAINTIFFS MISCONSTRUE AND MISAPPLY THE *BRUEN* FRAMEWORK ........................... 3

    A.   THE *BRUEN* TWO-STEP FRAMEWORK ...................................................... 3

    B.   PLAINTIFFS' MOTION MISSTATES AND MISAPPLIES THE *BRUEN* FRAMEWORK ........ 6

II.   PLAINTIFFS HAVE FAILED TO SHOW THAT ASSAULT WEAPONS AND LCMS FALL
    WITHIN THE TEXTUAL SCOPE OF THE SECOND AMENDMENT ....................................... 9

    A.   PLAINTIFFS HAVE FAILED TO ESTABLISH THAT ASSAULT WEAPONS AND LCMS
    ARE "IN COMMON USE TODAY FOR SELF-DEFENSE" ............................................. 9

    B.   LCMS ARE NOT "ARMS" ........................................................................ 14

III.   THERE IS NO DISPUTE OF MATERIAL FACT ON WHETHER THE ORDINANCES
    ARE CONSISTENT WITH THIS NATION'S HISTORY AND TRADITION OF FIREARM
    REGULATION ............................................................................................. 18

    A.   DEFENDANTS HAVE DEMONSTRATED THAT THE ORDINANCES ARE CONSISTENT
    WITH THIS NATION'S HISTORY AND TRADITION OF FIREARM REGULATION ......... 18

    B.   PLAINTIFFS HAVE FAILED TO PRESENT ANY HISTORICAL ANALYSIS ................... 20

IV.   PLAINTIFFS LACK STANDING ...................................................................... 20

CONCLUSION .................................................................................................................. 23

DEFENDANTS RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS ........... 24

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey,*
    910 F.3d 106 (3d Cir. 2018), *abrogated on other grounds by*
    *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) .................... 5, 16

*Barnett v. Raoul,*
    2023 WL 3160285 (S.D. Ill. Apr. 28, 2023), *vacated sub nom.*
    *Bevis v. City of Naperville, Ill.,* 2023 WL 7273709 (7th Cir. Nov. 3, 2023) ..................... 8, 16

*Bevis v. City of Naperville, Ill.,*
    2023 WL 7273709 (7th Cir. Nov. 3, 2023) ........................................................... 1, 8, 11, 16

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013) ..................................................................................... 20, 21

*Colo. Outfitters Ass'n v. Hickenlooper,*
    823 F.3d 537 (10th Cir. 2016) ................................................................................ 22

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.,*
    2023 WL 2655150 (D. Del. Mar. 27, 2023), *appeals docketed,*
    Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023) .................................................. 7, 8

*Dist. of Columbia v. Heller,*
    128 S. Ct. 2783 (2008) ............................................................................... *passim*

*Duncan v. Bonta,*
    2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) ....................................................... 8

*Duncan v. Bonta,*
    83 F.4th 803 (9th Cir. 2023) (en banc) ............................................................ 8

*Friedman v. City of Highland Park, Ill.,*
    136 S. Ct. 447 (2015) ................................................................................ 10

*Friedman v. City of Highland Park, Ill.,*
    784 F.3d 406 (7th Cir. 2015) ....................................................................... 11

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ....................................................................... 12

*Hanson v. Dist. of Columbia*,
   2023 WL 3019777 (D.D.C. Apr. 20, 2023), *appeal docketed*,
   No. 23-7061 (D.C. Cir. May 17, 2023) ..................................................................11

*Johnson v. Weld Cnty., Colo.*,
   594 F.3d 1202 (10th Cir. 2010) ........................................................................ 23

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) (en banc), *abrogated by*
   *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ............. 11, 12, 16

*Leone v. Owsley*,
   810 F.3d 1149 (10th Cir. 2015) ........................................................................ 9

*Miller v. Bonta*,
   2023 WL 6929336 (S.D. Cal. Oct. 19, 2023), *appeal docketed*,
   No. 23-2979 (9th Cir. Oct. 23, 2023) ................................................................ 8

*Nat'l Ass'n for Gun Rights v. Lamont*,
   2023 WL 4975979 (D. Conn. Aug. 3, 2023), *appeal docketed*,
   No. 23-1162 (2d Cir. Aug. 16, 2023) .......................................................... 7, 10, 14

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ................................................................... *passim*

*N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*,
   30 F.4th 1210 (10th Cir. 2022) ........................................................................ 22

*Ocean State Tactical, LLC v. Rhode Island*,
   646 F. Supp. 3d 368 (D.R.I. 2022),
   No. 23-1072 (1st Cir. argued Sept. 11, 2023) ............................................. 7, 16, 17

*Or. Firearms Fed'n v. Kotek*,
   2023 WL 3687404 (D. Or. May 26, 2023) ........................................................ 5, 8

*Or. Firearms Fed'n v. Kotek*,
   2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*,
   Nos. 23-35478, 23-35479 (9th Cir. Jul. 17, 2023) ....................................... *passim*

*Or. Firearms Fed'n, Inc. v. Brown*,
   644 F. Supp. 3d 782 (D. Or. 2022) ................................................................ 16, 17

*Peck v. McCann,*
    43 F.4th 1116 (10th Cir. 2022) ............................................................... 22

*Rio Grande Found. v. Oliver,*
    57 F.4th 1147 (10th Cir. 2023) ............................................................... 21

*Rocky Mountain Gun Owners v. Polis,*
    2023 WL 5017253 (D. Colo. Aug. 7, 2023), *appeal docketed,*
    No. 23-1251 (10th Cir. Aug. 14, 2023) ................................................... 7

*Teter v. Lopez,*
    76 F.4th 938 (9th Cir. 2023) ................................................................... 9

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023) ............................................................. 6, 9

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023) ................................................................... 5

*United States v. Rahimi,*
    61 F.4th 443 (5th Cir. 2023) ................................................................... 9

*Vincent v. Garland,*
    80 F.4th 1197 (10th Cir. 2023) ............................................................... 4

*Worman v. Healy,*
    922 F.3d 26 (1st Cir. 2019) ................................................................... 11

*Wright-Simmons v. City of Okla. City,*
    155 F.3d 1264 (10th Cir. 1998) ............................................................. 23

<u>STATUTES & RULES</u>

Fed. R. Evid. 701(c) ................................................................................. 21

# INTRODUCTION

In direct response to repeated, horrific mass shootings in the State of Colorado and across the country, Defendants passed ordinances ("Ordinances")[1] restricting the possession and sale of assault weapons and large capacity magazines ("LCMs"). Plaintiffs filed suit challenging the Ordinances on Second Amendment grounds, and the parties have filed cross-motions for summary judgment. For the reasons set forth below and in the uncontroverted record before the Court, Plaintiffs' motion should be denied and Defendants' motion granted.

Plaintiffs have failed to develop a sufficient factual record to warrant summary judgment in their favor—offering little evidence and instead resting their arguments on a misapplication of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiffs misstate *Bruen*'s enunciation of the relevant constitutional test, as well as the numerous federal court decisions properly applying *Bruen* to uphold laws similar to the Ordinances. In the end, Plaintiffs' constitutional analysis boils down to a circular and misguided argument that any weapon possessed by a large number of people must, *ipso facto*, be constitutional—a position unsupported by *Bruen* or any constitutional logic. Indeed, the Seventh Circuit recently rejected that very argument—raised by one of the Plaintiffs in this case—in denying its motion for a preliminary injunction against Illinois' assault weapon and LCM laws and similar local ordinances. *See Bevis v. City of Naperville, Ill.*, 2023 WL 7273709 (7th Cir. Nov. 3, 2023). The Court should reject Plaintiffs' argument here as well and, under a proper application of the governing Second Amendment framework, deny Plaintiffs' motion and enter summary judgment for Defendants.

---

[1] *See* Defendants' Motion for Summary Judgment (CM/ECF Dkt. No. 78) ("Def. SJ Mot."), Exs. A (Town of Superior, Colorado, Code Ch. 10, art IX (the "Superior Ord.")), B (City of Boulder, Colorado, Rev. Code Title 5, Ch. 8 (the "Boulder City Ord.")), C (City of Louisville, (….continued)

As an initial matter, Plaintiffs misapply *Bruen*'s two-step legal framework for analyzing Second Amendment claims.  The first step of *Bruen* requires Plaintiffs to show that the assault weapons and LCMs at issue fall within "the Second Amendment's plain text."  *Bruen*, 142 S. Ct. at 2126.  To meet this textual burden, Plaintiffs must demonstrate that (i) LCMs are "Arms" rather than accessories, *id.* at 2132, (ii) both assault weapons and LCMs are "in common use today for self-defense," *id.* at 2134, and (iii) they are also not the type of "dangerous and unusual" weapons unprotected by the Second Amendment, *id.* at 2128.  If Plaintiffs satisfy their burden on the first step, the analysis then proceeds to the second step where Defendants are required to show that the Ordinances are "consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.

In their attempt to address *Bruen*'s first step, Plaintiffs merely argue that assault weapons are "firearms" and therefore "Arms" protected by the Second Amendment.  Similarly, they argue that because a magazine of some capacity is necessary to operate certain firearms, *all* magazines, including LCMs, must be "Arms" for Second Amendment purposes.  In so doing, Plaintiffs omit any mention of their burden under *Bruen*'s first step to show that assault weapons and LCMs are "in common use today for self-defense" and are not the type of "dangerous and unusual" weapons falling outside the Second Amendment.  Plaintiffs instead argue that these are questions on which *Defendants* bear the burden of proof under the *second* step of *Bruen*.  Plaintiffs also impermissibly narrow the scope of the historical inquiry under the second step, arguing that only weapons that are "unusual" may be prohibited.  Plaintiffs' analysis is incorrect in each of these respects, and their arguments have been rejected by numerous post-*Bruen* cases.

---

Colorado, Code Tit. 9, Ch. VIII (the "Louisville Ord.")), D (Boulder County, Colorado, Ord. No. 2022-5 (the "Boulder Cnty. Ord.")).

In addition to misstating the law, Plaintiffs have presented virtually no factual evidence in support of their claims.  On the first step, Plaintiffs simply assert that assault weapons and LCMs are widely owned and that such ownership alone equates to common use for self-defense.  This reasoning, however, ignores the central question and has been rejected by numerous courts.  Plaintiffs also present no evidence to show that LCMs are bearable "Arms" within the protection of the Second Amendment, rather than unprotected accessories.

Although Defendants do not carry the burden on these first step inquiries, they have nonetheless submitted extensive evidence, including expert opinions essentially unchallenged by Plaintiffs, that assault weapons and LCMs are not commonly used for self-defense and that their military characteristics render them unsuitable for self-defense.  Defendants have also presented expert evidence that LCMs are not protected "Arms" as that term was historically understood.

On the second step of *Bruen*, Plaintiffs similarly point to no evidence to support their claims.  Plaintiffs have had repeated opportunities to marshal and address evidence regarding historical analogues to the Ordinances—including in initial and rebuttal expert discovery—and they have declined to do so.  Indeed, the Plaintiffs did not even take the depositions of Defendants' historical experts.

## ARGUMENT

## I.  Plaintiffs Misconstrue and Misapply the *Bruen* Framework

### A.  The *Bruen* Two-Step Framework

Drawing on the Supreme Court's decision in *Dist. of Columbia v. Heller*, 128 S. Ct. 2783 (2008), *Bruen* establishes a two-step framework for assessing the constitutionality of firearm regulations under the Second Amendment.  *See* Def. SJ Mot., Arg. Point I, at 9-11 (setting forth the two-step analysis and burdens of proof).  As the Tenth Circuit recently explained, a court first

3

asks whether "the Second Amendment's plain text cover[s] an individual's conduct." *Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023) (citing *Bruen*, 142 S. Ct. at 2129-30). "If the answer is *yes*," the court then goes on to determine if "the government [has] justified the [challenged law] by showing that it's consistent with the nation's 'historical tradition of firearm regulation.'" *Id.*

At the first step of *Bruen*, Plaintiffs carry the burden to show that the weapons and magazines at issue fall within the scope of protection of the Second Amendment. *See* Def. SJ Mot. at 10-11. To satisfy this textual inquiry, Plaintiffs must prove that the assault weapons and LCMs restricted by the Ordinances are "in common use today for self-defense," *Bruen*, 142 S. Ct. at 2134, and are not "most useful in military service" or "like" an "M-16." *See* Def. SJ Mot. at 10-11, 12-18. They must similarly show that these items are not the type of "dangerous and unusual" weapons outside of the scope of the Second Amendment. *See id.* at 10-11, 18-21. Plaintiffs must also demonstrate that the regulated items are "bearable arms" as that term is used in the Second Amendment, i.e., a "[w]eapon[] of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 128 S. Ct. at 2791; s*ee* Def. SJ Mot. at 10, 21-22.

Only if Plaintiffs satisfy their burdens under the first step (which they have failed to do here) are Defendants required to show that the Ordinances are "consistent with this Nation's historical tradition of firearms regulation," *Bruen*, 142 S. Ct. at 2126; *see* Def. SJ Mot. at 11, 23-39. In that regard, Defendants are not required to identify a precise historical equivalent and need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. Where, as here, the challenged laws implicate "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" to the

historical inquiry is warranted under *Bruen*. *Id.* at 2132. Notably, the Court is "entitled to decide [the] case based on the historical record compiled by the parties." *Id.* at 2130 n.6.

In their opening brief, Plaintiffs vaguely allude to "so-called 'legislative facts'" which they claim support entering summary judgment in their favor. *See* Plaintiffs' Motion for Summary Judgment ("Pl. SJ Mot.") at 1-2. To the extent Plaintiffs invoke "legislative facts" to excuse their failure to develop an evidentiary record, the Court should reject that effort. To be sure, constitutional litigation sometimes turns on "legislative facts," but "many of the facts in this record do not fall into th[at] category." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 115 n.13 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022); *see United States v. Daniels*, 77 F.4th 337, 360-61 (5th Cir. 2023) (Higginson, J., concurring) (*Bruen* "intimated" that assessing historical evidence "requires that an evidentiary inquiry first be conducted in courts of original jurisdiction, subject to party presentation principles, aided by discovery and cross-examination and with authority to solicit expert opinion."). In any event, the relevance of "legislative facts" to a particular constitutional claim does not relieve a party of his or her burden to adduce or rebut relevant evidence, nor do such facts permit courts to render decisions based on a party's unsupported policy preference. In this case, Plaintiffs have failed to develop any evidentiary record at all, or to contest the evidentiary record amassed by Defendants in support of their arguments. At a minimum, and irrespective of the kind of facts the Court must find to resolve the claims at issue, Plaintiffs' failure to develop a sufficient factual record requires denial of their summary judgment motion here. *See, e.g.*, *Or. Firearms Fed'n v. Kotek*, 2023 WL 3687404, at *2 (D. Or. May 26, 2023) (denying motion for summary judgment in case raising Second Amendment challenge similar to

Plaintiffs', in which the plaintiffs developed an evidentiary record giving rise to disputed issues of material fact).

### B.  Plaintiffs' Motion Misstates and Misapplies the *Bruen* Framework

Plaintiffs' motion fails at the outset because it misstates and misapplies the requirements of *Bruen*'s two-step framework in several critical ways, with respect to both the textual and historical inquiries under *Bruen*.

As to *Bruen*'s first step, Plaintiffs concede that they bear the burden of showing that the Second Amendment's text protects the assault weapons and LCMs they seek to keep and bear. *See* Pl. SJ Mot. at 33.  But they dispute the scope of that textual inquiry.  Plaintiffs erroneously argue that their textual burden in this case is satisfied merely by asserting that assault weapons are firearms and that magazines of some capacity are necessary to operate certain firearms.  *See id.* at 28-33.  Inquiries into whether the assault weapons and LCMs restricted under the Ordinances are in "common use" or and are "dangerous and unusual" are, Plaintiffs contend, part of the second step of *Bruen* on which Defendants carry the burden.  *See id.* at 34-37.

As to *Bruen*'s second step, Plaintiffs attempt to impermissibly narrow the scope of the historical inquiry, arguing that only weapons that are "unusual" may be prohibited.  *See id.* at 33-34.  They assert that any law prohibiting "a weapon that is commonly possessed for lawful purposes" is necessarily unconstitutional under *Bruen*'s historical inquiry—apparently without the need to engage in any further historical analysis at all.  *Id.*

Plaintiffs are wrong, as to both steps of the *Bruen* framework.  *Bruen* itself noted that it was undisputed that "handguns are weapons in common use today for self-defense" as part of its analysis of the "plain text of the Second Amendment"—and before it conducted the historical inquiry.  *Bruen* 142 S. Ct. at 2134; *see, e.g.*, *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th

Cir. 2023) (noting that *Bruen*'s textual inquiry involves a determination whether the weapons are "'in common use' today for self-defense" (quoting *Bruen*, 142 S. Ct. at 2134)).

Since *Bruen*, the overwhelming consensus among federal courts throughout the country is that plaintiffs have the burden to prove "common use for self-defense" as a part of *Bruen*'s first step. *See, e.g.*, *Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *9 (D. Colo. Aug. 7, 2023) (holding that Plaintiffs have the burden at *Bruen*'s first step to demonstrate that "the firearms at issue are 'weapons "in common use" today for self-defense'"), *appeal docketed*, No. 23-1251 (10th Cir. Aug. 14, 2023).  This is particularly so for cases like this one challenging restrictions on assault weapons and LCMs.  *See, e.g.*, *Nat'l Ass'n for Gun Rights v. Lamont*, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) ("*NAGR*") (holding, in a challenge to Connecticut's assault weapon and LCM laws, that Plaintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are "'"in common use" today for self-defense' and are typically possessed by law-abiding citizens for that purpose"), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027, at *5 & n.4 (D. Or. July 14, 2023) (same, as to Oregon's LCM law), *appeals docketed*, Nos. 23-35478, 23-35479 (9th Cir. Jul. 17, 2023); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 390 (D.R.I. 2022) (same, as to Rhode Island's LCM law), No. 23-1072 (1st Cir. argued Sep. 11, 2023).

Plaintiffs' argument that "[i]t will be impossible for [Defendants] to carry their burden under step two" because, according to Plaintiffs, "[i]t is beyond dispute that the banned arms are owned in the tens of millions" is similarly misguided.  Stopping the Second Amendment analysis after the "common use" inquiry is contrary to the Supreme Court's approach in both *Heller* and *Bruen*.  *See, e.g.*, *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 2023

WL 2655150, at *8 (D. Del. Mar. 27, 2023) (rejecting the argument that "once a weapon is found to be 'in common use' within the meaning of the Second Amendment, it cannot be regulated, and no historical analysis is necessary" (citing *Bruen*, 142 S. Ct. at 2129-30, 2135)), appeals docketed, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023); *Or. Firearms Fed'n*, 2023 WL 3687404, at *3 ("This Court agrees with the court's analysis in *Delaware State Sportsmen's Ass'n, Inc.* and concludes that whether a weapon is in common use for lawful purposes such as self-defense today is the first question—not the only question—that a court must consider under *Bruen*."). As explained further below, and in Defendants' moving brief, it is also contrary to the lengthy history and tradition of firearms regulation in the United States. *See infra* Section III.A.

In their brief, Plaintiffs rely heavily (*see* Pl. SJ Mot. at 2-3) on two cases decided by the same district court judge in the Southern District of California finding that California's assault weapon and LCM laws were unconstitutional. *See Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) (assault weapons), *appeal docketed,* No. 23-2979 (9th Cir. Oct. 23, 2023); *Duncan v. Bonta*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) (LCMs). But these outlier rulings, which are contrary to the great weight of post-*Bruen* authority, *see Bevis*, 2023 WL 7273709; Def. SJ Mot. at 2 n.2, should not be followed here.[2] The Ninth Circuit has since stayed both district court decisions and, in so doing, has held that California is "likely to succeed on the merits" of the appeals. *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (en banc); *see Miller v. Bonta*, No. 23-2979, Dkt. 13 (9th Cir. Oct. 28, 2023) (granting administrative stay of district court's decision "in light of this court's published order granting a stay in *Duncan v. Bonta*, 83

---

[2] Plaintiffs also rely on *Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023), *see* Pl. SJ Mot. at 41, which the Seventh Circuit has since vacated, *Bevis*, 2023 WL 7273709, at *19.

F.4th 803, 805-06 (9th Cir. 2023) (en banc) . . . , and the similarities between *Duncan* and this case").[3]

*       *       *

With the steps of *Bruen* and the parties' respective burdens clarified, Defendants below show why (1) Plaintiffs have failed to carry their burden on *Bruen*'s first step, and (2) Plaintiffs have failed to rebut or even dispute the robust historical record compiled by Defendants demonstrating that the Ordinances are consistent with the nation's historical tradition of firearm regulation.  *See* Def. SJ Mot., Arg. Point III, at 23-39.

## II.    Plaintiffs Have Failed to Show That Assault Weapons and LCMs Fall Within the Textual Scope of the Second Amendment

Plaintiffs have failed to satisfy their textual burden under *Bruen*.  To prevail on summary judgment, Plaintiffs must identify sufficient evidence to show that "no reasonable trier or fact could find other than for [them]."  *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (cleaned up).  Plaintiffs do not come close to satisfying the first step of *Bruen* here, and for this reason alone their motion should be denied.

### A.    Plaintiffs Have Failed to Establish That Assault Weapons and LCMs Are "In Common Use Today for Self-Defense"

Plaintiffs' argument that merely showing an item is "commonly possessed by law-abiding citizens for lawful purposes" satisfies the textual inquiry of *Bruen* (*see* Pl. SJ Mot., Points V.E., V.G, & V.H) is incorrect.  The phrase "in common use," as used in *Heller* and *Bruen,* does not merely refer to a weapon's prevalence in this country or the quantities

---

[3] Plaintiffs cite *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023), for the proposition that whether a firearm is "dangerous and unusual" is relevant to *Bruen*'s second prong.  Pls.' SJ Mot. at 35-36.  Although the *Teter* court did address this issue at the history and tradition stage, that decision is an outlier.  *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 455 (5th Cir. 2023) (considering "common use" at *Bruen*'s first step); *Alaniz*, 69 F.4th at 1128 (same).

manufactured, sold or owned.  Like *Heller*, *Bruen* repeatedly emphasized that to qualify as protected "Arms," a weapon must be commonly *used* for lawful self-defense by civilians.[4]

In keeping with this principle, Plaintiffs must establish much more than the item's common existence to satisfy their burden under the first step of *Bruen*.  They must also show that assault weapons and LCMs "are commonly used or are particularly suitable for self-defense." *NAGR*, 2023 WL 4975979, at *22; *see also Or. Firearms Fed'n*, 2023 WL 4541027, at *29 (holding that "the popularity of a firearm or firearm accessory alone cannot be dispositive when considering whether that item is "in common use today for self-defense" and that "the standard requires consideration of . . .  also the *use* of that firearm or firearm accessory"); *see also Heller*, 554 S. Ct. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including ease of storage, accessibility, and use).

In arguing otherwise, Plaintiffs largely rely on a dissent from a denial of certiorari in *Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447 (2015), and the same outlier district court decisions discussed above.  But, as explained, those non-binding opinions are contrary to the overwhelming consensus approach in the federal courts both before and after *Bruen*, and they should not be followed here.  *See supra*, Point I.B.

---

[4] *See Bruen,* 142 S. Ct. at 2138-39 (referring to "commonly *used* firearms for self-defense" (citing *Heller*, 128 S. Ct. at 2783) (emphasis added)); *id.* at 2142 n.12 (pocket pistols were "commonly *used* at least by the founding" (citing *Heller*, 128 S. Ct. at 2783) (emphasis added)); *id.* at 2143 (certain belt and hip pistols "were commonly *used* for lawful purposes in the 1600s" (citing *Heller*, 128 S. Ct. at 2783) (emphasis added)); *id.* at 2156 (referring to the "right to bear commonly *used* arms in public" (citing *Heller*, 128 S. Ct. at 2783) (emphasis added)),; *id.* (noting that the government would not have broadly prohibited the "public carry of commonly *used* firearms for personal defense" (emphasis added)).

Indeed, in the only federal court of appeals decision to have addressed this issue since *Bruen*, the Seventh Circuit expressly rejected the argument that assault weapons and LCMs are "in common use . . . because there are so many in private hands." *Bevis*, 2023 WL 7273709, at *15. Relying on its pre-*Bruen* decision in *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015), the court explained that assessing the challenged laws "on numbers alone . . . would have anomalous consequences." *Id.* For instance, when the Federal Assault Weapons Ban was enacted, only a few civilians owned AR-15s, but the weapon "began to occupy a more significant share of the market" after the federal law expired. *Id.* If the court looked only to numbers of items possessed, the federal law "would have been constitutional before 2004, but unconstitutional thereafter." *Id.*; *see Friedman*, 784 F.3d at 409 ("relying on how common a weapon is at the time of litigation would be circular"). In line with the Seventh Circuit, numerous courts, both before and after *Bruen*, have rejected Plaintiffs' incoherent view of the common use requirement.[5]

Accordingly, Plaintiffs' evidence that assault weapons and LCMs are "owned in the millions," whether or not true, fails to satisfy their burden under *Bruen*. The number of items allegedly in circulation simply does not establish whether such items are commonly "used" for self-defense. For the same reason, sales figures and ownership rates "do[] not [] show that

---

[5] *See NAGR*, 2023 WL 4975979, at *12 (*Bruen* rejects any treatment of "common use as a solely statistical question"); *Or. Firearms Fed'n*, 2023 WL 4541027, at *28 (rejecting "Plaintiffs' invitation to equate 'commonly owned' with "in common use today for self-defense"); *Hanson v. Dist. of Columbia*, 2023 WL 3019777, at *7 (D.D.C. Apr. 20, 2023) (noting that the number of LCMs possessed by civilians "does not" resolve the question "whether LCMs are covered by the Second Amendment"), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023); *see also Worman v. Healy*, 922 F.3d 26, 35 n. 5 (1st Cir. 2019) ("measuring 'common use' by the sheer number of weapons lawfully owned is [] illogical") (citing *Friedman*, 784 F.3d at 409); *Kolbe v. Hogan*, 849 F.3d 114, 141-42 (4th Cir. 2017) (en banc) ("the *Heller* majority said nothing to confirm that it was supporting the popularity test"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

[particular weapons] are in fact commonly possessed by law-abiding citizens for lawful purposes." *Fyock v. Sunnyvale,* 779 F.3d 991, 998 (9th Cir. 2015).

Plaintiffs' argument that actual use of a weapon for self-defense is not necessary to show that the weapon is "in common use for self-defense" is similarly misguided.  Plaintiffs cite the law enforcement career of Plaintiff Gordon Madonna who carried a firearm for 40 years and fired it at a suspect only once as evidence that "he was constantly using his firearm for self-defense even when he was not discharging it or brandishing it."  *See* Pl. SJ Mot. at 15, 39. Plaintiffs' reliance on the experience of a law enforcement officer is inapposite to their constitutional challenge to the Ordinances.  *Kolbe*, 849 F.3d at 147 ("law enforcement officers are not similarly situated to the general public with respect to the assault weapons and large-capacity magazines").

Moreover, Plaintiffs' argument, which gives predominance to the subjective intent of the individual in possessing the firearm for purposes of the constitutional analysis, is directly refuted by the objective evidence relevant to assault weapons and LCMs:  that they are almost never actually used for self-defense purposes, that their characteristics make them unsuited for self-defense, and that their best use against other human targets, and the use for which they were designed, is in a military context.  Defendants have proffered ample evidence on all of these points.  *See* Def. SJ Mot., Arg. Points II.A-B, at 12-18; *Or. Firearms Fed'n*, 2023 WL 4541027, at *30 (upholding regulation of LCMs based on objective evidence that they are not actually used in self-defense and stating that subject intent of the owner, while relevant, "cannot be

dispositive in assessing whether a firearm or firearm accessory is in common use for self-defense").[6]

Even if Plaintiffs were correct that they could satisfy their burden under the first step of *Bruen* by proof of a substantial number of assault weapons and LCMs in circulation, they have failed to satisfy even that standard in this case.  In an attempt to make that showing, Plaintiffs point to their proffered expert, Mr. Passamaneck, and one of Defendants' own experts, Dr. Klarevas.  But neither expert helps Plaintiffs to satisfy their evidentiary burden.

As set forth in Defendants' pending *Daubert* motion, Mr. Passamaneck's testimony regarding the number of assault weapons and LCMs is inadmissible.  Mr. Passamaneck recited certain estimates provided by third-party sources, but he lacks both the qualifications to evaluate the accuracy and reliability of those sources, as well as the necessary expertise to render his own estimates.  Further, even if the Court were to accept Mr. Passamaneck's testimony, his conclusions have been rigorously rebutted by Dr. Klarevas.  *See* Klarevas Rebuttal Rep. at ¶¶ 4-14 (rebutting Mr. Passamaneck's conclusions as to the number of assault weapons), ¶¶ 15-21 (rebutting Mr. Passamaneck's conclusions as to the number of LCMs).  At the very least, Mr.

---

[6] Plaintiffs' arguments regarding Plaintiff Madonna's career illustrate the difficulties of relying on evidence of subjective intent.  As a law enforcement officer, Plaintiff Madonna undoubtedly carried a weapon for numerous purposes, including deterring criminal activity and being prepared to actually stop criminal activity in process and detain suspects.  While he also may have understood that his weapon was for self-defense purposes, self-defense in the unique context of law enforcement is different than self-defense among private citizens, as law enforcement officers are charged with carrying weapons into the public realm in order to stop and deter crime.  Untangling and weighing the components of a law enforcement officer's intent and belief would be a murky digression in the constitutional analysis.  Finally, there is no evidence in the record that Plaintiff Madonna has ever actually used the assault weapons and LCMs that he owns as a private citizen for self-defense.  Thus, whatever were his career experiences, they are irrelevant to this case.

Passamaneck's estimates are vigorously disputed and not an appropriate basis for summary judgment.

Perhaps recognizing the flaws associated with Mr. Passamaneck's testimony, Plaintiffs have also attempted to co-opt the testimony of Dr. Klarevas for their own purposes. But Dr. Klarevas offers no support to Plaintiffs in seeking to establish the number of assault weapons or LCMs in circulation. Contrary to Plaintiffs' suggestion, Dr. Klarevas has *not* offered his own estimate of the number of such items in circulation, but he instead used the NSSF figures as a baseline to perform certain heuristic comparisons. He neither endorsed the NSSF figures nor offered alternative estimates. To the extent Plaintiffs claim otherwise, that position rests on a misunderstanding or misuse of Dr. Klarevas's opinions—a disputed issue also not appropriate for resolution at summary judgment.

As Plaintiffs are wrong on the applicable legal standard and do not carry their evidentiary burden as to the relevant "common use" inquiry under *Bruen*'s first step, their motion for summary judgment should be denied.

**B.      LCMs Are Not "Arms"**

Plaintiffs' motion should be denied for the additional reason that they fail to show that LCMs qualify as "Arms" under the Second Amendment. Plaintiffs argue that LCMs qualify for protection because they feed ammunition into guns and are thus "necessary for its exercise." Plaintiffs are again wrong on the facts and the law.

While some courts have held that "components of firearms that are *necessary to their operation*, such as ammunition, are covered by the Second Amendment," *see NAGR*, 2023 WL 4975979, at *19 (citing cases), such reasoning does not apply to LCMs precisely because the undisputed factual record shows that *large capacity* magazines are *not* necessary to *any* firearm's

operation. Plaintiffs cannot contest that semi-automatic weapons use ammunition magazines, whether fixed or detachable, to "contain and feed" ammunition into the firing chamber of the firearm. *See* Expert Report of former ATF Senior Special Agent James Yurgealitis, Def. SJ Mot., Ex. O ¶¶ 20, 29, 35, 39. Further, "any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself." *Id.* ¶¶ 12, 120. Accordingly, "any firearm designed to accept a detachable magazine holding more than 10 rounds [i.e., an LCM] will also accept a magazine with a maximum capacity of 10 rounds or fewer," i.e., a magazine that is lawful under the Ordinances. *Id.* ¶ 120. LCMs are thus in no way "necessary" to operate the firearm.

As Mr. Yurgealitis explained, he is "not aware of a single firearm that specifically requires a large-capacity magazine, as defined in the Ordinances, to operate." *Id.* ¶ 133. Plaintiffs' proffered expert—Mr. Passamaneck—does not opine to the contrary. He focuses only on the supposed necessity of magazines generally and does not offer an opinion that *large-capacity* magazines are necessary to render semi-automatic firearms operable. *See* Expert Report of Mark Passamaneck, dated April 12, 2023, Pl. SJ Mot., Passamaneck Decl. ¶ 2, PD004; *see also* Def. Mot. to Strike, Ex. F [CM/ECF Dkt. No. 68-6]; Passamaneck Dep. 37:13-21. To the extent Plaintiffs purport to contest any of these facts, that is reason alone to deny their motion for summary judgment.

Turning to the law, Plaintiffs have failed to show that magazines, and LCMs in particular, constitute "[w]eapons of offence, or armour of defence" under *Heller*, 128 S. Ct. at 2791. *See* Def. SJ Mot., Arg. Point II.D, at 21-22. To the contrary, such a device "holds the ammunition for a firearm before it is chambered and fired." *See* Def. SJ Mot., Ex. O ¶ 49 (Yurgealitis). Nor

do Plaintiffs provide any evidence to demonstrate that the text of the Second Amendment was understood to cover firearm accessories.  *See* Def. SJ Mot., Point II.D, at 22.

Further, several of Plaintiffs' cited cases are no longer good law or do not support their arguments.  For example, the court in *Ass'n of New Jersey Rifle and Pistol Clubs, Inc.*, denied the plaintiff's motion for a preliminary injunction, noting that the law restricting the capacity of LCMs "does not render the arm at issue here incapable of operating as intended."  910 F.3d at 118.  And in *Kolbe*, the Fourth Circuit ruled *en banc* that, contrary to the prior panel's holding, LCMs were *not* protected by the Second Amendment because they were "particularly designed and most suitable for military and law enforcement applications."  849 F.3d at 137.  Most recently, the Seventh Circuit vacated the lower court's ruling in *Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023), and held that LCMs are not protected by the Second Amendment because "assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense."  *Bevis*, 2023 WL 7273709, at *12.

Meanwhile, two federal district courts have flatly rejected Plaintiffs' position.  *See Ocean State*, 646 F. Supp. 3d at 384-88; *Or. Firearms Fed'n*, 2023 WL 4541027, at *9; *Or. Firearms Fed'n v. Brown*, 644 F. Supp. 3d 782, 798-99 (D. Or. 2022).  In *Ocean State*, the court, crediting the same expert Defendants offer in this case, found that plaintiffs had not met their burden to establish that LCMs are "Arms" within the textual meaning of the Second Amendment. 646 F. Supp. 3d at 388; *see* Def. SJ Mot. at 22; Expert Report of Prof. Dennis Baron, Def. SJ Mot., Ex. G ¶¶ 4, 9, 79.  In reaching this conclusion, the court noted, as Defendants have here, that "a firearm does not need a magazine containing more than ten rounds to be useful." *Ocean State*, 646 F. Supp. 3d at 386.  Similarly, in *Oregon Firearms Federation*, the court squarely held, after

trial and relying on the expert testimony of Mr. Yurgealitis, that "LCMs, as a subset of magazines, are never necessary to render firearms operable." *Or. Firearms Fed'n*, 2023 WL 4541027, at *26; *see id.* at *9 ("Magazine capacity is not a determining factor in the operability of a firearm."); *Or. Firearms Fed'n*, 644 F. Supp. 3d at 799 (reaching similar conclusion in denying TRO). The court thus found that "LCMs are not 'bearable arms'" under the Second Amendment. *Or. Firearms Fed'n*, 2023 WL 4541027, at *26.

Plaintiffs' attempt to distinguish these cases is unavailing. Plaintiffs query whether, under the reasoning of *Ocean State*, Defendants could disarm residents by rendering firearms useless. But restricting LCMs, as the Ordinances do, does not render firearms useless. Smaller-capacity magazines exist and may be substituted. *See* Def. SJ Mot., Ex. O ¶¶ 130, 131, 133 (Yurgealitis). And Plaintiffs provide no evidence showing that LCMs are necessary to self-defense. To the contrary, Defendants have demonstrated a lack of any evidence showing that LCMs are necessary or useful in self-defense. *See* Expert Report of Lucy Allen, Def. SJ Mot., Ex. F ¶ 10; *Or. Firearms Fed'n*, 2023 WL 4541027, at *11-12, 34 (relying on Ms. Allen's "credible" testimony to hold that "LCMs are not necessary for firearms to function and are not commonly used for self-defense," while also noting that the "limited anecdotal evidence" offered by the plaintiffs was not sufficient to meet their burden).

For these reasons, and as argued in Defendants' motion for summary judgment (*see* Def. SJ Mot., Arg. Point II.D, at 21-22), Plaintiffs have failed to carry their burden of showing under the first step of *Bruen* that LCMs are "Arms" under the Second Amendment.

**III.    There Is No Dispute of Material Fact on Whether the Ordinances Are Consistent with This Nation's History and Tradition of Firearm Regulation**

    **A.    Defendants Have Demonstrated That the Ordinances Are Consistent with This Nation's History and Tradition of Firearm Regulation**

Defendants have provided a robust historical analysis of the long history of laws restricting certain weapons, weapon features, and accessories viewed to be particularly dangerous or associated with criminal activity.  *See* Def. SJ Mot., Point III, at 28-34.  Plaintiffs' motion for summary judgment should thus be denied, and instead this Court should enter summary judgment in Defendants' favor.  *See* Def. SJ Mot. at 39.

Under *Bruen*, if Plaintiffs carry their burden at the first step, Defendants then must prove that the Ordinances are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  In their motion for summary judgment, Defendants did precisely that, demonstrating a long and uncontroverted history of laws restricting certain weapons, weapon features, and accessories viewed to be particularly dangerous or associated with criminal activity. *See* Def. SJ Mot., Arg. Point III at 23-39.

Defendants submitted detailed expert reports with their motion identifying numerous examples of such analogous historical regulations.  In the 18th and 19th centuries, notable restrictions included those on trap guns, Bowie knives, and concealable revolvers and pistols.  In the 20th century, the law evolved to restrict new dangers from Tommy guns and other automatic and semi-automatic weapons.  *See* Defs.' SJ Mot., at 31-34, Ex. N, Expert Report of Robert Spitzer ¶¶ 78-90 (fighting knives, including Bowie knives), 91-98 & (clubs and blunt weapons), 99–101 (pistols), 102-104 (trap guns); Ex. I, Expert Report of Brian DeLay, ¶ 48 (pepperboxes, revolvers, repeating pistols, percussion-cap pistols, bowie knives, and other concealable weapons); Ex. L, Expert Report of Randolph Roth ¶¶ 28-32 (pistols, folding knives, dirk knives,

Bowie knives, sword canes, and spears), 41-47 (pocket pistols, revolvers).  And, as the evidence marshaled by Defendants shows, this tradition—of legislatures regulating items as they spread in society and posed particular dangers to the public—continued as firearm technology developed.  *See id.* at Exs. N ¶¶ 44, 66 (Spitzer), I ¶¶ 28-29, 40-42 (DeLay), L ¶¶ 57-58 (Roth).[7]  The history of repeating and multi-shot weapons is an instructive example.  At the time of the Second Amendment's ratification, there were few multi-shot firearms, and those that did exist posed little danger to the populace and bore little resemblance to assault weapons or LCMs.  *See* Defs.' SJ Mot., at 25.  The same was true in the 19th century.  *See id.* at 25-26.  The first rapid-fire weapons entered the market in the 20th century and were primarily used by the military.  *Id.*  But when these weapons started to proliferate more in the civilian market legislatures began to regulate them—just as they had long done with other weapons and accessories posing particular danger to society.  *Id.* at 25.

The challenged Ordinances are "relevantly similar" to these historical regulations, *Bruen*, 142 S. Ct. at 2132:  they comparably impose little to no burden on the right to armed self-defense, as they leave available many alternatives for this purpose, and they are comparably justified by the need to protect the public from violence associated with particularly dangerous weapons.  Def. SJ Mot. at 35-39; *see Bruen*, 142 S. Ct. at 2133.  Accordingly, the uncontroverted historical record demonstrates that the Ordinances are "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126.

---

[7] Another judge in this district recently credited the expert testimony of Professors Roth and Spitzer on the history of firearms regulation in denying a preliminary injunction motion brought by Plaintiff RMGO in another Second Amendment case.  *See Rocky Mountain Gun Owners v. Polis*, No. 1:23-cv-02563, ECF 32, at 7-10, 16-18, 25-34 (Nov. 13, 2023).

B.      **Plaintiffs Have Failed to Present Any Historical Analysis**

Plaintiffs' motion for summary judgment does not point to any evidence contradicting Defendants' extensive historical analysis.  Notably, of the 75 allegedly undisputed facts submitted by Plaintiffs, *not one* relates to the history and tradition of firearm regulation in the United States.  *See* Pl. SJ Mot. at 3-15.  Plaintiffs also fail to identify any historical evidence supporting their contention that "history and tradition support banning only weapons that are unusual in society at large."  *See id.* at 33.

As explained, *supra* at Point I.B, Plaintiffs' approach would effectively collapse *Bruen* into a single step which asks only how many firearms are in circulation.  Several courts have properly rejected that argument as inconsistent with *Bruen*, *see supra* at Point I.B, including the only federal court of appeals to address this issue since *Bruen*.  For these legal and factual reasons pertaining to *Bruen*'s second step, Plaintiffs' motion should be denied.

IV.   **Plaintiffs Lack Standing**

As the parties "invoking federal jurisdiction," Plaintiffs bear the burden of establishing that they have standing.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148-49 (2013).  To demonstrate standing, a plaintiff must show that (1) they have suffered a "concrete, particularized, and actual or imminent" injury in fact, (2) the injury is "fairly traceable to the challenged action," and (3) the injury is "redressable by a favorable ruling."  *Id.* at 1140-41 (internal quotation marks omitted).  At summary judgment, Plaintiffs cannot rest on "mere allegations" and must instead "set forth by affidavit or other evidence specific facts" demonstrating their standing.  *Id.* at 1149 (internal quotation marks omitted).

Plaintiffs have failed to proffer sufficient evidence to show that they have standing in this case.  Most significantly, none of the individual Plaintiffs has presented sufficient evidence that

he currently owns or possesses firearms falling within the Ordinances.  In boilerplate language in their declarations, each individual Plaintiff merely declares that they "currently own and possess within the Municipality a number of firearms that are considered AW Firearms under the Ordinance" and a "number of LCMs."  Walker Dec. ¶¶ 8-10; Jones Dec. ¶¶ 8-10; Kehoe Dec. ¶¶ 8-9; LaFonte Dec. ¶¶ 8, 10; Madonna Dec. ¶¶ 8, 10.  While Plaintiffs contend that the facts set forth in these declarations must be "taken to be true" for the purposes of summary judgment (Pl. SJ Mot. at 16-17 (citing *Rio Grande Found. v. Oliver,* 57 F.4th 1147, 1162 (10th Cir. 2023)), the individual Plaintiffs' declarations do not state "facts"—they have not specified model numbers, brand names, features or specifications, or purchase dates regarding firearms and LCMs that they allegedly own.  Without such foundational information, Plaintiffs' declarations merely state that they believe they own firearms or LCMs prohibited by the Ordinances—legal conclusions that Plaintiffs are unqualified to offer and are entitled to no weight.  FED. R. EVID. 701(c) (The observations of a non-expert, or "lay," witness cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").  Consequently, Plaintiffs have failed to proffer evidence showing they currently own any firearms or LCMs affected by the Ordinances and therefore lack injury in fact.[8]

The individual Plaintiffs' declarations are also insufficient to establish definite plans to engage in future conduct that would violate the Ordinances.  Each declaration expresses merely a vague "desire" to acquire more firearms, or to transfer their firearms to others, at some undefined point in the future.  *See* Walker Dec. ¶¶ 8, 11-12; Jones Dec. ¶¶ 8, 11-12; Kehoe Dec. ¶¶ 8, 10-

---

[8] Moreover, Plaintiffs fail to establish injury because they have intentionally declined to acquire certificates of ownership that would render their ownership of LCMs lawful.  *Clapper*, 133 S. Ct. at 1151 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

21

11; LaFonte Dec. ¶¶ 8, 11-12; Madonna Dec. ¶¶ 8, 11-12.  The Tenth Circuit has held that "[s]uch 'some day' speculations are insufficient to establish an injury-in-fact for purposes of Article III standing."  *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 112 S.Ct. 2130, 2138 (1992)).[9]

Relatedly, the organization Plaintiffs (RMGO and NAGR) cannot establish standing because none of their individual members is able to do so on this record.  An association can establish standing only if it can show, *inter alia*, that its members would otherwise have standing to sue in their own right.  *N. New Mexico Stockman's Ass'n v. United States Fish & Wildlife Serv.*, 30 F.4th 1210, 1219 (10th Cir. 2022).  To this end, RMGO and NAGR have failed to specifically name a single member of their organizations, other than the individual Plaintiffs.[10] The president of both RMGO and NAGR, Dudley Brown, states that his members have informed him that they "currently own and possess within the municipality in which they reside" firearms

_____

[9] Plaintiffs incorrectly assert that since *Bruen* the lenient First Amendment standing analysis in *Peck* applies to Second Amendment cases.  *See Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022).  Plaintiffs contend that the fact that *Peck* arose in the First Amendment context "is a distinction that makes no difference."  Pl. SJ Mot. at 21-22.  Standing, however, was not at issue in *Bruen*.  This absence is meaningful, because "the First Amendment context creates unique interests that lead [courts] to apply the standing requirements somewhat more leniently, facilitating pre-enforcement suits."  *Peck*, 43 F.4th at 1129.  Plaintiffs' attempt to import First Amendment "chilling" doctrine into the Second Amendment context fails to recognize that the "unique interests" of the First Amendment do not similarly arise under the Second Amendment. To the extent Plaintiffs are actually injured by the Ordinances, they suffer that injury individually.  Society is not deprived of their firearm ownership in the same way it is deprived of expression, or injured by having its marketplace of ideas diminished, as in the First Amendment context.  Instead, *Colorado Outfitters Ass'n,* 823 F.3d at 549-51, provides the applicable, and binding, framework to analyze standing.

[10] Defendants note that individual Plaintiff Charles Bradley Walker is a member of RMGO, but not NAGR.  Walker Dec. ¶ 2.  Walker is the only individual Plaintiff residing in the Town of Superior, Colorado.  Accordingly, even if the Court were to find the individual Plaintiffs had established standing on the scant summary judgment record, NAGR would still lack standing as to the Superior Ordinance as it has failed to otherwise identify a specific member within the Superior municipality.

that would be subject to the Ordinances.  Brown Dec. ¶ 6.  Such purported statements are inadmissible hearsay that cannot be used to establish standing at summary judgment.  *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1208-10 (10th Cir. 2010) (plaintiff failed to make out a Title VII claim of sex discrimination because the proffered evidence was inadmissible hearsay); *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.").  Where the individual Plaintiffs have failed to establish standing, and without any other named members, Plaintiffs have failed to establish that they have standing to bring this suit, their motion for summary judgment should be denied, and the case should be dismissed for lack of jurisdiction.

*     *     *

Plaintiffs' summary judgment motion misconstrues and misapplies the two-step test set forth by the Supreme Court in *Bruen* for analyzing firearms regulations.  With respect to *Bruen*'s first step, Plaintiffs have failed to meet their burden of showing that the Second Amendment applies to assault weapons and LCMs.  With respect to the second step of *Bruen*, Plaintiffs have failed to rebut or contradict the voluminous record assembled by Defendants showing that the Ordinances are consistent with the Nation's history and tradition of firearms regulation.  Plaintiffs also lack sufficient standing to bring their claims.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment.

23

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF
UNDISPUTED MATERIAL FACTS**

---

1.      Defendants are the Town of Superior ("Superior"), the City of Louisville ("Louisville"), the City of Boulder ("Boulder"), and Boulder County (the "County").

RESPONSE:  Not disputed.

2.      Superior, Louisville, Boulder, and the County shall be referred to collectively as the "Municipalities."

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

3.      The term "Superior Law" shall mean SUPERIOR, COLO., CODE ch. 10, art. IX (as adopted Jun. 7, 2022 in Ord. No. O-9, § 1).  A copy of the Superior Law is attached as Exhibit A.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

4.      The term "Boulder Law" shall mean BOULDER, COLO., REV. CODE title 5, ch. 8 (as adopted Jun. 7, 2022 in Ord. Nos. 8494, 8525-29).  A copy of the Boulder Law is attached as Exhibit B.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

5.      The term "County Law" shall mean BOULDER COUNTY, COLO., ORDINANCES, Ord. No. 2022-5 (as adopted Aug. 2, 2022).  A copy of the Boulder Law is attached as Exhibit C.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

6.      The term "Louisville Law" shall mean LOUISVILLE, COLO., CODE title 9, ch. VIII (as adopted Jun. 7, 2022 in Ord. No. 1831-2022).  A copy of the Louisville Law is attached as Exhibit D.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

7.      The term "Superior Ordinance" shall mean Sections 10-9-40 and 10-9-240 of the

Superior Law as such apply to "assault weapons" and "large capacity magazines."

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

8.      The term "Boulder Ordinance" shall mean Sections 5-8-10 and 5-8-28 of the Boulder Law as such apply to "assault weapons" and "large capacity magazines."

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

9.      The term "County Ordinance" shall mean the portion of the County Law regarding "assault weapons" and "large capacity magazines."

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

10.     The term "Louisville Ordinance" shall mean Sections 9.84.010 and 9.86.010 of the Louisville Law as such apply to "assault weapons" and "large capacity magazines."

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

11.     The term "Ordinances" shall mean the Superior Ordinance, the Boulder Ordinance, the County Ordinance, and the Louisville Ordinance.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

12.     The term "AW Firearm" as used herein shall have the same meaning as "assault weapon" as that phrase is used in the Ordinances.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

13.     The term "LCM" as used herein means "large capacity magazine" as that phrase is used in the Ordinances.

RESPONSE:  Neither not disputed nor disputed.  Defendants take no position on Plaintiffs' defined terms.

14.     Magazines with a capacity of over 10 rounds are not necessarily large capacity magazines.  Walker Dec. ¶ 6.  Many firearms come standard with such magazines.  *Id.* "Assault weapon" is also a political term developed by anti-gun publicists.  *Stenberg v. Carhart*, 530 U.S. 914, 1001 n. 16 (2000) (Thomas, J., dissenting).  Nevertheless, in this Motion, Plaintiffs will use the politically charged terms used in the Ordinances.

RESPONSE:  Disputed that magazines with a capacity over 10 rounds are not necessarily

large capacity magazines, subject to the exceptions set forth in the Ordinances.  Pls.' Mot. Ex. A, 8; Pls.' Mot. Ex. Ex. B, 13; Pls.' Mot. Ex. C, 6; Pls.' Mot. Ex. D, 6.  Defendants also do not dispute that some firearms come standard with such magazines but dispute that "many" do; at a minimum a genuine issue of material fact exists as to whether "many" firearms come standard with LCMs, particularly as Plaintiffs attempt to use a dissenting opinion in support of their contention.  Defendants dispute that the Ordinances use politically charged terms but take no position on Plaintiffs'' decision to employ the same terminology.

15.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance classify AW Firearms and LCMs as "illegal weapons."  Ex. A, 8; Ex. B, 13; Ex. D, 6.

       RESPONSE:  These ordinances speak for themselves.

16.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance make it a crime to knowingly possess, sell, or otherwise transfer an illegal weapon. Ex. A, 10; Ex. B, 14; Ex. D, 9.

       RESPONSE:  These ordinances speak for themselves and include numerous exemptions as well.  Pl. SJ Mot. Ex. A, 10; Ex. B, 14; Ex. D, 9.

17.    The County Ordinance makes it a crime to manufacture, import, purchase, sell, or transfer any AW Firearm or LCM after August 2, 2022. Ex. C, 6, 7.

       RESPONSE:  The County Ordinance speaks for itself and includes numerous exemptions.  Pl. SJ Mot. Ex. C, 6, 7.

18.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance each have a provision for obtaining a "certificate of ownership" for an AW Firearm certifying that the AW Firearm was owned prior to July 1, 2022.  Pl. SJ Mot. Ex. A, 16; Ex. B, 16; Ex. D, 10.

       RESPONSE:  These ordinances speak for themselves.

19.    Even if a person were to obtain a "certificate of ownership" for an AW Firearm, under these ordinances he or she would not be permitted to possess the firearm anywhere but their own property, at a gunsmith, or a firing range, and they would also be prohibited from possessing any AW Firearm acquired after July 1, 2022.  Ex. A, 16-17; Ex. B, 17; Ex. D, 10-11.

       RESPONSE:  Disputed.  These ordinances speak for themselves and include numerous exceptions that would excuse a person from obtaining a "certificate of ownership."  Pl. SJ Mot. Ex. A, 10; Ex. B, 14; Ex. D, 9.

20.    The deadline for obtaining a "certificate of ownership" for an AW Firearm under the Superior, Boulder, and Louisville Ordinances was December 31, 2022. Ex. A, 16; Ex. B, 16; Ex. D, 10. There is no provision in the Ordinances for obtaining such a certificate after that date.

RESPONSE:  These ordinances speak for themselves.

21.    The Superior Ordinance, the Boulder Ordinance, and the Louisville Ordinance provide that it is an affirmative defense to a prosecution for possession of an illegal weapon if the illegal weapon is an assault weapon accompanied by a valid certificate of ownership.  Ex. A, 15; Ex. B, 15; Ex. D, 9.

RESPONSE:  These ordinances speak for themselves.

22.    None of the Ordinances has a provision for obtaining a certificate of ownership for an LCM; nor do any of the Ordinances provide for an affirmative defense for the possession of an LCM that was owned prior to a particular date.

RESPONSE:  These ordinances speak for themselves.

23.    In summary, the Superior, Boulder, and Louisville Ordinances make it illegal to possess an AW Firearm that a citizen owned prior to July 1, 2022, unless such citizen obtained a "certificate of possession" prior to December 31, 2022, and even then the citizen would not be permitted to use the AW Firearm for self-defense in public; and

RESPONSE:  Disputed.  These ordinances speak for themselves and include numerous exemptions such that the possession of such weapons is not *per se* a crime.  Pl. SJ Mot. Ex. A, 10; Ex. B, 14; Ex. D, 9.

24.    The Superior, Boulder, and Louisville Ordinances make it illegal for any citizen to acquire an AW Firearm under any circumstances after July 1, 2022; and

RESPONSE:  Disputed.  *See* Response 23, *supra*.

25.    The Superior, Boulder, and Louisville Ordinances make it illegal for a citizen to possess an LCM whether or not the citizen owned or possessed the LCM prior to any particular time; and

RESPONSE:  Disputed.  *See* Response 23, *supra*.

26.    The County Ordinance makes it illegal to manufacture, import, purchase, sell, or transfer any AW Firearm or LCM in the unincorporated part of the County after August 2, 2022.

RESPONSE:  Disputed.  *See* Response 23, *supra*.

27.    Plaintiff Charles Bradley Walker is a resident of Superior and a law-abiding citizen of the United States.  Walker Dec. ¶ 3.  He challenges the Superior Ordinance.

RESPONSE:   Not disputed that Walker is a resident of Superior and is challenging the Superior Ordinance.  Disputed to the extent Defendants lack knowledge as to whether he is a law-abiding citizen of the United States.

28.    Plaintiff James Michael Jones is a resident of Boulder and a law-abiding citizen of the

United States. Jones Dec. ¶ 3.  He challenges the Boulder Ordinance.

RESPONSE:   Not disputed that Jones is a resident of Boulder and is challenging the Boulder Ordinance.  Disputed to the extent Defendants lack knowledge as to whether he is a law-abiding citizen of the United States.

29.   Plaintiff Martin Carter Kehoe is a resident of the unincorporated portion of the County and is a law-abiding citizen of the United States. Kehoe Dec. ¶ 3.  He challenges the County Ordinance.

RESPONSE:   Not disputed that Kehoe is a resident of the unincorporated portion of the County and is challenging the County Ordinance.  Disputed to the extent Defendants lack knowledge as to whether he is a law-abiding citizen of the United States.

30.   Plaintiffs Bryan LaFonte and Gordon Madonna are residents of Louisville and are law-abiding citizens of the United States.  LaFonte Dec. ¶ 3; Madonna Dec. ¶ 3.  They challenge the Louisville Ordinance.

RESPONSE:   Not disputed that LaFonte and Madonna are residents of Louisville and are challenging the Louisville Ordinance.  Disputed to the extent Defendants lack knowledge as to whether they are law-abiding citizens of the United States.

31.   Each of the individual Plaintiffs currently owns and possesses within the municipality in which he resides a number of firearms and firearm magazines, which he possesses and uses for a variety of lawful purposes, including target shooting and self-defense.  Walker Dec. ¶ 7; Jones Dec. ¶ 7; Kehoe Dec. ¶ 7; LaFonte Dec. ¶ 7; Madonna Dec. ¶ 7.

RESPONSE:   Disputed.  Defendants do not dispute that certain Plaintiffs own and possess a number of firearms and magazines, although Defendants lack knowledge as to the number and nature of such arms and magazines.  Disputed to the extent that Plaintiffs have not established a foundation for the purported lawfulness of the purposes for which those firearms and firearm magazines are possessed and/or used.

32.   Each of the individual Plaintiffs currently owns and possesses within the municipality in which he resides firearms that are considered AW Firearms under the Ordinances. Walker Dec. ¶ 8; Jones Dec. ¶ 8; Kehoe Dec. ¶ 8; LaFonte Dec. ¶ 8; Madonna Dec. ¶ 8.

RESPONSE:   Disputed.  Defendants dispute that an adequate foundation has been laid to establish that the firearms owned and possessed by Plaintiffs are assault weapons as that phrase is used in the Ordinances.

33.   The individual Plaintiffs desire to continue to own and possess these AW Firearms within such municipality and in their homes in particular. *Id.*

RESPONSE:   Disputed.  *See* Response 32, *supra*.

34.   The individual Plaintiffs also desire to be able to freely transfer these AW Firearms to others, including members of their family. *Id.*

RESPONSE:  Disputed.  *See* Response 32, *supra*.

35.     Each of the individual Plaintiffs owns and possesses within the municipality in which he resides a number of LCMs.  Walker Dec. ¶ 10; Jones Dec. ¶ 10; Kehoe Dec. ¶ 9; LaFonte Dec. ¶ 10; Madonna Dec. ¶ 10.

RESPONSE:  Disputed.  Defendants dispute that an adequate foundation has been laid to establish that the magazines owned and possessed by Plaintiffs are LCMs as that phrase is used in the Ordinances.

36.     Each of the individual Plaintiffs has acquired AW Firearms in the past and would like to continue to be able to do so in the future and own and possess such AW Firearms in the municipality in which he resides.  Walker Dec. ¶ 11; Jones Dec. ¶ 11; Kehoe Dec. ¶ 10; LaFonte Dec. ¶ 11; Madonna Dec. ¶ 11.

RESPONSE:  Disputed.  Defendants dispute that adequate foundation has been laid to establish that the specific firearms owned by the individual Plaintiffs are assault weapons as that phrase is used in the Ordinances.  Further, Defendants dispute that adequate foundation has been laid to establish that the individual Plaintiffs "would like to continue" to acquire assault weapons in the future.

37.     Each of the individual Plaintiffs has acquired LCMs in the past and would like to continue to be able to do so in the future and own and possess such LCMs in the municipality in which he resides.  Walker Dec. ¶ 12; Jones Dec. ¶ 12; Kehoe Dec. ¶ 11; LaFonte Dec. ¶ 12; Madonna Dec. ¶ 12.

RESPONSE:  Disputed.  Defendants dispute that adequate foundation has been laid to establish that the specific magazines owned by the individual Plaintiffs are LCMs as that phrase is used in the Ordinances.  Further, Defendants dispute that adequate foundation has been laid to establish that the individual Plaintiffs "would like to continue" to acquire LCMs in the future.

38.     Many firearms, even those not considered AW Firearms under the Ordinances, come standard with an LCM.  Walker Dec. ¶ 6, 13.  Each of the individual Plaintiffs would like to continue to be able to acquire such firearms and the LCMs that come standard with them and possess them within the municipality in which he resides.  Walker Dec. ¶ 13; Jones Dec. ¶ 13; Kehoe Dec. ¶ 12; LaFonte Dec. ¶ 13; Madonna Dec. ¶ 13.

RESPONSE:  Disputed.  Defendants dispute that adequate foundation has been laid to identify the specific firearms to which they refer, or to establish that "many" such firearms have "LCMs that come standard with them," or that the magazines are LCMs as that phrase is used in the Ordinances.  Further, Defendants dispute that adequate foundation has been laid to establish that the individual Plaintiffs "would like to continue" to acquire such firearms and LCMs in the future.  Additionally, Defendants dispute that adequate foundation has been laid to establish that Walker, Jones, Kehoe, LaFonte, or Madonna know that certain firearms "come standard" with a certain magazine size.  Instead, the record reflects that firearms are sold with several different

29

magazine capacities. *See* Def. SJ Mot., Ex. O. 45-46 (Yurgealitis Report) at ¶ 128 (noting online catalog screenshot of Fabrique-Nationale's "Five-seveN" pistol showing both 10 and 20-round options).

39.     The enforcement of the Ordinances is currently stayed, but if the Ordinances were to become effective each of the individual Plaintiffs would refrain from acquiring AW Firearms and LCMs for fear of prosecution if he were to possess them within the municipality in which he resides. Walker Dec. ¶ 14; Jones Dec. ¶ 14; Kehoe Dec. ¶ 13; LaFonte Dec. ¶ 14; Madonna Dec. ¶ 14.

        RESPONSE:  Disputed. Defendants dispute that adequate foundation has been laid to establish what the individual Plaintiffs would do if the Ordinances were to become effective.

40.     Most of the individual Plaintiffs do not desire to obtain a certificate for any AW Firearm that they own, nor have they. Walker Dec. ¶ 9; Jones Dec. ¶ 9; LaFonte Dec. ¶ 9; Madonna Dec. ¶ 9.

        RESPONSE:  Disputed. Defendants dispute that adequate foundation has been laid to establish that (a) the specific firearms owned by the individual Plaintiffs are assault weapons as that phrase is used in the Ordinances; and (b) the individual Plaintiffs were eligible for certificates under the Ordinances.

41.     In any event, the deadline for obtaining a certificate passed while this litigation has been pending and the Ordinances were stayed.

        RESPONSE:  The Ordinances speak for themselves.

42.     Thus, were the Superior, Boulder, and Louisville Ordinances to become effective, the Ordinances would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of their presently-owned AW Firearms within these municipalities (including from their homes). Walker Dec. ¶ 8; Jones Dec. ¶ 8; LaFonte Dec. ¶ 8; Madonna Dec. ¶ 8.

        RESPONSE:  Disputed. Whether the Ordinances would require any Plaintiff to dispossess themselves of their presently-owned AW Firearms is a legal argument, improperly included in a statement of undisputed material facts. To the extent a response is required, Defendants dispute that adequate foundation has been laid to establish that the specific firearms owned by the individual Plaintiffs are assault weapons as that phrase is used in the Ordinances.

43.     As set forth above, the Superior, Boulder, and Louisville Ordinances have no grandfather provision for LCMs. Thus were these Ordinances to become effective, they would require the Plaintiffs that reside within these municipalities immediately to dispossess themselves of these arms within these municipalities. Walker Dec. ¶ 12; Jones Dec. ¶ 12; Kehoe Dec. ¶ 11; LaFonte Dec. ¶ 12; Madonna Dec. ¶ 12.

        RESPONSE:  The Ordinances speak for themselves. Whether the Ordinances would

30

require any Plaintiff to dispossess themselves of their LCMs is a legal argument, improperly included in a statement of undisputed material facts. To the extent a response is required, Defendants dispute that Plaintiffs have established an adequate foundation to establish that the specific magazines owned by the individual Plaintiffs are LCMs as that phrase is used in the Ordinances.

44.     Plaintiff Rocky Mountain Gun Owners shall be referred to herein as "RMGO," and Plaintiff National Association for Gun Rights shall be referred to as "NAGR."

        RESPONSE:   Neither not disputed nor disputed.  Defendants take no position on the defined terms used by the Plaintiffs.

45.     Dudley Brown is the President of RMGO and NAGR.  Brown Dec. ¶ 2.

        RESPONSE:   Not disputed.

46.     RMGO and NAGR are nonprofit membership and donor-supported organizations that seek to defend the right of all law-abiding individuals to keep and bear arms.  Brown Dec. ¶ 3.

        RESPONSE:   Not disputed that RMGO and NAGR are nonprofit membership and donor-supported organizations.  Defendants take no position on the purported missions of these organizations.

47.     RMGO and NAGR have members who reside within each of the Municipalities, and RMGO and NAGR represent the interests of these members.  Brown Dec. ¶ 4.

        RESPONSE:   Defendants do not dispute that RMGO has individual members who reside within each of the Municipalities.  Defendants dispute that adequate foundation has been laid to establish that any members of NAGR reside within the Town of Superior, Colorado.  Defendants take no position on whether RMGO and NAGR "represent the interests" of their members.

48.     Specifically, RMGO and NAGR represent the interests of those of their members whose Second Amendment rights have been infringed by the Ordinances.  Brown Dec. ¶ 5.

        RESPONSE:   Disputed that the Ordinances infringe on any Second Amendment rights.

49.     Brown has communicated with RMGO and NAGR members who reside in the Municipalities who have informed him that (a) they currently own and possess within the municipality in which they reside firearms that are considered AW Firearms under the Ordinances and they would like to continue to possess these firearms; (b) they have not obtained certificates of possession and do not intend to do so; and (c) they own and possess within the municipality in which they reside one or more LCMs.  Brown Dec. ¶ 6.

        RESPONSE:   Disputed, as Plaintiffs have failed to offer admissible evidence establishing these alleged facts.

50.     All of these activities would be illegal if the Ordinances were effective.

        RESPONSE:   Disputed.  Whether the Ordinances would render these activities illegal is a legal argument, improperly included in a statement of undisputed material facts.  To the extent a response is required, Defendants dispute this statement as Plaintiffs' assertion is overbroad and elides exceptions to the activities proscribed in the Ordinances.

51.     Plaintiffs Jones, Kehoe, and Madonna are members of both RMGO and NAGR.  Jones Dec. ¶ 2; Kehoe Dec. ¶ 2; Madonna Dec. ¶ 2.  Plaintiffs LaFonte and Walker are members of RMGO.  LaFonte Dec. ¶ 2; Walker Dec. ¶ 2.

        RESPONSE:   Not disputed.

52.     Plaintiffs have designated Mark Passamaneck as an expert regarding two topics: (1) an estimate of the number of "assault weapons" and "large capacity magazines" in the United States; and (2) the operation and durability of these magazines.

        RESPONSE:   Defendants do not dispute that Plaintiffs have designated Mark Passamaneck as an expert on these topics.  Defendants dispute that Passamaneck is sufficiently qualified as an expert to opine on "an estimate of the number of 'assault weapons' and 'large capacity magazines' in the United States."  Defendants have filed a motion to partially strike Passamaneck's expert repot and exclude Passamaneck's testimony on this topic.  (CM/ECF Dkt. No. 68)

53.     Without a magazine, the operation of a semi-automatic firearm in semi-automatic firing mode is impossible.  Passamaneck Declaration, 4-5.

        RESPONSE:   Disputed.  A magazine is not required for a semi-automatic firearm to function.  Generally speaking, a semi-automatic firearm, without a magazine inserted, can be loaded manually with a single cartridge and fired.  The magazine, with additional available cartridges, is what allows the firearm to fire additional shots without manual manipulation of a bolt or slide.  Def. SJ Mot., Ex. O. D. 40 (Yurgealitis Report) at ¶ 120 ("both of those examples [of semi-automatic rifles] will still fire a chambered round if there is no magazine inserted"); Yurgealitis Rebuttal Rep. ¶¶ 6-8, 15.  Further disputed to the extent Plaintiffs contend that *large capacity* magazines are necessary to the operation of a semi-automatic firearm.

54.     A magazine is not merely a box in which ammunition is stored; rather, it is a dynamic component that performs a function in any semi-automatic firearm.  *Id.*

        RESPONSE: Disputed.  Magazines did not exist at the Founding era and remained relatively rare until the 1920s.  (Def. SJ Mot., Report of Prof. Dennis Baron ¶¶ 24–25 (Ex. G)).  Instead, during the Founding era, firearm users kept ammunition in what were called "cartridge boxes," "cartouch boxes," or "pouches," which are the closest analogue to the modern-day magazine. (*Id.* ¶¶ 33, 35).  Those items were considered "accoutrements"—that is, "ancillary equipment"—as categorically distinct from "arms." (*Id.* ¶ 9).  Indeed, Founding-era sources "regularly referred to" "accoutrements" "separately from 'arms.'"  (*Id.* ¶¶ 31, 39).  This understanding persisted through the

32

Reconstruction era. (*Id.* ¶¶ 32, 53).  Further disputed to the extent Plaintiffs contend that *large capacity* magazines are necessary to the operation of a semi-automatic firearm.

55. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger.  *Id.*

RESPONSE:   Not disputed.

56. If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon.  *Id.*

RESPONSE:   Not disputed, except to the extent Plaintiffs contend that *large capacity* magazines are necessary to the operation of a semi-automatic firearm.

57. Thus, without a magazine as a designed dynamic component, semi-automatic firearms would not exist.  *Id.*

RESPONSE:   Disputed.  A magazine is not required for a semi-automatic firearm to function.  Generally speaking, a semi-automatic firearm, without a magazine inserted, can be loaded manually with a single cartridge and fired.  The magazine, with additional available cartridges, is what allows the firearm to fire additional shots without manual manipulation of a bolt or slide.  Def. SJ Mot., Ex. O. D. 40 (Yurgealitis Report) at ¶ 120 ("both of those examples [of semi-automatic rifles] will still fire a chambered round if there is no magazine inserted").  Yurgealitis Rebuttal Rep. ¶ 15.  Further disputed to the extent Plaintiffs contend that *large capacity* magazines are necessary to the operation of a semi-automatic firearm.

58. The National Shooting Sports Foundation ("NSSF"), the firearms industry trade association, included the table on the following page in its 2022 Industry Intelligence Report (the "2022 NSSF Compilation").

## Estimated Modern Sporting Rifles in the United States 1990 – 2020

| Year | US Production less exports of MSR/AR platform | US Import less exports of MSR/AR, AK platform | ANNUAL TOTAL |
|------|---------|---------|---------|
| 1990 | 43,000 | 31,000 | 74,000 |
| 1991 | 46,000 | 69,000 | 115,000 |
| 1992 | 33,000 | 72,000 | 105,000 |
| 1993 | 62,000 | 226,000 | 288,000 |
| 1994 | 103,000 | 171,000 | 274,000 |
| 1995 | 54,000 | 77,000 | 131,000 |
| 1996 | 27,000 | 43,000 | 70,000 |
| 1997 | 44,000 | 81,000 | 125,000 |
| 1998 | 70,000 | 75,000 | 145,000 |
| 1999 | 113,000 | 119,000 | 232,000 |
| 2000 | 86,000 | 130,000 | 216,000 |
| 2001 | 60,000 | 119,000 | 179,000 |
| 2002 | 97,000 | 145,000 | 242,000 |
| 2003 | 118,000 | 262,000 | 380,000 |
| 2004 | 107,000 | 207,000 | 314,000 |
| 2005 | 141,000 | 170,000 | 311,000 |
| 2006 | 196,000 | 202,000 | 398,000 |
| 2007 | 269,000 | 229,000 | 498,000 |
| 2008 | 444,000 | 189,000 | 633,000 |
| 2009 | 692,000 | 314,000 | 1,006,000 |
| 2010 | 444,000 | 140,000 | 584,000 |
| 2011 | 653,000 | 163,000 | 816,000 |
| 2012 | 1,308,000 | 322,000 | 1,630,000 |
| 2013 | 1,882,000 | 393,000 | 2,275,000 |
| 2014 | 950,000 | 237,000 | 1,187,000 |
| 2015 | 1,360,000 | 245,000 | 1,605,000 |
| 2016 | 2,217,000 | 230,000 | 2,447,000 |
| 2017 | 1,406,000 | 158,000 | 1,564,000 |
| 2018 | 1,731,000 | 225,000 | 1,956,000 |
| 2019 | 1,679,000 | 169,000 | 1,848,000 |
| 2020 | 2,466,000 | 332,000 | 2,798,000 |
| **TOTALS** | **18,901,000** | **5,545,000** | **24,446,000** |

RESPONSE:  Not disputed that NSSF published such a table but disputed to the extent that Plaintiffs suggest that the number of assault weapons in circulation is not in dispute.

59.    Defendants have designated Dr. Louis Klarevas as an expert in this matter.  His report is attached as Exhibit E.

RESPONSE:  Not disputed.

60.    "Modern Sporting Rifle" as used in the NSSF Compilation is a firearm industry term for AR-15-platform and AK-47-platform firearms.  Klarevas Report 11.

RESPONSE:  Not disputed, to the extent that Dr. Klarevas indicated in his report that the term is used in the firearms industry without adopting the usage himself.

61.    Based on the 2022 NSSF Compilation (and in particular the table set forth in paragraph 58), Mr. Passamaneck estimated the number of modern sporting rifles produced from

34

1990 to 2020 to be 24.4 million.  Passamaneck Declaration, 7.

RESPONSE:  Disputed.  Mr. Passamaneck made such an estimation but dispute to the extent that his opinion is not a "fact."  Further disputed that Mr. Passamaneck was qualified to make such an estimation or to determine whether the NSSF table is accurate and reliable.

62.    Dr. Klarevas also used the 24.4 million NSSF figure as the basis of his estimate of the number of "assault weapons" in the United States, citing the table set forth in paragraph 58.  Klarevas Report, 11 (paragraph 14 and note 8).

RESPONSE:  Disputed.  Dr. Klarevas has not offered an opinion on the number of assault weapons in circulation in the United States.  He merely opined that if one were to accept the NSSF estimates—which he expressly indicated he believes to be overestimates, *see* Klarevas Report, at 11, 23, *see also* Klarevas Rebuttal Rep. at ¶¶ 9-10—then certain heuristic comparisons can be calculated from those.

63.    Mr. Passamaneck attempted to estimate the number of AR-15-type rifles produced before 1990 and after 2020 (which would not be reflected in the table in paragraph 58) and arrived at a total estimate of 34 million.  Passamaneck Declaration, 4,

RESPONSE:  Disputed as Mr. Passamaneck's opinion is not a "fact."  Further disputed as Mr. Passamaneck did not "attempt to estimate[]" anything in his expert report.  He merely conveyed estimates provided to him by industry sources and drew his own comparisons without explaining why he believed the correct number of assault weapons in circulation was "certainly higher."  Passamaneck Declaration at 4, 8.

64.    Plaintiffs are willing to stipulate to the lower number on which Dr. Klarevas based his estimate of the number of "assault weapons."  The parties agree that tens of millions of such weapons are in circulation in the United States.

RESPONSE:  Disputed.  As noted, Dr. Klarevas did not proffer his own estimate of the number of "assault weapons."  Instead, he used the NSSF figures to undertake a heuristic comparison.  Further, Defendants do not "agree" that tens of millions of assault weapons are in circulation in the United States.  Plaintiffs have failed to offer admissible evidence establishing that proposition.

65.    The modern sporting rifle is the most-popular-selling centerfire semiautomatic rifle in the United States today according to the NSSF press release cited by Dr. Klarevas.  Klarevas Report, 11, n.8.

RESPONSE:  Not disputed that the NSSF press release states as much.  Disputed to the extent that Plaintiffs suggest that the press release establishes a "fact," as Plaintiffs have failed to offer admissible evidence establishing that proposition.

66.    Mr. Passamaneck agrees that millions of Americans own AR-15-style rifles and that it is the most popular rifle sold in America.  Passamaneck Declaration, 3.

RESPONSE:  Disputed as Mr. Passamaneck's opinion is not a "fact."  Further disputed as Plaintiffs have failed to offer admissible evidence that millions of Americans own AR-15 style files.

67.   The NSSF Compilation contains the table on the following page:



RESPONSE:  Not disputed that the NSSF published such a table, but disputed to the extent that Plaintiffs suggest that the number of LCMs in circulation is not in dispute.

68.   Mr. Passamaneck cited this table for his lower-bound estimate of the number of LCMs in the United States of 159.8 million.  Passamaneck Declaration, 3, 8.

RESPONSE:  Disputed as Mr. Passamaneck's opinion is not a "fact."  Disputed to the extent that Plaintiffs suggest that the number of LCMs in circulation is not in dispute.

69.   Dr. Klarevas also cited to an NSSF report that contained this same table.  Klarevas Report, 11, n.8, citing NSSF, Firearm Production in the United States with Firearm Import and Export Data, Industry Intelligence Report, 2020, available at https://bit.ly/3z67cBx.

RESPONSE:  Not disputed that Dr. Klarevas cited to the NSSF report but disputed to the extent that Plaintiffs suggest that Dr. Klarevas was endorsing any NSSF estimates as facts.

70. Mr. Passamaneck opined that the number of LCMs is certainly higher than reflected in the NSSF Compilation (perhaps as high as 350 million), but the NSSF data is a reliable lower bound.  Passamaneck Declaration, 4, 8.

RESPONSE:  Disputed as Mr. Passamaneck's opinion is not a "fact."  Disputed to the extent that Plaintiffs suggest that the number of LCMs in circulation is not in dispute.

71. Plaintiff Gordon Madonna was a law enforcement officer for over 40 years.  Madonna Dec. ¶ 15.

RESPONSE:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71 and on that basis dispute the same.

72. During his 40-plus-year career as a police officer, he was always armed while he was on duty.  *Id.* ¶ 16.  He discharged his firearm against a suspect only once during his career.  *Id.* ¶ 17.

RESPONSE:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72 and on that basis dispute the same.

73. During his career, he was constantly armed for the purpose of both actual and possible confrontation with an assailant.  *Id.* ¶ 18.

RESPONSE:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 and on that basis dispute the same.

74. Thus, during his career, he was constantly using his firearm for self-defense even when he was not discharging it or brandishing it.  *Id.*

RESPONSE:  Disputed as this assertion is an argument, not a "fact."  Further disputed to the extent that Plaintiffs suggest that mere possession of a weapon constitutes "use" of that weapon "for self-defense when . . . not discharging it or brandishing it."  *See, e.g., Or. Firearms Fed'n*, 2023 WL 4541027, at *30.

75. It is not true that he never used his firearm during 40-plus years except that one moment when he discharged it against a suspect.  *Id.* ¶ 19.

RESPONSE:  Disputed as this assertion is an argument, not a "fact."  Further disputed to the extent that Plaintiffs suggest that mere possession of a weapon constitutes "use" of that weapon.

Dated:    November 21, 2023

Respectively submitted,

By:    /s/ Antonio J. Perez-Marques
Antonio J. Perez-Marques
James H.R. Windels
Christopher P. Lynch
David B. Toscano
Hendrik van Hemmen
James C. Butler
Jennifer Kim
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4515
antonio.perez@davispolk.com
james.windels@davispolk.com
christopher.lynch@davispolk.com
david.toscano@davispolk.com
hendrik.vanhemmen@davispolk.com
james.butler@davispolk.com
jennifer.kim@davispolk.com
*Counsel for All Defendants*

Carey R. Dunne
Kevin Trowel
Martha Reiser
FREE AND FAIR LITIGATION GROUP
266 W. 37th Street, 20th Floor
New York, NY 10018
(917) 499-2279
carey@freeandfairlitigation.org
kevin@freeandfairlitigation.org
martha@freeandfairlitigation.org
*Counsel for All Defendants*

William Taylor
EVERYTOWN LAW
450 Lexington Avenue, #4184
New York, NY 10017
(646) 324-8215
wtaylor@everytown.org
*Counsel for All Defendants*

Gordon L. Vaughan
VAUGHAN & DEMURO
111 South Tejon Street
Suite 545
Colorado Springs, CO 80903
(719) 578-5500
gvaughan@vaughandemuro.com
*Counsel for Town of Superior and Town of
Louisville*

Luis A. Toro
Teresa T. Tate
BOULDER CITY ATTORNEY'S OFFICE
P.O. Box 791
1777 Broadway
Boulder, CO 80306
(303) 441-3020
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
*Counsel for the City of Boulder*

David Evan Hughes
Catherine R. Ruhland
BOULDER COUNTY ATTORNEY'S OFFICE
P.O. Box 471
Boulder, CO 80306
(303) 441-3190
dhughes@bouldercounty.org
truhland@bouldercounty.org
*Counsel for the Board of County Commissioners of
Boulder County*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2023, I served a true and complete copy of the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, upon all parties herein by e-filing with the CM/ECF system maintained by the court and/or email, addressed as follows:

Barry Kevin Arrington
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
barry@arringtonpc.com

*Attorneys for Plaintiffs*

Dated:    November 21, 2023

Respectively submitted,

By:    /s/ Antonio J. Perez-Marques
Antonio J. Perez-Marques
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4515
antonio.perez@davispolk.com
*Counsel for All Defendants*

EXHIBIT A TO DEFENDANTS'
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-2680-NYW-SKC

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

       Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

       Defendants.

---

## Declaration of LOUIS KLAREVAS

---

    I, Louis Klarevas, declare as follows:

    1.    I am over the age of 18 years of age and competent to testify to the matters stated below and do so based on my personal knowledge.

    2.    Exhibit 1 is a true and accurate copy of my rebuttal expert report in the above-captioned matter. It contains opinions to which I would testify if called upon as a witness in the above-captioned matter, and I declare under penalty of perjury that it is true and correct to the best of my knowledge.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

    Executed on this 21st day of November, 2023
at    Nassau County   ,   NY   

Louis Klarevas

Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-** _2680_

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO, CITY
OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

### Rebuttal Report of Louis Klarevas

---

## REBUTTAL REPORT OF LOUIS KLAREVAS

I, Louis Klarevas, declare:

1.      Plaintiffs' proffered expert Mark W. Passamaneck has submitted a report that, among other things, attempts to estimate the number of AR-15 style rifles and large-capacity magazines in civilian circulation in the United States.[1]  This rebuttal expert report responds to the first paragraph of the "Discussion" section of Passamaneck's report.[2]  This rebuttal report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in it.

**I.      Passamaneck Fails to Provide Source Citations, Often Making Verification of His Claims Difficult**

2.      Before addressing the specific claims asserted by Passamaneck, it is important to note that Passamaneck's report employs an unorthodox methodology: it asserts factual claims without providing specific sources for those claims.  One of the goals of research is that all analyses be reproducible.  In order to achieve this objective, detailed source citations are generally required, pointing reviewers to the precise data and/or evidence used in the original assessment.  Passamaneck fails to provide detailed source citations.  In fact, there is not a single, full citation of source material to be found anywhere in Passamaneck's report.  As such, it is often difficult, and at times impossible, to verify Passamaneck's claims.

---

[1] Expert Witness Report of Mark W. Passamaneck, PE, *Rocky Mountain Gun Owners, et al. v. Town of Superior, Colorado, et al.*, 22-cv-2680 (D. Colo.), April 12, 2023 (attached as **Exhibit A**).  Even though all four ordinances that are the subject of the present case define large-capacity magazines as ammunition-feeding devices with a capacity greater than 10 rounds, most of Passamaneck's analysis focuses on a subset of large-capacity magazines that have a capacity greater than 15 rounds of ammunition.  It is not clear why Passamaneck generally employs an ammunition threshold that is different from the ordinances that are the focus of the present case, nor does Passamaneck offer any explanation or justification for this discrepancy.

[2] Unless stated otherwise, any references to or quotations of Passamaneck's claims are from the first paragraph of the "Discussion" section of Passamaneck's report.  *Ibid.*, at 1-2.

## II.   Passamaneck Asserts Problematic and, At Times, Conflicting Factual Claims

3.      Passamaneck's claims seem to fall into two categories: claims about AR-15 style rifles and claims about large-capacity magazines (LCMs).  I will address each category in turn.

## II.A.   Assertions Pertaining to AR-15 Style Rifles

4.      With regard to AR-15 style rifles, Passamaneck writes:

Millions of Americans own and use AR15 style rifles.  A Washington Post survey in 2022 numbers the owners of AR15s at 16 million while the 2020 number was almost 20 million according to NSSF President and CEO Joseph Bartozzi, who called the AR-15 the "most popular rifle sold in America" and a "commonly owned firearm."  A 2021 survey conducted by Georgetown University Professor William English in 2021 of 16,000-gun owners revealed that of those, 30% owned AR15 style rifles.  Further, the NSSF 2020 Industry Intelligence report has the number of AR15 rifles produced minus exports (so sold in the US) at just under 20 million from 1990 through 2018.  It is estimated that about 8 to 9 million AR15s were owned by US citizens prior to 1990 and the total number of semi-automatic rifles owned in the US (2018) at just over 43 million.  From 2019 through 2022, another 3 to 4 million have been sold.  So, conservatively, there are at least 34 million AR15s owned by US citizens, and the vast majority of those rifles were sold with at least one 20 or 30 round (30 round standard being most common) magazines.[3]

5.      Passamaneck begins by asserting that "Millions of Americans own and use AR15 style rifles."  This is an unusually vague claim.  It is unclear exactly how many Americans *own* AR-15s and exactly how many Americans *use* AR-15s.  With regard to the latter, it is also not clear in what manner and with what frequency (if any) gun owners "use" AR-15 style rifles.  Finally, it is not evident if, by "Americans," Passamaneck is referring to private citizens who lawfully own personal AR-15 style rifles or if he is also including law enforcement officers, security guards, firearm sellers, and/or individuals prohibited from possessing firearms (e.g., criminals).  Without more precision and without citations to source materials, it is practically impossible to discern what exactly Passamaneck means by this statement.

---

[3] This block quotation, including punctuation and capitalization, is reproduced exactly as it appears in Passamaneck's report.

6.      Passamaneck does go on to provide some statistics about the number of AR-15 style rifles in circulation in the United States.  However, here too Passamaneck's analysis is plagued by the fact that he conflates owners with items owned and he conflates items manufactured with items sold—even though, in each instance, these factors are distinct.  Where possible, I have attempted to track down what I understand to be the sources of Passamaneck's claims so that I could assess them.

7.      Addressing the estimated number of AR-15 owners, Passamaneck writes, "A Washington Post survey in 2022 numbers the owners of AR15s at 16 million while the 2020 number was almost 20 million according to NSSF President and CEO Joseph Bartozzi." Passamaneck appears to be stating that the number of AR-15 owners has decreased from 20 million in 2020 to 16 million in 2022.  However, after reviewing the likely sources of these two claims, neither of these claims, as presented by Passamaneck, is accurate.

8.      According to two surveys conducted by Ipsos in 2022, one of which was co-sponsored by the *Washington Post*, approximately 31% of all American adults own at least one firearm and, of those gun owners, 19% own an AR-15 style rifle.[4]  In 2022, according to the U.S. Census Bureau, there were 260.8 million adults in the United States.[5]  Of those American adults, 80.8 million (31%) are estimated by Ipsos to own a gun.[6]  Of those 80.8 million gun owners, 15.4 million (19%) are estimated to own an AR-15 style rifle.[7]

9.      According to the National Shooting Sports Foundation (NSSF), which is the trade association of the firearm industry, in 2020, it was estimated that there were approximately 19.8

---

[4] Emily Guskin, Aadit Tambe, and Jon Gerberg, "Why Do Americans Own AR-15s?" *Washington Post*, March 27, 2023, *available at* https://www.washingtonpost.com/nation/interactive/2023/american-ar-15-gun-owners (last accessed May 31, 2023).
[5] United States Census Bureau, "National Population by Characteristics: 2020-2022," March 31, 2023, *available at* https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-detail.html (last accessed May 31, 2023).
[6] Guskin, Tambe, and Gerberg, *supra* note 4.
[7] *Ibid*.  The 15.4 million figure appears to have been erroneously rounded up to 16 million.

million "modern sporting rifles" (MSRs) in circulation in the United States.[8]  MSRs include AR- and AK-platform firearms.  MSRs are not limited only to AR-15 style rifles.  Because this estimate of 19.8 million MSRs includes other rifles such as AK-platform rifles, the number of AR-15 style rifles is necessarily lower than 19.8 million.  And, as I noted in my expert report in this case, NSSF estimates appear to be over-estimates that include the number of MSRs in the possession of law enforcement and security agencies, firearms retailers, and prohibited owners (such as criminals and domestic abusers).[9]  It is also likely that the NSSF's estimate includes firearms that have been illegally trafficked to other countries, especially neighboring Mexico.[10]  Regardless, Passamaneck misrepresents the nearly 20 million NSSF figure as the number of gun *owners* who have AR-15 style rifles, when the NSSF is actually providing an estimate as to the number of such *rifles* in circulation.

10.     Indeed, just two sentences later, Passamaneck notes that, according to a 2020 NSSF Industry Intelligence Report, it was estimated that the number of MSRs in circulation as of 2018 was "just under 20 million."  Passamaneck, however, again misrepresents this figure as the number of AR-15 style rifles *sold* in the United States.  A review of the NSSF report makes clear that this figure does not represent the number of AR-15 style rifles sold between 1990 and 2018, as Passamaneck claims.[11]  First, the NSSF tracks the broader category of MSRs, not the sub-category of AR-15 style MSRs.  Second, the NSSF does not publish MSR sales figures, let alone

---

[8] National Shooting Sports Foundation ("NSSF"), "NSSF Releases Most Recent Firearm Production Figures," November 16, 2020, *available at* https://www.nssf.org/articles/nssf-releases-most-recent-firearm-production-figures (last accessed May 31, 2023).  For the full report, *see* National Shooting Sports Foundation, *Firearm Production in the United States with Firearm Import and Export Data*, NSSF Industry Intelligence Reports, 2020, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed May 31, 2023).
[9] Expert Witness Report of Louis Klarevas, *Rocky Mountain Gun Owners, et al. v. Town of Superior, Colorado, et al.*, 22-cv-2680 (D. Colo.), May 5, 2023
[10] *See*, for example, Liz Mineo, "Stopping Toxic Flow of Guns from U.S. to Mexico," *Harvard Gazette*, February 18, 2022, *available at* https://news.harvard.edu/gazette/story/2022/02/stopping-toxic-flow-of-gun-traffic-from-u-s-to-mexico (last accessed May 31, 2023).
[11] NSSF, *Firearm Production in the United States with Firearm Import and Export Data, supra* note 8.

AR-15 sales figures.[12]  The figures that the NSSF published are based on estimates of how many MSRs were manufactured and imported each year, minus the number of MSRs exported.  This total produces an estimate of the number of MSRs that enter the American firearms market annually.  As a reminder, this figure appears to be an over-estimate of the number of MSRs owned by private citizens.

11.     Passamaneck also mentions a 2021 survey conducted by William English that found that "30% owned AR15 style rifles."  To quote the survey findings accurately, English states, "30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned."[13]  There is a wide discrepancy between the *Washington Post*-Ipsos estimate of 15.4 million owners of AR-15 style rifles and the English estimate of 24.6 million owners of AR-15 style rifles.  Similarly, there is a wide discrepancy between the NSSF estimate of 20 million MSRs (of which AR-15 style rifles owned by private citizens as personal firearms is only a portion) and the English estimate of 44 million AR-15 style rifles.

12.     Besides glossing over this wide discrepancy in the figures, Passamaneck fails to note what is arguably the most striking finding in the English paper.  In surveying ownership rates, English found that 0.3% of respondents "indicate owning over 100" AR-15 styled rifles.[14]  Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle, his survey results indicate that approximately 74,000 people own over 100 such rifles.  Moreover, English also reports that 1.3% of all AR-15 style rifle owners (approximately 320,000 people) own between 11 and 100 such rifles.[15]  Even if, for the sake of argument, these 74,000 people all owned only 101 AR-15s and these additional 320,000 people

---

[12] In all likelihood, the NSSF might not have accurate knowledge of how many MSRs are sold each year.
[13] William English, "2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned," Unpublished Paper (May 13, 2022; Revised September 22, 2022), *available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed May 31, 2023).
[14] *Ibid*.
[15] *Ibid*.

all owned 11 AR-15s—the lowest possible number in the range that they identified as best capturing the number of AR-15 styled rifles they own—that would mean that, ***at the very least, approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners***.[16]  As a reminder, 11 million AR-15 style rifles is a conservative estimate calculated using the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-more.[17]

13.     Next, Passamaneck, without any attribution, claims that "about 8 to 9 million AR15s were owned by US citizens prior to 1990."  From 1963 through 1977, when the patent for the AR-15 expired, Colt was the only firearms manufacturer producing AR-15 rifles for sale to

---

[16] In its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.  NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK- Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed May 31, 2023).  While the NSSF, unlike the English survey, does not report whether respondents in its surveys of modern sporting rifle owners happen to own more than 10, let alone more than 100, modern sporting rifles, NSSF has detected a growing trend toward increased ownership of multiple modern sporting rifles.  For instance, in its 2010 survey, it found that 40% of modern sporting rifle owners owned only 1 modern sporting rifle and 60% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned being 2.6.  In its 2013 survey, it found that 35% of modern sporting rifle owners owned only 1 modern sporting rifle and 65% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing to 3.1.  In its most recent, 2021 survey, the NSSF found that 24% of modern sporting rifle owners owned only 1 modern sporting rifle and 76% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing yet again to 3.8.  This speaks to a growing trend in which modern sporting rifles are being purchased by gun owners who already own a modern sporting rifle, resulting in modern sporting rifles being concentrated, relatively speaking, in the hands of those who already own modern sporting rifles.  *Ibid*.

[17] While the English survey is discussed in an unpublished academic paper that is publicly available online, there are significant concerns with the study, which call into question the findings reported in the paper.  Arguably, the biggest problem with the English survey (as reported in the unpublished paper) is that it appears to be in serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research (AAPOR).  *See* "AAPOR Code of Professional Ethics and Practices," April 2021, available at https://aapor.org/standards-and-ethics (last accessed May 31, 2023).  Among the ways that the English survey seemingly runs afoul of AAPOR canons, it fails to identify the source of sponsorship funding and it fails to fully and openly disclose the measurement tools (Rules III.A.2-3).  The former is vital to assuring that the survey was not designed and conducted to further the political or economic interests of particular people or organizations.  The latter allows independent observers and researchers to assess if, among other factors, question order, question wording, or answer options biased responses.  The latter is also crucial to assuring that select findings were not suppressed because they would, if publicized, undermine the agenda of the survey's sponsor(s).  Without release of the entire questionnaire and the full results to the public, it cannot be confirmed that questions and corresponding responses were not suppressed.

civilians.  Between 1963 and 1979, Colt only manufactured a total of 96,401 AR-15-Marked Sporter I rifles.[18]  Beginning in the early 1980s, other AR-15 style rifles entered the market for sale to the general public.  And, according to NSSF estimates, in 1990, only a total of 74,000 MSRs were introduced into civilian circulation (again likely including law enforcement and security agencies, firearms retailers, prohibited owners, and illegally trafficked firearms).[19]  Even if, for the sake of argument, 100,000 MSRs—an estimate much higher than the 74,000 that the NSSF estimated to have been introduced in 1990—had been introduced into the civilian market annually between 1980 and 1989 and all of these MSRs were AR-15 style rifles, less than 1.1 million AR-15 style rifles would have been in civilian circulation prior to 1990.[20]  Indeed, one estimate that reviewed the serial numbers of AR-15 style rifles in civilian circulation, prior to the federal Assault Weapons Ban taking effect in 1994, calculated that the number of such pre-ban rifles was less than 800,000.[21]  Accounting for the broader period of 1963 through 2017, that same analysis estimated that, based on manufacturing data, the total number of AR-15 style rifles in civilian circulation was less than 8.3 million.[22]  I am not aware of any basis for Passamaneck's unsubstantiated estimate that "about 8 to 9 million AR15s were owned by US citizens *prior to 1990*" (emphasis added).

---

[18] Christopher R. Bartocci, *America's Rifle: M16/M4 Late Cold War through Global War on Terror* (2022), at 283-284 (relevant excerpt attached as **Exhibit B**).  *See*, also, General Staff, "Estimating AR-15 Production, 1964-2017," November 9, 2019, *available at* http://www.generalstaff.org/Firearms/Count/AR15_Production.htm (last accessed June 2, 2023). The patent for the AR-15 rifle expired in 1977.  *Ibid*.  However, it took a few years for the design to appear in the civilian marketplace.  Todd C. Frankel, et al., "The Gun That Divides a Nation," *Washington Post*, March 27, 2023, *available at* https://www.washingtonpost.com/nation/interactive/2023/ar-15-america-gun-culture-politics (last accessed May 31, 2023).

[19] NSSF, *Firearm Production in the United States with Firearm Import and Export Data, supra* note 8.

[20] Assuming 100,000 MSRs entering the American market annually for the ten-year period of 1980-1989 would produce a total of 1 million MSRs.  Adding the number of AR-15 rifles produced by Colt for private citizens to purchase and own between 1963 and 1979 (96,401) to the figure of 1 million MSRs covering the timeframe of 1980-1989 results in a total of 1,096,401 MSRs maximum.

[21] General Staff, *supra* note 18.

[22] *Ibid*.

14. Despite the numerous issues just discussed, Passamaneck goes on to conclude that, at present, "conservatively, there are at least 34 million AR15s owned by US citizens"—an estimate that he offers without explaining how he calculated it.

## II.B. Assertions Pertaining to LCMs

15. With regard to LCMs, Passamaneck writes:

As magazines are a commodity that is sold without serialization or tracking, the total number of magazines that are above 15 rounds is difficult to measure. However, the 2018 NSSF Magazine Chart estimates 71 million handgun magazines of 11+ rounds, 9.4 million rifle magazines from 11-29 rounds (20 being the most common and 15 being the second most common) and 79 million rifles magazines of 30+ rounds. Mag-Pul, the largest manufacturer of AR15 magazines (and who also produces Glock and AR10 magazines) estimates the total number of magazines of 15+ rounds at 350 million…. Conservative estimates are that, conservative, and there certainly close to 100 million handgun magazines in the US that are over 15 rounds. That leaves approximately 250 million rifle magazines over 15 rounds. From one third to one half of all US gun owners surely own a magazine that is over 15 rounds.[23]

16. Passamaneck begins his overview of magazine circulation estimates with a statement that is accurate: "As magazines are a commodity that is sold without serialization or tracking, the total number of magazines that are above 15 rounds is difficult to measure." Passamaneck then goes on to discuss a chart published by the NSSF that estimated that, as of 2018, there were approximately 160 million LCMs with a capacity greater than 10 rounds in circulation in the United States.[24] However, as James Curcuruto, the NSSF's former Director of

---

[23] This block quotation, including punctuation and capitalization, is reproduced exactly as it appears in Passamaneck's report. The portion of the quotation that has been replaced by ellipsis reads: "The 2018 NSSF estimate of Semi-Automatic handguns is 89 million, with about 40% being 9mm, which are commonly 15 or 17 rounds depending on the frame size. The Glock 17 is the most prolific handgun in the US with 60 to 70 percent of LEOs utilizing them and at least 30% of target and sport shooters using them. They also have an edge for use as a home, or self-defense firearm. They are sold with 2 or 3 standard capacity 17 round magazines."

[24] The 2018 NSSF Magazine Chart is published in NSSF, *Firearm Production in the United States with Firearm Import and Export Data, supra* note 8, at 7. As Passamaneck notes, "the 2018 NSSF Magazine Chart estimates 71 million handgun magazines of 11+ rounds, 9.4 million rifle magazines from 11-29 rounds (20 being the most common and 15 being the second most common) and 79 million rifles magazines of 30+ rounds." While the NSSF Magazine Chart does estimate 159.8 million magazines with a capacity greater than 10 rounds of

Industry Research and Analysis and one of the creators of the NSSF's "Magazine Chart," has stated in another case, he is "not aware of any singular public source providing *reliable* figures identifying exactly how many ammunition magazines are manufactured or imported for sale within the United States each year."[25]  Therefore, there is good reason to be suspicious of the NSSF estimate mentioned by Passamaneck.  For starters, the NSSF estimate is asserted without any reviewable evidence to support it.  It is merely a blanket claim offered with zero proof.  Indeed, as Curcuruto himself conceded regarding the NSSF estimate, "magazines with a capacity greater than 10 rounds in circulation is an estimation based on extrapolation from indirect sources and *cannot be confirmed as unequivocally accurate*."[26]

17.     After presenting the NSSF estimate, Passamaneck presents an estimate that he attributes to the magazine manufacturing company Magpul, suggesting that there are 350 million LCMs with a capacity greater than 15 rounds of ammunition.  Because there is no link to any source material for this estimate, it is impossible to verify that Magpul has made such an estimate.  If Passamaneck's representation is correct, then, Magpul, a member of the firearms industry, has calculated a drastically larger estimate than the firearm industry trade association has suggested.  Indeed, the difference between the NSSF estimate (which covers all LCMs holding more than 10 rounds) and the Magpul estimate (which covers a subset of LCMs holding more than 15 rounds) might even be greater than three-fold.

18.     Passamaneck appears to believe that the unsubstantiated Magpul estimate of 350 million magazines with a capacity greater than 15 rounds is a conservative estimate.  As he states, "Conservative estimates are that, conservative, and there [*sic*] certainly close to 100 million handgun magazines in the US that are over 15 rounds."  He adds, "That leaves

---

ammunition, nowhere in the chart or the larger report (where the chart appears) does the NSSF provide a breakdown that shows the difference between rifle magazines with a capacity of 15 rounds compared to rifle magazines with a capacity of 20 rounds.  Passamaneck's assertion that "20 being the most common and 15 being the second most common" is unsubstantiated by the NSSF report which contains the Magazine Chart.  *Ibid*.

[25] Declaration of James Curcuruto, *Wiese v. Bonta*, 2:17-cv-00903-WBS-KJN (E.D. Calif.), June 14, 2017, Dkt. No. 28-3, para. 6 (emphasis added) (attached as **Exhibit C**).

[26] *Ibid*., para. 13 (emphasis added).

approximately 250 million rifle magazines over 15 rounds."  Again, these figures are presented without an evidentiary foundation.  Furthermore, Passamaneck does not explain how he (or Magpul) determined that the 350 million magazines holding more than 15 rounds broke down into 100 million handgun and 250 million rifle magazines.  Nor does he explain why this estimate is a conservative estimate (which, if true, would mean that the NSSF's estimate is grossly erroneous).

19.     Passamaneck concludes his assessment of LCM circulation estimates by declaring, "From one third to one half of all US gun owners *surely* own a magazine that is over 15 rounds" (emphasis added).  This is the first time that Passamaneck addresses how many gun *owners* possess an LCM (in this instance, LCMs with a capacity greater than 15 rounds), as opposed to how many *LCMs* are in circulation.  Based on the information in his report (or lack thereof), it is impossible to determine how Passamaneck arrived at this conclusion.  It is also not possible to determine why the range is so wide, from one-third to one-half.

20.     In 2013, in the immediate aftermath of the Sandy Hook Elementary School massacre, the news media was reporting that the number of LCMs holding more than 10 rounds of ammunition was estimated to be approximately 40 million.[27]  According to the NSSF, a mere five years later, the number of such LCMs with a capacity greater than 10 rounds was estimated to be 160 million, which represents more than a four-fold difference.[28]  And, allegedly according to Magpul, the number of LCMs holding not just more than 10 rounds of ammunition, but more than 15 rounds of ammunition, is estimated to be 350 million—a nearly nine-fold difference.

21.     As these three substantially different, unverifiable estimates (40/160/350 million) demonstrate, the number of LCMs in circulation in the United States is not known with any degree of certainty or accuracy.

---

[27] *See*, for example, Patrik Jonsson, "Gun Debate 101: Time to Ban High-Capacity Magazines?" *Christian Science Monitor*, January 16, 2013, *available at* https://www.csmonitor.com/USA/Politics/DC-Decoder/2013/0116/Gun-debate-101-Time-to-ban-high-capacity-magazines (last accessed May 31, 2023).
[28] NSSF, *Firearm Production in the United States with Firearm Import and Export Data, supra* note 8.

Executed on June 8, 2023, at Nassau County, New York.

/s/ _____

Louis Klarevas

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

**EXPERT DISCLOSURES**

---

      Plaintiffs submit the attached expert disclosures.

*/s/ Barry K. Arrington*

_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
(303) 205-7870
barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033

Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2023, I emailed the foregoing to:

Careydunne1@gmail.com
gvaughan@vaughandemuro.com
cmuse@vaughandemuro.com
vnd@vaughandemuro.com
david.toscano@davispolk.com
christopher.lynch@davispolk.com
christopher.lynch@davispolk.com
wtaylor@everytown.org
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
truhland@bouldercounty.org
dhughes@bouldercounty.org
hendrik.vanhemmen@davispolk.com
james.windels@davispolk.com

*/s/ Barry K. Arrington*
_____
Barry K. Arrington



**ENGINEERING CORP.**

Address **12650 W. 64th Ave E-507**
Arvada, CO 80004
Tel **720-880-5777**
Fax **720-880-5778**
Website **www.EntropyEC.com**

April 12, 2023

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
*Barry@arringtonpc.com*

## Expert Report

RE:   Client:          National Foundation for Gun Rights
EEC Project:          2402 Colorado Magazine Limits

Dear Mr. Arrington,

At your request, Entropy Engineering Corp (Entropy) has evaluated portions of the case referenced above. The purpose of this report is to provide expert opinions on matters for which the author is qualified and has extensive knowledge.

**Discussion**

Standard capacity magazines, as originally designed, manufactured and sold within the State of Colorado are commonly possessed and used for lawful purposes. Millions of Americans own and use AR15 style rifles. A Washington Post survey in 2022 numbers the owners of AR15s at 16 million while the 2020 number was almost 20 million according to NSSF President and CEO Joseph Bartozzi, who called the AR-15 the "most popular rifle sold in America" and a "commonly owned firearm." A 2021 survey conducted by Georgetown University Professor William English in 2021 of 16,000-gun owners revealed that of those, 30% owned AR15 style rifles. Further, the NSSF 2020 Industry Intelligence report has the number of AR15 rifles produced minus exports (so sold in the US) at just under 20 million from 1990 through 2018. It is estimated that about 8 to 9 million AR15s were owned by US citizens prior to 1990 and the

April 12, 2023
Arrington
EEC 2402
Page 2

total number of semi-automatic rifles owned in the US (2018) at just over 43 million.  From 2019
through 2022, another 3 to 4 million have been sold.  So, conservatively, there are at least 34
million AR15s owned by US citizens, and the vast majority of those rifles were sold with at least
one 20 or 30 round (30 round standard being most common) magazines.  As magazines are a
commodity that is sold without serialization or tracking, the total number of magazines that are
above 15 rounds is difficult to measure.  However, the 2018 NSSF Magazine Chart estimates 71
million handgun magazines of 11+ rounds, 9.4 million rifle magazines from 11-29 rounds (20
being the most common and 15 being the second most common) and 79 million rifles magazines
of 30+ rounds.  Mag-Pul, the largest manufacturer of AR15 magazines (and who also produces
Glock and AR10 magazines) estimates the total number of magazines of 15+ rounds at 350
million.  The 2018 NSSF estimate of Semi-Automatic handguns is 89 million, with about 40%
being 9mm, which are commonly 15 or 17 rounds depending on the frame size.  The Glock 17 is
the most prolific handgun in the US with 60 to 70 percent of LEOs utilizing them and at least
30% of target and sport shooters using them.  They also have an edge for use as a home, or self-
defense firearm.  They are sold with 2 or 3 standard capacity 17 round magazines.  Conservative
estimates are that, conservative, and there certainly close to 100 million handgun magazines in
the US that are over 15 rounds.  That leaves approximately 250 million rifle magazines over 15
rounds.  From one third to one half of all US gun owners surely own a magazine that is over 15
rounds.

Detachable magazines are necessary to make semi-automatic firearms, designed to receive such
magazines, operate effectively.  Without such magazines, semi-automatic firearms are
inoperable.  The feed angle, magazine spring pressure, and feed ramps are all design features
coupled between the magazine (when inserted into the magwell) and the firearm to ensure
function as intended.  Magazines, by nature and with use, are wear items that must be
periodically replaced.  The largest percentage of semi-automatic firearms failures are due to
damage, or wear, of the magazines.  When citizens are not allowed to purchase magazines for
their firearms, they will eventually become useless.  Some of the most common polymer
magazines will wear out and become inoperable in as little as 500 rounds.  Very few can pass
2000 rounds without replacement.  That is significantly less than the 50K to 100K rounds to
wear out a firearm.

Magazines are not merely a box in which ammunition is stored, rather, cartridges are held in the
magazine under spring tension.  When a semi-automatic firearm is fired, the spring pushes
another cartridge up for the bolt to push it into the chamber so that it can be fired with the next
pull of the trigger.  If there is no magazine pushing cartridges up into the action, one by one,
there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is

April 12, 2023
Arrington
EEC 2402
Page 3

the defining characteristic of a semi-automatic weapon. Thus, without magazines as a designed component of semi-automatic firearms they would not exist. In other words, magazines are a necessary and integral part of the operation of a semi-automatic firearm.

In addition, for at least the last 40 years, magazines, as an integral commodity product that allow the semi-automatic firearm to function, have been designed with basepads that specially allow them to be changed with different pads allowing for variable capacities.

**Report Limitation**

Entropy has been retained to provide advice relative to referenced matter. The findings and conclusions contained herein are derived from numerous sources and believed to be correct. This report is subject to change in the event that additional information or findings are provided to Entropy. Neither this report, nor any of the professional opinions contained herein (or the bases for those opinions) shall be used, relied upon, or otherwise disclosed to anyone other than the parties involved in this matter without Entropy's express written consent.

**Qualifications**

Mr. Passamaneck has extensive knowledge of firearms desing, manufacture and use. He has designed magazines, barrels, muzzle devices, gas blocks and complete firearms for manufacturers. Mr. Passamaneck has extensively tested firearms, ammunition and accessories. He has conducted shooting reconstructions related to both intentional and unintentional firing of firearms. Mr. Passamaneck has been admitted in courts as a firearms expert and as a ballistics expert. He holds several training certifications and has trained and coached shooting in a wide array of disciplines.

Mr. Passamaneck charges $250/hour for consulting services, including producing work product, testimony and travel. His testimony for the last 4 years is as follows:

| Project | Date | Arb, Depo, Trial, Hearing, Mediation | Case Number | Court | Case Name | | Client |
|---|---|---|---|---|---|---|---|
| 2280 | 05.03.19 | D | Case#201 8CV03095 4 | Office of Franz Hardy Gorden Rees Scully Mansukhani,LLP | Martha Munoz V Public Service DBA X-Cel Energy | | John Sheppard |

April 12, 2023
Arrington
EEC 2402
Page 4

| 2251 | 07.07.20 | T | Workers Comp. No. 5-123-298 | Call In Zoom Call | Cassandra Newell V O'Reilly Auto Parts | Brad Miller |
|------|----------|---|------------------------------|-------------------|-----------------------------------------|-------------|
| 2356 | 9/16/20 | T | Workers Comp. No. 5-119-454 | Office of Administrative Courts, Denver, CO | Larry Pfannenstiel V O'Reilly Auto Parts | Brad Miller |
| 2356 | 10.01.20 | D | Workers Comp. No. 5-119-454 | Office of Administrative Courts, Denver, CO | Larry Pfannenstiel V O'Reilly Auto Parts | Brad Miller |
| 2252 | 06.10.21 | D | Case#2018CV31645 | District Court Adams County | Steven-Roberts Originals, LLC V Rocky Mountain Mechanical Systems | Brian Suth |
| 2340 | 08.19.21 | T | Case#17CV6 | District Court Eagle County, Colorado | Tania Bricel v Wyndham Worldwide | James Bailey |
| 2373 | 4.21.22 | D | Case#2021CV30152 | Boulder County, | Pipe X v Park North | Brad Shefrin |
| 2392 | 12.13.22 | D | 2022CV30439 | District Court, Denver County, Colorado | Moutain States Plumbing v. Winter Park Land Co. LLC | Kirsten Kube |

Thank you for using Entropy in this matter. Please contact this writer if you have any questions or if we may be of further assistance.

Sincerely,
**Entropy Engineering Corp**

Mark W. Passamaneck, PE
President, Principal Engineer

EXHIBIT B

# AMERICA'S RIFLE

## M16/M4 LATE COLD WAR THROUGH GLOBAL WAR ON TERROR

### CHRISTOPHER R. BARTOCCI



**SMALL ARMS**
SOLUTIONS LLC

This is an authorized, revised and expanded edition of BLACK RIFLE II-M16 Into The 21st Century, originally published by Collector Grade Publications Inc. and edited by R. Blake Stevens, which is now out of print.

Serial Number Designations for Colt Semi-Automatic-Only Rifles  283

# Serial Number Designations for Colt Semi-Automatic-Only Rifles

## Arms Produced Prior to the Assault Weapon Ban of 1994

| SN and Prefix | Description |
|---|---|
| SP360200 and below | Pre-Ban AR-15-marked rifles |
| CC001616 and below | Pre-Ban Colt Carbine |
| CH019500 and below | Pre-Ban Competition HBAR |
| GC018500 and below | Pre-Ban Government Carbine |
| LH011326 and below | Pre-Ban Sporter Lightweight 7.62x39mm |
| MH086025 and below | Pre-Ban Sporter Match HBAR rifles |
| NL004800 and below | Pre-Ban Sporter Lightweight 9mm |
| SL027264 and below | Pre-Ban Sporter Lightweight .223 Rem |
| ST038100 and below | Pre-Ban Sporter Target rifles with muzzle brake |
| TA10100 and below | Pre-Ban 9mm Carbine |
| BD000134 and below | Pre-Ban AR-15A3 Tactical Carbine |

## Post-Ban Match Target Series Rifles

### Manufactured after September 13, 1994

| SN Prefix | Description |
|---|---|
| MTM | Match Target M4 Carbine |
| CCH | Match Target Competition HBAR |
| CNL | Match Target Lightweight |
| CST | Colt Match Target, Target Model |
| CMH | Match Target Match HBAR |
| CJC | Match Target Competition HBAR II |
| BK | CAR-A3 HBAR Elite |
| CSL | Colt Match Lightweight .223 Rem |
| CLH | Colt Match Lightweight 7.62x39mm |

## Colt Law Enforcement Series

| SN Prefix | Description |
|---|---|
| LSL | Law Enforcement Lightweight Carbine |
| LGC | Law Enforcement AR-15A2 Carbine |
| LTA | Law Enforcement 9mm Carbine |
| LBD | Law Enforcement AR-15A3 Tactical Carbine |
| LSL | Law Enforcement Lightweight Carbine |

## Serial Number Ranges For Colt AR-15 Sporter I Rifles

| Year | SN Range | Year | SN Range |
|---|---|---|---|
| 1963 | SP00001 – SP00023 | 1968 | SP10750 |
| 1964 | SP00101 | 1969 | SP14000 – SP14653 |
| 1965 | SP02501 | 1970 | SP15001 – SP15473 |
| 1966 | SP05600 | 1971 | SP16001 |
| 1967 | SP08250 | 1972 | SP19401 |

284  Serial Number Designations for Colt Semi-Automatic-Only Rifles

| Year | | SN Range | Year | | SN Range |
|------|---|----------|------|---|----------|
| 1973 | . . . . . . . . . . . | SP24201 | 1978 | . . . . . . . . . . . | SP83400 |
| 1974 | . . . . . . . . . . . | SP32601 | 1979 | . . . . . . . . . . . | SP96401 |
| 1975 | . . . . . . . . . . . | SP43801 | 1980 | . . . . . . . . . . . | SP112801 |
| 1976 | . . . . . . . . . . . | SP55301 | 1981 | . . . . . . . . . . . | SP134601 |
| 1977 | . . . . . . . . . . . | SP67651 | 1982 | . . . . . . . . . . . | SP158201 |

EXHIBIT C

1    George M. Lee (SBN 172982)
     Douglas A. Applegate (SBN 142000)
2    **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
     601 Montgomery Street, Suite 2000
3    San Francisco, California 94111
     Phone: (415) 979-0500
4    Fax:     (415) 979-0511

5    Raymond M. DiGuiseppe (SBN  228457)
     **LAW OFFICES OF RAYMOND MARK DIGUISEPPE, PLLC**
6    4002 Executive Park Blvd., Suite 600
     Southport, NC 28461
7    Phone: (910) 713-8804
     Fax:     (910) 672-7705

8

     Attorneys for Plaintiffs
9    WILLIAM WIESE, JEREMIAH MORRIS,
     LANCE COWLEY, SHERMAN MACASTON,
10   ADAM RICHARDS, CLIFFORD FLORES,
     L.Q. DANG, FRANK FEDEREAU, ALAN NORMANDY,
11   TODD NIELSEN, THE CALGUNS FOUNDATION,
     FIREARMS POLICY COALITION,
12   FIREARMS POLICY FOUNDATION,
     and SECOND AMENDMENT FOUNDATION

13

14                  UNITED STATES DISTRICT COURT

15           FOR THE EASTERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17   WILLIAM WIESE, et al., | Case No. 2:17-cv-00903-WBS-KJN |
| 18               Plaintiffs, | **DECLARATION OF JAMES CURCURUTO IN** |
| 19      vs. | **SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF PRELIMINARY INJUNCTION** |
| 20 | |
| 21   XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | **[FRCP 65; E.D. L.R. 231]** |
| 22               Defendants. | Date:      TBD |
| 23 | Time:      TBD |
| 24 | Courtroom 5 |
| | Judge:    Hon.  William B. Shubb |

25

26   //

27   //

28   //

*SEILER EPSTEIN ZIEGLER & APPLEGATE LLP*
*Attorneys at Law*

– 1 –

## DECLARATION OF JAMES CURCURUTO

1.      I, James Curcuruto, am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.      I am the Director, Industry Research and Analysis, at the National Shooting Sports Foundation ("NSSF"). The NSSF is the trade association for the firearms industry. Its mission is to promote, protect and preserve hunting and the shooting sports. Formed in 1961, NSSF has a membership of 12,000 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations and publishers.

3.      In my position as Director, Industry Research and Analysis, I am responsible for most of the industry research activities at NSSF, and I direct the activities of an internal research coordinator as well as outside companies retained to conduct research and gather market and consumer information useful to NSSF members.

4.      Many NSSF members manufacture, distribute and/or sell firearms and shooting and hunting-related goods and services, and as is usual and customary for trade associations, the NSSF collects and disseminates industry-specific, non-sensitive data reflecting consumer preferences, market trends and other information for use in their business decisions. Among the shooting and hunting-related goods and services manufactured, distributed and sold by NSSF members are ammunition magazines.  Research conducted by the NSSF and under my direction demonstrates that detachable ammunition magazines are very popular and are commonly owned by millions of persons in the United States for a variety of lawful purposes, including, but not limited to, recreational and competitive target shooting, home defense, collecting and hunting.

5.      In addition to ammunition magazines accompanying firearms that utilize them at the time of sale, such magazines are also widely available for sale as a standalone item to individuals who need a replacement, different-capacity, and/or additional magazines.

6.      I am not aware of any singular public source providing reliable figures identifying

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 2 –

1  exactly how many ammunition magazines are manufactured or imported for sale within the

2  United States each year. There are, however, data available to me from which estimations of the

3  amount of magazines that have been sold to the general population, as well as how many of those

4  have a capacity for ammunition exceeding ten rounds, can be calculated within a reasonable

5  degree of certainty.

6       7.     Using such data, I have, in the normal scope of my duties on behalf of the NSSF,

7  calculated estimations of the total number of magazines possessed by consumers in the United

8  States, as well as how many of those have a standard capacity for ammunition exceeding ten

9  rounds. These estimations are published in the NSSF® Magazine Chart attached as Exhibit "A."

10      8.     The NSSF® Magazine Chart estimates that 230 million pistol and rifle magazines

11  were in the possession of United States consumers between 1990 and 2015. The data supporting

12  the Chart further shows magazines capable of holding more than 10 rounds of ammunition

13  accounted for approximately 115 million or approximately half of all magazines owned.

14      9.     Sources used to compile the NSSF® Magazine Chart include the Bureau of

15  Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturers and Exports

16  Reports (AFMER), U.S. International Trade Commission (ITC), as well as, opinions of firearms

17  industry professionals. To prepare the NSSF® Magazine Chart, only the number of pistols and

18  rifles were used while revolver and shotgun data was excluded as revolvers and the vast majority

19  of shotguns do not utilize magazines.

20      10.    The ATF AFMER data provide historical figures for pistols by caliber (i.e., the

21  specific ammunition cartridge for which a firearm is chambered) and rifles produced in the

22  United States for consumer purchase. The ITC data provides historical figures for pistol and

23  rifles imported to and exported from the United States for consumer purchase. The total number

24  of firearms available for consumer purchase from 1990 through 2015 was calculated by adding

25  the total U.S.- production of firearms with total firearms imported and then subtracting total

26  firearms exported.

27      11.    The ATF AFMER and ITC data provided estimates of approximately 67.7 million

28

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

1    pistols and 42.6 million rifles capable of holding a magazine were available to United States

2    consumers between 1990 and 2015. Firearms industry professionals with knowledge of the pistol

3    and rifle magazine market then allocated magazines to the totals to complete the data provided in

4    the NSSF® Magazine Chart.

5           12.      It can be assumed that many more such magazines were manufactured in the

6    United States or imported to the United States for sale in the commercial marketplace both prior

7    to 1990 as well as after 2015.

8           13.      While the figure of 115 million magazines with a capacity greater than 10 rounds

9    in circulation is an estimation based on extrapolation from indirect sources and cannot be

10   confirmed as unequivocally accurate, it is safe to say that whatever the actual number of such

11   magazines in United States consumers' hands is, it is in the tens-of-millions, even under the most

12   conservative estimates.

13          I declare under penalty of perjury that the foregoing is true and correct. Executed

14   within the United States on June 9, 2017.

15

16

17                                                              James Curcuruto

18

19

20

21

22

23

24

25

26

27

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

– 4 –

EXHIBIT A



EXHIBIT B TO DEFENDANTS'
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-2680-NYW-SKC

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

       Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

       Defendants.

---

**Declaration of James Yurgealitis**

---

I, James E. Yurgealitis, declare as follows:

1.      I am over the age of 18 years of age and competent to testify to the matters stated below and do so based on my personal knowledge.

2.      Exhibit 1 is a true and accurate copy of my rebuttal expert report in the above-captioned matter. It contains opinions to which I would testify if called upon as a witness in the above-captioned matter, and I declare under penalty of perjury that it is true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 21 day of November, 2023
at Manchester, Maryland

_____
James E. Yurgealitis

Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2680**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT, and
GORDON MADONNA,
JAMES MICHAEL JONES,
and MARTIN CARTER
KEHOE,

     Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

     Defendants.

---

## Expert Rebuttal Report of James Yurgealitis

---

I, James E. Yurgealitis, state as follows:

1.      I have been retained by the Town of Superior, the City of Boulder, the City of Louisville, and the Board of County Commissioners of Boulder County ("Defendants") to serve as an expert witness in this case.

2.      At the request of Defendants, I previously prepared and submitted an expert report, executed May 5, 2023, addressing the types and operation of firearms, the evolution and operation of assault weapons, the evolution and operation of large-capacity and lower-capacity magazines, and the use of firearms in self-defense.

3.      My resume, qualifications, and rate of compensation as included with and stated in that initial report remain accurate, with the following addition: On June 6, 2023, I testified as an expert witness at trial in *Oregon Firearms Federation v. Kotek*, Nos. 2:22-cv-01815-IM (lead case), 3:22-cv-01859-IM (trailing case), 3:22-cv-01862-IM (trailing case), 3:22-cv-01869-IM (trailing case) (D. Or.).

4.      Since submission of my initial expert report, I have received and reviewed additional material submitted by Plaintiffs that was not available prior to the submission of my initial report: the report submitted by Plaintiffs' proffered expert, Mark W. Passamaneck. I have prepared this rebuttal expert report in response to Mr. Passamaneck's report. This rebuttal report responds in particular to the second, third, and fourth paragraphs of the "Discussion" section of Mr. Passamaneck's report.

5.      Like my initial report, this rebuttal report is based on my own personal knowledge and experience and, if called as a witness, I could and would testify competently to the truth of the matters discussed in this report. I hold all opinions expressed herein to a reasonable degree of professional certainty.

## **DISCUSSION**

6.      Mr. Passamaneck begins the second paragraph of the "Discussion" section of his report by stating: "Detachable magazines are necessary to make semi-automatic firearms, designed to receive such magazines, operate effectively. Without such magazines, semi-automatic firearms are inoperable." Those statements are not correct.

7.      As I explained in my initial report (*see* ¶¶ 29, 35, 49, 119, 121), numerous semi-automatic firearms operate with fixed internal magazines rather than detachable magazines. Some notable examples include the M1 Garand, the Browning BAR, and the SKS.

8.      In addition, as discussed further below, *see infra* ¶ 15, a magazine, whether fixed internal or detachable, is not required for a semi-automatic firearm to function.

9.      Mr. Passamaneck focuses much of his report on detachable magazines and statements regarding how firearms use detachable magazines. In order to respond to those portions of Mr. Passamaneck's report, it is necessary to provide some additional details about the construction and operation of detachable magazines.

10.     Detachable magazines are, generally speaking, devices that hold and facilitate the feeding of ammunition into semi-automatic or full-automatic firearms and are commonly constructed of five components:

      A.) the magazine body or tube (commonly constructed of metal or polymer),

      B.) the magazine follower,

      C.) the magazine spring,

      D.) the magazine lock plate, and

      E.) the magazine baseplate or floorplate.

11.     The following illustration details the five components of a detachable magazine for a Smith & Wesson semi-automatic pistol.[1]



12.     When assembled, the magazine body contains the other four components. The follower is mounted at the top of the spring and the lock plate at the bottom. The spring, with the two components attached, is compressed into the magazine body and secured by the baseplate. It is loaded by pushing ammunition cartridges down into the magazine body, against the follower, until the desired capacity is attained. This action also further compresses the spring, placing it under tension.

13.     When the magazine is inserted into a semi- or full-automatic firearm, the bolt of the firearm (rifles and shotguns) or slide (pistols) is pulled back and released, which "strips" the first cartridge from the top of the magazine and feeds it into the chamber. Subsequent cartridges will be pushed upwards in the magazine body by the follower, which is "powered" by the spring tension.

---

[1] Image Source: https://www.targetbarn.com/broad-side/media/partsofapistolmagazine.jpg

14.     It is important to note that the ability of a semi- or full-automatic firearm to function is not dependent on the capacity of the magazine. Any firearm capable of accepting or designed to utilize a detachable magazine with a capacity exceeding 10 rounds will function with a magazine with a capacity of 10 rounds or less. And thus any firearm capable of accepting or designed to utilize a detachable magazine with a capacity exceeding 10 rounds will function with a magazine legal under the ordinances challenged in this case. Magazine capacity is not a determinant of a firearm's operability.

15.     A magazine is not required for a semi-automatic firearm to function. Generally speaking, a semi-automatic firearm, without a magazine inserted, can be loaded manually with a single cartridge and fired.[2] The magazine, with additional available cartridges, is what allows the firearm to fire additional shots without manual manipulation of the bolt or slide.

16.     In the fourth paragraph of the "Discussion" section of his report, Mr. Passamaneck makes some statements about magazine baseplates or basepads. Magazine baseplates are a standard part of a detachable magazine and, in modern designs, typically removable. Removable baseplates facilitate cleaning, maintenance, and repair of the magazines. Because they are removable, these baseplates also can be replaced with aftermarket baseplate extensions or extenders available from numerous vendors, which can allow for the loading of additional cartridges above the original capacity of the magazine as manufactured.

---

[2] Exceptions to this include the FN/Browning "Hi Power" pistol and other firearms which incorporate a magazine safety (or magazine disconnect). The "Hi Power" pistol as manufactured will not fire, even with a cartridge in the chamber, unless a magazine is inserted into the magazine well which releases the safety. The vast majority of available semi-automatic pistols do not have a magazine safety. Note that, as with other semi-automatic firearms, the capacity of the magazine is not a determining factor, as it will function with a magazine having a capacity of 10 rounds or less or with one of greater capacity.

17.     Mr. Passamaneck also makes several statements in his report about the durability of detachable magazines. Specifically, in the second paragraph of the "Discussion" section of his report, he states:

> Magazines, by nature and with use, are wear items that must be periodically replaced. The largest percentage of semi-automatic firearms failures are due to damage, or wear, of the magazines. When citizens are not allowed to purchase magazines for their firearms, they will eventually become useless. Some of the most common polymer magazines will wear out and become inoperable in as little as 500 rounds. Very few can pass 2000 rounds without replacement. That is significantly less than the 50K to 100K rounds to wear out a firearm.

Those statements in Mr. Passamaneck's report are misleading and inaccurate.

18.     Consistent with their original development and design for military combat, which I discussed in my initial report (*see* ¶¶ 121-22), detachable magazines are designed and manufactured to be durable and function in adverse conditions. As such, they are not delicate devices and rarely fail in their entirety. Much as with any other mechanical device, malfunctions can usually be traced to damage or wear of one of the component parts. In my 26 years of experience in federal law enforcement, I only had two occasions where I needed to replace a cracked baseplate for one of my issued magazines. Other than those two occurrences, the magazines performed flawlessly while having thousands of rounds fired through them over a period of several years. My experience in this regard is consistent with the experience of other law enforcement officers I have either trained, or trained with, during my career.

19.     The bodies of detachable magazines are either made of metal (steel or aluminum) or polymer (a high-grade, impact-resistant plastic).

20.     Traditional steel- or aluminum-bodied detachable magazines are extremely durable, owing to their initial intended use in combat.

21.     Polymer-bodied magazines are very popular and are manufactured and/or included by popular handgun manufacturers, such as Glock. They are also manufactured by numerous aftermarket suppliers, such as Magpul. The chief advantages of polymer- over traditional steel- or aluminum-bodied magazines are their resistance to corrosion, ability to absorb impacts without dents or dings (which may impair function), and overall lighter weight.

22.     Although polymer-bodied magazines have certain advantages, military forces worldwide continue to utilize metal-bodied magazines, as they are durable and reliable (as proven in over a century of use in combat). Additionally, polymer-bodied magazines are not available for every firearm that utilizes detachable magazines.

23.     Polymer-bodied magazines are also inherently reliable, as evidenced by the recent Defense Logistics Agency (DLA) award of a three-year $20,000,000 contract with Magpul to produce their polymer-bodied magazine (PMAG) for the U.S. Armed Forces. This follows an earlier 2016 procurement by the U.S. Marine Corps as well as a DLA Contract in 2017 with Magpul for $12,000,000. Such widespread adoption by the U.S. military is confirmation of the advantages, both in reliability and durability, of polymer-bodied magazines.

> In December 2016, Magpul announced the Marines had, after a four-year testing evolution, adopted their MCT PMAG for use in all their 5.56mm platforms. In government-administered tests, the PMAG reportedly cycled 20,400 rounds of M855A1 ammo without any magazine-related stoppages. This, in turn, drew questions from lawmakers to Army Chief of Staff Gen. Mark Milley over why the country's primary small arms user wasn't fielding polymer mags. Subsequently, the DLA in 2017 announced a $12 million contract with Magpul to supply the Army, Air Force, and Marine Corps with PMAGs.[3]

---

3    https://www.guns.com/news/2023/01/20/magpul-grabs-20-million-pentagon-mag-contract; *see also* https://www.arbuildjunkie.com/ar-15-magazine-basics-performance-overview-duane-liptak-magpul/ (describing military testing where a magazine did not create a malfunction in a weapon until over 30,000 rounds had been fired).

Executed on June 8, 2023 at Portland, Oregon.

/s/

James E. Yurgealitis