IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02680-NYW-JPO

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

    Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

    Defendants.

---

**PLAINTIFFS' CITATION OF SUPPLEMENTAL AUTHORITY**

---

Pursuant to the Court's July 15, 2024, Order, Plaintiffs submit the following citation of supplemental authority.

## I. *Rahimi* Confirms *Heller* and *Bruen*

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court reaffirmed the plain text and historical tradition analysis for Second Amendment cases first announced in *D.C. v. Heller*, 554 U.S. 570 (2008), and reiterated in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Under that analysis, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24).

*Rahimi* involved a challenge to a federal statute that prohibited an individual subject to a domestic violence restraining order from possessing a firearm. The Court noted, as it had in *Heller* and *Bruen*, that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or 'historical twin.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 30). *Rahimi* concluded that the federal statute was constitutional since it was analogous to historical laws preventing individuals who threatened physical harm to others from misusing firearms. *Id.*, 144 S. Ct. at 1896.

For purposes of this case, the takeaway from *Rahimi* is that Defendants are wrong when they attempt to shift their burden under the *Bruen* test onto Plaintiffs. See Def. Mot. 12-13. Plaintiffs need only demonstrate that they are engaged in "arms

1

bearing conduct." *Id.*, 144 S. Ct. at 1897. Plaintiffs desire to keep and bear certain rifles and firearm magazines, and that is obviously "arms bearing conduct." Therefore, "as when the [Defendants] regulate other constitutional rights, they bear the burden to justify their regulations." *Id.* (cleaned up; internal citation and quotation marks omitted).

## II. The Plain Text Step Focuses on the Text, Not History

Earlier this month, the Fourth Circuit issued its en banc opinion in *Bianchi v. Brown*, 2024 WL 3666180 (4th Cir. 2024), a case involving Maryland's ban on certain so-called "assault weapons" and magazines. The majority engaged in the very interest balancing prohibited by *Bruen*, refused to implement the common use doctrine mandated by *Heller*, and upheld the arms ban. *Id.* at *26. In sum, the majority reached their result in the teeth of clear Supreme Court precedent. In contrast, in a masterful opinion written by Judge Richardson (which was joined by Judges Niemeyer, Agee, Quattlebaum and Rushing), the dissent faithfully applied *Heller*, *Bruen* and *Rahimi*. See *Bianchi*, at *35-75.[1]

Judge Richardson began by noting that for a plaintiff to meet his burden under the plain text step, he must show three things: (1) the law applies to "people" entitled to the right; (2) the law covers "arms'" and (3) the law regulates keeping or bearing those arms. *Id.* at *48. The term "people" applies to all members of the political community. *Id.* The AR-15s and other rifles banned by the statute obviously fall

---

[1] As was nearly always the case prior to *Bruen*, the dissenting opinion in the circuit court faithfully applies Supreme Court precedent. Thus, all references to *Bianchi* will be to that opinion unless otherwise noted.

2

within the plain meaning of the word "arms" as explicated in Founding-era dictionaries. *Id*. at *49. And since the law prohibits people from possessing such arms for any purpose, including self-defense, it regulates the keeping and bearing of arms. *Id*. The dissent rejected the proposition that plaintiffs are required to show that the arms are in common use for self-defense today as part of the plain text inquiry. The court wrote:

> The text protects the right to keep and bear "Arms" – not Arms in common use at the time. (quoting *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1209 (7th Cir. 2023), cert. denied sub nom. *Harrel v. Raoul*, 144 S. Ct. 2491 (2024) (Brennan, J., dissenting)). And when considering this plain text, the Court in *Heller* defined "Arms" to include "weapons of offence" and "anything that a man wears for his defence." *Heller*, 554 U.S. at 581, 128 S.Ct. 2783. The Court never mentioned the "common use" inquiry when discussing the Amendment's plain text. . . .
>
> The Court derived [the common use limitation] from the historical tradition of prohibiting the carrying of dangerous and unusual weapons. *Id*. at 627, 128 S.Ct. 2783. It was thus from our Nation's historical tradition of firearm regulation, and not the plain meaning of "Arms," that *Heller* drew this limitation on the scope of the right.

*Id*. at *50 (cleaned up; emphasis in original). In summary, Judge Richardson rejected the argument advanced by Defendants in this case and adopted the argument advanced by Plaintiffs. See Plaintiffs' Resp. to Def. Mot., 7-8.

### III. The Defendants' Ban is Unconstitutional Because the Banned Arms are in Common Use

Judge Richardson engaged in a lengthy exposition of *Heller's* "dangerous and unusual" limitation on the right to keep and bear arms after which he concluded:

> [In *Heller*, the Court] picked up on an enduring principle that stretched back far before and extended far after the Second Amendment's adoption. This principle reveals that the Second Amendment permits the government to ban weapons that are not commonly possessed for lawful purposes and are

3

particularly useful for criminal activity. But it does not permit the government to ban weapons that are not particularly useful for unlawful activity, nor weapons that are commonly possessed for lawful purposes, even if they happen to be dangerous.

*Bianchi*, at *59.

Thus, if an arm is in common use, it may not be banned. The dissent then stated:

Today, the AR-15 and its variants are one of the most popular and widely owned firearms in the Nation. As of 2021, there are at least twenty-eight million AR-style semiautomatic rifles in circulation. Roughly 2.8 million of those weapons entered the market in 2020 alone, making up around 20% of all firearms sold that year. For context, this means that there are more AR-style rifles in the civilian market than there are Ford F-Series pickup trucks on the road—the most popular truck in America. And when we look at actual ownership statistics, the numbers tell the same story. Various studies estimate that at least 16 million, but possibly up to 24.6 million, Americans own or have owned AR-style rifles.

*Id*. at *60.

In reaching these conclusions, the dissent relied heavily on figures published by the National Shooting Sports Foundation. See *Id.* at *60, n. 55, citing *NSSF Releases Most Recent Firearm Production Figures*, Nat'l Shooting Sports Found. (Jan. 11, 2024), https://www.nssf.org/articles/nssf-releases-most-recent-firearm-production-figures-2024/ [https://perma.cc/C533-T8TV].[2] The dissent also relied on studies published in the Washington Post and by Professor William English. See *Id.* n. 58, citing Emily Guskin, Aadit Tambe & Jon Gerberg, *Why Do Americans Own AR-15s?*, Wash. Post (Mar. 27, 2023), (estimating that about 16 million Americans—approximately 20% of gun owners—own AR-15-style rifles); and William English,

---

[2] In this case, Defendants' own expert relies on an earlier edition of this same report. See Plaint. Mot., Ex. E.

4

2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned 33 (May 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494 (estimating that 24.6 million Americans—approximately 30% of gun owners—have owned an AR-15 or similarly styled rifle). The NSSF has also issued a revised report regarding the number of magazines in circulation. The report surveyed 30-plus years of detachable magazine production and distribution and demonstrated that of the conservatively estimated 963,772,000 detachable magazines supplied from a firearm manufacturer and in the aftermarket, at least **717,900,000** have a capacity exceeding 10 rounds. See NSSF Detachable Magazine Report (available at https://nssfresearch.s3.amazonaws.com/Detachable-Magazine-NSSFReport.pdf).

Based on this data, for many years it has been "beyond debate" that the AR-15 is in common use for lawful purposes. *Id.* at *61. Indeed, even those justices that disagree with the Supreme Court's Second Amendment jurisprudence agree that the AR-15 is "commonly available." *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., joined by Kagan, J., and Jackson, J., dissenting). The dissent concluded that "the evidence shows that millions of Americans have chosen to equip themselves with semiautomatic rifles, like the AR-15, for various lawful purposes. So [the State has] failed to prove that these weapons are 'unusual' such that they can be constitutionally outlawed. Maryland's ban therefore violates the Second Amendment." *Bianchi*, at *62.

## IV. Defendants' View of the Purpose of the Second Amendment is "Overly Cramped"

Maryland, like the Defendants in this case, asserted that protecting the right of individual self-defense is the sole purpose of the Second Amendment and therefore the text should be restricted to further only that narrow purpose. *Id.* at *62. This will not do. First, a court may not derive exceptions to constitutional rights based on its notions of the text's underlying policies, purposes, or values. *Id.* (citing *Giles v. California*, 554 U.S. 353, 374-75 (2008)). More importantly, Defendants are wrong in the first place. The Second Amendment is not so limited. Nothing in *Heller, Bruen,* or *Rahimi* supports such a construction of the text. "That would have been an odd reading, indeed, seeing as the ratifying population widely agreed that the Second Amendment served larger purposes than individual self-defense, including the defense of the body politic and the prevention of tyranny." *Id.* at *63. Of particular interest to this case, Judge Richardson pointed to Colorado's experience to make this point: "For example, when serial killer Ted Bundy escaped from police custody in 1977, Colorado law enforcement convened a posse, carrying private firearms, and deployed it to successfully apprehend him." *Id.* n. 64 (citing David B. Kopel, *The* Posse Comitatus *and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 812-13 (2015)).

Judge Richardson is surely correct. The pre-existing right to keep and bear arms codified in the Second Amendment was understood at the Founding to rest on the twin pillars of the natural right of self-preservation and the natural right of resistance to tyranny. *Bianchi*, at *38. The right to arms thus ensured the people had the means to defend themselves against "private violence" and "public oppression."

6

*Id*. This is what the Court meant in *Heller* when it wrote that the right secured as a result of the Stuarts' abuses secures the means to protect against "both public and private violence." *Heller*, 554 U.S. at 594. In *Rahimi*, the Court reiterated that the Second Amendment vouchsafes both aspects of the right when the Court wrote: "As a leading and early proponent of emancipation observed, 'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.'" *Id*., 144 S. Ct. at 1897 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)).

## V. Defendants' "Suitability" Argument is Stealth Interest Balancing

Defendants argue that AR-15s are not "suitable" for self-defense. Def. Mot. 14. This is not accurate. More importantly, it not a matter about which this Court may properly inquire as Judge Richardson explained:

> At no point did *Heller* instruct federal judges to decide whether a particular weapon is "reasonably related or proportional to the end of self-defense." . . . That would be an odd mandate, indeed, as it would require federal judges to decide which weapons are most suitable for a country of individuals with different needs and abilities. Rather, the Supreme Court looked to the usage of the American people to determine which weapons they deem most suitable for lawful purposes. *Heller*, 554 U.S. at 629, 128 S.Ct. 2783. . . . It is thus the customary practices of the American people—not the uninformed meditations of federal judges—that determine which weapons are protected by the Second Amendment.

*Bianchi* at *64.

Thus, the *Bianchi* majority was engaging in the kind of interest balancing that *Heller, McDonald*, and *Bruen* rejected. Judge Richardson wrote: "The majority's new framework allows judges to decide just how important they think certain firearms are for self-defense and then to weigh this finding against the

7

threat they believe those arms pose to the public at large. Indeed, the entire concept of 'proportionality' is merely a license for unelected judges to usurp the public's role in determining whether a particular weapon is sufficiently *tailored* to the important *interest* of self-defense." *Id.* at *71 (emphasis in original).

## VI. Defendant's "Military Weapons" Argument Fails

Defendants argue that AR-15s may be banned because they are like M16s. Def. Mot. 20. This is wrong. Judge Richardson wrote: "Nor is there any support for the majority's assertion that the term 'dangerous,' at least by the time of the Revolution, included within its ambit military weapons. . . . [H]istory and tradition establish the exact opposite. At the Founding, citizens commonly possessed weapons useful for *both self-defense and for militia service.*" *Id.* at *64 (citing *Heller*, 554 U.S. at 624–25, ('In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.") (emphasis added).

## VII. Defendants' "Public Safety" Arguments Were Rejected by *Heller*

Defendants argue that AR-15s should be banned on public safety grounds. Def. Mot. 28. First, this is a policy argument that has no place in a *Bruen* analysis. Secondly, *Heller* rejected this exact argument. Judge Richardson explains: "The majority then touts the AR-15's criminal uses, portraying it as a destructive device which is only useful for slaughtering innocents and police officers. . . . Not only are these claims exaggerated, but they also can and have been made about handguns. Yet when faced with these same arguments, the Court in *Heller* concluded that

8

public-safety concerns cannot justify disarming millions of law-abiding citizens of the handguns they commonly own for lawful purposes. See 554 U.S. at 636, 128 S.Ct. 2783. The millions of Americans who similarly own semiautomatic rifles are entitled to the same treatment." *Bianchi* at *69. If proportional use in crime were the correct metric (which it is not), surely rifles like the AR-15 are more deserving of protection than handguns because according to FBI statistics, rifles of all kinds were used in only 2% of firearm homicides. *Id*.

## VIII. Rare Mass Shootings Do Not Justify Disarming Millions of Law-Abiding Americans

Defendants argue that their arms ban is justified by mass shootings. Def. Mot. 27. Again, this is not correct. Mass shootings account for fewer than 1% of firearms homicides, and handguns are used more often in such shootings than rifles. *Bianchi* at *70.

> There is little basis for claiming that semiautomatic rifles are more useful for or more used in criminal activity than other weapons. The data shows the exact opposite: Handguns are by far a greater existential threat to the peace and safety of our communities. Yet rather than assessing these facts, the majority spends pages upon pages describing mass shootings in graphic detail. *This is not judicial reasoning; it is fearmongering designed to invoke the reader's passions and mask lack of substance.*

*Id*. at *71 (emphasis added).

Moreover, faced with "constant invocations of the unique dangers of handguns, the Supreme Court refused to cast aside the constitutional liberties of millions to prevent the unlawful actions of the few." *Id*. The same should be true for rifles, which, proportionately are used far less in crime than handguns.

## IX.   Defendants' Historical Analysis is Flawed

9

Space limitations preclude a detailed examination of Judge Richardson's rejection of the majority's historical analysis, which is all but identical to the Defendants' analysis in this case. But highlights include:

- Gunpowder storage regulations were fire safety regulations, which was why *Heller* rejected them as analogues to gun bans. *Bianchi* at *72.

- Nineteenth century laws regulating carrying Bowie knives and pistols regulated dangerous and unusual weapons associated with criminal activity. They are not analogues to a ban on arms in common use for lawful purposes. *Id.* at *73. Moreover, they regulated only *carrying* such weapons. They did not prohibit their *possession* altogether. *Id.*

- Twentieth-century laws cannot establish a tradition that is inconsistent with the Founding-era tradition. *Id.* at 74.

## X.   Plaintiffs Bring Both Facial and As Applied Challenges

Plaintiffs bring both facial and as applied challenges to the Ordinances. Compl. 16. Therefore, they need not demonstrate that the Ordinances are unconstitutional in all of their applications as in a facial challenge. But even within the context of a facial challenge, a court may review a statute on a section-be-section basis. For example, *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), was a facial Second Amendment challenge. The court engaged in a section-by-section analysis of the statute and found some sections facially unconstitutional and others not. Similarly, *Bianchi* analyzed the facial challenge to the section of the Maryland statute that outlawed AR-15s on a stand-alone basis. This Court can do the same.

10

Respectfully submitted this 16th day of August 2024.

*/s/ Barry K. Arrington*
_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
(303) 205-7870
barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado  80033
Phone Number:  (303) 991-7600
Fax Number:  (303) 991-7601
E-mail:  shaun@pearmanlawfirm.com

*Attorneys for Plaintiffs*


# CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington