OCTOBER  TERM,  2024   1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SMITH & WESSON BRANDS, INC., ET AL. *v.* ESTADOS UNIDOS MEXICANOS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 23–1141.   Argued March 4, 2025—Decided June 5, 2025

The Protection of Lawful Commerce in Arms Act (PLCAA) bars certain lawsuits against manufacturers and sellers of firearms.  As relevant, it provides that a "qualified civil liability action . . . may not be brought in any Federal or State court," 15 U. S. C. §7902(a), and defines that term to include a "civil action or proceeding" against a firearms manufacturer or seller stemming from "the criminal or unlawful misuse" of a firearm by "a third party," §7903(5)(A).  But PLCAA's general bar on these suits has an exception, usually called the predicate exception, relevant here.  That exception applies to lawsuits in which the defendant manufacturer or seller "knowingly violated a State or Federal statute applicable to the sale or marketing" of firearms, and the "violation was a proximate cause of the harm for which relief is sought." §7903(5)(A)(iii).

The predicate violation PLCAA demands may come from aiding and abetting someone else's firearms offense.  PLCAA itself lists as examples two ways in which aiding and abetting qualifies—when a gun manufacturer (or seller) aids and abets another person in making a false statement about a gun sale's legality or in making specified criminal sales.  See §7903(5)(A)(iii)(I)–(II).  And more broadly, because federal law provides that whoever "aids [and] abets" a federal crime "is punishable as a principal," 18 U. S. C. §2(a), a gun manufacturer that aids and abets a federal gun crime may itself commit a PLCAA predicate violation.

Here, the Government of Mexico sued seven American gun manufacturers, alleging that the companies aided and abetted unlawful gun sales that routed firearms to Mexican drug cartels.  The basic theory of its suit is that the defendants failed to exercise "reasonable care" to

2    SMITH & WESSON BRANDS, INC. *v.* ESTADOS UNIDOS
MEXICANOS

Syllabus

prevent trafficking of their guns into Mexico, and so are responsible
for the harms arising there from the weapons' misuse. That theory
implicates PLCAA's general prohibition, so the complaint tries to
plead its way into the predicate exception. It alleges that the manu-
facturers were "willful accessories" in unlawful gun sales by retail gun
dealers, which in turn enabled Mexican criminals to acquire guns.
And it sets out three kinds of allegations relating to how the manufac-
turers aided and abetted retailers' unlawful sales: The manufacturers
allegedly (1) supply firearms to retail dealers whom they know illegally
sell to Mexican gun traffickers; (2) have failed to impose the kind of
controls on their distribution networks that would prevent illegal sales
to Mexican traffickers; and (3) make "design and marketing decisions"
intended to stimulate cartel members' demand for their products. The
District Court dismissed the complaint, but the First Circuit reversed,
finding Mexico had plausibly alleged that defendants aided and abet-
ted illegal firearms sales.

*Held*: Because Mexico's complaint does not plausibly allege that the de-
fendant gun manufacturers aided and abetted gun dealers' unlawful
sales of firearms to Mexican traffickers, PLCAA bars the lawsuit. Pp.
7–15.

(a) Federal aiding and abetting law reflects the view that a person
may be responsible for a crime he has not personally carried out if he
deliberately helps another complete its commission. To aid and abet a
crime, a person must take an affirmative act in furtherance of the of-
fense and intend to facilitate its commission—or as Judge Learned
Hand stated these requisites, must "participate in" a crime "as in
something that he wishes to bring about" and "seek by his action to
make it succeed." *United States* v. *Peoni*, 100 F. 2d 401, 402. In elab-
orating on that demand, this Court has developed several ancillary
principles. First, aiding and abetting is most commonly liability for
specific wrongful acts, though broader liability for a category of mis-
conduct is possible if a wrongdoer's participation is correspondingly
"pervasive, systemic, and culpable." *Twitter, Inc.* v. *Taamneh*, 598
U. S. 471, 502. Second, aiding and abetting usually requires misfea-
sance rather than nonfeasance: Absent an independent duty to act,
failures, omissions, or inactions will rarely support liability. And
third, routine and general activity that happens on occasion to assist
crime—in essence, incidentally—is unlikely to count as aiding and
abetting. Thus, for instance, an ordinary merchant does not become
liable for criminal misuse of her goods simply by knowing that, in some
fraction of cases, misuse will occur.

Two of this Court's cases illustrate these principles. In *Direct Sales
Co.* v. *United States*, 319 U. S. 703, the Court held that a mail-order
pharmacy could be convicted for assisting a small-town doctor's illegal

Cite as: 605 U. S. ____ (2025)    3

Syllabus

distribution of narcotics. The pharmacy sold the doctor massive quantities of morphine (5,000 to 6,000 half-grain tablets monthly versus the typical physician's 400 quarter-grain tablets annually), actively stimulated his purchases through special discounts and high-pressure sales methods, and continued these practices despite law enforcement warnings. All this showed that the pharmacy not only knew of and acquiesced in the doctor's illicit enterprise but "join[ed] both mind and hand with him to make its accomplishment possible." *Id.,* at 713. By contrast, in *Twitter*, the Court dismissed aiding and abetting claims against social-media companies for aiding and abetting a terrorist attack carried out by ISIS. Although the plaintiffs there alleged that ISIS supporters used the companies' platforms for recruiting and fundraising, and that the companies knew this but failed to adequately remove ISIS content, that was not enough to make the companies liable for ISIS's terrorist acts. At most, the plaintiffs alleged that the companies provided their platforms for general use, then "stood back and watched" as ISIS misused them. *Id.,* at 499. And more was needed for a provider of generally available goods and services to be liable for a customer's misuse of them—for example, conduct of the kind in *Direct Sales*. Pp. 7–10.

(b) Against the backdrop of that law, Mexico's complaint does not plausibly allege that the defendant manufacturers aided and abetted gun dealers' unlawful sales of firearms to Mexican traffickers. To begin, the complaint sets for itself a high bar. It does not pinpoint, as most aiding-and-abetting claims do, any specific criminal transactions that the defendants (allegedly) assisted. Instead, it levels a more general accusation: that all the manufacturers assist some number of unidentified rogue dealers in violation of various legal bars. The systemic nature of that charge cannot help but heighten Mexico's burden. To survive, it must be backed by plausible allegations of pervasive, systemic, and culpable assistance.

Mexico's lead claim—that the manufacturers elect to sell guns to, among others, known rogue dealers—fails to clear that bar. For one thing, it is far from clear that such behavior, without more, could ever count as aiding and abetting under the Court's precedents. And in any event, Mexico has not said enough to make its allegations on this point plausible: It does not confront that the manufacturers do not directly supply any dealers, and its complaint does not name alleged bad-apple dealers or provide grounds for thinking that anyone up the supply chain often acquires that information. What Mexico has plausibly alleged is only that manufacturers know some unidentified dealers routinely violate the law—but this describes "indifference" rather than assistance, similar to the insufficient allegations in *Twitter*.

For related reasons, Mexico's second set of allegations—that the

4      SMITH & WESSON BRANDS, INC. *v.* ESTADOS UNIDOS
MEXICANOS

Syllabus

manufacturers have declined to suitably regulate the dealers' practices—cannot fill the gap. Of course, responsible manufacturers might well impose constraints on their distribution chains to reduce the possibility of unlawful conduct. But a failure to do so is what *Twitter* called "passive nonfeasance." 598 U. S., at 500. Such "omissions" and "inactions"—especially in an already highly regulated industry—are rarely the stuff of aiding-and-abetting liability, and nothing in Mexico's allegations makes them so.

Finally, Mexico's allegations about design and marketing decisions add nothing of consequence. Mexico focuses on production of "military style" assault weapons, but these products are widely legal and purchased by ordinary consumers. Manufacturers cannot be charged with assisting criminal acts simply because Mexican cartel members also prefer these guns. The same applies to firearms with Spanish-language names or graphics alluding to Mexican history—while they may be "coveted by the cartels," they also may appeal to "millions of law-abiding Hispanic Americans." Even the failure to make guns with non-defaceable serial numbers cannot show that manufacturers have "joined both mind and hand" with lawbreakers in the manner required for aiding and abetting. Pp. 10–14.

(c) This conclusion aligns with PLCAA's core purpose. Congress enacted PLCAA to halt lawsuits attempting to make gun manufacturers pay for harms resulting from the criminal or unlawful misuse of firearms. Mexico's suit closely resembles those lawsuits. And while the predicate exception allows some such suits to proceed, accepting Mexico's theory would swallow most of the rule. The Court doubts Congress intended to draft such a capacious way out of PLCAA, and in fact it did not. Pp. 14–15.

91 F. 4th 511, reversed and remanded.

KAGAN, J., delivered the opinion for a unanimous Court. THOMAS, J., and JACKSON, J., filed concurring opinions.

Cite as: 605 U. S. ____ (2025)            1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 23–1141

———

## SMITH & WESSON BRANDS, INC., ET AL. PETITIONERS *v.* ESTADOS UNIDOS MEXICANOS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 5, 2025]

JUSTICE KAGAN delivered the opinion of the Court.

The Government of Mexico brought this lawsuit against seven American gun manufacturers. As required by a federal statute, Mexico seeks to show (among other things) that the defendant companies participated in the unlawful sale or marketing of firearms. See 15 U. S. C. §7903(5)(A)(iii). More specifically, Mexico alleges that the companies aided and abetted unlawful sales routing guns to Mexican drug cartels. The question presented is whether Mexico's complaint plausibly pleads that conduct. We conclude it does not.

I

A

The Protection of Lawful Commerce in Arms Act (PLCAA), 119 Stat. 2095, 15 U. S. C. §§7901–7903, bars certain lawsuits against manufacturers and sellers of firearms. Congress enacted the statute in response to a spate of litigation trying to hold gun companies liable in tort for harms "caused by the misuse of firearms by third parties, including criminals." §7901(a)(3) ("Findings" section). To

curb such suits, PLCAA provides that a "qualified civil lia-
bility action," as defined in the Act, "may not be brought in
any Federal or State court." §7902(a). The Act's definition
of that term includes a "civil action or proceeding" against
a firearms manufacturer or seller stemming from "the crim-
inal or unlawful misuse" of a firearm by "a third party."
§7903(5)(A).

But PLCAA's general bar on those suits has an exception,
usually called the predicate exception, relevant here. That
exception applies to suits in which the defendant manufac-
turer or seller "knowingly violated a State or Federal stat-
ute applicable to the sale or marketing" of firearms, and
that "violation was a proximate cause of the harm for which
relief is sought." §7903(5)(A)(iii). If a plaintiff can show
that provision is satisfied—that, say, a manufacturer com-
mitted a gun-sale violation proximately causing the harm
at issue—then a suit can proceed, even though it arises
from a third party's later misuse of a gun. Or otherwise
said, the predicate violation opens a path to making a gun
manufacturer civilly liable for the way a third party has
used the weapon it made.

Notably here, the predicate violation PLCAA demands
may come from aiding and abetting someone else's firearms
offense. The predicate exception itself lists as examples two
ways in which aiding and abetting qualifies—when a gun
manufacturer (or seller) aids and abets another person ei-
ther in making a false statement about a gun sale's legality
or in making specified criminal sales. See
§7903(5)(A)(iii)(I)–(II). And more broadly, aiding and abet-
ting can qualify as a PLCAA predicate violation by virtue of
another law assimilating an accomplice's liability to a prin-
cipal's. The federal statute generally accomplishing that
task is 18 U. S. C. §2(a), which provides that whoever "aids
[and] abets" the commission of a federal crime "is punisha-
ble as a principal." Because of that provision, a gun manu-
facturer that aids and abets a federal gun crime may itself

Opinion of the Court

commit a PLCAA predicate violation.  So principles of aiding and abetting from the criminal law—establishing what counts as aiding and abetting and what does not—may determine whether a plaintiff can satisfy PLCAA's predicate exception and thus proceed with a civil suit otherwise barred.  And that dependence on aiding-and-abetting law is a feature of the case before us.

### B

Mexico has a severe gun violence problem, which its government views as coming from north of the border.  The country has only a single gun store, and issues fewer than 50 gun permits each year.  But gun traffickers can purchase firearms in the United States—often in illegal transactions—and deliver them to drug cartels in Mexico.  Those groups, predictably enough, use the imported firearms to commit serious crimes—drug dealing, kidnapping, murder, and others.  According to the Mexican Government, as many as 90% of the guns recovered at crime scenes in Mexico originated in the United States.  See App. to Pet. for Cert. 7a (Complaint).

The Mexican Government, seeking redress for this gun violence, brought suit in 2021 against seven American firearms manufacturers.[1]  The suit, brought in a U. S. District Court, asserts a variety of tort claims against the defendants, mostly sounding in negligence.  The basic theory is that the defendants failed to exercise "reasonable care" to prevent trafficking of their guns into Mexico, and so are responsible for the harms arising there from the weapons' misuse.  *Id.*, at 184a.  That theory, as all agree, runs

_____

[1] The defendant manufacturers are Smith & Wesson Brands, Inc.; Barrett Firearms Manufacturing, Inc.; Beretta USA Corp.; Century International Arms, Inc.; Colt's Manufacturing Company, LLC; Glock, Inc.; and Sturm, Ruger & Co., Inc.  The suit also names as a defendant one gun distributor—Witmer Public Safety Group, Inc., which does business as Interstate Arms.  But the complaint barely mentions that company, so for simplicity's sake we refer to all the defendants as manufacturers.

straight into PLCAA's general prohibition. Mexico's action, that is, seeks to hold firearms manufacturers liable for "the criminal or unlawful misuse" of guns by third parties—and so, according to PLCAA, "may not be brought." §§7902(a), 7903(5)(A). The complaint thus tries to plead its way into PLCAA's predicate exception. It asserts, as that exception requires, that the third-party misuse of guns in Mexico resulted from the manufacturers' knowing violations of gun laws. See §7903(5)(A)(iii).

More specifically, the complaint alleges that the manufacturers' firearms violations were ones of aiding and abetting, rather than of independent commission. See *id.*, at 71a (invoking this Court's aiding-and-abetting caselaw); Tr. of Oral Arg. 58–59 (agreeing that the predicate violation alleged rests on §2, the federal aiding-and-abetting statute). The manufacturers, according to Mexico, were "willful accessories" in unlawful gun sales by retail dealers, which in turn enabled Mexican criminals to acquire guns (and use them to commit violent offenses). App. to Pet. for Cert. 71a. The complaint sets out three kinds of allegations relating to how the manufacturers aided and abetted retailers' unlawful sales.

Mexico's primary line of argument is that the manufacturers supply firearms to retail dealers whom they know illegally sell to Mexican gun traffickers. The complaint explains that the manufacturers use a three-tier distribution system: They sell to wholesale distributors, who sell to retail dealers, who sell to customers. See *id.*, at 140a. A "small minority" of the dealers are responsible for most of the sales to Mexican traffickers; and those sales often violate federal gun laws—by, for example, involving straw purchasers or proceeding without background checks. *Id.*, at 44a; see *id.*, at 86a.[2] Still more, the complaint alleges—and

_____

[2] A straw purchaser is "a person who buys a gun on someone else's behalf while falsely claiming that it is for himself." *Abramski* v. *United*

Opinion of the Court

this is key—that the manufacturers know "who th[ose] bad apple dealers are." Tr. of Oral Arg. 70; see App. to Pet. for Cert. 44a (The defendants "know that these dealers engage in" prohibited practices); see also *id.,* at 54a–55a, 80a (similar). Yet the manufacturers continue to supply those dealers, as they do legitimate ones, in order to boost their own profits. By choosing not to cut off the flow of firearms to the known rogue dealers, the complaint asserts, the manufacturers become "culpable and intentional participant[s]" in the dealers' federal "statutory violations." *Id.,* at 42a, 85a.[3]

Second, Mexico claims that the manufacturers have failed to impose the kind of controls on their distribution networks that would prevent illegal sales to Mexican traffickers. There are, Mexico contends, a raft of ways manufacturers could put "commonsense restraints on their supply chains." Brief for Respondent 32. For example, they could prohibit dealers from making "bulk sales" to individual customers, because guns sold in that way (Mexico says) are likely to be "diverted to the illegal market." App. to Pet. for Cert. 86a–87a. So too, they could bar dealers from selling their firearms at gun shows or out of their homes, because those sales (Mexico again says) often ignore regulatory requirements like background checks. See *id.,* at 88a–89a, 91a–92a. And more generally, manufacturers could implement processes for "monitor[ing] or "supervis[ing] their [dealers'] sales practices," so as to minimize illegal sales to traffickers. *Id.,* at 89a; see *id.,* at 137a–138a. Yet the defendant manufacturers, Mexico states, have done

─────────

*States*, 573 U. S. 169, 171–172 (2014).

[3]The complaint makes no allegations about the relationship between the manufacturers and the distributors, even though the distributors stand in between the manufacturers and the dealers selling to Mexican traffickers. Neither does the complaint, in setting out the assertions above, distinguish the lone distributor defendant from the manufacturer defendants. See *supra*, at 3, n. 1. Indeed, the complaint says virtually nothing about the distributor's sales practices, to bad-apple dealers or otherwise.

6    SMITH & WESSON BRANDS, INC. *v.* ESTADOS UNIDOS
MEXICANOS

Opinion of the Court

none of those things. Rather, they have embraced "a see-no-evil, hear-no-evil, speak-no-evil approach" to "their gun distribution system." *Id.*, at 32a. And that quite "deliberate[]" approach works to "funnel firearms to the cartels." Brief for Respondent 23.

And third, Mexico alleges that the manufacturers make "design and marketing decisions" intended to stimulate cartel members' demand for their products. *Ibid.* Most prominently, Mexico asserts that the manufacturers have "increased production of military-style" assault weapons, with an eye toward cultivating the criminal market. App. to Pet. for Cert. 104a; see Brief for Respondent 23. For example, one manufacturer has made a ".50 caliber long range sniper rifle," which cartels have used to attack the police and military. App. to Pet. for Cert. 99a. In addition, Mexico says, the manufacturers make guns whose serial numbers can be "obliterated or defaced," thus hindering police tracing efforts. *Id.,* at 131a. And the manufacturers produce firearms whose names or aesthetic features appeal to cartel members. Colt, for example, makes the ".38 caliber Super 'El Jefe' pistol; the .38 caliber Super 'El Grito' pistol; and the .38 caliber 'Emiliano Zapata 1911' pistol"—the last of which includes Zapata's image and the words "It is better to die standing than to live on your knees." *Id.,* at 75a.

The defendant manufacturers moved to dismiss Mexico's complaint, contending that PLCAA barred the suit. The District Court granted the motion. 633 F. Supp. 3d 425, 432 (Mass. 2022). But the Court of Appeals for the First Circuit reversed. It found that Mexico's complaint plausibly "allege[d] that defendants have been aiding and abetting the [illegal] sale of firearms by dealers." 91 F. 4th 511, 529 (2024). And because, in the court's view, the complaint also plausibly alleged that the defendants' aiding-and-abetting conduct proximately caused injury to Mexico, PLCAA's predicate exception was satisfied. *Id.*, at 538. As a result, Mexico's suit against the manufacturers could go forward.

Opinion of the Court

We granted certiorari. 603 U. S. ___ (2024).

## II

Mexico's complaint survives PLCAA only if, in accord with usual pleading rules, it has plausibly alleged conduct falling within the statute's predicate exception. See *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678–679 (2009). Because Mexico relies exclusively on an aiding-and-abetting theory, that means plausibly alleging that the manufacturers have aided and abetted gun dealers' firearms offenses (such as sales to straw purchasers), so as to proximately cause harm to Mexico. See *supra*, at 2–3. We need not address the proximate cause question, because we find that Mexico has not plausibly alleged aiding and abetting on the manufacturers' part. "Plausibly" does not mean "probably," but "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U. S., at 678. And Mexico has not met that bar. Its complaint does not plausibly allege the kind of "conscious . . . and culpable participation in another's wrongdoing" needed to make out an aiding-and-abetting charge. *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 493 (2023).

### A

Federal aiding-and-abetting law "reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out" if he deliberately "helps another to complete its commission." *Rosemond* v. *United States*, 572 U. S. 65, 70 (2014); see 18 U. S. C. §2. To aid and abet a crime, a person must "take[] an affirmative act in furtherance of that offense." *Rosemond,* 572 U. S., at 71. And he must "intend to facilitate [the offense's] commission." *Ibid.* Or as Judge Learned Hand stated those requisites, in what has become a canonical formulation, an aider and abettor must "participate in" a crime "as in something that he wishes to bring about" and "seek by his action

to make it succeed." *United States* v. *Peoni*, 100 F. 2d 401,
402 (CA2 1938); see *Twitter*, 598 U. S., at 490; *Nye & Nissen*
v. *United States*, 336 U. S. 613, 619 (1949).

In elaborating on that demand, this Court has developed
several ancillary principles. First, aiding and abetting is
most commonly "a rule of secondary liability for *specific*
wrongful acts." *Twitter,* 598 U. S., at 494 (emphasis added).
It is possible for someone to aid and abet a broad category
of misconduct, but then his participation must be corre-
spondingly "pervasive, systemic, and culpable." *Id.,* at 502.
Second, aiding and abetting usually requires misfeasance
rather than nonfeasance. Absent an "independent duty to
act," a person's "failure[s]," "omissions," or "inactions"—
even if in some sense blameworthy—will rarely support
aiding-and-abetting liability. *Id.,* at 489, 500. And third,
routine and general activity that happens on occasion to as-
sist in a crime—in essence, "incidentally"—is unlikely to
count as aiding and abetting. *Rosemond,* 572 U. S., at 77,
n. 8. So, for example, an "ordinary merchant[]" does not
"become liable" for all criminal "misuse[s] of [his] goods,"
even if he knows that in some fraction of cases misuse will
occur. *Twitter,* 598 U. S., at 489; see *id.,* at 499. The mer-
chant becomes liable only if, beyond providing the good on
the open market, he takes steps to "promote" the resulting
crime and "make it his own." *United States* v. *Falcone*, 109
F. 2d 579, 581 (CA2) (L. Hand, J.), aff'd, 311 U. S. 205
(1940).

Two of our cases—one approving liability for aiding an-
other's crime, the other not—illustrate how all this doctrine
plays out in practice. In *Direct Sales Co.* v. *United States*,
319 U. S. 703 (1943), we held that a mail-order pharmacy
could be convicted for assisting a small-town doctor's illegal
distribution of narcotics. The pharmacy, Direct Sales, sold
huge amounts of morphine to Dr. John Tate: Whereas the
average physician required no more than 400 quarter-grain
tablets annually, Direct Sales sold Tate some 5,000 to 6,000

Opinion of the Court

half-grain tablets every month. See *id.,* at 706. Still more,
Direct Sales "actively stimulated" Tate's purchases, by giv-
ing him special discounts for his most massive orders and
using "high-pressure sales methods." *Id.,* at 705, 711. And
it did all that against the backdrop of law enforcement
warnings: The Bureau of Narcotics had informed Direct
Sales that "it was being used as a source of supply" by law-
breaking doctors. *Id.*, at 707. All that evidence, this Court
found, was enough to sustain Direct Sales's conviction. It
showed that Direct Sales "not only kn[ew of] and acqui-
esce[d]" in Tate's "illicit enterprise," but "join[ed] both mind
and hand with him to make its accomplishment possible."
*Id.*, at 713.

By contrast, this Court recently ordered the dismissal of
a suit against several social-media companies for aiding
and abetting a terrorist attack carried out by ISIS. See
*Twitter*, 598 U. S., at 506–507. The plaintiffs, victims of the
attack, alleged that adherents of ISIS used the companies'
platforms for recruiting and fundraising. The complaint
further asserted that the companies knew that was so, yet
failed to identify and remove the ISIS-related accounts and
content. See *id.,* at 478, 481. But we held that was not
enough to make the companies liable for ISIS's terrorist
acts. The companies' relationship with ISIS and its sup-
porters, we reasoned, was "the same as their relationship
with their billion-plus other users: arm's length, passive,
and largely indifferent." *Id.*, at 500. There were no allega-
tions that the companies had given ISIS "any special treat-
ment," or "encourag[ed], solicit[ed], or advis[ed]" the group.
*Id.*, at 498, 500. Instead, after providing their platforms for
general use, the companies "at most allegedly stood back
and watched." *Id.*, at 499. More was needed, we stated, for
a provider of generally available goods or services to be lia-
ble for a customer's misuse of them—for example, conduct
of the kind in *Direct Sales*. See *Twitter*, 598 U. S., at 502.
When a company merely knows that "some bad actors" are

taking "advantage" of its products for criminal purposes, it
does not aid and abet. *Id.,* at 503. And that is so even if the
company could adopt measures to reduce their users' down-
stream crimes. See *ibid.*

### B

Viewed against the backdrop of that law, Mexico's com-
plaint does not plausibly allege that the defendant manu-
facturers aided and abetted gun dealers' unlawful sales of
firearms to Mexican traffickers. We have little doubt that,
as the complaint asserts, some such sales take place—and
that the manufacturers know they do. But still, Mexico has
not adequately pleaded what it needs to: that the manufac-
turers "participate in" those sales "as in something that
[they] wish[] to bring about," and "seek by [their] action to
make" succeed. *Peoni*, 100 F. 2d, at 402; see *Twitter*, 598
U. S., at 490.

To begin with, Mexico's complaint sets for itself a high
bar. The complaint does not pinpoint, as most aiding-and-
abetting claims do, any specific criminal transactions that
the defendants (allegedly) assisted. It does not say, for ex-
ample, that a given manufacturer aided a given firearms
dealer, at a particular time and place, in selling guns to a
given Mexican trafficker not legally permitted to buy them
under a specified statute. Instead, the complaint levels a
more general accusation: that all the manufacturers assist
some number of unidentified rogue gun dealers in making
a host of firearms sales in violation of various legal bars.
The systemic nature of that charge is not necessarily fatal.
But as noted earlier, it cannot help but heighten Mexico's
burden. See *supra*, at 8. To survive, the charge must be
backed by plausible allegations of "pervasive, systemic, and
culpable assistance." *Twitter*, 598 U. S., at 502.

Mexico's lead claim—that the manufacturers elect to sell
guns to, among others, known rogue dealers, see *supra*, at
4–5—fails to clear that bar, for a package of reasons. For

Opinion of the Court

one thing, it is far from clear that such behavior, without more, could ever count as aiding and abetting under our precedents. *Direct Sales* is the case Mexico relies on. See Brief for Respondent 24. But that case was more particularized than this one, involving as it did the aid given to a single named offender in violating a specified narcotics law. And yet more important, the abettor there did more than sell a product to a known lawbreaker, as it would to all others. The pharmacy, recall, not only supplied Dr. Tate, but also "actively stimulated" his far-greater-than-average purchases. 319 U. S., at 705; see *id.,* at 712, n. 8 (noting the significance of "stimulation" and "active incitement to purchase"); *id.,* at 713 (similarly stating that "[t]here [was] informed and interested coöperation, stimulation, instigation"). Mexico's complaint asserts nothing similar here. To the contrary, the complaint repeatedly states that the manufacturers treat rogue dealers just the same as they do law-abiding ones—selling to everyone, and on equivalent terms. See App. to Pet. for Cert. 44a–46a, 79a, 83a–84a, 139a–141a. So the complaint, even if taken at face value, would stretch the bounds of our caselaw.

And in any event, we cannot take the allegation here at face value, because Mexico has not said enough to make it plausible. In asserting that the manufacturers intentionally supply guns to bad-apple dealers, Mexico never confronts that the manufacturers do not directly supply any dealers, bad-apple or otherwise. They instead sell firearms to middlemen distributors, whom Mexico has never claimed lack independence. See *supra,* at 4, 5, n. 3.[4] Given that industry structure, Mexico's complaint must offer some reason to believe that the manufacturers attend to the conduct of individual gun dealers, two levels down. But it does not

—————

[4] As noted above, Mexico's suit names one distributor as a defendant. See *supra,* at 3, n. 1. But the complaint says virtually nothing about that company, and nothing at all about its choice of dealers.

so much as address that issue. And even assuming the
manufacturers know everything the distributors know, the
complaint still would not adequately support the charge
that they have identified the bad-apple dealers. Mexico
does not itself name those dealers, though they are the os-
tensible principals in the illegal transactions claimed.[5] Nor
does Mexico provide grounds for thinking that anyone up
the supply chain—whether manufacturer or distributor—
often acquires that information. Indeed, the complaint
points out that government agencies only sporadically pro-
vide upstream companies with information tracing Mexican
crime guns to certain dealers. See App. to Pet. for Cert.
47a–48a. So Mexico's allegation on this score is all specu-
lation; even on a motion to dismiss, it is not enough.

What Mexico has plausibly pleaded respecting sales to of-
fenders is a lesser wrong, which does not rise to the level of
aiding and abetting. Mexico's complaint alleges that some,
though unidentified, dealers often engage in illegal trans-
actions with Mexican traffickers. See *id.*, at 43a–44a, 71a–
73a, 81a–85a, 87a. So too, the complaint alleges that the
manufacturers know that much to be true—that among the
whole class of dealers, there are some who routinely violate
the law. See *id.,* at 31a–34a, 43a–50a, 82a–85a, 87a. And
finally the complaint alleges, with sufficient plausibility,
that the manufacturers could do more than they do to figure
out who those rogue dealers are, and then to cut off their
supply of guns. See *id.,* at 34a–39a, 46a–50a, 132a–141a.
But that is to say little more than the plaintiffs said in *Twit-*

───────────

[5]At one point, Mexico's complaint cites a Washington Post article from
2010 naming "12 dealers that sold the most guns recovered" at crime
scenes in Mexico. App. to Pet. for Cert. 44a; see Tr. of Oral Arg. 62. But
the article itself explains that those dealers could have made the list be-
cause of "sales volume [or] geography" rather than especial wrongdoing.
J. Grimaldi & S. Horwitz, Mexican Cartels Wielding American Weapons,
Washington Post, Dec. 13, 2010, p. A10, col. 1.

Opinion of the Court

*ter.* According to the complaint there, the social-media companies knew that among their customers were ISIS supporters, whom they could have done more to identify and remove. See 598 U. S., at 481–482; *supra,* at 9. Still, we decided, that "nonfeasance" was not enough to hold the companies responsible for the terrorists' unlawful acts. *Twitter*, 598 U. S., at 489. And the same is true here, for the same reasons. Mexico's plausible allegations are of "indifferen[ce]," rather than assistance. *Id.*, at 500; see *id.*, at 498. They are of the manufacturers' merely allowing some unidentified "bad actors" to make illegal use of their wares. *Id.,* at 503.

For related reasons, Mexico's second set of allegations—that the manufacturers have declined to suitably regulate the dealers' practices, see *supra,* at 5–6—cannot fill the gap. Of course, responsible manufacturers might well impose constraints on their distribution chains to reduce the possibility of unlawful conduct. (Mexico's prime examples, recall, are bans on bulk sales or sales from homes—permitted under federal law, but in Mexico's view conducive to unlawful transactions. See *supra,* at 5.) So too, those manufacturers might decide, as Mexico urges, to themselves monitor dealers' sales for law violations. See *ibid*. But a failure to do so is, again, what *Twitter* called "passive nonfeasance"—a "failure to stop" independent retailers downstream from making unlawful sales. 598 U. S., at 500. Such "omissions" and "inactions," especially in an already highly regulated industry, are rarely the stuff of aiding-and-abetting liability. *Id.,* at 489. And nothing special in Mexico's allegations makes them so. A manufacturer of goods is not an accomplice to every unaffiliated retailer whom it fails to make follow the law.

Finally, Mexico's allegations about the manufacturers' "design and marketing decisions" add nothing of consequence. Brief for Respondent 23. As noted above, Mexico here focuses on the manufacturers' production of "military

style" assault weapons, among which it includes AR–15 rifles, AK–47 rifles, and .50 caliber sniper rifles. See *supra,* at 6; App. to Pet. for Cert. 121a. But those products are both widely legal and bought by many ordinary consumers. (The AR–15 is the most popular rifle in the country. See T. Gross, How the AR–15 Became the Bestselling Rifle in the U. S., NPR (Apr. 20, 2023.) The manufacturers cannot be charged with assisting in criminal acts just because Mexican cartel members like those guns too. The same is true of firearms with Spanish-language names or graphics alluding to Mexican history. See *supra,* at 6. Those guns may be "coveted by the cartels," as Mexico alleges; but they also may appeal, as the manufacturers rejoin, to "millions of law-abiding Hispanic Americans." Tr. of Oral Arg 80; Reply Brief 20. That leaves only the allegation that the manufacturers have not attempted to make guns with non-defaceable serial numbers. See *supra,* at 6. But the failure to improve gun design in that way (which federal law does not require) cannot in the end show that the manufacturers have "join[ed] both mind and hand" with lawbreakers in the way needed to aid and abet. *Direct Sales*, 319 U. S., at 713.

## C

All of that means PLCAA prevents Mexico's suit from going forward. The kinds of allegations Mexico makes cannot satisfy the demands of the statute's predicate exception. That exception permits a suit to be brought against a gun manufacturer that has aided and abetted a firearms violation (and in so doing proximately caused the plaintiff's harm). See §7903(5)(A)(iii); *supra,* at 2–3. And Mexico's complaint, for the reasons given, does not plausibly allege such aiding and abetting. So this suit remains subject to PLCAA's general bar: An action cannot be brought against a manufacturer if, like Mexico's, it is founded on a third-party's criminal use of the company's product. See §§7902(a), 7903(5)(A); *supra,* at 2.

Opinion of the Court

And that conclusion, we note, well accords with PLCAA's core purpose. Recall that Congress enacted the statute to halt a flurry of lawsuits attempting to make gun manufacturers pay for the downstream harms resulting from misuse of their products. See *supra,* at 1–2. In a "findings" and "purposes" section, Congress explained that PLCAA was meant to stop those suits—to prevent manufacturers (and sellers) from being held "liable for the harm caused by those who criminally or unlawfully misuse firearm[s]." §7901(a)(5). Mexico's suit closely resembles the ones Congress had in mind: It seeks to recover from American firearms manufacturers for the downstream damage Mexican cartel members wreak with their guns. Of course, the law Congress wrote includes the predicate exception, which allows some suits falling within PLCAA's general ban to proceed. But that exception, if Mexico's suit fell within it, would swallow most of the rule. We doubt Congress intended to draft such a capacious way out of PLCAA, and in fact it did not. The predicate exception allows for accomplice liability only when a plaintiff makes a plausible allegation that a gun manufacturer "participate[d] in" a firearms violation "as in something that [it] wishe[d] to bring about" and sought to make succeed. *Peoni*, 100 F. 2d, at 402. Because Mexico's complaint fails to do so, the defendant manufacturers retain their PLCAA-granted immunity.

We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 605 U. S. ____ (2025)          1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

—————

No. 23–1141

—————

## SMITH & WESSON BRANDS, INC., ET AL. PETITIONERS *v.* ESTADOS UNIDOS MEXICANOS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 5, 2025]

JUSTICE THOMAS, concurring.

The Court today correctly decides that Mexico has not plausibly pleaded that its suit falls under the predicate exception to the Protection of Lawful Commerce in Arms Act (PLCAA). This exception allows otherwise-prohibited suits against gun manufacturers to go forward if, among other requirements, the manufacturer has "knowingly violated a State or Federal statute applicable to the sale or marketing of the product." 15 U. S. C. §§7902(a), 7903(5)(A)(iii). I write separately to note that the Court's opinion does not resolve what a plaintiff must show to establish that the defendant committed a "violation." §7903(5)(A)(iii). It concludes only that Mexico has not adequately pleaded its theory of the case—that, as a factual matter, the defendant gun manufacturers committed criminal aiding and abetting. See *ante,* at 10–14.

In future cases, courts should more fully examine the meaning of "violation" under the PLCAA. It seems to me that the PLCAA at least arguably requires not only a plausible *allegation* that a defendant has committed a predicate violation, but also an earlier *finding* of guilt or liability in an adjudication regarding the "violation." Allowing plaintiffs to proffer mere allegations of a predicate violation

2      SMITH & WESSON BRANDS, INC. *v.* ESTADOS UNIDOS
MEXICANOS

Thomas, J., concurring

would force many defendants in PLCAA litigation to litigate their criminal guilt in a civil proceeding, without the full panoply of protections that we otherwise afford to criminal defendants. And, these defendants might even include ones who were *cleared* in an earlier proceeding, such as through a noncharging decision or a not-guilty or not-liable verdict. Such collateral adjudication would be at best highly unusual, and would likely raise serious constitutional questions that would counsel in favor of a narrower interpretation. See *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score"). Particularly given the PLCAA's aim of *protecting* gun manufacturers from litigation, see §7901, this issue warrants careful consideration.

# SUPREME COURT OF THE UNITED STATES

————————

No. 23–1141

————————

## SMITH & WESSON BRANDS, INC., ET AL. PETITIONERS *v.* ESTADOS UNIDOS MEXICANOS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 5, 2025]

JUSTICE JACKSON, concurring.

The Court holds that Mexico's complaint fails to plausibly allege that gun manufacturers aided or abetted violations of firearms laws, as necessary to trigger the predicate exception to the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U. S. C. §7903(5)(A)(iii). I agree. I write separately to explain that, in my view, the complaint's core flaw is its failure to allege any nonconclusory statutory violations in the first place.

Tellingly, that failure exposes Mexico's lawsuit as precisely what Congress passed PLCAA to prevent. PLCAA was Congress's response to a flood of civil lawsuits that sought to hold the firearms industry responsible for downstream lawbreaking by third parties. *Ante*, at 1–3, 15. Activists had deployed litigation in an effort to compel firearms manufacturers and associated entities to adopt safety measures and practices that exceeded what state or federal statutes required. H. R. Rep. No. 109–124, pp. 18–20 (2005). Congress expressed concern that these lawsuits "attempt[ed] to use the judicial branch to circumvent the Legislative branch." §7901(a)(8). PLCAA embodies Congress's express rejection of such efforts—stymying those who, as Congress put it, sought "to accomplish through litigation that which they have been unable to achieve by legislation."

H. R. Rep. No. 109–124, at 18.  Put differently, PLCAA reflects Congress's view that the democratic process, not litigation, should set the terms of gun control.

Viewed in light of this objective, Congress's inclusion of the predicate exception makes perfect sense.  The exception allows lawsuits to proceed—despite PLCAA's general grant of immunity—if the complaint alleges that a gun manufacturer or seller "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  §7903(5)(A)(iii).  By tying the exception to statutory violations, Congress kept the door open to civil liability—but only liability flowing from duties that the People, rather than the courts, had chosen to impose.

PLCAA's predicate exception might well be triggered by aiding and abetting another's violation of a firearms statute, as the provision's two examples make clear.  First, §7903(5)(A)(iii)(I) describes, for example, aiding and abetting "any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product"—conduct that violates 18 U. S. C. §§922(m), 923(g), or 924(a)(3)(A).  Likewise, §7903(5)(A)(iii)(II) covers aiding and abetting "any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under" 18 U. S. C. §§922(g) and (n)—sales that breach §§922(b), (d), or (t)(1), for instance.  Critically, both predicate-exception examples relate to the aiding and abetting of *particular statutory violations*.

All that Mexico alleges here is that firearms-industry-wide practices—though lawful on their own—facilitated dealers' unspecified downstream violations.  Mexico does not tether its claims to alleged statutory breaches. *Ante*, at

JACKSON, J., concurring

10. Nor does it identify the dealers who would be the principals for any underlying statutory violations, as the Court observes. *Id.*, at 12. At bottom, then, Mexico merely faults the industry writ large for engaging in practices that legislatures and voters have declined to prohibit. *Id.*, at 13–14.

It is for these reasons that I view Mexico's allegations as insufficient to satisfy PLCAA's predicate exception, regardless of whether the business practices described might suffice to establish aiding-and-abetting or other forms of vicarious liability in distinct statutory or common-law contexts. Cf. *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 507 (2023) (JACKSON, J., concurring). Devoid of nonconclusory allegations about particular statutory violations, Mexico's lawsuit seeks to turn the courts into common-law regulators. But Congress passed PLCAA to preserve the primacy of the political branches—both state and federal—in deciding which duties to impose on the firearms industry. Construing PLCAA's predicate exception to authorize lawsuits like the one Mexico filed here would distort that basic design.