**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-TPO**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
BRYAN LAFONTE, and
JAMES MICHAEL JONES,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

I.      Factual Background ............................................................................. 3

II.     Procedural History ............................................................................... 4

LEGAL STANDARD ........................................................................................ 6

ARGUMENT .................................................................................................... 7

I.      The *Bruen-Rahimi* Framework .......................................................... 8

II.     Assault Weapons and LCMs Are Not Protected by the Second Amendment's
        Text... ................................................................................................. 10

        A.      Assault Weapons and LCMs Are Not "In Common Use Today for Self-
                Defense" ............................................................................... 11

                1.      Plaintiffs Have Not Carried Their Step-One Burden ...................... 11

                2.      The Undisputed Record Demonstrates That the Regulated Items
                        Are Not in Common Use for Self-Defense ................................ 12

                        a.      Assault Weapons and LCMs Are Not Commonly Used in
                                Self-Defense ..................................................... 13

                        b.      Assault Weapons and LCMs Are "Ill-Suited and
                                Disproportionate" to Self-Defense ....................... 14

                        c.      Assault Weapons and LCMs Were Designed for Military
                                Use and are "Most Useful in Military Service" ................. 17

                        d.      Assault Weapons and LCMs Are "Dangerous and
                                Unusual" ......................................................... 20

        B.      LCMs Are Not "Arms" ....................................................... 22

III.   The Ordinances Are Consistent with the Nation's Historical Tradition ............... 24

       A.   This Case Requires a "More Nuanced" Analogical Approach .................. 25

       B.   The Nation Has a Historical Tradition of Regulating Particularly
            Dangerous Weapons that Pose a Threat to Public Safety ...................... 29

       C.   The Ordinances Are "Relevantly Similar" to Historical Analogues .......... 36

            1.   The Ordinances Impose a Historically Comparable Burden on the
                 Right to Armed Self-Defense ........................................... 36

            2.   The Ordinances Are Comparably Justified.................................... 38

CONCLUSION............................................................................... 39

STATEMENT OF UNDISPUTED MATERIAL FACTS .................................. 40

CERTIFICATE OF SERVICE ............................................................. 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bevis v. City of Naperville*,
  85 F.4th 1175 (7th Cir. 2023),
  *cert. denied*, 144 S. Ct. 2491 (2024)..................................................7, 9, 17, 19, 29, 32

*Bianchi v. Brown*,
  111 F. 4th 438 (4th Cir. 2024) (en banc),
  *cert. denied*, 145 S. Ct. 1534 (2025)............... 3, 7, 9, 10, 13, 14, 16-19, 21, 22, 25-39

*Capen v. Campbell*,
  134 F.4th 660 (1st Cir. 2025) ....................................................................7, 12, 28, 38

*Capen v. Campbell*,
  708 F. Supp. 3d 65 (D. Mass. 2023), *aff'd*, 134 F.4th 660 (1st Cir. 2025)............ 20, 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................. 6

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024), *cert. denied*, 145 S. Ct. 1049 (2025) ....................... 8, 26

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  664 F. Supp. 3d 584 (D. Del. 2023), *aff'd*, 108 F.4th 194 (3d Cir. 2024),
  *cert. denied*, 145 S. Ct. 1049 (2025) ...........................................................26, 34, 38, 39

*DeWilde v. Att'y Gen.*,
  No. 24-8071, 2025 WL 1637695 (10th Cir. June 10, 2025) .......................................... 6

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................................................................................... 22

*Duncan v. Bonta*,
  133 F.4th 852 (9th Cir. 2025) (en banc),
  *petition for cert. filed*, No. 25-198 (Aug. 15, 2025)..................7, 8, 22-24, 26-33, 37-39

*Hanson v. District of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024), *cert. denied*, 2025 WL 1603612
  (June 6, 2025)............................................................................................7, 20, 26-28, 35

*Hanson v. District of Columbia*,
  671 F. Supp. 3d 1 (D.D.C. 2023), *aff'd*, 120 F.4th 223 (D.C. Cir. 2024),
  *cert. denied*, 2025 WL 1603612 (June 6, 2025)  ....................................................... 35

*Hartford v. Ferguson*,
    676 F. Supp. 3d 897 (W.D. Wash. 2023) ...................................................................... 33

*Nat'l Ass'n for Gun Rights v. Lamont*,
    --- F.4th ----, 2025 WL 2423599
    (2d Cir. Aug. 22, 2025) ................................... 1, 7, 14-22, 25-29, 31, 32, 35, 36, 38, 39

*Nat'l Ass'n for Gun Rights v. Lamont*,
    685 F. Supp. 3d 63 (D. Conn. 2023), *aff'd*, --- F.4th ----, 2025 WL 2423599
    (2d Cir. Aug. 22, 2025) ........................................................................................... 14

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) .......................................................................2, 7, 9, 22, 24, 25, 36

*Ocean State Tactical, LLC v. Rhode Island*,
    95 F.4th 38 (1st Cir. 2024),
    *cert. denied*, 2025 WL 1549866 (June 2, 2025) ................. 7, 12, 13, 28, 31, 32, 37, 38

*Ocean State Tactical, LLC v. Rhode Island*,
    646 F. Supp. 3d 368 (D.R.I. 2022), *aff'd*, 95 F.4th 38 (1st Cir. 2024),
    *cert. denied*, 2025 WL 1549866 (June 2, 2025) ........................................... 13, 22, 23

*Or. Firearms Fed'n v. Kotek*,
    682 F. Supp. 3d 874 (D. Or. 2023), *appeals pending*,
    Nos. 23-35478, 23-35479, 23-35539, 23-35540 (9th Cir.) ............20, 21, 24, 33, 37, 38

*Ortega v. Lujan Grisham*,
    No. 24-2121, 2025 WL 2394646 (10th Cir. Aug. 19, 2025)........................................... 9

*Rocky Mountain Gun Owners v. Polis*,
    121 F.4th 96 (10th Cir. 2024) ....................................................... 2, 3, 7-11, 19, 22, 23

*Rocky Mountain Gun Owners v. Polis*,
    No. 1:23-cv-01077, 2025 WL 1591401 (D. Colo. June 5, 2025)................................... 6

*Rupp v. Bonta*,
    723 F. Supp. 3d 837 (C.D. Cal. 2024),
    *appeal pending*, No. 24-2583 (9th Cir.) ........................................................ 14, 20, 27

*State v. Gator's Custom Guns, Inc.*,
    568 P.3d 278 (Wash. 2025) (en banc),
    *petition for cert. filed*, No. 25-153 (Aug. 6, 2025)..................................................... 8, 23

*Stewart v. Am. Fam. Mut. Ins. Co., S.I.*,
    744 F. Supp. 3d 1198 (D. Colo. 2024) ............................................................................ 6

*United States v. Cox*,
   906 F.3d 1170 (10th Cir. 2018) ................................................................. 8, 23

*United States v. Harrison*,
   --- F.4th ----, 2025 WL 2452293 (10th Cir. Aug. 26, 2025)................................9, 25, 29

*United States v. Isaac*,
   No. 2:23-cr-20050, 2025 WL 1755134 (D. Kan. June 25, 2025) ................................ 11

*United States v. Jackson*,
   138 F.4th 1244 (10th Cir. 2025) ................................................................. 6, 9

*United States v. Kuone*,
   No. 5:24-cr-40026, 2025 WL 1784973 (D. Kan. June 27, 2025) ................................ 11

*United States v. Morgan,*
   --- F.4th ----, 2025 WL 2502968 (10th Cir. Sept. 2, 2025).......... 2, 8-12, 14, 16, 17, 34

*United States v. Ogilvie*,
   --- F.4th ----, 2025 WL 2525579, at *2 (10th Cir. Sept. 3, 2025)................................... 6

*United States v. Rahimi*,
   602 U.S. 680 (2024) ..............................................................2, 24, 25, 35, 36

*United States v. Rayton*,
   No. 5:24-cr-40045, 2025 WL 901987 (D. Kan. Mar. 25, 2025) ............................ 11, 19

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
   741 F. Supp. 3d 172 (D. Vt. 2024), *appeal pending*, 24-2026 (2d Cir.)................ 13, 26

## Other Authorities

1786 N.H. Laws 383-84 ................................................................. 31

Fed. R. Civ. P. 56(a) ................................................................. 6

Defendants the Town of Superior, Colorado, City of Louisville, Colorado, City of Boulder, Colorado, and Board of County Commissioners of Boulder County, Colorado ("Defendants") respectfully submit this renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## INTRODUCTION

In response to repeated, horrific mass shootings in Colorado and elsewhere, Defendants enacted the four ordinances at issue in this case (the "Ordinances"), restricting the possession and sale of assault weapons and large capacity magazines ("LCMs").[1] These military-style firearms and accessories exponentially multiply killing power and have been used in virtually all modern mass shootings. Courts across the country—including "every Circuit to address the question," *Nat'l Ass'n for Gun Rights v. Lamont*, --- F.4th ----, 2025 WL 2423599, at *22 n.40 (2d Cir. Aug. 22, 2025) ("*NAGR II*"); *see infra* note 5—have consistently upheld similar laws restricting assault weapons and LCMs as constitutional under the Second Amendment.

This Court, too, should uphold the Ordinances' restrictions on assault weapons and LCMs. The Second Amendment does not protect weapons of war ill-suited to self-defense or the accessories that make them even more efficient killing machines. Nor does it render lawmakers powerless to address the dramatic changes in firearms

---

[1] *See* Ex. A (Superior Ordinance); Ex. B (City of Boulder Ordinance); Ex. C (Louisville Ordinance); Ex. D (Boulder County Ordinance).

technology since our nation's founding or the unprecedented societal ill of mass shootings enabled by those technologies.

The Supreme Court's decisions in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), established the governing text-and-history analysis. That analysis involves a two-step "burden-shifting framework." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("*RMGO*"). Plaintiffs' claims fail at both steps, both on the law and on the facts. They have offered no reliable, admissible evidence to support their claims. Defendants, by contrast, have compiled a voluminous record, with reports from ten experts covering the technical features of assault weapons and LCMs, their unique ability to mutilate the human body, and their poor suitability for self-defense, as well as the nation's lengthy history of weapons regulation. That juxtaposition is telling, and, as numerous courts have found when relying on similar records, it overwhelmingly demonstrates that the Ordinances are consistent with the Second Amendment.

Applying the governing legal standards to the record, Defendants' entitlement to summary judgment is clear. *First*, Plaintiffs have not demonstrated that assault weapons and LCMs are "arms" that are "in common use today for self-defense." *United States v. Morgan*, --- F.4th ----, 2025 WL 2502968, at *2 (10th Cir. Sept. 2, 2025) (quoting *RMGO*, 121 F.4th at 114). In fact, the undisputed evidence demonstrates that neither item satisfies this requirement; and, moreover, it demonstrates that LCMs are not "arms" at all, but accessories. *Second*, even if Plaintiffs had met their textual burden, the undisputed evidence also demonstrates that the Ordinances are "'consistent with the

2

*principles* that underpin our' Nation's historical tradition of firearm regulation." *RMGO*, 121 F.4th at 113 (quoting *Rahimi*, 602 U.S. at 692). Indeed, the Ordinances fit comfortably within the "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing," *Bianchi v. Brown*, 111 F. 4th 438, 446 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025)—as evidenced by historical laws from the founding, through Reconstruction and the 19th century, into the 20th century, and up to the present day. Accordingly, the Ordinances are constitutional, and Defendants are entitled to summary judgment.

## BACKGROUND

### I.    Factual Background

On the afternoon of March 22, 2021, a man armed with a Ruger AR-556 and wearing a tactical vest entered a King Soopers grocery store in the City of Boulder and opened fire—murdering ten people. Defendants enacted the Ordinances in response to the devastating toll of this tragedy and other mass shootings in Colorado and throughout the United States, as detailed in their original summary judgment motion. Ex. A at 1; Ex. B at 1; Ex. C at 1; Ex. D at 1; *see* Doc. 78 at 4-6.[2] The purpose of the Ordinances is "to protect the public health, safety and welfare" by restricting assault weapons and LCMs. Ex. A at 6, 8; *see* Ex. B at 7; Ex. C at 1, 2, 4; Ex. D at 1, 4. The Boulder County Ordinance applies in "unincorporated Boulder County," Ex. D § 2(a),

---

[2] This filing uses "Doc. __" and the document page numbers to refer to materials filed in this action.

3

while the Town of Superior, City of Louisville, and City of Boulder Ordinances (the

"Municipal Ordinances") each apply within the boundaries of their respective

incorporated municipalities.

The Boulder County Ordinance prohibits the manufacture, import, sale, or

transfer of assault weapons and LCMs, while the Municipal Ordinances prohibit the

possession, sale, or transfer of the same. *See* Ex. A §§ 10-9-20, 10-9-50(a); Ex. B §§ 5-

8-2, 5-8-10(a); Ex. C §§ 9.80.010, 9.84.010(a); Ex. D § 2(a). All four Ordinances define

the term "assault weapon" to encompass semiautomatic centerfire rifles and pistols with

certain characteristics, and the term "large capacity magazines" to encompass

"ammunition feeding device[s] with the capacity to accept more than 10 rounds." Ex. A §

10-9-20; Ex. B § 5-8-2; Ex. C § 9.80.010; Ex. D § 1(a). The Ordinances do not prohibit

any firearms that are not semiautomatic, nor do they prohibit or restrict semiautomatic

firearms that lack certain features rendering them particularly dangerous (*e.g.*, pistol

grips, flash suppressors, or barrel shrouds). They do not prohibit any magazines with a

maximum capacity of 10 or fewer rounds or limit the total number of lawful magazines

that an individual may possess. The Municipal Ordinances further allow individuals to

keep the assault weapons they owned prior to July 1, 2022, subject only to a

certification requirement. *See* Ex. A § 10-9-240(a), (c); Ex. B § 5-8-28(a), (c); Ex. C

§ 9.86.010(a), (c).

## II.    Procedural History

Plaintiffs filed their original complaint challenging the Ordinances on October 12,

2022. Doc. 1. On November 3, 2022, the Court entered an order, pursuant to the

4

parties' joint stipulation, approving a stay of the provisions challenged by Plaintiffs "until the Court rules on the Plaintiffs' request for any injunction or declaratory judgment, or when this Court enters final judgment, whichever comes earlier." Doc. 38.

The parties completed discovery on July 28, 2023. Doc. 49. Defendants served reports from ten expert witnesses addressing the historical, technical, and empirical issues relevant here. *See* Exs. F-O. Plaintiffs did not depose any of Defendants' experts and submitted reports from only one purported expert, whose opinions this Court then excluded in part. Doc. 90. Plaintiffs also sought leave to conduct additional discovery more than one year after discovery closed, which this Court denied. Doc. 115.

After the parties cross-moved for summary judgment, the Court initially denied both motions without prejudice, concluding that Plaintiffs lacked standing and ordering Plaintiffs to show cause why summary judgment should not be granted for Defendants on that basis. Doc. 96. After further briefing, the Court dismissed certain claims for lack of standing. Doc. 112. The following claims remain:

- Plaintiffs Jones, RMGO, and NAGR's challenge to the City of Boulder's prohibition on the possession, sale, or transfer of LCMs;

- Plaintiffs LaFonte and RMGO's challenge to Louisville's prohibition on the possession, sale, or transfer of LCMs and the sale or transfer of assault weapons;

- Plaintiff RMGO's challenge to Superior's prohibition on the possession of LCMs; and

- Plaintiffs RMGO and NAGR's challenge to Boulder County's prohibition on the sale or transfer of LCMs and assault weapons.

Plaintiffs subsequently filed an amended complaint. Doc. 116.[3] Defendants now file their renewed motion for summary judgment on all remaining claims.

## LEGAL STANDARD

Under Rule 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where a party "fails to make a showing sufficient to establish an essential element to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is required. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Stewart v. Am. Fam. Mut. Ins. Co., S.I.*, 744 F. Supp. 3d 1198, 1200 (D. Colo. 2024) .

Further, as this Court has recognized, Plaintiffs "challenge the Ordinances on their face." Doc. 112 at 33. Plaintiffs must therefore "establish that no set of circumstances exists under which the [Ordinances] would be valid." *United States v. Jackson*, 138 F.4th 1244, 1250 (10th Cir. 2025) (quoting *Rahimi*, 602 U.S. at 693). This "is the most difficult challenge to mount successfully." *Id.*; *see also United States v. Ogilvie*, --- F.4th ----, 2025 WL 2525579, at *2 (10th Cir. Sept. 3, 2025). So long as any item covered by the Ordinances may be constitutionally prohibited, Plaintiffs' facial challenge fails. *See, e.g.*, *DeWilde v. Att'y Gen.*, No. 24-8071, 2025 WL 1637695 at *2

---

[3] The amended complaint purports to reraise certain dismissed claims for purposes of preservation. Doc. 116 ¶¶ 61, 67-71. To the extent those claims are again before the Court, it should dismiss them for the same reasons. Doc. 112; *see, e.g.*, *Rocky Mountain Gun Owners v. Polis*, No. 1:23-cv-01077, 2025 WL 1591401, at *5 n.6 (D. Colo. June 5, 2025).

(10th Cir. June 10, 2025) (rejecting facial challenge to federal machinegun law on this basis); *Capen v. Campbell*, 134 F.4th 660, 674-75 (1st Cir. 2025) ("*Capen II*") (similar, as to assault weapon law); *Bianchi*, 111 F.4th at 453 (same).[4]

## ARGUMENT

The evidence adduced by Defendants in support of summary judgment is overwhelming and undisputed. Defendants have offered the credible, coherent, and admissible testimony of ten highly qualified experts, relevant to each issue this Court must address under *Bruen* and *Rahimi*. In response, Plaintiffs have offered conjecture and unsupported argument. In the Second Amendment context, like any other, the Court must decide the case based on the "record compiled by the parties," *Bruen*, 597 U.S. at 25 n.6; *see RMGO*, 121 F.4th at 113, and, as set forth below, only Defendants have compiled such a record. Based on that record, this Court should conclude that the Ordinances are consistent with the Second Amendment—just as numerous other courts have done when relying on materially identical records to uphold similar laws.[5]

---

[4] To be clear, Plaintiffs' challenge to the Ordinances fails as to *all* of the weapons and accessories they regulate. *Rahimi*'s "no set of circumstances" test puts the result even further beyond doubt. *See, e.g.*, *Bianchi*, 111 F.4th at 353-73 (assessing and rejecting Second Amendment challenge to Maryland's assault weapon law under text and history steps, even after concluding that plaintiffs had failed to satisfy the "no set of circumstances" test).

[5] This includes all six federal courts of appeals to consider the issue. *See NAGR II*, 2025 WL 2423599, at *22 (assault weapons and LCMs); *Capen II*, 134 F.4th at 675-77 (assault weapons and LCMs); *Duncan v. Bonta*, 133 F.4th 852, 860-61 (9th Cir. 2025) (en banc) (LCMs), *petition for cert. filed*, No. 25-198 (Aug. 15, 2025); *Hanson v. District of Columbia*, 120 F.4th 223, 240, 242-43 (D.C. Cir. 2024) (LCMs), *cert. denied*, 2025 WL 1603612 (June 6, 2025); *Bianchi*, 111 F.4th at 441-42 (assault weapons); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 52 (1st Cir. 2024) ("*OST II*") (LCMs), *cert. denied*, 2025 WL 1549866 (June 2, 2025); *Bevis v. City of Naperville*, 85

I.     **The *Bruen-Rahimi* Framework**

*Bruen* and *Rahimi* established a two-step analysis for Second Amendment

claims. First, plaintiffs must show that their challenge falls within the Second

Amendment's "explicit text, 'as informed by history.'" *RMGO*, 121 F.4th at 113 (quoting

*Bruen*, 597 U.S. at 19). If they cannot, their claims fail. *See id.* at 114. If they succeed,

the burden then shifts to the government to establish that its law "is 'consistent with the

*principles* that underpin our' Nation's historical tradition of firearm regulation." *Id.* at 113

(quoting *Rahimi*, 602 U.S. at 692).

As relevant here, the burden at step one includes demonstrating that "the item at

issue is an 'arm' that is 'in common use today for self-defense.'" *Id.* at 113-14; *accord*

*Morgan*, 2025 WL 2502968, at *4. That means, in this case, Plaintiffs must establish

that assault weapons and LCMs are protected "'Arms' within the meaning of the Second

Amendment," rather than unprotected accessories. *Duncan*, 133 F.4th at 865; *see*

*United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding a silencer is an

unprotected "firearm accessory" rather than a "bearable arm"). Plaintiffs must also

establish that both are "in common use today for self-defense"—a category that

_____

F.4th 1175, 1197, 1202 (7th Cir. 2023) (assault weapons and LCMs), *cert. denied*, 144
S. Ct. 2491 (2024); *see also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety &
Homeland Sec.*, 108 F.4th 194, 207 (3d Cir. 2024) (Roth, J., concurring) (assault
weapons and LCMs), *cert. denied*, 145 S. Ct. 1049 (2025). The Washington Supreme
Court also recently rejected a Second Amendment challenge to that state's LCM law.
*State v. Gator's Custom Guns, Inc.*, 568 P.3d 278, 286 (Wash. 2025) (en banc), *petition
for cert. filed*, No. 25-153 (Aug. 6, 2025). And—as detailed in Defendants' original
motion and notices of supplemental authority—numerous district courts have held
likewise, in challenges to both assault weapon and LCM restrictions.

8

includes weapons commonly used in and suitable for self-defense, but excludes
weapons that are "most useful in military service," *Morgan*, 2025 WL 2502968, at \*6, or
"dangerous and unusual," *RMGO*, 121 F.4th at 114, 117; *see Bianchi*, 114 F.4th at 450;
*Bevis*, 85 F.4th at 1194. If Plaintiffs do not meet this burden, "they fail to allege a
Second Amendment violation and [the] analysis ends." *RMGO*, 121 F.4th at 113; *see
Morgan*, 2025 WL 2502968, at \*9 (holding Second Amendment challenge "fails under
*Bruen* step one" because challenger "has not met his burden").

If the inquiry reaches step two, "the government must engage in 'analogical
reasoning'" to demonstrate that "a challenged regulation is consistent with our historical
tradition." *United States v. Harrison*, --- F.4th ----, 2025 WL 2452293, at \*5 (10th Cir.
Aug. 26, 2025) (quoting *Bruen*, 597 U.S. at 28, 30). "Why and how the regulation
burdens the right are central to this inquiry." *Jackson*, 138 F.4th at 1253 (quoting
*Rahimi*, 602 U.S. at 692). Importantly, the government need not identify "a historical
*twin*," or "a precise historical analogue," but may instead rely on broader historical
principles. *Harrison*, 2025 WL 2452293, at \*5-6, \*22; *accord*, *e.g.*, *Jackson*, 138 F.4th at
1254-55; *see also Ortega v. Lujan Grisham*, No. 24-2121, 2025 WL 2394646, at \*10
(10th Cir. Aug. 19, 2025). And where, as here, the challenged regulations address
"unprecedented societal concerns or dramatic technological changes," "a more nuanced
approach" to the historical analysis is warranted. *Bruen*, 597 U.S. at 27.

9

## II.    Assault Weapons and LCMs Are Not Protected by the Second Amendment's Text

Plaintiffs' challenge fails at step one of the *Bruen-Rahimi* framework because they have not met their burden of demonstrating that assault weapons and LCMs are "in common use today for self-defense." *Morgan*, 2025 WL 2502968, at *2 (quoting *RMGO*, 121 F.4th at 114). Common use "means more than 'the number of a certain weapon in private hands.'" *Id.* at *6 (quoting *Hanson*, 120 F.4th at 233). Rather, the relevant inquiry involves evidence of items' actual use and objective design and features, which demonstrate the uses for which the items are suited. *See id.* (considering whether "private individuals commonly use [weapons at issue] for self-defense" and what uses "make[] sense," given their design); *RMGO*, 121 F.4th at 116-17 (referring to weapons "commonly *used* and possessed" and considering the uses weapons are "adapted for") (emphasis added); *Bianchi*, 111 F.4th at 450-52, 460-61.[6] Plaintiffs have failed to adduce evidence showing assault weapons and LCMs are adapted for or commonly used in self-defense. To the contrary, the undisputed record—and the overwhelming caselaw—make clear that these items are *not* commonly used in self-defense; that they are "ill-suited and disproportionate" to that purpose, *Bianchi*, 111 F.4th at 459; that they are "most useful in military service," *id.*; and that they are "dangerous and unusual," *id.*

---

[6] *Morgan* also mentioned Justice Kavanaugh's observations—in a statement respecting the denial of certiorari in *Bianchi*—about whether AR-15s are in "common use" but did not adopt those non-binding observations of a single Justice. *See Morgan*, 2025 WL 2502968, at *5 n.5. Instead, *Morgan* relied heavily on decisions upholding assault weapon and LCM restrictions (including *Bianchi*) to likewise uphold a machine gun restriction. *See id.* at *3, *6.

at 452-53. Moreover, LCMs are unprotected for an additional reason: Plaintiffs have not shown that they are "Arms" within the meaning of the Second Amendment, rather than unprotected accessories.

### A. Assault Weapons and LCMs Are Not "In Common Use Today for Self-Defense"

#### 1. Plaintiffs have not carried their step-one burden

Plaintiffs have failed to adduce any evidence that assault weapons and LCMs are "in common use today for self-defense." *RMGO*, 121 F.4th at 114 (internal quotation marks omitted). The Tenth Circuit has made clear that it is their burden to do so. *Id.* at 113-14. That "failure to show common use is enough" to entitle Defendants to summary judgment. *Morgan*, 2025 WL 2502968, at *7 (rejecting Second Amendment challenge on this basis).[7]

Plaintiffs have failed to show that assault weapons and LCMs are suited to, or "make[] sense" for, self-defense. *Morgan*, 2025 WL 2502968, at *6. And they have presented no evidence that they are actually used in self-defense. *See id.* at *3, *6. On the contrary, RMGO has acknowledged that it is not aware of a single incident in which an RMGO member fired or even brandished an assault weapon or a weapon equipped with an LCM in self-defense. Ex. P at 86-87 (Rule 30(b)(6) deposition of RMGO). NAGR

---

[7] Applying this framework, district courts in this Circuit have likewise rejected Second Amendment challenges where the challengers have not shown that "the item at issue is an 'arm' that is in 'common use today for self-defense.'" *United States v. Kuone*, No. 5:24-cr-40026, 2025 WL 1784973, at *2-3 (D. Kan. June 27, 2025); *see United States v. Isaac*, No. 2:23-cr-20050, 2025 WL 1755134, at *10-12 (D. Kan. June 25, 2025); *United States v. Rayton*, No. 5:24-cr-40045, 2025 WL 901987, at *6-7 (D. Kan. Mar. 25, 2025).

11

President Dudley Brown suggested that he had heard about self-defense encounters involving assault weapons and LCMs, but he refused to provide the names of the individuals from whom he heard the stories, and he could not provide sufficient details to identify the incidents. Ex. Q at 116-22 (Rule 30(b)(6) deposition of NAGR). In their depositions, the individual Plaintiffs were also unable to attest that they had ever fired or brandished an assault weapon or any weapon equipped with an LCM in self-defense. Ex. R at 43-44 (Jones); Ex. T at 34 (LaFonte); *see* Exs. S, U, V, W (dismissed Plaintiffs Kehoe, Madonna, Wright, and Walker).[8] Plaintiffs in similar cases across the country have also failed to identify self-defense incidents involving assault weapons or LCMs, much less establish that assault weapons and LCMs are "commonly used" for that purpose. *See, e.g.*, *Capen II*, 134 F.4th at 670; *OST II*, 95 F.4th at 45.

For these reasons, Plaintiffs have failed to meet their step-one burden, and the Court should therefore grant summary judgment to Defendants. *See Morgan*, 2025 WL 2502968, at *1 (rejecting Second Amendment challenge where plaintiff failed to show "'common use' for self-defense").

> ## 2.    The undisputed record demonstrates that the regulated items are not in common use for self-defense

Even setting aside Plaintiffs' failure to carry their burden, the undisputed record in this case affirmatively demonstrates that assault weapons and LCMs are *not* "'in

---

[8] Plaintiffs attempted to develop common-use evidence through an expert report, but that purported expert's opinions did not address the usage of assault weapons and LCMs in self-defense incidents or their suitability for that purpose, and in any event the Court excluded the expert's opinions because he was unqualified to offer them. *See* Doc. 90 at 6.

common use' today for self-defense." *Id.* at \*2 (quoting *RMGO*, 121 F.4th at 114). More specifically, the record shows that they are: (a) not commonly used in self-defense; (b) not well-suited to that purpose; (c) "most useful in military service"; and (d) "dangerous and unusual." This aligns with the decisions of numerous courts throughout the country. *See, e.g.*, *Bianchi*, 111 F.4th at 441 ("The assault weapons at issue … are military-style weapons … ill-suited and disproportionate to the need for self-defense."); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 388 (D.R.I. 2022) ("*OST I*") ("There is simply no credible evidence in the record … that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not."), *aff'd*, *OST II*, 95 F.4th 38.

### a.    Assault weapons and LCMs are not commonly used in self-defense

Empirical data analyzed by Defendants' expert Dr. Lucy Allen supports the conclusion that neither assault weapons nor LCMs are commonly used in self-defense. For example, Dr. Allen determined, based on data compiled by the National Rifle Association ("NRA"), that the average number of shots fired in incidents of armed self-defense is 2.2—well below the capacity of an assault weapon equipped with an LCM. Ex. F ¶ 10 (Allen). Notably, of 736 incidents described in the NRA database, only two (0.3%) involved a defender firing more than ten shots. *Id.* Dr. Allen's analysis of published news stories revealed a similar number of average shots per incident of self-defense: 2.34. *Id.* ¶ 18. That analysis further found that in 97.3% of incidents the defender fired five or fewer shots, and in no incidents fired more than ten rounds. *Id.*

13

¶ 19. Numerous courts have relied on these and similar findings in rejecting Second Amendment challenges like Plaintiffs' at the text step. *See Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 191-97 (D. Vt. 2024) (crediting similar testimony from Allen, in LCM case); *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 96-97 (D. Conn. 2023) ("*NAGR I*") (same, in assault weapon and LCM case), *aff'd*, *NAGR II*, 2025 WL 2423599; *see also Morgan*, 2025 WL 2502968, at *6 (citing cases).

In addition, Dr. Allen analyzed a database published by the Heritage Foundation and found that rifles *of any type* were used in only 2-4% of self-defense scenarios. Ex. F ¶ 25 (Allen); *see NAGR I*, 685 F. Supp. 3d at 96. The figure would be even smaller (if any at all) for the subset of semiautomatic rifles, like the AR-15, covered by the Ordinances.

### b. Assault weapons and LCMs are "ill-suited and disproportionate" to self-defense

It is unsurprising that assault weapons and LCMs are so rarely used for self-defense because they are "ill-suited and disproportionate" to that purpose. *Bianchi*, 111 F.4th at 461; *see, e.g.*, *Rupp v. Bonta*, 723 F. Supp. 3d 837, 854-55 (C.D. Cal. 2024). As Defendant's firearms expert, former Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Senior Special Agent James Yurgealitis, explained, assault weapons and the ammunition used in them were designed "to kill or incapacitate enemy combatants at distances of hundreds of yards," and they are overpowered for civilian self-defense encounters. Ex. O ¶ 136 (Yurgealitis); *see also id*. ¶¶ 137-39. AR-platform

14

rifles fire .223-caliber and 5.56x45mm NATO cartridges at a muzzle velocity of 3,200 to 3,500 feet per second—nearly three times the muzzle velocity of a round fired from a 9mm pistol. *Id.* ¶¶ 46-47, 72, 79. As a result, a round fired from an assault weapon releases into its target more than three times the energy of a round fired by a Thompson submachinegun ("Tommy gun"), approximately four to 19 times more than a handgun (depending on caliber), and approximately ten times more than the energy released by a founding-era musket. Ex. J ¶ 26 (Hargarten). LCMs allow the user of an assault weapon to *further* increase their lethality by allowing them to fire repeatedly without having to reload, and therefore to "release more kinetic energy per minute than other kinds of firearms." *Id.* ¶ 14; Ex. M ¶ 28 (Schreiber).

Assault weapons' extraordinary lethality dramatically enhances the risk of serious injury to innocent people during self-defense encounters, which "are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire." Ex. O ¶ 136 (Yurgealitis). In an experiment published in the NRA's *American Rifleman* magazine in 2014, nine different types of .223-caliber/5.56mm ammunition easily penetrated walls made from typical home construction materials and "exploded" one-gallon water jugs placed three feet behind the walls. *Id.* ¶ 137. Most commercially available .223/5.56mm ammunition can penetrate some hardened steel, and commercially available 5.56x45mm NATO cartridges can penetrate up to 3mm of non-hardened steel. *Id.* ¶ 139. These capabilities "pose[] substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings." *Id.*; *see, e.g.*, *NAGR II*, 2025 WL

2423599, at *18. Individuals acting reasonably in a self-defense scenario do not want to create fatal risks to their own family members and neighbors.

Assault weapons also require more skill than handguns to operate under stress. If an assault weapon is safely stored, a user may need to take multiple mechanical steps to make the weapon ready to fire—steps that are difficult to accomplish under pressure, even for trained law enforcement officers. Ex. O ¶¶ 140-41 (Yurgealitis). An AR-15 also weighs more than twice as much as a conventional handgun and, unlike handguns, assault rifles and many assault pistols require two hands to aim and fire. *Id.* ¶¶ 140, 142. They also lack the features of handguns the Court highlighted in *Heller* as ideal for self-defense. *See id.*; *Morgan*, 2025 WL 2502968, at *3 n.2 (citing *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)); *NAGR II*, 2025 WL 2423599, at *18 (comparing AR-15 to handguns); *Bianchi*, 111 F.4th at 458-59 (same). Moreover, assault weapons and LCMs are not well suited to self-defense because, as explained above, self-defense scenarios typically do not require the ability to fire more than ten rounds, let alone without reloading. *See supra* pp. 13-14; Ex. F ¶¶ 10, 18, 19 (Allen); *see also Morgan*, 2025 WL 2502968, at *6 ("Mr. Morgan provides no reason why it would be common to need 'the rapid and uninterrupted discharge of many shots' for self-defense." (quoting *OST II*, 95 F.4th at 45)).

For these reasons, assault weapons and LCMs are not recommended for personal self-defense. Indeed, Dr. Martin Schreiber, one of Defendants' experts, was deployed once to Iraq and twice to Afghanistan as a U.S. Army surgeon, during which time he was required to carry a 9mm Beretta M9 pistol for self-defense. Ex. M ¶¶ 11, 20

(Schreiber). His undisputed testimony is that, in the "U.S. military's judgment[,] …
handguns, not assault rifles, are the right weapon for self-defense." *Id.* ¶ 20. Similarly,
Yurgealitis explains that, in over 25 years, he has never recommended an AR, AK or
other similar assault weapon as a personal-defense or home-defense weapon. *See* Ex.
O ¶¶ 135, 144-46 (Yurgealitis).

**c.    Assault weapons and LCMs were designed for military use and are "most useful in military service"**

Assault weapons and LCMs also fall outside the category of weapons in common
use for self-defense because they are "most useful in military service" and not
meaningfully distinguishable from M16 rifles. *Bianchi*, 111 F.4th at 453, 459 (quoting
*Heller*, 554 U.S. at 627); *Bevis*, 85 F.4th at 1193-94, 1197; *see also Morgan*, 2025 WL
2502968, at *2. These items were designed for extreme lethality on the battlefield, with
"features initially designed (or patterned after those designed) for a military purpose."
Ex. O ¶¶ 7-8, 54 (Yurgealitis); *see id.* ¶¶ 7-8, 46-47, 136; Ex. J. ¶¶ 14, 26 (Hargarten);
Ex. M ¶ 28 (Schreiber). The very same features that render these items overpowered
and counterproductive for civilian self-defense make them, in the "U.S. military's
judgment," most suitable "for killing enemy combatants." Ex. M ¶ 20 (Schreiber); *see*
*NAGR II*, 2025 WL 2423599, at *5, *17-18.

Assault weapons and LCMs "directly trace their origins to weapons developed for
use in military combat." Ex. O ¶ 7 (Yurgealitis). Modern assault weapons begin with the
German StG 44 "storm rifle" produced late in World War II, which incorporated novel
technologies like gas-powered semiautomatic fire, lightweight steel stampings, a

17

detachable magazine, a separate pistol-style grip, a barrel shroud, and a threaded
barrel. *Id.* ¶¶ 55-84. Each of these features "primarily served to increase the firepower
and lethality of an individual combatant." *Id.* ¶ 64. The Soviet Union developed the AK-
47 rifle—the "quintessential assault rifle"—based on the StG 44, *id.* ¶¶ 66-67 (internal
quotation marks omitted), and in the United States the same developments were
incorporated into the rifle that became known as the AR-15 in its commercially available
semiautomatic version and the M16 in its "select fire" military iteration, *id.* ¶ 84; *see also
id.* ¶¶ 41, 70-76.

The only difference between the military M16 and the civilian AR-15 was, and
continues to be, that the M16 is capable of firing in fully automatic mode. *Id.* ¶¶ 84, 112;
*see also* Ex. M. ¶ 21 (Schreiber). But, as courts have recognized, that distinction should
bear little weight in the Second Amendment analysis, given that the U.S. Army Manual
instructs that the most effective—*i.e.*, most lethal—use of an M16 at distances greater
than 25 yards *is in semiautomatic mode.* Ex. O ¶ 153 (Yurgealitis); *see, e.g., NAGR II*,
2025 WL 2423599, at *17; *Bianchi*, 111 F.4th at 456.

In the decades since the advent of the M16/AR-15, its "basic configuration,
appearance, construction, and operation … has remained unchanged." Ex. O ¶ 75
(Yurgealitis). Since its inception, the M16/AR-15 has chambered a 5.56x45mm NATO
cartridge and followed what has become "standard assault rifle design." *Id.* ¶¶ 72, 75
(Yurgealitis). When employed during the Vietnam War, this lethal design resulted in
"catastrophic injuries to Viet Cong combatants ... including severing of limbs and
decapitation." *Id.* ¶ 73. That design persists today in weapons regulated by the

18

Ordinances, incorporating many of the features of the German StG 44: an internal gas operating system, lightweight design, a separate pistol grip and shoulder stock, a barrel shroud, detachable magazines, and flash suppressor/muzzle brake variations. *Id.* ¶¶ 72, 75.[9]

LCMs were developed in tandem with these weapons, to facilitate their lethal military purpose, and they were generally not sold commercially when assault weapons became commercially available. *Id.* ¶¶ 121-23. Prior to the weapons described above, U.S. infantrymen were issued an M1 Garand semiautomatic rifle that had an internal fixed magazine that held eight rounds. *Id.* ¶ 121. In the 1950s and 1960s, the M16, and its precursor the M-14, were issued to U.S. infantrymen with a detachable 20-round magazine, while the AR-15 was sold commercially with two five-round magazines. *Id.* ¶¶ 121-22. After World War II, commercially available semiautomatic pistols were likewise generally equipped with magazines of ten or fewer rounds. *Id.* ¶ 124. As the record shows, and as numerous courts have found, both assault weapons and LCMs originate from and are most useful in military service. *See, e.g.*, *NAGR II*, 2025 WL 2423599, at *17; *Bianchi*, 111 F.4th at 454, 459; *Bevis*, 85 F.4th at 1195-96.

---

[9] The technological developments summarized here also led to the development, for military use, of automatic and semiautomatic weapons that fired pistol-caliber (or "sub-caliber") rounds, known as "submachine guns." *Id.* ¶¶ 85-92. Those developments are incorporated in some modern pistols, which are covered by the definition of "assault weapon" in the Ordinances. *Id.*

19

> **d.    Assault weapons and LCMs are "dangerous and unusual"**

Finally, "dangerous and unusual" items are unprotected by the Second

Amendment. *See RMGO*, 121 F.4th at 117 (quoting *Heller*, 554 U.S. at 627); *see also*

*Rayton*, 2025 WL 901987 at *7 (agreeing with "[s]everal circuit courts" that "machine

guns are not in common use because they are dangerous and unusual"). That category

does not reflect a rigid, two-part, conjunctive test; rather, "dangerous and unusual" is

best understood as meaning unusually or exceptionally dangerous. *See NAGR II*, 2025

WL 2423599, at *11-12; *id.* at *25-27 (Nathan, J., concurring); *Hanson*, 120 F.4th at 238

n.7. As explained below, and as the record shows, assault weapons and LCMs are

unusually dangerous.[10]

The effect of assault weapons' extraordinary muzzle velocity on the human body

is horrific, categorically different from the effect of the handguns at issue in *Heller* and

*Bruen*, and results in wounds "virtually identical" to those caused by similar weapons

used in military combat. Ex. M ¶¶ 35-37 (Schreiber); *see* Ex. H ¶¶ 12, 14 (Colwell).

5.56x45mm NATO rounds fired from an assault rifle create larger wound cavities than

other cartridges fired from other firearms, and they do "extreme damage to the tissue

and organs of shooting victims," particularly solid organs like the liver and spleen. Ex. J

---

[10] Even if "dangerous and unusual" referred to a conjunctive test, assault
weapons and LCMs satisfy that test, as several courts have found. *See, e.g.*, *Capen v.
Campbell*, 708 F. Supp. 3d 65, 85-87 (D. Mass. 2023) ("*Capen I*") (concluding that
assault rifles are both dangerous and unusual), *aff'd*, *Capen II*, 134 F.4th 660; *Or.
Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 922-23 (D. Or. 2023) (same); *Rupp*, 723
F. Supp. 3d at 852-62 (same).

20

¶ 14 (Hargarten); *see also* Ex. O ¶¶ 73, 79-82 (Yurgealitis); Ex. H ¶ 14 (Colwell); Ex. M

¶¶ 26-27 (Schreiber). Injuries caused by assault weapons to the head, neck and trunk

are "usually lethal," whereas wounds caused by handguns are "generally survivable

unless the bullet penetrates a critical organ or major blood vessel." Ex. M ¶¶ 38, 44

(Schreiber). Inside the human body, a round fired from an assault weapon "can destroy

organs in a way that looks like an explosion has happened." *Id.* ¶ 39; Ex. H ¶¶ 12, 14

(Colwell); *see also NAGR II*, 2025 WL 2423599, at *17 (comparing AR-15 wounds to

"being shot with a Coke can" (internal quotation marks omitted)); *Bianchi*, 111 F.4th at

455 (detailing the "phenomenal lethality" of AR-15s (internal quotation marks omitted)).

Such injuries are especially lethal to children. Ex. J ¶¶ 14, 32, 35 (Hargarten). Not one

child shot with an assault weapon at Sandy Hook survived. *Id.* ¶ 35.

   LCMs further "increase kill potential." Ex. K ¶ 35 (Klarevas). "[T]he more bullets a

shooter can fire at a target within a finite amount of time, the more potential wounds

they can inflict," and "the more bullets that strike a victim, the higher the odds that that

person will die." *Id.* ¶¶ 35, 37 (noting that the fatality rate is more than 60% higher

among those struck with more than one bullet); *see Or. Firearms Fed'n*, 682 F. Supp.

3d at 898-99, 922 (citing Dr. Klarevas). LCMs also provide "extended cover" to

shooters, because while they are firing, "it is difficult for those in harm's way to take

successful defensive maneuvers." Ex. K ¶ 38 (Klarevas). LCMs therefore enable

shooters "to easily fire more than eleven rounds before pausing to reload, thereby

eliminating breaks that afford victims time to escape and law enforcement time to

intervene." *NAGR II*, 2025 WL 2423599, at *18; *see* Ex. K ¶ 39 (Klarevas). The dangers

are compounded by assault weapons' ability to penetrate body armor, making it more likely that first responders "may be injured or killed in the performance of their duty." Ex. O ¶ 151 (Yurgealitis)); *see Bianchi*, 111 F.4th at 457; *Capen I*, 708 F. Supp. 3d at 84-85 (citing Yurgealitis).

The evidence compiled by Defendants on this point is overwhelming and undisputed: assault weapons and LCMs are uniquely and extraordinarily dangerous. And they are increasingly the tools of choice for "perpetrators of gun massacres." Ex. K ¶ 13 (Klarevas)); *see NAGR II*, 2025 WL 2423599, at *17-18; *Bianchi,* 111 F.4th at 456-57. The Second Amendment's protection does not extend to such weaponry. *See Bianchi*, 111 F.4th at 450-52, 460-61; *see also RMGO*, 121 F.4th at 116-17 ("[T]he Second Amendment does not extend to weapons … adapted for unlawful uses.").

### B.    LCMs Are Not "Arms"

In addition, LCMs are not entitled to threshold Second Amendment protection because they "are not 'Arms' within the meaning of the Second Amendment." *Duncan*, 133 F.4th at 865. The "Second Amendment's definition of 'arms' is fixed according to its historical understanding," which focuses on the word's "'normal and ordinary' meaning." *Bruen*, 597 U.S. at 20, 28 (quoting *Heller*, 554 U.S. at 576-77); *see RMGO*, 121 F.4th at 114. That term is neither defined nor historically understood to include "accessories, or accoutrements," like LCMs. *Duncan*, 133 F.4th at 867; *see* Ex. G ¶¶ 4, 9-10, 26, 79 (Baron).

LCMs do not fit the definition of "Arms." As defined at the founding, "Arms" are "weapons of offence" that are "use[d] in wrath to cast at or strike another." *Heller*, 554

U.S. at 581 (quoting historical dictionaries). But "LCMs, like other accessories to weapons, are not used in a way that 'casts at or strikes another.'" *OST I*, 646 F. Supp. 3d at 386-87; *see Duncan*, 133 F.4th at 867. Like silencers, LCMs "generally have no use independent of their attachment to a gun and you can't hurt anybody with one unless you hit them over the head with it." *OST I*, 646 F. Supp. 3d at 387 (cleaned up). Just as a silencer is a "firearm accessory" rather than "a weapon," LCMs are not "'bearable arm[s]' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *see Duncan*, 133 F.4th at 868 (relying on the Tenth Circuit's opinion in *Cox* in holding that LCMs are not protected "Arms"); *OST I*, 646 F. Supp. 3d at 387-88 (same).

That conclusion is confirmed by the uncontroverted historical record. Defendants' expert analyzed "the historical use of the terms *arms* and *accoutrements*" during the founding era and Reconstruction (a methodology referred to as "corpus linguistics" research) and found that the use of "'Arms' as a stand-alone term refers to weapons," and "almost never includes ammunition or ammunition storage containers." Ex. G ¶¶ 1, 2, 32 (Baron); *see RMGO*, 121 F.4th at 114 (advising that "[t]o aid in interpreting the plain text" of the Second Amendment, parties "may … utilize corpus linguistics"). Such ammunition containers—then known as "cartridge boxes," as the word "magazine" was not so used until the 1860s—were instead "viewed as accoutrements, the ancillary equipment associated with soldiering, or service in the military." Ex. G ¶¶ 25-26 (Baron); *see Duncan*, 133 F.4th at 867; *id.* at 889 (Berzon, J., concurring) (explaining that the majority drew from Prof. Baron's corpus linguistics-based expert evidence); *OST I*, 646 F. Supp. 3d at 387-88 (relying on expert declaration from Prof. Baron); *Gator's Custom*

23

*Guns*, 568 P.3d at 282 (same). As "*holders* of ammunition," *OST I*, 646 F. Supp. 3d at 387, LCMs are not "Arms" as historically understood.

LCMs are also not "necessary for the firearm to operate," as Plaintiffs suggest in their amended complaint. Doc. 116 ¶ 46; *see id.* ¶¶ 47-51. While some courts have found the Second Amendment includes a "corollary right to possess accessories that are necessary for the ordinary operation of a protected weapon," *Duncan*, 133 F.4th at 867; *see Or. Firearms Fed'n*, 682 F. Supp. 3d at 911-13, Plaintiffs do not—and cannot—meet such a standard here. As Defendants' firearms expert (a former ATF senior special agent) explained, he is "not aware of a single firearm that specifically requires a large-capacity magazine, as defined in the Ordinances, to operate." Ex. O ¶ 133 (Yurgealitis). Plaintiffs have offered no evidence to the contrary. Nor could they. Simply put, an LCM "is not necessary to operate any firearm." *Duncan*, 133 F.4th at 868; *see Or. Firearms Fed'n*, 682 F. Supp. 3d at 912-13 (relying on Yurgealitis).

For all these reasons, Plaintiffs have failed to meet their step-one burden. The Court may end its inquiry here and enter summary judgment for Defendants.

## III.    The Ordinances Are Consistent with the Nation's Historical Tradition

Even if Plaintiffs had met their step-one burden, their Second Amendment challenge would still fail because the Ordinances are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. A "more nuanced approach" applies to this analysis because the Ordinances are directed at an "unprecedented societal concern" driven by "dramatic technological changes," *Bruen*, 597 U.S. at 27— the epidemic of mass shootings perpetrated with assault weapons and LCMs. As

24

Defendants have demonstrated through the uncontroverted historical record—stretching consistently from the founding through Reconstruction and beyond—the Court should conclude that the Ordinances fit comfortably within the nation's "historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17).[11]

Plaintiffs have failed to raise any genuine dispute of material fact on these points. They have not rebutted the extensive collection of historical laws and expert testimony Defendants compiled. Nor have they presented contrary historical evidence. Given this unrebutted record, if the Court reaches the second, historical step of the *Bruen-Rahimi* inquiry, it should find—in accord with "every Circuit to address the question," *NAGR II*, 2025 WL 2423599, at *22 n.40 (citing cases)—that the Ordinances' restrictions on assault weapons and LCMs are fully consistent with the nation's "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing." *Bianchi*, 111 F.4th at 446. For this reason, too, the Court should grant summary judgment for Defendants.

## A.    This Case Requires a "More Nuanced" Analogical Approach

*Bruen* establishes that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the historical inquiry. 597 U.S. at 27. That is so here. The Ordinances address a dramatic technological change—the development of rapid-fire semiautomatic assault weapons

---

[11] As the Tenth Circuit recently explained, courts should "lean[] on primary sources, the work of professional historians, widely cited legal scholarship, and the decisions of other courts that have studied the historical evidence to the best of their ability," in conducting this historical inquiry. *Harrison*, 2025 WL 2452293, at *17 n.20.

and large-capacity magazines—and the unprecedented societal concern of mass shootings. This case thus "warrant[s] an even more flexible approach" to the historical inquiry "than the Court applied in *Rahimi*." *Duncan*, 133 F.4th at 873.

First, rapid-fire assault weapons and LCMs represent a "dramatic technological change" from the technology available at the founding and Reconstruction. Firearms during the colonial and founding eras could not be stored loaded, they were liable to misfire, they could not fire multiple rounds without reloading, and the process of loading each round took at least half a minute. Ex. L ¶ 19 (Roth); *see NAGR II*, 2025 WL 2423599, at *15 (citing Roth on the limitations of founding-era firearms); *Bianchi*, 111 F.4th at 464 (same). Early repeater weapons were "experimental, fraught with problems, and proven unfeasible." *Vt. Fed'n*, 741 F. Supp. 3d at 202 (citing Spitzer); *see* Ex. N ¶¶ 48-56 (Spitzer); Ex. I ¶¶ 5-27 (DeLay). And even when large-capacity, repeating firearms came onto the market after the Civil War, such weapons were "exceedingly rare" and not "remotely comparable" to the assault weapons and LCMs of today. Ex. I ¶¶ 43, 49-51, 57 (DeLay); *Hanson*, 120 F.4th at 242; *see id.* at 248-51 (detailing an appendix of historical firearms). Semiautomatic weapons capable of rapid fire "did not become feasible and available until the beginning of the twentieth century, and the primary market was the military." Ex. N ¶ 54 (Spitzer); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 598 (D. Del. 2023) ("*DSSA I*") (quoting Spitzer), *aff'd on other grounds*, 108 F.4th 194 (3d Cir. 2024). The most infamous was the Thompson submachine gun, or Tommy gun, which was made commercially available in the 1920s and used by criminal gangs to inflict mass casualties on rivals.

26

Ex. I ¶ 69 (DeLay); Ex. L ¶¶ 52, 55 (Roth); Ex. N ¶ 20 (Spitzer). The Tommy gun

dramatically increased the number of bullets a single shooter could fire in a short period

of time and was promptly regulated at the state and federal levels Ex. I ¶¶ 69-70

(DeLay); Ex. L ¶¶ 56-57 (Roth); Ex. N ¶¶ 34-36 (Spitzer); *see Bianchi*, 111 F.4th at 469

(citing DeLay, Roth, and Spitzer).

      The destructive power of modern assault weapons and LCMs dramatically

exceeds that of this earlier weaponry—even fully automatic Tommy guns. Ex. J ¶ 29

(Hargarten). "Semi-automatic firearms equipped with large-capacity magazines fire with

an accuracy, speed, and capacity that differ completely from the accuracy, speed, and

capacity of firearms from earlier generations." *Duncan*, 133 F.4th at 873. With even

minimal training, the user of an assault weapon equipped with an LCM can fire 40 to 50

rounds per minute. Ex. O ¶ 153 (Yurgealitis); *see also Hanson*, 120 F.4th at 242 (finding

that a "handgun with an [extra-large capacity magazine] can fire scores of shots in a

matter of seconds"). It is simply "unrealistic to argue that assault rifles that can fire 120

rounds in three minutes are not a dramatic technological change over a rifle [in the late

19th century] that, due to the lever-pull and manual-feeding requirements, could fire only

about 36 rounds." *Rupp*, 723 F. Supp. 3d at 880 (citing Spitzer). It is clear that "the

danger these firearms pose is intrinsically different from past weaponry." Ex. L ¶ 64

(Roth); *see NAGR II*, 2025 WL 2423599, at *15 (citing Roth on dangerousness and

lethality of AR-15).

      *Second*, the Ordinances respond to the unprecedented societal concern of mass

shootings. "There can be little doubt that mass shootings are an unprecedented societal

concern." *Hanson*, 120 F.4th at 241. Mass murder by a lone shooter was non-existent

before the twentieth century, with the "first known mass shooting resulting in 10 or more

deaths occur[ing] in 1949." Ex. K ¶ 18 (Klarevas); *see NAGR II*, 2025 WL 2423599, at

*16 (citing Klarevas). There have been more mass shootings resulting in ten or more

deaths since 2017 than there were in the first 224 years of our nation's history. Ex. K

¶ 19, Tbl. 6 (Klarevas). And in more than 75% of double-digit fatality mass shootings,

the shooter used an assault weapon and/or an LCM, resulting in substantially higher

loss of life. *Id.* ¶¶ 16, 17, 22; *see NAGR II*, 2025 WL 2423599, at *16 (crediting similar

statistics from Klarevas).

Accordingly, numerous courts in similar challenges to laws restricting assault

weapons or LCMs have determined that the "more nuanced" approach applies. The

First Circuit, for example, remarked that "Founding-era society faced no risk that one

person with a gun could, in minutes, murder several dozen individuals." *OST II*, 95 F.4th

at 49; *see Capen II*, 134 F.4th at 668. The D.C. Circuit has concluded that "[t]here were

no remotely comparable arms in common use even when the Fourteenth Amendment

was ratified." *Hanson*, 120 F.4th at 242. In the words of the Second Circuit, "[m]ass

shootings continue to be a growing threat unlike anything that the Framers could have

imagined." *NAGR II*, 2025 WL 2423599, at *16. And as the en banc Ninth Circuit

observed, "[i]t is hard to imagine a *clearer* example of an 'unprecedented societal

concern'" than mass shootings. *Duncan*, 133 F.4th at 873 (emphasis added). Put

simply, as the en banc Fourth Circuit stated, "[t]hese are not our forebears' arms, and

these are not our forebears' calamities." *Bianchi*, 111 F.4th at 464. Accordingly, if this

28

Court reaches the historical step of the *Bruen-Rahimi* analysis, it should apply the more nuanced approach.[12]

> **B.    The Nation Has a Historical Tradition of Regulating Particularly Dangerous Weapons that Pose a Threat to Public Safety**

Our nation's history reveals a "long and dynamic tradition of regulating excessively dangerous weapons whose demonstrable threat to public safety led legislatures to heed their constituents' calls for help." *Bianchi*, 111 F.4th at 472; *see* Ex. N ¶¶ 9-14, 44 (Spitzer); Ex. I ¶¶ 40-42 (DeLay); Ex. L ¶¶ 32, 51, 71-72 (Roth). This tradition is amply supported by founding-era evidence, and it continued through the 18th and 19th centuries, including Reconstruction, persisting into the 20th century and modern day. *See, e.g.*, *NAGR II*, 2025 WL 2423599, at *19-22; *Bianchi*, 111 F.4th at 464-71. Across these various eras, a throughline emerges from this "long view of this history": legislatures have consistently responded to "definable arc[s] of technological [weapons] innovation" with "corresponding arms regulation." *Bianchi*, 111 F.4th at 471. The following discussion highlights a few illustrative examples of legislatures "regulating the especially dangerous weapons of the time," *Bevis*, 85 F.4th at 1199, "once their

---

[12] Given the extensive historical record here, the Ordinances are constitutional regardless of whether this Court applies the more nuanced approach. *See, e.g.*, *Duncan*, 133 F.4th at 874 (concluding that "a more nuanced approach applies" but then upholding California's LCM law "under *Rahimi*'s straightforward approach" because it "reach[ed] the same result" under that approach); *see also Harrison*, 2025 WL 2452293, at *13 (explaining that principles-based analogical reasoning applies even without the "more nuanced" approach).

29

incompatibility with a lawful and safe society bec[a]me[] apparent," *Bianchi*, 111 F.4th at
441-42.[13]

     ***Trap Guns***. Since the earliest days of our nation, legislative bodies have
regulated particularly dangerous weapons and accessories posing a threat to public
safety. Beginning at least as early as the 1770s, for example, legislatures prohibited
"trap guns"—devices that were rigged to fire remotely when a string or wire was tripped.
Ex. N ¶ 102 (Spitzer). Trap guns were typically used by individuals "to defend their
businesses, homes, or possessions" and lauded for "their use as a deterrent to crime."
*Duncan*, 133 F.4th at 875; *see* Ex. N. ¶ 103 (Spitzer). "Inevitably, however, the traps
sometimes wound up hurting or killing innocents," Ex. N ¶ 104 (Spitzer), prompting
"[l]egislatures [to] respond[] by banning the use of firearms as trap guns," *Duncan*, 133
F.4th at 875. New Jersey prohibited trap guns in 1771, after which 17 other states
followed suit with anti-trap gun laws in the 19th and early 20th centuries. *See id.*; *see
also* Ex. N ¶¶ 102-04 (Spitzer). These laws directly reflect the concern by earlier
generations that threats to public safety—even if "infrequent," *Duncan*, 133 F.4th at
875—outweighed the subjective desire of some to use "trap guns" for self-defense. *See*
Ex. N ¶¶ 102-04 (Spitzer).

     ***Gunpowder***. "Founding-era communities … face[d] risks posed by the
aggregation of large quantities of gunpowder, which could kill many people at once if

---

    [13] Certain of these historical analogues are highlighted below. They are more
fully set forth, and discussed, in Defendants' accompanying expert reports. *See* Ex. I
(DeLay); Ex. L (Roth); Ex. N (Spitzer).

ignited," *OST II*, 95 F.4th at 49; *see Duncan*, 133 F.4th at 874. "In response to this

danger—which resulted from the accumulation of firepower disproportionate to the

lawful purpose of individual self-defense," *Bianchi*, 111 F.4th at 465—several colonies,

states, and localities enacted laws regulating the storage and aggregation of

gunpowder. *See Duncan*, 133 F.4th at 874 (citing laws); *Bianchi*, 111 F.4th at 465 n.3

(same). These laws "typically prohibited certain methods of storing gunpowder or

restricted the amount of gunpowder that could be stored in one place." *Duncan*, 133

F.4th at 874. For example, a Massachusetts law "banned taking a firearm loaded with

gunpowder into any house or building in Boston." *Id.* at 874-75 (citing 1782 Mass. Acts

119, ch. 46). And a 1789 law in Portsmouth, New Hampshire regulated an individual's

possession of "more than ten pounds of gun-powder at any one time," requiring that it

be securely stored and "forfeit[ed]" to the firewards of the city. 1786 N.H. Laws 383-84;

*see OST II*, 95 F.4th at 49 n.16 (citing New Hampshire law).

   ***Bowie Knives.*** Beginning in the early 19th century, knives "advanced in

lethality," *Bianchi*, 111 F.4th at 465—including the "Bowie knife, a distinctive weapon

with a 'longer blade designed expressly for fighting, rather than hunting or utility,'" *OST
II*, 95 F.4th at 48; *see* Ex. N ¶ 79 (Spitzer); Ex. L ¶ 29 (Roth). Bowie knives generally

had "clip points that made it easier to stab an opponent," *Bianchi*, 111 F. 4th at 465

(citing Roth), "were widely used in fights and duels," *id.*; Ex. N ¶ 80 (Spitzer), and "were

considered more dangerous than firearms," *OST II*, 95 F.4th at 48. "Once their

popularity in the hands of murderers became apparent," *id.* at 46, and after "they were

first used in a widely-publicized act of violence resulting in multiple fatalities," *NAGR II*,

31

2025 WL 2423599, at *19, states quickly responded consistent with earlier tradition: "From the beginning of the 1830s through the early twentieth century, the District of Columbia and every state except New Hampshire passed laws restricting Bowie knives." *OST II*, 95 F.4th at 48 (citing Spitzer); *see* Ex. N ¶¶ 79-90 (Spitzer) (discussing historical restrictions on Bowie knives and similar bladed weapons); *NAGR II*, 2025 WL 2423599, at *19-21 (same); *Duncan*, 133 F.4th at 875-76 (same); *Bianchi*, 111 F.4th at 466-67 & nn.5-6 (same). Georgia, for example, barred the possession, sale, or carry of "Bowie, or any other kind of knives," intended to be worn or carried as "arms of offence or defence." Ex. L ¶ 31 (Roth); Ex. N ¶ 88 (Spitzer); *see NAGR II*, 2025 WL 2423599, at *21 n.37. And Arkansas barred the sale of Bowie knives and similar weapons entirely in the 1880s. Ex. N ¶ 88 (Spitzer); *see Bevis*, 85 F.4th at 1201. The regulation of these knives provides yet another example of "legislators respond[ing] to a growing societal concern about violent crime by severely restricting the weapons favored by its perpetrators"—even where "those same weapons could conceivably be used for self-defense." *OST II*, 95 F.4th at 48.

*Slungshots, Clubs, and Other Blunt Weapons*. The slungshot followed a similar trajectory. Developed in the 1840s, a slungshot "is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle." Ex. N ¶ 95 (Spitzer); *see Duncan*, 133 F.4th at 876. Slungshots became "'a regular part of criminal weaponry,' and 'gangsters could be merciless in their use.'" *Bianchi*, 111 F.4th at 467 (quoting Spitzer); *see* Ex. N ¶ 95 (Spitzer). States again reacted: "Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the

32

1800s and 12 in the 1900s." Ex. N ¶ 95 (Spitzer). For example, "New York and Vermont prohibited the manufacture, sale, or carry of slungshots, punishable by up to five years' imprisonment." *Duncan*, 133 F.4th at 876 (citing 1849 New York and Vermont laws). And "[s]tates also regulated the carrying of blunt objects and bludgeons more generally." *Or. Firearms Fed'n*, 682 F. Supp. 3d at 908-09, 929-30 (citing Spitzer). Beginning in New York in 1664 and continuing into the early 20th century, every state in the nation had one or more laws against the carrying of various types of clubs and other blunt weapons. Ex. N ¶¶ 91-98 & Ex. C (Spitzer).

   ***Concealable Pistols and Revolvers.*** Advancements in weapons technology in the lead-up to the Civil War led the single-shot guns prevalent in the early 1800s to be displaced by multi-shot pistols and revolvers. Ex. L ¶¶ 33, 35-40 (Roth); *see Bianchi*, 111 F.4th at 465 (citing Roth, DeLay, and Spitzer). These weapons were more lethal than knives or older pistols and were concealable, and they quickly became the primary weapons used in interpersonal assaults during the latter part of this period. Ex. L ¶ 39 (Roth). Consistent with founding-era principles, once these weapons "began to spread from the military to the civilian market following the Civil War and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use." *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 906 (W.D. Wash. 2023) (citing Spitzer); *see* Ex. N ¶ 63 (Spitzer) (discussing historical restrictions on concealable pistols); *Duncan*, 133 F.4th at 876 (same). "Several states responded by restricting the carry of concealable pistols," *Duncan*, 133 F.4th at 876; indeed, "[b]y the end of the 1800s, nearly every state in the country" had laws restricting the concealed

33

carry of revolvers and other concealable pistols, *DSSA I*, 664 F. Supp. 3d at 601 (citing
Spitzer); *see* Ex. N ¶ 63 (Spitzer).

    ***Semiautomatic Firearms and Machineguns.*** Firearms technology developed
rapidly in the late 19th and early 20th centuries, with semiautomatic arms "bec[oming]
available to consumers in the 1890s," and "automatic weapons quickly follow[ing], with
the [Tommy gun] being patented in 1920." *Bianchi*, 111 F.4th at 469 (citing DeLay and
Spitzer); *see* Ex. I ¶ 65-69 (DeLay); Ex. N ¶ 20 (Spitzer). The Tommy gun, as well as
other "military firearms that had been developed for World War I, such as the Browning
Automatic Rifle, … 'found favor among criminals and gangsters in the 1920s and early
1930s.'" *Bianchi*, 111 F.4th at 469 (quoting Spitzer); *see* Ex. N ¶¶ 24-25 (Spitzer). "The
upshot was that early 20th-century criminals gained access to weapons with firepower
not seen before in civilian life," such that these weapons were used in "notorious
crimes" and exacted "devastating toll[s] and garnered extensive national attention."
*Bianchi*, 111 F.4th at 469 (citing Spitzer and Roth); *see* Ex. N ¶¶ 25-26 (Spitzer); Ex. L
¶ 56 (Roth).

    "Once again, legislatures responded" to new weapons technology as they had
since the founding. *Bianchi*, 111 F.4th at 469; *see also Morgan*, 2025 WL 2502968, at
*8-9 (summarizing machine gun history and congressional response). From the 1920s
through 1934, lawmakers nationwide enacted laws regulating automatic and
semiautomatic weapons. Ex. N ¶¶ 34-40 (Spitzer). Some 31 states and the District of
Columbia enacted restrictions on fully automatic weapons during this period, mainly
outright prohibitions on sale and possession. *Id*. ¶ 34 & Exs. B, D. As many as ten

34

states plus the District of Columbia enacted laws prohibiting or otherwise restricting semiautomatic weapons. *Id.* ¶ 39 & Exs. B, C; *see Bianchi*, 111 F.4th at 470. And recognizing that part of what made these automatic and semiautomatic weapons so dangerous was the ability to fire numerous shots without reloading, "nearly half of all states, representing approximately 58% of the American population at that time," adopted "[r]egulations concerning removable magazines and magazine capacity." *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 21 (D.D.C. 2023) (quoting Spitzer), *aff'd*, 120 F.4th 223 (D.C. Cir. 2024); *see* Ex. N ¶¶ 41-43 & Tbl. 1 (Spitzer). This culminated in the passage of the National Firearms Act in 1934, "which severely curtailed the civilian possession and general circulation of automatic weapons, as well as sawed-off shotguns, short-barreled rifles, and silencers." *Bianchi*, 111 F.4th at 470; *see* Ex. N ¶¶ 36, 43 (Spitzer); *NAGR II*, 2025 WL 2423599, at *21.

In sum, history from before our nation's founding to today—set forth in detail in the accompanying expert reports—establishes a clear and uncontroverted tradition. "Taken together," *Rahimi*, 602 U.S. at 698, the history establishes that legislative bodies have the power to restrict "especially dangerous variants of otherwise lawful types of weapons" to prevent "further acts of mass homicide and terror." *NAGR II*, 2025 WL 2423599, at *22. The Ordinances fit comfortably within this "broader and consistent story of our nation's regulation of excessively dangerous weaponry." *Bianchi*, 111 F.4th at 469-70.

**C.     The Ordinances Are "Relevantly Similar" to Historical Analogues**

The Ordinances are "one more chapter" in the "storied tradition of legislatures perceiving threats posed by excessively dangerous weapons and regulating commensurately." *NAGR II*, 2025 WL 2423599, at *13; *Bianchi*, 111 F.4th at 462. More specifically, they are "relevantly similar" to the historical analogues presented by Defendants along both metrics identified in *Bruen* and *Rahimi*: "how" and "why" they burden a law-abiding citizen's right to armed self-defense. *See Rahimi*, 602 U.S. at 692; *Bruen* 597 U.S. at 27. This is particularly the case where, as here, a "more nuanced" historical analysis applies. *See supra* Part III.A**.**

The Ordinances impose, at most, a minimal burden on self-defense that is comparable to the burden imposed by historical analogues. Any burden imposed by the Ordinances is further justified by the same concerns that motivated regulations of especially dangerous weaponry throughout our nation's history. Defendants have thus carried their burden at step two of the *Bruen-Rahimi* analysis.

**1.     The Ordinances Impose a Historically Comparable Burden on the Right to Armed Self-Defense**

The Ordinances impose little or no burden on the right to armed self-defense, much less a burden greater than comparable historical laws. To start, they "d[o] not impair the Second Amendment right to self-defense." *NAGR II*, 2025 WL 2423599, at *22. As explained above, assault weapons and LCMs are neither in common use, nor suitable, for self-defense. *See supra* Part II.A. The Ordinances also do not prevent Plaintiffs and others from acquiring, possessing, or carrying many firearms that *are*

commonly used for self-defense—including various kinds of semiautomatic weapons other than assault weapons and all manner of firearm magazines capable of holding ten or fewer rounds. *See* Ex. O ¶¶ 10-13, 96, 133 (Yurgealitis); Exs. A, B, C, D. Nor do the Ordinances limit the number of compliant magazines that an individual may possess, and the Municipal Ordinances allow individuals who owned assault weapons to keep them, subject only to a certification requirement. *See supra* p. 4.

Moreover, any burden imposed by these restrictions is comparable to their historical predecessors. Like early trap gun regulations, for example, the Ordinances restrict only certain weapons and accessories that are particularly dangerous, while leaving a variety of other weapons and accessories available for self-defense. *See Duncan*, 133 F.4th at 880 (explaining that, like LCM laws, "trap-gun laws allowed persons to use firearms in every way except one way that proved, at the relevant time, particularly dangerous to innocent persons"); *Or. Firearms Fed'n*, 682 F. Supp. 3d at 928-29. Courts have likewise found that founding-era gunpowder regulations support the constitutionality of laws like the Ordinances. *See, e.g.*, *Duncan*, 133 F.4th at 874-75; *Bianchi*, 111 F.4th at 464-65; *see also OST II*, 95 F.4th at 49 (explaining that gunpowder regulations "provide[] an especially apt analogy to [an] LCM ban"). And the same is true with respect to historical restrictions on Bowie knives, slungshots, clubs, concealable pistols and revolvers, and other "excessively dangerous weapons," *Bianchi*, 111 F.4th at 466-68—all of which, as many courts have concluded, are "relevantly similar" to modern laws prohibiting assault weapons and LCMs "in 'how' [they] burden[]

the right to armed self-defense." *Duncan*, 133 F.4th at 882 (citing cases); *see NAGR II*,
2025 WL 2423599, at *19-21; *Capen II*, 134 F.4th at 670-71.

The burden imposed by the Ordinances is also comparable to that imposed by
early 20th-century regulations of automatic and semiautomatic firearms, enacted shortly
after such weapons began to pose societal problems. Like the Ordinances, these 20th-
century laws regulated a particularly dangerous type of weapon, leaving available for
self-defense an array of other, better-suited options. *See, e.g.*, *OST II*, 95 F.4th at 48;
*Or. Firearms Fed'n*, 682 F. Supp. 3d at 933-35. They are additional "steps trod along a
well-worn path" in this nation's history of "regulat[ing] excessively dangerous weaponry."
*Bianchi*, 111 F.4th at 469-70; *see NAGR II*, 2025 WL 2423599, at *21.

For these reasons, courts have repeatedly found that laws like the Ordinances
"impose[] very little—if any—burden on the right of armed self-defense as compared to
the burdens imposed on that right by its historical predecessors." *OST II*, 95 F.4th at 46;
*see, e.g.*, *NAGR II*, 2025 WL 2423599, at *22; *Capen II*, 134 F.4th at 671. So too here.

### 2.    The Ordinances Are Comparably Justified

The Ordinances are also comparably justified by the same rationale as the
historical analogues: "to protect the public from the danger caused by weapons that
create a particular public safety threat." *Capen II*, 134 F.4th at 671; *see* Ex. A at 1-5; Ex.
B at 1-7; Ex. C at 1-4; Ex. D at 1-4. Like the many historical weapon restrictions
Defendants have identified, the Ordinances "were enacted in response to pressing
public safety concerns regarding weapons determined to be dangerous." *DSSA I*, 664
F. Supp. 3d at 603; *see, e.g*, *Bianchi*, 111 F.4th at 471-72. Specifically, like similar laws

38

upheld by other courts, the Ordinances were enacted in response to "a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons." *See DSSA I*, 664 F. Supp. 3d at 603; *see also, e.g.*, *NAGR II*, 2025 WL 2423599, at *1-2; *supra* p. 3.

As the record shows, mass shootings have increased at an alarming rate in the last three decades, as has the frequency with which mass shootings involve assault weapons and LCMs. Ex. K ¶¶ 12-13 (Klarevas); *see NAGR II*, 2025 WL 2423599, at *16 (citing Klarevas). Between 2018 and 2022, more than half of all mass shootings in the United States involved assault weapons, and *every* mass shooting involved LCMs. Ex. K ¶ 13-14 (Klarevas). And the use of assault weapons with LCMs has resulted in "devastating harm," *Duncan*, 133 F.4th at 877-78; *see* Ex. H ¶¶ 9-21 (Colwell); Ex. J ¶¶ 14-15, 26-30 (Hargarten); Ex. M ¶¶ 34-43 (Schreiber)—including a staggering 92% increase in fatalities in these mass-shooting incidents. Ex. K ¶ 17 (Klarevas).

In sum, the Ordinances faithfully follow "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians." *Bianchi*, 111 F.4th at 471. They do so while "honoring the right of Americans to possess arms more compatible with the Second Amendment's purpose" and the "calls of citizens" fearing the "mass violence" that "will afflict their communities absent government intervention." *Id.* at 471-72. The Constitution—and our nation's history—allows exactly that.

## CONCLUSION

Defendants respectfully request that the Court grant them summary judgment.

39

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Data compiled by the National Rifle Association ("NRA") about the use of weapons in self-defense indicate that of 736 reported incidents in which firearms were used in self-defense, the average number of shots fired was 2.2. Ex. F ¶ 10 (Allen).

2.  Of the 736 incidents described in the NRA's database about the use of weapons in self-defense, only 2 (0.3%) involved a defender firing more than ten rounds. *Id.* ¶ 10.

3.  An analysis of published news stories revealed that in a random selection of 200 accounts of armed self-defense incidents in the home, the average number of shots per incident was 2.34. *Id.* ¶ 18.

4.  The analysis of 200 published news stories found that in 97.3% of incidents the defender fired five or fewer shots, and there were no incidents where the defender was reported to have fired more than 10 rounds. *Id.* ¶ 19.

5.  Data compiled by the Heritage Foundation indicate that rifles were used in only 2% of defensive gun-use incidents, and only 4% of such incidents where the gun used could be identified. *Id.* ¶ 25.

6.  Assault weapons and LCMs were designed for extreme lethality against enemy combatants on the battlefield, and they are replete with military-style features. Ex. O ¶¶ 7-8, 46-47, 54, 136 (Yurgealitis).

7.  AR-15 rifles fire .223 and 5.56mm cartridges at a muzzle velocity of 3,200 to 3,500 feet per second—nearly three times the muzzle velocity of a round fired from a 9mm pistol. *Id.* ¶¶ 46, 47, 72, 79, 136.

8.  A round fired from an AR-15-style rifle releases into its target more than three times the energy of a round fired by a Thompson ("Tommy") submachinegun, approximately four to 19 times more than a handgun (depending on caliber), and approximately ten times more than the energy released by a musket. Ex. J ¶ 26 (Hargarten).

9.  LCMs allow the user of an assault weapon to increase his lethality by allowing him to fire repeatedly without having to reload, and therefore to release more kinetic energy per minute and increase the odds that someone shot will die. *Id.* ¶ 30; Ex. K ¶¶ 35, 37 (Klarevas); Ex. M ¶ 28 (Schreiber).

10.  LCMs also confer "extended cover" to shooters, because while they are firing without having to reload, "it is difficult for those in harm's way to take successful defensive maneuvers." Ex. K ¶¶ 38-39 (Klarevas).

11.  Rifle-caliber assault weapons can penetrate body armor commonly issued to law enforcement officers, increasing "the likelihood that first responders … may be injured or killed in the performance of their duty." Ex. O ¶¶ 151-52 (Yurgealitis).

12.  Data of mass-casualty acts of violence in the United States indicate that "among perpetrators of gun massacres, there is a growing preference for using assault weapons and LCMs to carry out their attacks." Ex. K ¶ 13 (Klarevas).

13.  Most commercially available .223/5.56mm ammunition can penetrate some hardened steel, and commercially available 5.56x45mm NATO cartridges can penetrate up to 3mm of non-hardened steel. Ex. O ¶ 139 (Yurgealitis).

14.  An experiment published in the NRA's *American Rifleman* magazine in 2014 found that nine different types of .223/5.56mm ammunition penetrated walls made from typical home construction materials and "exploded" one-gallon water jugs placed three feet behind such walls. *Id.* ¶ 137.

15.  "Potential overpenetration in a confined environment" creates "substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings." *Id.* ¶ 139.

16.  Self-defense encounters rarely, if ever, involve lengthy shootouts at long ranges with extensive exchanges of fire. *Id.* ¶ 136.

17.  An AR-15 weighs more than twice as much as a conventional handgun and (like many assault pistols, too) requires two hands to aim and fire. *Id.* ¶¶ 140, 142.

18.  A user may need to take multiple steps to ready a safely stored assault weapon for firing, which may be "difficult to accomplish under stress," even for trained law enforcement officers. *Id.* ¶¶ 140-41.

19.  Assault weapons and LCMs were originally designed for use in military combat and were not intended to be utilized by civilians or the general public. Ex. O ¶¶ 7-9 (Yurgealitis); *see also* Ex. M ¶¶ 11, 20 (Schreiber).

20.  The U.S. Department of Defense adopted the AR-15 as standard issue in the 1960s after field evaluations of the weapon in Vietnam described various catastrophic injuries to Viet Cong combatants who were shot by AR-15s, including severing of limbs and decapitation. Later, after a series of engineering

changes, the standard U.S. military designation was changed to the M16. Ex. O ¶¶ 73-74 (Yurgealitis).

21.    The design configuration of AR-15s produced today is virtually identical to the design configuration of M16s in the 1960s, and there are multiple internal parts of the weapons that are interchangeable. *Id.* ¶ 76.

22.    Since its inception, the M16/AR-15 has chambered a 5.56x45mm NATO cartridge and followed the same "standard assault rifle design." *Id.* ¶¶ 72, 75.

23.    When the AR-15 was first produced for sale on the civilian market, the only difference between the AR-15 and the M16 was that the civilian version was not capable of firing in fully automatic mode. That continues to be the sole operational distinction between them. *Id.* ¶¶ 41, 84, 112.

24.    The U.S. Army Manual instructs that the most effective use of an M16 at distances over 25 yards is in semiautomatic mode. *Id.* ¶ 153.

25.    The same technological developments that led to the M16/AR-15 also led to the development, for military use, of automatic and semiautomatic weapons that fire pistol-caliber rounds, known as "submachine guns." *Id.* ¶¶ 85-92.

26.    When the first semiautomatic variants of the M16 and AR-15 were distributed to civilians in 1964, they came supplied with two five-round magazines, not the military-issue 20-round magazine. *Id.* ¶¶ 121-22.

27.    After World War II, commercially available semiautomatic pistols were generally equipped with magazines of 10 or fewer rounds. *Id.* ¶ 124.

28.    Assault weapons are capable of inflicting enormous damage on the human body, and tend to cause more damage to muscles, bones, soft tissue and vital organs than other firearms. Ex. J ¶ 32 (Hargarten); Ex. M ¶¶ 35-39, 44-46 (Schreiber); Ex. H ¶¶ 12-18 (Colwell).

29.    The standard cartridge used in an AR-15—a 5.56x45mm NATO or .223 Remington cartridge—creates larger wound cavities than other cartridges fired from handguns and other firearms, and it does extreme damage to the tissue and organs of shooting victims, particularly solid organs like the liver and spleen. Ex. H ¶ 14 (Colwell); Ex. J ¶¶ 14, 27, 32 (Hargarten); Ex. M ¶¶ 26-27 (Schreiber); Ex. O ¶¶ 72-73, 79-80 (Yurgealitis).

30.    The likelihood of serious injury and death from a wound caused by an assault weapon is high for adult victims and even higher for pediatric victims, who

42

have smaller torsos, relatively more compressed/adjacent vital organs, and smaller blood reserves. Ex. J ¶¶ 14, 32, 35 (Hargarten).

31.   Until the late 19th century, single-shot, muzzle-loading firearms were the dominant guns in the United States. Ex. N ¶ 47 (Spitzer).

32.   Firearms "magazines" did not exist at the founding and remained relatively rare until the 1920s. Ex. G ¶¶ 24-25 (Baron).

33.   During the founding era, firearm users kept ammunition in what were called "cartridge boxes," "cartouch boxes," "cartridge cases," or "pouches." *Id.* ¶¶ 26, 33, 35.

34.   These ammunition holders were considered "accoutrements," as categorically distinct from "arms." *Id.* ¶¶ 4, 9. During the founding and Reconstruction eras, the term "arms" as a stand-alone term was used to refer to weapons and almost never included ammunition or ammunition storage containers such as cartridge boxes. *Id.* ¶¶ 9, 31, 32, 35, 53, 79.

35.   Firearms during the colonial era could not be stored loaded, were liable to misfire, could not fire multiple rounds without reloading, and the process of loading each round took at least half a minute Ex. L ¶ 19 (Roth).

36.   The handful of experimental multi-shot firearms that existed in the 18th century were rare curiosities that few alive at the time would have seen and virtually none would have had occasion to use. Ex. I ¶ 27 (DeLay); Ex. N ¶ 28 (Spitzer).

37.   None of the experimental multi-shot firearms that existed in the 18th century were safe or reliable enough to become militarily or commercially significant. Ex. I ¶ 11 (DeLay).

38.   The first repeating firearms entered the market in the 1830s. They typically held seven or fewer rounds and had to be manually reloaded round-by-round after all of the rounds were expended. *Id.* ¶¶ 47-51, 59.

39.   Weapons capable of rapid fire first entered the market at the turn of the 20th century, and the primary market for such weapons was the military. *Id.* ¶ 65; Ex. N ¶ 54 (Spitzer).

40.   The user of an assault weapon equipped with an LCM can fire 40 to 50 rounds per minute. Ex. O ¶ 153 (Yurgealitis).

41.　For a period of over 170 years—from 1776 to 1948—there was not a single known mass shooting incident in the United States that resulted in 10 or more fatalities. Ex. K ¶ 18 (Klarevas).

42.　There have been more mass shootings resulting in 10 or more deaths since 2017 than there were in the first 224 years of United States history. *Id.* ¶ 19, Tbl. 6.

43.　In more than 75% of the double-digit fatality mass shootings that have occurred in United States history, the shooter used an assault weapon and/or an LCM. *Id.* ¶ 22.

44.　The overwhelming majority of homicides during the colonial era were committed with hands and feet or weapons that were close to hand, such as whips, sticks, hoes, shovels, axes, or knives. Ex. L ¶¶ 18, 20 (Roth); Ex. I ¶ 30 (DeLay).

45.　Beginning in New York in 1664 and continuing into the early 20th century, every state in the nation enacted one or more laws against the carrying of various types of clubs and other blunt weapons. Ex. N ¶¶ 91, 92, 94 & Ex. C (Spitzer).

46.　Beginning in the 1770s, states also began prohibiting trap guns—devices that were used to protect businesses, property, and possessions that were rigged to fire remotely when a string or wire was tripped. New Jersey was the first state to prohibit the possession of trap guns in 1771, after which 15 states followed suit with anti-trap gun laws in the 19th and 20th centuries. *Id.* ¶¶ 102-04.

47.　Beginning in 1813, several states (Georgia, Kentucky, Louisiana, Indiana, Arkansas, Virginia) prohibited the possession and/or concealed carry of the kinds of weapons that were used in many of the era's murders and serious assaults, including concealable knives and pistols. Ex. L ¶ 30 (Roth).

48.　At least 44 states in the 19th century barred the concealed and/or public carry of a particularly dangerous type of knife, the Bowie knife, and Arkansas barred the sale of Bowie knives entirely. Ex. N ¶¶ 80, 87-90 (Spitzer).

49.　Firearms technology improved in the 19th century, which resulted in the development of the revolver. Due to its lethal, reliable, and easy-to-conceal nature, the revolver became the primary weapon used in interpersonal assaults during the latter part of the 19th century. Ex. L ¶¶ 36-39 (Roth).

50.　The first automatic and semiautomatic firearms came onto the market in the 1890s. Ex. I ¶ 65 (DeLay).

51.　When automatic and semiautomatic firearms began to disseminate among the public in the early 20th century, the weapons began to pose criminological

44

problems. The Tommy gun quickly became the most notorious and deadly of these weapons. *Id.* ¶ 69; Ex. N ¶¶ 20-21 (Spitzer).

52.     From the 1920s through 1934, lawmakers across the country responded to the problems created by automatic and semiautomatic weapons by enacting laws regulating them. *Id.* ¶¶ 34-40.

53.     Some 31 states and the District of Columbia enacted restrictions on fully automatic weapons from the 1920s through 1934—mainly outright prohibitions on sale and possession. As many as ten states plus the District of Columbia enacted laws prohibiting or otherwise restricting semiautomatic weapons. *Id.* ¶¶ 34, 39 & Exs. B, C.

54.     A number of the laws regulating automatic and semiautomatic weapons from the early 20th century focused on the number of rounds that could be fired without reloading, from more than one round (Massachusetts and Minnesota) up to a high of 18 (Ohio). Between 1917 and 1934, 23 states imposed limits on the number of rounds that automatic and/or semiautomatic weapons could fire without reloading. *Id.* ¶¶ 41-43 & Tbl. 1.

55.     In 1934, Congress enacted the first major piece of federal firearms legislation, the National Firearms Act, which imposed strict requirements on the civilian acquisition and circulation of automatic weapons. *Id.* ¶ 35, 43.

56.     The Ordinances regulate only certain weapons and accessories, and otherwise permit Plaintiffs and others to acquire, use and possess many commonly used firearms for self-defense, including various kinds of semiautomatic weapons other than assault weapons, as well as all manner of firearm magazines capable of holding ten or fewer rounds. Exs. A, B, C, D; Ex. O ¶¶ 10-13, 96, 131 (Yurgealitis).

57.     Mass shootings have increased at a significant rate in the last three decades, as has the frequency with which mass shootings involve assault weapons and LCMs. Ex. K ¶¶ 12-13 (Klarevas).

58.     Between 2018 and 2022, more than half of all mass shootings in the U.S. involved assault weapons, and every mass shooting involved an LCM. *Id.* ¶¶ 13, 15.

59.     From 1991 to 2022, the use of assault weapons with LCMs has resulted in a 92% increase in fatalities in mass shootings. *Id.* ¶ 17.

Dated: September 5, 2025

Respectfully submitted,

s/ James Windels
Antonio J. Perez-Marques
David Toscano
Christopher Lynch
James Windels
Hendrik van Hemmen
Jennifer So Jin Kim
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
 (212) 450-4000 (phone)
antonio.perez@davispolk.com
david.toscano@davispolk.com
christopher.lynch@davispolk.com
james.windels@davispolk.com
Hendrik.vanhemmen@davispolk.com
jennifer.kim@davispolk.com
ATTORNEYS FOR DEFENDANTS

William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Avenue, #4184
New York, NY 10017
(646) 324-8215 (phone)
wtaylor@everytown.org
ATTORNEY FOR DEFENDANTS

Carey R. Dunne
Kevin Trowel
Martha Reiser
FREE AND FAIR LITIGATION GROUP
266 West 37th Street, 20th Floor
New York, NY 10018
(646) 434-8604
carey@freeandfair.org
kevin@freeandfairlitigation.org
martha@freeandfairlitigation.org
ATTORNEYS FOR DEFENDANTS

Gordon L. Vaughan
VAUGHAN & DeMURO
111 South Tejon Street, Suite 545
Colorado Springs, CO 80903
(719) 578-5500 (phone)
gvaughan@vaughandemuro.com
ATTORNEY FOR DEFENDANTS
THE TOWN OF SUPERIOR and
CITY OF LOUISVILLE, COLORADO

Luis A. Toro, Senior Attorney
Taylor Tate, City Attorney
BOULDER CITY ATTORNEY'S OFFCE
1777 Broadway
Boulder, CO 80302
(303) 441-3020 (phone)
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
ATTORNEY FOR DEFENDANT
CITY OF BOULDER, COLORADO

David Hughes, Deputy County Attorney
Catherine R. Ruhland, Deputy County
Attorney
BOULDER COUNTY ATTORNEY
P.O. Box 471
Boulder, CO 80306
(303) 441-3190 (phone)
dhughes@bouldercounty.org
truhland@bouldercounty.org
ATTORNEY FOR DEFENDANT
BOARD OF COUNTY COMMISSIONERS
OF BOULDER COUNTY

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2025, I served a true and complete copy of

the foregoing DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT upon

all parties herein by e-filing with the CM/ECF system maintained by the Court, which will

send notification of such filing to the parties of record.

Dated: September 5, 2025

s/ James Windels
James Windels
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000 (phone)
james.windels@davispolk.com
ATTORNEY FOR DEFENDANTS