# EXHIBIT B

EXHIBIT A

ORDINANCE 8494

AN ORDINANCE AMENDING CHAPTER 5, "GENERAL OFFENSES," B.R.C. 1981, REPEALING ORDINANCES 8245 AND 8259, BANNING THE SALE AND POSSESSION OF ASSAULT WEAPONS, LARGE-CAPACITY MAGAZINES AND RAPID-FIRE TRIGGER ACTIVATORS, RAISING THE AGE TO PURCHASE FIREARMS, AMENDING SECTION 5-2-26, "MATTERS OF LOCAL AND MIXED CONCERN," B.R.C. 1981, AND ADDING A NEW SECTION 5-8-42, "SEVERABILITY," B.R.C. 1981; AND SETTING FORTH RELATED DETAILS.

THE CITY COUNCIL OF THE CITY OF BOULDER, COLORADO, FINDS AND RECITES THE FOLLOWING:

A.   Gun violence poses a grave public safety threat in Boulder. Statewide in Colorado, guns are the leading cause of death for children ages one through 17 and cause the deaths of nearly two-thirds of women who are killed by intimate partners.

B.   Colorado has the 18th highest gun death rate among the 50 states and saw elevated levels of mass shootings in 2020 and early 2021, when a mass shooter killed 10 people at King Soopers in Boulder using an assault weapon and large-capacity magazines.

C.   Assault weapons are semiautomatic firearms with large ammunition capacities and specific features that are useful in military and criminal applications yet are unnecessary in shooting sports or self-defense. These weapons include semiautomatic assault rifles that have the ability to accept large-capacity magazines holding up to 100 rounds, and with features that enhance concealability, control, and the ability to fire many dozens of rounds without pause. They also include assault pistols and high capacity "combat" shotguns.

D.   Boulder has a higher population density than more rural parts of the state, and is characterized by the presence of traffic and commuters, business districts, the University of

K:\CAAD\o-8494 2nd Rdg-424.docx

EXHIBIT A

Colorado and Naropa University, and entertainment and nightlife venues. These areas have a greater number of potential targets for large-scale school and workplace violence, mass shootings, and interpersonal gun violence, and, therefore, these demographic attributes create a special need to restrict weapons that facilitate mass shootings, including assault weapons, trigger activators, and large-capacity magazines.

E. Assault weapons are semiautomatic versions of firearms. Although these semiautomatic versions of military firearms are marketed to civilians, they are military-grade weapons; the U.S. military calls semiautomatic rifle fire the "most important firing technique during fast-moving, modern combat" and "most accurate technique of placing a large volume of fire." These rifles fire bullets with a velocity three times greater than 9mm handguns, leaving "softball-sized exit wounds" much more likely to kill than to incapacitate victims.

F. Perpetrators of the five deadliest shootings in modern U.S. history—Las Vegas, Orlando, Sandy Hook, Sutherland Springs, and El Paso—used assault rifles with military-style features. Colorado's deadliest mass shooters have also used assault rifles or pistols, including the Aurora movie theater shooter, who used an assault rifle and a 100-round drum magazine; and the King Soopers shooter, who used an AR-style pistol that an ATF expert described as "made for the military and designed for short-range combat."

G. Researchers have found that firearm purchasers with criminal histories are more likely to buy assault weapons, and that probability was even higher if purchasers have more serious criminal histories. These weapons are regularly used in violent crime beyond mass shootings, including violence against police officers.

H. Assault weapons are inappropriate for civilian use due to the unique features that allow shooters to rapidly fire a large number of rounds—more than is ever needed for lawful self-

defense—while maintaining control of the firearm in order to accurately target and kill more victims. Specific features that allow an assault weapon to perform this way are:

Detachable magazine: Firearms that can accept detachable magazines allow a shooter to attach magazines of any size available for the firearm and quickly reload the weapon with pre-filled magazines. In some cases, magazines can hold as many as 100 rounds.

Pistol grip: To counteract the movement that occurs during rapid fire, assault weapons are typically equipped with features that allow the shooter to steady the weapon. A pistol grip, not typically found on a sporting rifle or shotgun (which would be fired from the shoulder), allows the shooter to control the firearm more accurately—and lethally—by maneuvering the weapon or shooting from the hip during rapid fire;

Thumbhole stock: As with a pistol grip, a thumbhole stock allows the shooter to control the firearm during rapid fire;

Folding or telescoping stock: A folding or telescoping stock folds or collapses to make the weapon easier to conceal and transport;

Flash Suppressor: A flash suppressor enables a shooter to mask their location by reducing the visible signature of the firearm when it fires; and

Barrel shroud: As with a pistol grip and thumbhole stock, a barrel shroud allows the shooter to steady the firearm during rapid fire. The shroud encircles the barrel of the firearm and allows the shooter to hold it without getting burned.

I.  In addition to military-style assault rifles, gun manufacturers have also begun marketing AK-style and AR-style pistols with the same features that enable a shooter to continue shooting the weapon numerous times without losing control over it. These pistols are also

K:\CAAD\o-8494 2nd Rdg-424.docx

designed to fire rifle rounds capable of penetrating body armor, but which are concealable like handguns.

J.	AK-style and AR-style pistols pose a similar if not identical threat to public safety as do short-barreled rifles, because of the short length and ability to fire rifle rounds that can penetrate ballistic resistant vests worn by patrol officers. Because the lethality is on par with highly restricted short-barreled rifles, yet have almost entirely evaded regulation, armor-piercing, concealable firearms have been used in murders across the country, including at the 2021 King Soopers shooting and at the 2019 mass shooting in Dayton, Ohio.

K.	High capacity "tactical" or "combat" shotguns are assault weapons modeled after firearms originally used for riot control by foreign law enforcement. After the Armsel Striker, popular in South Africa and marketed in the U.S. as the Street Sweeper, was designated a "destructive device" under the National Firearms Act, gunmakers designed workaround weapons as powerful as the Street Sweeper that inflict catastrophic injuries by rapidly firing a dozen or more shotgun slugs.

L.	At the 2017 Mandalay Bay shooting in Las Vegas, Nevada, the shooter modified semiautomatic assault rifles with bump stocks so they could fire at speeds approaching fully automatic machine guns. Bump stocks, as well as binary triggers, burst triggers, rotating trigger cranks, and other after-market rapid-fire trigger activators enable firing many rounds per second.

M.	Several years after the Las Vegas shooting drew attention to the dangers of bump stocks that give shooters automatic firepower, the ATF adopted a federal rule effectively banning their possession. However, state and local action is needed to restrict other rapid-fire trigger activators.

N.     Large-capacity magazines are ammunition feeding devices that hold more than 10 rounds and may hold as many as 100 rounds of ammunition. Mass shootings that involve large-capacity magazines result in nearly five times as many people shot compared to mass shootings that do not involve high capacity magazines. These magazines increase the number of victims injured and killed by enabling shooters to fire more rounds before reloading—a critical moment when many criminal shooters are stopped before they can further increase their death tolls.

O.     Large-capacity magazines also make gun violence far more lethal in situations other than mass shootings, including interpersonal gun violence and shootings by organized crime or street groups. Firearms equipped with large-capacity magazines account for 22% to 36% of crime guns in most places, and research shows upwards of 40% of crime guns used in serious violent crimes, including murders of police officers, are equipped with large capacity magazines.

P.     City Council is unaware of any reported incidents where someone engaged in self-defense fired more than 10 rounds of a large capacity magazine to fend off an attack. Despite analyzing several decades of evidence about defensive shootings, gun-rights groups raising legal challenges to magazine restrictions in other jurisdictions have been unable to identify a single incident anywhere in the nation in which someone needed to fire more than ten rounds at once in lawful self-defense. Conversely, numerous high-profile mass shootings nationally and within Colorado have been carried out with LCMs, including the King Soopers shooting and the Aurora movie theater shooting.

Q.     In 1994, a federal ban on the manufacture, transfer, and possession of assault weapons and the transfer and possession of large capacity magazines was enacted. The law included a ten-year sunset provision. In 2004, Congress allowed the law to expire.

K:\CAAD\o-8494 2nd Rdg-424.docx

R.　Studies show that the federal assault weapon ban resulted in a marked decrease in the use of assault weapons and large capacity magazines in crime during its effective period. One study found that in several major cities, the share of recovered crime guns that were assault weapons declined by 32% to 40% after the federal ban was adopted. Another study in Virginia found a clear decline in the percentage of crime guns that were equipped with large capacity magazines after the federal ban was enacted. The percentage of guns seized by Virginia police reached a low of 10% in 2004 and then steadily climbed after Congress allowed the ban to expire; by 2010, the percentage was close to 22%.

S.　The federal law restricting assault weapon and large capacity magazines also had a significant protective effect in lowering mass shooting fatalities. During the 10-year period the law was in effect, mass shooting fatalities were 70% less likely to occur compared to when the ban wasn't in effect. In addition, the number of high-fatality mass shootings fell by 37%, and the number of people dying in such shootings fell by 43%. After the ban lapsed, there was a 183% increase in high-fatality mass shootings and a 239% increase in deaths from such shootings.

T.　State-level prohibitions on large capacity magazines have been shown to reduce the frequency and lethality of the deadliest mass shootings—strong evidence that regional and local legislation can be effective even absent a federal ban. A peer-reviewed study published in the American Journal of Public Health found that "states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents," seeing more than double the number of such shootings and three times the number of deaths from high-fatality mass shootings, as compared to states that ban large capacity magazines.

U.　Survey data and gun-industry supplied statistics suggest that, at most, only a small fraction of U.S. gun owners possess semiautomatic assault rifles and private ownership of these

weapons is concentrated in the hands of super-owners who have 10 or more firearms. Similar claims about the ubiquity of large capacity magazines is contradicted by the fact that most magazines for handguns—the "quintessential self-defense weapon," *see District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)—hold 10 rounds or fewer.

V.  Because assault weapons, trigger activators, and large capacity magazines are designed for and have repeatedly been used to inflict mass casualties and enable other violent crimes, and the fact that these weapons and accessories are ill-suited to and unnecessary for responsible self-defense, and are not chosen or used by most law-abiding gun owners for this purpose, City Council finds that it is in the best interests of the health, safety, and welfare of Boulder residents to prohibit the possession, sale, manufacture, and transfer of assault weapons, rapid-fire trigger activators, and large capacity magazines.

W.  Individuals 18 to 20 commit gun homicides at rates four times higher than those 21 and older. Research shows that there are fundamental developmental differences between the minds of adults and teenagers and that regions of the mind governing behavior do not fully mature until the twenties.

X.  Evidence shows that the firearm suicide rate among young men increases 26.9% between the ages of 20 and 21.

Y.  This ordinance recognizes the enactment of Senate Bill 21-256 and is intended to be consistent with that law.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF BOULDER, COLORADO:

Section 1.  Ordinances 8245 and 8259 are hereby repealed. The provisions of this ordinance shall apply prospectively only.

K:\CAAD\o-8494 2nd Rdg-424.docx

Section 2. Section 5-1-1, "Definitions," B.R.C. 1981, is reenacted to read as follows:

**5-1-1. – Definitions.**

The following terms used in this title have the following meanings unless the context clearly indicates otherwise:

*Act* means a bodily movement and includes words and possession of property.

*Affirmative defense* means a defense in which the defendant, to raise the issue, presents some credible evidence on that issue, unless the City's evidence raises the issue involving the alleged defense. If the issue involved in an affirmative defense is raised, then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the violation.

*Age* shall mean the chronological age of a person.

*Antipersonnel device* means any assemblage of material that is designed to, or does, kill, injure or trap people when activated.

*Approach* means to move closer with any part of the body or any extension thereof.

*Blackjack* means any billy club, sand club, sandbag or other hand-operated striking weapon consisting, at the striking end, of an encased piece of lead or other heavy substance and, at the opposite end, a strap or springy shaft that increases the force of impact.

*Bias motivated crime* shall mean the commission of any of the underlying offenses specified below if the offense is committed by reason of the actual or perceived race, color, religion, religious expression, national origin, age, disability, sex, sexual orientation, gender, gender identity or gender expression of another individual or group of individuals, regardless of the existence of any other motivating factor or factors. The underlying offenses are Sections 5-3-1, "Assault in the Third Degree," 5-3-2, "Brawling," 5-3-3, "Physical Harassment," 5-3-4, "Threatening Bodily Injury," 5-3-6, "Use of Fighting Words," 5-3-9, "Brandishing a Weapon," 5-4-1, "Damaging Property of Another," 5-4-14, "Graffiti Prohibited," 5-4-15, "Posting Signs on Property of Another Prohibited," 5-8-6, "Aiming Weapon at Another," or 5-8-7, "Flourishing Deadly Weapon in Alarming Manner," B.R.C. 1981. No "bias motivated crime" finding shall occur unless the allegation of bias motivation has been specifically charged and sustained by an in-court admission of a defendant, or by a specific finding established beyond a reasonable doubt by a judge or jury in a contested trial.

*Bodily injury* means physical pain, illness or any impairment of physical or mental condition.

*Code enforcement officer* means any city employee or person employed under independent contract by the City who is appointed by the city manager to enforce the laws of the City. "Code enforcement officer" also means an authorized volunteer appointed by the city manager to enforce the laws concerning parking of vehicles in spaces reserved for the handicapped by issuing parking tickets.

*Conduct* means an act or omission and its accompanying state of mind, if any, or, where relevant, a series of acts or omissions.

K:\CAAD\o-8494 2nd Rdg-424.docx

*Culpable mental state* means intentionally, or with intent, or knowingly, or willfully, or recklessly, or negligently as set forth below:

(a) *Intentionally* or *with intent* means that one's conscious objective is to cause the specific result proscribed by the provision of this code or the ordinance defining the violation. All violations defined in this code in which the mental culpability requirement is expressed as *intentionally* or *with intent* are specific intent offenses. It is immaterial to the issue of specific intent whether or not the result actually occurred.

(b) *Knowingly* or *willfully* means, with respect to conduct or to a circumstance described by a section of this code or an ordinance defining a violation, that a person is aware that such person's conduct is of that nature or that the circumstance exists. With respect to a result this means that a person is aware that such person's conduct is practically certain to cause the result. All violations defined in this code in which the mental culpability requirement is expressed as *knowingly* or *willfully* are general intent offenses.

(c) *Recklessly* means consciously to disregard a substantial and unjustifiable risk that a result will occur or that a circumstance exists.

(d) *Negligently* means to act with negligence with respect to a result or to a circumstance described by a section of this code by failing to exercise the degree of care that would be exercised by the ordinarily reasonable and prudent inhabitant of the City under the same or similar circumstances.

*Deadly physical force* means force, the intended, natural and probable consequence of which is to produce death, and which does, in fact, produce death.

*Deadly weapon* means any of the following that in the manner it is used or intended to be used is capable of producing death or serious bodily injury:

(a) A firearm, whether loaded or unloaded;

(b) A knife;

(c) A bludgeon; or

(d) Any other weapon, device, instrument, material or substance, whether animate or inanimate.

*Disability* shall mean a physical or mental impairment that substantially limits one or more major life activities, a record of such impairment or being regarded as having such impairment. The term excludes current use of alcohol or drugs.

*Dwelling* means a building that is used, intended to be used or usually used by a person for habitation, but excludes lobbies, boiler rooms, hallways and other common areas of hotels, motels, apartments, condominiums, nursing homes and similar communal residential buildings.

*Firearm* means any handgun, automatic revolver, pistol, rifle, shotgun, or other instrument or device capable or intended to be capable of discharging bullets, cartridges, or other explosive charges. This definition does not include an antique firearm as defined in 18 U.S.C. § 921(a)(16).

EXHIBIT A

*Gas gun* means a device designed for projecting gas-filled projectiles that release their contents after having been projected from the device and includes projectiles designed for use in such a device.

*Gas or mechanically operated gun* means an air or gas operated gun that discharges pellets, BB shots, arrows or darts, including, without limitation, BB guns, spring guns and other similarly operated guns or weapons.

*Gender* shall have the same meaning as the term "sex" defined in Section 12-1-1, "Definitions," B.R.C. 1981.

*Gender identity* and *gender expression* shall have the meanings defined in Section 12-1-1, "Definitions," B.R.C. 1981.

*Gravity knife* means any knife with a blade that may be released from the handle or sheath thereof by the force of gravity or the application of centrifugal force, which when released is locked in place by means of a button, spring, lever or other device.

*Health care facility* means a state-licensed general hospital, psychiatric hospital or community clinic, as defined in Colorado state statutes, as they may be amended from time to time, or a building containing an office or other place where a state-licensed physician practices medicine, on a full- or part-time basis, which is not required to be licensed under Colorado state statutes, but which is identified by a sign, visible from the adjacent public way.

*Knife* means any dagger, dirk, knife or stiletto with a blade over three and one-half inches in length, or any other dangerous instrument capable of inflicting cutting, stabbing or tearing wounds, but does not include a hunting or fishing knife carried for sports use.

*Mall* means the Downtown Boulder Mall as defined in Ordinance No. 4267, as amended by Ordinance No. 4543.[2]

*Omission* means a failure to perform an act as to which a duty of performance is imposed by law.

*Peace officer* means any police officer or city code enforcement officer.

*Police officer* means:

(a)    Any city police officer commissioned by the city manager;

(b)    Any person appointed by the city manager pursuant to Charter Section 72;

---

[2] The ordinances generally describe the area included within the mall as the entire right-of-way of Pearl Street from approximately the east curb line of 11th Street to the west curb line of 15th Street except for the roadway at the intersections at Broadway, 13th and 14th Streets; and, the area directly south of the Boulder County courthouse complex, specifically, the area bounded by the east curb line of 13th Street on the west, the west curb line of 14th Street on the east, the north boundary line of the Pearl Street right-of-way on the south and, on the north, by a line coinciding with the south wall of the west wing of the County courthouse complex and extending westerly at a right angle from the west wall thereof to the east curb line of 13th Street and extending easterly at a right angle from the east wall thereof to the west curb line of 14th Street; excepting, however, any buildings or portions of buildings which are owned by the County of Boulder and located in such area.

K:\CAAD\o-8494 2nd Rdg-424.docx

(c) Any peace officer of another jurisdiction who is also commissioned by the city manager to enforce the laws of the City;

(d) Any city park patrol officer commissioned by the city manager;

(e) Any city fire chief or fire marshal or firefighter commissioned by the city manager; and

(f) Any other city employee designated by the city manager to exercise police powers, including the power of arrest, and commissioned by the city manager.

*Religious expression* shall have the meaning defined in Section 12-1-1, "Definitions," B.R.C. 1981.

*Serious bodily injury* means bodily injury that involves a substantial risk of death, serious permanent disfigurement or protracted loss or impairment of the function of any part of an organ of the body.

*Specific defense* means a defense in which the defendant, to raise the issue, presents some credible evidence on that issue, unless the City's evidence raises the issue involving the defense. If the issue involved in the specific defense is raised, it may be submitted to the trier of fact along with other issues, but the defendant bears the burden of proving the issue by a preponderance of the evidence, although the City must prove all other issues by proof beyond a reasonable doubt in any criminal action.

*Switchblade knife* means any knife, the blade of which opens automatically by hand pressure applied to a button, spring or other device in its handle.

Section 3. Section 5-2-26, "Matters of Local and Mixed Concern," B.R.C. 1981, is amended to read as follows:

**5-2-26. – Matters of Local and Mixed Concern.**

It is the intention of the cCity cCouncil that those ordinances and provisions of this code that deal with matters of "local" concern supersede the laws of the State of Colorado to the extent that they conflict and that those that deal with matters of "mixed" concern apply concurrently with the laws of the State of Colorado. No provision of this code on a matter of "mixed" concern is to be construed expressly or by implication to permit conduct that is illegal under the laws of the State of Colorado or to prohibit conduct that is expressly permitted by the laws of the state. The provisions of this code are to be construed to apply to misdemeanors and other minor and petty offenses only and are not to be interpreted to apply conduct that is defined as a felony under the laws of the State of Coloradosubject to the jurisdiction of the City of Boulder.

Section 4. Section 5-8-2, "Definitions," B.R.C. 1981, is reenacted to read as follows:

**5-8-2. – Definitions.**

The following terms used in this Chapter have the following meanings unless the context

clearly requires otherwise:

*About the person* means sufficiently close to the person to be readily accessible for immediate use.

*Assault weapon* means:
(a) All semi-automatic center-fire rifles that have the capacity to accept a detachable magazine and that have any of the following characteristics:
  (1) A pistol grip or thumbhole stock;
  (2) A folding or telescoping stock;
  (3) A flash suppressor; or
  (4) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearms with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.
(b) All semi-automatic center-fire pistols that have any of the following characteristics:
  (1) A threaded barrel;
  (2) A secondary protruding grip or other device to allow the weapon to be stabilized with the non-trigger hand;
  (3) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;
  (4) A flash suppressor;
  (5) The capacity to accept a detachable ammunition feeding device at some location outside of the pistol grip;
  (6) A manufactured weight of 50 ounces or more when unloaded;
  (7) A buffer tube, arm brace, or other part that protrudes horizontally under the pistol grip; or
  (8) A fixed magazine that has the capacity to accept more than 10 rounds.
(c) All semi-automatic shotguns that have any of the following characteristics:
  (1) A pistol grip or thumbhole stock;
  (2) A folding or telescoping stock;
  (3) A fixed magazine capacity in excess of five rounds; or
  (4) The capacity to accept a detachable magazine.
(d) Any firearm which has been modified to be operable as an assault weapon as defined herein.
(e) Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may

K:\CAAD\o-8494 2nd Rdg-424.docx

be readily assembled if those parts are in the possession or under the control of the same person.

*Constructive knowledge* means knowledge of facts or circumstances sufficient to cause a reasonable person to be aware of the fact in question.

*Illegal weapon* means an assault weapon, large-capacity magazine, rapid-fire trigger activator, blackjack, gas gun, metallic knuckles, gravity knife or switchblade knife.

*Large-capacity magazine* means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:
  (a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.
  (b) A 22-caliber tube rim-fire ammunition feeding device.
  (c) A tubular magazine that is contained in a lever-action firearm.

*Locked container* means a secure container which is enclosed on all sides and locked by a padlock, key lock, combination lock, or similar device, but does not include the utility compartment, glove compartment, or trunk of a motor vehicle.

*Minor* means a person under twenty-one years of age.

*Pistol Grip* means a grip that protrudes conspicuously beneath the action of the weapon and that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.

*Provide* means to give, lend, sell, or to place in an unsecured location where a minor, an unauthorized person or an incompetent person could foreseeably gain access to a firearm.

*Rapid-Fire Trigger Activator* means:
  (a) A device that attaches to a firearm to allow the firearm to discharge two or more shots in a burst when the device is activated; or
  (b) A manual or power-driven trigger-activating device that, when attached to a firearm, increases the rate of fire of that firearm.

*Semi-automatic* means a firearm that fires a single round for each pull of the trigger and automatically chambers a new round immediately after a round is fired.

<u>Section 5</u>.  Section 5-8-10, "Possession of Illegal Weapons," B.R.C. 1981, is reenacted to read as follows:

K:\CAAD\o-8494 2nd Rdg-424.docx

EXHIBIT A

**5-8-10. – Possession and Sale of Illegal Weapons.**

(a) No person shall knowingly possess or sell or otherwise transfer an illegal weapon.

(b) Nothing in this section shall be construed to forbid any person:

(1) Holding a Federal Firearms License issued by the United States Government from possession of any firearm authorized pursuant to such license;

(2) From possessing a firearm for which the United States Government has issued a stamp or permit pursuant to the National Firearms Act; or

(3) Selling an illegal weapon to a person identified in Section 5-8-25, "Exemptions from this Chapter," B.R.C. 1981.

(c) Nothing in this section shall be deemed to apply to any firearm that has been modified either to render it permanently inoperable or to permanently make it not an assault weapon.

(d) Nothing in this section shall be deemed to restrict a person's ability to travel with a firearm in a private motor vehicle or other private means of conveyance for lawful hunting, for lawful competition, or for lawful protection of a person or another person or property while traveling into, though, or within, the City of Boulder, regardless of the number of times the person stops in the City of Boulder.

Section 6. Section 5-8-22, "Defenses," B.R.C. 1981, is reenacted to read as follows:

**5-8-22. – Defenses.**

(a) It is an affirmative defense to a charge of violating Sections 5-8-3, "Discharge of Firearms," 5-8-4, "Possessing and Discharging Firearm or Bow in Park or Open Space," 5-8-5, "Negligently Shooting Bow or Slingshot," 5-8-6, "Aiming Weapon at Another," 5-8-7, "Flourishing Deadly Weapon in Alarming Manner," and 5-8-8, "Possession of Loaded Firearms," B.R.C. 1981, that the defendant was:

(1) Reasonably engaged in lawful self-defense under the statutes of the State of Colorado; or

(2) Reasonably exercising the right to keep and bear arms in defense of the defendant's or another's home, person and property or in aid of the civil power when legally thereto summoned.

(b) It is a specific defense to a charge of violating Sections 5-8-3, "Discharge of Firearms," 5-8-4, "Possessing and Discharging Firearm or Bow in Park or Open Space," and 5-8-8, "Possession of Loaded Firearms," B.R.C. 1981, that the events occurred in an area designated as a target range by the city manager under Section 5-8-26, "City Manager May Designate Target Ranges," B.R.C. 1981, for the type of weapon involved. It is a specific defense to a charge of violating Section 5-8-4, "Possessing and Discharging Firearm or Bow in Park or Open Space," B.R.C. 1981, by possession that the defendant was going directly to or returning directly from such a target range.

K:\CAAD\o-8494 2nd Rdg-424.docx

(c) It is an affirmative defense to a charge of violating Sections 5-8-8, "Possession of Loaded Firearms," 5-8-9, "Carrying a Concealed Weapon," and 5-8-11, "Possessing Firearm While Intoxicated," B.R.C. 1981, that the defendant was:

(1) In the defendant's own dwelling or place of business or on property owned or under the defendant's control at the time; or

(2) In a private automobile or other private means of conveyance at the time and was carrying the weapon for lawful protection of the defendant's or another's person or property while traveling; or[3]

(3) Charged with carrying a knife that was a hunting or fishing knife carried by the defendant for sport use.

(d) It is a specific defense to a charge of violating Sections 5-8-8, "Possession of Loaded Firearms," and 5-8-9, "Carrying a Concealed Weapon," B.R.C. 1981, that the defendant was carrying the weapon pursuant to a concealed weapons permit valid under the statutes of the State of Colorado.

(e) It is a specific defense to a charge of violating Sections 5-8-3, "Discharge of Firearms," and 5-8-8, "Possession of Loaded Firearms," B.R.C. 1981, that the loaded gas or mechanically operated gun was possessed or discharged in a building with the permission of the property owner and the projectile did not leave the building.

(f) It is a specific defense to a charge of violating section 5-8-10, "Possession of Illegal Weapons," B.R.C. 1981:

(1) That the person had a valid permit for such weapon pursuant to federal law at the time of the offense; or

(2) That the illegal weapon was an assault weapon accompanied by a certificate of ownership, issued under Section 5-8-28I, or previously issued prior to December 31, 2018, by the Boulder Police Department.

(g) It is a specific defense to a charge of violating Section 5-8-4, "Possessing and Discharging Firearm or Bow in Park or Open Space," B.R.C. 1981, that the firearm, gas or mechanically operated gun, bow, slingshot or crossbow possessed by the person was being transported in a motor vehicle. This defense does not apply to a charge of violation involving discharge of a missile.

(h) It is an affirmative defense to any charge of a violation of this Chapter relating to carrying firearms that the defendant was carrying the firearm in a private automobile or other private means of conveyance for hunting while traveling in, into or through the city, as permitted by § 18-12-105.6, C.R.S.

---

[3] § 18-12-105(2)(b), C.R.S.

K:\CAAD\o-8494 2nd Rdg-424.docx

Section 7.  Section 5-8-25, "Exemptions from Chapter," B.R.C. 1981, is reenacted to read as follows:

**5-8-25. – Exemptions from Chapter.**

Nothing in this Chapter shall be construed to forbid the following persons from having in their possession, displaying, concealing or discharging such weapons as are necessary in the authorized and proper performance of their official duties:

(a) United States Marshals, any sheriffs, constables, and their deputies.
(b) Any regular or ex officio police officer.
(c) Any government agent, officer, or employee, any other peace officer, or Members of the United States Armed Forces, Colorado National Guard or Reserve Officer Training Corps acting in the course and scope of their duties.

Section 8.  Section 5-8-28, "Assault Weapons," B.R.C. 1981, is reenacted to read as follows:

**5-8-28. – Assault Weapons.**

(a) Any person who, prior to July 1, 2022, was legally in possession of an assault weapon or large capacity magazine shall have until December 31, 2022 to obtain a certificate for the assault weapon as provided in subsection (c) of this section.

(b) Any person who, prior to July 1, 2022, was legally in possession of a rapid-fire trigger activator shall have until August 1, 2022 to do any of the following without being subject to prosecution:
  (1) Remove the rapid-fire trigger activator from the City of Boulder; or
  (2) Surrender the rapid-fire trigger activator to the Boulder Police Department for destruction.

(c) Any person seeking to certify an assault weapon that he or she legally possessed prior to July 1, 2022, unless they obtained a certificate of ownership prior to December 31, 2018, must comply with the following requirements:
  (1) Submit to a background check conducted by the appropriate law enforcement agency to confirm that he or she is not prohibited from possessing a firearm pursuant to 18 U.S.C. § 922 or C.R.S § 18-12-108; and
  (2) Unless the person is currently prohibited by law from possessing a firearm, prior to December 31, 2022 apply for a certificate for the assault weapon from the Boulder Police Department.

(d) All persons who hold a certificate issued prior to December 31, 2018 or who obtain a certificate pursuant to subsection I of this section shall:
  (1) Safely and securely store the assault weapon pursuant to the regulations adopted by the appropriate law enforcement agency;

(2) Possess the assault weapon only on property owned or immediately controlled by the person, or while on the premises of a licensed gunsmith for the purpose of lawful repair, or while engaged in the legal use of the assault weapon at a duly licensed firing range, or while traveling to or from these locations, provided that the assault weapon is stored unloaded in a locked container during transport. The term "locked container" does not include the utility compartment, glove compartment, or trunk of a motor vehicle; and

(3) Report the loss or theft of a certified assault weapon to the appropriate law enforcement agency within 48 hours of the time the discovery was made or should have been made.

(e) If a certified assault weapon is used in the commission of a crime, the owner shall be civilly liable for any damages resulting from that crime. The liability imposed by this subsection shall not apply if the assault weapon was stolen and the certified owner reported the theft of the firearm to law enforcement within 48 hours of the time the discovery was made or should have been made.

(f) Certified assault weapons may not be purchased, sold or transferred in the City of Boulder, except for transfer to a licensed gunsmith for the purpose of lawful repair, or transfer to the appropriate law enforcement agency for the purpose of surrendering the assault weapon for destruction.

(g) Persons acquiring an assault weapon by inheritance, bequest, or succession shall, within 90 days of acquiring title, do one of the following:

(1) Modify the assault weapon to render it permanently inoperable;

(2) Surrender the assault weapon to the Boulder Police Department for destruction;

(3) Transfer the assault weapon to a firearms dealer who is properly licensed under federal, state and local laws; or

(4) Permanently remove the assault weapon from the City of Boulder.

(h) The owner of a certified assault weapon may not possess in the City of Boulder any assault weapons purchased on or after July 1, 2022.

(i) The city manager shall charge a fee for each certificate sufficient to cover the costs of administering the certificate program. The city manager shall issue to qualified applicants two original copies of each certificate issued. The City of Boulder shall not maintain any records of certificates issued. The person who received the certificate shall keep one copy with the weapon certified and the second copy in a secure place to replace the certificate maintained with the weapon.

EXHIBIT A

<u>Section 9</u>.  A new Section 5-8-42, "Severability," B.R.C. 1981, is added to read as follows:

**5-8-42. – Severability.**

If any section, subsection, sentence or clause of this Chapter is for any reason declared unconstitutional or invalid or unenforceable by any court of competent jurisdiction, such decision shall not affect the constitutionality, validity or enforceability of the remaining portions of this Chapter or any part thereof. The City Council hereby declares that it would have adopted this Chapter notwithstanding the unconstitutionality, invalidity or unenforceability of any one or more of its sections, subsections, sentences or clauses.

<u>Section 10</u>.  This ordinance is necessary to protect the public health, safety, and welfare of the residents of the city, and covers matters of local concern.

<u>Section 11</u>.  The City Council deems it appropriate that this ordinance be published by title only and orders that copies of this ordinance be made available in the office of the city clerk for public inspection and acquisition.

INTRODUCED, READ ON FIRST READING, AND CONTINUED this 10th day of May 2022.

_____
Aaron Brockett,
Mayor

Attest:

_____
Elesha Johnson,
City Clerk

K:\CAAD\o-8494 2nd Rdg-424.docx

EXHIBIT A

1   READ ON CONTINUED FIRST READING, AND ORDERED PUBLISHED BY
2   TITLE ONLY this 24th day of May 2022.

                                              _____
                                              Aaron Brockett,
                                              Mayor

Attest:

_____
Elesha Johnson,
City Clerk

   READ ON SECOND READING, PASSED AND ADOPTED this 7th day of June 2022.

                                              _____
                                              Aaron Brockett,
                                              Mayor

Attest:

_____
Elesha Johnson,
City Clerk

K:\CAAD\o-8494 2nd Rdg-424.docx