# EXHIBIT K - PART I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-2680-NYW-TPO**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
BRYAN LAFONTE, and
JAMES MICHAEL JONES

     Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

    Defendants.

---

### Declaration of LOUIS KLAREVAS

---

I, Louis Klarevas, declare as follows:

1.    I am over the age of 18 years of age and competent to testify to the matters stated below and do so based on my personal knowledge.

2.    Attachment A is a true and accurate copy of my expert report in the above-captioned matter. It contains the opinions to which I would testify if called upon as a witness in the above-captioned matter.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 4th day of September, 2025
at Nassau County, NY

                                 Louis Klarevas

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 22-cv-** _2680_

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

     Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO, CITY
OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

    Defendants.

---

### Expert Report of Louis Klarevas

---

1

## EXPERT REPORT OF LOUIS KLAREVAS

I, Louis Klarevas, declare:

1.      I have been asked by the Defendants to prepare an Expert Report addressing recent trends in mass shootings in the United States, the use of assault weapons and large-capacity magazines (LCMs) in mass shootings and the impact on fatalities and harm caused, and how restrictions on assault weapons and LCMs have affected mass shooting violence.  This Report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report ("Report" hereinafter).

### PROFESSIONAL QUALIFICATIONS

2.      I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3.      I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts.  I have also served as Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

4.      My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that focuses on reducing intentional shootings at elementary and secondary schools.

5.      In addition to having made over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces.  In

---

[1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

2

2019, my peer-reviewed article on the effectiveness of restrictions on LCMs in reducing high-fatality mass shootings that result in six or more victims killed was published in the *American Journal of Public Health*.[2]  This study found that jurisdictions with LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans.  Despite being over 3 years old now, this study continues to be one of the highest impact studies in academia.  It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

      6.     Since January 1, 2019, I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

**California – Central District**
*Rupp v. Bonta*          8:17-cv-00746-JLS-JDE
**California – Eastern District**
*Wiese v. Bonta*          2:17-cv-00903-WBS-KJN
**California – Southern District**
*Duncan v. Bonta*          17-cv-1017-BEN-JLB
*Jones v. Bonta*          19-cv-01226-L-AHG
*Miller v. Bonta*          3:19-cv-1537-BEN-JBS
*Nguyen v. Bonta*          3:20-cv-02470-WQH-MDD
**Colorado**
*Gates v. Polis*          1:22-cv-01866-NYW-SKC
**Connecticut**
*National Association for Gun Rights v. Lamont*          3:22-cv-01118-JBA
**Hawaii**
*National Association for Gun Rights v. Lopez*          1:22-cv-404-DKW-RT

---

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed February 11, 2023).  According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies.  Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans.  They helped build the foundation for future studies while overcoming the limitations of previous research."  *Ibid.*

**Illinois – Northern District**

| | |
|---|---|
| *Viramontes v. Cook County* | 1:21-cv-04595 |
| *National Association for Gun Rights v. Highland Park* | 22-cv-04774 |
| *Herrera v. Raoul* | 1:23-cv-00532 |

**Illinois – Southern District**

| | |
|---|---|
| *Harrel v. Raoul*[*] | 23-cv-141-SPM |
| *Langley v. Kelly*[*] | 23-cv-192-SPM |
| *Barnett v. Raoul*[*] | 23-cv-209-SPM |
| *Federal Firearms Licensees of Illinois v. Pritzker*[*] | 23-cv-215-SPM |
| *Kenneally v. Raoul* | 3:23-cv-50039 |

**Massachusetts**

| | |
|---|---|
| *National Association for Gun Rights v. Campbell* | 1:22-cv-11431-FDS |

**Oregon**

| | |
|---|---|
| *Oregon Firearms Federation v. Kotek*[†] | 2:22-cv-01815-IM |
| *Fitz v. Rosenblum*[†] | 3:22-cv-01859-IM |
| *Eyre v. Rosenblum*[†] | 3:22-cv-01862-IM |
| *Azzopardi v. Rosenblum*[†] | 3:22-cv-01869-IM |

**Washington – Eastern District**

| | |
|---|---|
| *Brumback v. Ferguson* | 1:22-cv-03093-MKD |

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

7.     In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20. I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8.     I have also submitted declarations in the following state court cases: *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado, 2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant County, Washington, 23-2-00377-13 (Civil).

4

9.     A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this Report.

10.     I am being compensated at a rate of $480/hour for my work on this Report, $600/hour for any testimony in connection with this matter, and $120/hour for travel required to provide testimony.

## OPINIONS

11.     It is my professional opinion, based upon my extensive review and analysis of the data, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs.  Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of gun massacres.[4]

---

[4] For purposes of this Report, mass shootings are defined in a manner consistent with my book *Rampage Nation*, *supra* note 1 (*see* Excerpt Attached as **Exhibit B**).  "Mass shootings" are shootings resulting in four or more victims being shot (fatally or non-fatally), regardless of location or underlying motive.  As a subset of mass shootings, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more victims being shot to death, regardless of location or underlying motive.  The data on high-fatality mass shootings is from a data set that I maintain and continuously update.  This data set is reproduced

I.      **MASS SHOOTINGS ARE A GROWING THREAT TO PUBLIC SAFETY**

12.     Examining mass-casualty acts of violence in the United States since 1991 points

to two disturbing patterns.[5]  First, as demonstrated in Table 1, the deadliest individual acts of

intentional criminal violence in the United States since the terrorist attack of September 11,

2001, have all been mass shootings.  Second, as displayed in Figures 1-2, the problem of high-

fatality mass shooting violence is on the rise.  To put the increase over the last three decades into

perspective, between the 1990s and the 2010s, the average population of the United States

increased approximately 20%.  However, when the number of people killed in high-fatality mass

shootings in the 1990s is compared to the number killed in such incidents in the 2010s, it reflects

an increase of 260%.  In other words, the rise in gun massacre violence has far outpaced the rise

in national population—by a factor of 13.  The obvious takeaway from these patterns and trends

is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

---

in **Exhibit C**.  Unless stated otherwise, all of the data used to perform original analyses and to
construct tables and figures in Sections I, II, and VI of this Report are drawn from **Exhibit C**.

[5] Because the analysis in Section VI of this Report necessarily uses data from 1991
through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections
I and II also use data from 1991 through 2022.

**Figure 1.  Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2.  Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**



Note: The dotted line is a linear trendline.  A linear trendline is a straight line that captures the overall pattern of the individual data points.  When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right.  When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

7

## II.  THE USE OF ASSAULT WEAPONS AND LCMs ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

13.    In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6]  As shown in Figures 3-4, based on high-fatality mass shootings where details allow a determination on the use of assault weapons and LCMs are available, over half of all incidents in the last four years involved assault weapons and all incidents in the last four years involved LCMs having a capacity greater than 10 bullets.  As shown in Figures 5-6, a similar pattern emerges when examining deaths in high-fatality mass shootings in the last four years, with 62% of deaths resulting from incidents involving assault weapons and 100% of deaths resulting from incidents involving LCMs having a capacity greater than 10 bullets.  These trends demonstrate that, among perpetrators of gun massacres, there is a growing preference for using assault weapons and LCMs to carry out their attacks.[7]

---

[6] Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault pistols, assault rifles, and assault shotguns.  For purposes of this Report, unless otherwise stated, assault weapons are defined and coded in a manner consistent with **Exhibit C**.  Per the 1994 federal ban definition, LCMs are generally ammunition-feeding devices with a capacity greater than 10 bullets.  The ammunition threshold of the 1994 federal definition (greater than 10 bullets) is identical to that of the definition of LCMs in the ordinances of all four jurisdictions that are parties in the present case.  For purposes of this Report, unless otherwise stated, LCMs will be defined in a manner consistent with the 1994 federal ban on LCMs, which defined them as ammunition-feeding devices with a capacity greater than 10 bullets.  While the term "assault weapons" as referenced in the present case is defined by law, the modern-day roots of the term can be traced back to the 1980s, when gun manufacturers branded military-style firearms with the label in an effort to make them more marketable to civilians.  *See*, Violence Policy Center, *Assault Weapons and Accessories in America* (1988) (Attached as **Exhibit D**); Violence Policy Center, *Bullet Hoses: Semiautomatic Assault Weapons—What Are They? What's So Bad about Them?* (2003) (Attached as **Exhibit E**); Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (2008) (Relevant Excerpt Attached as **Exhibit F**); and Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 16, 2013, *available at* https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html (last accessed January 24, 2023).

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents.  Furthermore, for two

8

**Figure 3.  Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4.  Share of High-Fatality Mass Shooting Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

---

of these 14 incidents, it is also not possible to determine whether they involved assault weapons. Therefore, the tables, figures, and percentages discussed in this section of the Report are based on calculations that only use data points from the incidents in which the involvement of assault weapons and/or LCMs could be determined.

9

**Figure 5. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**



Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.

**Figure 6. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs (Ammunition Capacity Greater Than 10 Rounds), 1991-2022**



Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

10

14.     The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data.  The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme.  Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform firearms—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly available data (24.4 million out of an estimated 461.9 million firearms).[8]  And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement agencies in the United States.[9]  But even using this estimate, if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons.  However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar. Indeed, the current difference is approximately ten-fold, with the rate at which assault weapons

---

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data.  The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available).  NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).  In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States.  NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023). According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide.  ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023).  Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million.  The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 8, at 12; NSSF, 2020, *supra* note 8, at 2-3.

are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

15.     Another pattern that stands out when examining the relationship between assault weapons use and gun massacre violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs.  For instance, returning to the aforementioned list of the seven deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, six of the seven incidents (86%) involved assault weapons and LCMs, as shown in Table 2.  When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking.  In the past 32 years, assault weapons and LCMs with an ammunition capacity greater than 10 rounds have been used, respectively, in 34% and 77% of all high-fatality mass shootings.  However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs.  For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8).  As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

---

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

**Table 2. The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapons | Involved LCMs ( > 10 Rounds ) |
|---|---|---|---|---|
| 60 | 10/1/2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | 612/2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | 4/16/2007 | Blacksburg, VA | | ✓ |
| 27 | 12/14/2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | 11/5/2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | 8/3/2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | 5/24/2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

**Figure 7. Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

13

**Figure 8.  Percentage of High-Fatality Mass Shootings Involving LCMs (Ammunition Capacity Greater Than 10 Rounds) by Fatality Threshold, 1991-2022**



Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

16.     Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths.  The average death toll for these 31 incidents is 13.7 fatalities per shooting.  By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3).  Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use was determined, 61 involved LCMs with an ammunition capacity greater than 10 rounds, resulting in 704 deaths.  The average death toll for these 61 incidents is 11.5 fatalities per shooting.  The average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4).  In other words, in the last 32 years, the use of assault weapons and LCMs in gun massacres has resulted, correspondingly, in 67% and 58% increases in average fatalities per incident (Tables 3-4).

17.     Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs.  When

LCMs with an ammunition capacity greater than 10 rounds are not used, the average death toll is 7.3 fatalities.  When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities.  When LCMs are used with assault weapons, the average death toll is 14.0 fatalities.  The data show that using LCMs without an assault weapon resulted in a 26% increase in the average death toll.  However, using LCMs with an assault weapon resulted in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involved neither LCMs nor assault weapons.

17.    This review of the data suggests that assault weapons and LCMs are force multipliers when used in mass shootings.

**Table 3.  The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| 1991-2022 | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) in High-Fatality Mass Shootings in the U.S., 1991-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| 1991-2022 | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5.  The Average Death Tolls Associated with the Use of LCMs (Ammunition Capacity Greater Than 10 Rounds) and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7.3 | 9.2 | 26% | 9.2 | 14.0 | 52% | 7.3 | 14.0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons and/or LCMs were used.

## III.  DOUBLE-DIGIT-FATALITY MASS SHOOTINGS ARE A POST-WORLD WAR II PHENOMENON IN AMERICAN HISTORY AND THEY INCREASINGLY INVOLVE ASSAULT WEAPONS

18.      I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9).[11]  In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949.  In other words, for 70% of its 247-year existence as a nation, the United States did not experience a

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

*single* mass shooting resulting in double-digit fatalities. They are relatively modern phenomena in American history.[12]

19.     After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966. The third such mass shooting then occurred nine years later, in 1975. And the fourth such incident occurred seven years after, in 1982. Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era. Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit G** of this Report.

**Table 6.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**

|  | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe, TX | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators.  An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban or (2) the statutes of the state where the gun massacre occurred.  An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

**Figure 9.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**



**Figure 10.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



20.    The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years (Table 6 and Figure 10). This timeframe also reflects the first time that assault weapons were used to perpetrate mass

19

shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths).  But this cluster of incidents was followed by a 20-year period in which only two double-digit-fatality mass shootings occurred (Figure 10).  This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

21.    It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[14]  Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern.  In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities (a frequency rate of one incident every 5.6 years).  In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings (a frequency rate of one incident every 0.9 years).  In other words, the frequency rate has increased over six-fold since the Federal Assault Weapons Ban expired (Table 6 and Figure 10).  (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section VI of this Report.)

22.    Over three-quarters of the mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs (Table 6).  As also shown in the analyses of mass shootings in Section II, death tolls in double-digit-fatality mass shootings are related to the use of firearm

---

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit H**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit I**); Charles DiMaggio, et al., "Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019) (Attached as **Exhibit J**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021) (Attached as **Exhibit K**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as **Exhibit L**).

technologies like assault weapons and LCMs that, in terms of mass shootings, serve as force multipliers.

## IV. ASSAULT WEAPONS ARE ALMOST NEVER USED BY PRIVATE CITIZENS IN SELF-DEFENSE DURING ACTIVE SHOOTINGS

23.     An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them?  As shown above in Section II, assault weapons have been used to perpetrate approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3).  And in the past eight years, the share of high-fatality mass shootings that have been perpetrated with assault weapons has risen to approximately half (Figure 3).

24.     The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15]  According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16]  A simple way to conceptualize active shooter incidents is to think of them as attempted mass shootings.  As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

---

[15] All of the information in this section, including definitions and data, are publicly available from the FBI.  *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023).

[16] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023, at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2022-042623.pdf/view (last accessed May 4, 2023).  The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms.  The *active* aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome."  *Ibid.* (emphasis in original).  In addition to the report on incidents in 2022, the FBI has published seven other reports on active shooter incidents covering the following seven time periods: 2000-2013, 2014-2015, 2016-2017, 2018, 2019, 2020, and 2021.  All of these reports are available at the FBI's "Active Shooter Safety Resources" website, *supra* note 15.

25.    In the 23 years between January 1, 2000 and December 31, 2022, the FBI has identified 456 active shootings occurring in the United States.  Out of these 456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17]  Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one assault rifle).[18]  In other words, out of the 17 incidents where an armed civilian intervened and it was possible to identify the DGU firearm, only one incident (5.9%) involved an assault weapon.[19]  Within the broader context of all active shooter incidents, only one incident out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon.[20]

_____

[17] In 17 of the 18 DGU-involved active shooter incidents, there was an exchange of gunfire.  For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased.  FBI, *supra* notes 15 and 16.

[18] All 14 DGU incidents that involved handguns also involved armed civilians who held valid concealed-carry permits or were legally carrying their handguns.  *Ibid*.  In 12 of these 14 incidents, details about the types of handguns used in self-defense were available in news media accounts or in news media photographs of the crime scene.  In two of the 14 incidents, the use of concealed handguns was inferred based on details about the shooting reported in news media accounts.  There is no evidence that either of these two DGU incidents involved an assault pistol.

[19] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident.  *Ibid*.  Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun.  *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023).  Adding this incident to the 17 DGU-involved incidents would mean that 5.6% (as opposed to 5.9%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[20] FBI, *supra* notes 15 and 16.  The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas.  In that incident, an armed private citizen used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene.  While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him.  *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

26.     The bottom line is that assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[21]

## V.     OWNERSHIP RATES OF "MODERN SPORTING RIFLES" IN THE U.S.

27.     As noted above in Para. 13, based on the most recent publicly available NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform firearms— appear to make up as many as 5.3% of all firearms in circulation in American society (24.4 million out of an estimated 461.9 million firearms, although this is likely an overestimate due to the apparent inclusion of modern sporting rifles possessed by law enforcement agencies). Furthermore, in its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.[22]  Based on this data, only 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[23]  In other words, less than 8% of all civilian gun owners in the United States own modern sporting

---

[21] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention.  As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

[22] NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed January 16, 2023).

[23] The estimate that approximately 6.4 million gun owners possess what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such rifles estimated to be in civilian circulation.  This calculation (24.4 million divided by 3.8) equals 6.4 million. Based on survey data, 81 million American adults are estimated to own guns.  Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022, *available at* https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-ban-wont-turn-gun-owners- (last accessed January 16, 2023).

23

rifles.[24]  In terms of the total population of the United States, estimated by the Census Bureau to be approximately 333 million people in 2022, less than 2% of all Americans own a modern sporting rifle.[25]

28.     In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[26]  According to the ATF, from 1986 through 2020 (which reflects the most currently available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[27]  As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

29.     According to ATF data, handguns are the most commonly owned firearms; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[28]

---

[24] The finding that less than 8% of all gun owners possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American adults estimated to be gun owners.  Taking 6.4 million and dividing it by 81 million equals 7.9%.

[25] The Census Bureau's total population estimate for 2022 is 333,287,557 persons.  U.S. Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last accessed January 16, 2023).  The finding that less than 2% of all Americans possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333 million persons in the United States.  Taking 6.4 million and dividing it by 333 million equals 1.9%.

[26] NSSF, 2020, *supra* note 8.

[27] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 8.  For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[28] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

**Figure 11.  Share of Firearms in Civilian Circulation in the United States, 1986-2020**



## VI.    RESTRICTIONS ON ASSAULT WEAPONS AND LCMS REDUCE THE INCIDENCE OF GUN MASSACRES, RESULTING IN LIVES SAVED

### VI.A.    THE OPERATIVE MECHANISM OF ASSAULT WEAPONS BANS: SUPPRESSION AND SUBSTITUTION EFFECTS

30.    As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[29]  The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements.  This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[30]

**Figure 12.  The Trinity of Violence**



---

[29] Klarevas, *supra* note 1, at 27-29, 229-238.

[30] *Ibid.*

31.     Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[31]  Bans on assault weapons and LCMs generally make it illegal to manufacture, import, transfer, own, or possess certain firearms and certain magazines.  Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial.  With regard to perpetrators, bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior.  In the case of bans on assault weapons and LCMs, they threaten conviction, imprisonment, and/or fines should an individual build or otherwise acquire a prohibited assault weapon or LCM.  The primary mechanism at work here centers around dissuading potential shooters from trying to acquire banned firearm technologies.  But there is also a secondary mechanism at work, focused on the assault weapon or LCM itself: *deprive potential instruments of violence*.  Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons and LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it.  This, in essence, reinforces the strategy of dissuading the offender with the strategy of denying the instruments of violence.

32.     Ideally, someone intent on committing a mass shooting with an assault weapon and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice are not available.  In such a scenario, the attack would be quashed.  This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely related desirable outcome.[32]  A real-world example

---

[31] Philip J. Cook, "Research in Criminal Deterrence: Laying the Groundwork for the Second Decade," 2 *Crime and Justice* 211 (1980) (Attached as **Exhibit M**); and Daniel S. Nagin, "Deterrence in the Twenty-First Century," 42 *Crime and Justice* 199 (2013) (Attached as **Exhibit N**).

[32] Paul Dolan and Mateo M. Galizzi, "Like Ripples on a Pond: Behavioral Spillovers and Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015) (Attached as **Exhibit O**); K. Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755 (2020) (Attached as **Exhibit P**).

of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun (that did not have an LCM).  At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle and LCMs.  In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse."  He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on a rampage and "killed as many people as I possibly could."  As he noted, "because I didn't have an assault weapon, that didn't happen."[33]  In this case, the unavailability of an assault weapon due to the federal ban appears to have suppressed the perpetrator's impulse to commit a mass shooting.

33.     Of course, some potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable.  They will instead replace their desired instruments of violence with available alternatives.  This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[34]  A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California.  In that attack, the gunman appears to have been unable to acquire an assault rifle and LCMs due to California's ban on both.  Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines.  As a result, the gunman quickly ran out of bullets, and while pausing to reload—which appears to have been extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a

---

[33] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023).

[34] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981) (Attached as **Exhibit Q**); Anthony A. Braga, et al., "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021) (Attached as **Exhibit R**).

congregant chased him away, preventing him from continuing his attack.[35]  In this incident,
which resulted in one death, California's ban on assault weapons and LCMs worked exactly as
intended.  It deprived the active shooter of the mechanisms that might have allowed him to kill
enough people to surpass the fatality threshold of a mass shooting.  Stated differently, if you
examine data sets that identify shootings resulting in mass murder, you will not find the Poway
synagogue attack on their lists.

34.    It might seem perverse to think that restrictions on certain instruments of violence
operate on the premise that, if an act of violence cannot be averted, then it will proceed with an
alternative instrument.  Nevertheless, this is exactly how bans on assault weapons and LCMs
work in theory.  They suppress the inclinations of potential mass shooters to go on killing
rampages in the first place because their means of choice are unavailable.  And, should
deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous,
prohibited ones, reducing the casualty tolls of attacks when they do occur.

## VI.B.    THE OPERATIVE MECHANISM OF LCM BANS: FORCING PAUSES IN ACTIVE SHOOTINGS

35.    Restrictions on assault weapons and LCMs also address the multiple advantages
LCMs provide to active shooters.  Offensively, LCMs increase kill potential.  Basically, the more
bullets a shooter can fire at a target within a finite amount of time, the more potential wounds
they can inflict.  Furthermore, the more bullets that strike a victim, the higher the odds that that
person will die.  These two factors—sustained-fire capability and multiple-impact capability—
allow LCMs to increase a shooter's kill potential.

36.    When inserted into either a semiautomatic or fully automatic firearm, an LCM
facilitates the ability of an active shooter to fire a large number of rounds at an extremely quick

---

[35] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50
Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-
north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last
accessed January 24, 2023).

rate without pause.  This phenomenon—sustained-fire capability—comes in handy when a target

is in a gunman's line of sight for only a few seconds.  For example, sustained-fire capability

allows a reasonably competent shooter to fire three rounds per second with a semiautomatic

firearm and ten rounds per second with an automatic firearm.  That results in numerous chances

to hit a target in a short window of opportunity, especially when ammunition capacity is large.

      37.     LCMs also facilitate the ability of a shooter to strike a human target with more

than one round.  This phenomenon—multiple-impact capability—increases the chances that the

victim, when struck by multiple rounds, will die.  At least two separate studies have found that,

when compared to the fatality rates of gunshot wound victims who were hit by only a single

bullet, the fatality rates of those victims hit by more than one bullet were over 60 percent

higher.[36]  The implication is straightforward: being able to strike human targets with more than

one bullet increases a shooter's chances of killing their victims.  In essence, LCMs are force

multipliers when it comes to kill potential—and the evidence from gun massacres supports this

conclusion (*see* Section II).

      38.     In addition to offensive advantages, LCMs also provide the defensive advantage

of extended cover.  During an active shooting, a perpetrator is either firing their gun or not firing

their gun.  While pulling the trigger, it is difficult for those in harm's way to take successful

defensive maneuvers.  But if the shooter runs out of bullets, there is a lull in the shooting.  This

precious downtime affords those in the line of fire with a chance to flee, hide, or fight back.

      39.     There are several examples of individuals fleeing or taking cover while active

shooters paused to reload.  For instance, in 2012, several first-graders at Sandy Hook Elementary

School in Newtown, Connecticut, escaped their attacker as he was swapping out magazines,

---

[36] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in
Washington, DC, 1983–1990," 127 *Archives of Surgery* 694 (June 1992) (Attached as **Exhibit
S**); Angela Sauaia, et al., "Fatality and Severity of Firearm Injuries in a Denver Trauma Center,
2000–2013," 315 *JAMA* 2465 (June 14, 2016) (Attached as **Exhibit T**).

allowing them to exit their classroom and dash to safety.[37]  Other well-known examples include

the 2007 Virginia Tech and the 2018 Borderline Bar and Grill rampages.[38]  There is also the

possibility that someone will rush an active shooter and try to tackle them (or at the very least try

to wrestle their weapon away from them) while they pause to reload.[39]  In recent history, there

have been numerous instances of gunmen being physically confronted by unarmed civilians

while reloading, bringing their gun attacks to an abrupt end.  Prominent examples include the

1993 Long Island Rail Road, the 2011 Tucson shopping center, the 2018 Nashville Waffle

House, and the 2022 Laguna Woods church shooting rampages.[40]  When there are pauses in the

shooting to reload, opportunities arise for those in the line of fire to take life-saving action.

---

[37] *See* Dave Altimari, et al., "Shooter Paused and Six Escaped," *Hartford Courant*, December 23, 2012 (Attached as **Exhibit U**).

[38] Virginia Tech Review Panel, Mass Shootings at Virginia Tech, April 16, 2007: Report of the Virginia Tech Review Panel Presented to Governor Kaine, Commonwealth of Virginia, Revised with Addendum, November 2009, *available at* https://scholar.lib.vt.edu/prevail/docs/April16ReportRev20091204.pdf (last accessed February 1, 2023); "California Bar Shooting: Witnesses Describe Escaping as Gunman Reloaded," CBS News, December 7, 2018, *available at* https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in (last accessed February 1, 2023).

[39] The longer a shooter can fire without interruption, the longer they can keep potential defenders at bay.  The longer potential defenders are kept from physically confronting a shooter, the more opportunity there is for the shooter to inflict damage.

[40] *See*, Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at* http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-hero-stopped-murderer-article-1.1540846 (last accessed February 1, 2023); Sam Quinones and Nicole Santa Cruz, "Crowd Members Took Gunman Down," *Los Angeles Times*, January 9, 2011, *available at* https://www.latimes.com/archives/la-xpm-2011-jan-09-la-na-arizona-shooting-heroes-20110110-story.html (last accessed February 1, 2023); Brad Schmitt, "Waffle House Hero: Could You Rush Toward a Gunman Who Just Killed People?" *The Tennessean*, April 24, 2018, *available at* https://www.tennessean.com/story/news/crime/2018/04/24/waffle-house-hero-could-you-rush-toward-gunman-who-just-killed-people/543943002 (last accessed February 1, 2023); "Parishioners Stop Gunman in Deadly California Church Attack," NPR, May 16, 2022, *available at* https://www.npr.org/2022/05/16/1099168335/parishioners-stop-gunman-in-california-church-shooting (last accessed February 1, 2023).

**VI.C.      BANS ON ASSAULT WEAPONS AND LCMS IN PRACTICE**

40.     In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence.  Prominent among these measures was the 1994 Federal Assault Weapons Ban.  In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[41]

41.     Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[42]  Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand.  As Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[43]

42.     The legislative intent of the Town of Superior, the City of Boulder, the City of Louisville, and Boulder County in enacting the laws being challenged in the present case is similar to that of other legislative bodies that have restricted assault weapons and LCMs:

---

[41] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[42] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

[43] *See* sources cited *supra* note 14.

reducing gun violence, especially the frequency and lethality of mass shootings. Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

43.    Currently, 32% of the U.S. population is subject to a ban on both assault weapons and LCMs. The following is a list of the eleven state-level jurisdictions that presently restrict both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[44]  As a reminder, from September 13, 1994 through September 12, 2004, the entire country was also subject to a federal ban on both assault weapons and LCMs.

44.    In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect. This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time. Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans. In addition, fatality rates—the number of deaths, per population, that result from particular events

_____

[44] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[45]

45.     Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit C**).[46]  Calculating incidence and fatality rates for this time period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates.  They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of whether assault weapons or LCMs were used (Table 7).[47]

46.     When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories is even more pronounced.  In the time period from January 1, 1991 through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs. Similarly, jurisdictions with such bans in effect experienced a 72% decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

---

[45] For purposes of this Report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control.  *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

[46] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990.  Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs.  As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990 would make no difference.

[47] Between September 13, 1994 and September 12, 2004, the Federal Assault Weapons Ban was in effect.  During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs.  As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the time frame that the Federal Assault Weapons Ban was in effect.

47.     All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

48.     The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs.  The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost.

49.     Moreover, forcing active shooters to reload creates critical pauses in an attack. These pauses provide opportunities for people in the line of fire to take life-saving measures (such as fleeing the area, taking cover out of the shooter's sight, and fighting back), which in turn can help reduce casualties.

50.     The epidemiological data lend support to the policy choices of the Town of Superior, the City of Boulder, the City of Louisville, and Boulder County that seek to enhance public safety through restrictions on civilian access to certain firearms and magazines.  While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to restrict such instruments of violence should result in lives being saved.

**Table 7. Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022**

|  | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings |  |  |  |  |  |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States |  |  | 56% |  | 66% |
| High-Fatality Mass Shootings Involving Assault Weapons or LCMs |  |  |  |  |  |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States |  |  | 62% |  | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

Executed on May 5, 2023, at Nassau County, New York.



/s/ Louis Klarevas

35

# EXHIBIT A

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**

**Education**

Ph.D.   International Relations, 1999
        School of International Service
        American University
        Washington, DC

B.A.    Political Science, *Cum Laude*, 1989
        School of Arts and Sciences
        University of Pennsylvania
        Philadelphia, PA

**Author**

*Rampage Nation: Securing America from Mass Shootings*

**Current Positions**

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

**Professional Experience**

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*                                              *Undergraduate*
Counter-Terrorism and Homeland Security        American Government and Politics
International Political Economy                  European-Atlantic Relations
International Politics in a Post-Cold War Era    International Political Economy
International Security                           International Relations
Machinery and Politics of American Foreign Policy    Transnational Terrorism
Role of the United States in World Affairs       United States Foreign Policy
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy


**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

3

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

4

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

## Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

7

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009


**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011


**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)


**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

16

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Town of Superior, Colorado, 2023-

City of Boulder, Colorado, 2023-

City of Louisville, Colorado, 2023-

County of Boulder, Colorado, 2023-

State of Connecticut, 2023-

State of Hawaii, 2023-

State of Illinois, 2023-

State of Massachusetts, 2023-

State of New Jersey, 2023-

State of Oregon, 2023-

City of Highland Park, Illinois, 2022-

County of Cook, Illinois, 2022-

State of Washington, 2022-

Government of Canada, 2021-2022

Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th
Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019

State of California, 2017-

State of Colorado, 2016-2017, 2022-

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Branas and Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT B




# LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS



Prometheus Books

59 John Glenn Drive
Amherst, New York 14228

### Table 2.1. The Concept of a Mass Shooting.

**Definition of a Mass Shooting:**

Any violent attack that results in four or more individuals incurring gunshot wounds.

**Categories of Mass Shooting:**

1. *Nonfatal*
   Mass shootings in which no one dies.

2. *Fatal*
   Mass shootings in which at least one victim dies.

3. *High-Fatality / Gun Massacre*
   Mass shootings in which six or more victims die.



It's easy to dismiss conceptual discussions and debates as exercises in Ivory Tower intellectualism. But how we identify and think about mass shootings impacts which attacks capture national attention and which are disregarded—something which has far-reaching policy consequences. Thus, coming up with the best possible definition and conceptualization is a vital first step toward explaining and preventing rampage violence. As the Socratic adage reminds us, "The beginning of wisdom is the definition of terms."[43]




# EXHIBIT C

**Exhibit C**
**High-Fatality Mass Shootings in the United States, 1991-2022**

|  | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 1 | 1/26/1991 | Chimayo | NM | 7 | N | N |
| 2 | 8/9/1991 | Waddell | AZ | 9 | N | N |
| 3 | 10/16/1991 | Killeen | TX | 23 | N | Y |
| 4 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N | N |
| 5 | 1/8/1993 | Palatine | IL | 7 | N | N |
| 6 | 5/16/1993 | Fresno | CA | 7 | Y | Y |
| 7 | 7/1/1993 | San Francisco | CA | 8 | Y | Y |
| 8 | 12/7/1993 | Garden City | NY | 6 | N | Y |
| 9 | 4/20/1999 | Littleton | CO | 13 | Y | Y |
| 10 | 7/12/1999 | Atlanta | GA | 6 | N | U |
| 11 | 7/29/1999 | Atlanta | GA | 9 | N | Y |
| 12 | 9/15/1999 | Fort Worth | TX | 7 | N | Y |
| 13 | 11/2/1999 | Honolulu | HI | 7 | N | Y |
| 14 | 12/26/2000 | Wakefield | MA | 7 | Y | Y |
| 15 | 12/28/2000 | Philadelphia | PA | 7 | N | Y |
| 16 | 8/26/2002 | Rutledge | AL | 6 | N | N |
| 17 | 1/15/2003 | Edinburg | TX | 6 | Y | U |
| 18 | 7/8/2003 | Meridian | MS | 6 | N | N |
| 19 | 8/27/2003 | Chicago | IL | 6 | N | N |
| 20 | 3/12/2004 | Fresno | CA | 9 | N | N |
| 21 | 11/21/2004 | Birchwood | WI | 6 | Y | Y |
| 22 | 3/12/2005 | Brookfield | WI | 7 | N | Y |
| 23 | 3/21/2005 | Red Lake | MN | 9 | N | Y |
| 24 | 1/30/2006 | Goleta | CA | 7 | N | Y |
| 25 | 3/25/2006 | Seattle | WA | 6 | N | N |
| 26 | 6/1/2006 | Indianapolis | IN | 7 | Y | Y |
| 27 | 12/16/2006 | Kansas City | KS | 6 | N | N |
| 28 | 4/16/2007 | Blacksburg | VA | 32 | N | Y |
| 29 | 10/7/2007 | Crandon | WI | 6 | Y | Y |
| 30 | 12/5/2007 | Omaha | NE | 8 | Y | Y |
| 31 | 12/24/2007 | Carnation | WA | 6 | N | U |
| 32 | 2/7/2008 | Kirkwood | MO | 6 | N | Y |
| 33 | 9/2/2008 | Alger | WA | 6 | N | U |
| 34 | 12/24/2008 | Covina | CA | 8 | N | Y |
| 35 | 1/27/2009 | Los Angeles | CA | 6 | N | N |
| 36 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y | Y |
| 37 | 3/29/2009 | Carthage | NC | 8 | N | N |
| 38 | 4/3/2009 | Binghamton | NY | 13 | N | Y |

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 39 | 11/5/2009 | Fort Hood | TX | 13 | N | Y |
| 40 | 1/19/2010 | Appomattox | VA | 8 | Y | Y |
| 41 | 8/3/2010 | Manchester | CT | 8 | N | Y |
| 42 | 1/8/2011 | Tucson | AZ | 6 | N | Y |
| 43 | 7/7/2011 | Grand Rapids | MI | 7 | N | Y |
| 44 | 8/7/2011 | Copley Township | OH | 7 | N | N |
| 45 | 10/12/2011 | Seal Beach | CA | 8 | N | N |
| 46 | 12/25/2011 | Grapevine | TX | 6 | N | N |
| 47 | 4/2/2012 | Oakland | CA | 7 | N | N |
| 48 | 7/20/2012 | Aurora | CO | 12 | Y | Y |
| 49 | 8/5/2012 | Oak Creek | WI | 6 | N | Y |
| 50 | 9/27/2012 | Minneapolis | MN | 6 | N | Y |
| 51 | 12/14/2012 | Newtown | CT | 27 | Y | Y |
| 52 | 7/26//2013 | Hialeah | FL | 6 | N | Y |
| 53 | 9/16/2013 | Washington | DC | 12 | N | N |
| 54 | 7/9/2014 | Spring | TX | 6 | N | Y |
| 55 | 9/18/2014 | Bell | FL | 7 | N | U |
| 56 | 2/26/2015 | Tyrone | MO | 7 | N | U |
| 57 | 5/17/2015 | Waco | TX | 9 | N | Y |
| 58 | 6/17/2015 | Charleston | SC | 9 | N | Y |
| 59 | 8/8/2015 | Houston | TX | 8 | N | U |
| 60 | 10/1/2015 | Roseburg | OR | 9 | N | Y |
| 61 | 12/2/2015 | San Bernardino | CA | 14 | Y | Y |
| 62 | 2/21/2016 | Kalamazoo | MI | 6 | N | Y |
| 63 | 4/22/2016 | Piketon | OH | 8 | N | U |
| 64 | 6/12/2016 | Orlando | FL | 49 | Y | Y |
| 65 | 5/27/2017 | Brookhaven | MS | 8 | Y | Y |
| 66 | 9/10/2017 | Plano | TX | 8 | Y | Y |
| 67 | 10/1/2017 | Las Vegas | NV | 60 | Y | Y |
| 68 | 11/5/2017 | Sutherland Springs | TX | 25 | Y | Y |
| 69 | 2/14/2018 | Parkland | FL | 17 | Y | Y |
| 70 | 5/18/2018 | Santa Fe | TX | 10 | N | N |
| 71 | 10/27/2018 | Pittsburgh | PA | 11 | Y | Y |
| 72 | 11/7/2018 | Thousand Oaks | CA | 12 | N | Y |
| 73 | 5/31/2019 | Virginia Beach | VA | 12 | N | Y |
| 74 | 8/3/2019 | El Paso | TX | 23 | Y | Y |
| 75 | 8/4/2019 | Dayton | OH | 9 | Y | Y |
| 76 | 8/31/2019 | Midland and Odessa | TX | 7 | Y | Y |
| 77 | 3/15/2020 | Moncure | NC | 6 | U | U |
| 78 | 6/4/2020 | Valhermoso Springs | AL | 7 | Y | Y |
| 79 | 9/7/2020 | Aguanga | CA | 7 | U | U |

C 2

| | Date | City | State | Deaths | Involved AWs | Involved LCMs |
|---|---|---|---|---|---|---|
| 80 | 2/2/2021 | Muskogee | OK | 6 | N | U |
| 81 | 3/16/2021 | Acworth and Atlanta | GA | 8 | N | Y |
| 82 | 3/22/2021 | Boulder | CO | 10 | Y | Y |
| 83 | 4/7/2021 | Rock Hill | SC | 6 | Y | Y |
| 84 | 4/15/2021 | Indianapolis | IN | 8 | Y | Y |
| 85 | 5/9/2021 | Colorado Springs | CO | 6 | N | Y |
| 86 | 5/26/2021 | San Jose | CA | 9 | N | Y |
| 87 | 1/23/2022 | Milwaukee | WI | 6 | N | U |
| 88 | 4/3/2022 | Sacramento | CA | 6 | N | Y |
| 89 | 5/14/2022 | Buffalo | NY | 10 | Y | Y |
| 90 | 5/24/2022 | Uvalde | TX | 21 | Y | Y |
| 91 | 7/4/2022 | Highland Park | IL | 7 | Y | Y |
| 92 | 10/27/2022 | Broken Arrow | OK | 7 | N | U |
| 93 | 11/22/2022 | Chesapeake | VA | 6 | N | U |

Note: High-fatality mass shootings are mass shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or motive.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban or (2) the statutes of the state where the shooting occurred.  For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device with a capacity of more than 10 bullets.  Incidents in gray shade are those incidents that occurred at a time when and in a state where legal prohibitions on both assault weapons and large-capacity magazines were in effect statewide or nationwide.

Sources: Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022); and "Gun Violence Archive," *available at* https://www.gunviolencearchive.org (last accessed January 3, 2023).  The Gun Violence Archive was only consulted for identifying high-fatality mass shootings that occurred since January 1, 2018.

# EXHIBIT D



# ASSAULT WEAPONS AND ACCESSORIES IN AMERICA

**Firearms Policy Project
of the
Violence Policy Center**

1834 18th Street, NW
Washington, D.C. 20009
(202) 265-1920

# Assault Weapons and Accessories in America

Josh Sugarmann

Executive Director
Violence Policy Center

September 1988

This study was funded in part by a grant from the
Educational Fund to End Handgun Violence.

Copyright 1988
Violence Policy Center

# TABLE OF CONTENTS

Introduction                                          p.   1

Assault Weapons Violence                              p.   2

Drug Traffickers, Paramilitary Groups...             p.   5

And Just Plain Folk                                   p.   8

Assault Weapons Marketing                             p.   9

Assault Weapon Look-Alikes:  Airguns and Toy Guns    p.  10

Publications                                          p.  11

Accessories                                           p.  14

Paramilitary Training Camps and Combat Schools       p.  19

The Assault Weapons Debate                            p.  21

Conclusion                                            p.  26

Appendix I                                            p.  30

Appendix II                                           p.  32

Footnotes                                             p.  34

## INTRODUCTION

Across America, the firepower in the hands of gun owners
of varying stripes is increasing dramatically.  The reason:
assault weapons.  Drug traffickers are finding that assault
weapons--in addition to 'standard issue' handguns--provide the
extra firepower necessary to fight police and competing dealers.
Right-wing paramilitary extremists, in their ongoing battle
against the "Zionist Occupational Government," have made these
easily purchased firearms their gun of choice.  And rank and
file gun aficionados--jaded with handguns, shotguns, and hunting
rifles--are moving up to the television glamour and movie sex
appeal of assault weapons.  The growing market for these
weapons--coupled with a general rising interest in the non-
sporting use of firearms--has generated an industry of
publications, catalogs, accessories, training camps, and combat
schools dedicated to meeting its needs.

Assault weapons are growing in popularity for a variety of
reasons.  For manufacturers, assault weapons are a necessary new
product line in the wake of the mid-1980s decline in handgun
sales.  Yet, manufacturers didn't create a market, they
recognized one.  For criminals, the weapons look intimidating,
have increased firepower, and can be purchased under the same
controls as a hunting rifle or shotgun:  that is, virtually none.
For survivalists who envision themselves fending off a horde of
desperate neighbors from their bomb shelters, the high
ammunition capacity and other anti-personnel capabilities of
assault weapons are exactly what is needed.  And for fans of
Rambo and "Miami Vice," assault weapons offer the look and feel
of the real thing.  Not surprisingly, this shift to increased
firepower--in both criminal and law-abiding hands--has law
enforcement worried.

The assault weapons threat is exacerbated by the fact that
the weapons are difficult to define in legal terms.  Legislators
and members of the press have proposed placing increased
restrictions on all semi-auto firearms, which would include some
hunting rifles.  Whether these proposals are merely the result of
ignorance of the wide variety of firearms that are semi-
automatic, or misguided efforts in the face of definitional
problems, they only lend credence to the gun lobby's argument
that restrictions on assault weapons are merely the first step
toward banning all semi-automatic guns.

Assault firearms are semi-automatic (firing one bullet per trigger pull) and fully automatic (the weapon will keep on firing as long as the trigger is depressed) anti-personnel rifles, shotguns, and handguns that are designed primarily for military and law enforcement use. With muzzle velocities that are often greater than standard long guns, and high-capacity ammunition magazines, assault weapons are built to kill large numbers of human beings quickly and efficiently. In tests at their firing range, San Jose, California police found that a fully automatic UZI could fire its 30-round magazine in slightly less than two seconds. A semi-automatic version of the weapon required only five seconds for the magazine to be emptied.[1] Most assault weapons have no legitimate hunting or sporting use. Assault rifles and shotguns often have pistol grips and folding stocks, and are typically lighter and more concealable than standard long guns. Some assault pistols have threaded barrels for the easy attachment of silencers. Many assault weapons are merely semi-automatic versions of military machine guns, making them easier to convert to fully automatic machine guns.

The number of assault weapons in civilian hands--both criminal and law abiding--is estimated to be in the hundreds of thousands, perhaps millions.[2] No exact figures are available. An unknown number of these weapons have been illegally converted to full-auto. (For an explanation of the different categories and types of firearms, please see Appendix I.)

## ASSAULT WEAPONS VIOLENCE

o    October 1984. San Jose, California police officer Joe Tamarett is shot and wounded with an UZI carbine.[3]

o    January 1988. Virginia resident Michael Anthony Eberhardt is arrested in Washington, D.C., for allegedly purchasing 72 guns in Virginia during an 18-month period and then smuggling them into D.C. for sale to drug dealers. According to The Washington Post, "Many of the weapons were the semi-automatic TEC-9s favored by local drug dealers."[4]

o    April 1986. Two FBI agents are killed with a Ruger Mini-14 in a shootout in Miami, Florida.[5]

o    April 1984. Dennis Cresta, dressed in camouflage fatigues and carrying a Ruger Mini-14 and Colt AR-15, opens fire in Oakland, California, after being questioned by a policeman. No one is hit.[6]

o    July 1987. An elderly woman and her three sons kill three police officers who come to their motel room in Inkster, Michigan, to serve a warrant for a $286.40 bad check. One of the weapons used to slay the officers is a Heckler & Koch assault rifle.[7]

o    September 1988.  Samuel Eloud holds 11 people hostage in a
     Richmond, Virginia shopping center with a **semi**-automatic
     AK-47 and handgun in order to bring "peace to Lebanon."[8]

o    June 1984.  Denver, Colorado radio show personality Alan
     Berg is gunned down with a silenced MAC-10 by right-wing
     extremists.[9]

o    July 1984.  James Huberty goes "hunting for humans" with
     an UZI, a handgun, and a shotgun in a San Ysidro,
     California McDonald's.  Twenty-one die; 19 are injured.[10]

o    December 1985.  Portland, Connecticut eighth-grader Floyd
     Warmsley kills school janitor David Bengston with his
     father's TEC-9, then holds a classroom of children
     hostage.[11]

o    July 1988.  Manassas, Virginia, police officer John
     Conner is gunned down with a Colt AR-15 by a man whose
     wife had recently left him.[12]

o    April 1987.  William B. Cruse opens fire with a Ruger
     Mini-14 outside a Palm Bay, Florida shopping center,
     killing six and injuring 10.[13]

o    March 1988.  An arsenal that includes a Chinese-made
     semi-automatic AK-47, a hand grenade, 14 other semi-
     automatic guns, 32-round ammunition magazines, and a
     handgun outfitted with a laser sight is seized from five
     men in New York City's Port Authority bus terminal.[14]

o    February 1988.  At a press conference decrying the
     increase in assault weaponry, Prince Georges County
     (Maryland) Police Chief Michael J. Flaherty states, "The
     real issue is the safety of our officers."  Holding up a
     TEC-9, he adds,"It's not used for hunting, and it's not
     used for sporting events.  In my opinion, they should not
     be sold in the United States."[15]

     These events are not isolated incidents.  Although no
comprehensive, nationwide statistics are available on the misuse
of assault weapons specifically, police organizations, police
departments, government agencies, and handgun restriction
organizations agree that the sale and misuse of assault weapons
has escalated dramatically during the 1980s.  (Most law
enforcement reporting systems are set up only to separate
handguns from long guns. The federal Bureau of Alcohol, Tobacco
and Firearms (ATF), the government agency charged with enforcing
federal firearms laws, will soon begin breaking out assault
weapons from standard long guns.[16])

     "There has been an increase in [assault] weapons by all
walks of life--gang members, drug dealers, your next door
neighbor, even police officers," states Detective Bohannon of the

3

Los Angeles Police Department Gun Detail.  In Los Angeles, assault weapons have turned up increasingly in gang violence and drive-by shootings.  Says Bohannon, "These are not sporting weapons.  They're designed for one purpose and one purpose only, and that's to kill people."  (Bohannon stresses that his opinions are personal and do not reflect the view of the Los Angeles Police Department.)  According to Bohannon, essentially the same models of weapons are being seen on the streets by police:  "Your least expensive weapons are your MACs and TECs.  In the middle you've got your AK-47s and your UZI.  At the top level are going to be your AR-15s....[and others]."[17]

During fiscal year 1987, almost a third of the firearms seized by agents of the Drug Enforcement Agency (DEA)--the leading federal agency charged with enforcing America's federal drug laws--from drug traffickers were semi-automatic and fully automatic. (These figures include non-assault semi-automatic pistols.  Figures on solely assault rifles and pistols are not available.)  Sixteen percent were fully automatic.  On a daily basis, DEA agents seized automatic weapons that included M-16s, AK-47s, MAC-10s, MAC-11s, and UZIs.[18]

From January 1 to February 10, 1988, of the 388 guns seized by District of Columbia police, the vast majority were either semi-automatic or fully-automatic.  Only seven such weapons were seized during the first six months of 1987, six in 1986, one in 1985, and two in 1984.[19]

In neighboring Prince George's County, Maryland, from July 1987 through February 1988, police seized 140 semi-automatic or automatic weapons, including a TEC-9 and several UZI submachine guns, some equipped with silencers.[20]

In 1986, ATF seized 2,854 illegal machine guns.  These weapons were either converted illegally or illegally possessed. In 1985, the number of illegal weapons seized was 2,042.  In 1984, 539.[21]

The most popular assault weapons are the AK-47, AR-15A2, MAC-10, MAC-11, Ruger Mini-14, TEC-9 and UZI.  (For a description and brief history of each weapon, as well as select advertising information, please see Appendix II.)  Recognizing the strong market for high-capacity, concealable assault weapons that are painted black and look threatening, America's firearms industry continues to introduce new models.  Two of the latest are:

> o  The Calico M100P pistol, manufactured by American
>    Industries in Bakersfield, California.  With its
>    futuristic lines and black finish, this .22 caliber
>    weapon is the Darth Vader of handguns.  Composed of a
>    lightweight alloy frame, it has a "helical feed" 100-
>    round capacity plastic magazine.  A 50-round
>    magazine is also available.  The weapon also comes in

a carbine (a short-barreled, lightweight rifle)
version with a folding stock. Under the headline
"Durable, Accurate, Light, Versatile," an ad for the
gun shows an intimidating M100P pistol with an
optional "Klear-Vue" magazine (a see-through magazine
that gives the shooter "complete visibility of
rounds remaining in the magazine") and laser sight.[22]

The pistol version of the weapon is 17 inches long
with the 100-round magazine, and weighs 3.75 pounds.
The carbine version, with its stock retracted and the
100-round magazine, is 29.8 inches long. In November
1988, Calico will introduce a 9mm version of the
weapon.[23]

o    The Street Sweeper is a 12-gauge riot shotgun with a
revolving cylinder that rotates with each trigger
pull. Able to fire 12 rounds in less than three
seconds, the weapon is manufactured by SWD, Inc.
(manufacturers of the MAC-11). An ad for the weapon
reads, "It's a Jungle Out There! There Is A Disease
And We've Got the Cure." It invites the reader to
"Make you [sic] streets safe and clean with the help
of 'The Street Sweeper'!" With its folding stock
retracted, the weapon has an overall length of 25 5/8
inches.[24] The SWD weapon is modeled on a shotgun
used by South African security personnel, the Striker
12. Efforts had been made to import the Striker, but
the weapon was the first long gun ever to fail the
sporting-use test that ATF applies to imported long
guns. (Domestically produced firearms do not have to
meet any sporting use standard.)

## DRUG TRAFFICKERS, PARAMILITARY GROUPS...

Because of their ease of purchase, effectiveness,
convertibility, and mystique, assault weapons have become
increasingly popular among people involved in the drug trade. Or
as one DEA spokesman put it, "There's a machismo to carrying the
biggest, ugliest, and most powerful weapon available."[25]

According to DEA Special Agent Maurice Hill, drug dealers
in Miami began to switch over from revolvers to higher capacity
pistols in the early 1970s. By the end of the decade, they had
begun using shoulder-carried weapons, and by the early 1980s had
upgraded to weapons like the UZI. Since then, criminals
nationwide have expanded into a broad category of assault
weapons. Regarding assault weapons, Special Agent Maurice Hill
says, "They're all over now."[26]

Noting that drug traffickers "seem to like the AR-15s, AK-
47s, TEC-9s," ATF spokesperson Tom Hill concurs: "We've seen a
proliferation because of the drug trade. More and more people

want to have increased firepower and the status of having the semi-automatic assault type weapon. It looks dangerous. Most assault weapons used in criminal acts were initially purchased legally. Some are stolen, some come from over the counter through straw purchases, some are from people who fill out the forms illegally."[27]

In 1987, ATF traced weapons seized from two members of a Jamaican drug gang (known as "posses") in Tampa, Florida. The trace found that 149 weapons had been purchased over the counter from Tampa-area dealers. The majority of the weapons were TEC-9s, MACs, AR-15s, and Glock 17 handguns, "all preferred weapons of the Jamaican posses."[28] (The Glock 17, the first handgun to incorporate plastic into its structural design, is not considered an assault weapon.) As the result of this increased criminal firepower, police departments are beginning to abandon their six-shot revolvers for higher-capacity semi-automatic handguns.

Assault weapons have also become the weapon of choice for a different category of criminal: America's right-wing paramilitary extremists. In his book, Armed and Dangerous: The Rise of the Survivalist Right, author James Coates describes the scene outside the 224-acre compound of the paramilitary extremist organization, The Covenant, Sword and Arm of the Lord (CSA), located in Three Brothers, Arkansas, prior to a raid by law enforcement officials in 1985:[29]

"[A]ll visitors were greeted by a group of roughly half a dozen obviously frightened and surly young men carrying Mini-14s, MAC-10s and other automatic and semi-automatic weapons. Other armed CSA soldiers were clearly visible in a fifty-foot-tall guard tower overlooking the front gate, from which they pointed machine guns at reporters. Noble [a CSA member], wearing a Bowie knife strapped to one leg and cradling a converted AR-15 automatic rifle in his arm, repeatedly came to the gate to spar verbally with the nervous news media."[30]

Until recently, police had believed that the CSA--after its members were subjected to increased government prosecution, its compound deserted, and its leader, James Ellison, imprisoned for crimes that included the manufacture of automatic weapons-- had disbanded. But in May of 1988, CSA member Londell Williams was charged with conspiring to assassinate presidential candidate Jesse Jackson. Police recovered a converted AR-15 from Williams.[31]

Other paramilitary organizations that favor assault weapons and have been known to convert them to fully automatic machine guns include the Posse Comitatus, Aryan Nations, and The Order.

Although many drug traffickers and members of paramilitary organizations are convicted felons, they are often able to

illegally buy these weapons from retail sales outlets.  In every
state, assault rifles and shotguns are sold under the same lax
restrictions that apply to hunting rifles and shotguns.  Assault
pistols are sold under the same laws that apply to handguns,
which vary from locality to locality.

Some states do require that the purchaser of any firearm
first receive an owner's ID card or permit, while other states
have a waiting period for all firearms.  Yet most states'
standards for the sale of long guns are no more severe than the
federal law, which requires only that the purchaser be 18 years
old and fill out a federal form 4473.  On this form, the
purchaser swears that he is not a convicted felon, drug addict
or alcoholic, and that he does not have a history of mental
illness.  Most purchases are cash and carry, and long guns can be
purchased interstate, with no limit on the number of weapons that
can be purchased.[32]

The federal standards for handguns are essentially
identical to that of long guns, except that they cannot be sold
interstate, the purchaser must be 21 years old, and multiple
purchases (more than one handgun purchased within five working
days) must be reported to ATF.[33]

(In 1986, Congress outlawed the future production of
machine guns for civilian use.  Currently, there is a pool of
more than 187,000 machine guns that citizens can legally
purchase.[34]  To obtain a machine gun, a citizen must be
fingerprinted, photographed, submit to a background check, wait
five to six months, and a $200 transfer tax must be paid.  These
same standards must be met to possess silencers, sawed-off rifles
and shotguns, and military weaponry, such as hand grenades, land
mines, grenade launchers, and other weapons and accessories
restricted under the National Firearms Act of 1934.[35])

The most restrictive handgun laws are on the state and
local level, and assault pistols would be sold under these
standards.  Handgun laws in America range from Morton Grove,
Illinois, which has banned the sale and private possession of
handguns, to the state of Florida, which operates essentially
under only the federal standards.[36]

Because many assault weapons--such as the AR-15A2, M100P
carbine, Ruger Mini-14, Street Sweeper, and UZI carbine--can be
purchased as standard long guns by virtually anyone who is
willing to lie on the form, they are a boon to criminals.
Assault pistols can be purchased easily by criminals in states
with lax handgun laws such as Texas, Virginia, and Florida.  From
there, these weapons can then be sold to criminals in cities and
states with more restrictive laws.

## AND JUST PLAIN FOLK

Although much attention has been focused on drug traffickers and paramilitary extremists, many assault weapons are purchased by "just plain folk." These people run the gamut from survivalists who want to be ready "just in case" to gun owners who want the thrill of owning the latest high-tech weapons.

A 1986 <u>Defense Monitor</u> on "Militarism in America," published by the Center for Defense Information (CDI), in Washington, D.C., notes an increasing "fascination for paramilitary weapons and training" among the general public.[37]

Television shows such as "The A-Team," first broadcast on ABC in 1983, "Miami Vice," first broadcast on NBC in 1984, and other action/adventure/police dramas have acted as a showcase for new weaponry. In effect, these shows supply free advertising for assault weapons manufacturers.

The Center for Media and Public Affairs, based in Washington, D.C., monitored 620 television programs throughout the past 30 years, revealing a noticeable shift toward military-style assault weapons.[38]

According to Daniel Amundson, research director for The Center, "There certainly is a greater number of automatic weaponry," and this is "partly reflecting news from the front pages and partly reflecting artistic embellishment." Noting that guns have been "ever present" in television, Amundson adds, "The presence hasn't changed, but which ones are present has. 'Miami Vice' requires very sleek and modern weapons. This shows a reflection of the headlines. If drug lords are using more UZIs and MAC-10s, you're going to see it in 'Miami Vice' six to nine months later."

According to Amundson, television has a "tremendous potential to act as a marketplace for anything: weapons, violence, soap, attitudes toward blacks and women. Television has helped the average person to identify weapons more than we'd ever thought, expanded our knowledge, terminology, of the types of guns available. UZI, MAC-10 is no longer jargon for firearms specialists; and that tells us a great deal."[39]

Meanwhile, in movie theaters, the .44 magnum handgun of Clint Eastwood pales in comparison to the weapons of Rambo and his ilk. Throughout the 1980s, Sylvester Stallone films such as the Rambo series and "Cobra," Chuck Norris movies such as the "Missing in Action" series and "Invasion USA," and Arnold Schwarzenegger movies such as "Terminator," "Predator," and "Commando" have helped popularize paramilitary weapons and accessories.

8

## ASSAULT WEAPONS MARKETING

The marketing of assault weapons throughout this decade is in large part due to the slump in handgun sales that has afflicted the industry since 1982. Handgun production dropped from a high of 2.7 million that year to less than 1.7 million in 1984--a decrease of nearly 40 percent. In 1986, production increased to 1.9 million, a level still well below that of the early 1980s.[40] (Because handgun manufacturers will not release sales figures, and are not required to do so by law, production figures are the only available gauge of the market.) With an estimated 35 to 40 million handguns in American hands,[41] the slump is apparently the result of saturation of the primary market--white males--and the increasing resale of used handguns.

In their marketing of assault weapons, manufacturers often focus on their police or military functions, their ruggedness and dependability, and the cache of a lone man and his gun against the elements, crime, or the unstated threat of post-nuclear survival.

Colt Industries has even developed an ad aimed directly at survivalists. The 1985 ad features a handsome rancher looking across his land. He has leather patches on the elbows of his flannel shirt and an AR-15A2 in one hand. The headline reads: "Survival means different things to different people. For a rancher in the high country of Wyoming, being self-sufficient can mean keeping varmints from his sheep. For a rugged individual in the wilderness, it means being prepared for any eventuality. For both these men, and thousands like them, there's only one gun. The Colt AR-15A2. The reasons are as simple as they are plentiful. First, it's the rifle they're already familiar with. The AR-15A2 Sporter II is the civilian version of the battle proven and recently improved U.S. military M-16A1..."[42]

This survivalist sales pitch is echoed in an ad for Heckler & Koch's HK 91 semi-automatic assault rifle. The ad's headline reads, "When you're determined to survive, you leave nothing to chance. In a survival situation, you want the most uncompromising weapons that money can buy. The HK 91 Semi-Automatic Assault Rifle from Heckler & Koch." The ad ends with the tag line, "In a world of compromise, some men don't."[43]

An ad for the FIE/Franchi LAW-12 shotgun--which comes in standard hunting and assault configurations--urges the reader to "Take the 'LAW' Into Your Own Hands. Whether you patrol the birdlands when the sun is rising...or patrol the boonies when the sun sets...the FIE/Franchi LAW-12 is the LAW of the land! All the LAW you need! Situation - The sun has set, it's now midnight, you're called to a Code 3 situation! Your backup is deployed to another sector. You're all alone, left to handle a tough situation...What do you do? Take the LAW-12 into your hands - A possible 9 rounds of heavy hitting 12 guage [sic] "00"

9

Buck - All 9 rounds can be emptied on target in less than 3
seconds...operation successful..."[44]

## ASSAULT WEAPON LOOK-ALIKES: AIRGUNS AND TOY GUNS

Paramilitary enthusiasm has not been limited to the
firearms market. America's manufacturers of non-powder firearms
(such as BB guns and pellet guns) and toy guns have been quick to
realize that assault weaponry is in. These manufacturers' role
models are no longer hunting rifles and Western-style six-
shooters, but machine guns and large-caliber handguns. This
shift has been accompanied by a keener eye to detail and advances
in plastic molding. The result: non-powder firearms and toy
guns that are virtually indistinguishable from their more lethal
counterparts.

Daisy Manufacturing was one of the first to recognize this
potential market. The company introduced its paramilitary line
of imported Softair guns in 1986. Softair guns are working
replicas, down to the point of expelling spent shells and firing
plastic pellets. They retail for approximately $60. "So
accurate in detail you'll swear it's the real thing!...a 'must
have' for paramilitary enthusiasts of all ages," reads the
catalog description for a replica of the UZI Assault pistol.
Copy for a replica of the KG9-SP (predecessor of the TEC-9)
boasts that it's "an authentic reproduction of the American-
made semiautomatic defense weapon used by anticommunist
guerrillas in Angola." A replica of a Heckler & Koch weapon is
described as being "without a doubt the most exciting
paramilitary airgun on the market today! Styled after the
semiautomatic firearm carried by the German police and made
famous in the motion picture, 'Rambo: First Blood Part II,' the
Model 15 has the look and feel of the real thing."[45]

Rival manufacturer Crosman has its own UZI look-alike
(which fires metal projectiles) and a reproduction of Colt's M-16
machine gun dubbed the A.I.R. 17. Crosman guarantees that "it
looks just like the real thing," down to a detachable pellet clip
and flash guard on the muzzle of the gun.[46]

Larc International, located in Longwood, Florida, offers--
by mail--the M19-A BB submachine gun. "Imagine--a 3,000 BB per
minute cycle rate with an effective range of over 50 yards--
That's some AWESOME Fire Power!!!" With a magazine capacity of
3,000 BBs, the weapon also comes in a pistol version. Each sells
for $39. On the ordering coupon, the purchaser must promise that
he or she is 18 years or older.[47]

The Para-Ordnance M-85 is a full-auto paint ball "splat
gun" MAC-11 machine pistol replica that fires 1,200 rounds per
minute at 440 feet per second. The 24-round magazine can be
emptied in 1.2 seconds. It sells for $299.50.[48]

Far more common than paramilitary non-powder firearms are plastic-molded toy assault weapons. In addition to such staples as M-16s, AK-47s, UZIs, and KG-9s, Daisy, the self-proclaimed leader in the field, offers toy silenced MAC-10 pistols (the Alan Berg murder weapon) and bolt action machine guns.[49]

The International Association of Chiefs of Police (IACP), located in Gaithersburg, Maryland views look-alikes as a unique threat to public safety. As criminal misuse of assault weapons increases, police are more likely to assume that look-alikes are in fact real firearms. People who thoughtlessly display or brandish look-alikes run the risk of finding themselves in a deadly face-off with a police officer who must make a split-second decision on whether to draw a weapon and fire. According to the IACP, incidents involving airguns, highly detailed toy guns, and paint "splat guns" are increasing dramatically.[50]

In May 1988, as an amendment to a bill dealing with the threat posed by non-detectable "plastic" firearms, Congress voted to require that every look-alike sold in America be clearly marked with an orange stripe or other color to distinguish it from its real counterpart. The bill is awaiting presidential signature, which is expected. On the state and local level, laws have been introduced and enacted regarding the sale, production, and brandishing of look-alikes.

But even prior to the bill, various companies, reacting to the growing debate over look-alikes and the increasing negative publicity their sales generated, began to shift their product lines and mark their products to help distinguish them from real firearms. In late 1987, Daisy stopped the sale of its SoftAir guns, which had been imported from Japan. A spokesman for the company noted, however, that the decision was "90 percent financial. The guns just weren't selling."[51]

Critics of the marking concept point out that the markings can be easily painted over and will do little good in the dark, while criminals can paint similar markings on real guns.

What makes look-alikes so appealing--that they look <u>just like</u> the increasingly popular assault weapons--is precisely what makes them so dangerous.

## PUBLICATIONS

The growing fascination with assault weapons has been accompanied by a growth in the number of publications dedicated to the non-sporting use of firearms.

<u>Firepower</u>, published by Everett Moore out of Cornville, Arizona, is the only magazine in America dedicated to full-auto and high-capacity firearms and has a circulation of 90-95,000.

(Prior to the 1986 machine gun ban, the magazine had been devoted exclusively to full-auto.) Each issue of the magazine is filled with weapon, ammunition, and accessory reviews. Virtually all of the weapons reviewed are assault weapons.

According to Moore, "We jokingly refer to them as black and wicked-looking types of guns. They fill a need in the consumer market for people...who cannot afford the automatic version of the same weapon." Moore acknowledges that violence involving these weapons is "a legitimate concern. It's reality and you can't deny that." He adds, though, that, "it seems like any time we go to disarm the criminal, we end up disarming the legitimate, honest civilian."[52]

American Survival Guide is "the magazine for safer living." Published by McMullen Publishing in Anaheim, California, articles are listed under headings that include "Survival Weapons," "Survival Gear," and "Survival How To."[53]  It also contains the "Survivalist Directory," a post-apocalypse personals column that offers a "confidential listing of survivalists who wish to become known to others of like mind." Personal ads in the August issue include:

  o    "Melbourne, Florida. Teenage military organization that does U.F.O. research would like to recruit members. Also would like to set-up [sic] information exchange and meet others in this area for training. All races and sexes are welcome. Ages 12 and over only. No racists or religious fanatics need apply."

  o    "Northern Arkansas. Young, conservative male seeks correspondence with other survivalists in area. Special interest is nuclear survival. No liberals, atheists, druggies or alcoholics. Females welcome. All ages reply."

  o    "Baltimore, Maryland. Urban group which meets biweekly is looking for interested local survivalists wishing to exchange information. We are not Rambos, racists, or extremists, but family-oriented and interested in workable, realistic solutions to short and long term survival scenarios."[54]

Published since 1979, Survival Guide has a circulation of between 30,000 and 70,000.[55]

In addition to his mainstay, the monthly Combat Handguns, New York-based Stanley Harris also publishes such annuals as Guns & Survival and Special Weapons. Another Harris publication, Eagle, which had promised its readers "violent combat action," has ceased publication. An October 1983 issue of the magazine featured an article entitled, "The Amazing Soft Drink Silencer -- I'm a Pepper, You're a Dead Man." The article outlined the ease

12

with which a two-liter plastic soft-drink container could be used
as a silencer for a MAC-10.  Eagle found it to be "the best
suppressor found in today's supermarkets.  It's cheap, effective,
and mixes well at parties.  What more could you want?"[56]

     The Special Weapons annual offers "The Newest Ideas in
Guns and Equipment as Well as Combat-Proven Tactics."[57]
Articles in Special Weapons include:  "Colt Delta HBAR--Boasting
sniper rifle accuracy we compare this new Colt to the combat-
proven Galil"; "The Search for Compact Firepower--We compare
submachine guns to short assault rifles"; "The Offensive Handgun-
-It's the tool of the assassin"; "How to Buy Automatic Weapons--
Latest prices and availability of Class III firearms"; and the
"Assault Rifle Buyer's Guide."[58]

     "The Offensive Handgun" is a how-to piece on
assassination.  The article advises that "single shots are
preferred.  The head, neck, and spine are the best targets."[59]
Recognizing that sometimes "an unsuppressed pistol may be the
only one available," the article advises that, "the sound can be
muffled by shooting through...a potato or pillow.  If the muzzle
is held against the target this also may muffle the sound, but it
can also cause him to react in unexpected ways, besides
presenting the possibility of the pistol jamming from bits of
clothing or flesh caught in the muzzle or chambers."[60]  The
article notes that the speed and capacity of a modern machine
pistol are "important when shooting a number of people at
once."[61]

     Soldier of Fortune, published out of Boulder, Colorado,
describes itself as "The Journal of Professional Adventurers."
In a disclaimer on its title page (a trait many of these
magazines share), it warns readers that the magazine "does not
verify validity of every advertisement and/or the legality of
every product contained herein.  Soldier of Fortune magazine does
not intend for any product or service to be used in any illegal
manner."[62]  The magazine has been published since 1975 by
National Rifle Association board member Robert K. Brown.

     In addition to various "you are there" articles such as
"Sandinista Staredown" and "Bum Trip in Bolivia,"[63] the magazine
contains weapon reviews and combat tactics.  Soldier of Fortune
had also carried classified ads for mercenaries for hire.  This
practice has since been discontinued as the result of a lawsuit
filed by the family of a victim whose murderer was hired as the
result of an ad placed in the September 1984 issue of the
magazine.  The ad read: "Ex-marines. 67-69 Nam Vets. Ex-DI,
weapons specialist--jungle warfare. Pilot. ME. High risk
assignments. US or overseas."

     In 1984 Robert Black hired John Wayne Hearn to kill his
wife.  Hearn did so in February 1985.  It had been Hearn's third
murder in 19 days.  As the result of this, the victim's parents
and son sued Soldier of Fortune for $21 million, arguing that the

13

magazine was aware of the implication contained in the ad.[64]  In
March 1988, a Colorado jury found that the magazine should have
known that the ad was offering the services of a hired killer and
ordered it to pay $9.4 million.  The decision is currently being
appealed.[65]  (Soldier of Fortune refused to answer any questions
for this report, including circulation and initial date of
publication, on advice of their legal counsel pending outcome of
the suit.)

New Breed, "the magazine for military adventure,"[66] is
published by Harry S. Belil, out of Nanuet, New York.  Though the
magazine focuses more on military action, it does contain
articles on assault weaponry and tactics.  The August 1988 issue
also contains a review of the 1988 SHOT (Shooting, Hunting,
Outdoor Trade) show, the annual trade show of the firearms
industry, held last January.  In the piece, the author notes that
"there were plenty of assault rifles at the show."[67]

Shotgun News describes itself as "The Trading Post for
anything that shoots."  Published three times a month out of
Hastings, Nebraska, the 200-page, tabloid-style magazine has a
circulation of nearly 190,000.[68]  The magazine is crammed with
classified and display ads for firearms and accessories, most of
which are geared to firearms dealers.

In addition to a cavalcade of gun ads, Shotgun News
carries ads for a variety of accessories (including Nazi
memorabilia such as coffee mugs with swastikas[69]), firearms, and
publications, including The Turner Diaries, the "bible of right-
wing extremists."  In the book, "Earl Turner and his fellow
patriots...are forced underground when the U.S. government bans
the private possession of firearms and stages the mass Gun Raids
to round up suspected gun owners.  An all-out race war occurs as
the struggle escalates.  Turner and his comrades suffer terribly,
but their ingenuity and boldness in devising and executing new
methods of guerrilla warfare lead to a victory of cataclysmic
intensity and worldwide scope.  If the government had the power
to ban books, The Turner Diaries would be at the top of their
list.  Order your copy today."  The $5.95 book is offered by the
neo-Nazi National Vanguard located in Arlington, Virginia.[70]

## ACCESSORIES

Not only do these publications supply information, but
they also contain advertisements for various catalogs and
products.  The Survival Systems book catalog describes itself as
offering "the most unusual and controversial books you've ever
seen in your life."[71]  In a disclaimer, the company notes,
"Certain of the books in this catalog deal with activities and
items which could be in violation of various laws if actually
performed or constructed.  We do not advocate the breaking of any
law.  Our books are sold for entertainment purposes only and only
to adults!"[72]

With a toll-free number for credit-card orders, the catalog contains books on revenge, fraud, dirty tricks, firearms conversion, home construction of firearms and explosives, and murder techniques.

Books offered by <u>Survival Systems</u> include:

o   <u>How to Build Silencers: An Illustrated Manual.</u>  "A complete manual for the construction of silencers at home with simple tools.  Build in less than one hour. $5.95."[73]

o   <u>Improvised Weapons of the American Underground.</u> "This book makes other 'cookbooks' things for Sunday School picnics.  This collection of original articles covers: Making of Nitroglycerin; Plastic Explosives; Detonators and Primers; Fuses; Impact Ignition Incendiary Devices; and Construction of Various Types of Silencers; and Complete Plans for a Home Made Machine Gun which can be built for less than $20.00. An absolutely incredible manual.  $7.50."[74]

o   <u>Full Auto.</u>  "A completely illustrated modification manual on selective fire conversions for the following weapons: Mini-14; AR-15; HK-91-93; MAC 10-11; and the M1 Carbine.  With this new edition, you can convert all five weapons into their full-automatic configurations with ease, as all procedures are thoroughly explained in an easily understood, fully illustrated, step-by-step manner. Without a doubt, this is the finest conversion manual on the market.  $12.00."[75]

Robert K. Brown's Paladin Press offers a 47-page, glossy catalog that includes sections on sniping, revenge and humor, survival, weapons, explosives and demolitions, guerrilla warfare, silencers, new ID and personal freedom, locksmithing, and terrorism.  In an essay entitled "New Age Survival," readers are reassured that "We don't want to alarm you into heading for the hills today--but will help you become prepared to do so tomorrow."[76]

Books offered in the catalog include:

o   <u>Anarchist Handbook.</u>  "For the modern anarchist, all you need to know to construct an impressive selection of improvised weapons," including "an expedient silencer; a pipe hand grenade; plastic explosive; and a rocket launcher.  For each weapon, the author supplies a list of materials easily acquired from drug or hardware stores, hobby shops, supermarkets or even junk piles; step-by-step procedures; simple diagrams and how-to-use instruction for certain weapons.  $7.00."[77]

o   <u>The Mini-14 Exotic Weapons System</u>.  "Convert your
    Mini into a full-auto, silenced, SWAT-type weapon
    that is capable of field clearing firepower.  Note
    that this conversion process requires no machining or
    special tools.  Once completed it takes just five
    minutes to drop in the Automatic Connector (the
    book's secret!) or remove it as needed.  It's that
    simple!  $15.00"[78]

o   <u>Improvised Explosives--How to Make Your Own</u>.  "Ten
    simple but powerful formulas for explosives and
    incendiaries" that gives the reader the ability "to
    construct actual bombs, booby traps and mines.
    Learn how to obtain or make all the necessary
    chemicals or get acceptable substitutes.  Various
    fuses, detonators, and chemical and electrical
    timers are covered, as are pipe bombs, plastic bottle
    bombs, jerry can bombs and tamperproof bombs.  With
    ease, you can construct such devices as a package
    bomb, booby-trapped door, auto trap, sound-
    detonated bomb, or pressure mine--to name just a
    few.  $10.00"[79]

o   <u>How to Kill</u> (volumes one through six).  "[M]akes no
    moral judgments, but merely describes what has been
    known for years by the professionals who are part of
    the shadowy world of international espionage and
    intrigue.  As the author states in his preface, 'My
    only premise is that there are times when one must
    attack with complete ruthlessness and fight with
    lethal fury.  This fury and ruthlessness must be
    harnessed and directed to the gravest possible
    damage--to kill.'"  Priced at $8 per volume, the
    catalog notes that no book in the <u>How to Kill</u> series
    is available in Canada due to legislation by the
    Canadian solicitor general.[80]

     In addition to operating a 24-hour-a-day, toll-free order
line and offering a "no questions asked" money-back guarantee,
Paladin Press also offers gift certificates, which "make
excellent gifts for you to send to friends and relatives."[81]

     <u>Firepower's</u> Everett Moore also runs a mail-order
publications house.  Moore's Desert Publications offers many of
the same publications as his competitors under headings that
include: weapons and firearms, specialized warfare, police
science, survival, self-defense, full-auto, suppressors, and
improvised munitions.[82]  Moore, who sells between 2,000 and 5,000
copies of specific titles a year, refers to the publications as
"big boy toys," adding, "I haven't known a man yet who didn't
like [to know how] to pick a lock."[83]

The catalog of Phoenix Systems, Inc., located in Evergreen, Colorado, offers its buyers "The Right Stuff," which includes:

o   U.S. Military Practice Grenades "with ALL the mechanical parts IN THE FUSE ASSEMBLY!!! -- NO EXPLOSIVES."  The ad warns that "ACTIVATION OF THESE DEVICES REQUIRES PRIOR BATF APPROVAL.  $19.95 each."[84]

o   Booby Trap Firing Device (M-1), "Standard U.S. Military PRESSURE RELEASE firing device used to initiate detonation of explosive charges in BOOBY TRAP applications or remote firing of Claymore mines. EXCELLENT training device because it is RELOADABLE with new primer caps (when not coupled DIRECTLY TO AN EXPLOSIVE CHARGE).  Hundreds of applications -- can be screwed directly into an explosive charge for instantaneous detonation or coupled to detonator cord for remote firing.  $14.95 each."[85]

o   The Ballistic Knife--The Knife That Shoots. "CONGRESS OUTLAWED THE SPRINGS--BUT YOU CAN STILL BUY THE KNIFE!"  The knife "can be fired up to an effective range of 30 feet.  The typical penetration of this knife is about three times that of a manual stab.  Extra blades and flight stabilizer available. $79.95 each."  Under the heading "ATTENTION COLLECTORS AND SPORTSMEN," the ad notes, "Due to recent Federal regulation, the Ballistic Knife may no longer be sold with the projection spring.  The Ballistic Knife, IN LEGAL KIT FORM, that we are now able to sell, is identical to the original knife without the spring included."  The ad adds, "WE SELL NO SPRINGS."[86]

o   "FULL AUTOMATIC FIRE FOR YOUR AR-15.  The drop-in auto sear is the KEY component in converting an AR-15 to M-16 selective fire capability (semi or full automatic) and is the ONLY part for this conversion that is now required to be registered if CURRENTLY manufactured.  OUR auto sears were manufactured prior to 11/1/81 when it was NOT required to have a serial number stamped on this part.  COMPLETELY LEGAL TO PURCHASE."  With the purchase of "five other commonly available M-16 replacement parts," the conversion can be made "in SECONDS without tools." The ad urges readers to "Act now while it is still legal to purchase these auto sears.  When existing supplies are exhausted, THERE WILL BE NO MORE!! $175.00 each."[87]

The recommended reading list of the catalog includes books on silencers; on UZI, MAC-10, and AR-15 conversions; and on home munitions.  Other products available through ads placed in these magazines include:

o    The BMF Activator, a hand crank that can be attached to a rifle, boasts the "newest crank-operated rapid fire capability since the gatling gun!!  Legally fire up to 1200 rounds per minute on your semi-automatic .22 rifle.  Imagine the sensation of firing a truly rapid fire rifle.  Since each turn of the crank handle fires the rifle four times, it is capable of pulling the trigger many times faster than you can."  The advertising flyer for the activator includes a copy of a letter from ATF stating that "a manually operated device of this type is not subject to any of the provisions of the Gun Control Act of 1968."[88]

o    The Tri Burst Trigger Activator, distributed by Orpheus Industries, offers "legal firepower."  It "allows a 3-round burst from your AR-15...mounts in seconds" and fits "all makes" of AR-15 rifles.  It sells for a "special introductory price" of only $34.95.[89]

o    "The Ultimate" trigger activator derides its competitors as "the rapid fire plastic gizmo and the sheet metal device."  With models available for the AR-15, Mini-14 and 30, M-1 Carbine, and AK models, The Ultimate allows the user to "fire individual rounds, 3 shot bursts or 50 round bursts at your instant discretion."  The ad notes that "all federal laws (if any) will apply.  The ATF has ruled this device is not regulated by federal law."  It retails for $129.95.[90]

o    The API Predator Laser Target Designator is equipped with "helium neon lasers" that "project an intense, narrow beam of red light" with "an effective range" of up to 500 meters.  Laser sights give their users point-and-shoot assassination capability.  "Generally, the only visible element of the laser beam is a spot on a solid object that reflects light back to the operator.  The beam itself is invisible in clear air."  Priced at $495, the API laser sight is only one of many laser sights on the market, with some costing hundreds of dollars less.[91]

o    An ad for Kephart Publications offers plans for such exotic weapons as:  hand, rifle, and shotgun grenades; L.A.W., RPG-7, Bazooka, Pod, Pocket, Shotgun, and T.O.W. rockets; claymore and land mines; flame throwers; and others.  The ad guarantees "these plans are legal to own and make according to

BATF provisions" and promises that the "basic
information is complete and all WILL work. All
devices are simple to make and very inexpensive.
Only common material and hand tools required.  NO
MACHINE SHOP WORK."  The ad offers any 10 plans for
$55.00.[92]

o    The "Deadly Weapons--Firearms & Firepower" video tape
     advertisement features an assassination kit of a
     silenced MAC-10 in a briefcase.  The ad asks, "Do you
     know which bullets will penetrate a car door?  A
     windshield?  Just how quiet is a real silencer?  How
     effective is full auto fire?"  Purchasers of the tape
     can "SEE & Learn the Answers to these questions and
     much more!"  The tape sells for $49.95.[93]

o    The "Ninety Rounder" is a circular "assault magazine"
     that can hold 90 rounds of ammunition "for people who
     want real firepower!"  Offered by the MWG Company it
     promises "LMG [light machine gun] Type Firepower
     From a Semi Auto Rifle."  It retails for 49.95.[94]

o    For the leisure hours, "Rock N' Roll #3--Sexy Girls
     and Sexy Guns, The Video" offers "14 outrageous,
     southern California beauties...firing some of the
     sexiest machine guns ever produced.  And you're
     probably wondering about the girls.  What can I tell
     you?  They're hot.  14 different girls in string
     bikinis and high heels blasting UZIs, MAC-10s, M-16s,
     MP-5s, AK-47s, M-14s and more.  It's something you
     just have to see."[95]

## PARAMILITARY TRAINING CAMPS AND COMBAT SCHOOLS

     Those interested in assault weapons and combat techniques
do not need to rely solely on book knowledge.  Around the United
States, training centers--from the paramilitary training camps of
right-wing extremists to commercial combat schools--offer
training in the use of weapons, explosives, and combat skills.

     According to testimony offered before the Subcommittee on
Security and Terrorism in September 1985, paramilitary/mercenary
training camps can be broken down into three categories:

o    Franchises or commercial establishments that offer
     training to law enforcement or security firms
     worldwide;

o    Paramilitary and survivalist organizations that offer
     training in the use of small arms, map reading, and
     survival under extreme circumstances (those operated
     by the Covanent, Sword and Arm of the Lord, for
     example).  According to the Anti-Defamation League of

B'nai B'rith, many of these camps also include an
indoctrination of race hatred.

o    Mercenary training camps, the goal of which is to
     offer the knowledge and skills necessary to be a
     soldier-for-hire.[96]

In 1984, paramilitary training camps garnered media
attention when the FBI revealed that several Sikh students had
attended a two-week session at the Merc School in Dolomite,
Alabama, with the intention of using their new-found knowledge to
assassinate Indian Prime Minister Rajiv Ghandi.[97]

At the time, the Merc School's owner, Frank Camper,
stated that he operated strictly within the law and was merely
training people to survive in combat situations.[98]  Said Camper,
"If someone were to train with me and to go away and perform an
act of terrorism, then I'm not responsible for that person's
actions.  They are responsible for themselves."[99]  (Camper,
however, apparently did inform on the Sikh students to the FBI,
helping lead to their arrest.)

Critics of the camps argue that those run by survivalist
and paramilitary organizations are turning out terrorists.  The
ADL states in the fall issue of its 1986 Law Report, "ADL
Paramilitary Training Statute: A Response to Extremism," that in
many camps, "'combat' training is interspersed with the
indoctrination of hatred and totalitarianism in preparation for
anticipated civil strife, the rationale being the vision of a
'coming race war.'"[100]

In 1980 such camps were uncovered in Alabama, California,
Connecticut, Illinois, North Carolina, and Texas.[101]  Daniel M.
Hartnett, ATF Acting Deputy Associate Director, Law Enforcement,
stated at the 1985 hearings that camps run by extremists have
shown "a willingness to commit violent crimes to further their
cause and support their movement."[102]

A 1985 raid conducted by law enforcement officials at a
compound run by the Posse Comitatus outside of Rulo, Nebraska,
yielded a cache of weapons that included assault rifles and 13
fully automatic pistols and rifles, including modified AR-15s.[103]

In 1986, the ADL formulated model state legislation that
would ban paramilitary training "aimed at provoking civil
disorder."[104]  In drafting the model bill, the ADL specifically
stated that the statute must not violate First Amendment freedoms
of speech and association.  Another objective was to draft the
statute narrowly so that it would not prohibit legitimate lawful
activities such as target shooting and other sporting events.
This was important, the ADL stated, for "minimizing opposition
to the bill by powerful special interest groups."[105]  Laws based
on the statute have passed in Arkansas, California, Colorado,
Connecticut, Florida, Georgia, Idaho, Illinois, Michigan,

Missouri, Nebraska, New Jersey, North Carolina, Oregon,
Pennsylvania, Rhode Island, Virginia, and West Virginia.[106]

In a statement opposing legislation restricting
paramilitary training camps, America's leading pro-gun
organization, the National Rifle Association (NRA), based in
Washington, D.C., states that such "legislation is objectionable
because it makes the mere possession of firearms a crime,
therefore undermining the right to keep and bear arms" and that
"the constitutionality of such legislation is questionable at
best, and could not, in all probability, withstand a court
challenge based on violation of First Amendment rights."[107]

The controversy has faded since the 1985 hearings,
although camps and schools continue to operate.  The FBI
currently has no figures on the numbers of camps and schools
operating in the United States.  One such school, Brigade
Security Forces, located in Mooreville, North Carolina, offers
six-day courses in "commando tactics."  It offers "absolutely the
best firearms training available with numerous NATO and COMMUNIST
firearms."  One can also enroll in a special 30-day course
"designed for the adventurer that demands it all in one course."
Counter terrorist, sniper, and covert operations are some of the
areas covered.  Brigade also offers private instruction for
"Individuals or Groups who desire Total Secrecy and Special
Training.  NO COMMUNISTS, GAYS, ATHIESTS [sic]!!!" are allowed,
and one must be at least 16 years old to attend.[108]

## THE ASSAULT WEAPONS DEBATE

Not surprisingly, the increasing number and subsequent
misuse of assault weapons has resulted in a growing debate over
their place in American society.  The battle lines mirror those
drawn over other such "gun control" issues as waiting periods for
handgun purchases, bans on armor-piercing bullets, and
restrictions on the sale of "plastic" firearms.  On one side of
the debate is America's gun lobby.  The other side consists of
handgun restriction advocates and various police organizations.

America's gun lobby--composed of pro-gun organizations,
manufacturers, and various publications--staunchly opposes any
restrictions on the sale or availability of assault weapons.
The leading voice of dissent belongs to the NRA.  With 2.7
million members and a budget of more than $71 million, the NRA is
America's largest and most powerful pro-gun organization.[109]  In
1987 the organization published a pamphlet entitled Semi-Auto
Firearms--The Citizen's Choice.  A year later the organization
published Semi-Auto Rifles: Data and Comment, a collection of
articles on semi-automatics that had appeared in the NRA's
magazine, The American Rifleman.

In both the pamphlet and the book, the NRA presents the
controversy over assault weapons as a broader attack on all semi-

21

automatic firearms, including hunting rifles with semi-automatic mechanisms. By framing the debate as one concerning all semi-autos, as opposed to a specific category of semi-auto, the NRA is able to present efforts to restrict assault weapons as a threat to hunters. The NRA recognizes the fact that it is far easier to mobilize its membership and non-NRA outdoorsmen with images of banning their trusted hunting rifles as opposed to UZIs or TEC-9s.

The cover of Semi-Auto Firearms--The Citizen's Choice features a duck hunter, duck call in mouth, silhouetted against a bright orange sunrise. In his hand he appears to hold a shotgun. On the first page of the pamphlet, the NRA offers its view of the debate: "The national media and organized 'gun control' groups have advanced from demanding prohibitions on certain handguns and ammunition, to calls for banning semi-automatic firearms. The pattern is obvious, and the strategy has long been clear--isolate certain types of firearms, label them as inherently 'evil' or 'crime prone,' and then try to segregate and drive a wedge between firearms owners...[110] Fully automatic and high-tech firearms often seen on television programs, and in popular yet violent movies, perpetuate the myth that 'semi-autos' are frequently used for criminal purposes...[111] Even to experts, admittedly, semi-automatic target or sporting rifles such as the AR15 and M1A look like the full-automatic military M16s and M14s. Why not? A civilian jeep looks like a military jeep, a civilian tent looks like a military tent and a civilian shooter at the national Matches at Camp Perry looks very much like his military counterpart."[112]

(The NRA's stand on assault weapons is not surprising considering the fact that it has labeled repeal of the 1986 federal ban on the future production of machine guns for civilian use a "high priority."[113] In outlining its position on machine guns, the organization states, "Sporting events involving automatic firearms are similar to those events such as silhouette shooting and other target-related endeavors and deserve the same respect and support."[114] The NRA promises that it "will take all necessary steps to educate the public on the sporting uses of automatic firearms"[115] and explains that "The Second Amendment is not limited by its language to the type of arms that the people have the right to own."[116] The organization supports "the right of any law abiding individuals to own any firearms, including automatic firearms."[117]) (Although the NRA was asked to answer questions regarding its stand on assault firearms, the appropriateness of Soldier of Fortune publisher Robert K. Brown being on its board of directors, paramilitary accessories, and paramilitary training camps, a spokesman, after reviewing the questions, stated that the NRA was "declining to provide information for this report.")

While the NRA struggles to turn the assault weapons debate into a semi-auto debate for public relations purposes, legislators and members of the press have been making it into one

inadvertently. Neither of America's national handgun
restriction organizations has come out in favor of restricting or
banning all semi-autos, and have only recently begun dealing with
long guns (there is no national organization calling for
restrictions on all guns). Yet in discussions of assault
firearms, those urging restrictions on these weapons have used
the terms assault, paramilitary, and semi-automatic weapon
interchangeably. This misusage apparently stems from an
unfamiliarity with weapons terminology and a lack of
understanding of the wide range of weapons covered by the term
semi-automatic. As the result of this lack of knowledge, and the
difficulties in defining assault weapons in legal terms, laws
have been proposed on the state level that would place waiting
periods on all semi-auto weapons. In August 1988, The New York
Times ran two editorials in favor of such a law on the federal
level, as well as urging a ban on the sale of assault weapons.[118]

According to John Hosford, executive director of the
Citizens Committee for the Right to Keep and Bear Arms (CCRKBA),
a 500,000 member pro-gun organization located in Bellevue,
Washington, the issue of paramilitary weapons will be addressed
at the organization's board meeting in September 1988. Says
Hosford, "It would be safe to say that we will take an aggressive
position in support of these." Founded in 1971, the CCRKBA
favors a repeal of the Gun Control Act of 1968 and has lobbied
against gun control ordinances on the local, state, and federal
level.[119]

The 100,000 plus-member Gun Owners of America (GOA),
located in Springfield, Virginia, views the assault weapons
debate as part of a long-range plan by handgun restriction
advocates to disarm America. Says GOA Director of Government
Affairs Craig Markva, "The goal was to target the machine guns
first, then the semi-autos, and right along with the handguns.
The whole premise [of handgun restriction organizations] has been
based upon the fact that the Second Amendment is a hunting
right." But Markva argues, "the whole idea of the Second
Amendment is self-defense. The goal of the anti-gunner is to
isolate different categories of firearms for control or banning,
and them move on. The slippery slope is alive and well and
continues rolling on."

America's handgun restriction movement has been cautious
in its response to the assault weapons debate. Their reticence
is understandable. By moving against a category of firearm that
is not only a long gun, but difficult to define, they run the
risk of appearing to prove the gun lobby right: that is, that
handgun restrictions are merely the first step down the
aforementioned slippery slope.

In the past, the "gun control" debate was easily defined.
"Good" guns were long guns that were used for hunting and
sporting purposes, while "bad" guns were easily concealable
handguns that had limited sporting use and were prone to misuse.

Previously, the standard for restricting weapons involved
concealability and a cost/benefit analysis:  Is the harm done by
a given category of firearm outweighed by any possible benefit?
Yet, although assault weapons are frequently misused and many are
more concealable than standard long guns, a new standard is
emerging:  For what purpose was this weapon designed?  The first
application of this standard came in 1986, when Congress voted to
outlaw the future production of machine guns for civilian use.
The number of criminal incidents involving legally owned machine
guns prior to the ban had been few.  Yet, Congress saw no reason
for this category of weapon to remain in civilian hands.

Handgun Control Inc. (HCI), based in Washington, D.C., is
America's leading handgun restriction organization.  The
organization has more than 180,000 dues-paying members and an
annual budget of more than $4 million.  Its vice-chair is Sarah
Brady, wife of White House press secretary James Brady, who was
injured in the March 1981 assassination attempt on President
Reagan.  In its organization literature, HCI calls for the
"restriction on the sale of UZI-type assault weapons, the
weapons of war like that used in the 1983 McDonald's massacre in
California."  The organization adopted this stand in 1983.
Recently, HCI has run newspaper ads calling for unspecified
restrictions on assault weapons, labeling them "drug guns."  In
addition, HCI came out in favor of banning the Striker-12 from
import.  In addition to its stand on "UZI-type assault weapons,"
the organization favors a waiting period with background check
for all handgun purchases, a ban on the sale of snub-nosed
handguns, and a ban on the production and sale of plastic
handguns.[120]

The National Coalition to Ban Handguns (NCBH), based in
Washington, D.C., is a coalition of 31 national religious,
professional, educational, and public health organizations that
favors banning the sale and private possession of handguns in
America.  Exceptions to this would include possession by police,
military personnel on active duty, target shooters who keep and
use their handguns at bona fide shooting clubs, and federally
licensed collectors.  NCBH has approximately 20,000 members and
an annual budget of $400,000.  Prior to 1985, the organization
dealt only with handguns.  But in May of that year, its board
voted to work to ban the sale and private possession of machine
guns.  Currently, its board is considering whether to endorse
banning the sale and private possession of assault weapons.  It
is scheduled to reach a decision at its November 1988
meeting.[121]

The Law Enforcement Steering Committee is the leading
voice of law enforcement on the gun control issue.  The Committee
consists of:  the Federal Law Enforcement Officers Association;
the International Association of Chiefs of Police; the Fraternal
Order of Police; the International Brotherhood of Police
Officers; the National Association of Police Organizations; the
Police Executive Research Forum; the Police Management

24

Association; the Police Foundation; the Major Cities Chief
Administrators; the National Organization of Black Law
Enforcement Executives; and the National Troopers Coalition.[122]
As of September 1988, none of the members of the Committee have
adopted an official stand on assault weapons, although the topic
is scheduled to be discussed in the future.[123]

On the federal level, no bills dealing with assault
weapons have yet been introduced in Congress. It is expected
that such a bill will be introduced sometime during 1989.

On the state level, the first proposed law restricting the
availability of assault weapons was introduced by California
State Representative Art Agnos (Dem., San Francisco) in 1985.
(Agnos was elected mayor of San Francisco in 1987.) The law,
which would have banned the sale and possession of specific
assault weapons--such as the UZI, MAC, and AR-15--failed to pass.
In 1988, Assemblyman Michael Roos (Dem., Los Angeles) introduced
a measure that also would have banned specific assault weapons.
The bill was later amended to require instead a 15-day waiting
period with background check for all semi-automatic weapons. The
amended version of the bill failed to pass. Roos expects to file
a bill next year that would place a waiting period on specific
assault weapons.[124]

In addition, product liability lawsuits have been filed
against manufacturers of assault weapons. Such suits are based
on the legal theory that the manufacturers of these weapons know
that their products are inherently dangerous and prone to
criminal misuse. Therefore, they should be held responsible for
the resulting death and injury. One of the first product
liability suits dealing with an assault weapon was filed on April
22, 1987, against Intratec USA, manufacturers of the TEC-9. The
suit was filed by the estate of David L. Bengston of Connecticut.
Bengston, a high school janitor, was fatally shot by an eighth
grader on December 10, 1985, with a TEC-9 that belonged to the
student's father. The student later held a classroom of children
hostage until his father came and convinced him to turn over the
weapon. In their complaint, attorneys for Bengston argued that
the TEC-9 is in fact a super Saturday Night Special. The case is
currently awaiting trial.[125]

The first victory for proponents of the legal theory that
some handguns are inherently defective because of specific design
characteristics occurred on October 3, 1985, when the Maryland
Court of Appeals ruled in Kelley v. R. G. Industries that
manufacturers of Saturday Night Specials could be held liable for
their criminal misuse. The case stemmed from a March 1981
robbery in which the plaintiff, Olen J. Kelley, was shot in the
chest with a Rohm handgun.[126] (As part of the law outlawing the
sale of Saturday Night Specials passed in Maryland in 1988, the
Maryland legislature--as part of a compromise with the gun lobby-
-added a component that would in effect nullify the Kelley
decision.)

The signs are increasing of a growing awareness that America has an assault weapons "problem." At the end of its July 1988 documentary on handgun violence in America, "Guns, Guns, Guns," NBC reporter Connie Chung notes the increasing misuse of assault weapons like the UZI.[127] In his speech at the Democratic National Convention, Democratic presidential candidate Jesse Jackson, states of drug dealers, "They say, 'We don't have Saturday Night Specials any more.' They say, 'We buy AK-47s and UZIs, the latest lethal weapons. We buy them across the counter on Long Beach Boulevard.' You cannot fight a war on drugs unless and until you are going to challenge the bankers and the gun sellers...."[128]

**CONCLUSION**

Assault weapons are increasingly being perceived by legislators, police organizations, handgun restriction advocates, and the press as a public health threat. As these weapons come to be associated with drug traffickers, paramilitary extremists, and survivalists, their television and movie glamour is losing its lustre to a violent reality.

Because of this fact, assault weapons are quickly becoming the leading topic of America's gun control debate and will most likely remain the leading gun control issue for the near future. Such a shift will not only damage America's gun lobby, but strengthen the handgun restriction lobby for the following reasons:

o      It will be a new topic in what has become to the press and public an "old" debate.

Although handguns claim more than 20,000 lives year, the issue of handgun restriction consistently remains a non-issue with the vast majority of legislators, press, and public. The reasons for this vary: the power of the gun lobby; the tendency of both sides of the issue to resort to sloganeering and pre-packaged arguments when discussing the issue; the fact that until an individual is affected by handgun violence he or she is unlikely to work for handgun restrictions; the view that handgun violence is an "unsolvable" problem; the inability of the handgun restriction movement to organize itself into an effective electoral threat; and the fact that until someone famous is shot, or something truly horrible happens, handgun restriction is simply not viewed as a priority. Assault weapons--just like armor-piercing bullets, machine guns, and plastic firearms--are a new topic. The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons--anything that looks like a machine gun is assumed to be a machine gun--can only increase the chance of public support for restrictions on these weapons. In

addition, few people can envision a practical use for
these weapons.

o    Efforts to stop restrictions on assault weapons will only
     further alienate the police from the gun lobby.

         Until recently, police organizations viewed the gun
lobby in general, and the NRA in particular, as a reliable
friend.  This stemmed in part from the role the NRA
played in training officers and its reputation regarding
gun safety and hunter training.  Yet, throughout the
1980s, the NRA has found itself increasingly on the
opposite side of police on the gun control issue.  Its
opposition to legislation banning armor-piercing
ammunition, plastic handguns, and machine guns, and its
drafting of and support for the McClure/Volkmer handgun
decontrol bill, burned many of the bridges the NRA had
built throughout the past hundred years.  As the result of
this, the Law Enforcement Steering Committee was formed.
The Committee now favors such restriction measures as
waiting periods with background check for handgun
purchases, and a ban on machine guns and plastic firearms.
If police continue to call for assault weapons
restrictions, and the NRA continues to fight such
measures, the result can only be a further tarnishing of
the NRA's image in the eyes of the public, the police, and
NRA members.  The organization will no longer be viewed as
the defender of the sportsman, but as the defender of the
drug dealer.

o    Efforts to restrict assault weapons are more likely to
     succeed than those to restrict handguns.

         Although the majority of Americans favor stricter
handgun controls, and a consistent 40 percent of
Americans favor banning the private sale and possession of
handguns,[129] many Americans do believe that handguns are
effective weapons for home self-defense and the majority
of Americans mistakenly believe that the Second Amendment
of the Constitution guarantees the individual right to
keep and bear arms.[130]  Yet, many who support the
individual's right to own a handgun have second thoughts
when the issue comes down to assault weapons.  Assault
weapons are often viewed the same way as machine guns and
"plastic" firearms--a weapon that poses such a grave risk
that it's worth compromising a perceived constitutional
right.

         Although the opportunity to restrict assault weapons
exists, a question remains for the handgun restriction movement:
How?  Defining an assault weapon--in legal terms--is not easy.
It's not merely a matter of going after guns that are "black and
wicked looking."  Although those involved in the debate know the
weapons being discussed, it's extremely difficult to develop a

27

legal definition that restricts the availability of assault
weapons without affecting legitimate semi-automatic guns.  Most
likely, any definition would focus on magazine capacity, weapon
configuration, muzzle velocity, the initial purpose for which the
weapon (or its full-auto progenitor) was developed,
convertibility, and possible sporting applications.  Any law
based on this definition would, however, need to have a clause to
excuse legitimate semi-automatic weapons that would inadvertently
fall under it.  And although legislation could be passed that
would ban specific weapons, the world's arms manufacturers are
expert at producing weapons that follow the letter, but not the
intent, of the law.  This often results in products that are
virtually identical to the restricted weapon, yet different
enough to remain on the market.

Yet, the framework for restricting assault weapons already
exists.  On the federal level, ATF currently excludes from import
handguns recognized as Saturday Night Specials.  This is done by
application of criteria designed by the agency that takes into
account such things as barrel length, caliber, quality of
materials, safety devices, and other factors.  Any gun that does
not meet the importation threshold cannot be sold in the United
States.  Any manufacturer whose product is refused for import
can challenge the decision in federal court.  Criteria to
identify and categorize assault weapons could be developed by ATF
and applied toward restricting the availability of both foreign-
and domestically-produced assault weapons.

The state of Maryland has taken a similar approach in
banning the sale of Saturday Night Specials.  The 1988 Maryland
law established a nine-member board responsible for creating a
roster of permitted handguns.  The nine members of the board
include:  the superintendent of the state police; representatives
of the Maryland States' Attorney's Association, Maryland
Association of Chiefs of Police, Marylanders Against Handgun
Abuse, the National Rifle Association, and a Maryland gun
manufacturer; and three citizen board members to be determined by
the governor.  After January 1, 1990, the law requires that no
person in Maryland may:  manufacture a handgun not on the Handgun
Roster, or sell or offer to sell any handgun not on the Handgun
Roster that was manufactured after January 1, 1985.  In
determining whether a handgun has a legitimate use and can
therefore be placed on the roster, the board will consider:
concealability; ballistic accuracy; weight; quality of materials;
quality of manufacture; and reliability as to safety, caliber,
and detectability by standard security devices used at airports
and courthouses.[131]  States could develop similar rosters to ban
the sale of assault weapons.

Since passage of the Maryland law, the NRA has collected
enough signatures of Maryland residents to bring the measure to
referendum on the November 1988 ballot. The NRA's opposition to
such a panel is not surprising. The organization fears giving
the government, at any level, the power to restrict the

availability of firearms--conjuring up images of a "gun czar."
And although such proposals would solve the definitional problems
posed by assault weapons, it would guarantee fierce opposition
from the gun lobby.

The success of any proposed legislation to restrict
assault weapons and their accessories depends not only on
whether the American public pays attention to the topic, but
agrees that these products are dangerous.  Obviously, some
aspects of America's fascination with assault weapons and their
accessories are here to stay.  Publications are clearly protected
under the First Amendment of the Constitution.  Yet the weapons
themselves, and accessories such as laser sights and grenades
requiring only the explosive charge, can be restricted and even
banned at the local, state, or federal level.  The fact that
assault weapons are increasingly being equated with America's
drug trade may play a major role in motivating the public to call
for their restriction.  Yet, recognizing the country's
fascination for exotic weaponry and the popular images and myths
associated with guns, it may require a crisis of a far greater
proportion before any action is taken.

**APPENDIX I**

According to law enforcement officials, federal agencies, and handgun control organizations, the assault weapons of choice appear to be the following (all models are semi-automatic versions):

AK-47--The Kalashnikov rifle, also known generally as the AK-47, was developed in the Soviet Union in 1947 by Mikhail T. Kalashnikov. Semi-automatic versions of a Chinese model--the Model 56--are currently imported into the United States, as are models developed by other countries. The Chinese AK-47 produced by POLY Technologies and distributed in the United States by PTK International, Inc., is 34 3/8 inches long. With a folding stock, the weapon has an overall length of 34 5/8 with the stock extended, and approximately 30 inches folded. The weapon can accept 20-, 30-, 40-, and 75-round magazines.[132] Semi-automatic versions of the AK-47 retail for as little as $300.[133]

AR-15A2--The AR-15A2, commonly known as the AR-15, is manufactured by Colt Industries of Hartford, Connecticut. It is the civilian version of the company's M-16 machine gun. The AR-15A2 rifle has an overall length of 39 inches. The Government Model Carbine comes with a folding stock. Its overall length with the stock folded is 35 inches, 32 closed. In 1987 the company introduced the Delta HBAR, a sniper rifle version of the rifle. The weapon comes with a 5-round magazine, but can accept a variety of high-capacity magazines.[134] The AR-15A2 retails for approximately $680.

MAC-10, MAC-11--The MAC-10 machine pistol was originally developed by Gordon Ingram at Military Armaments Corporation (MAC) in 1969. Soon thereafter, the MAC-11 was marketed and subsequently semi-auto versions of both were developed. MAC went bankrupt in 1978. Currently, the rights for the MAC-10 are owned by a Stephensville, Texas, company which took the Military Armaments Corporation name. Manufacturing rights for the MAC-11 now belong to various corporate entities operated by Sylvia and Wayne Daniels of Georgia.[135] An ad placed in Shotgun News for the semi-auto 9mm M11/9 produced by the Daniels, describes it as "The Gun That Made the '80's' Roar" and characterizes it as being as "American as God, Mom, and Apple Pie!"[136] The 9mm MAC-11 is 12.15 inches long. It comes with a 32-round magazine. The 9mm MAC-10 has a length of 10.5 inches with its stock folded and comes with a 32-round magazine. Both have threaded barrels for the attachment of silencers and barrel extensions.[137] The MAC-11 can retail for as little as $200.

**RUGER MINI-14**--The Ruger Mini 14 is manufactured by Sturm, Ruger & Company, Inc. of Southport, Connecticut, and was introduced into the civilian market in 1975. With a folding stock, the weapon has an overall length of 37.75 inches, 27.5 with the stock closed. The gun comes with a standard 5-round magazine, but magazines have been developed for it that can hold up to 40 rounds.[138] The Mini-14 retails for approximately $330.

**TEC-9**--The 9mm TEC-9 assault pistol was originally developed by Interdynamics AB of Sweden and produced in the U.S. by F.I.E. of Florida. The original version, the KG-9, was easily converted to full auto and was subsequently reclassified as a machine gun by ATF in 1982. Soon after, the weapon was redesigned to sell as a semi-auto and reclassified the KG-99. Subsequently, a Hong Kong company bought the rights to the weapon from Interdynamics AB and a new company, Intratec USA, was formed in the United States to manufacture the weapon, now dubbed the TEC-9. In November of 1987, Intratec USA reorganized to become Intratec. Twelve and a half inches long, the lightweight TEC-9 comes with a 36-round magazine. The TEC-9M, a smaller version of the weapon, is 10.5 inches long. Both have threaded barrels so that they can accept silencers and barrel extensions. High-impact plastic is used for the gun's receiver, magazine well, and pistol grip.[139] Promotional material for the guns describe them as being "high-spirited" and "weapons that are as tough as your toughest customers."[140] The TEC-9 retails for approximately $250.

**UZI**--Manufactured by Israeli Military Industries, the 9mm UZI was designed in the early 1950s by Army Major Uziel Gal. In 1979, a semi-automatic version was first imported to the United States for civilian sale by Action Arms of Philadelphia. The UZI semi-auto carbine has an overall length of 24.4 inches with its stock folded, 31.5 with the stock open, and comes with a standard 25-round magazine. In 1984, the company introduced the UZI pistol, which has an overall length of 9.45 inches. In 1987, Israeli Military Industries introduced the Mini-UZI carbine, which with its stock folded has an overall length of 26.1 inches, 35.75 with the stock unfolded.[141] A 1988 Action Arms ad for the UZI exclaims, "When the going gets tough...the tough get an UZI. Whether for a backwoods camp, RV or family home, don't trust anything less. The UZI Carbine is the perfect choice for the sportsman who wants unfailing reliability and top performance in a rugged, compact size." With a kit that will allow the weapon to use .22 ammunition, the gun becomes "an inexpensive plinker."[142] The UZI carbine retails for approximately $700, the pistol for $510.

**APPENDIX II**

Paramilitary weapons are just the latest topic in the ongoing debate over the role of specific categories of firearms in American society. Unfortunately, there is often confusion among the press and public--and even among handgun restriction advocates--regarding the various types of firearms. In an article published in the April 1987, American Rifleman, National Rifle Association staff member Paul Blackman writes, "When a reporter calls a semi-automatic rifle, pistol or shotgun a "submachine gun"...He may just not know any better." Blackman's right. He points out that The Associated Press Stylebook and Libel Manual incorrectly defines a "submachinegun" as "A lightweight automatic or semiautomatic gun firing small arms ammunition."[143]

Recognizing this, descriptions of the various categories of firearms are as follows:

Firearms refer to weapons that use a powder charge to fire a projectile. (Airguns such as BB and pellet guns use a burst of air to fire their projectiles and hence are not considered firearms, although they are capable of inflicting severe or fatal injuries.)

Firearms have been broken down into essentially two groups: long guns and handguns. Long guns are weapons designed to be fired from the shoulder. According to ATF standards, to qualify as a rifle, the shoulder-fired weapon must have a barrel length of 16 inches, 18 inches for a shotgun.[144] Handguns are firearms designed to be fired from a single hand and are usually defined as having an overall length of less than 18 inches.[145] Repeating firearms are those that allow the shooter, by operating a mechanism on the gun, to load another round into the gun after a shot has been fired. Manually operating the bolt, lever, pump, or other mechanism extracts and ejects the empty case after the cartridge has been fired. It then reloads a fresh shell or cartridge from the magazine into the chamber and cocks the gun. Semi-automatic guns do this automatically when they fire. With each squeeze of the trigger the semi-automatic repeats the process of firing, ejecting, and reloading.[146] Although a semi-automatic will fire only one cartridge per trigger pull, an automatic will continue to fire cartridges as long as the trigger is pulled. An automatic is also known as a machine gun. More than 119 million rifles and shotguns have been produced in the U.S. since 1899.[147] It is estimated that the majority of these weapons remain in circulation.

Handguns can be either revolvers or semi-automatic pistols. Revolvers have a round cylinder that is actually the magazine and acts as a chamber when properly aligned with the barrel. In double-action revolvers, each time the trigger is pulled the weapon fires and the cylinder advances to the next chamber. Single-action revolvers require that the hammer be

manually cocked before each shot.  A revolver's cylinder usually holds six cartridges.  Instead of a revolving cylinder, a semi-automatic handgun (also known as a pistol) carries its extra cartridges in a magazine usually located in the handle of the handgun.  Spring pressure forces the cartridges upward in the magazine.  Each time the weapon is fired, a new cartridge is moved up and is loaded into the chamber.  Pistol magazines usually hold between 14 and 17 cartridges.[148]  Pistols are often known as "automatics" although they do require a separate trigger pull for each shot.  Pistols that <u>are</u> fully-automatic, that is, that will continue to fire as long as the trigger is pulled, are known as machine pistols.

Handguns with barrel lengths of three inches or less are known as "snubbies."  Snubbies are preferred by criminals because of their increased concealability.  A subcategory of snubbies are Saturday Night Specials--inexpensive, inaccurate snubbies made of inferior materials.  Because of their low quality and inaccuracy, these weapons have no sporting purpose and are best suited for criminal use.  There are an estimated 35 to 40 million handguns in America.[149]

Assault firearms are semi-automatic (firing one bullet per trigger pull) and fully automatic (the weapon will keep on firing as long as the trigger is depressed) anti-personnel rifles, shotguns, and handguns that are designed primarily for military and law enforcement use.  With muzzle velocities that are often greater than standard long guns, and high-capacity ammunition magazines, assault weapons are built to kill large numbers of human beings quickly and efficiently.  Most assault weapons have no legitimate hunting or sporting use.  Assault rifles and shotguns often have pistol grips and folding stocks, and are typically lighter and more concealable than standard long guns.  Some assault pistols have threaded barrels for the easy attachment of silencers.  Many assault weapons are merely semi-automatic versions of military machine guns, making them easier to convert to fully automatic machine guns.

1.    McNamara, Joseph D., "Developing a Rational, National Firearms Policy," The Police Chief, (March 1988), p. 26.

2.    It was estimated by the National Coalition to Ban Handguns in 1985 that there were more than 500,000 assault weapons in civilian hands, an unknown number of which had been converted to fully automatic machine guns, a figure which the Bureau of Alcohol, Tobacco and Firearms concurred with. Recent estimates in the press (See footnote #5) have put the figure at between 650,000 and two million. Because of the fact that manufacturers are not required to release sales figures and there is no differentiation between standard long guns and assault weapons in reporting, there are no totally reliable figures on America's assault weapons population.

3.    McNamara, p. 26.

4.    "Virginia Man Held for Transporting Guns," The Washington Post, (January 30, 1988), p. A7.

5.    "The Arms Race in Your Own Back Yard," U.S. News & World Report, (April 4, 1988), p. 24.

6.    "Machine Gun U.S.A.," Newsweek, (October 14, 1985), p. 50.

7.    "Three Officers Slain Serving Routine Warrant," United Press International, July 10, 1987. Additional information obtained from the Inkster, Michigan, police department, August 1988.

8.    "11 Hostages Held at Virginia Shopping Mall," The Washington Post, (September 15, 1988) p. A22.

9.    Coates, James, Armed and Dangerous: The Rise of the Survivalist Right, Hill and Wang, New York, (1987), p. 8.

10.   Fox, James Alan and Levin, Jack, Mass Murder: America's Growing Menace, Plenum Press, New York and London, (1985), p. 63.

11.   Interview with David W. Cooney, attorney for the estate of David Bengsten, August, 1988.

12.   "Manassas Mourns 1st Officer Slain in 115 Years," The Washington Post, (July 26, 1988), p. A1, A9.

13.   "Florida Gunman Charged With Killing 6," The New York Times, (April 25, 1987), p. A9.

14.    "Seized Arsenal Tied to "Crack Dealers," The Washington
Post, (March 8, 1988), p. A6.  Additional information
obtained from ATF New York office, September, 1988.

15.    "Arms Race Escalates," The Washington Post, (February 23,
1988), p. B5.

16.    Interview with ATF spokesperson Tom Hill, July 1988.

17.    Interview with Detective Bohannon, July 1988.

18.    Lawn, John C., "Drug Dealers' Sophisticated Weaponry Poses
Continuing Threat," The Police Chief, (March 1988), p. 47.

19.    "D.C. Police to Boost Drug War Firepower," The Washington
Post, (February 10, 1988), p. A1, A12.

20.    "Arms Race Escalates,"  p. B5.

21.    Interview with ATF spokesperson Tom Hill, August 1988.

22.    American Industries advertisement, Firepower, (September
1988), inside back cover.

23.    Information obtained from American Industries, 405 East
19th Street, Bakersfield, California, August 1988.

24.    Street Sweeper advertisement, Shotgun News, (January 20,
1988), p. 154, 155.

25.    "The Arms Race in Your Own Back Yard," p. 24.

26.    Interview with DEA spokesperson Maurice Hill, July 1988.

27.    Interview with ATF spokesperson Tom Hill, July 1988.

28.    McGuire, Phillip C., "Jamaican Posses:  A Call for
Cooperation Among Law Enforcement Agencies," The Police
Chief, (January 1988), p. 22.

29.    Coates, p. 136.

30.    Coates, p. 143.

31.    "Suspect Denies Having Role in Plot to Kill Jackson,"
Detroit Free Press, (May 19, 1988), p. 16A.

32.    Information obtained from the National Coalition to Ban
Handguns.

33.    Information obtained from Bureau of Alcohol, Tobacco and
Firearms.

34.   Information obtained from the Bureau of Alcohol, Tobacco
      and Firearms.

35.   Information obtained from the National Coalition to Ban
      Handguns.

36.   Information obtained from the National Coalition to Ban
      Handguns.

37.   "Militarism in America," <u>The Defense Monitor,</u> Volume XV,
      Number 3, p. 1.

38.   Interview with Daniel Amundson, September 1988.

39.   Interview with Daniel Amundson, July 1988.

40.   Production figures obtained from the Bureau of Alcohol,
      Tobacco, and Firearms by the Educational Fund to End
      Handgun Violence under the Freedom of Information Act.

41.   Information obtained from the National Coalition to Ban Handguns.

42.   Colt Industries advertising flyer.

43.   Heckler & Koch advertising flyer.

44.   F.I.E. advertisement, <u>Firepower,</u> (September 1988), inside
      front cover.

45.   Daisy 1986 Airguns, Ammo and Accessories Catalog.
      Obtained from Daisy Manufacturing Company, Inc., Rogers,
      Arkansas, 72757-0220.

46.   Crosman Airguns 1987 catalog.  Obtained from Crosman
      Airguns, Routes 5 & 20, East Bloomfield, New York, 14443.

47.   Larc International advertisement, <u>Shotgun News,</u> (January
      20, 1988), p. 114.

48.   Command Post, Inc., <u>Firepower,</u> (September 1987), p. 63.

49.   Daisy 1988 Toy Gun Catalog.  Obtained from Daisy
      Manufacturing Company, Inc., Rogers, Arkansas, 72757-0220.

50.   Interview with IACP spokesperson Wendy Howe, July 1987.

51.   Interview with Daisy spokesperson David Lewis, August
      1988.

52.   Interview with Everett Moore, July 1988.

53.   <u>American Survival Guide,</u> (August 1988), p. 4.

54.   <u>American Survival Guide,</u> p. 66.

55.     Interview with <u>American Survival Guide</u> spokesperson, July
        1988.

56.     Adair, James B., "The Amazing Soft-Drink Silencer," <u>Eagle,</u>
        (October 1983), p. 14, 15.

57.     <u>Special Weapons,</u> (1988 annual), inside front cover.

58.     <u>Special Weapons,</u> p. 2.

59.     Steele, David, "The Offensive Handgun," <u>Special Weapons,</u>
        (1988), p. 68.

60.     Steele, p. 69.

61.     Steele, p. 70.

62.     <u>Soldier of Fortune,</u> (August 1988), p. 1.

63.     <u>Soldier of Fortune,</u> p. 1.

64.     "Soldier of Fortune Magazine is Sued Over Slaying," <u>New
        York Times,</u> (February 14, 1988), p. 27.

65.     "Magazine is Ordered to Pay $9.4 <u>Million," The New York
        Times,</u> (March 4, 1988), p. A12.

66.     <u>New Breed,</u> (July/August 1988), p. 5.

67.     Haire, Chad A., "Shot Show 1988," <u>New Breed,</u> (July/August
        1988), p. 16.

68.     Information obtained from the National Coalition to Ban
        Handguns.

69.     J. Bird Manufacturing advertisement, <u>Shotgun News,</u> (July
        20, 1988), p. 78.

70.     National Vanguard Books advertisement, <u>Shotgun News,</u>
        (January 20, 1988), p. 84.

71.     <u>Survival Systems</u> book catalog, #701, (1988), p. 2.
        Obtained from Survival Systems, P.O. Box 30309, Phoenix,
        Arizona, 85046.

72.     <u>Survival Systems,</u> p. 2.

73.     <u>Survival Systems,</u> p. 12.

74.     <u>Survival Systems,</u> p. 12.

75.     <u>Survival Systems</u>, p. 19.

76.    <u>Paladin Press</u> catalog, Vol. 18, No. 1, p. 24.  Obtained
       from Paladin Press, P.O. Box 1307, Boulder, Colorado,
       80306.

77.    <u>Paladin Press</u>, p. 20.

78.    <u>Paladin Press</u>, p. 23.

79.    <u>Paladin Press</u>, p. 26.

80.    <u>Paladin Press</u>, p. 34.

81.    <u>Paladin Press,</u> p. 14.

82.    Desert Publications advertisement, <u>Firepower,</u> (July 1987),
       p. 99.

83.    Interview with Everett Moore, July 1988.

84.    <u>The Right Stuff,</u> Phoenix Systems Inc., p. 14.  Catalog
       obtained from Phoenix Systems Inc., P.O. Box 3339,
       Evergreen, Colorado, 80439.

85.    <u>The Right Stuff,</u> p. 15.

86.    <u>The Right Stuff,</u> p. 18.

87.    <u>The Right Stuff,</u> p. 27.

88.    BMF Activator advertising literature.  Literature received
       from BMF Activator, P.O. Box 262364, Houston, Texas,
       77207.

89.    Orpheus Industries advertising literature.  Literature
       received from Orpheus Industries, P.O. Box 1415, Montrose,
       Colorado, 81402.

90.    Firearms Systems and Design, Inc. advertisement, <u>Shotgun
       News,</u> (June 1, 1988), p. 97.

91.    API Marketing Inc. advertising literature.  Literature
       received from API Marketing Inc., 1600 Monrovia Avenue.,
       Newport Beach, California, 92663.

92.    Kephart Publications advertisement, <u>Shotgun News,</u> (June
       20, 1988), p. 166.

93.    The Anite Co. advertisement, <u>Firepower,</u> (January 1988),
       p. 91.

94.    MWG Company advertisement, <u>Shotgun News,</u> (June 1, 1988),
       p. 148.  Pricing information obtained from MWG Company,
       Miami, Florida, September, 1988.

95.    Mail Order Video advertisement, <u>Firepower,</u> (January 1988), p. 3.

96.    Gilbert, Wayne R., Deputy Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation, opening statement before the Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985).  Obtained from the Center for Defense Information, 1500 Massachusetts Ave., NW, Washington, D.C., 20036.

97.    Denton, Jeremiah, U.S. Senator, statement before the Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985). Obtained from the Center for Defense Information, 1500 Massachusetts Ave., NW, Washington, D.C., 20036.

98.    "Combat Schools Sprout in America's Backwoods," <u>U.S. News & World Report,</u> (October 14, 1985), p. 72.

99.    "Combat Schools Sprout in America's Backwoods,"  p. 73.

100.    "ADL Paramilitary Training Statute:  A Response to Extremism," <u>ADL Law Report,</u> (Fall, 1986), p. 1.  Obtained from the Anti-Defamation League of B'nai B'rith, 823 United Nations Plaza, New York, NY, 10017.

101.    "ADL Paramilitary Training Statute:  A Response to Extremism," p. 1.

102.    Hartnett, Daniel M., Acting Deputy Associate Director, Law Enforcement, Bureau of Alcohol, Tobacco and Firearms, statement before Subcommittee on Security and Terrorism, Committee on the Judiciary, United States Senate, (October 2, 1985).  Obtained from Center for Defense Information, 1500 Massachusetts Avenue, NW, Washington, DC, 20036.

103.    "ADL Paramilitary Training Statute:  A Response to Extremism," p. 3.

104.    Press Release, Anti-Defamation League of B'nai B'rith, (October 30, 1986).

105.    "ADL Paramilitary Training Statute:  A Response to Extremism," p. 4.

106.    "ADL Paramilitary Training Statute:  A Response to Extremism," p. 7-12.  Additional information obtained from ADL, July, 1987.

107.    "Paramilitary Training Legislation" fact sheet, National Rifle Association, p. 1.  Received from the National Rifle Association Institute for Legislative Action, 1600 Rhode Island Avenue, NW, Washington, D.C., 20036.

108.  Brigade Security Forces pamphlet.  Literature received
      from Brigade Security Forces, P.O. Box 1237, Mooresville,
      North Carolina, 28115.

109.  Information obtained from the National Coalition to Ban
      Handguns.

110.  Semi-Auto Arms--The Citizen's Choice, National Rifle
      Association Institute for Legislative Action, (June
      1987), p. 1.

111.  Semi-Auto Firearms--The Citizen's Choice, p. 11.

112.  Semi-Auto Firearms--The Citizen's Choice, p. 17.

113.  "NRA to Fight Machine Gun Ban," Monitor, Volume 13, Number
      13, (August 15, 1986), p. 1.  The Monitor is a publication
      of the National Rifle Association's Institute for
      Legislative Action.

114.  "NRA to Fight Machine Gun Ban," p. 3.

115.  "NRA to Fight Machine Gun Ban," p. 3.

116.  "NRA to Fight Machine Gun Ban," p. 3.

117.  "NRA to Fight Machine Gun Ban," p. 1.

118.  "Drug Thugs and Rambo Guns," The New York Times, (August
      1, 1988), p. A14; "War on Drugs, War on Guns," The New
      York Times, (August 28, 1988), p. 22.

119.  Interview with Citizens Committee for the Right to Keep
      and Bear Arms Executive Director John Hosford, July 1988.
      Additional information obtained from staff member Jan
      Grant, September 1988.

120.  Handgun Control Inc. organization brochure, obtained from
      Handgun Control Inc., 1225 I Street, NW, Suite 1100,
      20005.  Additional information obtained from HCI
      Communications Director Barbara Lautman.

121.  Interview with National Coalition to Ban Handguns
      President Michael K. Beard, September, 1988.

122.  Interviews with Arnetta Porter, Police Foundation, 1001
      22nd Street, NW, Suite 200, 20037, August 1988, September
      1988.

123.  Interview with Martha Plotkin, Police Executive Research
      Forum, 2300 M Street, NW, Suite 910, Washington, D.C.,
      20037, August 1988.

124.  Interview with Helen Mansfield, office of California
      Assemblyman Michael Roos, August 1988.

125.  Interview with David Cooney, attorney for the estate of
      David Bengston, August 1988.

126.  "Maryland Court Ruling Could Ban Handguns," The Banner,
      (1985), p. 1.  The Banner is the newsletter of the
      National Coalition to Ban Handguns.

127.  "Guns, Guns, Guns," NBC News documentary, July 5, 1988.

128.  "Jackson Talks of Hope, Dreams As He Weaves 'Quilt of
      Unity,'" Congressional Quarterly, (July 23, 1988),
      p. 2059.

129.  "Public Continues to Favor Stringent Curbs on Handguns,"
      The Gallup Poll, (May 11, 1986).

130.  Information obtained from the National Coalition to Ban
      Handguns.

131.  "The Maryland Handgun Roster Law," press release, issued
      by the Office of the Attorney General, Baltimore,
      Maryland.

132.  Long, Duncan, Assault Pistols, Rifles and Submachine Guns,
      Citadel Press, Secaucus, (1986), p. 89-98.  Additional
      information obtained from PTK International, Inc., 2814
      New Spring Road, Suite 340, P.O. Box 724827, Atlanta,
      Georgia, 30339.

133.  All prices quoted are based on information received from
      Virginia and California gun stores.

134.  Information obtained from Colt Industries, P.O. Box 1868,
      Hartford, CT, 06101.

135.  Long, p. 21-24.  Additional inform from firearms product
      liability attorney D. Michael Hancock, September 1988.

136.  Cobray advertisement, Shotgun News, (July 1, 1988),
      p. 143.

137.  Long, p. 21-24.

138.  Information obtained from Sturm, Ruger & Company,
      Southport, Connecticut, 06490.

139.  Long, p. 41-43.  Additional information obtained from
      Intratec, 11990 S.W. 128 Street, Miami, Florida, 33186.

140.  Intratec advertising brochure.  Obtained from Intratec, 11990 S.W. 128 Street, Miami, Florida, 33186.

141.  Long, p. 48-51.  Additional information obtained from Action Arms, P.O. Box 9573, Philadelphia, Pennsylvania, 19124, August 1988.

142.  Action Arms advertisement, <u>Gun World,</u> (April 1988), p. 35.

143.  Blackman, Paul, "Mugged by the Media," <u>American Rifleman,</u> (April 1987), p. 34.

144.  Information obtained from Bureau of Alcohol, Tobacco and Firearms.

145.  Information obtained from the National Coalition to Ban Handguns.

146.  <u>Hunting Safety and Conservation Program,</u> National Rifle Association, (1973, revised 1976), p. 19.

147.  Information obtained from Bureau of Alcohol, Tobacco and Firearms.

148.  <u>Hunter Safety and Conservation Program,</u> p. 20.

149.  Information obtained from the National Coalition to Ban Handguns.

# EXHIBIT E

# BULLET HOSES
## SEMIAUTOMATIC ASSAULT WEAPONS



## What Are They? What's So Bad About Them?



Violence Policy Center

**The Violence Policy Center (VPC)** is a national non-profit educational organization that conducts research and public education on firearms violence and provides information and analysis to policymakers, journalists, advocates, and the general public.  The Center examines the role of firearms in America, analyzes trends and patterns in firearms violence, and works to develop policies to reduce gun-related death and injury.

This report was authored by VPC Senior Policy Analyst Tom Diaz and edited by VPC Publications Coordinator Aimée Stenzel.

This study was funded in part with the support of The David Bohnett Foundation, The California Wellness Foundation, The George Gund Foundation, The Joyce Foundation, The John D. and Catherine T. MacArthur Foundation, and The Streisand Foundation.  Past studies released by the VPC include:

*   *"Officer Down"—Assault Weapons and the War on Law Enforcement* (May 2003)
*   *Firearms Production in America 2002 Edition—A Listing of Firearm Manufacturers in America with Production Histories Broken Out by Firearm Type and Caliber* (March 2003)
*   *"Just Like Bird Hunting"—The Threat to Civil Aviation from 50 Caliber Sniper Rifles* (January 2003)
*   *When Men Murder Women:  An Analysis of 2000 Homicide Data* (October 2002)
*   *No Deal:  The Drop in Federally Licensed Firearms Dealers in America* (September 2002)
*   *Sitting Ducks—The Threat to the Chemical and Refinery Industry from 50 Caliber Sniper Rifles* (August 2002)
*   *License to Kill IV:  More Guns, More Crime* (June 2002)
*   *American Roulette:  The Untold Story of Murder-Suicide in the United States* (April 2002)
*   *The U.S. Gun Industry and Others Unknown—Evidence Debunking the Gun Industry's Claim that Osama bin Laden Got His 50 Caliber Sniper Rifles from the U.S. Afghan-Aid Program* (February 2002)
*   *"A .22 for Christmas"—How the Gun Industry Designs and Markets Firearms for Children and Youth* (December 2001)
*   *Kids in the Line of Fire:  Children, Handguns, and Homicide* (November 2001)
*   *Unintended Consequences:  Pro-Handgun Experts Prove That Handguns Are a Dangerous Choice For Self-Defense* (November 2001)
*   *Voting from the Rooftops:  How the Gun Industry Armed Osama bin Laden, Other Foreign and Domestic Terrorists, and Common Criminals with 50 Caliber Sniper Rifles* (October 2001)
*   *Shot Full of Holes:  Deconstructing John Ashcroft's Second Amendment* (July 2001)
*   *Hispanics and Firearms Violence* (May 2001)
*   *Where'd They Get Their Guns?—An Analysis of the Firearms Used in High-Profile Shootings, 1963 to 2001* (April 2001)
*   *A Deadly Myth:  Women, Handguns, and Self-Defense* (January 2001)
*   *Handgun Licensing and Registration:  What it Can and Cannot Do* (September 2000)
*   *Pocket Rockets:  The Gun Industry's Sale of Increased Killing Power* (July 2000)
*   *Gunland USA:  A State-by-State Ranking of Gun Shows, Gun Retailers, Machine Guns, and Gun Manufacturers* (June 2000)
*   *Guns For Felons:  How the NRA Works to Rearm Criminals* (March 2000)
*   *One Shot, One Kill:  Civilian Sales of Military Sniper Rifles* (May 1999)
*   *Cease Fire:  A Comprehensive Strategy to Reduce Firearms Violence* (Revised, October 1997)

Violence Policy Center
1140 19th Street, NW, Suite 600
Washington, DC  20036
202-822-8200  phone
202-822-8205  fax
www.vpc.org web

©May 2003
Violence Policy Center

## TEN KEY POINTS ABOUT WHAT ASSAULT WEAPONS ARE
## AND WHY THEY ARE SO DEADLY

This study documents the following 10 important key points on the pages noted.

**1. Semiautomatic assault weapons (like AK and AR-15 assault rifles and UZI and MAC assault pistols) are civilian versions of military assault weapons.** There are virtually no significant differences between them. (Page 1)

**2. Military assault weapons are "machine guns."** That is, they are capable of fully automatic fire. A machine gun will continue to fire as long as the trigger is held down until the ammunition magazine is empty. (Page 1)

**3. Civilian assault weapons are not machine guns.** They are semiautomatic weapons. (Since 1986 federal law has banned the sale to civilians of new machine guns.) The trigger of a semiautomatic weapon must be pulled separately for each round fired. It is a mistake to call civilian assault weapons "automatic weapons" or "machine guns." (Page 1)

**4. However, *this is a distinction without a difference in terms of killing power.*** Civilian semiautomatic assault weapons incorporate all of the functional design features that make assault weapons so deadly. They are arguably more deadly than military versions, because most experts agree that semiautomatic fire is more accurate—and thus more lethal—than automatic fire. (Pages 1, 5-6, 11-14)

**5. The distinctive "look" of assault weapons is not cosmetic. It is the visual result of specific functional design decisions.** Military assault weapons were designed and developed for a specific military purpose—*laying down a high volume of fire over a wide killing zone*, also known as "hosing down" an area. (Pages 2-6)

**6. Civilian assault weapons keep the specific functional design features that make this deadly spray-firing easy.** These functional features also distinguish assault weapons from traditional sporting guns. (Pages 5-10)

**7. The most significant assault weapon functional design features are: (1) ability to accept a high-capacity ammunition magazine, (2) a rear pistol or thumb-hole grip, and, (3) a forward grip or barrel shroud.** Taken together, these are the design features that make possible the deadly and indiscriminate "spray-firing" for which assault weapons are designed. None of them are features of true hunting or sporting guns. (Pages 5-6)

**8. "Spray-firing" from the hip, a widely recognized technique for the use of assault weapons in certain combat situations, has no place in civil society.** Although assault weapon advocates claim that "spray-firing" and shooting from the hip with such weapons is never done, numerous sources (including photographs and diagrams)

i

show how the functional design features of assault weapons are used specifically for this purpose. (Pages 12-14)

**9.  Unfortunately, most of the design features listed in the 1994 federal ban—such as bayonet mounts, grenade launchers, threaded barrels, and flash suppressors—have nothing to do with why assault weapons are so deadly.** As a result, the gun industry has easily evaded the ban by simply tinkering with these "bells and whistles" while keeping the functional design features listed above. (Page 14)

**10.  Although the gun lobby today argues that there is no such thing as civilian assault weapons, the gun industry, the National Rifle Association, gun magazines, and others in the gun lobby enthusiastically described these civilian versions as "assault rifles," "assault pistols," "assault-type," and "military assault" weapons to boost civilian assault-weapon sales throughout the 1980s.** The industry and its allies only began to use the semantic argument that a "true" assault weapon is a machine gun after civilian assault weapons turned up in inordinate numbers in the hands of drug traffickers, criminal gangs, mass murderers, and other dangerous criminals. (Pages 14-16)

## *WHAT IS A SEMIAUTOMATIC ASSAULT WEAPON?*

Semiautomatic assault weapons are civilian versions of automatic military assault rifles (like the AK-47 and the M-16) and automatic military assault pistols (like the UZI).

### Assault Weapons





|  |  |
|---|---|
| **Military AK-47**<br>**Assault Rifle** | **Civilian AK-47**<br>**Assault Rifle** |

These guns look the same because they are virtually identical, save for one feature: military assault rifles (like the rifle on the left above) are machine guns. A machine gun fires continuously as long as its trigger is held back—until it runs out of ammunition. Civilian assault rifles (like the gun on the right) are *semi*-automatic weapons. The trigger of a semiautomatic weapon must be pulled back separately for each round fired.

Because federal law has banned the sale of new machine guns to civilians since 1986,[a] and heavily regulates sales to civilians of older model machine guns, there is virtually no civilian market for military assault weapons. The gun industry introduced semiautomatic versions of military assault weapons in order to create and exploit new civilian markets for these deadly weapons. The next section explains why civilian semiautomatic assault weapons are no less deadly than military automatic assault weapons. In fact, they are arguably even more deadly.

---

[a] See, 18 U.S. Code, Section 922(o).

### *WHAT'S SO BAD ABOUT SEMIAUTOMATIC ASSAULT WEAPONS?*

Assault weapons did not "just happen." They were developed to meet specific combat needs. All assault weapons—military and civilian alike—incorporate specific features that were designed to provide a specific military combat function. That military function is *laying down a high volume of fire over a wide killing zone*, also known as "hosing down" an area. Civilian assault weapons keep the specific design features that make this deadly spray-firing easy. These features also distinguish assault weapons from traditional sporting firearms.

### Assault Weapon Design Follows Specific Combat Function



Assault rifles are used for sustained fire action at relatively close range (under 100 meters being the norm). Here Russian troops engage targets with their AK-47/AKM assault rifles.

Illustration and caption from Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, CO: Paladin Press, 1984): 166.

The distinctive "look" of assault weapons is not merely "cosmetic," as the gun lobby often argues—the assault weapon's appearance is the result of the design of the gun following its function. A brief summary of how assault weapons came into being makes clear the reason for, and the nature of, their distinctive design features.

***The problem of trench warfare.*** The roots of military assault weapons lie in the trench fighting of the First World War. The standard infantry weapon of that conflict was the long-range battle rifle. "Infantrymen in most armies were equipped with high-powered rifles: long, unwieldy, but accurate to ranges of 1,000 m (3,280 ft) or more. But a long weapon was a definite handicap in the close-quarter fighting of the trenches, and long-range capability was wasted when combat usually took place at ranges of tens of metres or less."[1]



**Right—Troops in a World War I trench, fixing bayonets on battle rifles. Below—Springfield Model 1903, the U.S. Army's main battle rifle in World War I.**



***Submachine guns—the intermediate step.*** When armies bogged down in the World War I trenches, weapons designers looked for ways to break the bloody stalemate. Among them was the submachine gun, designed to be a "compact, fast-firing, short-range weapon" for use in the trenches and by highly mobile storm troops in new tactical formations.[2] According to the *Illustrated Book of Guns*, "A submachine gun (SMG) is a close-range, automatic weapon, firing pistol cartridges (e.g., 9mm Parabellum), and is compact, easy to carry, and light enough to be fired from either the shoulder or the hip."[3]

**Among some famous American submachine guns are the more finely machined Thompson, or "Tommy Gun," shown on the right in the hands of British Prime Minister Winston Churchill, and its successor, the mass-produced M3 "Grease Gun," shown below. Both are chambered in .45ACP, a pistol cartridge.**





3

***The final step—the first assault rifle.***   The last step in the evolution of the military assault rifle came during the Second World War.  It grew out of the German military's pre-war interest in "obtaining a relatively high-power intermediate or mid-range cartridge *and corresponding weapon* for infantry application."[4]  (Emphasis added).  On the one hand, the submachine gun was useful in close-range fighting, but the pistol cartridge it fired (typically 9mm) lacked power and range.   On the other, German military thinkers realized that the battle rifle was too much gun for modern combat scenarios:  "Since most infantry action took place at ranges under 400 meters, the long-range potential of the standard cartridge and service rifle were actually wasted."[5]  There were also logistical problems in supplying armies in the field with different kinds of rounds of ammunition:  the larger rifle cartridges for the battle rifle and the smaller pistol cartridges for the submachine guns.[6]





German MP-40 9mm submachine at left, and Mauser Karabiner 98k battle rifle below.  Both guns shown in the field with French Nazi soldiers at right.



The solution to these logistical and firepower problems practically suggested itself:

> Logically, it was inescapable that sooner or later someone would consider a compromise between the long range, powerful, rifle and the rapid fire, but short range, submachine gun.   During their Operation Barbarossa (Russian) campaign and elsewhere, the Germans were continually reminded of the ever-increasing need for a rapid fire arm that was small enough to be convenient to hand carry, but at the same time possessed sufficient range and power to be adequate out to about 200 meters.[7]

The result of German research and development was that very compromise.  It came in the form of the STG (*Sturmgewehr*) ("storm gun") 44, the "father of all assault rifles....After the war it was examined and dissected by almost every major gunmaking nation and led, in one way and another, to the present-day 5.56mm assault rifles."[8]

4

### THE "FATHER OF ALL ASSAULT RIFLES"



Above, the Nazi army's Sturmgewehr (STG) 44, the first assault rifle.
Below, the STG 44 in combat action.



***Deadly designs.*** One thing leaps out from these pictures: the remarkable similarity of the first assault rifle to the assault rifles currently flooding America's streets. This family resemblance is not a coincidence. From the STG-44 "storm gun" to the Bushmaster XM-15, assault weapons have incorporated into their design *specific* features that enable shooters to spray ("hose down") a large number of bullets over a broad killing zone, without having to aim at each individual target. These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger—including firing from the hip, a procedure seldom used in hunting anything but human beings. The most important of these design features are:

o   ***"High-capacity," detachable ammunition magazines*** (often called "clips") that hold as many as 75 rounds of ammunition. "This allows the high volume of fire critical to the 'storm gun' concept."[9]

o   ***A rear pistol grip*** (handle), including so-called "thumb-hole stocks" and magazines that function like pistol grips.

o   ***A forward grip or barrel shroud.*** Forward grips (located under the barrel or the forward stock) "give a shooter greater control over a weapon during recoil."[10] Forward grips and barrel shrouds also make it possible to hold the gun with the non-trigger hand, even through the barrel gets extremely hot from firing multiple rounds. In the case of assault pistols

5

(like the UZI, MAC, and Intratec TEC series) the forward grip often appears as an ammunition magazine or a barrel shroud, a vented tube surrounding the gun barrel.





**Barrel shrouds make it possible to hold a hot barrel during firing (right). Forward pistol grips help control recoil (above). Images and captions from Duncan Long,** ***The Terrifying Three***.[11]

Barrel shrouds like the one on this gun do little ballistically, but they do provide a safe place to rest the off hand for those wishing to grip the barrel of the firearm during firing.



**Military assault rifles, like this Heckler & Koch G41 invariably accept a high-capacity magazine ("clip") and have some form of pistol grip and fore-end grip.**

**Barrel shrouds, like the one on the right sold by Bushmaster Firearms for use on the UZI, are "ventilated all around for maximum heat dissipation."**



These design features create the ability to quickly lay down a high volume of fire, making semiautomatic assault weapons a particularly dangerous addition to the civilian gun market. They explain why assault weapons are favored by terrorists, mass killers, and violent criminals, and they distinguish such weapons from true hunting and target guns.

## MODERN DESCENDANTS OF THE STG-44 ON AMERICA'S STREETS

Most of the assault weapons sold on America's civilian market are semiautomatic descendants of the STG-44. Here are a few of the more popular and notorious.

***Kalashnikov AK-47 and its variants.*** The Soviet Army's AK-47 was derived from the STG-44 shortly after the Second World War, boosted by material and personnel that fell into Soviet hands when the Red Army overran German research and engineering facilities.[12] The AK-47 (in many variants, like the AKM) has become, since the 1940s, the most widely-distributed rifle in the world.[13] According to *The Gun Digest Book of Assault Weapons*:



"The AKM was the revolutionary weapon of the 1960s and '70s, used by everyone from the Viet Cong to the Palestine Liberation fighters. Its comparatively short length and light weight made war more available to Third World women and children, probably not an advance for civilization."[14]

**Above: AK-47, foreground, AKM, upper right background.**

China exported few guns to the United States before the 1980s. But, beginning in 1987, Chinese rifle imports—mostly semi-automatic versions of the AK-47—surged. The flood of Chinese rifles reached 64 percent of all rifles imported into the United States in 1993 and was only cut off by the administration of former President Bill Clinton. (See table at right.)[15]

China accounted for forty-two percent of all rifles imported into the U.S. civilian market between 1987 and 1994, the year in which President Clinton finally blocked the Chinese gun dumping (see Table 8).

Table 8

**Rifle Imports from China to the United States, 1987 - 1994**

|  | Total Rifles Imported | Chinese Rifles Imported | Percent Chinese |
|---|---|---|---|
| 1987 | 452,059 | 100,897 | 22% |
| 1988 | 484,976 | 182,935 | 38% |
| 1989 | 350,012 | 141,382 | 40% |
| 1990 | 273,102 | 31,370 | 11% |
| 1991 | 339,966 | 115,902 | 34% |
| 1992 | 420,085 | 164,271 | 39% |
| 1993 | 764,498 | 490,399 | 64% |
| 1994 | 698,907 | 344,648 | 49% |
| Total | 3,783,605 | 1,571,804 | 42% |

Source: U.S. Census Bureau, Foreign Trade Division

7

***AR-15 Variant of the M-16.***  The U.S. Army's decision in the 1960s to replace its M-14 battle rifle with the M-16 assault rifle was based on reasoning similar to the German army's and highly revealing of the function of assault weapons.  After studying over three million casualty reports from World Wars I and II, and data from the Korean War, the Army's Operations Research Office (ORO) found that, "in the overall picture, aimed fire did not seem to have any more important role in creating casualties than randomly fired shots.  Marksmanship was not as important as volume.  Fire was seldom effectively used beyond 300 meters due to terrain...and [ORO] discovered that most kills occur at 100 meters or less.  From this data, ORO concluded that what the Army needed was a low recoil weapon firing a number of small projectiles....The [Armalite] AR-15 was chosen as the best small caliber weapon and it was adopted as the M16."[16]

**The U.S. Army adopted the M-16 assault rifle, right, in the 1960s.  It saw extensive service during the Vietnam War**.



Another expert's explanation of the Army's reasoning sheds light on one of the principal dangers of assault weapons on civilian streets—"spray and pray" firing:

> The studies showed that...in spite of the huge amounts of money spent by the military services in training combat infantrymen to be marksmen, few were capable of firing effectively beyond ranges of 200 to 300 meters in the heat of battle.  "Spray and pray" would come to be the practice on the future battlefields of Vietnam.[17]



**Books like these two illustrate that there is virtually no difference between the military M-16 and the civilian AR-15, the latter being only slightly modified for sale in the civilian market.  The titles themselves show the popular equivalence.**



The gun industry was quick to begin churning out civilian versions of the M-16, labeling the semiautomatic models the "AR-15," not coincidentally the same name as the prototype version of the military assault rifle.



**Bushmaster's version of the AR-15, left, achieved new heights of notoriety in 2002 when it was revealed that one model was the weapon used by the infamous Washington, DC-area snipers.**

*Assault Pistols—UZI, Ingram, Intratec, and More.* A particularly deadly variant in the gun industry's marketing program has been the sale of civilian assault pistols, which are for the most part simply semiautomatic versions of submachine guns. Firearms expert Duncan Long explained the marketing basis of this trend in his book *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families*:

> As the militaries of the world increasingly rely on assault rifles to fill the submachine gun role, making money on a new submachine gun design becomes harder and harder. Consequently, a number of companies have tried to capture the police and civilian markets....Citizens purchasing firearms for everything from plinking to self-defense have provided a lucrative market, especially in the United States. Those weapons produced for the civilian market are generally semiauto versions of the automatic weapons, often modified slightly to conform to U.S. firearms laws.[18]





**Lagging sales to the military spurred the gun industry to market to civilians semiautomatic versions of assault pistols such as the UZI and Ingram MAC series. Assault pistols like these quickly became the preferred weapon for criminal gangs, fringe groups like militias, and mass murderers.**



*44*                    *THE TERRIFYING THREE*

The size comparison between the TEC-9 and a regular 9mm pistol (shown here is the H&K P7M13) shows one reason why many people prefer guns such as those made by Intratec. The slightly larger size provides better control of the firearm during recoil and the magazine holds more than twice as many rounds. Added to this is the submachine-gun look, which can be intimidating to those unfamiliar with such guns.

**Firearms expert Duncan Long has succinctly summarized the perverse attractions of semiautomatic assault pistols like the Intratec TEC-9 shown above. (Image and caption from Duncan Long, _The Terrifying Three_.)[19]**

10

## THE GUN INDUSTRY'S LIES

The gun industry—aided by its apologists in the gun lobby, the NRA, and the gun press—has tried to divert attention from the inevitable consequences of its cynical marketing of these killing machines, and thwart regulation. This has been done by inventing what can only be fairly described as a series of lies and deceptions about assault weapons and their effects. Some of the more prominent among them are discussed below.

***Is "automatic fire" an essential feature of a "real" assault weapon?*** The answer is, "absolutely not." But that hasn't kept the gun industry from using this line of argument to pretend that civilian assault weapons simply don't exist. The red herring of the automatic fire "issue" was raised by the gun lobby only after civilian assault weapons were widely criticized. This criticism came after mass murderers and drug traffickers began to "hose down" America's streets and schoolyards with civilian assault weapons.



**Military assault weapons, like the M-16 shown above, have a "selective fire" switch to change the mode of fire from semiautomatic to automatic (machine gun).**

This argument is entirely semantic. By limiting the "definition" of assault weapon to military machine guns, the gun industry and its friends hope to define away the problem. But, fully automatic fire has little to do with the killing power of assault weapons. As the leading pro-assault weapons expert Duncan Long wrote in his 1986 publication, *Assault Pistols, Rifles and Submachine Guns*:

> The next problem arises if you make a semiauto-only model of one of these selective-fire rifles. According to the purists, an assault rifle has to be selective fire. Yet, if you think about it, it's a little hard to accept the idea that firearms with extended magazines, pistol grip stock, etc. cease to be assault rifles by changing a bit of metal.[20]

Long's point is well taken because, in fact, military and civilian experts agree that semiautomatic fire is actually *more*—not less—likely to hit the target than is automatic fire, and is thus more deadly.[21] In fact, expert Long wrote about the semiautomatic UZI in another book, "One plus of the semiauto version is that it has a greater potential accuracy...."[22] In any case, a person of moderate skill can fire a semiautomatic assault weapon at an extremely fast rate of fire.[23]

And even if automatic fire were more deadly, many semiautomatic assault weapons not only can be converted to automatic fire with home tools and modest skill, but readily available books and videos walk the would-be converter through the process.



Easily obtained videos and books like these show how to convert semiautomatic assault rifles to fully automatic machine guns (even though semiautomatic fire is more accurate).



***Do assault weapons really encourage "spray firing"?***   Gun industry apologists also disparage the use of such terms as "spray firing" and "shooting from the hip" to describe the deadly capabilities of assault weapons.  But, as was explained earlier, "spray and pray" was exactly the point of developing assault weapons.  And the following illustrations show graphically how specific assault weapons features allow a "point-and-shoot" grip and help control recoil so the shooter can "hose down" a wide area with a lethal "spray" of bullets.

**"Pray and Spray" Hip-Firing**













Deliberate, aimed fire from the shoulder may be more accurate than the kind of "pray

and spray" hip-firing illustrated on the prior page.  But the mass murderers, criminal gangs, drug traffickers, and other violent criminals who are drawn to assault weapons are not after marksmanship medals.  They want to kill or maim as many people as possible in as short a time as possible—the exact job for which the semiautomatic assault weapon was designed.

***But what about harmless bayonet mounts?***  Unfortunately, the 1994 federal assault weapons ban attempted to define assault weapons on the basis of parts usually associated with military weapons, such as grenade launchers, bayonet mounts, and threaded barrels for adding silencers and flash suppressors (to reduce flash from the weapon's muzzle at night).  The problem is that these features have virtually nothing to do with the functional design of the assault weapon.  As a result, gun manufacturers have simply eliminated these "bells and whistles" from their civilian assault weapon designs, while keeping the lethal design factors—high-capacity magazines and pistol grips—that make assault weapons so deadly.  These cosmetic changes meet the letter of the federal law, but accomplish little else.

***Don't gun experts say there is no such thing as a civilian "assault gun?"***  The NRA, the gun industry, the gun press, and other pro-gun "experts" today claim that there is no such thing as a civilian "assault weapon."  But before the guns came under fire, these same experts enthusiastically described exactly these civilian versions as "assault rifles," "assault pistols," and "military assault" weapons.

For example, in 1982, *Guns & Ammo* published a book titled *Assault Rifles*, advertising "complete data on the best semi-automatics."[24]  In 1984, *Guns & Ammo* advertised a similar publication, now titled *Assault Firearms* (see ad on right), "full of the hottest hardware available today....covers the field with...assault rifles from the armies of the world....a new slant on .22s with 'Plinkers in Battle Dress.'  And, if you are interested in survival tactics and personal defense, we'll give you a look at the newest civilianized versions of the semi-auto submachine gun."[25]



In 1988, *Guns & Ammo* handgun expert Jan Libourel defined an "assault pistol" simply as, "A high-capacity semi-automatic firearm styled like a submachine gun but having a pistol-length barrel and lacking a buttstock."[26]  This definition handily fit guns like the UZI and Intratec TEC-9 that were regularly advertised on the pages of *Guns & Ammo* during the 1980s as "assault pistols."  A 1989 ad in *Guns & Ammo* for the Intratec TEC-9 (a precursor to the one used in the 1999 Columbine high school shootings) flatly declared that "the TEC-9 series clearly stands out among high capacity 9mm assault-type pistols."[27]

*Guns & Ammo*, the leading gun magazine, regularly called civilian semiautomatic assault weapons "assault firearms," "assault rifles," and "assault pistols" until a series of tragic shootings caused the industry to deny there was such a thing as a civilian assault weapon.





Gun magazines also specifically praised the spray-fire features of civilian assault weapons. For example, a 1989 *Guns & Ammo* review of the "Partisan Avenger .45 Assault Pistol" (right) noted that when the gun "is fired rapidly from the hip, its swivelling front grip makes for easy and comfortable control of the recoil" and that the "forward pistol grip extension of this powerful assault pistol not only helps point it instinctively at the target but goes a long way to controlling the effects of recoil...."[28] *Guns & Ammo* found hip-shooting "surprisingly easy" with the HK 94 9mm Carbine.[29] A 1990 review in the NRA's *American Rifleman* of the Sites Spectre HC Pistol stated: "A gun like the Spectre is primarily intended for hip-firing...."[30] The same magazine's 1993 review of the Steyr Mannlicher SPP Pistol reported: "Where the SPP really shines is in firing from the hip."[31] A cottage industry of accessory suppliers also sprang up, all of which targeted ads soliciting owners of civilian "assault weapons."[32]



15

The gun industry itself deliberately used the military character of semiautomatic "assault weapons" and the lethality-enhancing utility of their distinctive characteristics as selling points. The German company Heckler & Koch, for example, published ads calling their civilian guns "assault rifles" and stressing their military lineage. "The HK 91 Semi-Automatic Assault Rifle from Heckler & Koch...was derived directly from the G3," a German army weapon, said one full page ad (right).[33] Another described the HK 94 Carbine as "a direct offspring of HK's renowned family of MP5 submachine guns."[34] An Intratec ad said the company's TEC-9 "clearly stands out among high capacity assault-type pistols."[35]    Magnum Research advertised that the Galil rifle system to which it had import rights "outperformed every other assault rifle."[36]

Early gun magazine reviews of assault guns also specifically noted their limited sporting value. For example, the NRA's *American Rifleman* reviewed the Calico M-100 rifle in 1987 and concluded, "The M-100 is certainly not a competition gun, hardly a hunting gun, and is difficult to visualize as a personal defense gun.[37] Similarly, a 1983 *Guns & Ammo* review of the Heckler & Koch HK 94 rifle reported that "you certainly aren't going to enter any serious, formal matches with it...."[38]

At the same time, the gun industry has actively promoted the intimidating looks of assault weapons to increase their sales. A 1989 *Guns & Ammo* review of the A.A. Arms AP9 praised the appeal of the gun's "wicked looks" to teenagers, noting "it is one mean-looking dude, considered cool and Ramboish by the teenage crowd....Take a look at one. And let your teen-age son tag along. Ask him what *he* thinks."[39] (Emphasis in original). *Guns & Ammo* expert Garry James noted in his review of Colt's 9mm AR-15 rifle that "the intimidation factor of a black, martial-looking carbine pointing in one's direction cannot be underestimated."[40]    Howard French, of the same magazine, said of the HK 94 9mm Para Carbine that "you would not get much static from an intruder eyeballing its rather lethal appearance."[41]    C.A. Inc. advertisements for the Mark 45 and Mark 9 "Tommy-Gun" style carbines explicitly made the point that a "show of force can be stopping power worth having"[42]

## SUMMING UP

The plain truth is that semiautomatic assault weapons look bad because they are bad. They were designed and developed to meet a specific military goal, which was killing and wounding as many people as possible at relatively short range as quickly as possible, without the need for carefully aimed fire. In short, they are ideal weapons for war, mass killers, drug gangs, and other violent criminals.



**TEC-DC9 in use, surveillance tape, Columbine High School.**

17

18

## Endnotes

1.  Chris Bishop (ed.), *Guns in Combat* (Edison, N.J.: Chartwell Books, 1998): 37.

2.  Ian V. Hogg, *Submachine Guns* (Pennsylvania: Stackpole Books, 2001): 7.

3.  David Miller (ed.), *The Illustrated Book of Guns* (London: Salamander Books Ltd., 2000): 232.

4.  Peter R. Senich, *The German Assault Rifle, 1935-1945* (Boulder, CO: Paladin Press, 1987): 1.

5.  Peter R. Senich, *The German Assault Rifle, 1935-1945* (Boulder, CO: Paladin Press, 1987): 1.

6.  Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, Paladin Press, 1984), p. 2.

7.  Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, CO: Paladin Press, 1984): 2.

8.  Ian Hogg, *Jane's Guns Recognition Guide* (Glasgow: Harper Collins Publishers, 2000): 302.

9.  Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, CO: Paladin Press, 1984): 5.

10. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989): 104.

11. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989): 97.

12. Chuck Taylor, *The Fighting Rifle: A Complete Study of the Rifle in Combat* (Boulder, CO: Paladin Press, 1984): 4.

13. Chris Bishop (ed.), *Guns in Combat* (Edison, N.J.: Chartwell Books, 1998): 72.

14. Jack Lewis and David E. Steele, *The Gun Digest Book of Assault Weapons*, 5th ed. (Iola, WI: Krause Publications, 2000): 75.

15. Tom Diaz, *Making a Killing: The Business of Guns in America* (New York: The New Press, 1999): 73.

16.  "History and Evolution of the M-16," *West Point Parents Club of Georgia Newsletter* 13 (March 1999):  8.

17.  Joe Poyer, *The M16/AR15 Rifle:  A Shooter's and Collector's Guide* (Tustin, CA: North Cape Publications, 2000):  13.

18.  Duncan Long, *The Terrifying Three:  Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO:  Paladin Press, 1989):  3-4.

19.  Duncan Long, *The Terrifying Three:  Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO:  Paladin Press, 1989):  44.

20.  Duncan Long, *Assault Pistols, Rifles and Submachine Guns* (Boulder, CO: Paladin Press, 1986):  1.

21.  See, "How Effective is Automatic Fire?," *American Rifleman*, May 1980, 30.

22.  Duncan Long, *The Terrifying Three:  Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO:  Paladin Press, 1989):  11.

23.  See, e.g., "Calico M-100 rifle," *American Rifleman*, January 1987, 60, 61 ("the full 100 rounds were sent downrange in 14 seconds by one flicker-fingered tester").

24.  Advertisement, *Guns & Ammo*, July 1982, 20.

25.  Advertisement, *Guns & Ammo*, July 1984, 16.

26.  "Handgunner's Glossary," *Guns & Ammo*, August 1988, 42.

27.  Advertisement, *Guns & Ammo*, January 1989, 77.

28.  "Partisan Avenger .45 Assault Pistol," *Guns & Ammo Handgun Annual,* 1989, 26-30.

29.  "H&K's 9mm Para Carbine," *Guns & Ammo*, November 1983, 44.

30.  "Sites Spectre HC Pistol," *American Rifleman*, December 1990, 58.

31.  "Steyr Mannlicher SPP Pistol," *American Rifleman*, August 1993, 70, 72; see also, "Colt's 9mm AR-15," *Guns & Ammo*, July 1985, 35, 76 ("fired from the hip....about as natural a pointer as you can get.")

32.  See, e.g., Assault Systems advertisements in *Guns & Ammo*, July 1981, 90 ("assault rifle case"), 92 ("lightweight assault bipod"); *Guns & Ammo*, November 1983, 101 ("assault rifle cases" and "padded Assault Rifle sling"); Beeman advertisement in *Guns & Ammo*, December 1982, 14 ("Beeman Short Scopes: New

20

for Assault Rifles to Airguns...Use on assault rifles...."); Ventech Inc. advertisement for "Assault Weapon Accessories" in *Guns & Ammo*, February 1991, 96 ("Mini-14...10/22...AR-7").

33. Heckler & Koch advertisement in *Guns & Ammo*, July 1984, 9.

34. Heckler & Koch advertisement in *Guns & Ammo*, June 1984, back cover.

35. Intratec advertisement, *Guns & Ammo*, January 1989, 77.

36. Magnum Research advertisement, *Guns & Ammo*, November 1982, 59.  See also, e.g., advertisement by Paragon S&S Inc. for AR 10, *Guns & Ammo*, July 1981, 90 ("Used world wide by military and LAW ENFORCEMENT officers.  This famous assault rifle is now available in a semi-auto form!")

37. "Calico M-100 rifle," *American Rifleman*, January 1987, 60, 61.

38. "H&K's 9mm Para Carbine," *Guns & Ammo*, November 1983, 44.

39. "A.A. Arms AP9 Assault Pistol," *Guns & Ammo Handgun Annual*, 1989, 48, 51.

40. "Colt's 9mm AR-15," *Guns & Ammo*, July 1985, 35, 76.

41. "H&K's 9 mm Para Carbine," *Guns & Ammo*, November 1983, 42.

42. CA Inc. advertisement, *Guns & Ammo*, March 1981, 92.

## About the Violence Policy Center

The Violence Policy Center (VPC) is a national nonprofit educational organization working to reduce death and injury from firearms. As America's premier think tank on gun policy, the VPC studies current firearms issues and provides information to policymakers, journalists, public health professionals, and grassroots activists.

The virtually unrestricted distribution of firearms is more than a crime problem, it is a national health crisis. Unlike every other consumer product, firearms are exempt from federal health and safety laws. Guns—especially handguns and assault weapons—are inherently dangerous products, and the failure to regulate them like all other products costs thousands of lives and billions of dollars every year. By conducting research on key issues in firearms policy, the VPC counters the gun lobby's distortions and brings hard facts to the debate over firearms death and injury.

**Violence Policy Center          www.vpc.org**