# EXHIBIT K - PART II

# EXHIBIT F

# GUN DIGEST®

## — Buyer's Guide to —

# Assault Weapons

**Phillip Peterson**



© 2008 By Krause Publications

Published by



**Gun Digest®Books**

*An imprint of F+W Publications*
700 East State Street • Iola, WI 54990-0001
715-445-2214 • 888-457-2873
www.gundigestbooks.com

Our toll-free number to place an order or obtain
a free catalog is (800) 258-0929.

All rights reserved. No portion of this publication may be reproduced
or transmitted in any form or by any means, electronic or mechanical,
including photocopy, recording, or any information storage and retrieval
system, without permission in writing from the publisher, except by a
reviewer who may quote brief passages in a critical article or review to
be printed in a magazine or newspaper, or electronically transmitted on
radio, television, or the Internet.

Library of Congress Control Number: 2008925112

ISBN-13: 978-0-89689-680-2

ISBN-10: 0-89689-680-3

Designed by Marilyn McGrane

Edited by Dan Shideler

Printed in the United States of America

# Introduction:
# What's in a Name?

Assault Weapon.

Those words, on the cover of this book, are probably what drew you to pick it up. "Assault weapon" is a term that causes arguments within the pro-gun community. Any use of the terms "assault weapon" or "assault rifle" by media or politicians is attacked by some pro-gun writers, organizations and many firearm owners. Long wordy debates take place on internet message boards arguing the definitions and usage of terms.

Why is that?

The main reason seems to be that the term has gained use by the anti-gun movement and media. Whenever a crime is committed with a semi-automatic military pattern firearm, the mainstream media will quickly jump in with headlines like "assault weapon used in killing spree" or "drug sweep nets assault weapons." The only time many in the non-gun owning public are exposed to this class of firearms is through negative media exposure.

If you use the historically applied terminology, an assault weapon must be capable of full-automatic fire, i.e., a machine gun. The term assault rifle had its beginning with the Germans during WWII and was applied to a new class of firearm: the "SturmGewehr," or storm rifle, properly known as the MP-44.

This is generally considered to be the first true assault rifle. It was a select-fire rifle that used an intermediate-sized rifle cartridge called the 8x33mm Kurz (short).

The intermediate cartridge concept helps define an assault rifle in military circles. The intermediate cartridge is smaller than the rifle cartridges used in belt-fed machine guns and larger than the pistol cartridges used in submachine guns. Intermediate cartridges are what many semi-automatic assault weapons chamber. These include the 5.56mm (.223), 7.62x51mm (.308), 7.62x39mm, and 5.54x39mm.

What is an assault weapon? If one were to use a strict definition, it could be ANY object that is used against another individual to cause bodily harm. That can be a firearm, a rock or a feather poked in the eye. The military definition was discussed in the last paragraph. In the context of this book, however, "assault weapon" refers to a semi-automatic firearm that accepts high capacity magazines (10+ rounds) and is patterned after military issue select-fire weapons. This can mean an exact copy of an existing design, minus the components that allow full-automatic fire. Or it can be a new design that utilizes similar characeristics.

The popularly-held idea that the term "assault weapon" originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry to stimulate sales of certain firearms that did not have an appearance that was familiar to many firearm owners. The manufacturers and gun writers of the day needed a catchy name to identify this new type of gun.

The fact that some of the semi-automatic versions of the military-style firearms retained their bayonet lugs, extended pistol grips, high capacity magazines, folding stocks and even threading for muzzle brakes and grenade launchers has been used to erroneously define "assault weapons." But these design features were part of the attraction to this kind of firearm. All of these features are merely cosmetic and there is little if any evidence that their inclusion on a gun has been essential to some specific criminal use.

Look in many 1980s-era editions of *Gun Digest* and you will find listings of several makes and models of guns that were categorized as assault rifles or assault pistols. There were also some issues of a magazine called *The Complete Book of Assault Rifles* published in the 1980s. *Guns & Ammo* magazine published at least one issue of a magazine with the title *Assault Rifles: The New Breed of Sporting Arms*. And the truth is that many gun owners have used and still use the term in everyday conversations about firearms.

Some alternate monikers suggested by the never-call-them-assault-weapons crowd include paramilitary firearms, military pattern semi-automatics, homeland defense rifles, tactical firearms, sports

utility rifles, EBRs (Evil Black Rifles), or simply firearms. I tend to favor the term neat guns, but that could be just about any gun. There needs to be a commonly understood name for this type of firearm that does not require a drawn out definition. It really should not be that complicated.

Whatever arguments can be made about what terminology to use, the name assault weapon has been defined by law with the passage of several state and local AW laws and by the Federal Assault Weapon Ban, also known as the Crime Control and Law Enforcement Act of 1994. This law, and most of the others, regulate these firearms by model name and characteristics. (See the chapter on legal issues to read the exact wording of the currently expired Federal AW law.) By using the term "assault weapon" throughout the text of the law, they have forever added this name to the American dictionary.

# EXHIBIT G

## Mass Shootings Resulting in Double-Digit Fatalities in American History (1949-2022)



# EXHIBIT H



LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






**Prometheus Books**

59 John Glenn Drive
Amherst, New York 14228





**240     PART 3: PRESCRIPTION**

that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check.[32]

- The Federal Assault Weapons Ban of 1994: Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings. The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St. Valentine's Day massacre in Chicago.[34] While there are still machine guns in circulation, the National Firearm Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons.



Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s: the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres.[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994. At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision. As Congress never renewed the ban, it automatically expired on September 13, 2004.



The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular. As to the former, the academic consensus seems to be that the AWB had a minimal impact on reducing violent crime.[36] This hardly comes as a surprise. After all, most crimes don't involve assault weapons. The real test should be: Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis. Basically, that's a fancy name for a before-and-after test. Figures 7.1





Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.

Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.







| | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| ▪ Incidents | 19 | 12 | 34 |
| ▪ Deaths | 155 | 89 | 302 |

Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.

Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.

The data are drawn from Table 3.2.



and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[40] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[41]

## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[42] That

# EXHIBIT I

**AJPH** OPEN-THEMED RESEARCH

# The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017

*Louis Klarevas, PhD, Andrew Conner, BS, David Hemenway, PhD*

*Objectives.* To evaluate the effect of large-capacity magazine (LCM) bans on the frequency and lethality of high-fatality mass shootings in the United States.

*Methods.* We analyzed state panel data of high-fatality mass shootings from 1990 to 2017. We first assessed the relationship between LCM bans overall, and then federal and state bans separately, on (1) the occurrence of high-fatality mass shootings (logit regression) and (2) the deaths resulting from such incidents (negative binomial analysis). We controlled for 10 independent variables, used state fixed effects with a continuous variable for year, and accounted for clustering.

*Results.* Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

*Conclusions.* LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings. (*Am J Public Health.* 2019;109:1754–1761. doi: 10.2105/AJPH.2019.305311)

The recent spate of gun massacres in the United States has re-energized the debate over how to prevent such tragedies.[1] A common response to high-profile acts of gun violence is the promotion of tighter gun legislation, and there is some evidence that laws imposing tighter restrictions on access to firearms have been associated with lower levels of mass shootings.[2] One proposal that has received renewed interest involves restricting the possession of large-capacity magazines (LCMs).[3–5] This raises an important question: what has been the impact of LCM bans on high-fatality mass shootings?

In an attempt to arrest an uptick in mass shooting violence in the early 1990s, Congress in 1994 enacted the federal assault weapons ban, which, among other things, restricted ownership of certain ammunition-feeding devices.[6,7] The law, which contained a sunset provision, was allowed to expire a decade later. Pursuant to that ban (18 USC §921(a) [1994]; repealed), it was illegal to possess LCMs—defined as any ammunition-feeding device holding more than 10 bullets—unless the magazines were manufactured before the enactment of the ban. LCM restrictions are arguably the most important component of assault weapons bans because they also apply to semiautomatic firearms without military-style features.[8,9]

Beginning with New Jersey in 1990, some states implemented their own regulations on LCMs. Today, 9 states and the District of Columbia restrict the possession of LCMs. The bans vary along many dimensions, including maximum bullet capacity of permissible magazines, grandfathering of existing LCMs, and applicable firearms. Moreover, overlaps sometimes exist between assault weapons bans and LCM bans, but not in all states. For example, California instituted a ban on assault weapons in 1989, but LCMs remained unregulated in the state until 1994, when the federal ban went into effect. In 2000, California's own statewide ban on LCMs took effect as a safeguard in the event the federal ban expired, which happened in 2004.[10,11]

LCMs provide a distinct advantage to active shooters intent on murdering numerous people: they increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons. Evidence shows that victims struck by multiple rounds are more likely to die, with 2 studies finding that, when compared with the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than 1 bullet were more than 60% higher.[12,13] Being able to strike human targets with more than 1 bullet increases shooters' chances of killing their victims. Analyses of gunshot wound victims at level I trauma centers have suggested that this multiple-impact capability is often attributable to the use of LCMs.[14,15]

In addition, LCMs provide active shooters with extended cover.[16] During an attack, perpetrators are either firing their guns or not firing their guns. While gunmen are firing, it is extremely difficult for those in the line of fire to take successful defensive maneuvers. But if gunmen run out of bullets, there are lulls in the shootings, as the perpetrators are forced to pause their attacks to reload or change weapons. These pauses provide opportunities for people to intervene and disrupt a shooting. Alternatively, they provide individuals in

## ABOUT THE AUTHORS

*Louis Klarevas is with the Teachers College, Columbia University, New York, NY. Andrew Conner is with the Frank H. Netter, MD, School of Medicine, Quinnipiac University, North Haven, CT. David Hemenway is with the Harvard T. H. Chan School of Public Health, Harvard University, Boston, MA.*

*Correspondence should be sent to Louis Klarevas, Research Professor, Office of the Provost, Teachers College, Columbia University, 525 W 120th St, New York, NY 10027 (e-mail: ljk2149@tc.columbia.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 22, 2019.*

*doi: 10.2105/AJPH.2019.305311*

harm's way with a chance to flee or hide. Legislative endeavors that restrict access to LCMs are implemented with the express objective of reducing an active shooter's multiple-impact capability and extended cover.[10]

Although mass shootings have received extensive study, there has been little scholarly analysis of LCM bans.[17–24] The studies undertaken that have broached the subject of ammunition capacity have primarily concentrated on the effect of LCM bans on violent crimes other than mass shootings or on the impact of the assault weapons bans on mass shootings.[25–27]

Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings.[10,20,28] Proponents of LCM bans believe that without LCMs, fewer people will be killed in a mass shooting, other things equal. In turn, fewer shootings will cross the threshold required to be classified as what we call a "high-fatality mass shooting" (≥ 6 victims shot to death). If LCM bans are effective, we should expect to find that high-fatality mass shootings occur at a lower incidence rate when LCM bans are in place, and fewer people are killed in such attacks. But have LCM bans actually saved lives in practice? To our knowledge, the impact of LCM bans has never been systematically assessed. This study fills that void.

## METHODS

Mass shootings have been defined in a variety of ways, with some analyses setting the casualty threshold as low as 2 people wounded or killed and others requiring a minimum of 7 gunshot victims.[18,22,29] We focused on high-fatality mass shootings—the deadliest and most disturbing of such incidents—which are defined as intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators.[20,30,31] After an exhaustive search, we identified 69 such incidents in the United States between 1990 and 2017. We then discerned whether each high-fatality mass shooting involved an LCM—unless otherwise stated, defined consistent with the 1994 federal ban as a detachable ammunition-feeding device capable of holding more than 10 bullets. (See Table 1 for a list of incidents and for additional details on

the search and identification strategy we employed.)

The first state to enact an LCM ban was New Jersey in 1990. Since then, another 8 states and the District of Columbia have enacted LCM bans (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[10] With no LCM bans in effect before 1990, a priori we chose that year to begin our analysis to avoid inflating the impact of the bans. Our data set extends 28 years, from 1990 through 2017. As a secondary analysis, we used a 13-year data set, beginning in 2005, the first full year after the federal assault weapons ban expired.

Our primary outcome measures were the incidence of high-fatality mass shootings and the number of victims killed. We distinguished between high-fatality mass shootings occurring with and without a ban. Because the federal ban was in effect nationwide from September 13, 1994, through September 12, 2004, we coded every state as being under an LCM ban during that 10-year timeframe.

Our interest was in the effect of LCM bans. We ran regression analyses to determine if any relationship between LCM bans and high-fatality mass shootings can be explained by other factors. In our state–year panel multivariate analyses, the outcome variables were (1) whether an LCM-involved high-fatality mass shooting occurred, (2) whether any high-fatality mass shooting occurred, (3) the number of fatalities in an LCM-involved high-fatality mass shooting, and (4) the number of fatalities in any high-fatality mass shooting. Our analyses first combined and then separated federal and state LCM bans.

Consistent with the suggestions and practices of the literature on firearm homicides and mass shootings, our explanatory variables are population density; proportion of population aged 19 to 24 years, aged 25 to 34 years, that is Black, and with a college degree; real per-capita median income; unemployment rate; and per-capita prison population.[2,26,27,32] We also added a variable for percentage of households with a firearm. All regression models controlled for total state population. When the dependent variable reflected occurrences of incidents (ordered choice data), we used logit regression; we ran probit regression as a sensitivity analysis. We had multiple observations for individual

states. To control for this, we utilized cluster-robust standard errors to account for the clustering of observations. When the dependent variable reflected deaths (count data), we used negative binomial regression; Gius used a Poisson regression, and we used that approach as a sensitivity analysis.[26] We included state fixed effects. We used a continuous variable for year because the rate of high-fatality mass shootings has increased over time. For purposes of sensitivity analysis, we also replaced the linear yearly trend with a quadratic function. We performed multivariate statistical analyses by using Stata/IC version 15.1 (StataCorp LP, College Station, TX).

Population data came from the US Census Bureau, unemployment data came from the Bureau of Labor Statistics, and imprisonment data came from the Bureau of Justice Statistics. The percentage of households with a firearm was a validated proxy (the percentage of suicides that are firearm suicides) derived from Centers for Disease Control and Prevention National Vital Statistics Data.[33]

## RESULTS

Between 1990 and 2017, there were 69 high-fatality mass shootings (≥ 6 victims shot to death) in the United States. Of these, 44 (64%) involved LCMs, 16 did not (23%), and for 9 (13%) we could not determine whether LCMs were used (Table 1). The mean number of victims killed in the 44 LCM-involved high-fatality mass shootings was 11.8; including the unknowns resulted in that average falling to 11.0 (not shown). The mean number of victims killed in high-fatality mass shootings in which the perpetrator did not use an LCM was 7.3 (Table B, available as a supplement to the online version of this article at http://www.ajph.org); including the unknowns resulted in that average falling to 7.1 (not shown). When we excluded unknown cases, the data indicated that utilizing LCMs in high-fatality mass shootings resulted in a 62% increase in the mean death toll.

Data sets of mass shooting fatalities by their nature involve truncated data, with the mode generally being the baseline number of fatalities required to be included in the data set (6 fatalities in the current study). Our data

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 1 | Jun 18, 1990 | Jacksonville | FL | Y | 9 | N | N |
| 2 | Jan 26, 1991 | Chimayo | NM | N | 7 | N | N |
| 3 | Aug 9, 1991 | Waddell | AZ | N | 9 | N | N |
| 4 | Oct 16, 1991 | Killeen | TX | Y | 23 | N | N |
| 5 | Nov 7, 1992 | Morro Bay and Paso Robles | CA | N | 6 | N | N |
| 6 | Jan 8, 1993 | Palatine | IL | N | 7 | N | N |
| 7 | May 16, 1993 | Fresno | CA | Y | 7 | N | N |
| 8 | Jul 1, 1993 | San Francisco | CA | Y | 8 | N | N |
| 9 | Dec 7, 1993 | Garden City | NY | Y | 6 | N | N |
| 10 | Apr 20, 1999 | Littleton | CO | Y | 13 | Y | Y |
| 11 | Jul 12, 1999 | Atlanta | GA | U | 6 | Y | Y |
| 12 | Jul 29, 1999 | Atlanta | GA | Y | 9 | Y | Y |
| 13 | Sep 15, 1999 | Fort Worth | TX | Y | 7 | Y | Y |
| 14 | Nov 2, 1999 | Honolulu | HI | Y | 7 | Y | Y |
| 15 | Dec 26, 2000 | Wakefield | MA | Y | 7 | Y | Y |
| 16 | Dec 28, 2000 | Philadelphia | PA | Y | 7 | Y | Y |
| 17 | Aug 26, 2002 | Rutledge | AL | N | 6 | Y | Y |
| 18 | Jan 15, 2003 | Edinburg | TX | U | 6 | Y | Y |
| 19 | Jul 8, 2003 | Meridian | MS | N | 6 | Y | Y |
| 20 | Aug 27, 2003 | Chicago | IL | N | 6 | Y | Y |
| 21 | Mar 12, 2004 | Fresno | CA | N | 9 | Y | Y |
| 22 | Nov 21, 2004 | Birchwood | WI | Y | 6 | N | N |
| 23 | Mar 12, 2005 | Brookfield | WI | Y | 7 | N | N |
| 24 | Mar 21, 2005 | Red Lake | MN | Y | 9 | N | N |
| 25 | Jan 30, 2006 | Goleta | CA | Y | 7 | Y | N |
| 26 | Mar 25, 2006 | Seattle | WA | Y | 6 | N | N |
| 27 | Jun 1, 2006 | Indianapolis | IN | Y | 7 | N | N |
| 28 | Dec 16, 2006 | Kansas City | KS | N | 6 | N | N |
| 29 | Apr 16, 2007 | Blacksburg | VA | Y | 32 | N | N |
| 30 | Oct 7, 2007 | Crandon | WI | Y | 6 | N | N |
| 31 | Dec 5, 2007 | Omaha | NE | Y | 8 | N | N |
| 32 | Dec 24, 2007 | Carnation | WA | U | 6 | N | N |
| 33 | Feb 7, 2008 | Kirkwood | MO | Y | 6 | N | N |
| 34 | Sep 2, 2008 | Alger | WA | U | 6 | N | N |
| 35 | Dec 24, 2008 | Covina | CA | Y | 8 | Y | N |
| 36 | Jan 27, 2009 | Los Angeles | CA | N | 6 | Y | N |
| 37 | Mar 10, 2009 | Kinston, Samson, and Geneva | AL | Y | 10 | N | N |
| 38 | Mar 29, 2009 | Carthage | NC | N | 8 | N | N |
| 39 | Apr 3, 2009 | Binghamton | NY | Y | 13 | Y | N |
| 40 | Nov 5, 2009 | Fort Hood | TX | Y | 13 | N | N |
| 41 | Jan 19, 2010 | Appomattox | VA | Y | 8 | N | N |

*Continued*

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 42 | Aug 3, 2010 | Manchester | CT | Y | 8 | N | N |
| 43 | Jan 8, 2011 | Tucson | AZ | Y | 6 | N | N |
| 44 | Jul 7, 2011 | Grand Rapids | MI | Y | 7 | N | N |
| 45 | Aug 7, 2011 | Copley Township | OH | N | 7 | N | N |
| 46 | Oct 12, 2011 | Seal Beach | CA | N | 8 | Y | N |
| 47 | Dec 25, 2011 | Grapevine | TX | N | 6 | N | N |
| 48 | Apr 2, 2012 | Oakland | CA | N | 7 | Y | N |
| 49 | Jul 20, 2012 | Aurora | CO | Y | 12 | N | N |
| 50 | Aug 5, 2012 | Oak Creek | WI | Y | 6 | N | N |
| 51 | Sep 27, 2012 | Minneapolis | MN | Y | 6 | N | N |
| 52 | Dec 14, 2012 | Newtown | CT | Y | 27 | N | N |
| 53 | Jul 26, 2013 | Hialeah | FL | Y | 6 | N | N |
| 54 | Sep 16, 2013 | Washington | DC | N | 12 | Y | N |
| 55 | Jul 9, 2014 | Spring | TX | Y | 6 | N | N |
| 56 | Sep 18, 2014 | Bell | FL | U | 7 | N | N |
| 57 | Feb 26, 2015 | Tyrone | MO | U | 7 | N | N |
| 58 | May 17, 2015 | Waco | TX | Y | 9 | N | N |
| 59 | Jun 17, 2015 | Charleston | SC | Y | 9 | N | N |
| 60 | Aug 8, 2015 | Houston | TX | U | 8 | N | N |
| 61 | Oct 1, 2015 | Roseburg | OR | Y | 9 | N | N |
| 62 | Dec 2, 2015 | San Bernardino | CA | Y | 14 | Y | N |
| 63 | Feb 21, 2016 | Kalamazoo | MI | Y | 6 | N | N |
| 64 | Apr 22, 2016 | Piketon | OH | U | 8 | N | N |
| 65 | Jun 12, 2016 | Orlando | FL | Y | 49 | N | N |
| 66 | May 27, 2017 | Brookhaven | MS | U | 8 | N | N |
| 67 | Sep 10, 2017 | Plano | TX | Y | 8 | N | N |
| 68 | Oct 1, 2017 | Las Vegas | NV | Y | 58 | N | N |
| 69 | Nov 5, 2017 | Sutherland Springs | TX | Y | 25 | N | N |

*Note.* LCM = large-capacity magazine; N = no; U = unknown; Y = yes. From September 13, 1994, until and including September 12, 2004, each and every state, including the District of Columbia, was subject to a ban on LCMs pursuant to the federal assault weapons ban. To collect the data in Table 1, we searched the following news media resources for every shooting that resulted in 6 or more fatalities: America's Historical Newspapers, EBSCO, Factiva, Gannett Newsstand, Google News Archive, Lexis-Nexis, Newspaper Archive, Newspaper Source Plus, Newspapers.com, Newswires, ProQuest Historical Newspapers, and ProQuest Newsstand. We also reviewed mass shooting data sets maintained by *Mother Jones*, the *New York Times*, and *USA Today*. In addition to news media sources, we reviewed reports on mass shootings produced by think tank, policy advocacy, and governmental organizations, including the US Federal Bureau of Investigation Supplementary Homicide Reports, the crowdsourced Mass Shooting Tracker, and the open-source databases maintained by the Gun Violence Archive and the Stanford University Geospatial Center. Finally, when it was relevant, we also reviewed court records as well as police, forensic, and autopsy reports. As a general rule, when government sources were available, they were preferred over other sources. Furthermore, when media sources conflicted on the number of casualties or the weaponry involved, the later sources were privileged (as later reporting is often more accurate).

set of high-fatality mass shootings was no exception. As such, the median average number of fatalities for each subset of incidents—those involving and those not involving LCMs—was necessarily lower than the mean average. Nevertheless, like the mean average, the median average was higher when LCMs were employed—a median

average of 8 fatalities per incident compared with 7 fatalities per incident for attacks not involving LCMs.

For the 60 incidents in which it was known if an LCM was used, in 44 the perpetrator used an LCM. Of the 44 incidents in which the perpetrators used LCMs, 77% (34/44) were in nonban states. In the 16 incidents in which the perpetrators did not use LCMs, 50% (8/16) were in nonban states (Table B, available as a supplement to the online version of this article at http://www.ajph.org). Stated differently, in nonban states, 81% (34/42) of high-fatality mass shooting perpetrators used LCMs; in LCM-ban states, only 55% (10/18) used LCMs.

The rate of high-fatality mass shootings increased considerably after September 2004 (when the federal assault weapons ban expired). In the 10 years the federal ban was in effect, there were 12 high-fatality mass shootings and 89 deaths (an average of 1.2 incidents and 8.9 deaths per year). Since then, through 2017, there have been 48 high-fatality mass shootings and 527 deaths (an average of 3.6 incidents and 39.6 deaths per year in these 13.3 years).

Of the 69 high-fatality mass shootings from 1990 to 2017, 49 occurred in states without an LCM ban in effect at the time and 20 in states with a ban in effect at the time. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 11.7 per billion population; the annual incidence rate for high-fatality mass shootings in states with an LCM ban was 5.1 per billion population. In that 28-year period, the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM ban (Table 2).

Non–LCM ban states had not only more incidents but also more deaths per billion population in the non–LCM ban states was

127.4. In the LCM ban states, it was 41.6 (Table 2).

For the time period beginning with the first full calendar year following the expiration of the federal assault weapons ban (January 1, 2005–December 31, 2017), there were 47 high-fatality mass shootings in the United States. Of these, 39 occurred in states where an LCM ban was not in effect, and 8 occurred in LCM ban locations. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 13.2 per billion population; for states with an LCM ban, it was 7.4 per billion population (Table 2). During this period, non–LCM ban states had not only more incidents but also more deaths per incident (11.4 vs 9.4). In terms of high-fatality mass shooting deaths per billion population, the annual number of deaths in the non–LCM ban states was 150.6; in the LCM ban states it was 69.2 (Table 2).

When we limited the analysis solely to high-fatality mass shootings that definitely involved LCMs, the differences between ban and nonban states became larger. For example, for the entire period of 1990 to 2017, of the 44 high-fatality mass shootings that involved LCMs, the annual incidence rate for LCM-involved high-fatality mass shootings

in nonban states was 8.1 per billion population; in LCM-ban states it was 2.5 per billion population. The annual rate of high-fatality mass shooting deaths in the non–LCM ban states was 102.1 per billion population; in the LCM ban state it was 23.3. In terms of LCM-involved high-fatality mass shootings, we also found comparable wide differences in incidence and fatality rates between ban and nonban states for the post–federal assault weapons ban period (2005–2017; Table 2).

We found largely similar results in the multivariate analyses (1990–2017). States that did not ban LCMs were significantly more likely to experience LCM-involved high-fatality mass shootings as well as more likely to experience any high-fatality mass shootings (regardless of whether an LCM was involved). States that did not ban LCMs also experienced significantly more deaths from high-fatality mass shootings, operationalized as the absolute number of fatalities (Table 3).

When the LCM bans were separated into federal and state bans, both remained significantly related to the incidence of LCM-involved high-fatality mass shooting events and to the number of LCM-involved high-fatality mass shooting deaths. The associations between federal and state bans and

| | Average Annual Population, No. (Millions) | Total Incidents, No. | Annual Incidents per Billion Population, No. | Total Deaths, No. | Annual Deaths per Billion Population, No. | Deaths per Incident, No. |
|---|---|---|---|---|---|---|
| All high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 49 | 11.7 | 534 | 127.4 | 10.9 |
| LCM ban states | 140.7 | 20 | 5.1 | 164 | 41.6 | 8.2 |
| All high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non–LCM ban states | 227.8 | 39 | 13.2 | 446 | 150.6 | 11.4 |
| LCM ban states | 83.4 | 8 | 7.4 | 75 | 69.2 | 9.4 |
| LCM-involved high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 34 | 8.1 | 428 | 102.1 | 12.6 |
| LCM ban states | 140.7 | 10 | 2.5 | 92 | 23.3 | 9.2 |
| LCM-involved high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non–LCM ban states | 227.8 | 28 | 9.5 | 369 | 124.6 | 13.2 |
| LCM ban states | 83.4 | 4 | 3.7 | 42 | 38.7 | 10.5 |
| Non-LCM high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 8 | 1.9 | 56 | 13.4 | 7.0 |
| LCM ban states | 140.7 | 8 | 2.0 | 60 | 15.2 | 7.5 |

*Note.* LCM = large-capacity magazine.

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
| --- | --- | --- | --- | --- |
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| All LCM bans (federal and state) | −2.217 (−3.493, −0.940) | −5.912 (−9.261, −2.563) | −1.283 (−2.147, −0.420) | −3.660 (−5.695, −1.624) |
| Population density | −0.011 (−0.052, 0.031) | 0.013 (−0.068, 0.095) | 0.001 (−0.003, 0.006) | 0.011 (−0.005, 0.026) |
| % aged 19–24 y | −0.480 (−1.689, 0.730) | −2.496 (−5.893, 0.901) | 0.283 (−0.599, 1.164) | −0.585 (−2.666, 1.495) |
| % aged 25–34 y | −0.801 (−1.512, −0.089) | −2.390 (−4.391, −0.388) | −0.337 (−0.871, 0.197) | −1.114 (−2.463, 0.235) |
| % Black | −0.227 (−1.062, 0.607) | −0.654 (−2.831, 1.522) | −0.163 (−0.703, 0.377) | −0.261 (−1.391, 0.870) |
| % with a bachelor's degree or higher | −0.009 (−0.492, 0.474) | −0.469 (−1.590, 0.652) | 0.143 (−0.214, 0.501) | 0.183 (−0.715, 1.081) |
| Percentage of households with a firearm (proxy) | −0.047 (−0.195, 0.101) | −0.147 (−0.546, 0.251) | −0.020 (−0.131, 0.091) | −0.084 (−0.368, 0.200) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.072 (−0.293, 0.149) | −0.476 (−1.081, 0.129) | 0.041 (−0.135, 0.216) | −0.182 (−0.628, 0.263) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.012, 0.001) | −0.007 (−0.017, 0.004) | −0.001 (−0.006, 0.003) | −0.003 (−0.012, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.31 | 0.16 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.49.
[a]Logit regression.
[b]Negative binomial regression.

the overall incidence of all high-fatality mass shootings as well as the total number of victims in these events remained strongly negative but was only sometimes statistically significant (Table 4).

In terms of sensitivity analyses, using probit instead of logit gave us similar results (not shown). When the outcome variable was the number of high-fatality mass shooting deaths, we obtained largely similar results concerning the association between LCM bans and the outcome variables, regardless of whether we used Poisson or negative binomial regression (not shown). Moreover, replacing the linear yearly trend with a quadratic function did not change the major results of the analyses (not shown). Variance inflation factors for all the independent variables never exceeded 10.0, with the variance inflation factor for LCM ban variables always being less than 2.0, indicating that there were no significant multicollinearity issues (Tables 3 and 4).

## DISCUSSION

In the United States, LCMs are disproportionately used in high-fatality mass shootings (incidents in which ≥6 victims are shot to death). In at least 64% of the incidents

since 1990, perpetrators used LCMs. (For 23%, we determined that they did not involve LCMs, and a determination could not be made for the remaining 13%.) Previous research has shown that LCM firearms are used in a high share of mass murders (typically defined as ≥4 homicides) and murders of police.[9]

We could not find reliable estimates of LCM firearms in the US gun stock. However, it is likely much lower than 64%, given that commonly owned firearms such as revolvers, bolt-action rifles, and shotguns are not typically designed to be LCM-capable. During the decade the federal assault weapons ban was in effect, no firearms were legally manufactured with LCMs for sale in the United States. In the postban era, semiautomatic firearms, especially pistols, are often sold with factory-issue LCMs, but firearms that are not semiautomatic are not sold with magazines.

Why do we find LCMs so prominent among high-fatality mass shootings? We suspect there are 2 main reasons. The first is that perpetrators probably deliberately select LCMs because they facilitate the ability to fire many rounds without having to stop to reload. The second reason is that the ability of shooters to kill many victims—especially the 6 victims required to be included in our data set—may be reduced if LCMs are not

available. In other words, the first explanation is that shooters perceive LCMs to be more effective at killing many people; the second explanation is that LCMs are indeed more effective at killing many people.

High-fatality mass shootings are not common, even in the United States. Between 1990 and 2017, there has been an average of 2.5 incidents per year, with an average of 25 people killed annually in such attacks. However, the number of incidents and the number of people killed per incident have been increasing since the end of the federal assault weapons ban.

In our study, we found that bans on LCMs were associated with both lower incidence of high-fatality mass shootings and lower fatality tolls per incident. The difference in incidence and overall number of fatalities between states, with and without bans, was even greater for LCM-involved high-fatality mass shootings.

The multivariate results are largely consistent with these bivariate associations. When we controlled for 10 independent variables often associated with overall crime rates, as well as state and year effects, states with LCM bans had lower rates of high-fatality mass shootings and fewer high-fatality mass shooting deaths. When we investigated federal and state bans separately in the multiple

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| Federal LCM ban | −1.434 (−2.622, −0.245) | −3.571 (−7.103, −0.038) | −0.895 (−1.806, 0.016) | −2.570 (−4.902, −0.238) |
| State LCM bans | −2.603 (−4.895, −0.311) | −8.048 (−15.172, −0.925) | −1.277 (−2.977, 0.422) | −3.082 (−7.227, 1.064) |
| Population density | −0.012 (−0.055, 0.030) | −0.001 (−0.085, 0.083) | 0.001 (−0.003, 0.006) | 0.009 (−0.007, 0.024) |
| % aged 19–24 y | −0.311 (−1.499, 0.878) | −2.589 (−6.057, 0.879) | 0.342 (−0.551, 1.236) | −0.531 (−2.759, 1.698) |
| % aged 25–34 y | −0.812 (−1.532, −0.093) | −2.660 (−4.848, −0.471) | −0.323 (−0.864, 0.217) | −0.848 (−2.236, 0.539) |
| % Black | −0.229 (−1.101, 0.643) | −0.770 (−3.232, 1.693) | −0.150 (−0.698, 0.398) | −0.154 (−1.321, 1.013) |
| % with a bachelor's degree or higher | −0.031 (−0.447, 0.509) | −0.479 (−1.577, 0.618) | 0.156 (−0.199, 0.511) | 0.269 (−0.567, 1.106) |
| Percentage of households with a firearm (proxy) | −0.055 (−0.210, 0.101) | −0.227 (−0.651, 0.196) | −0.019 (−0.133, 0.094) | −0.107 (−0.399, 0.186) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.061 (−0.284, 0.162) | −0.420 (−1.041, 0.201) | 0.046 (−0.132, 0.224) | −0.157 (−0.619, 0.305) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.013, 0.000) | −0.012 (−0.026, 0.002) | −0.002 (−0.007, 0.003) | −0.003 (−0.014, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.30 | 0.15 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.45.
[a]Logit regression.
[b]Negative binomial regression.

regressions, both were significantly associated with the incidence of LCM-involved high-fatality mass shootings as well as the number of victims in LCM-involved attacks. The relationship between these bans, considered separately, and all high-fatality mass shooting incidence and deaths is often not statistically significant, although this may be attributable to lack of statistical power (number of observations) to find a statistically significant effect.

Our analysis provides answers to 4 important questions:

1. How often are LCMs used in high-fatality mass shootings? At minimum, 64% of high-fatality mass shootings perpetrated between 1990 and 2017 involved LCMs.
2. Are more people killed when LCMs are used? Yes, and the difference in our data set is substantial and statistically significant (11.8 vs 7.3). We should add that our results likely underestimate the difference because we have a truncated sample (we only examined incidents with at least 6 victim fatalities), compounded by the fact that the number of homicide incidents fell as the number of victims increased.
3. Do states with LCM bans experience high-fatality mass shootings involving LCMs at a lower rate and a lower fatality

count than those states with no such bans in effect? Yes. In fact, the effect is more pronounced for high-fatality mass shootings involving LCMs than for those not involving LCMs.
4. Do states with LCM bans experience high-fatality mass shootings (regardless of whether they involve LCMs) at a lower rate and a lower fatality count than states with no such bans in effect? Yes.

## Limitations

Our study had various limitations. First, although we carefully searched for every high-fatality mass shooting, it is possible that we might have missed some. Nevertheless, we suspect that this is unlikely, because it would mean that others who compiled lists have also missed the same ones, for we checked our list against multiple sources.

Second, our definition of a high-fatality mass shooting is a shooting that results in 6 or more fatal victims. A different threshold criterion (e.g., 6 or more people shot; 5 or more victims killed), might lead to somewhat different results. We expect that as the number of victims in a shooting increases, the likelihood that the perpetrator used an LCM

also increases. Indeed, of the 13 high-fatality mass shootings with 10 or more fatalities in our data set, 12 (92%) involved an LCM.

Third, although many high-fatality mass shootings tend to be highly publicized, in 13% of the incidents we reviewed, we could not determine whether an LCM was used. As a sensitivity analysis, we assessed the assumptions that all of the unknown cases first did, and then did not, involve LCMs. Neither assumption appreciably changed our main results (not shown).

Fourth, as a general rule, clustering standard errors is most appropriate when there is a large number of treated units. Although during the decade of the federal assault weapons bans all 50 states plus the District of Columbia regulated LCMs, during the remaining time periods under examination, only 8 jurisdictions regulated LCMs. As a result, there is the possibility that the standard errors were underestimated in our analyses.[34]

Fifth, there were only 69 events that met our criterion for a "high-fatality mass shooting." Although 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limits the power to detect significant associations. For example, we did not have the statistical power (and thus did not even try) to determine whether

different aspects of the various LCM laws might have differential effects on the incidence of high-fatality mass shootings. Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overestimated.[35]

## Public Health Implications

LCMs increase the ability to fire large numbers of bullets without having to pause to reload. Any measure that can force a pause in an active shooting—creating opportunities for those in the line of fire to flee, take cover, or physically confront a gunman—offers a possibility of reducing the number of victims in such an attack. To put it in different terms, if the only firearms available were 18th-century muskets, it is doubtful that mass shootings would be the social problem they are today.

The impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive laws and taken to states with more restrictive laws. This is partly why efforts aimed at reducing the frequency and lethality of mass shootings must necessarily be multifaceted and multi–disciplinary. Legal restrictions on firearms are merely a part of this broader, public health approach. That being said, the theory behind reducing the availability of LCMs to reduce the number of victims in mass shootings makes sense, and our empirical results, consistent with much of the limited literature on mass shootings, suggest that LCM bans have been effective in saving lives.

## CONTRIBUTORS
L. Klarevas and D. Hemenway designed the study, collected the data, and contributed equally to all parts of the study. A. Conner ran the statistical analyses and helped construct the tables that report the results of the multivariate analyses. All authors approved the final article as submitted.

## ACKNOWLEDGMENTS
The authors would like to thank John Berrigan, research assistant at the Harvard Injury Control Research Center, for his assistance with the undertaking of this study.

## CONFLICTS OF INTEREST
L. Klarevas has, in the past 2 years, served as an expert to the states of Colorado and California in civil litigation that involved the constitutionality of state restrictions on large-capacity magazines. The authors have no additional conflicts of interest to report.

## HUMAN PARTICIPANT PROTECTION
No protocol approval was needed because no human participants were involved in this study.

## REFERENCES
1. Wintemute GJ. How to stop mass shootings. *N Engl J Med*. 2018;379(13):1193–1196.

2. Reeping PM, Cerda M, Kalesan B, Wiebe DJ, Galea S, Branas CC. State gun laws, gun ownership, and mass shootings in the US: cross sectional time series. *BMJ*. 2019; 364(8190):l542–l548.

3. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. October 5, 2017. Available at: https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed June 10, 2019.

4. Kamerow D. Guns don't kill crowds, people with semi-automatics do. *BMJ*. 2011;342(1):d477.

5. Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non–gun owners in 2017. *Am J Public Health*. 2018;108(7): 878–881.

6. Lenett MG. Taking a bite out of violent crime. *Univ Dayton Law Rev*. 1995;20(2):573–617.

7. Muchnick JY. The assault weapons ban: saving lives. *Univ Dayton Law Rev*. 1995;20(2):641–651.

8. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001;17(1):33–74.

9. Koper CS, Johnson WD, Nicholas JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. *J Urban Health*. 2018;95(3):313–321.

10. Giffords Law Center to Prevent Gun Violence. Large capacity magazines. Available at: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines. Accessed June 10, 2019.

11. Giffords Law Center to Prevent Gun Violence. Assault weapons. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons. Accessed June 10, 2019.

12. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. *Arch Surg*. 1992;127(6): 694–698.

13. Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. *J Quant Criminol*. 2001;17(1):81–88.

14. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg*. 2014;76(1):2–9.

15. Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. *J Trauma Acute Care Surg*. 2017;84(1):58–65.

16. McCullough J. *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques*. New York, NY: Skyhorse; 2012.

17. Fox JA, DeLateur MJ. Mass shootings in America: moving beyond Newtown. *Homicide Stud*. 2014;18(1): 125–145.

18. Krouse WJ, Richardson DJ. Mass murder with firearms: incidents and victims, 1999–2013. CRS Report R44126. Washington, DC: Congressional Research Service; 2015.

19. Wilson LC. *The Wiley Handbook of the Psychology of Mass Shootings*. Hoboken, NJ: Wiley; 2016.

20. Klarevas L. *Rampage Nation: Securing America From Mass Shootings*. Amherst, NY: Prometheus; 2016.

21. Schildkraut J, Elsass HJ. *Mass Shootings: Media, Myths, and Realities*. Denver, CO: Praeger; 2016.

22. Schildkraut J. *Mass Shootings in America: Understanding the Debates, Causes, and Responses*. Denver, CO: ABC-CLIO; 2018.

23. Rocque M, Duwe G. Rampage shootings: an historical, empirical, and theoretical overview. *Curr Opin Psychol*. 2018;19(1):28–33.

24. Phaneuf SW. Mass shootings: understanding the complexities. In: Hilinski-Rosick CM, Lee DR, eds. *Contemporary Issues in Victimology: Identifying Patterns and Trends*. New York, NY: Lexington; 2018.

25. Moody CE, Marvell TB. Clustering and standard error bias in fixed effects panel data regressions. *J Quant Crim*; 2018:1–23.

26. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Appl Econ Lett*. 2015;22(4):281–284.

27. Blau BM, Gorry DH, Wade C. Guns, laws and public shootings in the United States. *Appl Econ*. 2016;48(49): 4732–4746.

28. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones*. May 31, 2019. Available at: https://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed June 10, 2019.

29. Kleck G. Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages. *Justice Res Policy*. 2016;17(1):28–47.

30. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins University Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

31. Kleck G. *Targeting Guns: Firearms and Their Control*. Hawthorne, NY: Aldine de Gruyter; 1997.

32. Hemenway D. *Private Guns, Public Health*. Ann Arbor, MI: University of Michigan Press; 2017.

33. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership: measurement, structure and trends. *J Quant Criminol*. 2004;20(1):43–62.

34. Conley TG, Taber CR. Inference with "difference in differences" with a small number of policy changes. *Rev Econ Stat*. 2011;93(1):113–125.

35. Button KS, Ioannidis JPA, Mokrysz C, et al. Power failure: why small sample size undermines the reliability of neuroscience [erratum *Nat Rev Neurosci*. 2013;14(6):451]. *Nat Rev Neurosci*. 2013;14(5):365–376.

# EXHIBIT J

AAST 2018 Podium Paper

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

**Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD,** *and* **Spiros Frangos, MD, MPH**, *New York, New York*

## AAST Continuing Medical Education Article

### Accreditation Statement

This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma. The American College of Surgeons is accredited by the ACCME to provide continuing medical education for physicians.

*AMA PRA Category 1 Credits™*

The American College of Surgeons designates this journal-based CME activity for a maximum of 1 *AMA PRA Category 1 Credit™*. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

Of the *AMA PRA Category 1 Credit™* listed above, a maximum of 1 credit meets the requirements for self-assessment.

### Credits can only be claimed online

### Objectives

After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery*, participants should be able to demonstrate increased understanding of the material specific to the article. Objectives for each article are featured at the beginning of each article and online. Test questions are at the end of the article, with a critique and specific location in the article referencing the question topic.

### Claiming Credit

To claim credit, please visit the AAST website at http://www.aast.org/ and click on the "e-Learning/MOC" tab. You must read the article, successfully complete the post-test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post-test. Post-tests receiving a score of below 75% will require a retake of the test to receive credit.

### System Requirements

The system requirements are as follows: Adobe® Reader 7.0 or above installed; Internet Explorer® 7 and above; Firefox® 3.0 and above, Chrome® 8.0 and above, or Safari™ 4.0 and above.

### Questions

If you have any questions, please contact AAST at 800-789-4006. Paper test and evaluations will not be accepted.

### Disclosure Information

In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest. Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors. The ACCME defines a `commercial interest' as "any entity producing, marketing, re-selling, or distributing health care goods or services consumed by, or used on, patients." "Relevant" financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12'months preceding and during the time that the individual is engaged in writing the article. All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However, if you'perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off-label use of an approved device, product, or drug or unapproved usage.

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff

Ernest E. Moore, Editor: PI, research support and shared U.S. patents Haemonetics; PI, research support, Instrumentation Laboratory, Inc.; Co-founder, Thrombo Therapeutics. Associate Editors David Hoyt, Ronald V. Maier and Steven Shackford have nothing to disclose. Editorial staff and Angela Sauaia have nothing to disclose.

### Author Disclosures

The authors have nothing to disclose.

### Reviewer Disclosures

The reviewers have nothing to disclose.

### Cost

For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity. For those who are not a member or subscriber, the cost for each credit is $25.

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D., J.A., C.B., M.B., J.F., M.K., N.S., M.T., S.F.), New York University School of Medicine, New York, New York.

Address for reprints: Charles DiMaggio, PhD, MPH, Department of Surgery, New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196; email: Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI: 10.1097/TA.0000000000002060

Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abggQZXdgGj2MwlZLeI4cP3VC4 on 01/07/2019

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

| | |
|---|---|
| **BACKGROUND:** | A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal. The ban expired in 2004. The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention. |
| **METHODS:** | Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports. We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population. We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poison model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios. |
| **RESULTS:** | Assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8–88.9) in 44 mass-shooting incidents. Mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides (coefficient for year, 0.7; $p = 0.0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0.3$). In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0.03$). Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0.30; 95% confidence interval, 0.22–0.39). |
| **CONCLUSION:** | Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004. (*J Trauma Acute Care Surg.* 2019;86: 11–19. Copyright © 2018 American Association for the Surgery of Trauma.) |
| **LEVEL OF EVIDENCE:** | Observational, level II/IV. |
| **KEY WORDS:** | Firearms; mass-shootings; assault weapons; epidemiology. |

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons.[1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic. Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States. In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States.

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes. In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined.[3] Any public perception of recent increases in the number of these events is borne out by analysis of available data.[4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century.[5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO; Roseburg, OR; San Bernadino, CA; Newtown, CT; Orlando; Las Vegas; Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons.

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory. Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines. Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994." The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it.

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer firearms in the population.[11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions. The incidence of firearm injuries per 1,000 total traumatic injuries was significantly lower in states with restrictive laws, 2.2 compared with 5.9.[12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations". The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted.[13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities.[14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States. Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources. We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States. We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB.

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources: Mother Jones Magazine, the Los Angeles Times and Stanford

*© 2018 American Association for the Surgery of Trauma*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three common open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "assault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. The yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided $p$ values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings between 1981 and 2017 confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period

**Figure 1.** Mass shooting deaths. United States 1981–2017.

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2 = 0.37$). A subanalysis

**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 per 348,528 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p = 0.05$). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban

**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

© *2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

**TABLE 2.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1219.7 | 333.9 | −3.7 | 0.0009 |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.6; $p = 0.03$). A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0.4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0.4; $p = 0.02$).

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size. In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3).

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i.e., AR-15)," [33] and 76% of the Board of Governors were in favor of a limit to "… civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity)." [34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use." [35] This analysis adds evidence to support these recommendations.

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides. However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national assault weapon ban on mass shootings as measured through the lens of case fatality. While the data are amenable to a number of additional analyses, such as stratification by location (e.g. school vs. nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities. In this way, we relied on the least subjective aspects of the published reports. We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides. These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero. [36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides),

it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study. Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results.

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB. We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries. This might at first seem counterintuitive and paradoxical. The destructive effect of these weapons is unequivocal. They are engineered to cause maximum tissue damage rapidly to the greatest number of targets. However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio. By contrast, the use of nonassault weapons may result in more precise targeting of victims. It is also possible that improvements in trauma care are driving down case fatality. [37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission. [38]

Despite US federal funding restrictions on firearm-related research dating to 1996, [39,40] there is a small but growing number of analyses of mass shooting violence in the United States. Many articles have focused on the mental health aspects of these incidents, [41–43] or on social effects like increased firearm acquisition following mass shootings. [44,45] However, fewer studies have taken a strictly public health or clinical approach. Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective. [46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum. [47,48]

Our choice of data and analytic approach may reasonably be debated. We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides. This is not a population-based risk estimate, but is in fact rate as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

**TABLE 3.** Exponentiated Coefficients Generalized Linear Poisson Model

| Variable | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981–20017.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

DiMaggio et al.

that occurred over the number of times that event could occur. It is the risk of a homicide occurring as a result of a mass shooting. It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate. The demographics of most homicide victims may differ appreciably from those of mass shooting victims. We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability. Our sensitivity analyses indicate that our results were robust to most any choice of denominator. We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities. Our comparative Poisson model results were essentially consistent with the primary model.

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete. It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources. We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Even with this approach, the data remain imprecise and subject to differing definitions. We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, "… an approximate answer to the right question ...(rather) than the exact answer to the wrong question..."

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States. However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB. Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results.

Federally referenced denominator data were not available for the last year of the study. We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017. This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate.[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings. We note there were many years in which the number of mass-shooting fatalities is listed as zero. There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis.

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides. It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60.7% of 36,252 deaths from firearms in 2015.[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban. Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States. Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence. However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States.

## DISCLOSURE

The authors have no conflicts of interest to declare.
There are no federal or nonfederal funding sources associated with this study.

## REFERENCES

1. Wolchover N. Why gun control is so contentious in the US. *LiveScience.* 20 July 2012 https://www.livescience.com/21741-gun-control-second-amendment.html. Accessed 10 August 2018.
2. Bond S. Students take the lead in US gun control debate. *Financial Times.* 23 February 2018. https://www.ft.com/content/9341021e-1818-11e8-9376-4a6390addb44. Accessed 10 August 2018.
3. Lemieux F. 6 things to know about mass shootings in America. *Scientific American.* 13 June 2016. https://www.scientificamerican.com/article/6-things-to-know-about-mass-shootings-in-america/. Accessed 6 June 2018.
4. Webster DW. The true effect of mass shootings on Americans. *Annals of Internal Medicine.* 16 May 2017. The http://annals.org/aim/fullarticle/2624992/true-effect-mass-shootings-americans. Accessed 6 June 2018.
5. Katsiyannis A, Whitford DK, Ennis RB. Historical examination of United States intentional mass school shootings in the 20th and 21st centuries: implications for students, schools, and society. *Child Fam Stud.* (19 April 2018). https://doi.org/10.1007/s10826-018-1096-2.
6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones.* 9 November 2012. https://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness/. Accessed 11 August 2018.
7. Carey B. "Are mass murderers insane? Usually not, researchers say". *New York Times.* 8 November 2017. https://www.nytimes.com/2017/11/08/health/mass-murderers-mental-illness.html. Accessed 11 August 2018.
8. Duwe G, Rocque M. Actually, there is a clear link between mass shootings and mental illness. *Los Angeles Times.* 23 February 2018. http://www.latimes.com/opinion/op-ed/la-oe-duwe-rocque-mass-shootings-mental-illness-20180223-story.html. Accessed 11 August 2018.
9. Gillin J, Greenberg J, Jacobson L, Valverde M. The facts on mass shootings in the United States. *Politifact.* 8 November 2017. http://www.politifact.com/truth-o-meter/article/2017/nov/08/facts-mass-shootings-united-states/. Access 6 June 2018.
10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times.* 5 October 2017. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed 6 June 2018.

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

11. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. *Am J Public Health*. 1997;87(2):297–298.

12. Safavi A, Rhee P, Pandit V, Kulvatunyou N, Tang A, Aziz H, Green D, O'Keeffe T, Vercruysse G, Friese RS, et al. Children are safer in states with strict firearm laws: a national inpatient sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–1.

13. Koper CS, Roth JA. The impact of the 1994 Federal Assault Weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001; Vol. 17, No. 1.

14. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*. 2015;22(4):281–284.

15. Lemieux F, Bricknell S, Prenzler T. Mass shootings in Australia and the United States, 1981-2013. *Journal of Criminological Research, Policy and Practice*. 1(3):131–142.

16. Follman M, Aronsen G, Pan D, Caldwell M. US mass shootings, 1982-2018: data from mother Jones' investigation. *Mother Jones*. 2012; https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed 3 June 2018.

17. The Los Angeles times staff. "Deadliest U.S. mass shootings", 1984-2017. *Los Angeles Times*. Oct 1, 2017, timelines latimes.com/deadliest-shooting-rampages/. Accessed 29 August 2018.

18. Stanford mass shootings in America, courtesy of the Stanford Geospatial Center and Stanford libraries. 2016. Available at: https://library.stanford.edu/projects/mass-shootings-america. Accessed 29 August 2018.

19. Fox JA, Levin J, Fridel EE. *Extreme Killing: Understanding Serial and Mass Murder*. Sage Publications; 2018.

20. Dillon L. *Mass Shootings in the U.S.: An Exploratory Study of the Trends from 1982–2012*. PhD thesis; 2014.

21. Lankford A. Public mass shooters and firearms: a cross-national study of 171 countries. *Violence Vict*. 2016;31(2):187.

22. Lowe SR, Galea S. The mental health consequences of mass shootings. *Trauma Violence Abuse*. 2017;18(1):62–82.

23. Fox JA, Fridel EE. The tenuous connections involving mass shootings, mental illness, and gun laws. *Violence Gend*. 2016;3(1):14–19.

24. Luca M, Malhotra DK, Poliquin C. The impact of mass shootings on gun policy. *Harvard Business School NOM Unit Working Paper No*. 2016;1:16–126.

25. Buchholtz LK. Command-directed mental health evaluations and mental health related discharges from the U.S. military: an argument for command authority. *J Health Care Finance*. 2016.

26. Bradley K. Code blue: the expanding field of tactical/battlefield medicine. *J Law Enforcement*. 2017;6(2).

27. Smart R. Mass shootings: definitions and trends. RAND Corporation. https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html. Accessed 2 June 2018.

28. Krouse WJ, Richardson DJ. *Mass Murder with Firearms: Incidents and Victims, 1999–2013*. Washington, D.C.: Congressional Research Service, R44126 2015.

29. Centers for Disease Control and Prevention. CDC's WISQARS (web-based injury statistics query and reporting system). https://www.cdc.gov/injury/wisqars/fatal.html. Accessed 12 February 2018.

30. The online gun violence archive: past summary ledgers. http://www.gunviolencearchive.org/past-tolls. Accessed 12 February 2018.

31. Studdert DM, Donohue JJ, Mello MM. Testing the immunity of the firearm industry to tort litigation. *JAMA Intern Med*. 2017;177(1):102–105.

32. Public Safety and Recreational Firearms Act. P.L. 103-322, Title XI. 103rd Cong. (1994).

33. Kuhls DA, Campbell BT, Burke PA, Allee L, Hink A, Letton RW, Masiakos PT, Coburn M, Alvi M, Lerer TJ, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury: consensus and opportunities. *J Trauma Acute Care Surg*. 2017;82(5):877–886.

34. Puls M, Kuhls D, Campbell B, Burke P, Michelassi F, Stewart R. Survey of the American College of Surgeons Board of governors on firearm injury prevention: consensus and opportunities. *Bull Am Coll Surg*. 2017; 102(10):30–36.

35. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, Wilkerson D, Benjamin GC, Hubbard WC. Firearm-related injury and death in the U.S.: a call to action from 8 health professional organizations and the American Bar Association. *Ann Intern Med*. 2015;162(7):513–516.

36. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3): 291–299.

37. DiMaggio C, Ayoung-Chee P, Shinseki M, Wilson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S. Traumatic injury in the U.S.: in-patient epidemiology 2000-2011. *Injury*. 2016;47(7):1393–1403.

38. Peek-Asa C, Butcher B, Cavanaugh JE. Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the U.S. *Inj Epidemiol*. 2017; 4(1):20.

39. Wexler L. "gun shy: how a lack of funds translates to inadequate research on gun violence in America". *Hopkins Bloomberg Public Health Fall*. 2017; https://magazine.jhsph.edu/2017/fall/features/cassandra-crifasi-hopkins-moderate-gun-owner-gun-policy-researcher/how-the-dickey-amendment-affects-gun-violence-research.html. Access 5 June 2018.

40. Greenberg J. Spending bill's gun research line: does it nullify dickey amendment? *Politifact*. 27 March 2018. http://www.politifact.com/truth-o-meter/article/2018/mar/27/spending-bills-gun-research-line-does-it-matter/. Accessed 6 June 2018.

41. Pinals DA, Anacker L. Mental illness and firearms: legal context and clinical approaches. *Psychiatr Clin North Am*. 2016;39(4):611–621.

42. Leiner M, De la Vega I, Johansson B. Deadly mass shootings, mental health, and policies and regulations: what we are obligated to do!. *Front Pediatr*. 2018;6:99.

43. Swartz MS, Bhattacharya S, Robertson AG, Swanson JW. Involuntary outpatient commitment and the elusive pursuit of violence prevention. *Can J Psychiatry*. 2017;62(2):102–108.

44. Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wintemute GJ. Handgun acquisitions in California after two mass shootings. *Ann Intern Med*. 2017; 166(10):698–706.

45. Stroebe W, Leander NP, Kruglanski AW. The impact of the Orlando mass shooting on fear of victimization and gun-purchasing intentions: not what one might expect. *PLoS One*. 2017;12(8):e0182408.

46. Smith ER, Shapiro G, Sarani B. The profile of wounding in civilian public mass shooting fatalities. *J Trauma Acute Care Surg*. 2016;81(1):86–92.

47. Behrman P, Redding CA, Raja S, Newton T, Beharie N, Printz D. Society of Behavioral Medicine (SBM) position statement: restore CDC funding for firearms and gun violence prevention research. *Transl Behav Med*. 2018.

48. Wong S. "GOP chairman: congress should rethink CDC ban on gun violence research". *The Hill*. 15 February 2018 http://thehill.com/homenews/house/374149-gop-chairman-congress-should-rethink-cdc-ban-on-gun-violence-research. Accessed 5 June 2018.

49. Basu S, Meghani A, Siddiqi A. Evaluating the health impact of large-scale public policy changes: classical and novel approaches. *Annu Rev Public Health*. 2017;38:351–370.

50. Drange M. The Kentucky gun owner who developed his own count of gun violence in the US. *The Guardian*. 23 April 2016. https://www.theguardian.com/world/2016/apr/23/kentucky-gun-owner-gun-violence-archive-mark-bryant. Accessed 5 June 2018.

51. Murphy SL, Xu J, Kochanek KD, Curtin SA, Elizabeth Arias E. *National Vital Statistics Reports*. Volume 66, Number 6 November 27, 2017. Deaths: Final Data for 2015. Centers for Disease Control and Prevention.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado): Thank you, Dr. Rotondo and Dr. Reilly. Can I please have the discussion video. [sounds of a gun shooting]. Well, that is the AR15 rifle. Literally, 30 potential lethal shots delivered within 10 seconds. Is this safe to have in our society?

I congratulate Dr. DiMaggio and his colleagues from NYU for their superb presentation on a very timely issue. The AAST has had a long-term interest in reducing gun violence in the United States, and has recently published our 14-point approach. Access to assault rifles is one of them. At a reductionist level, mass shootings are the net result of (1) a deranged person intending to kill random individuals in a populated area, and (2) the use of an assault rifle. Since we seem to be unable to identify

© 2018 American Association for the Surgery of Trauma.

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon.

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings. According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis; but I think we need to consider some of the potential limitations.

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate. The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public. The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency.

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition. Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period; whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years.

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States.

You employed the Gun Violence Archive to estimate homicides in 2017. Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018. Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue.

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders. You still assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely. You have idicated that you analyzed mass-shooting fatalities per population per year; perhaps you could elaborate more about this analysis.

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity. The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D.C., have these restrictions in effect. How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010. While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles. The Las Vegas shooting is a cogent example of how these data may be misleading.

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period.

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States. While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution.

**Sheldon H. Teperman, MD** (Bronx, New York): Dr. DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation.

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U.N. General Assembly. But in New York, we don't see long-gun injuries. New York has the Safe Act, and there is an assault weapons ban. So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan): Thank you for your nice presentation. How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee): Thank you. I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem.

This is not a right versus left problem, this is not a Second Amendment problem. This is a public health problem.

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people." So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people.

**Deborah A. Kuhls, MD** (Las Vegas, Nevada): And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time.

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available. Thank you.

**Charles DiMaggio, MPH, PhD** (New York, New York): Thank you very much for all these comments and questions.

Dr. Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission. In this case, we could call assault weapons one link, whether it's agent or host, we can decide.

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area.

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there. I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus.

© *2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition.

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count.

We restricted our analysis to these three databases. And so the limiting factor was the one database. And I can tell you it was the LA Times – they had the fewest number. And if it wasn't in the LA Times, then the other databases didn't contribute to this data set.

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers.

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries. That really raises the number of deaths that can be included. We didn't include it, but I think going forward we absolutely should.

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator. We also felt that population was an imperfect denominator. And again, as we keep on circling around, it has to do with the data in this case.

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities.

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case.

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes. We can distinguish local effects.

We took a very broad approach on this particular study as a first pass on the data. But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies.

Also, we can link our data to other sources that have those variables. There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness.

The issue of the case fatality rate is very interesting and challenging. I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease.

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator. These are indiscriminate weapons.

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case.

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons. They're usually characterized by someone who knows who they want to kill. And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these.

I'm going to close at this point, given the time constraints.

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

# EXHIBIT K

JMIR PUBLIC HEALTH AND SURVEILLANCE
Post et al

Original Paper

# Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis

Lori Post[1], PhD; Maryann Mason[1], PhD; Lauren Nadya Singh[1], MPH; Nicholas P Wleklinski[2], MD; Charles B Moss[3], PhD; Hassan Mohammad[1]; Tariq Z Issa[2], BA; Adesuwa I Akhetuamhen[2], MD; Cynthia A Brandt[4], MD, MPH; Sarah B Welch[1], MPH; James Francis Oehmke[1], PhD

[1]Buehler Center for Health Policy and Economics, Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[2]Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[3]Institute of Food and Agricultural Sciences, University of Florida, Gainsville, FL, United States
[4]Yale Center for Medical Informatics, Yale School of Medicine, Yale University, New Haven, CT, United States

**Corresponding Author:**
Lori Post, PhD
Buehler Center for Health Policy and Economics
Feinberg School of Medicine
Northwestern University
420 E Superior
Chicago, IL, 60611
United States
Phone: 1 203 980 7107
Email: lori.post@northwestern.edu

## Abstract

**Background:** Public mass shootings are a significant public health problem that require ongoing systematic surveillance to test and inform policies that combat gun injuries. Although there is widespread agreement that something needs to be done to stop public mass shootings, opinions on exactly which policies that entails vary, such as the prohibition of assault weapons and large-capacity magazines.

**Objective:** The aim of this study was to determine if the Federal Assault Weapons Ban (FAWB) (1994-2004) reduced the number of public mass shootings while it was in place.

**Methods:** We extracted public mass shooting surveillance data from the Violence Project that matched our inclusion criteria of 4 or more fatalities in a public space during a single event. We performed regression discontinuity analysis, taking advantage of the imposition of the FAWB, which included a prohibition on large-capacity magazines in addition to assault weapons. We estimated a regression model of the 5-year moving average number of public mass shootings per year for the period of 1966 to 2019 controlling for population growth and homicides in general, introduced regression discontinuities in the intercept and a time trend for years coincident with the federal legislation (ie, 1994-2004), and also allowed for a differential effect of the homicide rate during this period. We introduced a second set of trend and intercept discontinuities for post-FAWB years to capture the effects of termination of the policy. We used the regression results to predict what would have happened from 1995 to 2019 had there been no FAWB and also to project what would have happened from 2005 onward had it remained in place.

**Results:** The FAWB resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries. We estimate that the FAWB prevented 11 public mass shootings during the decade the ban was in place. A continuation of the FAWB would have prevented 30 public mass shootings that killed 339 people and injured an additional 1139 people.

**Conclusions:** This study demonstrates the utility of public health surveillance on gun violence. Surveillance informs policy on whether a ban on assault weapons and large-capacity magazines reduces public mass shootings. As society searches for effective policies to prevent the next mass shooting, we must consider the overwhelming evidence that bans on assault weapons and/or large-capacity magazines work.

*(JMIR Public Health Surveill 2021;7(4):e26042)*   doi: 10.2196/26042



XSL•FO
RenderX

JMIR PUBLIC HEALTH AND SURVEILLANCE

Post et al

**KEYWORDS**
firearm surveillance; assault weapons ban; large-capacity magazines; guns control policy; mass shootings; regression lines of discontinuity

## Introduction

### Background

Approximately 44,000 people are killed and an additional 100,000 people are injured by a gun each year in the United States [1,2]. Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths [3] and have largely been ignored until recently [4,5]; yet, mass shooting events occur multiple times per year [6]. This information is based on insights from firearm surveillance performed by a variety of researchers, and state and federal agencies on incidence, prevalence, risk factors, injuries, deaths, and precipitating events, similar to the surveillance of infectious diseases such as COVID-19 [7-21]. Teutch and Thacker [22] defined public health surveillance as

> *the ongoing systematic collection, analysis, and interpretation of health data, essential to the planning, implementation, and evaluation of public health practice, closely integrated to the dissemination of these data to those who need to know and linked to prevention and control.*

Not only do surveillance systems generate hypotheses to test but they also provide the data to test them.

The Federal Assault Weapons Ban (FAWB, also known as the Public Safety and Recreational Firearms Use Protection Act) included a ban on the manufacture for civilian use or sale of certain semiautomatic firearms defined as assault weapons as well as certain large-capacity magazines (LCMs). The Act was in effect for 10 years from 1994 until it sunsetted in 2004. Semiautomatic weapons (rapid fire) and assault weapons (second grip plus other features) are distinct; however, the two are often incorrectly conflated as similar [23-26]. Semiautomatic weapons are defined as weapons that automatically load another cartridge into a chamber, preparing the weapon for firing, but requiring the shooter to manually release and press the trigger for each round [23-26]. By contrast, automatic weapons are similarly self-loading, but allow for a shooter to hold the trigger for continuous fire [27]. Furthermore, the FAWB also prohibited certain ammunition magazines that were defined as "large-capacity" cartridges [28] containing more than 10 bullets [29]. These LCMs can feed ammunition to semiautomatic weapons that do not meet the criteria of being considered assault weapons. Furthermore, LCMs are considered one of the most important features of the FAWB as research has found a relationship between bans on LCMs and casualty counts at the state level [30-34]. The 10-year federal ban was signed into law by President Clinton on September 13, 1994 [28].

Firearm surveillance data have been used to test potential policy responses to prevent mass shootings, including the FAWB [32,34-39], Extreme Risk Protection Orders (also known as red flag laws) [40-45], and federal and state LCM bans [31,32,46]. In particular, it seems likely that the FAWB and LCM bans have potential to affect mass shootings because they regulate weapons and ammunition formats that are designed to enable rapid discharge, which is a key feature in mass shooting incidents [24,47]. Other types of gun deaths may not be responsive to the FAWB or LCM bans. As an example, Extreme Risk Protection Orders or "Red Flag" orders [43,48], which temporarily prohibit at-risk individuals from owning or purchasing firearms, may be effective for preventing firearm suicides or domestic violence homicides [49] but less effective for public mass shooters [50,51]. The prohibition of LCMs may have no impact on firearm suicide because suicide decedents only require one bullet to kill themselves [52].

Several studies during and after the FAWB attempted to determine if gun policy that restricts the production and sale of assault weapons and LCMs decreased gun deaths [53,54]. These initial studies make meaningful contributions to the literature because they describe what constitutes assault weapons, magazine capacity, ballistics, and loopholes in the FAWB legislation [3,53-57]. However, these studies have found little to no evidence that these policies have had any overall effect on firearm homicides, gun lethality, or overall crime [58-61]. Since deaths from public mass shootings comprise less than 1% of all homicides based on our definition, testing whether or not the FAWB/LCM ban has an impact on homicide would wash out the effect. Since the FAWB/LCM ban may be effective at specific types of gun deaths, sampling must be limited to specific types of shooters over overall gun deaths or tests for lethality [62,63]. Finally, the variation in research findings is related to differences in research design, sampling frame, and case definition of a public mass shooting [3,53-56,64,65].

Our study differs from other studies that evaluated the efficacy of the FAWB because we used economic methods and a different outcome variable. Specifically, we focused on whether the FAWB resulted in fewer public mass shooting "events," whereas other studies evaluated the number of gun injuries and deaths that occurred during the course of a mass shooting.

### Objective

The aim of this study was to test whether curbing *access to certain types of guns and magazines* will decrease mass shooting *events*. We sought to empirically answer if there was a relationship between the FAWB and a reduction in mass shooting events.

## Methods

### Data Source

We created a firearm surveillance system based on the National Institute of Justice–funded Violence Project dataset, which culled mass shooting events from 1966 to 2019 [6]. Consistent with earlier studies, we rely on the original Federal Bureau of Investigation (FBI) definition of a massacre, specifically where 4 or more people are killed within a single timeframe. We differentiate our mass shootings from others in that our inclusion criteria require the shootings to have occurred in a public setting.



Post et al

We adapted this definition to only include massacres that involved gun deaths of 4 or more victims to isolate a particular type of mass shooter [66]. Many firearm surveillance systems that include mass shootings use a lower threshold of persons shot and many do not include deaths. An FBI report on active shooters in mass shooting events identified planning and preparation behaviors that are central to prevention [67]. This more narrow definition isolates premeditation, whereas broader definitions may include shooters that are more reactive [68]. Our case definition does not include family annihilators or felony killers because *familicides are defined by the victim-offender relationship, public massacres are defined by location, and felony killings are distinguished by motive* [69]. This differentiation is consistent with other mass shooting studies [70-72].

We examined the annual number of public mass shootings occurring between 1966 and 2019 that resulted in 4 or more fatalities. The hypothesis was that the FAWB reduced the number of public mass shootings per year during the period of the ban. We used regression discontinuity analysis to test the hypothesis. Regression discontinuity analysis is a standard economist tool used in policy analysis taking advantage of quasi-experimental designs [65,73].

**Analyses**

Regression discontinuity analysis allows for discontinuities or shifts in both the intercept and the slope of the trend line at both the onset and sunset of the FAWB. That is, we introduced intercept shift parameters in 1995 and 2005, and trend shift parameters for the periods 1995-2004 and 2005-2019. A statistically significant shift in a parameter indicates a discontinuity (ie, a finding that the FAWB had a statistically significant effect on the number of public mass shootings). We tested for statistical significance of the intercept and trend shift parameters both independently and jointly. All statistical inference was based on a significance level set at .05. We used the Huber-White robust residuals, which attenuate problems of autocorrelation, heteroscedasticity, and some types of model misspecification [74].

We then used the estimated model for two types of counterfactual analysis. First, we used the model to predict the number of public mass shootings that would have occurred had the FAWB not been in place. The difference between this counterfactual prediction and the modeled number of incidents with the FAWB in place provided an estimate of the number of public mass shootings that the FAWB prevented.

Second, we projected forward the number of public mass shootings that would have occurred had the FAWB been permanent (ie, continued from 2004 through to the end of the sample period). We note that in some sense, this is an "out of

sample" exercise because even though the sample extends to 2019, the FAWB ended in 2004; thus, this exercise would not pick up events in the past 15 years that would have augmented or compromised the effects of the FAWB. The difference between the modeled number of public mass shootings and the projected counterfactual number of public mass shootings could provide an estimate of the number of public mass shootings that the FAWB prevented.

We performed a regression of the 5-year moving average of public mass shootings on the US population in millions, the homicide rate, and discontinuity variables to capture both the effects of the FAWB and its discontinuation. We did not introduce a trend line for the entire sample period because it is highly collinear with the population variable. For the period of the FAWB's implementation, we originally introduced an intercept shift, time trend, and shift in the homicide rate; for the post-FAWB period, we introduced an intercept shift and a time trend. Due to collinearity, we retained only the trend shift in the final model for the FAWB period; for the post-FAWB period, we retained both the intercept and the trend shift.

## Results

We identified a total of 170 public mass shooting events, the primary outcome variable, with 4 or more fatalities between 1966 and 2019. The 5-year cumulative number of public mass shootings is shown in Figure 1, providing a visualization of the impacts of the FAWB on the number of shootings. The first mass shooting occurred in 1966; hence, the first data point for the cumulative number of shootings over the previous 5 years occurs in 1970. For 1966 and 1967, the cumulative number of public mass shootings was 3. This number then increased to 12 in 1993 and declined to 3 in 2004. After 2004, the cumulative number of public mass shootings increased to 81 in 2019. The last year of the ban, 2004, experienced the fewest public mass shootings through 2019.

The regression results showed excellent explanatory power ($R^2$=0.94). The coefficient on population was positive and statistically significant (.044, $P$<.001). This coefficient means that for every increase in population of 1 million people, there are an additional .044 public mass shooting events per year. The coefficient on the homicide rate was negative and statistically significant (–.249, $P$=.01). The coefficient on the time trend for the FAWB period captures the effect of the FAWB; this coefficient was negative and statistically significant (–.187, $P$=.001). Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. The intercept discontinuity for 2005-2019 was negative and statistically significant (–2.232, $P$=.001), and the trend coefficient was positive and statistically significant (.081, $P$=.001).



**Figure 1.** Public mass shooting trend line using five year moving averages (1966-2019).

These results are graphed in Figure 2 in which the black stars represent the actual data and the green line represents the predicted numbers of public mass shootings from the regression discontinuity model. A bending of the trend during the FAWB period to become downward sloping at the end of the period is apparent, as is the return of the upward trajectory upon expiration of the FAWB. The red squares represent the projected numbers of public mass shootings during the FAWB period had there been no FAWB. The difference between the red squares and the green lines represents the predicted number of public mass shootings averted by the FAWB. The model predicts that 11 public mass shootings were averted over the period of 1995-2004.

The blue diamonds represent the projected effects of a continuation of the FAWB through 2019 based on the observed trend from 1995 to 2004. This projection indicates that 30 public mass shootings would have been prevented from 2005 to 2019 had the FAWB been left in place.

**Figure 2.** Regression lines from discontinuity analysis of the federal assault weapons ban (1994-2004).



## Discussion

### Principal Findings

In total, 1225 people were killed in a mass shooting over the past 53 years with more than half occurring in the last decade, a function of increases in mass shootings and weapon lethality [62,63,75]. Public mass shooting fatalities and injuries far outpace population growth [75]. Between 1966 and 2019, the US population increased by 67% [76], whereas public mass shooting deaths increased by over 5-fold. The rise in public mass shootings throughout the sample period is in fact partially a function of population growth and homicide rate, along with the effects of the FAWB and its removal. An increase in the US population of 1 million people was associated with an increase of .040 ($P$<.005) public mass shootings per year. During the post-FAWB period, the increase in population from approximately 300 million in 2005 to 330 million in 2019 should be associated with an increase of 1.2 public mass shootings per year, compared to the actual increase of 4 public mass shootings per year in the data (5-year moving average). After controlling for population growth and homicide rate, a positive and statistically significant coefficient (.081, $P$=.001) on the 2005-2018 trend was seen. This further indicates a separate, nonpopulation trend of increasing violence operating during the post-FAWB period. The negative coefficient on the homicide rate invalidates the hypothesis that decreases in the numbers of public mass shootings are simply reflections of an overall decreasing homicide rate. The negative intercept discontinuity is consistent with an effect of the FAWB that persists somewhat beyond the immediate end of the ban. The positive trend coefficient is consistent with the hypothesis that the FAWB was associated with a decrease in the number of public mass shootings, as the expiration of the FAWB was associated with a shift from a downward trend to an upward trend in the number of public mass shootings per year.

The most striking finding from this study is that there was a reduction in the number of public mass shooting events while the FAWB was in place. Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. By projecting what would have happened if the FAWB remained in place, we found that there would have been significantly fewer public mass shootings if the FAWB had remained in place to 2019. Remarkably, although it is intuitive that the removal of assault weapons and magazine clips will reduce the lethality of a mass shooting, we observed an inverse relationship between weapons/ammunition and mass shooting events, meaning that mass shooters may be less likely to perpetrate a mass shooting without rapid fire military-style weapons. This is an independent effect, which indirectly leads to fewer injuries and deaths. DiMaggio et al [64] also found evidence of a decrease in public mass shootings during the ban; however, their study period was shorter and was restricted to 51 public mass shootings. Unlike our study, they implicitly modeled public mass shootings as a random instance of general gun homicides that had a high death count [64]. In contrast, our findings suggest that public mass shootings are a unique type of premeditated gun violence. We found that prior to enactment of the FAWB, the rate of public

mass shootings was increasing. During enactment of the FAWB, there was a downward trend of mass shooting events. After the FAWB was lifted, public mass shootings increased dramatically. Firearm homicides in general follow no such patterns.

This effect was not found in the work of Koper, Roth, and colleagues [53-55]; however, their inclusion of all gun homicides masks the ban's effect on mass shootings. Even though Peterson and Densley's [77] work focused on perpetrator histories and not the FAWB, their findings that ease of gun access is characteristic of public mass shooters further supports our study. We restricted the inclusion criteria to public mass shootings to specifically test the effectiveness of the FAWB on public mass shooting events.

Regardless of the FAWB, bringing a semiautomatic rifle with high magazine capacity to a massacre significantly increases the number of fatalities and injuries. The increase in deaths is a function of rapid fire and increased ballistic energy. The increase in injuries is also a function of rapid fire and high-capacity magazines, enabling the shooter to shoot more people in crowded venues quickly before the crowd can disperse or hide. When controlling for the FAWB, the use of assault rifles decreased by half during implementation of the ban and tripled after the ban was lifted. This is a particularly important finding given that the FAWB had loopholes and that overall violent crime is decreasing [78]. First, all people with an assault weapon prior to the FAWB were allowed to retain their semiautomatic weapons [54,64]. Second, without a buyback program, semiautomatic weapons remained in the community [54,64]. Third, the ban did not target some military assault-like weapons [54,64]. Finally, a major loophole found in gun control legislation is that buyers can bypass background checks by purchasing their weapons and ammunition from gun shows, through illegal purchasing, or legally purchasing their guns and ammunition from another gun owner [57,63,79-87]. Even with these loopholes and issues, there was still a significant reduction in public mass shootings during the FAWB. These loopholes indicate that most people who purchase assault weapons do not become mass shooters; however, mass shooters require assault weapons and LCMs to carry out a mass shooting. Ban effectiveness might have improved if all assault weapons were included in the FAWB.

Some recent studies have specifically analyzed the effects of LCM bans on the incidence of public mass shootings. In a review of state legislation, Webster et al [88] found that bans of LCMs were associated with a significant reduction in the incidence of fatal public mass shootings. This study shows that the FAWB, which included a ban on LCMs, was associated with fewer fatalities and injuries during mass shootings in addition to fewer public mass shooting events. Koper et al [27] previously reported that 19% of public mass shootings resulting in 4 or more fatalities included the use of LCMs, while only 10% involved an assault weapon. Klarevas et al [29] found a similar pattern in shootings of 6 or more people, in which 67% of shooters utilized LCMs, whereas only 26% utilized an assault weapon. Because our study only looked at effects of the FAWB, which included an LCM ban, we were only able to determine the combined effects of limiting assault weapons and LCMs. To be clear, the reduction in the number of public mass


XSL·FO
RenderX

Post et al

shootings, and resulting fatalities and injuries, may be a function of the ban on assault weapons, assault weapons plus LCMs, or only LCMs. We cannot separate out their independent effects at the national level.

Unlike our study, Webster et al [88] did not evaluate the incidence of assault weapons used in public mass shootings. Rather, they focused on fatalities from public mass shootings vs public mass shooting events. Although Webster et al [88] utilized the FBI Supplemental Homicide Report as their dataset, which is a voluntary reporting measurement system prone to errors in reporting, their findings are applicable to our analysis.

## Limitations

Although we found statistically significant decreases during the FAWB, we cannot isolate aspects of the policy that are attributed to the decline. Most notably, the FAWB also included LCMs during the ban. It may be that the type of gun and/or the type of magazine resulted in a decline. Indeed, assault weapons and LCMs provide the means to carry out a mass shooting; however, there are likely other factors beyond this study that partially explain the radical increase in public mass shootings in the post-FAWB period. For example, the FAWB was in place from 1994 to 2004, which is the same time period that the US population largely adopted the internet, along with associated social communication software and websites. This may have resulted in better tracking of public mass shootings or increased media coverage. Because our study specifically targeted the federal legislation, we omitted state-level gun policies such as state-level prohibitions on certain types of guns, LCMs, or more lethal types of bullets. It is likely that the internet serves as a contagion and as a guide to potential mass shooters, allowing them to access weapons and multiple stories about other mass shooters [62,67,89,90].

## Conclusions

In summary, public mass shootings are a unique and specific type of homicide by a gun. We found evidence that public mass shootings are qualitatively different from general homicides because after the FAWB expired, mass shooting events increased while general homicides decreased. The increase in public mass shootings was more dramatic in the final 10 years of the study period following the end of the FAWB. We suspect that these outcomes may be improved by removing existing semiautomatic weapons with large bullet capacity by creating a buyback program for all rapid-firing weapons. Moreover, the legislation would be strengthened if it closed loopholes that allow gun buyers to get around the background check legislation and other purchase prohibitions by exempting gun shows and internet or person-to-person purchases, which were exempted from the FAWB and LCM ban [87].

## Acknowledgments

The Violence Project Mass Shooter database generated data for our surveillance. This study was financially supported by the Buehler Endowment at Feinberg School of Medicine.

## Conflicts of Interest

None declared.

## References

1. Web-based Injury Statistics Query and Reporting System. Centers for Disease Control and Prevention, Injury Prevention and Control. 2020 Jul 01. URL: https://www.cdc.gov/injury/wisqars/index.html [accessed 2021-01-15]
2. Christensen AJ, Cunningham R, Delamater A, Hamilton N. Introduction to the special issue on gun violence: addressing a critical public health challenge. J Behav Med 2019 Aug;42(4):581-583. [doi: 10.1007/s10865-019-00075-8] [Medline: 31367923]
3. Drake B. Mass shootings rivet national attention, but are a small share of gun violence. Pew Research Center. 2013 Sep 17. URL: https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/ [accessed 2020-12-10]
4. Bowers TG, Holmes ES, Rhom A. The nature of mass murder and autogenic massacre. J Police Crim Psych 2009 Nov 7;25(2):59-66. [doi: 10.1007/s11896-009-9059-6]
5. Delisi M, Scherer AM. Multiple homicide offenders. Crim Justice Behav 2016 Jun 30;33(3):367-391. [doi: 10.1177/0093854806286193]
6. Mass shooter database. The Violence Project. 2020. URL: https://www.theviolenceproject.org/ [accessed 2021-01-14]
7. Shelby D. Association between adult alcohol misuse, adult mental health, and firearm storage practices in households with children: findings from the Behavioral Risk Factor Surveillance System (BRFSS). MPH Thesis. ScholarWorks @ Georgia State University. 2021 Dec 09. URL: https://scholarworks.gsu.edu/iph_theses/725 [accessed 2021-01-08]
8. Loder R, Mishra A, Atoa B, Young A. Spinal injury associated with firearm use. Cureus 2021 Mar 16;13(3):e13918 [FREE Full text] [doi: 10.7759/cureus.13918]
9. Mueller KL, Trolard A, Moran V, Landman JM, Foraker R. Positioning public health surveillance for observational studies and clinical trials: The St. Louis region-wide hospital-based violence intervention program data repository. Contemp Clin Trials Commun 2021 Mar;21:100683 [FREE Full text] [doi: 10.1016/j.conctc.2020.100683] [Medline: 33385095]


XSL•FO
RenderX

10. Horn DL, Butler EK, Stahl JL, Rowhani-Rahbar A, Littman AJ. A multi-state evaluation of the association between mental health and firearm storage practices. Prev Med 2021 Apr;145:106389. [doi: 10.1016/j.ypmed.2020.106389] [Medline: 33385422]

11. Gunn JF, Boxer P. Gun laws and youth gun carrying: results from the youth risk behavior surveillance system, 2005-2017. J Youth Adolesc 2021 Mar;50(3):446-458. [doi: 10.1007/s10964-020-01384-x] [Medline: 33420890]

12. Rozel J, Soliman L, Jain A. The gun talk: how to have effective conversations with patients and families about firearm injury prevention. In: Zun LS, Nordstrom K, Wilson MP, editors. Behavioral Emergencies for Healthcare Providers. Switzerland: Springer; Jan 05, 2021:465-473.

13. Keyes KM, Kandula S, Olfson M, Gould MS, Martínez-Alés G, Rutherford C, et al. Suicide and the agent–host–environment triad: leveraging surveillance sources to inform prevention. Psychol Med 2021 Mar 05;51(4):529-537. [doi: 10.1017/s003329172000536x]

14. Bluestein G, Hallerman T. Future directions for firearm injury intervention, policy, and research. In: Lee LK, Fleeger EW, editors. Pediatric Firearm Injuries and Fatalities: The Clinician's Guide to Policies and Approaches to Firearm Harm Prevention. Switzerland: Springer; Feb 06, 2021:223-234.

15. Oehmke J, Moss C, Singh L, Oehmke T, Post L. Dynamic panel surveillance of COVID-19 transmission in the United States to inform health policy: observational statistical study. J Med Internet Res 2020 Oct 05;22(10):e21955 [FREE Full text] [doi: 10.2196/21955] [Medline: 32924962]

16. Oehmke J, Oehmke T, Singh L, Post L. Dynamic panel estimate-based health surveillance of SARS-CoV-2 infection rates to inform public health policy: model development and validation. J Med Internet Res 2020 Sep 22;22(9):e20924 [FREE Full text] [doi: 10.2196/20924] [Medline: 32915762]

17. Post L, Benishay E, Moss C, Murphy R, Achenbach C, Ison M, et al. Surveillance metrics of SARS-CoV-2 transmission in central Asia: longitudinal trend analysis. J Med Internet Res 2021 Feb 03;23(2):e25799 [FREE Full text] [doi: 10.2196/25799] [Medline: 33475513]

18. Post LA, Issa TZ, Boctor MJ, Moss CB, Murphy RL, Ison MG, et al. Dynamic public health surveillance to track and mitigate the US COVID-19 epidemic: longitudinal trend analysis study. J Med Internet Res 2020 Dec 03;22(12):e24286 [FREE Full text] [doi: 10.2196/24286] [Medline: 33216726]

19. Post LA, Lin JS, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 wave two surveillance in East Asia and the Pacific: longitudinal trend analysis. J Med Internet Res 2021 Feb 01;23(2):e25454 [FREE Full text] [doi: 10.2196/25454] [Medline: 33464207]

20. Post L, Marogi E, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 surveillance in the Middle East and North Africa: longitudinal trend analysis. J Med Internet Res 2021 Jan 15;23(1):e25830 [FREE Full text] [doi: 10.2196/25830] [Medline: 33302252]

21. Post LA, Argaw ST, Jones C, Moss CB, Resnick D, Singh LN, et al. A SARS-CoV-2 surveillance system in Sub-Saharan Africa: modeling study for persistence and transmission to inform policy. J Med Internet Res 2020 Nov 19;22(11):e24248 [FREE Full text] [doi: 10.2196/24248] [Medline: 33211026]

22. Teutsch S, Thacker S. Planning a public health surveillance system. Epidemiol Bull 1995 Mar;16(1):1-6. [Medline: 7794696]

23. Jacobs J, Fuhr Z. The Safe Act: New York's ban on assault weapons and large capacity magazines. Crim Law Bull 2017 Jun 29;53(1):4 [FREE Full text]

24. Wallace EG. Assault weapon myths. South Ill Univ Law J 2018 Nov 18;43:193. [doi: 10.4135/9781452229300.n127]

25. Kopel D, Lowy J, Rostron A. Heller and "Assault Weapons". Campbell Law Rev 2018 Feb 02;40(2):461-480 [FREE Full text]

26. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 26;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

27. Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. J Urban Health 2018 Jun;95(3):313-321 [FREE Full text] [doi: 10.1007/s11524-017-0205-7] [Medline: 28971349]

28. United States Congress House Committee on the Judiciary. Subcommittee on Crime and Criminal Justice. Public Safety and Recreational Firearms Use Protection Act. In: Hearing before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, second session, on H.R. 3527. Washington, DC: US Government; Apr 25, 1994.

29. Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. Am J Public Health 2019 Dec;109(12):1754-1761. [doi: 10.2105/ajph.2019.305311]

30. Kleck G. Large-capacity magazines and the casualty counts in mass shootings. Justice Res Policy 2016 Jun 01;17(1):28-47. [doi: 10.1177/1525107116674926]

31. Abbasi J. Large-capacity magazine bans linked with fewer mass shootings, deaths. JAMA 2020 Jan 14;323(2):108-109. [doi: 10.1001/jama.2019.20457] [Medline: 31851333]

32. Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high‐capacity semiautomatic firearms. Criminol Public Policy 2020 Jan 10;19(1):147-170. [doi: 10.1111/1745-9133.12485]



JMIR PUBLIC HEALTH AND SURVEILLANCE                                                                                                    Post et al

33.  Towers S, Wallace D, Hemenway D. Temporal trends in public mass shootings: high-capacity magazines significantly increase fatality counts, and are becoming more prevalent. medRxiv preprint server. 2019 Dec 15. URL: https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 [accessed 2021-04-17]

34.  Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

35.  Lowy J. Comments on assault weapons, the right to arms, and the right to live. Harv J Law Public Policy 2020;43(2):375-386 [FREE Full text]

36.  Kim A. United States gun policy and the effect on mass shootings. California State University Northridge Scholarworks Open Access Repository. Northridge, CA: CSU Northridge University Library; 2020 Aug 25. URL: http://hdl.handle.net/10211.3/217278 [accessed 2020-12-06]

37.  Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 26;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

38.  Balakrishna M, Wilbur KC. How the Massachusetts Assault Weapons Ban Enforcement Notice changed firearm sales. SSRN J 2021 Feb 4:1-51 [FREE Full text] [doi: 10.2139/ssrn.3779510]

39.  Soto L, Chheda S, Soto J. Reducing fatalities in mass attacks and the related matter of gun control policy following the El Paso August 2019 shooting. Tex Hisp J Law Policy 2020;26:85.

40.  Nagin DS, Koper CS, Lum C. Policy recommendations for countering mass shootings in the United States. Criminol Public Policy 2020 Jan 10;19(1):9-15. [doi: 10.1111/1745-9133.12484]

41.  Gay C. 'Red Flag' laws: how law enforcement's controversial new tool to reduce mass shootings fits within current Second Amendment jurisprudence. Boston Coll Law Rev 2020 Apr 30;61(4):1491-1533 [FREE Full text]

42.  Nielsen D. Disarming dangerous persons: how Connecticut's Red Flag Law saves lives without jeopardizing constitutional protections. Quinnipiac Health Law J 2020;23(3):253.

43.  Blocher J, Charles J. Firearms, extreme risk, and legal design: "Red Flag" laws and due process. Virginia Law Rev 2020 Oct 19;106(6):1285.

44.  Kopel DB. Red Flag Laws: proceed with caution. Law Psychol Rev 2020 Jul 16:forthcoming [FREE Full text] [doi: 10.2139/ssrn.3653555]

45.  Blodgett S. Dementia, guns, Red Flag laws: Can Indiana's Statute balance elders' constitutional rights and public safety? NAELA J 2020 Sep;16:1-22 [FREE Full text]

46.  Kerr S. "What We Need Is Bullet Control": could regulation of bullets reduce mass shootings? In: Crews G, editor. Handbook of Research on Mass Shootings and Multiple Victim Violence. Hershey, PA: IGI Global; Oct 2019:432-446.

47.  Moore EE. Another mass shooting: Time to ban the assault rifle. J Trauma Acute Care Surg 2018 Jun;84(6):1036. [doi: 10.1097/TA.0000000000001863] [Medline: 29799817]

48.  Delaney GA, Charles JD. A double-filter provision for expanded Red Flag laws: a proposal for balancing rights and risks in preventing gun violence. J Law Med Ethics 2020 Dec;48(4_suppl):126-132. [doi: 10.1177/1073110520979412] [Medline: 33404308]

49.  Honberg RS. Mental illness and gun violence: research and policy options. J Law Med Ethics 2020 Dec;48(4_suppl):137-141. [doi: 10.1177/1073110520979414] [Medline: 33404306]

50.  Laqueur HS, Wintemute GJ. Identifying high‐risk firearm owners to prevent mass violence. Criminol Public Policy 2019 Dec 16;19(1):109-127. [doi: 10.1111/1745-9133.12477]

51.  Pallin R, Schleimer JP, Pear VA, Wintemute GJ. Assessment of extreme risk protection order use in California from 2016 to 2019. JAMA Netw Open 2020 Jun 01;3(6):e207735 [FREE Full text] [doi: 10.1001/jamanetworkopen.2020.7735] [Medline: 32556258]

52.  Hurka S, Knill C. Does regulation matter? A cross‐national analysis of the impact of gun policies on homicide and suicide rates. Regul Gov 2018 Dec 21;14(4):787-803. [doi: 10.1111/rego.12235]

53.  Koper C, Roth J. The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. J Quant Criminol 2001 Mar;17(1):33-74.

54.  Koper C, Woods D, Roth J. Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, United States Department of Justice. 2004 Jul. URL: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf [accessed 2020-12-11]

55.  Roth J, Koper C, Adams W, Johnson S, Marcotte J, McGready J, et al. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report. Urban Institute. Washington, DC: The Urban Institute; 1997 Mar 13. URL: https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994/view/full_report [accessed 2021-02-10]

56.  Webster D, Vernick J, McGinty E, Alcorn T. Regulating Gun Sales: An Excerpt from Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press; 2013.

57.  Jacobs J. Can Gun Control Work? (Studies in Crime and Public Policy). Oxford: Oxford University Press; Oct 14, 2004.



58.  Lee LK, Fleegler EW, Farrell C, Avakame E, Srinivasan S, Hemenway D, et al. Firearm laws and firearm homicides: a systematic review. JAMA Intern Med 2017 Jan 01;177(1):106-119. [doi: 10.1001/jamainternmed.2016.7051] [Medline: 27842178]

59.  Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett 2013 Nov 26;21(4):265-267. [doi: 10.1080/13504851.2013.854294]

60.  Cook P, Goss K. The Gun Debate: What Everyone Needs to Know. New York: Oxford University Press; May 01, 2014.

61.  Cook P, Goss K. The Gun Debate: What Everyone Needs to Know, 2nd Edition. New York: Oxford University Press; Apr 16, 2020.

62.  Lankford A, Silver J. Why have public mass shootings become more deadly? Criminol Public Policy 2019 Dec 16;19(1):37-60. [doi: 10.1111/1745-9133.12472]

63.  Schiff M. IZA Discussion Paper 12784: Greater US gun ownership, lethality and murder rates: analysis and policy proposals. IZA Institute of Labor Economics. 2019 Nov 27. URL: https://www.iza.org/publications/dp/12784/greater-us-gun-ownership-lethality-and-murder-rates-analysis-and-policy-proposals [accessed 2021-04-17]

64.  DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019 Jan;86(1):11-19. [doi: 10.1097/ta.0000000000002060]

65.  World Telecommunication/ICT Indicators Database 2020 (24th Edition). International Telecommunications Union. Geneva: International Telecommunications Union; 2021 Jan. URL: https://www.itu.int/en/ITU-D/Statistics/Pages/publications/wtid.aspx [accessed 2021-04-17]

66.  Lopez G. America's unique gun violence problem, explained in 17 maps and charts. Vox. 2021 Mar 23. URL: https://www.vox.com/policy-and-politics/2017/10/2/16399418/boulder-colorado-mass-shooting-gun-violence-statistics-charts [accessed 2021-03-29]

67.  Silver J, Simons A, Craun S. A study of the pre-attack behaviors of active shooters in the United States between 2000 and 2013. FBI Documents. Washington, DC: US Department of Justice, Federal Bureau of Investigations; 2018. URL: https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view [accessed 2020-10-25]

68.  DeFoster R, Swalve N. Guns, culture or mental health? Framing mass shootings as a public health crisis. Health Commun 2018 Oct;33(10):1211-1222. [doi: 10.1080/10410236.2017.1350907] [Medline: 28841045]

69.  Fridel EE. A multivariate comparison of family, felony, and public mass murders in the United States. J Interpers Violence 2021 Feb;36(3-4):1092-1118. [doi: 10.1177/0886260517739286] [Medline: 29294976]

70.  Duwe G. Mass murder in the United States: a history. Jefferson, NC: McFarland & Company; Jan 07, 2007.

71.  Fox J, Levin J. Mass confusion concerning mass murder. Criminologist 2015;40(1):8-11 [FREE Full text] [doi: 10.4135/9781412950619.n277]

72.  Fox JA, Levin J. Firing back: the growing threat of workplace homicide. An Am Acad Pol Soc Sci 2016 Sep 08;536(1):16-30. [doi: 10.1177/0002716294536001002]

73.  Stevenson AJ, Flores-Vazquez IM, Allgeyer RL, Schenkkan P, Potter JE. Effect of removal of Planned Parenthood from the Texas Women's Health Program. N Engl J Med 2016 Mar 03;374(9):853-860. [doi: 10.1056/nejmsa1511902]

74.  Freedman DA. On the so-called "Huber Sandwich Estimator" and "Robust Standard Errors". Am Statistician 2006 Nov;60(4):299-302. [doi: 10.1198/000313006x152207]

75.  Duwe G. Mass shootings are getting deadlier, not more frequent. Politico Magazine. 2017 Oct 04. URL: https://www.politico.com/magazine/story/2017/10/04/mass-shootings-more-deadly-frequent-research-215678/ [accessed 2021-01-30]

76.  Population Trends. United States Census Bureau. 2019. URL: https://www.census.gov/ [accessed 2019-08-26]

77.  Peterson J, Densley J. We have studied every mass shooting since 1966. Here's what we've learned about the shooters. Los Angeles Times. 2019 Aug 04. URL: https://www.latimes.com/opinion/story/2019-08-04/el-paso-dayton-gilroy-mass-shooters-data [accessed 2020-02-01]

78.  Klingner DE, Williams E. Topic: Public Safety. Public Integrity 2019 Mar 06;21(2):220-224. [doi: 10.1080/10999922.2019.1565268]

79.  Hand C. Gun control and the Second Amendment. Minneapolis, MN: ABDO; Dec 15, 2016.

80.  Popovits A. Dominican University of California Political Science & International Studies (Senior Thesis). 2020 May. URL: https://tinyurl.com/se3vrmd6 [accessed 2020-12-01]

81.  Miller SV. What Americans think about gun control: evidence from the General Social Survey, 1972-2016. Soc Sci Quart 2018 Nov 18;100(1):272-288. [doi: 10.1111/ssqu.12555]

82.  Kellner D. School shootings, societal violence and gun culture. In: Shapiro H, editor. The Wiley Handbook on Violence in Education: Forms, Factors, and Preventions. Medford, MA: John Wiley & Sons, Inc; 2018:53-68.

83.  Schildkraut J. Assault weapons, mass shootings, and options for lawmakers. Rockefeller Institute of Government. 2019 Mar 22. URL: https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/ [accessed 2021-02-11]

84.  Jacobs J, Fuhr Z. The potential and limitations of universal background checking for gun purchasers. Wake Forest J Law Policy 2017;7(2):537-583.



85. Braga AA, Brunson RK, Cook PJ, Turchan B, Wade B. Underground gun markets and the flow of illegal guns into the Bronx and Brooklyn: a mixed methods analysis. J Urban Health 2020 Sep 04:online ahead of print. [doi: 10.1007/s11524-020-00477-z] [Medline: 32888157]

86. Chai C. Gun control: can we take a shot at it? AMASS 2019;24(2):34-36.

87. Goldberg J. The case for more guns (and more gun control). The Atlantic. 2012 Dec. URL: https://www.theatlantic.com/magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/ [accessed 2020-11-20]

88. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

89. Lankford A, Madfis E. Media coverage of mass killers: content, consequences, and solutions. Am Behav Sci 2018 Mar 20;62(2):151-162. [doi: 10.1177/0002764218763476]

90. Kien S, Begay T, Lee A, Stefanidis A. Social media during the school shooting contagion period. Violence Gender 2019 Dec 01;6(4):201-210. [doi: 10.1089/vio.2019.0043]

## Abbreviations

**FAWB:** Federal Assault Weapons Ban
**FBI:** Federal Bureau of Investigation
**LCM:** large-capacity magazine

*Edited by G Eysenbach, T Sanchez; submitted 19.02.21; peer-reviewed by T Alcorn; comments to author 12.03.21; revised version received 24.03.21; accepted 30.03.21; published 22.04.21*

*Please cite as:*
*Post L, Mason M, Singh LN, Wleklinski NP, Moss CB, Mohammad H, Issa TZ, Akhetuamhen AI, Brandt CA, Welch SB, Oehmke JF*
*Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*
*JMIR Public Health Surveill 2021;7(4):e26042*
*URL: https://publichealth.jmir.org/2021/4/e26042*
*doi: 10.2196/26042*
*PMID: 33783360*

©Lori Post, Maryann Mason, Lauren Nadya Singh, Nicholas P Wleklinski, Charles B Moss, Hassan Mohammad, Tariq Z Issa, Adesuwa I Akhetuamhen, Cynthia A Brandt, Sarah B Welch, James Francis Oehmke. Originally published in JMIR Public Health and Surveillance (https://publichealth.jmir.org), 22.04.2021. This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Public Health and Surveillance, is properly cited. The complete bibliographic information, a link to the original publication on https://publichealth.jmir.org, as well as this copyright and license information must be included.



# EXHIBIT L

Opinion

# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.

Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201

Supplemental content

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semiautomatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

© 2022 American Medical Association. All rights reserved.

Opinion   Viewpoint

### Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

### The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shooting in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

### Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

### Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

**ARTICLE INFORMATION**

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

**REFERENCES**

**1**. Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know*. 2nd ed. Oxford University Press; 2020.

**2**. Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

**3**. Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

**4**. Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy*. RAND; 2020.

**5**. Duwe G. Patterns and prevalence of lethal mass violence. *Criminol Public Policy*. 2020;19(1):17-35. doi:10.1111/1745-9133.12478

**6**. Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

**7**. Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://www.theviolenceproject.org/mass-shooter-database/

**8**. Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

**9**. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3):291-299. doi:10.1001/jama.2016.8752

**10**. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

© 2022 American Medical Association. All rights reserved.

# EXHIBIT M

*Philip J. Cook*

# Research in Criminal Deterrence: Laying the Groundwork for the Second Decade

ABSTRACT

Deterrence theory has been developed primarily by economists, who have viewed potential criminals as rational decision-makers faced with an array of illicit opportunities characterized by costs (time, possible adverse legal consequences, and so forth) and payoffs. The crime decision is thus characterized in a way that fits the well-developed theoretical framework of decision-making under uncertainty. Herbert Simon and others have questioned the descriptive accuracy of this theory, and are beginning to uncover systematic patterns in decision-making that violate the predictions of the economic theory: this work could usefully be incorporated into the crime choice framework. One of the most important issues for further research in this area is the way in which potential criminals acquire information about criminal opportunities and the effectiveness of the criminal justice system. A simple "realistic" model of threat communication can be outlined that yields deterrence-like effects, even though no one is well informed concerning the true effectiveness of the system. Three other questions that have been of great interest to deterrence theorists are discussed: (1) what factors influence the rate at which active criminals commit crimes; (2) which dimension of the threat of punishment has a greater deterrent effect—likelihood or severity; and (3) what effect does the threat of punishment for one type of crime have on involvement in other criminal activities?

Philip J. Cook is Associate Professor of Public Policy Studies and Economics, Duke University.

212    Philip J. Cook

Much of the recent empirical work on deterrence has used
a fundamentally flawed approach to estimating the responsiveness
of crime rates to sanction probability and severity. The flaw is
that the measures of "probability of punishment" used in these
studies reflect the choices made by criminals as well as the
intrinsic effectiveness of the criminal justice system. Therefore,
these measures do not serve as appropriate indices of criminal
justice system effectiveness. The empirical approach that appears
most productive is the evaluation of discrete changes in law
and policy—"natural experiments," that can tell us a good
deal about the deterrence process.

The core concern of deterrence research has been to develop a
scientific understanding of the relationship between the crime
rate and the threat of punishment generated by the criminal jus-
tice system. A decade ago, criminologists tended to view deter-
rence as an archaic theoretical construct associated with Ben-
tham, Beccaria, and other somewhat naive scholars from the
distant past. Deterrence research has enjoyed a revival during
the 1970s, but so far has produced little more than a frame of
reference, a variety of hypotheses and suppositions, and a scat-
tering of empirical observations which are more anecdotal than
systematic.

This essay serves in part as an introduction to modern research
in criminal deterrence. My main concerns are to present a clear
statement of the questions that have motivated social scientists
working in this area, and a critical discussion of the methods used
to answer these questions. This literature has already been sum-
marized and critiqued by a number of scholars (e.g., Brier and
Fienberg 1978; Carroll forthcoming; Chaiken 1978; Cook 1977;
Ehrlich 1979; Gibbs 1975; Nagin 1978; Walker 1979; Zimring
and Hawkins 1973). The most notable contribution of this sort
is the recent report of the National Academy of Sciences Panel
on Deterrence and Incapacitation (Blumstein, Cohen, and Nagin
1978), which offers a very well-documented assessment of the
empirical literature. While this essay inevitably covers some of
the same ground, it is more a complement than a substitute for
the panel report; for example, I devote considerably more atten-
tion to discussing the theory of criminal choice, and organize

213    Research in Criminal Deterrence

my discussion of the empirical literature in a way that I believe
offers important new insights into the problems and prospects
of this work.

For those who have not already acquired a taste for the the-
oretical and empirical investigation of criminal deterrence, some
initial attempt to motivate the reader may be helpful. When
criminologists assemble to exchange thoughts on crime control,
a common observation is that the criminal justice system has
little impact on crime rates; the big effects, so it is said, come
from "root causes" such as demographic patterns, the influence
of family and neighborhood, and the distribution of legitimate
opportunities. Yet consider the likely consequences if we dis-
banded the police and rewrote the criminal codes to eliminate
sanctions; there would surely be a crime wave of unprecedented
proportions. Evidence from police strikes and related incidents
supports this prediction.[1] Furthermore, the inevitable response
to mushrooming crime rates would be the widespread develop-
ment of private alternatives to the criminal justice system—vig-
ilante groups and vastly increased efforts at private protection.[2]
My assessment is that the criminal justice system, ineffective
though it may seem in many areas, has an overall crime deterrent
effect of great magnitude, and would quickly be reinvented in
some form by the private sector if government got out of the
business of issuing threats of punishment to would-be criminals.
If this assessment is correct, it would be fair to say that the
deterrents generated by the justice system have a large civilizing
influence which is by no means minor in comparison to the in-
fluence of "root causes" of crime.

The everyday debates in the criminal justice policy arena are

[1] Police strikes in Liverpool (1919) and Montreal (1956) and the mass arrest
of the Copenhagen police force by the Nazis in 1944 are discussed by Johannes
Andenaes (1974). The huge increase in crime rates that followed each of these
events is persuasive evidence that the threat of punishment has a substantial
inhibiting effect on crime.

[2] Current private expenditures on protection against crime probably exceed
total public expenditures on the criminal justice system. Bartel (1975) gives
some empirical results on the demand for private protection, and both she and
Clotfelter (1977) discuss the degree of substitutability between public and
private expenditures.

214    Philip J. Cook

not, of course, concerned with whether to stop punishing crim-
inals entirely, but rather with questions of degree: how many
tax dollars should be devoted to apprehending and punishing
criminals, how severe a punishment is appropriate for each crime
type, and so forth. The evaluation of these issues hinges in part
on our assessment of the *marginal* deterrent effects of changes in
the certainty and severity of punishment, a more problematic
issue than assessing the overall deterrent effect of current threat
levels. It is quite possible that mild penalties are almost as effec-
tive as severe penalties, or that a 50 percent change either way
in the size of the typical big-city police department would have
a much less than proportionate effect on crime. If there are sharp-
ly decreasing returns to scale in criminal justice system activities,
then there is no contradiction between my assessment that the
overall deterrent effect of the system is enormous, while the
effect at the margin tends to be small or perhaps even zero in
some instances. Estimating the magnitudes of marginal deterrent
effects stemming from various criminal justice system activities
is the ultimate task facing scholars in this area.

What is actually known about these magnitudes? The answer
is "not much," if we exclude theoretical speculation, laboratory
experiments, and results derived from badly flawed data and
statistical methods. What is left is a collection of anecdotes—
case studies—that suggest only one generalization: a wide range
of criminal activity is subject to the influence of legal threats.
A sample of recent findings supports this generalization. (1)
Large increases in police patrol activity were effective in reduc-
ing robberies in New York City subways (Chaiken, Lawless,
and Stevenson 1974) and outdoor felonies in the Twentieth Pre-
cinct of New York (Press 1971). (2) The increase in the per-
ceived probability and severity of punishment for drunk driving
resulting from the British Road Safety Act was initially very
effective in reducing this crime and alcohol-related accident rates
(Ross 1973, 1977). A reduction in the legal minimum drinking
age from twenty-one to eighteen in Michigan, Wisconsin, and
Ontario caused a small increase in alcohol-related accidents for
this age group (Williams et al. 1975). (3) Draft evasion rates

during the Vietnam war era were responsive to conviction rates
(Nagin and Blumstein 1977). (4) The increase in the likelihood
of arrest for attempted airline hijacking that resulted from the
airport security measures adopted in 1973 virtually eliminated
this crime (Landes 1978). (5) The increase in the statutory pun-
ishment for carrying a gun illegally in Massachusetts (the Bart-
ley-Fox Amendment) apparently reduced the use of guns in
violent crime (Pierce and Bowers 1979).

These studies suggest that there exist feasible actions on the
part of the criminal justice system that may be effective in de-
terring crimes committed by drunks (driving under the influ-
ence) and desperate men (hijacking); crimes that are widespread
and not considered immoral (carrying a concealed weapon, un-
derage drinking); crimes that are, for some at least, a matter of
conscience (draft evasion); and common crimes of theft and
violence. These studies do *not* demonstrate that all types of
crimes are potentially deterrable, and certainly they provide
little help in predicting the effects of any specific governmental
action.

What about the various hypotheses and suppositions that con-
stitute the conventional wisdom concerning deterrence? Are
crime rates more responsive to changes in the probability of
punishment than to equivalent changes in the severity of punish-
ment? Are juveniles less deterrable than adults? Are "crimes of
passion" deterrable at all? These and related questions may be
answered by "common sense" or theoretical considerations, but
relevant empirical evidence is weak or nonexistent. The first
decade of social science research in criminal deterrence has gen-
erated many interesting questions but few answers.

This essay is organized as follows. Section I explains the model
of individual rational choice, which is the centerpiece of deter-
rence theory, with an eye to answering the objections of those
who find the model silly or implausible. I include a discussion
of three questions of great interest to deterrence theorists. (1)
What factors determine the rate at which an active criminal com-
mits crimes? (2) Which dimension of the threat of criminal
punishment has a greater deterrent effect—probability or severi-

ty? (3) What effect does the threat of punishment for one type
of crime have on involvement in other criminal activities? Sec-
tion II describes, analyzes, and rejects the "Ehrlich paradigm,"
the approach to estimating the deterrence effects that has dom-
inated the literature during the last decade. Section III then sum-
marizes and assesses the policy evaluation literature, with greater
focus on technique than on specific findings. The final section
proposes a partial research agenda for deterrence research in the
1980s.

## I. The Crime Decision: Theoretical Perspectives on
the Deterrence Process

The role of theory in the study of criminal deterrence, as in other
scientific inquiries, is to generate interesting, testable hypotheses
and provide a framework for interpreting empirical observations.
A "good" theory explains known facts in a parsimonious way
and generates accurate predictions. There are two main issues to
be considered in a complete theory of criminal deterrence: first,
the influence of the threat of criminal sanctions on the choices
made by individuals regarding their participation in criminal ac-
tivity; and second, the effectiveness of various criminal justice
system activities in producing threats. This section is limited to
the first issue; the threat production process is discussed briefly
in section II.

### A. The Rational Potential Criminal

An increase in the probability or severity of punishment for
a particular type of crime, or both, will reduce the rate at which
that crime is committed, other things being equal. This assertion
is not an assumption but, rather, is derived from a theoretical
argument, developed primarily by economists in recent years.[3]
Observed crime rates are viewed as the aggregate result of
choices made by rational individuals. Potential criminals weigh
the possible consequences of their actions, both positive and
negative, and take advantage of a criminal opportunity only if

[3] See Heineke (1978a) for a recent review. Gary Becker (1968) gave the
first statement of this theory in modern times; his work was extended by Ehr-
lich (1973), Block and Lind (1975), Block and Heineke (1975), and others.

217    Research in Criminal Deterrence

it is in their self-interest to do so. Jeremy Bentham expressed
the point this way: "[T]he profit of the crime is the force which
urges a man to delinquency: the pain of the punishment is the
force employed to restrain him from it. If the first of these
forces is the greater the crime will be committed: if the second,
the crime will not be committed" (quoted in Zimring and Hawk-
ins 1973, p. 75).

A satisfactory characterization of the "rational potential crim-
inal" must elaborate on Bentham's proposition to take into ac-
count the subjectivity of "profit" and "pain," as well as individ-
ual differences in objective circumstances. Individuals respond
differently to equivalent criminal opportunities, for reasons that
include the following:

1. Individuals differ in their willingness to accept risks. The
consequences of committing a crime are uncertain. Arrest and
conviction are always less than certain, and for some common
crimes the probabilities are small indeed. The consequences of
conviction are also uncertain, given the wide discretionary power
of judges in sentencing. Potential criminals will differ in their
assessment of the probability of "losing" the gamble offered by
a particular criminal opportunity, and also differ in the degree
to which they are risk-averse.

2. Individuals differ with respect to "honesty preference"—
the strength of their preference for behaving in a law-abiding
manner. How much net "profit" is required to persuade an in-
dividual to overcome his ethical concern for staying within the
law? Furthermore, for crimes that are *malum in se*, the individ-
ual's ethical concern may extend to the criminal act itself.

3. Individuals differ with respect to their evaluation of the
"profit" to be gained from a crime. These differences are largest
for crimes for which the payoff is not money (which most every-
one values) but rather is "in kind"—consider, for example, crimes
of violence, vandalism, draft evasion, and double parking.

4. Individuals differ in their objective circumstances: their in-
come, the value they place on their time, their skills in commit-
ting crimes successfully and evading capture, and their reputa-
tion in the community. An arrest for shoplifting, followed by a

dismissal of charges, may be of little consequence for an unem-
ployed teenager but may ruin the life of a college professor. An
individual's circumstances also influence the nature of criminal
opportunities available to him—few of us are in a position to em-
bezzle money, fix prices, or commit treason.

Thus, the "profit" and "pain" associated with equivalent crim-
inal opportunities will be evaluated differently by different in-
dividuals. Some may find it very worthwhile, others will be close
to indifferent, while a third group will view it as highly unat-
tractive. The key point is that a change in either the probability
or average severity of punishment will cause some people to
change their minds about whether the opportunity is, on balance,
attractive, and thereby change their behavior. A small change
will affect only those who were previously close to indifference
(perceived "profit" and "pain" about equal); changing the be-
havior of others will require a larger change in probability or
severity.

Most discussions of the deterrence mechanism distinguish be-
tween "general" and "special" deterrence. The latter concept
refers to the deterrent effect of punishment on those who have
been punished. This notion is a bit vague (Walker 1979). It is
possible that those who have suffered a criminal sanction once
will be more likely to be deterred by the threat of punishment
thereafter, but there is no evidence to support this notion.

The threat of punishment may play a grander role than simply
acting as a debit in the potential criminal's cost-benefit analysis
of a crime opportunity. Cook (1977) discusses its role as a so-
cializing and moralizing force.

Punishment in the form of incarceration reduces crime by in-
capacitating inmates (Cohen 1978). Correctional treatments may
also reduce crime by rehabilitating some convicts, although exist-
ing programs appear to be largely ineffective (Lipton, Martinson,
and Wilks 1975).

### B. Objections to the Theory

The economists' theory of criminal deterrence, as characterized
above, has been useful in developing the implications of a long
neglected notion in the criminology literature—that criminals can

219    Research in Criminal Deterrence

be viewed as rational decision makers intent on furthering their
personal welfare in an environment that provides crime oppor-
tunities coupled with sanction threats. However, some critics find
this assumption of rationality in the decision to commit a crime
highly implausible and inconsistent with descriptive evidence on
criminal behavior. Herbert Jacob (1979) succinctly states the
two major objections with that assumption:

> (a) It implies that people who contemplate committing a
> crime have a realistic perception of the probabilities of being
> sanctioned and of the severity of the sanction. The little
> evidence we have on perceptions of legal sanctions by the
> general public indicates that these perceptions are incorrect
> and variable. . . . (b) It implies that people who commit
> crimes act after rational calculation rather than on impulse.
> We have much reason to believe that many crimes are
> committed on impulse, either under the influence of
> alcohol or simply as the result of opportunity and
> need intersecting. (p. 584)

Jacob's arguments are persuasive, and lead many criminologists
to conclude that common appropriative crimes and much vio-
lence are not very responsive to the threat of punishment. But
this conclusion does not follow from his argument. The existence
of a strong deterrent effect does not require that potential crim-
inals be fully informed or fully rational in their crime deci-
sions. A theoretical model which postulates full rationality on
the part of criminals is clearly "unrealistic" but may nonetheless
generate valid predictions because it contains essential elements
of truth. The assumptions of a rational choice/full information
model can be relaxed without undermining the prediction that
an increase in the threat of punishment will reduce crime. I deal
with Jacob's objections in reverse order, since the second point
is more fundamental.

   *1. Limits on rational calculation.* It may be true, as Jacob sug-
gests, that many criminals do not consider the consequences of
their acts, other than those consequences which are obvious, cer-
tain, and immediate. This impulsiveness is often thought to be
particularly characteristic of youths and of people who are in-

toxicated, in a state of high emotional arousal, deviant, or emotionally disturbed. These groups constitute a large percentage of the perpetrators of some types of crime. Are these crimes deterrable? Two affirmative arguments are worth mentioning.

Deterrence theory is concerned with making predictions about aggregate behavior. The accuracy of such predictions does not require that every individual act predictably. The prediction that crime is deterrable follows just as readily from an assumption that 10 percent of criminals are capable of rational decision-making, as from an assumption that *all* potential criminals have this ability; assuming, that is, that the remaining 90 percent do not respond to a change in the threat level in a systematically perverse fashion.

The deterrence mechanism does not require that each crime opportunity be evaluated separately or fully. Herbert Simon (1957) and his followers (Payne 1980) have developed the notion of "limited rationality" as a descriptively more accurate alternative to the "full rationality" notion propounded by economic theorists (see Carroll 1978 for a discussion of this issue in the context of the crime decision). Limited rationality models of decision-making incorporate observed limitations on people's capacity to acquire and process information. In particular, it is thought that people tend to economize on this scarce capacity by adopting rules of thumb, or "standing decisions," which eliminate the need completely to analyze every new decision. A person whose judgment is impaired by emotion or inebriation may still be guided by his personal standing decisions, which in turn may reflect concern with the threat of punishment. Most of us have long ago adopted standing decisions to refrain from robbery and assault, no matter what the circumstances. An increase in the threat of punishment may have the effect of persuading more people to adopt such decisions, thus inhibiting them from acting "on impulse" when next an attractive crime opportunity arises.[4]

[4] John Conklin's interviews (1972) with convicted robbers in Boston yield some anecdotal evidence on impulse control: "A few offenders stated that they could not trust themselves with loaded firearms, fearing that in a confrontation with a resisting victim they might 'lose their head' and shoot" (p. 111). Conklin reported that these robbers carried unloaded or partially unloaded guns.

This defense of the rational choice model is not entirely satis-
factory. The remaining concern is that those potential criminals
who are sufficiently thoughtful and aware to respond to changes
in the threat of punishment will, under some circumstances, vio-
late the norms of rational decision-making in some systematic
and predictable fashion. If so, then it would be possible to gain
improved predictive power from a theory which took these sys-
tematic deviations from rationality into account. For example,
extensive experimentation by psychologists using human subjects
demonstrates that people tend to make certain predictable errors
in decision-making tasks involving choices between lotteries.[5] An
example is the tendency of experimental subjects to ignore low-
probability events entirely—a tendency which is confirmed by
the failure of most residents of flood plains to buy heavily sub-
sidized flood insurance policies (Kunreuther and Slovic 1978).
In circumstances where people do take low-probability events
into account (e.g., shark attack), there is a tendency to place an
inappropriately large weight on these low-probability outcomes.
Most of this experimental work has not employed criminal choice
problems, although the analogy should be clear. An exception
is Carroll's recent report (1978) of experimental findings involv-
ing crime choice with convicted criminals as subjects, which may
prove the entering wedge to further research of this sort. Car-
roll's perspective is worth quoting: "The proposed approach thus
offers a new model of how the person decides about crime op-
portunities. He or she is not viewed as the 'economic person'
making exhaustive and complex calculations leading to an optimal
choice. Rather, it is the 'psychological person,' who makes a few
simple and concrete examinations of his or her opportunities and

[5] Two interpretative summaries of this literature are provided by Kahneman
and Tversky (forthcoming) and Tversky and Kahneman (1974).

Some crimes, such as robbery, are usually committed by two or more per-
petrators working together. The crime decision in this case must involve some
sort of group process. Social psychologists have studied group decision-making
in the face of risky choices, and documented a fascinating effect known as
"risky shift"; the reference is to the tendency of a group discussion to shift
the preferences of members of the group toward more risky choices than
they would have selected before the discussion. This effect is observed only
if the individuals who make up the group are already inclined to a relatively
risky choice before the discussion. See Myers and Lamm (1976) for a review
of this and other "group polarization" effects.

makes guesses that can be far short of optimal" (p. 1513). The challenge to deterrence theorists is to find predictable ways in which the "psychological person" deviates from the "economic person."

2. *Threat communication.* Jacob's first objection to the rational choice model of criminal behavior concerns the reliability of the threat communication process. Rational choice models provide a framework for analyzing the effect of the individual's *perception* of the legal sanction threat on his participation in illegal activities. This relationship is of theoretical interest but is not directly policy relevant: what policy-makers need is information on the effect of *actual* (rather than perceived) criminal justice system activities on crime rates. If perceptions were sufficiently accurate, there would be no need to distinguish between, say, the actual probability of arrest for a particular criminal act and this probability as perceived by various potential criminals. If the link between actual and perceived is weak, then one can question the claim that increased enforcement efforts will deter crime. A third possibility is that public perceptions are not accurate, but do tend to be sysrematically related to criminal justice system activities. This possibility serves as the basis for a response to Jacob's first criticism of rational choice models of criminal behavior.

What are the important channels by which information on the certainty and severity of punishment is communicated to potential criminals? Three channels are discussed below: the media, visible presence of enforcers, and personal experience and observation. Although these channels do not provide potential criminals with accurate information, the information they do provide is systematically related to the truth. That systematic relationship is sufficient to generate predicted deterrent effects.

*The media.* The threats generated by criminal justice system activities are "advertised" in the media, primarily through news reporting of legislative actions, newsworthy crimes and criminal court cases, introduction of new programs and policies, etc. Occasionally, officials will launch an effort to publicize a particular law enforcement effort, such as a crackdown on speeding. A

dramatic example of the possibilities for a media "advertising" campaign is the intensive publicity given the British Road Safety Act of 1967—most of the British public was aware of the provisions of this act by the time it was implemented (Ross 1973).[8] But such success is surely rare.

Verbal messages concerning specific provisions of the law, the likelihood of being caught, or both, are communicated through a variety of other means: bumper strips remind us of the 55 mph speed limit; roadside signs inform us that there are penalties for littering, that the local traffic enforcement unit employs radar, and that a residential area is protected by a neighborhood watch organization; official documents announce the legal penalties for supplying false information; and residences and stores post warning signs—"Shoplifters will be prosecuted," "Operation Identification," and so on.

The use of such official verbal communications is like other forms of advertising. The effectiveness of such messages might well be enhanced by a systematic application of the technology of using the media to inform and persuade, but Madison Avenue has not yet entered the crime control business.

*Visible presence of enforcers.* The proximity of police emits a potent signal that the probability of arrest for a crime committed in the immediate vicinity is high. A police cruiser eliminates driving infractions in its immediate area—an effect which is extended by CB radio communication. Private guards in stores, airports, and other public locations produce an analogous signal for would-be robbers, hijackers, and shoplifters.

The resources devoted to routine patrol activity by police would presumably be hard to justify unless this visible police presence had an effect beyond the immediate vicinity. If the police are seen frequently in an area, potential criminals may be persuaded that there is a high likelihood of arrest in that area due to presumed low police response time and the chance that

---

[8] The British Road Safety Act creates a precise scientific standard by which to judge whether a driver is legally "under the influence" of alcohol (viz., blood alcohol content in excess of .08 percent) and it establishes a mandatory one-year suspension of driving privileges for drivers who are convicted of violating this standard.

224    Philip J. Cook

they will happen on the scene while the crime is in progress.
While the relation between police visibility and public percep-
tions of their effectiveness has not been studied directly, there are
a number of studies of the deterrence effect of the density of
police patrol. These studies are reviewed in section IV.

*Personal experience and observation.* Active criminals accumu-
late personal experience during the course of their criminal ca-
reers; this experience surely has a powerful effect on perceptions
of criminal justice system effectiveness among the group which is
of greatest importance in the crime picture. If active criminals find
that they are rarely arrested, unlikely to be convicted if arrested,
and unlikely to be sentenced to prison terms if convicted, then
they may acquire a justified sense of invulnerability. The effect of
arrest and subsequent proceedings on the criminal's perception of
the system's effectiveness is the key issue in the study of "special
deterrence"—the deterrent effect of the punishment threat on an
individual who has been convicted. An arrest can push the crim-
inal's overall perception of the risk of punishment for crime up
or down, depending on whether the consequences of arrest are
more or less unpleasant than he expected. Probation and parole
dispositions are interesting in this context when viewed as an
effort to persuade the convict that he will be closely watched
and is very likely to be imprisoned if rearrested.

Victims, witnesses, and jurors also acquire personal experience
with the effectiveness of the system, and this experience may
influence their perception of whether "crime pays." Further-
more, an active criminal's friends and associates may be some-
what aware of his criminal activities and their legal consequences.
Thus, each arrest, court proceeding, and sentence may have a
large influence on the perceptions of a relatively few people. On
the other hand, the public at large is not likely to know about
or be influenced by any one case, unless it is highly newsworthy.

This communication mechanism suggests that the deterrence
process may often operate in a strikingly different fashion than
is typically assumed in the rational choice models of criminal be-
havior. These models implicitly assume that each potential crim-
inal in some fashion monitors the overall probability of appre-

hension and punishment for each crime type. By this assumption, each arrest and criminal disposition has some marginal (infinitesimal) effect on the perceptions of all potential criminals. This assumption seems highly unrealistic, given that even criminologists working with volumes of statistics have difficulty in measuring changes in these probabilities accurately (although the first two communication channels discussed above may provide potential criminals with some vague sense of the overall performance of the system). The alternative possibility, suggested here, can be stated as follows:

> Each arrest and disposition has a relatively large effect on the perceptions of a small number of potential criminals (including the arrestee himself), and goes essentially unnoticed by all others.

I have developed a model (Cook 1979d) which simulates the criminal behavior of a population of robbers, incorporating this assumption. The main features of this model are:

(a) At any time, a robber's perception of arrest and punishment is influenced by his own recent experience and that of a few "friends." Perceptions differ widely among robbers, because each observes only a small fraction of the actions taken by the system.

(b) Even if the true effectiveness of the system remains constant, there is considerable turnover among active robbers: robbers are deterred and "undeterred" according to their own experiences and those of their friends.

(c) An increase in the true effectiveness of the system results in a corresponding increase in the mean of robbers' perceptions of effectiveness, and an increase in the number of robbers who are deterred. These changes do not occur because the robbers observe that the system has become more effective, but rather because the likelihood that a robber will observe one or more friends apprehended is increased when the overall effectiveness of the system increases.

This model is abstract, and can be criticized for its simple, mechanistic assumptions concerning the complex phenomena of perception, communication, and criminal behavior. It does serve to demonstrate, however, that the deterrence process does not require that criminals' perceptions of the risk of punishment be accurate or that they be derived from observations of the overall performance of the criminal justice system. It may also serve the useful purpose of provoking further research into the communications processes which link official activity to individual perceptions of the threat of punishment.

The three communication channels discussed above do not exhaust the possibilities. In some instances, direct word-of-mouth communication among criminals with similar interests may be important; rumors concerning police and judicial activities circulate and at times have considerable potency. Another possibility is that potential criminals make judgments on the basis of direct observation of the extent of criminal activity in the area: if "everyone" is doing it, it must pay. A familiar example to many of us is the judgment of how much it is "safe" to exceed the speed limit; if the traffic is averaging 70 mph, then it seems safe to assume that the probability of being ticketed for driving 70 is very low.

In general, it is reasonable to assume that the relative importance of each of the several channels of information on criminal justice system effectiveness differs with the type of crime, the degree to which the potential criminal associates with criminally active people, and other factors. The link between official activities and the public's perception of them constitutes half of the deterrence story. Better understanding of this link could be exploited to the advantage of crime control efforts. Two examples are worth noting:

The initial publicity given the British Road Safety Act apparently succeeded in giving the British public a greatly exaggerated impression of the true likelihood of being caught. While this impression evidently was corrected

227   Research in Criminal Deterrence

after several years of experience, many lives were saved
in the interim (Ross 1973).

Intensive police manning of the New York subways during
high crime hours of the day initially caused a deterrent
effect not only during these times but also during the rest
of the day (when police manning levels were not changed).
It has been suggested that this "phantom effect" could
have been sustained by random changes in police
assignments (Chaiken, Lawless, and Stevenson 1974).

Jacob's observations that potential criminals are poorly in-
formed, and in some cases act impulsively, are valid but nor
sufficient to negate the predictions of deterrence theory. These
predictions do not depend on every criminal being fully in-
formed and rational. Limited rationality on the part of some
fraction of potential criminals, combined with an information
transmission mechanism that is systematic if not completely ac-
curate, is sufficient to generate deterrent effects. Indeed, there is
a great deal of evidence that criminals, like other people, respond
to objective changes in their opportunities as if they were ra-
tional. It would be unfortunate to reject the claims of deterrence
theory on the a priori grounds of implausibility.

On the other hand, careful descriptive studies and laboratory
experiments to investigate the way in which individuals acquire
information and evaluate opportunities may well yield some in-
sights into criminal decision-making, insights that will help re-
fine the predictions of rational choice models and even suggest
means of increasing the effectiveness of the system in deterring
crime.

The preceding discussion developed a basic perspective on the
deterrence process, focusing on information processing and de-
cision-making by the potential criminal. Three specific issues are
discussed below from this perspective: the determinants of the
extent to which an individual participates in criminal activity;
the relative importance of the probability and severity of punish-
ment in deterring crime; and the influence of sanction threats

for one type of crime on the relative attractiveness of other types
of crime.

## C. Degree of Involvement in Crime

Previous sections have discussed the deterrence phenomenon
as if criminal activity were an all-or-nothing decision. Yet crimi-
nals differ widely in their degree of involvement in crime. The
number of, say, robberies committed in a year is the product
of the number of active robbers and the average number of rob-
beries committed by each. The deterrence process may influence
both factors: the *rate* at which active robbers commit crimes, as
well as the decision whether to "enter" the robbery "business"
at all.

The basic question with respect to intensity of criminal ac-
tivity is this: what limits are there on the extent of participation
in illicit activity of a potential criminal who decides that it is
worthwhile to commit his first offense? The discussion focuses
on property crimes and three mechanisms that may act to limit
the activity level of an active burglar, robber, shoplifter, or other
economic criminal.

I suspect that a large proportion of the population is "oppor-
tunistic" with respect to property crimes. Without special ef-
fort, many people occasionally encounter an extraordinarily good
opportunity to steal, and take advantage of it. Examples include
taking towels from a hotel, walking out of a shop without paying
because the checkout lines are momentarily left unattended, and
so forth. We can imagine each person having a standard rule of
thumb by which he judges whether such opportunities are
worthwhile; the more stringent one's standards (in terms of legal
risks and payoff), the less frequently will one encounter suitable
opportunities in the normal course of daily activities. An increase
in the effectiveness of the criminal justice system or in the severi-
ty of punishment will reduce the number of suitable opportuni-
ties for those who are opportunists, with a resulting reduction in
their individual theft rates.

A more active involvement in theft would be characteristic
of people we ordinarily would think of as "robbers," "burglars,"

"shoplifters," etc. Instead of a series of yes-or-no decisions on opportunities supplied by the individual's environment, more active thieves would be concerned with searching out and developing opportunities, and would make explicit decisions about the intensity of their illicit activity. Two limiting factors for such people are the opportunity cost of time, and the effects of increased income on the willingness to take risks.

The latter effect seems relevant to understanding employee theft and embezzlement, income tax evasion, and other economic crimes for which time is not an important input (see Allingham and Sandmo 1972 for a formal model of this sort). Given that the magnitude of the offense is positively correlated with the risk of detection and punishment (and also the severity of punishment, perhaps) the miscreant can be viewed as choosing a risk-payoff combination from a continuum of possibilities. An increase in the effectiveness of the system for detecting and punishing criminals in these cases will make this type of crime less attractive and persuade some to "drop out" completely. For those who remain active, it is not obvious whether the augmented risk of punishment will cause an increase or decrease in the rate of offending. A perverse result of increased effectiveness may occur, for example, if the increase in effectiveness is concentrated at the low end of the theft spectrum; those who do not drop out may move up the continuum, given that the difference in risk for large and small thefts has been reduced.

For crimes which require a substantial time input, such as fencing, running numbers, and prostitution, the opportunity cost of time may be an important limiting factor in the extent of involvement. The legitimate wage rate would then influence both the entry decision and the decision with respect to degree of involvement. (Ehrlich 1973 develops a model of this sort, which is criticized by Heinecke 1978a. See also Block and Heinecke 1975.) Once again there is a theoretical possibility that an increased probability of apprehension will *increase* criminal activity levels for those who do not drop out. For example, if police start arresting prostitutes more frequently, some may increase their efforts in order to maintain their standard of living

230    Philip J. Cook

while meeting the additional costs of bail, legal fees, and fines. This result is analogous to the theoretical possibility of a "backward bending labor supply curve"; there is nothing intrinsically irrational about people choosing to work harder in response to a reduction in the net rate of return to their efforts.

While these models of participation in illicit economic activities permit a theoretical possibility that an increase in the likelihood of detection will increase the overall crime rate, the actual importance of this possibility is doubtful. It seems more plausible that if more effective measures are taken against a particular type of criminal activity, the dominant effect will be to cause criminals to act with greater caution or to switch into other illicit or licit activities.

## D. Certainty versus Severity of Punishment

One of the more intriguing issues in the deterrence literature is whether crime rates are more responsive to changes in the likelihood or the severity of punishment. The importance of this issue is suggested by two relevant policy dilemmas. First, sentencing authorities must allocate scarce prison capacity among felony convicts; one consideration is whether prison sentences should be relatively common but short, or relatively uncommon but long. Second, prosecutors have to decide whether to use their scarce resources to produce a high conviction rate with relatively low-quality convictions (through generous offers in plea bargaining), or to concentrate their resources on gaining high-quality convictions of a relatively few defendants while dismissing the remaining cases. The first alternative in each case is compatible with the commonly held view that the likelihood of punishment has a greater deterrent impact on crime rates than does the severity of punishment.

A precise illustrative statement of this hypothesis can be expressed as follows:

A 10 percent increase in the average severity of punishment for a crime will have a smaller deterrent effect than a 10 percent increase in the likelihood of punishment.

231        Research in Criminal Deterrence

For example, if the only form of punishment for convicted rob-
bers is imprisonment, an increase in average sentence from three
years to 3.3 years will have less deterrent effect than an increase
in likelihood of imprisonment from .050 to .055.

The usual assumptions made in economic analysis of decision-
making under uncertainty support this claim when the punish-
ment is in the form of imprisonment, but support the opposite
conclusion when the punishment is a fine. The argument behind
these conclusions can be illustrated by the following two "lot-
teries" involving prison sentences. In the first lottery, there is
a 10 percent chance of receiving a one-year prison sentence; the
second lottery offers a 5 percent chance of a two-year prison
sentence. These two lotteries have the same expected value (one-
tenth of a year in prison), but most people would not view them
as equally threatening; if two years in prison is not viewed as
being twice as bad as one year, then the second lottery would
be preferred. If so, then the first lottery would have a greater
deterrent value. In general, we expect that increases in the prob-
ability of imprisonment, coupled with proportionate reductions in
the prison term, will increase the deterrent value of the threat of
punishment.

The second example involves punishment in the form of a
fine. Suppose now that the prison terms in the two lotteries
specified above are replaced with fines of $1,000 and $2,000 re-
spectively. Once again the two lotteries have the same expected
value ($100). If people are risk-averse, a common assumption in
economic theory, they will prefer the first lottery (a $2,000 loss
is subjectively more than twice as bad as a $1,000 loss to a risk-
averse person). However, Tversky and Kahneman (1974) report
that in laboratory experiments most subjects are *not* risk-averse
with respect to financial losses, and would in fact choose the
smaller probability of a proportionately larger fine. Once again,
then, the first lottery should have greater deterrent value, and
the conventional wisdom (among criminologists, not necessarily
economists), regarding certainty and severity of punishment is
reaffirmed. While this sort of theoretical analysis and laboratory
experimentation seems rather remote from criminal behavior, it

is interesting to observe that this type of evidence does support the conventional wisdom.

The claim that certain punishment is a more effective deterrent than severe punishment is often buttressed by an assertion that crime rates are unresponsive to variations in severity. If true, the sentencing authorities could reduce average sentences a great deal without noticeable effect on the crime rate. The most compelling issue, and the one given the greatest scholarly attention, is whether capital punishment is a greater deterrent to murder than a long prison term. At the other end of the spectrum are questions concerning the potential loss of deterrent effect resulting from the increased use of diversion programs, suspended sentences, and fines in the place of incarceration.

It is commonly acknowledged that the threat of a more severe penalty will cause defendants to put more effort and resources into their defense. Indeed, one of the social costs of capital punishment, mandatory sentencing provisions, and related efforts to increase the severity of punishment is that these cases take up an increased portion of court resources through appeals and other defense efforts to resist conviction. It seems implausible that the severity of punishment should be highly salient to the criminal after arrest but not before.

While we would expect a rational criminal to respond in some degree to increases in the severity of punishment, it is certainly plausible that the marginal deterrent effect of increasing prison sentences declines rapidly as the length of the sentence increases, due to the tendency of people to discount the future. A simple mathematical model may be helpful in illustrating this point.[7] Suppose that an individual assigns one unit of "disutility" to a

---

[7] The model postulates that the individual's subjective evaluation of the prison terms is equal to the sum of the disutilities discounted to the present. If the disutility of one year in prison is denoted $d$, and the discounted present value of $n$ years in prison is denoted $D_n$, then

$$D_n = \sum_{t=1}^{n} d \left( \frac{1}{1.15} \right)^{t-1}.$$

The value chosen for $d$ does not influence the value of the ratios reported in the text, and was set equal to 1.

year in prison, and has a time discount rate of 15 percent per annum. It would then be true, in present value terms, that a two-year prison term has about 87 percent greater disutility than a one-year term. However, under these assumptions a twenty-year term has only 25 percent greater disutility than a ten-year term. It is plausible, then, that increasing the severity of punishment when punishment is mild may have a much greater deterrent effect (even proportionately speaking) than increasing severity when punishment is already severe.

### E. Substitutes and Complements

Establishing a rational sentencing policy, and appropriate priorities in prosecution and police investigation, is complicated by the possibility that variations in the threat of punishment for one type of crime may affect the incidence of other crime types, via two mechanisms. First, given limited police, court, and corrections resources, increasing the priority given to one type of crime necessarily entails a reduction in the priority given one or more other crime types. Second, in deciding whether to commit one type of crime, criminals will be influenced by the legal threat not only to that crime type but also to related types of crime. The latter mechanism must be given consideration in any complete characterization of the deterrence process. An analogy from the economic theory of consumer demand provides insight and useful terminology for discussing this mechanism. Suppose the price of gasoline increases 50 percent due to a change in policy by the OPEC cartel. The primary effect would be to reduce the quantity of gasoline purchased. Secondary effects include an increase in the demands for public transportation, fuel-efficient autos, and central city housing, and a decrease in demand for luxury autos and suburban housing. Commodities which become more desirable when the price of gasoline increases are known as "substitutes" for gasoline; those which become less desirable are "complements." While the analogy is by no means perfect, I will use these terms to discuss the secondary effects of a change in the threat level to a particular type of crime.

*1. Substitutes.* Various types of property crime are presumably

substitutes for each other. Recidivism data demonstrate that
there is a great deal of crime switching among active criminals;
for example, 22 percent of men arrested for burglary in the Dis-
trict of Columbia in 1973 were subsequently arrested for robbery
within three years (compared with 33 percent who were rear-
rested for burglary) (Cook and Nagin 1979). The Rand study
of self-reported crime by a sample of forty-nine incarcerated
robbers found that they admitted having collectively committed
1,492 auto thefts, 2,331 burglaries, 855 robberies, and 1,018 other
serious thefts during their criminal careers (Petersilia, Green-
wood, and Lavin 1978). Given this sort of versatility, one would
expect that an increase in the relative law enforcement effective-
ness against robbery would result in an increase in other types
of theft crimes. Variations in other sorts of crime-specific de-
terrents would be predicted to have the same effect: if shop-
keepers arm themselves, then thieves may switch from commer-
cial robbery to commercial burglary; increased use of burglar
alarms would have the opposite effect.

A second dimension to the substitution phenomenon is geo-
graphic displacement. A large increase in the number of police
assigned to one precinct in a city may result in some increase
in crimes committed in neighboring precincts. A houseowner
who posts an Operation Identification sticker increases the burg-
lary risk to his stickerless neighbor. Intensive police manning of
the subway system may cause an increase in taxicab and bus
robberies. Exact fare systems on buses may increase the robbery
risk to convenience stores. I know of no studies of crime displace-
ment across state lines or between distant metropolitan areas,
but it is likely that some buyers of illicit merchandise (drugs,
machine guns, stolen goods) travel some distance in order to
take advantage of more lax enforcement in another jurisdiction.
Organized crime operations would be expected to locate their
activities so as to minimize legal risks, to the extent that other
considerations permit; an example in this context would be the
decision of where to land illicit drug shipments smuggled in from
South America or Mexico.

A very important aspect of the substitution phenomenon fre-

quently arises in the design of criminal sentencing policy. It is
thought that the structure of criminal sentences must include a
strong marginal deterrent to the use of threat or violence to re-
duce the likelihood of violent resistance to arrest. If the typical
sentence for robbery without violence is a long term of imprison-
ment, robbers may be more inclined to kill their victims and other
witnesses. Defendants who are faced with the likelihood of con-
viction and severe punishment will be more tempted than others
to jump bail and intimidate witnesses, knowing that even if they
are caught there is little more that the system can do to them;
this is, of course, the reasoning behind denying defendants the
right to bail in capital cases.

Zimring and Hawkins (1973) discuss this aspect of sentencing
policy in terms of the "fortress" and the "stepladder." The "for-
tress" approach is to erect a high and more or less uniform "bar-
rier" around the domain of criminal activity. The "stepladder"
approach adjusts the punishment to the seriousness of the crime,
in the hope that if the potential criminal *does* decide to act, the
penal code will provide an adequate incentive to limit the seri-
ousness of his crimes. If the preceding discussion of the deterrent
effect of changes in the length of prison term is correct, the
bottom "rungs" of the stepladder must be kept low in order to
allow "room" for effective differences in sentencing between
robbery, robbery with victim injury, and robbery murder; the
usual sentence for robbery should not be more than a year or
two in prison. This type of policy must be evaluated in the
context of priority-setting by police and prosecutors—if sentences
are relatively uniform, then a greater burden is placed on officials
to create a stepladder effect through gradations in the likelihood
of arrest and conviction.

2. *Complements.* Complementarity arguments have been ex-
tremely important in motivating criminal justice policy in the
area of heroin and handguns. A key argument for vigorous law
enforcement efforts to interdict the flow of heroin and other
illicit drugs is that an increase in the "effective price"[8] of such
drugs resulting from law enforcement efforts will reduce the

[8] A term coined by Mark Moore (1973), and discussed in his article.

incidence of property crimes. Similarly, the crimes of illegal ac-
quisition, possession, and carrying of handguns are thought to be
complementary to robbery and murder. Both these claims of
complementarity are highly controversial, of course, and even if
there is such a relation it must be demonstrated that these round-
about techniques for reducing property crimes or murder are the
most effective use of resources against these crimes.

There are some very interesting sorts of interrelations within
market-oriented complexes of criminal activity. Typically illegal
commodities markets will involve suppliers, middlemen, and cus-
tomers. In prostitution, they are, respectively, the prostitutes,
pimps, and johns; in heroin, they are the poppy growers and
heroin processors, the importers and retailers, and the users; in
burglary they are the burglars, the fences, and the purchasers of
stolen merchandise. In each case, we would expect that law
enforcement efforts directed at any one of the three types of
actors would reduce the amount of criminal activity by the other
two types of actors. For example, a crackdown on fencing would
lower the price that fences pay to burglars and make fences
generally more cautious in dealing with both burglars and cus-
tomers. The result would be to reduce the rate of return to burg-
lary, thereby causing a reduction in the number of burglaries
and ultimately a reduction in the illegal purchase of stolen
merchandise.[9]

The question for law enforcement officials is what strategy
will be most effective in disrupting the market which supports
each of these activities. In the case of burglary, for example,
prosecutors can bargain with burglary defendants to gain convic-
tions of fences, or vice versa. Undercover police can pose as
fences to identify and collect evidence against burglars, or al-

[9] Strictly speaking, burglary and fencing are not "complementary" activities
in the sense this term is used io economic theory. An increased legal threat to
fencing does not *directly* cause a reduction in burglary, as would be true if
they were complementary crimes. The reduction in burglary is an indirect
effect of the crackdown oo fencing, the direct cause being the reduction in the
price paid by the fence.

Recent literature on prospects for combating fencing include Blakey and
Goldsmith (1976) and Walsh (1976). Klockars (1974) provides a fascinating
description of fencing activities.

ternatively pose as burglars to facilitate arrests against fences.
Similar strategic choices are available in illicit drugs and prostitu-
tion. The correct strategy should be dictated by the considera-
tion of which of the roles in these illicit markets are most vul-
nerable to available techniques of law enforcement.

## II. Empirical Study of the Deterrence Process

The discussion of theoretical issues in deterrence research pre-
sented above suggests a wide-ranging agenda for empirical work,
including basic research on decision-making under uncertainty,
on communications processes, and on the structure of illicit mar-
kets. The great bulk of the empirical deterrence literature, how-
ever, has been concerned with deriving estimates of the impact
of criminal justice system activities on crime rates, and it is this
body of applied research that I review here and in section III.

Measuring deterrence effects outside of the laboratory requires
data on criminal opportunities and criminal behavior for a num-
ber of units of observation. Almost all studies have used some
geographic entity as the unit of observation—precincts, cities,
states, or the entire nation. The empirical study of deterrence
has thus been concerned with aggregate rather than individual
behavior. Practical problems of collecting data on individuals
have prevented field studies of microbehavior.

There are two basic approaches to the empirical study of the
deterrence process, which I label "criminal opportunity" and
"policy impact." This distinction can be explained with the aid
of a simple diagram:

| actions | A | criminal | B | crime |
|---------|---|----------|---|-------|
| (policy) | $\longrightarrow$ | opportunities | $\longrightarrow$ | rates |

In the diagram, the causal connection between crime rates and
crime control policy (broadly construed to include the criminal
law, resource levels, priorities, and so forth) is broken down
into two links. Link A represents the effect of policy on the
quality of criminal opportunities; this can be viewed as a pro-
duction process in which criminal justice system inputs "pro-
duce" threats of punishment. The probability and severity of

238     Philip J. Cook

punishment associated with each criminal opportunity thus con-
stitute the vector of outputs of the system. Link B represents
the deterrence effect of threats of punishment on crime rates.
The criminal opportunity studies attempt to estimate the strength
of this deterrence relationship for a variety of crime types. In
many cases these studies also include a separate estimate of the
production relationship (link A), so that it is possible by com-
bining the two relationships to derive an estimate of policy on
crime. Policy impact studies, on the other hand, estimate the ef-
fect of policy on crime directly, without considering the inter-
vening variables characterizing the quality of criminal oppor-
tunities.

It would seem that the criminal opportunity studies are the
more informative of the two categories, especially if the objective
is to learn about the deterrence process rather than about policy
impacts. However, these studies, unlike the policy impact studies,
require the use of an index of the quality of criminal opportuni-
ties, or "threat level." I argue below that the measures of threat
level actually used in these studies are not valid, and furthermore
that the data necessary to calculate a valid measure are not usual-
ly available. In short, this approach appears to be a dead end,
in spite of the numerous studies of this sort which have appeared
in the economics and sociology literature during the last decade.
Before justifying this rather extreme claim, I first give a more
complete description of the approach and its intellectual history.
A review of the policy impact literature is left for section III.

## A. A Decade of "Criminal Opportunity" Studies

Jack Gibbs published the first article reporting a statistical
analysis of this sort in 1968. Gibbs simply related (by a con-
tingency table method) the murder rate with a variable intended
to measure the probability of punishment—namely, the number
of convicts sent to prison for murder divided by the number of
murders—using cross-section data by state for 1959–61. He also
related the state murder rates with the average prison terms
served by incarcerated murder convicts in each state. He inter-
preted his results as evidence that murder is indeed deterrable.

239    Research in Criminal Deterrence

Gibbs's technique was very primitive by reigning standards for
the statistical analysis of nonexperimental data, since it did not
attempt to control for other variables which influence murder,
and took no account of the possibility that the causal relation
between crime and punishment may go in both directions. The
first state-of-the-art study was incorporated in Isaac Ehrlich's
thesis in 1970, subsequently published in 1973—the same year as
Sjoquist, and Carr-Hill and Stern, published very similar studies.
These studies, while much more sophisticated than Gibbs's, used
measures of the probability and severity of punishment similar
to his. A paradigm was established by this work which has been
employed since by a number of economists and sociologists.
These studies have employed a variety of data sets, including
state-level data for recent census years, data on large cities, data
on precincts of New York and counties in California, and similar
data sets for Canada and the United Kingdom.[10] The results of
these studies have for the most part been favorable to the deter-
rence doctrine, seemingly documenting a statistically significant
and often rather large effect of the "probability of punishment"
as measured on each of the seven FBI index crimes. The results
for the deterrent effect of punishment severity have generally
been weaker and less consistently significant. However, Ehrlich's
(1975) subsequent and highly sophisticated study of the marginal
deterrent effect of capital punishment on murder estimated a
deterrent effect so large that only the most confirmed abolitionist
could claim it to be irrelevant—one way of summarizing his re-
sult is that each execution saves eight lives. This study received
widespread attention, and was submitted to the Supreme Court
as part of the solicitor general's brief in *Gregg v. Georgia*, 428
U.S. 153 (1976).[11]

The great potential importance of this work, and particularly
the intense controversy engendered by Ehrlich's study of capital
punishment, culminated in the formation of the National Re-
search Council's Panel on Research on Deterrent and Incapacita-
tive Effects. This panel performed a thorough review of all the

10 Nagin (1978) includes a very useful table which summarizes these studies.
11 Bailey (1978) has a brief history of the use of this and other such studies.

Philip J. Cook

major reports published at that time, including replications of
Ehrlich's work and a highly technical critique of the problems
with the econometric paradigm employed in this literature. The
panel's conclusion was decidedly negative: "The major challenge
for future research is to estimate the magnitude of the effects of
different sanctions on various crime types, an issue on which
none of the evidence available thus far provides very useful
guidance" (Blumstein, Cohen, and Nagin 1978, p. 7). The panel
did not choose to reject the basic approach, however, but in-
stead encouraged scholars to develop better data sets and seek
methods for eliminating certain biases which they consider dam-
aging to the validity of the results (pp. 46–50).

It is easy to criticize any nonexperimental statistical technique
which employs error-ridden data to assess some aspect of a com-
plex and poorly understood process. Much more difficult is to
judge whether the criticisms are sufficiently important and dam-
aging to warrant rejection of available findings, or even abandon-
ment of the entire approach. If there is no practical alternative
for studying the phenomenon, the relevant question is whether
the statistical technique in question can generate results which
are more reliable than intuition alone. In this case I accept the
panel's conclusion as cited, but would go even farther than they
in discouraging future use of the Ehrlich paradigm. My con-
clusion is influenced by the numerous problems discussed in the
panel report and elsewhere,[12] but stems primarily from apparent-
ly insuperable difficulties with measuring the quality of criminal
opportunities.

## B. *Measuring the Quality of Criminal Opportunities*

Since the primary motivation for criminal opportunity studies
is to estimate the response of crime rates to the probability and

---

[12] Studies of the deterrent effect that use cross-section or times series data
on jurisdictions, such as those that fit the Ehrlich paradigm, suffer from a
variety of statistical problems, including: (1) the poor quality of the data on
crime; (2) the difficulty of distinguishing between the effect of punishment
on crime rates, and the effect of crime rates on the likelihood and severity
of punishment; (3) the difficulty in controlling for the variety of factors that
influence crime rates. These problems are discussed below in section III, and
are developed in detail in Blumstein, Cohen, and Nagin (1978), Cook (1977),
and Brier and Fienberg (1978) among other places.

241    Research in Criminal Deterrence

severity of punishment, obtaining valid measures of these vari-
ables is crucial to the whole enterprise. In practice, the measure
of probability used in this literature is some type of clearance
rate, most commonly the arrest rate or the ratio of prison admis-
sions to crimes reported to the police. While these clearance
rates may *look* like probability measures (they usually lie be-
tween zero and one), they cannot be literally interpreted as such.
After all, the individual crimes reflected in these measures are
not homogeneous but, rather, differ widely with respect to a
number of factors. For example, the 1960 ratio of prison admis-
sions for murder to murders committed in New York was .54
(see Vandaele 1978a, p. 331), but the probabilities of punishment
for the hundreds of murders reflected in this ratio ranged from
near zero (in the case of some skillfully planned gangland execu-
tions) to near one (for, say, murders of family members). If the
clearance rate is not a measure of a single probability of pun-
ishment, then what does it measure? At best, it can be viewed
as a measure of the *average* probability of punishment for crimes
committed.[13] Is it appropriate to use the average probability as
a sort of index of the overall effectiveness of the criminal justice
system?

In fact, the clearance rate fails even as an index of overall ef-
fectiveness, because the clearance rate reflects not only criminal
justice system activities but also the many factors (including the
system's effectiveness) which influence the care and judgment
exercised by criminals. (The argument here was first made in
Cook 1979a and elaborated in Cook 1979c.) For example, robbers
would be expected to adapt to an increase in the potential ef-
fectiveness of the system in solving robbery cases and gaining
convictions of robbery defendants; if, under the new more ef-
fective regime, robbers tend to be more selective in choosing vic-

---

[13] The major source of inaccuracy in the clearance rate is in the denominator
—the number of crimes. Cook (1977, p. 189) compares clearance rates for
burglary using two measures of the number of burglaries committed: the
"burglaries known to the police" in the Uniform Crime Reports, and the bur-
glary rate estimates derived from the crime surveys in twenty-six cities spon-
sored by the Law Enforcement Assistance Administration. The differences tend
to be large and variable.

tims and more cautious in their modus operandi, the observed change in the clearance rate may be misleadingly small.

Consider the following artificial example. Suppose that Crime City makes arrests and convictions in 10 percent of its street robberies and 20 percent of its commercial robberies in 1980. In 1981, the Crime City police organize a hidden camera program to combat commercial robberies, which is successful in increasing the probability of arrest and conviction for such robberies to 30 percent. This increase in effectiveness has a strong deterrent effect on commercial robberies, with some displacement effect to street robberies. Suppose the relevant numbers look like the data in table 1.

Usually the available data would not be detailed enough to permit separate analysis of commercial and street robbery. A statistician may therefore conclude that the hidden camera program had no effect—after all, the overall clearance rate did not change. The problem here is not that the clearance rate is inaccurately measured (although that too is usually a problem in practice)—the problem is that the clearance rate is not a valid index of the true effectiveness of the criminal justice system. In this example, the true increase in effectiveness had no effect on the clearance rate. If other numbers had been used, the observed clearance rate could have gone up—or even down.

Economists have studied this type of index number problem rather extensively (Fisher and Shell 1972). One conceptually simple solution is to construct a Laspeyres index. The Consumer Price Index is of this sort. In my numerical example, a Laspeyres

TABLE 1

|  | 1980 | | 1981 | |
|---|---|---|---|---|
|  | # of Robberies | Clearance Rate | # of Robberies | Clearance Rate |
| Commercial............ | 100 | .20 | 50 | .30 |
| Street................. | 100 | .10 | 135 | .10 |
| Total............... | 200 | .15 | 185 | .15 |

243       Research in Criminal Deterrence

index for the clearance rate would use the 1980 mix of crimes
as weights in calculating clearance indexes for both 1980 and
1981. This index would be .15 in 1980 and .20 in 1981, the in-
crease reflecting the actual increase in the effectiveness of the
police. But there is little hope for the forseeable future that
the detailed data necessary to construct such an index will be-
come available.[14]

The only promising prospect for criminal opportunity studies
that I can see involves "target-specific" analyses of victimization
rates. We can imagine a study of bank robbery within a jurisdic-
tion, for example, which characterized the robbery opportunities
provided by each bank in terms of an assortment of attributes
including presence of a guard, ease of escaping from the scene,
use of hidden cameras, and average amount of loot available from
cashiers. The extent to which these variables explain differences
in victimization rates is a measure of the deterrent effect of these
dimensions of the quality of bank robbery opportunities. Similar
studies could be conducted of robbery and burglary victimization
rates for other types of commercial targets, of shoplifting where
the quality and display of the merchandise were the key mea-
sures, and of location-specific traffic violations as a function of
the characteristics of the location. Such studies would yield use-
ful information on the deterrence process.

### III. Lessons from Policy Innovations

Major changes in criminal law and policy, if properly evaluated,
can serve as object lessons concerning criminal behavior and the
performance of the system. In particular, policy innovations
which are intended to change the threat level can teach us about
the process of threat production and the responsiveness of crim-
inals to changes in the threat level. A number of such evaluations
have been published during the last decade. These studies repre-
sent the beginnings of an empirical basis for deterrence-oriented
policy formation.

Policy innovations which have been evaluated in terms of their

[14] A more complete discussion of the "endogeneity" problem in the use of
the clearance rate is in Cook (1979a). Manski (1978) discusses some closely
related technical issues.

deterrent effects include changes in the substantive law (legaliza-
tion of abortions, change in the speed limit, reduction of legal
drinking age), changes in resource allocation (increased preven-
tive patrol, career criminals prosecution units), and changes in
the severity of criminal sentencing provisions. (Zimring 1978
provides a summary of several of these studies.) Evaluations of
these innovations have much in common with evaluations of in-
novations in other areas of social policy, and my review draws
on this larger context to some extent.

## A. Comparison with the Criminal Opportunity Studies

The main objective of the criminal opportunity studies, the
deterrence research fitting the Ehrlich paradigm, is to isolate
and measure the effect of the threat level on crime rates. Absent
a valid index of the threat level, this objective is beyond reach.
The alternative, incorporated in the policy impact studies, is to
analyze the deterrence effects of factors which are thought to
determine the threat level—the criminal code, the quality and
quantity of committed resources, the organization of these re-
sources, the quality of civilian cooperation, and so on. Whatever
deterrent effect is generated by changes in these factors can be
assumed to stem from the induced change in the threat level, but
the magnitude of this change is unknown.

An example serves to illustrate this limitation of the policy
impact evaluations. In 1966, the New York Police Department
increased the number of patrolmen assigned to the Twentieth
Precinct by about 40 percent. S. J. Press (1971) conducted a
thorough and sophisticated evaluation of the impact of this in-
crease, and concluded that it reduced "inside" felonies (those
which are invisible from the street) by 5 percent and outside
felonies 36 percent during the year following the change. These
estimates are certainly interesting and relevant to evaluating the
worth of the increase in police manpower. However, there is no
way of measuring the change in the threat levels to inside and
outside felonies, so it is not possible to derive an estimate of the
responsiveness of crime to the threat level from this report. (Press
does report the changes in the arrest rates for inside and outside

felonies, but, as explained above, the arrest rate is not a valid
indicator for the threat level.) Given the large reduction in the
number of outside felonies, we can conclude that the extra police
were very productive in terms of augmenting the threat level,
that the outside felony rate is highly responsive to changes in the
threat level, or some combination of the two. This ambiguity
frustrates the search for evidence on the degree to which crime
is deterrable in the abstract sense formulated in the Ehrlich
paradigm.

## B. Three Approaches to Policy Evaluation

Three basic approaches to policy evaluation are distinguished
by the type of data being used: (1) cross-section comparisons
of jurisdictions which differ with respect to some dimension of
criminal justice policy (e.g., police per capita, use of capital
punishment for murder); (2) time series analysis of crime in a
single jurisdiction before and after the adoption of some policy
innovation; and (3) analysis of experimental field trials, involving
random assignment of units to different "treatments" to test the
efficacy of some policy innovation. Not all evaluations fit neatly
into one of these three categories, but this partition is an adequate
framework for discussing the relevant methodological issues.

The cross-section analyses involve correlating crime rates with
"input" levels across jurisdictions. Several studies have analyzed
interstate differences in crime rates as a function of the number
of police per capita and other factors in order to measure the
marginal deterrent effect of additional policy resources (see, e.g.,
Greenwood and Wadycki 1973 and Swimmer 1974). Several
other studies have attempted to measure the impact of particular
criminal code provisions (e.g., gun control ordinances, capital
punishment) by systematic comparison of jurisdictions governed
by these provisions with those which lack them (see, e.g., Mag-
gadino n.d. on gun control).

The most frequently used approach is the "before and after"
analysis of a policy innovation in a single jurisdiction. A partial
listing of such studies published since 1970 is given in table 2.
Some of these innovations were adopted as an experiment, in-

246

TABLE 2
Policy Impact Studies

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Williams et al. (1975) | Reduction in legal minimum drinking age from 21 to 18 in Michigan, Wisconsin, and Ontario. | None. | Drivers under 21 involved in fatal motor vehicle crashes: total; night time only; single-vehicle crash only. | Corresponding numbers for neighboring states. | Yes, but small. |
| Ross (1973) | The British Road Safety Act of 1967: creates "scientific" measures of drunkenness (.08% alcohol in blood) and mandates that suspect drivers submit to breathalyzer tests. Massive publicity campaign preceded implementation. Sanctions for conviction include a one year mandatory license suspension. | 1. Survey of public knowledge of new law.<br><br>2. Number of breath tests administered.<br><br>3. Number of drivers charged under this and related laws.<br><br>4. Alcoholic beverage sales. | 1. Total road casualties and fatalities.<br><br>2. Fatalities and serious injuries during peak drinking hours.<br><br>3. Fraction of drivers killed in accidents who were drunk. | 1. Time series prior to enactment.<br><br>2. (a) Time series prior to enactment on same measure. (b) Fatalities and serious injuries for other times of the week.<br><br>3. Average for same measure prior to enactment. | Yes, strong initially. |

247

TABLE 2 (*Continued*)

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Ross (1977) | Chief constable's order for stricter enforcement of British Road Safety Act in Cheshire, September 1975. | Number of breathalyzer tests. | 1. Fatalities and serious injuries.<br><br>2. Total crashes during drinking hours. | 1. Time series before and after intervention.<br><br>2. (a) Time series before and after intervention. (b) Time series on total crashes during other times. | Yes. |
| Robertson, Rich, and Ross (1973) | Supervising judge's order to Chicago magistrates to sentence drunk drivers to 7-day jail terms, December 1970 to June 1971. | 1. Numbers of arrests for DWI.<br><br>2. Conviction rates for DWI.<br><br>3. Number of 7-day jail sentences for all traffic-related offenses. | 1. Auto fatality rate by month.<br><br>2. Pedestrian fatality rate. | 1. Time series on both Chicago and Milwaukee.<br><br>2. Time series on both Chicago and Milwaukee. | No. |
| Landes (1978) | Mandatory pre-board screening of airline passengers and carry-on luggage in U.S., 1973. | Proportion of offenders apprehended within 12 months. | Number of domestic hijackings. | 1. Time series of domestic hijackings.<br><br>2. Hijackings in other countries. | Yes. |

248

TABLE 2 (*Continued*)

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Chaiken, Lawless, and Stevenson (1974) | Tripling of N.Y.C. Transit Police force in 1975, with the additional men placed in stations and on trains from 8 pm to 4 am. | 1. Police manning levels.<br><br>2. Arrest rates. | 1. Total felonies, total robberies, etc.<br><br>2. Felonies, robberies during 8 pm to 4 am period. | 1. Time series prior to intervention.<br><br>2. Felonies, robberies during 4 am to 8 pm period. | Yes. |
| Beha (1977) | The Bartley-Fox Amendment creating a mandatory one year minimum prison sentence for carrying a firearm without a permit in Massachusetts. Implemented April 1975. | Various measures of arrests and dispositions of gun-related cases. | 1. Number of FID cards and carrying licenses issued.<br><br>2. Fractions of aggravated assaults, homicides, and robberies involving firearms. | 1. Time series prior to amendment.<br><br>2. Time series prior to amendment. | Yes. |
| Joint Committee on New York Drug Law Evaluation (1978) | The "Rockefeller" Drug Laws 1973, lengthening prescribed minimum prison sentences and creating a one year mandatory minimum sentence for heroin dealers. | Various measures of arrests and dispositions of heroin-related offenses in New York City. | 1. Serum hepatitis cases and narcotics related deaths, N.Y.C.<br><br>2. Admissions to detoxification program and methadone maintenance in N.Y.C. | 1. Time series, and corresponding series for Baltimore, Washington, D.C., and Philadelphia.<br><br>2. Time series. | No. |

TABLE 2 (*Continued*)

| Source | Intervention | Process Measures | Outcome Measures | Controls | Evidence of Deterrent Effect? |
|---|---|---|---|---|---|
| Press (1971) | Experimental increase of police manpower in New York City's 20th Precinct by 40 percent in October 1966. | Arrests for felonies and misdemeanors. | The differences in reported number of crimes between a previous "low man-power" and a "high manpower" period, weekly average seasonally adjusted. Calculated for 10 crime categories. | Corresponding differences calculated for groups of similar precincts. The pre-cincts included in the control groups differ according to crime category. | Yes, for outdoor crimes. |
| Zimring (1972) | Decriminalization of abortion in Hawaii, 1970. | Number of legal abortions and ratio of abortions to live births, 1970–71. | 1. Change in number of live births between 1969 and 1970.<br><br>2. Change in ratio of illegitimate to legitimate births, 1969 to 1970.<br><br>3. Change in number of live births by ethnic group. | 1. Corresponding change in Oregon and California. | No. |
| Schwartz and Clarren (1977) | Experimental adoption of team policing in one district of Cincinnati, 1973. | Arrest data, measures of police-community relations. | 1. Crime rates, mea-sured by survey and by crimes reported by police. | 1. Time series.<br><br>2. Crime rates in other districts of Cincinnati. | Yes, for burglary only. |

eluding the team policing study in Cincinnati (Schwartz and
Clarren 1977), the field interrogation study in San Diego (Boyd-
stun 1975), and the increase in the Twentieth Precinct police
force in New York (Press 1971). But these "experiments" lack
most of the features of a complete experimental design, which
would have to involve many geographic units sorted randomly
between an experimental group (in which the policy innovation
is implemented) and a control group.

A controlled experimental design with random assignment is
generally viewed as the most reliable source of information about
the effects of social innovations, and has been used on a large
scale on subjects as diverse as the Salk vaccine tests and the nega-
tive income tax experiments. The use of this technique in crim-
inal justice research has largely been limited to correctional pro-
gramming studies, focused on rehabilitation effects. A partial
(and famous) exception in the deterrence research is the Kansas
City Preventive Patrol experiment (Kelling and Pate 1974).

## C. Methodological Issues

The three approaches to policy impact evaluation share certain
methodological concerns. A discussion of these issues serves as
a more useful review of this literature than a summary of results,
because policy impact evaluation has more promise than past.
My discussion here focuses on problems of measurement and
causation.

1. *Measurement of outcomes.* The first and often most difficult
problem in outcomes measurement is obtaining *reliable* measures
of target variables. The outcomes measures in the evaluation of
a deterrence-oriented policy innovation are usually crime rates
of some sort. A majority of relatively serious common law crimes
are reported to the police, and these crime reports ordinarily
are the most readily available data for measuring the impact of
policy innovation. Problems arise with reliance on reported crime
as a measure because reporting rates differ across jurisdictions
and over time, and because the crime count is subject to manip-
ulation by officials. For example, Chaiken (1978) discovered
that the official records on subway crime in New York were

counterfeit to some extent, due to a police official's zeal to demonstrate the effectiveness of intensive police manning in reducing subway crime. Even without conscious manipulation of the data, large changes in police presence in an area may cause systematic biases in the data, due to the possibility that police visibility may influence reporting rates by citizens. For this reason some of the more careful studies have supplemented police data with victimization surveys (e.g., Schwartz and Clarren's 1977 report on the Cincinnati Team Policing Experiment; see table 2).

Victimless crimes pose a still greater measurement problem because they only become known to authorities by accident or by dint of police undercover work. A number of the studies listed in table 2 have resolved this problem by using available data on proxy variables thought to be highly correlated with the incidence of the crime in question. The three studies of drunk driving crackdowns and the study of changes in the minimum legal drinking age all used readily available data on traffic accidents and casualties. Beha's study (1977) of the Bartley-Fox Amendment employed robbery, assault, and murder data; he argues that if the crime defined in the amendment (carrying a gun without a license) were reduced by the harsh penalties it stipulated, the rate of violent crime would also be reduced. Zimring's study (1972) of the legalization of abortion in Hawaii employed data on the live birth rate as the basis for inferring the number of illegal abortions before legalization.

These proxies are plausible indirect measures of the victimless crimes targeted by these policy innovations. The real virtue of these proxies, however, is that they are of direct policy interest in themselves. Indeed, preventing serious traffic accidents is the raison d'être of drunk driving statutes, and preventing violent crimes was certainly the main purpose of the Bartley-Fox Amendment.

A second important issue in the measurement of outcomes is specificity. The usual categories in which crimes are counted are often too crude to provide sensitive indicators of policy impact. Several important examples come to mind. First, a change in statutory sentencing severity, as in the Rockefeller drug laws or

252    Philip J. Cook

tbe Bartley-Fox Amendment, usually exempts juveniles. The
measure of severity used in most studies fitting the Ehrlich
paradigm, average prison sentence, is applicable only to adults
and the rare juvenile defendant who is waived to adult court.
Given that a large percentage of serious crimes is committed by
juveniles, an outcome measure which does not distinguish be-
tween juveniles and adults will tend to be an insensitive and
"noisy" indicator of the effect of the policy.

Studies of the deterrent effect of capital punishment[15] almost
always use some aggregate criminal homicide measure as the in-
dicator of impact, even though the capital sanction is ordinarily
reserved for felony murderers and other relatively small subsets
of homicide defendants, and would not be expected to deter the
sorts of homicide which constitute the majority in these statistics.

The importance of using as specific a crime measure as possible
is that most policy innovations have a small effect at best,[16] and
this effect can easily be submerged and lost in the normal fluctua-
tions of an insensitive indicator. Part of the persuasiveness of
Ross's evaluation (1973) of the British Road Safety Act results
from his use of highly sensitive indicators. Instead of limiting
his study to the gross accident rate, he distinguishes between
fatalities, casualties, and minor accidents (accidents associated
with drunk driving are more serious on the average than others);
further, he distinguishes between accident rates during common
drinking hours and accident rates on weekdays. Press (1971)
expected (correctly) that the increase in police manning of the
Twentieth Precinct would have a greater effect on outdoor,
visible felonies than on indoor felonies, and analyzed these two
crime types separately. Zimring (1972) distinguishes between
illegitimate and legitimate birth rates in his study of abortion.
Beha (1977) missed a good bet in failing to distinguish between
firearms assaults committed at home, and those committed away
from home. The latter necessitated carrying a gun in violation

[15] Sellin's studies of capital punishment are critiqued in Ehrlich (1975), Cook
(1977), and Klein, Forst, and Filatov (1978).

[16] This generalization is documented and discussed in Gilbert, Light, and
Mosteller (1975).

253    Research in Criminal Deterrence

of Bartley-Fox, and so the rate of such assaults should be the more sensitive to the new law.

The third important issue in outcomes measurement is *inclusiveness*. A complete evaluation of a policy innovation requires inclusion of all likely outcomes which are of concern to deterrence theorists or policy makers. The most common issue here is displacement—a policy innovation targeted on one geographic area or one type of crime will, in addition to a possible deterrent effect, displace criminals to other areas or crime types. Press studied crime rates in precincts bordering the twentieth; Williams et al. (1975) studied accident rates for youthful drivers in regions bordering states which had lowered their legal minimum drinking age; Chaiken, Lawless, and Stevenson (1974) studied the effects of nighttime intensive police manning on the New York subways on daytime subway crime rates and on robbery rates for buses and taxis. Obvious substitution possibilities resulting from Bartley-Fox include an increase in nongun violent crime, a substitution of more vulnerable targets for commercial targets in robbery, and a substitution of burglary for robbery. In general, predicting the sorts of displacement effects that are worth studying requires insight into criminal behavior and criminal opportunities.

*2. Measurement of inputs.* A change in law or policy, however important it looks in theory, may be undermined or transformed during its implementation. It is important to study the implementation of a policy innovation to facilitate interpretation of measured outcomes. In some cases a careful analysis of implementation has revealed that the criminal justice system has absorbed an apparently important innovation with hardly a trace, thus explaining the lack of effect on crime.

The Kansas City Preventive Patrol Experiment (Kelling and Pate 1974) is a case in point. In this experiment, fifteen contiguous beats were divided into three groups; five beats were to receive intensive preventive patrol, in five a normal level of preventive patrol prevailed, and in the remaining five preventive patrol was eliminated. While this experimental design suggests that visible police presence would differ widely among the three groups

of beats, Larson (1975) has argued that this was not so in practice. Police made it a point to patrol the perimeter of the "no patrol" beats, and to respond to calls in a highly visible fashion in these beats. A further indication of the lack of effect is that police response time to calls did not differ among the three experimental groups.

The Rockefeller drug laws, which increased statutory penalties for dealing in heroin and other drugs, had little effect on actual sentencing: the percentage of such defendants convicted and sentenced as felons was the same (11 percent) in 1976 as in 1973. Despite considerable advance advertising to the contrary, the British Road Safety Act of 1967 had little effect on the propensity of police to make arrests or issue citations in drunk driving cases. Similarly, the crackdown on drunk driving in Chicago, studied by Robertson, Rich, and Ross (1973), found there had been no significant change in arrest or conviction rates for drunk driving.

Of course, the innovation does not always get lost during implementation. Beha (1977) was impressed by the degree to which prosecutors and judges were carrying out the intent of the Bartley-Fox Amendment to impose one year minimum prison sentences on those guilty of carrying a gun without a license. None could argue that airport security measures introduced in 1973 were undermined during implementation—indeed, Landes (1978) reports that all hijackers since that time in the United States have been either killed or imprisoned. The team policing experiment in Cincinnati was successfully implemented for the first eighteen months, but undermined later by changes in policy. In any event, it is not safe to take any new policy at face value, and an investigation of its actual effects on the behavior of officials is an important feature of a complete evaluation.

In cross-section studies involving analysis of crime in jurisdictions which differ according to criminal code provisions or input levels, a common failing is to ignore differences in enforcement intensity. Maggadino (undated) compares states which differ with respect to gun control ordinances without analyzing enforcement procedures for these ordinances. A variety of studies

255   Research in Criminal Deterrence

of the deterrent effect of capital punishment have simply compared murder rates of retentionist and abolitionist states, without considering the *frequency* of executions in retentionist states. Wilson and Boland (1976) argue persuasively that the number of police employed in a city is not a good measure of police activity, since police departments differ widely with respect to prevention programs and to the percentage of the force which is actually on the streets at any one time. Much of the information we would like to obtain from a policy innovation is lost if implementation of the policy is ignored. While it may not be possible to measure the change in the threat level, it is usually possible to obtain some empirical notion of the degree to which the new policy influenced activity levels and decision-making. Such information aids in interpretation of findings on the crime impact of the policy. In particular, if the innovation is found to have no significant effect on crime, input measures may help distinguish between two very different interpretations: "this type of crime is not deterrable" versus "this crime was not deterred because the actual performance of the system changed little or not at all."

*3. Causation and control.* Specifying the causal process which generated nonexperimental data requires that assumptions be made about how the different parts of the system being studied fit together. These assumptions are usually controversial and sometimes wrong. Indeed, Gilbert, Light, and Mosteller (1975) find in their wide-ranging review of social policy innovation studies that nonexperimental studies have reported misleading findings on a number of occasions, as demonstrated later by a controlled experiment. The two major challenges to the validity of a nonexperimental finding are the possibility of reverse causation, and the possibility that factors other than the policy innovation caused the observed effect.

In checking for the possibility of reverse causation, the key question is why the innovation was adopted at a particular place and time. The innovation may have been motivated by some feature of the level or trend in crime in that jurisdiction. For example, an unusual increase in traffic fatalities may motivate a

256    Philip J. Cook

crackdown on speeding, which in turn is followed by a natural
"regression" in fatality rates to the trend line.[17] The reduction
in fatalities follows the crackdown but is not caused by it.[18]

Cross-section studies are particularly vulnerable to the reverse
causation problem. Anyone who has correlated the number of
police per capita with crime rates across cities understands this
problem. This correlation is positive for most samples, simply
because whatever deterrent effect extra police may yield is
swamped by the reverse process: relatively high crime rates
"cause" relatively large police forces, presumably due to the ef-
fect of crime on the public's demand for police protection. (See
Cook 1977 for a discussion and display of these data.) The same
effect must be expected in studies of interstate differences in gun
control ordinances, capital punishment provisions, minimum legal
drinking age provisions, and so forth—these laws are not adopted
in a vacuum but, rather, are influenced by the public's concern
with crime.

The reverse causation problem is not insurmountable. At least
in principle, statistical techniques are available which permit es-
timation of a model that specifies equations characterizing both
the deterrent effect of policy and the influence of crime on pol-
icy. The technical difficulties with these statistical techniques are
a major topic of the National Academy of Sciences Panel's report
(see Fisher and Nagin 1978).

Other than the problem of causal ordering, the most important
challenge to the validity of a finding is the difficulty in control-
ling for factors, other than the policy innovation, which also
influence crime rates. There are two basic approaches to con-
trolling for other criminogenic factors. The first is to develop
a model which explicitly specifies these other factors and uses
a multivariate statistical technique which accounts for a number

[17] A regression effect of this sort was documented by Campbell and Ross
(1968).

[18] The beauty of the imposition of the national 55 mile per hour speed limit
in 1974, from an evaluator's viewpoint, is that it was clearly motivated by a
consideration (the oil embargo) which had nothing to do with traffic safety.
The unusually large reduction in fatalities in 1974 can be safely interpreted as
a result of the new speed limit.

257    Research in Criminal Deterrence

of these variables simultaneously. The second approach involves
comparison of the crime trends for the group directly influenced
by the policy innovation, with corresponding trends for similar
groups not subject to the innovations. In either case, the objective
is to predict what the crime rate *would have been* in the absence
of the innovation, as a basis for comparison with the actual crime
rate. The difference is, of course, a measure of the policy's im-
pact on crime.

The multivariate approach is most often used in cross-section
comparison studies. Crime rates differ among jurisdictions be-
cause of differences in criminal opportunities and the demo-
graphic, cultural, and socioeconomic characteristics of the pop-
ulations. Only after accounting for these factors is it possible
to partial out the specific effects of interjurisdiction differences
in enforcement policy. One of the most important underlying
differences among geographic units may be a complex of atti-
tudes which can be labeled "public-spiritedness" or perhaps "re-
spect for authority." In neighborhoods or cities characterized by
a high degree of respect for authority, the crime rate will be
relatively low due to effective citizen cooperation with police
and prosecutors. (See Bayley 1976; Cook and Fischer 1976.)
This attitude is also likely to be reflected in official policy,
resulting in a systematic relationship between policy and crime
rates across jurisdictions which adds to the direct effects of dif-
ferences in policy. The difficulty in controlling for this complex
of attitudes is in knowing exactly how it should be defined and
measured. However, short-term policy impact studies in a single
jurisdiction are immune to this problem if, as seems reasonable,
attitudes toward authority change slowly.

Evaluations of individual policy innovations must control for
criminogenic variables which tend to fluctuate over the period
under consideration. Crime varies with the time of day, the day
of the week, the season of the year, and a host of other factors.
Controlling for these variables can be attempted through a multi-
variate model, estimated from historical data for the jurisdiction.
More commonly, evaluation studies have used interrupted time

258    Philip J. Cook

series analysis or comparisons with trends in crime rates for
groups similar to the group that is directly affected by the in-
novation. The interrupted time series analysis is most persuasive
when the implementation of the policy has an immediate "slam
bang" effect on crime—a change in the crime rate which is much
larger than would be expected from historical fluctuations in the
crime rate. Ross (1973), for example, reported a 60 percent drop
in the "drinking hours" auto fatality rate immediately after im-
plementation of the British Road Safety Act. Landes (1978)
reports that there was only one domestic airline hijacking during
the first year of intensive airport security measures, compared
with twenty-seven the preceding year. The possibility of docu-
menting a large effect of this sort is enhanced by use of a specific
and sensitive measure of crime, but slam bang effects are rare.
Gilbert, Light, and Mosteller (1975) document this point for
policy interventions generally; crime is no exception.

The choice of control groups for a nonexperimental innova-
tion is more an art than a science. The criterion is that crime
rates in the control groups should be subject to the same influ-
ences (except for the innovation itself), and respond to them in
roughly the same fashion, as the target group. Zimring (1972)
chose California and Oregon as controls in his abortion legaliza-
tion study in Hawaii; Williams et al. (1975) also used neighbor-
ing states in their study of the minimum drinking age. Proximity
as a basis for choice of controls is not limited to geography:
Ross (1973) used auto fatality rates during nondrinking hours,
and Chaiken, Lawless, and Stevenson (1974) used subway crime
rates during daytime hours. In some cases different age groups
can serve as a basis of comparison—Williams et al., for example,
could have used the auto fatality rate for drivers aged 21–24 as
a control for his study of underage drinking.

An alternative to proximity as the basis for choice of control
group is similarity. Press (1971) did not use precincts neighbor-
ing the twentieth as his controls, but rather chose groups of
precincts (different for each crime type) which were similar to
the twentieth in terms of population and crime rate. Beha (1977)

compared violent crime in Boston with other large cities in the
Northeast in his study of Bartley-Fox.[19]

*4. Generalizations.* Valid generalizations from the policy im-
pact studies are few, and leave us far short of being able to
answer the many questions posed by the theoretical discussion of
deterrence in section I. Perhaps the only general statements worth
making are: (1) a wide variety of crimes are deterrable, and
there are no types of crime which have been demonstrated to be
undeterrable; (2) the criminal justice system has considerable
inertia, with seemingly large policy innovations often resulting
in small change in the behavior of officials; and (3) given the
difficulty of evaluating policy impacts, the fine points of deter-
rence theory will have to be checked out in the laboratory rather
than the field. But the gradual accumulation of data from the
field will certainly enhance our feeling for what works, and
under what circumstances.

### IV. Notes on a Research Agenda

Research relevant to understanding and managing the criminal
deterrence process includes a wide range of topics and research
methods. The five topics discussed below strike me as deserving
greater attention by criminologists and research funding agencies
than they have received in the recent past.

*1. Comparative studies of risky decision-making.* Laboratory
experiments in decision-making under uncertainty can provide
information on how decisions are influenced by the threat of
adverse consequences of varying probability and severity. Extrap-
olating from the artificial laboratory setting to the "real world"
is difficult, of course, but some questions are hard to investigate
in a natural setting. One such question is the extent to which
such factors as age, emotional arousal, and inebriation are related
to "deterrability." One illustrative issue here is whether people
tend to be more willing to risk adverse consequences when drunk

[19] Whatever the reasoning behind the choice of controls, it is important to
validate the choice by correlating the crime rate for the control units with
that of the target unit, preferably over a substantial period of time prior to
the innovation. Omission of this validity check is a common failing of this
literature.

than sober; a more important issue is whether this willingness to
risk adverse consequences is less responsive to changes in the
threat level when the subject is drunk than sober.

*2. Threat communication.* The extent to which the threat of
punishment deters crime depends to some extent on how this
threat is "marketed." Several lines of research may prove useful
in this regard:

—An analysis of research findings on commercial advertising,
  dissemination of information on new products, etc., as
  a source of hypotheses concerning threat communication.

—Interviews with active and potential criminals to determine
  what sorts of information they regularly acquire on the
  effectiveness of law enforcement activities.

—Studies of the criminal's response to specific environmental
  cues related to the likelihood of arrest and punishment,
  including visible police patrol, signs posted to warn would-be
  violators ("shoplifters will be prosecuted"), and so forth.

*3. Complements and substitutes.* As explained in section IE
above, the incidence of one type of crime will be influenced
by the effectiveness of law enforcement efforts against closely
related types of crime. A crackdown on fencing may reduce the
burglary rate; a crackdown on carrying concealed weapons may
reduce the rates of armed assault and robbery; an increase in the
severity of sentencing for selling heroin may increase the rates
at which defendants jump bail and attempt to intimidate wit-
nesses before trial. Research on such interconnections among
crime types should aid in targetting law enforcement resources.

*4. Private protection activities.* Expenditures on private pro-
tection against crime have been growing faster than public ex-
penditures, and the total private and public expenditures are now
of the same order of magnitude. Some types of investments in
private security—guards, burglar alarms, hidden cameras—in-
crease the probability of arrest and conviction for crimes against
targets that are so protected. We would expect private efforts to
enhance the overall effectiveness of the system, while at the same

time increasing the victimization rate of targets that remain unprotected. These effects may be quite large, and should be given greater attention by social scientists.

*5. Other preventive effects of punishment.* Deterrence effects have almost been ignored in discussions of the other preventive effects of punishment. This sort of compartmentalized thinking is dangerous for policy prescription and costly to the scientific development of criminology. If the threat level influences the *rate* at which active criminals commit crimes, as well as the *number* of criminals who are active, then the measurement of incapacitation effects cannot ignore the deterrence phenomenon (Cook 1979d). Similarly, the outcome measures almost always used in studies of correctional rehabilitation—some sort of recidivism rate—will be influenced via deterrence by the threat environment facing the released convict. A related concern is the possibility that a correctional program will have a large enough effect on the severity of punishment to undermine the deterrent effect of punishment—a finding of reduced recidivism is insufficient to demonstrate that the rehabilitation program reduced crime.

Together, these five research topics would substantially expand the range of deterrence research, and they by no means exhaust the list of interesting possibilities. But to an important extent, productive research projects cannot be identified deductively—there should be a large element of opportunism in the choice of projects. The richest source of the "raw material" for deterrence research has always been dramatic changes in criminal justice policy in state and local jurisdictions, and that will continue to be true. The keys to exploiting this raw material are early involvement and special data collection efforts.

Franklin Zimring (1978) has written an excellent analysis of the research implications of recent policy experiments in deterrence. He concludes that a great deal of useful information which could have been extracted from recent innovations was lost because of poor planning. A full evaluation of an innovation usually requires special data collection efforts. Measuring sensitive outcome variables and controls, and gathering information on implementation, require careful planning, an early start, and access

262    Philip J. Cook

to official records—all of which have frequently been lacking with respect to major policy innovations. The problems in evaluating policy impacts for deterrence effects have much in common with policy evaluations in other areas of social policy. The greatest challenges to any such evaluation are measuring what are often small (but possibly important) effects, and measuring long-term effects.

The first decade of deterrence research has had some false starts and some successes. The successes in empirical field research have, for the most part, involved careful studies of specific policy changes. The major false start has been what I have called the "Ehrlich paradigm," though Isaac Ehrlich is only one of many who have utilized this approach. The appeal of this approach lies in the seeming generality of its empirical results. I believe there is a moral here: the quest for a single set of universally applicable estimates of deterrence effects is hopeless, given the nature of available data and the complexity of the underlying process which generates crime rates and sanction threats. It may pay deterrence researchers of the next decade to be modest. Sound generalizations will gradually emerge from the accumulation of carefully tested evidence on the deterrence process.

### REFERENCES

Allingham, Michael G., and Agnar Sandmo. 1972. "Income Tax Evasion: A Theoretical Analysis," *Journal of Public Economics* 1:323–38.

Andenaes, Johannes. 1974. *Punishment and Deterrence*. Ann Arbor: University of Michigan Press.

Bailey, William C. 1978. *Deterrence and the Celerity of the Death Penalty: A Neglected Question in Deterrence Research*. Madison: Institute for Research on Poverty, University of Wisconsin.

Bartel, Ann. 1975. "An Analysis of Firm Demand for Protection Against Crime," *Journal of Legal Studies* 4:443–78.

Bayley, David H. 1976. "Learning About Crime—the Japanese Experience," *The Public Interest* 44:55–68.

Becker, G. 1968. "Crime and Punishment: An Economic Approach," *Journal of Political Economy* 78:526–36.

263    Research in Criminal Deterrence

Beha, James A., II. 1977. "And *Nobody* Can Get You Out," *Boston University Law Review* 57:96–146 and 289–333.

Beyleveld, D. 1978. *The Effectiveness of General Deterrents against Crime: An Annotated Bibliography of Evaluative Research.* Cambridge, England: Institute of Criminology (in microfiche).

Blakey, G. Robert, and Michael Goldsmith. 1976. "Criminal Redistribution of Stolen Property: The Need for Law Reform," *Michigan Law Review* 74:1512–1626.

Block, Michael K., and John M. Heineke. 1975. "A Labor Theoretic Analysis of the Criminal Choice," *American Economic Review* 65:314–25.

Block, Michael K., and Robert C. Lind. 1975. "An Economic Analysis of Crimes Punishable by Imprisonment," *Journal of Legal Studies* 4:479–92.

Blumstein, Alfred, Jacquelin Cohen, and Daniel Nagin, eds. 1978. *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates.* Washington, D.C.: National Academy of Sciences.

Blumstein, Alfred, and Daniel Nagin. 1977. "The Deterrent Effect of Legal Sanctions on Draft Evasion," *Stanford Law Review* 28:241–75.

Boydstun, J. E. 1975. *San Diego Field Interrogation: Final Report.* Washington, D.C.: Police Foundation.

Brier, Stephen S., and Stephen E. Fienberg. 1978. *Recent Econometric Modelling of Crime and Punishment: Support for the Deterrence Hypothesis?* School of Statistics, University of Minnesota.

Campbell, Donald T., and H. Laurence Ross. 1968. "The Connecticut Crackdown on Speeding," *Law and Society Review* 3:33–53.

Carr-Hill, R. A., and N. H. Stern. 1973. "An Econometric Model of the Supply and Control of Recorded Offences in England and Wales," *Journal of Public Economics* 2:289–318.

Carroll, John S. 1978. "A Psychological Approach to Deterrence: The Evaluation of Crime Opportunities," *Journal of Personality and Social Psychology* 36:1512–20.

————. (forthcoming). "Committing a Crime: The Offender's Decision." In *Social-Psychological Analysis of Legal Processes*, ed. V. J. Konecni and E. G. Ebbesen. San Francisco: Freeman.

Chaiken, Jan M. 1978. "What Is Known about Deterrent Effects of Police Activities." In *Preventing Crime*, ed. James A. Cramer. Beverly Hills: Sage Publications.

Chaiken, Jan M., Michael W. Lawless, and Keith A. Stevenson. 1974. "The Impact of Police Activity on Subway Crime," *Urban Analysis* 3:173–205.

Clotfelter, Charles. 1977. "Public Services, Private Substitutes, and
the Demand for Protection against Crime," *American Economic
Review* 67:867–77.

Cohen, Jacquelin. 1978. "The Incapacitating Effect of Imprisonment:
A Critical Review of the Literature." In Blumstein, Cohen, and
Nagin (1978).

Conklin, J. 1972. *Robbery and the Criminal Justice System.* New
York: Lippincott.

Cook, Philip J. 1977. "Punishment and Crime: A Critique of Current
Findings Concerning the Preventive Effects of Punishment," *Law
and Contemporary Problems* 41:164–204.

———. 1979a. "The Clearance Rate as a Measure of Criminal Justice
System Effectiveness," *Journal of Public Economics* 11:135–42.

———. 1979b. "The Effect of Gun Availability on Robbery and Rob-
bery Murder." In *Policy Studies Review Annual*, Vol. 3, ed. R. H.
Haveman and B. B. Zellner. Beverly Hills: Sage Publications.

———. 1979c. "The Implications of Deterrence and Incapacitation
Research for Policy Evaluation." In *An Anatomy of Criminal
Justice*, ed. Cleon Foust and D. Robert Webster. Lexington, Mass.:
Lexington Books.

———. 1979d. "A Unified Treatment of Deterrence, Incapacitation,
and Rehabilitation: A Simulation Study." Durham, N.C.: Institute
of Policy Sciences and Public Affairs, Duke University.

———. 1980. "Reducing Injury and Death Rates in Robbery," *Policy
Analysis* 6:21–45.

Cook, P. J., and Gregory W. Fischer. 1976. "Citizen Cooperation
with the Criminal Justice System." Durham, N.C.: Institute of
Policy Sciences and Public Affairs, Duke University.

Cook, P. J., and Daniel Nagin. 1979. *Does the Weapon Matter?*
Washington, D.C.: Institute for Law and Social Research.

Ehrlich, Isaac. 1970. *Participation in Illegitimate Activities: An Eco-
nomic Analysis.* Ph.D. dissertation, Columbia University.

———. 1972. "The Deterrent Effect of Criminal Law Enforcement,"
*Journal of Legal Studies* 1:259–76.

———. 1973. "Participation in Illegitimate Activities: A Theoretical
and Empirical Investigation," *Journal of Political Economy*
81:521–65.

———. 1975. "The Deterrent Effect of Capital Punishment: A Ques-
tion of Life and Death," *American Economic Review* 65:397–417.

———. 1979. "The Economic Approach to Crime: A Preliminary As-
sessment." In *Criminology Review Yearbook*, ed. Sheldon Messin-
ger and Egon Bittner. Beverly Hills: Sage Publications.

265    Research in Criminal Deterrence

Ehrlich, Isaac, and Mark Randall. 1977. "Fear of Deterrence: A Critical Evaluation of the 'Report of the Panel on Research on Deterrent and Incapacitative Effects,'" *Journal of Legal Studies* 6:293–316.

Erickson, Maynard L., and Jack P. Gibbs. 1979. "On the Perceived Severity of Legal Penalties," *Journal of Criminal Law and Criminology* 70:102–16.

Fisher, Franklin M., and Karl Shell. 1972. *The Economic Theory of Price Indices*. New York: Academic Press.

Fisher, Franklin M., and Daniel Nagin. 1978. "On the Feasibility of Identifying the Crime Function in a Simultaneous Model of Crime Rates and Sanction Levels." In Blumstein, Cohen, and Nagin (1978).

Forst, Brian. 1976. "Participation in Illegitimate Activities: Further Empirical Findings," *Policy Analysis* 2:477–92.

Friedland, Nehemia, John Thibaut, and Laurens Walker. 1973. "Some Determinants of the Violation of Rules," *Journal of Applied Social Psychology* 3:103–18.

Geerken, Michael R., and Walter R. Gove. 1975. "Deterrence: Some Theoretical Considerations," *Law and Society Review* 9:497–513.

Gibbs, Jack P. 1968. "Crime, Punishment, and Deterrence," *Southwestern Social Science Quarterly* 48:515–30.

———. 1975. *Crime, Punishment, and Deterrence*. New York: Elsevier.

Gilbert, John P., Richard J. Light, and Frederick Mosteller. 1975. "Assessing Social Innovations: An Empirical Base for Policy." In *Benefit-Cost and Policy Analysis, 1974*. Chicago: Aldine.

Greenwood, Michael J., and W. J. Wadycki. 1973. "Crime Rates and Public Expenditures for Police Protection: Their Interaction," *Review of Social Economy* 31:138–51.

Heineke, John M. 1978a. "Economic Models of Criminal Behavior: An Overview." In *Economic Models of Criminal Behavior*, ed. J. M. Heineke. New York: North-Holland Publishing Company.

———. 1978b. "Substitution among Crime and the Question of Deterrence: An Indirect Utility Function Approach to the Supply of Legal and Illegal Activity." In *Economic Models of Criminal Behavior*, ed. J. M. Heineke. New York: North-Holland Publishing Company.

Jacob, Herbert. 1979. "Rationality and Criminality," *Social Science Quarterly* 59:584–85.

Johnston, James M. 1972. "Punishment of Human Behavior," *American Psychologist* 27:1033–54.

Joint Committee on New York Drug Law Enforcement. 1978. *The
Nation's Toughest Drug Law: Evaluating the New York Experi-
ence*. Washington, D.C.: U.S. Government Printing Office.

Kahneman, Daniel, and Amos Tversky (**forthcoming**). "Prospect
Theory: An Analysis of Decision under Risk," *Econometrica*.

Kelling, G., and A. Pate. 1974. *The Kansas City Preventive Patrol
Experiment*. Washington, D.C.: The Police Foundation.

Klein, Lawrence R., Brian Forst, and Victor Filatov. 1978. "The
Deterrent Effect of Capital Punishment: An Assessment of the
Evidence." In Blumstein, Cohen, and Nagin (1978).

Klockars, Carl B. 1974. *The Professional Fence*. New York: Free
Press.

Kunreuther, Howard, and Paul Slovic. 1978. "Economics, Psychol-
ogy, and Protective Behavior," *American Economic Review* 68:64–
69.

Landes, William M. 1978. "An Economic Study of U.S. Aircraft Hi-
jacking, 1961–1976," *The Journal of Law and Economics* 21:1–32.

Larson, Richard C. 1975. "What Happened to Patrol Operations in
Kansas City? A Review of the Kansas City Preventive Patrol Ex-
periment," *Journal of Criminal Justice* 3:267–97.

Lipton, D., R. Martinson, and J. Wilks. 1975. *The Effectiveness of
Correctional Treatment: A Survey of Treatment Evaluation Stud-
ies*. New York: Praeger.

Maggadino, J. P. n.d. "Towards an Economic Evaluation of State
Gun Control Laws." Long Beach, Calif.: California State Uni-
versity.

Manski, Charles. 1978. "Prospects for Inference on Deterrence
through Empirical Analysis of Individual Criminal Behavior." In
Blumstein, Cohen, and Nagin (1978).

Moore, Mark. 1973. "Policies to Achieve Discrimination on the Ef-
fective Price of Heroin," *American Economic Review* 63:270–77.

Myers, David G., and Helmut Lamm. 1976. "The Group Polarization
Phenomenon," *Psychological Bulletin* 83:602–27.

Nagin, Daniel. 1978. "General Deterrence: A Review of the Em-
pirical Evidence." In Blumstein, Cohen, and Nagin (1978).

Packer, Herbert L. 1968. *The Limits of the Criminal Sanction*. Stan-
ford: Stanford University Press.

Payne, John. 1980. "Information Processing Theory: Some Concepts
and Methods Applied to Decision Research." In *Cognitive Pro-
cesses in Choice and Decision Behavior*, ed. T. Wallsten. Hillsdale,
N.J.: Lawrence Elrbaum.

Petersilia, Joan, Peter W. Greenwood, and M. Lavin. 1978. *Criminal*

267      Research in Criminal Deterrence

    *Careers of Habitual Felons.* Santa Monica, Calif.: Rand Corporation.

Pierce, Glenn, and William Bowers. 1979. "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts." Boston: Center for Applied Social Research, Northeastern University.

Plattner, Mark F. 1976. "The Rehabilitation of Punishment," *The Public Interest* 44:104–14.

Press, S. James. 1971. *Some Effects of an Increase in Police Manpower in the 20th Precinct of New York City.* New York: Rand Institute.

Robertson, Leon, Robert F. Rich, and H. Laurence Ross. 1973. "Jail Sentences for Driving While Intoxicated in Chicago: A Judicial Policy That Failed," *Law and Society Review* 8:55–68.

Ross, H. Laurence. 1973. "Law, Science, and Accidents: The British Road Safety Act of 1967," *Journal of Legal Studies* 2:1–78.

———. 1977. "Deterrence Regained: The Cheshire Constabulary's 'Breathalyser Blitz,' " *Journal of Legal Studies* 6:241–92.

Schwartz, Alfred I., and Sumner Clarren. 1977. *The Cincinnati Team Policing Experiment: A Summary Report.* Washington, D.C.: Police Foundation.

Sellin, T., ed. 1967. *Capital Punishment.* New York: Harper & Row.

Simon, Herbert A. 1957. *Models of Man.* New York: Wiley.

Sjoquist, D. 1973. "Property Crime and Economic Behavior: Some Empirical Results," *American Economic Review* 63:439–46.

Swimmer, E. 1974. "Measurement of the Effectiveness of Urban Law Enforcement: A Simultaneous Approach," *Southern Economic Review* 40:618–30.

Tullock, Gordon. 1974. "Does Punishment Deter Crime?," *The Public Interest* 36:103–11.

Tversky, Amos, and Daniel Kahneman. 1974. "Judgment under Uncertainty: Heuristics and Biases," *Science* 185:1124–31.

Vandaele, Walter. 1978a. "Participation in Illegitimate Activities: Ehrlich Revisited." In Blumstein, Cohen, and Nagin (1978).

———. 1978b. "An Econometric Model of Auto Theft in the United States." In *Economic Models of Criminal Behavior,* ed. J. Heineke. New York: North Holland Publishing Company.

von Hirsch, Andrew. 1976. *Doing Justice.* New York: Hill and Wang.

Walker, Nigel. 1979. "The Efficacy and Morality of Deterrents," *Criminal Law Review,* pp. 129–44.

Walsh, Marilyn. 1976. *Strategies for Combatting the Criminal Re-*

168      Philip J. Cook

*ceiver (Fence) of Stolen Goods.* Washington, D.C.: U.S. Government Printing Office.

Williams, Allan F., et al. 1975. "The Legal Minimum Drinking Age and Fatal Motor Vehicle Crashes," *Journal of Legal Studies* 4:219–39.

Wilson, James Q., and Barbara Boland. 1976. "Crime." In *The Urban Predicament*, ed. W. Gorham and N. Glazer. Washington, D.C.: The Urban Institute.

Witte, Ann. 1980. "Estimating the Economic Model of Crime with Individual Data," *Quarterly Journal of Economics* 97:57–84.

Zimring, Franklin E. 1972. "Of Doctors, Deterrence, and the Dark Figure of Crime—A Note on Abortion in Hawaii," *University of Chicago Law Review* 39:699–721.

———. 1978. "Policy Experiments in General Deterrence: 1970–1975." In Blumstein, Cohen, and Nagin (1978).

Zimring, Franklin E., and Gordon J. Hawkins. 1973. *Deterrence.* Chicago: University of Chicago Press.

# EXHIBIT N

*Daniel S. Nagin*

# Deterrence in the Twenty-First Century

ABSTRACT

The evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment. However, the evidence in support of certainty's effect pertains almost exclusively to apprehension probability. Consequently, the more precise statement is that certainty of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent. This conclusion has important policy implications among which are that lengthy prison sentences and mandatory minimum sentencing cannot be justified on deterrence. There are four major research gaps. The first concerns the mechanism by which police affect perceptions of the probability of apprehension. The second concerns the inextricable link between the deterrent effect of the threat of punishment and the potentially criminogenic effect of the experience of punishment. The third concerns the concept of a sanction regime defined by the sanctions legally available and how that legal authority is administered. Theories of deterrence conceive of sanctions in the singular, not the plural, and do not provide a conceptual basis for considering the differential deterrent effects of different components of the sanction regime. The fourth involves sanction risk perceptions. Establishing the link between risk perceptions and sanction regimes is imperative; unless perceptions adjust, however crudely, to changes in the sanction regime, desired deterrent effects will not be achieved.

Three enduring questions have occupied centuries of scholarship on crime and punishment. Does punishment prevent crime? How does punishment prevent crime? And should punishment be used to prevent crime? This essay is concerned with the first two of these questions.

Daniel S. Nagin is the Teresa and H. John Heinz III University Professor of Public Policy and Statistics at Carnegie Mellon University.

© 2013 by The University of Chicago. All rights reserved.
0192-3234/2013/4201-0004$10.00

200    Daniel S. Nagin

The criminal justice system dispenses justice by apprehending, pros-
ecuting, and punishing individuals who break the law. These activities
may prevent crime by three distinct mechanisms: incapacitation, spe-
cific deterrence, and general deterrence. Convicted offenders are some-
times punished with imprisonment. Incapacitation concerns crimes
averted by their physical isolation during the period of their incarcer-
ation. Specific and general deterrence involve possible behavioral re-
sponses. General deterrence refers to the crime prevention effects of
the threat of punishment. Specific deterrence concerns the aftermath
of the failure of general deterrence—the effect on reoffending, if any,
that results from the experience of actually being punished.

In this essay, I consider the theoretical and evidentiary basis for gen-
eral deterrence. In another recent *Crime and Justice* essay (Nagin, Cul-
len, and Jonson 2009), I surveyed the evidence on the specific deter-
rence effects of imprisonment. Here, I draw heavily from recent and
prior deterrence reviews by me and others.

My aim is to provide a succinct summary of the current state of
theoretical and empirical knowledge about deterrence in support of
several interrelated objectives. The first is to provide a selective intel-
lectual history of deterrence research that identifies important recur-
ring themes. I highlight both what has been learned and persistent
flaws that should be addressed in future research.

The second objective concerns the framing of discourse on deter-
rence, which often takes the same pattern, particularly in policy dis-
cussions: one group arguing that sanction threats always deter and
another group arguing that sanction threats never deter. When deter-
rence effects are unpacked, it is clear that sanction threats are not
universally efficacious: magnitudes of deterrent effects range from none
to seemingly very large. Thus, another primary objective is to move
discourse about deterrence away from the equally indefensible posi-
tions that deterrence effects are always or never present to a more
nuanced and useful inquiry into the basis for variation in the existence
and size of deterrent effects.

The third objective is policy related. Prison populations have been
rising in the United States for four decades. Only recently have there
been signs that the increase is abating. In 2009 and 2010, state-level
prison population declined but federal-level population continued to
increase (Bureau of Justice Statistice 2012). Less well recognized is that
prison populations have risen elsewhere in the world, for example, in

the Netherlands since 1975 and more recently in England and Wales, Portugal, Spain, and New Zealand. An incarceration-based sanction policy that reduces crime solely by incapacitation will necessarily increase the rate of imprisonment. In contrast, if the crime control policy also prevents crime by deterrence, it may be possible to reduce both imprisonment and crime; successful prevention by any mechanism, whether by deterrence or otherwise, has the virtue of averting not only crime but also the punishment of perpetrators. Hence, it is important to identify policies that increase imprisonment but have only negligible effects on crime rates.

My main conclusions are as follows: First, there is little evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs. Such severity-based deterrence measures include "three strikes, you're out," life without the possibility of parole, and other laws that mandate lengthy prison sentences.

Second, on the basis of the earlier noted *Crime and Justice* review (Nagin, Cullen, and Jonson 2009), I have concluded that there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that that reoffending is either unaffected or increased.

Third, there is substantial evidence that increasing the visibility of the police by hiring more officers and allocating existing officers in ways that materially heighten the perceived risk of apprehension can deter crimes. This evidence is consistent with the perceptual deterrence literature that surveys individuals on sanction risk perceptions and relates these perceptions to their actual or intended offending behavior. This literature finds that perceived certainty of punishment is associated with reduced self-reported or intended offending.

Thus, I conclude, as have many prior reviews of deterrence research, that evidence in support of the deterrent effect of various measures of the certainty of punishment is far more convincing and consistent than for the severity of punishment. However, the certainty of punishment is conceptually and mathematically the product of a series of conditional probabilities: the probability of apprehension given commission of a crime, the probability of prosecution given apprehension, the probability of conviction given prosecution, and the probability of sanction given conviction. The evidence in support of certainty's de-

202    Daniel S. Nagin

terrent effect pertains almost exclusively to apprehension probability. Consequently, the conclusion that certainty, not severity, is the more effective deterrent is more precisely stated as *certainty of apprehension* and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent. This more precise statement has important policy implications; the empirical evidence from the policing and perceptual deterrence literature is silent on the deterrent effectiveness of policies that mandate incarceration after apprehension. These include policies such as mandatory minimum sentencing laws or sentencing guidelines that mandate incarceration. Thus, this revised conclusion about the deterrent effect of punishment certainty should not be construed as implying that policies mandating severe legal consequences have been demonstrated to achieve deterrent effects.

Together these conclusions have a range of policy implications, particularly as they relate to the United States (Durlauf and Nagin 2011*b*). First, it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime prevention basis. Thus, the case for crime prevention benefits of measures requiring lengthy prison sentences such as California's three-strikes law must rest on incapacitation. Another implication is that crime prevention would be enhanced by shifting resources from imprisonment to policing or, in periods of declining criminal justice system budgets, that policing should get a larger share of a smaller overall budget.

While accumulation of knowledge about deterrence in the past four decades has been impressive, much remains to be learned. There are four major theoretical and related empirical gaps. The first concerns the deterrent effect of the certainty of apprehension. There are two distinct mechanisms by which the police may deter crime. One stems from their effectiveness in apprehending perpetrators of crimes; by definition this activity involves occurrences in which deterrence has failed. Thus, police effectiveness in successfully apprehending criminal perpetrators can have a deterrent effect only on others or on the perpetrator's future behavior. The second mechanism involves the effect of the intensity of police presence in creating a perception that apprehension risk is sufficiently high that no crime is committed in the first place. I speculate that this second mechanism is the primary source of police effectiveness in deterring crime whereas the first role primarily prevents crime by capturing and incapacitating crime-prone individuals. The research gap involves developing rigorous empirical tests of

this contention and developing improved theoretical models of how
police presence and tactics can reduce the attractiveness of criminal
opportunities by increasing the perceived risk of apprehension.

The second gap concerns the distinction between specific and general deterrence. The two are inextricably linked because the experience
of punishment is a consequence of the failure of the threat of punishment to deter crime, yet no theory of deterrence explicitly addresses
how the experience of punishment influences the deterrent effect of
the threat of punishment. Relevant issues include how the experience
of punishment affects the proclivity to commit crime due to potential
stigma effects, sustained contacts with criminals in a prison setting, or
participation in rehabilitative programs as well as the effect of the experience of punishment on perceptions of the certainty and severity of
sanctions. Analysis of these and other related issues will require longitudinal data on individuals who do and do not have the experience
of punishment.

The third theoretical gap concerns the concept of a sanction regime.
A sanction regime defines the sanctions that are legally available for
the punishment of various types of crime and how that legal authority
is administered. Depending on the crime and characteristics of the
offenders, such as age or prior record, available sanctions range in severity from verbal reprimands to fines and different forms of community service to lengthy terms of imprisonment and execution. How
the legal authority is administered determines the relative frequency
with which the available sanction options are used and also the swiftness of their application. Thus, both dimensions of the sanction regime—the legal authority for different types of sanctions and how that
authority is administered—combine to determine the certainty, severity, and celerity of sanctioning options available for punishment of a
specific type of crime.

Theories of deterrence, however, specify sanction threats in the singular, not the plural. For example, a sizable number of studies examine
the question whether capital punishment deters murder. Yet properly
understood, the relevant question is the differential or marginal deterrent effect of execution over the deterrent effect of other available or
commonly used penalties. In this case the alternative penalty would be
a lengthy prison sentence—sometimes life without the possibility of
parole. Yet none of the capital punishment studies take account of differences across states and over time in the severity of noncapital pun-

ishments for murder (Nagin and Pepper 2012). Theories of deterrence that conceive of sanctions in the singular do not provide a conceptual basis for considering the differential deterrent effect of different types of sanction options. The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes. At least in the United States, such data are largely unavailable.

The fourth theoretical and empirical gap involves sanction risk perceptions, an issue that I emphasized in an earlier review of the deterrence literature (Nagin 1998). Deterrence is the behavioral response to the perception of sanction threats. Establishing the link between risk perceptions and sanction regimes is imperative; the conclusion that crime decisions are affected by sanction risk perceptions is not sufficient to conclude that policy can deter crime. Policy cannot directly manipulate perceptions. It can affect only the variety and severity of sanctions legally available in the sanction regime and the manner of their administration. Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved.

Since the publication of Nagin (1998), valuable headway has been made in how the experience of apprehension or not following commission of a crime affects sanction risk perceptions. This research is valuable for specification of a theory that combines the concepts of general and specific deterrence. However, it does not address how perceptions are formed about the two key dimensions of a sanction regime: the legal authority for different types of sanctions and how that authority is administered. Numerous surveys have been conducted of the general public's knowledge of sanction regimes, especially concerning the legal authority for different types of sanctions (Apel 2013). Not surprisingly, the surveys find that knowledge of sanction regimes is poor. However, the fundamental flaw with these surveys is that knowledge of the potential legal consequences of lawbreaking is unnecessary for most people; their decisions to refrain from crime are based on the mere knowledge that the behavior is legally prohibited or for other nonlegal considerations such as morality or fear of social censure (Packer 1968; Zimring and Hawkins 1973; Andenaes 1974; Wikström et al. 2012). That said, for individuals for whom sanction threats might affect their behavior, it is preposterous to assume that their perceptions conform to the realities of the legally available sanction options and their administration. More than a decade after my

earlier review, it remains the case that little is known about how in-
dividuals form perceptions of the sanction regimes they confront.

This essay is organized in the following sections. Key concepts of
deterrence are discussed in Section I, where I also set out a simplified
model of deterrence that is referred to throughout the essay. Section
II provides a brief summary of the themes, conclusions, and flaws of
research on the deterrent effects of prison and the police up to about
1990. In Section III, I summarize the evidence on the deterrent effects
of capital punishment. I discuss the capital punishment literature sep-
arately because of its distinctive features and salience. I then examine
in Section IV post-1990 studies of the crime prevention effects of im-
prisonment and in Section V post-1990s studies of the police effects
on crime. Section VI discusses the survey-based literature on the ac-
curacy of sanction risk perceptions, their formation, and their relation-
ship to self-reported criminality. Section VII offers conclusions.


### I. Key Concepts

Deterrence is a theory of choice in which would-be offenders balance
the benefits and costs of crime. Benefits may be pecuniary, as in the
case of property crime, but may also involve intangible benefits such
as defending one's honor, expressing outrage, demonstrating domi-
nance, cementing a reputation, or seeking a thrill. The potential costs
of crime are comparably varied. Crime can entail personal risk if the
victim resists. It may also invoke pangs of conscience or shame (Braith-
waite 1989). I am mainly concerned with offender responses to the
costs that attend the imposition of official sanctions such as arrest,
imprisonment, execution, fines, and other restrictions on freedom and
liberty such as mandated drug testing or electronic monitoring.

The origins of most modern theories of deterrence can be traced to
the work of the Enlightenment-era legal philosophers (Beccaria 1764;
Bentham 1789). The motivation for their work was their mutual ab-
horrence of the administration of punishment without constructive
purpose. For them the constructive purpose was preventing crime. As
Beccaria observed, "it is better to prevent crimes than punish them"
([1764] 1986, p. 93). Beccaria and Bentham argued that there are three
key ingredients to the deterrence process: the severity, certainty, and
celerity of punishment. These concepts, particularly the certainty and
severity of punishment, form the foundation of nearly all contemporary

theories of deterrence. The enduring impact of their thinking is re-
markable testimony to their innovation.

The theory of deterrence is predicated on the idea that if state-
imposed sanction costs are sufficiently severe, criminal activity will be
discouraged, at least for some. Thus, one of the key concepts of de-
terrence is the severity of punishment. Severity alone, however, cannot
deter. There must also be some possibility that the sanction will be
incurred if the crime is committed. Indeed the argument that the prob-
ability of punishment, not severity, is the more potent component of
the deterrence process goes back to Beccaria, who observed that "one
of the greatest curbs on crime is not the cruelty of punishments, but
their infallibility. . . . The certainty of punishment even if moderate
will always make a stronger impression" ([1764] 1986, p. 58).

In the lifetimes of Beccaria and Bentham there was no criminal jus-
tice system as we know it. Punishment for lawbreaking was almost
certainly less regular and more haphazard than it is today. Punishment
in contemporary society, however, also still remains far from guaran-
teed. In order for a formal sanction—whether moderate or severe—to
be imposed, the offender must first be apprehended, usually by the
police.[1] He must next be charged and successfully prosecuted and, fi-
nally, sentenced by the judge. Successful passage through all of these
stages is far from certain. The most important set of actors affecting
certainty is the police: without detection and apprehension, there is no
possibility of conviction or punishment. For this reason special atten-
tion is given to discussing what is known about the deterrent effect of
police activities and presence.

The third conceptual component of the theory of deterrence ad-
vanced by Bentham and Beccaria is the swiftness of punishment, which
Bentham referred to as celerity. Celerity is the least studied of the
conceptual troika underlying deterrence theory. The theoretical basis
for its effect on deterrence is ambiguous, as is the empirical evidence
on its effectiveness. Even Beccaria seemed to base his case for celerity
more on normative considerations of just punishment than on deter-
rence effectiveness. He observed that "the more promptly and the
more closely punishment follows upon the commission of a crime, the
more just and useful will it be. I say more just, because the criminal is

---

[1] Crime may also be sanctioned entirely outside of the criminal justice system
through retaliation by the victim or by others on his or her behalf (Jacobs and Wright
2006).

thereby spared the useless and cruel torments of uncertainty, which increase with the vigor of imagination and with the sense of personal weakness" (Beccaria [1764] 1986, p. 36).

In 1968 economist Gary Becker published the first modern formalization of the Beccaria-Bentham conception of the deterrence process (Becker 1968). Since then, other formalizations have appeared in economics, criminology, law, and sociology—some in the form of mathematical models and others in the form of nonmathematical conceptual theories (Cornish and Clarke 1986).

For the purposes of this essay still another formalization is provided. I have two purposes. One is to provide a conceptual structure for framing results that are well established in the literature. The second is more ambitious. I earlier indicated that the seemingly greater deterrent effect of certainty rather than severity of punishment reflected a response to the certainty of apprehension. In this regard, I distinguished two distinct functions of the police: apprehending the perpetrators of crime and serving in a sentinel function that deters crime from happening in the first place. The second purpose is to formalize this distinction. In so doing I link situational crime prevention theory with deterrence theory.

Bentham's conception of criminal choice involved the would-be offender balancing the potential pains of punishment against the pleasures of the offense. In this spirit the model formalizes the decision of a would-be offender to victimize a potential criminal opportunity, whether that opportunity is a person in the form of a potential robbery victim or property that might be stolen or vandalized.

The choice model is depicted in figure 1. It distinguishes four possible outcomes if the target is victimized: the criminal act is successfully completed, the act is not successfully completed and the perpetrator is not apprehended, the act is not successfully completed and the perpetrator is apprehended but not convicted, and the act is not successfully completed and the perpetrator is both apprehended and convicted. The probability of each of these outcomes is determined by the following probabilities.

*Perceived Probability of Successful Completion of the Act.* This probability, which is denoted by $P_s$, measures the would-be offender's perception of the chances the target can be successfully victimized. This perception will be affected by how effectively the opportunity is protected. For property targets, the level of protection is determined by

208       Daniel S. Nagin



FIG. 1.—The decision to victimize a target

technological safeguards such as alarm and surveillance systems and use of physical protection such as locked showcases. For human targets, the protection level is affected by the care with which valuable property is secured, for example, by keeping it out of sight. Protection may also be provided by what Cohen and Felson (1979) call capable guardians such as security guards, vigilant employees, or onlookers who are willing to intervene. Importantly, the police may also serve as a guardian. I refer to police as acting as sentinels when acting in this role. An idling police car outside a liquor store greatly reduces the chance, probably to zero, that the store can be successfully robbed. This brings me to the risk of apprehension.

*Perceived Probability of Apprehension Given Noncompletion.* Police perform another crime control function that is distinct from their role as official guardians. They apprehend those offenders who chose to act on a criminal opportunity. When acting in this role, police are described as "apprehension agents." The sentinel and apprehension roles of the police are conceptually linked but distinct. They are conceptually linked because both roles are based on the legal authority of the police to arrest persons suspected of committing a crime. Because a contributing factor to $P_s$ is the risk of apprehension, arrest authority is one source of police influence on $P_s$ in their sentinel role. However, the sentinel role of police is distinct from their apprehension role because the latter comes into play only when deterrence has failed and a

would-be offender becomes an actual offender. Thus, at one moment police can be functioning as a sentinel and in the next moment they can be acting as an apprehension agent. The would-be offender's perception of the probability of apprehension given commission of the crime is denoted by $P_a$.

In this model I assume that the risk of apprehension is limited to acts that are not successfully completed. I make this assumption for several reasons. First, it is useful for clarifying the distinction between police acting as sentinels and police acting as apprehension agents. Second, it conforms to the seeming reality that most offenders are apprehended at the scene of the crime or soon thereafter. I say seeming because I have been able to identify only two studies (Greenwood, Chaiken, and Petersilia 1977; Blake and Coupe 2001) that report relevant data. Data reported in both support this assumption.

*Perceived Probability of Conviction Given Apprehension.* The offender's perception of the probability that apprehension will actually result in conviction is denoted by $P_{c|a}$.

Under this setup, the probability of successful completion is $P_s$, the probability of nonsuccessful completion but with apprehension avoidance is $(1 - P_s)(1 - P_a)$, the probability of nonsuccessful completion followed by apprehension but not conviction is $(1 - P_s)(P_a)(1 - P_{c|a})$, and the probability of nonsuccessful completion followed by apprehension and conviction is $(1 - P_s)(P_a)(P_{c|a})$.

The benefits and costs of each of these outcomes are assumed to be determined by the following factors:

- *Rewards.* Rewards measures the total benefits of victimizing a target. For a crime with a property motive, the value of the property to the perpetrator likely accounts for all or a major share of the total reward. However, the thrill of offending or—in the case of violent crimes without a property motive—the satisfaction of humiliating, physically hurting, or killing the victim may also be relevant to the reward value of a target.
- *Crime commission cost.* Crime commission cost measures the total cost of committing the crime separate from the sanction cost defined below. Commission cost includes time searching for the opportunity, planning time, if any, and the effort required to commit the crime itself. Importantly, it also includes the potential costs to the perpetrator of victim retaliation or resistance. Finally, commission cost includes Raskolnikov-like feelings of guilt or shame that

210    Daniel S. Nagin

may affect the perpetrator, whether or not he is apprehended and
sanctioned.

- *Perceived formal sanction cost.* Perceived sanction cost measures the
  would-be perpetrator's assessment of the formal sanction cost that
  might be imposed if convicted. These costs include the loss of free-
  dom if imprisoned and the unpleasantness of other restrictions on
  freedom due to conditions of parole or probations and fines.
- *Perceived informal sanction cost.* The imposition of formal sanctions
  may also trigger informal sanctions by family, friends, and the com-
  munity at large, which for some offenders may be even more costly
  than the formal sanctions. Informal sanction cost may also involve
  large economic costs due to job loss.
- *Perceived cost of apprehension.* Apprehension imposes costs that are
  distinct from formal and informal sanction costs. These include the
  unpleasantness of the apprehension itself, possible loss of liberty due
  to pretrial detention, and legal fees. Perceived cost of apprehension
  also includes the social and economic costs triggered by arrest, even
  without conviction, such as disapproval of family, friends, and the
  community at large, as well as job loss.

At the end of each branch, figure 1 shows the costs that attend the
various forms of an unsuccessful attempt or the benefit of a successful
attempt. If the individual chooses to act on a criminal opportunity, the
benefits and costs of the four possible outcomes and their attendant
probabilities are as follows:

1.  The offender successfully completes the criminal act. This oc-
    curs with probability $P_s$, and the net benefit to the offender is
    reward less commission cost. Thus, the expected benefit of vic-
    timization is $P_s$(Reward − Commission Cost), which is denoted
    as $P_s(R − CC)$.
2.  The offender is not successful and is not apprehended. This
    occurs with probability $(1 − P_s)(1 − P_a)$. The cost to the offender
    is that much, or all, of the commission cost is incurred but with
    no reward. For simplicity it is assumed that all of the commis-
    sion cost is incurred. Thus, the contribution of this outcome to
    expected cost is $(1 − P_s)(1 − P_a)$(Commission Cost), which is de-
    noted as $(1 − P_s)(1 − P_a)CC$.
3.  The offender is not successful and is apprehended but is not
    convicted and formally sanctioned. This occurs with probability

Deterrence in the Twenty-First Century    211

$(1 - P_s)(P_a)(1 - P_{a|c})$. In this case the cost to the offender is commission cost plus apprehension cost. Thus the contribution of this outcome to expected cost is $(1 - P_s)(P_a)(1 - P_{c|a})$(Commission Cost + Apprehension Cost), which is denoted as $(1 - P_s)(P_a)(1 - P_{c|a})(CC + AC)$. Because, as already noted, most apprehensions occur at the scene of the crime or shortly thereafter, it is assumed that the perpetrator does not have the opportunity to enjoy the rewards provided by the act.

4. The offender is not successful but is apprehended, convicted, and formally sanctioned. This occurs with probability $(1 - P_s)(P_a)(P_{c|a})$. In this case the cost to the offender is commission cost plus apprehension cost plus formal and informal sanction cost. Thus, the contribution of this outcome to expected cost, again assuming that the rewards are not enjoyed, is $(1 - P_s)(P_a)[P_{c|a}$(Commission Cost + Apprehension Cost + Formal Sanction + Informal Sanction Cost)], which is denoted as $(1 - P_s)(P_a)(P_{c|a})(CC + AC + FS + ISC)$.[2]

An arrow at the top of figure 1 highlights that the possible events depicted occur over time. Success or failure at completion is typically immediate, whereas the down tree events occur later, often months after the criminal event in the case of conviction and sentencing. I return to this observation in the discussion of the celerity of punishment.

It is assumed that the crime will be committed if the expected benefits from a successful completion exceed the expected cost of an unsuccessful attempt, namely, if

$$P_s(R - CC) > (1 - P_s)(1 - P_a)CC + (1 - P_s)(P_a)(1 - P_{c|a})(CC + AC) \quad (1)$$
$$+ (1 - P_s)(P_a)(P_{c|a})(CC + AC + FS + ISC).$$

An equivalent form of this relationship moves $P_s$ on the left-hand side to the right-hand side, in which case the crime will be committed if

$$(R - CC) > \left(\frac{1 - P_s}{P_s}\right)[(1 - P_a)CC + (P_a)(1 - P_{c|a})(CC + AC) \quad (2)$$
$$+ (P_a)(P_{c|a})(CC + AC + FS + ISC)].$$

The left-hand side of equation (2) measures the net benefits of com-

2 This model assumes that success precludes the possibility of subsequent apprehension and the attendant risk of formal sanction.

212    Daniel S. Nagin

mitting the crime and the right-hand side measures the costs. Several observations about this relationship are relevant to the remainder of the discussion.

First, unless the net benefit of crime commission is positive (i.e., $R - C > 0$),[3] the offense will not be committed regardless of the formal and informal sanction costs specified on the right-hand side of equation (2). Particularly if commission cost is understood to include the shame of committing an act that involves taking another person's property or doing violence to that person, for most people sanction costs are irrelevant to the decision to refrain from crime. For example, Bachman, Paternoster, and Ward (1992) found in a study of sexual assault that sanction risk perceptions were relevant to self-reported intentions to offend only for the least morally committed. The absence of an effect for those with higher levels of moral commitment, however, should not be construed as their being impervious to incentives but to their moral commitment being a sufficient basis for refraining from sexual assault.[4] This elementary but fundamental point has been made repeatedly in the discussion about to the degree to which sanction threats affect behavior among different individuals. See, for example, Zimring and Hawkins (1973) and more recently Piquero et al. (2011) and Wikström et al. (2012). I return to this point in the discussion of sanction risk perceptions and their influence on behavior in Section VI.

Second, the bottom three branches of the tree pertain to the consequences of failure to complete the crime. Commission cost contributes to the total cost of all three of these branches, apprehension cost contributes to two of the three branches—apprehension with and without conviction—and informal and formal sanction costs contribute only to the final branch, apprehension with conviction. This implies that increases in perceived commission cost will have a greater deterrent effect than equal increases in either perceived apprehension cost or perceived formal and informal sanction costs. In turn the structure of the tree implies that increases in apprehension cost will have a greater deterrent effect than equal increases in either formal or informal sanction cost. This observation helps to explain the longstanding conclusion from the perceptual deterrence literature that shame, a key component of commission cost and apprehension cost, plays a more

[3] Rewards and commission cost may also be affected by risk preferences.

[4] Knowledge of potential punishment may also reinforce a normative sense of wrongfulness.

decisive role in the deterrence process than sanction cost. This issue is discussed further in Section III. It also explains the seeming effectiveness of situational crime prevention tactics, a topic I allude to in Section V.

Third, the structure of the tree also implies that decreases in $P_s$ will have larger deterrent effects than equal-sized increases in either $P_a$ or $P_{s|a}$ and that increases in $P_a$ will have a bigger deterrent impact than an equal increase in $P_{s|a}$. This observation is consistent with the longstanding belief dating back to Beccaria that the certainty of punishment is a more effective deterrent than the severity of punishment. However, I earlier noted that the evidence suggests that a more precise statement of the certainty conclusion pertains to the certainty of apprehension. The decision model laid out here provides a still more precise statement of that conclusion. Decreases in $P_s$ provide more effective deterrence than equal increases in $P_a$. Concerning the distinction between police serving as sentinels or as apprehension agents, when serving in their role as sentinels, they affect $P_s$, whereas when serving as apprehension agents, they affect $P_a$. This implies that the sentinel role of policing is more effective in deterring crime than their apprehension agent role. This observation is relevant to the discussion in Section V of the varying findings on police effectiveness in preventing crime.


## II. Deterrence Research to the 1990s

Empirically based deterrence research began in earnest in the late 1960s. There were three major instigators. One was technological: the growing availability of computers and statistical software for analyzing crime data, which were also growing in availability. The second was social: the steady growth of crime rates during the 1960s. The third was intellectual, especially within economics, with the publication in 1968 of Becker's seminal article "Crime and Punishment: An Economic Approach."

Deterrence studies up to the 1990s are usefully grouped into three categories: experimental and quasi-experimental studies, aggregate studies, and perceptual deterrence studies. My 1998 *Crime and Justice* review provided an extended discussion of the three types of studies (Nagin 1998). This section summarizes conclusions of the experimental and quasi-experimental studies and aggregate studies of this research era that are most relevant to this review. Because of the persistence of

214     Daniel S. Nagin

themes in the pre- and post-1990s perceptual deterrence research and the continuity of the research methods used, I discuss this body of research without reference to era in Section VI.

### A. Experimental and Quasi-Experimental Studies

This category of studies examines the effect of targeted policy interventions such as police crackdowns or implementation of statutes changing penalties. In the experimental studies the intervention and control treatments are randomly assigned. A classic example is the Minneapolis Domestic Violence Experiment (Sherman and Berk 1984) in which police responded to misdemeanor incidents of domestic violence with one of three randomly chosen responses. The arrest response was found to be most effective in preventing recidivism, but as discussed in Section V, this finding was not consistent across replications of the experiment in other localities.

True experiments, however, compose only a small fraction of the studies in this category. Most are quasi experiments. The best-designed quasi-experimental studies attempt to incorporate important features of a true experiment: a well-defined treatment regime, measurement of response before and after treatment, and a control group. Two classic studies of this genre are Ross's studies of the effects on drunk driving of the British Road Safety Act (Ross 1973) and of Scandinavian-style drunk driving laws. Most studies in this group examine the effects of police crackdowns on drug markets, disorderly behavior, and drunk driving. Excellent reviews of these studies are available in Sherman (1990) and Ross (1982). Both Sherman and Ross conclude that the interventions were generally successful in generating an initial deterrent effect. For instance, in drunk-driving interventions, this was evidenced by a reduction in fatalities in which the driver was intoxicated or in drug market crackdowns by reduced dealing. However, they also concluded that the effect was generally only transitory: the initial deterrent effect typically began decaying even while the intervention was in effect. One exception to this finding of at least initial deterrent effectiveness concerned studies of increases in sentence severity. Ross (1982) discusses the ineffectiveness of severity enhancements in three very different places: Finland, Chicago, and New South Wales, Australia. Evidence even of an initial effect is less consistent than in studies of interventions that increased the certainty of apprehension.

I take away three important lessons from this literature. First, the

generally more consistent findings of initial effectiveness in the appre-
hension-based interventions, compared to the severity-based interven-
tions, provide more evidence in support for my modified version of
the certainty effect, namely, that certainty of apprehension is a more
effective deterrent than the severity of the ensuing legal consequences,
but with an important proviso. Ross (1982) attributed the ineffective-
ness of severity-enhancing policies to the fact that they trigger a system
response that reduced certainty of punishment. He pointed out that if
judges or juries believed the penalties too harsh, they may have re-
sponded by refusing to convict guilty defendants. Police and prose-
cutors may respond similarly. Thus, any potential deterrent effect of
the severity enhancement may be canceled by the reduction in cer-
tainty. This result is a reminder not only of the difficulty of enforcing
penalties that are deemed unjust but also that certainty and severity do
not operate independently—they interact. Tonry (2009) forcefully elab-
orates on many of these points.

Second, Sherman (1990) offers useful nomenclature for describing
the finding of only transitory effects. He uses the term "initial deter-
rence decay" to describe the decline in the deterrent response as "po-
tential offenders learn through trial and error that they had overesti-
mated the certainty of getting caught at the beginning of the
crackdown" and "residual deterrence," which is a crime suppression
effect that extends beyond the intervention until offenders learn by
experience or word of mouth that "it is once again 'safe' to offend" (p.
10). Sherman's observations are a reminder that deterrence is a per-
ceptual phenomenon. In Sherman (1990) and Nagin (1998), we both
discuss the decay of initial deterrence as a possible response to what
behavioral economists call ambiguity aversion. People consistently pre-
fer gambles in which the risks are clearly comprehensible compared to
equivalent gambles in which the risks are less transparent. Initial de-
terrence may be a response to perceptions of uncertainty about true
risk rather than to any change in the true risk of apprehension. Thus,
unless policy can affect perceptions, there will be no behavioral re-
sponse. It is also a reminder that perceptions may be updated in re-
sponse to cues from the environment and therefore will not necessarily
be stable. I return to this important issue in the discussion of the per-
ceptions studies in Section VI.

Third, the findings from these studies have stood the test of time.
In my judgment, well-conducted experimental and quasi-experimental

studies of deterrence provide the most convincing evidence of the circumstances under which deterrence is and is not effective. This holds for both the post-1990s and the pre-1990s literatures.

## B. Aggregate Studies

The pre-1990s aggregate studies generally analyzed the association of crime rates across geographic units, usually states, with measures of the certainty and severity of punishment. The most basic form of these analyses involved bivariate correlations across states of crimes rates for the crime categories composing the FBI part I crime index (e.g., murder and nonnegligent homicide, robbery, burglary) with certainty of punishment, measured by prison admissions per reported crime, and severity of punishment, measured by median time served. More elaborate analyses were conducted in a regression format. These analyses added various state characteristics known to be correlated with crime (e.g., age and racial composition, urbanization) to the base regression model relating crime rate to the certainty and severity measures. Negative and significant associations were generally found between the crime rate and the certainty of imprisonment ratio. The association of time served with the crime rate was generally insignificant.

Reviews of these studies, including a high-visibility National Research Council (NRC) report (Blumstein, Cohen, and Nagin 1978), concluded that the aggregate studies suffered from such grave flaws that they did not provide a basis for valid inference about deterrent effects. Two flaws are particularly noteworthy because they remain relevant to the interpretation of a successor strand of post-1990 aggregate studies discussed in Section IV. The first is that the associations do not distinguish the behavioral response to sanction threats, deterrence, from incapacitation. The second is more fundamental—distinguishing cause from effect. All forms of nonexperimental data are vulnerable to the criticism that the outcome of interest, in this case the crime rate, is the cause of the predictor of interest, in this case sanctions, and not vice versa. High crime rates, for example, might prompt a police crackdown followed by crime rates declining for other reasons. Cross-polity studies of natural variations in crime rates and sanction levels are particularly vulnerable to this concern because there is generally no basis for assessing whether the variations in sanction levels are the result of factors independent of the crime rate. By contrast, for quasi-experi-

mental studies, institutional research can reveal whether the intervention was prompted by rising crime rates.

### III. Capital Punishment

Studies of the deterrent effect of capital punishment have been and continue to be the source of bitter contention. Isaac Ehrlich's 1975 study, in which he concluded that each execution averted seven to eight homicides, is undoubtedly the most-cited study of this kind. The 1978 NRC report (Blumstein, Cohen, and Nagin 1978) and an accompanying commissioned paper (Klein, Forst, and Filatov 1978) laid out a lengthy list of criticisms of the Ehrlich analysis. The NRC report concluded that "available studies [including Ehrlich's] provide no useful evidence on the deterrent effect of capital punishment" (p. 9).

Coincidentally, that report was issued shortly after the 1976 Supreme Court decision *Gregg v. Georgia* ended the moratorium on execution in the United States. In the 35 years since publication of the 1978 report, and more especially in recent years, a considerable number of post-*Gregg* studies have attempted to estimate the effect of the legal status or the actual implementation of the death penalty on homicide rates. These studies have reached widely varying conclusions and have resulted in often bitter disagreement about their interpretation.

This more recent literature has been the subject of still another NRC report titled *Deterrence and the Death Penalty*, which I coedited (Nagin and Pepper 2012), as well as two reviews of the literature commissioned by the NRC committee (Chalfin, Haviland, and Raphael 2013; Charles and Durlauf 2013) and two valuable reviews by Donohue and Wolfers (2005, 2009). The NRC report and all of the reviews are highly critical of the post-*Gregg* research. The report concluded, "Research to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates. Therefore, the Committee recommends that these studies not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide. Consequently, claims that research demonstrates that capital punishment decreases or increases the homicide rate by a specified amount or has no effect on the homicide rate should not influence policy judgments about capital punishment" (Nagin and Pepper 2012, p. 3).

The NRC report leveled two key criticisms of the post-*Gregg* capital

218    Daniel S. Nagin

punishment deterrence research that transcend the high-profile but still narrow issue of the deterrent effect of capital punishment. They also apply to studies of the deterrent effect of other forms of sanction—prison, fines, and community control—that form the backbone of contemporary sanction policy in the United States and most other countries.

One criticism concerned the incomplete specification of the sanction regime for homicide. Even for capital-eligible convictions for homicide, only a minority of cases result in a sentence of death, let alone an execution (Nagin and Pepper 2012). This is true even for states such as Texas and Virginia that make the most intense use of capital punishment. Instead, most homicides result in a lengthy prison sentence, sometimes life without parole. A study by Cook (2009) illustrates this point. Of 274 cases prosecuted as capital cases, only 11 resulted in a death sentence. Another 42 resulted in dismissal or a verdict of not guilty, which left 221 cases resulting in conviction and sentences to a noncapital sanction.

None of the post-*Gregg* studies take into account the noncapital component of the sanction regime. As discussed in Nagin and Pepper (2012) and Chalfin, Haviland, and Raphael (2013), there are sound reasons for expecting that the severity of the noncapital sanctions for homicide varies systematically with the availability and the intensity of use of capital punishment. For example, the political culture of a state may affect the frequency of use of capital punishment and also the severity of noncapital sanctions for homicide. Thus, any effect that these noncapital sanctions have on homicide may contaminate the estimated effect of capital punishment on homicide. In capital punishment studies the potential for such bias is particularly strong because, as noted, noncapital sanctions remain the dominant sanction response to capital-eligible murders, even in states that make the most intense use of capital punishment.

Homicide is not the only criminal offense punishable by a range of qualitatively different sanction alternatives. Indeed the sanction regimes for most other criminal offenses, even felonies, include more than one sanction option for their punishment. This point is returned to in Section IV.

A second key criticism elaborated in the NRC report concerned the specification of perceptions of the capital punishment component of the sanction regime. Studies typically suppose that people who are con-

templating murder perceive sanction risks as subjective probabilities of arrest, conviction, and execution. Lacking data on these subjective probabilities, researchers presume that they are somehow based on the observable frequencies of arrest, conviction, and execution.

The report concluded that several factors made the attempts by the panel studies to specify the capital component of state sanction regimes uninterpretable. First, the findings are very sensitive to the way in which the risk of execution is specified. For example, because of delays between the imposition of a death sentence and its being carried out, if ever, researchers routinely computed ratios in which the numerator was the number of executions in a given state and year divided by the number of death sentences imposed in that state in some prior year. Results are very sensitive to how that ratio is computed (Chalfin, Haviland, and Raphael 2013), and there is no logical basis for resolving disagreements about how the true risk of execution should be measured. Among the difficulties is that only 15 percent of those sentenced to death in the United States since 1977 have been executed, with close to 40 percent leaving death row for other reasons (vacated sentences or convictions, commutations, a successful appeal, or death by other causes) and 45 percent still awaiting execution (Snell 2010). Available information for calculating the risk depends on the size of the state: for large states such as Texas and California, there are far more data for calibrating risk than for small states such as Delaware and Montana. Further complicating matters, policies can change as a result of court decisions and administrative decrees of elected officials. This unpredictability calls into question the usefulness of prior data on the death penalty when calculating present and future risk. Because none of the measures used has any clear relationship with the correct measure, there is no reasoned basis for arbitrating competing claims about which study provides the better estimate of the deterrent effect of the death penalty.

Even if it were possible to judge which measure more closely corresponds to true risk, there is no evidence that the perceptions of potential murderers correspond to this risk. The above discussion concerns only one aspect of sanction regime, the risk of execution given conviction. Other relevant dimensions of the sanction regime are the risk of conviction given commission of a murder and the certainty and severity of the noncapital component alternatives to the death penalty. The assumption that potential murderers have accurate perceptions of

these risks and consequences is not credible: indeed it is preposterous. I return to the issue of sanction risk perceptions in Section VI.

## IV. Imprisonment and Crime

There have been two distinct waves of aggregate studies of the relationship between imprisonment and crime. Studies in the 1960s and 1970s described in Section II examined associations of state-level crime rates to state-level certainty of punishment, measured by the ratio of prison admissions to reported crimes, and to state-level severity of punishment as measured by median time served. These studies suffered from fundamental deficiencies laid out in the 1978 NRC report (Blumstein, Cohen, and Nagin 1978) and elsewhere. As a consequence, aggregate-level deterrence research went largely "silent" for more than a decade.

### A. Post-1990s Aggregate Studies

By the mid-1990s, a second generation of studies emerged. Unlike the first-generation studies, which primarily involved cross-sectional analyses of states, second-generation studies had a longitudinal component in which data were analyzed across states and over time. Another important difference in the second-generation studies is that they did not attempt to estimate certainty and severity effects separately. Instead they examined the relationship between the crime rate and the rate of imprisonment as measured by prisoners per capita.

A review by Donohue (2009) identifies six studies of the relationship of crime rates to imprisonment rates. All find statistically significant negative associations between imprisonment rates and crime rates, implying a crime prevention effect for imprisonment. However, the magnitude of the estimate varied widely: from nil for a study that allowed for the possibility that prevention effects decline as the scale of imprisonment increases (Liedka, Piehl, and Useem 2006) to $-0.4$ percent for each 1 percent increase in the imprisonment rate (Spelman 2000).

Apel and Nagin (2009), Donohue (2009), and Durlauf and Nagin (2011$a$, 2011$b$) discuss important flaws in these studies. One is that they are necessarily measuring the combined effect of deterrence and incapacitation on crime rates and thus cannot be interpreted as measuring the deterrent effect of imprisonment. At best they can be said to estimate the upper bound of that effect.

Other shortcomings are even more fundamental. One concerns the same fundamental flaw of the first-generation studies—distinguishing cause from effect. While imprisonment prevents crime through a combination of deterrence and incapacitation, crime also generates the prison population. The object of interest is the effect of the imprisonment rate on the crime rate, but data available for estimation of that effect also reflect the effect of the crime rate on the imprisonment rate. Thus, statistical isolation of the crime prevention effect requires properly accounting for the effect of crime on imprisonment.

The shortcomings in the statistical strategies used in these studies to identify the crime prevention effect of imprisonment are discussed at length in Durlauf and Nagin (2011*a*, 2011*b*). To summarize, with the exception of Levitt (1996) and Johnson and Raphael (2012), the conclusions of the studies rest on a form of statistical analysis pioneered by the Nobel laureate Clive Granger (1969). Granger's method is often mistakenly interpreted as providing estimates with a causal interpretation, which in the context of the aggregate imprisonment studies would be the expected change in the crime rate resulting from a policy that changes the imprisonment rate by a specified amount. In fact, the results are not in general amenable to this interpretation. Instead, application of Granger's method provides only a basis for forecasting future changes in the crime rate as a function of prior changes in the imprisonment rate and the crime rate. While valid forecasts can be based on correlations alone, valid causal interpretation requires more than establishing correlation.

Figure 2 illustrates the problem. Panel *A* depicts hypothetical crime and imprisonment functions. The crime function $C(I)$ describes the crime rate as a function of the imprisonment rate, *I*, and the imprisonment function $I(C)$ measures the imprisonment rate as a function of the crime rate, *C*. The function $C(I)$ is shown to be downward sloping in *I* to reflect the crime reduction effects of imprisonment via some combination of deterrence and incapacitation. Studies of the relationship of the crime rate to the imprisonment rate aim to measure whether this line is in fact downward sloping and, if so, by how much. The function $I(C)$ is depicted as upward sloping because for any fixed set of policies determining the certainty and severity of punishment, imprisonment rates will be a rising function of the crime



FIG. 2.—The challenge of identifying the effect of the imprisonment rate on the crime rate

rate.[5] The intersection of the $C(I)$ and $I(C)$ functions at $I_0$ and $C_0$ measures the observed level of crime and imprisonment.

Crime rates and imprisonment rates are, of course, affected by a multitude of other factors beyond their mutual interaction as depicted in panel $A$. The key to estimating $C(I)$ is identifying some factor, called an instrumental variable (IV), that is thought to affect the imprisonment rate but that affects the crime rate only via its effect on shifting the location of imprisonment rate function. Suppose that such an IV were identified and denoted by $z$. Panel $B$ demonstrates how changing values of $z$ from $z_1$ to $z_2$ to $z_3$ shifts the $I(C)$ function and, in so doing, traces out the $C(I)$ function. Connecting the points $(I_1, C_1)$, $(I_2, C_2)$, and $(I_3, C_3)$ estimates $C(I)$. In this fashion, IV regression models can be said to identify $C(I)$ and thereby the crime reduction effect of the imprisonment rate on the crime rate. However, the key to IV regression successfully isolating this effect is that $C(I)$ is not directly affected by $z$. Panel $C$ illustrates the failure of this assumption. If $z$ also shifts $C(I)$, the changing equilibrium values of the imprisonment rate and crime rate no longer trace out the $C(I)$ function.

Only Levitt (1996) and Johnson and Raphael (2012) use an IV regression approach to identify the causal effect of imprisonment on crime. Levitt uses court-ordered prison releases to form a set of IVs. He argues that such court orders meet the test for providing a valid estimate of the effect of the imprisonment rate on the crime rate: the orders have no direct effect on the crime rate and affect it only insofar as the court orders affect the imprisonment rate, which in turn affects the crime rate.

Even if one accepts this argument, the estimated effect has only limited policy value. By its construction, it is likely measuring the effect on crime of the early release of selected prisoners, probably those nearing the end of their sentenced terms. It may also be reflecting the effect of diversion of individuals convicted of less serious crimes either to local jails or to community supervision. In either case, the estimates are not informative about the crime prevention effects, whether by deterrence or incapacitation, of sentence enhancements related to the

[5] As in the entire imprisonment and crime literature, I too assume that sanction policies are unaffected by either the crime rate or the imprisonment rate. This is not a tenable assumption. However, all the points I make in the ensuing discussion would continue to hold if the model were generalized to allow sanction policy to be affected by crime rates and imprisonment rates.

224    Daniel S. Nagin

manner in which a crime is committed (e.g., weapon use), the characteristics of the perpetrator (e.g., prior record), or policies affecting the likelihood of incarceration. More generally, the uncertainty about what is actually being measured inherently limits the value of the estimated effects for both policy and social science.

A more recent study by Johnson and Raphael (2012) is based on a technically complex IV regression model. Identification is based on the assumption that prison populations do not change instantaneously in response to changes in the size of the criminal population. Similarly to the non-IV-based analysis of Liedka, Piehl, and Useem (2006), Johnson and Raphael conclude that the crime prevention effect of imprisonment has diminished with the scale of imprisonment, which was rising steadily over the period of their analysis, 1978–2004.

One explanation for the Johnson and Raphael finding is that the states and the federal government over this period collectively implemented policies with steadily declining average deterrent effectiveness. Given that knowledge of the deterrent effectiveness of alternative sanction policies is so limited, this explanation is not credible. An alternative explanation involving incapacitation is more credible. If the crime reduction effect of incarceration primarily stems from incapacitation, the Johnson and Raphael finding is consistent with the concept of "stochastic selectivity" (Canela-Cacho, Blumstein, and Cohen 1997), whereby high-rate offenders are more likely to be apprehended and incarcerated than low-rate offenders. Thus, as the scale of imprisonment increases, higher-rate offenders will be less likely to be at large committing crimes. Johnson and Raphael's finding is replicated by Vollaard (2013) in an analysis of the Netherlands' Habitual Offender Law. Vollaard attributes the entirety of the crime prevention effect that he estimates to incapacitation. Also of note, Owens (2009) in her analysis of 2003 data from Maryland finds modest incapacitation effects.

The incapacitation interpretation of the Johnson and Raphael finding of decreasing crime prevention returns with the scale of imprisonment is more credible than the deterrence interpretation. This interpretation also implies that the study is not useful for learning about deterrence. However, even the incapacitation interpretation is cast in doubt by the aging of the US prison population. Between 1991 and 2010, the percentage of prisoners in state and federal prisons over 45 years old has nearly tripled from 10.6 percent to 27.4 percent (Bureau of Justice Statistics 1999, 2011). Thus, the seeming decline in the in-

capacitative effectiveness of prison with scale may be reflecting only the aging of the prison population, which coincides with rising imprisonment rates. Further complicating the decreasing returns interpretation is the changing composition of the prison population in terms of the composition of prisoner conviction offense. Over the past four decades, the percentage of prisoners incarcerated for non–part I FBI index crimes has increased substantially (Blumstein and Beck 1999, 2005). Thus, the reduction in crime prevention effectiveness may be due to the types of prisoners incarcerated, not to scale effects.

All of these studies, whether IV based or not, also suffer from an important conceptual flaw that limits their usefulness in understanding deterrence and devising crime control policy. Prison population is not a policy variable per se; rather, it is an outcome of sanction policies dictating who goes to prison and for how long, namely, the certainty and severity of punishment. In all incentive-based theories of criminal behavior, in the tradition of Bentham and Beccaria, the deterrence response to sanction threats is posed in terms of the certainty and severity of punishment, not in terms of the imprisonment rate. Therefore, to predict how changes in certainty and severity might affect the crime rate requires knowledge of the relationship of the crime rate to certainty and severity as separate entities, which is not provided by the literature that analyzes the relationship of the crime rate to the imprisonment rate.

The studies are also conducted at a too-global level. In Nagin (1998), I describe the two-dimensional taxonomy of sanction policies affecting the scale of imprisonment. One dimension labeled "type" distinguishes three broad categories: policies regulating certainty of punishment such as laws requiring mandatory imprisonment, policies influencing sentence length such as determinate sentencing laws, and policies regulating parole powers. The second dimension of the taxonomy, "scope," distinguishes policies that cast a wide net, such as a general escalation of penalties for broad categories of crime, compared to policies that focus on targeted offenses (e.g., drug dealing) or offenders (e.g., three-strikes laws).

The nearly 500 percent growth in prison population over the last two decades is attributable to a combination of policies belonging to all cells of this matrix. Parole powers have been greatly curtailed; sentence lengths increased, both in general and for particular crimes (e.g., drug dealing); and judicial discretion to impose nonincarcerative sanc-

226    Daniel S. Nagin

tions has been reduced (Tonry 1996; Blumstein and Beck 1999, 2005; Raphael and Stoll 2009). Consequently, any effect on the crime rate of the increase in prison population reflects the effects of an amalgam of potentially interacting treatments.

There are good reasons for predicting differences in the crime reduction effects of different types of sanctions (e.g., mandatory minimums for repeat offenders vs. prison diversion programs for first-time offenders). Obvious sources of heterogeneity in offender response include factors such as prior contact with the criminal justice system, demographic characteristics, and the mechanism by which sanction threats are communicated to their intended audience. Indeed, available evidence on the deterrent effect of sentence enhancements, the next topic of discussion, demonstrates such heterogeneity.

*B. Policy Evaluation Studies of Sentence Enhancements*

There have been comparatively few studies of the deterrent effects of sentence enhancements, judged relative to their importance in contemporary crime control policy. The earliest post-1970s attempts to measure severity effects analyzed the deterrent impact of sentence enhancements for gun crimes. In a series of studies, Loftin, McDowell, and colleagues (Loftin and McDowall 1981, 1984; Loftin, Heumann, and McDowall 1983) examined whether sentence enhancements for gun use in committing another type of crime such as robbery deter gun use in the commission of crime. While the findings are mixed, this body of research has generally failed to uncover evidence of a deterrent effect (but see McDowall, Loftin, and Wiersema 1992).

However, one important caveat remains with respect to extrapolating these studies to understanding the link between deterrence and severity. The same literature that found that gun penalty enhancements were ineffective also found that these laws generally failed to increase the sentences actually received in gun-related crime prosecutions. Thus, gun-using criminals may not have responded because the real incentives were not changed. This again is a reminder of Tonry's (2009) commentary on the highly inconsistent administration of mandatory minimum sentencing.

Kessler and Levitt (1999) examine the deterrent impact of another California sentence enhancement law, Proposition 8, passed in 1982. Proposition 8 anticipated the three-strikes laws passed by many states in the 1990s. They estimate a 4 percent decline in crime attributable

to deterrence in the first year after enactment. Within 5–7 years, the effect grows to a 20 percent reduction. As acknowledged by Kessler and Levitt, the longer term estimate includes incapacitation effects.

Webster, Doob, and Zimring (2006) challenged the basic finding of any preventive effects. Kessler and Levitt examine data from every other year. When all annual data are used, Webster, Doob, and Zimring find that the decline in crime rates in the affected categories begins before Proposition 8's enactment, and the slope of this trend remains constant through implementation. But see Levitt (2006) for a response and commentary supporting Webster et al. by Raphael (2006).

One exception to the scarcity of studies on the crime prevention effects of sentence enhancements concerns analyses of the deterrent effect of California's "three strikes, you're out" law, which mandated a minimum sentence of 25 years upon conviction for a third-strike offense. Zimring, Hawkins, and Kamin (2001) concluded that the law reduced the felony crime rate by at most 2 percent. They also conclude that only those individuals with two convictions for two offenses qualifying as "strikes" showed any indication of reduced offending. Other studies by Stolzenberg and D'Alessio (1997) and Greenwood and Hawken (2002), who like Zimring, Hawkins, and Kamin (2001) examine before and after trends, conclude that the crime prevention effects were negligible.

I turn now to six studies that in my judgment report particularly convincing evidence on the deterrent effect of incarceration. They also nicely illustrate heterogeneity in the deterrence response to the threat of imprisonment.[6] Weisburd, Einat, and Kowalski (2008) and Hawken and Kleiman (2009) study the use of imprisonment to enforce fine payment and conditions of probation, respectively, and find substantial deterrent effects; Helland and Tabarrok (2007) analyze the deterrent effect of California's third-strike provision and find a modest deterrent effect; Raphael and Ludwig (2003) examine the deterrent effect of prison sentence enhancements for gun crimes and find no effect; and Hjalmarsson (2009) and Lee and McCrary (2009) examine the heightened threat of imprisonment that attends coming under the jurisdiction of the adult courts at the age of majority and find no deterrent effect.

Weisburd, Einat, and Kowalski (2008) report on a randomized field

[6] For further discussion of heterogeneity in deterrence response, see Paternoster (2010) and Piquero et al. (2011).

228    Daniel S. Nagin

trial of alternative strategies for incentivizing the payment of court-ordered fines. The most salient finding involves the "miracle of the cells," namely, that the imminent threat of incarceration provides a powerful incentive to pay delinquent fines, even when the incarceration is for only a short period. The miracle of the cells provides a valuable perspective on the conclusion that the certainty, rather than the severity, of punishment is the more powerful deterrent. Consistent with the "certainty principle," the common feature of treatment conditions involving incarceration is a high certainty of imprisonment for failure to pay the fine. However, that Weisburd et al. label the response the "miracle of the cells" and not the "miracle of certainty" is telling. Their choice of label is a reminder that certainty must result in a distasteful consequence in order for it to be a deterrent. The consequences need not be draconian, just sufficiently costly, to deter the proscribed behavior.

The deterrence strategy of certain but nondraconian sanctions has been applied with apparently great success in Project HOPE, an intervention heralded in Hawken and Kleiman (2009), Kleiman (2009), and Hawken (2010). Project HOPE is a Hawaii-based probation enforcement program. In a randomized experiment, probationers assigned to Project HOPE had much lower rates of positive drug tests and missed appointments and—most importantly—were significantly less likely to be arrested and imprisoned. The cornerstone of the HOPE intervention was regular drug testing, including random tests, and certain but short punishment periods of confinement (e.g., 1–2 days) for positive drug tests or other violation of conditions of probation. Thus, both the Weisburd, Einat, and Kowalski (2008) fine experiment and Project HOPE show that highly certain punishment can be an effective deterrent in cases in which deterrence has previously been ineffective in averting crime.

Helland and Tabarrok (2007) examine whether California's "three strikes, you're out" law deters offending among individuals previously convicted of strike-eligible offenses. The future offending of individuals convicted of two previous eligible offenses was compared with that of individuals who had been convicted of only one eligible offense but who, in addition, had been tried for a second eligible offense but were ultimately convicted of a noneligible offense. The two groups of individuals were comparable on many characteristics such as age, race, and time in prison. Even so, Helland and Tabarrok find that arrest

rates were about 20 percent lower for the group with convictions for two eligible offenses. The authors attribute this to the greatly enhanced sentence that would have accompanied conviction for a third eligible offense.

Raphael and Ludwig (2003) examine the deterrent effect of sentence enhancements for gun crimes that formed the basis for a much publicized Richmond, Virginia, federal program called Project Exile. Perpetrators of gun crimes, with a particular emphasis on those with a felony record, were the targets of federal prosecution that provided for far more severe sanctions for weapon use than were provided by Virginia state law. In a careful and thorough analysis involving comparisons of adult homicide arrest rates with juvenile homicide arrest rates within Richmond and comparisons of gun homicide rates between Richmond and other cities with comparable pre-intervention homicide rates, Raphael and Ludwig conclude that the threat of an enhanced sentence had no apparent deterrent effect.

For most crimes, the certainty and severity of punishment increase discontinuously upon reaching the age of majority, when jurisdiction for criminal wrongdoing shifts from the juvenile to the adult court. In an extraordinarily careful analysis of individual-level crime histories from Florida, Lee and McCrary (2009) attempt to identify a discontinuous decline in offending at age 18, the age of majority in Florida. Their point estimate of the discontinuous change is negative as predicted but is minute in magnitude and not even remotely close to achieving statistical significance.[7]

Another analysis of the effect, if any, of moving from the jurisdiction of the juvenile to adult courts by Hjalmarsson (2009) uses the 1997

[7] The finding that the young fail to respond to changes in penalties associated with the age of majority is not uniform across studies. An earlier analysis by Levitt (1998) finds a large drop in the offending of young adults when they reach the age of jurisdiction for adult courts. For several reasons, Durlauf and Nagin (2011*a*, 2011*b*) judge the null effect finding of Lee and McCrary (2009) more persuasive in terms of understanding deterrence. First, Levitt focuses on differences in age measured at annual frequencies, whereas Lee and McCrary measure age in days or weeks. At annual frequencies, the estimated effect is more likely to reflect both deterrence and incapacitation; hence Levitt's results may be driven by incapacitation effects rather than by deterrence per se. Second, the Lee and McCrary analysis is based on individual-level data and so avoids problems that can arise because of aggregation (Durlauf, Navarro, and Rivers 2008; Durlauf and Nagin 2011*a*). On their own terms, the individual-level data studied by Lee and McCrary are unusually informative since they also contain information on the exact age of arrestees, which allows for the calculation of very short-run effects of the discontinuity in sentence severity, e.g., effects within 30 days of turning 18.

230    Daniel S. Nagin

National Longitudinal Survey of Youth to examine whether young males' perception of incarceration risk changed at the age of criminal majority. Youths were asked, "Suppose you were arrested for stealing a car; what is the percent chance that you would serve time in jail?" She found that subjective probabilities of being sent to jail increased discontinuously on average by 5.2 percentage points when youths reached the age of majority in their state of residence. While youths perceived an increase in incarceration risk, she found no convincing evidence of an effect on their self-reported criminal behavior.

*C. Summary*

In combination, these six studies demonstrate that debates on the effectiveness of deterrence are poorly conceived. Instead, the discussion should be framed in terms argued by Beccaria and Bentham more than two centuries ago: Does the specific sanction deter or not, and if it does, are the crime reduction benefits sufficient to justify the costs of imposing the sanction? Helland and Tabarrok's (2007) study is an exemplar of this type of analysis. They conclude that California's third-strike provision does indeed have a deterrent effect, a point even conceded by Zimring, Hawkins, and Kamin (2001). However, Helland and Tabarrok also conclude, on the basis of a cost-benefit analysis, that the crime-saving benefits are so much smaller than the increased costs of incarceration that the lengthy prison sentences mandated by the third-strike provision cannot be justified by means of a cost-benefit criterion.

The six exemplar studies suggest several important sources of the heterogeneity of the deterrent effect of imprisonment. One concerns the length of the sentence itself. Figure 3 depicts two alternative forms of the response function relating crime rate to sentence length. Both are downward sloping, which captures the idea that increases in severity deter crime. At the status quo sentence length, $S_1$, the crime rate, $C_1$, is the same for both curves. The curves are drawn so that they predict the same crime rate for a zero sanction level. Thus, the absolute deterrent effect of the status quo sanction level is the same for both curves. But because the two curves have different shapes, they also imply different responses to an incremental increase in sentence level to $S_2$. The linear curve (*A*) is meant to depict a response function in which there is a material deterrent effect accompanying the increase to $S_2$, whereas the nonlinear curve (*B*) is meant to depict a small crime

Deterrence in the Twenty-First Century    231



FIG. 3.—Marginal versus absolute deterrent effects

reduction response due to diminishing deterrent returns to increasing sentence length.

My reading of the evidence on the deterrent effect of sentence length is that it implies that the relationship between crime rate and sentence length more closely conforms to curve *B* than to curve *A*. Raphael and Ludwig (2003) find no evidence that gun crime enhancement deters, Hjalmarsson (2009) and Lee and McCrary (2009) find no evidence that the greater penalties that attend moving from the juvenile to the adult justice systems deter, and Helland and Tabarrok (2007) find only a small deterrent effect from California's third strike. As a consequence, the deterrent return to increasing an already long sentence is small, possibly zero. This interpretation forms the basis for my conclusion that mandatory minimum sentencing is unlikely to have a material deterrent effect.

The fine payment and Project HOPE experiments also suggest that curve *B*, not curve *A*, more closely resembles what in medical jargon would be described as the dose-response relationship between crime and sentence length. While neither of these studies is directed at the deterrence of criminal behavior, both suggest that, unlike increments in long sentences, increments in short sentences do have a material deterrent effect on a crime-prone population.

Notwithstanding their strengths, these six exemplar studies do not

address several important aspects of the offender response, if any, to the sanction regime. Except for the most trivial offenses, the question at hand is not the deterrent effect of some particular sanction compared to no sanction whatsoever. Instead, it is the deterrent effectiveness of a specified sanction relative to alternative sanction options. In the case of the death penalty, the alternative is a very lengthy prison sentence. For less serious crimes, sanction options to incarceration include fines and various forms of community supervision, or some combination that may also include a period of incarceration. In 2006, for example, 10 percent of felony defendants were diverted to programs such as mandatory drug treatment prior to adjudication. Of those convicted, 29 percent did not receive a jail or prison sentence (Bureau of Justice Statistics 2010) but instead were sentenced to some form of community control, paid a fine, or both.

Theories of deterrence need to be generalized to specify how offenders perceive and respond to the multiplicity of sanction options available for the punishment of most crimes. The theories also need to account for the possibility that offender perceptions of the severity of sanction options may differ. For example, some may view the possibility of life without parole as worse than execution, and still others may view strict community supervision as more onerous than a short period of incarceration (Wood and May 2003). The multiplicity of sanction options and heterogeneity in the response to these options greatly complicate the specification of a deterrence model, but both features are essential to the deterrence phenomenon.

I also note that testing such generalized models of deterrence will require a major expansion of the criminal justice data collection infrastructure at least in the United States. It is currently not possible to measure the availability and frequency of use of sanction alternatives at the state level because the required data are not available. Available data include those from the Bureau of Justice Statistics, which publishes nationwide statistics on sentences for prison admissions and time served for prison releases, based on data collected as part of the National Corrections Reporting Program initiated in the early 1980s. More than 40 states now report annual data on sentences for admissions and time served for releases. Individual-level demographic characteristics are also reported. In principle, these data could be used to measure the administration of the legally authorized dimensions of most state sanction regimes by type of crime. The difficulty is that the

data are often extremely incomplete. In some years, some states fail to report any data, and the data that are sent to the bureau are often so incomplete that it is impossible to construct valid state-level measures of the administration of the sanction regime.

### V. Police and Crime

The police may prevent crime through many possible mechanisms. Apprehension of active offenders is a necessary first step for their conviction and punishment. If the sanction involves imprisonment, crime may be prevented by the incapacitation of the apprehended offender. The apprehension of active offenders may also deter would-be criminals by increasing their perception of the risk of apprehension. Many police tactics, such as rapid response to calls for service at crime scenes or postcrime investigation, are intended not only to capture the offender but to deter others by projecting a tangible threat of apprehension. Police may, however, deter without actually apprehending criminals: their very presence may deter a motivated offender from carrying out a contemplated criminal act.

Research on the deterrent effect of police has evolved in two distinct literatures. One has focused on the deterrent effect of the level of police numbers or resources, for example, by examining the relationship between police per capita and crime rates. The other has focused on the crime prevention effectiveness of different strategies for deploying police.

### A. Studies of Levels of Police Numbers and Resources

Studies of the effect of police numbers and resources come in two forms. One is an analogue of the imprisonment rate and crime rate studies described in the preceding section. These studies are based on panel data sets, usually of US cities over the period circa 1970–2000. They relate crime rates to the resources committed to policing as measured by police per capita or police expenditures per capita. The second form of study is more targeted. These studies analyze the effect on crime from abrupt changes in the level of policing due, for example, to terror alerts.

1. *Panel Studies.* Panel studies include Marvell and Moody (1994), Levitt (1997, 2002), McCrary (2002), and Evans and Owens (2007). With the exception of McCrary's study, these studies consistently find

234    Daniel S. Nagin

evidence that larger resource commitments to policing are associated
with lower crime rates.[8]

The studies use different statistical strategies for estimating the effect
of police resource levels on crime. For example, Marvell and Moody
(1996) analyze two panel data sets and apply Granger-causality type
statistical models to these data. Levitt (1997, 2002) uses IV-type re-
gression models. In Levitt (1997), election cycles are used as an IV to
untangle the cause-effect relationship between crime rates and police
manpower. Levitt (2002) uses the number of firefighters and civil ser-
vice workers as IVs for the same purpose.

The panel studies consistently find evidence that higher levels of
police resources are associated with lower crime rates. Durlauf and
Nagin (2011*a*, 2011*b*) discuss important qualifications to the interpre-
tation and validity of this form of analysis. One is that the police panel
studies, like the studies of imprisonment and crime, do not distinguish
between incapacitation and deterrent effects. The negative associations
between police numbers and crime rates identified in these studies may
reflect increased effectiveness in apprehending and incarcerating active
offenders rather than in deterring crime. More importantly, an under-
appreciated limitation of these analyses is the assumption that the effect
of police levels on crime rates is the same across place and time. As
the discussion of studies of the effects of police deployment strategies
on crime makes clear, this assumption is not tenable. Nevertheless, the
findings of these studies are consistent with those of studies of abrupt
changes in police presence that police numbers do matter.

2. *Abrupt Change Studies.* Studies of this type, which are sometimes
called "interrupted time series" or "regression discontinuity" studies,
examine the effects of abrupt changes in police presence. If the change
in police presence is attributable to an event unrelated to the crime
rate, studies of this type can provide particularly convincing evidence
of deterrence. For example, in September 1944, German soldiers oc-
cupying Denmark arrested the entire Danish police force. According
to an account by Andenaes (1974), crime rates rose immediately but
not uniformly. The frequency of street crimes such as robbery, whose

[8] McCrary identified an error in the computation of standard errors in Levitt (1997)
that when corrected nullified the finding of a crime prevention effect of police numbers.
Levitt (2002) argues that McCrary's findings do not overturn his general claim that
increased numbers of police reduce crime rates and presents new evidence to that
effect.

control depends heavily on visible police presence, rose sharply. By
contrast, crimes such as fraud were less affected. See Sherman and Eck
(2002) and Sherman (in this volume) for other examples of crime in-
creases following a collapse of police presence.

The Andenaes anecdote illustrates several important points. It pro-
vides a useful reminder of the difference between absolute and mar-
ginal deterrence. As shown in figure 3, absolute deterrence refers to
the difference in the crime rate between the status quo level of sanction
threat, $S_1$, and a complete (or near) absence of sanction threat, $S_0$. The
Andenaes anecdote is a compelling demonstration that the absolute
deterrent effect is large. However, from a policy perspective, the issue
is not the absolute deterrent effect posed by police presence. The ques-
tion is whether, on the margin, crime can be prevented by incremental
increases in police numbers or by changes in the way police are de-
ployed. Also, the anecdote is another useful reminder that deterrent
effects are heterogeneous: sanction threats (or the absence thereof) do
not uniformly affect all types of crime or, more generally, all types of
people.

Contemporary tests of the police-crime relationship based on abrupt
decreases in police presence investigate the effect on the crime rate of
reductions in police presence and productivity as a result of large bud-
get cuts or lawsuits following racial profiling scandals. Such studies
have examined the Cincinnati Police Department (Shi 2009), the New
Jersey State Police (Heaton 2010), and the Oregon State Police
(DeAngelo and Hansen 2008). Each concludes that decreases in police
presence and activity substantially increase crime. Shi (2009) studies
the fallout from an incident in Cincinnati in which a white police of-
ficer shot and killed an unarmed African American suspect. The inci-
dent was followed by 3 days of rioting, heavy media attention, the filing
of a class action lawsuit, a federal civil rights investigation, and the
indictment of the officer in question. These events created an unofficial
incentive for officers from the Cincinnati Police Department to curtail
their use of arrest for misdemeanor crimes, especially in communities
with higher proportional representation of African Americans, out of
concern for allegations of racial profiling. Shi finds measurable declines
in police productivity in the aftermath of the riot and also documents
a substantial increase in criminal activity. The estimated elasticities of
crime to policing based on her approach were $-0.5$ for violent crime
and $-0.3$ for property crime.

236    Daniel S. Nagin

The ongoing threat of terrorism has also provided a number of unique opportunities to study the effect of police resource allocation in cities around the world, including the District of Columbia (Klick and Tabarrok 2005), Buenos Aires (Di Tella and Schargrodsky 2004), Stockholm (Poutvaara and Priks 2006), and London (Draca, Machin, and Witt 2008). The Klick and Tabarrok (2005) study examines the effect on crime of the color-coded alert system devised by the US Department of Homeland Security in the aftermath of the September 11, 2001, terrorist attack. Its purpose was to signal federal, state, and local law enforcement agencies to occasions when it might be prudent to divert resources to sensitive locations. Klick and Tabarrok use daily police reports of crime collected by the district's Metropolitan Police Department for the period March 2002 to July 2003, when the terrorism alert level rose from "elevated" (yellow) to "high" (orange) and back down to "elevated" on four occasions. During high alerts, anecdotal evidence suggested that police presence increased by 50 percent. The authors estimate that each 1 percent increase in number of police during the terror alert reduced total crime by 0.3 percent.

To summarize, studies of police presence conducted since the mid-1990s consistently find that putting more police officers on the street—either by hiring new officers or by reallocating existing officers to put them on the street in larger numbers or for longer periods of time—has a substantial deterrent effect on serious crime. There is also consistency with respect to the size of the effect. Most estimates reveal that a 10 percent increase in police presence yields a reduction in total crime of about 3 percent. Yet these police manpower studies speak only to the number and allocation of police officers and not to what police officers actually do on the street beyond making arrests.

*B. Police Deployment and Crime*

Much research has examined the crime prevention effectiveness of alternative strategies for deploying police resources. This research has mostly been conducted by criminologists and sociologists. Among this group of researchers, the preferred research designs are quasi experiments involving before-and-after studies of the effect of targeted interventions as well as true randomized experiments. The discussion that follows draws heavily on two excellent reviews of this research by Weisburd and Eck (2004) and Braga (2008).

For the most part, deployment strategies affect the certainty of pun-

ishment through their effect on the probability of apprehension. One
way to increase apprehension risk is to mobilize police in a fashion that
increases the probability that an offender is arrested after committing
a crime. Strong evidence of a deterrent as opposed to an incapacitation
effect resulting from the apprehension of criminals is limited. Studies
of the effect of rapid response to calls for service (Kansas City Police
Department 1977; Spelman and Brown 1981) do not directly test for
deterrence but found no evidence of improved apprehension effective-
ness. The reason may be that most calls for service occur well after
the crime event, with the result that the perpetrator has fled the scene.
Thus, it is doubtful that rapid response materially affects crime. Sim-
ilarly, apprehension risk is probably not materially affected by im-
proved investigations. Eck concluded that "it is unlikely that improve-
ments in the way investigations are conducted or managed have a
dramatic effect on crime or criminal justice" (1992, p. 33). The reason
is that most crimes are solved either by the offender being apprehended
at the scene or by eyewitness identification of the perpetrator (Green-
wood, Chaiken, and Petersilia 1977). Modern forensic methods may
ultimately improve the effectiveness of postcrime investigations, but as
Braga et al. (2011) note, clearance rates have remained stubbornly sta-
ble over the period 1970–2007.

The second source of deterrence from police activities involves
averting crime in the first place. In this circumstance, there is no ap-
prehension because there was no offense. In my view, this is the pri-
mary source of deterrence from the presence of police. Thus, measures
of apprehension risk based only on enforcement actions and crimes
that actually occur, such as arrests per reported crime, are not valid
measures of the apprehension risk represented by criminal opportu-
nities not acted on because the risk was deemed too high (Cook 1979).

One example of a police deployment strategy for which there is good
evidence of effectiveness is "hot spots" policing. The idea of hot spots
policing stems from a striking empirical regularity uncovered by Sher-
man and colleagues. Sherman, Gartin, and Buerger (1989) found that
only 3 percent of addresses and intersections ("places," as they were
called) in Minneapolis produced 50 percent of all calls to the police.
Weisburd and Green (1995) found that 20 percent of all disorder crime
and 14 percent of crimes against persons in Jersey City, New Jersey,
arose from 56 drug-related crime hot spots. Twenty-five years later in
a study of Seattle, Weisburd et al. (2004) reported that between 4 and

238    Daniel S. Nagin

5 percent of street segments in the city accounted for 50 percent of crime incidents for each year over a 14-year period. Other, more recent studies finding comparable crime concentrations include Brantingham and Brantingham (1999), Eck, Gersh, and Taylor (2000), and Roncek (2000).

The rationale for concentrating police in crime hot spots is to create a prohibitively high risk of apprehension. The first test of the efficacy of concentrating police resources on crime hot spots was conducted by Sherman and Weisburd (1995). In this randomized experiment, hot spots in the experimental group were subjected to, on average, a doubling of police patrol intensity compared with hot spots in the control group. Declines in total crime calls ranged from 6 to 13 percent. In another randomized experiment, Weisburd and Green (1995) found that hot spots policing was similarly effective in suppressing drug markets.

Braga's (2008) informative review of hot spots policing summarizes the findings from nine experimental or quasi-experimental evaluations. The studies were conducted in five large US cities and one suburb of Australia. All but two found evidence of significant reductions in crime. Further, no evidence was found of material crime displacement to immediately surrounding locations. On the contrary, some studies found evidence of crime reductions, not increases, in the surrounding locations but a "diffusion of crime-control benefits" to nontargeted locales. Note also that the findings from the previously described econometric studies of focused police actions—for example, in response to terror alert level—buttress the conclusion that the strategic targeting of police resources can be very effective in reducing crime.

Another example of a police deployment strategy for which there is credible evidence of effectiveness, albeit less consistent than for hot spots policing, is problem-oriented policing. One of the most visible instances of problem-oriented policing is Boston's Operation Ceasefire (Kennedy et al. 2001). The objective of the collaborative operation was to prevent intergang gun violence using two deterrence-based strategies. The first strategy was to target enforcement against weapons traffickers who were supplying weapons to Boston's violent youth gangs. The second involved a more novel approach. The youth gangs themselves were assembled by the police on multiple occasions in order to send the message that the law enforcement response to any instance of serious violence would be "pulling every lever" legally available to

punish gang members collectively. This included a salient severity-related dimension: vigorous prosecution for unrelated, nonviolent crimes such as drug dealing. Thus, the aim of Operation Ceasefire was to deter violent crime by increasing the certainty and severity of punishment, but only in targeted circumstances—specifically, if the gang members committed a violent crime.

Since Operation Ceasefire, the strategy of "pulling every lever" has been the centerpiece of field interventions in many large and small US cities including Richmond, Virginia; Chicago; Stockton, California; High Point, North Carolina; and Pittsburgh. See Kennedy (2009), one of the architects of the pulling every lever strategy, for an extended description of these interventions and the philosophy behind them. Independent evaluations have also been conducted of many of these interventions.[9] As part of the Campbell Collaboration review process, Braga and Weisburd (2012) identified 10 studies of pulling levers focused policing strategies that met their criteria of rigor and relevance to be included in the review. Nine of these studies reported statistically significant reductions in crime. They concluded that "pulling levers focused deterrence strategies are associated with an overall statistically-significant, medium-sized crime reduction effect" (p. 7). However, they caution that focused deterrence has yet to be tested with a randomized control trial. Their caution is also shared by others. In Cook's (2012) commentary on the High Point focused deterrence intervention, he observes that initial conclusions of eye-catchingly large effects have been replaced with far more modest assessments of effect sizes and cautions about the generalizability of the results. Reuter and Pollack (2012) wonder whether a successful intervention in a small urban area such as High Point can be replicated in a large city such as Chicago. Ferrier and Ludwig (2011) point out the difficulty in understanding the mechanism that underlies a seemingly successful intervention that pulls many levers. Despite concerns, these interventions illustrate the potential for combining elements of both certainty and severity enhancements to generate a targeted deterrent effect. Additional evaluations of the efficacy of these multipronged strategies should be a high priority, with the proviso that any designs implemented be amenable to rigorous evaluation as emphasized by commentators. For a useful

[9] For Boston, see Cook and Ludwig (2006); for Richmond, see Raphael and Ludwig (2003); for Chicago, see Papachristos, Meares, and Fagan (2007); for Pittsburgh, see Wilson and Chermak (2011); and for High Point, see Corsaro et al. (2012).

240    Daniel S. Nagin

discussion of the importance of understanding mechanisms, see Lud-
wig, Kling, and Mullainathan (2011). The theory behind focused de-
terrence interventions includes attention to, among other things, de-
terrence, police legitimacy, informal social control, police/community
relations, the provision of social services, and addressing situational
factors. Existing evaluations do not address either the contribution (if
any) of individual elements or their likely interplay.

*C. Summary*

The evidence is clear that large changes in police presence do affect
crime rates. The change in presence may be the result of an unplanned
event, such as a terror alert that triggers a large increase in police
officers in public spaces, or it may be a strategic response to a known
crime problem, such as in hot spots policing deployments. In either
case, crime rates are reduced in places where police presence has been
materially increased. While far from definitive, there is no evidence of
displacement of crime to places contiguous to the heightened police
presence, at least in the short run. Indeed, there is some evidence of
crime reductions in the areas immediately surrounding the heightened
presence. By contrast, there is no evidence that the rapidity of the
response to crime or the thoroughness of the postcrime investigation
has a material influence on crime rates. Combined, these two sets of
findings suggest that how police are deployed is as important as the
number of police deployed in their influence on crime rates.

Notwithstanding these important findings, some additional issues
about police presence remain unresolved. The finding from the hot
spots policing evaluations that crime is not displaced to adjacent places
may not hold up in the long run. The seeming diffusion of crime
control benefits may evaporate as offenders become aware that the
heightened patrol activity is not present in adjacent places. More fun-
damentally, the hot spot itself may be displaced to some new location,
for example, to a bar that had not previously been a crime hot spot. A
longer-term perspective on the effectiveness of hot spots policing is
required.

While the evaluations of hot spots policing provide important evi-
dence that police presence can be a deterrent, overall crime control
policy cannot be built around such a narrowly formulated tactic. Eval-
uations of problem-oriented policing suggest police effectiveness in a
wider set of circumstances than intensive patrol of high crime micro-

places. However, these evaluations do not reveal the mechanism by which prevention is achieved.

The introduction distinguished two distinct crime prevention functions of the police: their role as apprehension agents following the commission of a crime and their role as sentinels. In their sentinel role the police are acting, in the parlance of Cohen and Felson (1979), as "capable guardians." Capable guardians are persons whose presence discourages a motivated offender from victimizing a criminal opportunity. Capable guardians include persons with no official crime control authority who nonetheless are personally willing to intervene or to summon those with the authority to intervene. The police themselves also serve as capable guardians in their conventional patrol and monitoring functions.

For many reasons the apprehension agent role is the most scrutinized and recognized crime control function of the police. The apprehension agent function has been and continues to be glamorized by television in long-running programs such as *Dragnet* in the 1950s and 1960s, *Hawaii Five-0* in the 1970s, *Hill Street Blues* in the 1980s, *Homicide Life on the Streets* in the 1990s, and *CSI* and *Law and Order* in the present. The apprehension role is also salient because it involves the police response to real victims of sometimes horrendous crimes and the ensuing efforts to bring the perpetrators to justice. From a technocratic perspective, police effectiveness in this role can be measured with statistics like the clearance rate. From a crime control perspective, the apprehension agent function protects public safety by capturing and incapacitating sometimes dangerous and repetitive offenders. However, as yet there is no evidence that the apprehension agent role results in a material deterrent effect. By contrast, the evidence on police presence suggests that in their sentinel role police can have a very large deterrent effect. While the differential deterrent effect of the police in their apprehension and sentinel roles has not been demonstrated, there is sufficient evidence to characterize it as a hypothesis with sufficient empirical support to make it credible.

What then is the explanation for the differential deterrent effectiveness of the sentinel/guardian and apprehension roles of the police? The model of the decision to victimize a criminal opportunity laid out in the introduction, I believe, provides useful perspective on the answer. The model distinguishes two key probabilities: the probability that the opportunity can be successfully completed, $P_s$, and the probability of

242    Daniel S. Nagin

apprehension conditional on the victimization of the target, $P_a$. In this model, activities that enhance police visibility, such as concentration of police at crime hot spots, affect $P_s$, whereas actions such as rapid response to calls for service or improved investigation methods affect $P_a$. The sentinel role of police is distinct from the apprehension role because the latter comes into play only when deterrence has failed and a would-be offender becomes an actual offender. Thus, at one moment police can function as sentinels and in the next as apprehension agents.

The depiction of the decision to victimize a criminal opportunity in figure 1 provides an explanation for the greater deterrent effectiveness of the police in their sentinel role than in their apprehension role. The police in their sentinel role influence $P_s$ and thereby the probability of all four outcome branches. In particular, improved guardianship reduces the probability that the target can be successfully victimized and increases the probability of the three outcomes that represent failure from the offender's perspective. In contrast, improved effectiveness in the apprehension agent role comes into play only after a crime is committed and can affect only the three branches of the tree related to failure. Thus, innovations that make police more effective sentinels will tend to be more influential in the decision process characterized by this model than innovations in apprehension effectiveness.

The model is also useful in clarifying the basis for the effectiveness of situational crime prevention (Clarke 1995), many forms of which can be construed as reducing $P_s$. Just as police in their sentinel role reduce the attractiveness of a criminal opportunity, situational crime prevention works by affecting all four branches of the tree.

### VI. Perceptual Deterrence and Sanction Risk Perceptions Studies

Analyses of perceptual deterrence examine the association between perceptions of sanction risk, whatever their source, and self-reported illegal behavior or intent to engage in illegal behavior. Analyses of sanction risk perceptions examine the relationship of an individual's perceptions with experience (e.g., being arrested as well as factors external to the individual such as statutorily defined penalties). Some studies address both topics, but most emphasize one or the other.

*A. Perceptual Deterrence*

The perceptual deterrence literature was spawned by a cadre of re-
searchers (Meier and Johnson 1977; Minor 1977; Tittle 1977, 1980;
Grasmick and Bryjak 1980) interested in probing the perceptual un-
derpinnings of the deterrence process.

Perceptual deterrence studies have been based on three types of data:
cross-sectional survey studies, panel survey studies, and scenario-based
studies. In cross-sectional survey studies, individuals are questioned
about their perceptions of the certainty and severity of sanctions and
about either their prior offending behavior or their future intentions
to offend. For example, Grasmick and Bryjak (1980) queried a sample
of city residents about their perceptions of the risk of arrest for offenses
such as a petty theft, drunk driving, and tax cheating. They also asked
respondents whether they thought they would commit any of these
acts in the future. In panel survey studies the sample is repeatedly
surveyed on risk perceptions and criminal behavior. For example, Pa-
ternoster et al. (1982) followed a sample of students through their 3
years in high school and surveyed them on the frequency with which
they engaged in various delinquent acts and their perceptions of the
risks and consequences of being caught. In scenario-based studies, in-
dividuals are questioned about their perception of the risks of com-
mitting a crime that is described to them in detail. They are also asked
about their own behavior should they find themselves in that situation.
Bachman, Paternoster, and Ward (1992), for instance, constructed a
scenario describing the circumstances of a date rape. They then sur-
veyed a sample of college males about their perceptions of the risk of
the scenario male being arrested for sexual assault and what they them-
selves would do in the same circumstance.

Perceptional deterrence research has been faulted with some justi-
fication on a number of grounds. One is that the sampled populations
are typically high school or college students who do not, by and large,
engage in serious crime and delinquency. Other concerns are related
to the veracity of the data collected. How well can respondents actually
calibrate sanction risks? Do the ways in which questions about percep-
tions of morality and sanction cost are structured prime responses
about actual or projected offending? Despite these questions, in my
judgment this class of studies has provided enduring contributions to
our understanding of deterrence processes.

One contribution is that, with the exception of the early panel stud-

244    Daniel S. Nagin

ies, perception studies consistently find that actual or projected of-
fending is negatively related to perceptions of sanction certainty. Find-
ings of a deterrence-like relationship of self-reported offending with
perceptions of sanction severity are less consistent. When combined,
these two findings provide still further support for the "certainty" prin-
cipal, but with a proviso that certainty results in a negative but not
necessarily draconian consequence. Grasmick and Bryjak (1980) show
that when respondents' assessments of the personal costs of the sanc-
tion are incorporated into the analysis, perceptions of severity are neg-
atively associated with self-reported behavior.

A second contribution of the perceptual deterrence literature, which
may also be its most important, does not involve the evidence it has
amassed on deterrence effects per se. Rather it has focused its attention
on the links between formal and informal sources of social control.
Recognition of this connection predates the perceptual deterrence lit-
erature. Zimring and Hawkins (1973) observe that "official *actions* can
set off societal *reactions* that may provide potential offenders with more
reason to avoid conviction than the officially imposed unpleasantness
of punishment" (p. 174; emphasis in original). See also Andenaes
(1974), Gibbs (1975), Blumstein and Nagin (1976), and Williams and
Hawkins (1986) for this same argument. Perceptual deterrence re-
search has consistently found that individuals who report higher stakes
in conventionality are more deterred by perceived risk of public ex-
posure for lawbreaking.

A salient finding in this regard concerns my own research on tax
evasion. Enforcement actions by tax authorities are private matters.
Criminal prosecutions, however, are the exception to this rule. They
necessarily involve public exposure. Thus, from the taxpayer's per-
spective, civil enforcement actions jeopardize money but not reputation
whereas criminal prosecution jeopardizes both. In Klepper and Nagin
(1989*a*, 1989*b*), we found that if respondents perceived no risk of crim-
inal prosecution, a majority of respondents reported a material prob-
ability of taking advantage of noncompliance opportunities. However,
the perception of a nonzero risk of criminal prosecution was sufficient
to deter most of the middle-class respondents to the survey. Stated
differently, if the tax evasion gamble also involved putting reputation
and community standing at risk, the middle-class respondents to the
survey were less likely to consider taking the gamble.

While my tax evasion research does not pin down the specific

sources of these costs, other research on the effects of a criminal record on access to legal labor markets suggests a real basis for the fear of stigmatization (Freeman 1991; Bushway 1996). Freeman estimates that a record of incarceration depresses probability of work by 15–30 percent, Waldfogel (1994) estimates that conviction for fraud reduces income by as much as 40 percent, and Bushway (1996) concludes that even an arrest for a minor offense impairs access to legal labor markets, at least in the short run.

The findings from the perceptual deterrence studies directly relate to two of the main themes of this essay. The first concerns the source of the "certainty" effect. In laying out the implications of the model of the decision to victimize a target, it was pointed out that the cost of apprehension appeared in two of the terms on the right-hand side of equation (2). This side of the equation measures the potential cost of offending: the term measuring the cost of apprehension without conviction and the term measuring the cost of apprehension with conviction. Formal and informal sanction costs appeared only in the second of these terms. Stated differently, apprehension cost is incurred regardless of whether a conviction ensues, whereas sanction costs can be incurred only if apprehension is followed by conviction. This structure formalizes the argument of Williams and Hawkins (1986) that what they call "fear of arrest" serves as a greater deterrent than formal sanction cost. It is also consistent with the conclusion of my own research with coauthors Paternoster (Nagin and Paternoster 1993, 1994) and Pogarsky (Nagin and Pogarsky 2001, 2003) that individuals with the greatest stakes in conformity were the most deterred by informal sanction costs.

The fourth branch of figure 3 is the total cost of formal and informal sanctions. The perceptions research combined with the criminal record research suggests that, for people without a criminal record, informal sanction cost makes a large contribution to this total. That contribution may be substantially reduced once an individual has had contact with the criminal justice system and obtains a criminal record. This observation relates back to a point I emphasized in Nagin (1998). If fear of stigma is a key component of the deterrence mechanism, punishment must be a relatively rare event. Just as the stigma of Hester Prynne's scarlet "A" depended on adultery being uncommon in Puritan America, a criminal record cannot be socially and economically isolating if it is commonplace. For that reason, policies that work well in

246    Daniel S. Nagin

the short term may erode their effectiveness over the long run if they increase the proportion of the population who are stigmatized.

This observation is also germane to the recommendation that future empirical research and theorizing should take account of whether and how the experience of punishment (which in my view is inappropriately referred to as specific deterrence) affects the response to the threat of punishment, or general deterrence. The experience of punishment may affect general deterrence in two distinct ways. First, it may affect perceptions of sanction risks. Second, it may affect the basic proclivity for offending. Proclivity could be reduced by effective rehabilitation programs or an individual's conclusion that prison is not an experience to be repeated. However, proclivity could also be increased by stigmatization, erosion of human capital during a spell of incarceration, or the social influence of close contact with a mostly crime-prone population. Nagin, Cullen, and Jonson (2009) provide a detailed discussion of this issue.

*B. Sanction Risk Perceptions Studies*

Studies of sanction risk perception come in three primary forms: surveys of the general public's knowledge of the sanction regime, studies of the effect of apprehension (or nonapprehension) on risk perceptions and subsequent behavior, and scenario-based studies in which respondents are questioned about their perceptions of the risk of apprehension and punishment in specific circumstances.[10]

1. *General Population Surveys.* Apel (2013) identifies only two surveys of the general public's knowledge of the statutory penalties for the types of crime that compose the FBI's crime index (e.g., murder, robbery). Both are dated. A survey of Tucson, Arizona, residents conducted in the 1970s suggests generally good knowledge of the types of sanctions (e.g., fine, prison) available for the punishment of the 14 types of crime surveyed (Williams, Gibbs, and Erickson 1980). Erickson and Gibbs (1979) also find that respondents were reasonably well calibrated on the relative severity of punishments across types of crime (e.g., punishment for robbery is generally more severe than for larceny). However, a 1960s study commissioned by the California Assembly Committee on Criminal Procedure (1968) found that the general

[10] For an exhaustive and thoughtful review, on which this discussion draws heavily, see Apel (2013).

public's knowledge of the statutorily prescribed level of punishment was poor. Only about a quarter of the sample correctly identified the maximum prison sentence available for the punishment of the various crimes included in the survey. However, 62 percent of incarcerated adults correctly identified the maximum. I return to the large difference in knowledge between the incarcerated and not-incarcerated samples below.

There have also been general population surveys of sanction perceptions for two types of crimes—marijuana use and drunk driving— that are far more prevalent in the general population than crimes such as robbery or burglary. The surveys suggest far better, although hardly perfect, knowledge of the legally available sanctions for these two offenses. MacCoun et al. (2009) describe a study by Johnston Lloyd, O'Malley, and Bachman (1981) of student knowledge of punishment for marijuana possession. In states that decriminalized possession between 1976 and 1980, the percentage reporting a possible jail sentence declined from 58 percent to 18 percent. Corresponding changes for students living in states that did not decriminalize were not as large. This finding suggests that for populations in which there is greater need-to-know of sanction risks, knowledge of the risks is better but still crude. For example, MacCoun et al. (2009) also report that knowledge of the maximum penalties for marijuana use was not good. Surveys of knowledge among adults of drunk-driving penalties by Ross (1973) and Grube and Kearney (1983) also suggest greater awareness of the drunk-driving sanctions and available enforcement tools (e.g., Breathalyzers) than corresponding knowledge for street-type crimes.

The Tucson-based survey and more recent surveys by Kleck and colleagues (Kleck et al. 2005; Kleck and Barnes, forthcoming) attempt to assess the accuracy of sanction risk perceptions. Kleck et al. (2005), for example, survey adults residing in 54 large urban counties. For crimes such as homicide and robbery, they correlate respondent estimates of quantities such as arrests per crime and convictions per crime with ratios based on the actual data. They find that the correlation is close to zero.

The results of the surveys by Kleck and colleagues are not surprising on several counts. First, for the reasons elaborated long ago by Beccaria and Bentham and most recently by Wikström et al. (2012) and Apel (2013), most of the general public has no intention of committing the

types of crime surveyed in these studies.[11] Thus, there is no reason for
them to be aware of the sanction regime for these types of crime.
Consequently, their ignorance of the sanction regime is not informative
about whether people who have a potential need-to-know of the sanc-
tion regime obtain that knowledge, however crudely, and take it into
account in the decision whether or not to offend. Second, the ratios
calculated by Kleck and colleagues pertain only to criminal opportu-
nities that have actually been acted on. As first pointed out by Cook
(1979), the ratio of arrest per crime is not a valid measure of the risk
of apprehension for criminal opportunities that are not acted on.
Third, statistics such as arrests per crime are calculated at the county
or city level and may be very poor indicators of risk at the specific
locations where would-be offenders are plying their trade (Apel 2013).

2. *Studies of the Effect of Experience on Perceptions.* Salient findings
of the early panel perceptual deterrence studies include considerable
instability in sanction risk perceptions and that nonoffenders and nov-
ice offenders have higher sanction risk perceptions than experienced
offenders. Paternoster and colleagues (Paternoster et al. 1982; Pater-
noster 1983) called this an experiential effect whereby delinquent
youths learned that sanction risks were lower than initially anticipated.

An important study by Horney and Marshall (1992) of serious of-
fenders finds that subjects who had higher arrest ratios, that is, self-
reported arrests to self-reported crime, reported higher risk perception.
Since that time a large number of studies have used longitudinal data
to analyze whether the effect of success or failure in avoiding appre-
hension influences sanction risk perceptions. The analytical strategy
involves relating experience with success or failure in prior survey
waves with perceptions of apprehension risk in later survey waves.
Studies of this type by criminologists were prompted by an influential
article by Stafford and Warr (1993), who distinguished between two
sources of information on sanction risk: one's own experience and the
experience of peers. A parallel literature has also appeared in economics
based on the concept of "Bayesian updating."

The Bayesian updating model and the arguments of Stafford and
Warr are complementary. Bayesian updating formalizes their argu-
ments. The Bayesian updating model is designed to describe the pro-

---

[11] In the context of the decision model laid out in Sec. I, these are individuals for
whom the net reward of committing a crime is negative even without consideration
of sanction costs.

Deterrence in the Twenty-First Century   249

cess by which people update their perceptions of a phenomenon of interest on the basis of new information about that phenomenon. In this case, individuals would update their perceptions of sanction risk with new information regarding success or failure of themselves or their peers in avoiding apprehension. The predictions of the model depend on the specifics of its mathematical specification, but models of this type make predictions about the updating process that are intuitively sensible. The models predict that people generally do not entirely abandon prior beliefs as a result of new information. Most commonly, they only incrementally adjust them.[12]

In the case of perception of apprehension risk, this implies that the experience of apprehension will result in an incremental upward shift in risk perception, and experience of what Stafford and Warr (1993) call "apprehension avoidance" will result in an incremental reduction in risk. A second prediction of the Bayesian updating model is that the magnitude of the change will depend on the depth of prior knowledge. Individuals with more prior knowledge will tend to adjust less to new information than individuals with less prior knowledge. In the context of sanction risk perceptions, this implies that individuals with more experience with offending will make smaller adjustments in their risk perceptions based on current experience with apprehension than will individuals with less experience. Both of these predictions are supported by studies of risk perception updating.

Concerning the first prediction, numerous studies find that increases (or decreases) in perceived apprehension risk are associated with failure (success) in avoiding apprehension (Bridges and Stone 1986; Piliavin et al. 1986; Paternoster and Piquero 1995; Pogarsky, Piquero, and Paternoster 2004; Pogarsky, Kim, and Paternoster 2005; Matsueda, Kreager, and Huizinga 2006; Lochner 2007; Hjalmarsson 2008). There are, however, exceptions to this finding. Apospori and Alpert (1993) and Pogarsky and Piquero (2003) report evidence that is the reverse of this prediction. Pogarsky and Piquero attribute this to a variant of what is called the "gambler's fallacy" whereby offenders believe that bad luck is not followed by bad luck. This is an interesting possibility, but the evidence is overwhelmingly consistent with the Bayesian updating model.

[12] Prior history may be ignored if a regime change (e.g., the occupying German army arresting the Danish police force) makes it irrelevant.

250    Daniel S. Nagin

Evidence consistent with the second prediction is reported in Po-garsky, Piquero, and Paternoster (2004), Matsueda, Kreager, and Hui-zinga (2006), and Anwar and Loughran (2011). Anwar and Loughran conducted a particularly thorough test of this prediction. They ana-lyzed a sample composed of about 1,300 adjudicated/convicted youths from Arizona and Pennsylvania enrolled in the Pathways to Desistance study who were interviewed eight times in 5 years (Mulvey 2011). Be-ing arrested significantly increased subjective probabilities (prediction 1), but the magnitude of the change was less for more experienced offenders (prediction 2). Specifically, they showed that experienced of-fenders placed relatively more weight on their prior subjective proba-bilities and therefore updated less in response to new arrests. Inexpe-rienced offenders, by contrast, updated more by placing more weight on their current arrest ratios and less weight on their prior subjective probabilities. It is also noteworthy that they concluded that the effect of arrest on subjective probabilities was specific within classes of criminal behaviors: youths arrested for aggressive crimes did not update their subjective probabilities concerning income-generating crimes. This find-ing implies that there are not spillover effects across classes of crime.

3. *Studies of Situational Effects on Risk Perceptions.*    This grouping of studies examines the effect of situational factors on risk perceptions. Particularly important in this regard are situational factors that can be manipulated by policy, such as official sanctions and police presence.

As already noted, knowledge of official sanctions seems to be strongly affected by the need-to-know principle. Knowledge is better, but hardly perfect, among populations with the greatest involvement in the illegal activity. On the basis of the California assembly study, for example, knowledge of maximum penalties for various FBI index-type crimes was far better for incarcerated sample members than for not-incarcerated sample members.

Other interesting evidence of awareness of official sanctions is the previously discussed study by Hjalmarsson (2009) of the effect of reaching the age of majority on perceptions of the risk of incarceration for auto theft. She found that male respondents in the 1997 National Longitudinal Survey of Youth increased that risk by 5.2 percentage points upon reaching their age of majority. The increase, however, had no statistically significant effect on behavior.

Evidence on how police presence affects perceptions of apprehension risk is scant. In my own work with Paternoster, we constructed sce-

narios and examined how respondent perceptions of sanction risks were affected by scenario conditions (Nagin and Paternoster 1993). We found that respondent perceptions of sanction cost in a drunk-driving scenario were higher in the scenario condition involving a police crackdown on drunk driving versus a scenario condition described as involving state police cutbacks. In addition, perceptions of sanction cost were lower if surveillance could be avoided by driving on back roads. In scenarios concerning peer provocation, Wikström et al. (2012) found that adolescents reported a lower likelihood of violent response in scenario conditions in which adult monitors were present. Evidence from ethnographic studies suggests that offenders are very conscious of police presence when selecting targets. Wright and Decker (1994) report that burglars avoid neighborhoods with a heavy police presence and that robbers prefer to target individuals unlikely to report the crime to the police, such as drug dealers.

*C. Summary*

Perceptual deterrence research has established that self-reported offending or intention to do so is linked to sanction risk perceptions. The outstanding question is whether those perceptions are grounded in reality. If they are not, behavior is beyond the reach of public policy. The evidence on the sources of sanction risk perceptions suggests that risk perceptions are affected by an individual's own experience with success or failure at averting apprehension. The link between perception and the legally authorized sanctions is less compelling but does indicate that there is at least a rough awareness among individuals in a need-to-know scenario. The other key component of the sanction regime is the intensity of application of the legally authorized sanctions. Research on this topic is based on general population studies of the correlations of perceptions of quantities of the ratio of arrest to crimes with estimates of these ratios calculated from official statistics. For reasons discussed above, in my judgment these studies are not informative about whether perceptions of intensity among the population with need-to-know sanction risks are affected by the actual intensity of application of legally authorized sanctions.

Pogarsky (2007) offers a useful taxonomy of responsiveness to legal threats for considering the implications of these summary observations. The taxonomy distinguishes three groups: acute conformists, deterrables, and incorrigibles. In the context of the decision model laid out

252     Daniel S. Nagin

in Section I, conformists are individuals for whom reward minus commission cost is negative. For reasons I have already discussed, they have no need to gain knowledge of sanction risks because there is no profit in crime even without potential sanction costs. Deterrables are individuals for whom reward minus commission cost is positive and who are attentive to sanction threats. For such individuals the issue is whether the net benefit of successful commission exceeds the potential costs attending failure. The incorrigible group is also composed of individuals for whom crime is profitable but who for whatever reason are not attentive to sanction threats. The relative sizes of the incorrigible and deterrable groups and the specific form of the sanction regime will determine the effectiveness of criminal justice public policy in preventing crime via deterrence and thereby avoiding the sanction costs of incapacitation.

Future research on sanction risk perceptions needs to target Pogarsky's deterrables and incorrigibles to gain better knowledge of their awareness of the two key elements of the sanction regime: the legally authorized sanctions and the intensity of their application. For the types of crime in the FBI index this will require abandoning surveys of the general population and instead sampling populations with a large representation of deterrables and incorrigibles. An example of such a survey is the Pathways to Desistance project used in the Anwar and Loughran (2011) analysis, which sampled juveniles adjudicated for felony offenses in Philadelphia and Phoenix.

Surveys targeting deterrables and incorrigibles should also include batteries of questions designed to learn how the actions of the police and other guardians affect perceptions of the probability of success, which, for the reasons described in Section V, is likely to be particularly decisive in the deterrence process.

### VII. Conclusions

Over the past four decades, much has been learned about the foundations of deterrence that were laid out more than two centuries ago by Cesare Beccaria and Jeremy Bentham. We now know that deterrence is ubiquitous but that the effects are heterogeneous, ranging in size from seemingly null to very large. There is little evidence that increasing already long prison sentences has a material deterrence effect. Evidence on the deterrent effect of the certainty of punishment

is more consistent, but the source of the effect is less clear. In this essay I have argued that the certainty effect stems primarily from police functioning in their official guardian role rather than in their apprehension agent role.

These conclusions have important policy implications that are developed in detail in Durlauf and Nagin (2011*b*). They suggest that lengthy prison sentences cannot be justified on deterrent grounds, but rather must be justified either on crime prevention through incapacitation or on retributive grounds. The crime prevention efficiency of incapacitating aged criminals is dubious, and thus the case for lengthy prison sentences must rest on retributive considerations. The conclusions also suggest that crime control effectiveness would be improved by shifting resources from corrections to policing methods that enhance the effectiveness of police in their official guardian role.

While much progress has been made in understanding sources of deterrence and the circumstances in which deterrence is and is not effective, much remains to be learned. Theory needs to be generalized to combine the response to the threat of punishments, known as general deterrence in criminology, and the response to the experience of punishment, which I have argued is inappropriately labeled specific deterrence. A second theoretical and empirical gap concerns the concept of a sanction regime and its two dimensions: the legal authority for different types of sanctions and the way in which authority is administered. These two dimensions combine to determine the certainty, severity, and celerity of sanction options available for punishment of a specific type of crime. Theories of deterrence, however, specify sanction threats in the singular, not in the plural. Theories of deterrence that conceive of sanctions in the singular do not provide the conceptual basis for considering the differential deterrent effect of different types of sanction options. The empirical companion to this theoretical expansion involves assembling the data required to measure sanction regimes.

A third theoretical and empirical gap involves sanction risk perceptions. Deterrence is the behavioral response to the perception of sanction threats. Establishing the link between risk perceptions and actual sanction regimes is imperative because policy cannot directly manipulate perceptions. Unless perceptions adjust, however crudely, to changes in the sanction regime, the desired deterrent effect will not be achieved. More research on the sources of sanction risk perceptions in

254    Daniel S. Nagin

crime-prone populations is likely to pay large dividends for theory and policy.

The fourth major gap in theory and empirical knowledge involves a thorough testing of my contention that the guardian role, not the apprehension role, of the police is the most important source of their effectiveness in crime prevention. This theory also needs to be expanded to account for how the police and other guardians affect the distribution of criminal opportunities.

REFERENCES

Andenaes, Johannes. 1974. *Punishment and Deterrence*. Ann Arbor: University of Michigan Press.

Anwar, Shamena, and Thomas A. Loughran. 2011. "Testing a Bayesian Learning Theory of Deterrence among Serious Juvenile Offenders." *Criminology* 49:667–98.

Apel, Robert. 2013. "Sanctions, Perceptions, and Crime: Implications for Criminal Deterrence." *Journal of Quantitative Criminology* 29(1):87–101.

Apel, Robert, and Daniel S. Nagin. 2009. "Deterrence." In *Crime*, edited by James Q. Wilson and Joan Petersilia. Oxford: Oxford University Press.

Apospori, Eleni, and Geoffrey Alpert. 1993. "Research Note: The Role of Differential Experience with the Criminal Justice System in Changes in Perceptions of Severity of Legal Sanctions over Time." *Journal of Research in Crime and Delinquency* 39:184–94.

Assembly Committee on Criminal Procedure. 1968. *Deterrent Effects of Criminal Sanctions*. Sacramento: Assembly of the State of California.

Bachman, Ronet, Raymond Paternoster, and Sally Ward. 1992. "The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault." *Law and Society Review* 26(2):343–72.

Beccaria, Cesare. 1986. *On Crimes and Punishments*. Translated by Henry Paolucci. New York: Macmillan. (Originally published 1764.)

Becker, Gary S. 1968. "Crime and Punishment: An Economic Approach." *Journal of Political Economy* 76(2):169–217.

Bentham, Jeremy. 1988. *An Introduction to the Principles of Morals and Legislation*. Amherst, NY: Prometheus Books. (Originally published 1789.)

Blake, L., and R. T. Coupe. 2001. "The Impact of Single and Two-Officer Patrols on Catching Burglars in the Act." *British Journal of Criminology* 41: 381–96.

Blumstein, Alfred, and Allen J. Beck. 1999. "Population Growth in the U.S. Prisons, 1980–1996." In *Prisons*, edited by Michael Tonry and Joan Petersilia. Vol. 26 of *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press.

———. 2005. "Reentry as a Transient State between Liberty and Recommit-ment." In *Prisoner Reentry and Crime in America*, edited by Jeremy Travis and Christy Visher. Cambridge: Cambridge University Press.

Blumstein, Alfred, Jacqueline Cohen, and Daniel Nagin, eds. 1978. *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*. Washington, DC: National Academies Press.

Blumstein, Alfred, and Daniel Nagin. 1976. "The Deterrent Effect of Legal Sanctions on Draft Evasion." *Stanford Law Review* 29(2):241–75.

Braga, Anthony A. 2008. *Police Enforcement Strategies to Prevent Crime in Hot Spot Areas*. Edited by Office of Community Oriented Policing. Washington, DC: US Department of Justice.

Braga, Anthony A., Edward A. Flynn, George L. Kelling, and Christine M. Cole. 2011. "Moving the Work of Criminal Investigators towards Crime Control." *New Perspectives in Policing*. Washington, DC: US Department of Justice, National Institute of Justice.

Braga, Anthonly A., and David L. Weisburd. 2012. "The Effects of 'Pulling Levers' Focussed Deterrence Strategies on Crime." Campbell Systematic Reviews. http://campbellcollaboration.org/lib/project/96/.

Braithwaite, John. 1989. *Crime, Shame, and Reintegration*. Cambridge: Cambridge University Press.

Brantingham, Patricia L., and Paul J. Brantingham. 1999. "Theoretical Model of Crime Hot Spot Generation." *Studies on Crime and Crime Prevention* 8:7–26.

Bridges, George S., and James A. Stone. 1986. "Effects of Criminal Punishment on Perceived Threat of Punishment: Toward an Understanding of Specific Deterrence." *Journal of Research in Crime and Delinquency* 23:207–39.

Bureau of Justice Statistics. 1999. *Prisoners in 1998*. Edited by Allen J. Beck and Christopher J. Mumola. Washington, DC: Bureau of Justice Statistics.

———. 2010. *Felony Defendants in Large Urban Counties, 2006*. Edited by Thomas H. Cohen and Tracey Kyckelhahn. Washington, DC: Bureau of Justice Statistics.

———. 2011. *Prisoners in 2010* (*Revised*). Edited by Paul Guerino, Paige M. Harrison, and William J. Sabol. Washington, DC: Bureau of Justice Statistics.

———. 2012. *Correctional Populations in the United States, 2011*. Edited by Lauren E. Glaze and Erika Parks. Washington, DC: Bureau of Justice Statistics.

Bushway, Shawn. 1996. "The Impact of a Criminal History Record on Access to Legitimate Employment." PhD dissertation, Carnegie Mellon University.

Canela-Cacho, Jose A., Alfred Blumstein, and Jacqueline Cohen. 1997. "Relationship between the Offending Frequency of Imprisoned and Free Offenders." *Criminology* 35(1):133–76.

Chalfin, Aaron, Amelia M. Haviland, and Steven Raphael. 2013. "What Do Panel Studies Tell Us about a Deterrent Effect of Capital Punishment? A Critique of the Literature." *Journal of Quantitative Criminology* 29(1):5–43.

Charles, Kerwin K., and Steven N. Durlauf. 2013. "Pitfalls in the Use of Time

Series Methods to Study Deterrence and Capital Punishment." *Journal of Quantitative Criminology* 29(1):45–66.

Clarke, Ronald V. 1995. "Situational Crime Prevention." In *Building a Safer Society: Strategic Approaches to Crime Prevention*, edited by Michael Tonry and David P. Farrington. Vol. 19 of *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press.

Cohen, Lawrence E., and Marcus Felson. 1979. "Social Change and Crime Rate Trends: A Routine Activity Approach." *American Sociological Review* 44(4):588–608.

Cook, Philip J. 1979. "The Clearance Rate as a Measure of Criminal Justice System Effectiveness." *Journal of Public Economics* 11:135–42.

———. 2009. "Potential Savings from Abolition of the Death Penalty in North Carolina." *American Law and Economics Review* 11(2):498–529.

———. 2012. "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence: An Evaluation of the High Point Drug Market Intervention." *Criminology and Public Policy* 11(2):161–64.

Cook, Philip J., and Jens Ludwig. 2006. "Aiming for Evidence-Based Gun Policy." *Journal of Policy Analysis and Management* 48:691–735.

Cornish, Derek B., and Ronald V. Clarke. 1986. *The Reasoning Criminal: Rational Choice Perspectives on Offending*. Secausus, NJ: Springer-Verlag.

Corsaro, N., E. D. Hunt, N. K. Hipple, and E. F. McGarrell. 2012. "The Impact of Drug Market Pulling Levers Policing on Neighborhood Violence." *Criminology and Public Policy* 11:167–99.

DeAngelo, Greg, and Benjamin Hansen. 2008. "Life and Death in the Fast Lane: Police Enforcement and Roadway Safety." Unpublished manuscript. University of California, Santa Barbara, Department of Economics.

Di Tella, Rafael, and Ernesto Schargrodsky. 2004. "Do Police Reduce Crime? Estimates Using the Allocation of Police Forces after a Terrorist Attack." *American Economic Review* 94:115–33.

Donohue, John J. 2009. "Assessing the Relative Benefits of Incarceration: The Overall Change over the Previous Decades and the Benefits on the Margin." In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A. Stoll. New York: Sage.

Donohue, John J., and Justin Wolfers. 2005. "Uses and Abuses of Empirical Evidence in the Death Penalty Debate." *Stanford Law Review* 58:791–846.

———. 2009. "Estimating the Impact of the Death Penalty on Murder." *American Law and Economic Review* 11(2):249–309.

Draca, Mirko, Stephen Machin, and Robert Witt. 2008. *Panic on the Streets of London: Police, Crime, and the July 2005 Terror Attacks.* Bonn: Institute for the Study of Labor.

Durlauf, Steven N., and Daniel S. Nagin. 2011*a*. "The Deterrent Effect of Imprisonment." In *Controlling Crime: Strategies and Tradeoffs*, edited by Philip J. Cook, Jens Ludwig, and Justin McCrary. Chicago: University of Chicago Press.

———. 2011*b*. "Imprisonment and Crime: Can Both Be Reduced?" *Criminology and Public Policy* 10:9–54.

Durlauf, Steven, S. Navarro, and D. Rivers. 2008. "On the Interpretation of Aggregate Crime Regressions." In *Crime Trends*, edited by A. Goldberger and R. Rosenfeld. Washington DC: National Academy of Sciences Press.

Eck, John E. 1992. "Criminal Investigation." In *What Works in Policing? Operations and Administrations Examined*, edited by Gary W. Cordner and Donna C. Hale. Cincinnati: Anderson.

Eck, John E., Jeffrey S. Gersh, and Charlene Taylor. 2000. "Finding Crime Hot Spots through Repeat Address Mapping." In *Analyzing Crime Patterns: Frontiers of Practice*, edited by Victor Goldsmith, Philip G. McGuire, John H. Mollenkopf, and Timothy A. Ross. Thousand Oaks, CA: Sage.

Ehrlich, Isaac. 1975. "The Deterrent Effect of Capital Punishment: A Question of Life and Death." *American Economic Review* 65(3):397–417.

Erickson, Maynard L., and Jack P. Gibbs. 1979. "On the Perceived Severity of Legal Penalties." *Journal of Criminal Law, Criminology, and Police Science* 70: 102–16.

Evans, William N., and Emily G. Owens. 2007. "COPS and Crime." *Journal of Public Economics* 91:181–201.

Ferrier, M., and Jens Ludwig. 2011. "Crime Policy and Informal Social Control." *Criminology and Public Policy* 10:1029–36.

Freeman, Richard B. 1991. *Crime and the Employment of Disadvantaged Youths.* Cambridge, MA: National Bureau of Economic Research.

Gibbs, Jack P. 1975. *Crime, Punishment, and Deterrence*. New York: Elsevier.

Granger, C. W. J. 1969. "Investigating Causal Relations by Econometric Models and Cross-Spectral Methods." *Econometrica* 37:424–38.

Grasmick, Harold, and George Bryjak. 1980. "The Deterrent Effect of Perceived Severity of Punishment." *Social Forces* 59(2):471–91.

Greenwood, Peter, Jan Chaiken, and Joan Petersilia. 1977. *The Investigation Process*. Lexington, MA: Lexington.

Greenwood, Peter, and Angela Hawken. 2002. *An Assessment of the Effect of California's Three-Strikes Law.* Toronto: Greenwood Associates.

Grube, Joel W., and Kathleen A. Kearney. 1983. "A 'Mandatory' Jail Sentence for Drinking and Driving." *Evaluation Review* 7:235–46.

Hawken, Angela. 2010. "Behavioral Triage: A New Model for Identifying and Treating Substance-Abusing Offenders." *Journal of Drug Policy Analysis* 3: 1–5.

Hawken, Angela, and Mark Kleiman. 2009. *Managing Drug-Involved Probationers with Swift and Certain Sanctions: Evaluating Hawaii's HOPE.* Washington, DC: National Institute of Justice.

Heaton, Paul. 2010. "Understanding the Effects of Antiprofiling Policies." *Journal of Law and Economics* 53(1):29–64.

Helland, E., and A. Tabarrok. 2007. "Does Three Strikes Deter? A Nonparametric Estimation." *Journal of Human Resources* 42(2):309–30.

Hjalmarsson, Randi. 2008. "Criminal Justice Involvement and High School Completion." *Journal of Urban Economics* 63:613–30.

———. 2009. "Crime and Expected Punishment: Changes in Perceptions at

258    Daniel S. Nagin

the Age of Criminal Majority." *American Law and Economics Review* 7:209–48.

Horney, Julie, and Ineke Haen Marshall. 1992. "Risk Perceptions among Serious Offenders: The Role of Crime and Punishment." *Criminology* 30:575–93.

Jacobs, Bruce A., and Richard Wright. 2006. *Street Justice: Retaliation in the Criminal Underworld*. New York: Cambridge University Press.

Johnson, Rucker, and Steven Raphael. 2012. "How Much Crime Reduction Does the Marginal Prisoner Buy?" *Journal of Law and Economics* 55(2):275–310.

Johnston Lloyd, D., Patrick M. O'Malley, and Jerald G. Bachman. 1981. "Cannabis Decriminalization: The Impact on Youth 1975–1980." In *Monitoring the Future: Occasional Paper*. Ann Arbor, MI: Institute for Social Research.

Kansas City Police Department, eds. 1977. *Response Time Analysis*. Kansas City: Kansas City Police Department.

Kennedy, David M. 2009. *Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction*. New York: Routledge.

Kennedy, David M., Anthony A. Braga, Anne Morrison Piehl, and Elin J. Waring. 2001. *Reducing Gun Violence: The Boston Gun Project's Operation Ceasefire*. Washington, DC: US National Institute of Justice.

Kessler, Daniel, and Steven Levitt. 1999. "Using Sentence Enhancements to Distinguish between Deterrence and Incapacitation." *Journal of Law and Economics* 42:348–63.

Kleck, Gary, and J. C. Barnes. Forthcoming. "Do More Police Lead to More Crime Deterrence?" *Crime and Delinquency*. doi: 10.1177/0011128710382263.

Kleck, Gary, Brion Sever, Spencer Li, and Marc Gertz. 2005. "The Missing Link in General Deterrence Research." *Criminology* 46:623–59.

Kleiman, Mark. 2009. *When Brute Force Fails, How to Have Less Crime and Less Punishment*. Princton, NJ: Princeton University Press.

Klein, Lawrence R., Brian Forst, and Victor Filatov. 1978. "The Deterrent Effect of Capital Punishment: An Assessment of the Estimates." In *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, edited by Alfred Blumstein, Jacqueline Cohen, and Daniel S. Nagin. Washington, DC: National Academy of Sciences.

Klepper, Steven, and Daniel Nagin. 1989*a*. "The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited." *Criminology* 27(4):721-46.

———. 1989*b*. "Tax Compliance and Perceptions of the Risks of Detection and Criminal Prosecution." *Law and Society Review* 23:209–40.

Klick, Jonathan, and Alexander Tabarrok. 2005. "Using Terror Alert Levels to Estimate the Effect of Police on Crime." *Journal of Law and Economics* 46:267–79.

Lee, David S., and Justin McCrary. 2009. *The Deterrent Effect of Prison: Dynamic Theory and Evidence*. Princeton, NJ: University of Princeton, Industrial Relations Section.

Levitt, Steven D. 1996. "The Effect of Prison Population Size on Crime Rates:

Evidence from Prison Overcrowding Legislation." *Quarterly Journal of Economics* 111:319–52.

———. 1997. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime." *American Economic Review* 87:270–90.

———. 1998. "Juvenile Crime and Punishment." *Journal of Political Economy* 106:1156–85.

———. 2002. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Reply." *American Economic Review* 92:1244–50.

———. 2006. "The Case of the Critics Who Missed the Point: A Reply to Webster et al." *Criminology and Public Policy* 5:449–60.

Liedka, Raymond V., Anne Morrison Piehl, and Bert Useem. 2006. "The Crime-Control Effect of Incarceration: Does Scale Matter?" *Criminology and Public Policy* 5:245–76.

Lochner, Lance. 2007. "Individual Perceptions of the Criminal Justice System." *American Economic Review* 97:444–60.

Loftin, Colin, Milton Heumann, and David McDowall. 1983. "Mandatory Sentencing and Firearms Violence: Evaluating an Alternative to Gun Control." *Law and Society Review* 17:287–318.

Loftin, Colin, and David McDowall. 1981. "'One with a Gun Gets You Two': Mandatory Sentencing and Firearms Violence in Detroit." *Annals of the American Academy of Political and Social Science* 455(1):150–67.

———. 1984. "The Deterrent Effects of the Florida Felony Firearm Law." *Journal of Criminal Law and Criminology* 75:250–59.

Ludwig, Jens, Jeffrey R. Kling, and Sendhil Mullainathan. 2011. "Mechanism Experiments and Policy Evaluations." *Journal of Economic Perspectives* 25(3): 17–38.

MacCoun, Robert, Rosalie Liccardo Pacula, Jamie Chriqui, Katherine Harris, and Peter Reuter. 2009. "Do Citizens Know Whether Their State Has Decriminalized Marijuana? Assessing the Perceptual Component of Deterrence Theory." *Review of Law and Economics* 5:347–71.

Marvell, Thomas B., and C. Moody Jr. 1994. "Prison Population Growth and Crime Reduction." *Journal of Quantitative Criminology* 10:109–40.

———. 1996. "Specification Problems, Police Levels, and Crime Rates." *Criminology* 34:609–46.

Matsueda, Ross L., D. A. Kreager, and D. Huizinga. 2006. "Deterring Delinquents: A Rational Choice Model of Theft and Violence." *American Sociological Review* 71:95–122.

McCrary, Justin. 2002. "Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment." *American Economic Review* 92: 1236–43.

McDowall, D., C. Loftin, and B. Wiersema. 1992. "A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crimes." *Journal of Criminal Law and Criminology* 83:378–94.

Meier, R. F., and W. T. Johnson. 1977. "Deterrence as Social Control: The Legal and Extralegal Production of Conformity." *American Sociological Review* 42:292–304.

260    Daniel S. Nagin

Minor, W. W. 1977. "A Deterrence-Control Theory of Crime." In *Theory of Criminology*, edited by R. F. Meier. Beverly Hills, CA: Sage.

Mulvey, E. P. 2011. *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders*. Juvenile Justice Fact Sheet. Washington, DC: Department of Justice.

Nagin, Daniel S. 1998. "Criminal Deterrence Research at the Outset of the Twenty-First Century." In *Crime and Justice: A Review of Research*, vol. 23, edited by Michael Tonry. Chicago: University of Chicago Press.

Nagin, Daniel S., Francis T. Cullen, and Cheryl Lero Jonson. 2009. "Imprisonment and Reoffending." In *Crime and Justice: A Review of Research*, vol. 38, edited by Michael Tonry. Chicago: University of Chicago Press.

Nagin, Daniel S., and Raymond Paternoster. 1993. "Enduring Individual Differences and Rational Choice Theories of Crime." *Law and Society Review* 27:467–99.

———. 1994. "Personal Capital and Social Control: The Deterrence Implications of Individual Differences in Criminal Offending." *Criminology* 32: 581–606.

Nagin, Daniel S., and John V. Pepper, eds. 2012. *Deterrence and the Death Penalty*. Washington, DC: National Academies Press.

Nagin, Daniel S., and Greg Pogarsky. 2001. "Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence." *Criminology* 39:865–92.

———. 2003. "An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity." *Criminology* 41:167–93.

Owens, Emily G. 2009. "More Time, Less Crime? Estimating the Incapacitative Effects of Sentence Enhancements." *Journal of Labor Economics* 53(3): 551–79.

Packer, H. L. 1968. *The Limits of the Criminal Sanction*. Stanford, CA: Stanford University Press.

Papachristos, Andrew V., Tracey L. Meares, and Jeffrey Fagan. 2007. "Attention Felons: Evaluating Project Safe Neighborhoods in Chicago." *Journal of Empirical Legal Studies* 4:223–72.

Paternoster, Raymond. 1983. "Estimating Perceptual Stability and Deterrent Effects: The Role of Perceived Legal Punishment in the Inhibition of Criminal Involvement." *Journal of Criminal Law and Criminology* 74:210–97.

———. 2010. "How Much Do We Really Know about Criminal Deterrence?" *Journal of Criminal Law and Criminology* 10(3):765–823.

Paternoster, Raymond, and Alex Piquero. 1995. "Reconceptualizing Deterrence: An Empirical Test of Personal and Vicarious Experiences." *Journal of Research in Crime and Delinquency* 32:251–86.

Paternoster, Raymond, Linda E. Saltzman, Theodore G. Chiricos, and Gordon P. Waldo. 1982. "Perceived Risk and Deterrence: Methodological Artifacts in Perceptual Deterrence Research." *Journal of Criminal Law and Criminology* 73:1238–58.

Piliavin, Irving, Craig Thornton, Rosemary Gartner, and Ross L. Matsueda.

1986. "Crime, Deterrence, and Rational Choice." *American Sociological Review* 51:101–19.

Piquero, Alex, Raymond Paternoster, Greg Pogarsky, and Thomas A. Loughran. 2011. "Elaborating the Individual Difference Component in Deterrence Theory." *Annual Review of Law and Social Science* 7:355–60.

Pogarsky, Greg. 2007. "Deterrence and Individual Differences among Convicted Offenders." *Quantitative Criminology* 23(1):59–74.

Pogarsky, Greg, KiDuek Kim, and Raymond Paternoster. 2005. "Perceptual Change in the National Youth Survey: Lessons for Deterrence Theory and Offender Decision-Making." *Justice Quarterly* 22:1–29.

Pogarsky, Greg, and Alex R. Piquero. 2003. "Can Punishment Encourage Offending? Investigating the 'Resetting' Effect." *Journal of Research in Crime and Delinquency* 40:95–120.

Pogarsky, Greg, Alex R. Piquero, and Raymond Paternoster. 2004. "Modeling Change in Perceptions about Sanction Threats: The Neglected Link in Deterrence Theory." *Journal of Quantitative Criminology* 20:343–69.

Poutvaara, Panu, and Mikael Priks. 2006. "Hooliganism in the Shadow of a Terrorist Attack and the Tsunami: Do Police Reduce Group Violence?" Working Paper no. 1882. Munich: Center for Economic Studies and Ifo Institute for Economic Research.

Raphael, Steven. 2006. "The Deterrent Effects of California's Proposition 8: Weighing the Evidence." *Criminology and Public Policy* 5:471–78.

Raphael, Steven, and Jens Ludwig. 2003. "Prison Sentence Enhancements: The Case of Project Exile." In *Evaluating Gun Policy: Effects on Crime and Violence*, edited by Jens Ludwig and Philip J. Cook. Washington, DC: Brookings Institution Press.

Raphael, Steven, and Michael A. Stoll. 2009. "Why Are So Many Americans in Prison?" In *Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom*, edited by Steven Raphael and Michael A. Stoll. New York: Sage.

Reuter, Peter, and Howard Pollack. 2012. "Good Markets Make Bad Neighbors: Regulating Open-Air Drug Markets." *Criminology and Public Policy* 11(2):211–20.

Roncek, Dennis W. 2000. "Schools and Crime." In *Analyzing Crime Patterns: Frontiers of Practice*, edited by Victor Goldsmith, Philip G. McGuire, John H. Mollenkopf, and Timothy A. Ross. Thousand Oaks, CA: Sage.

Ross, H. Laurence. 1973. "Law, Science, and Accidents: The British Road Safety Act of 1967." *Journal of Legal Studies* 2:1–78.

———. 1982. *Deterring the Drinking Driver: Legal Policy and Social Control*. Lexington, MA: Lexington.

Sherman, Lawrence W. 1990. "Police Crackdowns: Initial and Residual Deterrence." In *Crime and Justice: A Review of Research*, vol. 12, edited by Michael Tonry and Norval Morris. Chicago: University of Chicago Press.

———. In this volume. "The Rise of Evidence-Based Policing: Targeting, Testing, and Tracking."

Sherman, Lawrence W., and Richard A. Berk. 1984. "The Specific Deterrent

Effects of Arrest for Domestic Assault." *American Sociological Review* 49:261–72.

Sherman, Lawrence W., and John E. Eck. 2002. "Policing for Prevention." In *Evidence Based Crime Prevention*, edited by Lawrence W. Sherman, David Farrington, and Brandon Welsh. New York: Routledge.

Sherman, Lawrence W., Patrick Gartin, and Michael Buerger. 1989. "Hot Spots of Predatory Crime: Routine Activities and the Criminology of Place." *Criminology* 27:27–55.

Sherman, Lawrence, and David Weisburd. 1995. "General Deterrent Effects of Police Patrol in Crime 'Hot Spots': A Randomized Study." *Justice Quarterly* 12:625–48.

Shi, Lan. 2009. "The Limits of Oversight in Policing: Evidence from the 2001 Cincinnati Riot." *Journal of Public Economics* 93:99–113.

Snell, T. L. 2010. *Capital Punishment 2009—Statistical Tables*. Washington, DC: US Department of Justice.

Spelman, William. 2000. "What Recent Studies Do (and Don't) Tell Us about Imprisonment and Crime." In *Crime and Justice: A Review of Research*, vol. 27, edited by Michael Tonry. Chicago: University of Chicago Press.

Spelman, William, and Dale K. Brown. 1981. *Calling the Police: A Replication of the Citizen Reporting Component of the Kansas City Response Time Analysis*. Washington, DC: Police Executive Research Forum.

Stafford, Mark C., and Mark Warr. 1993. "A Reconceptualization of General and Specific Deterrence." *Journal of Research in Crime and Delinquency* 30: 123–35.

Stolzenberg, Lisa, and Stewart J. D'Alessio. 1997. "'Three Strikes and You're Out': The Impact of California's New Mandatory Sentencing Law on Serious Crime Rates." *Crime and Delinquency* 43(4):457–69.

Tittle, Charles. 1977. "Sanction Fear and the Maintenance of Social Order." *Social Forces* 55:579–96.

———. 1980. *Sanctions and Social Deviance: The Question of Deterrence*. New York: Praeger.

Tonry, Michael. 1996. *Sentencing Matters*. Oxford: Oxford University Press.

———. 2009. "The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings." In *Crime and Justice: A Review of Research*, vol. 38, edited by Michael Tonry. Chicago: University of Chicago Press.

Vollaard, Ben. 2013. "Preventing Crime through Selective Incapacitation." *Economic Journal* 123(567):262–84.

Waldfogel, Joel. 1994. "The Effect of Criminal Conviction on Income and the Trust 'Reposed in the Workmen.'" *Journal of Human Resources* 29:62–81.

Webster, Cheryl Marie, Anthony Doob, and Franklin Zimring. 2006. "Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent." *Criminology and Public Policy* 5:417–48.

Weisburd, David, Shawn Bushway, Cynthia Lum, and Su-Ming Yang. 2004. "Trajectories of Crime at Places: A Longitudinal Study of Street Segments in the City of Seattle." *Criminology* 42:238–320.

Weisburd, David, and John Eck. 2004. "What Can Police Do to Reduce

Crime, Disorder, and Fear?" *Annals of the American Academy of Political and Social Science* 593:42–65.

Weisburd, David, Tomar Einat, and Matt Kowalski. 2008. "The Miracle of the Cells: An Experimental Study of Interventions to Increase Payment of Court-Ordered Financial Obligations." *Criminology and Public Policy* 7:9–36.

Weisburd, David, and Lorraine Green. 1995. "Policing Drug Hot Spots: The Jersey City Drug Market Analysis Experiment." *Justice Quarterly* 12:711–35.

Wikström, Per-Olof H., D. Oberwittler, K. Treiber, and B. Hardie. 2012. *Breaking Rules: The Social and Situational Dynamics of Young People's Urban Crime*. Oxford: Oxford University Press.

Williams, Kirk R., Jack P. Gibbs, and Maynard L. Erickson. 1980. "Public Knowledge of Statutory Penalties: The Extent and Basis of Accurate Perception." *Sociological Review* 23:105–28.

Williams, Kirk R., and Richard Hawkins. 1986. "Perceptual Research on General Deterrence: A Critical Overview." *Law and Society Review* 20:545–72.

Wilson, J. M., and S. Chermak. 2011. "Community-Driven Violence Reduction Programs." *Criminology and Public Policy* 10:993–1027.

Wood, Peter B., and David C. May. 2003. "Racial Differences in Perceptions of Severity of Sanctions: A Comparison of Prison with Alternatives." *Justice Quarterly* 20(3):605–31.

Wright, Richard T., and Scott H. Decker. 1994. *Burglars on the Job: Streetlife and Residential Break-ins*. Boston: Northeastern University Press.

Zimring, Franklin, and Gordon Hawkins. 1973. *Deterrence: The Legal Threat in Crime Control*. Chicago: University of Chicago Press.

Zimring, Franklin E., Gordon Hawkins, and Sam Kamin. 2001. *Punishment and Democracy: Three Strikes and You're Out in California*. New York: Oxford University Press.

EXHIBIT O

Journal of Economic Psychology 47 (2015) 1–16



Contents lists available at ScienceDirect

# Journal of Economic Psychology

journal homepage: www.elsevier.com/locate/joep



Review

# Like ripples on a pond: Behavioral spillovers and their implications for research and policy



Paul Dolan, Matteo M. Galizzi *

*Department of Social Policy, Behavioral Research Lab, London School of Economics, UK*
*Centre for the Study of Incentives in Health, Institute of Psychiatry, King's College London, UK*

## ARTICLE INFO

*Article history:*
Received 30 March 2014
Received in revised form 15 December 2014
Accepted 18 December 2014
Available online 5 January 2015

*JEL classification:*
C18
C91
C93
D03

*PsycINFO classification:*
2260
2346
2360
3040

*Keywords:*
Behavioral spillovers
Policy-making
Nudges
Crowding in/out

## ABSTRACT

No behavior sits in a vacuum, and one behavior can greatly affect what happens next. We propose a conceptual frame within which a broad range of behavioral spillovers can be accounted for when applying behavioral science to policy challenges. We consider behaviors which take place sequentially and are linked, at a conscious or unconscious level, by some underlying motive. The first behavior leads to another behavior which can either work in the same direction as the first (*promoting* spillover), or push back against it (*permitting* or *purging* spillover). Looking through this conceptual lens at the existing evidence, we find pervasive evidence for all kinds of spillover effects across a variety of fields and domains. As a result, behavioral scientists, especially those seeking to inform policy, should try to capture all the ripples from one behavior to the next when a pebble of intervention is thrown in the pond, and not just at the immediate behavioral splash it makes.

© 2014 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

## Contents

1.  Introduction .................................................................................................. 2
2.  Behavioral spillovers ...................................................................................... 2
3.  Promoting spillovers ....................................................................................... 6
4.  Permitting spillovers ....................................................................................... 7
5.  Purging spillovers........................................................................................... 8
6.  Facilitating conditions for promoting, permitting, and purging spillovers ............................... 8

* Corresponding author at: Department of Social Policy, Behavioral Research Lab, LSE Health, London School of Economics, Houghton Street, G09 Cowdray House, WC2A2AE London, UK. Tel.: +44 020 7955 5386.
   *E-mail address:* m.m.galizzi@lse.ac.uk (M.M. Galizzi).

http://dx.doi.org/10.1016/j.joep.2014.12.003
0167-4870/© 2014 The Authors. Published by Elsevier B.V.
This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*

7. Future directions and challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## 1. Introduction

Policymakers have begun taking seriously the results of behavioral research (Camerer, 1999; Camerer, Issacharoff, Loewenstein, O'Donoghue, & Rabin, 2003; Congdon, Kling, & Mullainathan, 2011; Dolan et al., 2011; Shafir, 2012; Sunstein, 2011; Thaler & Sunstein, 2003). This trend is to be welcomed but the various discussions of the evidence are typically made in 'behavioral silos', focusing on one specific behavioral response at a time (Thøgersen, 1999a). Yet no behavior sits in a vacuum and we need to consider the possible spillover effects from one behavioral response to the next.

Imagine an intervention that successfully reduces energy consumption in the home, e.g. by installing LED light bulbs, but that has the spillover effect of increasing energy use elsewhere, e.g. through leaving more lights on at work. Some or all of the benefits from the reduction in $CO_2$ emissions could be lost (Gillingham, Kotchen, Rapson, & Wagner, 2013; Jacobsen, Kotchen, & Vandenbergh, 2012; Thøgersen & Crompton, 2009; Tiefenbeck, Staake, Roth, & Sachs, 2013). To inform policy, we should ideally capture all ripples of behavior when a pebble of intervention is thrown in the pond. The '*mapping of these ripples is now one of the most exciting pursuits in psychological research*' (Kahneman, 2011, p.53).

## 2. Behavioral spillovers

We propose a conceptual frame within which a broad range of 'behavioral spillovers' (Thøgersen, 1999a) can be systematically interpreted when applying behavioral science to policy challenges. Our framework is based on three building blocks.

First, we begin by assuming that two *different* behaviors take place sequentially: *behavior 1* is followed by *behavior 2*. This differentiates the analysis of behavioral spillovers from the long-established, distinct, literature on *adaptive learning*, which typically focuses on the repetition of the *same* behavior over time (e.g. learning in repeated games, as opposed to playing one-shot games, Fudenberg & Levine, 1998; Goeree & Holt, 2001; Vega-Redondo, 1996).

The typical situation we have in mind is a sequence of two different behaviors where *behavior 1* is the target of an intervention. An intervention is defined broadly here: it could be a policy intervention by a public decision-maker, or an experimental manipulation by a researcher. Implicitly, the following discussion is conducted on the presumption that we can compare a 'treatment' case where *behavior 1* is targeted by an intervention with a 'control' group where there is no intervention. What we would like to emphasize, however, is that the key focus of our interest here is what happens to *behavior 2* as the consequence of the intervention.

It is not uncommon, in fact, to find studies in the economics and psychology literatures where it is looked at when and how a policy intervention could '*backfire*' in the sense of having unintended compensatory or offsetting effects with respect to the ones originally envisaged by the decision-maker (e.g. Schultz, Nolan, Cialdini, Goldstein, & Griskevicius, 2007). For instance, for interventions in the context of risk and safety (e.g. seat belts in cars), the theories of *risk compensation*, *risk homeostasis*, or *behavioral adaptation* have since long argued that people can adjust their behavior in response to the perceived level of risk (Asch, Levy, Shea, & Bodenhorn, 1991; Bhattacharyya & Layton, 1979; Cohen & Einav, 2003; Evans & Graham, 1991; Garbacz, 1990a, 1990b, 1991, 1992; Peltzman, 1975; Rudin-Brown & Jamson, 2013; Schoemaker, 1993; Viscusi & Cavallo, 1994; Wilde, 1982a, 1982b, 1998; Wilde, Robertson, & Pless, 2002). This is an interesting but distinct question, the difference with our focus here being that those analyses typically look at the impact of the intervention on the *same* behavior originally targeted, not at what happens to *another* behavior occurring later on.

To narrow further down the scope of our analysis, we exclude from our remit two types of 'interventions' that deserve separate investigation. The first one refers to all those situations where *behavior 1* is not conceptually distinguishable from the intervention itself. Some archetypical examples of these situations refer to the literature on *priming* (Bargh, 1990; Gollwitzer, Heckhausen, & Steller, 1990). Priming occurs unconsciously when '*the passive activation of trait categories in one situational context carried over to influence social judgments in subsequent, ostensibly unrelated contexts*' (Bargh, 2006, p.148). Among the many examples, more self-sufficient behavior was prompted by the mere presence of a pile of Monopoly notes or a screensaver with various denominations of currency (Vohs, Mead, & Goode, 2006), whereas more cooperative, or competitive, behavior was prompted by the mere presence of a backpack, or a briefcase, respectively (Kay, Wheeler, Bargh, & Ross, 2004). As another 'ideomotor' example, subjects shown pictures of a library spoke more quietly thereafter than subjects shown pictures of a railway station (Aarts & Dijksterhuis, 2003).

While in all these situations, the intervention clearly affects a subsequent behavior, it is also clear that '*behavior 1*' consists of the mere exposure to the priming manipulation itself which, more often than not, is a subliminal presentation of words or images. In other words, rather than a triplet '*intervention – behavior 1 – behavior 2*' most priming situations consist of a manipulation and *a single* behavior.

The second area excluded from our analysis pertains to *price mechanisms* and financial incentives. For instance, the overall use of energy can increase in response to an environmental policy intervention that results in lower costs of the energy. We

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*    3

do not see this effect as a 'behavioral spillover', though: it is merely a market adjustment to a relative price change, similarly to many other 'rebound' effects commonly referred to as '*Jevons paradoxes*' (Alcott, 2005; Jevons, 1866).

Analogously, the economic and psychology literature on *financial incentives* has since long highlighted the '*hidden costs*' of incentives (Fehr & List, 2004), including crowding out of intrinsic motivation (Deci, Koestner, & Ryan, 1999; Frey & Oberholzer-Gee, 1997); changing social norms or individual beliefs about social norms (Gneezy & Rustichini, 2000a, 2000b; Heyman & Ariely, 2004); interacting in unpredictable ways with reciprocity, reputation, and social comparison concerns (Ariely, Bracha, & Meier, 2009; Dur, Non, & Roelfsema, 2010; Fehr & Gachter, 1997; Gachter & Thoni, 2010; Greiner, Ockenfels, & Werner, 2011; Rigdon, 2009); and 'choking' due to the anxiety aroused by relating payment to performance (Ariely, Gneezy, Loewenstein, & Mazar, 2009). In such cases, incentives may '*backfire*', in that they result in the opposite effects to the ones originally envisaged (Bénabou & Tirole, 2003, 2006; Fehr & Falk, 2002; Kamenica, 2012). The focus of such 'unintended consequences' of financial incentives, however, has mainly been on the *same* behavior originally targeted by the incentive. With few exceptions (e.g. Al-Ubaydli, Andersen, Gneezy, & List, in press; Dolan & Galizzi, 2014), this stream of literature has not looked at the spillover effects that incentives may have on behaviors *other* than the one directly targeted. For the same reasons highlighted above about the studies on risk compensation and price adjustments, we thus exclude the literature on financial incentives from our analysis, and reiterate that our core interest here is on what happens to *behavior 2* after the intervention.

The second building block of our conceptual framework is that we assume that the two subsequent behaviors are linked, at a conscious or unconscious level, by some underlying *motive*. With motives here we mean a broadly intended range of factors that drive behavior (Bargh & Barndollar, 1996). When behaviors occur under conscious deliberation and individuals are fully aware of their *preferences*, the motive can be represented as the argument of a standard utility function, as typically postulated in traditional economics models.

More generally, motives can also be conceptualized as *deep preferences*, '*self-defining*' or '*identity goals*' (Wicklund & Gollwitzer, 1981, 1982), or '*long-term goals, major affiliations, and basic values*' (Baumeister, 1986): individuals may at times be uncertain over these motives, may not consciously attend to them, or may even be unaware of them, because, for instance, of imperfect recall, or because distracted by other more salient or tempting options (Aarts & Dijksterhuis, 2000; Akerlof & Kranton, 2000; Bargh & Barndollar, 1996; Bargh, Gollwitzer, Lee-Chai, Barndollar, & Trotschel, 2001; Bénabou & Tirole, 2006, 2011; Chartrand & Bargh, 1996; DellaVigna, 2009; Dijksterhuis & Bargh, 2001; Dijksterhuis, Bos, Nordgren, & van Baaren, 2006; Dijksterhuis & Nordgren, 2006; Gneezy, Gneezy, Riener, & Nelson, 2012; Gneezy, Imas, Brown, Nelson, & Norton, 2012; Gollwitzer, 1990; Kahneman, 2003; Kruglanski et al., 2002; Norton, 2012; Novemsky & Dhar, 2005; Trope & Fishbach, 2000).

To visualize this most general case, what we have in mind is an analytical framework such as the prominent '*Beliefs As Assets*' model for moral behavior by Bénabou and Tirole (2011), to which we refer for a full theoretical analysis. For the sake of illustration only, we report here a simplified variant of the Bénabou and Tirole (2011) model inspired by the '*general satisfaction*' idea by Frijters (2000) and Van Praag, Frijters, and Ferrer-i-Carbonell (2003), and to its extension in terms of the *Adaptive Global Utility Model* (*AGUM*) by Bradford and Dolan (2010).

In our setting, we imagine that an individual derives satisfaction from $k = 1, \ldots, K$ primitive life-satisfaction 'accounts': for instance, wealth, health, career, family, morality, friendship, pleasure, purpose, political engagement, the environment, and so on. In this setting, *motives* correspond to those life satisfaction accounts, the '*deep preferences*' driving individual choices and actions. The multiplicity of motives reflects the fact that, in reality, we may hold different, possibly conflicting, identity goals simultaneously (Baumeister & Vohs, 2007; Carver, 2003; Carver & Scheier, 1998; Dhar & Simonson, 1999; Fishbach & Dhar, 2005; Kruglanski et al., 2002; Louro, Pieters, & Zeelenberg, 2007; Simon, 1967; Stroebe, Mensink, Aarts, Schut, & Kruglanski, 2008; Susewind & Hoelzl, 2014), and corresponds to the case of '*multidimensional identity*' in Bénabou and Tirole (2011).

We next imagine that $X^N$ represents the space of all possible *behavioral outcomes*. For instance, think at an outcome as a consumption bundle, an allocation of money across different destinations, or a distribution of time or effort among different activities. A specific behavioral outcome $x_i \in X^N$ is thus an observable metrics: the amount of money spent in a luxury good or donated to a charity; the hours in a day spent working, exercising, or volunteering; the number of $CO_2$ emissions. Individuals are assumed to have a, conscious or unconscious, single preference relation, $\geqslant$, which supports a one-dimensional ranking across all pair-wise comparisons of possible outcomes $(x_i, x_j) \in X^N$ where $(x_i, x_j)$ represent $N$-dimensional vectors of specific points in the overall behavioral outcomes space $X^N$.

What is more, we assume that there exists a *profile* of preference relations

$$P \equiv (\geqslant_1, \geqslant_2, \ldots, \geqslant_k) \tag{1}$$

which maps the possible outcomes $(x_i, x_j) \in X^N$ onto rankings defined over each of the $k = 1, \ldots, K$ primitive life-satisfaction 'accounts' for a specific individual. Thus, for instance, one behavioral outcome can be preferred to an alternative over a motive (e.g. pleasure, career) but not over another one (e.g. health, family).

As in the *AGUM* model, one can visualize each preference relation using functional relationships $v^k(x_i) : X^N \to R^+, \quad \forall \ k = 1, \ldots, k$, such that $v^k(x_i) \geqslant v^k(x_j)$ if and only if $x_i \geqslant_k x_j$. These functions can be rationalized as value functions of the *direct* satisfaction from a behavioral outcome for each of the $k = 1, \ldots, K$ primitive accounts, such that the single vector of outcomes $x_i$ simultaneously generates $K$ measures of direct life satisfaction. This reflects the idea that the same behavior or mean can serve more than one identity goal ('*multifinality*' in Shah, Friedman, and Kruglanski (2002)).

Importantly, besides direct satisfaction from a behavioral outcome, each motive's life satisfaction also includes indirect utility from *self-perception* or *self-image* $l^k(\cdot)$ over that same account. This reflects the idea that we may derive satisfaction not just from tangible behavioral outcomes, but also from the accumulation of signals and beliefs about our own identities (Bénabou & Tirole, 2011; Gomez-Minambres, 2012; Mazar, Amir, & Ariely, 2008; Nisan & Horenczyk, 1990; Tesser, 1988; Wicklund & Gollwitzer, 1981). For instance, in the prominent context of donations, one can derive direct utility from contributing to a public good ('*pure altruism*') but also indirectly from feeling good about the act of giving itself (e.g. the '*warm-glow*' in Andreoni (1990)). In line with the '*self-inference*' process described by Bénabou and Tirole (2011), in fact, individuals derive indirect satisfaction from signals because they may have no conscious access to their deep preferences, or because they recall their true motives and identities only imperfectly. The indirect satisfaction from self-image signals, moreover, is a key channel through which the various self-regulation mechanisms based on entitlement and justification take place (De Witt Huberts, Evers, & De Ridder, 2014; Hsee, 1995; Kivetz & Simonson, 2002; Kivetz & Zheng, 2006; Merritt, Effron, & Monin, 2010; Mukhopadhyay & Johar, 2009).

Alike in Bénabou and Tirole (2011) we imagine that the accumulation of *self-image* follows a dynamic process, where the levels of $l^k(\cdot)$ at $t = 2$ typically depends on the outcomes of behavior 1 and on the initial level of self-image in that account, that is: $l^k_{t=2} = l^k(x^k_{t-1}; l^k_{t-1})$ where $t = 1, 2$ refers to the time when behavior 1 and 2 take place respectively. This reflects the idea that self-beliefs are, to some extent, '*malleable through actions*' (Bénabou & Tirole, 2011). In what follows we assume that there are no links between self-images across different motives (e.g. '*being healthy*' and '*being green*'), but we will return to this point in Section 7.

We further imagine that the account value functions can be combined into an ultimate '*global life-satisfaction*' function as in Frijters (2000) and Van Praag et al. (2003). Alike in the *AGUM* model, one way to do it is by attaching increasing and quasi-concave weights $\omega_k(\cdot)$ to each particular life account, and, for instance, taking a linear generalized utilitarian form for the global satisfaction such as

$$U(x) = \sum_k \omega_k(\cdot) V(v^k(x), l^k(\cdot)) \tag{2}$$

The weight attached, consciously or unconsciously, to a specific life satisfaction account reflects the facts that the value of a given motive can be known only at a subconscious level (Bodner & Prelec, 2003; Fishbach, Friedman, & Kruglanski, 2003; Simon, 1967), and that at times people may even be unaware of the existence of some accounts (e.g. one may be unaware of career or family motives before getting a job, or meeting the significant other, respectively). This also reflects the idea of '*multidimensional identity*' in Bénabou and Tirole (2011), where people tradeoff between different dimensions of identity '*linked by uncertainty over their relative value*' (p.815). Equivalently, the weights attached to each life satisfaction account can be interpreted in terms of *attention* (Chabris & Simons, 2011; Dolan, 2014; Kahneman, 1973; Moskowitz, 2002), or as indicators of the cognitive '*accessibility*' of each specific construct: the higher is the weight, the more accessible is the motive (Forster, Liberman, & Higgins, 2005; Goschke & Kuhl, 1993; Higgins & King, 1981; Kruglanski, 1996; Kruglanski & Webster, 1996; Shah & Kruglanski, 2002, 2003; Srull & Wyer, 1979; Zeigarnik, 1927).

Finally, alike in the *AGUM* model, we imagine that the weights attached to each account can also change over time following a dynamic process similar to the one imagined for the self-images. In particular, the weight of motive $k$ at time $t = 2$, $\omega_k(\cdot)$ typically depends on the initial level of the weight at $t = 1$, and on the outcomes of behavior 1, that is $\omega^k_{t=2} = \omega^k(x^k_{t-1}; \omega^k_{t-1})$ where $t = 1, 2$ refers to the time when behavior 1 and 2 take place respectively. Here too we imagine that there are no cross-motives effects on the weights. Such a dynamics of weights readjustment does not necessarily need to be conscious or deliberate, though. Weights attached to different motives can shift as result of an unconscious reprioritization process where an unattended goal 'demands' a higher priority by '*intruding on awareness*' (Carver, 2003; Simon, 1967). For instance, not only intrusive thoughts, rumination, and dreams, but also moods, affects, and emotions can often manifest themselves as calls for reprioritizing weights across identity motives (Carver, 2003; Forster et al., 2005; Fredrickson, 1998; Isen, 1987, 2000; Isen & Simmonds, 1978; Lewin, 1951; Martin & Tesser, 1996; Simon, 1967; Tesser, Crepaz, Collins, Cornell, & Beach, 2000; Trope & Neter, 1994; Trope & Pomerantz, 1998).

In our setting, thus, having a high *motive* is the amalgamation of three main factors: enjoying direct satisfaction from the behavioral outcome ('*I have just donated £10 to a good cause*'); benefitting from the associated self-inference ('*I am a good person*'); and, consciously or unconsciously, attaching a high weight to that motive in terms of life satisfaction ('*Being a good person makes me happy*').

This conceptualization of the motives naturally lends itself to introduce the last building block of our framework, the link between behavior 1 and 2. In our framework, in fact, the first behavior leads to a subsequent behavior which, as the motive is concerned, can either work in the same direction as the first, or push back against it.

Consider the initial motive to reduce $CO_2$ emissions by cycling or car-sharing to work (Evans et al., 2013). This could lead to another behavior which also reduces emissions, e.g. by using the train instead of the airplane for domestic travel. We refer to this sequence of behaviors with concordant sign as a *promoting* spillover: the initial push to the motive promotes a further increase later on.

The same first behavior, however, might instead lead to another behavior which increases emissions, e.g. using the car more with our family. We refer to this as a *permitting* spillover: the initially increased motive permits a subsequent disengagement from the same. There is then a final class of spillovers, which we call *purging*, where the second behavior is motivated out of a, conscious or unconscious, desire to undo some of the damage caused by the first behavior. For example, we

might use the train for holidays in response to using long-haul flights for work, so that the 'environmental' motive is first undermined and then restored.

In practice, the sequence of concordant or discordant signs can be visualized referring to the observable *behavioral outcome*, while the motive's *self-image* and *weight* mainly illustrate the mechanisms linking the two behaviors. Consider these further examples.

Wearing a charity's pin today (*behavior 1*) can have a number of effects on tomorrow's charitable giving (*behavior 2*). On the one hand, it can highlight an underlying 'pro-sociality' motive of which we were previously unsure or even unaware, leading us to attach a higher weight to that account tomorrow. This more accessible motive, in turn, may lead us to deliberately maximize the direct utility from donating to a charity tomorrow, thus triggering a *promoting* behavioral spillover. Similarly, signing at the top of a tax return form before filling it out, can lead to unconsciously highlight a previously unattended 'morality' account, with the result of cheating less in the subsequent tax declaration (Shu, Mazar, Gino, Ariely, & Bazerman, 2012).

On the other hand, if the 'pro-sociality' motive has already some positive weight attached to it, today's wearing of the charity's pin can boost our self-image of 'being a do-gooder'. In turn, this can lead to *permitting* spillovers through two channels. If the utility from self-image is a, perfect or imperfect, substitute for the direct satisfaction from donating money, we can end up donating *less* to a charity tomorrow. Alternatively, or concurrently, having already accomplished, or attended to, the 'pro-sociality' motive today means that resources can be, consciously or unconsciously, redirected toward other accounts tomorrow, with a consequent reprioritization of weights that also leads to donate *less* to the charity tomorrow.

On the other hand, a small lie today when claiming a welfare benefit (*behavior 1*) can have various effects on tomorrow's 'moral' behavior (*behavior 2*). For instance, as long as the 'morality' motive is already accessible, today's lying can depress our self-image of 'being a good person'. In turn, this can lead to *purging* spillovers through two channels. If the disutility from a depressed self-image is a, perfect or imperfect, substitute for the direct satisfaction from paying taxes, we can cheat *less* in our tax declaration tomorrow in order to restore our satisfaction in that account. Alternatively, or concurrently, depressed self-image leads to a weight reprioritization that increases the accessibility of the 'morality' motive tomorrow. This heightened accessibility, in turn, may also lead us to cheat *less* in our tax declaration tomorrow.

Finally, one can also imagine cases of *all-negative promoting* spillovers. For instance, lying to claim a welfare benefit today can compress or temporarily 'shut down' the underlying 'morality' motive, leading us to no longer attach any weight to that account of life satisfaction tomorrow. This reduced accessibility, in turn, may lead us to cheat *more* in the tax declaration tomorrow under the presumption that our moral identity 'has already gone', thus triggering a 'downward spiral' all-negative promoting spillover.

Fig. 1 illustrates some further possible examples of promoting, permitting, and purging spillovers in the context of *health* behavior.

Our tri-partition of behavioral spillovers is thus in line with the well-established distinctions in psychology between *consistency* (assimilation) and *contrast* (compensatory) behavior (Bargh et al., 2001; Bem, 1972; Cialdini, Trost, & Newsom, 1995; Conway & Peetz, 2012; Cooper & Fazio, 1984; Dijksterhuis & Bargh, 2001; Dijksterhuis et al., 1998; Festinger, 1957; Gneezy, Imas et al., 2012; Liberman, Forster, & Higgins, 2007; Mussweiler, 2003; Norton, 2012; Schwarz & Bless, 2005); and between *reinforcing* (highlighting) and *compensating* (balancing) self-regulatory dynamics (Baumeister, Heatherton, & Tice, 1994; Carver, 2003; Carver & Scheier, 1981, 1998; Dhar & Simonson, 1999; Fishbach & Choi, 2012; Fishbach & Dhar, 2005; Fishbach, Koo, & Finkelstein, in press; Fishbach & Zhang, 2008; Fishbach, Zhang, & Koo, 2009). In economics, our tri-partition echoes the distinctions between motivation *crowding-in* and *crowding-out*; *complement* and *substitution* effects; and *positive* and *negative externalities* (Bénabou & Tirole, 2003, 2006; Frey & Oberholzer-Gee, 1997; Gneezy & Rustichini, 2000a, 2000b).

Also, our tri-partition openly reckons that, when it comes to compensatory or contrast behavior, the order of discordant signs really matters (Forster, Grant, Idson, & Higgins, 2001; Truelove, Carrico, Weber, Raimi, & Vandenbergh, 2014). The psychological drivers beyond *permitting* and *purging* spillovers, in fact, are conceptually and practically very distinct. The permitting versus purging distinction, for instance, is closely in line with '*self-completion theory*' (Wicklund & Gollwitzer, 1981, 1982), which postulates that, upon achieving an identity-relevant goal, we can feel 'complete' and thus 'temper' our future identity goal strivings. Conversely, upon experiencing a failure in pursuing an identity goal, we can feel 'incomplete' and step up our goal striving. The distinction is also in line with the closely connected '*cybernetic control*', '*feedback-loop*', or '*cruise control*' model (Carver, 2003; Carver & Scheier, 1981, 1982, 1990, 1998): while after feeling a failure we

| Behavior 1 | | Behavior 2 | |
|---|---|---|---|
| | | Eat healthy | Eat Less Healthy |
| | A run after work | **Promoting** | **Permitting** |
| | | *I ran an hour, let's keep up the good work* | *I ran an hour, I deserve a big slice of cake* |
| | Sofa-sitting after work | **Purging** | **Promoting** |
| | | *I've been lazy today, best not eat so much tonight* | *I've been lazy today, so what the heck, let's have a big slice of cake* |

**Fig. 1.** Examples of promoting, permitting, and purging behavioral spillovers in health behavior.

**Fig. 2.** Main types of promoting, permitting, and purging behavioral spillovers documented in the behavioral science literatures.

typically try harder in an attempt to catch up, after experiencing a progress in excess of our envisaged target we are likely to '*coast*' a little, '*not necessarily stop, but ease back*' (Carver, 2003, p. 246). In our setting, this temporary 'pull back' dynamics is one of the mechanisms explaining how 'freed up' resources can lead to reprioritize weights across motives.

All the above conceptualizations in psychology and economics have insofar proceeded along parallel streams, and our framework attempts to bring them closer together. Looking at the evidence from behavioral science through our conceptual lens, we can see that spillovers are documented extensively across a variety of fields and domains: Fig. 2 summarizes the main types of promoting, permitting, and purging spillovers.

### 3. Promoting spillovers

The two archetypical promoting spillovers are the *cognitive dissonance* (Bem, 1972; Festinger, 1957; Festinger & Carlsmith, 1959) and the *foot-in-the-door* effects (Burger, 1999; Freedman & Fraser, 1966; Pliner, Hart, Kohl, & Saari, 1974). What they have in common is that both essentially count on a *preference for consistency* (Alberracin & Wyler, 2000; Cialdini, 1984; Cialdini et al., 1995): we tend to behave consistently with our prior actions and beliefs. So, for instance, if we have already agreed to a relatively costless request (e.g. signing a petition in favor of '*Keeping California Beautiful*'), we are more likely to agree to another more costly request (e.g. displaying a large signboard in the front lawn supporting safe driving) (Burger, 1999; Freedman & Fraser, 1966). In an all-negative analogy, if we have already rejected a highly demanding initial request, we are less willing to grant a smaller request later on (DeJong, 1979).

In some ways analogous to von Heisenberg's *uncertainty principle* in physics, the *intention-behavior effect* posits that the mere measurement of intention can have an influence on subsequent behavior (Morwitz & Fitzsimons, 2004; Morwitz, Johnson, & Schmittlein, 1993). Simply asking people whether they intended to vote increased their actual participation in the following day's elections, whereas merely measuring purchasing intention led to higher purchases of PCs or cars (Fitzsimons & Morwitz, 1996).

Similarly, in *question-behavior* and *survey effects*, the mere fact of answering hypothetical questions or being surveyed can remind subjects of a motive not previously attended to (Fitzsimons & Moore, 2008; Fitzsimons & Shiv, 2001; Fitzsimons & Williams, 2000; Levav & Fitzsimons, 2006; Moore, Neal, Fitzsimons, & Shiv, 2012). Households assigned to more frequent health surveys, one year later had higher levels of chlorine in their stored drinking water, or were more likely to take up health insurance (Zwane & et al., 2011). Consumers who, during a door-to-door survey, were asked to imagine themselves subscribing to cable TV, few months later were more likely to actually subscribe to it than neighbors who just received information about the service (Gregory, Cialdini, & Carpenter, 1982).

*Rationality crossovers* promote the use of economic rationality from a behavior occurring in market-like settings (e.g. a choice between two lotteries in presence of arbitrage), to a subsequent behavior taking place in the absence of financial incentives (e.g. non-market valuation of willingness to pay) (Cherry, Crocker, & Shogren, 2003; Cherry & Shogren, 2007). Similar forms of *extrapolation* have been documented by experimental economists looking at the links between the lab and the field (Harrison & List, 2004; Levitt & List, 2007a, 2007b; Levitt, List, & Reiley, 2010). Successful skills and heuristics evolved in some familiar situations carryover to other similar field or lab settings: for instance, experienced sports-cards dealers did not fall prey to the typical winner's curse in a lab auction (Harrison & List, 2008), whereas professional football players played more equilibrium strategies than students in laboratory coordination games (Palacios-Huerta & Volji, 2008). These

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*          7

rationality crossovers are conceptually close to some of the *semantic* or *procedural priming* effects documented in the psychology literature (Forster, Liberman, & Friedman, 2007; Gollwitzer et al., 1990; Kruglanski et al., 2002; Neely, 1977).

Experiments in game theory have found that playing a sequence of two different strategic games is not the same of playing one of the games in isolation (Knez & Camerer, 2000). Two distinct *cross-games spillovers* can occur, both of which are essentially promoting spillovers (Bednar, Chen, Liu, & Page, 2012). First, players can learn about the structural properties of a game and transfer this knowledge to another game, e.g. whether the game is a coordination game (*structural learning*, *cross-games learning*: Cooper & Kagel, 2003; Huck, Jehiel, & Rutter, 2011; Mengel & Sciubba, 2010). Second, when playing a game, subjects can resort to cognitive or behavioral heuristics developed while playing *another* game (Bednar et al., 2012). If subjects had previously bid more aggressively in an auction, they next tended to contribute less in a subsequent public good game (Cason & Gangadharan, 2013; Cason, Savikhin, & Sheremeta, 2012; Savikhin & Sheremeta, 2013). Low donors to a charity cooperated less in a subsequent, unrelated, prisoners' dilemma game (Albert, Guth, Kirchler, & Maciejkovsy, 2007). Players managed to coordinate their moves more efficiently in a game if they had previously played another game in which they had experienced efficient coordination (*precedent*: Knez & Camerer, 2000) (Ahn, Ostrom, Schmidt, Shupp, & Walker, 2001; Devetag, 2005; Knez & Camerer, 2000). If subjects had played a structurally similar (different) game before, they were quicker (slower) to achieve equilibrium in another game (Grimm & Mengel, 2012).

*Carryover effects of emotions* and *self-herding* suggest that incidental emotions not only directly affect decisions at an unconscious level, but also indirectly spillover on other subsequent choices and actions taking place long after the initial emotional experience (Harlé & Sanfey, 2007; Lerner, Small, & Loewenstein, 2004). This is because, when we look back to our initial behavior, we tend to misattribute it to some of our deep preferences rather than to a fleeting emotion, and we choose our subsequent actions to follow suit the same inferred path (Andrade & Ariely, 2009). For instance, subjects who first watched a video that induced anger were not only more likely to reject unfair offers in a following, unrelated, ultimatum game than subjects who watched a happy video; but also made fairer offers to their partners in a subsequent dictator game, and even in a second ultimatum game where they acted as proposers (Andrade & Ariely, 2009). Conceptually similar is the already discussed *self-signaling* or *self-inference* tendency (Bénabou & Tirole, 2011; Gneezy, Gneezy et al., 2012). For instance, wearing counterfeit sunglasses can send a self-signal that we are cheaters, which can then lead us to actually cheat more when reporting our performance in a math puzzle task (Gino, Norton, & Ariely, 2010).

According to the *what-the-hell* effect, another all-negative promoting spillover, once individuals decide upon a course of behavior that is inconsistent with a motive (a diet), they are less likely to take the middle ground (low fat cookie) and more likely to exacerbate their failure to behave in line with the motive (eating the whole bag of cookies) (Herman & Mack, 1975; Herman & Polivy, 2010; Urbszat, Herman, & Polivy, 2002). Similar *abstinence violation* effects have been documented among alcoholics (Collins & Lapp, 1991), smokers (Shiffman et al., 1996), and drug users (Stephens & Curtin, 1994).

## 4. Permitting spillovers

*Ego depletion* is perhaps the 'classic' case of *permitting* spillovers: after having exerted high levels of self-control or effort in the first behavior, the same subject exerts lower levels of effort or self-control in the second behavior. Having resisted the temptation of indulging in sweets, or stifled emotions in emotion-arousing movies, subjects gave up earlier in impossible-to-solve puzzles (Baumeister, Bratslavsky, Muraven, & Tice, 1998). Having completed a difficult puzzle, subjects were more likely to cheat on their performance in an ostensibly unrelated task (Mead, Baumeister, Gino, Schweitzer, & Ariely, 2009). Ego depletion has physiological roots, in that to exert self-control we draw from a limited pool of mental energy: physical, but also mental activities consume energy that is converted from glucose into neurotransmitters (Baumeister & Vohs, 2007; Baumeister, Vohs, & Tice, 2007; Gailliot et al., 2007).

*Moral licensing* is a *permitting* spillover where, after having done 'well' in behavior 1, we act as if we have earned the moral entitlement to reward ourselves in behavior 2. Using the metaphor of a 'moral bank account', good deeds establish moral credits that can be withdrawn to purchase the right to undertake 'bad' actions. Subjects who, in a hypothetical choice to appoint a manifestly better candidate for a job, had the chance to establish they were not racist or sexist, were more likely to make prejudiced choices in a subsequent harder hiring decision (Monin & Miller, 2001). Subjects who said they were endorsing Obama in political elections, then allocated money to a charity fighting poverty in a white rather than in a black neighborhood (Effron, Cameron, & Monin, 2009). Advisors who disclosed their conflict of interest to advisees provided more biased advices (Cain, Loewenstein, & Moore, 2005). Subjects who first imagined teaching homeless children were less likely to donate to a local charity part of the experimental earnings, and made more frivolous purchases afterwards (Khan & Dhar, 2006; Strahilevitz & Myers, 1998).

Other related 'permitting' spillovers are the *resting on laurels effect*, by which seeing a progress as a sub-goal makes us spending less effort toward the final goal (Amir & Ariely, 2008); the *single-action bias*, by which an initial motive-directed action induces the impression that no further action is needed, even when is actually beneficial (Weber, 1997); the *reverse foot-in-the-door* effect, by which having said 'yes' to a request (e.g. signing a petition in favor of greater government aid for the homeless) leads to say 'no' to another request later on (e.g. volunteering to help at a canned food drive for the homeless) (Guadagno, Asher, Demaine, & Cialdini, 2001); and the already mentioned '*coasting*' tendency, by which after having exceeded our target rate of progress, we typically 'ease back' subsequent effort for the same motive (Carver, 2003).

## 5. Purging spillovers

*Moral cleansing* (or '*Lady Macbeth effect*') is the reverse of licensing: a *purging* spillover where, after having done 'badly', we act as if we need to restore our integrity. Subjects who hand-copied a story describing in the first person an unethical act, manifested higher desirability of cleansing products over neutral items, and, when offered the choice between an antiseptic wipe and a pencil, were more likely to take the antiseptic wipe (Zhong & Liljenquist, 2006). Participants who recalled a past unethical deed but also had cleansed their hands with an antiseptic wipe volunteered less to help out a colleague (Zhong & Liljenquist, 2006). Subjects who first hand-wrote a story using words for negative traits gave more to a local charity (Sachdeva, Iliev, & Medin, 2009), while participants who were induced to lie to a fictitious person on the phone, preferred mouthwash over soap, whereas the opposite held for subjects induced to lie in an email (Lee & Schwarz, 2010).

Similarly, the *conscience accounting* effect posits that people who have earned a given payoff by lying or stealing are more likely to donate to a charity than subjects who have earned the same amount without deceiving: anticipating this, subjects lied more when they knew that there would be an opportunity to donate immediately afterwards (Gneezy, Imas, & Madarasz, in press).

Other 'purging' spillovers related to moral cleansing are the *transgression-compliance* effect and the *negative state relief* by which, after that our personal values or moods (respectively) are affected by a negative state, we tend to act more altruistically in the attempt to restore them (Carlsmith & Gross, 1969; Manucia, Baumann, & Cialdini, 1984). Subjects led to believe that they had harmed someone else, were then more likely to comply with a request or to help a third person when given the opportunity (Manucia et al., 1984). Subjects with artificially 'lowered' mood but who also received an unexpected gratifying praise, however, no longer had to act altruistically to restore their mood (Manucia et al., 1984).

The *moral balancing* and *self-concept maintenance* effects share the same 'compensatory ethics' idea of both moral licensing and cleansing (Zhong, Ku, Lount, & Murnighan, 2010), and posit that people who think highly of themselves in terms of honesty behave dishonestly only to the extent to which they can retain their positive views of themselves (Mazar et al., 2008; Nisan & Horenczyk, 1990): when given the possibility to cheat on their payments with no consequences, subjects cheated only about 20 percent of the maximal possible amount they could get away with (Mazar et al., 2008).

## 6. Facilitating conditions for promoting, permitting, and purging spillovers

Spillovers from one behavior to the next could thus lead to either amplify or offset the initial intervention effect on the motive. From both the research and the policy perspective it seems imperative to explore under which conditions behavioral spillovers are more likely to manifest themselves as promoting, permitting, or purging: when is an initial nudge likely to feed into a further push to the motive, and when instead into a push-back?

There is, surprisingly, relatively little systematic research on this key point (Fishbach et al., in press; Susewind & Hoelzl, 2014). Mazar and Zhong (2010), for instance, explicitly compare *priming* and *licensing* effects. Subjects who previously were merely exposed to a store selling green items, then, in an ostensibly unrelated dictator game, shared more money than those who were exposed to a conventional store. This pattern, however, completely reversed when subjects selected products to purchase: participants who had purchased in the green store shared *less* money in the dictator game than those who had purchased in the conventional store.

Looking more broadly at the various literatures in the behavioral science, it is possible to identify at least five main streams of research that have looked at the boundary conditions that facilitate the occurrence of promoting, permitting, and purging spillovers. They focus, respectively, on: (i) the relative costs of behavior 1; (ii) the completeness of behavior 1 and its interaction with the focus of attention; (iii) the concreteness and the (temporal or spatial) proximity of behaviors 1 and 2; (iv) the trade-offs between different motives, or between a motive and a resource; and, finally, (v) the cognitive mindset during the two behaviors. In what follows we try to distill and summarize the state-of-the-art evidence from those streams of literature.

On (i), Gneezy, Imas et al. (2012) explicitly investigate the role of different costs of behavior 1 on the type of spillover. They find that subjects who donated part of their own earnings to a charity were less likely to deceive their counterpart in a subsequent sender–receiver game, while subjects who participated into a costless charitable donation were *more* likely to lie. This suggests that permitting spillovers are more likely over promoting when the costs of behavior 1 are low. High costs, in fact, self-signal the commitment toward the motive in question. Dolan and Galizzi (2014) link these findings to the distinct literature on financial incentives in health: they focus on whether incentives targeting one health behavior (physical exercise) spillover to another non-targeted health behavior (healthy eating), and find that spillovers are more likely to manifest themselves as permitting when the incentives associated to behavior 1 significantly outdo its costs. Relatedly, and in line with *counter-attitudinal advocacy*, promoting spillovers are less likely to occur when we can attribute our behavior 1 to an external cause, such as being paid or coerced to do something (Pittman, 1975; Zanna & Cooper, 1974). The different overall costs of behavior 1 can also explain why in some situations encountering and resisting a temptation can automatically activate the weight attached to a motive and thus lead to promoting spillovers, as postulated by *counteractive control theory* (Fishbach et al., 2003; Kroese, Evers, & De Ridder, 2009, 2011), while in other occasions it can trigger permitting spillovers through the activation of *justification* and *entitlement* feelings (De Witt Huberts et al., 2014; Hsee, 1995; Kivetz & Simonson, 2002; Kivetz & Zheng, 2006; Merritt et al., 2010; Mukhopadhyay & Johar, 2009). The literatures on justification

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*    9

and entitlement, in fact, show that what matters for self-regulatory dynamics are *perceived* costs and efforts, rather than their actual levels (Clarkson, Hirt, Jia, & Alexander, 2010; De Witt Huberts, Evers, & De Ridder, 2012; Kivetz & Zheng, 2006; Werle, Wansink, & Payne, 2011).

On (ii), Fishbach et al. (in press) argue that permitting spillovers are more likely over promoting when, while pursuing a goal, individuals focus on completed, rather than missing, actions. This is because, generally, missing actions increase motivation by self-signaling a need for progress. This, however, depends on the underlying motive and focus of attention (Marsh, Hicks, & Bink, 1998). Similarly to what discussed above, Fishbach and Dhar (2005) argue that what really matters is the *perception* of progress rather than its objective level. Attention to completed actions, in fact, signals personal commitment and increases motivation when we are not yet committed to our goals, while attention to missing actions signals a need to progress and increases motivation when we are already committed.

Fishbach et al. (in press) observe that this combines with the so-called '*goal-gradient hypothesis*': regardless of the focus of attention, motivation increases with proximity to a goal's end state (Brown, 1948; Forster, Higgins, & Idson, 1998; Hull, 1932; Kivetz, Urminsky, & Zheng, 2006). For instance, consumers in a coffee-shop's '*buy 10, get 1 free*' program (a song-rating website) accelerate their purchases (site visits) as they get closer to the final reward (Kivetz et al., 2006). A simple psychophysical explanation of the *goal-gradient* effect is that '*the last action accomplishes 100% of the remaining progress, which is twice the impact of the second-to-last action*' (Fishbach et al., in press, p. 39). Using a similar psychophysical argument, Fishbach et al. (in press) observe that, when striving toward a goal, we are more motivated when we focus on whichever is smaller in size between the completed and the missing actions. According to this '*small-area hypothesis*', at the beginning of goal pursuit, when our commitment is typically low, the focus on completed actions increases motivation by signaling commitment, while later on, beyond the midpoint, the focus on remaining actions increases motivation by self-signaling need to progress (Fishbach et al., in press). This potential mechanism for promoting spillovers would also explain why motivation is typically lower in the middle of goal pursuit, a phenomenon known as '*stuck in the middle*' (Bonezzi, Brendl, & De Angelis, 2011).

On (iii), Conway and Peetz (2012) find that permitting spillovers are more likely over promoting when we visualize behavior 1 in a concrete and tangible fashion. This is because abstract construals tend to activate self-identity considerations, while concrete constructs may activate self-regulatory or compensatory mindsets (Trope & Liberman, 2003). For instance, subjects who were asked to describe how they would perform a '*fair, friendly, generous*' behavior donated less money to a charity than subjects who described how they would perform an '*unfair, unfriendly, greedy*' behavior, whereas no difference was found for subjects discussing what those traits would mean for their personality. Similarly, subjects who were asked to make concrete plans to exercise later that day, consumed more sweet snacks in a subsequent tasting test than control subjects who only wrote abstract statements (Kronick & Knauper, 2010). Coherently with the idea that distal events are perceived in a more abstract way, while temporally proximate events are perceived more concretely (Liberman, Sagristano, & Trope, 2002; Trope & Liberman, 2003), the same pattern emerged when concreteness was manipulated in terms of recalling deeds '*within the past week*' (concrete), as opposed to '*over one year ago*' (abstract). Similarly, Fishbach and Zhang (2005) find that permitting spillovers are more likely over promoting when in each behavior the two options (e.g. healthy and unhealthy food items) are physically presented together, and they seem to complement each other. Conversely, promoting spillovers are more likely to occur when the two options appear spatially apart, and seem to compete against each other.

On (iv), Dhar and Simonson (1999) propose that promoting spillovers are more likely in situations where each behavior involves a trade-off between a motive (e.g. pleasure) and a resource (e.g. money): for instance, after having chosen a tasty, expensive entrée over a less tasty, less expensive entrée, we are more likely to choose a tasty, expensive main course over a less tasty, less expensive one. Permitting spillovers, however, are more likely to occur in situations where each behavior involves a trade-off between two motives (e.g. pleasure and health): for instance, after having chosen a healthy entrée over a tasty one, we are more likely to prefer a tasty, over a healthy, main course.

On (v), Cornelissen, Bashshur, Rode, and Le Menestrel (2013) argue that permitting spillovers are more likely over promoting when we are in an outcome-based mindset rather than a rule-based mindset. The reason is that in an outcome-based (consequentialist) mindset we appraise the consequences of each behavioral alternative both for ourselves and for the others involved, allowing us to be relatively flexible when trading off different motives. Moral rules, at the contrary, do not naturally lend themselves to such trade-offs, because 'a rule is a rule'. They find that subjects who recalled a past episode that they thought was ethical '*because it benefitted other people*' (outcome-based mindset) cheated more in their payments than subjects who recalled a past episode that was unethical '*because it hurt other people*'. In contrast, subjects asked to recall a past episode that was ethical because they did their '*duty to follow an ethical norm or principle*' (rule-based mindset) cheated less in their payments than subjects who recalled a past episode that was unethical because they did not their duty.

More broadly, it should be noted that exploring under which conditions spillovers are most likely to be promoting, permitting, or purging, is a necessary but not a sufficient condition to be able to draw conclusions on the overall effect of a sequence of behaviors. Both researchers and policy-makers, in fact, would typically be interested also in quantifying the relative magnitude of behavioral spillovers. There is virtually no evidence at date, in the lab nor in the field, from systematically testing head-to-head two or more types of spillovers, with the objective of measuring their relative strength, magnitude, and persistence over time. Quantifying the magnitude of permitting and purging spillovers, in particular, is imperative in order to disentangle 'rebound' from 'backfire' (or 'boomerang') effects (Gillingham et al., 2013; Goeschl & Perino, 2009; Jacobsen et al., 2012; Jenkins, Nordhaus, & Shellenberger, 2011): although the two terms are often used interchangeably, from a policy

perspective it is crucial to conceptually distinguish when the net effect of the two behaviors results in an overall increase or decrease in the behavioral outcome (Tiefenbeck et al., 2013).

## 7. Future directions and challenges

Lab and field experiments across all the behavioral sciences thus show that behaviors are history-dependent and that spillovers are pervasive. From the methodological perspective, this reinstates the importance of the current best practices by lab researchers of counter-balancing sequences of tasks and explicitly controlling for order effects. It is encouraging to see that field and online experiments increasingly adhere to such practices even in settings which are naturally less controllable than the lab.

Evidence shows that spillovers occur through deliberation and also unconsciously. This confirms the importance of considering a broad operational definition of behaviors and motives, consistent with the recognition of the major role of automatic, involuntary, and unconscious processes in human decisions and behavior (Aarts & Dijksterhuis, 2000; Bargh & Chartrand, 1999; Chaiken & Trope, 1999; Chartrand & Bargh, 2002; Chartrand, Huber, Shiv, & Tanner, 2008; Dijksterhuis & Nordgren, 2006; Fitzsimons et al., 2002; Kahneman, 2003, 2011; Wilson & Schooler, 1991). Our framework can be used to consider the ripple effects of sequences of behavior and not just the initial splash from the first behavioral response. As such, it provides the glue that can help to hold together our understanding of the conscious and unconscious spillovers from one behavior to the next. It also provides a useful lexicon for researchers and policy decision-makers from different fields and perspectives.

From a research and policy perspective, we should abandon 'behavioral silos' and 'sector-thinking' (Thøgersen, 1999a). The impact of a policy intervention can be greatly enhanced in presence of promoting spillovers, but it can also be severely hindered, or completely jeopardized, by the occurrence of permitting effects. And this is to further disregard the possible role of purging spillovers as potential levers to trigger envisaged changes in behavior.

There are a number of outstanding issues. Most of the evidence to date documents the occurrence of spillovers within short temporal horizons. We know very little about the longevity of spillovers beyond the time frame typically considered in lab experiments (Fitzsimons & Morwitz, 1996; Gregory et al., 1982; Tiefenbeck et al., 2013; Zwane et al., 2011). The design of field experiments in naturalistic settings is practically challenging if one really wants to map all possible ramifications of a behavior. This gap in the evidence calls for a further integration of longitudinal surveys and experimental methods in behavioral science, and for higher efforts to link experiments, administrative records, and 'big data' that are already available (Dolan & Galizzi, in press).

Future efforts should also be directed toward understanding the contexts and domains under which spillovers are most likely to take place. Most of the evidence at date, in fact, considers spillovers occurring within the same domain, such as environmental behavior (Evans et al., 2013; Jacobsen et al., 2012; Lanzini & Thøgersen, 2014; Poortinga, Whitmarsh, & Suffolk, 2013; Thøgersen, 1999a, 1999b; Thøgersen & Crompton, 2009; Thøgersen & Olander, 2003; Tiefenbeck et al., 2013); prosocial behavior (Brañas-Garza, Bucheli, Espinosa, & Garcia-Muñoz, 2013; Cornelissen et al., 2013; Effron, Miller, & Monin, 2012; Gneezy, Imas et al., 2012; Gneezy et al., in press; Jordan, Mullen, & Murnighan, 2011; Merritt et al., 2010, 2012; Norton, 2012; Ploner & Regner, 2013; Zhong & Liljenquist, 2006); or health behavior (Chiou, Wan, Wu, & Lee, 2011; Chiou, Yang, & Wan, 2011; De Witt Huberts et al., 2012; Dolan & Galizzi, in press; Effron, Monin, & Miller, 2013; Epstein, Dearing, Roba, & Finkelstein, 2010; Kroese et al., 2009, 2011; Van Kleef, Shimizu, & Wansink, 2011; Werle, Wansink, & Payne, 2010; Wilcox, Vallen, Block, & Fitzsimons, 2009; Wisdom, Downs, & Loewenstein, 2010).

There is little evidence on whether spillovers can occur across different domains, and whether such cross-domains spillovers are most likely to be promoting, permitting, or purging (Baird, Garfein, McIntosh, & Özler, 2012; Khan & Dhar, 2006; Mazar & Zhong, 2010; Sachdeva et al., 2009). Conceptually, such spillovers can be visualized as cross-motives links between self-images ('*I am healthy and environment-friendly*'), accounts weights ('*what makes me happy is working hard and being a good father*') or both. From the policy perspective, a comprehensive mapping of the links between behaviors, contexts, and domains will illuminate not only *which* areas to target to induce behavior change, but also *where* to start from (Thøgersen, 1999a). For example, does more responsible behavior at school feed into healthier choices, or what happens if we start by 'nudging' healthy behavior instead?

Evidence is also missing on whether behavioral spillovers are only related to specific contexts, domains, and situations, or whether they are also explained by differences across people, such as personality, cognitive skills, and socio-economic conditions (Borghans, Duckworth, Heckman, & ter Weel, 2008; Heckman, 2007a, 2007b; Heckman & Rubistein, 2001).

We should finally seek to better understand the neuro-physiological roots of behavioral spillovers. Research in neuroscience has substantially advanced our current understanding of the neural correlates of human decision-making and behavior (Camerer, Loewenstein, & Prelec, 2005; Glimcher, Fehr, Camerer, & Poldrack, 2008). The forthcoming efforts to thoroughly map the human brain will provide precious insights on how the numerous ripples documented here might spread through the complex network of our mind.

Notwithstanding these open questions, the time seems ripe to explicitly account for the pervasive impact of behavioral spillovers. Behavioral scientists, especially those seeking to inform policy, should try to capture all the ripples when a pebble of intervention is thrown in the pond, and not just the immediate splash it makes.

### Acknowledgments

The project was funded by the Centre for the Study of Incentives in Health (CSIH), from a strategic award from the Wellcome Trust Biomedical Ethics Programme (PI Marteau: 086031/Z/08/Z). We gratefully acknowledge this funding. We thank the Editor and two anonymous referees for excellent comments and suggestions that have substantially improved the article. We also thank our colleagues at CSIH, Alex Imas, Heather Kappes, Natasha Perkins, and the participants at seminars at Aberdeen, Cologne, and LSE for helpful comments and suggestions.

### References

Aarts, H., & Dijksterhuis, A. (2000). Habits as knowledge structures: Automatic in goal-directed behavior. *Journal of Personality and Social Psychology, 78*, 53.

Aarts, H., & Dijksterhuis, A. (2003). The silence of the library: Environment, situational norm, and social behavior. *Journal of Personality and Social Psychology, 84*, 18–28.

Ahn, T. K., Ostrom, E., Schmidt, D., Shupp, R., & Walker, J. (2001). Cooperation in PD games: Fear, greed, and history of play. *Public Choice, 106*, 137–155.

Akerlof, G. A., & Kranton, R. A. (2000). Economics and identity. *Quarterly Journal of Economics, 105*, 715–753.

Albarracin, D., & Wyler, R. S. (2000). The cognitive impact of past behavior: Influences on beliefs, attitudes, and future behavioral decisions. *Journal of Personality and Social Psychology, 79*(1), 5–22.

Albert, M., Guth, W., Kirchler, E., & Maciejkovsy, B. (2007). Are we nicer to nicer people? An experimental analysis. *Experimental Economics, 10*, 53–69.

Alcott, B. (2005). Jevon's paradox. *Ecological Economics, 54*(1), 9–21.

Al-Ubaydli, O., Andersen, S., Gneezy, U., & List, J. A. (in press). Carrots that look like sticks: Toward an understanding of multitasking incentive schemes. *Southern Economic Journal.*

Amir, O., & Ariely, D. (2008). Resting on laurels: The effects of discrete progress markers as subgoals on task performance and preferences. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 34*(5), 1158–1171.

Andrade, E. B., & Ariely, D. (2009). The enduring impact of transient emotions on decision making. *Organizational Behavior and Human Decision Processes, 109*, 1–8.

Andreoni, J. (1990). Impure altruism and donations to public goods: A theory of warming glow giving? *Economic Journal, 100*(401), 464–477.

Ariely, D., Bracha, A., & Meier, S. (2009a). Doing good or doing well? Image motivation and monetary incentives in behaving prosocially. *American Economic Review, 99*, 544–555.

Ariely, D., Gneezy, U., Loewenstein, G., & Mazar, N. (2009b). Large stakes and big mistakes. *Review of Economic Studies, 76*, 451–469.

Asch, P., Levy, D. T., Shea, D., & Bodenhorn, H. (1991). Risk compensation and the effectiveness of safety belt use laws: A case study of New Jersey. *Policy Sciences, 24*(2), 181–197.

Baird, S. J., Garfein, R. S., McIntosh, C. T., & Özler, B. (2012). Effect of a cash transfer programme for schooling on prevalence of HIV and herpes simplex type 2 in Malawi: A cluster randomised trial. *The Lancet, 379*, 1320–1329.

Bargh, J. A. (1990). Auto-motives: Preconscious determinants of thought and behavior. In E. T. Higgins & R. M. Sorrentino  (Eds.). *Handbook of motivation and cognition: Foundations of social behavior* (Vol. 2, pp. 93–130). New York: Guildford.

Bargh, J. (2006). Agenda 2006: What have we been priming all these years? On the development, mechanisms, and ecology of nonconscious social behavior. *European Journal of Social Psychology, 36*, 147–168.

Bargh, J., & Barndollar, K. (1996). Automaticity in action: The unconscious as repository of chronic goals and motives. In P. M. Gollwitzer & J. A. Bargh (Eds.). *The psychology of action: Linking cognition and motivation to behavior* (pp. 457–481). New York: Guildford Press.

Bargh, J., & Chartrand, T. L. (1999). The unbearable automaticity of being. *American Psychologist, 54*(7), 462–479.

Bargh, J. A., Gollwitzer, P. M., Lee-Chai, A., Barndollar, K., & Trotschel, R. (2001). The automated will: Non-conscious activation and pursuit of behavioral goals. *Journal of Personality and Social Psychology, 81*, 1014–1027.

Baumeister, R. F. (1986). *Identity: Cultural change and the struggle for self.* Oxford: Oxford University Press.

Baumeister, R. F., Bratslavsky, E., Muraven, M., & Tice, D. M. (1998). Ego depletion: Is the active self a limited resource? *Journal of Personality and Social Psychology, 74*(5), 1252–1265.

Baumeister, R. F., Heatherton, T. F., & Tice, D. M. (1994). *Losing control: How and why people fail at self-regulation.* San Diego, CA: Academic Press.

Baumeister, R. F., & Vohs, K. D. (2007). Self-regulation, ego-depletion, and motivation. *Social and Personality Psychology Compass, 1*(1), 115–128.

Baumeister, R. F., Vohs, K. D., & Tice, D. M. (2007). The strength model of self-control. *Current Directions in Psychological Science, 16*, 351–355.

Bednar, J., Chen, Y., Liu, T. X., & Page, S. (2012). Behavioral spillover and cognitive load in multiple games: Experimental results. *Games and Economic Behavior, 74*, 12–31.

Bem, D. J. (1972). Self-perception theory. In L. Berkowitz  (Ed.). *Advances in experimental social psychology* (Vol. 6, pp. 1–62). New York: Academic Press.

Bénabou, R., & Tirole, J. (2003). Intrinsic and extrinsic motivation. *Review of Economic Studies, 70*(3), 489–520.

Bénabou, R., & Tirole, J. (2006). Incentives and prosocial behaviour. *American Economic Review, 96*(5), 1652–1678.

Bénabou, R., & Tirole, J. (2011). Identity, morals, and taboos: Beliefs as assets. *Quarterly Journal of Economics, 126*, 805–855.

Bhattacharyya, M. N., & Layton, A. P. (1979). Effectiveness of seat belt legislation on the Queensland road toll: An Australian case study in intervention analysis. *Journal of the American Statistical Association, 74*(367), 596–603.

Bodner, R., & Prelec, D. (2003). Self-signaling and diagnostic utility in everyday decision-making. In I. Brocas & J. Carillo  (Eds.). *The psychology of economic decisions* (Vol. 1, pp. 105–124). Oxford: Oxford University Press.

Bonezzi, A., Brendl, C. M., & De Angelis, M. (2011). Stuck in the middle: The psychophysics of goal pursuit. *Psychological Science, 22*(5), 607–612.

Borghans, L., Duckworth, A. L., Heckman, J., & ter Weel, B. (2008). The economics and psychology of personality traits. *Journal of Human Resources, 43*(4), 972–1059.

Bradford, W. D., & Dolan, P. (2010). Getting used to it: The adaptive global utility model. *Journal of Health Economics, 29*(6), 811–820.

Brañas-Garza, P., Bucheli, M., Espinosa, M. P., & Garcia-Muñoz, T. (2013). Moral cleansing and moral licensing: Experimental evidence. *Economics and Philosophy, 29*, 199–212.

Brown, J. S. (1948). Gradients of approach and avoidance responses and their relation to level of motivation. *Journal of Comparative and Physiological Psychology, 41*(6), 450–465.

Burger, J. M. (1999). The foot-in-the-door compliance procedure: A multiple-process analysis and review. *Personality and Social Psychology Review, 3*, 303–325.

Cain, D. M., Loewenstein, G., & Moore, D. A. (2005). The dirt on coming clean: Perverse effects of disclosing conflicts of interest. *Journal of Legal Studies, 34*, 1–25.

Camerer, C. (1999). Behavioral economics: Reunifying psychology and economics. *Proceedings of the National Academy of Sciences United States of America, 96*(19), 10575–10577.

Camerer, C. F., Issacharoff, S., Loewenstein, G., O'Donoghue, T., & Rabin, M. (2003). Regulation for conservatives: Behavioral economics and the case for asymmetric paternalism. *University of Pennsylvania Law Review, 1151*, 1211–1254.

Camerer, C., Loewenstein, G., & Prelec, D. (2005). Neuroeconomics: How neuroscience can inform economics. *Journal of Economic Literature, 18*, 9–64.

Carlsmith, J. M., & Gross, A. E. (1969). Some effects of guilt on compliance. *Journal of Personality and Social Psychology, 11*, 232–239.

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*

Carver, C. S. (2003). Pleasure as a sign you can attend to something else: Placing positive feelings within a general model of affect. *Cognition and Emotion, 17*, 241–261.

Carver, C. S., & Scheier, M. F. (1981). *Attention and self-regulation: A control theory approach to human behavior*. New York: Springer-Verlag.

Carver, C. S., & Scheier, M. F. (1982). Control theory: A useful conceptual framework for personality, social, clinical, and health psychology. *Psychological Bulletin, 92*, 111–135.

Carver, C. S., & Scheier, M. F. (1990). Origins and functions of positive and negative affect: A control-process view. *Psychology Review, 97*(1), 19–35.

Carver, C. S., & Scheier, M. F. (1998). *On the self-regulation of behavior*. New York: Cambridge University Press.

Cason, T. M., & Gangadharan, L. (2013). Cooperation spillovers and price competition in experimental markets. *Economic Inquiry, 51*(3), 1715–1730.

Cason, T., Savikhin, A. C., & Sheremeta, R. M. (2012). Behavioral spillovers in coordination games. *European Economics Review, 56*, 233–245.

Chabris, C., & Simons, D. (2011). *The invisible gorilla: How our intuitions deceive us*. London: Harmony.

Chaiken, S., & Trope, Y. (1999). *Dual-process theories in social psychology*. New York: Guildford Press.

Chartrand, T. J., & Bargh, J. A. (1996). Automaticity of impression formation and memorization goals. *Journal of Personality and Social Psychology, 71*, 464–478.

Chartrand, T. L., & Bargh, J. (2002). Non-conscious motivation: Their activation, operation, and consequences. In A. Tesser, D. Stapel, & J. Wood (Eds.). *Self-motivation: Emerging psychological perspectives* (Vol. 2, pp. 13–41). New York: American Psychological Association Press.

Chartrand, T., Huber, J., Shiv, B., & Tanner, R. (2008). Non-conscious goals and consumer choice. *Journal of Consumer Research, 35*, 189–201.

Cherry, T. L., Crocker, T. D., & Shogren, J. F. (2003). Rationality spillovers. *Journal of Environmental Economics and Management, 45*, 63–84.

Cherry, T. L., & Shogren, J. F. (2007). Rationality crossovers. *Journal of Economic Psychology, 28*, 261–277.

Chiou, W. B., Wan, C. S., Wu, W. H., & Lee, K. T. (2011a). A randomized experiment to examine unintended consequences of dietary supplement use among daily smokers: Taking supplements reduces self-regulation of smoking. *Addiction, 106*(12), 2221–2228.

Chiou, W. B., Yang, C. C., & Wan, C. S. (2011b). Ironic effects of dietary supplementation: Illusory invulnerability created by taking dietary supplements licenses health-risk behaviors. *Psychological Science, 22*, 1081–1086.

Cialdini, R. B. (1984). *Influence: How and why people agree to things*. New York: Morrow.

Cialdini, R. B., Trost, M. R., & Newsom, J. T. (1995). Preference for consistency: The development of a valid measure and the discovery of surprising behavioral implications. *Journal of Personality and Social Psychology, 69*, 318–328.

Clarkson, J., Hirt, E., Jia, L., & Alexander, M. (2010). When perception is more than reality: The effects of perceived versus actual resource depletion on self-regulatory behavior. *Journal of Personality and Social Psychology, 98*, 29–46.

Cohen, A., & Einav, L. (2003). The effects of mandatory seat belt laws on driving behavior and traffic fatalities. *Review of Economics and Statistics, 85*(4), 828–843.

Collins, L. R., & Lapp, W. M. (1991). Restraint and attributions: Evidence of the abstinence violation effect in alcohol consumption. *Cognitive Therapy and Research, 15*, 68–94.

Congdon, W. J., Kling, J. R., & Mullainathan, S. (2011). *Policy and choice: Public finance through the lens of behavioural economics*. New York: Brookings.

Conway, P., & Peetz, J. (2012). When does feeling moral actually make you a better person? Conceptual abstraction moderates whether past moral deeds motivate consistency or compensatory behavior. *Personality and Social Psychology Bulletin, 38*(7), 907–919.

Cooper, J., & Fazio, R. H. (1984). A new look at dissonance theory. *Advances in Experimental Social Psychology, 17*, 229–266.

Cooper, D., & Kagel, J. H. (2003). Lessons learned: Generalizing learning across games. *American Economic Review, 93*(2), 202–207.

Cornelissen, G., Bashshur, M. R., Rode, J., & Le Menestrel, M. (2013). Rules or consequences? The role of ethical mindsets in moral dynamics. *Psychological Science*.

De Witt Huberts, J. C., Evers, C., & De Ridder, D. T. D. (2012). License to sin: Self-licensing as a mechanism underlying hedonic consumption. *European Journal of Social Psychology, 42*, 490–496.

De Witt Huberts, J. C., Evers, C., & De Ridder, D. T. D. (2014). 'Because I Am Worth It': A theoretical framework and empirical review of a justification-based account if self-regulation failure. *Personality and Social Psychology Review, 18*(2), 119–138.

Deci, E. L., Koestner, R. M., & Ryan, R. (1999). A meta-analytic review of experiments examining the effect of extrinsic rewards on intrinsic motivation. *Psychological Bulletin, 125*, 627–668.

DeJong, W. (1979). An examination of self-perception mediation in the foot-in-the-door effect. *Journal of Personality and Social Psychology, 37*, 2221–2239.

DellaVigna, S. (2009). Psychology and economics: Evidence from the field. *Journal of Economic Literature, 47*, 315–372.

Devetag, G. (2005). Precedent transfer in coordination games: An experiment. *Economics Letters, 89*, 227–232.

Dhar, R., & Simonson, I. (1999). Making complementary choices in consumption episodes: Highlighting versus balancing. *Journal of Marketing Research, 36*, 29–44.

Dijksterhuis, A., & Bargh, J. A. (2001). The perception–behaviour expressway: Automatic effects of social perception on social behavior. In M. Zanna (Ed.). *Advances in experimental social psychology* (Vol. 33, pp. 1–40). San Diego, CA: Academic Press.

Dijksterhuis, A., Bos, M. W., Nordgren, L. F., & van Baaren, R. B. (2006). On making the right choice: The deliberation-without-attention effect. *Science, 311*, 1005–1007.

Dijksterhuis, A., & Nordgren, L. F. (2006). A theory of unconscious thought. *Perspectives on Psychological Science, 1*, 95–109.

Dijksterhuis, A., Spears, R., Postmes, T., Stapel, D., Koomen, W., Knippenberg, A. V., et al (1998). Seeing one thing and doing another: Contrast effects in automatic behavior. *Journal of Personality and Social Psychology, 75*, 862–871.

Dolan, P. (2014). *Happiness by design: Change what you do, not what you think*. London: Hudson Street Press.

Dolan, P., & Galizzi, M. M. (2014). Because I'm worth it. A lab-field experiment on the spillover effect of incentives in health. LSE CEP discussion paper CEPDP 1286.

Dolan, P., & Galizzi, M. M. (in press). Getting policy-makers to listen to field experiments. *Oxford Review of Economic Policy, 30*(4).

Dolan, P., Hallsworth, M., Halpern, D., King, D., Metcalfe, R., & Vlaev, I. (2011). Influencing behavior: The mindspace way. *Journal of Economic Psychology, 33*, 264–277.

Dur, R., Non, A., & Roelfsema, H. (2010). Reciprocity and incentive pay in the workplace. *Journal of Economic Psychology, 31*, 676–686.

Effron, D. A., Cameron, J. S., & Monin, B. (2009). Endorsing Obama licenses favoring whites. *Journal of Experimental Social Psychology, 45*, 590–593.

Effron, D. A., Miller, D. T., & Monin, B. (2012). Inventing racist roads not taken: The licensing effect of immoral counterfactual behaviors. *Journal of Personality and Social Psychology, 103*, 916–932.

Effron, D. A., Monin, B., & Miller, D. T. (2013). The unhealthy road not taken: Licensing indulgence by exaggerating counterfactual sins. *Journal of Experimental Social Psychology, 49*, 573–578.

Epstein, L. H., Dearing, K. K., Roba, L. G., & Finkelstein, E. (2010). The influence of taxes and subsidies on energy purchased in an experimental purchasing study. *Psychological Science*, 1–9.

Evans, W. N., & Graham, J. D. (1991). Risk reduction or risk compensation? The case of mandatory safety-belt use laws. *Journal of Risk and Uncertainty, 4*(1), 61–73.

Evans, L., Maio, G. R., Corner, A., Hodgetts, C. J., Ahmed, S., & Hahn, U. (2013). Self-interest and pro-environmental behavior. *Nature Climate Change, 3*, 122–125.

Fehr, E., & Falk, A. (2002). Psychological foundations of incentives. *European Economic Review, 46*, 687–724.

Fehr, E., & Gachter, S. (1997). Reciprocity as a contract enforcement device: Experimental evidence. *Econometrica, 65*, 833–860.

Fehr, E., & List, J. (2004). The hidden costs and returns of incentives: Trust and trustworthiness among CEOs. *Journal of the European Economic Association, 2*(5), 743–771.

Festinger, L. (1957). *A theory of cognitive dissonance*. Stanford, CA: Stanford University Press.

Festinger, L., & Carlsmith, J. M. (1959). Cognitive consequences of forced compliance. *Journal of Abnormal and Social Psychology, 58*(2), 203–210.

*P. Dolan, M.M. Galizzi / Journal of Economic Psychology 47 (2015) 1–16*                    13

Fishbach, A., & Choi, J. (2012). When thinking bout goals undermines goal pursuit. *Organizational Behavior and Human Decision Processes, 118*, 99–107.

Fishbach, A., & Dhar, R. (2005). Goals as excuses or guides: The liberating effect of perceived goal progress on choice. *Journal of Consumer Research, 32*, 370–377.

Fishbach, A., Koo, M., & Finkelstein, S. R. (in press). Motivation resulting from completed and missing actions. In Olson, J., & Zanna, M. P. (Eds.). *Advances in experimental social psychology* (Vol. 50).

Fishbach, A., Friedman, R. S., & Kruglanski, A. W. (2003). Leading us not into temptation: Momentary allurements elicit overriding goal activation. *Journal of Personality and Social Psychology, 84*, 296–309.

Fishbach, A., & Zhang, Y. (2008). Together or apart: When goals and temptations complement versus compete. *Journal of Personality and Social Psychology, 94*, 547–559.

Fishbach, A., Zhang, Y., & Koo, M. (2009). The dynamics of self-regulation. *European Review of Social Psychology, 20*, 315–344.

Fitzsimons, G., Hutchinson, J. W., Williams, P., Alba, J. W., Chartrand, T. L., Huber, J., et al (2002). Non-conscious influences on consumer choice. *Marketing Letters, 13*(3), 269–279.

Fitzsimons, G., & Moore, S. (2008). Should I ask our children about sex, drugs and Rock'n'Roll? Potentially harmful effects of asking questions about risky behaviours. *Journal of Consumer Research, 18*, 82–95.

Fitzsimons, G. J., & Morwitz, V. (1996). The effect of measuring intent on brand-level purchasing behavior. *Journal of Consumer Research, 23*, 1–11.

Fitzsimons, G. J., & Shiv, B. (2001). Non-conscious and contaminative effects of hypothetical questions on subsequent decision-making. *Journal of Consumer Research, 334*, 782–791.

Fitzsimons, G., & Williams, P. (2000). Asking questions can change choice behaviour. Does it do so automatically or effortfully? *Journal of Experimental Psychology: Applied, 6*, 195–206.

Forster, J., Grant, H., Idson, L. C., & Higgins, E. T. (2001). Success/failure, feedback, expectancies, and approach/avoidance motivation: How regulatory focus moderates classification. *Journal of Experimental Social Psychology, 37*(3), 253–260.

Forster, J., Higgins, E. T., & Idson, L. C. (1998). Approach and avoidance strength during goal attainment: Regulatory focus and the 'Goal Looms Larger' effect. *Journal of Personality and Social Psychology, 75*(5), 1115–1131.

Forster, J., Liberman, N., & Friedman, R. S. (2007). Seven principles of goal activation: a systematic approach to distinguishing goal priming from priming of non-goal constructs. *Personality and Social Psychology Review, 11*(3), 211–233.

Forster, J., Liberman, N., & Higgins, E. T. (2005). Accessibility from active and fulfilled goals. *Journal of Experimental Social Psychology, 41*, 220–239.

Fredrickson, B. L. (1998). What good are positive emotions? *Review of General Psychology, 2*, 300–319.

Freedman, J. L., & Fraser, S. C. (1966). Compliance without pressure: The foot-in-the-door technique. *Journal of Personality and Social Psychology, 4*, 195–202.

Frey, B. S., & Oberholzer-Gee, F. (1997). The cost of price incentives: An empirical analysis of motivation crowding-out. *American Economic Review, 87*(4), 746–755.

Frijters, P. (2000). Do individuals try to maximize general satisfaction? *Journal of Economic Psychology, 21*(3), 281–304.

Fudenberg, D., & Levine, D. K. (1998). *The theory of learning in games*. Cambridge, MA: MIT Press.

Gachter, S., & Thoni, C. (2010). Social comparison and performance: Experimental evidence on the fair wage-effort hypothesis. *Journal of Economic Behavior & Organization, 76*, 531–543.

Gailliot, M. T., Baumeister, R. F., DeWall, C. N., Maner, J. K., Plant, E. A., Tice, D. M., et al (2007). Self-control relies on glucose as a limited energy source: Willpower is more than a metaphor. *Journal of Personality and Social Psychology, 92*, 325–336.

Garbacz, C. (1990a). Estimating seat belt effectiveness with seat belt usage data from the Centre for Disease Control. *Economics Letters, 34*, 83–88.

Garbacz, C. (1990b). How effective is automobile safety legislation? *Applied Economics, 22*, 1705–1714.

Garbacz, C. (1991). Impact of the New Zealand seat belt law. *Economic Inquiry, 29*, 310–316.

Garbacz, C. (1992). More evidence on the effectiveness of seat belt laws. *Applied Economics, 24*, 313–315.

Gillingham, K., Kotchen, M. J., Rapson, D. S., & Wagner, G. (2013). Energy policy: The rebound effect is overplayed. *Nature, 493*, 475–476.

Gino, F., Norton, M. I., & Ariely, D. (2010). The counterfeit self. *Psychological Science, 21*(5), 712–720.

Glimcher, P. W., Fehr, E., Camerer, C., & Poldrack, R. A. (2008). *Neuroeconomics: Decision-making and the brain*. New York: Academic Press.

Gneezy, U., Imas, A., & Madarasz, K. (in press). Conscience accounting: Emotion dynamics and social behavior. *Management Science*.

Gneezy, A., Gneezy, U., Riener, G., & Nelson, L. D. (2012). Pay-what-you-want, identity, and self-signaling in markets. *Proceedings of the National Academy of Sciences United States of America, 109*(19), 7236–7240.

Gneezy, A., Imas, A., Brown, A., Nelson, L. D., & Norton, M. I. (2012). Paying to be nice: Consistency and costly prosocial behavior. *Management Science, 58*(1), 179–187.

Gneezy, U., & Rustichini, A. (2000a). Pay enough or don't pay at all. *Quarterly Journal of Economics, 115*(3), 791–810.

Gneezy, U., & Rustichini, A. (2000b). A fine is a price. *Journal of Legal Studies, 29*(1).

Goeree, J., & Holt, C. (2001). Ten little treasures of game theory and ten intuitive contradictions. *American Economic Review, 91*(5), 1402–1422.

Goeschl, T., & Perino, G. (2009). On backstops and boomerangs: Environmental R&D under technological uncertainty. *Energy Economics, 31*(5), 800–809.

Gollwitzer, P. M. (1990). Action phases and mindsets. In E. T. Higgins & R. M. Sorrentino (Eds.), *Handbook of motivation and cognition: Foundations of social behavior* (Vol. 2, pp. 53–92). New York: Guildford.

Gollwitzer, P. M., Heckhausen, H., & Steller, B. (1990). Deliberative and implemental mindsets: Cognitive tuning towards congruous thoughts and information. *Journal of Personality and Social Psychology, 59*, 1119–1127.

Gomez-Minambres, J. (2012). Motivation through goal setting. *Journal of Economic Psychology, 33*(6), 1223–1239.

Goschke, T., & Kuhl, J. (1993). Representation of intentions: Persisting activation in memory. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 19*, 1211–1226.

Gregory, W. L., Cialdini, R. B., & Carpenter, K. M. (1982). Self-relevant scenarios as mediators of likelihood estimates and compliance: Does imagining make it so? *Journal of Personality and Social Psychology, 43*, 89–99.

Greiner, B., Ockenfels, A., & Werner, P. (2011). Wage transparency and performance: A real-effort experiment. *Economics Letters, 111*, 236–238.

Grimm, V., & Mengel, F. (2012). An experiment on learning in a multiple games environment. *Journal of Economic Theory, 147*(6), 2220–2259.

Guadagno, R. E., Asher, T., Demaine, L. J., & Cialdini, R. B. (2001). When saying yes leads to saying no: Preference for consistency and the reverse foot-in-the-door effect. *Personality and Social Psychology Bulletin, 27*(7), 859–867.

Harlé, K. M., & Sanfey, A. G. (2007). Incidental sadness biases social economic decisions in the ultimatum game. *Emotion, 7*, 876–881.

Harrison, G. W., & List, J. A. (2004). Field experiments. *Journal of Economic Literature, 42*(4), 1009–1055.

Harrison, G. W., & List, J. A. (2008). Naturally occurring markets and exogenous laboratory experiments. A case study of the winner's curse. *The Economic Journal, 118*(528), 822–843.

Heckman, J. J. (2007a). The economics, technology, and neuroscience of human capability formation. *Proceedings of the National Academy of Sciences United States of America, 104*(33), 13250–13255.

Heckman, J. J. (2007b). The technology, and neuroscience of capacity formation. *Proceedings of the National Academy of Sciences United States of America, 104*(3), 13250–13255.

Heckman, J. J., & Rubistein, Y. (2001). The importance of noncognitive skills: Lessons from the Ged testing program. *American Economic Review, 91*(2), 145–149.

Herman, P. C., & Mack, D. (1975). Restrained and unrestrained eating. *Journal of Personality, 43*, 647–660.

Herman, P. C., & Polivy, J. (2010). The self regulation of eating: Theoretical practical problems. In R. F. Baumeister & K. D. Vohs (Eds.), *Handbook of self-regulation: Research, theory, and applications* (2nd ed., pp. 522–536). New York: Guildford.

Heyman, J., & Ariely, D. (2004). Effort for payment: A tale of two markets. *Psychological Science, 15*(11), 787–793.

Higgins, E. T., & King, G. (1981). Accessibility of social constructs: Information processing consequences of individual and contextual variability. In N. Cantor & J. Kihlstrom (Eds.), *Personality, cognition, and social interaction* (pp. 69–121). Hillsdale, Nj: Erlbaum.

Hsee, C. K. (1995). Elastic justification: How tempting but task-irrelevant factors influence decisions. *Organizational Behavior and Human Decision Processes, 62*, 330–337.

Huck, S., Jehiel, P., & Rutter, T. (2011). Feedback spillover and analogy-based expectations: A multi-game experiment. *Games and Economic Behaviour, 71*(2), 351–365.

Hull, C. L. (1932). The goal-gradient hypothesis and maze learning. *Psychological Review, 39*(1), 25–43.

Isen, A. M. (1987). Positive affect, cognitive processes, and social behavior. In L. Berkowitz  (Ed.). *Advances in experimental social psychology* (Vol. 20, pp. 203–252). San Diego, CA: Academic Press.

Isen, A. M. (2000). Positive affect and decision-making. In M. Lewis & J. M. Haviland-Jones (Eds.), *Handbook of emotions* (2nd ed., pp. 417–435). New York: Guildford Press.

Isen, A. M., & Simmonds, S. F. (1978). The effect of feeling good on a helping task that is incompatible with good mood. *Social Psychology Quarterly, 41*, 345–349.

Jacobsen, G. D., Kotchen, M. J., & Vandenbergh, M. P. (2012). The behavioral response to voluntary provision of an environmental public good: Evidence from residential electricity demand. *European Economic Review, 56*, 946–960.

Jenkins, J., Nordhaus, T., & Shellenberger, M. (2011). *Energy emergence: Rebound and backfire as emergent phenomena: A review of the literature*. Oakland, CA: Breakthrough Institute. February.

Jevons, W. S. (1866). *The coal question*. London: MacMillan and Company.

Jordan, J., Mullen, E., & Murnighan, J. K. (2011). Striving for the moral self: The effects of recalling past moral actions on future moral behavior. *Personality and Social Psychology Bulletin, 37*(5), 701–713.

Kahneman, D. (1973). *Attention and effort*. Englewood Cliffs, NJ: Prentice Hall.

Kahneman, D. (2003). Maps of bounded rationality: Psychology for behavioral economics. *American Economics Review, 93*, 1449–1475.

Kahneman, D. (2011). *Thinking, fast and slow*. London: Penguin, p. 53.

Kamenica, E. (2012). Behavioural economics and psychology of incentives. *Annual Review of Economics, 4*(13), 1–26.

Kay, A. C., Wheeler, S. C., Bargh, J., & Ross, L. (2004). Material priming: The influence of mundane physical objects on situational constructs and competitive behavioral choice. *Organizational Behavior and Human Decision Processes, 95*, 83–96.

Khan, U., & Dhar, R. (2006). Licensing effect in consumer choice. *Journal of Marketing Research, 43*, 259–266.

Kivetz, R., & Simonson, K. (2002). Earning the right to indulge: Effort as a determinant of customer preferences toward frequency program rewards. *Journal of Marketing Research, 39*, 155–170.

Kivetz, R., Urminsky, O., & Zheng, Y. (2006). The goal-gradient hypothesis resurrected: Purchase acceleration, illusionary goal progress, and customer retention. *Journal of Marketing Research, 43*, 38–58.

Kivetz, R., & Zheng, Y. (2006). Determinants of justification and self-control. *Journal of Experimental Psychology: General, 135*, 572–587.

Knez, M., & Camerer, C. F. (2000). Increasing cooperation in Prisoners' Dilemma by establishing a precedent of efficiency in coordination games. *Organizational Behavior and Human Decision Processes, 82*, 194–216.

Kroese, F. M., Evers, C., & De Ridder, D. T. D. (2009). How chocolate keeps you slim: The effect of food temptations on weight watching goal importance, intentions, and eating behavior. *Appetite, 53*, 430–433.

Kroese, F. M., Evers, C., & De Ridder, D. T. D. (2011). Tricky treats: Paradoxical effects of temptation strength on self-regulation processes. *European Journal of Social Psychology, 41*, 281–288.

Kronick, L., & Knauper, B. (2010). Temptations elicit compensatory intentions. *Appetite, 54*, 398–401.

Kruglanski, A. W. (1996). Goals as knowledge structures. In P. M. Gollwitzer & J. A. Bargh (Eds.), *The psychology of action: Linking cognition and motivation to behavior* (pp. 599–618). New York: Guildford.

Kruglanski, A. W., Shah, J. Y., Fishbach, A., Friedman, R., Chun, W., & Sleeth-Keppler, D. (2002). A theory of goal systems. In M. P. Zanna  (Ed.). *Advances in experimental social psychology* (Vol. 34, pp. 331–378). San Diego, CA: Academic Press.

Kruglanski, A. W., & Webster, D. M. (1996). Motivated closing of the mind: "seizing" and "freezing". *Psychological Review, 103*, 263–283.

Lanzini, P., & Thøgersen, J. (2014). Behavioral spillover in environmental domain: An intervention study. *Journal of Environmental Psychology, 40*, 381–390.

Lee, S., & Schwarz, N. (2010). Dirty hands and dirty mouths: Embodiment of the moral-purity metaphor is specific to the motor modality involved in moral transgression. *Psychological Science, 21*, 1423–1425.

Lerner, J. S., Small, D. A., & Loewenstein, G. (2004). Heart strings and purse strings: Carryover effects of emotions on economic decisions. *Psychological Science, 15*, 337–341.

Levav, J., & Fitzsimons, G. (2006). When questions change behaviour: The role of ease of representation. *Psychological Science, 17*, 207–213.

Levitt, S., & List, J. (2007a). What do laboratory experiments measuring social preferences reveal about the real world? *Journal of Economic Perspectives, 21*(2), 153–174.

Levitt, S., & List, J. (2007b). On the generalizability of lab behaviour in the field. *Canadian Journal of Economics, 40*(2), 343–370.

Levitt, S., List, J., & Reiley, D. (2010). What happens in the field stays in the field: Exploring whether professionals play minimax in laboratory experiments. *Econometrica, 78*(4), 1413–1434.

Lewin, K. (1951). *Field theory in social science: Selected theoretical papers*. New York: Harper & Row.

Liberman, N., Forster, J., & Higgins, E. T. (2007). Set/reset or inhibition after goal fulfillment? A fair test between two mechanisms producing assimilation and contrast. *Journal of Experimental Psychology, 43*, 258–264.

Liberman, N., Sagristano, M. D., & Trope, Y. (2002). The effect of temporal distance on level of mental construal. *Journal of Experimental Social Psychology, 38*(6), 523–534.

Louro, M. J., Pieters, R., & Zeelenberg, M. (2007). Dynamics of multiple goal pursuit. *Journal of Personality and Social Psychology, 93*, 174–193.

Manucia, G. K., Baumann, D. J., & Cialdini, R. B. (1984). Mood influences on helping: Direct effects or side effects? *Journal of Personality and Social Psychology, 46*(2), 357–364.

Marsh, R. L., Hicks, J. L., & Bink, M. L. (1998). Activation of completed, uncompleted, and partially completed intentions. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 24*, 350–361.

Martin, L. L., & Tesser, A. (1996). Some ruminative thoughts. In R. S. Wyer  (Ed.). *Advances in social cognition* (Vol. 9, pp. 1–47). Hillsdale, NJ: Lawrence Erlbaum.

Mazar, N., Amir, O., & Ariely, D. (2008). The dishonesty of honest people: A theory of self-concept maintenance. *Journal of Marketing Research, 45*(6), 633–644.

Mazar, N., & Zhong, C. B. (2010). Do green products make us better people? *Psychological Science, 21*(4), 494–498.

Mead, N. L., Baumeister, R. F., Gino, F., Schweitzer, M. E., & Ariely, D. (2009). Too tired to tell the truth: Self-control resource depletion and dishonesty. *Journal of Experimental Social Psychology, 45*, 594–597.

Mengel, F., & Sciubba, E. (2010). Extrapolation and structural learning in games. Maastricht University Working Papers.

Merritt, A. C., Effron, D. A., Fein, S., Savitsky, K. K., Tuller, D. M., & Monin, B. (2012). The strategic pursuit of moral credentials. *Journal of Experimental Social Psychology, 48*, 774–777.

Merritt, A. C., Effron, D., & Monin, B. (2010). Moral self-licensing: When being good frees us to be bad. *Social and Personality Psychology Compass, 4*(5), 344–357.

Monin, B., & Miller, D. T. (2001). Moral credentials and the expression of prejudice. *Journal of Personality and Social Psychology, 81*, 33–43.

Moore, S. G., Neal, D. T., Fitzsimons, G. J., & Shiv, B. (2012). Wolves in sheep's clothing: How and when hypothetical questions influence behavior. *Organizational Behavior and Human Decision Processes, 117*, 168–178.

Morwitz, V., & Fitzsimons, G. (2004). The mere measurement effect: Why does measuring intentions change actual behaviour? *Journal of Consumer Psychology, 14*, 64–74.

Morwitz, V., Johnson, E., & Schmittlein, D. (1993). Does measuring intent change behavior? *Journal of Consumer Research, 20*, 46–61.

Moskowitz, G. B. (2002). Preconscious effects of temporary goals on attention. *Journal of Experimental Social Psychology, 38*, 397–404.

Mukhopadhyay, A., & Johar, G. V. (2009). Indulgence as self-reward for prior shopping restraint: A justification-based mechanism. *Journal of Consumer Psychology, 19*, 334–345.

Mussweiler, T. (2003). Comparison processes in social judgment: Mechanisms and consequences. *Psychological Review, 110*, 472–489.

Neely, J. H. (1977). Semantic priming and retrieval from lexical memory: Roles of inhibition less spreading activation and limited-capacity attention. *Journal of Experimental Social Psychology: General, 106*, 226–254.

Nisan, M., & Horenczyk, G. (1990). Moral balance: The effect of prior behaviour on decision in moral conflict. *British Journal of Social Psychology, 29*(1), 29–42.

Norton, E. (2012). Shame on the rich. *Science now*. Posted on news.sciencemag.org. February 27.

Novemsky, N., & Dhar, R. (2005). Goal fulfillment and goal targets in sequential choice. *Journal of Consumer Research, 32*, 396–404.

Palacios-Huerta, I., & Volji, O. (2008). Experiencia docet: Professionals play minimax in laboratory experiments. *Econometrica, 76*(1), 71–115.

Peltzman, S. (1975). The effects of automobile safety regulation. *Journal of Political Economy, 83*, 667–725.

Pittman, T. S. (1975). Attribution of arousal as a mediator in dissonance reduction. *Journal of Experimental Social Psychology, 11*(1), 53–63.

Pliner, P., Hart, H., Kohl, J., & Saari, D. (1974). Compliance without pressure: Some further data on the foot-in-the-door technique. *Journal of Experimental Social Psychology, 10*, 17–22.

Ploner, M., & Regner, T. (2013). Self-image and moral balancing: an experimental analysis. *Journal of Economic Behavior & Organization, 93*, 374–383.

Poortinga, W., Whitmarsh, L., & Suffolk, C. (2013). The introduction of a single-use carrier bag charge in Wales: Attitude change and behavioral spillover effects. *Journal of Environmental Psychology, 36*, 240–247.

Rigdon, M. (2009). Trust and reciprocity in incentive contracting. *Journal of Economic Behavior & Organization, 70*, 93–105.

Rudin-Brown, C., & Jamson, S. (2013). *Behavioural adaptation and road safety: Theory, evidence, and action*. London: CRC Press.

Sachdeva, S., Iliev, R., & Medin, D. L. (2009). Sinning saints and saintly sinners: The paradox of moral self-regulation. *Psychological Science, 20*(4), 523–528.

Savikhin, A. C., & Sheremeta, R. M. (2013). Simultaneous decision-making in competitive and cooperative environments. *Economic Inquiry, 51*(2), 1311–1323.

Schoemaker, P. J. H. (1993). Determinants of risk-taking: Behavioral and economic views. *Journal of Risk and Uncertainty, 6*, 49–73.

Schultz, P. W., Nolan, J. M., Cialdini, R. B., Goldstein, N. J., & Griskevicius, V. (2007). The constructive, destructive, and reconstructive power of social norms. *Psychological Science, 18*(5), 429–434.

Schwarz, N., & Bless, H. (2005). Mental construal processes: The inclusion/exclusion model. In D. Stapel & J. Suls (Eds.), *Assimilation and contrast in social psychology* (pp. 119–141). Philadelphia: Psychology Press.

Shafir, E. (2012). *The behavioral foundations of public policy*. Princeton: Princeton University Press.

Shah, J. Y., Friedman, R. S., & Kruglanski, A. W. (2002). Forgetting all else: On the antecedents and consequences of goal shielding. *Journal of Personality and Social Psychology, 83*, 1261–1280.

Shah, J. Y., & Kruglanski, A. W. (2002). Priming against your will: How goal pursuit is affected by accessible alternatives. *Journal of Experimental Social Psychology, 38*, 368–383.

Shah, J. Y., & Kruglanski, A. W. (2003). When opportunity knocks: Bottom-up priming of goals by means and its effects on self-regulation. *Journal of Personality and Social Psychology, 84*, 1109–1122.

Shiffman, S., Hickcox, M., Paty, J., Gnys, M., Kassel, J. D., & Richards, T. J. (1996). First lapses to smoking: Within-subjects analysis of real-time reports. *Journal of Consulting and Clinical Psychology, 64*, 993–1002.

Shu, L. L., Mazar, N., Gino, F., Ariely, D., & Bazerman, M. H. (2012). Signing at the beginning makes ethics salient and decreases dishonest self-reports in comparison to signing at the end. *Proceedings of the National Academy of Sciences United States of America, 109*(38), 15197–15200.

Simon, H. (1967). Motivational and emotional controls of cognition. *Psychology Review, 74*, 29–39.

Srull, T. K., & Wyer, R. S. Jr., (1979). The role of category accessibility in the interpretation of information about persons: Some determinants and implications. *Journal of Personality and Social Psychology, 37*, 1660–1672.

Stephens, R. S., & Curtin, L. (1994). Testing the abstinence violation effect construct with marijuana cessation. *Addictive Behaviors, 19*, 23–32.

Strahilevitz, M., & Myers, J. (1998). Promised donations to charity as purchase incentives: How well they work may depend on what you're trying to sell. *Journal of Consumer Research, 24*(4), 434–446.

Stroebe, W., Mensink, W., Aarts, H., Schut, H., & Kruglanski, A. W. (2008). Why dieters fail: Testing the goal conflict model of eating. *Journal of Experimental Social Psychology, 44*, 25–36.

Sunstein, C. R. (2011). Empirically informed regulation. *University of Chicago Law Review, 78*, 1349–1429.

Susewind, M., & Hoelzl, E. (2014). A matter of perspective: Why past moral behavior can sometimes encourage and other times discourage future moral striving. *Journal of Applied Social Psychology, 44*(3), 201–209.

Tesser, A. (1988). Toward a self-evaluation maintenance model of social behavior. In L. Berkowitz (Ed.). *Advances in experimental social psychology* (Vol. 21, pp. 181–227). San Diego, CA: Academic Press.

Tesser, A., Crepaz, N., Collins, J. C., Cornell, D., & Beach, S. R. H. (2000). Confluence of self-esteem regulation mechanisms: On integrating the self-zoo. *Personality and Social Psychology Bulletin, 26*, 1476–1489.

Thaler, R. H., & Sunstein, C. R. (2003). Libertarian paternalism. *American Economics Review, 93*(2), 175–179.

Thøgersen, J. (1999a). Spillover processes in the development of a sustainable consumption pattern. *Journal of Economic Psychology, 20*, 53–81.

Thøgersen, J. (1999b). The ethical consumer: Moral norms and packaging choice. *Journal of Consumer Policy, 22*, 439–460.

Thøgersen, J., & Crompton, T. (2009). Simple and painless? The limitations of spillover in environmental campaigning. *Journal of Consumer Policy, 32*, 141–163.

Thøgersen, J., & Olander, F. (2003). Spillover of environment-friendly consumer behavior. *Journal of Environmental Psychology, 32*, 141–163.

Tiefenbeck, V., Staake, T., Roth, K., & Sachs, O. (2013). For better or for worse? Empirical evidence of moral licensing in a behavioral energy conservation campaign. *Energy Policy, 57*, 160–171.

Trope, Y., & Fishbach, A. (2000). Counteractive self-control in overcoming temptations. *Journal of Personality and Social Psychology, 79*(4), 493–506.

Trope, Y., & Liberman, N. (2003). Temporal construal. *Psychological Review, 110*, 403–421.

Trope, Y., & Neter, E. (1994). Reconciling competing motives in self-evaluation: The role of self-control in feedback seeking. *Journal of Personality and Social Psychology, 66*, 646–657.

Trope, Y., & Pomerantz, E. M. (1998). Resolving conflicts among self-evaluative motives: Positive experiences as a resource for overcoming defensiveness. *Motivation and Emotion, 22*, 53–72.

Truelove, H. B., Carrico, A. R., Weber, E. U., Raimi, K. T., & Vandenbergh, M. P. (2014). Positive and negative spillover of pro-environmental behavior: An integrative review and theoretical framework. *Global Environmental Change, 29*, 127–138.

Urbszat, D., Herman, C. P., & Polivy, J. (2002). Eat, drink, and be merry, for tomorrow we diet: Effects of anticipated deprivation on food intake in restrained and unrestrained eaters. *Journal of Abnormal Psychology, 111*, 396–401.

Van Kleef, E., Shimizu, M., & Wansink, B. (2011). Food compensation: Do exercise ads change food intake? *International Journal of Behavioral Nutrition and Physical Activity, 8*(6), 661–664.

Van Praag, B. M. S., Frijters, P., & Ferrer-i-Carbonell, A. (2003). The anatomy of subjective well-being. *Journal of Economic Behavior & Organization, 51*(1), 29–49.

Vega-Redondo, F. (1996). *Evolution, games, and economic behaviour*. Oxford: Oxford University Press.

Viscusi, P., & Cavallo, G. O. (1994). The effect of product safety regulation on safety precautions. *Risk Analysis, 14*(6), 917–930.

Vohs, K., Mead, N. L., & Goode, M. R. (2006). The psychological consequences of money. *Science, 314*, 1154–1156.

Weber, E. U. (1997). Perception and expectation of climate change. In M. H. Bazerman (Ed.), *Environment, ethics, and behavior: The psychology of environmental valuation* (pp. 314–341). New York: Lexington Books.

Werle, C., Wansink, B., & Payne, C. (2010). Just thinking about exercise makes me serve more food. Physical activity and calorie compensation. *Appetite, 56*(2), 332–335.

Werle, C. O. C., Wansink, B., & Payne, C. R. (2011). 'Just thinking about exercise makes me serve more food': Physical activity and calorie compensation. *Appetite, 56*(2), 332–335.

Wicklund, R. A., & Gollwitzer, P. M. (1981). Symbolic self-completion, attempted influence, and self-depreciation. *Basic and Applied Social Psychology, 2*(2), 89–114.

Wicklund, R. A., & Gollwitzer, P. M. (1982). *Symbolic self-completion*. Hillsdale, NJ: Erlbaum.

Wilcox, K., Vallen, B., Block, L., & Fitzsimons, G. J. (2009). Vicarious goal fulfillment: when the mere presence of a healthy option leads to an ironically indulgent decision. *Journal of Consumer Research, 36*(3), 380–393.

Wilde, G. J. S. (1982a). The theory of risk homeostasis: Implications for safety and health. *Risk Analysis, 2*, 209–225.

Wilde, G. J. S. (1982b). Critical issues risk homeostasis theory: A reply. *Risk Analysis, 2*, 249–258.

Wilde, G. J. S. (1998). Risk homeostasis theory: An overview. *Injury Prevention, 4*, 89–91.

Wilde, G. J. S., Robertson, L. S., & Pless, I. B. (2002). For and against: Does risk homeostasis theory have implications for road safety? *British Medical Journal, 324*, 1149–1152.

Wilson, T. D., & Schooler, J. W. (1991). Thinking too much: Introspection can reduce the quality of preferences and decisions. *Journal of Personality and Social Psychology, 60*, 181–192.

Wisdom, J., Downs, J. S., & Loewenstein, G. (2010). Promoting healthy choices: Information versus convenience. *American Economic Journal: Applied Economics, 2*, 164–178.

Zanna, M. P., & Cooper, J. (1974). Dissonance and the pill: An attribution approach to studying the arousal properties of dissonance. *Journal of Personality and Social Psychology, 29*(5), 703–709.

Zeigarnik, B. (1927). Das Behalten erledigter und unerledigter Handlugen [The memory of completed and uncompleted actions]. *Psychologische Forschung, 9*, 1–85.

Zhong, C. B., Ku, G., Lount, R. B., & Murnighan, J. K. (2010). Compensatory ethics. *Journal of Business Ethics, 92*, 323–339.

Zhong, C. B., & Liljenquist, K. (2006). Washing away your sins: Threatened morality and physical cleansing. *Science, 313*, 1451–1452.

Zwane, A. P. et al (2011). Being surveyed can change later behavior and related parameter estimates. *Proceedings of the National Academy of Sciences United States of America, 108*(5), 1821–1826.

# EXHIBIT P

Methodology

*For reprint orders, please contact: reprints@futuremedicine.com*

# Analyzing the concept of spillover effects for expanded inclusion in health economics research

## Journal of **Comparative Effectiveness Research**

K Jane Muir*,[1] & Jessica Keim-Malpass[1]
[1]Department of Acute and Specialty Care, University of Virginia School of Nursing, Charlottesville, VA 22903, USA

*Author for correspondence: kjm5xw@virginia.edu

**Background:** The incorporation of spillover effects in health economic research is recognized by regulatory agencies as useful for valuing health interventions and technologies. To date, spillover effects are not universally used within economic evaluations and conceptual definitions of spillover effects are vague within the context of health economics research. **Materials & methods:** In an effort to enhance awareness of spillover effects for health economic evaluations, a concept analysis using Walker and Avant's approach was performed to elucidate the key attributes, definitions, antecedents and consequences of spillover effects across a range of disciplines. **Results:** Key attributes included lack of intention, positive and negative impacts, and two entity/domain involvement. Antecedents included an initial action and desired outcome. Consequences involved spillovers across industries, work life to personal life domains, patient to family member domains and across healthcare markets. **Conclusion:** The analysis provides greater clarification around the dimensions of spillover effects and reveals opportunities to enhance methodological approaches to assessing spillovers.

First draft submitted: 1 April 2020; Accepted for publication: 1 June 2020; Published online: 17 June 2020

**Keywords:** concept analysis • economic evaluations • health economics • spillover effects

Health economic evaluations have been indicated to facilitate decision-making around medical interventions, technological advancement, pharmaceutical innovation, healthcare professional workforce projections and other healthcare-related topics [1–3]. Given rising US healthcare spending, information gleaned from economic evaluations can lead to the appropriate allocation of resources needed to improve patient outcomes, healthcare systems, health policy and other healthcare-related decisions [3].

Economic evaluations are commonly classified as cost–effectiveness analyses, cost–utility analyses and cost–benefit analyses [4]. The various economic evaluation techniques similarly compare costs in the form of monetary units and differ with regards to measuring consequences [4,5]. For example, cost–effectiveness analyses, as described by Drummond and colleagues [4], measure a single consequence in the form of a natural unit, such as blood sugar reduction, life years gained or averted missed work days. Cost–utility analyses can measure outcomes of interventions based on preferences or utility weights. Cost–utility analyses are considered a broader type of cost–effectiveness analysis. A common cost–utility measurement is the quality-adjusted life year [4]. Cost–benefit analyses focus on a single cost and benefit measurement in the form of a monetary unit alone [4,5]. The availability of multiple economic evaluation techniques is beneficial for evaluating health programs and interventions, as well as resource allocation decision making where value judgments may vary by research question or approach [4,5].

An important concept discussed in the health economics literature is spillover effects, known as the health impacts and costs that extend beyond a health intervention or program's targeted recipient (the patient) to unintentionally impact other recipients either in a positive or negative way [6,7]. Health economic studies have predominantly assessed spillover effects within the family unit, where a patient's health status spills over to impact the quality of life of a family member [6]. Despite acknowledgement by the Second US Panel on Cost–Effectiveness in Health and Medicine that spillover effects are needed to enhance cost and benefit estimates of health interventions, a gap exists



Future Medicine

| Table 1. Spillover effect concept characteristics. | | |
|---|---|---|
| **Attributes** | **Antecedents** | **Consequences** |
| • Unintentional<br>• Positive or negative impacts<br>• Two entity/domain involvement | • Initial action<br>• Desired outcome | • Unintentional impact from one entity to a second entity<br>• Cross-industry, interpersonal, professional life to personal life domain |

in health economics research regarding universal inclusion of such effects [8]. A potential cause of such spillover effect exclusion could be uncertainty around the concept of spillover effects, given the existing focus in health economics on the family caregiver spillover domain [9,10].

The purpose of this analysis was to examine the concept of spillover effects in order to identify defining attributes, antecedents and consequences across a variety of academic disciplines. An expanded analysis of the concept across multiple disciplines can inform increased integration of spillovers within health economic evaluations. Additionally, an analysis of the concept may expand the types of spillovers evaluated in health economic studies. The concept analysis consists of an eight-step process outlined in subsequent paragraphs, followed by implications for health economics research.

### Concept analysis of spillover effects

In analyzing the concept of 'spillover effects', a systematic eight-step procedure was conducted using Walker and Avant's concept analysis process [9]. The Walker and Avant [9] concept analysis process consists of: selecting a concept, determining the purpose(s) of the analysis, identifying uses of the concept, defining attributes, identifying a model case, identifying contrary cases, identifying antecedents and consequences and defining empirical referents. The first two steps of Walker and Avant's approach (concept selection and purpose development) are addressed in the introduction; the remaining steps are discussed in the following sections [9].

### Materials & methods

The concept of interest for the analysis was spillover effects, which is identified in a variety of terms in the literature as 'spillovers', 'spillover effects' and 'externalities' among a wide range of academic disciplines. These terms were all considered related to the identified concept of spillover effects. For the analysis, the literature search was restricted to health economics, psychology, sociology and business. A comprehensive search of the literature was conducted using PubMed, Google Scholar and Ovid Medline to understand the range of definitions and uses of spillovers. The primary search terms and Medical Subject Headings terms used either in combination or alone were 'spillover', 'spillover effects', 'externalities', 'economic', 'economic evaluation', 'economic modeling', 'Markov', 'cost–effectiveness', 'health', 'nurse', 'nursing', 'physician', 'caregiver', 'psychology', 'sociology' and 'business'. The search was filtered such that keywords were identified in the title and abstract of the articles. The article inclusion criteria included: articles or white papers that included the words 'spillovers' or 'externalities' written in English language within the past 15 years. Papers published in non-peer-reviewed journals, as well as gray literature and editorials were included.

A total of 50 articles that met the inclusion criteria were initially reviewed. A total of 34 articles were selected [10–41,44,45]. A total of 21 articles were from the health economics discipline, six from psychology, four from sociology and three from business. The majority of excluded articles discussed mathematical modeling of spillover effects, which was not relevant to the current research topic. The identified literature was reviewed and analyzed to identify attributes, antecedents and consequences of spillover effects (Table 1).

### Identifying uses of the concept

The initial step of the analysis involved examining the definition of 'spillovers' in the dictionary and uses in the relevant published literature. According to Merriam-Webster [42], 'spillover' refers to 'an extension of something, especially when an excess exists'. Use of the term 'spillover effects' are discussed in the following sections within the domains of health economics, psychology, sociology and business. A total of 23 of the articles explicitly described a definition of spillover effects, while the remaining articles described examples without clear definitions.

### Uses in health economics

Spillover effects were examined within the academic discipline of health economics and were discussed as either 'spillovers', 'spillover effects' or 'externalities'. Within the health economics field, spillovers were most commonly discussed in relation to a health intervention, scientific advancement or technological development. Gold [7], discusses spillovers, synonymous with externalities, as a positive or negative market exchange impacting individuals or groups who are not direct participants in such exchanges (p. 66). In a case study discussion on measuring spillover effects of patients with meningitis, Bhaduri and colleagues [22], refer to spillovers as 'wider health benefits' impacting patients in addition to individuals who are close to the patient (p. 1). Lakdawalla and colleagues [26], defined spillovers within the concept of scientific spillovers as the benefit of a scientific advancement imparted upon future knowledge development. Scientific spillovers occur when one advancement is made and other scientists, researchers or innovators expand on the given idea or advancement over time.

Much of the health economics literature studied spillovers in the context of the family caregiver or informal carer. Caregiver spillover effects, first introduced by Basu and Meltzer [6], refer to the various conditions, treatments and contacts that impact the welfare of family members. Spillovers manifest as the caregiver health effects and/or informal care time costs resulting from the health status/condition of a family member or close individual [13]. Spillovers have also been explored in terms of their impact on healthcare markets and provider practice patterns. A study by Johnson and colleagues [27], posited that decreases in fee-for-service traditional Medicare spending resulted from the spillover effect of increased Medicare Advantage penetration within states. Baicker and Robbins [16], found that a 10% increase in Medicare Advantage state penetration was associated with an approximate US$250 reduction in fee-for-service traditional Medicare resource use per patient. Cost-controlling measures within Medicare Advantage, such as the presence of health maintenance organizations, resulted in decreased costly inpatient hospitalizations and more cost-reducing outpatient service use. Overall, the health economics literature considered spillovers the impacts that extend beyond a patient and impact individuals or groups within a social network of a patient.

### Uses in psychology

Within the psychology discipline, spillovers were discussed as an attitudinal or behavioral transfer from one life to domain to another [30,32]. In studying shift work among nurses with families, Kunst and colleagues referred to spillovers as "... *transfers of mood, energy and skills from one sphere to another*" [30]. Spillovers were described in psychology as bidirectional in movement, occurring between work and family life domains [30]. Behavioral spillovers were a particular domain of spillovers in the psychology literature defined as a secondary process that can lead to larger-scale societal and scientific consequences [33]. Nash and colleagues described behavioral spillover theory as, "*a way to catalyze broad lifestyle change from one behavior to another in ways that generate greater impacts than piecemeal interventions*" [34]. Behavioral spillovers have been contextualized within environmental impacts within countries, where the concept of a conscious spillover can be cultivated in countries that value pro-environmental behavior [34]. Additional behavioral spillovers have evaluated exercise and healthy eating practices [34]. Overall, spillovers in psychology emphasized behaviors and the transfer of emotional or behavioral influences from one life or societal domain to another.

### Uses in sociology

Uses of spillover effects in the sociology literature shed light on intersections between individual disparities, institutions and social outcomes. Timmermans and colleagues situated their qualitative study on lack of health insurance spillovers based on neoclassical economic underpinnings [37]. Within this study, spillovers were discussed as 'collateral effects' and 'externalities' that are costs or benefits resulting from activities impacting "*an otherwise uninvolved party who did not choose to incur that cost or benefit*" [37]. Spillovers were further described as a tool to examine the effects of activities between entities that are unrelated but seemingly impacted by one another [37]. In studying the spillover effects of deterrence strategies to reduce crime, Braga and colleagues did not explicitly define spillover effects, but reference them as synonymous with indirect effects [38]. Hagan and Foster [36], assessed spillovers in the context of incarcerated mothers and the associated 'social costs' incarceration can have on children's education. Thus, the identified sociology literature referred to spillovers as the unintentional impacts of a policy, process, or phenomenon on societal institutions and outcomes.



### Uses in business

In the business literature, spillovers were discussed in the context of innovation and idea expansion between groups. Frischmann and Lemley [39], define spillovers as the, "*uncompensated benefits that one person's activity provides to another*". Grillitsch and Nillson [41], examined knowledge spillovers in Swedish firms that are located within industrial 'clusters' or regions of high local knowledge density versus firms that are located within a knowledge 'periphery'. The study found that innovative firms in the knowledge periphery collaborate with external firms to compensate for the lack of knowledge spillovers that are gained by firms located within the knowledge/industrial cluster [41].

In a business advertising context, Sahni analyzed the impact of online advertisements on advertiser competition [40]. The findings from the randomized field experiments from a restaurant-search website suggested that spillovers were significant when advertising efforts were of the lowest frequency, while minimal spillovers occurred with high-intensity advertising techniques. Thus, the stronger intensity advertising techniques saturated consumer interest in the main advertiser, which offset spillovers toward other competitors [40]. Business spillover effects in the identified literature referenced spillovers in the context of innovation, marketing influences and consumer activities.

### Defining attributes

The determination of defining attributes is central to identify and define characteristics central to the concept under study. Based on the relevant review of the literature, three common attributes of spillover effects were noted: lack of intention, positive or negative impacts and two entity/domain involvement.

### Lack of intention (unintentional)

The majority of the literature examined described spillovers as unintentional in nature. Frischmann and colleagues [38], described spillovers as never planned nor calculated from the outset of an activity, process, intervention, or phenomenon. Thus, the receiving individual or third party is not privy to a transaction or compensations [19,22,39]. Sahni discusses the unintentional nature of advertisement techniques that invoke consumer memory recall of associated brands or products [40]. The literature described advertising techniques as having an unintentional consequence of priming a consumer to recall a non-advertised option in addition to the primary product/service advertised [40]. Health economics spillover effects around health interventions were described as an unintended effect on informal caregivers, family members, or other individuals within the social network of a patient. The majority of the identified spillover literature in the psychology and sociology disciplines discussed spillovers within the frame of being unintentional. One domain of psychology with a greater level of intentionality described was within behavioral spillovers specifically within environmental research. For example, Nash and colleagues [34] described behavioral spillovers as strongly influenced by "*behavioral interventions, changes in awareness, availability of infrastructure and resources and technological advances and policy change.*" Across the identified literature, spillovers were not intentionality imparted upon the indirect recipient.

### Positive or negative impacts

Each of the disciplines characterized spillovers as capable of causing positive or negative effects. Within the realm of business and innovation, spillovers were cited as a social benefit that expands the influence of ideas to wider groups [39,40]. The social benefit of such a spillover is viewed as the advancement of an idea or innovation for the benefit of an industry. Furthermore, ideas cultivated in one industrial field were considered to commonly spill over into other fields – considered an interindustry spillover – in which case the benefit of these spillovers are accrued by both fields [39]. Frischmann and Lemley [39] attributed, in part, the 1980s computer boom to positive spillovers effects due to knowledge spillovers moving freely within Silicon Valley. Similarly, Grillitsch and Nillson's examination of knowledge spillovers between firms further supports the notion of positive innovation spillovers within regional clusters [41]. The study demonstrated that innovative spillovers between firms is positive, valuable and firms will strive to obtain these spillovers either through geographical means (internal access) or through collaborations externally [41]. Sahni discussed spillovers within advertising as positive or negative, based on the advertising effort companies implement [40]. Lower frequency advertising strategies resulted in positive spillovers for the advertising company's competitors, while higher frequency techniques resulted in positive spillovers for the advertising company.

In the discipline of psychology, spillovers have been described as both positive and negative within the work–family life spheres. Amstad and Semmer [32] describe work as a positive spillover where workers can develop



beneficial time management and efficiency habits that benefit productivity and communication within the family unit. Conversely, work is described as a negative spillover when stress transfers from the work domain to the home life domain [32]. Negative spillovers manifest as the undue stress imparted to family members by an employee ruminating at work within the family setting [31].

Much of the literature on spillover effects within health economics described the negative spillovers from a patient illness to a family member or individual close to the patient. Caregiver spillover effects, first introduced by Basu and Meltzer [6], refer to the various conditions, treatments and contacts that impact the welfare of family members. Such spillovers manifest as caregiver health effects and/or informal care time costs resulting from the health status/condition of a family member or close individual [13]. Al-Janabi and colleagues [22], describe family caregiver spillovers as the psychological, physical, financial and emotional burden that family caregivers experience while caring for a sick family member. Family caregiver spillovers have been studied among parents of children with medical complexity and autism, as well as spouses of adult patients; such effects include increased parent absenteeism, physical injury, depression and anxiety [10,12]. Bhadhuri and colleagues assessed meningitis family spillovers and found that long-term morbidity for meningitis survivors caused negative spillovers in the form of family member health losses [23]. Thus, negative spillover health impacts toward family members/caregivers predominated the health economics literature.

### Two entity/domain involvement

A unifying theme across the spillover effect literature was the involvement of two entities or domains impacted by an action or process. Specifically, spillovers were described to have a direct impact on a targeted entity (or domain), as well as a second entity unintentionally. This common characteristic manifested within the business literature as innovation spillovers from one entity, or industry, to another. Within one sociology study, one family entity, an incarcerated mother, had an unintentional impact on her child's performance in the school domain [36]. An additional sociology perspective assessed the impact of a health insurance domain on societal institutions (schools and churches) [37]. Among the identified literature, there were noted similarities between psychology and health economics in that family members were the two entities frequently impacted by spillovers [10–13,30–32]. As mentioned previously, spillover effects studied within the psychology discipline assessed professional life spillovers to the home and family setting [30,32]. Within the health economics literature, spillover effects were most commonly referenced as well-being impacts on family members of patients. Further health economic studies referenced changes in innovation from a present scientific to future scientific domain [26].

## Identifying a model case & contrary case
### Model case

Model case construction is the fifth step of Walker and Avant's [9] concept analysis and consists of including the identified attributes in a model case based on literature or invention by the author. The following case was created by the author and discusses the spillover impacts of a healthcare unit systems-level intervention on patient outcomes.

Elkwood Hospital Emergency Department (ED) provides adult, pediatric and women's health services. It has a triage section, a main ED treatment area and a pediatric treatment area. Recently, the ED has experienced a surge in patient volumes due to local population growth. The department decides to implement a new triage workflow configuration for patients after identifying that 70% of all presenting ED patients are low acuity and do not need to be seen in the main ED treatment area. Thus, the department initiates a 'triage quick assessment' process facilitating quick assessment and treatment of low-acuity patients in order to free up bed and clinician resources for high-acuity patients and to reduce patient wait times.

In order to increase efficiency in the new triage center, patients are initially brought into a triage room after patient registration where vital signs, initial assessments and labs are taken by a nurse. After this process, the patient is returned to the waiting room where they wait to be called back into the triage room for a physician assessment. As the first patient waits in the waiting room, new low-acuity patients are brought into the triage room to go through the same process by the nurse.

The new triage configuration is efficient in that it facilitates a quick assessment of every patient, where a nurse can identify if a patient is truly stable (or not) and return patients to the waiting room until their physician assessment. The additional benefit of the quick assessment process is that it allows for continuous bed availability should a high-acuity patient present in need of immediate stability and subsequent transfer to a permanent room.

Over time, the ED observes significant drops in patient wait times due to this new configuration. However, although the process has benefited overall patient time metrics in the ED, the process has been detrimental to patient satisfaction ratings. Patients have reported negative feedback regarding the constant transport between the triage room and the waiting room and report perceived fragmented care imparted by the staff. Additionally, the department has observed a 10% increase in clinician turnover since implementation of the new triage configuration. Nurses on the unit cite increased moral distress due to the rising time pressures and increased time constraints related to quickly completing patient registration, assessments and labs. The physicians have reported missed nursing care on common tasks, such as incomplete vital signs and delayed medication administration. Upon closer evaluation, the director of the ED has noted rising patient re-admissions to the ED. Despite quick evaluations among these low-acuity patients, approximately 30% are returning within one week to the ED again.

This case addresses the defining attributes of spillover effects wherein the intervention resulted in unintentional impacts such as decreased patient satisfaction, clinician turnover, nurse moral distress, patient adverse events and increased patient re-admissions. The department did not intend from the outset for a systemic intervention to cause clinician moral distress impacting clinician performance and patient outcomes. The resulting spillovers of increased efficiency in one arena (reducing wait times) included increased clinician error detrimentally impacted patient outcomes and/or reduced patient satisfaction impacting patient utilization.

The case results in negative spillovers, evidenced by increased patient utilization, clinician error, moral distress and patient dissatisfaction. Though the same entities are involved (patients, clinicians and the emergency department), different domains, or 'arenas' as mentioned in the psychology literature base, are impacted. Overall, the primary intention of the intervention was to increase patient efficiency (domain 1), while a variety of secondary domains were unintentionally impacted through spillovers (patient satisfaction, quality of care delivery, clinician turnover, patient health status, patient utilization).

### Model case: methods expansion

This case additionally highlights the need for close examination of the methods used to measure the identified spillovers. A mixed-methods approach could be used to elucidate such effects mentioned within the case, particularly within an economic evaluation [43,44]. For example, a cost–benefit analysis could be conducted to quantify the impact of the new triage intervention, with spillover effects evaluated through increased patient re-admission costs and clinician turnover-rate costs. Furthermore, qualitative methodologies could be used to elucidate the systemic impacts on clinician challenges linked to fulfilling the identified workflow. Mixed-methods approaches could be employed to assess the quantifiable aspects of these spillovers, with qualitative methods informing the moral distress, intention to leave the workplace and patient dissatisfaction [43,44]. Thus, a variety of measurement strategies could be employed to best understand spillovers in the context of a health system intervention.

### Contrary case

An ED creates a triage configuration to rapidly assess patients. Upon evaluating performance metrics, ED identifies that on a daily basis, 70% of the total patients seen in the ED who are low-acuity patients are successfully being treated and discharged from this new triage configuration. The physicians and nurses who work in the main section of the ED have noticed that the time to treat patients who are high acuity has decreased, meaning clinicians are seeing the sickest patients faster than before the intervention. This is a contrary case to a spillover because the implementation of the new triage configuration is intended to increase efficiency for low- and high-acuity patients. The ED aimed to treat 70% of the patients through a rapid assessment configuration in order to increase time to treat efficiency for high-acuity patients. Only one domain is impacted in this case – patient efficiency – given that it is the ED's intent to reduce wait times for all patients due to a workflow change. Thus, this case lacks the attributes of two entities and being unintentional in nature.

## Identifying antecedents

Antecedent identification helps to understand the characteristics of attributes of spillover effects that exist prior to fulfillment of the concept [9]. There are two antecedents of spillovers: an intentional first action and a desired outcome. The intentional first action is the act of delivering or implementing a primary process. The desired outcome is inherently linked to the first action. A first action would be considered, for example, the development of a new healthcare technology to help patients with chronic pain. The desired outcome of technological advancement would be to reduce a patient's perceived or pathophysiologic suffering from pain. An initial action and desired

outcome are an antecedent because it determines the first entity or domain impacted in the spillover effect cascade. The secondary aspect, or consequences of the spillover effect involves impacts to secondary entities. Consequences are discussed in subsequent paragraphs.

### Identifying consequences

Consequences are resulting events or phenomena that emerge from the identified concept [9]. As previously described, consequences of spillovers are considered the unintentional impacts resulting from an intentional first action and can have positive or negative impacts. The magnitude of the spillover effect consequences varied among the disciplines reviewed and provided rich perspectives on micro- and macro-level impacts among various entities under study. For example, the business literature predominantly described spillover effects as having a large-scale impact as various industries were involved [39–41]. Geographic context strongly influenced the transference of knowledge and innovation spillovers [39,41].

Similarly, health economic spillovers were discussed in the context of scientific innovation, however the majority of studies discussed spillover impacts between individuals [26]. Specifically, individuals with illnesses and their social networks were the focus of health economic spillover effect research [19,20]. Health economic studies, therefore focused mostly on individual versus industry spillovers. A noted methodological consequence of measuring spillovers relates to the issue of double-counting [25]. An example is in the case of a patient experiencing depression or anxiety related to watching a family or clinician caregiver provide challenging care. This situation poses a methodological risk of double counting, in which the quality of life decrement is 'counted' as a utility for the patient when it could already be 'counted' in the utility of the caregivers [25].

The discipline of psychology also discussed smaller magnitude spillovers within the family unit, however behavioral spillover literature addressed environmental spillovers on a national level of larger magnitude [32,33]. Finally, spillovers within the sociology context assessed broader societal impacts of policies, processes, or access challenges [35–37]. Though individual family unit spillovers were assessed, a broader spillover focus was on societal impacts. The analyzed literature expressed a variety of spillover effect impacts that are important to consider in developing research around spillovers.

### Identifying empirical referents

The final stage of Walker and Avant's approach [9] is identifying empirical referents, specifically how the concept is measured. The measurement of spillover effects was identified as highly variable across the various disciplines. Although definitions of spillovers across the disciplines overlap, there existed noted differences in the measurement of spillovers among the examined literature.

Spillovers evaluated within the fields of psychology, sociology and business have used both qualitative, quantitative and mixed-methods approaches to assess spillover effects. In the sociology context, Timmermans and colleagues [37] evaluated how lack of health insurance affects religious institutions and school (kindergarten–12th grade) functioning. Using in-depth, qualitative interviewing methods, the authors found negative education spillovers relevant to increased student absenteeism, as well as increased ED utilization rates and 'waiting illnesses out' (p. 367) [37]. In examining spillover crime impacts, Braga and colleagues [38] used a quasi-experimental design and regression analysis to examine gang shooting trends. During data collection for the study, the team employed qualitative interviewing to gain insight into shooting events, relationships between gang victims and other contextual information relevant to gun-related gang activity [38]. Spillover inclusion in the examined business literature has predominantly included quantitative regression analyses of market impacts or consumer behaviors [39,40].

Within the health economic literature, quantitative approaches to assess spillovers have dominated over qualitative approaches. Health economic studies have assessed spillovers using state-preference valuation techniques, such as surveys like the EuroQoL-5 Dimension (EQ-5D-3L) and the Short Form-6 Dimension (SF-6D) to assess individuals' health status [45,46]. Such surveys ask participants to rate their health within a wide range of dimensions such as sleep quality, anxiety/depression, pain/discomfort and more. Data from these surveys are then quantitatively evaluated using regression-based or correlational analyses to understand associations between patient health quality and caregiver quality to determine potential spillovers [23].

Additional spillover assessments in economic evaluations include discrete choice experiments, where caregivers are given a set of scenarios and are asked to select their preferences of variables/choices within specific scenarios [15]. Such assessments are useful in determining willingness-to-accept values regarding caregiver informal care payment [20,28].

Other spillover assessments include accounting for displaced time due to caregiving through opportunity costs in economic models and recording caregiver tasks in diary logs [13].

Qualitative approaches have been used sparsely in health economic studies [47]. One identified study by Canaway and colleagues [19] used in-depth interviewing and hierarchical mapping to identify the social networks of end-of-life (EOL) patients [19]. The authors found that EOL patient caregiving network size was dependent on disease trajectory; EOL patients had an average of eight close family members/and or caregivers. Information gleaned from the interviews can be used by economists to assess the emotional and personal connectedness spillover effects of EOL caregiving within a network [19].

Despite the use of mixed-methods and qualitative approaches in the fields of psychology and sociology, qualitative methodologies are less prominent in health economics literature. No general consensus existed among the selected literature on how to universally assess spillovers. The implications of the identified diverse approaches to assessing spillover effects is discussed in subsequent paragraphs.

### Implications for health economics & comparative effectiveness research

Implications from this concept analysis include expanding the types of spillover effects assessed in economic evaluations, as well as the methods used to assess spillovers. First, this concept analysis demonstrates an opportunity to expand spillover effect analyses to include entities beyond family caregivers or scientific innovation advancement in the future. Health economic studies have evaluated spillovers between healthcare markets in a similar manner to inter-industry spillovers in the business literature. However, increased opportunity exists in quantifying spillovers beyond the patient social network to include frontline caregivers, systems-level spillovers of health interventions (i.e., increased outpatient clinic visits, ED re-admissions) and health intervention spillovers to manufacturing industries [19]. Additionally, there is a gap in understanding the existence of and potential impact of multiple spillovers occurring at the same time. Future research is needed to understand multidimensional spillovers, where, for example, an entity experiences multiple spillover effects at once. Family caregivers, for example, may experience health spillovers while informally caring for a sick loved one while simultaneously experiencing financial spillovers from a new medication for the patient's symptom relief.

Second, the examined methods used to assess spillover effects (empirical referents) from the examined literature can be applied to health economic studies to further elaborate on spillover effects comprehensively. Qualitative methodologies, for example, can be used to best elaborate on spillover effects that may be challenging to quantify in traditional spillover effect measures such as regression analyses, choice experiments or surveys. Dopp and colleagues [44] suggest that qualitative perspectives can facilitate mixed-method approaches in economic evaluations to fill a 'qualitative residual' where stakeholder and contextual information is traditionally absent (p. 2). The mixed approaches to assessing spillovers, for example in the sociology literature, where qualitative methods were used, suggests that spillovers may employ rich, descriptive contextual perspectives that are well-suited to compare health interventions [18,37]. Qualitative methodologies are well suited to assess spillovers due to inherent epistemological underpinnings in thick, contextual descriptions, emic–etic (insider, outsider) perspectives and observational data on drivers and mechanisms of topics under study [48–50,53]. Inclusion of qualitative methods to assess spillovers in economic studies may result in the investment of healthcare resources that are appropriately allocated to targeted populations. The subsequent section addresses factors to consider when integrating spillover effect assessments into health economic research.

### Expanding spillover effect inclusion in health economic studies

Figure 1 can be used as a framework to guide spillover effect inclusion in health economic evaluations. Adapted from Galizzi and Whitmarsh's [29], methodological recommendations for behavioral spillovers, relevant questions to consider about spillover effect inclusion based on Figure 1 factors are listed below.

Context: What is the setting where the spillover effect(s) takes place?

Entities: What are the entities, domains and/or populations involved? What is the intended (directed) and unintended impact? What are any targeted interventions targeting directed outcomes?

Magnitude: What are the potential outcomes from the intended outcome? What is the breadth and depth of the impacts?

Methods: Can these spillovers best be elucidated through experimental or non-experimental approaches? Are there opportunities for qualitative or mixed-method approaches?



**Figure 1.   Framework for spillover effect research inclusion.**

The highlighted factors are gleaned from the concept analysis and were developed after assessing relevant attributes, antecedents, definitions and overall characteristics of spillover effects. The first relevant factor–context describes the need to identify the environment where the spillover effect takes place. Such settings could include a hospital, a patient/family home, a healthcare corporation, or an academic evaluation of a healthcare market. The second important factor to consider is entities and domains. This factor aims to identify what/who is the entity intended to be impacted and which entity is receiving a potential spillover impact. Subsequently, the third domain is the magnitude or overall impact of spillovers. Magnitude can be considered a geographic, interpersonal or interindustry impact. Estimating the potential magnitude can aid in understanding the extent to which the spillover needs to be studied. A final consideration is the methods approach. Finally, methods selection should be guided by the contextual, entity and magnitude considerations. Such evaluation of important factors driving spillover effects, as determined from this concept analysis, can guide spillover effect integration in health economic studies.

## Conclusion

This concept analysis expands definitions and characteristics of spillover effects for consideration in health economic studies. Few health economic studies to date adequately incorporate spillover effects and when incorporated, most evaluations focus on family spillovers evaluated quantitatively [20]. Spillover effects serve a role in enhancing the societal perspective of a study, given that they reveal contexts and unintended effects of a strategy or intervention on various groups or entities that have been traditionally overlooked in a traditional economic model [25,51]. This concept analysis used a multidisciplinary lens to identify defining characteristics of spillover effects to expand considerations of spillover effects for use in health economic evaluations.

Methodology    Muir & Keim-Malpass

### Summary points

- Within health economics research, spillover effects are traditionally considered the health impacts of an intervention unintentionally imparted upon the family member of an ill individual. Broader considerations of spillover effects can enhance economic evaluations.
- A concept analysis was conducted across academic disciplines. Key attributes included: lack of intention (unintentional), positive or negative impacts and two entity/domain involvement. An initial action and targeted outcome were identified antecedents of spillover effects. Consequences varied in terms of magnitude and domain of impact across industries, life domains and interpersonal relationships.
- Expanded conceptualizations of spillover effects can strengthen economic evaluations. Economic evaluations assessing spillovers should consider the context, entities and magnitude of spillovers to inform method selection.

#### Author contributions

KJ Muir contributed substantially to manuscript conception and design, literature review and drafting of manuscript work. J Keim-Malpass contributed substantially to manuscript conception and design, drafting of manuscript work and revisions of drafts. Both authors agree to be accountable for all aspects of the work, inclusive of manuscript integrity.

#### Financial & competing interests disclosure

The authors have no relevant affiliations or financial involvement with any organization or entity with a financial interest in or financial conflict with the subject matter or materials discussed in the manuscript. This includes employment, consultancies, honoraria, stock ownership or options, expert testimony, grants or patents received or pending, or royalties.

No writing assistance was utilized in the production of this manuscript.

### References

Papers of special note have been highlighted as: ● of interest

1    Kamal AH, Wolf SP, Troy J *et al.* Policy changes key to promoting sustainability and growth of the specialty palliative care workforce. *Health Aff.* 38(6), 910–918 (2019).

2    Dowd B, Nyman JA. cost–effectiveness analysis in the context of us commercial health insurance. *Pharmacoeconomics* 37(6), 743–744 (2019).

3    Ward MJ, Bonomo JB, Adeoye O *et al.* cost–effectiveness of diagnostic strategies for evaluation of suspected subarachnoid hemorrhage in the emergency department. *Acad. Emerg. Med.* 19(10), 1134–1144 (2012).

4    Drummond MF, Sculpher MJ, Claxton K, Stoddart GL, Torrance GW. *Methods for the Economic Evaluation of Health Care Programmes.* NY, USA, USA (2015).

5    Sanders GD, Neumann J, Basu A *et al.* Recommendations for conduct, methodological practices and reporting of cost–effectiveness analyses: second panel on cost–effectiveness in health and medicine. *JAMA* 316(10), 1093–1103 (2016).

6    Basu A, Meltzer D. Implications of spillover effects within the family for medical cost–effectiveness analysis. *J. Health Econ.* 24(4), 751–773 (2005).

7    Gold M. Panel on cost–effectiveness in health and medicine. *Med. Care* 34(12), DS197–DS199 (1996).

8    Sanders GD, Neumann PJ, Basu A *et al.* Recommendations for conduct, methodological practices and reporting of cost–effectiveness analyses: second panel on cost–effectiveness in health and medicine. *JAMA* 316(10), 1093–1103 (2016).

9    Walker LO, Avant KC. *Strategies for Theory Construction in Nursing. (4th Edition).* Pearson Education, NJ, USA (2004).

10   Lin PJ, D'Cruz B, Leech AA *et al.* 2019. Family and caregiver spillover effects in cost-utility analyses of Alzheimer's disease interventions. *Pharmacoeconomics* 37(4), 597–608 (2019).

11   Tubeuf S, Saloniki EC, Cottrell D. Parental health spillover in cost–effectiveness analysis: evidence from self-harming adolescents in England. *Pharmacoeconomics* 37(4), 513–530 (2019).

●    **Used data from a randomized, controlled trial comparing two interventions for self-harming adolescents, family therapy with treatment as usual. Findings suggested that parents' utility values increased throughout the duration of the trial and were positively associated with their adolescent's health status, measured by utility values.**

12   Wittenberg E, James LP, Prosser LA. Spillover effects on caregivers' and family members' utility: a systematic review of the literature. *Pharmacoeconomics* 37(4), 475–499 (2019).

13   Grosse SD, Pike J, Soelaeman R, Tilford JM. Quantifying family spillover effects in economic evaluations: measurement and valuation of informal care time. *Pharmacoeconomics* 37(4), 461–473 (2019).

14   Jacobs JC, Van Houtven CH, Tanielian T, Ramchand R. Economic spillover effects of intensive unpaid caregiving. *Pharmacoeconomics* 37(4), 553–562 (2019).



15    Hurley J, Mentzakis E. Health-related externalities: evidence from a choice experiment. *J. Health Econ.* 32(4), 671–681 (2013).

16    Baicker K, Robbins JA. Medicare payments and system-level health-care use: the spillover effects of Medicare managed care. *Am. J. Health Econ.* 1(4), 399–431 (2015).

17    Brown CC, Tilford JM, Payakachat N *et al.* Measuring health spillover effects in caregivers of children with autism spectrum disorder: a comparison of the eq-5d-3l and sf-6d. *Pharmacoeconomics* 37(4), 609–620 (2019).

18    Campbell JA, Ezzy D, Neil A *et al.* A qualitative investigation of the health economic impacts of bariatric surgery for obesity and implications for improved practice in health economics. *Health Econ.* 27(8), 1300–1318 (2018).

•    **Cost–effectiveness analysis on bariatric surgery; authors finds positive human capital spillovers from patients reflecting positive self-worth into their productivity as an employee in the workplace after bariatric surgery.**

19    Canaway A, Al-Janabi H, Kinghorn P *et al.* Close-person spill-overs in end-of-life care: using hierarchical mapping to identify whose outcomes to include in economic evaluations. *Pharmacoeconomics* 37(4), 573–583 (2019).

20    Hoefman RJ, van Exel J, Brouwer WBF. The monetary value of informal care: obtaining pure time valuations using a discrete choice experiment. *Pharmacoeconomics* 37(4), 531–540 (2019).

21    McCabe C. Expanding the scope of costs and benefits for economic evaluations in health: some words of caution. *Pharmacoeconomics* 37(4), 457–460 (2019).

22    Al-Janabi H, McLoughlin C, Oyebode J *et al.* Six mechanisms behind carer wellbeing effects: a qualitative study of healthcare delivery. *Soc. Sci. Med.* 235, 112382 (2019).

23    Bhadhuri A, Jowett S, Jolly K *et al.* A comparison of the validity and responsiveness of the EQ-5D-5L and SF-6D for measuring health spillovers: a study of the family impact of meningitis. *Med. Decis. Mak.* 37(8), 882–893 (2017).

24    Miller C, Pender J, Hertz T. *Employment Spillover Effects of Rural Inpatient Healthcare Facilities.* (Economic Research Report No. (ERR-241)) (2017). https://www.ers.usda.gov/publications/pub-details/?pubid=86253

25    Brouwer WBF. The inclusion of spillover effects in economic evaluations: not an optional extra. *Pharmacoeconomics* 37(4), 451–456 (2019).

26    Lakdawalla DN, Doshi JA, Garrison LP Jr, Phelps CE, Basu A, Danzon PM. Defining elements of value in health care – a health economics approach: an ISPOR Special Task Force Report. *Value Health* 21(2), 131–139 (2018).

27    Johnson G, Figueroa JF, Zhou X, Orav EJ, Jha AK. Recent growth in Medicare Advantage enrollment associated with decreased fee-for-service spending in certain US counties. *Health Affairs* 35(9), 1707–1715 (2016).

28    Arora S, Goodall S, Viney R *et al.* Using discrete-choice experiment methods to estimate the value of informal care: the case of children with intellectual disability. *Pharmacoeconomics* 37(4), 501–511 (2019).

29    Galizzi MM, Whitmarsh L. How to measure behavioral spillovers: a methodological review and checklist. *Front. Psychol.* 10, 342 (2019).

30    Kunst JR, Løset GK, Hosøy D *et al.* The relationship between shift work schedules and spillover in a sample of nurses. *Int. J. Occup. Saf. Ergon.* 20(1), 139–147 (2014).

31    Zhou ZE, Meier LL, Spector PE. The spillover effects of coworker, supervisor and outsider workplace incivility on work-to-family conflict: a weekly diary design. *J. Organizational Behav.* 40(9–10), 1000–1012 (2019).

32    Amstad FT, Semmer NK. Spillover and crossover of work-and family-related negative emotions in couples. *Psychol. Everyday Activity* 4(1), 43–55 (2011).

33    Jones CR, Whitmarsh LE, Byrka K *et al.* Methodological, theoretical and applied advances in behavioural spillover. *Front. Psychol.* 10, 2701 (2019).

34    Nash N, Whitmarsh L, Capstick S *et al.* Climate-relevant behavioral spillover and the potential contribution of social practice theory. *WIREs Clim. Change* 8, e481 (2017).

35    Aranda E, Menjívar C, Donato KM. The spillover consequences of an enforcement-first u.s. immigration regime. *Am. Behav. Sci.* 1687–1695 (2014).

36    Hagan J, Foster H. Children of the american prison generation: student and school spillover effects of incarcerating mothers. *Law Soc. Rev.* 46(1), 37–69 (2012).

37    Timmermans S, Orrico LA, Smith J. Spillover effects of an uninsured population. *J. Health Soc. Behav.* 55(3), 360–374 (2014).

•    **Uses open-interviewing, qualitative methods to elucidate the effects of a lack of insurance on two institutions, churches and schools. Negative spillover effects noted with increased absenteeism within schools, while less spillovers were noted in religious institutions.**

38    Braga AA, Zimmerman G, Barao L, Farrell C, Brunson RK, Papachristos AV. Street gangs, gun violence and focused deterrence: comparing place-based and group-based evaluation methods to estimate direct and spillover deterrent effects. *J. Res. Crime Delinquency* 56(4), 524–562 (2019).

39    Frischmann BM, Lemley MA. Spillovers. *Colum. L. Rev.* 107, 257 (2007).

40    Sahni NS. Advertising spillovers: evidence from online field experiments and implications for returns on advertising. *J. Marketing Res.* 53(4), 459–478 (2016).

41    Grillitsch M, Nilsson M. Innovation in peripheral regions: do collaborations compensate for a lack of local knowledge spillovers? *Ann. Reg. Sci.* 54(1), 299–321 (2015).

42    Merriam-Webster. *Merriam-Webster Online* (2020). https://www.merriam-webster.com/dictionary/spillover?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

43    Jemna LM. Qualitative and mixed research methods in economics: the added value when using qualitative research methods. *J. Public Admin. Finance Law* 154–67 (2016).

44    Dopp AR, Mundey P, Beasley LO *et al.* Mixed-method approaches to strengthen economic evaluations in implementation research. *Implement. Sci.* 14(1), 1–9 (2019).

•    **Overview of qualitative methodological integration into mixed methods research. Asserts that elucidation of patient preferences can be overlooked when qualitative investigations are omitted from economic evaluations.**

45    Brazier J, Roberts J, Tsuchiya A. A comparison of the EQ-5D and SF-6D across seven patient groups. *Health Econ.* 13(9), 873–884 (2004).

46    Brooks R, Group E. EuroQol: the current state of play. *Health Pol.* 37(1), 53–72 (1996).

47    Husbands S, Jowett S, Barton P *et al.* How qualitative methods can be used to inform model development. *Pharmacoeconomics* 35(6), 607–612 (2017).

48    Kauffman KS. The insider/outsider dilemma: field experience of a white researcher "getting in" a poor black community. *Nursing Res.* 43(3), 179–183 (1994).

49    Wolcott HF. On ethnographic intent. *Educat. Admin. Q* 21(3), 187–203 (1985).

50    Lincoln YS, Guba EG. *Naturalistic Inquiry.* Sage Publications Inc., CA, USA (1985).

51    Siebert U, Alagoz O, Bayoumi AM *et al.* Conceptualizing a model: a report of the ispor-smdm modeling good research practices task force-2 mark. *Med. Decis. Mak.* 32(5), 678–689 (2012).

52    Coast J. Qualitative methods for health economics. Rowman & Littlefield, MD, USA, 261–270 (2009).

•    **Systematic review article evaluates the use of economic evaluations for decision making on a national and local (within hospitals or among providers) level. Institutional, methodological and cultural factors influences the use of economic evaluations for decision-making.**

# EXHIBIT Q

ANNALS, AAPSS, **455**, May 1981

# The Effect of Gun Availability on Violent Crime Patterns

By PHILIP J. COOK

ABSTRACT: Social scientists have started to find answers to some of the questions raised in the ongoing debate over gun control. The basic factual issue in this debate concerns the effect of gun availability on the distribution, seriousness, and number of violent crimes. Some evidence is available on each of these dimensions of the violent crime problem. The distribution of violent crimes among different types of victims is governed in part by the "vulnerability pattern" in weapon choice. The seriousness of robbery and assault incidents is influenced by weapon type, as indicated by the objective dangerousness and instrumental violence pattern. A reduction in gun availability would cause some weapon substitution and probably little change in overall robbery and assault rates—but the homicide rate would be reduced.

---

*Philip J. Cook is an associate professor of public policy studies and economics, Duke University. His research has focused primarily on the criminal justice system and other aspects of social regulation. He has collaborated with Mark H. Moore on a series of studies relating to gun control.*

THE DEBATE over the appropriate degree of governmental regulation of firearms has been a prominent feature of the political landscape for the last two decades. The claims and counterclaims for various gun control strategies have been bruited in congressional and state legislative hearings, political campaigns, editorials, and bumper strips. The issues are by this time familiar to even disinterested bystanders: the proper interpretation of the Second Amendment; the value of guns as a means of defense against burglars, or foreign invaders, or local tyrants; the difficulty of depriving criminals of guns without depriving the rest of us of basic rights; and so forth. This "great American gun war"[1] clearly involves both value questions and questions of fact, and the latter have been the subject of numerous statistical skirmishes. Strangely, however, the relevant factual questions have not attracted much attention from scholars until very recently. The role of guns—and other types of weapons—in violent crime is a fit and important subject for scientific inquiry. No etiological theory of violent crime is complete without due consideration of the technology of violent crime. This would be true even in the absence of political interest in gun control.

Each of the major categories of violent crime—criminal homicide, aggravated assault, robbery, and rape—is committed with a variety of weapons. Guns are used in a minority of violent crimes, but are of special concern because they are used in almost two thirds of the most serious events, criminal homicides,

and because, unlike most other commonly used weapons (hands, kitchen knives, and baseball bats), it is conceivable that we might reduce the availability of guns without imposing unacceptable costs on the public. The principal factual question in the gun control debate is whether reducing gun availability would reduce the amount and/or seriousness of violent crime. Can potential violent criminals be deterred from obtaining guns, carrying guns, and using guns in crime? If so, will this reduction in gun use make any difference, or will criminals simply substitute other weapons to equal effect? The answers to these questions are crucial to policy evaluation. Our ability to answer these questions—to make accurate predictions about the effects of legal interventions in this area—is one measure of our scientific understanding of the role of weapons in violent crime.

At the sacrifice of some dramatic tension, I provide a preview of my results here. The type of weapon used in a violent crime is in part determined by the nature of the victim; guns are most likely to be used against the least vulnerable victims in robbery and homicide. The type of weapon used in a violent crime influences the outcome of the crime: gun robberies, when compared with other types of robbery, are more likely to be successful, less likely to result in injury to the victim, and more likely to result in the victim's death; gun assaults are more likely to result in the victim's death than knife assaults, *ceteris paribus*. A general increase in gun availability would probably have little effect on the overall robbery rate, but would increase the homicide rate, including the rate of robbery murder, and possibly reduce

1. A phrase coined by B. Bruce-Briggs, "The Great American Gun War," *The Public Interest*, 45:1–26 (fall 1976).

the number of aggravated assaults. These and other predictions emerge from the empirical results presented here. My overall conclusion is that the technology of violent crime matters a great deal in a number of dimensions, with important implications for the gun control debate.

## THE BASIC ISSUES

Gun control measures come in a variety of forms, but most share the objective of reducing the availability of guns for use in violent crime. Most federal and state gun regulations in the United States are moderate interventions intended to reduce criminal use while preserving the majority's access to guns for legitimate uses.[2] Washington, D.C., and New York City have adopted a much broader attack on the handgun problem, with a ban on sales to all but a few people. Whether the regulations are moderate or extreme, some opponents of gun control insist that a regulatory approach will be ineffective in reducing criminal violence. Their position is summarized in two bumper strips: "When guns are outlawed, only outlaws will have guns," and "Guns don't kill people—people kill people." The former suggests that "outlaws" will acquire guns, despite whatever steps are taken to stop them, that is, that criminals will continue to do what is necessary to obtain guns, even if the price, hassle, and legal threats associated with obtaining a gun are increased substantially. The latter bumper strip apparently is meant to suggest that people who decide to kill will find a way even if they do not have access to guns. This is one aspect of a more general issue, the degree of "sub-

stitutibility" between guns and other weapons in homicide and other violent crimes. In short, does the type of weapon matter?

Supposing that we were somehow successful in discouraging some violent people from obtaining guns and using them in crime, how might violent crime patterns change? Three dimensions of the violent crime problem are important: (1) the *distribution* of robberies, aggravated assaults, rapes, and homicides across different types of victims, for example, commercial versus noncommercial robbery; (2) the *seriousness* of robberies, rapes, and aggravated assaults; and (3) the overall *rates* of each of these crimes. These three dimensions are considered in turn in the next three sections.[3]

### DISTRIBUTION: THE VULNERABILITY PATTERN

People who attempt robbery or homicide are more likely to succeed with a gun than with other commonly used weapons. A gun is particularly valuable against victims who are physically strong, armed, or otherwise relatively invulnerable—the gun is "the great equalizer." The patterns of weapon use in criminal homicide and robbery demonstrate that perpetrators are most likely to use guns against victims who would have the best chance of defending themselves against other weapons; that is, the likelihood of a gun being chosen by a robber or killer increases with the value of a gun in effecting a successful completion of the crime. These observations suggest that a program that is successful in re-

<hr />

2. For a summary of federal and state gun control measures, see my article, with James Blose, in this issue.

3. I am indebted to Mark Moore for this approach to carving up the violent crime problem. In the review that follows I omit any discussion of rape, since relevant empirical studies are lacking for this crime.

ducing the rate of gun ownership by potential robbers or killers will change the relative distribution of these crimes among different types of victims. The evidence and implications of the vulnerability pattern are presented in the following sections, beginning with criminal homicide.

### Criminal homicide

A decision to kill is easier and safer to implement with a gun than with other commonly available weapons—there is less danger of effective victim resistance during the attack, and the killing can be accomplished more quickly and impersonally, with less sustained effort than is usually required with a knife or blunt object. A gun has greatest value against relatively invulnerable victims, and the vulnerability of the victim appears to be an important factor in determining the probability that a gun will be used as the murder weapon.

The least vulnerable victims are those who are guarded or armed. All presidential assassinations in U.S. history were committed with a handgun or rifle. Almost all law enforcement officers who have been murdered in recent years were shot: in 1978, 91 of 93 murdered officers were killed by guns.[4]

Physical size and strength are also components of vulnerability. In 1977, 68.5 percent of male homicide victims were shot, compared with only 51.0 percent of female homicide victims.[5] The victims' age pattern of

gun use also reflects the vulnerability pattern: about 70 percent of victims aged 20–44 are shot, but this fraction drops off rapidly for younger and older—that is, more vulnerable—victims.[6]

Vulnerability is of course a relative matter. We would expect that the lethality of the murder weapons would be directly related to the difference in physical strength between the victim and killer, other things being equal. To investigate this hypothesis, I used FBI data coded from the supplemental homicide reports submitted for 1976 and 1977 by police departments in 50 large cities. These data include the demographic characteristics of the victim and, where known, the offender, as well as the murder weapon, immediate circumstances, and apparent motive of the crime. The results calculated from these data tend to confirm the relative vulnerability hypothesis. First, women tend to use more lethal weapons to kill their spouses than do men: 97 percent of the women, but only 78 percent of the men, used a gun or knife. The gun fractions in spouse killings are 67 percent and 62 percent, respectively—not a large difference, but one that is notable, since women typically have less experience than men in handling guns and are less likely to think of any guns kept in the home as their personal property. It is also true that women who kill their "boyfriends" are more likely to use a gun than men who kill their "girlfriends."

Table 1 focuses on killings resulting from arguments and brawls in which both the killer and the victim were males. The gun fraction increases with the age of the killer and is inversely related to the age

4. FBI, *Crime in the United States, 1978* (Washington, DC: U.S. Government Printing Office).

5. U.S. Department of Commerce, Bureau of the Census, *Statistical Abstract of the U.S., 1978* (Washington, DC: U.S. Government Printing Office).

6. FBI.

TABLE 1

GUN USE IN MURDERS AND NONNEGLIGENT HOMICIDES RESULTING FROM
ARGUMENTS OR BRAWLS, MALE VICTIM AND MALE OFFENDER

| VICTIM'S AGE | OFFENDER'S AGE | | |
|---|---|---|---|
| | 18–39 | 40–59 | 60+ |
| 18–39 (in percentage) | 68.0 | 79.6 | 87.2 |
| N* | 1906 | 368 | 47 |
| 40–59 (in percentage) | 54.5 | 64.1 | 66.7 |
| N | 398 | 245 | 57 |
| 60+ (in percentage) | 48.3 | 49.2 | 63.3 |
| N | 58 | 61 | 30 |

SOURCE: FBI Supplemental Homicide Reports, 50 large cities, 1976 and 1977 combined (unpublished).
    * N = the sample size, that is, the denominator of the fraction. Cases in which the age of the killer is not known are excluded.

of the victim: the highest gun fraction—87 percent—involves elderly killers and youthful victims; the lowest gun fraction—48 percent—involves youthful killers and elderly victims. Since age is highly correlated with strength and robustness, these results offer strong support for the relative vulnerability hypothesis.

Why are less vulnerable murder victims more likely to be shot than relatively vulnerable victims? A natural interpretation of this result is that intended victims who are physically strong or armed in some fashion are better able to defend themselves against homicidal assault than more vulnerable victims—unless the assailant uses a gun, the "great equalizer." The "vulnerability pattern" can then be explained as resulting from some combination of three mechanisms. (1) Homicidal attacks are more likely to fail against strong victims than weak ones, and the difference in the likelihood of failure is greater for nongun attacks than attacks with a gun. (2) The likelihood that an individual will act on a homicidal impulse depends in part on the perceived probability of success. The intended

victim's ability to defend himself acts as a deterrent to would-be killers—but this deterrent is much weaker if the killer has a gun than otherwise. (3) In the case of a planned murder, the killer will have the opportunity to equip himself with a tool that is adequate for the task. Against well-defended victims, the tool chosen will almost certainly be a gun, if one can be obtained without too much difficulty.

Each of these mechanisms is compatible with the prediction that a reduction in gun availability will cause a reduction in homicide, a reduction that will be concentrated on killings that involve a victim who is physically stronger than the killer. A number of specific hypotheses are suggested by this observation, including the following: a reduction in gun availability will reduce the male:female victimization ratio in killings of spouses and other intimates, reduce the fraction of homicide victims who are youthful males, and reduce the fraction of killers who are elderly.

### Robbery

Robbery is defined as theft or attempted theft by means of force or

the threat of violence.[7] The robber's essential task is to overcome through intimidation or force the victim's natural tendency to resist parting with his valuables. A variety of techniques for accomplishing this task are used in robbery, including actual attack—as in "muggings" and "yokings"—and the threatening display of a weapon such as a gun, knife, or club. Whatever the means employed, the objective is to quickly gain the victim's compliance or to render him helpless, thereby preventing the victim from escaping, summoning help, or struggling. The amount of what could be called "power"—capability of generating lethal force—the robber needs to achieve these objectives with high probability depends on the characteristics of the robbery target—victim—and in particular on the vulnerability of the target. The most vulnerable targets are people who are young, elderly, or otherwise physically weak or disabled—for example, by alcohol—who are alone and without ready means of escape. The least vulnerable targets are commercial places, especially where there are several customers and clerks and possibly even armed guards—a bank being one extreme example.

A gun is the most effective tool for enhancing the robber's power. Unlike other common weapons, a gun gives a robber the capacity to threaten deadly harm from a distance, thus allowing him to maintain a buffer zone between himself and the victim and to control several victims simultaneously. A gun serves to pre-empt any rational victim's inclination to flee or resist.[8] Wesley Skogan documented the effectiveness of a gun in forestalling victim resistance in his analysis of a national sample of victim-reported robberies:[9] only 8 percent of gun robbery victims resisted physically in noncommercial robberies, compared with about 15 percent of victims in noncommercial robberies involving other weapons.[10] Other types of resistance—arguing, screaming, and fleeing—were also less common in gun robbery than in robbery involving other weapons.

It seems reasonable to assume that, from the robber's viewpoint, the value of employing a gun tends to be inversely related to the vulnerability of the target. A gun will cause a greater increase in the likeli-

7. The perspective of this section was first developed in John Conklin's seminal work on robbery in Boston: *Robbery and the Criminal Justice System* (Philadelphia: J. B. Lippincott, 1972).

8. Ibid., pp. 110–11; Conklin analyzes a gun's usefulness in terms of the ability it provides the robber to (1) maintain a buffer zone; (2) intimidate the victim; (3) make good the threat, if necessary; and (4) ensure escape.

9. Wesley Skogan, "Weapon Use in Robbery: Patterns and Policy Implications," unpublished manuscript (Northwestern University: Center for Urban Affairs, 1978). He used the robbery incident reports collected from the National Crime Panel, which occurred during calendar year 1973. It should be noted that any analysis of victim survey data relies on the victim's impression of the nature of the weapon that was employed in the robbery. In some cases the "gun" may be a toy, or simulated; Floyd Feeney and Adrianne Weir [*The Prevention and Control of Robbery: A Summary*," unpublished manuscript (University of California, Davis: Center on Admin. of Criminal Justice, 1974] report that of 58 "gun" robbers interviewed in Oakland, 3 claimed to have used toys and 4 to have simulated the possession of a gun.

10. Richard Block [*Violent Crime* (Lexington, MA: Lexington Books, 1977)] found from studying robbery police reports in Chicago that victims who resisted with physical force typically (68 percent) did so in response to the robber's use of force. Other types of resistance typically (70 percent) preceded the robber's use of force.

hood of success against well-defended targets than against more vulnerable targets. A strong-arm technique will be adequate against an elderly woman walking alone on the street—a gun would be redundant with such a victim—but a gun is virtually a requirement of successful bank robbery. Skogan provides evidence supporting this claim: he finds little relationship between robbery success rates and weapon type for personal robbery, but a very strong relationship for commercial robbery. He reports that success rates in commercial robbery were 94 percent with a gun, 65 percent with a knife, and 48 percent with other weapons.[11]

In economic terms, we can characterize robbery as a production process with weapons, robbers, and a target as "inputs."[12] The "output" of the production process can be defined as the probability of success. This probability increases with the number and skill of the robbers, the vulnerability of the target, and the lethal effect of the weapons. For given robber and target characteristics, the "marginal product" of a gun can be defined as the increase in probability of success if the robber(s) substitute a gun for, say, a knife. The evidence presented in the preceding paragraphs suggests that the marginal product of a gun is small against vulnerable targets and is relatively large against well-defended targets. We can go one step further and de-

fine the "value of a gun's marginal product" as its marginal product (increase in success probability) multiplied by the amount of loot if the robbery is successful. Since for obvious reasons, targets with greater potential loot tend to be better defended against robbery,[13] the *value* of the gun's marginal product is even more strongly related to target vulnerability than is the marginal product of the gun. The conclusion can be put in the form of a proposition:

The economic value of a gun in robbery tends to be greatest against commercial targets and other well-defended targets, and least against highly vulnerable targets.

It makes good economic sense, then, for gun use in robbery to be closely related to target vulnerability. This is indeed the case, as demonstrated in Table 2, which is based on tabulating results of more than 12,000 robbery reports taken from victim survey data gathered in 26 large cities.

From Table 2, we see that 55 percent of gun robberies committed by adults, but only 13 percent of other adult armed robberies, involve commercial targets. Those relatively few gun robberies that were committed against people on the street are concentrated on relatively invulnerable targets—groups of two or more victims or prime-age males—while street robbery with other weapons was more likely to involve women, children, and elderly victims. Skogan

11. Skogan.

12. This perspective is further developed in Philip J. Cook, "The Effect of Gun Availability on Robbery and Robbery Murder: A Cross Section Study of Fifty Cities," in *Policy Studies Review Annual*, eds. Robert H. Haveman and B. Bruce Zellner, Vol. 3 (Beverly Hills, CA: Sage, 1979), pp. 752–53 (hereafter cited as "The Effect of Gun Availability").

13. It is obvious that commerical targets tend to be more lucrative than noncommercial and that a group of two or more victims will be more lucrative on the average than a single victim. Feeney and Weir (p. 24) report the not-so-obvious result that robberies of male victims resulted in a much higher median take ($50) than robberies of female victims (less than $20).

No. 1:22-cv-02680-NYW-TPO    Document 123-12    filed 09/05/25    USDC Co
pg 214 of 223

TABLE 2

DISTRIBUTION OF ROBBERIES (IN PERCENTAGE)

| ALL ROBBERIES ACROSS LOCATIONS | GUN | KNIFE OR OTHER WEAPON | UNARMED |
|---|---|---|---|
| Commercial | 55.1 | 13.3 | 19.1 |
| Residence | 6.4 | 10.4 | 8.5 |
| Street, vehicle, and so forth | 38.5 | 76.3 | 72.4 |
| Total | 100.0 | 100.0 | 100.0 |

| STREET ROBBERIES BY VICTIM CHARACTERISTICS | GUN | KNIFE OR OTHER WEAPON | UNARMED |
|---|---|---|---|
| Male victim age 16–54 | 59.8 | 53.8 | 41.1 |
| Two or more victims | 10.5 | 5.8 | 3.7 |
| All others (young, elderly, and/or female victim) | 29.7 | 40.4 | 55.2 |
| Total | 100.0 | 100.0 | 100.0 |

SOURCE: Adapted from Philip J. Cook, "Reducing Injury and Death Rates in Robbery," p. 43. © 1980 by The Regents of the University of California. Reprinted from *Policy Analysis*, Volume 6, No. 1 (Winter 1980), by permission of The Regents. The distributions are calculated from National Crime Panel victimization survey data of 26 cities.

NOTE: All incidents involved at least one male robber age 18 or over. Entries in the table reflect survey sampling weights.

provides further detail for commercial robberies, reporting that the likelihood that a gun is present in such robberies is only 44 percent for commercial places that have only one employee, but 68 percent for commercial places with two or more employees.[14]

What is the causal process that produces these patterns in gun robbery? There are two plausible explanations, both compatible with the evidence presented in the preceding paragraphs: (1) robbers who aspire to well-defended, lucrative targets equip themselves with a gun in order to increase their chance of success or (2) robbers who happen to have a gun are more tempted to rob lucrative, well-defended targets than robbers who lack this tool. In short, the question is whether the weapon is chosen to suit the task or, rather,

the available weapon helps define the task. There is doubtless some truth in both explanations.

The first explanation suggests that the observed relationship between gun use and target choice is the result of differences between the kinds of people that rob lucrative targets and those who commit relatively petty street robberies—a difference reminiscent of John Conklin's distinction between "professionals" and "opportunists."[15] Victim survey evidence does suggest that gun robbers as a group have more of the earmarks of professionalism than other armed robbers: besides the fact that they make bigger "scores," gun robbers are older, less likely to rob acquaintances, and less likely to work in large groups of three or more. The factors that determine a robber's choice of weapon have some tendency to persist: a cohort of adult

14. Ibid., calculated from figures in his Table 3.

15. Ibid.

men arrested for gun robbery in the District of Columbia showed a greater propensity to use guns in subsequent robberies than the corresponding cohort of nongun robbery arrestees.[16]

It seems reasonable to hypothesize, then, that robbers who engage in planning and who seek out big scores will take pains to equip themselves with the appropriate weapon —usually some type of firearm. The frequency with which other less professional robbers use guns, and hence the kinds of targets they choose, may be more sensitive to the extent to which such people have access to guns and are in the habit of carrying them, for whatever reason. Increased availability of guns may then result in some target switching by this group—substitution of more lucrative, better-defended targets for more vulnerable targets. Increased gun availability may also result in weapon substitution for a given type of target, implying an increase in the fraction of street robberies committed with a gun; that is, guns will be put to less valuable uses, as guns become "cheaper." These hypotheses can be stated more precisely as follows:

16. Philip J. Cook and Daniel Nagin, *Does the Weapon Matter?* (Washington, DC: Institute for Law and Social Research, 1979). The results cited here are based on 541 adult male gun robbery arrestees and 761 nongun robbery arrestees. This cohort, which was arrested in 1973, was tracked through 1976 through Prosecutor's Management Information System (PROMIS). The robbery re-arrest rate for the gun cohort was 43 percent, of which 58 percent were gun robberies. The robbery re-arrest rate for the nongun cohort was 45 percent, of which 40 percent were gun robberies. The two cohorts had the same re-arrest rate for burglary (13 percent), but the nongun cohort was much more likely to be re-arrested for assaultive crimes (22 percent, as opposed to 13 percent for the gun cohort); see Table 9 of Cook and Nagin.

An increase in gun availability in a city will (1) increase the fraction of noncommercial robberies commited with a gun and (2) increase the fraction of robberies committed against commercial and other well-defended targets.

In an earlier study of robbery patterns across 50 cities,[17] I found some confirmation for the first of these two predictions; controlling for other robbery-related variables, the fraction of robberies committed with a gun increases with the density of gun ownership in a city. A 10 percent increase in the fraction of households that owns guns is associated with approximately a 5 percent increase in the rate of gun robbery.

*Conclusions*

The preceding evidence demonstrates the existence of an important vulnerability pattern in weapon choice in homicide and robbery. Guns give assailants the power to succeed in killing or robbing relatively invulnerable victims who would have a good chance of fending off attack with a less lethal weapon. If some potential killers were deprived of guns, the criminal homicide rate would be reduced. The reduction would be concentrated among the least vulnerable types of potential victims—law enforcement officers, people with bodyguards, husbands of homicidal women, youthful men, and so forth. If robbers were deprived of guns, there would be a reduction in robberies against commercial places and other well-defended victims. In general, a reduction in gun availability would change the distribution of violent crimes, with greater concentration on vulnerable victims.

17. Cook "The Effect of Gun Availability."

## SERIOUSNESS: THE OBJECTIVE DANGEROUSNESS PATTERN

Recall that I am concerned with three dimensions of violent crime: the distribution, the seriousness, and the number of incidents. The vulnerability pattern suggests that gun availability will in certain respects influence the distribution of robberies and homicides across different categories of victims. I now turn to the seriousness dimension of violent crime. "Seriousness" in this discussion will be defined as the degree of injury to the victim. A violent or potentially violent confrontation, as in robbery, rape, or assault, can result in a range of possible outcomes, from no physical harm up to serious injury or death of the victim. The likelihood that the victim will be killed is influenced by the lethal effects of the weapon used by the perpetrator. The evidence on this "objective dangerousness" pattern is presented first for serious assaults, and subsequently for robbery.

### Serious assaults

The fraction of serious gun assaults that result in the victim's death is much higher than for assaults with other weapons. Richard Block, for example, found that of all aggravated assaults resulting in injury to the victim—and reported to the Chicago Police—14 percent of the gun cases, but only 4 percent of the knife cases, resulted in the victim's death.[18] In part, this difference is the result of differences between gun and knife attacks in intent and capability. An assailant who intends to kill his victim, and who has some chance to prepare, is more likely to equip himself with a gun than an

assailant who merely intends to hurt his victim. Furthermore, an attack that is intended to kill is more likely to be successful if perpetrated with a gun than with a knife or other weapon —especially against victims who are capable of defending themselves. But differences in intent and capability are not the whole story.

Franklin Zimring has demonstrated that a large proportion of murders are similar to serious assaults in that the attacks are unsustained[19]—the assailant does not administer the coup de grace, the blow that would ensure the death of his victim. Indeed, the victim was shot only once in about two thirds of the gun homicides in Zimring's Chicago samples. These cases differ very little from serious assaults: for every death resulting from a single wound in the head or chest, Zimring found 1.8 victims with the same type of wound who did not die[20]—victims who were clearly not saved by any differences in the gunman's intent or capability, but rather just by good luck with respect to the precise location of the wound.

Evidently, some proportion of gun murders are not the result of a clear intent to kill; given that the majority of murders are the immediate result of altercations, often involving alcohol and rarely much thought, it seems unlikely that many killers have any clearly formulated "intent" at the time of their attack. The assailant's mental state is characterized by an impulse—to punish, avenge an insult, or stop a verbal or physical attack—backed by more or less

18. Ibid., p. 33

19. Franklin Zimring, "The Medium is the Message: Firearm Calibre as a Determinant of Death from Assault," *J. Legal Studies*, I(1): 97–124 (Jan. 1972); and idem, "Is Gun Control Likely to Reduce Violent Killings?" *Univ. Chicago Law Review*, 35:721–37 (1967).

20. Ibid., computed from Table 7, p. 104.

cathexis. The immediate availability of a gun makes these circumstances more dangerous than would a less lethal weapon because an unsustained attack with a gun—a single shot—is more likely to kill than an unsustained attack with another weapon.

Zimring buttressed the conclusions from his first study, which compared knife and gun attacks, with a later study comparing large and small caliber gun attacks. Even after controlling for the number and location of wounds, he found that .38 caliber attacks were more than twice as likely to kill as .22 caliber attacks.[21] It appears, then, that weapon dangerousness has a substantial independent impact on the death rate from serious assaults.

Zimring's seminal work in this area supports several important propositions, including:

1. A restrictive gun control policy that causes knives and clubs to be substituted for guns will reduce the death rate in serious assault.

2. A gun control policy that focuses on handguns may increase the death rate from gun assault if shotguns and rifles are substituted for handguns as a result.[22]

3. In setting prosecution and sentencing priorities for aggravated assault cases, gun assaults should be viewed as more serious than assaults with other weapons, *ceteris paribus*, since there is a higher probability of the victim's dying in the gun assaults. This is Zimring's "objective dangerousness" doctrine.[23]

21. Ibid., 1972.

22. This implication has been pointed out by Gary Kleck, "The Assumptions of Gun Control" (Florida State University, 1980) (unpublished).

23. "In the generality of cases, how likely is it that conduct such as that engaged in by the offender will lead to death?" Zimring, p. 114.

Richard Block extended Zimring's work on instrumentality by comparing death rates in aggravated assault and robbery cases. He concludes that "the relative fatality of different weapons in violent crime may be a technological invariant— . . . the probability of death given injury and a particular weapon remains relatively constant and unrelated to the type of crime committed."[24]

The notion that the number of deaths per 100 injuries is a "technical" constant, largely determined by the lethality of the weapon, is not supportable, however. Zimring demonstrated that the type of weapon was one important determinant of the outcome of serious attacks, but did not claim it was the only determinant. Presumably the weapon-specific death rates in such attacks will differ across jurisdictions and vary over time depending on the mix of circumstances, the quality of medical care, and so forth. Arthur Swersey presents an interesting case in point.[25]

Swersey reports that the number of assaultive—as opposed to felony—gun homicides in Harlem increased from 19 in 1968 to 70 in 1973, and then fell back to 46 in 1974. Much of the change between 1968 and 1973 was from an increase in intentional killings resulting from disputes involving narcotics activities. The importance of changes in the intent of violent perpetrators during this period is indicated by the fact that the death rate in gun attacks doubled between 1968 and 1973, and then fell back in 1974. Swersey concludes that more than 80 percent

24. Block, p. 32.

25. "A Greater Intent to Kill: The Changing Pattern of Homicide in Harlem and New York City" (Yale School of Organization and Management, 1980) (unpublished).

No. 1:22-cv-02680-NYW-TPO    Document 123-12    filed 09/05/25    USDC Co
pg 218 of 223

TABLE 3

LIKELIHOOD OF PHYSICAL ATTACK AND INJURY IN ROBBERY (IN PERCENTAGE)

| | GUN* | KNIFE† | OTHER WEAPON | UNARMED |
|---|---|---|---|---|
| Noncommercial robbery** | | | | |
|   Victim attacked | 22.1 | 39.4 | 60.4 | 73.5 |
|   Victim required medical treatment† | 7.2 | 10.9 | 15.5 | 11.1 |
|   Victim hospitalized overnight | 2.0 | 2.6 | 2.7 | 1.6 |
|   Number of cases (not in percentage) | 892 | 841 | 1060 | 1259 |
| Commercial robbery | | | | |
|   Victim required medical treatment | 4.8 | 10.8 | 17.9 | 5.1 |
|   Victim hospitalized overnight | 1.5 | 3.5 | 6.0 | 0.4 |
|   Number of cases (not in percentage) | 2307 | 288 | 117 | 570 |

SOURCE: National Crime Panel victimization surveys of 26 cities. This table is excerpted from Philip J. Cook, "Reducing Injury and Death Rates in Robbery," Table 2. © 1980 by The Regents of the University of California. Reprinted from *Policy Analysis*, Volume 6, No. 1 (Winter 1980), by permission of The Regents.

NOTE: All incidents included in this table involved at least one male robber age 18 or over. Entries in the table do not reflect the survey sampling weights, which differed widely among the 26 cities.

\* Many robberies involve more than one type of weapon. Incidents of that sort were classified according to the most lethal weapon used.

\*\* Robberies occurring on the street, in a vehicle, or near the victim's home.

† Only about one third of the injured gun robbery victims were actually shot. Two thirds of the injured knife robbery victims were stabbed.

of the rise and fall in Harlem homicides was due to changes in the number of deliberate murders. He finds a similar pattern for the rest of New York City.[26]

Swersey's findings do not undermine Zimring's position. Zimring did not deny that some killings were unambiguously motivated, or that the importance of intent in murder was subject to change over time, or that it might be more important in Harlem than in Chicago. In any event, Swersey's results are useful in documenting these possibilities.

My conclusions can be briefly stated. The likelihood of death from a serious assault is determined, *inter alia*, by the assailant's intent and the lethal nature of the weapon he uses. The type of weapon is especially important when the intent is ambig-

26. Swersey also notes several other indications of an increasing fraction of deliberate murders in the homicide statistics for New York City as a whole. During the 1970s, the clearance rate declined for homicide, as did the fraction of homicides occurring on the weekend and the fraction involving family members.

uous. The fraction of homicides that can be viewed as deliberate—unambiguously intended—varies over time and space, but is probably fairly small as a rule. The fraction of gun assaults that results in the death of the victim is one indication of the relative prevalence of deliberate gun murders.

### Robbery

The principal role of a weapon in robbery is to aid the robber in coercing the victim—either by force or threat—to part with his valuables. If the threat is sufficiently convincing, physical force is not necessary. For this reason, it is hardly surprising that the use of force is closely related to the weapon type in robbery, being very common in unarmed robbery and rare in gun robbery. Table 3 documents this pattern for both commercial and noncommercial robberies committed by adult males. As shown in this table, gun robberies are less likely than other armed robberies to involve

physical violence and, furthermore, are less likely to injure the victim.[27] These patterns are compatible with the notion that violence plays an instrumental role in robbery—that it is employed when the robber believes it is needed to overcome or forestall victim resistance and that this need is less likely to arise when the robber uses a gun than otherwise.

There is evidence, however, that this "instrumental violence" pattern can account for only a fraction of the injuries and deaths that result from robbery. Three observations are relevant in this respect. First, over two thirds of victims injured in noncommercial gun robberies do not resist in any way—even after the attack;[28] similarly, 20 out of 30 victims killed in gun robberies in Dade County between 1974 and 1976 did not resist the robber. Second, the likelihood that the victim will be injured in an armed robbery is much higher if the robbery is committed by a gang of three or more than otherwise; since victims are less likely to offer resistance to a group of three or four robbers than to a lone robber, this result is clearly incompatible with the "instrumental violence" hypothesis. Third, judging from re-arrest statistics for a large cohort of adult robbery arrestees in Washington, D.C., it appears that robbers who injure their victims tend to be more violence prone than other robbers.[29]

These findings are different aspects of an "excess violence" pattern: much of the violence in robbery is not "necessary," in the sense of being an instrumental response to anticipated or actual resistance by the victim. Rather, it is motivated by objectives or impulses that have little to do with ensuring successful completion of the theft. In particular, the high incidence of violence in street robberies committed by larger groups—which typically have a low "take"—is best viewed as a form of recreation, and the gratuitous violence against the victim may be just part of the fun.

Given these findings, it is useful to attempt a distinction between "robbery with intent to injure" or kill and robbery without such intent—in which violence would only be used to overcome victim resistance. The latter form of robbery dominates the statistics—most victims are not in fact injured, and the likelihood of injury is less with guns than with other weapons. However, the more violent strain of robbery, involving an intent to injure, apparently accounts for a high percentage of the serious injuries and deaths that do occur in the robbery context. Furthermore, the incidence of excess violence in robbery is subject to change over time, as Zimring demonstrated in his study of robbery murder in Detroit.[30] He found a sharp discontinuity in 1972 in the fraction of victims killed in armed robbery: after 10 years of stable weapon-specific death rates, this fraction doubled between 1971 and 1973 for gun robberies and increased even more during this period for other armed robberies.

27. Other sources on this pattern include Conklin; Skogan; and Philip J. Cook, "A Strategic Choice Analysis of Robbery" in *Sample Surveys of the Victims of Crimes*, ed. Wesley Skogan (Cambridge, MA: Ballinger, 1976) (hereafter cited as "A Strategic Choice Analysis of Robbery").

28. Philip J. Cook, "Policies to Reduce Injury and Death Rates in Robbery," *Policy Analysis*, 6(1):36 (winter 1980) (hereafter cited as "Policies to Reduce Injury and Death Rates").

29. Cook and Nagin, p. 39.

30. Franklin Zimring, "Determinants of the Death Rate from Robbery: A Detroit Time Study," *J. Legal Studies*, 6(2):317–32 (June 1977).

Are gun robberies more dangerous than other armed robberies, in the sense of being more likely to result in the victim's death? Victims are killed in a higher fraction of gun robberies than others: based on victim surveys and homicide data in eight cities, I calculated that there are 9.0 victim fatalities for every 1000 gun robberies, compared with 1.7 victim fatalities per 1000 nongun armed robberies.[31] Furthermore, it appears that the type of weapon plays an independent role in determining the likelihood of robbery murder; in a cross-sectional analysis of 50 cities, I found that the fraction of robberies resulting in the victim's death is closely related to the fraction of robberies that involve firearms.[32] Thus the objective dangerousness pattern applies to robbery as

31. Cook, "Policies to Reduce Injury and Death Rates," p. 39.

32. Cook, "The Effect of Gun Availability," p. 775. The regression equation is as follows:

$$\frac{\text{Robbery murders}}{1000 \text{ robberies}}$$

$$= \underset{(1.16)}{1.52} + \underset{(2.38)}{5.68} \frac{\text{Gun robberies}}{\text{Robberies}}$$

A closely related result uses the per capita, rather than "per robbery," murder rate:

$$\frac{\text{Rob. murders}}{100,000} = \underset{(.232)}{-.284} + \underset{(.089)}{.907} \frac{\text{Gun robs.}}{1000}$$

$$+ \underset{(.072)}{.136} \frac{\text{Nongun robs.}}{1000}.$$

(Numbers in parentheses are the standard errors of the ordinary least squares regression coefficients.) The data for 50 cities are 1975–76 averages. The second equation has an $R^2 = .82$, suggesting that robbery murder is very closely linked to robbery. Inclusion of the assaultive murder rate in this equation as an independent variable does not affect the other coefficients much—and the coefficient on the murder variable is not statistically significant. I conclude that robbery murder is more robbery than murder.

well as assault, for reasons that remain a bit obscure.

Why does the presence of a loaded, authentic gun in robbery increase the probability of the victim's death? My studies of robbery murder in Atlanta and Dade County[33] indicated that in at least half of the cases the killing was deliberate: for example, the victim was tied and then executed, or shot several times from close range. But insofar as intent could be ascertained from police reports, it appears that these intentional killings were not premeditated, but rather decided on during the course of the robbery. Perhaps the explanation for why these spontaneous decisions are more likely to occur when the robber is holding a gun is related to Marvin Wolfgang's suggestion: "The offender's physical repugnance to engaging in direct physical assault by cutting or stabbing his adversary, may mean that in the absence of a firearm no homicide occurs."[34]

Two conclusions can be inferred from the preceding discussion:

1. A reduction in gun availability will increase the robbery injury rate,[35] but reduce the robbery murder rate.

2. Given the excess violence pattern in robbery, the robbery cases in which the victim is injured should be allocated special emphasis in establishing criminal prosecution and sentencing priorities.[36] In a high proportion of these crimes, the attack that caused the injury was not instrumental to the robbery, but

33. Cook, "Policies to Reduce Injury and Death Rates."

34. Marvin Wolfgang, *Patterns in Criminal Homicide* (Philadelphia: University of Pennsylvania, 1958), p. 79.

35. See Skogan.

36. Cook, "Policies to Reduce Injury and Death Rates."

rather was a distinct act. A relatively severe judicial response to such cases might act as a deterrent to excess violence in robbery.

## Coercion and assault

Does the instrumental violence pattern in robbery have any parallel in assault? I suspect the answer is yes, but I know of no empirical evidence.

Some unknown fraction of assault cases are similar to robbery in that the assailant's objective is to coerce the victim's compliance—the assailant wants the victim to stop attacking him, physically or verbally, or stop dancing with his girlfriend, or get off his favorite barstool, or turn down the stereo. And, as in the case of robbery, the probability of a physical attack in such cases may be less if the assailant has a gun than otherwise because the victim will be less inclined to ignore or resist a threat enforced by the display of a gun. It may also be true that the assailant would be more hesitant to use a gun than another weapon to make good his threat. If this reasoning is correct, than a general increase in gun availability may reduce the number of assault-related injuries.

## INCIDENCE: THE SUBSTITUTION PATTERN

The preceding evidence suggests that gun availability has a substantial effect on the distribution and seriousness of violent crime. The third dimension of the violent crime problem is incidence—the number of violent confrontations and attacks. For each of the crimes under consideration—assault, robbery, and homicide—a reduction in gun availability to criminals would presumably cause a reduction in the number

of incidents involving guns. But for each crime there is a real possibility that the number of incidents involving weapons other than guns would increase as a result of the reduction in gun availability. If this weapon substitution does occur, the net effect of reduced gun availability on crime rates could be either positive or negative.

First, consider the crime of assault. In an environment in which a high percentage of the violence-prone people carry guns, it is possible that a sort of mutual deterrent is created, whereby a rational person would think twice before picking a fight. A protagonist that is foolish enough to start a fight in such an environment may be persuaded to back off if his intended victim pulls a gun. When physical attacks do occur, they are likely to be perpetrated with a gun and to be serious. This line of argument may explain why the Bartley-Fox Amendment in Massachusetts—an anticarrying law that was apparently quite effective—may have resulted in an increase in the rate of aggravated assaults—the gun assault rate went down substantially following implementation, but the nongun assault rate increased even more.[37] A legal intervention that is successful in getting guns off the streets may encourage relatively harmless fights with fists and broken bottles. Definitive results in this area are hard to come by, in part due to the difficulty in measuring the assault rate in a consistent manner over time or across jurisdictions.

My cross-sectional analysis of robbery in 50 cities found that one measure of gun availability—the

37. Glenn L. Pierce and William J. Bowers, "The Impact of the Bartley-Fox Gun Law on Crime in Massachusetts," unpublished manuscript (Northeastern University: Center for Applied Social Research, 1979).

78                THE ANNALS OF THE AMERICAN ACADEMY

density of gun ownership—was statistically unrelated to the overall robbery rate when other causal factors were taken into account.[38] By way of illustration, the two cities with the highest robbery rates—Detroit and Boston—differed markedly in gun ownership. Boston was one of the lowest, and Detroit was above average. The same study demonstrated that the fraction of robberies committed with a gun was closely related to the density of gun ownership in the city. Apparently robbers tend to substitute guns for other weapons as guns become readily available, but with little or no change in their rate of commission.

If guns were less widely available, the criminal homicide rate would fall. This prediction is justified by three distinct arguments developed in this article: (1) knives and clubs are not close substitutes for guns for implementing a decision to kill, especially when the intended victim is relatively invulnerable; (2) Zimring's "objective dangerousness" results demonstrate that a reduction in gun use in serious—but ambiguously motivated—assaults will reduce the homicide rate, and (3) my results on robbery murder in the 50-cities study indicate that the fraction of robberies that result in the victim's death is closely related to the fraction of robberies involving guns. A final bit of evidence comes from evaluations of the Bartley-Fox Amendment, which suggest that it reduced the criminal homicide rate in Massachusetts.[39] The tough new handgun law in the District of Columbia has also apparently been effective in this regard.[40] It should be noted that a

38. Cook, "The Effect of Gun Availability."
39. See the article by Pierce and Bowers in this issue.
40. See Jones's article in this issue.

crackdown focused on the least lethal type of gun—small caliber handguns—might not have the desired effect on criminal homicide if perpetrators substituted large caliber handguns or longguns.

My conclusion is that effective gun control measures are unlikely to reduce the total number of violent confrontations and attacks, but may well reduce the criminal homicide rate.

CONCLUSIONS

The type of weapon matters in violent crime, both in terms of its seriousness and its distribution. If robbers could be deprived of guns, the robbery murder rate would fall, the robbery injury rate would rise, and robberies would be redistributed to some extent from less to more vulnerable targets. The assaultive murder rate would decline, with the greatest reductions involving the least vulnerable victims. The overall assault rate might well increase. These predictions are based on common sense and a variety of empirical observations. None of this evidence is conclusive, but it is the best that is currently available.

Is it reasonable to suppose that moderate gun control measures have the potential to discourage some violent criminals—potential or active—from obtaining guns? No doubt there are some active criminals and other violence-prone people who have the incentive and resources required to acquire a gun even in the face of substantial legal barriers. But such determined people do not figure importantly in the violent crime statistics—indeed, most assaults and robberies do not even involve guns now, despite the fact that guns are readily available in most

jurisdictions. A gun control measure that increases the average cost and hassle of a youthful urban male acquiring his first handgun may at least delay acquisition for a year or two—with noticeable effect on the gun crime rate. A vigorous crackdown on carrying concealed weapons may have a similar beneficial effect.

Not all of the predicted effects on violent crime of a reduction in gun availability are attractive. None of these predictions can be made with a high degree of certainty. But it is not unreasonable to suggest that a moderate, vigorously enforced program for regulating the sale and use of guns would save a substantial number of lives. Gun control is not "the solution" to America's violent crime problem, but perhaps it should be one aspect of the effort to find a solution.