EXHIBIT O

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-SKC**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
GORDON MADONNA,
JAMES MICHAEL JONES, and
MARTIN CARTER KEHOE,

       Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

       Defendants.

---

### Declaration of James Yurgealitis

---

I, James E. Yurgealitis, declare as follows:

1.     I am over the age of 18 years of age and competent to testify to the matters stated below and do so based on my personal knowledge.

2.     Attachment A is a true and accurate copy of my expert report in the above-captioned matter. It contains the opinions to which I would testify if called upon as a witness in the above-captioned matter, and I declare under penalty of perjury that it is true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 17th day of October, 2023
at Manchester, Maryland.

_____
James E. Yurgealitis

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN
RIGHTS, CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
CRAIG WRIGHT,
and GORDON
MADONNA,
JAMES MICHAEL JONES,
and MARTIN CARTER
KEHOE,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE,
COLORADO, CITY OF BOULDER,
COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

**Expert Report of James Yurgealitis**

---

I, James E. Yurgealitis, state as follows:

1.      I have been retained by the Town of Superior, the City of Boulder, the City of Louisville, and the Board of County Commissioners of Boulder County to render expert opinions in this case and to prepare an expert report for disclosure under FRCP 26(a)(2)(B) addressing the types and operation of firearms, the evolution and operation and  of assault weapons, the evolution and operation of large-capacity and lower-capacity magazines, and the use of firearms in self-defense. This report is based on my own personal knowledge and experience. I hold all opinions expressed herein to a reasonable degree of professional certainty.

2.      I am currently self-employed as a Legal and Forensic Consultant providing firearms related technical and public policy consulting, forensic case reviews, and testing and training services to corporations, legal counsel, and the public sector. During my previous 26-year career as a Federal Law Enforcement Officer, I have been recognized, and testified as, an expert witness in numerous local, state, and federal courts. I have toured numerous firearms and ammunition manufacturers' facilities both in the United States and overseas. I maintain a personal library of firearms- and ammunition-related books and periodicals and maintain contact with other recognized experts in the field. My final assignment in government service was as Senior Special Agent and Program Manager for Forensic Services for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), U.S. Department of Justice, a position I held for nine years. During that time, I was responsible for all Bureau firearms- and forensic-firearms-related training and research at the ATF National Laboratory Center in Ammendale, Maryland.

3.      My credentials, training, background, and experience are stated in my curriculum vitae, a true and correct copy of which is attached as **Exhibit A**. My credentials, training, background, and experience as an expert witness, including all cases where I have testified at trial

2

or by deposition within the last four years, are detailed on my Statement of Qualifications, a true and correct copy of which is attached as **Exhibit B**.

4.      I am being compensated at the rate of $400 per hour for my work and $1,600 per travel + work day.

5.      My opinion or opinions as stated in this report are the result of my training, knowledge, and experience, technical, statistical, and historical research, review of the firearms ordinances challenged in this case (the "Ordinances"), as well as the Plaintiffs' pleadings in this case as submitted.

6.      During the course of my work in this case, as additional research, technical or statistical materials become available or relevant, they will be reviewed. As such, I reserve the right to amend my report, opinion, or testimony to include consideration of those materials should their relevance warrant.

## SUMMARY OF OPINIONS

7.      As discussed in this report, many of the firearms covered by the Ordinances directly trace their origins to weapons developed for use in military combat. As such, these weapons were never initially intended for general distribution to the public or sale in the civilian market.

8.      Similarly, detachable magazines were initially developed for, and can trace their heritage to, late 19th century advancements and developments in military small arms technology. As such, large-capacity magazines were neither initially designed, nor intended, for utilization by the civilian population/general public. They are an evolutionary development of military technology which has subsequently been adopted by manufacturers of civilian firearms.

3

9. The prohibited features of the firearms covered by the Ordinances were designed to increase the effectiveness of the firearm in a military combat scenario. However, such features are not necessary or suitable for civilian self-defense.

10. Firearms without these prohibited features are lawful under the Ordinances and widely available to civilian customers and provide effective means for civilian self-defense.

11. Firearms traditionally considered "sporting" or "hunting" firearms traditionally have magazine capacities which are legal under the Ordinances (both rifles and shotguns).

12. The operation of any firearm which utilizes a large-capacity magazine is unaffected by a magazine with a capacity legal under the statute. As their function is unaffected by the number of rounds in the magazine, they will operate as designed regardless of the capacity of the magazine.

13. Detachable magazines compliant with the Ordinances are, and have been, widely available since the mid 1990s. There are numerous options available that are both effective for civilian self-defense and compliant with the Ordinances.

14. As tragically demonstrated by recent mass shootings in Colorado and elsewhere, assault weapons and large-capacity magazines, as defined under the Ordinances, are capable of inflicting significant carnage upon civilians in a short period of time.

15. Additionally, assault weapons and large-capacity magazines, as defined under the Ordinances, pose a significant risk to law enforcement officers and other first responders.

**DISCUSSION**

**I.      Firearms Terminology, Types, and Operation**

16. As the issues in this case center around firearms terminology and technology, it is important to discuss different types of modern firearms and how they function.

4

### A. Handguns and Long Guns

17.    Modern firearms as currently manufactured for civilian ownership fall into two general types: handguns and long guns (or shoulder-fired weapons).

### i. Handguns

18.    **Handguns**. Handguns are generally defined as a firearm having a short stock (grip), and are designed to be held, and fired, with one hand. The term "handgun" defines two distinct types of modern firearms: the revolver and the semi-automatic pistol.

19.    **Revolver**. A revolver is a handgun designed and manufactured with a revolving cylinder to contain, chamber, and feed multiple rounds of ammunition. In a modern double-action revolver, pulling the trigger rotates the cylinder, bringing an unfired ammunition cartridge in line with the barrel and firing pin. Pulling the trigger also cocks the hammer and then releases it either directly (or indirectly via a firing pin) to strike the primer of the cartridge, initiating the firing sequence. In this type of revolver, the trigger must again be pulled to rotate the cylinder in order to fire another cartridge. When all cartridges have been fired, the user must unlock the cylinder from the frame and swing it out to the side of the frame to facilitate removal of cartridge casings and insert unfired cartridges. The cylinder is then closed and relocked within the frame and the handgun is again ready to fire when the trigger is pulled.

20.    **Semi-automatic pistol**. A semi-automatic pistol is a handgun designed and manufactured with the firing chamber as an integral part of the barrel and generally utilizes a detachable "box" magazine to contain and feed multiple rounds of ammunition. In this type of handgun, generally, the box magazine is inserted into the firearm and the slide or bolt is pulled back and released. It then springs forward and loads a cartridge into the chamber. When the trigger is pulled, the firing pin or striker is released and impacts the primer of the cartridge and initiates the firing sequence of the ammunition. In most pistols, a portion of the recoil or gas pressure

generated by firing the cartridge is utilized to move the slide or bolt rearward, extract and eject the expended cartridge case, and chamber another round from the magazine. This sequence can be repeated by pulling the trigger once for each shot. The pistol can then be reloaded by removing the empty magazine and inserting a loaded magazine.

### ii.  Long Guns

21.     In terms of modern firearms manufacture, long guns are generally of two distinct types: rifles and shotguns.

22.     **Rifle**. A rifle is a firearm which is designed and intended to be fired from the shoulder.  It fires a single shot through a rifled bore for each pull of the trigger.

23.     **Shotgun**. A shotgun is a firearm that is also designed and intended to be fired from the shoulder. It fires either a number of ball shot (commonly termed "buckshot" or "birdshot") or a single projectile (commonly termed a "slug") through a smooth (non-rifled) bore for each pull of the trigger.

24.     In terms of rifle "types," there are numerous variations. All of these variations, generally speaking, are defined and distinguished by the way they are loaded and reloaded.

25.     **Single-shot rifle**. For example, single-shot rifles fire one shot for each pull of the trigger. They have no internal or external magazine capacity and must be reloaded with a new unfired cartridge by hand for each shot. Many of these have a hinged or "break open" receiver to facilitate loading and unloading.

26.     **Pump-action rifle**. A pump-action rifle requires the operator to manually manipulate a forearm piece which is traditionally found underneath the barrel. After firing, the forearm is pulled rearward, which unlocks the bolt and extracts and ejects the fired cartridge case. Pushing the forearm forward feeds an unfired cartridge from the magazine, cocks the firearm

6

mechanism, and locks the bolt for a successive shot. Pump-action rifles have been manufactured with both tubular and detachable box magazines.

27. **Bolt-action rifle**. Bolt-action rifles require the operator to manually manipulate the bolt of the rifle. After firing, the bolt is first unlocked from the chamber and then moved rearward. This action also extracts and ejects the expended cartridge case. The bolt is then moved forward, which feeds an unfired cartridge from the magazine into the chamber. Once the bolt is then locked again by the operator, it is ready to fire. Bolt-action rifles usually have an internal fixed magazine or tubular magazine which will facilitate reloading via manipulation of the bolt until that capacity is exhausted, but models that use detachable magazines are also available. Bolt-action rifles are popular among hunters to this day and were generally the choice among military forces through the end of World War II.

28. **Lever-action rifle**. A lever-action rifle is similar to the bolt-action rifle in that the operator is required to manipulate the mechanism of the firearm. A lever at the bottom of the rifle's receiver is manipulated in a up and down motion in order to unlock the bolt and move it rearward, extract and eject the expended cartridge case, feed an unfired cartridge into the chamber, and lock it. This action is required for each shot fired through the rifle. Generally speaking, lever-action rifles are usually manufactured with tubular magazines which will vary in capacity depending on the caliber of the firearm and length of the magazine tube.

29. **Semi-automatic rifle**. A semi-automatic rifle utilizes the energy generated by the firing of the cartridge to power the cycle of fire. This is accomplished by siphoning off a portion of the gases generated by firing to operate the mechanism, or by utilizing the recoil generated by firing, much like a semi-automatic pistol, as described previously. Once loaded, the operation of this cycle of fire is not dependent on the operator for any portion of the process other than to pull

7

the trigger. Semi-automatic rifles are, and have been previously, manufactured with both fixed internal magazines and a capacity to accept detachable external magazines. As such, this type of rifle is capable of firing with each pull of the trigger until the supply of ammunition is exhausted. As stated previously, the majority of military firearms through World War II were bolt action. The exception to this rule was the United States entering the war with the semi-automatic M1 Garand rifle in .30-06 caliber as standard issue. The Garand had a fixed internal magazine with an 8-round capacity. Some soldiers also carried the select-fire Browning Automatic Rifle (BAR), which used 20-round detachable magazines, and the U.S. military also developed the semi-automatic M1 carbine that entered service in 1942 for paratroopers, tankers, and support troops with 15-round detachable magazines.

30.    Modern shotguns, as stated previously in regard to rifles, are generally classified and characterized by their operating system (i.e., the manner in which they function, are loaded, and are reloaded). Additionally, in the case of shotguns with multiple barrels, they are defined by the placement or orientation of their barrels.

31.    **Single-shot shotguns**. Single-shot shotguns function similarly to the single-shot rifle. They may have a hinged receiver which allows the operator to open the action to facilitate loading and unloading of the firearm. There are also single-shot models that are loaded and unloaded through a bolt-action mechanism and have no additional magazine capacity.

32.    **Bolt-action shotguns**. Bolt-action shotguns are manufactured with internal, tubular, or detachable magazines to facilitate easier and faster reloading. They function in the same way as a bolt-action rifle and require manual manipulation of the bolt by the operator to unload and reload.

33.    **Lever-action shotguns**. Lever-action shotguns again function in the same fashion as similarly designed rifles. Manual manipulation of the lever is required for successive shots.

8

34.     **Pump-action shotguns**. Pump-action shotguns have the same general operating system as similarly designed rifles. The forearm piece of the shotgun must be worked forward and back by the operator to unlock the bolt, extract and eject the expended shotgun shell, reload, and relock the bolt for firing.

35.     **Semi-automatic shotguns**. Semi-automatic shotguns, as with their rifle-caliber counterparts, utilize energy (either recoil or gas pressure) generated by firing ammunition to "power" the operating system of the firearm. These are manufactured with a number of different magazines, both internal and fixed, as well as external and detachable. They are capable of firing a single shot with each pull of the trigger until the supply of ammunition in the magazine is exhausted.

36.     **Break-open, double-barreled, and "tip-up" shotguns**.    Break-open, double-barreled, and "tip up" shotguns have a hinged receiver which facilitates access to the rear of the chamber for unloading and reloading. They are manufactured in single-shot and double-barreled variations. Double-barreled variations are further delineated by the placement of their barrels. Side-by-side shotguns have two barrels positioned next to one another in a horizontal arrangement. Over-under shotguns have two barrels superimposed upon one another in a vertical plane. The mechanisms in each of these allow staggered firing of each of the two barrels with a separate pull of the trigger. When the hinged action is opened, the expended shotgun shell hulls can be manually extracted, although more complex designs with auto ejectors perform that function when "opened" without action by the operator.

### B.  General Firearms Definitions

37.     In discussing modern firearms, it is important to understand how they are defined under statute, how they function, and the differences between types commonly found and available to the public.

38.     Additional terms often used when discussing modern firearms are semi-automatic, full-automatic, select-fire, rifling, caliber, gauge, and magazine.  I define these terms as follows:

39.     **Semi-automatic**. Semi-automatic fire refers to a repeating firearm that fires one shot for each pull of the trigger until the ammunition supply is exhausted. The energy of the fired cartridge is utilized to cycle the mechanism of the firearm to feed and chamber the next shot.

40.     **Full-automatic**. Full-automatic refers to a firearm that will continuously fire successive shots when the trigger is pulled, and will only stop when the trigger is released or the supply of ammunition is exhausted. Fully automatic weapons are commonly known as machine guns.

41.     **Select-fire**. A select-fire firearm is capable of switching between and functioning in either full- or semi-automatic firing mode.

42.     **Rifling**. Rifling refers to a series of grooves cut or impressed inside the barrel in a spiral pattern. The "high" portions of these patterns are called "lands." The "lower" portion of this pattern are called "grooves." When a projectile (or bullet) is fired in a "rifled" firearm, it comes into contact with the lands as it leaves the chamber and begins to travel down the barrel. Because the lands are oriented in a spiral pattern, the rifling imparts spin on the projectile, which improves stability and accuracy.

43.     **Caliber**. Caliber is a dimensional measurement of the inside (or bore) of a rifled barrel. In the United States, caliber is traditionally expressed in fractions of an inch. For example, a .22-caliber firearm is designed to chamber and fire a projectile which measures 0.22 inches (or slightly less than a quarter of an inch). A .50-caliber firearm chambers and fires a projectile which is approximately a half-inch in diameter.[1]

---

[1] In Europe and most other countries that utilize the metric system, "caliber" has historically been expressed in millimeters (mm). Therefore, a 9mm firearm is designed to chamber and fire a

10

44.     It is important to note for the purposes of this report that the caliber designation of any given ammunition cartridge usually refers only to the diameter of the projectile (bullet) and not the relative "power" of the cartridge itself (in terms of muzzle energy, effective range, and muzzle velocity). For example, there is an important distinction between cartridges commonly referred to as .22 caliber and cartridges commonly referred to as .223 caliber.

45.     .22-caliber ammunition is a popular and relatively low-power cartridge developed in the 1880s. It is also known as ".22 rimfire," as the primer mixture in the cartridge is seated in the rim of the cartridge and not contained in a separate primer cup in the cartridge base. It is commonly used for target shooting as well as hunting small game and can be fired from both handguns and rifles chambered in that caliber. The bullets for .22-caliber cartridges typically weigh between 30 to 60 grains (0.08 to 0.13 ounces). Their muzzle velocities are usually in the 1,100 to 1,300 feet per second (fps) range.

46.     .223-caliber ammunition, by comparison, is a high-velocity cartridge developed in the 1950s in part for use in the original AR-15 and M-16 rifles. It is a "centerfire cartridge," meaning the primer is contained in a separate cup in the center of the cartridge base. Although the diameter of the bullet is only slightly greater (approximately the width of a human hair) than the .22-caliber cartridge mentioned previously, it is a vastly more powerful cartridge in terms of muzzle velocity and range. This ammunition is also somewhat interchangeable with 5.56mm NATO ammunition. Here is a side-by-side comparison of a .223-caliber cartridge (left) and a .22-caliber cartridge (right) with a quarter for size reference:

---

projectile with a diameter of 9mm. European caliber designations may also include the measurement of the length of the cartridge case (9x19mm, 7.62x39mm, etc.). A number of widely manufactured firearm calibers have two separate caliber designations, one in inch measurements and one in metric, which are equivalent and interchangeable. For example, .380 ACP caliber ammunition in the U.S. is referred to as 9x17mm caliber in Europe.



47.    The bullets used in .223/5.56mm ammunition are heavier than .22-caliber rimfire projectiles, typically weighing between 50 to 62 grains (0.11 to 0.14 ounces). Common muzzle velocities are approximately 3,200 to 3,500 fps—about three times as fast as .22 caliber projectiles. A heavier bullet and increased velocity equate to more of the cartridge's energy being transferred to the target. A writer for *American Rifleman*, a National Rifle Association (NRA) magazine, tested the U.S. Army's .223-caliber M885Al cartridges in 2014, and the results are published here: https://www.americanrifleman.org/content/testing-the-army-s-m855a1-standard-ball-cartridge/.

48.    **Gauge**. Gauge is a dimensional measurement which is traditionally used to denote the bore of a non-rifled or "smoothbore" firearm (i.e., a shotgun). Shotguns were initially designed to fire a mass of round shot as opposed to one solid projectile, and therefore a caliber designation is not readily applicable. Gauge refers to the number of lead spheres that will fit inside the bore and equal one pound. For example, in a 12-gauge shotgun, you can fit 12 spheres of lead, which are approximately 18.52mm or 0.73 inches in diameter, the total weight of which will equal one pound. If the diameter of the spheres is increased, less of them are required to equal one pound.

12

Therefore, the smaller the "gauge," the larger the bore diameter. The exception to this measurement system is .410-gauge ammunition for shotguns and handguns, which is actually a caliber designation.

49.     **Magazine**. A magazine holds the ammunition for a firearm before it is chambered and fired. The earliest magazines were "fixed," or integral, to the firearm, such as the tubular magazines located underneath the barrels of lever-action rifles and, later, pump-action shotguns. Toward the very end of the 19th century, inventors developed firearms that utilized detachable magazines, which facilitate faster reloading.

### C. General Firearms Operation

50.     Modern firearms operate utilizing the expanding gases generated by the rapidly burning gunpowder contained in modem ammunition. Gunpowder (or smokeless powder) is the propellant contained within metallic cartridges or shotshells utilized by modern firearms. A single cartridge or shotshell is also referred to as a "round" of ammunition. Once a cartridge or shotshell is chambered or loaded in a modern firearm, and the trigger is pulled, the primer at the base of the cartridge or shotshell is struck by a firing mechanism. The primer contains a pressure-sensitive explosive compound which ignites when struck. The ignition of the primer, in turn, ignites the main powder charge contained in the case of the cartridge or shotshell. The main powder charge ignites and burns rapidly in what is essentially a contained explosion.

51.     This contained explosion generates gases at enormous pressures. The generated gases push the projectile out of the mouth of the cartridge, down the barrel of the firearm, and out of the firearm through the muzzle.

52.     More simply defined, a firearm is a weapon that utilizes the gas pressure generated by combusting gunpowder in a modern ammunition cartridge to propel a projectile through the barrel and out of the firearm through the muzzle.

13

53.    All modern breech-loading firearms,[2] no matter the type, operate according to a nine-step process known as the "cycle of fire."[3] These steps are:

1) **Feeding**: Feeding refers to the process for insertion of cartridges into the chamber; the breech bolt pushes the cartridge into final position. Typically, the incoming round slides across the bolt or breech face during this caroming action. The feeding function can be manual or performed by various kinds of magazines and clips. For example, machine guns use belts of cartridges.

2) **Chambering**: Chambering is the insertion of the cartridge into the chamber. If a cartridge of the incorrect length or diameter is used or if there is foreign matter in the chamber, chambering may be obstructed, causing a malfunction. Excess oil or grease in the chamber may cause overpressure, resulting in a ruptured cartridge case and potentially serious accidents.

3) **Locking**: The breech bolt mechanism locks the cartridge into position in the barrel before firing. Most quality firearms are equipped with an interrupter mechanism that disconnects the trigger from the firing pin, thus making it impossible to fire until the mechanism is safely locked. This critical relationship is referred to as

---

[2] A breech-loading firearm is one in which the cartridge is loaded and fired from the breech (rear) end of the barrel as opposed to a muzzle-loading firearm, wherein the propellant/powder and bullet are loaded from the muzzle (front) end.

[3] This nine-step process is outlined in the training program for apprentice forensic firearm and toolmark examiners, a program developed by the Association of Firearm and Toolmark Examiners (AFTE) in conjunction with the U.S. Department of Justice (DOJ) and the National Institute of Justice (NIJ). *Cycle-of-Fire Steps*, Firearm Examiner Training (2008), https://projects.nfstc.org/firearms/module08/fir_m08_t04.htm. An animated illustration of these steps as they occur in the AR-15 and M-16 is viewable here: https://www.youtube.com/watch?v=omv85cLfmxU&t=261s.

14

timing. (Blowback mechanisms involve a spring-held bolt; the mechanism is not technically locked, but is held together by spring tension and bolt inertia.)

4) **Firing**: When the breech is fully locked, a pull on the trigger mechanically translates to the firing pin release. In the cocked position, the firing pin has a hammer behind it with a spring forcing it towards the primer, restrained only by a sear that is engaged by the trigger. A pull on the trigger trips the sear from the engaging notch in the hammer. The hammer, actuated by a cocked spring, drives the firing pin sharply against the percussion sensitive primer, which fires the cartridge.

5) **Obturation**: Obturation occurs when powder gases under high pressure (e.g., two and one-half tons per square inch in the .30-06 Springfield cartridge) are sealed to prevent them from jetting between primer cup and cartridge case, cartridge case and primer wall, and projectile and bore. Cartridge cases must be sufficiently flexible to expand against the chamber wall and transmit the instantaneous powder pressure to the barrel metal that surrounds the chamber. When the chamber pressure has returned to zero, the cartridge case must also be flexible enough to release itself from the chamber wall (even though it is now pressure form-fitted to the chamber). Likewise, the primer cup has been pressure-held against the side of the cartridge case and depends upon the face of the breechblock for locked support during the interval of high chamber pressure. Obturation also occurs with the projectile; bullets are made sufficiently larger than the bore diameter to extrude into the rifling grooves and seal the gases. The sharp hammer action of the instantaneous high pressure and temperature may upset the projectile base, which enhances sealing. Shotgun wads perform the sealing function in smoothbore weapons.

15

6) **Unlocking**: This is the reverse of the locking process and is frequently performed in conjunction with extraction.

7) **Extraction:** Although cartridge cases do not commonly exceed their elastic limit during firing, they have a tendency to stick to the chamber after firing. After firing, cartridge cases are larger in diameter than before firing. All cartridge cases are designed with a rim or groove (cannelure) at the base so that an extractor claw can grasp this edge in order to achieve extraction.

8) **Ejection**: In the final stages of extraction, the cartridge case encounters a projection that is usually at right angles to the exit portal of the breech. Rotating on the fulcrum of the extractor, the case base is contacted on the opposite side by the ejector, which flips the case out of the actuating mechanism.

9) **Cocking**: The hammer spring is usually cocked when the bolt of a rifle, pistol, or repeater shotgun is retracted. An exception to this is the M1917 Enfield rifle, which cocks upon forward motion of the bolt. Exposed hammers may be cocked by manual retraction, using the thumb. The Walther series of pistols provides for manual cocking or trigger pull cocking (double action), as do most open hammer revolvers.

II.    **Recent Development and Evolution of Firearms with Features Designed for Military Purposes**

54.    In recent years, there has been an increase in the popularity and availability of semi-automatic rifles, pistols, and shotguns with features initially designed (or patterned after those designed) for a military purpose. It is important to discuss the history of the development and evolution of firearms with these features.

### A.  Assault Rifle Development and Evolution

55.      The first "assault rifle" or "assault weapon" was the German StG 44 (*Sturmgewehr*

Model 1944), which appeared in production form late in World War II. Earlier pre-production

variants included the MP 42 and MP 43 (*Maschinenpistole* 1942 and 1943 respectively). The

Germans termed the rifle "*Sturmgewehr*" (literally "storm rifle"), and a number of the features

included utilization of a portion of the gas generated by the burning cartridge propellant to operate

the rifle, extensive use of steel stampings in its construction, a detachable magazine, a separate

pistol-style grip (not integrated with the shoulder stock), a bayonet mounting lug, and a threaded

barrel to facilitate the attachment of a grenade launcher. It fired a cartridge that was smaller

dimensionally and less "powerful" (in terms of muzzle velocity and foot-pounds of energy) than

the standard 8mm Mauser cartridge in use by the German Army in their issued bolt-action Mauser

rifles.



`                                                                                              [4]

---

[4] STG 44 Image source: Peter Suciu, "Sturmgewehr, the First Assault Rifle," Recoil: The Ultimate Firearms Destination for the Gun Lifestyle, June 19, 2016, available at https://www.recoilweb.com/sturmgewehr-the-first-assault-rifle-100907.html.

56.     It is important to note that the features designed into the German StG 44 were intended to increase the effectiveness of the individual soldier in combat:

57.     **Gas-powered semi-automatic fire**. Gas-powered semi-automatic fire enabled more rapid fire than was possible using standard-issue bolt-action rifles.

58.     **Steel stampings**. Steel stampings made for a lighter weapon, increasing the amount of ammunition an individual combatant could carry and/or increasing mobility. Additionally, steel stampings were easier and less expensive to manufacture.

59.     **Detachable magazine**. Detachable magazines allow more rapid reloading than previous standard-issue bolt-action firearms.

60.     **Separate pistol-style grip**. A separate pistol-style grip enhanced the ability of combat soldiers to quickly maneuver their firearms into firing position and retain stability for more precise aim while firing rapidly.

61.     **Barrel shroud**. A barrel shroud encircles and protects the barrel while providing an auxiliary grip surface for the soldier's nondominant hand and preventing it from being burned.

62.     **Bayonet mounting lug**. This feature allowed soldiers to mount bayonets on their rifles, providing them with an additional weapon for use in close combat.

63.     **Threaded barrel**. A threaded barrel allowed for the attachment of grenade launcher (on this particular rifle), providing combat soldiers with an additional weapon, albeit for use at a greater distance.

64.     It is widely accepted that in the design of military small arms, "form follows function," and each of these innovations primarily served to increase the firepower and lethality of an individual combatant.

65.    Following the end of World War II, captured StG 44s were analyzed by the Allies, and although there was reluctance to move to a smaller-caliber cartridge, a number of the features of the StG 44 found favor in the design of successive European, American, and Eastern Bloc military rifles. Noted firearm expert and historian Jim Supica wrote in his foreword to the book *Guns*:

> Most military establishments hesitated to "downsize" the range and power of their primary rifles in the early Cold War years. The semi-auto detachable magazine concept was an obvious success and there was something to be said for full auto capability.[5]

He further writes:

> However the assault rifle concept wouldn't go away. The Soviet Union accepted the lower power round idea in its fixed magazine semi-auto chambered for an intermediate power 7.62 x 39 mm round in 1945, the SKS, which saw wide distribution and production in Soviet client states.[6]

66.    Two years later in 1947, the USSR followed the SKS with what Supica terms "the quintessential assault rifle—the Kalashnikov designed AK-47."[7]

67.    The design of the AK-47 carried forward a number of the features introduced on the German StG 44. These features include a gas-powered operating system, use of steel stampings in its construction, a separate pistol grip, separate shoulder stock, a detachable magazine, a bayonet lug, and provision for attachment of a grenade launcher. Due to the separate stock and pistol grip, the AK, much like the StG 44, also utilized a barrel shroud, or handguard, on the forward third of the rifle. Some variations of the early AK-47s (AKMs) also featured a "compensator" at the muzzle

---

[5] Supica, *Guns* (TAJ Books 2006). PP. 26-28.
[6] *Id.*
[7] *Id.*

that deflected gas upward and to the right to compensate for the rifle's tendency to kick up and to the right with every shot.

68.     In the 1950s, many countries sought to replace World War I and World War II vintage bolt-action and semi-automatic rifles with these newer and more effective designs. With the birth of the North Atlantic Treaty Organization (NATO), however, utilization of Soviet Bloc AK or SKS assault rifles was not possible. Accordingly, a number of firearms manufacturers outside the Soviet sphere of influence developed military rifles that carried forward these same features to one extent or another. *Fabrique Nationale* (FN) of Herstal, Belgium, and Heckler & Koch (HK) of Oberndorf, Germany are two noteworthy examples.

69.     FN developed the FAL (*Fusil Automatique Leger*) and HK the G3, which found a ready market among nations that did not favor the Soviet AK-type designs. Both incorporated features that, like the AK, were derived directly from the StG 44. Their designs featured some parts made from metal stampings as opposed to heavier and more expensive machined-steel pieces. Their separate pistol grips and shoulder stocks, detachable magazines, and barrel shrouds followed the basic design of the StG 44. Flash suppressors and muzzle brakes have appeared in production variations of both rifles. These rifles were destined from inception to become widely exported as the domestic market in both countries was relatively limited. The FAL and G3 have been in production since the 1950s, and both FN and HK have licensed production to numerous countries in South America, Africa, and the Middle East.

70.     In the United States, progress in this arena moved at a significantly slower pace.

71.     The prevailing wisdom in the United States was to stay away from lighter, smaller rifle calibers and cartridges, as the .30-06 cartridge used in the M1 Garand rifle during World War II had proven to be very effective. The U.S.'s initial answer to the burgeoning move towards

20

assault rifles was a variation of the basic M1 Garand operating system, the T44, or M-14. Outwardly, the M-14 retained a full-length wood stock similar to the Garand; however, the M-14 featured a detachable magazine, select-fire (both semi-automatic and full-automatic) capability, and a flash suppressor. It competed directly against the FN FAL (designated the T88) in U.S. Army trials and was selected in 1957.

72.     In the mid 1950s, Eugene Stoner, the chief engineer of the American company ArmaLite Corporation, developed a number of lightweight assault rifle designs which resulted in the AR-10 (or ArmaLite Rifle Model 10) in .308 caliber. Its design closely followed what was now becoming standard assault rifle design, i.e., light weight (forged aluminum receivers as opposed to machined steel), a separate pistol grip and shoulder stock, a barrel shroud/handguard, detachable magazines, and numerous flash suppressor/muzzle brake variations. ArmaLite continued to refine the basic design of the AR-10, which resulted in the AR-15. The AR-15 was designed to chamber and fire the 5.56x45mm NATO cartridge, which is mostly interchangeable with .223 Remington ammunition.

73.     In 1961, the Department of Defense purchased a quantity of AR-15 rifles from Colt for evaluation. A number of these were subsequently shipped to U.S. Army advisors in Vietnam to test their suitability for issue to South Vietnamese Army forces. Following the field evaluation, the Department of Defense Advanced Research Projects Agency (DARPA) prepared a report (AD-343778, dated August 20, 1962) summarizing the results. Amongst the data compiled via surveys of the U.S. Army advisors are a number of comments regarding actual field use of the weapon and cartridge. These comments describe various catastrophic injuries to Viet Cong combatants who were shot by AR-15s, including severing of limbs and decapitation.[8]

---

[8] Advanced Research Projects Agency, Office of the Secretary of Defense, Field Test Report, AR-15 Armalite Rifle, at 24 (July 31, 1962), available at https://apps.dtic.mil/sti/pdfs/AD0343778.pdf.

9. (C) Remarks. Unit Commanders' and Advisors' remarks concerning the value of the AR-15 to Vietnamese Units and its worth as a combat weapon in the war in South Vietnam as opposed to existing weapons were also requested. Generally, the comments were extremely favorable to the AR-15. All of the comments received are presented below in their entirety and in the form in which they were received.

(1) (C) "On 160900 June 62, one platoon from the 340 Ranger Company was on an operation vic. YT260750 and contacted 3 armed VC in heavily forested jungle. Two VC had carbines, grenades, mines, and one had a

4

ANNEX "A"

CONFIDENTIAL

CONFIDENTIAL

SMG. At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC with 3 rounds with the first burst. One round in the head-took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that any one of the three would have caused death. The other 2 VC ran, leaving the dead VC with 1 carbine, 1 grenade and 2 mines. " (Rangers)

(2.) (C) "On 9 June a Ranger Platoon from the 40th Inf Regt was given the mission of ambushing an estimated VC Company. The details are as follows:

    a. Number of VC killed: 5
    b. Number of AR-15's employed: 5
    c. Range of engagement: 30-100 meters
    d. Type wounds:
        1. Back wound, which caused the thoracic cavity to explode.
        2. Stomach wound, which caused the abdominal cavity to explode.
        3. Buttock wound, which destroyed all tissue of both buttocks.
        4. Chest wound from right to left, destroyed the thoracic cavity.
        5. Heel wound, the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip.
These deaths were inflicted by the AR-15 and all were instantaneous except the buttock wound. He lived approximately five minutes.

22

74.    This rifle was adopted as standard issue by the U.S. Army in the mid 1960s. The production of the rifle had been licensed to Colt, and initially the model designation was, as produced, AR-15.



[9]

Later, after a series of engineering changes, the standard U.S. military designation was changed to M-16. When first deployed as a standard-issue rifle for U.S. military forces, the AR-15/M-16 platform was maligned as unreliable and prone to jamming. This was due, in part, to inadequate maintenance by the operators themselves. Once the problems were addressed and rectified, the rifle proved to be as reliable and accurate as the AK-type rifles deployed by the North Vietnamese and Viet Cong.

75.    In the ensuing 50-plus years, both the military and civilian versions of the M-16/AR-15 platform have undergone numerous modifications both cosmetic and mechanical. However, the basic configuration, appearance, construction, and operation of the internal gas-operating system (as designed) has remained unchanged since its initial inception and acceptance

---

[9] Colt AR-15 Image Source: Stevens, R. Blake & Ezell, Edward C., *The Black Rifle,* (Collector Grade Publications, 2004), P.95.

as a military weapon. However, Colt continued to promote the similarity between the M-16 rifle produced for the U.S. military and the civilian semi-automatic variant.

76.     The expiration of Colt's patents in the late 1970s naturally spawned competition in the marketplace. Throughout the design's lifespan, many of the internal fire-control components have remained unchanged and their specifications standardized industry wide. There are multiple internal parts that are completely interchangeable between military M-16s manufactured in the 1960s by Colt and an AR-15 type rifle produced today by any one of hundreds of U.S. manufacturers who produce either receivers or internal operating parts. For example, a bolt carrier manufactured in 1967 by Colt will fit, and function as designed, in an AR copy manufactured today. Additionally, the overall configuration of "copycat" AR rifles remains virtually identical to the original production design of the early 1960s. The overall design configuration (two-piece hinged receiver, shoulder stock in line with the chamber and barrel, placement of the magazine, external switches, and other features) are identical or nearly so.

77.     As stated previously, due to their modular construction, AR-type rifles are easily customized to suit the owner's personal preference. This also applies to pistols which are based on AR- and AK- type rifle receivers. The rifle receiver itself is a hinged two-piece unit and the "upper receiver" and "lower receiver" can be swapped out for other similar pieces with relative ease. The design also facilitates replacement of internal fire control components and assemblies. The following video illustrates this: https://www.youtube.com/watch?v=F00FEJZbrb0.

78.     It is important to note the respective characteristics of the 5.56mm/.223 caliber cartridge that influenced the U.S. military's decision to switch over from the 7.62 x 51mm/.308 caliber round used in the preceding model M-14 rifles. Dimensionally, the 7.62 x 51mm cartridge

24

is 71mm (2.8 inches) long overall and weighs approximately 0.9 ounces. The 5.56mm cartridge is

57mm (2.24 inches) long overall and weighs approximately 0.4 ounces.



[10]

Five pounds (80 oz.) of 7.62 ammunition would consist of 89 cartridges. Five pounds of 5.56

would consist of 200 cartridges. The lighter weight and smaller dimensions of a 5.56/.223 caliber

cartridge would allow more ammunition to be carried by an individual combatant for an equivalent

weight. The shorter overall dimensions of the 5.56 also commensurately allowed for smaller

detachable magazines and/or larger capacity magazines for the same size. A 30-round magazine

for a 5.56mm AR-15 rifle is smaller than a 20-round magazine for a 7.62mm M-14 rifle.

79.    Performance in terms of muzzle velocity was also a consideration. The 7.62x51mm

(.308) cartridge has a muzzle velocity of approximately 3,200 fps. The 5.56mm cartridge has

approximately the same velocity (for reference, a 9mm pistol cartridge has a muzzle velocity of

approximately 1,100 fps). 5.56mm bullets, upon contacting tissue, will "yaw" (begin to rotate on

its axis), which contributes to the creation of both temporary and permanent large wound cavities.

---

[10].223 and .308 caliber ammunition Image Source: https://www.intherabbithole.com/e176/

In contrast, because handgun-caliber bullets are heavier and travel at lower velocities, they do not typically yaw upon contact with tissue and do not create as large of a wound cavity nor commensurate destruction of tissue. The yaw movement of .223/5.56mm bullet can also cause it to fragment upon striking bone, which contributes to additional tissue damage not immediately adjacent to the cavity itself.

80.    Noted wound ballistics expert Vincent DiMaio, in *Gunshot Wounds*, writes:

As the bullet enters, the body, there is "tail splash" or backward hurling of injured tissue. This material may be ejected from the entrance. The bullet passes through the target, creating a large temporary cavity whose maximum diameter is up to 11-12.5 times the diameter of the projectile. The maximum diameter of the cavity occurs at the point at which the maximum rate of loss of kinetic energy occurs. This occurs at the point where the bullet is at maximum yaw, i.e., turned sideways (at a 90[-degree] angle to the path) and/or when it fragments. If fragmentation does not occur and the path is long enough, the yawing continues until the bullet rotates 180[ degrees] and ends up in a base-forward position. The bullet will continue traveling base first with little or no yaw as this position puts the center of mass forward.

The temporary cavity will undulate for 5-10 msec before coming to rest as a permanent track. Positive and negative pressures alternate in the wound track, with resultant sucking of foreign material and bacteria into the track from both entrance and exit. In high-velocity centerfire rifle wounds, the expanding walls of the temporary cavity are capable of doing severe damage. There is compression, stretching and shearing of the displaced tissue. Injuries to blood vessels, nerves, or organs not struck by the bullet, and a distance from the path, can occur as can fractures of bones, though, in the case of fractures, this is relatively rare. In the author's experience, fractures usually occur when the bullet perforates an intercostal space fracturing ribs above and below the bullet path.[11]

81.    DiMaio further states:

Projectile fragmentation can amplify the effects of the temporary cavity increasing the severity of a wound. This is the reason for the effectiveness of the 5.56 x 45-mm cartridge and the M-16 rifle. For the M-193 55-gr. bullet, on the average, the yaw becomes significant

_____

[11] DiMaio, *Gunshot Wounds*, 2d (CRC Press LLC, 1999). P. 54-55

at 12 cm with marked issue disruption occurring most commonly at
15-25 cm due principally to bullet fragmentation.[12]

82.    This video graphically illustrates the temporary wound cavity as described by DiMaio: https://www.youtube.com/watch?v=8HM96wpPVoQ.

83.    Because of the propensity of the 5.56/.223 caliber round to create significant damage upon impacting living tissue, it is not generally considered to be nor favored as a hunting cartridge.

84.    Colt sought to capitalize on the military acceptance of the AR-15/M-16 and shortly thereafter began to produce these rifles for sale on the civilian market. The only difference between the military and civilian versions was removal of select-fire (both semi-automatic and full-automatic) capability. The additional features on these rifles intended to enhance their capability as military firearms remained. As the AR-15/M-16 gained a reputation for reliability in military use, its popularity in terms of sales to the civilian market increased. Arguably, the AR-type rifle is in second place behind AK-type firearms in terms of production, sale, and use by military forces worldwide. This animation thoroughly details the key operational components of the M-16/AR-15 in full-automatic, semi-automatic and burst modes: https://www.youtube.com/watch?v=omv85cLfmxU

### B.  Evolution and Development of Pistol-Caliber Firearms

85.    It is also important in terms of this particular case to address the evolution and development of firearms that chamber and fire pistol-caliber ammunition, including those firearms known as submachine guns. Submachine guns are defined as machine guns that fire "sub caliber" (i.e., pistol-caliber) ammunition. A number of the pistols that are prohibited under the Ordinances

---

[12] *Id.,* P. 56

are direct evolutionary descendants of submachine guns initially designed and produced for military use.

86.     Many of the construction and design features attributed to assault weapons, and the StG 44, were first utilized in the design and manufacture of mid-20th-century submachine guns. Nazi Germany entered World War II with the innovative *Maschinenpistole* 38 (MP38). It was chambered in 9mm and later, after a number of engineering changes, re-designated as the MP40. It has design features commonly found in later assault weapons, including an adjustable stock, a separate pistol grip, a detachable magazine, and the use of steel stampings in its construction. The MP40 is pictured here:



[13]

87.     While the United States initially entered World War II with a military variant of the Thompson .45-caliber submachine gun, it was heavy and expensive to manufacture because a number of the major components were machined from solid steel. Before the end of the war, the Thompson had been supplemented by the M3 "Grease Gun" initially produced by General Motors. The receiver was a stamped and welded sheet-metal assembly with an adjustable, sliding shoulder stock. Like the MP38 and MP40, it had a separate pistol grip, a sliding/adjustable shoulder stock,

---

[13] MP40 Image Source: https://www.rockislandauction.com/detail/84/613/german-erma-mp40-submachine-gun

and a detachable box magazine with a 30-round capacity. In a utilitarian sense, it was as effective as the Thompson and, at approximately $20, it was less than half as expensive.

88.     The United Kingdom produced over one million Sten submachine guns during World War II. A rugged and reliable firearm made largely from welded steel stampings, it is known for its utility, reliability, and ease of manufacture. Features shared with the American M3 and German MP38/MP40 include an adjustable shoulder stock, a detachable magazine, and, on some variations, a barrel shroud allowing the operator to utilize the area surrounding the barrel as an auxiliary grip without touching a heated barrel.

89.     Prior to and during World War II, a number of other nations developed submachine guns which followed the same design and construction philosophy. Notable examples include the Soviet PPSh-41, the Italian Beretta Model 38/42, and the Swedish Carl Gustav Model 45.

90.     Following World War II, most new submachine gun designs continued the design philosophy which combined utility, ease of manufacture, and the features of wartime firearms. In the early 1960s, HK introduced the MP5 which became an immensely popular choice for military and law enforcement agencies worldwide due to its inherent reliability and accuracy. The MP5 was produced in multiple iterations to include a semi-automatic civilian version as well as a pistol variant without a provision for a shoulder stock (HK SP89). The SP89 is pictured here:

29



[14]

91.    Israeli Military Industries also successfully marketed their Uzi submachine gun for export in select-fire and civilian semi-automatic variants. The  Uzi Pro" pistol is shown below:



[15]

---

[14]  SP89  Image  Source:  https://www.gunsinternational.com/guns-for-saleonline/pistols/9mm-pistols/excellent-condition-factory-german-hk-sp89-9mm-pistol.cfm?gun_id=101037518.
[15] Image Source: https://blog.cheaperthandirt.com/shot-2013-iwi-uzi-pro-pistol/

92.    Additionally, a number of submachine gun designs proved unsuccessful in terms of military and government sales but nonetheless found a ready market when re-engineered as semi-automatic pistols. Notable examples include the Military Armaments Corporation (MAC) MAC-10 (and successive variants) and the Intratec TEC-9, which was initially designed and produced in Sweden as the Interdynamic MP-9 submachine gun. A MAC-10 is pictured here:



[16]

A TEC-9 pistol is shown in the following picture:

---

[16] Image Source: https://www.armslist.com/posts/11522946/st-louis-missouri-handguns-for-sale--vulcan-mac-10



[17]

### III.    Features of Assault Weapons Under the Ordinances

93.    Equipment designed, produced, and issued to modern military forces for utilization in the field emphasizes functionality. In terms of small arms designed and produced for military use, form follows function, and features are present to maximize effectiveness. Maximizing effectiveness in terms of military small arms includes the ability to deliver reliable lethality or the ability to incapacitate the chosen target and provide increased survivability for the operator in battle.

94.    Numerous assault weapons available for purchase by the public are, save the lack of select-fire capability, identical copies of military firearms. As such, they retain a number of features originally designed to maximize their effectiveness in battle. Other firearms available to the public that were not initially intended for sale to government or military customers incorporate features mimicking those found on military firearms. There are countless accessories available to

---

[17] Image Source:
https://www.egunner.com/intratec-tec-dc99mmpara,name,11952922,auction_id,auction_details

add to firearms traditionally considered "sporting firearms" (i.e., those initially designed and manufactured for target shooting or hunting), which brings their functionality more towards the military side of the spectrum and away from the sporting side.

### A. Prohibited Firearms and Features Under the Ordinances

#### i. Prohibited Firearms

95.    The Ordinances do not ban all firearms, all semi-automatic firearms, or even all firearms chambered to fire .223/556mm (AR-platform) or 7.62x39mm (AK-platform) caliber ammunition.

96.    Instead, the Ordinances prohibit a number of firearms and features with obvious military (i.e., non-sporting) heritage. The features delineated in the Ordinances are direct descendants from those on military firearms. These features are not necessary for civilian self-defense; firearms without these features are permitted under the Ordinances, and these lawful alternatives are widely available to civilian customers and provide effective means for civilian self-defense.

97.    Each Ordinance also bans certain weapons based on magazine capacity. I discuss magazine capacity below.

#### ii. Prohibited Features

98.    Included in the Ordinances' definitions of "assault weapon" are a number of features that, when added to certain firearms, bring those firearms under the statutory definition of assault weapons. Specifically, a semi-automatic rifle or pistol that has the capacity to accept a detachable magazine (or can be readily modified to do so) or a semi-automatic shotgun is considered an assault weapon if the firearm includes one of the features delineated in the Ordinances.

99.     Each of the following features, whether incorporated into the firearm by the manufacturer as standard equipment or subsequently added by the owner as an accessory, can generally be considered capable of increasing the firearm's effectiveness in a military combat scenario.

100.    **A pistol grip or thumbhole stock** (for semi-automatic rifles and shotguns). A semi-automatic rifle or shotgun that includes a pistol grip (without a shoulder stock) increases the ability of the operator to conceal the rifle or shotgun and to maneuver the firearm in a confined space such as a vehicle. The pistol grip also facilitates easier firing from positions other than the shoulder (firing from the hip or a point position directly in front of the operator). Thumbhole stocks have historically been utilized on some firearms for sport and target shooting; however, during the time the Federal Assault Weapons Ban was in effect (1994 to 2004), a number of AK-style firearms (amongst others) were equipped with thumbhole stocks to circumvent the ban's prohibition on pistol grips.

101.    **Folding or telescoping stock** (for semi-automatic rifles and shotguns): Folding and telescoping stocks allow the operator to more easily conceal or maneuver the weapon in a confined space such as a vehicle. They also facilitate easier or more comfortable firing from positions other than the shoulder. However, a firearm does not need an adjustable stock to operate. Folding stocks were added to the M1 carbine in World War II for paratrooper use. More recent variants of the U.S. military's M-16 (M-4 carbine) have incorporated telescoping stocks as a standard feature.

102.    **Flash suppressor** (for semi-automatic rifles and pistols). A flash suppressor reduces the muzzle flash, allowing the operator to more easily maintain vision in low-light conditions and also helps to conceal the flash from view. This allows the operator to more easily

acquire additional targets in a shorter period of time without having to wait for their vision to adjust to a brighter muzzle flash as well as helps conceal the shooter's position.

103.    **Shroud attached to the barrel, or that partially or completely encircles the barrel** (for semi-automatic rifles and pistols). Historically, barrel shrouds were a feature of military rifles produced and adopted at the beginning of the 20th century. The bolt-action U.S. Model 1903 Springfield Rifle (standard issue for U.S. Forces in WWI) incorporated a wooden barrel shroud to protect the shooter's nondominant hand. The M1 Garand rifle utilized by the U.S. military during WWII also incorporated a traditional wooden stock and a wooden handguard that covered two-thirds of the barrel. Barrel shrouds encircle and protect the barrel from damage and provide the operator with an auxiliary grip point without being burned. In a modern gas-operated semi-automatic military rifle, it also serves to protect the gas tube/piston mechanism from inadvertent damage and provides additional space for the operator to grip and control the rifle during rapid repeat firing without risking being burned by a hot barrel.

104.    **Threaded barrel** (for semi-automatic pistols). A threaded barrel allows for attachment of a suppressor (commonly referred to as a silencer) which allows the operator to better conceal themselves from their target by reducing the report of their firearm. It also allows the attachment of some flash suppressors with the resultant effect mentioned previously.

105.    **A secondary protruding grip or other device to allow the firearm to be stabilized with the non-trigger hand** (for semi-automatic pistols, rifles (Boulder County only), and shotguns (Boulder County only)). Protruding foregrips allow increased stability of the firearm by the operator. This allows the operator to better control recoil and muzzle climb, thus increasing their hit probability for successive shots. A protruding foregrip is not a feature found on traditional sporting firearms. It appeared on some versions of AK-based rifles; however, it was not until the

35

advent of the Rail Attachment Systems (RAS) and acceptance by the U.S. military that foregrips for semi-automatic rifles became more widespread. Adding a foregrip to a pistol also renders it "any other weapon" under the National Firearms Act and subjects it to more restrictive controls, including registration in a national database.

106.    **The capacity to accept a detachable ammunition feeding device at some location outside of the pistol grip** (for semi-automatic pistols). The placement of a detachable ammunition feeding device or magazine outside of the pistol grip is a feature not common to sporting pistols and can trace its origin to military pistols. The Bergmann Military Model 1897 (or No. 5) featured a detachable magazine outside the pistol grip. Further evolution of this design can be found in the Mauser C96 or "Broomhandle" pistols, which were manufactured with fixed internal as well as detachable magazines forward of the pistol grip. Modern firearms recently or currently manufactured in this configuration are either semi-automatic pistol variants of submachine gun designs (HK SP89, Czech Scorpion, TEC-9, etc.) or pistols based upon AR and AK receivers. The forward magazine placement provides a second grip, which can increase stability and allow for more controlled rapid fire.

107.    **A manufactured weight of 50 ounces or more when unloaded (for semi-automatic pistols)**. Under federal law, a handgun, whether it be a pistol or revolver, is designed to be "held and fired with the use of a single hand."[18] Unloaded, an AR-platform pistol weighs between 5 and 6 pounds, effectively requiring two hands to hold and operate. By comparison, the Glock 17, a popular semi-automatic pistol, weighs 22 ounces unloaded and can be held and fired with one hand.

---

[18] 18 USC § 921(a)(30).

108.    **Buffer tube, arm brace, or other part that protrudes horizontally under the pistol grip** (for semi-automatic pistols). An arm brace converts a rifle-caliber pistol into a short-barreled rifle (a type of weapon restricted under the National Firearms Act), as it can allow the operator to fire it from the shoulder, increasing stability while maintaining concealability. Buffer tubes provide a mounting point for arm braces and/or shoulder stocks facilitating conversion of a pistol to a short-barreled rifle.

109.    **Fixed magazine that has the capacity to accept more than five rounds** (for semi-automatic shotguns) **or ten rounds** (for semi-automatic pistols). This feature prohibits larger-capacity fixed magazines. A fixed magazine capable of holding more than 5 rounds of ammunition for a semi-automatic shotgun or 10 rounds for a semi-automatic pistol is not necessary for the firearm to operate  as designed. All firearms are capable of functioning with compliant capacities. It is also worth noting that most modern semi-automatic shotguns that are designed, manufactured, and marketed as "hunting shotguns" have a fixed magazine capacity of less than 5 rounds, including, for example, the Remington Model 1100, which has a fixed magazine capacity of 4 rounds. As for pistols, semi-automatic models that utilize fixed magazines, let alone fixed magazines that hold over 10 rounds of ammunition, are not common.

110.    **An ability to accept a detachable magazine** (semi-automatic rifles and pistols; semi-automatic shotguns (Boulder County only). Detachable magazines allow shooters to replace an empty or depleted magazine with a fresh magazine to resume firing quickly.

111.    For more than 30 years, these types of prohibited features—useful for offensive military applications in combat settings but not necessary or suited for civilian self-defense—have been the subject of study and regulation.

112.    For example, in 1989, an ATF working group formed under the President George H.W. Bush administration evaluated the importability of semi-automatic rifles and completed a report, which is attached as **Exhibit C**.[19] That working group determined that certain civilian rifles were generally semi-automatic versions of select-fire military assault rifles.[20] As the working group explained, select-fire military assault rifles can fire in fully automatic mode (AKA: a machine gun). By contrast, civilian semi-automatic assault weapons cannot fire in fully automatic mode, but they have the same "general characteristics which are common to the modern military assault rifle."[21]

113.    These characteristics are associated with features that are designed for offensive military applications. As the working group found, these characteristics and features carried over from the military assault rifle to the semi-automatic versions, and distinguished the semi-automatic assault weapons from traditional sporting rifles.[22] The ability to accept a detachable magazine, folding and telescoping stocks, pistol grips, and other identified characteristics were "military configurations."[23] As a result, the ATF working group determined that semi-automatic assault weapons were not "generally recognized as particularly suitable for or readily adaptable to sporting purposes."[24]

114.    In 1994, Congress enacted the federal assault weapons ban, creating criminal penalties for the manufacture, transfer, or possession of assault weapons and large-capacity magazines. In enacting the federal ban, Congress recognized the tragic threat posed by gangs,

---

[19] *Report and Recommendation on the Importability of Certain Semiautomatic Rifles*, Department of the Treasury Bureau of Alcohol, Tobacco and Firearms (July 6, 1989).
[20] *Id*. at 5-6.
[21] *Id*. at 6.
[22] *Id*.
[23] *Id*. at 6-7
[24] *Id*. at 12.

drug-traffickers, mentally deranged persons, and others armed with assault weapons.[25] Specifically, Congress noted that assault weapons had become the weapon of choice for gangs, and law enforcement faced a "rising level of lethality … from assault weapons on the street."[26]

115.    Congress, when drafting the 1994 Federal Assault Weapons Ban, incorporated the technical work of the 1989 ATF working group.[27] Congress recognized that "semiautomatic assault rifles … represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle."[28] Congress further recognized that these features serve "specific, combat-functional ends" that provide "a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns."[29]

116.    ATF organized two subsequent working groups in 1998 and 2011. The 1998 working group concurred with the conclusions of the 1989 study and added a finding that "the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989."[30] The 2011 working group then considered the importability of certain shotguns, finding that features such as a folding, telescoping, or collapsible stock, magazines holding over 5 rounds, and forward pistol grips were most appropriate for military or law enforcement use and not sporting purposes.[31]

---

[25] H.R. Rep. No. 103-489, Public Safety and Recreational Firearms Use Protection Act (May 2, 1994) (attached as **Exhibit D**) at 12.

[26] *Id*. at 13-14.

[27] *Id*. at 17.

[28] *Id*.

[29] *Id*. at 18–20.

[30] *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, Department of the Treasury Bureau of Alcohol, Tobacco and Firearms* (April 1998) (attached as **Exhibit E**) at 2.

[31] *ATF Study on the Importability of Certain Shotguns, U.S. Department of Justice Bureau of*

117.    As described above, the prohibited features serve military-style offensive purposes as opposed to traditional sporting or self-defense uses. And the ATF's concerns about the offensive nature of these firearms have certainly been borne out by their subsequent criminal use in mass shootings and assaults on law enforcement in the past decade.

### B.  Prohibited Large-Capacity Magazines

118.    Magazine capacity plays a role in defining assault weapons under the Ordinances, and the Ordinances also separately restrict large-capacity magazines themselves, which are generally defined as magazines with the capacity to accept more than ten rounds of ammunition.

119.    Modern semi-automatic rifles that are designed, manufactured, and marketed as "hunting rifles" traditionally have an internal magazine capacity of less than 10 rounds depending on caliber. For example, the Browning BAR in .30-06 caliber as currently manufactured has an internal magazine capacity of four (4) rounds.

120.    The operation (or cycle of fire) of any firearm designed and manufactured to accept a detachable magazine will function regardless of the maximum capacity of the magazine itself. For example, firearms such as the Glock 17 semi-automatic pistol and AR-15 type semi-automatic rifle will function as designed whether the operator utilizes a magazine limited to 10 rounds or one of greater capacity. In fact, both of those examples will still fire a chambered round if there is no magazine inserted. Generally speaking, any firearm designed to accept a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity of 10 rounds or fewer. This includes the vast majority of handguns and shoulder-fired firearms designed and manufactured to utilize detachable magazines.

---

*Alcohol, Tobacco, Firearms and Explosives* (January 2011) (attached as **Exhibit F**), at iv, 9-13.

40

121.    Large-capacity detachable magazines were not initially designed or intended for the civilian marketplace. The lineage and refinement of large-capacity detachable magazines and belt-feeding mechanisms can be traced directly to a military heritage. WWI introduced numerous magazine-fed light machine guns to combat, and the trend continued through WWII. As far as the individual infantryman's rifle was concerned in WWII, the standard-issue semi-automatic rifle for the U.S. Army as well as the U.S. Marine Corps was the M1 Garand chambered in .30-06. The M1 has an internal fixed magazine with a capacity of 8 rounds. The magazine was loaded via an 8 round "en bloc" which was ejected from the magazine after those 8 rounds were expended. It was not until the mid-1950s, with the adoption of the M-14, that a rifle with a detachable magazine was approved as standard issue to front line members of the U.S. military. The M-14 was issued with a 20-round magazine.[32]

122.    Although technological advances in military firearms accelerated at a rapid pace following WWII, large-capacity detachable magazines were not commonly marketed for the general public. For example, when the AR-15 (later designated M-16) was first purchased and issued to U.S. Forces in the early 1960s, it was intended to be utilized, and was issued, with 20-round detachable magazines.[33] However, when the first semi first semi-automatic variants of the M-16, the Colt AR-15 SP1 Sporter, became available for sale to the public in 1964, it came supplied with two five-round magazines, not the military-issue 20-round magazines.

---

[32] Hogg, Ian V. & Weeks, John S., Military Small Arms of the 20th Century, 7th Ed., (Krause Publications, 2000), P. 291
[33] Stevens, R. Blake & Ezell, Edward C., The Black Rifle (Collector Grade Publications, 2004), P. 108



123.    "Initially, Colt simply added a five round limitation spacer to the 20-round magazine which could be installed or removed at will by simply removing the floor plate of the magazine. This was primarily intended for hunters, in compliance with the laws in most states which limit magazines in the field to a five-round capacity for hunting. With the introduction of the Colt Sporter series, the configuration of this magazine was altered by the addition of a permanent rivet in the floorplate to prevent the removal of the spacer, thus making this a magazine of dedicated five-round capacity for hunting applications."[34]

---

[34] Bartocci, Christopher R., *The Black Rifle II* (Collector Grade Publications, 2004), P. 263

42



| MODEL NO. | MODEL | CALIBER | BBL LENGTH (inches) | FINISH | APPROX. WEIGHT (lbs.) | O/A LENGTH (inches) | SIGHT RADIUS (inches) | ROUNDS MAG. |
|---|---|---|---|---|---|---|---|---|
| R6600DH | AR-15A2 DELTA H-BAR w/scope and acces. | 223 Rem (5.56mm) | 20 | M | 10 | 39 | 19.75 | 5 |
| R6600 | AR-15A2 H-BAR | 223 Rem (5.56mm) | 20 | M | 8.0 | 39 | 19.75 | 5 |
| R6500 | AR-15A2 SPORTER II | 223 Rem (5.56mm) | 20 | M | 7.5 | 39 | 19.75 | 5 |
| R6420 | AR-15A2 CARBINE | 223 Rem (5.56mm) | 16 | M | 5.8 | 35 extended 32 closed | 14.5 | 5 |

Rifles

© 1986 Colt Industries Inc
Printed in U.S.A.

Colt continued to provide five round magazines with their AR-15 rifles as late as 1987.[35]

124.    Post-war development of semi-automatic pistols continued after WWII; however, magazine capacities generally remained under 10 rounds. Notable examples include the Beretta Model 1951 (8 rounds), Sig Sauer P220 (1975, 7 to 10 rounds depending on caliber), Heckler & Koch P7 (1978, 8 rounds).

125.    In 1994, Congress adopted the Violent Crime Control and Law Enforcement Act, (which included provisions also known as the Federal Assault Weapons Ban or "AWB"), which, like the Ordinances, limited the maximum capacity of a detachable magazine to ten rounds. As a result, numerous firearm manufacturers, as well as aftermarket magazine manufacturers, initiated production of what were colloquially termed "post-ban" magazines to conform to the new legislation. The post-ban magazines were modified, or retooled, versions of existing large-capacity magazines, in order to keep their dimensions identical and ensure that the 10-round magazines functioned identically to existing magazines of 11 rounds or more in their firearms. For example, pictured below is a "pre-ban" 13-round magazine for a Browning 9mm "Hi Power" semi-automatic pistol:

---

[35] Colt Firearms 1987 Catalog, (Colt Industries Inc., 1986), P.16



126.    And shown below is a "post-ban" 10-round magazine for the same pistol. You will note the 10-round magazine differs as a portion of the metal magazine body is replaced with a molded polymer plug. This modification effectively limits the interior volume and capacity of the magazine to 10 rounds. Manufacturers have also utilized various other methods to restrict magazine capacity, including dimpling the lower quadrant of the magazine body inwards, placing rivets in the magazine body, or thickening the walls of polymer-bodied magazines to reduce capacity.



127. Following the expiration of the Federal Assault Weapons Ban, numerous states and localities enacted their own legislation, which also contained magazine capacity limitations. As a result, many manufacturers of popular semi-automatic handguns and rifles during the Federal Assault Weapons Ban continued to offer "state compliant" versions to customers in states so affected. Manufacturers such as Glock, Sig Sauer, FN USA, Beretta, and Smith & Wesson, among numerous others, offer handguns and rifles compliant with individual state regulations. Most major firearm manufacturers offer models that come "standard" with 10-round magazines.

128. Shown here is a page from the current online catalog of FN USA (the U.S. based subsidiary of Belgian arms manufacturer *Fabrique Nationale*) showing the "California Compliant" version of their "Five-seveN" pistol.

45



[36]

129.     And a "California Compliant" Glock Model 19 9mm pistol available from Sportsman's Warehouse:

---

36 Image Source: https://fnamerica.com/catalog-and-wallpapers/



[37]

130.    Additionally, there are numerous well-respected aftermarket manufacturers who offer 10-round magazines specifically for use in handguns that come with LCMs. Mec-Gar and ProMag are two of many:

---

[37] Image Source: https://www.sportsmans.com/shooting-gear-gun-supplies/handguns/glock-19-9mm-luger-402in-black-nitrite-pistol-101-rounds-california-compliant/p/1155366

47



[38]

[39]

---

[38]   Image   Source:   https://mec-gar.com/shop/magazines/sig-sauer/sig-sauer-p229-1-9mm-10-round/

[39] Image Source: https://promagindustries.com/fits-the-glock-model-17-19-26-9mm-10-rd-black-polymer/

131.    In regard to semi-automatic rifles compliant with the Ordinances, many manufacturers also offer magazines that have a 10-round maximum capacity. For example, magazines compliant with the Ordinances for the Ruger Mini-14 rifle (a weapon generally legal under the Ordinances) are available here:

https://gunmagwarehouse.com/magfinder/ruger-mini-14

132.    Without argument, the ability to fire an increased quantity of cartridges without reloading increases the lethality and effectiveness of small arms in combat, or the military would not have incorporated this feature. Less time required to reload can equate to more time spent acquiring targets and shooting. As stated previously, form follows function in regard to equipment designed and intended for military use.

133.    To the best of my knowledge, any semi-automatic capable of accepting a large-capacity detachable magazine will accept a magazine with a capacity of ten rounds or less. I have fired a significant number of handguns and rifles with magazines of varying capacities. The capacity of the magazine did not affect the ability of those firearms to function as designed. In fact, based on my training, knowledge, and experience, I am not aware of a single firearm that specifically requires a large-capacity magazine, as defined in the Ordinances, to operate.

**IV.    Assault Weapons and Self-Defense**

134.    It is my opinion that assault weapons, as defined by the Ordinances, are a poor choice for civilian self-defense.

135.    I have been asked on numerous occasions over the past 35 years what firearm I would recommend for personal or home defense. My recommendation is based upon my inquiry in return regarding the individual's (and their family members') personal experience and comfort level with firearms. In over 25 years, I have never recommended an AR, AK, or other similar rifle or assault pistol as a personal-defense or home-defense weapon.

49

136.     Home defense and/or self-defense (including street/commercial robbery) situations are rarely, if ever, lengthy shootouts at long ranges with extensive exchanges of gunfire. Assault weapons, as defined by the Ordinances, were designed to be effective at battlefield ranges of up to 500 yards. The typical muzzle velocity of a .223-caliber bullet is 3,200 fps. Projectiles travelling at velocities found in these weapons pose a serious risk of overpenetration in most home construction materials, such as gypsum board/sheet rock and typical 2x4 lumber. When this cartridge was designed for the AR-15/M-16, it was intended to kill or incapacitate enemy combatants at distances of hundreds of yards, not dozens of feet.

137.     In August 2014, the NRA's *American Rifleman* published an article by Stanton Wormley titled "The AR-15 for Home Defense: Penetration Tests."[40] Wormley conducted penetration tests on nine different types of .223/5.56mm ammunition by firing them through simulated wall sections constructed of gypsum board/sheet rock and wooden 2x4 studs. When fired at a 90-degree angle to the walls, all nine types of ammunition (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall sections as well as the water jugs placed three feet behind them:

> But just how much energy did the penetrating projectiles carry? All the loads, including the Glaser, exploded one-gallon water jugs placed 3 feet behind the wall sections.[41]

138.     The tests conducted by Wormley also included firing longitudinally through the wall sections, resulting in the penetration of three successive 2-inch-thick 2x4 studs by a number of the projectiles. These tests vividly highlight the inherent dangers of utilizing assault weapons with high-velocity ammunition in a home-defense scenario.

---

[40] https://www.americanrifleman.org/content/the-ar-15-for-home-defense-penetration-tests/
[41] *Id.*

139.    In reference to the *American Rifleman* article mentioned previously, current U.S. Army-issue .223-caliber ammunition is capable of penetrating 3/8-inch hardened steel at 350 yards. Potential overpenetration in a confined environment is problematic in terms of risks to bystanders or family members outside the target location. Most jacketed, commercially available .223/5.56mm ammunition has impressive penetration capabilities in this regard. Additionally, the (former) NATO-issue M855 SS109 5.56mm is readily available for purchase by civilians. This ammunition was designed to penetrate up to 3mm of "soft" (non-hardened) steel. This capability is certainly unnecessary for self-defense and poses substantial risks to individuals in adjoining rooms, neighboring apartments, or other attached dwellings.

140.    During a stressful situation such as a home invasion or break-in, there may be multiple steps required by the operator to bring the weapon from a "safe" condition to a firing condition. Manipulation of a charging handle, safety switch, or inserting a magazine may be difficult to accomplish under stress, particularly if the operator has not adequately trained or practiced with their firearm. Other family members may not be familiar with bringing the weapon to a firing condition or fail to complete adequate steps to do so under duress. Unloaded, an AR-platform rifle weighs approximately 6.5 to 7 pounds. It also requires two hands to aim and fire. In a home-defense scenario, a homeowner would likely be attempting to call 911 while addressing the intruder, which is difficult if not impossible while wielding their AR-15 effectively and safely. Additionally, it would hamper, if not prevent, leading a vulnerable adult away from danger or guiding/carrying a small child. By comparison, common handgun weights are between 2 and 3 pounds and require only one hand to operate.

141.    While employed as a Special Agent with ATF, the agency transitioned to an AR-type rifle in the early 2000s. Each agent was required to attend, and successfully complete, a one-

week/40-hour transition training class in order to familiarize themselves, and qualify, with the firearm. The training included repetitive live-fire drills under stressful conditions. Additionally, we were required to requalify with these firearms quarterly and repeat the same drills as during the initial transition training. Nonetheless, I witnessed agents make errors that resulted in a failure of the weapon to fire during those drills, even though those agents had performed the drills repeatedly under stress. It is worth noting here that the M4 carbines issued to ATF Field Offices were select-fire rifles (i.e., machine guns capable of fully automatic fire) that were converted to semi-automatic fire only.

142.    Assault pistols are also a poor choice for home defense or personal protection. Due to their weight and length, many assault pistols prohibited by the Ordinances require two hands to effectively aim and shoot. (Certainly, the same can be said for a rifle.) In a home-defense situation, an individual may be required to use one hand to call 911 while attempting to operate a two-handed firearm with just one hand. Such a situation would also preclude the homeowner from utilizing their non-gun hand to pick up or guide a small child, or an elderly or disabled individual, during such an event.

143.    Additionally, I am not of the opinion that an abundance of ammunition is a substitute for weapons familiarization and shot placement. Repeated practice and shooting with your chosen firearm will make you a more effective deterrent than the capability to fire more rounds should deadly force be required.

144.    If the individual had a preference for shoulder-fired weapons, I have recommended a pump-action 12- or 20-gauge shotgun (Remington 870, Mossberg 500, etc.) loaded with 00 buckshot and stored with the "hammer dropped" on an empty chamber and the safety off. The only action required to bring the shotgun from a "safe" unloaded condition to a firing condition is to

52

work the pump action of the shotgun. The advantages of this type of firearm and storage condition are unmatched stopping power, low probability of overpenetration (as compared to high velocity, rifle-caliber projectiles), and zero manipulation of safety mechanisms required in high-stress situations. The loading/chambering process itself is an audible deterrent. Training and familiarization with this type of a firearm is simple and straightforward.

145.    For a handgun, my first inclination is to recommend an eight-shot revolver in .38 +P caliber/.357 Magnum (such as a Smith & Wesson Model 627, Taurus Model 608, etc.) loaded with hollow-point bullets. As with my rationale for recommending a pump-action shotgun, there are no complicated safety mechanisms to manipulate in a high-stress situation and the probability of overpenetration is low. In addition, it is easy to reload with a speed loader should more than eight shots be required. Revolvers are also easier and less complicated for other family members to learn to operate, especially if they have less familiarity with firearms.

146.    In terms of a carry handgun, I value concealability over ammunition capacity. The advantage of concealed carry is protection without broadcasting the fact. In a street robbery scenario, I believe the best course of action is to quickly extricate yourself from the "kill zone" and not engage in a protracted gunfight. When I was employed as a Special Agent with ATF, our primary duty weapons were Sig Sauer P229 pistols in .40 S&W caliber. We were also given the choice of a Sig Sauer P239 in .40 S&W or a five-shot Smith and Wesson Model 640 in .357 Magnum as a backup firearm. When off duty, I carried the S&W Model 640 and a speed loader extensively as opposed to the P229. I found it easy to conceal and am of the opinion that 10 rounds was an adequate amount of ammunition to enable me, or myself and my wife, or child, to extricate myself from a street or retail location robbery should I encounter one. Consequently, I have most often recommended either a lightweight small revolver (such as a S&W Bodyguard, Ruger LCR,

Smith and Wesson Model 36, 640 or variant) carried with a speed-loader or a small, low-profile, small semi-automatic pistol (Sig Sauer P239, Ruger LCP, Colt Mustang Pocketlite etc., which each generally hold 6 to 7 rounds of ammunition) with a spare magazine.

147.    Essentially, the types of firearms classified as assault weapons under the Ordinances, specifically AR- and AK-type rifles and pistols, are direct developmental descendants of military weapons designed for use in combat. The "civilian" AR-15-type rifles in .223/5.56mm retain the same performance characteristics (in terms of muzzle velocity, range, etc.) as the military M-16 and its variants (M-16A2, M-4, etc.).

148.    According to the U.S. Army Manual 3-22.9 "Rifle Marksmanship M-16A1, M-16A2/3, M-16A4, and M4 Carbine, April 2003," the maximum range of these rifles is 2,650-3,000 meters. They were not designed, nor are they suitable, for personal or home defense in short-range or close-quarter situations.

FM 3-22.9(FM 23-9)

CHAPTER 2

**CHARACTERISTICS, AMMUNITION, AND
ACCESSORIES**

*This chapter describes the general components, characteristics,
ammunition, and accessories for the M16- and M4-series weapons to include
a brief explanation of how to mount the various accessories.*

**2-1.    CHARACTERISTICS**

The M16-/M4-series weapons are 5.56-mm, magazine-fed, gas-operated, air-cooled,
shoulder-fired weapons. This section describes the general characteristics (Table 2-1) and the
components of the M16-/M4-series weapons. Table 2-2 (page 2-2) shows the characteristics
of various accessories.

| CHARACTERISTIC | M16A1 | M16A2/A3 | M16A4 | M4 |
|---|---|---|---|---|
| **WEIGHT (pounds):** | | | | |
| Without magazine and sling | 6.35 | 7.78 | 9.08 | 6.49 |
| With sling and loaded: | | | | |
| 20-round magazine | 6.75 | 8.48 | 9.78 | 7.19 |
| 30-round magazine | 7.06 | 8.79 | 10.09 | 7.50 |
| | | | | |
| Bayonet knife, M9 | 1.50 | 1.50 | 1.50 | 1.50 |
| Scabbard | 0.30 | 0.30 | 0.30 | 0.30 |
| Sling, M1 | 0.40 | 0.40 | 0.40 | 0.40 |
| **LENGTH (inches):** | | | | |
| Rifle w/bayonet knife | 44.25 | 44.88 | 44.88 | N/A |
| Overall rifle length | 30.00 | 39.63 | 39.63 | N/A |
| Buttstock closed | N/A | N/A | N/A | 29.75 |
| Buttstock open | N/A | N/A | N/A | 33.0 |
| **OPERATIONAL CHARACTERISTICS:** | | | | |
| Barrel rifling-right hand 1 twist (inches) | 12 | 7 | 7 | 7 |
| Muzzle velocity (feet per second) | 3,250 | 3,100 | 3,100 | 2,970 |
| Cyclic rate of fire (rounds per minute) | 700-800 | 700-900 | 800 | 700-900 |
| **MAXIMUM EFFECTIVE RATE OF FIRE:** | | | | |
| Semiautomatic (rounds per minute) | 45-65 | 45 | 45 | 45 |
| Burst (3-round bursts) (rounds per minute) | N/A | 90 | 90 | 90 |
| Automatic (rounds per minute) | 150-200 | 150-200 A3 | N/A | N/A |
| Sustained (rounds per minute) | 12-15 | 12-15 | 12-15 | 12-15 |
| **RANGE (meters):** | | | | |
| Maximum range | 2,653 | 3,600 | 3,600 | 3,600 |
| Maximum effective range | | | | |
| Point target | 460 | 550 | 550 | 500 |
| Area target | N/A | 800 | 600 | 600 |

**Table 2-1. Characteristics of the M16-/M4-series weapons.**

NOTE:    For further technical information, refer to TM 9-1005-319-10 and
TM 9-1005-249-10.

2-1

## V.    Assault Weapons as a General Threat to Public Safety

149.    As mentioned previously in this report, many of the firearms prohibited by the Ordinances directly trace their origins to those developed for use in combat. As such, these firearms were never initially intended for general distribution or sale to the public.

150.    As tragically demonstrated by recent mass shootings in Colorado and elsewhere throughout the country—such as the 2021 shooting at the King Soopers supermarket in Boulder (10 fatalities); the 2022 Club Q nightclub shooting in Colorado Springs (5 fatalities, 17 wounded); the 2012 Aurora movie theater shooting (12 fatalities, 70 wounded); the Pulse Nightclub shooting in Orlando, Florida, in 2016 (49 fatalities, 50+ wounded); the 2017 Las Vegas shooting (60

55

fatalities, 400+ wounded); the 2022 Uvalde, Texas, school shooting (21 fatalities, 17 wounded); and the July 4, 2022, shooting in Highland Park (7 fatalities, 48 wounded)[42]—the assault weapons, in conjunction with large-capacity magazines, as defined under the Ordinances are capable of inflicting significant carnage upon civilians in a short period of time.

151. Rifle-caliber assault weapons as prohibited under the Ordinances pose a significant risk to law enforcement officers. It has been my experience that the soft body armor issued to most Uniformed Officers has a "Level II" or "Level IIIA" protection rating. These ratings are suitable for protection against most handgun bullets, as those projectiles range up to 1,200 fps in velocity. Rifle-caliber assault weapons, including AR- and AK-type rifles, can achieve muzzle velocities of between 2,700 to 3,200 fps and readily penetrate Level II and Level IIIA body armor (as well as some Level III hard body armor, which is not universally standard issue among law enforcement agencies nationwide). Not only do the firearms subject to the Ordinances pose a threat to overall public safety, but they increase the likelihood that first responders charged with stopping such a threat or attending to wounded citizens may be injured or killed in the performance of their duty.

152. This video illustrates the capability of commonly available .223/5.56mm caliber ammunition to penetrate Level III body armor. The narrator states that this test was performed at a distance of "about 7 yards." https://www.youtube.com/watch?v=oMYkEMhPsO8

153. The argument that commercially available, AR-type firearms are somehow less dangerous or lethal simply because they fire only in semi-automatic mode is misleading. They retain the identical performance capabilities and characteristics (save full-automatic capability) as initially intended for use in combat. With even minimal training, an operator can fire 40 to 50 shots per minute in semi-automatic mode. According to the U.S. Army manual referenced in paragraph

---

[42] https://everytownresearch.org/wp-content/uploads/sites/4/2023/03/data.csv

148, the most effective use of the M-16 at ranges beyond 25 yards is rapid semi-automatic fire—

not full-automatic fire.

**7-8.   RAPID SEMIAUTOMATIC FIRE**
The most important firing technique during modern, fast moving combat is rapid semiautomatic fire. Rapid-fire techniques are the key to hitting the short exposure, multiple, or moving targets described previously. If properly applied, rapid semiautomatic fire delivers a large volume of effective fire into a target area. The soldier intentionally fires a quick series of shots into the target area to assure a high probability of a hit. (Figure 7-10, page 7-8 shows the current training program for rapid semiautomatic fire.)

**Figure 7-10. Rapid semiautomatic fire training program.**

a.   **Effectiveness of Rapid Fire.** When a soldier uses rapid semiautomatic fire properly, he sacrifices some accuracy to deliver a greater volume of effective fire to hit more targets. It is surprising how devastatingly accurate rapid fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures (shots per target, trigger pulls per hit, and even time to hit). The decrease in accuracy when firing faster is reduced with proper training and repeated practice.

154.    Such capability, combined with the performance characteristics of .223/5.56mm

ammunition originally intended for combat, can, and has, resulted in catastrophic civilian mass-

casualty events.

Executed on 05 / 05 /2023  at MANCHESTER, MD.                .

/s/ _James E. Yurgealitis_

James E. Yurgealitis

57

# EXHIBIT A

# James E. Yurgealitis

5004 Roller Rd., Manchester, Maryland 21102
24 Hour Mobile: (443) 452-7248
Email: jyurgealitis@gmail.com

_____

SUMMARY:

Self employed as a Legal and Public Policy Consultant providing Technical Firearms and Forensic
Consulting, Testing and Policy Research / Training Services to Corporations, Legal Counsel and the
Public Sector

EDUCATION:

B.A., Political Science and Psychology, St. John Fisher University, Rochester, New York – May 1985

PROFESSIONAL EXPERIENCE:

December 2012 to Present: Independent Legal and Policy Consultant / Subject Matter Expert

Currently provide independent consulting services to Corporations, Legal Counsel and Governmental
entities in regard to Public Policy and Technical matters relating to Firearms, Firearms Policy, Forensics
and Law Enforcement. Current and former clients include the Office of the District Attorney for Cook
County Illinois, The City of Sunnyvale, California, The City of Highland Park, Illinois, The Office of the
Attorney General for the Commonwealth of Massachusetts and the Center for American Progress,
Washington D.C. I have provided sound policy and technical assistance for my clients to include expert
testimony which successfully endured the opposition's legal appeals to the U.S. Circuit Court of Appeals
and the U.S. Supreme Court.

December 2003 to December 2012: Senior Special Agent / Program Manager for Forensic Services
ATF National Laboratory Center (NLC), Beltsville, Maryland. U. S Department of Justice, Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF)

Directed the administration and management of ATF's Forensic Training Programs to include the
National Firearms Examiner Academy (NFEA) a 12-month training program for State and Local Forensic
Firearm Examiner Trainees. Also managed two additional forensic training programs. Administered a
$1M + budget in accordance with strict ATF and National Institute of Justice (NIJ) guidelines and
reporting requirements. Responsible for oversight of all Forensic Firearms related research at the NLC.
Supervised a full and part time cadre of fifty-two (52) instructors and administrative personnel.
Maintained liaison with commercial firearms and ammunition manufacturers and subject matter experts
and ensure that lesson plans and curriculum reflected the latest technical developments in firearms
manufacture, forensics and their application to federal and state law. Applied for, received and managed
in excess of $2M in external grants to facilitate uninterrupted delivery of training during internal budget
shortfalls. Detailed to the Department of Homeland Security Command Center in 2005 with overall
responsibility to coordinate and direct Federal, State and Local Law Enforcement assets during and
following Hurricanes "Irene" and "Katrina" and again in 2010 for "Andrew" and "Danielle".

June 1997 - December 2003:  Special Agent / Violent Crime Coordinator, ATF Baltimore Field Division,
Baltimore, Maryland

Responsible for management of ATF's "Project Disarm", a joint law enforcement initiative between ATF, The United States Attorney's office for the District of Maryland (USAO), the Baltimore City Police Department, the Baltimore City States Attorney's Office and the Maryland State Police. Duties included reviewing over 400 state and local firearms related arrests annually for subsequent referral to the USAO and Federal Prosecution. Managed a caseload of 75 – 100 criminal cases annually. Responsible for selection, referral, follow - up investigation and subsequent indictment and prosecution of armed career criminals. Testified in front of Federal Grand Juries in excess of 75 times annually. Was recognized, and testified, as an expert witness in the Identification, Operability and origin of Firearms and Ammunition in three Federal Judicial Districts. Toured over 25 firearms and ammunition manufacturing facilities in Europe and the United States. Temporarily assigned in 2001 for three months to the 9-11 Task Force investigation in conjunction with FBI Assets. Temporarily assigned to the D.C. Sniper Task Force Intelligence Group in 2002 for two months.

June 1990 – June 1997:
Special Agent, ATF Baltimore Field Division, Baltimore, Maryland

Served in various capacities as a street-level Special Agent.  Acted as Group Supervisor and Assistant Special Agent in Charge on numerous occasions. Served on the Washington – Baltimore High Intensity Drug Trafficking Area (HIDTA) task force from 1995 – 1999.  Investigated armed narcotics trafficking organizations, seized assets, authored and executed Federal and state search and arrest warrants, conducted surveillance, interviews / interrogations, testified in Federal and state courts as a fact witness, purchased firearms, explosives and narcotics while in an undercover capacity, investigated fatal bombings and arsons, firearms trafficking, alcohol and tobacco trafficking, homicide, fraud and gun store burglaries. Also while detailed for 8 months as the Public Information Officer authored press releases, provided interviews to local and national print and television media outlets and made presentations to local and national public and special interest groups and associations.

April 1989 – June 1990 and July 1986 – March 1987: Special Agent, United States Department of State, Diplomatic Security Service (DSS), Washington Field Office, Rossyln, VA

Conducted investigations of violations of Federal Law under the department's purview to include Passport and Visa Fraud, Illegal trafficking of restricted firearms and war materials to prohibited countries, human trafficking, seized assets, authored and executed State, local and Federal Arrest and Search Warrants,  testified in Federal Court as a fact witness, detailed on an as needed basis to the Dignitary Protection Division as Agent in Charge of  multiple protective details for visiting and resident foreign dignitaries, temporarily assigned to support Physical and Personal Protective Security in various U.S. Embassies overseas on an as needed basis, detailed to the Secretary of State Protective Division on an as needed basis to supervise agents assigned to augment the permanent protective detail.

March 1987-February 1989: Special Agent, DSS, Secretary of State Protective Division, Washington, DC

Served in various capacities as Acting Agent in Charge, Acting Shift Leader, Lead Advance Agent and Shift Agent. Responsibilities included close personal protection of the Secretary of State both domestically and overseas, extensive foreign travel to facilitate and prepare security arrangements for overseas visits to include Presidential Summit meetings, liaison with foreign host government officials to plan and solicit assistance with security arrangements, supervision of agents temporarily assigned to augment the detail, liaison with U.S Government Intelligence Agencies and other Federal, State and Local Law Enforcement Agencies to identify and protect against potential threats to the Secretary of State.

<u>CLEARANCES:</u>  Top Secret March 1986 valid through February 2015. Numerous prior SCI Clearances.

<u>TEACHING EXPERIENCE:</u>

- Instructed at the Federal Law Enforcement Training Center (FLETC), for ATF and other Federal Law Enforcement Agencies
- Instructed at the International Law Enforcement Academy (ILEA) in Budapest, Hungary
- Instructed for numerous State, local and / or regional law enforcement agencies both in the United States, Canada and Central America

<u>LINKEDIN PROFILE AND ENDORSEMENTS:</u>

https://www.linkedin.com/in/james-jim-yurgealitis-68618464?trk=nav_responsive_tab_profile_pic

<u>REFERENCES:</u>

Available upon request

# EXHIBIT B

**Professional Qualifications of James E. Yurgealitis**
**Independent Legal, Public Policy and Forensic Consultant**

I, James E. Yurgealitis, being duly sworn, depose and state:

1.) That I was previously employed as a Senior Special Agent / Program Manager with the Bureau of Alcohol, Tobacco Firearms & Explosives, (ATF) United States Department of Justice, and had been so employed since 1990. Prior to 1990 I was employed as a Special Agent with the Bureau of Diplomatic Security, (DSS) United States Department of State and had been so employed since 1986.

2.) I have a Bachelor of Arts Degree in Political Science and Psychology from St. John Fisher College, Rochester, New York.

3.) I am a graduate of the Federal Law Enforcement Training Center, Glynco, Georgia, the Criminal Investigator Training Program, Bureau of Diplomatic Security New Agent Training, and the Bureau of ATF New Agent Training Program.

4.) I have completed the Firearms Interstate Nexus Training Program conducted by the Firearms Technology Branch, ATF Headquarters, Washington, D.C.

5.) I have completed both Advanced Interstate and European Nexus Training conducted by ATF in conjunction with several domestic and European firearm manufacturers.

6.) I have testified in excess of 200 times before Federal Grand Juries regarding the classification, operability, and commerce of firearms and / or ammunition.

7.) I have previously qualified as an expert witness regarding the origin, operability / classification and interstate movement of firearms and ammunition in U.S. District Court for the District of Maryland, U.S. District Court for the District of Delaware and the Circuit Court For Baltimore City, Maryland.

8.) I have conducted regular training for local, state and federal law enforcement agencies both domestically and overseas regarding firearms classification, operability and firearms statutes.

9.) I maintain a personal library of books, printed material and documents that relate to the field of firearms, ammunition, and firearms classification, attend local and national trade shows and professional association meetings, and regularly review periodicals relating to firearms and ammunition.

10.) I attend trade shows, maintain contact with, and regularly consult with other persons, to include published authors and recognized experts in the origin, identification and classification of firearms and ammunition.

11.) I have, during my tenure with ATF, personally examined in excess of five thousand

-1-

Qualifications Of  James E. Yurgealitis contd.

firearms to determine their origin and classification and operability, and to facilitate
the tracing of  those firearms.

I have toured production facilities for numerous firearms and ammunition manufacturers. The
tours were conducted by corporate historians, corporate officers, or production engineering
personnel.

Domestic Firearm Manufacturers:
Bushmaster Firearms, Ilion, NY, USA
Colt, New Haven CT, USA (4x)
H&R 1871 Inc., Chicopee, MA, USA (2x)
Marlin, North Haven CT, USA (4x)
O.F. Mossberg & Sons, North Haven, CT, USA (4x)
Remington Firearms, Ilion, NY, USA
Savage Arms Inc., Westfield, MA, USA (4x)
Sig-Sauer / SIGARMS Inc., Exeter, NH, USA (3x)
Smith and Wesson, Springfield, MA, USA (4x)
Sturm Ruger, Newport, NH, USA (4x)
Yankee Hill Machining, Florence, MA, USA

Foreign Firearm Manufacturers:
Carl Walther GmbH, Ulm, Germany
Ceska Zbrojovka (CZ), Uhersky Brod, Czech Republic
Fegarmy (FEG), Budapest, Hungary
F.N Herstal S.A., Herstal, Belgium
Glock GmbH, Deutsch-Wagram, Austria
Heckler & Koch GmbH, Oberndorf au Neckar, Germany
J.P. Sauer & Sohn GmbH, Eckernforde, Germany

Domestic Ammunition Manufacturers:
Fiocchi Ammunition, Ozark, MO, USA
PMC, Boulder City, NV, USA
Remington, Lonoke, AR, USA (4x)
Sierra, Sedalia, MO, USA
Starline Brass, Sedalia, MO, USA

European Proof Houses
Beschussamt Ulm, (Ulm Proofhouse) Ulm, Germany
Beschusstelle Eckernforde, (Eckernforde Proofhouse) Eckernforde, Germany
Czech Republic Proofhouse, Uhersky Brod, Czech Republic
Liege Proofhouse, Liege, Belgium

-2-

Qualifications Of  James E. Yurgealitis contd.

I have been allowed regular access to the following reference collections:
Bureau of Alcohol, Tobacco Firearms and Explosives Reference Collection, Martinsburg, West Virginia, USA consisting of 5,000+ firearms

Liege Proofhouse, Liege, Belgium consisting of 1,000+ ammunition cartridges

Springfield Armory National Historic Site Firearms Collection, Springfield, MA, USA consisting of 10,000+ Firearms

Smithsonian Institution (Museum of American History) Firearms Reference Collection Washington, DC, USA, consisting of 4000+ firearms

Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany consisting of 10,000+ Firearms

I have toured the following museums:
Heeresgeschichtliches Museum, (Museum of Military History), Vienna, Austria
Hungarian Military Museum, Budapest, Hungary
Springfield Armory National Historic Site, Springfield, MA, USA
United States Air Force Museum, Dayton, OH, USA
United States Army Ordnance Museum, Aberdeen Proving Ground, Aberdeen, MD, USA
United States Military Academy Museum, West Point, NY, USA
United States Naval Academy Museum, Annapolis, MD, USA
Wertechnische Studiensammlung des BWB, (Federal Defense Procurement Bureau Museum) Koblenz, Germany

Membership in Professional Organizations:

Member, International Ammunition Association (IAA)
Technical Advisor (pending approval), Association of Firearm and Toolmark Examiners (AFTE)
Member, Federal Law Enforcement Officers Association (FLEOA)

James E. Yurgealitis: Consulting Engagements 2013 – 2023

(D) – Engaged by Defendant's Counsel

(P) – Engaged by Plaintiff's Counsel

(O) – Engaged by other entity

1. State of Maryland v. Smith, Linwood T, Circuit Court for Baltimore County, Maryland, Case No. 03-K-12-004002 (D) – Defendant's Private Counsel. Case review and consultation.

2. Freidman v. City of Highland Park, Illinois, United States District Court for the District of Illinois, Case No. 1:13-cv-9073 (D) – Defendant's Private Counsel acting as City Attorney. Report & Deposition.

3. Wilson v. Cook County, Illinois, Illinois Supreme Court, Case No. 2012 IL 112026 (D) – Office of the State's Attorney for Cook County, IL. Report & Deposition.

4. Fyock v. The City of Sunnyvale, California, United States District Court for the Northern District of California, Case No. 13-cv-05807 RMW (D) – City Solicitor. Declaration.

5. Wrenn v. District of Columbia, United States District Court for the District of Columbia, Civil Action Case No. 15-162 CKK (D) – U.S. Attorney's Office for the District of Columbia. Report & Deposition.

6. Mosaic Research Management, New York, New York, (O) – Private consulting firm. Confidential business assessment and projection.

7. Worman v. Healey, United States District Court for the District of Massachusetts, Case No. 1:17-cv-10107 (D) – Office of the Attorney General for the Commonwealth of Massachusetts. Report & Deposition.

8. Buckeye Firearms v. City of Cincinnati, Hamilton County, Ohio Court of Common Pleas, Case No. A1803098 (D) – Office of the City Attorney. Report & Deposition.

9. Powell v. The State of Illinois, United States District Court for the Northern District of Illinois, Case No. 18-cv-6675 (D) – Plaintiff's Private Counsel. Consultation.

10. Fletcher v. Century Arms, Circuit Court of the 15th Judicial District, in and for Palm Beach County, Florida, Case No. 502018CA009715 (P) – Plaintiff's Private Counsel. Case Review, Consultation & Deposition.

11. Pullman Arms v. Healey, United States District Court for the District of Massachusetts, Case No. 4:16-40136-TSH (D) - Office of the Attorney General for the Commonwealth of Massachusetts. Report.

-4-

Yurgealitis Consulting Engagements 2013 – 2023 contd.

12. United States v. Richard Cooke, United States District Court for the Western District of New York, Case No. 17-CR-0038 (D) – Office of the Federal Public Defender for the Western District of New York. Case review & consultation.

13. Long v. GAMO Outdoor U.S.A. Inc., District Court, Clark County Nevada, Case No. A-16-748401-C (P) – Plaintiff's Private Counsel. Test firing & consultation.

14. Viramontes v. Cook County, IL, United States District Court for the Northern District of Illinois, Case No. 1:21-CV-04595 (D) – Office of the State's Attorney for Cook County, Illinois. Report & Deposition.

15. Arnold, Joseph et al., v. Kate Brown et al - Harney County, OR Circuit Court, Case No. 22CV41008 (D) – State of Oregon. Case review & Court Testimony.

16. Oregon Firearms Federation et al., v. Kotek et al., United States Court for the District of Oregon, Pendleton Division, Case No. 2:22-cv-01815-IM (lead case), 3:22-cv-01859-IM (trailing case), 3:22-cv-01862-IM (trailing case), 3:22-cv-01869-IM (trailing case) (D) – State of Oregon. Case review, declaration & deposition.

17. National Assn. for Gun Rights & Capen v. Campbell, United States Court for the District of Massachusetts, Case No. 1:22-cv-11431-FDS (D) – Office of the Attorney General for the Commonwealth of Massachusetts. Declaration.

18. Delaware State Sportman's Assn. et. al. v. Delaware, United States District Court for the District of Delaware, Case No.  No. 1:22-cv-00951-RGA (Consolidated), (D) – Office of the Attorney General for the State of Delaware. Declaration & consultation.

19. National Assn. for Gun Rights v. Lopez, United States District Court for the District of Hawai'i, Case No. 1:22-cv-404-DKW-RT (D) – Office of the Attorney General for the State of Hawai'i. Declaration.

20. Harrel et.al. v. Raoul, United States District Court for the Southern District of Illinois, Case No. 23-141-SPM (D) – Office of the Attorney General for the State of Illinois. Declaration

21. Herrera v. Raoul et.al., United States District Court for the Northern District of Illinois, Case No. 1:23-cv-00532 (D) – Office of the District Attorney for Cook County, Illinois. Declaration

22. Gates et.al. v. Polis, United States District Court for the District of Colorado, Case No. 1:22-cv-01866 (D) – Office of the Attorney General for the State of Colorado. Expert Report.

Yurgealitis Consulting Engagements 2013 – 2023 contd.

23. Herrera v. Raoul et.al., United States District Court for the Northern District of Illinois, Case No. 1:23-cv-00532 (D) – Department of Law, City of Chicago, IL. Declaration

24. National Association for Gun Rights v. The City of Highland Park, Illinois, United States District Court for the Northern District of Illinois, Case No. 22-cv-4774 (D) – City of Highland Park, IL. Declaration.

25. Rocky Mountain Gun Owners et.al. v. The Town of Superior, Colorado (additional defendants The City and County of Boulder & City of Louisville, CO). United States District Court for the District of Colorado, Case No. 22-cv-1685-RM-NRN (D) – Town of Superior, CO. In progress.

# EXHIBIT C



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

JUL 06 1989

MEMORANDUM T0:    Director

FROM:    Associate Director (Compliance Operations)

SUBJECT:    Report and Recommendation on the
Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins  7/6/89*

Disapprove: _____

**REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP
ON THE IMPORTABILITY OF CERTAIN
SEMIAUTOMATIC RIFLES**


<u>**SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS**</u>

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

       a.   military appearance

       b.   large magazine capacity

       c.   semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.


<u>**BACKGROUND**</u>


Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

      The Secretary shall authorize a firearm. . .to be imported or
      brought into the United States . . if the firearm . .

            (3) is of a type that does not fall within the definition
            of a firearm as defined in section 5845(a) of the
            Internal Revenue Code of 1954 and is generally
            recognized as particularly suitable for or readily

adaptable to sporting purposes, excluding surplus
military firearms. . .

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets
Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended
Title IV later that year. According to the Senate Report on Title IV, this provision was intended to
"curb the flow of surplus military weapons and other firearms being brought into the United States
which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d
Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow
the importation of traditional sporting rifles, while excluding military-type rifles. The Senate
Report on the Gun Control Act observed that the importation standards ". . . are designed and
intended to provide for the importation of quality made, sporting firearms, including . . . rifles such
as those manufactured and imported by Browning and other such manufacturers and importers of
firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being
imported by Browning at that time were semiautomatic and manually operated traditional sporting
rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that
military firearms would not meet the "sporting purposes" test for importation. The mere fact that a
military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition
". . . would not interfere with the bringing in of currently produced firearms, such as rifles . . . of
recognized quality which are used for hunting and for recreational purposes, or for personal
protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News
2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting
importation to firearms particularly suitable for target shooting or hunting since firearms
particularly suitable for those purposes can obviously be used for other purposes such as
recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the
Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the
legislative history suggests that the term "sporting purposes" refers to the traditional sports of
target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond
the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess.
80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act
stated:

> The difficulty of defining weapons characteristics to meet this target [of eliminating
> importation of weapons used in crime] without discriminating against sporting quality
> firearms, was a major reason why the Secretary of the Treasury has been given fairly broad
> discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. Defining the type of weapon under review.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain types of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

    a.  Ability to accept a detachable magazine. Virtually allmodern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

    b.  Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

    c.  Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of themilitary weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

    d.  Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

e.  Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

f.  Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

g.  Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

h.  Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2. Whether the weapon is a semiautomatic version of a machinegun.

The vast majority of modern military firearms are selective fire, i.e., they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3. Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms.[19] Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in <u>Gilbert Equipment Company, Inc., v Higgins,</u> 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. <u>Suitability</u>.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle <u>generally recognized as particularly suitable for or readily adaptable to</u> the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

2. How has the use of the rifle been described by firearms technical writers?

3. What is the rifle's reported use by importers?

4. Do hunting guides recommend the rifle?

5. Do editors of hunting magazines recommend the rifle?

6. Is the rifle used in target shooting competitions?

7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.22

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

CONCLUSIONS

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.


NOTES

1. Paul Wahl, ed., Gun Trader's Guide, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as particularly suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not truly suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

   Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

   > Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "
   >
   > Mr. DODD. I would think so.
   >
   > Mr. HANSEN. What about trap and skeet shooting?
   >
   > Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.
   >
   > Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"
   >
   > Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.
   >
   > Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

> Would all of these firearms be classified as weapons constituting a "sporting purpose?"
>
> Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.
>
> Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?
>
> Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.
>
> Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
> I say that is true? (27461)
>
> Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.
>
> Mr. HANSEN. <u>If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct</u>?
>
> Mr. DODD. That would seem right to me ….. As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.….. I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3.  Ken Warner, ed., <u>Gun Digest 1989</u>, (Northbrook, I1. 1988), pp. 293-300; William S. Jarrett, ed., <u>Shooter's Bible, No. 80</u>, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, <u>Small Arms of the World</u>, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., <u>Jane's Infantry Weapons</u>, <u>1987-88</u>, (New York 1987); Jack Lewis, ed., <u>The Gun Digest Book of Assault Weapons</u>, (Northbrook, I1. 1986).

4.  Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," <u>Guns & Ammo</u>, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5.  Daniel D. Musgrave and Thomas B.Nelson, <u>The World's Assault Rifles</u>, (Virginia, 1967), p. 1.

6.  See generally, Angus Laidlaw, ed., <u>Paul Wahl's Big_ Gun Catalog/1</u>, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

7. Ibid.

8. Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9. See generally, Hogg; Musgave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ezell, p. 844; Dickey, p. 31.

17. Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18. Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19. See, for example, Walter Rickell, "The Plinker's AK GunsMagazine, (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," Guns & Ammo, (January 1987), p. 37; John Lachuk, ".22 Erma Carbine," Guns & Ammo, (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," Gun World, (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," Gun World, (December 1985), p. 28; Garry James, "Mitchell Arms AK-22," Guns & Ammo, (November 1985), p. 72.

20. See note 2, colloquy between Senators Dodd and Hansen.

21. Ibid.

22. See generally, bibliography.

BIBLIOGRAPHY

"Armalite AR-180 Rifle," <u>American Rifleman</u>, (February 1981), 65-66.

"Beretta AR. 70 Rifle," <u>American Rifleman</u>, (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," <u>Guns & Ammo</u>, (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," <u>Guns & Ammo</u>, (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," <u>Guns Magazine</u>, (September 1986), 37-39, 42,43,
        57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," <u>The Gun Digest Book of Assault Weapons</u>,
        (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," <u>Gun World</u>, (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", <u>Gun World</u>, (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," <u>The Gun Digest Book of Assault Weapons</u>,
        (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," <u>The Gun Digest Book of Assault Weapons</u>, (1988),
        188-195.

"Cooking and Heckling with H & K's HK94A3," <u>Gun World</u>, (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," <u>Guns Magazine</u>, (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," <u>American Rifleman</u>, (June 1985), 29-32,
        65-67.

Ezell, Edward Clinton. <u>Small Arms of the World</u>. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," <u>American Rifleman</u>,(January 1988), 58-60.


Ferguson, Tom. "A Hard Look at The AR-180", <u>The Gun Digest Book of Assault Weapons</u>,
        (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," <u>Guns & Ammo</u>, (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," <u>Gun World</u>, (September 1986), 40-41.

"Heckler & Koch 91," <u>American Rifleman</u>, (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. <u>Janes' Infantry Weapons. 1987-1988</u>. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", <u>American Rifleman</u>, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " <u>Special Weapons and Tactics</u>, (July 1989), 42-46.

James, Garry. "Austrailian LlAlA Rifle," <u>Guns & Ammo</u>, (December 1987),

James, Garry. "Chinese AK-47 .223," <u>Guns & Ammo</u>, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," <u>Guns & Ammo</u>, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," <u>Guns & Ammo</u>, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," <u>American Rifleman</u>, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," <u>Guns & Ammo</u>, (August 1985), 64-66.

Jarrett, William S., ed. <u>Shooter's Bible. No. 80</u>. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," <u>Gun World</u>, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," <u>Gun World</u>, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," <u>Guns & Ammo</u>, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," <u>Guns & Ammo</u>, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. <u>Paul Wahl's Big Gun Catalog/l.</u> Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. <u>The Gun Digest Book of Assault Weapons</u>. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 76-81.

Lewis, Jack. "EMF's Look-Alike AP-74," The Gun Digest Book of Assault Weapons, (1986),
        166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," Gun World, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," The Gun Digit Book of Assault Weapons, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," The Gun Digest Book of Assault Weapons, (1986),
        160-171.

Mason, James D. "The Maadi in America," Guns Magazine, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. The World's Assault Rifles. Washington, DC: Goetz
        Company, 1967.

O'Meara, Robert. "The Guns of Israel," Guns Magazine, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" Firepower, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," Guns & Ammo, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," Guns Magazine, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," American Rifleman, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," Firepower, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," Gun World, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," American Rifleman, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," Guns Magazine, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," Guns Magazine, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," Gun World, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," Guns & Ammo, (Jaunary 1982), 32-36, 76.Tappan,
        Mel. "Survive: Survival Rifles-Part 2, " Guns & Ammo, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," American Rifleman, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," American Rifleman, (January 1986), 59.

"Uzi Semi-Automatic Carbine," American Rifleman, (August 1981), 55-57.

"Valmet M78 Rifle," <u>American Rifleman</u>, (April 1988), 64-66

Wahl, Paul, ed. <u>Gun Trader's Guide</u>, 13th Edition, South Hackensack: Stoeger Publishing
        Company, 1987.

Warner, Ken, ed. <u>Gun Digest 1989</u>. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," <u>Guns Magazine</u>, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," <u>Guns Magazine</u>, (February 1986), 28-29,
        60-61.

Zwirz, Bob. "Valmet's Military Look," <u>Gun World</u>, (September 1988), 28-30.

<u>NOTE</u>**:** This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles",** published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.

# EXHIBIT D

| 103D CONGRESS<br>2d Session | HOUSE OF REPRESENTATIVES | REPORT<br>103–489 |
|---|---|---|

# PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT

MAY 2, 1994.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. BROOKS, from the Committee on the Judiciary, submitted the following

# REPORT

together with

## SUPPLEMENTAL AND DISSENTING VIEWS

[To accompany H.R. 4296]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4296) to make unlawful the transfer or possession of assault weapons, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

**SEC. 2. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMI-AUTOMATIC ASSAULT WEAPONS.**

(a) RESTRICTION.—Section 922 of title 18, United States Code, is amended by adding at the end the following:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to—

79–006

**2**

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that—

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

"(4) Paragraph (1) shall not apply to—

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) DEFINITION OF SEMIAUTOMATIC ASSAULT WEAPON.—Section 921(a) of such title is amended by adding at the end the following:

"(30) The term 'semiautomatic assault weapon' means—

"(A) any of the firearms, or copies or duplicates of the firearms, known as—

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) a semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of—

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

**3**

"(iii) a fixed magazine capacity in excess of 5 rounds; and

"(iv) an ability to accept a detachable magazine.".

(c) PENALTIES.—

(1) VIOLATION OF SECTION 922(v).—Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".

(2) USE OR POSSESSION DURING CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.—Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

(d) IDENTIFICATION MARKINGS FOR SEMIAUTOMATIC ASSAULT WEAPONS.—Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

## SEC. 3. RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS.

(a) OFFENSE.—Section 922 of title 18, United States Code, as amended by section 2(a) of this Act, is amended by adding at the end the following:

"(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.

"(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.

"(5) As used in this subsection, the term 'form 4473' means—

"(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or

"(B) any other form which—

"(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and

"(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).".

(b) PENALTY.—Section 924(a) of such title is amended by adding at the end the following:

"(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.".

## SEC. 4. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.

(a) PROHIBITION.—Section 922 of title 18, United States Code, as amended by sections 2 and 3 of this Act, is amended by adding at the end the following:

"(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) This subsection shall not apply to—

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

**4**

(b) DEFINITION OF LARGE CAPACITY AMMUNITION FEEDING DEVICE.—Section 921(a) of such title, as amended by section 2(b) of this Act, is amended by adding at the end the following:

"(31) The term 'large capacity ammunition feeding device'—

"(A) means—

"(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

"(ii) any combination of parts from which a device described in clause (i) can be assembled; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) LARGE CAPACITY AMMUNITION FEEDING DEVICES TREATED AS FIREARMS.—Section 921(a)(3) of such title is amended in the first sentence by striking "or (D) any destructive device." and inserting "(D) any destructive device; or (E) any large capacity ammunition feeding device.".

(d) PENALTY.—Section 924(a)(1)(B) of such title, as amended by section 2(c) of this Act, is amended by striking "or (v)" and inserting "(v), or (x)".

(e) IDENTIFICATION MARKINGS FOR LARGE CAPACITY AMMUNITION FEEDING DEVICES.—Section 923(i) of such title, as amended by section 2(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

### SEC. 5. STUDY BY ATTORNEY GENERAL.

(a) STUDY.—The Attorney General shall investigate and study the effect of this Act and the amendments made by this Act, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) REPORT.—Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

### SEC. 6. EFFECTIVE DATE.

This Act and the amendments made by this Act—

(1) shall take effect on the date of the enactment of this Act; and

(2) are repealed effective as of the date that is 10 years after that date.

### SEC. 7. APPENDIX A TO SECTION 922 OF TITLE 18.

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

#### "APPENDIX A

##### Centerfire Rifles—Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M-1 Carbine
Iver Johnson 50th Anniversary M-1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

##### Centerfire Rifles—Lever & Slide

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30" Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions

**5**

E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine
Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rilfe
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

### Centerfire Rifles—Bolt Action

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle
Krico Model 700 Bolt-Action Rifles
Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle

**6**

Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sako Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel
Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage Model 116FSK Kodiak Rifle
Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter

7

Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM-S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade
Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

### Centerfire Rifles—Single Shot

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G-90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

### Drillings, Combination Guns, Double Rifles

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle

8

Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR-7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL-22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM-321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM-452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60-J-ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT-22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU-KKW Training Rifle
Navy Arms TU-33/40 Carbine
Navy Arms TU-KKW Sniper Trainer
Norinco JW-27 Bolt-Action Rifle
Norinco JW-15 Bolt-Action Rifle
Remington 541-T
Remington 40-XR Rimfire Custom sporter
Remington 541-T HB Bolt-Action Rifle
Remington 581-S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

### Competition Rifles—Centerfire & Rimfire

Anschutz 64-MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle

**9**

Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013
Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP-1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86-SR Specialty Rifle
McMillan M-86 Sniper Rifle
McMillan Combo M-87/M-88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M-89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M-87 Target Rifle
Parker-Hale M-85 Sniper Rifle
Remington 40-XB Rangemaster Target Centerfire
Remington 40-XR KS Rimfire Position Rifle
Remington 40-XBBR KS
Remington 40-XC KS National Match Course Rifle
Sako TRG-21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG-UIT Rifle
Steyr-Mannlicher SSG P-I Rifle
Steyr-Mannlicher SSG P-III Rifle
Steyr-Mannlicher SSG P-IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

**Shotguns—Autoloaders**

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A-303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning Bsa 10 Stalker Auto Shotgun
Browning A-500R Auto Shotgun
Browning A-500G Auto Shotgun
Browning A-500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11-87 Premier shotgun
Remington 11-87 Sporting Clays
Remington 11-87 Premier Skeet
Remington 11-87 Premier Trap
Remington 11-87 Special Purpose Magnum
Remington 11-87 SPS-T Camo Auto Shotgun
Remington 11-87 Special Purpose Deer Gun
Remington 11-87 SPS-BG-Camo Deer/Turkey Shotgun
Remington 11-87 SPS-Deer Shotgun
Remington 11-87 Special Purpose Synthetic Camo
Remington SP-10 Magnum-Camo Auto Shotgun
Remington SP-10 Magnum Auto Shotgun
Remington SP-10 Magnum Turkey Combo
Remington 1100 LT-20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun

**10**

Remington 1100 LT–20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

### Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG–Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

### Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U
American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models
Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Centurion Over/Under Shotgun
Chapuis Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U

11

Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A/Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K-80 Sporting Clays O/U
Krieghoff K-80 Skeet Shotgun
Krieghoff K-80 International Skeet
Krieghoff K-80 Four-Barrel Skeet Set
Krieghoff K-80/RT Shotguns
Krieghoff K-80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM-6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun
Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U
Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

**Shotguns—Side by Sides**

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkel Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side

**12**

Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

**Shotguns—Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun
Browning BT-99 Competition Trap Special
Browning BT-99 Plus Trap Gun
Browning BT-99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun
Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS-5 Trap Gun
Krieghoff KS-5 Special
Krieghoff K-80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel
Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90-T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.".

## SUMMARY AND PURPOSE

The purpose of this bill is to create criminal penalties for the manufacture, transfer, or possession of certain firearms within the category of firearms known as "semiautomatic assault weapons." It also creates such penalties for certain ammunition feeding devices, as well as any combination of parts from which such a device can be assembled.

In reporting legislation banning certain assault weapons last Congress, the Committee on the Judiciary said:

> The threat posed by criminals and mentally deranged individuals armed with semi-automatic assault weapons has been tragically widespread.[1]

Since then, the use of semiautomatic assault weapons by criminal gangs, drug-traffickers, and mentally deranged persons continues to grow.[2]

H.R. 4296 will restrict the availability of such weapons in the future. The bill protects the rights of persons who lawfully own such weapons on its date of enactment by a universal "grandfathering" clause and specifically exempts certain firearms traditionally used for hunting and other legitimate support. It contains no confiscation or registration provisions; however, it does establish record-keeping requirements for transfers involving grandfathered semiautomatic assault weapons. Such record-keeping is not required for transfers of grandfathered ammunition feeding devices

---

[1] "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong. 1st Sess., Rept. 102–242, October 7, 1991, at 202.
[2] See, e.g., Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 Firearms; Chief Sylvester Daughtry, President, International Association of Chiefs of Police; Mr. John Pitta, National Executive Director, Federal Law Enforcement Officers Association).

13

(or their component parts.) H.R. 4296 expires ("sunsets") on its own terms after 10 years.

## BACKGROUND

A series of hearings over the last five years on the subject of semiautomatic assault weapons has demonstrated that they are a growing menace to our society of proportion to their numbers:[3] As this Committee said in its report to the last Congress:

> The carnage inflicted on the American people be criminals and mentally deranged people armed with Rambo-style, semi-automatic assault weapons has been overwhelming and continuing. Police and law enforcement groups all over the nation have joined together to support legislation that would help keep these weapons out of the hands of criminals.[4]

Since then, evidence continues to mount that these semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder.

Use in Crimes. On April 25, 1994, the Director of the Federal Bureau of Alcohol, Tobacco and Firearms testified that the percentage of semiautomatic assault weapons among guns traced because of their use in crime is increasing:

> In 1990, 5.9 percent of firearms traced were assault weapons. In 1993, that percentage rose to 8.1 percent. Since Justice Department studies have shown that assault weapons make up only about 1 percent of the firearms in circulation, these percentages strongly suggest that they are proportionately more often used in crimes.[5]

Law enforcement officials confirm this statistical evidence in accounts of the rising level of lethality they face from assault weapons on the street. For example, the representative of a national police officers' organization testified:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and

---

[3] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994; Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991; Hearing on Semiautomatic Assault Weapons, Part II, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, July 25, 1991; Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5 and 6, 1989.

[4] "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102–242, October 7, 1991, at 203.

[5] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. John Magaw, Director, Bureau of Alcohol, Tobacco and Firearms).

14

> preservation. The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[6]

A representative of federal law enforcement officers testified that semiautomatic assault weapons "dramatically escalate the firepower or the user" and "have become the weapon of choice for drug runners, hate groups and the mentally unstable."[7]

> The TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals. Cities across the country confiscate more TEC–9s than any other assault pistol. The prototype for the TEC–9 was originally designed as a submachine gun for the South African government. Now it comes standard with an ammunition magazine holding 36 rounds of 9 mm cartridges. It also has a threaded barrel to accept a silencer, and a barrel shroud to cool the barrel during rapid fire. To any real sportsman or collector, this firearm is a piece of junk, yet is very popular among criminals.[8]

The Secretary of Housing and Urban Development testified that criminal gangs in Chicago routinely use semiautomatic assault weapons to intimidate not only residents but also security guards, forcing the latter to remove metal detectors installed to detect weapons.[9]

Use in Mass Killings and Killings of Law Enforcement Officers. Public concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered.

On April 25, 1994, the Subcommittee on Crime and Criminal Justice heard testimony about several incidents representative of such killings.

On February 22, 1994, Los Angeles (CA) Police Department rookie officer Christy Lynn Hamilton was ambushed and killed by a

---

[6] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Tony Loizzo, executive vice president, National Association of Police Organizations). See also, Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal Order of Police) (assault weapons "pose a grave and immediate threat to the lives of those sworn to uphold our laws"); Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5, 1989 (Testimony of Daniel M. Hartnett, associate director, law enforcement, Bureau of Alcohol, Tobacco and Firearms) ("Fifteen years ago, police rarely encountered armed drug dealers. Today, firearms, especially certain types of semiautomatic weapons, are status symbols and tools of the trade for this country's most vicious criminals.")

[7] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[8] Hearing on H.R. 4296 and H.R. 3527, Public Safety and recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[9] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development).

15

drug-abusing teenager using a Colt AR–15. The round that killed Officer Hamilton penetrated a car door, skirted the armhole of her protective vest, and lodged in her chest. The teenager also killed his father, who had given him the gun, and took his own life as well. Officer Hamilton had been voted the most inspirational officer in her graduating class only weeks before her murder. Officer Hamilton's surviving brother testified about the impact of this murder.[10]

On December 7, 1993, a deranged gunman walked through a Long Island Railroad commuter train, shooting commuters. Six died and 19 were wounded. The gunman used a Ruger semiautomatic postol. Although the pistol itself would not be classified as an assault weapon under this bill, its 15 round ammunition magazine ("clip") would be banned. The gunman had several of these high capacity 15 round magazines and reloaded several times, firing between 30 to 50 rounds before he was overpowered while trying to reload yet again. The parents of one of the murdered victims, Amy Locicero Federici, testified about the impact of this murder.[11]

On February 28, 1993, 4 special agents of the Bureau of Alcohol, Tobacco and Firearms were killed and 15 were wounded while trying to serve federal search and arrest warrants at the Branch Davidian compound in Waco, Texas. The Branch Davidian arsenal included hundreds of assault weapons, including AR–15s, AK–47s, Street Sweepers, MAC10s and MAC–11s, along with extremely high capacity magazines (up to 260 rounds).[12]

Finally, on July 1, 1993, gunman Gian Luigi Ferri Killed 8 people and wounded 6 others in a San Francisco high rise office building. Ferri—who took his own life—used two TEC DC9 assault pistols with 50 round magazines, purchased from a gun dealer in Las Vegas, Nevada. Two witnesses, both of whom lost spouses in the slaughter, and one of whom was herself seriously injured, testified about this incident.[13]

Numerous other notorious incidents involving semiautomatic assault weapons have occurred. They include the January 25, 1993, slaying of 2 CIA employees and wounding of 3 others at McLean, VA, (AK–47), and the January 17, 1989 murder in a Stockton, CA, schoolyard of 5 small children, and wounding of 29 others (AK–47 and 75 round magazine, firing 106 rounds in less than 2 minutes).

Several witnesses who were victims themselves during such incidents testified in opposition to H.R. 4296/H.R. 3527, and in opposition to the banning of any semiautomatic assault weapons or ammunition feeding devices.

Dr. Suzanna Gratia witnessed the brutal murder, in Luby's cafeteria located in Killeen, Texas, of both of her parents who had just

[10] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ken Brondell, Jr.).

[11] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Jacob Locicero and Arlene Locicero).

[12] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

[13] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Michelle Scully and Steve Sposato).

**16**

celebrated their 47 weeding anniversary. Just a few days before, she had removed her gun from her purse and left it in her car to comply with a Texas law which does not allow concealed carrying of a firearm. Dr. Gratia testified:

> I am mad at my legislators for legislating me out of a right to protect myself and my family. I would much rather be sitting in jail with a felony offense on my head and have my parents alive. As far as these so-called assault weapons, you say that they don't have any defense use. You tell that to the guy that I saw on a videotape of the Los Angeles riots standing on his rooftop protecting his property and his life from an entire mob with one of these so-called assault weapons. Tell me that he didn't have a legitimate self-defense use.[14]

Ms. Jacquie Miller was shot several times with a semiautomatic assault weapon and left for dead at her place of employment with the Standard Gravure Printing Company in Louisville, Kentucky, when a fellow employee went on a killing spree. Now permanently disabled, Ms. Miller testified:

> It completely enrages me that my tragedy is being used against me to deny me and all the law abiding citizens of this country to the right of the firearm of our choosing. I refuse in return to use my tragedy for retribution against innocent people just to make myself feel better for having this misfortune. Enforce the laws against criminals already on the books. After all, there are already over 20,000 of them.[15] More won't do a thing for crime control * * * You cannot ban everything in the world that could be used as a weapon because you fear it, don't understand it, or don't agree with it.
>
> This is America, not Lithuania or China. Our most cherished possession is our Constitution and Bill of Rights. Let's not sell those down the river or we could one day find ourselves in a boat without a paddle against the criminals who think we are easy pickings.[16]

Mr. Phillip Murphy used his lawfully-possessed Colt AR–15 H-BAR Sporter semiautomatic rifle—a gun which would be specifically banned by H.R. 4296—to capture one of Tucson, Arizona's most wanted criminals who was attempting to burglarize the home of Mr. Murphy's parents. The 19-year old criminal he captured was

---

[14] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on crime and Criminal Justice, April 25, 1994 (State of Dr. Suzanna Gratia, Copperas Cove, Texas)

[15] The Committee notes that, under the Gun Control Act of 1968 as amended in 1986, it is a Federal felony for a convicted felon to be in possession of any firearm, including an assault weapon, under 18 U.S.C. 922(g)(1). Violations carry up to five years imprisonment and a $250,000 fine. If a criminal—whether previously convicted or not—is carrying an assault weapon and is involved in a drug trafficking crime, that criminal is subject to a mandatory minimum of 5 years imprisonment and a $250,000 fine under 18 U.S.C. 924(c)(1). Any criminal who has three prior violent felony and/or serious drug offenses convictions and is in possession of a firearm is subject to a mandatory minimum of 15 years imprisonment and a $250,000 fine under 18 U.S.C. 924(e)(1).

[16] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ms. Jacquie Miller, Louisville, Kentucky).

17

a three-time loser with 34 prior convictions who was violating his third adult State parole for a knife assault. Mr. Murphy testified:

> I respectfully urge this Committee and the Congress of the United States to restrain themselves from forcing tens of millions of law-abiding Americans like me to choose between the law and their lives.[17]

The Characteristics of Military-Style Semiautomatic Assault Weapons. The question of what constitutes an assault weapon has been studied by the Congress and the executive branch as the role of these guns in criminal violence has grown.

A Bureau of Alcohol, Tobacco and Firearms working group formed under the Bush administration to consider banning foreign imports of such semiautomatic assault weapons conducted the most recent comprehensive study of military assault weapons and the civilian firearms that are modelled after them.[18] The working group formulated a definition of the civilian version, and a list of the assault weapon characteristics that distinguish them from sporting guns. That technical work has to a large extent been incorporated into H.R. 4296.[19]

The working group settled on the term "semiautomatic assault" for the civilian firearms at issue. That term distinguishes the civilian firearms from the fully automatic military weapons (machine-guns)[20] after which they are modelled and often simply adapted by eliminating the automatic fire feature. The group determined that "semiautomatic assault rifles * * * represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle."[21]

The group elaborated on the nature of those characteristics as follows:

> The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK–47, is a weapon designed for killing or disabling the enemy and * * * has characteristics designed to accomplish this purpose.
> We found that the modern military assault rifle contains a variety of physical features and characteristics designed

---

[17] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Mr. Phillip Murphy, Tucson, Arizona).

[18] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989.

[19] The ultimate question of law upon which the working group was advising the Secretary of the Treasury was whether these import firearms met a "sporting purpose" test under 18 U.S.C. Code section 925(d). He held that they did not. Although that legal question is not directly posed by this bill, the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features.

[20] An automatic gun fires a continuous stream as long as the trigger is held down, until it has fired all of the cartridges ("rounds" or "bullets") in its magazine (or "clip"). Automatic firearms are also known as machineguns. A semi-automatic gun fires one round, then loads a new round, each time the trigger is pulled until its magazine is exhausted. Manually operated guns require the shooter to manually operate a bolt, slide, pump, or lever action to extract the fired round and load a new round before pulling the trigger.

[21] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

18

for military applications which distinguishes it from tradi-
tional sporting rifles. These military features and charac-
teristics (other than selective fire) are carried over to the
semiautomatic versions of the original military rifle.[22]

The "selective fire" feature to which the working group referred
is the ability of the military versions to switch from fully automatic
to semiautomatic fire at the option of the user. Since Congress has
already banned certain civilian transfer or possession of machine-
guns,[23] the civilian models of these guns are produced with semi-
automatic fire capability only. However, testimony was received by
the Subcommittee on Crime and Criminal Justice that it is a rel-
atively simple task to convert[24] a semiautomatic weapon to auto-
matic fire[25] and that semiautomatic weapons can be fired at rates
of 300 to 500 rounds per minute, making them virtually indistin-
guishable in practical effect from machineguns.[26]

The 1989 Report's analysis of assault characteristics which dis-
tinguish such firearms from sporting guns was further explained
by an AFT representative at a 1991 hearing before the Subcommit-
tee on Crime and Criminal Justice:

> We found that the banned rifles represented a distinc-
> tive type of rifle characterized by certain military features
> which differentiated them from the traditional sporting ri-
> fles. These include the ability to accept large capacity de-
> tachable magazines, bayonets, folding or telescoping
> stocks, pistol grips, flash suppressors, bipods, grenade
> launchers and night sights, and the fact that they are
> semiautomatic versions of military machineguns.[27]

Proponents of these military style semiautomatic assault weap-
ons often dismiss these combat-designed features as merely "cos-
metic." The Subcommittee received testimony that, even if these
characteristics were merely "cosmetic" in effect, it is precisely those
cosmetics that contribute to their usefulness as tools of intimida-
tion by criminals.[28]

However, the expert evidence is that the features that character-
ize a semiautomatic weapon as an assault weapon are not merely
cosmetic, but do serve specific, combat-functional ends. By facilitat-

---

[22] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.
[23] 18 U.S. Code, section 922(o).
[24] The Committee notes that such conversion is a Federal felony that carries penalties of up to 10 years imprisonment and a $250,000 fine under 26 U.S.C. 5861.
[25] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal order of Police).
[26] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal order of police).
[27] Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Divisions, Bureau of Alcohol, Tobacco and Firearms) at 268.
[28] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms, Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Paul J. McNulty, Principal Deputy Director, Office of Policy development, Department of Justice) at 288.

19

ing the deadly "spray fire" of the weapon or enhancing its portability—a useful attribute in combat but one which serves to enhance the ability to conceal the gun in civilian life.[29]

High-capability magazine, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent.[30] Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds. Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds. Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. As noted above, tests demonstrate that semiautomatic guns can be fired at very high rates of fire. In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities—from 3 to 5.

Because of the greater enhanced lethality—numbers of rounds that can be fired quickly without reloading—H.R. 4296 also contains a ban on ammunition magazines which hold more than 10 rounds, as well as any combination of parts from which such a magazine can be assembled.

Barrel shrouds also serve a combat-functional purpose.[31] Gun barrels become very hot when multiple rounds are fired through them quickly. The barrel shroud cools the barrel so that it will not overheat, and provides the shooter with a convenient grip especially suitable for spray-firing.

Similar military combat purposes are served by flash suppressors (designed to help conceal the point of fire in night combat), bayonet mounts, grenade launchers, and pistol grips engrafted on long guns.[32]

The net effect of these military combat features is a capability for lethality—more wounds, more serious, in more victims—far beyond

---

[29] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[30] U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[31] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[32] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

20

that of other firearms in general, including other semiautomatic guns.[33]

### BRIEF EXPLANATION OF H.R. 4296

H.R. 4296 combines two approaches which have been followed in the past in legislation proposed to control semiautomatic assault weapons—the so-called "list" approach and the "characteristics" approach.

The bill does not ban any semiautomatic assault weapons nor large capacity ammunition feeding device (or component parts) otherwise lawfully possessed on the date of enactment. However, records must be kept by both the transferor and the transferee involved in any transfer of these weapons, but not of the feeding devices (or combination of parts).

The bill explicitly exempts all guns with other than semiautomatic actions—i.e., bolt, slide, pump, and lever actions. In addition, it specifically exempts by make and model 661 long guns most commonly used in hunting and recreational sports,[34] making clear that these semiautomatic assault weapons are not and cannot be subject to any ban.

Section 2(z) of the bill lists 19 specific semiautomatic assault weapons—such as the AK–47, M–10, TEC–9, Uzi, etc.—that are banned.[35] It also defines other assault weapons by specifically enumerating combat style characteristics and bans those semiautomatic assault weapons that have 2 or more of those characteristics.[36]

The bill makes clear that the list of exempted guns is not exclusive. The fact that a gun is not on the exempted list may not be construed to mean that it is banned. Thus, a gun that is not on the list of guns specifically banned by name would only be banned if it met the specific characteristics set out in the characteristics test. No gun may be removed from the exempted list.

H.R. 4296 also bans large capacity ammunition feeding devices—clips that accept more than 10 rounds of ammunition—as well as

---

[33] Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary. Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement and testimony of Dr. David Milzman, Associate Director, Trauma Services, Georgetown University Medical Center, Washington, DC); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

[34] See H.R. 4296, Appendix A, for the list.

[35] H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN–FAL/LAR; Galil; MAC 10, MAC 11-type; Steyr AUG; Street Sweeper; Striker 12; TEC–9; Uzi.

[36] While noting that its list is not all-inclusive, the Bureau of Alcohol, Tobacco, and Firearms has listed the following semi-automatic firearms that would be banned based on their general characteristics:

1. Semi-automatic Rifles: AA Arms AR9 semi-automatic rifle; AMT Lightning 25 rifle; Auto Ordnance Thompson Model 1927 carbines (finned barrel versions); Calico M100 carbine; Colt Sporter Rifle (all variations); Federal XC900 carbine; Federal XC450 carbine; Grendel R31 carbine; Iver Johnson M1 carbine (version w/collapsible stock and bayonet mount); Springfield M1A rifle.

2. Pistols: AA Arms AP9 pistol; Australian Automatic Arms pistol; Auto Ordnance Model 1927A5 pistol; American Arms Spectra pistol; Calico Model M950 pistol; Calico Model 110 pistol; All Claridge Hi-Tec pistol; D Max auto pistol; Grendel P–31 pistol; Heckler & Koch SP89 pistol; Wilkinson Linda pistol.

3. Shotguns: Benelli M1 Super 90 Defense shotgun; Benelli M3 Super 90 shotgun; Franchi LAW 12 shotgun; Franchi SPAS 12 shotgun; USAS 12 shotgun.

21

any combination of parts from which such a device can be assembled.

The bill exempts all semiautomatic assault weapons and large capacity ammunition feeding devices (as well as any combination of parts) that are lawfully possessed on date of enactment. Owners of such semiautomatic assault weapons need do nothing under the bill unless they wish to transfer the semiautomatic assault weapon.

H.R. 4296 differs significantly from previously-proposed legislation—it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns. Most significantly, the ban in the 1991 proposed bill gave the Bureau of Alcohol, Tobacco, and Firearms authority to ban any weapon which "embodies the same configuration" as the named list of guns. The current bill, H.R. 4296 does not contain any such general authority. Instead, it contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons.

### 102D CONGRESS

The Subcommittee on Crime and Criminal Justice held hearings on semiautomatic assault weapons on June 12 and July 25, 1991. A ban on certain semiautomatic assault weapons was included as Subtitle A of Title XX in H.R. 3371, the Omnibus Crime Control Act of 1991. A ban on large capacity ammunition feeding devices was included in the same bill. The bill was reported out of the Judiciary Committee on October 7, 1991. The provisions dealing with semiautomatic assault weapons and large capacity ammunition feeding devices were struck by the House of Representatives by a vote of 247–177 on October 17, 1991.

### 103D CONGRESS

The Subcommittee on Crime and Criminal Justice held hearings on H.R. 4296 and its predecessor, H.R. 3527, which ban semiautomatic assault weapons, on April 25, 1994. The Subcommittee reported favorably on an amendment in the nature of a substitute to H.R. 4296 on April 26, 1994, by a recorded vote of 8–5.

### COMMITTEE ACTION

The Committee on the Judiciary met on April 28, 1994 to consider H.R. 4296, as amended. Two amendments were adopted during the Committee's consideration.

An amendment was offered to provide that the absence of a firearm from the list of guns specifically exempted from the ban may not be construed as evidence that the semiautomatic assault weapon is banned, and that no gun may be removed from the exempt list so long as the Act is in effect. This amendment was adopted by voice vote.

An amendment was offered to delete a provision that barred from owning any firearms those persons convicted of violating the recordkeeping requirements relating to grandfathered weapons. This amendment was adopted by voice vote.

22

A reporting quorum being present, the Committee on the Judiciary, by a roll call vote of 20 to 15, ordered H.R. 4296, as amended, favorably reported to the House.

### SECTION-BY-SECTION ANALYSIS

#### SECTION 1—SHORT TITLE

This section provides that the Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

#### SECTION 2—RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS

Subsection 2(a) makes it unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon (including any "copies or duplicates.")

The ban on transfer and possession does not apply to (1) weapons otherwise lawfully possessed on the date of enactment; (2) any of the firearms (or their replicas or duplicates) listed in Appendix A; (3) any manually operated (bolt, pump, slide, lever action), permanently inoperable, or antique firearms; (4) semiautomatic rifles that cannot accept a detachable magazine that holds more than 5 rounds; or, a semiautomatic shotgun that cannot hold more than 5 rounds in a fixed or detachable magazine.

The fact that a gun is not listed in Appendix A may not be construed to mean that it is banned. No gun listed in Appendix A may be removed from that exempted list so long as the Act is in effect.

Federal departments and agencies and those of States and their subdivisions are exempted. Law enforcement officers authorized to purchase firearms for official use are exempted, as are such officers presented with covered weapons upon retirement who are not otherwise prohibited from receiving such a weapon. Finally, weapons made, transferred, possessed, or imported for the purposes of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 2(b) defines semiautomatic assault weapons, both by name and by characteristics. It lists by name specific firearms, including "copies or duplicates" of such firearms.[37] Characteristics of covered semiautomatic rifles, pistols, and shotguns are defined by separate subsections applicable to each. In the case of rifles and pistols, in addition to being semiautomatic, a gun must be able to accept a detachable magazine and have at least 2 listed characteristics.

In the case of rifles, those characteristics are: (1) folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (5) a grenade launcher.

In the case of pistols, the characteristics are: (1) a magazine that attaches to the pistol outside of the pistol grip; (2) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (3) a barrel shroud that permits the

---

[37] H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN–FAL/LAR; Galil; MAC 10, MAC 11-type; Steyr AUG; Street Sweeper; Striker 12; TEC–9; Uzi

23

shooter to hold the firearm without being burned; (4) an unloaded manufactured weight of 50 ounces or more; and (5) a semiautomatic version of an automatic firearm.

In the case of shotguns, covered weapons must have at least 2 of the following four features: (1) a folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a fixed magazine capacity in excess of 5 rounds; and (4) an ability to accept a detachable magazine.

The section provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban on manufacture, transfer and possession. It also adds use of a semiautomatic assault weapon to the crimes covered by the mandatory minimum of 5 years under 18 USC Section 924(c)(1) for use in a federal crime of violence or drug trafficking crime.

Finally, the section requires that semiautomatic assault weapons manufactured after the date of enactment must clearly show the date on which the weapon was manufactured.

#### SECTION 3—RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS

This section makes it unlawful to transfer a grandfathered semi-automatic assault weapon unless both the transferor and the transferee complete and retain a copy of federal form 4473 (or its successor). Within 90 days of enactment, the Secretary of the Treasury must issue regulations ensuring the availability of the form to owners of semiautomatic assault weapons. The Committee expects the Secretary to make such forms easily and readily available to such gun owners. The Committee further expects the Secretary to maintain the confidentiality of the requester and to ensure the destruction of any and all information pertaining to any request for such forms immediately upon complying with the request. The Committee does not expect the Secretary to release any such information to any other Department of the Federal, State or local Governments or to use the information in any way other than to comply with the requests for the form. The Committee would consider failure to comply with these expectations a very serious breach.

A person who knowingly violates the recordkeeping requirement shall be fined not more than $1,000, imprisoned for not more than 6 months or both.              .

#### SECTION 4—BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES

Subsection 4(a) makes it unlawful for a person to transfer or possess a large capacity ammunition feeding device (which is defined to include any combination of parts from which such a device can be assembled.)

The ban on transfer and possession does not apply to (1) devices (or component parts) otherwise lawfully possessed on the date of enactment; (2) Federal departments and agencies and those of States and their subdivisions; (3) law enforcement officers authorized to purchase ammunition feeding devices for official use; devices transferred to such officers upon retirement who are not otherwise prohibited from receiving them; and (3) devices (or combination of parts) made, transferred, possessed, or imported for the pur-

24

pose of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 4(b) defines large capacity ammunition feeding device to mean a magazine, belt, drum, feed strip, or similar device that has a capacity of more than 10 rounds, or can be readily restored or converted to accept more than 10 rounds. It includes any combination of parts from which such a device can be assembled. It exempts an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition.

Subsection 4(c) adds large capacity ammunition feeding devices to the definition of "firearm" under 18 US Code section 921(a)(3).

Subsection 4(d) provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban.

Subsection 4(e) requires that large capacity ammunition feeding devices manufactured after the date of enactment be identified by a serial number that clearly shows the device was manufactured after the date or imported after the date of enactment, and such other identification as the Secretary of the Treasury may by regulation prescribe.

### SECTION 5—STUDY BY ATTORNEY GENERAL

This section requries the Attorney General to study and report to the Congress no later than 30 months after its enactment the effects of the Act, particularly with regard to its impact—if any—on violent and drug-trafficking crime.

The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment.

### SECTION 6—EFFECTIVE DATE

The Act and the amendment made by the Act take effect on the date of enactment and are repealed effective as of the date that is 10 years after that date.

### SECTION 7—APPENDIX A TO SECTION 922 OF TITLE 18

This section adds, as Appendix A, a list of firearms that are specifically exempted from the ban on semiautomatic assault weapons.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

25

## New Budget Authority and Tax Expenditures

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## Inflationary Impact Statement

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 4296 will have no significant inflationary impact on prices and costs in the national economy.

## Congressional Budget Office Cost Estimate

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 4296, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. Congress,
Congressional Budget Office.
*Washington, DC, May 2, 1994.*

Hon. Jack Brooks,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

Dear Mr. Chairman: The Congressional Budget Office has reviewed H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, as ordered reported by the House Committee on the Judiciary on April 28, 1994. We estimate that enactment of the bill would result in costs to the federal government over the 1995–1999 period of less than $500,000 from appropriated amounts. In addition, we estimate that enactment of H.R. 4296 would lead to increases in receipts of less than $10 million a year from new criminal fines. Such receipts would be deposited in the Crime Victims Fund and spent in the following year. Because the bill could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill would not affect the budgets of state or local governments.

H.R. 4296 would ban the manufacture, transfer, and possession of certain semiautomatic assault weapons not lawfully possessed as of the date of the bill's enactment. The bill also would ban the transfer and possession of certain large-capacity ammunition feeding devices not lawfully possessed as of the date of enactment. In addition, H.R. 4296 would establish recordkeeping requirements for transfers of grandfathered weapons and would direct the Attorney General to conduct a study of the bill's impact. Finally, the bill would create new federal crimes and associated penalties—prison sentences and criminal fines—for violation of its provisions.

The new recordkeeping requirements and the impact study would increase costs to the Department of the Treasury and the Department of Justice, respectively, but we estimate that these costs would be less than $500,000 over the next several years from appropriated amounts. The imposition of new criminal fines in H.R. 4296 could cause governmental receipts to increase through greater

26

penalty collections. We estimate that any such increase would be less than $10 million annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

ROBERT D. REISCHAUER, *Director*.

### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### CHAPTER 44 OF TITLE 18, UNITED STATES CODE

*    *    *    *    *    *    *

### CHAPTER 44—FIREARMS

### § 921. Definitions

(a) As used in this chapter—
(1) * * *

*    *    *    *    *    *    *

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; [or (D) any destructive device.] *(D) any destructive device; or (E) any large capacity ammunition feeding device.* Such term does not include an antique firearm.

*    *    *    *    *    *    *

*(30) The term "semiautomatic assault weapon" means—*
*(A) any of the firearms, or copies or duplicates of the firearms, known as—*
*(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);*
*(ii) Action Arms Israeli Military Industries UZI and Galil;*
*(iii) Beretta Ar70 (SC–70);*
*(iv) Colt AR–15;*
*(v) Fabrique National FN/FAL, FN/LAR, and FNC;*
*(vi) SWD M–10, M–11, M–11/9, and M–12;*
*(vii) Steyr AUG;*
*(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and*
*(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;*
*(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—*
*(i) a folding or telescoping stock;*

27

*(ii)* a pistol grip that protrudes conspicuously beneath the action of the weapon;

*(iii)* a bayonet mount;

*(iv)* a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

*(v)* a grenade launcher;

*(C)* a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

*(i)* an ammunition magazine that attaches to the pistol outside of the pistol grip;

*(ii)* a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

*(iii)* a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

*(iv)* a manufactured weight of 50 ounces or more when the pistol is unloaded; and

*(v)* a semiautomatic version of an automatic firearm; and

*(D)* a semiautomatic shotgun that has at least 2 of—

*(i)* a folding or telescoping stock;

*(ii)* a pistol grip that protrudes conspicuously beneath the action of the weapon;

*(iii)* a fixed magazine capacity in excess of 5 rounds; and

*(iv)* an ability to accept a detachable magazine.

*(31)* The term "large capacity ammunition feeding device"—

*(A)* means—

*(i)* a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

*(ii)* any combination of parts from which a device described in clause (i) can be assembled; but

*(B)* does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

## § 922. Unlawful acts

(a) It shall be unlawful—

\*       \*       \*       \*       \*       \*       \*

*(v)(1)* It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

*(2)* Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

*(3)* Paragraph (1) shall not apply to—

*(A)* any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

*(B)* any firearm that—

*(i)* is manually operated by bolt, pump, lever, or slide action;

*(ii)* has been rendered permanently inoperable; or

28

*(iii) is an antique firearm;*

*(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or*

*(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.*

*The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.*

*(4) Paragraph (1) shall not apply to—*

*(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;*

*(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;*

*(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or*

*(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.*

*(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.*

*(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.*

*(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.*

*(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.*

*(5) As used in this subsection, the term "form 4473" means—*

*(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or*

*(B) any other form which—*

*(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and*

*(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).*

29

*(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.*

*(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.*

*(3) This subsection shall not apply to—*

*- (A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;*

*(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;*

*(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or*

*(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.*

## APPENDIX A

### Centerfire Rifles—Autoloaders

*Browning BAR Mark II Safari Semi-Auto Rifle*
*Browning BAR Mark II Safari Magnum Rifle*
*Browning High-Power Rifle*
*Heckler & Koch Model 300 Rifle*
*Iver Johnson M–1 Carbine*
*Iver Johnson 50th Anniversary M-1 Carbine*
*Marlin Model 9 Camp Carbine*
*Marlin Model 45 Carbine*
*Remington Nylon 66 Auto-Loading Rifle*
*Remington Model 7400 Auto Rifle*
*Remington Model 7400 Rifle*
*Remington Model 7400 Special Purpose Auto Rifle*
*Ruger Mini-14 Autoloading Rifle (w/o folding stock)*
*Ruger Mini Thirty Rifle*

### Centerfire Rifles—Lever & Slide

*Browning Model 81 BLR Lever-Action Rifle*
*Browning Model 81 Long Action BLR*
*Browning Model 1886 Lever-Action Carbine*
*Browning Model 1886 High Grade Carbine*
*Cimarron 1860 Henry Replica*
*Cimarron 1866 Winchester Replicas*
*Cimarron 1873 Short Rifle*
*Cimarron 1873 Sporting Rifle*
*Cimarron 1873 30" Express Rifle*
*Dixie Engraved 1873 Rifle*
*E.M.F. 1866 Yellowboy Lever Actions*
*E.M.F. 1860 Henry Rifle*
*E.M.F. Model 73 Lever-Action Rifle*
*Marlin Model 336CS Lever-Action Carbine*
*Marlin Model 30AS Lever-Action Carbine*
*Marlin Model 444SS Lever-Action Sporter*
*Marlin Model 1894S Lever-Action Carbine*
*Marlin Model 1894CS Carbine*

30

*Marlin Model 1894CL Classic*
*Marlin Model 1895SS Lever-Action Rifle*
*Mitchell 1858 Henry Replica*
*Mitchell 1866 Winchester Replica*
*Mitchell 1873 Winchester Replica*
*Navy Arms Military Henry Rifle*
*Navy Arms Henry Trapper*
*Navy Arms Iron Frame Henry*
*Navy Arms Henry Carbine*
*Navy Arms 1866 Yellowboy Rifle*
*Navy Arms 1873 Winchester-Style Rifle*
*Navy Arms 1873 Sporting Rifle*
*Remington 7600 Slide Action*
*Remington Model 7600 Special Purpose Slide Action*
*Rossi M92 SRC Saddle-Ring Carbine*
*Rossi M92 SRS Short Carbine*
*Savage 99C Lever-Action Rifle*
*Uberti Henry Rifle*
*Uberti 1866 Sporting Rifle*
*Uberti 1873 Sporting Rifle*
*Winchester Model 94 Side Eject Lever-Action Rifle*
*Winchester Model 94 Trapper Side Eject*
*Winchester Model 94 Big Bore Side Eject*
*Winchester Model 94 Ranger Side Eject Lever-Action Rifle*
*Winchester Model 94 Wrangler Side Eject*

### Centerfire Rifles—Bolt Action

*Alpine Bolt-Action Rifle*
*A-Square Caesar Bolt-Action Rifle*
*A-Square Hannibal Bolt-Action Rifle*
*Anschutz 1700D Classic Rifles*
*Anschutz 1700D Custom Rifles*
*Anschutz 1700D Bavarian Bolt-Action Rifle*
*Anschutz 1733D Mannlicher Rifle*
*Barret Model 90 Bolt-Action Rifle*
*Beeman/HW 60J Bolt-Action Rifle*
*Blaser R84 Bolt-Action Rifle*
*BRNO 537 Sporter Bolt-Action Rifle*
*BRNO ZKB 527 Fox Bolt-Action Rifle*
*BRNO ZKK 600, 601, 602 Bolt-Action Rifles*
*Browning A-Bolt Rifle*
*Browning A-Bolt Stainless Stalker*
*Browning A-Bolt Left Hand*
*Browning A-Bolt Short Action*
*Browning Euro-Bolt Rifle*
*Browning A-Bolt Gold Medallion*
*Browning A-Bolt Micro Medallion*
*Century Centurion 14 Sporter*
*Century Enfield Sporter #4*
*Century Swedish Sporter #38*
*Century Mauser 98 Sporter*
*Cooper Model 38 Centerfire Sporter*
*Dakota 22 Sporter Bolt-Action Rifle*
*Dakota 76 Classic Bolt-Action Rifle*
*Dakota 76 Short Action Rifles*
*Dakota 76 Safari Bolt-Action Rifle*
*Dakota 416 Rigby African*
*E.A.A./Sabatti Rover 870 Bolt-Action Rifle*
*Auguste Francotte Bolt-Action Rifles*
*Carl Gustaf 2000 Bolt-Action Rifle*
*Heym Magnum Express Series Rifle*
*Howa Lightning Bolt-Action Rifle*
*Howa Realtree Camo Rifle*
*Interarms Mark X Viscount Bolt-Action Rifle*
*Interarms Mini-Mark X Rifle*
*Interarms Mark X Whitworth Bolt-Action Rifle*
*Interarms Whitworth Express Rifle*
*Iver Johnson Model 5100A1 Long-Range Rifle*

31

*KDF K15 American Bolt-Action Rifle*
*Krico Model 600 Bolt-Action Rifle*
*Krico Model 700 Bolt-Action Rifles*
*Mauser Model 66 Bolt-Action Rifle*
*Mauser Model 99 Bolt-Action Rifle*
*McMillan Signature Classic Sporter*
*McMillan Signature Super Varminter*
*McMillan Signature Alaskan*
*McMillan Signature Titanium Mountain Rifle*
*McMillan Classic Stainless Sporter*
*McMillan Talon Safari Rifle*
*McMillan Talon Sporter Rifle*
*Midland 1500S Survivor Rifle*
*Navy Arms TU–33/40 Carbine*
*Parker-Hale Model 81 Classic Rifle*
*Parker-Hale Model 81 Classic African Rifle*
*Parker-Hale Model 1000 Rifle*
*Parker-Hale Model 1100M African Magnum*
*Parker-Hale Model 1100 Lightweight Rifle*
*Parker-Hale Model 1200 Super Rifle*
*Parker-Hale Model 1200 Super Clip Rifle*
*Parker-Hale Model 1300C Scout Rifle*
*Parker-Hale Model 2100 Midland Rifle*
*Parker-Hale Model 2700 Lightweight Rifle*
*Parker-Hale Model 2800 Midland Rifle*
*Remington Model Seven Bolt-Action Rifle*
*Remington Model Seven Youth Rifle*
*Remington Model Seven Custom KS*
*Remington Model Seven Custom MS Rifle*
*Remington 700 ADL Bolt-Action Rifle*
*Remington 700 BDL Bolt-Action Rifle*
*Remington 700 BDL Varmint Special*
*Remington 700 BDL European Bolt-Action Rifle*
*Remington 700 Varmint Synthetic Rifle*
*Remington 700 BDL SS Rifle*
*Remington 700 Stainless Synthetic Rifle*
*Remington 700 MTRSS Rifle*
*Remington 700 BDL Left Hand*
*Remington 700 Camo Synthetic Rifle*
*Remington 700 Safari*
*Remington 700 Mountain Rifle*
*Remington 700 Custom KS Mountain Rifle*
*Remington 700 Classic Rifle*
*Ruger M77 Mark II Rifle*
*Ruger M77 Mark II Magnum Rifle*
*Ruger M77RL Ultra Light*
*Ruger M77 Mark II All-Weather Stainless Rifle*
*Ruger M77 RSI International Carbine*
*Ruger M77 Mark II Express Rifle*
*Ruger M77VT Target Rifle*
*Sako Hunter Rifle*
*Sako Fiberclass Sporter*
*Sako Safari Grade Bolt Action*
*Sako Hunter Left-Hand Rifle*
*Sako Classic Bolt Action*
*Sako Hunter LS Rifle*
*Sako Deluxe Lightweight*
*Sako Super Deluxe Sporter*
*Sako Mannlicher-Style Carbine*
*Sako Varmint Heavy Barrel*
*Sako TRG–S Bolt-Action Rifle*
*Sauer 90 Bolt-Action Rifle*
*Savage 110G Bolt-Action Rifle*
*Savage 110CY Youth/Ladies Rifle*
*Savage 110WLE One of One Thousand Limited Edition Rifle*
*Savage 110GXP3 Bolt-Action Rifle*
*Savage 110F Bolt-Action Rifle*
*Savage 110FXP3 Bolt-Action Rifle*

32

*Savage 110GV Varmint Rifle*
*Savage 112FV Varmint Rifle*
*Savage Model 112FVS Varmint Rifle*
*Savage Model 112BV Heavy Barrel Varmint Rifle*
*Savage 116FSS Bolt-Action Rifle*
*Savage Model 116FSK Kodiak Rifle*
*Savage 110FP Police Rifle*
*Steyr-Mannlicher Sporter Models SL, L, M, S. S/T*
*Steyr-Mannlicher Luxus Model L, M, S*
*Steyr-Mannlicher Model M Professional Rifle*
*Tikka Bolt-Action Rifle*
*Tikka Premium Grade Rifles*
*Tikka Varmint / Continental Rifle*
*Tikka Whitetail / Battue Rifle*
*Ultra Light Arms Model 20 Rifle*
*Ultra Light Arms Model 28, Model 40 Rifles*
*Voere VEC 91 Lightning Bolt-Action Rifle*
*Voere Model 2165 Bolt-Action Rifle*
*Voere Model 2155, 2150 Bolt-Action Rifles*
*Weatherby Mark V Deluxe Bolt-Action Rifle*
*Weatherby Lasermark V Rifle*
*Weatherby Mark V Crown Custom Rifles*
*Weatherby Mark V Sporter Rifle*
*Weatherby Mark V Safari Grade Custom Rifles*
*Weatherby Weathermark Rifle*
*Weatherby Weathermark Alaskan Rifle*
*Weatherby Classicmark No. 1 Rifle*
*Weatherby Weatherguard Alaskan Rifle*
*Weatherby Vanguard VGX Deluxe Rifle*
*Weatherby Vanguard Classic Rifle*
*Weatherby Vanguard Classic No. 1 Rifle*
*Weatherby Vanguard Weatherguard Rifle*
*Wichita Classic Rifle*
*Wichita Varmint Rifle*
*Winchester Model 70 Sporter*
*Winchester Model 70 Sporter WinTuff*
*Winchester Model 70 SM Sporter*
*Winchester Model 70 Stainless Rifle*
*Winchester Model 70 Varmint*
*Winchester Model 70 Synthetic Heavy Varmint Rifle*
*Winchester Model 70 DBM Rifle*
*Winchester Model 70 DBM-S Rifle*
*Winchester Model 70 Featherweight*
*Winchester Model 70 Featherweight WinTuff*
*Winchester Model 70 Featherweight Classic*
*Winchester Model 70 Lightweight Rifle*
*Winchester Ranger Rifle*
*Winchester Model 70 Super Express Magnum*
*Winchester Model 70 Super Grade*
*Winchester Model 70 Custom Sharpshooter*
*Winchester Model 70 Custom Sporting Sharpshooter Rifle*

### Centerfire Rifles—Single Shot

*Armsport 1866 Sharps Rifle, Carbine*
*Brown Model One Single Shot Rifle*
*Browning Model 1885 Single Shot Rifle*
*Dakota Single Shot Rifle*
*Desert Industries G-90 Single Shot Rifle*
*Harrington & Richardson Ultra Varmint Rifle*
*Model 1885 High Wall Rifle*
*Navy Arms Rolling Block Buffalo Rifle*
*Navy Arms #2 Creedmoor Rifle*
*Navy Arms Sharps Cavalry Carbine*
*Navy Arms Sharps Plains Rifle*
*New England Firearms Handi-Rifle*
*Red Willow Armory Ballard No. 5 Pacific*
*Red Willow Armory Ballard No. 1.5 Hunting Rifle*
*Red Willow Armory Ballard No. 8 Union Hill Rifle*

33

*Red Willow Armory Ballard No. 4.5 Target Rifle*
*Remington-Style Rolling Block Carbine*
*Ruger No. 1B Single Shot*
*Ruger No. 1A Light Sporter*
*Ruger No. 1H Tropical Rifle*
*Ruger No. 1S Medium Sporter*
*Ruger No. 1 RSI International*
*Ruger No. 1V Special Varminter*
*C. Sharps Arms New Model 1874 Old Reliable*
*C. Sharps Arms New Model 1875 Rifle*
*C. Sharps Arms 1875 Classic Sharps*
*C. Sharps Arms New Model 1875 Target & Long Range*
*Shiloh Sharps 1874 Long Range Express*
*Shiloh Sharps 1874 Montana Roughrider*
*Shiloh Sharps 1874 Military Carbine*
*Shiloh Sharps 1874 Business Rifle*
*Shiloh Sharps 1874 Military Rifle*
*Sharps 1874 Old Reliable*
*Thompson/Center Contender Carbine*
*Thompson/Center Stainless Contender Carbine*
*Thompson/Center Contender Carbine Survival System*
*Thompson/Center Contender Carbine Youth Model*
*Thompson/Center TCR '87 Single Shot Rifle*
*Uberti Rolling Block Baby Carbine*

### Drillings, Combination Guns, Double Rifles

*Baretta Express SSO O/U Double Rifles*
*Baretta Model 455 SxS Express Rifle*
*Chapuis RGExpress Double Rifle*
*Auguste Francotte Sidelock Double Rifles*
*Auguste Francotte Boxlock Double Rifle*
*Heym Model 55B O/U Double Rifle*
*Heym Model 55FW O/U Combo Gun*
*Heym Model 88b Side-by-Side Double Rifle*
*Kodiak Mk. IV Double Rifle*
*Kreighoff Teck O/U Combination Gun*
*Kreighoff Trumpf Drilling*
*Merkel Over/Under Combination Guns*
*Merkel Drillings*
*Merkel Model 160 Side-by-Side Double Rifles*
*Merkel Over/Under Double Rifles*
*Savage 24F O/U Combination Gun*
*Savage 24F–12T Turkey Gun*
*Springfield Inc. M6 Scout Rifle/Shotgun*
*Tikka Model 412s Combination Gun*
*Tikka Model 412S Double Fire*
*A. Zoli Rifle-Shotgun O/U Combo*

### Rimfire Rifles—Autoloaders

*AMT Lightning 25/22 Rifle*
*AMT Lightning Small-Game Hunting Rifle II*
*AMT Magnum Hunter Auto Rifle*
*Anschutz 525 Deluxe Auto*
*Armscor Model 20P Auto Rifle*
*Browning Auto-22 Rifle*
*Browning Auto-22 Grade VI*
*Krico Model 260 Auto Rifle*
*Lakefield Arms Model 64B Auto Rifle*
*Marlin Model 60 Self-Loading Rifle*
*Marlin Model 60ss Self-Loading Rifle*
*Marlin Model 70 HC Auto*
*Marlin Model 990l Self-Loading Rifle*
*Marlin Model 70P Papoose*
*Marlin Model 922 Magnum Self-Loading Rifle*
*Marlin Model 995 Self-Loading Rifle*
*Norinco Model 22 ATD Rifle*
*Remington Model 522 Viper Autoloading Rifle*

34

*Remington 552BDL Speedmaster Rifle*
*Ruger 10/22 Autoloading Carbine (w/o folding stock)*
*Survival Arms AR-7 Explorer Rifle*
*Texas Remington Revolving Carbine*
*Voere Model 2115 Auto Rifle*

### Rimfire Rifles—Lever & Slide Action

*Browning BL-22 Lever-Action Rifle*
*Marlin 39TDS Carbine*
*Marlin Model 39AS Golden Lever-Action Rifle*
*Remington 572BDL Fieldmaster Pump Rifle*
*Norinco EM-321 Pump Rifle*
*Rossi Model 62 SA Pump Rifle*
*Rossi Model 62 SAC Carbine*
*Winchester Model 9422 Lever-Action Rifle*
*Winchester Model 9422 Magnum Lever-Action Rifle*

### Rimfire Rifles—Bolt Actions & Single Shots

*Anschutz Achiever Bolt-Action Rifle*
*Anschutz 1416D/1516D Classic Rifles*
*Anschutz 1418D/1518D Mannlicher Rifles*
*Anschutz 1700D Classic Rifles*
*Anschutz 1700D Custom Rifles*
*Anschutz 1700 FWT Bolt-Action Rifle*
*Anschutz 1700D Graphite Custom Rifle*
*Anschutz 1700D Bavarian Bolt-Action Rifle*
*Armscor Model 14P Bolt-Action Rifle*
*Armscor Model 1500 Rifle*
*BRNO ZKM-452 Deluxe Bolt-Action Rifle*
*BRNO ZKM 452 Deluxe*
*Beeman/HW 60-J-ST Bolt-Action Rifle*
*Browning A-Bolt 22 Bolt-Action Rifle*
*Browning A-Bolt Gold Medallion*
*Cabanas Phaser Rifle*
*Cabanas Master Bolt-Action Rifle*
*Cabanas Espronceda IV Bolt-Action Rifle*
*Cabanas Leyre Bolt-Action Rifle*
*Chipmunk Single Shot Rifle*
*Cooper Arms Model 36S Sporter Rifle*
*Dakota 22 Sporter Bolt-Action Rifle*
*Krico Model 300 Bolt-Action Rifles*
*Lakefield Arms Mark II Bolt-Action Rifle*
*Lakefield Arms Mark I Bolt-Action Rifle*
*Magtech Model MT-22C Bolt-Action Rifle*
*Marlin Model 880 Bolt-Action Rifle*
*Marlin Model 881 Bolt-Action Rifle*
*Marlin Model 882 Bolt-Action Rifle*
*Marlin Model 883 Bolt-Action Rifle*
*Marlin Model 883SS Bolt-Action Rifle*
*Marlin Model 25MN Bolt-Action Rifle*
*Marlin Model 25N Bolt-Action Repeater*
*Marlin Model 15YN "Little Buckaroo"*
*Mauser Model 107 Bolt-Action Rifle*
*Mauser Model 201 Bolt-Action Rifle*
*Navy Arms TU-KKW Training Rifle*
*Navy Arms TU-33/40 Carbine*
*Navy Arms TU-KKW Sniper Trainer*
*Norinco JW-27 Bolt-Action Rifle*
*Norinco JW-15 Bolt-Action Rifle*
*Remington 541-T*
*Remington 40-XR Rimfire Custom Sporter*
*Remington 541-T HB Bolt-Action Rifle*
*Remington 581-S Sportsman Rifle*
*Ruger 77/22 Rimfire Bolt-Action Rifle*
*Ruger K77/22 Varmint Rifle*
*Ultra Light Arms Model 20 RF Bolt-Action Rifle*
*Winchester Model 52B Sporting Rifle*

**35**

### Competition Rifles—Centerfire & Rimfire

*Anschutz 64–MS Left Silhouette*
*Anschutz 1808D RT Super Match 54 Target*
*Anschutz 1827B Biathlon Rifle*
*Anschutz 1903D Match Rifle*
*Anschutz 1803D Intermediate Match*
*Anschutz 1911 Match Rifle*
*Anschutz 54.18MS REP Deluxe Silhouette Rifle*
*Anschutz 1913 Super Match Rifle*
*Anschutz 1907 Match Rifle*
*Anschutz 1910 Super Match II*
*Anschutz 54.18MS Silhouette Rifle*
*Anschutz Super Match 54 Target Model 2013*
*Anschutz Super Match 54 Target Model 2007*
*Beeman/Feinwerkbau 2600 Target Rifle*
*Cooper Arms Model TRP–1 ISU Standard Rifle*
*E.A.A./Weihrauch HW 60 Target Rifle*
*E.A.A./HW 660 Match Rifle*
*Finnish Lion Standard Target Rifle*
*Krico Model 360 S2 Biathlon Rifle*
*Krico Model 400 Match Rifle*
*Krico Model 360S Biathlon Rifle*
*Krico Model 500 Kricotronic Match Rifle*
*Krico Model 600 Sniper Rifle*
*Krico Model 600 Match Rifle*
*Lakefield Arms Model 90B Target Rifle*
*Lakefield Arms Model 91T Target Rifle*
*Lakefield Arms Model 92S Silhouette Rifle*
*Marlin Model 2000 Target Rifle*
*Mauser Model 86–SR Specialty Rifle*
*McMillan M–86 Sniper Rifle*
*McMillan Combo M–87/M–88 50-Caliber Rifle*
*McMillan 300 Phoenix Long Range Rifle*
*McMillan M–89 Sniper Rifle*
*McMillan National Match Rifle*
*McMillan Long Range Rifle*
*Parker-Hale M–87 Target Rifle*
*Parker-Hale M–85 Sniper Rifle*
*Remington 40–XB Rangemaster Target Centerfire*
*Remington 40–XR KS Rimfire Position Rifle*
*Remington 40–XBBR KS*
*Remington 40–XC KS National Match Course Rifle*
*Sako TRG–21 Bolt-Action Rifle*
*Steyr-Mannlicher Match SPG–UIT Rifle*
*Steyr-Mannlicher SSG P–I Rifle*
*Steyr-Mannlicher SSG P–III Rifle*
*Steyr-Mannlicher SSG P–IV Rifle*
*Tanner Standard UIT Rifle*
*Tanner 50 Meter Free Rifle*
*Tanner 300 Meter Free Rifle*
*Wichita Silhouette Rifle*

### Shotguns—Autoloaders

*American Arms/Franchi Black Magic 48/AL*
*Benelli Super Black Eagle Shotgun*
*Benelli Super Black Eagle Slug Gun*
*Benelli M1 Super 90 Field Auto Shotgun*
*Benelli Montefeltro Super 90 20-Gauge Shotgun*
*Benelli Montefeltro Super 90 Shotgun*
*Benelli M1 Sporting Special Auto Shotgun*
*Benelli Black Eagle Competition Auto Shotgun*
*Beretta A–303 Auto Shotgun*
*Beretta 390 Field Auto Shotgun*
*Beretta 390 Super Trap, Super Skeet Shotguns*
*Beretta Vittoria Auto Shotgun*
*Beretta Model 1201F Auto Shotgun*
*Browning BSA 10 Auto Shotgun*

**36**

*Browning Bsa 10 Stalker Auto Shotgun*
*Browning A–500R Auto Shotgun*
*Browning A–500G Auto Shotgun*
*Browning A–500G Sporting Clays*
*Browning Auto-5 Light 12 and 20*
*Browning Auto-5 Stalker*
*Browning Auto-5 Magnum 20*
*Browning Auto-5 Magnum 12*
*Churchill Turkey Automatic Shotgun*
*Cosmi Automatic Shotgun*
*Maverick Model 60 Auto Shotgun*
*Mossberg Model 5500 Shotgun*
*Mossberg Model 9200 Regal Semi-Auto Shotgun*
*Mossberg Model 9200 USST Auto Shotgun*
*Mossberg Model 9200 Camo Shotgun*
*Mossberg Model 6000 Auto Shotgun*
*Remington Model 1100 Shotgun*
*Remington 11–87 Premier Shotgun*
*Remington 11–87 Sporting Clays*
*Remington 11–87 Premier Skeet*
*Remington 11–87 Premier Trap*
*Remington 11–87 Special Purpose Magnum*
*Remington 11–87 SPS–T Camo Auto Shotgun*
*Remington 11–87 Special Purpose Deer Gun*
*Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun*
*Remington 11–87 SPS-Deer Shotgun*
*Remington 11–87 Special Purpose Synthetic Camo*
*Remington SP–10 Magnum-Camo Auto Shotgun*
*Remington SP–10 Magnum Auto Shotgun*
*Remington SP–10 Magnum Turkey Combo*
*Remington 1100 LT–20 Auto*
*Remington 1100 Special Field*
*Remington 1100 20-Gauge Deer Gun*
*Remington 1100 LT–20 Tournament Skeet*
*Winchester Model 1400 Semi-Auto Shotgun*

**Shotguns—Slide Actions**

*Browning Model 42 Pump Shotgun*
*Browning BPS Pump Shotgun*
*Browning BPS Stalker Pump Shotgun*
*Browning BPS Pigeon Grade Pump Shotgun*
*Browning BPS Pump Shotgun (Ladies and Youth Model)*
*Browning BPS Game Gun Turkey Special*
*Browning BPS Game Gun Deer Special*
*Ithaca Model 87 Supreme Pump Shotgun*
*Ithaca Model 87 Deerslayer Shotgun*
*Ithaca Deerslayer II Rifled Shotgun*
*Ithaca Model 87 Turkey Gun*
*Ithaca Model 87 Deluxe Pump Shotgun*
*Magtech Model 586–VR Pump Shotgun*
*Maverick Models 88, 91 Pump Shotguns*
*Mossberg Model 500 Sporting Pump*
*Mossberg Model 500 Camo Pump*
*Mossberg Model 500 Muzzleloader Combo*
*Mossberg Model 500 Trophy Slugster*
*Mossberg Turkey Model 500 Pump*
*Mossberg Model 500 Bantam Pump*
*Mossberg Field Grade Model 835 Pump Shotgun*
*Mossberg Model 835 Regal Ulti-Mag Pump*
*Remington 870 Wingmaster*
*Remington 870 Special Purpose Deer Gun*
*Remington 870 SPS–BG-Camo Deer/Turkey Shotgun*
*Remington 870 SPS-Deer Shotgun*
*Remington 870 Marine Magnum*
*Remington 870 TC Trap*
*Remington 870 Special Purpose Synthetic Camo*
*Remington 870 Wingmaster Small Gauges*
*Remington 870 Express Rifle Sighted Deer Gun*

**37**

*Remington 879 SPS Special Purpose Magnum*
*Remington 870 SPS–T Camo Pump Shotgun*
*Remington 870 Special Field*
*Remington 870 Express Turkey*
*Remington 870 High Grades*
*Remington 870 Express*
*Remington Model 870 Express Youth Gun*
*Winchester Model 12 Pump Shotgun*
*Winchester Model 42 High Grade Shotgun*
*Winchester Model 1300 Walnut Pump*
*Winchester Model 1300 Slug Hunter Deer Gun*
*Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun*
*Winchester Model 1300 Turkey Gun*
*Winchester Model 1300 Ranger Pump Gun*

### Shotguns—Over/Unders

*American Arms/Franchi Falconet 2000 O/U*
*American Arms Silver I O/U*
*American Arms Silver II Shotgun*
*American Arms Silver Skeet O/U*
*American Arms/Franchi Sporting 2000 O/U*
*American Arms Silver Sporting O/U*
*American Arms Silver Trap O/U*
*American Arms WS/OU 12, TS/OU 12 Shotguns*
*American Arms WT/OU 10 Shotgun*
*Armsport 2700 O/U Goose Gun*
*Armsport 2700 Series O/U*
*Armsport 2900 Tri-Barrel Shotgun*
*Baby Bretton Over/Under Shotgun*
*Beretta Model 686 Ultralight O/U*
*Beretta ASE 90 Competition O/U Shotgun*
*Beretta Over/Under Field Shotguns*
*Beretta Onyx Hunter Sport O/U Shotgun*
*Beretta Model SO5, SO6, SO9 Shotguns*
*Beretta Sporting Clay Shotguns*
*Beretta 687EL Sporting O/U*
*Beretta 682 Super Sporting O/U*
*Beretta Series 682 Competition Over/Unders*
*Browning Citori O/U Shotgun*
*Browning Superlight Citori Over/Under*
*Browning Lightning Sporting Clays*
*Browning Micro Citori Lightning*
*Browning Citori Plus Trap Combo*
*Browning Citori Plus Trap Gun*
*Browning Citori O/U Skeet Models*
*Browning Citori O/U Trap Models*
*Browning Special Sporting Clays*
*Browning Citori GTI Sporting Clays*
*Browning 325 Sporting Clays*
*Centurion Over/Under Shotgun*
*Chapuis Over/Under Shotgun*
*Connecticut Valley Classics Classic Sporter O/U*
*Connecticut Valley Classics Classic Field Waterfowler*
*Charles Daly Field Grade O/U*
*Charles Daly Lux Over/Under*
*E.A.A./Sabatti Sporting Clays Pro-Gold O/U*
*E.A.A/Sabatti Falcon-Mon Over/Under*
*Kassnar Grade I O/U Shotgun*
*Krieghoff K–80 Sporting Clays O/U*
*Krieghoff K–80 Skeet Shotgun*
*Krieghoff K–80 International Skeet*
*Krieghoff K–80 Four-Barrel Skeet Set*
*Krieghoff K–80/RT Shotguns*
*Krieghoff K–80 O/U Trap Shotgun*
*Laurona Silhouette 300 Sporting Clays*
*Laurona Silhouette 300 Trap*
*Laurona Super Model Over/Unders*
*Ljutic LM–6 Deluxe O/U Shotgun*

**38**

*Marocchi Conquista Over/Under Shotgun*
*Marocchi Avanza O/U Shotgun*
*Merkel Model 200E O/U Shotgun*
*Merkel Model 200E Skeet, Trap Over/Unders*
*Merkel Model 203E, 303E Over/Under Shotguns*
*Perazzi Mirage Special Sporting O/U*
*Perazzi Mirage Special Four-Gauge Skeet*
*Perazzi Sporting Classic O/U*
*Perazzi MX7 Over/Under Shotguns*
*Perazzi Mirage Special Skeet Over/Under*
*Perazzi MX8/MX8 Special Trap, Skeet*
*Perazzi MX8/20 Over/Under Shotgun*
*Perazzi MX9 Single Over/Under Shotguns*
*Perazzi MX12 Hunting Over/Under*
*Perazzi MX28, MX410 Game O/U Shotguns*
*Perazzi MX20 Hunting Over/Under*
*Piotti Boss Over/Under Shotgun*
*Remington Peerless Over/Under Shotgun*
*Ruger Red Label O/U Shotgun*
*Ruger Sporting Clays O/U Shotgun*
*San Marco 12-Ga. Wildflower Shotgun*
*San Marco Field Special O/U Shotgun*
*San Marco 10-Ga. O/U Shotgun*
*SKB Model 505 Deluxe Over/Under Shotgun*
*SKB Model 685 Over/Under Shotgun*
*SKB Model 885 Over/Under Trap, Skeet, Sporting Clays*
*Stoeger/IGA Condor I O/U Shotgun*
*Stoeger/IGA ERA 2000 Over/Under Shotgun*
*Techni-Mec Model 610 Over/Under*
*Tikka Model 412S Field Grade Over/Under*
*Weatherby Athena Grade IV O/U Shotguns*
*Weatherby Athena Grade V Classic Field O/U*
*Weatherby Orion O/U Shotguns*
*Weatherby II, III Classic Field O/Us*
*Weatherby Orion II Classic Sporting Clays O/U*
*Weatherby Orion II Sporting Clays O/U*
*Winchester Model 1001 O/U Shotgun*
*Winchester Model 1001 Sporting Clays O/U*
*Pietro Zanoletti Model 2000 Field O/U*

### Shotguns—Side by Sides

*American Arms Brittany Shotgun*
*American Arms Gentry Double Shotgun*
*American Arms Derby Side-by-Side*
*American Arms Grulla #2 Double Shotgun*
*American Arms WS/SS 10*
*American Arms TS/SS 10 Double Shotgun*
*American Arms TS/SS 12 Side-by-Side*
*Arrieta Sidelock Double Shotguns*
*Armsport 1050 Series Double Shotguns*
*Arizaga Model 31 Double Shotgun*
*AYA Boxlock Shotguns*
*AYA Sidelock Double Shotguns*
*Beretta Model 452 Sidelock Shotgun*
*Beretta Side-by-Side Field Shotguns*
*Crucelegui Hermanos Model 150 Double*
*Chapuis Side-by-Side Shotgun*
*E.A.A./Sabatti Saba-Mon Double Shotgun*
*Charles Daly Model Dss Double*
*Ferlib Model F VII Double Shotgun*
*Auguste Francotte Boxlock Shotgun*
*Auguste Francotte Sidelock Shotgun*
*Garbi Model 100 Double*
*Garbi Model 101 Side-by-Side*
*Garbi Model 103A, B Side-by-Side*
*Garbi Model 200 Side-by-Side*
*Bill Hanus Birdgun Doubles*
*Hatfield Uplander Shotgun*

**39**

*Merkell Model 8, 47E Side-by-Side Shotguns*
*Merkel Model 47LSC Sporting Clays Double*
*Merkel Model 47S, 147S Side-by-Sides*
*Parker Reproductions Side-by-Side*
*Piotti King No. 1 Side-by-Side*
*Piotti Lunik Side-by-Side*
*Piotti King Extra Side-by-Side*
*Piotti Piuma Side-by-Side*
*Precision Sports Model 600 Series Doubles*
*Rizzini Boxlock Side-by-Side*
*Rizzini Sidelock Side-by-Side*
*Stoeger/IGA Uplander Side-by-Side Shotgun*
*Ugartechea 10-Ga. Magnum Shotgun*

### Shotguns—Bolt Actions & Single Shots

*Armsport Single Barrel Shotgun*
*Browning BT–99 Competition Trap Special*
*Browning BT–99 Plus Trap Gun*
*Browning BT–99 Plus Micro*
*Browning Recoilless Trap Shotgun*
*Browning Micro Recoilless Trap Shotgun*
*Desert Industries Big Twenty Shotgun*
*Harrington & Richardson Topper Model 098*
*Harrington & Richardson Topper Classic Youth Shotgun*
*Harrington & Richardson N.W.T.F. Turkey Mag*
*Harrington & Richardson Topper Deluxe Model 098*
*Krieghoff KS–5 Trap Gun*
*Krieghoff KS–5 Special*
*Krieghoff K–80 Single Barrel Trap Gun*
*Ljutic Mono Gun Single Barrel*
*Ljutic LTX Super Deluxe Mono Gun*
*Ljutic Recoilless Space Gun Shotgun*
*Marlin Model 55 Goose Gun Bolt Action*
*New England Firearms Turkey and Goose Gun*
*New England Firearms N.W.T.F. Shotgun*
*New England Firearms Tracker Slug Gun*
*New England Firearms Standard Pardner*
*New England Firearms Survival Gun*
*Perazzi TM1 Special Single Trap*
*Remington 90–T Super Single Shotgun*
*Snake Charmer II Shotgun*
*Stoeger/IGA Reuna Single Barrel Shotgun*
*Thompson/Center TCR '87 Hunter Shotgun.*

## § 923. Licensing

(a) * * *

\* \* \* \* \* \* \*

(i) Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer. *The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured. A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.*

**40**

### § 924. Penalties

(a)(1) Except as otherwise provided in this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever—

(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

(B) knowingly violates subsection (a)(4), (a)(6), (f), (k), [or (q) of section 922] *(r), (v), or (x) of section 922;*

\*        \*        \*        \*        \*        \*        \*

*(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.*

\*        \*        \*        \*        \*        \*        \*

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, *or semiautomatic assault weapon,* to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein.

\*        \*        \*        \*        \*        \*        \*

## SUPPLEMENTAL VIEWS OF HON. DAN GLICKMAN

I supported this bill because it is a narrowly crafted bill focused on specific weapons that have no business being on our streets. It is aimed at rapid fire weapons that have the sole purpose of killing people, and it is aimed at weapons that are more suited for the battlefield than the target range.

I believe that violence in our nation is getting out of hand. It is devastating to read that a student killed a student with a semi-automatic weapon. But it is equally devastating to hear of students killing students with anyone. What we really need to focus on is why students are engaging in violence in the first place. For this reason, I think this legislation must be viewed as part of the effort to reduce crime—in conjunction with the comprehensive crime bill that increases penalties, calls for tougher sentencing, provides for more jails and police officers, and provides for prevention programs.

But we must not abrogate the Second Amendment rights that are provided for in the Constitution. We must be extremely careful that in this legislation and in any legislation in the future, that we are not taking away guns that truly are used for sports, hunting, or self-defense.

I don't believe that this bill is the first step in a long road to banning guns. However, some of my constituents have expressed their fear that the Congress is moving slowly toward banning all guns for all people. We must be absolutely clear that this narrowly crafted legislation is not that first step and is not just a precursor to further, broader federal gun control and federal gun bans. Sport shooters and hunters tell me that they don't want assault weapons on the streets and in the hands of gang members any more than anyone else. But what they don't want is for Congress to take the short step to saying that the hunting rifles are being used on the streets, and should be taken away. And then the handguns are being used on the streets and should be taken away.

I want to make sure that what we are doing has a purpose—that it gets at the weapons that are being used by gang members and others in killing sprees or other random violence. I want to be able to assure the hunters, sport shooters and folks who want to be prepared for self-defense that we're not going to turn around and tell these gun owners that their sporting guns are illegal. This is a good bill, but let's tread very carefully before going any further.

Finally, because I want to make sure that there is no mistake about which guns are banned and which are exempt, especially guns that will be developed in the future, I offered an amendment during Committee markup that was accepted by the Committee. This amendment clarifies that simply because a gun is not on the list of specifically exempted guns, does not mean that that firearm is banned. A firearm must meet the specific criteria set out in the

(41)

**42**

bill, or be specifically named as a banned gun before it can be banned. In other words, the exempted gun list is not exhaustive.

Furthermore, my amendment makes clear that no gun may be taken off the list of specifically exempted guns as long as the act is in effect. In this way, it is absolutely clear that the intent of Congress is that exempted guns remain exempted.

## DISSENTING VIEWS OF HON. F. JAMES SENSENBRENNER, JR., HON. GEORGE GEKAS, HON. LAMAR S. SMITH, HON. BILL McCOLLUM, HON. HOWARD COBLE, HON. STEVE SCHIFF, AND HON. BOB GOODLATTE

We strongly oppose H.R. 4296 which would ban a variety of guns. The primary problem with this bill is that it targets law abiding citizens. If this bill passes, simply possessing a shotgun or rifle could land you in jail. You don't have to shoot anybody. You don't have to threaten anyone, just leaving it in the hall closet is enough to land you in jail. Even if you use the gun for self-defense, you can go to jail.

It is already a federal crime for convicted criminals to possess these weapons, or any other gun for that matter. The laws aimed at these criminals should be fully enforced before we start going into the homes of law-abiding citizens and arresting them.

Another problem with this legislation is that simple, cosmetic changes to certain guns would turn those guns from being illegal to, all of a sudden being legal. For example, simply by removing a pistol grip, or a bayonet mount from a rifle saves the owner from going to jail, but leaves the gun's performance unaffected.

Finally, the problem of these guns has been greatly exaggerated. Although semiautomatic weapons are used in the most high profile killings that make it on the nightly news, in fact, more than 99 percent of killers eschew assault rifles and use more prosaic devices. According to statistics from the Justice Department and reports from local law enforcement, five times as many people are kicked or beaten to death than are killed with assault rifles.

Passing this legislation is an excuse to avoid the real issues of violent crime, and threatens the rights of law-abiding citizens. Therefore, we oppose H.R. 4296.

F. JAMES SENSENBRENNER, Jr.
GEORGE W. GEKAS.
LAMAR SMITH.
BILL McCOLLUM.
HOWARD COBLE.
STEVE SCHIFF.
BOB GOODLATTE.

(43)

## DISSENTING VIEWS OF HON. JACK BROOKS

I am strongly opposed to H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, because it misidentifies the causes of violent crime in the United States; diverts national priorities away from meaningful solutions to the problem of violent crime; punishes honest American gun owners who buy and use firearms for legitimate, lawful purposes such as, but not necessarily limited to, self-defense, target shooting, hunting, and firearms collection; fails to focus the punitive powers of government upon criminals. Most fundamentally, a prohibition on firearms violates the right of individual Americans to keep and bear arms, protected by the Second Amendment to the Constitution of the United States—a stark fact of constitutional life that the proponents of H.R. 4296 conveniently overlook in their zeal to abridge the rights of law-abiding citizens.

Reasons claimed to justify a prohibition on the firearms that would be affected by H.R. 4296 include the assertion that those particular firearms are used often in the commission of violent crimes. Data on the use of the firearms H.R. 4296 labels as "assault weapons" is not comprehensive, but such data as do exist consistently show that "assault weapons" are involved in a small percentage of violent crimes.

Most of the firearms labelled as "assault weapons" in H.R. 4296 are rifles—yet rifles are the general category of firearms used least often in the commission of violent crimes. The FBI Uniform Crime Reports, 1992, the most recent comprehensive data available, shows that rifles of any description are used in 3.1 percent of homicides, for example, while knives are used in 14.5 percent, fists and feet are used in 5 percent, and blunt objects are used in another 5 percent.

Professor Gary Kleck, of Florida State University, the 1993 recipient of the American Society of Criminology's Hindelang Award, estimates that one-half of 1 percent of violent crimes are committed with "assault weapons." University of Texas criminologist Sheldon Ekland-Olson estimates that one-quarter of rifle-related homicides may involve rifles chambered for military cartridges, which would include not only so-called "assault" type semi-automatic rifles, but non-semiautomatic rifles as well.

Since 1980, rifle-related homicides have declined by more than a third. According to the Metropolitan Police of Washington, D.C., the city which has the highest per capita rate of homicides of any major city in the United States, between 1980–1993 there occurred only 4 rifle-related homicides out of a total of more than 4,200 homicides in the period. The last rifle homicide during the period was recorded in 1984. Other data from D.C. police show that rifles are used in about one-tenth of 1 percent of robberies and assaults.

**45**

The California Department of Justice surveyed law enforcement agencies in the state in 1990, as the state's legislature addressed "assault weapon" ban legislation there. The California Department of Justice found that only 3.7 percent of the firearms that are used in homicides and assaults were "assault weapons," defined there to include even more firearms than are defined as "assault weapons" in H.R. 4296.

Connecticut State Police report that less than 2 percent of firearms seized by police in the state are "assault weapons"; the Massachusetts State Police report that "assault" type rifles were used in one-half of 1 percent of homicides between 19851991.

I believe the proponents of H.R. 4296 are in error in claiming that the Bureau of Alcohol, Tobacco and Firearms (BATF) has traced a large number of "assault weapons" to crime. This claim has been effectively contradicted by both the BATF itself and the Congressional Research Service's (CRS) report on the BATF firearms tracing system. The BATF has stated that it "does not always know if a firearm being traced has been used in a crime." For instance, sometimes a firearm is traced simply to determine the rightful owner after it is found by a law enforcement officer.

Each year, the BATF traces about 50,000 firearms, yet only about 1 percent of these traces relate to "assault weapons" that have been seized by police in the course of investigations of violent crimes. Most "assault weapons" traced relate not to violent crime but to property violations, such as stolen guns being traced so that they may be returned to their lawful owners, violations of the Gun Control Act, and other non-violent circumstances.

As noted by BATF and by CRS in its report to Congress entitled "Assault Weapons: Military-Style Semiautomatic Firearms Facts and Issues" (1992) that firearms traces are not intended to "trace guns to crime," that few "assault weapons" traced relative to violent crime investigations, and that available state and local law enforcement agency data shows relatively little use of "assault weapons" are used frequently in violent crimes.

"Assault weapons" function in the same manner as any other semi-automatic firearm. They fire once with each pull of the trigger, like most firearms. They use the same ammunition as other firearms, both semi-automatic and not. Therefore, "assault weapons" are useful for target shooting, self-defense, hunting, and other legitimate purposes, just as other firearms are.

H.R. 4296 would prohibit rifles that are commonly used for competitive shooting, such as the Springfield N1A and the Colt "AR-15."

Accessories found on some models of "assault weapons," such as folding stocks, flash suppressors, pistol grips, bayonet lugs, and detachable magazines may look menacing to persons unfamiliar with firearms, but there is absolutely no evidence that any of these accessories provide any advantage to a criminal. As has been demonstrated on many occasions, firearms which H.R. 4296 specifically exempts from its prohibition, firearms not equipped with those accessories, can be fired at the same rate, with the same accuracy, and with the same power as "assault weapons."

Time and again, supporters of H.R. 4296 have claimed that "assault weapons" can be "spray-fired from the hip"; but this is simply

**46**

not true. The firearms targeted in H.R. 4296 are not machineguns. Machineguns are restricted under the National Firearms Act of 1934. H.R. 4296's guns are semi-automatic, and fire only one shot at a time.

H.R. 4296's limitation on the capacity of ammunition feeding devices would do nothing to reduce the number of rounds available to a criminal. It has been demonstrated frequently that such devices can be switched in less than a second, so a criminal determined to have available a number of rounds greater than H.R. 4296 would permit in a single magazine would need only to possess additional smaller magazines. However, police have reportedly consistently that when criminals fire shots, they rarely discharge more than 2–5 rounds, well below the number of rounds H.R. 4296 would permit in a single magazine.

Most fundamentally, to impinge upon the constitutionally-protected rights of honest, law-abiding Americans on the basis of myth, misinformation, and newspaper headlines is a crime in and of itself. To protect against such a mockery of our Constitution and the infliction of such harm upon our citizens, I intend to oppose H.R. 4296 vigorously on the House floor in the hope that careful reflection will permit cooler heads and the light of reason to prevail.

○