## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-02680-NYW-TPO

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
CHARLES BRADLEY WALKER,
BRYAN LAFONTE,
GORDON MADONNA, and
JAMES MICHAEL JONES,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

## RESPONSE TO DEFENDANTS'
## RENEWED MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs submit the following response to Defendants' Renewed Motion for Summary Judgment [ECF 123].

## I. SUMMARY OF ARGUMENT

The resolution of this case should be simple. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court held that if a plaintiff's proposed conduct is covered by the plain text of the Second Amendment, a law regulating that conduct is presumptively unconstitutional. *Id.* at 17. The government cannot overcome this presumption simply by positing that the regulation promotes an important interest. *Id.* Rather, the burden shifts to the government to demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. *Id.* Only if the government carries that burden may a court conclude that the plaintiff's conduct falls outside the Second Amendment's "unqualified command." *Id.* (citation omitted).

Here, Plaintiffs propose to keep and possess certain semi-automatic rifles[1] and firearm magazines.[2] Under *Bruen's* plain text step, a challenger's only burden is to show that the rifles and magazines are bearable arms. See *Rocky Mountain Gun*

---

[1] These rifles are characterized as "assault weapons" in the challenged Ordinances. However, the term "assault weapon" is not a term used in the firearms industry or community for firearms commonly available to civilians. Instead, the term is a rhetorically charged political term meant to stir the passions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. However, as this is the term used in the Ordinances, Plaintiffs will use it as well rather than belabor this response with the more appropriate phrase "so-called assault weapon."

[2] The Ordinances characterize the banned magazines as "large capacity magazines." This too is a politically charged misnomer meant to stir the passions of the public against the law-abiding citizens who possess literally hundreds of millions of such magazines, which are the standard capacity magazine for many lawfully owned firearms. However, as this is the term used in the Ordinances, Plaintiffs will use it as well rather than belabor this response with the more appropriate phrase "so-called large capacity magazine."

*Owners v. Polis*, 121 F.4th 96, 116 (10th Cir. 2024), quoting *D.C. v. Heller*, 554 U.S. 570, 581-82 (2008) ("The term 'arms' within the Second Amendment encompasses 'all instruments that constitute bearable arms,' regardless of their existence at the time of the Founding."). By any measure, the rifles and magazines Plaintiffs propose to keep and bear are bearable arms. See *United States v. Bridges*, 2025 WL 2250109, at *5 (6th Cir. 2025) (all firearms are "arms" for purposes of the plain text analysis); and *Duncan v. Bonta*, 133 F.4th 852, 896 (9th Cir. 2025) (en banc) (Bumatay, J., joined by Ikuta, R. Nelson, and VanDyke, dissenting) (all magazines of any capacity are unquestionably arms under the plain text step). Thus, the Ordinances are presumptively unconstitutional.

To rebut this presumption and "pass constitutional muster, the government must demonstrate that the statute is consistent with the Nation's historical tradition of firearm regulation." *United States v. Bridges*, 2025 WL 2250109, at *6 (6th Cir. 2025) (citations and quotation marks omitted). "To do so, the government must identify a historical law that is analogous, or relevantly similar, to the challenged regulation." *Id*. (internal quotation marks and citation omitted).

Defendants have attempted to justify their arms ban by trying to demonstrate that the banned arms are "dangerous and unusual." Mot. 20. It is true that "dangerous and unusual" arms may be banned. *Heller*, 554 U.S. at 627. Under this tradition, however, a weapon may not be banned unless it is *both* dangerous and unusual." *Snope v. Brown*, 145 S. Ct. 1534, 1536 (2025) (Thomas, J., dissenting from denial of certiorari), citing *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito,

J., concurring in judgment) (emphasis in the original). However, weapons in common use today for self-defense and other lawful purposes remain fully protected. *Id.* (cleaned up), citing *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).

It follows that if a weapon is in common use, it necessarily cannot be both dangerous and unusual. *Duncan v. Bonta*, 133 F.4th 852, 903 (9th Cir. 2025) (Bumatay, J., dissenting) ("In other words, whether a weapon is 'dangerous and unusual' or 'in common use' are different sides of the same coin."). The AR-15s owned by Plaintiffs are manifestly in common use, as the Tenth Circuit recently suggested in *United States v. Morgan*, 2025 WL 2502968, at *5, n.5 (10th Cir. 2025), where it quoted with approval Justice Kavanaugh's assertion that there is a "strong argument that AR-15s are in 'common use' because 'millions of Americans own AR-15s' and they 'are legal in 41 of the 50 states.'" *Id.* at *5, n.5, quoting *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari). The banned magazines are in common use as well. While estimates vary, there are easily more than 100 million of these magazines in the country. *Duncan*, 133 F.4th at 902 (Bumatay, J., dissenting).

In summary, Defendants have failed to demonstrate that their arms bans are consistent with the Nation's historical tradition of firearm regulation. Therefore, they have failed to rebut the presumption that the Ordinances are unconstitutional.

## II. STANDING

In its order dated July 21, 2025 [Doc. 110] (the "Standing Order"), the Court ruled regarding the various Plaintiffs' standing to assert their claims in this case. Pursuant to the law of the case doctrine, the Standing Order is binding for purposes

of resolution of Defendants' motion for summary judgment. *Arizona v. California*, 460 U.S. 605, 618 (1984) (prior decisions of a court should continue to govern the same issues in subsequent stages in the same case). Therefore, Plaintiffs will not revisit the extensive factual and legal issues previously raised with respect to standing.

In the Standing Order, the Court ruled that Plaintiffs Rocky Mountain Gun Owners, National Association for Gun Rights, Bryan LaFonte, and James Michael Jones have standing to assert certain claims. Specifically, the Court ruled that standing exists for:

 a. A challenge of the Current Possession Clause of the applicable Ordinance with respect to large capacity magazines brought by:
  i. Plaintiff Rocky Mountain Gun Owners against the City of Superior, Colorado;
  ii. Plaintiffs Bryan LaFonte and Rocky Mountain Gun Owners against the City of Louisville, Colorado; and
  iii. Plaintiffs James Michael Jones, Rocky Mountain Gun Owners, and National Association for Gun Rights against the City of Boulder, Colorado;

 b. A challenge to the Future Possession Clause of the applicable Ordinance with respect to assault weapons brought by:
  i. Plaintiffs Bryan LaFonte and Rocky Mountain Gun Owners against City of Louisville, Colorado;
  ii. Plaintiffs Rocky Mountain Gun Owners and National Association for Gun Rights against the Board of County Commissioners of Boulder County, Colorado; [and]

 c. A challenge to the Future Possession of the applicable Ordinance with respect to large capacity magazines brought by:
  i. Plaintiffs Bryan LaFonte and the Rocky Mountain Gun Owners against City of Louisville, Colorado; and
  ii. Plaintiffs James Michael Jones, Rocky Mountain Gun Owners, and National Association for Gun Rights against the City of Boulder, Colorado; and
  iii. Plaintiff National Association for Gun Rights against the Board of County Commissioners of Boulder County, Colorado.

In the Standing Order, the Court ruled that Plaintiff Charles Bradley Walker and Plaintiff Gordon Madonna do not have standing. As set forth in the First Amended Complaint, Mr. Walker and Mr. Madonna reasserted their claims for the purpose of preserving them for appeal. See First Amended Complaint ("Amend. Compl.") ¶¶ 67-71. Mr. Walker and Mr. Madonna do not concede that they lack standing. However, they understand that, under the law of the case doctrine, their claims will be dismissed without prejudice for the reasons stated in the Standing Order.

### III. THE BANNED ARMS ARE PROTECTED BY THE SECOND AMENDMENT

**A.    Several Circuit Courts Have Failed to Adhere to *Heller***

The Tenth Circuit has not upheld a categorical ban of AR-15s or large capacity magazines such as the bans at issue in this case. Thus, there is no binding circuit precedent requiring this Court to do so.[3] Defendants point out that all of the circuit courts that have considered firearms bans after *Bruen* have upheld those bans. Mot. 7 and n. 5 (collecting cases). That is true. It was also true before *Bruen*, and *Bruen* held that every one of those pre-*Bruen* cases failed to apply *Heller* properly. The circuit courts in the cases cited by Defendants have failed again.

---

[3] *United States v. Morgan*, 2025 WL 2502968 (10th Cir. 2025), involved fully automatic machine guns, which are categorically different from AR-15s. See *Staples v. United States*, 511 U.S. 600, 612 (1994). Even if the relief Plaintiffs seek is foreclosed by binding precedent (which they do not concede), they advance the arguments set forth in this Response to preserve them for further review. See *United States v. Herrera-Perez*, 38 F. App'x 532, 534 (10th Cir. 2002) (citing *McKnight v. Gen. Motors Corp.*, 511 U.S. 659, 660 (1994)).

5

In *Heller*, the Court held that the Second Amendment protects arms in common use for lawful purposes. *Id*. at 624. The lower courts responded to *Heller* by resisting both its specific holding and the analytical framework it established, opting instead to establish a judge-empowering "balancing test" that weakened the Second Amendment right to the point of irrelevance. See *Association of N. J. Rifle & Pistol Clubs, Inc. v. Attorney General N. J.*, 910 F.3d 106 (3rd Cir. 2018); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106 (2nd Cir. 2020); *Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021); *National Rifle Assn. of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012); *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011); *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011); and *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

Every one of these cases got *Heller* wrong, and each was abrogated by *Bruen*, most expressly, the rest by implication. See 597 U.S. at 18-20 and n. 4. The post-

*Heller* failure of the circuit courts cannot be laid at the feet of understandable confusion about the analytical framework *Heller* established. *Heller's* "text, history, and tradition" test for assessing the constitutionality of firearms regulations and its rejection of a judge-empowering interest-balancing inquiry were obvious. *Bruen*, 597 U.S. at 22. The lower courts that ignored *Heller's* plain holding were fully aware of what they were doing, as then-judge Kavanaugh noted early on in his dissent in *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"): "*Heller* and *McDonald* leave *little doubt* that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny." *Id*. at 1271 (Kavanaugh, J., dissenting) (emphasis added). In *United States v. Rahimi*, 602 U.S. 680 (2024), Justice Gorsuch reflected on the lower courts' resistance to *Heller*: "How did the government fare under [the two-step interest-balancing] regime? In [the Ninth Circuit], it had an 'undefeated, 50–0 record.'" *Id*. at 712 (Gorsuch, J., concurring), quoting *Duncan v. Bonta*, 19 F.4th 1087, 1167 n. 8 (9th Cir. 2021) (en banc) (VanDyke, J., dissenting).

In *Bruen*, the Court called out the circuit courts' failure and emphatically demanded that they stop undermining *Heller*. The Court was particularly critical of the courts that had denied Second Amendment claims because they believed citizens do not really "need" the banned arms. The Court reminded the inferior courts that "'[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.' *Heller*, 554 U.S.

at 634 . . . 'A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.' *Ibid.*" *Id.* at 23 (emphasis in the original).

Unfortunately, *Bruen's* admonitions fell on deaf ears. According to Justice Thomas, the lower courts continue to be "bent on distorting th[e] Court's Second Amendment precedents." *Snope v. Brown*, 145 S. Ct. 1534, 1538 (2025) (Thomas, J., dissenting from denial of certiorari). So, yes, as of today, the circuit courts are unanimous in rejecting Second Amendment challenges to firearms bans. But the same thing could have been said on June 22, 2022 (i.e., the day before *Bruen* was decided), and we saw how that turned out.

Plaintiffs would understand if the Court were tempted to dismiss the above discussion as an overwrought jeremiad from Second Amendment activists. But this is not a fringe position. Plaintiffs direct the Court's attention to an amicus brief filed days ago in the Supreme Court by a solid majority (i.e., 27) of the States seeking review of the Washington Supreme Court's decision upholding a magazine ban in *State v. Gator's Custom Guns, Inc.*, 568 P.3d 278 (Wash. 2025). The State *amici* wrote:

> [I]it is time for this Court to address the *repeated defiance* of this Court's holdings, particularly in jurisdictions that have repeatedly infringed on citizens' Second Amendment rights. The evident errors below and in similar cases manifest a *deep hostility* to both the Second Amendment itself and this Court's precedents. . . . Several courts have already upheld outright bans on America's most common civilian rifle, the AR-15. Plus-ten magazines have faced similar bans, which have been upheld by the Washington Supreme Court below and other courts. *Judicial defiance*, not a careful application of the *Bruen* framework, seems to have driven these outcomes. . . . This combination of legislative and *judicial defiance* of this Court's precedents is a compounded blow to the constitutional rights of law-abiding Americans. It is again time for the Court to step in.

Brief of Amici State of Montana, *et al* in Support of Petitioners, *Gator's Custom Guns, Inc. v. Washington*, __ U.S. __, No. 25-153, at 3, 4, 12 (internal citations and quotation marks omitted; emphasis added).

Plaintiffs are confident that all of the post-*Bruen* circuit court decisions cited by Defendants are destined to be abrogated[4], just as the pre-*Bruen* decisions were. Plaintiffs are confident for two main reasons. First, like then-Judge Kavanaugh's dissent in *Heller II*,[5] many of the post-*Bruen* cases upholding arms bans have had extremely strong dissenting opinions. See, e.g., *Bianchi v. Brown*, 111 F.4th 438, 483-536 (4th Cir. 2024), cert. denied sub nom. *Snope v. Brown*, 145 S. Ct. 1534 (2025) (en banc) (Richardson, J., joined by Niemeyer, Agee, Quattlebaum, and Rushing, dissenting); *Duncan v. Bonta*, 133 F.4th 852, 891-915 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting) (cert. petition pending); and *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1206-28 (7th Cir. 2023), cert. denied sub nom. *Harrel v. Raoul*, 144 S. Ct. 2491 (2024) (Brennan, J., dissenting). We find ourselves in familiar territory. The dissenting opinions in the pre-*Bruen* cases accurately expressed the law, whereas every single one of the majority opinions got it wrong. The same is true post-*Bruen*.

Secondly, and perhaps most significantly, individual statements of several Supreme Court justices suggest that, if a case were considered today, a majority of the Court's members would likely agree with those dissenting opinions. For example,

---

[4] As noted above, Plaintiffs do not believe that any of these decisions are binding precedent that requires this Court to uphold Defendants' bans. The point of this discussion is that the Court should not even consider them as persuasive authority.

[5] *Heller II*, 670 F.3d at 1269-1296 (Kavanaugh, J., dissenting).

a couple of months ago, the Supreme Court denied certiorari in *Snope v. Brown*, 145 S. Ct. 1534 (2025). While the Court did not take that case, Justices Kavanaugh and Thomas seized the opportunity to summarize the law regarding Second Amendment challenges to gun bans, and they strongly indicated that the Fourth Circuit got it wrong.

In summary, the Supreme Court is likely to review an AR-15 ban case "in the next Term or two." *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari). And when it does, it is likely to hold such bans unconstitutional. *Id*. ("In short, under this Court's precedents, the Fourth Circuit's decision [to uphold the AR-15 ban] is questionable."). In doing so, it will abrogate (either expressly or by implication) the cases cited by Defendants.

## B.    AR-15s Are Protected by the Second Amendment

In *Heller*, the Court ruled that the Second Amendment must be interpreted in light of the Constitution's text, history, and tradition. *Id*. 554 U.S. at 576-628. The Court also held that the Second Amendment protects those weapons that are in "common use" by law-abiding citizens. *Id*., at 624, 627. Handguns are in common use by law-abiding citizens. Therefore, the Court held that the District of Columbia's ban on handguns violated the Second Amendment. *Id*., at 628–629. The Court's later Second Amendment decisions in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), did not disturb the historically based "common use" test with respect to the possession of particular weapons. See *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of

certiorari), citing *Bruen*, 597 U.S. at 47 and *Rahimi*, 602 U.S. at 735-36 (Kavanaugh, J., concurring).

Defendants assert that this case is a purely facial challenge to the Ordinances. Mot. 6. That is not correct. Plaintiffs have also brought as-applied challenges based on the Plaintiffs' particular conduct, including their possession of AR-15 rifles and similar rifles and the banned magazines. See Amend. Compl. ¶¶ 27, 28, 35, 45, and 62. Americans today possess an estimated 20 to 30 million AR–15s. *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari). And AR–15s are legal in 41 of the 50 States. *Id*. The AR–15 is the most popular civilian rifle in America. *Snope*, 145 S. Ct. 1534, 1535 (2025) (Thomas, J., dissenting from denial of certiorari). In *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025), the Court rejected Mexico's argument that it could sue the manufacturers of AR-15s because they are "military style" assault weapons. The Court rejected that argument because AR-15s are widely legal and owned by ordinary citizens. Specifically, Justice Kagan, writing for the Court, stated:

> Finally, Mexico's allegations about the manufacturers' "design and marketing decisions" add nothing of consequence. As noted above, Mexico here focuses on the manufacturers' production of "military style" assault weapons, among which it includes AR–15 rifles [and] AK–47 rifles. But those products are both widely legal and bought by many ordinary consumers. (The AR–15 is the most popular rifle in the country. See T. Gross, How the AR–15 Became the Bestselling Rifle in the U. S., NPR (Apr. 20, 2023).) The manufacturers cannot be charged with assisting in criminal acts just because Mexican cartel members like those guns too.

*Id.*, at 1569 (cleaned up; emphasis added). See also *Garland v. Cargill*, 602 U.S. 406, 429 (2024) (Sotomayor, J., dissenting) (AR-15s are "commonly available, semiautomatic rifles").

All of this means that jurisdictions that prohibit AR–15s, such as the Defendants, are "something of an outlier." *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari), citing *Staples v. United States*, 511 U.S. 600, 612 (1994) (stating that AR–15s "traditionally have been widely accepted as lawful possessions"). The Tenth Circuit agrees. In *United States v. Morgan*, 2025 WL 2502968, at *5, n.5 (10th Cir. 2025), the court quoted with approval Justice Kavanaugh's assertion in *Snope* that there is a "strong argument that AR-15s are in 'common use' because 'millions of Americans own AR-15s' and they 'are legal in 41 of the 50 states.'" *Id*. at *5, n.5, quoting *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari) (contrasting AR-15s with machine guns).[6] See also *Heller II*, 670 F.3d at 1286–1288 (Kavanaugh, J., dissenting) (AR-15s are in common use and protected by the Second Amendment).

Moreover, under the Supreme Court's Second Amendment precedents, it is analytically difficult to distinguish the AR–15s at issue here from the handguns at issue in *Heller*. *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari). AR–15s are semi-automatic, but so too are most handguns. *Id*. Law-

---

[6] The court also stated that "[u]nlike stun guns in *Caetano* and AR-15s in *Snope*, the lawful possession of machineguns is strictly limited, undermining Mr. Morgan's argument that machineguns are in common use." *Id*. at *7. This statement makes sense only if the reverse is also true, i.e., the widespread lawful possession of AR-15s in the vast majority of states leads to the conclusion that they are in common use.

abiding citizens use both AR–15s and handguns for a variety of lawful purposes, including self-defense in the home. *Id*. Criminals use both AR–15s and handguns, as well as a variety of other lawful weapons and products, in unlawful ways that threaten public safety. *Id*. However, handguns can be more easily carried and concealed than rifles, and handguns—not rifles—are used in the vast majority of murders and other violent crimes that individuals commit with guns in America. *Id*.

The question in this case is whether the Second Amendment allows Defendants to ban "the most popular civilian rifle in America." *Snope*, at 535 (Thomas, J., dissenting from denial of certiorari). Second Amendment plaintiffs have the initial burden of showing that Constitution's "plain text covers [their] conduct." *Id*., citing *Bruen*, 597 U.S. 1, 17. Once a challenger makes that showing, "the Constitution presumptively protects [his] conduct," and the burden shifts to the government to "demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. 1, 17. If the government fails to make that showing, the restriction must be deemed unconstitutional. Ibid.

Defendants' categorical prohibition on AR–15s does not pass muster under this framework. *Snope*, at 1535 and 1538 (Thomas, J., dissenting from denial of certiorari). To start, AR–15s are clearly "Arms" under the Second Amendment's plain text. *Id*. In *Heller*, 554 U.S. at 581, the Court has held that the term "Arms" covers all "'[w]eapons of offence, or armour of defence.'" See also ibid. (explaining that "Arms" include "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another'"). Thus, "the Second Amendment extends, prima

facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.*, at 582; accord *Rahimi*, 602 U.S. at 691; *Bruen*, 597 U.S., at 28; *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam). AR–15s fall squarely within this category. *Snope*, at 1535 (Thomas, J., dissenting from denial of certiorari).

AR–15s are covered by the plain text. Therefore, the burden shifts to Defendants to show that banning AR–15s is "consistent with this Nation's historical tradition of firearm regulation." *Id.*, at 1535-36, citing *Bruen*, 597 U.S. at 17. But there is no "historical regulation" that could serve as "a proper analogue" to Defendants' ban. *Id.* Defendants invoke the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." Mot. 20. Under this tradition, however, "[a] weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.*, citing *Caetano*, 577 U.S. at 417 (Alito, J., concurring in judgment) (emphasis in the original). However, weapons in common use today for self-defense and other lawful purposes remain fully protected. *Id.* (cleaned up), citing *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). "In other words, whether a weapon is 'dangerous and unusual' or 'in common use' are different sides of the same coin." *Duncan v. Bonta*, 133 F.4th 852, 903 (9th Cir. 2025) (Bumatay, J., dissenting).

AR–15s appear to fit neatly within the "common use" category of protected arms. *Id.* Tens of millions of Americans own AR–15s, and the "overwhelming majority" of them "do so for lawful purposes, including self-defense and target shooting." *Id.*, quoting *Friedman v. Highland Park*, 577 U.S. at 1042 (2015) (Thomas,

J., joined by Scalia, J., dissenting from denial of certiorari); and *Harrel v. Raoul*, 144 S.Ct. 2491, 2491–92 (2024) (Thomas, J., statement respecting denial of certiorari). And the prohibition of an entire class of arms that is overwhelmingly chosen by American society for lawful purposes falls outside the government's power. *Id.* (cleaned up) citing *Heller*, 554 U.S. at 628.

Despite all of this, in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024), the court held that AR-15s may be banned as "dangerous and unusual" weapons. *Id.*, at 450, 454–459. Defendants in this case urge the Court to follow this reasoning. However, the Court should not do so because that "reasoning is dubious at least twice over." *Snope*, at 1536 (Thomas, J., dissenting from denial of certiorari): (1) *Bianchi* placed too high a burden on the challengers to show that the Second Amendment presumptively protected their conduct, and (2) its determination that AR–15s are dangerous and unusual does not withstand scrutiny. *Id.*

The Fourth Circuit erred when it held that challengers must prove that the Second Amendment protects their right to own AR–15s—or, in the terms of the Court's Second Amendment jurisprudence, that their conduct falls outside the historical exceptions to the right to keep and bear arms. *Id.* A challenger only needs to show that the plain text of the Second Amendment covers his conduct. *Id.*, citing *Bruen*, 597 U.S., at 32. This burden is met if the law at issue regulates Americans' arms-bearing conduct. *Id.*, citing *Rahimi*, 602 U.S., at 691. Once the challenger makes this initial showing, the burden shifts to the government to demonstrate that a historic limit on the right to bear arms nevertheless justifies its regulation. *Id.*

Thus, *Bianchi* "placed the burden of producing historical evidence on the wrong party." *Id.*, at 1537.

The Fourth Circuit's error is "plain" under the Supreme Court's precedents. *Id.* In *Bruen*, the Court had "little difficulty" determining that "the plain text of the Second Amendment" encompasses "carrying handguns publicly for self-defense." *Id.*, quoting *Bruen*, 597 U.S., at 32. The Court considered the historical limits on the right to bear arms only to determine whether the State had met its burden of proving that its regulation was historically justified. *Id.*, citing *Bruen*, at 34–70. Likewise, in *Rahimi*, the Court found it self-evident that a law prohibiting individuals subject to domestic-violence restraining orders from possessing firearms "regulates arms-bearing conduct." *Id.*, citing *Rahimi*, 602 U.S., at 691, 693. The Court again considered historical limits only after shifting the burden of proof to the Government. *Id.*, citing *Rahimi*, at 693–702.

In summary, treating the Second Amendment like other constitutional provisions, the Court has similarly placed the burden on the government to show that a regulation of arms-bearing conduct falls outside the Second Amendment's protection. *Id.* (cleaned up). And under *Bruen's* plain text step, a challengers' only burden is to show that AR–15s are bearable "Arms"—i.e., weapons of offence. *Id.* (cleaned up). "By any measure, they are." *Id.*

The Fourth Circuit also erred when it held that AR–15s fall within the historic exception for dangerous and unusual weapons. Weapons in common use are fully protected, *id.*, but the circuit court nevertheless eschewed any inquiry into the

commonality of AR–15s and the purposes for which they are used, which it dismissed as an "ill-conceived popularity test." *Id.*, citing *Bianchi,* 111 F.4th at 460. Instead, the court performed its own independent investigation of AR–15s' "utility for self-defense," examining their "military origin," "firepower," and "muzzle velocity," among other features. *Id.*, citing *Bianchi,* 111 F.4th at 454–459. But "the Constitution allows the American people—not the government—to decide which weapons are useful for self-defense." *Id.* "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Heller,* 554 U.S., at 634. The Court has never relied on its own assessment of how useful an arm is for self-defense before deeming it protected. *Snope,* at 1537-1538 (Thomas, J., dissenting from denial of certiorari). In *Heller,* the Court found handguns protected because that "class of arms is overwhelmingly chosen by American society for the lawful purpose of self-defense. *Id.*, at 1538, citing *Heller,* at 628 (cleaned up). In *Caetano,* the Court recognized that stun guns were protected arms solely because they were not unusual; it did not address the state court's holding that stun guns were "dangerous per se at common law." *Id.*, citing *Caetano,*" 577 U.S., at 412; accord, *id.*, at 417 (Alito, J., concurring); and *Bruen,* 597 U.S., at 28. In *Bruen,* the Court found handguns are protected solely because they are in common use today for self-defense, without inquiring whether they are in fact useful for that purpose. *Id.*, at 32. In summary, "the scope of the right to bear arms cannot turn on judicial speculation about the American people's self-defense needs." *Snope,* at 1538 (Thomas, J., dissenting from denial of certiorari). Otherwise, the courts might allow "the government [to] depriv[e]

Americans of the rifle that they most favor for protecting themselves and their families." *Id.*

## C.    Tens of Millions of AR-15s are Possessed in the United States

The Court struck Plaintiffs' expert report regarding numerical estimates. *Rocky Mountain Gun Owners v. Town of Superior*, 2024 WL 3496824, at *5 (D. Colo. 2024). Nevertheless, Plaintiffs have admissible evidence regarding numerical estimates of AR-15s. *Defendants's expert* Louis Klarevas estimates that there are 24.4 million rifles similar to AR-15s and AK-47s in the United States. *Id.* Mot. Ex. K [Doc 123-11], 11. That evidence is admissible against Defendants both at the summary judgment stage and at trial.

Indeed, that identical evidence already has been admitted against government defendants in two cases. *Miller v. Bonta*, 699 F. Supp. 3d 956, 967 (S.D. Cal. 2023), was a summary judgment case. There, the court stated: "Americans today own 24.4 million modern rifles (i.e., AR-15 platform and AK-47 platform rifles)." *Id.* at 967 and n.12 (citing Klarevas expert report as the basis for the court's finding of fact). In *Barnett v. Raoul*, 756 F. Supp. 3d 564 (S.D. Ill. 2024), the parties went to trial. That case was decided in a similar posture to this case in that the court struck the Plaintiffs' numerical estimate witnesses.[7] Nevertheless, the court was able to find based on a report submitted by Klarevas that millions of AR-15s are in circulation. Specifically, the court found: "[T]he Government's own expert [i.e., Klarevas]

---

[7] See *Barnett v. Raoul*, 2024 WL 4719468 (S.D. Ill. 2024).

indicated that, at minimum, *millions* of Americans own AR-15s at this very moment." *Id*. at 626 (emphasis in the original).

This same evidence is before the Court in this case. Indeed, for purposes of resolving Defendants' motion for summary judgment, the evidence is not even disputed, because it is the Defendants' own evidence. Accordingly, this issue of material fact must be resolved against Defendants.

**D.    The Common Use Issue Cannot Be Resolved Against Plaintiffs on Summary Judgment**

The Court may grant Defendants' motion for summary judgment only if there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Lazy S Ranch Props., LLC v. Valero Terminaling & Distribution Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). Most of this response has been dedicated to showing why Defendants are not entitled to judgment as a matter of law. However, Defendants' motion founders on an independent ground – i.e., there are genuine issues of material fact. An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Lazy S Ranch Props.*, 92 F.4th at 1198 (citations and quotation marks omitted). "[I]mportantly, a court views the facts and their reasonable inferences in the light most favorable to the nonmovant." *Id*. The Court may not weigh the evidence, make credibility determinations, or assess the credibility of conflicting testimony at the summary judgment stage. *Id*. The Court must resolve disputed factual issues in Plaintiffs' favor unless Plaintiffs' facts are

"blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Id*. (internal citation and quotation marks omitted).

Given these considerations, the material factual issue of whether AR-15s are in common use cannot be resolved against Plaintiffs at the summary judgment stage. The common use issue is obviously a factual inquiry, and in *United States v. Morgan*, 2025 WL 2502968 (10th Cir. Sept. 2, 2025), the Tenth Circuit identified three factors for evaluating this factual issue. The court stated: "[I]n determining common use, courts [1] have counted weapons; [2] considered common-sense weapons use, and [3] compared laws of other states." *Id*. at *5.

Plaintiffs have adduced evidence regarding all of these factors. They have counted weapons, and presented admissible evidence that there are over 24 million AR-15s in circulation. See *supra* Section III.C. The fact that Plaintiffs have demonstrated that the overwhelming majority of the rifles are used for lawful purposes. See infra Section IV.H. Finally, as the Tenth Circuit has already noted, AR-15s are legal in the overwhelming majority of states. *Morgan*, 2025 WL 2502968, at *5, n.5.

In summary, Plaintiffs have produced credible evidence on all three *Morgan* factors. Indeed, based on the evidence that Plaintiffs have adduced, the Tenth Circuit has already stated that they would have a "strong argument that AR-15s are in common use." *Id*., at *5, n.5. At the very least, Plaintiffs' facts regarding common use are not "blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Lazy S Ranch Props*., *supra*. Surely, therefore, that factual issue cannot be

resolved against them at this stage of the litigation. And since that issue is critical for Defendants' motion, that motion must be denied.

### E.    The Banned Magazines Are Protected by the Second Amendment

Magazines—whether they hold ten rounds, more than ten rounds, or fewer than ten rounds—are unquestionably "Arms" under the Second Amendment. *Duncan v. Bonta*, 133 F.4th 852, 896 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting). The term "Arms" "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. At a minimum, the meaning of "Arms" "covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28.

Any dispute regarding the facts set forth in this paragraph (to the extent they are disputed) must be resolved in Plaintiffs' favor. In his expert declaration[8], Mr. Passamaneck stated that a magazine is not merely a box in which ammunition is stored; rather, it is a dynamic component that performs a function in any semi-automatic firearm. Passamaneck Declaration, 4-5. Without a magazine, the operation of a semi-automatic firearm in semi-automatic firing mode is impossible. *Id*. The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id.* If there is no

---

[8] Doc. 76-11. In its order granting Defendants' motion to partially strike Mr. Passamaneck's report, the Court struck the report regarding numerical estimates only. It did not strike the part of the report regarding the technical aspects of magazines. *Rocky Mountain Gun Owners v. Town of Superior*, 2024 WL 3496824, at *5 (D. Colo. 2024).

magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id*. Thus, without magazines, semi-automatic firearms would not exist. *Id*.

Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 118 (10th Cir. 2024), quoting *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Even the *Duncan* majority recognized this principle when it stated that "for the right to bear arms to have meaning, the Amendment's text must carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Duncan v. Bonta*, 133 F.4th 852, 866 (9th Cir. 2025). The Duncan majority also held that this principle applies to detachable magazines. The court stated that "the Second Amendment's text necessarily encompasses the corollary right to possess a magazine for firearms that require one, just as it protects the right to possess ammunition and triggers." *Id*. at 867-68.[9]

Thus, the plain text of the Second Amendment protects the possession of magazines capable of feeding more than ten rounds, and Defendants' ban is "presumptively unconstitutional." *Duncan v. Bonta*, 133 F.4th 852, 901 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting). To rebut this presumption, California must

---

[9] The *Duncan* majority's opinion is confusing. *Duncan's* core holding was that certain magazines are covered by the text and others are not. Plaintiffs will address this startling conclusion below. For current purposes, the point is that even the Ninth Circuit conceded that magazines essential to the operation of semi-automatic firearms are covered by the text.

justify its regulation by proving that its ban fits within our "historical tradition of firearm regulation." *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 17, 24).

Defendants cannot carry this burden because they cannot possibly demonstrate that large capacity magazines are weapons that may be banned under the tradition of banning "dangerous and unusual" weapons. *Id*., 133 F.4th at 901-902. The magazines Defendants ban are the furthest thing from unusual. *Id*., at 902. Indeed, firearms with magazines holding more than ten rounds are the overwhelming choice of Americans for self-defense and other lawful purposes. *Id*. Easily more than 100 million of these magazines exist in the country. *Id*. According to one estimate, these magazines account for half of all American magazines—that's 115 million out of 230 million magazines in circulation today. *Id*., citing *Duncan VIII*, 695 F. Supp. 3d at 1217. The *Duncan* majority opinion did not dispute these numbers. *Duncan*, 133 F.4th at 862 (conceding that approximately half of magazines in the nation have a capacity greater than 10). These conclusions are consistent with this Court's conclusions in *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050 (D. Colo. 2014), vacated and remanded, 823 F.3d 537 (10th Cir. 2016), in which the court found that "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions . . . [and] semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense." *Id*. at 1068.

## IV.  DEFENDANTS' ERRORS

In this section, Plaintiffs will address the numerous errors of law Defendants made in their motion.

### A.    The Court Should Reject Defendants' Invitation to Engage in Interest Balancing

If one thing is clear from *Bruen*, it is that courts are forbidden from engaging in means-end scrutiny (or "interest balancing" as it is sometimes called) in the Second Amendment context. *Bruen*, 597 U.S. at 19; see also *id*. at 29 n.7 (the historical analysis does not give courts license to "engage in independent means-end scrutiny under the guise of an analogical inquiry . . . Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances . . . It is not an invitation to revise that balance through means-end scrutiny"). Even when a ban has been upheld, the courts have given at least lip service to this principle. "*Bruen* makes clear that the question whether a burden is comparably justified cannot be answered by pointing to the gravity of the harms the legislation was designed to avert and the appropriateness of the mechanism they adopt." *Bevis*, 85 F.4th 1175, 1200 (7th Cir. 2023) (internal quotation and citation omitted). Nevertheless, in their motion, Defendants request the Court to perform an extensive analysis balancing the public safety implications of the banned weapons against the government's assessment of whether Plaintiffs really "need" those weapons. Mot. 14-17; 20-21. The Court should decline this invitation.

**B.      Defendants Have Failed to Identify a Historical Tradition of Banning These Weapons**

Defendants have identified several historical regulations that they assert are analogous to their arms bans. Mot. 24-39. But as Justice Thomas noted in *Snope*, none of these regulations establishes such a tradition. He stated: "The Fourth Circuit also purported to hold in the alternative that, assuming that AR–15s are protected arms, banning them is consistent with a national tradition of responding to the 'threats posed by excessively harmful arms with responsive and proportional legislation.'" *Snope*, 145 S. Ct. 1539, fn. (Thomas, J., dissenting from denial of certiorari), quoting *Bianchi*, 111 F.4th at 464. Justice Thomas continued: "To support the existence of this tradition, the Fourth Circuit identified several 19th-century laws prohibiting certain easily concealable weapons like pistols, dirks, sword canes, and Bowie knives. See *id.*, at 466–467. But, the court nowhere attempted to explain why these laws were not simply instances of States prohibiting dangerous and unusual weapons not in common use for self-defense. As the dissent noted, when these laws were challenged, 19th-century courts evaluated them based on 'whether the regulated weapon was in common use for lawful purposes.' See *id.*, at 510–513, 533– 534 (opinion of Richardson, J.)."

In the *Bianchi* opinion to which Justice Thomas referred, Judge Richardson dismantled the very evidence relied upon by the majority in that case and the Defendants in this case.[10] The nineteenth century saw improvements in weapons technologies and increased interpersonal violence. See, e.g., Mot. 44, ¶ 49. This

---

[10] All citations to *Bianchi* in this section will be to that dissenting opinion.

prompted widespread legislative responses to the dangers posed by the sale, possession, and carry of weapons considered particularly "dangerous" or "deadly." *Bianchi*, 111 F.4th at 508. Between 1800 and 1860, at least six jurisdictions outlawed the possession, sale, or exchange of weapons like pistols, Bowie knives, or slung-shots. *Id*. At least four jurisdictions taxed the ownership or sale of such weapons. *Id*. And at least seven jurisdictions prohibited the concealed carry of dangerous weapons, while about four jurisdictions prohibited all carry—concealed or open—of dangerous weapons. *Id*. at 508-09. From Reconstruction through the end of the nineteenth century, at least nine jurisdictions passed statutes outlawing the possession, sale, or exchange of dangerous weapons; six jurisdictions taxed their ownership or sale; at least twenty-three jurisdictions prohibited the concealed carry of dangerous weapons; and at least ten jurisdictions prohibited all carry of such weapons. *Id*. at 509.

It is important to remember that historic regulations are relevant only insofar as they evince constitutional principles that undergird the right. *Id*. at 510, citing *Rahimi*, 602 U.S. at 692. In determining such principles, courts should consider how contemporary courts passed on the constitutionality of those laws. *Id*., citing *Bruen*, 597 U.S. at 27. Both *Heller* and *Bruen* relied extensively on such state court decisions. *Id*., citing *Heller*, 554 U.S. at 629 and *Bruen*, 597 U.S. at 52–55, 64–66, 68 and n.30.

Throughout the nineteenth century, state courts often entertained challenges to the statutes cited by Defendants. *Id*. Many of these decisions upheld various statutes because they merely regulated the *manner of carrying these weapons*, without considering whether *their possession or carry* could be completely prohibited.

26

*Id.* (emphasis added). Other decisions considered the kinds of arms citizens could be prohibited from keeping or carrying, and when drawing that line, the courts generally distinguished between "dangerous and unusual" weapons and common weapons. *Id.*

For example, in *Aymette v. State*, 21 Tenn. 154 (1840), the Tennessee Supreme Court explained that the right to keep and bear arms protects those arms "usually employed in civilized warfare[ ] and that constitute the ordinary military equipment." 21 Tenn. at 157–58. The court concluded that the legislature may "regulat[e] the manner in which [such] arms may be employed," but it may not totally prohibit their use. *Id.* at 159. However, the right does not protect "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Id.* at 158. Applying these principles, the court upheld the conviction in that case since the statute prohibited concealed carry of a Bowie knife—a weapon the court deemed uncommon for lawful purposes and closely associated with criminal activity. See *id.* at 161–62.

In *Andrews v. State*, 50 Tenn. 165 (1871), the court recognized that the right to keep and bear arms only protects "the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties as well as of the State." *Id.* at 179 (including "the rifle of all descriptions, the shot gun, the musket, and [the] repeater"). The uses of common arms could be regulated "to subserve the general good" (such as to prevent crime), but their possession and carry could not be completely prohibited, for "[t]he power to regulate does not fairly mean the power to prohibit; on the contrary, to regulate, necessarily

involves the existence of the thing or act to be regulated." *Id*. at 179–81. The court then applied these principles to the statute before it. The court upheld the prohibition on carrying dirks, sword canes, Spanish stilettos, and pistols, since, under *Aymette*, these were uncommon for lawful purposes and closely associated with criminal activity. *Id*. at 186. But the court found that the statute potentially included military revolvers—i.e., weapons commonly owned for public defense—within its reach. *Id*. If so, then "the prohibition of the statute is too broad to be allowed to stand," since it would completely prohibit the bearing of a protected arm. *Id*. at 187–88.

*State v. Duke*, 42 Tex. 455 (1875), involved a constitutional challenge to a Texas statute prohibiting the carry of "deadly" weapons, including pistols, unless the person had reasonable grounds to fear an immediate and pressing attack on his person. The court explained that the right protects "such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State." 42 Tex. at 458. The court's definition thus encompassed arms common for public and private defense.

Finally, in *Fife v. State*, 31 Ark. 455 (1876), the court upheld a man's conviction for openly carrying a pocket pistol. Relying on *Aymette*, the court found that "the arms which [the Second Amendment] guarantees American citizens the right to keep and to bear, are such as are needful to, and ordinarily used by a well regulated militia, and such as are necessary and suitable to a free people, to enable them to resist oppression, prevent usurpation, [and] repel invasion." 31 Ark. at 458. But the pistol in question was "not such as is in ordinary use, and effective as a weapon of war, and

useful and necessary for 'the common defense.'" *Id*. at 461. Instead, it was "such as is usually carried in the pocket, or of a size to be concealed about the person, and used in private quarrels and brawls." *Id*. The court concluded that the legislature could completely prohibit the carry of such firearms "without any infringement of the constitutional right of the citizens of the State to keep and bear arms for their common defense." *Id*. at 462.

All four of these courts assessed the challenged statutes according to the same principle – whether the regulated weapon was in common use for lawful purposes. *Bianchi*, 111 F.4th at 513. If it was, the government could regulate the possession or carry of that weapon, but it could not completely ban it. *Id*. Yet if that weapon was not in common use for lawful purposes, and if the weapon was particularly useful for criminal activity, then the government could outlaw it. *Id*. With possibly two outlying exceptions, every court that considered the types of arms that could be prohibited coalesced around this basic principle. *Id*. The courts widely concurred that the government can prohibit particular weapons only if they are *both* (1) particularly useful for criminal activity, and (2) not common for lawful purposes. *Id*. at 514 (citation omitted). The courts broadly concluded that the government can regulate, but cannot prohibit, the keeping or bearing of arms commonly used for lawful purposes. *Id*.

Judge Richardson's analysis is supported by a common sense reading of *Bruen*, where the dissent pointed to the same Bowie knife/dirk/pocket pistol laws cited by Defendants and argued that those laws established a historical tradition of barring

public carrying of weapons. See *Id.*, 597 U.S. at 124 (Breyer, J., dissenting). The *Bruen* majority obviously did not agree. If those laws did not even establish a tradition of prohibiting *carrying weapons*, *a fortiori* they did not establish a tradition of categorically prohibiting *possessing weapons*.[11]

In summary, the weapons banned by Defendants are in common use for lawful purposes. None of the historical regulations identified by Defendants categorically banned the mere possession of such weapons for lawful purposes. Therefore, the Defendants have failed to carry their burden under *Bruen* step two.

**C.    The Court Should Reject Defendants' Attempt to Transmogrify the Phrase "Dangerous and Unusual" into "Unusually Dangerous"**

*Heller* held that "dangerous and unusual" arms may be banned. *Id.*, 554 U.S. at 627. As discussed above, Defendants have no hope of proving the AR-15s and magazines they have banned are dangerous and *unusual*, because they are plainly in common use by millions of Americans. Recognizing this obvious fact, Defendants have tried to end-run *Heller* by means of linguistic alchemy. With their lexical sorcerer's stone, they have transmogrified the base metal phrase "dangerous and unusual" into the golden phrase "unusually dangerous." Mot. 20.

This will not do. As a matter of simple grammar, the phrase "unusually dangerous" is not even remotely synonymous with the phrase "dangerous and unusual." More importantly, the Court should reject Defendants' argument because

---

[11] The discussion in this section has primarily debunked Defendants' reliance on laws regulating pistols, bladed weapons, and clubs. Defendants' reliance on laws regulating "trap guns" and gunpowder are "even more far afield" for the reasons explained by Judge Bumatay. *Duncan*, 133 F.4th at 907-909 (Bumatay, J., dissenting).

it is a thinly disguised gambit to resurrect the means-end scrutiny banned by *Bruen*. Defendants argue that the banned weapons are too dangerous when weighed against their benefits for self-defense. That is interest-balancing no matter how one cuts it.

This is easy to demonstrate. How would this Court know whether Defendants are correct, i.e., that the banned weapons are too dangerous for self-defense purposes? It would have to evaluate Defendants' expert evidence and decide if the dangerousness of the weapons demonstrated by that evidence makes the banned weapons unsuitable for self-defense. But that is exactly the sort of "difficult empirical judgment[]" about "the costs and benefits of firearms restrictions" that *Bruen* said this Court cannot make. *Id.*, 597 U.S. at 25. This is why the "relative dangerousness" of a weapon in common use is irrelevant to the constitutional analysis. 577 U.S. at 418 (Alito, J., concurring in the judgment). And it is also why Plaintiffs have not introduced any "dangerousness" evidence to counter Defendants' evidence (which they easily could have done). Such evidence is simply not relevant.

**D.    Defendants Misunderstand *Heller's* Statements Regarding "Military Service"**

Defendants attempt to justify their ban by arguing that the banned weapons could be used for military applications. Mot. 17-19. This argument betrays a fundamental misunderstanding of *Heller's* allusion to arms "most useful in military service." See *Heller*, 554 U.S. at 627. In the passage from *Heller* cited by Defendants, the Court held that specialized military arms like M16 machine guns "that are highly unusual in society at large" are not protected for civilian use by the Second Amendment. *Heller*, 554 U.S. at 627. *See also id.* at 625 (contrasting machine guns,

31

which may be banned, with weapons in common use which may not be banned). *Heller* said the opposite of what Defendants argue. Militias fight wars.[12] It would be anomalous indeed if the Second Amendment did not protect the right to bear arms that could be used for that purpose. "*Miller* and *Heller* [merely] recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use." *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring). *See also Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting) (calling an arm a "weapon of war" is irrelevant, because under *Heller* "weapons that are most useful for military service" does not include "weapons typically possessed by law-abiding citizens."). Defendant's assertion that semi-automatic AR-15s can be banned because they are similar to fully automatic M16s is also wrong. In *Staples v. United States*, 511 U.S. 600 (1994). There, the Court contrasted machineguns such as the M16 with semi-automatic weapons such as the AR-15 and noted that the latter "traditionally have been *widely accepted as lawful possessions*." *Id.*, at 612 (emphasis added).

### E.    A Magazine is Not a Mere Ammunition Storage Box

Defendants cite the opinion of Dennis Baron, an expert on "corpus linguistics," to argue that a firearm magazine is just a box that stores ammunitions. Mot. 22-24. This argument borders on silly. Professor Baron's evidence proves nothing of any

---

[12] The Fifth Amendment refers to when the militia is "in service in *time of War*." (emphasis added).

relevance to the Second Amendment analysis. Instead, it demonstrates why the "counting words" approach of corpus linguistics advocates like Baron is all but worthless for constitutional analysis.[13] Indeed, in *Heller,* Justice Scalia described the conclusions drawn by the dissent based on Baron's and his colleagues' work as "worthy of the Mad Hatter." *Id.*, 554 U.S. at 589. Nothing has changed since then.

If a magazine were merely a box containing ammunition, no one would argue that it is an arm. But that is obviously not the case. Instead, as discussed in detail above, magazines are dynamic components that are essential to the operation of semiautomatic firearms. As the Third Circuit has stated, magazines actively "feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, [therefore] magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018), abrogated on other grounds by *Bruen*. Accordingly, the conclusions Defendants reached based on Professor Baron's corpus linguistics evidence are unsound.

**F.    The Common Use Issue is Resolved at *Bruen* Step Two**

*Morgan* appeared to assume that the "common use" issue is resolved at Bruen step one. Plaintiffs believe that the issue should be resolved at step two. It does not matter for purposes of this motion, because Plaintiffs should prevail either way. Nevertheless, Plaintiffs make the arguments in this section for the purposes of preserving them. The common use issue is more appropriately resolved at *Bruen* step

---

[13] *See generally* Mark W. Smith & Dan M. Peterson, *Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, 70 Drake L. Rev. 387 (2022).

two, for the reasons set forth by Judge Bumatay in *Duncan* (see *id.*, 133 F.4th at 900–01 (Bumatay, J., dissenting)) and Judge Brennan in *Bevis* (see *id.*, 85 F.4th at 1209 (Brennan, J., dissenting)).

## G.    The Court Should Reject Defendants' Cramped View of the Right to Self Defense

Defendants assert that the banned weapons are rarely fired in actual self-defense situations, and therefore they are not commonly actually used for self-defense. Mot. 13. They are wrong for two reasons. First, self-defense is not limited to defense against criminal attacks. Secondly, the phrase "commonly used" is not synonymous with the phrase "commonly fired."

In *Rahimi*, the Court noted that the right to use arms in self-defense is not restricted to defense against criminal attacks. The Court stated:

> We have held that the right to keep and bear arms is among the fundamental rights necessary to our system of ordered liberty. Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense. The spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to seize the local farmers' arms and powder stores. In the aftermath of the Civil War, Congress's desire to enable the newly freed slaves to defend themselves against former Confederates helped inspire the passage of the Fourteenth Amendment, which secured the right to bear arms against interference by the States. As a leading and early proponent of emancipation observed, "*Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty*." Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens).

*Id.*, 602 U.S. at 690 (selected citations and quotation marks omitted; emphasis added).

*Rahimi's* reference to Lexington and Concord and Congress's desire to assist newly freed slaves' defense against former Confederates pointed to an aspect of the right to self-defense that the Defendants completely ignored—the right to resistance. As *Rahimi* noted, the pre-existing right to self-defense codified in the Second Amendment is based on the English common-law tradition. *Id. Heller* summarized that tradition as follows:

> By the time of the founding, the right to have arms had become fundamental for English subjects. Blackstone, whose works, we have said constituted the preeminent authority on English law for the founding generation, cited the arms provision of the Bill of Rights as one of the fundamental rights of Englishmen. It was, he said, the natural right of *resistance and self-preservation* and the right of having and using arms for *self-preservation and defence*. Other contemporary authorities concurred. Thus, the right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against *both public and private violence*.

*Heller*, 554 U.S. at 593–94 (internal citations and quotation marks omitted; emphasis added).

One immediately notices that the common-law right to self-defense was described using doublets that encompassed the two different components of the right, i.e., "resistance and self-preservation" and "self-preservation and defence." Using a similar doublet, *Heller* summarized the right as the right to defend against "both public and private violence." By using the word "both" in that sentence, *Heller* was emphasizing that the right to self-defense encompasses the right to defend against two different kinds of violence. But in their effort to cabin *Heller*, Defendants have elided completely the first kind of violence to which *Heller* referred. Yes, the right to keep and bear arms encompasses the right to defend against a criminal attack

(private violence). But it also encompasses the right to defend against government tyranny as at Lexington and Concord and the unchecked predations of lawless mobs such as those encountered by the newly freed slaves (public violence).

*Rahimi* brought both kinds of violence described by *Heller* into focus when it quoted Representative Stevens' statement: "'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.' Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)." *Rahimi, Id*., 602 U.S. at 690. Representative Stevens used two sentences to describe the evil of disarming citizens. In the first sentence he referred to taking away the means of defending life—i.e. depriving citizens of their right of self-preservation. This is evil because (using *Heller's* terms) it deprives them of the means to defend against private violence.

Representative Stevens then referred to taking away citizens' "inalienable right of defending liberty." Surely, he was alluding to the Declaration of Independence, which states that men are "endowed by their Creator with certain unalienable Rights." The Declaration's purpose was to justify separation from England because the "present King" had sought "establishment of an absolute Tyranny over these States." The Declaration stated that men have a natural right to resist such tyranny. Thus, by invoking the Declaration, Representative Stevens was referring to the inalienable natural right of "resistance." In *Heller's* terms, he was referring to the right to defend against public violence. *Rahimi* could have quoted only Stevens' first sentence. Instead, it quoted both sentences because the Court

36

intended to re-emphasize the second aspect of the right to keep and bear arms—the right to defend against public violence.

In *Bianchi*, Judge Richardson was correct about this as well. He wrote that the right "of having arms" set forth in the English Bill of Rights is derived from "the natural right of resistance and self-preservation." *Bianchi*, 111 F.4th 438, 486-87 (Richardson, J., dissenting), citing 1 William Blackstone, *Commentaries on the Laws of England* \*136. The right is an "auxiliary right" which served to protect the three great and primary rights of personal security, personal liberty, and private property. *Id*., at 487, citing 1 Blackstone, *supra*, at \*136, \*139; and 2 J.L. de Lolme, *The Rise and Progress of the English Constitution* 886–87 (1784) (A. Stephens ed., 1838). The right ensured Englishmen the right to personal defense, but it also allowed them to defend against government violations of their rights. *Id*., citing 1 Blackstone, *supra*, at \*139 and Granville Sharp, *Tracts Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 27 (3d ed. 1782). Judge Richardson correctly concluded as follows:

> At its most basic level, that right guarantees that "the people" can have and carry arms in defense of themselves and their communities. Self-defense, in other words, is [the Second Amendment's] foundational purpose. *But self-defense can be individual or collective.* And the Second Amendment expressly ensures that the people can preserve "the security of a free State"—that is, a "free country" or "free polity"—should their government ever threaten their inviolable liberties. Individual and communal self-defense against both foreign and domestic threats were thus the purposes enshrined in the Second Amendment upon ratification. That text still being law, they remain the Amendment's purposes to this day.

*Id*., 111 F.4th at 492–93.

The Defendants' conception of the overall right to self-defense is cramped, excluding as it does the vital aspect of collective self-defense. Moreover, their conception of the right to defend against private violence is also radically blinkered. Defendants assert (or at least imply) that weapons are used in self-defense only those times they are actually employed in particular self-defense situations. Mot. 13. This is not the case because the phrase "commonly used" is not synonymous with the phrase "commonly fired," as Gordon Madonna's experience illustrates. Mr. Madonna was a law enforcement officer for over 40 years. Madonna Dec. [Doc. 76-10] ¶ 15. During his 40-plus-year career as a police officer, he was always armed while he was on duty. *Id*. ¶ 16. He discharged his firearm against a suspect only once during his career. *Id*. ¶ 17. However, he was constantly armed for the purpose of both actual and possible confrontation with an assailant. *Id*. ¶ 18. Thus, he was constantly using his firearm for self-defense even when he was not discharging it or brandishing it. *Id*.

The term "use" covers both the times a firearm is discharged as well as the possession of the firearm for a purpose even it is not actually fired. *See Duncan v. Bonta*, 2023 WL 6588623, at *10 (9th Cir. Oct. 10, 2023) (Bumatay, J., dissenting). The same is true on the other side of the law. Criminal statutes do not require a firearm to be discharged in order for it to be "used" in a crime. *See, e.g., Smith v. United States*, 508 U.S. 223 (1993). Defendants' position is like saying a person does not use her seatbelt unless she crashes or she never used her alarm system if a burglar never set it off. The word "use" requires consideration of context. *Bailey v. United States*, 516 U.S. 137, 143 (1995) (someone can "use" a gun to protect his house

while never having to "use" it). And in context it is clear that *Heller*, *McDonald,* and *Bruen* all used the word "use" to mean possession with a purpose. This is obvious because none of the cases required empirical studies of actual use. It is also obvious, because that is what the cases actually said. *Heller* held that weapons "typically *possessed* by law-abiding citizens for lawful purposes," are protected. 554 U.S. at 625 (emphasis added). The Second Amendment guarantees the "right to possess and carry weapons *in case of confrontation*." *Id*. at 592 (emphasis added). In *McDonald*, the Court wrote that the right to keep and bear arms is valued "because the *possession* of firearms was thought to be essential for self-defense." 561 U.S. at 787 (emphasis added). In *Bruen*, the Court wrote that the Second Amendment protects *carrying* weapons in common use. *Id*., 597 U.S. at 47 (emphasis added). In summary, Defendants' blinkered conception of the scope of the word "use" in the phrase "common use" is plainly precluded by the Supreme Court's precedents.

## H.    The Banned Weapons Are Overwhelmingly Used for Lawful Purposes

Defendants argue that AR-15s may be categorically banned because they are sometimes used in some criminal acts. That is not the law. In *Miller v. Bonta*, 699 F. Supp. 3d 956 (S.D. Cal. 2023), the court observed that 99.999985% of these rifles are used for lawful purposes. The court arrived at this figure as follows:

> California's "assault weapon" ban takes away from its residents the choice of using an AR-15 type rifle for self-defense. Is it because modern rifles are used so frequently for crime? No. The United States Department of Justice reports that in the year 2021, in the entire country 447 people were killed with rifles (of all types). … if 447 rifles were used to commit 447 homicides and every rifle-related homicide involved an AR-15, it would mean that of the approximately 24,400,000 AR-15s in the national stock, *less than .00001832% were used in*

*homicides.* It begs the question: what were the other AR-15 type rifles used for? The only logical answer is that 24,399,553 (or 99.999985%) of AR-15s were used for lawful purposes.

*Id.,* 968 (emphasis added).

Defendants might respond that this argument does not include mass shootings.[14] That would be wrong, because it does. Deaths from AR-15s used in mass shootings are a small fraction of the small fraction of deaths from rifles to which *Miller* alluded. This brings the real question to be answered in this case into relief. That question is this: Should tens of millions of rifles used for overwhelmingly peaceful purposes by law-abiding citizens lose their protection under the Second Amendment because a handful of evil men have used them to commit horrific (yet, thankfully, extremely rare) crimes? *Heller* answered that question:

> *We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution.* The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see *supra*, at 2816 – 2817, and n. 26. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. *These include the absolute prohibition of handguns held and used for self-defense* in the home.

*Id.* 554 U.S. at 636 (emphasis added).

In *Heller II*, then-Judge Kavanaugh argued that if semi-automatic handguns are protected even though they are frequently used by criminals, *a fortiori* semi-

---

[14] Moreover, banning weapons to further the governmental interest of addressing mass shootings is obviously precluded by *Bruen*. Even courts that have ultimately upheld bans have recognized that they cannot base their decision on this consideration. The Seventh Circuit put it this way: "The governmental parties devoted considerable attention in their briefs to the horrors of the mass shootings . . . We have not relied on this point, however, because, as we have mentioned, it appears to depend on the type of means/end analysis that *Bruen* disapproved." *Bevis* 85 F.4th at 1203.

automatic rifles like the AR-15—which are used by criminals much less frequently—are protected:

> There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles.[15] Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use by law-abiding citizens for self-defense in the home, hunting, and other lawful uses. *Moreover, semi-automatic handguns are used in connection with violent crimes far more than semi-automatic rifles are*. It follows from *Heller's* protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected . . .

*Heller II*, at 1269–70 (Kavanaugh, J., dissenting) (emphasis added).

The Supreme Court has stated in the First Amendment context that "a free society prefers to punish the few who abuse rights [] after they break the law [rather] than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975). *Bruen* held that First Amendment principles apply equally to the Second Amendment, because the latter is not a "second-class right." 597 U.S. at 70, citing *McDonald*, 561 U.S. at 780. It follows, that the rights of the literally millions of law-abiding citizens who own the banned rifles and magazines cannot be trammeled on the ground that a handful of evil men abused those rights.

## V. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1—5: Plaintiffs neither admit nor deny. In *Miller v. Bonta*, 699 F. Supp. 3d 956 (S.D. Cal. 2023), the court engaged in an extensive examination of Allen's opinions. The court found that her methods were suspect and her opinions were misleading and unreliable. *Id*. at 1004-1006. Also, Plaintiffs have not retained an expert to rebut the

---

[15] Judge Kavanaugh noted that he had AR-15s specifically in mind as the emblematic semi-automatic rifle. See *id*. at 1287.

misleading and unreliable opinions expressed in these paragraphs because those opinions are not relevant to the Court's resolution of the pending motion for summary judgment.

6—30, 40—44, 49, 57—59: Plaintiffs neither admit nor deny. The statements in these paragraphs were submitted to further the Defendants' interest-balancing arguments. Interest balancing is specifically prohibited by *Bruen*. See *id*. at 26. Plaintiffs have not retained an expert to rebut the opinions expressed in these paragraphs because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment.

31—39, 50—51: Plaintiffs neither admit nor deny. The statements in these paragraphs were submitted to further Defendants' argument that their arms ban is justified because the banned arms did not exist in the Founding Era. These arguments are specifically prohibited by *Bruen*. See *id*. at 28. Plaintiffs have not retained an expert to rebut the opinions expressed in these paragraphs because those opinions are not relevant to the Court's resolution of the pending motions for summary judgment.

45—48, 52—55: Plaintiffs admit that certain laws listed in Spitzer's report existed. Plaintiffs do not admit to Spitzer's legal arguments characterizing these laws.

56: Deny. The Ordinances speak for themselves and Plaintiffs. Defendants' legal argument justifying the Ordinances because while banning some arms they do not ban others is specifically prohibited by *Heller*. See *id*. at 629. Plaintiffs have not retained an expert to rebut the opinions expressed in these paragraphs because those

opinions are not relevant to the Court's resolution of the pending motions for summary judgment.

## VI.  STATEMENT OF ADDITIONAL DISPUTED FACTS

1.    Without a magazine, the operation of a semi-automatic firearm in semi-automatic firing mode is impossible. Passamaneck Declaration [Doc. 76-11], 4-5.

2.    A magazine is not merely a box in which ammunition is stored; rather, it is a dynamic component that performs a function in any semi-automatic firearm. *Id*.

3.    The magazine holds cartridges under spring tension, and when a semi-automatic firearm is fired, the spring pushes another cartridge up for the bolt to push into the chamber so that it can be fired with the next pull of the trigger. *Id*.

4.    If there is no magazine pushing cartridges up into the action, one by one, there is no ability to fire a subsequent cartridge due to a subsequent pull of the trigger, which is the defining characteristic of a semi-automatic weapon. *Id*.

5.    Thus, without a magazine as a designed dynamic component, semi-automatic firearms would not exist. *Id*.

6.    Plaintiff Gordon Madonna was a law enforcement officer for over 40 years. Madonna Dec. [Doc. 76-10] ¶ 15.

7.    During his 40-plus-year career as a police officer, he was always armed while he was on duty. *Id*. ¶ 16. He discharged his firearm against a suspect only once during his career. *Id*. ¶ 17.

8.    During his career, he was constantly armed for the purpose of both actual and possible confrontation with an assailant. *Id*. ¶ 18.

9.      Thus, during his career, he was constantly using his firearm for self-defense even when he was not discharging it or brandishing it. *Id.*

10.     It is not true that he never used his firearm during 40-plus years except that one moment when he discharged it against a suspect. *Id.* ¶ 19.

11.     Defendants' expert Klarevas estimates that there are 24.4 million rifles similar to AR-15s and AK-47s in the United States. *Id.* Mot. Ex. K [Doc. 123-11], 11.

12.     Millions of Americans own AR-15s and they are legal in 41 of the 50 states. *United States v. Morgan*, 2025 WL 2502968, at *5, n.5 (10th Cir. 2025), citing *Snope*, at 1534 (Kavanaugh, J., statement respecting denial of certiorari).

## VII.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to deny Defendants' motion for summary judgment.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Voice: (303) 205-7870; Fax: (303) 463-0410
Email: barry@arringtonpc.com

Shaun Pearman
The Pearman Law Firm, P.C.
4195 Wadsworth Boulevard
Wheat Ridge Colorado 80033
Phone Number: (303) 991-7600
Fax Number: (303) 991-7601
E-mail: shaun@pearmanlawfirm.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to parties of record.

*/s/ Barry K. Arrington*
_____
Barry K. Arrington