**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 22-cv-2680-NYW-TPO**

ROCKY MOUNTAIN GUN OWNERS,
NATIONAL ASSOCIATION FOR GUN RIGHTS,
BRYAN LAFONTE, and
JAMES MICHAEL JONES,

      Plaintiffs,

v.

THE TOWN OF SUPERIOR,
CITY OF LOUISVILLE, COLORADO,
CITY OF BOULDER, COLORADO, and
BOARD OF COUNTY COMMISSIONERS OF BOULDER COUNTY,

      Defendants.

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR RENEWED MOTION FOR
SUMMARY JUDGMENT**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION.......................................................................................................... 1

ARGUMENT................................................................................................................ 2

I.    Plaintiffs Have Preserved Only a Facial Challenge—and Their Clams Fail
Regardless ................................................................................................ 2

II.    Assault Weapons and LCMs Are Not Protected by the Second
Amendment's Text.................................................................................... 3

    A.    "Common Use" Is a Step-One Inquiry at Which Plaintiffs Must
Establish that the Item at Issue Is an "Arm" that Is "In Common Use
Today for Self-Defense" ...................................................................... 4

    B.    Plaintiffs' Proposed Frameworks Are Contrary to Law.......................... 5

        1.    The "Common Use" Inquiry Is Not About Ownership Statistics.. 5

        2.    "Dangerous and Unusual" Refers to Unusually Dangerous
Weapons.................................................................................... 7

        3.    Plaintiffs' Jurisdiction-Counting Approach Is Illogical—and Not
the Law .................................................................................... 10

        4.    The Second Amendment Does Not Protect a Right to
"Collective" Self-Defense .........................................................11

    C.    Plaintiffs' Attempts to Sidestep Their Lack of Evidence Fail ............... 12

    D.    LCMs Are Not "Arms" and Are Unnecessary to a Firearm's
Operation........................................................................................... 15

III.    The Ordinances Are Consistent with the Nation's Historical Tradition........... 16

    A.    Historical Regulations Can Establish an Analogous Tradition Even if
They Are Not Weapons "Bans" .......................................................... 17

    B.    Plaintiffs' Effort to Rebut Any Reliance on Historical Laws Restricting
Trap Guns and Gunpowder Also Fails ................................................ 21

IV.    Reply Concerning Defendants' Statement of Undisputed Material Facts ...... 22

V.      Response Concerning Disputed Facts ........................................................... 24

CONCLUSION ......................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Barnett v. Raoul*,
No. 3:23-cv-00209, 2024 WL 4719468 (S.D. Ill. Nov. 8, 2024) ............................... 14

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023),
*cert. denied*, 144 S. Ct. 2491 (2024) ...............................................................*passim*

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc),
*cert. denied*, 145 S. Ct. 1534 (2025) ...............................................................*passim*

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ................................................................................................ 8

*Capen v. Campbell*,
134 F.4th 660 (1st Cir. 2025) ................................................................................. 3

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024), *cert. denied*, 145 S. Ct. 1049 (2025) ....................... 5-6

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................................................ 8, 12

*Duncan v. Bonta*,
133 F.4th 852 (9th Cir. 2025) (en banc),
*petition for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025) .....................................*passim*

*Est. of Newman v. Bd. of Cnty. Comm'rs of Montezuma*,
No. 1:22-cv-01763, 2024 WL 1300278 (D. Colo. Mar. 27, 2024) ........................... 22

*Garland v. Cargill*,
602 U.S. 406 (2024) .............................................................................................. 14

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024),
*cert. denied*, 145 S. Ct. 2278 (2025)...................................................................... 8, 9

*Lane v. Cacace*,
No. 7:22-cv-10989, 2025 WL 903766 (S.D.N.Y. Mar. 25, 2025) ............................... 4

*Nat'l Ass'n for Gun Rts. v. Lamont*
685 F. Supp. 3d 63 (D. Conn. 2023),
*aff'd*, 153 F.4th 213 (2d Cir. 2025)......................................................................... 6, 7

*Nat'l Ass'n for Gun Rts. v. Lamont*,
153 F.4th 213 (2d Cir. 2025),
*petition for cert. filed*, No. 25-421 (U.S. Oct. 3, 2025)........................................*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ................................................................................................. 11, 18

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024),
*cert. denied*, 145 S. Ct. 603 (2025)........................................................................ 8, 22

*Or. Firearms Fed'n v. Kotek*,
682 F. Supp. 3d 874 (D. Or. 2023), *appeal docketed*,
No. 23-35478 (lead) (9th Cir. July 17, 2023) .............................................................. 7

*Pertile v. Gen. Motors, LLC*,
No. 1:15-cv-00518, 2017 WL 4117908 (D. Colo. Sept. 15, 2017) ........................... 23

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) .......................................................................... 1, 4, 16

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .................................................................................................. 10

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025) .................................................................................................. 14

*Snope v. Brown*,
145 S. Ct. 1534 (2025) ................................................................................................ 8

*Staples v. United States*,
511 U.S. 600 (1994) .................................................................................................. 14

*Stewart v. Am. Family Mutual Ins. Co., S.I.*,
744 F. Supp. 3d 1198 (D. Colo. 2024) ............................................................... 13, 25

*Terranova v. Safeco Ins. Co. of Am.*,
No. 1:21-cv-03286, 2024 WL 4068759 (D. Colo. Sept. 5, 2024) .............................. 23

*United States v. Bader*,
No. 1:20-cv-03017, 2023 WL 2168503 (D. Colo. Feb. 6, 2023),
*adopted by* 2023 WL 2163567 (D. Colo. Feb. 22, 2023) .......................................... 23

*United States v. Cousar*,
No. 6:23-cr-10004, 2024 WL 1406898 (D. Kan. Apr. 2, 2024) ................................... 8

*United States v. Hardman*,
297 F.3d 1116 (10th Cir. 2002) (en banc) ............................................................... 21

iv

*United States v. Harrison*,
　153 F.4th 998 (10th Cir 2025) ...................................................... 10, 19, 20

*United States v. Jackson*,
　138 F.4th 1244 (10th Cir. 2025) ............................................................ 19

*United States v. Morgan*,
　150 F.4th 1339 (10th Cir. 2025).......................................................*passim*

*United States v. Rahimi*,
　602 U.S. 680 (2024) ...................................................... 10, 11, 16, 18, 19

*United States v. Stevens*,
　559 U.S. 460 (2010) ............................................................................... 2

*United States v. Sup. Ct. of N.M.*,
　839 F.3d 888 (10th Cir. 2016) ................................................................ 2

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham*,
　741 F. Supp. 3d 172 (D. Vt. 2024),
　*appeal docketed*, No. 24-2026 (2d Cir. July 29, 2024) ...................... 18, 21

*White v. Deere & Co.*,
　No. 1:13-cv-02173, 2016 WL 346862 (D. Colo. Jan. 28, 2016) ............................. 23

**Statues & Rules**

Fed. R. Civ. P. 56 ................................................................................ 13, 25

18 U.S.C. § 922 ........................................................................................ 19

**Other Authorities**

Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use, and Imagined
　Use from the 2021 National Firearms Survey: Response to William English*,
　78 SMU L. Rev. 239 (2025) .................................................................... 14

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual":
　Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ....................... 9

## INTRODUCTION

Plaintiffs' opposition to Defendants' motion for summary judgment misunderstands Supreme Court precedent, relies on dissenting and concurring opinions in other cases that are neither persuasive nor binding, and fails to engage with Defendants' actual motion. Plaintiffs' assertions are unsupported by evidence, and none identifies any genuine dispute of material fact, precisely because Plaintiffs adduced no evidence in support of their claims.

Applying the operative text-and-history framework to the record in this case, Plaintiffs' claims fail at both steps of the Second Amendment analysis—as numerous courts have concluded when rejecting similar challenges based on similar records. At the text step, Plaintiffs have not shown that their conduct falls within the scope of the right. Instead, their analysis boils down to a circular argument that any weapon possessed in large enough numbers must, *ipso facto*, be constitutionally protected—a position that the Tenth Circuit and other courts of appeals have rejected. Further, if this Court reaches the historical step of the analysis, Defendants have demonstrated that the Ordinances are "'consistent with the *principles* that underpin our' Nation's historical tradition of firearm regulation." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("*RMGO*") (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)). Plaintiffs have failed to rebut the overwhelming evidence Defendants have adduced in support. In sum, Plaintiffs have failed to identify any issue of material fact necessitating a trial, and the Court should therefore grant summary judgment in Defendants' favor.

## ARGUMENT

### I.    Plaintiffs Have Preserved Only a Facial Challenge—and Their Claims Fail Regardless

Plaintiffs assert that they challenge the Ordinances both on their face and as applied to their "particular conduct, including their possession of AR-15 rifles and similar rifles and the banned magazines." Pls.' Resp. to Defs.' Renewed Mot. Summ. J., Doc. 124 ("Opp.") 11. They, however, have not "adequately develop[ed] a separate attack on a defined subset of the [Ordinances'] applications." *United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010). The law is clear that in determining whether to apply a facial or an as-applied standard to a claim, a court "must focus on whether the claim and the relief therein extend *beyond the plaintiffs' particular circumstances*," not on "the labels the parties attach to [their] claims." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016) (emphasis added).

Here, Plaintiffs have not developed any as-applied claim. While they point to allegations that they own or seek to purchase certain items regulated by the Ordinances, *see* Opp. 11, their claim and request for relief go far beyond these specific items or their own circumstances or desires. *See* Doc. 116 ¶¶ 60, 62.[1] That is why this Court has already recognized that Plaintiffs "challenge the Ordinances on their face." Doc. 112 at 33. Plaintiffs thus must establish that "no set of circumstances" exists under which the Ordinances would be valid—which they plainly cannot do. *See* Defs.'

---

[1] This filing uses "Doc. __" and the document page number to refer to materials filed in this action.

2

Renewed Mot. Summ. J., Doc. 123 ("Mot.") 6-7; *see also Capen v. Campbell*, 134 F.4th

660, 663, 674-75 (1st Cir. 2025) (assessing near-identical complaint brought by Plaintiff

NAGR and Plaintiffs' counsel under this standard). In any event, Plaintiffs have failed to

meet their burden as to *any* regulated item—including the AR-15—for the reasons set

out in Defendants' summary judgment motion and discussed further below.

## II.    Assault Weapons and LCMs Are Not Protected by the Second Amendment's Text

As Defendants explained in their motion, Plaintiffs' challenge fails at step one of

the *Bruen-Rahimi* framework because they have not met their burden of demonstrating

that assault weapons and LCMs are "'in common use' today for self-defense." *United*

*States v. Morgan*, 150 F.4th 1339, 1345 (10th Cir. 2025) (quoting *N.Y. State Rifle &*

*Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022)); *see* Mot. 11-12. Indeed, the undisputed

record—and the overwhelming caselaw—make clear that these items are *not* commonly

used in self-defense; that they are "ill-suited and disproportionate" to that purpose,

*Bianchi v. Brown*, 111 F.4th 438, 459 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct.

1534 (2025); that they are "most useful in military service," *id.*; and that they are

"dangerous and unusual," *id.* at 452-53. *See* Mot. 12-22. LCMs are also unprotected for

the additional reason that they are not "Arms" within the meaning of the Second

Amendment. *See id.* at 22-24.

Plaintiffs offer a smorgasbord of arguments in opposition. None is viable.

Plaintiffs, in fact, tacitly acknowledge that their claims find no support in the law by

relying principally on dissenting and concurring opinions, rather than on record evidence

or binding authority. The Court should reject each of Plaintiffs' arguments, and grant summary judgment in favor of Defendants.

    **A.**    **"Common Use" Is a Step-One Inquiry at Which Plaintiffs Must Establish that the Item at Issue Is an "Arm" that Is "In Common Use Today for Self-Defense"**

Plaintiffs argue that the "common use" issue should be resolved at the step-two, historical inquiry, and that their only textual burden is to show that the items at issue here "are bearable arms." *See* Opp. 1-2, 16, 33-34. That is contrary to binding precedent. The Tenth Circuit has repeatedly stated that "common use" is part of the challenger's burden at *Bruen*'s step one. *Morgan*, 150 F.4th at 1345-46; *RMGO*, 121 F.4th at 113-14; *see* Mot. 8.[2] Indeed, in a recent filing in the U.S. Supreme Court, Plaintiff NAGR and Plaintiffs' counsel acknowledged unequivocally that the Tenth Circuit has "held that common use must be addressed at the plain text step." Petition for Writ of Certiorari at 13, *National Ass'n for Gun Rights v. Lamont*, No. 25-421 (U.S. Oct. 3, 2025). Plaintiffs' contrary argument here should not be countenanced.[3]

The Tenth Circuit has also made clear that the relevant "common use" question in Second Amendment analysis is "whether the item at issue is an 'arm' that is 'in common use today for self-defense.'" *RMGO*, 121 F.4th at 113-14; *accord Morgan*, 150

---

[2] Plaintiffs brazenly contend that, in *Morgan*, the Tenth Circuit only "appeared to assume" that "common use" was a step-one question, *see* Opp. 33—but, in fact, *Morgan applied* "common use" at step one and decided the appeal on that basis.

[3] The Tenth Circuit is in good company in locating "common use" at step one. "The overwhelming majority of courts considering Second Amendment challenges address common use at step one." *Lane v. Cacace*, No. 7:22-cv-10989, 2025 WL 903766, at *7 (S.D.N.Y. Mar. 25, 2025) (citing *RMGO* and other cases).

F.4th at 1343-44. This standard involves consideration of items' actual use and

objective design and features, which demonstrate the uses for which they are suited.

*See Morgan*, 150 F.4th at 1347-48; Mot. 8-10. As Defendants explained in their motion,

*see* Mot. 10-22, Plaintiffs have not met their burden under this governing "common use"

standard, and the Court should therefore grant summary judgment to Defendants.

### B.    Plaintiffs' Proposed Frameworks Are Contrary to Law

Despite this governing authority as to the proper application of the "common use"

analysis, Plaintiffs offer a host of proposed alternative approaches for assessing the

constitutionality of assault weapon and LCM restrictions. None has merit.

#### 1.    The "Common Use" Inquiry Is Not About Ownership Statistics

Plaintiffs' main contention is that if a weapon or magazine is owned in sufficient

numbers, then it is in "common use" and cannot be prohibited. *See* Opp. 3, 14-15, 23.

But that is not the law of the Tenth Circuit, which has already addressed this question

and held that "the [Supreme] Court's choice of phrase common *use* instead of common

*possession* means more than 'the number of a certain weapon in private hands.'"

*Morgan*, 150 F.4th at 1347 (quoting *Bianchi*, 111 F.4th at 460, and *Hanson v. District of

Columbia*, 120 F.4th 223, 233 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2278 (2025))

(citation omitted). Other courts and judges considering this same issue agree. *See, e.g.*,

*Duncan v. Bonta*, 133 F.4th 852, 882-83 (9th Cir. 2025) (en banc) (citing cases from the

First, Fourth, Seventh, and D.C. Circuits), *petition for cert. filed*, No. 25-198 (U.S. Aug.

15, 2025); *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 232-33 (2d Cir. 2025)

("*NAGR II*"), *petition for cert. filed*, No. 25-421 (U.S. Oct. 3, 2025); *Del. State*

5

*Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 212-13 (3d
Cir. 2024) (Roth, J., concurring), *cert. denied*, 145 S. Ct. 1049 (2025).

Plaintiffs' numbers-based approach would mean that no government could
prohibit a weapon "any time an undefined number of people own an undefined number"
of that weapon, regardless of how rarely it is used in self-defense or its suitability for
self-defense. *Duncan*, 133 F.4th at 882-83. Such a standard "would strain both logic
and administrability, as it would hinge the right on … a 'trivial counting exercise' that
would 'lead[] to absurd consequences' where unusually dangerous arms like the M-16
or 'the W54 nuclear warhead' can 'gain constitutional protection merely because [they]
become[] popular before the government can sufficiently regulate [them].'" *NAGR II*,
153 F.4th at 233 (quoting *Bianchi*, 111 F.4th at 460).

Plaintiffs' "ownership-statistics theory," *Duncan*, 133 F.4th at 883, is also
inconsistent with constitutional principles more generally. No other right "is read to
expand or contract based on nothing more than contemporary market trends." *Bianchi*,
111 F.4th at 461; *accord Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 102
(D. Conn. 2023) ("*NAGR I*"), *aff'd*, *NAGR II*, 153 F.4th 213. That makes perfect sense,
as the reasoning of such an approach is inescapably "circular." *Bevis v. City of
Naperville*, 85 F.4th 1175, 1190 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2025);
*see Bianchi*, 111 F.4th at 461 (rejecting position that "arms manufacturers can secure
constitutional immunity for their products so long as they distribute a sufficient quantity
before legislatures can react"). "[I]t would be absurd to say that the reason why a
particular weapon can be banned is that there is a statute banning it, so that it isn't

6

commonly owned." *Bevis*, 85 F.4th at 1190 (quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)). This further explains why the Tenth Circuit has properly foreclosed this popularity-based approach. *See Morgan*, 150 F.4th at 1347.[4]

### 2. "Dangerous and Unusual" Refers to Unusually Dangerous Weapons

Relatedly, Plaintiffs argue that assessing whether a weapon is "dangerous and unusual" reduces to this same flawed inquiry into common ownership. *See* Opp. 3, 14-17, 23, 30-31. That, too, is wrong.[5]

Plaintiffs contend that "dangerous and unusual" represents two separate criteria: a weapon cannot be prohibited unless it is "*both* dangerous and unusual." *See* Opp. 2. Not so. As Defendants discussed in their motion, and as several circuits have

---

[4] Plaintiffs also suggest that the number of items possessed matters because "common use" should depend on whether an individual purports to possess a firearm for self-defense. *See* Opp. 38-39. The Tenth Circuit, however, has already rejected reliance on the subjective intent of firearms owners as part of the common-use inquiry. *See Morgan*, 150 F.4th at 1347 (observing that challenger "posits he uses his machineguns for self-defense," but giving it no consideration in "common use" inquiry); *see also NAGR I*, 685 F. Supp. 3d at 87 (rejecting an approach that would "allow[] the [common-use] analysis to be driven by nebulous subjective intentions … regardless of how the weapons were actually used, a result that the Supreme Court does not indicate in the slightest that it intended"); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 918 (D. Or. 2023), *appeal docketed*, No. 23-35478 (lead) (9th Cir. July 17, 2023).

[5] As Defendants explained in their motion, the Tenth Circuit has placed the "dangerous and unusual" inquiry at step one of the *Bruen-Rahimi* analysis. *See* Mot. 8-9, 20 (citing *RMGO*, 121 F.4th at 117); *see also Morgan*, 150 F.4th at 1348 n.10 (explaining that "[a] weapon's dangerousness …is 'a relevant factor'" in "whether it is in common use for a lawful purpose"). But even if this inquiry was situated at the second, historical step, the record indisputably establishes that the covered items are unusually dangerous and that the Ordinances are consistent with the historical tradition of regulating excessively dangerous weapons.

explained, the category of "dangerous and unusual" weapons unprotected by the Second Amendment "encompasses those arms that legislators determined were *unusually dangerous* because of their characteristics." *NAGR II*, 153 F.4th at 233; *accord Hanson*, 120 F.4th at 238 n.7 ("uncommonly dangerous"); *Bianchi*, 111 F.4th at 450 ("excessively dangerous"); *see* Mot 20. That is the "historically faithful" understanding the Court should follow here. *NAGR II*, 153 F.4th at 250 (Nathan, J., concurring); *see id.* at 234 (majority opinion) (joining in Judge Nathan's concurrence).

Plaintiffs point to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), in support. *See* Opp. 2-3, 14, 17, 31 (citing *id.* at 417-18 (Alito, J., concurring in the judgment)).[6] But "this non-binding concurrence cannot bear the weight Plaintiffs place on it." *NAGR II*, 153 F.4th at 233; *accord Hanson*, 120 F.4th at 238 n.7; *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 51 (1st Cir. 2024) ("*OST II*"), *cert. denied*, 145 S. Ct. 2771 (2025). Indeed, as another district judge in the Tenth Circuit recently observed, "the *Caetano* majority itself never delved into whether [the weapons at issue] are 'dangerous and unusual'" and "did not vacate the decision below because of any numerical disagreement." *United States v. Cousar*, No. 6:23-cr-10004, 2024 WL 1406898, at *13 (D. Kan. Apr. 2, 2024).

Plaintiffs' appeal to "simple grammar" is likewise unpersuasive. *See* Opp. 30-31. It places dispositive weight on the single word "and" in *District of Columbia v. Heller*,

---

[6] Plaintiffs also cite to Justice Thomas's recent solo dissent from denial of certiorari in *Snope v. Brown*, 145 S. Ct. 1534, 1536 (2025) (Thomas, J., dissenting from denial of certiorari), which endorses the *Caetano* concurrence. *See* Opp. 2-3, 14-17. It is unpersuasive here for these same reasons.

554 U.S. 570 (2008)—a "possible misquote of Blackstone," *NAGR II*, 153 F.4th at 251

(Nathan, J., concurring)—while ignoring the actual historical sources on which *Heller*

relied, which use both "dangerous and unusual" and "dangerous or unusual." *See id.* at

250-51. As the Second and D.C. Circuits have explained, the phrase is best understood

as "a hendiadys, which individuals in the founding era would have interpreted as

'unusually dangerous.'" *Id.* at 234 n.19 (majority opinion); *see Hanson*, 120 F.4th at 238

n.7 (citing Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual":*

*Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016)).[7] This helps explain

why *Heller*'s sources used this phrase both disjunctively and conjunctively—and why

"the interchangeable use of 'dangerous and unusual' and 'dangerous or unusual'

supports the proposition that neither 'and' nor 'or' should be read so literally." *NAGR II*,

153 F.4th at 251 (Nathan, J., concurring). Instead, "unusually dangerous" (or

"uncommonly dangerous" or "excessively dangerous") is "the most faithful formulation."

*Id.*; *see Hanson*, 120 F.4th at 238 n.7; *Bianchi*, 111 F.4th at 450.

　　　　Nor are Plaintiffs correct that analysis of whether a weapon is "unusually

dangerous" and suitable for self-defense constitutes improper "means-end scrutiny

banned by *Bruen*." *See* Opp. 24, 30-31. To the contrary, the Tenth Circuit has made

clear that courts may consider evidence of the sort Defendants have presented in this

case, including "statistics, expert opinions, and predictive judgments" in Second

---

[7] A hendiadys is a traditional rhetorical device by which two terms, "separated by a conjunction," nonetheless "work together as a single complex expression." *NAGR II*, 153 F.4th at 234 n.19 (citation omitted). The technical term was well known in the founding era. *See* Bray, 102 Va. L. Rev. at 697-99.

Amendment cases. *United States v. Harrison*, 153 F.4th 998, 1033 n.26 (10th Cir.

2025); *see also Morgan*, 150 F.4th at 1348 (considering machinegun's function and

features to determine whether it is "exceedingly dangerous" and "makes sense" for

common use in self-defense (citation omitted)). Considering such evidence is fully

consistent with *Bruen*. *See Harrison*, 153 F.4th at 1033 n.26.

### 3. Plaintiffs' Jurisdiction-Counting Approach Is Illogical—and Not the Law

Plaintiffs also suggest that the "common use" inquiry should ask how many other

jurisdictions restrict the item at issue today. *See* Opp. 3, 12, 20. But that approach

would wrongly hinge the reach of a constitutional right on contemporary legislative

choices. *Cf. Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) (criticizing as "flawed" a

"'use it or lose it' view of legislative authority"). That is antithetical to basic principles of

federalism, embodied in the Supreme Court's assurance that "[s]tate and local

experimentation with reasonable firearms regulations will continue under the Second

Amendment." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (citation omitted);

*see, e.g.*, *Bianchi*, 111 F.4th at 446 ("This conclusion that the Maryland regulation is

consistent with the Constitution is not some sort of edict to the rest of the states,

obligating them to follow suit."); *Bevis*, 85 F.4th at 1203 (recognizing same). And it

poses similar circularity problems as Plaintiffs' ownership-statistics theory: it makes a

law's existence in enough jurisdictions into "the source of its own constitutional validity."

*Bevis*, 85 F.4th at 1190 (citation omitted).

Plaintiffs point to the Tenth Circuit's recent decision in *United States v. Morgan* in support of their position here. *See* Opp. 3, 12, 20. But *Morgan* did not establish a jurisdiction-counting approach to "common use," as Plaintiffs contend. Rather, the Tenth Circuit engaged in this analysis as part of showing that the challenger had failed to show "common use" by any conceivable metric—without holding that "common use" turns on jurisdiction counting. *See Morgan*, 150 F.4th at 1344, 1346. It did not adopt such a circular approach as the key to Second Amendment analysis.

### 4.    The Second Amendment Does Not Protect a Right to "Collective" Self-Defense

Plaintiffs are also wrong that Defendants have improperly excluded some concept of "collective" self-defense from the Second Amendment right. *See* Opp. 34-39. The Supreme Court has made clear that the Second Amendment protects "individual self-defense," not collective or common defense. *Bruen*, 597 U.S. at 29; *see Rahimi*, 602 U.S. at 690 (describing the right as "secur[ing] for Americans a means of self-defense"). The Tenth Circuit has followed suit, looking to whether "private individuals commonly use [a weapon] for self-defense" and whether it "make[s] sense" for this purpose—and echoing *Heller* in emphasizing that weapons "'most useful in military service' … 'may be banned' consistent with the Second Amendment." *Morgan*, 150 F.4th at 1347-48; *see id.* at 1343. That the right was enshrined at a time when self-defense weapons would also be used in militia service does not change its scope. While the right's prefatory clause about militia service "announce[d] a purpose" for which the

11

right was codified, the Amendment "secure[d] an individual right unconnected with militia service." *Heller*, 554 U.S. at 577, 616.

Unsurprisingly, no court has adopted Plaintiffs' expansive view of the Second Amendment as including a right to "collective" self-defense. And the en banc Fourth Circuit has expressly rejected it, explaining that a right to "'collective' self-defense" as proposed here by Plaintiffs "contradicts both the purpose and language of *Heller* and *Bruen*," disregards the legislature's judgment about how to best protect the community, and converts a right to self-defense to "a right to possess arms whose uses on offense are all too prominent." *Bianchi*, 111 F.4th at 452. Plaintiffs neglect to mention this persuasive majority opinion, instead once again favoring a dissent. *See* Opp. 37. This Court should join the en banc Fourth Circuit majority—and the Supreme Court—in rejecting Plaintiffs' erroneous argument.

### C.    Plaintiffs' Attempts to Sidestep Their Lack of Evidence Fail

As Defendants have explained, Plaintiffs' failure to develop any evidentiary record dooms their case at step one of the *Bruen-Rahimi* framework. *See* Mot. 11-12; *supra* Section II.A. Plaintiffs' efforts to sidestep their lack of supporting evidence are unpersuasive.

*First*, Plaintiffs appear to argue that there are somehow disputed issues of fact precluding summary judgment simply because they disagree with Defendants' position that assault weapons and LCMs are not "in common use today for self-defense." *See* Opp. 19-21. But that is not how Rule 56 works. Because Plaintiffs have the burden on this issue, to avoid summary judgment, they must "set forth specific facts showing that

there is a genuine issue for trial." *Stewart v. Am. Family Mutual Ins. Co., S.I.*, 744 F. Supp. 3d 1198, 1200 (D. Colo. 2024) (citation omitted). And they must do so through record evidence. *See* Fed. R. Civ. P. 56(c)(1)(a). Plaintiffs have failed to meet this burden—submitting no supporting evidence at all. *See* Mot. 6, 11-12.

    *Second*, Plaintiffs puzzlingly assert that they have satisfied their step-one burden through Defendants' expert. Specifically, Plaintiffs claim that Dr. Louis Klarevas has offered an estimate of how many assault weapons are owned in the United States. *See* Opp. 18-19. That is false. At no point has Dr. Klarevas offered any statistics on how widely assault weapons are owned. Rather, he analyzed other sources' estimates without endorsing them. Observing that such sources likely "over-estimat[e]" the number of assault weapons in private hands, Dr. Klarevas made the point that *even assuming* such levels of assault weapon ownership for the sake of argument, the weapon is disproportionately used in mass shootings. Ex. K ¶¶ 14, 23 (Klarevas). In any case, as explained, such ownership statistics do not answer the relevant "common use" question. *See Morgan*, 150 F.4th at 1347 ("Even if Mr. Morgan could establish an accurate count of privately-held registered machineguns, that would not tell us how many are in use or for what purpose." (footnote omitted)); *supra* Section II.B.1.

    *Third*, Plaintiffs cite several dissents and other nonbinding opinions for the same, nondispositive proposition that Americans own millions of assault weapons. *See* Opp. 3, 11, 14-15, 23.[8] But Plaintiffs did not introduce the data underlying such factual

---

[8] Plaintiffs also suggest that the Tenth Circuit embraced Justice Kavanaugh's suggestion that there is a "strong argument" that AR-15s are in common use because

assertions in this case, and it was not subject to adversarial testing. Their attempt to circumvent summary-judgment procedure is especially problematic because much of the evidence frequently relied upon for such statistics has been shown to have serious methodological flaws.[9] Indeed, this Court has already excluded Plaintiffs' purported expert's opinions on this topic because he was unqualified to offer them, *see* Doc. 90 at 6—making Plaintiffs' efforts to sweep in extra-record evidence particularly problematic.

*Finally*, Plaintiffs seek support from inapposite dicta in several Supreme Court opinions that make reference to assault weapons. *See* Opp. 11-12 (citing *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025); *Garland v. Cargill*, 602 U.S. 406, 429 (2024) (Sotomayor, J., dissenting); *Staples v. United States*, 511 U.S. 600, 612 (1994)). These scattered dicta cannot substitute for admissible evidence on this factual matter. Regardless, none of those cases concerned the Second Amendment, let alone a restriction on assault weapons or LCMs. And not

_____

"millions of Americans" own them. *See Morgan*, 150 F.4th at 1347 n.5 (quoting *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of certiorari)); Opp. 12. In fact, as Defendants already explained, *see* Mot. 10 n.6, *Morgan* pointed to Justice Kavanaugh's solo statement but did not adopt his argument or reach any holding whatsoever concerning assault weapons. Rather, *Morgan* relied heavily on decisions upholding assault weapon and LCM restrictions in upholding a machinegun restriction. *See Morgan*, 150 F.4th at 1347-48.

[9] *See, e.g.*, *Barnett v. Raoul*, No. 3:23-cv-00209, 2024 WL 4719468, at *7-9 (S.D. Ill. Nov. 8, 2024) (precluding surveys proffered to show common ownership because they were "empirically and statistically unreliable" and "methodologically suspect and potentially biased"); Debora Azrael et al., *A Critique of Findings on Gun Ownership, Use, and Imagined Use from the 2021 National Firearms Survey: Response to William English*, 78 SMU L. Rev. 239 (2025).

one specifically addressed the question of "common use" or, more relevantly, "common use today for self-defense." *See also* Doc. 108 at 1-3 (explaining same).

### D. LCMs Are Not "Arms" and Are Unnecessary to a Firearm's Operation.

LCMs also fall outside the scope of the Second Amendment for an additional reason: they are accessories, not "Arms." *See* Mot. 22-24. And as the uncontroverted record demonstrates, they are not necessary to the operation of any firearm. Ex. O ¶¶ 12, 133 (Yurgealitis); Ex. X ¶ 14 (Yurgealitis rebuttal). Plaintiffs' arguments in opposition (*see* Opp. 21-22, 32-33) do nothing to change this analysis.

Plaintiffs contend that, unlike founding-era "cartridge boxes," modern-day magazines "are essential to the operation of semiautomatic firearms." Opp. 33; *see id.* 21-22. But whether or not that statement is accurate, *see* Ex. X ¶ 15 (Yurgealitis rebuttal), the issue is irrelevant. Defendants have not argued that *all* magazines may be prohibited under the Second Amendment. Instead, the only issue presented by Plaintiffs' challenge is whether the Ordinances' restrictions of LCMs that *hold more than 10 rounds* is consistent with the Second Amendment. Plaintiffs do not address that question at all—and do not dispute the relevant evidentiary record compiled by Defendants, which establishes that "[m]agazine capacity is not a determinant of a firearm's operability." *Id.* ¶ 14; *see* Ex. O ¶¶ 12, 133 (Yurgealitis).

The relevant caselaw is also on Defendants' side. As the en banc Ninth Circuit recently held in upholding a similar law, an LCM "is not necessary to operate any firearm." *Duncan*, 133 F.4th at 868; *see* Mot. 22-24 (citing cases). Plaintiffs ignore this

holding and point instead to the dissenting opinion in the case, which simply does not address the relevant issue here, *i.e.*, that "firearms that accept magazines operate as intended when equipped with magazines containing ten rounds or fewer." *Duncan*, 133 F.4th at 868; *see* Ex. O ¶¶ 12, 133 (Yurgealitis); Ex. X ¶ 14 (Yurgealitis rebuttal). That uncontested fact, by itself, defeats Plaintiffs' challenge.

Further, Plaintiffs' attempt to discount the expert testimony of Professor Dennis Baron because he relies on corpus linguistics is also without merit. *See* Opp. 32-33. The Tenth Circuit has made clear that parties may "utilize corpus linguistics" to "interpret[] the plain text" of the Second Amendment. *RMGO*, 121 F.4th at 114. And several courts have properly relied on such evidence, and Professor Baron, to conclude that LCMs are accessories unprotected by the Second Amendment. *See* Mot. 23-24.

## III. The Ordinances Are Consistent with the Nation's Historical Tradition

Even if Plaintiffs had met their step-one burden, their Second Amendment challenge would still fail because the Ordinances are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. As set forth in Defendants' motion for summary judgment—and as "every Circuit to address the question" has concluded, *NAGR II*, 153 F.4th at 246 n.40—modern restrictions on assault weapons and LCMs fit comfortably within our nation's "strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing," *Bianchi*, 111 F.4th at 446. *See* Mot. 29-39. That tradition is evidenced by comparable laws at the founding, during the antebellum period, at Reconstruction, and into the 20th century—including limits on trap guns, gunpowder,

16

Bowie knives, slungshots and other blunt weapons, concealable pistols and revolvers, and high-capacity semiautomatic firearms and machineguns. *See id.* 29-35.

Defendants submitted a detailed historical record with their motion setting forth and explaining this long tradition of regulation. Ex. I (DeLay); Ex. L (Roth); Ex. N (Spitzer); *see* Mot. 29-35. Plaintiffs have failed to introduce any evidence in response, much less have they identified any disputed fact that would necessitate a trial. *See* Opp. 41-44 (not identifying any disputed fact relating to history and tradition of weapons regulation). Plaintiffs instead lodge two objections to Defendants' extensive historical analysis: *first*, they claim that this Court may consider only past prohibitions on *possession*, not historical carry restrictions, sales restrictions, and taxes, *see id.* at 25-30; and *second*, they attempt to challenge two pieces of specific historical evidence (restrictions on trap guns and gunpowder) through a bare footnote reference to an out-of-circuit dissent, *see id.* at 30 n.11. Neither argument has merit.[10]

### A. Historical Regulations Can Establish an Analogous Tradition Even if They Are Not Weapons "Bans"

Plaintiffs' primary contention is that only historical laws "banning" the possession of weapons can be analogous to the Ordinances. *See id.* at 25-30. That is wrong.

As an initial matter, referring to the Ordinances as "bans" on the possession of assault weapons and LCMs is, at best, misleading. The Boulder County Ordinance does not restrict the possession of assault weapons or LCMs, and instead restricts their

---

[10] *See also supra* Section II.A, B (addressing arguments concerning "common use" and "dangerous and unusual," which Plaintiffs improperly place at the history step, at the text step).

17

manufacture, import, sale, or transfer. *See* Ex. D § 2(a). And the Ordinances enacted by the Town of Superior, City of Louisville and the City of Boulder allow individuals to keep the assault weapons they owned prior to July 1, 2022, subject only to a certification requirement. *See* Ex. A § 10-9-240(a), (c); Ex. B § 5-8-28(a), (c); Ex. C § 9.86.010(a), (c). Nor do the Ordinances target all firearms or all magazines; they instead address only particular subcategories of semiautomatic rifles, pistols, and shotguns and magazines that have features or characteristics that place them beyond the scope of the Second Amendment and the regulation of which is consistent with our nation's history and tradition. *See* Mot. 4, 36-39.[11]

Plaintiffs' assertion that historical laws restricting the carry or sale of certain weapons or imposing taxes on them are not analogous also fails as a matter of law. The Supreme Court made clear in *Bruen* that "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin" or a "dead ringer." 597 U.S. at 30. And *Rahimi* left no doubt that modern possession statutes can be supported by more than predecessor possession bans. As noted, the central Second Amendment historical question is whether a modern law fits within "principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. A

---

[11] For these reasons, other courts have resisted characterizations of similar laws as "bans." *See, e.g.*, *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 199 (D. Vt. 2024) ("Vermont's restriction on LCMs is best considered a limitation on the ways in which firearms may be used, rather than as a flat ban."), *appeal docketed*, No. 24-2026 (2d Cir. July 29, 2024); *NAGR II*, 153 F.4th at 242 (similar); *see also Bevis*, 85 F.4th at 1199 ("The laws before us have one huge carve-out: people who presently own the listed firearms or ammunition are entitled to keep them, subject only to a registration requirement that is no more onerous than many found in history.").

principles-based inquiry "does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors." *Harrison*, 153 F.4th at 1030 (quoting *Pitsilides v.* Barr, 128 F.4th 203, 210 (3d Cir. 2025)). Rather, "[t]he word 'principle' suggests a higher level of generality," in which even "imperfect sources … are instructive." *Id.* at 1031-32; *see also United States v. Jackson*, 138 F.4th 1244, 1254-55 (10th Cir. 2025) (upholding modern law "[e]ven in the absence of identical historical antecedents").[12]

Indeed, were Plaintiffs' approach correct, *Rahimi* would be wrong. There, the Court relied upon surety statutes and going-armed laws to uphold the federal ban on firearms possession by those subject to a domestic-violence restraining order, 18 U.S.C. § 922(g)(8), even though neither banned firearm possession like § 922(g)(8): surety statutes only required "individuals suspected of future misbehavior to post a bond," 602 U.S. at 695, and going-armed laws prohibited only "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land," *id.* at 697 (quoting 4 Blackstone 149). But while § 922(g)(8)'s possession ban was "by no means identical" to historical regimes that did not prohibit possession, the Court had "no trouble concluding" that the federal law fits the principle of "allow[ing] the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 698, 700.

---

[12] This is particularly so where, as here, a "more nuanced" historical analysis applies. *See* Mot. 25-29. Notably, Plaintiffs do not contest in their opposition that a "more nuanced" approach is warranted in this case.

So too here. Defendants submitted reams of historical laws restricting weapons whose proliferation presented excessive danger—from the founding era through Reconstruction and beyond. To be sure, not every jurisdiction adopted an identical policy to confront this public-safety problem. But their choices to restrict sale or carry, or to impose taxes, hardly prove that possession prohibitions were unlawful, given that governments do not "maximally exercise[] their power to regulate." *Id.* at 739-40 (Barrett, J., concurring); *see Harrison*, 153 F.4th at 1019 (noting "countless reasons the Founders may not have used a distinctly similar regulation to one used today," none of which "implicate[s] the Second Amendment"); *see also* Ex. N ¶ 90 (Spitzer) (providing one policy reason that many jurisdictions would have chosen to restrict carry or sale rather than possession, *i.e.*, they lacked sufficient administrative and enforcement systems to implement possession bans). Nor are governments "limited to precisely the same restrictions when addressing new technology that enables a new, more devastating type of societal harm." *Duncan*, 133 F.4th at 881.

As Defendants explained in their motion, and numerous courts have found, "historical arms regulations that singled out the unusually dangerous weapons of their day are 'relevantly similar'" to laws like the Ordinances restricting assault weapons and LCMs. *NAGR II*, 153 F.4th at 246 & n.40 (citing cases); *see* Mot. 36-39. In reaching this conclusion, courts have specifically rejected the very distinction Plaintiffs attempt to draw here, explaining that while some historical weapon laws may be "distinguishable" in some respects, including because they "restricted the concealed or open carry of particular arms in public" rather than their possession, such distinctions do "not diminish

20

the constitutionality" of "restrictions on the acquisition and possession of certain weapons." *NAGR II*, 153 F.4th at 246; *see Duncan*, 133 F.4th at 880-81; *Bianchi*, 111 F.4th at 471-72; *Vt. Fed'n*, 741 F. Supp. 3d at 200-01. Simply put, these historical laws evidence "our nation's long and dynamic tradition of regulating excessively dangerous weapons whose demonstrable threat to public safety led legislatures to heed their constituents' calls for help." *Bianchi*, 111 F.4th at 472; *see* Mot. 29-35. It is that tradition that supports granting summary judgment to Defendants.

Plaintiffs also attempt to rely on several 19th-century state court decisions in support of their argument. *See* Opp. 26-29. But that effort is misplaced and does nothing to help their cause. To the contrary, as other courts have found since *Bruen*, these decisions provide further support to Defendants' historical analysis, as state courts from this period repeatedly upheld the constitutionality of "laws imposing the most severe restrictions on unusually dangerous weapons" as "permissible exercises of state police power." *NAGR II*, 153 F.4th at 244-45 & n.38 (citing cases); *see Bianchi*, 111 F.4th at 468 (same).

**B.    Plaintiffs' Effort to Rebut Any Reliance on Historical Laws Restricting Trap Guns and Gunpowder Also Fails**

Plaintiffs make a cursory attempt to challenge two pieces of specific historical evidence, restrictions on trap guns and gunpowder, through a one-sentence, footnote reference to an out-of-circuit dissent. *See* Opp. 30 n.11. That attempt fails. "Arguments raised in a perfunctory manner, such as in a footnote, are waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc). In any event, several courts

21

have correctly pointed to these early trap-gun and gunpowder laws as part of the historical tradition demonstrating the constitutionality of laws restricting assault weapons and LCMs. *See, e.g.*, *Duncan*, 133 F.4th at 874-75; *Bianchi*, 111 F.4th at 464-65; *OST II*, 95 F.4th at 49. This Court should do the same here. *See* Mot. 29-35.

In sum, Plaintiffs have failed to identify any genuine dispute of material fact concerning the historical inquiry at step two of the *Bruen-Rahimi* analysis. The Court thus should grant summary judgment on this basis in favor of Defendants

## IV.    Reply Concerning Defendants' Statement of Undisputed Material Facts

Many of Plaintiffs' Responses to Defendants' Statement of Undisputed Facts (*see* Opp. 41-43) do not comply with this Court's Uniform Civil Practice Standards. Those Practice Standards require that a response to a summary judgment motion contain a "Response to Statement of Undisputed Material Facts" section that must "admit or deny the movant's asserted material facts" and be "accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial." NYW Civ. Practice Standard 7.1D(b)(4). Plaintiffs' responses fail in both respects.

*Facts 1-5, 6-30, 31-39, 40-44, 49, 50-51, 57-59*: These facts should be deemed admitted because Plaintiffs neither admitted nor denied them in contravention of the Practice Standard's mandate, *see* Opp. 41-42 (stating that "Plaintiffs neither admit nor deny" these facts). *See, e.g.*, *Est. of Newman v. Bd. of Cnty. Comm'rs of Montezuma*, No. 1:22-cv-01763, 2024 WL 1300278, at *2 n.5 (D. Colo. Mar. 27, 2024) ("[B]ecause the Hospital neither admitted nor denied plaintiffs' Facts 13 and 21, the Court deems

them admitted."); *Pertile v. Gen. Motors, LLC*, No. 1:15-cv-00518, 2017 WL 4117908, at
*2 n.4 (D. Colo. Sept. 15, 2017) (similar); *United States v. Bader*, No. 1:20-cv-03017,
2023 WL 2168503, at *2 (D. Colo. Feb. 6, 2023) (similar), *adopted by*, 2023 WL
2168503 (D. Colo. Feb. 22, 2023).

Even if the Court were to find that Plaintiffs have objected to these facts, the facts
should still be deemed admitted because any such objection would relate only to
relevance. *See* Opp. 41-42. This is not a proper basis for disputing a fact. *See, e.g.*,
*White v. Deere & Co.*, No. 1:13-cv-02173, 2016 WL 346862, at *2 nn.8, 9 (D. Colo. Jan.
28, 2016) (deeming facts admitted where plaintiffs' sole basis for denying facts was
relevance). Moreover, Plaintiffs fail to provide "specific reference to material in the
record supporting the denial," as mandated by the Practice Standard. NYW Civ.
Practice Standard 7.1D(b)(4); *see, e.g.*, *Terranova v. Safeco Ins. Co. of Am.*, No. 1:21-
cv-03286, 2024 WL 4068759, at *2 n.1 (D. Colo. Sept. 5, 2024) (Wang, J.) (deeming
portions of undisputed facts that were denied without "competent contrary evidence" as
"undisputed without further note"). Accordingly, the Court should deem Facts 1-5, 6-30,
31-39, 40-44, 49, 50-51, and 57-59 as admitted.

*Facts 45-48, 52-55*: The Court should also deem these facts admitted, as
Plaintiffs likewise do not state that they deny them. *See* Opp. 42. At most, Plaintiffs
state that they "do not admit" portions of these facts without citing any "competent
contrary evidence," which is not a denial under this Court's Practice Standards. *Id.*

*Fact 56*: This is the only fact that Plaintiffs affirmatively dispute. But this fact
should also be deemed admitted where Plaintiffs fail to provide "a specific reference to

23

material in the record supporting the denial" as required by Practice Standard

7.1D(b)(4). Moreover, Plaintiffs' only objection relates to the relevance of the facts, *see*

Opp. 42-43, which, as discussed above, is an improper basis for disputing a fact.

## V.    Response Concerning Disputed Facts

1. Disputed. A magazine is not required for a semiautomatic firearm to function.
   Generally speaking, a semiautomatic firearm, without a magazine inserted, can be
   loaded manually with a single cartridge and fired. The magazine, with additional
   available cartridges, is what allows the firearm to fire additional shots without manual
   manipulation of a bolt or slide. Ex. O ¶ 120 (Yurgealitis) ("[B]oth of those examples
   [of semiautomatic firearms] will still fire a chambered round if there is no magazine
   inserted."); Ex. X ¶¶ 6-8, 15 (Yurgealitis rebuttal). It is undisputed that LCMs,
   specifically, are not necessary to the operation of a semiautomatic firearm. Ex. O
   ¶¶ 12, 109, 133 (Yurgealitis); Ex. X ¶ 14 (Yurgealitis rebuttal).

2. Disputed to the extent that Plaintiffs claim that magazines are required in every
   semiautomatic firearm. It is undisputed that LCMs are not necessary to the operation
   of any semiautomatic firearm. *See supra* Response ¶ 1.

3. Not disputed.

4. Not disputed.

5. Disputed. *See supra* Response ¶ 1.

6. Undisputed. Defendants lack knowledge or information sufficient to form a belief as
   to the truth of the allegations in Paragraph 6 but do not dispute the allegations for
   purposes of this motion.

7. Undisputed. Defendants lack knowledge or information sufficient to form a belief as
   to the truth of the allegations in Paragraph 7 but do not dispute the allegations for
   purposes of this motion.

8. Undisputed. Defendants lack knowledge or information sufficient to form a belief as
   to the truth of the allegations in Paragraph 8 but do not dispute the allegations for
   the purposes of this motion.

9. Disputed as this assertion is an argument, not a fact. Further disputed to the extent
   that Plaintiffs suggest that mere possession of a weapon constitutes "use" of that
   weapon "for self-defense when … not discharging it or brandishing it." *See, e.g.*,

*Morgan*, 150 F.4th at 1344 ("only instances of 'active employment' of the weapon should count" (quoting *Bianchi*, 111 F.4th at 438)).

10. Disputed as this assertion is an argument, not a fact. Further disputed to the extent that Plaintiffs suggest that mere possession of a weapon constitutes "use" of that weapon. *See, e.g.*, *Morgan*, 150 F.4th at 1344 ("only instances of 'active employment' of the weapon should count" (quoting *Bianchi*, 111 F.4th at 438)).

11. Disputed. Dr. Klarevas has not offered an opinion on the number of assault weapons in the United States. Dr. Klarevas analyzed other sources' estimates without endorsing them. Ex. K ¶¶ 14, 23 (Klarevas). In any case, such ownership statistics do not answer the relevant "common use" question. *See Morgan*, 150 F.4th at 1347 ("Even if Mr. Morgan could establish an accurate count of privately-held registered machineguns, that would not tell us how many are in use or for what purpose."); *supra* Section II.B.1 & p.13.

12. Disputed. Plaintiffs have failed to offer admissible evidence establishing this proposition. *See Stewart*, 744 F. Supp. 3d at 1200; Fed. R. Civ. P. 56(c)(1)(a). Paragraph 12 is also a legal argument, improperly included in a statement of facts. And it would not answer the relevant "common use" question. *See supra* Section II.B.1, 3.

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment in their favor.

Dated: October 24, 2025

Respectfully submitted,

s/ James Windels
Antonio J. Perez-Marques
David Toscano
Christopher Lynch
James Windels
Hendrik van Hemmen
Jennifer So Jin Kim
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
 (212) 450-4000
antonio.perez@davispolk.com
david.toscano@davispolk.com
christopher.lynch@davispolk.com
james.windels@davispolk.com
hendrik.vanhemmen@davispolk.com
jennifer.kim@davispolk.com
ATTORNEYS FOR DEFENDANTS

William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org
ATTORNEY FOR DEFENDANTS

Carey R. Dunne
Kevin Trowel
Martha Reiser
FREE AND FAIR LITIGATION GROUP
266 West 37th Street, 20th Floor
New York, NY 10018
(646) 434-8604
carey@freeandfair.org
kevin@freeandfairlitigation.org
martha@freeandfairlitigation.org
ATTORNEYS FOR DEFENDANTS

Gordon L. Vaughan
VAUGHAN & DeMURO
111 South Tejon Street, Suite 545
Colorado Springs, CO 80903
(719) 578-5500
gvaughan@vaughandemuro.com
ATTORNEY FOR DEFENDANTS
THE TOWN OF SUPERIOR and
CITY OF LOUISVILLE, COLORADO

Luis A. Toro, Senior Attorney
Teresa Taylor Tate, City Attorney
BOULDER CITY ATTORNEY'S OFFCE
1777 Broadway
Boulder, CO 80302
(303) 441-3020
torol@bouldercolorado.gov
tatet@bouldercolorado.gov
ATTORNEY FOR DEFENDANT
CITY OF BOULDER, COLORADO

David Hughes, Deputy County Attorney
Catherine R. Ruhland, Deputy County
Attorney
BOULDER COUNTY ATTORNEY
P.O. Box 471
Boulder, CO 80306
(303) 441-3190
dhughes@bouldercounty.org
truhland@bouldercounty.org
ATTORNEY FOR DEFENDANT
BOARD OF COUNTY COMMISSIONERS
OF BOULDER COUNTY

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2025, I served a true and complete copy of

the foregoing DEFENDANTS' REPLY IN SUPPORT OF THEIR RENEWED MOTION

FOR SUMMARY JUDGMENT upon all parties herein by e-filing with the CM/ECF

system maintained by the Court, which will send notification of such filing to the parties

of record.

Dated: October 24, 2025

<div style="margin-left:50%">

s/ James Windels

James Windels
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000 (phone)
james.windels@davispolk.com
ATTORNEY FOR DEFENDANTS

</div>