# EXHIBIT A

***Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.***

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0514

TYREE BENSON, APPELLANT,

v.

UNITED STATES, APPELLEE,

and

DISTRICT OF COLUMBIA, INTERVENOR-APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF2-005996)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued December 12, 2024                                    Decided March 5, 2026)

*Sicilia C. Englert* for appellant.

*Chrisellen R. Kolb*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time, and *Katherine M. Kelly*, *John P. Mannarino*, and *Kraig Ahalt*, Assistant United States Attorneys, were on the brief, for appellee.

*Caroline S. Van Zile*, Solicitor General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, and *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Thais-Lyn Trayer*, Deputy Solicitor General, and *Marcella Coburn*, Assistant Attorney General, were on the brief, for intervenor-appellee.

*Alice Wang*, with whom *Samia Fam* was on the brief, for Public Defender Service, amicus curiae in support of appellant.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and DEAHL, *Associate Judges*.

Opinion for the court by *Associate Judge* DEAHL.

Dissenting opinion by *Chief Judge* BLACKBURNE-RIGSBY at page 55.

DEAHL, *Associate Judge*: This appeal presents a Second Amendment challenge to the District's ban on firearm magazines capable of holding "more than 10 rounds of ammunition." D.C. Code § 7-2506.01(b)-(c). Appellant Tyree Benson argues that ban contravenes the Second Amendment so that his conviction for violating it should be vacated. The United States, which prosecuted Benson in the underlying case and defended the ban's constitutionality in the initial round of appellate briefing, now concedes that this ban violates the Second Amendment. The District of Columbia, which is also a party to this appeal,[1] continues to defend the constitutionality of its ban.

---

[1] This court's rules require that the District be provided notice of any appeal raising a challenge to "the constitutionality of an act of the Council of the District of Columbia," like the present Second Amendment challenge to the District's ban on 11+ magazines. D.C. App. R. 44(b). After receiving that notice, the District expressly sought to intervene "as an appellee" in this appeal. Both Benson and the United States consented to its party status, and this court granted its motion "to intervene as an appellee." The District is thus a party, and has all the rights of a party, in this appeal. That includes the right to petition for rehearing, rehearing en banc, or certiorari in response to this opinion.

3

Magazines capable of holding more than 10 rounds of ammunition are ubiquitous in our country, numbering in the hundreds of millions, accounting for about half of the magazines in the hands of our citizenry, and they come standard with the most popular firearms sold in America today.  Because these magazines are arms in common and ubiquitous use by law-abiding citizens across this country, we agree with Benson and the United States that the District's outright ban on them violates the Second Amendment.  *See generally District of Columbia v. Heller*, 554 U.S. 570 (2008); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

We therefore reverse Benson's conviction for violating the District's magazine capacity ban.  And because Benson could not have registered, procured a license to carry, or lawfully possessed ammunition for his firearm given that it was equipped with a magazine capable of holding more than 10 rounds, we likewise reverse his convictions for possession of an unregistered firearm, carrying a pistol without a license, and unlawful possession of ammunition.   In light of our disposition, we do not reach Benson's independent Second Amendment challenges to the District's firearm registration and licensing schemes, nor do we reach his Fourth Amendment challenge to his underlying search and seizure.

4

# I. Factual Background

Tyree Benson was charged with multiple firearm offenses after police officers found him in possession of an unregistered semiautomatic firearm equipped with a 30-round magazine.  For the uninitiated, a detachable magazine is basically a container that holds multiple rounds of ammunition and can be inserted into a gun's receiver to load ammunition into the gun.  Once attached, a magazine typically feeds the cartridges of ammunition that it holds into the gun as it fires.  Benson was indicted for (1) possession of a "large capacity ammunition feeding device," D.C. Code § 7-2506.01(b); (2) possession of an unregistered firearm, *id.* § 7-2502.01(a); (3) carrying a pistol without a license, *id.* § 22-4504(a); and (4) unlawful possession of ammunition, *id.* § 7-2506.01(a)(3).

Benson filed two pretrial motions relevant here, both of which were denied: (1) a motion to suppress the firearm police officers found on him during a stop and frisk, alleging his seizure and search violated the Fourth Amendment; and (2) a motion to dismiss the indictment because the District's firearm statutes violated the Second Amendment in numerous respects.  Namely, he argued that the "large capacity" magazine ban and the District's registration and licensure schemes were unconstitutional.  The trial court denied his suppression motion and declined to

dismiss the indictment, reasoning that the Supreme Court's decision in *Bruen* "did not invalidate [D.C.'s] gun laws."

Benson was convicted at a bench trial on stipulated facts. He stipulated that: (1) the recovered firearm was equipped with a magazine that had a 30-round capacity;[2] (2) it was unregistered and contained ammunition; and (3) he did not have a license to carry it outside the home. He was convicted on all four counts, received suspended sentences and one year of probation, and was barred from ever possessing a firearm in the future.

## II. Analysis

Benson now appeals his convictions, renewing each of his Second and Fourth Amendment challenges. We focus our analysis on Benson's Second Amendment challenge to the District's ban on magazines capable of holding "more than 10

---

[2] More precisely, the stipulations indicated that "the firearm recovered in this case had one round in the chamber and 30 rounds in the magazine," and "the magazine inserted into the recovered firearm had a capacity of 31 rounds." We read that to mean the magazine itself had a 30-round capacity while the firearm could independently hold an additional round in the chamber, as is typical, so "the magazine inserted into the firearm" had a combined capacity of 31 rounds.

6

rounds of ammunition," which we call 11+ magazines.[3]    D.C. Code
§ 7-2506.01(b)-(c).

Our analysis proceeds in four parts.  First, we detail the relevant Second
Amendment framework, with a focus on the Supreme Court's opinions in *Heller*,
*Bruen*, and *United States v. Rahimi*, 602 U.S. 680 (2024).  Second, we apply that
framework to the parties' three central disputes: (1) whether 11+ magazines are arms
protected by the Second Amendment; (2) the extent to which 11+ magazines are in
"common use" for lawful purposes, like self-defense; and (3) whether there is any
history and tradition of banning similar arms.  To preview our answers to those
central questions, they are that 11+ magazines are unquestionably arms, they are in
not only common but ubiquitous use for lawful purposes, and there is no history or
tradition of blanket bans on arms in such common use, so that the District's magazine
capacity ban violates the Second Amendment.  Third, we reject the District's
argument that Benson's facial challenge to the District's ban on 11+ magazines
should nonetheless fail because he in fact possessed a magazine holding 30 rounds.

---

[3] The statute uses the term "large capacity ammunition feeding device," and
beyond magazines it covers belts, drums, feed strips, and any other device used to
feed ammunition into a gun.  D.C. Code § 7-2506.01(c).  We are concerned here
only with the ban on 11+ magazines—our holding does not affect the ban on belts,
drums, feed strips, etc.—and we use that term rather than "large capacity" magazines
to avoid any misleading suggestion that they are outside the norm or larger than your
average magazine.

Fourth, and finally, we hold that the unconstitutionality of the District's capacity ban infects and requires reversal of each of Benson's convictions.

We now address those four points in turn.

### A. The Second Amendment Framework Under Heller, Bruen, and Rahimi

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The text of that constitutional command could be sliced in two very different ways.

On one view, the amendment's prefatory militia clause ("A well regulated Militia, being necessary to the security of a free State") restricts its operative clause ("the right of the people to keep and bear Arms, shall not be infringed"). Under that view, the amendment protects only a collective right to keep and bear arms that is strictly tethered to its militia-related interests, and it protects only against federal government disarmament of state militias. Under a competing view, the Second Amendment's prefatory militia clause simply identifies one reason for codifying its operative clause but does not define or otherwise restrict the bounds of the right to keep and bear arms. That is, protecting state militias from disarmament was a mere

animating force behind constitutionalizing an individual right to keep and bear arms, but the right itself belongs to individuals, not any collective.[4]

For decades, the first view was the dominant one subscribed to by a vast majority of this nation's courts. That is, this court and virtually all other appellate courts held that the Second Amendment protects only a collective right to keep and bear arms in connection with a militia. *See Sandidge v. United States*, 520 A.2d 1057, 1058 (D.C. 1987) ("We agree with numerous other courts that 'the Second Amendment guarantees a collective rather than an individual right.'" (quoting

---

[4] To strip away the trappings about the desirability of guns and gun control in this country, consider two analogies mirroring the Second Amendment's syntax: (1) "A well-educated electorate, being necessary to the preservation of a free society, the right of the people to keep and read books shall not be infringed," and (2) "A robust military, being necessary for effective national defense, the right of the people to develop and possess weapons of mass destruction shall not be infringed." The first analogy is designed to make you think the right is independent of its stated animating purpose, largely because your prior views are surely that the right to keep and read books *is* independent of whether you are a member of the electorate, and of whether any particular book advances civic education. Most people would conclude that the non-voter's right to read Harry Potter is protected under this first analogy, if only because they think that is an individual right regardless of the prefatory language. The second analogy pushes you toward the opposite conclusion, that the right is restricted by the prefatory clause, because nobody in their right mind thinks individuals should be able to develop and possess their own weapons of mass destruction. That seems like a collective right for institutional actors operating within our national defense apparatus if only because, surely, that right must be so limited. That is all to say that there is a strong temptation to read the Second Amendment to align with one's prior views about whether individuals should have a right to keep and bear arms, though on its face the awkwardly constructed amendment could fairly be read either way.

*United States v. Warin*, 530 F.2d 103, 106 (6th Cir. 1976))); *Heller*, 554 U.S. at 638 n.2 (Stevens, J., dissenting) (noting that "every Court of Appeals to consider the question had understood . . . that the Second Amendment does not protect the right to possess and use guns for purely private, civilian purposes" until the Fifth Circuit held otherwise in 2001).

That changed in 2008 when the Supreme Court in *Heller* rejected the first view and instead adopted the second, holding that the Second Amendment protects an individual right to keep and bear arms.  554 U.S. at 592.

### 1.  *District of Columbia v. Heller*

In *Heller*, the Supreme Court considered a challenge to the District's general prohibition on handgun possession, including on handguns within the home.  *Id.* at 574.  *Heller* struck that law down, recognizing that the Second Amendment protects an individual right to keep and bear arms, explaining that "[t]he prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right" to keep and bear arms, so the prefatory clause should not be understood as limiting the operative clause.  *Id.* at 599.  Instead, after exhaustively surveying Founding-era authorities, *Heller* concluded that Americans "undoubtedly thought" the right to keep and bear arms was "even more important for self-defense and hunting" than it was for maintaining a militia.  *Id.*  So while the prefatory clause

was the stated reason for constitutionalizing the right to keep and bear arms, it did not alter or qualify the bounds of the "ancient right of individuals to keep and bear arms" for lawful purposes. *Id*. With that core and rather contentious debate settled in favor of the Second Amendment protecting an individual right to keep and bear arms, the task remained to define the contours of that individual right.

On that topic, *Heller* recognized that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Id*. at 582. That covers "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. at 581 (quoting 1 Timothy Cunningham, A New and Complete Law Dictionary (1771)). So long as something is a bearable arm, it is covered—at least as a threshold matter—by the Second Amendment's plain terms. *Id*. at 581-82. The mere fact that something qualifies as an arm covered by the Second Amendment's terms does not mean it cannot be restricted or even banned outright. "Like most rights, the right secured by the Second Amendment is not unlimited," and it does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626. But such restrictions are permitted only to the extent they are rooted in "historical tradition," with a clear focus on Founding-era history. *Id*. at 627.

11

With those critical preliminaries out of the way, *Heller* turned its attention to the District's ban on handguns. It held that "handguns are the most popular weapon chosen by Americans for self-defense," and for that standalone reason the District's "complete prohibition" of them was "invalid." *Id.* at 629. *Heller* repeated, again and again, that the District's ban on handguns was invalid because "it amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense, *id.* at 628, and "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster" no matter what level of scrutiny applied. *Id.* at 628-29. There simply was no "historical tradition" of banning arms that are in "common use . . . for lawful purposes like self-defense," and such outright bans can be squared with the Second Amendment only when they apply to "dangerous and unusual weapons," like short-barreled or "sawed-off" shotguns. *Id.* at 624, 627 (discussing *United States v. Miller*, 307 U.S. 174 (1939)).

After *Heller*, the District reacted by permitting some handgun possession within the home (subject to various restrictions), but it banned carrying handguns outside the home entirely. *See* D.C. Code § 22-4504(a) (2009). After a federal trial court struck that ban down, *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the District pivoted to a licensing scheme which "confine[d] carrying a handgun in public to those with a special need for self-defense." *Wrenn v. District*

12

*of Columbia*, 864 F.3d 650, 655 (D.C. Cir. 2017). Although that restriction was also struck down, *id.* at 668, most courts upheld similar restrictions on carrying handguns outside of the home after applying intermediate scrutiny and concluding that the restrictions bore "a substantial relationship to important governmental interests." *Gould v. Morgan*, 907 F.3d 659, 662 (1st Cir. 2018); *see also Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (upholding under intermediate scrutiny a scheme granting permits to carry outside the home only upon demonstrating a "good and substantial reason" to do so); *Bruen*, 597 U.S. at 18-19 & n.4 (collecting cases). These laws authorizing individuals to carry outside the home only when they could show a special need for self-defense came under attack in *Bruen*, which we now turn to.

### 2. *New York State Rifle Association v. Bruen*

In *Bruen*, the Supreme Court considered a Second Amendment challenge to laws that prohibited individuals from carrying firearms outside the home, unless they obtained a license to carry based on a "special need" for doing so. 597 U.S. at 11. *Bruen* expressly held what *Heller* made reasonably evident, that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home." *Id*. at 10. And *Bruen* held that New York's licensing scheme violated the Second Amendment. *Id*. at 11.

13

*Bruen* clarified how to approach the Second Amendment analysis that came out of *Heller*, though unlike its predecessor, *Bruen* did not concern a ban on any particular kind of arm; instead it addressed a regulation on where they could be possessed. So far as firearm regulations go, there is first a threshold question of whether the "Second Amendment's plain text covers" the conduct at issue, in which case the conduct is "presumptively protect[ed]" and the government bears the burden of justifying its regulation. *Id.* at 17. *Bruen* made explicit that, at least as a threshold matter, the Second Amendment's protection for arms covers all "modern instruments that *facilitate* armed self-defense." *Id.* at 28 (emphasis added). If the regulation implicates the Second Amendment at that threshold inquiry, then the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," and "[o]nly then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 24. That is to say, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. That means, in practice, that the government must show that there is "a well-established and representative historical *analogue*" for its regulations, though it need not be a "historical *twin*" or "a dead ringer for historical precursors." *Id.* at 30.

14

In so holding, the Court forcefully rejected the "means-end scrutiny" that most lower courts had applied to firearm regulations after *Heller*, and explained that such regulations cannot be justified simply because they satisfy "strict or intermediate scrutiny." *Id.* at 22. That is, it is entirely beside the point whether the regulation is "substantially related to the achievement of an important governmental interest," as intermediate scrutiny requires, or is "narrowly tailored to achieve a compelling governmental interest," as strict scrutiny demands. *Id.* at 18-19. The "means-end scrutiny" step of the lower courts' two-step approach to analyzing firearm restrictions was "one step too many." *Id.* at 19. Instead, what matters is whether there is a history and tradition of regulating the arm at issue, and any modern regulations can be justified only if they are sufficiently similar to historical analogues both in "how" they regulate arms and "why" they do so. *Id.* at 29.

*Bruen* also echoed what *Heller* had to say about categorical bans on arms, as opposed to mere regulations on who, when, and how people can carry them. The Court repeated *Heller*'s core holding that any "historical tradition of prohibiting" arms extended only to "dangerous and unusual weapons," which it contrasted with arms "that are 'in common use at the time.'" *Id.* at 21. That is, while mere regulations could be justified through sufficiently similar historical analogues, so far as bans on entire categories of arms are concerned, the Court has already done the historical inquiry for us: categorical bans on arms can be justified where the arms in

question are sufficiently dangerous and unusual, but outright bans on arms in common use for lawful purposes are a non-starter under the Second Amendment. *Id.*

### 3.  *United States v. Rahimi*

That brings us to *Rahimi*, the Supreme Court's only post-*Bruen* assessment of what regulations qualify as sufficiently analogous to pass *Bruen*'s historical test.[5] *Rahimi* did not concern a ban on any particular arm, but a restriction on who could possess firearms.  It involved a federal statute that "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety'" of another.  602 U.S. at 684-85.  The Court had "no trouble" rejecting Rahimi's challenge to that statute because "our Nation's tradition of firearm regulation

---

[5] While we focus on this trio of its cases, the Supreme Court has notably issued other post-*Heller* decisions that offer insight into the Second Amendment's contours.  For instance, *McDonald v. City of Chicago* held that the Second Amendment "is fundamental to *our* scheme of ordered liberty" and so is incorporated against the states via the Fourteenth Amendment.  561 U.S. 742, 767 (2010); *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (rejecting lower court's reasons for concluding that "stun guns" are not protected by the Second Amendment and remanding for reconsideration).  But the big three, and in order of importance for present purposes at least, are *Heller*, *Bruen*, and *Rahimi*.

16

distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at 700.

The Court discerned that tradition of regulation from Founding-era "surety and going armed laws," which it summarized as providing that a "threatening individual may be disarmed" when he "poses a clear threat of physical violence to another." *Id.* at 698. The Court found those laws analogous to the federal statute both in terms of "how" they each burdened the right to bear arms (through disarmament), and in terms of "why" they did so (because of a credible threat to another). *Id.* The Court explained that these two questions, "[w]hy and how the regulation burdens the right" to bear arms, "are central" to the Second Amendment inquiry. *Id.* at 692 (citing *Bruen*, 597 U.S. at 29). Because our nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others," the federal statute at issue in *Rahimi* complied with the Second Amendment. *Id.* at 700.

With these precedents in mind, we now turn to assessing whether the District's ban on 11+ magazines violates the Second Amendment.

17

### *B. There is no historical tradition of banning arms in common and ubiquitous use, like 11+ magazines*

The question before us is whether the District's outright ban on 11+ magazines violates the Second Amendment. The parties engage in three subsidiary debates that inform that big-picture question: (1) are 11+ magazines bearable arms? (2) are 11+ magazines in "common use" for lawful purposes? and (3) is there a historical tradition of banning arms in such common use? The answers to those questions are yes, yes, and no, respectively, so that the District's ban on 11+ magazines violates the Second Amendment. We now explain each of those answers in turn.

### 1.  Magazines of all capacities are arms

The threshold question is whether 11+ magazines are "bearable arms" covered by the Second Amendment's plain text. *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). That is, are they something that a person might "take[] into his hands" to use "in wrath to cast at or strike another," *Heller*, 554 U.S. at 581, or do they otherwise "facilitate armed self-defense"? *Bruen*, 597 U.S. at 28. The answer to each of those questions is "yes." An 11+ magazine facilitates armed self-defense

because it is used to load a firearm, and it then feeds successive cartridges[6] into the gun's firing chamber as a person shoots—a particularly essential feature for semi-automatic guns—eliminating any need to manually reload the gun until the magazine is spent and itself needs to be reloaded. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."). That can come in handy in fending off an attacker, particularly if you need to fire a second shot. It is also helpful for getting some target practice in, either for entertainment's sake or to improve one's marksmanship and ability to defend themselves, without having to manually reload the weapon after each shot. Magazines of all capacities are thus arms covered by the plain text of the Second Amendment.

The District's first response is that Benson has "forfeited any argument about why [11+ magazines] constitute 'bearable arms'" because his opening brief did not

---

[6] A cartridge consists of a bullet, its casing, gunpowder, and a primer (which is what the gun's firing pin strikes to ignite the gunpowder to trigger the blast that ejects the bullet). People often refer to cartridges as bullets, though that is not quite right—the bullet is just the small projectile that shoots out from the firearm, whereas with magazine-fed guns, the spent casing usually ejects out just a few feet from the shooter.

19

adequately address that question.  That is a frivolous contention.  By simply invoking the Second Amendment a defendant is quite obviously claiming that his conduct is covered by it.  And Benson did far more than that here—he argued in the trial court that "ammunition feeding devices qualify as 'arms' under the plain text of the Second Amendment," and he reiterated in his opening brief that 11+ magazines are "in common use today for self-defense" and are "standard issue with the most popular handguns used for self-defense by law enforcement and civilians alike," invoking the familiar arguments for why these 11+ magazines are arms protected by the Second Amendment.  The trial court's ruling also took it as a given that magazines are arms.  So the fact that Benson did not, in his opening brief, more exhaustively and preemptively rebut the District's inventive take that magazines are not arms did not forfeit anything.  Benson did plenty to preserve his claim in the trial court that 11+ magazines are arms protected by the Second Amendment, and to press that same point on appeal.

The District next counters on the merits that 11+ magazines, by themselves, are "practically harmless" and of "no use" without ammunition and a receiver (the firearm's core component), so that magazines themselves are not arms.  That is not a defensible approach to identifying what constitutes an arm—a gun is also practically harmless and of no use without ammunition, but it is still obviously an arm.  The District's position that magazines are not arms has a couple of glaring

flaws.  First, it ignores *Bruen*'s clear explanation that arms include "instruments that facilitate armed self-defense," which magazines clearly do by reloading the gun and enabling semi-automatic firing.  597 U.S. at 28.  Second, the District's view reduces to the absurd proposition that legislatures can prohibit all of the core components of firearms—the trigger, the hammer, the slide, the firing pin, the sights, etc.—because none of them do much good without the others, and none of them is strictly necessary to a functioning firearm.  *See Duncan v. Bonta*, 133 F.4th 852, 897 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting), cert. pending, No. 25-198 (U.S. filed Aug. 15, 2025) ("[T]he Second Amendment's protection of 'Arms' must extend to their functional components," or "the Second Amendment would be a shallow right— easily infringed by indirect regulation."); *id.* at 917 (Vandyke, J., dissenting) ("[U]nder that logic, basically every part of a firearm is an 'optional component'" and thus "not protected under the Second Amendment.").

The District persists that while some magazines might be arms, 11+ magazines are not because no firearm requires an 11+ magazine to operate.  The en banc Ninth Circuit recently endorsed that same view in *Duncan*.  133 F.4th at 867-68.  The fatal flaw in this argument is that the relevant question is not whether 11+ magazines are strictly necessary for armed self-defense, but whether they *facilitate* it, as magazines of any capacity do.  *Bruen*, 597 U.S. at 28 (emphasis added); *see also Heller*, 554 U.S. at 629 ("It is no answer . . . that it is permissible to

21

ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").  On the District's logic, states could ban two-round or even one-round magazines—there's no reason a semiautomatic firearm cannot fire with an empty or "dummy" magazine so long as there is a round in the chamber.[7]  And bans like that would permit states to effectively eliminate any semi-automatic firing capacity and require manual reloading after each shot.  In fact, under the District's view the state could just directly outlaw the semi-automatic firing mechanism because, by itself, that is a harmless component of a firearm and it is not a necessary feature of any gun.  That would run contrary to *Heller*'s central command that states cannot ban the most popular weapons chosen by law-abiding Americans for lawful purposes.  554 U.S. at 581.  For that matter, modern cartridges, *see supra* n.6, are not necessary for firing a gun either.  If the Second Amendment applied only to those things that are strictly necessary for a gun's operation, states could ban cartridges so long as primitive musket balls remained a legal alternative ammunition.

---

[7] A gun can fire even when its magazine is empty, and if need be you can typically load a cartridge directly into the chamber manually without the aid of a magazine.  So on the District's and *Duncan*'s reasoning, we do not see what precludes states from banning magazines with any capacity to hold live rounds, permitting only "dummy" magazines, and leaving users to manually reload after each shot.

The more sensible view is that magazines of all sizes, like other core components of firearms, are arms that are covered by the Second Amendment's plain text as a threshold matter. "To hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level." *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024); *see also id.* ("A magazine is necessary to make meaningful an individual's right to carry a handgun for self-defense."); *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116 (similar). Any components integral to a firearm's operation, like magazines, fit comfortably within the Second Amendment's protection of arms.

### 2. Magazines holding more than 10 rounds are in common and ubiquitous use

The next question is whether 11+ magazines are in common use for lawful purposes. While the parties agree that this is a critical question, they disagree about its precise import.

#### a. The relevance of the common use inquiry

In the District's view, whether 11+ magazines are in common use informs whether they are arms at all. That is, the District posits that the common use inquiry informs a threshold question of whether the instrument at issue is a bearable arm and receives any Second Amendment protection. Benson and his amicus counter that

whether an arm is in common use is irrelevant to the "threshold textual inquiry" of whether the capacity ban "regulates arms-bearing conduct," *Rahimi*, 602 U.S. at 691, which reduces to whether the instrument regulated is one that a person might "useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581, or whether it generally "facilitate[s] armed self-defense," *Bruen*, 597 U.S. at 28, i.e., the inquiry we conducted above in Part II.B.1.  They argue instead that the common use inquiry comes into play only in the next step of the inquiry, where under *Bruen*'s test we consider whether there are sufficient historical analogues for banning arms in such common use.

Like the parties, courts are divided on the import of the common use inquiry. "There is no consensus on whether the common-use issue" is a threshold textual inquiry, as the District asserts, or a historical inquiry pertaining to the permissibility of outright bans, as Benson and his amicus assert.  *Hanson*, 120 F.4th at 232 n.3 (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023)); *see also Bianchi v. Brown*, 111 F.4th 438, 501-02 (4th Cir. 2024) (Richardson, J., dissenting) (cataloguing support for both approaches in the Supreme Court's opinions, noting that "*Bruen* is somewhat ambiguous on this point," and concluding that "the 'common use' inquiry best fits at *Bruen*'s second," historical inquiry "step").

24

This apparent tension in the Supreme Court's directives is best resolved by recognizing that there are distinct common use inquiries relevant at each step of the analysis. At the threshold inquiry, the Supreme Court has said that "the sorts of weapons protected" by the Second Amendment are "those 'in common use,'" *Heller*, 554 U.S. at 627 (citing *Miller*, 307 U.S. at 179), and that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *Bruen*, 597 U.S. at 21. We take that to mean that an instrument must be designed or at least somewhat commonly used as a weapon to qualify as an arm covered by the Second Amendment. So while you could bludgeon somebody with a taxidermied marmot, or beat them with a non-stick frying pan, a ban on stuffed rodents and regulations on Teflon cookware do not implicate the Second Amendment as a threshold matter because those instruments are not designed or typically used as weapons. This threshold inquiry is not an exacting one. If the instrument is the type of thing that generally facilitates self-defense, *Bruen*, 597 U.S. at 28—which, as we have explained, magazines of all sizes are—then it is in common enough use as an arm to receive some Second Amendment protection.

At the next step of the analysis, when an instrument is in such common use that it is no longer "unusual" and ranks among the most popular arms possessed by law-abiding citizens—let's call that ubiquitous use to disambiguate the distinct meanings of "common use"—then by that virtue alone it cannot be banned outright

because there is no historical precedent for a ban on ubiquitous arms. *Heller* made clear that any historical tradition of firearm bans in this country extends only to "dangerous *and unusual*" weapons, like short-barreled shotguns and fully automatic machineguns.[8]  *Heller*, 554 U.S. at 625, 627 (emphasis added); *see also United States v. Bridges*, 150 F.4th 517, 519 (6th Cir. 2025) (recognizing that machineguns are arms under the Second Amendment but that a ban on them "is consistent with our Nation's historical tradition of prohibiting private possession of dangerous and unusual weapons"); *see also United States v. Mitchell*, 734 F. Supp. 3d 702, 707-08 (N.D. Ohio 2024) ("After *Heller*, the Courts of Appeals have uniformly held that machineguns are dangerous, unusual, and not in common use").   The only "historical tradition" supporting "complete prohibitions" extends exclusively to bans on "dangerous *and unusual*" weapons.  *Heller*, 554 U.S. at 627, 629 (emphasis added); *Hanson*, 120 F.4th at 271 (Walker, J., dissenting) ("*Heller* and its progeny . . . have *already* held that the government cannot ban an arm in common use for lawful purposes.").

So if 11+ magazines are arms in common and ubiquitous use, the Second Amendment inquiry is over: not only does the Second Amendment apply as a

---

[8] Both short-barreled shotguns and fully automatic machineguns are self-evidently arms, contrary to the District's suggestions, at the threshold Second Amendment inquiry.

26

threshold matter, but the District's outright ban on 11+ magazines violates the Second Amendment. *Heller* already made clear that the only historical tradition of banning arms extended only to those arms that are dangerous and unusual, and because arms in ubiquitous use are by definition not unusual, they cannot be banned outright. Recall that *Heller* itself did not begin its analysis with the fact that "handguns are the most popular weapon chosen by Americans for self-defense," it ended it there. 554 U.S. at 629. That alone was sufficient to hold that a complete ban on them was "invalid." *Id.*; *see also id.* at 628-29 ("[B]anning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster" in all circumstances).

### b. Magazines holding more than 10 rounds are in common and ubiquitous use

That brings us to the critical question of whether 11+ magazines are in common and ubiquitous use. They are. These magazines facilitate armed self-defense and law-abiding citizens possess hundreds of millions of them in this country. *See* William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned at 25 (May 13, 2022) ("Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds."); Nat'l Shooting Sports Found., Detachable Magazine Report 1990-2021 at 3 (2024) (estimating "717 million" 11+ magazines "entered the commercial market between

1990 and 2021"), https://perma.cc/R9VT-MR6V; *see also Duncan*, 133 F.4th at 892 (Bumatay, J., dissenting) ("'[I]n the realm of firearms,' these magazines 'are possibly the most commonly owned thing in America." (quoting *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1214 (S.D. Cal. 2023))); *id.* at 892 ("They come standard with the most popular firearms sold nationwide," account for roughly "half" of the magazines in America, and there are "more than a hundred million" of them in this country by "the most conservative estimates"); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (en banc) ("Most pistols are manufactured with magazines holding ten to seventeen rounds."). That should be the end of this inquiry. "There may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten." *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011).[9]

---

[9] The District and our dissenting colleague critique some of these sources substantiating the ubiquity of 11+ magazines, but they conspicuously offer no contrary authority, nor will they brave even a bare assertion that there are fewer than hundreds of millions of 11+ magazines in the hands of law-abiding citizens in this country. Even still, the District critiques the study from Prof. William English that we have cited above as a "non-peer-reviewed survey [that] has been criticized as methodologically unreliable." *See* William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). And to self-critique, we have also cited to one study above from the National Shooting Sports Fund, a firearms industry trade association which is nobody's idea of a fair and neutral source on this topic. But the problem for the District and the dissent is that there is no contrary authority—not even from a horribly biased

The District raises several counterarguments, and highlights that each of the five federal circuit courts of appeals to have confronted this issue in the years after *Bruen* has upheld 11+ magazine bans like the District's.  *See Duncan*, 133 F.4th 852; *Hanson*, 120 F.4th 223; *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024); *Bevis*, 85 F.4th at 1175; *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025).  The District and those courts raise four core arguments for why 11+ magazines are not in common use in the relevant sense and thus may be banned:[10] (1) that an arm does not need to be both dangerous *and* unusual to fall outside the category of arms in common use that cannot be banned—bans instead might be appropriate on any arm that is "unusually dangerous"; (2) the ownership statistics we have just relied upon cannot be determinative of whether an arm is in common use; (3) *Heller* could not logically have prohibited bans on arms in common use because that would be "circular"; and (4) 11+ magazines are not in common use

---

source—that will say 11+ magazines are less than ubiquitous because it is a plain counterfactual.  To conclude that they are anything other than common and ubiquitous, you would have to ignore every study out there.  You would also likely have to avoid consorting with the third of Americans who personally own firearms, or the nearly half of Americans who live in a household with one.  *See Guns*, Gallup, https://perma.cc/2PTC-AB8M (last visited March 1, 2026).  Ask just about any one of them and they can tell you that twelve-, fifteen-, and seventeen-round magazines are the norm rather than any kind of outlier.

[10] Two of the five circuits upholding 11+ magazine bans post-*Bruen*—the Ninth and the Seventh circuits—start from the wrong premise (see above) that 11+ magazines are not arms at all.  The D.C. Circuit correctly held that they are arms, and the First and Second Circuits assumed (without holding) that they are.

29

because people rarely fire more than 2-3 rounds in self-defense. We consider those arguments one by one.

First, the District argues that "unusual" does not mean what you think it means—i.e., that things in ubiquitous use like 11+ magazines can still be "dangerous and unusual" in the relevant Second Amendment sense. The District maintains that "dangerous and unusual" is best understood as a "hendiadys," similar to "cruel and unusual" or "necessary and proper," where two words combine to form a single concept distinct from the meaning of its component parts. And in this case, that concept refers to any arms that are "unusually dangerous," no matter how ubiquitous they are, or so the argument goes.

That is a tortured argument. We cannot ignore what *Heller* and *Bruen* actually said, which is that an arm cannot be banned unless it is both "dangerous *and* unusual." *Heller*, 554 U.S. at 627 (emphasis added); *Bruen*, 597 U.S. at 47 (emphasis added); *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment) (an arm must be "*both* dangerous *and* unusual" for a ban on it to comply with the Second Amendment). The Supreme Court tends not to speak in code and usually means what it says, so that a weapon is not "dangerous and unusual" if it is "in common use today." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Hanson*, 120 F.4th at 259-60 (Walker, J., dissenting) (same). If the Supreme

Court wanted to say "unusually dangerous," it was quite capable of stringing the two words together in just that way, but it went with "dangerous and unusual" weapons instead; and to make itself especially clear, it juxtaposed "dangerous and unusual" weapons with weapons "in common use," making clear that it meant "unusual" in its ordinary sense, to wit, uncommon.  *See Heller*, 554 U.S. at 627; *but see Lamont*, 153 F.4th at 234 & n.19 (endorsing the view that "dangerous and unusual" is a hendiadys for "unusually dangerous"); *id.* at 251-52 (Nathan, J., concurring) (same).[11]

---

[11] Judge Nathan highlights that the sources *Heller* cites as supporting "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" sometimes use the disjunctive, "dangerous or unusual," 153 F.4th at 250-51, so that they may support the view that sufficiently dangerous weapons can be banned even when they are in common use, and, thus, not unusual at all.  In fact, the first source *Heller* cited as support for that tradition was Blackstone, which used only the disjunctive "dangerous or unusual" at the very pages *Heller* cited to.  *Id.* (describing proscriptions on the "'offence of riding or going armed, with dangerous or unusual weapons'") (quoting 4 William Blackstone, Commentaries *148-49).  That led Judge Nathan to posit that *Heller*'s conjunctive test is perhaps based on a "possible misquote of Blackstone."  *Id.* at 251.  That rather uncharitable reading of *Heller* is not a plausible one.  Our takeaway is that after reviewing the body of historical authorities, Justice Scalia (*Heller*'s author) and the rest of the majority, rightly or wrongly, concluded that any historical tradition of banning weapons extended only to "dangerous and unusual" arms—that this conjunctive test better captured the history of arms bans—and they rather deliberately endorsed that view and not the disjunctive version of it that sometimes appeared in the same historical literature and seemingly would have led to a different result in *Heller* itself.  *Heller* notably did refer to "dangerous or unusual weapons" elsewhere in the opinion, but only in describing one of the government's arguments that it would go on to reject.  554 U.S. at 623.

Still, even if we assume that Justice Scalia uncharacteristically and without warning used a "hendiadys" in a vital portion of his watershed *Heller* opinion to mean something other than what he said,[12] "dangerous and unusual" cannot possibly mean what the District asserts.  If *Heller* meant to say that bans on "unusually dangerous" weapons were in bounds, then there's no telling why the Court did not uphold the District's handgun ban.  Handguns *are* unusually dangerous as compared to most other weapons like knives, clubs, swords, bows, and—given how easy they are to conceal—even rifles or shotguns (at least if you take assault rifles like the AR–15 out of the equation).  *Cf. Snope v. Brown*, 605 U.S. ---, 145 S. Ct. 1534, 1534 (2025) (mem.) (Kavanaugh, J., respecting the denial of certiorari) ("Given that millions of Americans own AR–15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR–15s are in 'common use'" and that bans on them thus violate the Second Amendment).  One

---

[12] The scholar best known for advancing hendiadys as a way to read conjunctive phrases in a manner distinct from their component parts often used Justice Scalia as a foil, precisely because of Justice Scalia's general commitment to reading conjunctive requirements as demanding two distinct things, as you might expect of an ardent textualist (or even a faint-hearted one).  *See* Samuel L. Bray, "*Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 707 (2016) ("The text of the Eighth Amendment is understood by some as prohibiting punishments that meet two requirements: they are 'cruel' and they are 'unusual.'  That view has roots in some cases from the late nineteenth and early twentieth centuries, and it has more recently been advanced by Justice[] Scalia," among others).

of the District's core arguments in *Heller* was that even if the Second Amendment protects an individual right to bear arms, its handgun ban was nonetheless justified by how unusually dangerous handguns are.  Br. for Petitioners, *District of Columbia v. Heller*, 2008 WL 102223, at 50 ("[H]andguns are uniquely dangerous," and "the dangers to others, both in the home and outside of it, justify the handgun ban.").  The Supreme Court did not cast any doubt on the premise of that argument—handguns are of course extraordinarily dangerous—it simply deemed that point irrelevant, because there is no historical tradition of banning arms that are overwhelmingly possessed for lawful purposes.

Second, some circuit courts have held that 11+ magazines are not in common use, despite their ubiquity, reasoning that an "ownership-statistics" approach to assessing what arms are in common use is too "simplistic."  *Duncan*, 133 F.4th at 882; *see also Bevis*, 85 F.4th at 1198-99 (declining to base its analysis "on numbers alone").  But that's like saying a tape measure is too simple a tool for measuring the width of a table, or that a thermometer is too crude for gauging the temperature outside.  When assessing whether an arm is in "common use" and "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 624-25, ownership statistics might not tell the whole story—they do not tell you if the arms are held for lawful purposes—but they tell most of it, and they are right on point.

33

Just because a tool does not give you the measurement you had hoped for does not mean it is broken or ill-suited to the task.

The Ninth Circuit in *Duncan* persisted in its attack on ownership statistics, positing that reliance on them would mean that "any time an undefined number of people owned an undefined number of" arms, those arms could not be banned. 133 F.4th at 883. That strawman of an argument is not at all what we mean. What we mean is what *Heller* said: that arms that are utterly ubiquitous in this country, like the hundreds of millions of 11+ magazines, cannot be banned. Just as handguns cannot be banned because they are "the most preferred [type of] firearm in the nation," 307 U.S. at 628-29, the 11+ magazines that tend to accompany them are the most preferred type of magazine and likewise cannot be banned.

*Duncan* further critiqued the "ownership-statistics approach" to discerning common use because, under it, it seemed to the majority that machineguns could not be banned because there are an "estimated . . . 176,000 machine guns" possessed by civilians. *Id.* at 883. But there is no difficulty in reconciling a machinegun ban with our holding today—11+ magazines are about one-thousand times more prevalent than machineguns are in the hands of civilians. Maybe there will be a difficult line-drawing problem in determining where in between hundreds of thousands, and hundreds of millions, an arm becomes so commonplace that an outright ban on it

34

becomes unconstitutional.  But it is not hard to tell which side of any conceivable line these 11+ magazines fall on.  Under no view are 11+ magazines anything but in common and ubiquitous use.  *Heller II*, 670 F.3d at 1261.  Besides, the *Duncan* majority is in no position to cast aspersions when it comes to line-drawing problems. It could not explain why its reasoning would not equally permit a ban on eight-, five-, or two-round magazines, despite the dissenters' direct challenges to explain why its analysis would not permit such bans.  *See Duncan*, 133 F.4th at 917 (Vandyke, J., dissenting) ("presumably," under the majority's rationale, "California could also ban magazines holding five rounds.  Maybe even two.").

Third, the District argues that precluding prohibitions on firearms in common use is "hopelessly circular," because that would mean that once a firearm became sufficiently popular, there is no clawing it back.  Put another way, the District posits that under the common use test, "gun manufacturers and retailers would only need to race to make their products commonly possessed before any limitations could be enacted to forever prohibit such limitations under the Second Amendment."  That argument has some logical force to it, but it is no more forceful now than when the District pressed it in *Heller*, and yet, the Supreme Court squarely rejected it and adopted the common use test anyway.  *See* Br. for Petitioners, *District of Columbia v. Heller*, 2008 WL 102223, at 45 ("[T]he [common use] test leads to tragic results. It suggests, for instance, that Congress could ban the private ownership of a

35

particularly dangerous weapon right after its invention, before it grows into common use, yet not if its dangerousness becomes clear only after its use becomes widespread.").  If the District wants to relitigate that fight, it needs to take it up with our brothers and sisters up the road at 1 First Street.  We are not in the business of grading the Supreme Court's homework, and whatever the wisdom of its Second Amendment holdings, they remain binding on us.

In any event, the logical force of the District's argument is limited in cases like this one, where the District is an outlier in putting any capacity limits on magazines.  There are no magazine capacity limits federally nor are there any in the vast majority of states.  *Duncan*, 133 F.4th at 892 n.3 (Bumatay, J., dissenting) (noting that "[o]nly twelve states and the District of Columbia ban the outright possession of magazines with more than a certain number of rounds," with 10 being the low-water mark, but some states setting higher limits like 15 or 17).  The District's critique would be more forceful if this were a uniform federal ban on some class of arms that stood a chance of meaningfully diminishing the arm's ubiquity— the Supreme Court has not addressed anything like that since the 1930s in *Miller*, and perhaps it will reassess its "common use" test if it crops up in the context of a federal ban.  But there is nothing circular about saying that individual states cannot ban arms within their borders when they can be easily procured and brought into the state from elsewhere by people who pay no mind to the law.  One could literally jog

from the District to Virginia to procure a 30- or 50-round magazine, and one perfectly coherent view is that law-abiding citizens everywhere should have access to the same arms that are legal, widely owned, and generally available throughout the rest of the country.

Fourth, and finally, the District argues that 11+ magazines are not in common use because "it is extremely rare for an individual to fire more than ten rounds in self-defense." *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 920 (D. Or. 2023). The District again addresses the wrong question. *Heller* was not concerned with how often arms were actually fired in self-defense; it asked only whether they were "typically *possessed* by law-abiding citizens for lawful purposes." 554 U.S. at 625 (emphasis added); *see also Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014) ("[T]he standard is whether the prohibited magazines are 'typically possessed by law-abiding citizens for lawful purposes,' not whether the magazines are used for self-defense." (quoting *Heller*, 554 U.S. at 625)); *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1225 (S.D. Cal. 2023) ("[T]o be protected, an arm needs only to be regarded as typically possessed or carried, or commonly kept, by citizens to be ready for use, if needed. The Supreme Court has not said that the actual firing of a gun is any part of the test."). Most firearms held in self-defense will never be fired in self-defense at all—that cannot justify a ban on ammunition simply because it is rare for law-abiding citizens to actually shoot some attacker, or because blanks might

suffice to scare most attackers off without live ammunition. Moreover, we have no doubt that law-abiding citizens do regularly fire more than 10 rounds for lawful purposes like target practice and marksmanship, and the Second Amendment's protections extend to those activities as well. *See Heller*, 554 U.S. at 599 (explaining that "hunting" is another lawful purpose that the Second Amendment protects).

Because 11+ magazines are in common and ubiquitous use for lawful purposes, the District's outright ban on them violates the Second Amendment.

## 3. There is no historical tradition of banning arms in common and ubiquitous use

Our holdings resolving the first two disputes render this third one an afterthought: there is no historical tradition of banning bearable arms in common and ubiquitous use and *Heller* already held as much. And because 11+ magazines are bearable arms in common and ubiquitous use, an outright ban on them violates the Second Amendment.

Even assuming that we are free to second-guess *Heller*'s assessment after a fresh review of historical analogues,[13] the District has not carried its burden of

---

[13] Our dissenting colleague contends that we have not performed *Bruen*'s "required historical analysis" because we read *Heller* as instructing that outright bans on arms ubiquitously held in self-defense simply have no historical analogue.

identifying any historical analogue banning bearable arms that approach the ubiquity of 11+ magazines, much less a historical tradition of similar bans. The District highlights historical bans on "trap guns," but those are not bearable arms at all, and they were never particularly common. Trap guns, by design, fire without an operator, typically via a tripwire triggered by an unsuspecting person (they are boobytraps). To bear it is to render it something other than a trap gun. The District next points to Founding-era "[r]estrictions on gunpowder storage," which required that gunpowder be divided into containers of not more than seven pounds to avoid explosions that might cause mass casualties. 1784 Laws of N.Y. 627, ch. 28. But those laws did not ban anything (they regulated only how gunpowder was stored) so they are not relevantly similar in "how" they regulated conduct, despite the District's reliance on them as "an especially apt analogy." *But see Ocean State Tactical*, 95 F.4th at 49 (endorsing the flawed analogy). And the District highlights that most states *regulated* how Bowie knives could be carried and transported in the late nineteenth century, but no state banned those knives outright, so again the District's analogy falls flat when it comes to the "how" of these historical regulations. *See*

---

Or, in *Heller*'s own words, because "handguns are the most popular weapon chosen by Americans for self-defense," a "complete prohibition" of them is "invalid." 554 U.S. at 629. Notwithstanding that point, we now conduct the additional historical analysis our colleague insists is required, and the result is the same—neither the District nor our dissenting colleague have pointed to any historical analogue for banning arms that come anywhere near the popularity of 11+ magazines.

39

*Hanson*, 120 F.4th at 272 (Walker, J., dissenting) (explaining that only "two states (Texas and Arkansas) and a federal territory (Arizona) prohibited the open carry of Bowie knives," but none banned their possession outright).

"Why and how the regulation burdens the right" to bear arms "are central" to the Second Amendment inquiry, *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 29), and none of the District's analogies get off the ground because two of them are not bans at all—failing at the "how" step of the inquiry.[14]  The only actual ban it can point to is of unusual and non-bearable trap guns, so that ban is not analogous.

---

[14] Contrary to our dissenting colleague's repeated assertions, we do not hold that 11+ magazines "may never" be regulated or "cannot be regulated," *post* at 56, 71, only that they cannot be banned outright.  This critical distinction that our colleague elides is why nothing in our analysis is at odds with this court's recent opinion in *Picon v. United States*, 343 A.3d 57 (D.C. 2025), cert. pending, No. 25-5713 (U.S. filed Sept. 23, 2025).  In *Picon*, we upheld the District's "age-based firearm registration and licensing statutes," requiring individuals aged eighteen to twenty to receive parental permission before they could lawfully possess a firearm. *Id.* at 59-60.  We reasoned that because "'a person was an infant or a minor in the eyes of the law until the age of twenty-one'" at the Founding, and thus "generally could not purchase firearms," modern regulations restricting when people under twenty-one years old could lawfully possess a firearm aligned with Founding-era history. *Id.* at 63-64 (quoting *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc)).  Today we cast no doubt on and have said nothing at odds with *Picon*; there is simply no similar historical support for outright bans across all age groups on the law-abiding public's arms of choice, like 11+ magazines, no matter what narrower regulations might pass constitutional muster.  There are unquestionably regulations on 11+ magazines that would comply with the Second Amendment, just as there are constitutionally permissible regulations on handguns.

Pulling back from those specific disanalogous examples, the District asks us to recognize a more generic "historical tradition."  It invokes the "established tradition of targeting dangerous and unusual weapons and accessories when they have contributed to violence and other crime, while minimally burdening the right to armed self-defense."    If that test sounds familiar, it is because it is indistinguishable from the interests-balancing tests that the circuit courts routinely applied after *Heller*, the Supreme Court then decisively repudiated in *Bruen*, and yet a handful of circuits still cling to.  *See, e.g.*, *Duncan*, 133 F.4th at 913-14 (Bumatay, J., dissenting) (describing the majority as engaged in "interest balancing . . . masquerading as respect for the Second Amendment's historical scope").   When *Bruen* rejected such interest balancing as "one step too many" in the Second Amendment inquiry, 597 U.S. at 19, it took "out of the hands of government . . . the power to decide" what burdens on arms possession could be justified by overriding interests, no matter how compelling they are, *id.* at 23 (quoting *Heller*, 554 U.S. at 634).  And the Supreme Court left us with a fairly rigid historical test in place of any balancing test, and whatever you think about it, that is the test we must apply.[15]

---

[15] The District and our dissenting colleague, like the various circuits upholding 11+ magazine bans, rely heavily on one sentence in *Bruen* to support their contrary view.  *Bruen* says: "While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic

41

With all that said, we are not blind to the blight of gun violence in this country and the horrors it visits on our citizenry.  Our children, like many of yours, have undergone that distinctly American ritual of active shooter drills since they were in preschool.  Some members of this division have lost close friends to gun violence.  And we sympathize with those who decry the Supreme Court's rulings in *Heller* and *Bruen* as fetishizing the right to bear arms, as treating the Constitution as a "suicide pact," and as refusing to let modern gun restrictions catch up with the ever-increasing lethality of firearms.  *Cf. Terminiello v. City of Chicago,* 337 U.S. 1, 37 (1949) (R. Jackson, J., dissenting) ("[I]f the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.").  We take no issue with the legislative judgment that banning 11+ magazines does not meaningfully hamper self-defense.  And we do not doubt the legislative

---

technological changes may require a more nuanced approach."  597 U.S. at 27; *see also, e.g., Duncan*, 133 F.4th at 872-73 (explaining "that a more nuanced approach is appropriate here"); *Ocean State Tactical*, 95 F.4th at 44 (reasoning that a "lack of directly on-point tradition" does not doom 11+ magazine bans because "a more nuanced approach" is appropriate).  We understand the Court in that sentence to be recognizing only that analogical reasoning can be difficult, or even fraught, so that a state seeking to ground its regulations in history need not produce a "dead ringer" or "historical twin"—a close cousin will do.  597 U.S. at 30.  We do not understand *Bruen*, with that one sentence, to have upended the remainder of its analysis and to have thereby thrust us back into the means-end balancing test that the heart of its analysis squarely rejected, as the District and our dissenting colleague read it.

42

judgment that the burden on gunowners of being limited to 10-round magazines is comparably slight when compared to the potential benefit of lowering death tolls.

But the Supreme Court has rejected that kind of interest-balancing test under the Second Amendment, and we are bound to follow its precedents. *Heller*, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."). It is not our province to correct any course the Supreme Court has set us on—only the Court is free to do that, barring the political will to pass a constitutional amendment. Under *Heller* and *Bruen*, there simply is no historical tradition of banning arms in common and ubiquitous use like 11+ magazines, so the District's ban on them violates the Second Amendment.

### *C. Benson raises a justiciable facial challenge to the 11+ magazine ban*

The District and our dissenting colleague argue that even if Benson were correct that a ban on 11+ magazines is unconstitutional, he is in no position to litigate that question because he in fact possessed a 30-round magazine. In the District's view, in light of that fact, we ought to limit ourselves to reviewing whether bans on 30-round magazines pass constitutional muster. The District's argument comes in two steps: (1) that any facial challenge to the District's capacity ban must fail unless a ban on magazines of *any capacity*—30+, 100+, 1,000+—would violate the Second Amendment, because only then is there "no set of circumstances . . . under which

43

the [District's] Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because there's obviously some number at which these magazines become "dangerous and unusual" so that they can be banned, any facial challenge must fail in the District's view. And (2) that leaves Benson with only his as-applied challenge, and as-applied to him, the capacity ban is fine because his 30-round magazine is unusual enough that surely it can be banned, so either version of his argument fails.

We disagree with the District at the first step of its argument. The 11+ magazine ban is facially unconstitutional because it is unconstitutional on its plain terms, not just in some idiosyncratic applications, and it is not readily susceptible to any judicial narrowing that avoids its constitutional infirmities. The fact that it captures some conduct that hypothetically could have been proscribed by a more narrow statute is beside the point. It might be that a ban on 30-round magazines, or on 100-round magazines, would pass constitutional muster. But in no sense does that mean that *this law* could be constitutionally applied to prosecute those who possess those larger magazines. Because this law does not require the government to prove those higher capacities, it has not drawn the line in a constitutionally permissible place. This statute draws that line in a constitutionally protected place, between 10 and 11 rounds, and it is not susceptible to any judicial gloss that could narrow the statute to a plainly legitimate sweep. It is thus facially unconstitutional in all of its applications.

44

Before we walk through the relevant precedents, we first acknowledge that there are few areas of jurisprudence that are more difficult to decipher than when a litigant can successfully raise a facial challenge.  While the Supreme Court has sometimes described facial challenges as "disfavored," *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 450 (2008), it has at the same time noted that there have been "several Terms in which 'the Court adjudicated more facial challenges on the merits than it did as-applied challenges.'"  *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (quoting Richard H. Fallon, *Fact and Fiction About Facial Challenges*, 99 Cal. L. Rev. 915, 918 (2011)); *see also* Fallon, *supra*, at 917 ("[T]he assumption that facial challenges are and ought to be rare . . . is false as an empirical matter and highly dubious as a normative proposition.  What is more, misunderstanding on this point reflects more general myopia and confusion with respect to facial challenges in the Supreme Court, perhaps most especially, but by no means exclusively, among the Justices themselves.").

This court's most thorough effort to wade through this thicket—and, in our view, the one that best aligns with the Supreme Court's precedents and practices in the area—came in *Conley v. United States*, 79 A.3d 279 (D.C. 2013).  *Conley* concerned a facial challenge to a statute criminalizing a person's mere presence in an automobile that they know contains a firearm whenever that firearm happens to be unlawful.  *Id.* at 274 (describing elements of offense).  In other words, if you

45

knew a friend brought a gun with them into your car, you could be prosecuted if your friend was not in lawful possession of that firearm, even if you had no clue that the gun was unlawful and your friend assured you that it was perfectly legal. That lack of any mens rea requirement was constitutionally problematic, and in *Conley*, we struck down that statute as facially unconstitutional. *Id.* at 289. We did so despite the fact that a person *might* very well know that the firearm in their car is unlawful, so that the statute covered plenty of conduct that could have been properly proscribed. That point was simply immaterial to the facial challenge before us.

We explained that in a facial challenge, "[w]e look only to whether the statute properly proscribes criminal conduct; *we do not examine whether appellant's conduct could have been criminalized under a hypothetical statute*." *Id.* at 277 (emphasis added) (citing *Grange*, 552 U.S. at 449-50); *see also Patel*, 576 U.S. at 418 ("[W]hen assessing whether a statute" is facially unconstitutional, "the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct."). Instead, "in a facial challenge, 'the claimed constitutional violation inheres in the terms of the statute, not its application.'" *Id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)). So—and here's the critical part—whenever a criminal statute "[1] fails to require the government to prove everything the Constitution requires it to prove for a criminal sanction to be imposed, . . . [2] and the limits of the judicial function do not permit us to read the critical

missing elements into the statute" or to sever out the statute's constitutionally infirm parts, "then [3] appellant has carried his burden of showing that every application of [the statute] is unconstitutional—even if a validly written statute could have reached appellant's particular conduct." *Id.*

In short, *Conley* instructs that Benson's facial challenge to the 11+ magazine ban is proper and that we must assess that ban on its own terms, as we already did in Part II.B above, not based on whether magazines could be banned at *some* capacity via a constitutionally-compliant statute. Let's walk through *Conley*'s test from the paragraph above: (1) does the District's 11+ magazine ban "fail[] to require the government to prove everything the Constitution requires it to prove for a criminal sanction to be imposed"? It does, because the government needs to prove only that a defendant possessed an 11-round magazine, which as we have explained, is constitutionally protected activity; (2) can we "read the critical missing elements into the statute," or can we "sever" out the constitutionally problematic portion of it? *Id.* at 277, 281 (discussing severability). We can't do either of those things. The first involves legislative line-drawing where the only line the legislature drew is between 10 and 11 rounds, and for us to read some other number into the statute would exceed our judicial function and intrude into the legislative role. The second severability option is off the table because there's nothing to sever—if you sever out

the number 10 from the statute, the statute is meaningless.[16]  That leaves only the third part from above, *Conley*'s conclusion, that (3) Benson has therefore carried his burden of showing that this statute is facially unconstitutional regardless of whether "a validly written statute could have reached appellant's particular conduct."  *Id.* at 277.

While *Conley* alone makes clear that Benson's facial challenge is properly assessed by adjudging the constitutionality of an 11+ magazine ban, and not whether capacity limits can be set at *some* number, we further note that *Conley* is no outlier. We have explained and applied its analysis multiple times since.  *See, e.g.*, *Tilley v. United States*, 238 A.3d 961, 969-70 (D.C. 2020) (holding that "Sexual Psychopath Act" was facially unconstitutional despite the fact that "a validly written statute could have reached [appellant's] conduct" because "the limits of the judicial function do not permit us to read the critical missing elements into the statute"

---

[16] Try it out for yourself.  Here's the relevant text: "No person in the District shall knowingly possess, sell, or transfer any . . . magazine . . . that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition."  D.C. Code § 7-2506.01(b)-(c).  You cannot render that statute constitutional by crossing out any words; you could hope to do that only by rewriting it to include some number higher than 10, which goes beyond any judicial function. One can sever out the statutory ban on other feedings devices with capacities for more than ten rounds, like belts, drums, and feed strips.  *Id.*  We have already done that by narrowing our focus to only magazines and leaving those related bans unaffected by today's decision.  *Supra* n.3.

(quoting *Conley*, 79 A.3d at 277)); *Valdez v. United States*, 320 A.3d 339, 383-84 (D.C. 2024) (reiterating that a statute is facially invalid if it "fails to require the government to prove everything the Constitution requires it to prove for a criminal sanction to be imposed," "and the limits of the judicial function do not permit us to read the critical missing elements into the statute," but concluding that a statute outlawing sodomy had a "plainly legitimate sweep" and so could be judicially narrowed to bar only nonconsensual sodomy (quoting *Conley*, 79 A.3d at 277)).

As for Supreme Court precedent, consider *Heller* itself, which was a successful facial challenge to the District's handgun ban. 554 U.S. at 635; *Patel*, 576 U.S. at 415 (recognizing that *Heller* adjudicated a "facial challenge" under the Second Amendment); *Rhode v. Bonta*, 145 F.4th 1090, 1118 (9th Cir. 2025) ("In *Heller*, the Supreme Court considered a facial challenge to Washington, D.C.'s law banning handgun possession."); Br. for Petitioners, *District of Columbia v. Heller*, 2008 WL 102223, at 57 (describing "this facial challenge").[17]  If the District's

_____

[17] The District points out that this court has previously said that "in *Heller*, the Court neither held nor implied that a law requiring a license to carry a pistol on its face violates the Second Amendment," and that "*Heller* did not . . . invalidate any of the District's individual gun control laws." *Brown v. United States*, 979 A.2d 630, 639 (D.C. 2009)).  That is true, so far as it goes.  But to the extent that *Brown* opined that *Heller* was not a successful facial challenge at all—as the District seems to read *Brown* to say—the Supreme Court has since put any debate on that topic to rest.  The Court in *Patel* accurately described *Heller* as one in which it adjudicated a facial challenge under the Second Amendment.  576 U.S. at 415.

49

approach to facial challenges under the Second Amendment were correct, the Supreme Court should have spurned the facial challenge in *Heller* because, as *Heller* recognized, there are clearly some hypothetical handgun prohibitions—applying only to felons and/or the mentally ill, or only to fully automatic handguns—that would pass constitutional muster. *See Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."); *id.* at 624 (suggesting it would be "startling" if bans on machineguns were unconstitutional). But the Court instead sustained the facial challenge because our statutes' sweeping application to everybody and to all handguns made them facially unconstitutional in all applications, despite there being some subset of handguns that could be prohibited outright, and some subset of people that could be prohibited from possessing handguns entirely.

Similarly, the fact that there is surely some subset of larger 11+ magazines that could be properly outlawed through a more narrowly tailored statute does not save the District from this facial challenge. The only thing the government is required to prove to secure a conviction under this statute is that a person possessed a magazine capable of holding more than ten rounds of ammunition. Because that statute draws the line in a constitutionally prohibited place, and it is not within the

50

judicial function for us to draw that line in a new place, the statute is unconstitutional in all of its applications and is facially invalid.

### D. All of Benson's convictions are infected by the Second Amendment violation

Finally, Benson could not have registered or procured a license to carry his firearm because it was equipped with an 11+ magazine. *See* Metropolitan Police Department, Application for Firearms Registration Certificate (requiring applicant to state the "No. of Shots" for the firearm being registered); D.C. Code § 7-2509.02(a)(2) (requiring applicant for license to carry a pistol to prove that the pistol is registered); *Hanson*, 120 F.4th at 230 (explaining how appellant "attempted to register a firearm with a 12-round magazine in the District, but the Metropolitan Police Department denied his application because of the" 11+ magazine ban). And because he could not have registered his gun as constituted, he likewise could not have lawfully possessed ammunition for it. D.C. Code § 7-2506.01(a)(3) (precluding the general public from possessing ammunition unless they are "the holder of a valid registration certificate for a firearm").

The unconstitutionality of the District's capacity ban thus infects Benson's convictions for unlawful possession of ammunition, possession of an unregistered

51

firearm, and carrying a pistol without a license.[18]    Because "the District's

unconstitutional ban" on 11+ magazines "made registration" of Benson's handgun

"impossible," which in turn made obtaining a license to carry the gun and possessing

ammunition attendant to it impossible for him to do lawfully, it was "impermissible

under the Second Amendment to convict [him]" of any of those offenses.  *Magnus*

*v. United States*, 11 A.3d 237, 242-43 (D.C. 2011); *see also Plummer v. United*

*States*, 983 A.2d 232, 341-42 (D.C. 2009) (defendant "had standing to raise the

Second Amendment issue as a defense to the criminal charges against him by

moving to dismiss the indictment, even though he did not attempt to obtain a

---

[18] Benson and his amicus, the Public Defender Service (PDS), first squarely made the argument that the unconstitutionality of the capacity ban infects each of the convictions at oral argument, and PDS later filed a supplemental pleading pressing the same point in more detail.   The District responded in its own supplemental pleading, including by arguing that Benson forfeited this argument by failing to brief it initially.  We disagree.  Benson argued broadly in his opening brief that all of his convictions should be reversed, and none of the parties sought to disentangle in their briefs which convictions should fall if any particular subset of his constitutional challenges were successful.  We consider that a shared oversight of the parties that should not be held against any one of them, given that they each clarified their positions at oral argument and have now had an opportunity to file supplemental pleadings on this question.  *See Jacobson v. Clack*, 309 A.3d 571, 578 n.3 (D.C. 2024) (It is a "discretionary decision whether this court will 'elect' to address an argument first raised in a supplemental brief that a party has been given leave to file." (quoting *Blades v. United States*, 200 A.3d 230, 236-37 (D.C. 2019))); *Blades*, 200 A.3d at 236-37  (electing to consider argument "raised for the first time in a supplemental brief" given the "importance" of the issue); *Gathy v. United States*, 754 A.2d 912, 916 (D.C. 2000) (exercising discretion to consider issue first raised in reply brief because appellee was permitted to file supplemental brief addressing the issue).

52

registration certificate and license for his handgun," given the "absolute prohibition"

that precluded him from registering or licensing his handgun pre-*Heller*).[19]

The District has not pointed to any independent basis that would have

precluded Benson from registering and licensing his firearm—for instance, it does

not suggest that Benson was disqualified from gun ownership by virtue of being a

felon or mentally ill. *See Heller*, 554 U.S. at 626; *Herrington v. United States*, 6

---

[19] The District does not dispute that Benson could not have registered his firearm with its 11+ magazine, but suggests that Benson could have outfitted his receiver with a magazine holding 10 or fewer rounds, and then registered it. Maybe so, but we do not think it was incumbent on Benson to engage in that subterfuge where he in fact intended to possess a firearm with an 11+ magazine. We have concluded Benson had a constitutional right to possess the 11+ magazine that his firearm was actually equipped with, and it was impossible for Benson to register a firearm with such a magazine, which is enough for us to conclude that his other convictions are infected by the unconstitutionality of the magazine-capacity ban. Additionally, even if Benson had engaged in that subterfuge and registered his firearm with a magazine of 10 or fewer rounds, it is not at all clear that the District would have treated Benson's firearm as the one that he registered once it was equipped with a 30-round magazine, given the District's seeming view in the registration process that the number of shots a firearm is capable of firing is a component of the firearm itself. The District has expressed no view about that. To the extent that depends on a statutory interpretation question of whether a registered firearm encompasses the magazine it is equipped with, the parties have not briefed that question, and we express no view about it. Finally, relying on *Poulos v. New Hampshire*, 345 U.S. 395 (1953), the United States argues that it was incumbent on Benson to at least try and register his firearm, and bring any challenge to the capacity ban and registration requirements by challenging the denial of his registration application. The United States made that same argument in *Plummer*, and after carefully considering *Poulos*'s analysis, this court rejected it in this same context. 983 A.2d at 340-42. We do likewise, and view *Plummer* as controlling on the point.

A.3d 1237, 1245 n.24 (D.C. 2010) (reversing conviction for unlawful possession of ammunition where appellant could not have lawfully possessed ammunition owing to the District's unconstitutional handgun ban, and the government did not make "a prima facie showing that the defendant was disqualified from exercising his Second Amendment rights" in any other way).  So we reverse each of his convictions.[20]

## III. Conclusion

For these reasons, we reverse and vacate Benson's convictions for possession of a "large capacity ammunition feeding device," possession of an unregistered firearm, carrying a pistol without a license, and unlawful possession of ammunition.

---

[20] The United States has conceded that we should vacate Benson's conviction for possessing an 11+ magazine, though it maintains that the remainder of his convictions should be affirmed.  The District alone argues that the United States' concession moots out Benson's constitutional challenge to the capacity ban, but that's wrong for at least three reasons. First, as we have explained, the constitutional infirmity with the capacity ban infects all of Benson's convictions, so the constitutional validity of the District's ban on 11+ magazines has downstream effects for convictions the United States still defends. Second, the District has provided no indication that it intends to suspend enforcement of the 11+ magazine ban.  So it appears that local police officers will continue to enforce the ban via arrests and confiscations, with the United States simply refusing to prosecute those cases, leaving this issue capable of repetition yet evading review—an exception to the mootness doctrine.  Third, we have no fair assurance that the United States will not resume prosecuting these offenses if, for instance, there is a change in administration.  *See In re Bright Ideas Co.*, 284 A.3d 1037, 1042 (D.C. 2022) ("A party claiming mootness because of its voluntary cessation of conduct faces 'the heavy burden' of demonstrating that its challenged activity will not resume." (quoting *Mbakpuo v. Ekeanyanwu*, 738 A.2d 776, 783 (D.C. 1999))).

54

Given our disposition, we do not address Benson's Second Amendment challenges
to the District's registration and licensure schemes, nor do we address his Fourth
Amendment challenge.

*So ordered.*

55

BLACKBURNE-RIGSBY, *Chief Judge*, dissenting:

The majority's opinion is inconsistent with Supreme Court precedent[1] as well

as with all of the state[2] and federal[3] courts of appeal that have upheld challenges to

---

[1] *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 602 U.S. 680 (2024).

[2] *See State v. Bibbs*, 579 P.3d 110, 112 (Haw. Ct. App. 2025) (holding that Hawaii's prohibition on the possession of large-capacity magazines (LCMs) does not violate the Second Amendment), *as corrected* (Nov. 18, 2025), *cert. denied*, No. SCWC-22-0000754, 2026 WL 253193, at *1 (Haw. Jan. 30, 2026); *Picon v. United States*, 343 A.3d 57, 63 (D.C. 2025) (holding that the District's LCM ban does not violate the Second Amendment as applied to people between the ages of eighteen and twenty-one), *pet. for cert. filed*, No. 25-5713 (U.S. Sept. 24, 2025); *State v. Gator's Custom Guns, Inc.*, 568 P.3d 278, 280 (Wash. 2025) (holding that Washington's LCM ban does not violate the Second Amendment), *as amended* (May 14, 2025), *pet. for cert. filed*, No. 25-153 (U.S. Aug. 6, 2025); *Caulkins v. Pritzker*, 228 N.E.3d 181, 191 (Ill. 2023) (rejecting the appellant's argument that the Illinois' LCM ban was unconstitutional because of waiver), *cert. denied*, 144 S. Ct. 567 (2024).

[3] *See Nat. Ass. for Gun Rights v. Lamont*, 153 F.4th 221, 222 (2d Cir. 2025) (rejecting the appellant's argument that Connecticut's LCM ban is unconstitutional), *pet. for cert. filed sub nom.*, *Grant v. Higgins*, No. 25-566 (U.S. Nov. 7, 2025); *Duncan v. Bonta*, 133 F.4th 852, 860 (9th Cir. 2025) (concluding that California's LCM ban comports with the Second Amendment), *pet. for cert. filed*, No. 25-198 (U.S. Aug. 15, 2025); *Capen v. Campbell*, 134 F.4th 660, 663 (1st Cir. 2025) (rejecting the appellant's argument that Massachusetts' LCM ban is unconstitutional); *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (rejecting the appellant's argument that the District's LCM ban is unconstitutional); *Bianchi v. Brown*, 111 F.4th 438, 461-62 (4th Cir. 2024) (rejecting the appellant's argument that Maryland's LCM ban is unconstitutional); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 207

states' LCM bans.  Therefore, I respectfully dissent.

I disagree with the majority's opinion on each prong of its analysis under the two-step framework established in *Bruen* for addressing Second Amendment challenges to gun laws.    Under the first prong of *Bruen*, the majority declares that LCMs are in common and ubiquitous use and therefore cannot be regulated or banned because that would constitute an infringement upon Second Amendment rights.  The majority bases its common usage analysis on ownership statistics that show only that magazines holding 11, 15, or 17 rounds of ammunition are in common use.  The majority, however, fails to contend with the reality that these statistics do *not* support the conclusion that the particularly lethal 30-round magazine, such as the one Mr. Benson possessed here, is in common use for

---

(3d Cir. 2024) (J. Roth, concurring) (rejecting the appellant's argument that Delaware's LCM ban is unconstitutional), *cert. denied sub nom.*, *Gray v. Jennings*, 145 S. Ct. 1049 (2025); *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1182, 1197-98 (7th Cir. 2023) (rejecting the appellant's argument that Illinois' LCM ban is unconstitutional); Mem. Op. & Ord., *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, No. 22-CV-02680-NYW-TPO, Dkt. No. 96 (D. Colo. Sept. 30, 2024) (denying the plaintiffs' motion for summary judgment on claim that Colorado's LCM ban was unconstitutional); Mem. Op., *Cheeseman v. Platkin*, No. 22-04360-PGS-JBD, Dkt. No. 80 (D. N.J. July 30, 2024) (concluding that New Jersey's LCM ban is constitutional), *appeal docketed sub nom.*, *Assoc. NJ Rifle & Pistol Clubs I v. New Jersey*, No. 24-2450 (3rd Cir. Aug. 9, 2024); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 216 (D. Vt. 2024) (rejecting the appellant's argument that Vermont's LCM ban is constitutional), *appeal docketed*, No. 24-2026 (2d Cir. July 31, 2024) (oral argument scheduled for the week of April 27, 2026).

self-defense.  It simply is not.

Under the second prong of the *Bruen* test, the government must establish that the "how and why" of the LCM ban is consistent with this nation's historical tradition of firearm regulation.  The majority incorrectly characterizes the District's historical analogues as a second-guess of *Bruen*, and therefore hastily rejects them. Rather, like the D.C. Circuit concluded in *Hanson*, the District's proffered historical analogies to the regulation of weapons that are particularly capable of unprecedented lethality share a "why" with the District's LCM ban because the ban "addresses the same or similar problem."  *Picon*, 343 A.3d at 62.  There is also similarity between "how" the regulation of unprecedently lethal weapons and the District's LCM ban burden a person's Second Amendment right because both restrict the public's usage. *See id.*  By failing to adhere to the Supreme Court's guidance that "cases implicating unprecedented societal concerns or dramatic technological changes may require *a more nuanced approach*,"  *Bruen*, 597 U.S. at 27 (emphasis added), the majority undermines the District's ability to ensure public safety and regulate 30-round LCMs, which have been used for dangerous and unlawful purposes, including mass shootings.

The majority utilizes a novel approach to invalidate the District's LCM ban. The majority's opinion conflicts with the legal framework for both facial and as-

applied constitutional challenges. Under our precedents, we can declare the LCM ban facially invalid and unconstitutional only if Mr. Benson establishes that there are no lawful circumstances to which the LCM ban would apply. But even accepting that standard handgun magazines typically holding 11, 15, or 17 rounds of ammunition are in common use, there is *no* similar support for 30+ round magazines. Likewise, Mr. Benson's as-applied challenge, for which we consider the particular factual circumstances of his gun possession, fails too. He cannot successfully show that the LCM ban, as applied to his possession of a gun with 30 rounds in its magazine, violates the Second Amendment, because there is no statistical support for concluding that such a lethal weapon is in common use for lawful purposes.

## I. Legal Background

"Like most rights, the right secured by the Second Amendment is not unlimited." *Picon*, 343 A.3d at 61 (quoting *Heller*, 554 U.S. at 626). "From Blackstone through the 19th-century cases, commentators and courts [have] routinely" considered the proper contours of that right. *Id.* (citation modified). This appeal continues in this historical tradition and—as illustrated herein—the issues involved in any Second Amendment challenge that we confront are not easy. Nevertheless, in *Heller*, the Supreme Court instructed that the right to arm oneself "was *not* a right to keep and carry any weapon whatsoever in any manner whatsoever

and for whatever purpose." 554 U.S. at 626 (emphasis added). Recent Supreme

Court cases, such as *Bruen* and *Rahimi*, have redefined the principles that guide us

in achieving the appropriate balance between individual liberty and public safety.

*Bruen* adopted *Heller*'s "methodological approach to the Second

Amendment," *Bruen*, 597 U.S at 19-22, by establishing "a two-part test" for

constitutional challenges to gun-related legislation. *Picon*, 343 A.3d at 62. "First,

courts must determine whether a defendant is 'part of "the people" whom the Second

Amendment protects' and whether 'the plain text of the Second Amendment

protects' the defendant's 'course of conduct.'" *Id.* (quoting *Bruen*, 597 U.S at

31-32). "Second, if the challenger is entitled to protection under the Second

Amendment, the government bears the burden to show that the challenged regulation

'is consistent with this Nation's historical tradition of firearm regulation.'" *Id.*

(quoting *Bruen*, 597 U.S at 34).

Constitutional challenges to the District's LCM ban have twice failed. The

first challenge was rejected just a little more than a year ago by the D.C. Circuit

Court of Appeals in *Hanson*. In *Hanson*, the D.C. Circuit affirmed the district

court's denial of the appellant's motion for a preliminary injunction because he

failed to make the "clear showing" that the LCM ban was unconstitutional. 120

F.4th at 230. In subjecting the District's LCM ban to *Bruen*'s two-part test, a

majority of the D.C. Circuit panel in *Hanson* rejected the argument that

"under *Bruen*, to find an arm is in common use renders any restriction of that arm

unconstitutional." *Id.* at 233. Yet the majority in this case adopts *Hanson*'s

dissenting judge's view of the common use test as the centerpiece of their analysis

here. The majority in *Hanson* followed *Bruen*'s example of conducting "an

extended analysis of the Government's proposed historical analogues." *Id.* at 234.

The *Hanson* majority further noted *Bruen*'s explicit instruction that courts "apply

the nuanced approach" in doing so. *Id.* at 235 (quoting *Bruen*, 597 U.S. at 27)

("While the historical analogies here and in *Heller* are relatively simple to draw,

other cases implicating unprecedented societal concerns or dramatic technological

changes may require a more nuanced approach.").[4]

The D.C. Circuit determined that the District's historical analogy for its LCM

ban "comports with the principles of the Second Amendment" because "they share

the same basic purpose: To inhibit then unprecedentedly lethal criminal activity by

restricting or banning weapons that are particularly susceptible to, and were widely

---

[4] The majority dismisses the Supreme Court's "nuanced approach" language
in *Bruen* as mere commentary meaning only that analogical reasoning can be
difficult. The majority's ease at downplaying the court's express instructions is
specious, given its own criticisms of the District for allegedly doing the same, based
on the majority's view that "[t]he Supreme Court tends not to speak in code and
usually means *what it says*[.]"

61

used for, multiple homicides and mass injuries." *Id.* at 240. The D.C. Circuit accordingly held that "at this interlocutory juncture, the District has met its burden to show its magazine cap is consistent with the Nation's historical tradition of firearm regulation . . . ." *Id.*

Courts nationwide have upheld LCM bans based on a similar rationale, and the Supreme Court has not intervened in these cases, yet.[5] Oddly, the majority here repeatedly cites to the dissenting opinion in *Hanson* but never explicitly justifies reaching a decision here, which is contrary to *Hanson*'s majority's holding.

This court rejected the second constitutional challenge to the District's LCM ban in *Picon*. Applying *Bruen*'s two-part test, a division of this court held that the LCM ban as applied to persons under twenty-one was "consistent with the principles that underpin our regulatory tradition" and was "'analogous enough' to historical restrictions 'to pass constitutional muster.'" *Picon*, 343 A.3d at 67 (quoting *Rahimi*, 602 U.S. at 691-92 and *Bruen*, 597 U.S. at 30). *Picon* holds that "the District's firearm laws are consistent with our regulatory tradition in why and how they burden

---

[5] *See, e.g.*, *id.*, *cert. denied* 145 S. Ct. 2778 (2025); *Bianchi*, 111 F.4th at 471 ("Throughout this history lies a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians."), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025). Of note, however, there are four cases, *Picon*, *Duncan*, *Lamont*, and *Gator's Custom Guns, Inc.*, involving LCM bans with pending petitions for certiorari currently under the Court's consideration.

62

the right of those under twenty-one to keep and bear arms." *Id.* at 66 (citation modified).   Importantly, *Picon* did not truncate *Bruen*'s two-step analysis by deeming the LCM ban unconstitutional simply because it applies to an arm in common use for lawful purposes.   Nor did we ignore the District's historical analogues or suggest that analyzing them was optional.[6]

*Hanson* and *Picon* made clear that the Second Amendment does not bar the District from protecting its citizenry from increasingly-lethal weaponry, if consistent with Founding-era history and tradition.

Contrary to the majority's assertion that "the District is an outlier in putting any capacity limits on magazines," the reality is that, of the fifteen jurisdictions that regulate LCMs, eleven (including the District) regulate LCMs to prohibit possession of no more than ten rounds of ammunition.   *United States v. McIntosh*, 124 F.4th

---

[6] The majority claims that there is no tension between their decision and *Picon* because it accepts *Picon*'s reliance on the historical analogue for age-based prohibitions on arms at the founding.   But the majority's pronouncement that it's sources for the popularity of LCMs "should be the end of this inquiry" before even turning to the historical analogs runs counter to the two-step framework provided by *Bruen* and greatly undermines its own claim that the majority's opinion supports an inference that "[t]here are unquestionably regulations on 11+ magazines that would comply with the Second Amendment."   The majority, rather, dangerously paves the way for popularity contests to decide issues of public safety.

199, 210 n.8 (3d Cir. 2024).[7]  The majority's decision is at odds with *Hanson*, *Picon*, and all of the state and federal courts that have rejected constitutional challenges to LCM bans.

## II. Discussion

### A. *Bruen* Did Not Moot Our Historical Analysis

The majority claims that "[t]he only 'historical tradition' supporting 'complete prohibitions' extends exclusively to bans on 'dangerous *and unusual*' weapons."  So, here, after concluding that 11+ round LCMs are arms in "common use for self-defense," the majority declares that no further analysis is required.  But no other court agrees that *Bruen* supports truncating the Second Amendment analysis without consideration of historical analogues.  Nevertheless, contrary to courts nationwide, the majority elects to invalidate the District's LCM ban.  The majority gives an overly broad interpretation of *Bruen*'s "common use" test to equate the popularity of dangerous weapons with their constitutionality.

---

[7] Of the four states with higher capacity limits Illinois, 720 ILCS 5/24-1.10, and Vermont, 13 V.S.A. § 4021, "restrict long guns to 10 rounds and handguns to 15 rounds."  *McIntosh*, 124 F.4th at 210 n.8.  Colorado's ban has "a 15-round numeric threshold[.]"  *Id.* (citing Colo. Rev. Stat. § 18-12-301(2)(a)(I)).  Finally, Delaware "defines 'large-capacity' as being able to hold 'more than 17 rounds of ammunition[.]'"  *Id.* (quoting Del. Code. Ann. tit. 11, § 1468(2)).

### 1. *Bruen*'s Application of *Heller*'s Methodological Approach Requires that We Evaluate the District's Historical Analogues

At issue in *Bruen* was a Second Amendment challenge to a New York state law that entirely banned gun possession without a license, either in the home or otherwise.  579 U.S. at 1.  To address this challenge, the Supreme Court adopted *Heller*'s methodological approach to the Second Amendment.  *Id.* at 19.  In *Heller*, which involved a District law that banned handgun possession in the home, the Supreme Court described "the right protected by the Second Amendment as bearing arms for a lawful purpose" and said, "that the people must look for their protection against any violation by their fellow-citizens of the rights it recognizes to the States' police power."  554 U.S. at 573, 620 (citation modified).  *Bruen* then followed *Heller*'s example of "relying on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right."  579 U.S. at 21 (citation modified).  *Bruen* further illustrated how courts should approach this analysis.  First, *Bruen* instructs that "the historical tradition of prohibiting the carrying of dangerous and unusual weapons" "fairly supported" concluding "that the Second Amendment protects the possession and use of weapons that are in common use at that time."  *Id.* (citation modified).  The Court also explained that its analysis was not meant to be "exhaustive . . . of the full scope of the Second Amendment."  *Id.* (citation modified).

*Bruen* next demonstrated the second analytical inquiry in a Second Amendment challenge: a court must "assess the lawfulness . . . by scrutinizing whether it comported with history and tradition." *Id.* at 22 (citation modified). The court looked to *Heller*, which "focused on the historically unprecedented nature of the District's ban" and reasoned that "few laws in the history of our Nation have come close to [that] severe restriction." *Id.* (citation modified). *Bruen* explains that the Court reached its decision in *Heller* only after evaluating the historical analogues put forth by the dissenting Justices and concluding that all failed to match the "how and why" for the challenged law. *Id.* at 29. The Court provided that "how and why" the challenged law burdens the Second Amendment right were "two metrics" for analyzing the "features that render regulations relevantly similar under the Second Amendment[.]" *Id.* (citation modified). The Court accordingly "addressed each purported analogue and concluded that they were either irrelevant or did not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 22 (citation modified). Following *Heller*'s example, the Court in *Bruen* considered New York's proffered historical analogues, but found no historical tradition for a complete ban on handgun possession. *Id.* at 38-39. When the case returned to the D.C. Circuit, the D.C. Circuit noted the popularity of 10-round magazines but notably also acknowledged that there "*may well be some capacity above which magazines are not in common use . . . .*" *Heller v. District of Columbia*

*(Heller II)*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (emphasis added).

The majority contends that *Heller* supports the notion that there is no need for "a fresh review of historical analogues" or that doing so is a second-guess of *Heller*'s assessment. I disagree. Unlike the handgun bans challenged in *Heller* and *Bruen*, we are concerned with a ban on LCMs. Nothing in *Heller* supports the majority's view that there can be no historical justification for banning popular arms, and no other court has interpreted *Heller* in that way.[8]

## 2. Courts Have Unanimously Followed *Bruen*'s Example When Considering the Constitutionality of LCM bans

No court considering the constitutionality of any state's LCM ban has adopted the majority's simplistic application of *Bruen*. Instead, courts have engaged in a nuanced review of the historical analogues as illustrated by *Bruen*'s application of *Heller*. There is a pattern of courts considering historical analogues across cases even despite disagreements about the appropriateness of the "why and how" of the government's proffered historical analogues. Indeed, every federal appellate court

---

[8] One prevailing view in numerous federal courts of appeals, *see, e.g.*, *Del. State Sportsmen's Ass'n, Inc.*, 108 F.4th at 216, and argued by the District here is that the "common use" question pertains to only the threshold question of the Second Amendment's applicability. *See generally Bruen*, 597 U.S. at 47 ("Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'").

to evaluate an LCM ban has performed the required historical analysis.

As an example, "using the tools of history and tradition required by the analytical framework set forth by the Supreme Court" in *Heller* and *Bruen*, the Second Circuit upheld the LCM ban Connecticut passed in the wake of the mass shooting in Sandy Hook where the gunman used "an AR-15-style semiautomatic rifle, with 30-round magazines in taped reloads to reduce reload time." *Lamont*, 153 F.4th at 221-22, 233 (citation modified).  In upholding the Massachusetts LCM ban, the First Circuit expressed that "on both the how and the why metrics of *Bruen* and *Rahimi*'s analogical inquiry, . . . (as it pertains to assault weapons like the AR-15) is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Capen*, 134 F.4th at 674 (citation modified); *see also Hanson*, 120 F.4th at 234 (deciding that "the District's magazine cap" is "relevantly similar to a tradition of regulating firearms"); *Bianchi*, 111 F.4th at 462 (citation modified) ("Under *Bruen*, we must engage in reasoning by analogy to determine whether a historical regulation is a proper analogue for a distinctly modern firearm regulation."); *Del. State Sportsmen's Ass'n, Inc.*, 108 F.4th at 217 (citation modified) ("Even assuming that the assault weapons and LCMs at issue fall within the ambit of Arms protected by the Second Amendment, [there is] no doubt that Delaware's laws are consistent with the nation's historical traditional of firearm regulation."); *Bevis*, 85 F.4th at 1182 ("Using the tools of history and tradition to which the

Supreme Court directed us in *Heller* and *Bruen*, we conclude that the state and the affected subdivisions have a strong likelihood of success in the pending litigation.").

State courts agree that a historical analysis is required by *Bruen* and have all upheld their respective LCM bans.  *See Bibbs*, 2025 WL 2694417, at *8 (Hawaii); *Picon*, 343 A.3d at 63 (D.C.); *Gator's Custom Guns, Inc.*, 568 P.3d at 283 (Washington); *Caulkins*, 228 N.E.3d at 191 (Illinois).  Likewise, even the dissent in *Duncan*—which the majority cites favorably countless times—considers and rejects the state's proffered historical analogues.  133 F.4th at 893 (Bumatay, J., dissenting) (citation modified) ("Neither the text of the Second Amendment nor our country's historical tradition of firearm regulation supports California's magazine ban.").  At no point does Judge Bumatay suggest that a historical analysis was optional, as the majority appears to do here.

### 3.  Equating the Popularity of Arms with their Constitutionality is Dangerous

#### a)  The Majority Opinion Contravenes Precedent

Equating the popularity of unprecedently lethal weapons with their constitutionality threatens public safety and deviates from the legal framework of *Bruen*.  The majority contends that many of the District's arguments are foreclosed by *Heller*.  But *Heller* does not foreclose anything "unless . . . the judicial mind has been applied to and passed upon *the precise question*."  *United States v. Debruhl*, 38

69

A.3d 293, 298 (D.C. 2012) (emphasis added). As *Heller* involved the District's ban on possessing guns in the home, the application of *Bruen*'s two-part analysis to different laws like the LCM ban was not before the court in *Bruen* or *Heller*. The majority is too hasty in rejecting the LCM ban and the District's specific arguments in support of it, which are better characterized as "questions which merely lurk[ed] in the record," in *Heller*, as they have "neither [been] brought to the attention of the court nor ruled upon." *Id.* (citation modified). Accordingly, the District's arguments "are not to be considered as having been so decided as to constitute precedents." *Id.*

*Bruen* emphasized that "cases implicating unprecedented societal concerns or dramatic technological changes may require *a more nuanced approach*." 597 U.S. at 27 (emphasis added). *Heller* (as carried forward by *Bruen*) never purported to be the final word on Second Amendment historical tradition, as the Court said it was "not undertak[ing] an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Bruen*, 597 U.S. at 31 (citation modified).

The majority additionally does not follow the Court's example in *Rahimi*, where it explained that its "recent Second Amendment cases" "were not meant to suggest a law trapped in amber," or frozen in time with the court's *Heller* decision. 602 U.S. at 691. But the majority here would do just that by leaving no room for courts to meaningfully consider the "unprecedented societal concerns" like mass

shootings, which prompted many states to pass their LCM bans. *Bruen*, 597 U.S. at 27.

Further, the majority's approach would "trap[]" the District "in amber" by rejecting its historical examples because their how and why's for the LCM ban are not an exact match with the analogues. *Rahimi*, 602 U.S. at 691. For instance, the majority rejects the District's analogue to historical regulations of Bowie knives because the regulation was not an outright ban. But *Rahimi* provides that "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). As described by the majority in *Duncan*:

> When criminals took advantage of technological advances in weapons, legislatures acted to restrict an especially dangerous use of those weapons: Bowie knives were designed to—and did—cause significant harm in fights, with little self-defense value, so legislatures banned their carry outside the home; the slungshot proved incredibly useful to criminals but of minimal value in self-defense, so legislatures banned their carry outside the home; and pistols became easy for criminals to conceal, to the detriment of public safety, so legislatures banned their concealed carry.

133 F.4th at 876; *see also Hanson*, 120 F.4th at 240 (accepting the District's

historical analogy to the "broader regulation of weapons that are particularly capable of unprecedented lethality," including the regulation of Bowie knives and the ban on sawed-off shotguns).

In sum, because the "Second Amendment permits more than just those regulations identical to ones that could be found in 1791," "holding otherwise" here is "as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 602 U.S. at 691-92 (citation modified).  Instead, as in *Hanson*, we should hold that the LCM ban is analogous enough to the historical regulation of weapons that are particularly capable of unprecedented lethality.  120 F.4th at 237.

### b)  The Majority's Common Ownership Statistics are Flawed

Relatedly, the majority elects to embrace ownership statistics to support its conclusion that LCMs are in common use.  *See e.g.*, *Duncan*, 133 F.4th at 883.  The majority characterizes concerns expressed by the *Duncan* majority about the use of ownership statistics as a "strawman of an argument."  The District argues that "gun manufacturers and retailers would only need to race to make their products commonly possessed before any limitations could be enacted to forever prohibit such limitations under the Second Amendment.."  I agree with the *Duncan* majority and the District that the predictable result of the majority's view of when to engage in the historical tradition inquiry is that the government may never regulate what is popular.  While admitting that the District's "argument has some logical force to it,"

72

the majority ultimately dismisses the District's concern after characterizing its position as having been "squarely rejected" in *Heller*.  I disagree.  The majority overstates the preclusive impact of *Heller* on the LCM ban.

Grappling with the foundational differences in consumer surveys is important for the proper application of *Bruen*'s common use inquiry.[9]    Critically, distinguishing between handguns and rifles and their standard ammunition shows that 30+ round magazines are not in common use.  First, compared to rifles, handguns are "by far the most common type" of gun owned by gunowners that own

---

[9] Courts must be duly skeptical of potentially shallow, scientific-sounding statistics.  *See* Nick Thieme, *Statistics in Court*, 15-5 Significance 14, at 15 (Oct. 2018).  The majority strikes down the LCM ban without establishing that the surveys it relies upon are supported by a proper foundation.  The majority concedes the lack of foundation for its statistical authority, admitting that one of the opinion's cited statistics "is nobody's idea of a fair and neutral source on this topic."  The well-accepted foundational requirements for deciding whether a consumer survey is consistent with professional survey research include:

> whether (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and nonleading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured.

*Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1017 (N.D. Ill. 2013) (collecting cases).

a single gun.  Kim Parker, *et al.*, *America's Complex Relationship With Guns*, Pew Rsch. Ctr. (June 22, 2017), https://perma.cc/EF3B-9WUP.  Thus, showing that handguns are in common use does not support concluding that 30+ round magazine clips of ammunition are in common use.  Rather, the statistics show that handguns use magazines with a lesser capacity than rifles.  Mike Navitsky, *Navigating the Differences Between Rifles and Pistols* (*Differences*), Bastion, (Jan. 25, 2024), https://perma.cc/DB78-JW6K.  Specifically, while "standard capacity magazines are very popular in the recreational shooting community," Cong. Sportsmen Found., *Standard Capacity Magazines*, https://perma.cc/MBN9-VVUH, "the most popular sizes range up to 17 rounds."  Navitsky, *Differences*; *see also Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1214 (S.D. Cal. 2023) ("For handguns, the most popular sizes range up to 17 rounds; the most popular size for rifles is 30 rounds."), *rev'd and remanded*, 133 F.4th at 852.  Therefore, a *handgun* is not commonly or ubiquitously equipped with a 30+ round magazine, like the one Mr. Benson possessed.

The differences in popular handgun sizes is also relevant to the common use inquiry because it impacts our analysis of whether possession of a 30+ round magazine is consistent with bearing arms *for a lawful purpose*.  For instance, "magazine capacities of full-size handguns can be upwards of 20-rounds," and are less commonly used for self-defense.  McKenzie Hanson, *Handgun Sizes Explained*,

The Broad Side, (Aug. 25, 2023), https://perma.cc/C8PM-J7B3.[10]   But compact handguns are more ideal for concealed carry, easier to shoot, and their "magazine capacities can be similar to that of full-size pistols, but can also be found in 10-15-round capacities."  *Id.*[11]   A 30+ round magazine is not as commonly used with a handgun; rather, an extended magazine clip is almost always required to accommodate 30 rounds of ammunition, rendering it more lethal and much less "common" for use in self-defense.  *See* Scott Nixon, *A Guide to Pistol Sizes: Full-Sized to Compact Options*, Acad. Sports and Outdoors, (Dec. 26, 2024), https://perma.cc/AAW7-VYQ6 (showing the standard magazine capacity of handguns as less than 20 rounds).

Moreover, handgun statistics do not support the proposition that LCMs are in common use.  A handgun is equipped with a classic magazine and is therefore more

---

[10] *See id.* (portraying a "standard or full-Size handgun")



[11] *See id.* (portraying a "compact handgun")



75

practical for concealed carry and home defense, whereas a handgun with an extension clip accommodating 30 rounds will not fit in most holsters. *See id.* ("[L]arger handguns often have extended grip lengths that are usually not easily concealable . . . .").[12] Therefore the majority relies on statistics that, at best, evidence only the common usage of 11, 15, or 17 round magazines for standard handguns. Because the majority does not grapple with the differences between handguns' and rifles' differences in popularity, shape of respective ammunition, and design constraints, and, most importantly, use in self-defense, the majority incorrectly concludes that all LCMs are in common use under the first prong of *Bruen*.

**B. The District's LCM Ban Withstands a Facial Constitutional Challenge**

In *United States v. Salerno*, the Supreme Court provided that a successful facial challenge, *i.e.*, "the most difficult challenge to mount successfully," requires

---

[12] *See* Sig Sauer, *P250, P320 9MM 30RD Extended Magazine*, (portraying a handgun fashioned with an extension for compatibility with a 30-round magazine), https://perma.cc/2VHA-CHD9, (last visited Feb. 19, 2026).



a proponent to establish that the law applies exclusively to protected conduct: "the challenger *must establish that no set of circumstances exists under which the Act would be valid.*" 481 U.S. 739 (1987) (emphasis added). Accordingly, here, because the LCM ban applies to the possession of a clip holding more than ten rounds of ammunition, it applies to the possession of 30+ round magazines. Even accepting the majority's stance that the Second Amendment protects the possession of some magazines because they are popular—this argument only stretches so far as none of the majority's cited sources support the conclusion that 30+ round magazines are in common use for a lawful purpose.

In fact, to the contrary, all of the majority's evidence for its conclusion that LCMs are ubiquitous suggests that 30+ round magazines are **not** common for handguns, but are instead dangerous and unusual for self-defense purposes. Specifically, one of the majority's sources provides no statistics about the commonality of 30+ round magazines. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, at 25 (May 13, 2022), https://perma.cc/7W8R-PJFB. Another shows that more than half of the population possesses 11+ round handgun magazines, but less than half of the population possesses 30+ round rifle magazines. Nat'l Shooting Sports Found., *Detachable Magazine Report 1990-2021*, at 3 (2024), https://perma.cc/FS7A-YKXT.

Moreover, the majority decides that 11+ round magazines are in common use based on authority showing that "most *pistols* are manufactured with magazines holding *ten to seventeen rounds*." *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (emphases added) (citation modified), *abrogated by Bruen*.  In *Heller II*, the D.C. Circuit noted the popularity of 10-round magazines and acknowledged that there "may well be some capacity above which magazines are not in common use[.]"  670 F.3d at 1261 (citation modified).  In my view, 30+ round magazines exceed that capacity and are not in common use for a lawful purpose.

Finally, the majority cites *Duncan*, 695 F. Supp. 3d at 1214, which was vacated by the en banc Ninth Circuit, for the proposition that "the most popular size for rifles is 30 rounds."  Even if this authority were good law, at best, it only offers support to the majority's popularity approach for rifles, and so it remains that Mr. Benson cannot establish that the District's LCM ban applies to protected conduct in all factual applications, including the handgun equipped with a 30-round magazine Mr. Benson possessed in this case.  Moreover, even the most popular rifle comes with a standard 10-round magazine, further evidencing the unusualness of 30+ round magazines.  *See* Cassandra McBride, *Most Popular Guns in the U.S.*, Ammo.com (Sept. 29, 2025), https://perma.cc/5LFP-SJSX (naming the Ruger 10/22, a semi-automatic rifle, the nation's most popular gun for 2025); Ruger.com, 10/22, https://perma.cc/8HYQ-MAPC (providing that the firearm comes standard with a 10

78

round magazine capacity) (last visited Feb. 12, 2026).[13]

Mr. Benson cannot satisfy his burden of showing under *Bruen* that possessing a 30+ round magazine is conduct protected by the Second Amendment.  It is not. The LCM ban applies to prohibited conduct and so it "is still validly applicable to . . . activity within its scope that is not constitutionally protected."  *Valdez v. United States*, 320 A.3d 339, 383 (D.C. 2024) (applying *Conley v. United States*, 79 A.3d 270 (D.C. 2013)) (holding that "the sodomy statute is still validly applicable to nonconsensual conduct and other activity within its scope that is not constitutionally protected"); *see Capen*, 134 F.4th at 674-75 ("The validity of one application means that the Massachusetts Ban is not facially invalid."); *Caulkins*, 228 N.E.3d at 18 ("A facial challenge requires a showing that the statute is unconstitutional under any set of facts[.]").  Said differently, 30+ round magazines are not commonly used for lawful purposes and therefore are not entitled to Second Amendment protections. We should therefore hold that the LCM ban is not facially unconstitutional.

---

[13] *See id.* (showing the most popular rifle equipped with its standard 10-round magazine).



79

The factual scenario of the LCM ban applying to the possession of a 30+ round magazine is not an "idiosyncratic application" of the LCM ban as the majority contends.  Rather, the District is correct that the LCM ban is constitutionally valid because it applies to an infinite number of ammunition magazines that are not commonly possessed for legal purposes.[14]   Indeed, the reasonableness of the District's analogy is evidenced by the application of the LCM ban to Mr. Benson's stipulated possession of a 30-round magazine.  Further still, the LCM ban validly applies to the possession of a handgun equipped with a 40-round magazine.[15]   No one has argued that such a magazine is common and ubiquitous or used for the lawful purpose of self-defense.  As there are countless scenarios where the LCM ban applies to uncommon or unlawful possession, it is not facially unconstitutional.

---

[14] To be clear, I engage with the stipulated facts of Mr. Benson's offense only to illustrate the reasonable applications of the LCM ban.  However, as distinguished from his as-applied challenge, Mr. Benson's conduct does not control the outcome of the analysis of the facial constitutionality of the LCM ban.

[15] Rifle Supply, *ETS 40 Round 9mm Magazine* (portraying a 40-round magazine), https://perma.cc/Y99T-2XSQ (last visited Feb. 19, 2026).



80

*Conley* supports the argument that the District's LCM ban applies to constitutionally unprotected conduct. In *Conley*, we addressed a statute that penalized a person for being present "in a motor vehicle if the person knows that the vehicle contains a firearm." 79 A.3d at 272. We declared the statute in violation of "the requirement of notice embodied in due process," which "'places some limits' on the application of these tenets when a law criminalizes 'conduct that is wholly passive . . . unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed.'" *Id.* at 282 (quoting *Lambert v. California*, 355 U.S. 225, 228 (1957)). We held that the statute was facially unconstitutional because, as written, it "purports to allow the government, *in every case*, to obtain a conviction by proving only what cannot by itself be a crime." *Id.* at 289 (emphasis added).

Applied here, the LCM ban is distinguishable from the law we invalidated in *Conley* because there are applications where the District's LCM ban applies to non-constitutionally protected conduct. The majority, however, reasons that the District's position that the law has valid applications contradicts *Conley*'s pronouncement that "we do not examine whether appellant's conduct could have been criminalized under a hypothetical statute." *Id.* at 277. The majority further rationalizes that *Conley*'s instruction that "the claimed constitutional violation inheres in the terms of the statute" means that we cannot consider specific

applications of the LCM ban to the possession of 30+ round magazines for instance. *See id.* This is incorrect.

First, *Conley* quotes *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) for its "hypothetical statute" language. Looking closely at *Washington State Grange* shows that the Court was simply instructing that it is not controlling whether the law could be implemented in lawful ways or operates differently in practice than on its face—not that a plaintiff can sidestep *Salerno*'s requirement to show that "no set of circumstances" would render the law valid. 552 U.S. at 449-50 (detailing how "the State has had no opportunity to implement I–872, and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context").

Second, *Conley*'s assertion that "the claimed constitutional violation inheres in the terms of the statute" comes from *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). Yet a review of the full context of *Ezell* shows that the court was simply describing how, in a facial challenge, a "plaintiff's personal situation becomes irrelevant." *Id.* at 697.[16] *Ezell* confirms that Mr. Benson must show that the LCM

---

[16] In full, *Ezell* states:

        In a facial challenge like this one, *the claimed*

ban is invalid in all applications as it provides that "a successful facial attack means

the statute is wholly invalid and cannot be applied to anyone.  Chicago's law, if

unconstitutional, is unconstitutional without regard to its application—or in all its

applications, as *Salerno* requires."  *Id*. at 698-99.

We may therefore consider all reasonable applications of the LCM ban in

assessing Mr. Benson's facial challenge.  And, because considering all reasonable

applications of the LCM ban shows that there are countless lawful applications of

the LCM ban to the possession of a handgun equipped with an extension containing

30+ magazine rounds that are particularly lethal and uncommon, the LCM ban is

therefore facially constitutional.

That leaves Mr. Benson's as-applied challenge.  "An as-applied challenge

requires that the application of the statute, by its own terms, infringe constitutional

freedoms in the circumstances of the particular case."  *Dubose v. United States*, 213

A.3d 599, 604 (D.C. 2019) (citation modified).  "In other words, an as-applied

challenge is a claim that a statute is unconstitutional on the facts of a particular case

---

> *constitutional violation inheres in the terms of the statute*,
> not its application.  The remedy is necessarily directed at
> the statute itself and *must* be injunctive and declaratory; a
> successful facial attack means the statute is wholly invalid
> and *cannot be applied to anyone*.

651 F.3d at 698 (emphases added).

83

or in its application to a particular party." *Id.* (citation modified).

Here, Mr. Benson has failed to show that the LCM ban is unconstitutional as applied to the circumstances of his gun possession.  Instead, Mr. Benson's stipulated possession of a gun with 30 rounds of ammunition in its magazine is not guaranteed any Second Amendment protection because there is no evidence that such a lethal weapon is in common use for lawful purposes.  In sum, we should conclude that the District's LCM ban, as applied to Mr. Benson, did not infringe on his Second Amendment right to lawfully possess a handgun with a 30-round magazine.   Mr. Benson's as-applied challenge, consequently, should fail.

## III.  Conclusion

For the foregoing reasons, I would uphold the District's LCM ban and affirm each of Mr. Benson's convictions.  The LCM ban is analogous to our nation's historical tradition of regulating weapons that are particularly capable of unprecedented lethality and are not in common use.  Additionally, Mr. Benson cannot show that the LCM ban is unconstitutional in all applications.  Not only is the majority's opinion at odds with this court's decision in *Picon*, and the D.C. Circuit's decision in *Hanson*, both of which upheld the District's LCM ban, but the majority's opinion contravenes every other state and federal court to consider LCM bans.  The District's LCM ban should survive Mr. Benson's facial challenge to its

84

constitutionality because there are numerous circumstances to which the LCM ban lawfully applies. Mr. Benson's possession of a 30-round LCM is one such example. An extended ammunition clip capable of holding 30+ rounds is dangerous and is not commonly used for a lawful purpose such as self-defense. The District's LCM ban is constitutional and should be upheld. Therefore, I respectfully dissent.